EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 04-293 (KAJ) |
| | ) | |
| HERCULES INCORPORATED and | ) | |
| CYTEC INDUSTRIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### HERCULES' SUPPLEMENTAL RESPONSE TO PLAINTIFF CIBA SPECIALTY CHEMICALS CORPORATION'S FIRST SET OF INTERROGATORIES (NO. 2)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Hercules, Incorporated ("Hercules") hereby supplements its response to the First Set of Interrogatories (No. 2) served by Plaintiff, Ciba Specialty Chemicals Corporation ("Ciba").

Hercules' supplemental response to this interrogatory, including any documents to be produced, are based upon reasonable and diligent inquiry and the best knowledge or information known or readily available to Hercules as of the date of this response. Further investigation may reveal additional responsive information and documents. Hercules reserves the right to continue discovery and investigation into this matter and to present at trial or otherwise, in accordance with the Federal Rules of Civil Procedure, additional information discovered after the date of this response. Hercules therefore reserves the right to supplement, modify, change, amend, or alter this supplemental response at any time between now and the pretrial order.

## GENERAL OBJECTIONS

Hercules adopts and incorporates its General Objections stated in Hercules' Responses and Objections to Plaintiff Ciba Specialty Chemicals Corporation's First Set of Interrogatories (Nos. 1-9), served on March 2, 2005.

Hercules further notes that this response is made without waiving any rights or objections or admitting the relevance, materiality, or admissibility into evidence of the subject matter or facts contained in any request or Hercules' responses thereto.

## HERCULES' OBJECTIONS AND RESPONSES TO CIBA'S INTERROGATORIES

## INTERROGATORY NO. 2

With respect to Hercules' allegation that the patents in suit are invalid including Defendants' Answers alleging that the patents in suit are "invalid for failure to comply with the conditions for patentability specified by 35 U.S.C. §§ 102, 103, and/or 112," state all bases and evidence supporting such allegations, including all underlying facts, testimony, documents, witnesses, etc. supporting such allegations or which may be relied upon by either of Defendants at trial, separately addressing each element of each claim, provide claim charts for each claim asserted to be invalid under 35 U.S.C. §§ 102 or 103 setting forth an element-by-element application of each prior art disclosure to each claim of the patents in suit, including an explanation of why each particular element is or is not met by each prior art disclosure, and state the scope and content of the prior art, the similarities and differences between each prior art disclosure and each claim, the level of ordinary skill in the art, and where specifically the suggestion to combine the prior art may be found for any combination of prior art asserted by either of Defendants.

## OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 2

Hercules objects to this interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, and/or any other applicable privilege or immunity. Hercules further objects to this interrogatory to the extent it seeks information outside of Hercules' possession, custody, or control, as it is directed to "Defendants" and not solely to Hercules. Hercules further objects to this interrogatory as premature. Paragraph 3(d) of the December 20, 2004, Scheduling Order provides that the parties "shall file their initial Federal Rule of Civil Procedure 26(a)(2) disclosures of expert testimony

on or before July 22, 2005 on the issues as to which each party has the burden of proof," but this interrogatory seeks information concerning the level of ordinary skill in the art, the subject of expert testimony, in advance of this scheduled date. Similarly, Paragraph 11 of the Scheduling Order specifically provides that the parties shall "exchange a list of those claim term(s)/phrase(s) that they believe need construction and their proposed construction of those term(s)/phrase(s)." Therefore the construction of the claim terms is premature, as such information will be provided on November 18, 2005, as designated by this Court. The subsequent determination of patent invalidity is likewise premature.

Subject to and without waiving these objections and its General Objections, Hercules responds that Ciba has not identified the claims of the patents-in-suit allegedly infringed by Hercules. In the interest of furthering discovery and for purposes of responding to this interrogatory, however, Hercules will assume that at least claim 1 of the '766 and '808 patents are asserted against Hercules. Accordingly, Hercules responds that U.S. Patent No. 4,528,321 to Allen et al. ("the Allen '321 patent") or U.S. Patent No. 4,720,346 to Flesher et al. ("the Flesher '346 patent"), alone or in combination with U.S. Patent No. 5,180,473 to Akune et al., invalidate at least claim 1 of each of the '766 and '808 patents under 35 U.S.C. §§ 102 and/or 103. Furthermore, claim 1 of each of these patents may fail to comply with the requirements for patentability specified in 35 U.S.C. § 112 ¶¶ 1 and/or 2, for their disclosure, or lack thereof, concerning the measurement of particle diameter and particle size diameter. These patents may also be unenforceable for inequitable conduct based on at least the failure to disclose the Allen '321 patent and/or the Flesher '346 patent to the U.S. Patent Office.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2

The following claim chart compares claim 1 of the '766 patent with the Flesher '346 patent, the Allen '321 patent, and/or U.S. Patent No. 5,180,473 to Akune *et al.* ("the Akune '473 patent"):

### U.S. Patent No. 5,167,766 vs. Prior Art

| Claim Limitation | Prior Art |
|---|---|
| 1. A method of making paper which comprises | The Flesher '346 patent discloses a method of making paper. (*See* '346 patent, col. 5, lines 35-65.) |
| adding to an aqueous paper furnish | The Flesher '346 patent discloses adding polymeric particles to an aqueous cellulosic suspension in a paper making process. (*See* '346 patent, col. 5, lines 35-65.) |
| from about 0.05 to about 20 lbs/ton, based on the dry weight of paper furnish solids, | A person of skill in the art would have known to add the polymeric particles of the Flesher '346 patent to the aqueous paper furnish within this broad range. Furthermore, the Flesher '346 patent discloses adding between 0.2 and 60 lbs/ton of polymer to achieve optimum floc stability: "[s]uitable doses are in the range of 0.01 to 3%, often 0.5 to 3%, by weight polymer based on dry solids." ('346 patent, col. 11, lines 9-11.) Example 14 of the Flesher '346 patent likewise discloses adding a polymer dose of about 6 kg/ton (around 13 lb/ton). ('346 patent, Example 14.)<br><br>The Akune '473 patent similarly sates that the amount of "polymer particles to be added to the paper stock suspension is from 0.005% by weight, preferably from 0.01 to 0.1% by weight, as the solid content of the polymer, to the solid content in the paper stock suspension." ('473 patent, col. 4, lines 18-22.) |
| of an ionic, organic, cross-linked polymeric microbead, | The Flesher '346 patent teaches that its ionic, organic polymeric particles may be cross-linked. (*See* '346 patent, col. 6, lines 52-57; |

-4-

| | |
|---|---|
| | col. 7, lines 51-54; Examples 2, 3, and 12.) |
| the microbead having an unswollen particle diameter of less than about 750 nanometers | The polymer particles of the Flesher '346 patent meet this particle size range of less than about 0.75 microns. (*See* '346 patent, col. 6, lines 25-26 (stating that the polymeric material in suspension "should preferably be a microdispersion") and lines 31-33 (stating that its polymeric particles "are preferably below 2µm" in size); *see also* Examples 2, 3, and 12.) <br><br> At column 9, lines 20-25, the Flesher '346 patent also refers to EP No. 0126528 when describing its method of reverse phase polymerization. EP No. 0126528, which is an equivalent of the Allen '321 patent, describes particle sizes in the 0.3-3.0 micron range (p.5, lines 63) and in the 0.2-2.0 micron range (Example 1). <br><br> American Cyanamid and its patent attorney Frank Van Riet, conceded during prosecution of another application that the polymer particles of the Flesher '346 patent would have sizes in the range of 0.2 to 2.0 microns: <br><br> "Further support for Appellants' position is found at col. 9, lines 21-24 of [the Flesher '346 patent] wherein EP No. 0126528 is disclosed as including details of the type of polymerization used in [the Flesher '346 patent]. As mentioned, macroemulsion technology produces polymer particles averaging about one (1) micron in diameter. *Reference to U.S. Patent No. 4,528,321, copy attached, which is an equivalent of the above-identified EP patent, shows the production of polymers having an average particle size range of from 0.2-2.0, see Example 1, line 50.* Thus, it is clear that [the Flesher '346 patent's] polymer particles, which are all above 0.2 micron and average 1.1 micron, are far larger than claimed by Appellants i.e. all are below 0.1 micron, not an average." <br><br> (U.S. Application Serial No. 07/552,958, Appeal Brief on Behalf of Appellants dated |

-5-

| | |
|---|---|
| | Sept. 13, 1991, at 8 (emphasis added; underlining in original).) The cross-linked polymeric particles of the Flesher '346 patent and the Allen '321 patent meet this particle size limitation. (*See* '321 patent, col. 5, lines 61-63; Example 7; *see also* U.S. Application Serial No. 07/552,958, Appeal Brief on Behalf of Appellants dated Sept. 13, 1991, at 8.) |
| and an ionicity of at least 1%, but at least 5%, if anionic and used alone. | The polymeric particles in the Flesher '346 patent meet this ionicity limitation of at least 1% (*see* '346 patent, col. 9, lines 56-61; Examples 2, 3), or at least 5% if anionic and used alone (*see* '346 patent, Example 12.) |

As shown in this claim chart, the Flesher '346 patent anticipates claim 1 of the '766 patent. Furthermore, the combination of the Flesher '346 patent and the Allen '321 patent anticipates and would have rendered obvious claim 1 of the '766 patent.

The following claim chart compares claim 1 of the '808 patent with the Flesher '346 patent and the Allen '321 patent:

### U.S. Patent No. 5,171,808 vs. Prior Art

| Claim Limitation | Prior Art |
|---|---|
| 1. A composition comprising | Both the Flesher '346 patent and the Allen '321 patent disclose compositions. |
| cross-linked | The Flesher '346 patent teaches that its polymeric particles may be cross-linked. (*See* '346 patent, col. 6, lines 52-57; col. 7, lines 51-54; Example 12.) The Allen '321 patent teaches that its polymeric particles may be cross-linked. (*See* '321 patent, col. 4, lines 59-69; Example 7.) |

-6-

| | |
|---|---|
| anionic or amphoteric polymeric microparticles | The Flesher '346 patent teaches anionic polymeric particles. (*See* '346 patent, col. 5, lines 63-64; col. 8, lines 40-46; Example 12.)<br><br>The Allen '321 patent teaches anionic polymeric particles. (*See* '321 patent, col. 4, lines 43-48; Example 7.) |
| derived solely from the polymerization of an aqueous solution of at least of one monomer, | The Flesher '346 patent teaches polymeric particles derived from the reverse phase polymerization of an aqueous solution of at least one monomer. (*See* '346 patent, col. 6, lines 45-47; col. 7, lines 45-54; col. 9, lines 7-10; Example 12.)<br><br>The Allen '321 patent teaches polymeric particles derived from the reverse phase polymerization of an aqueous solution of at least one monomer. (*See* '321 patent, col. 4, lines 22-27; Example 7.) |
| said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron, | The polymer particles of the Flesher '346 patent meet this particle size range. (*See* '346 patent, col. 6, lines 25-26 (stating that the polymeric material in suspension "should preferably be a microdispersion") and lines 31-33 (stating that its polymeric particles "are preferably below 2μm" in size); *see also* Example 12.)<br><br>At column 9, lines 20-25, the Flesher '346 patent also refers to EP No. 0126528 when describing its method of reverse phase polymerization. EP No. 0126528, which is an equivalent of the Allen '321 patent, describes particle sizes in the 0.3-3.0 micron <u>range</u> (p.5, lines 63) and in the 0.2-2.0 micron <u>range</u> (Example 1).<br><br>American Cyanamid and persons there owing a duty of candor to the PTO in connection with the prosecution of the '808 patent, including at least patent attorney Frank Van Riet, conceded during prosecution of another application that the polymer particles of the Flesher '346 patent would have sizes in the range of 0.2 to 2.0 microns: |

-7-

| | |
|---|---|
| | "Further support for Appellants' position is found at col. 9, lines 21-24 of [the Flesher '346 patent] wherein EP No. 0126528 is disclosed as including details of the type of polymerization used in [the Flesher '346 patent]. As mentioned, macroemulsion technology produces polymer particles averaging about one (1) micron in diameter. ***Reference to U.S. Patent No. 4,528,321, copy attached, which is an equivalent of the above-identified EP patent, shows the production of polymers having an average particle size range of from 0.2-2.0, see Example 1, line 50.*** Thus, it is clear that [the Flesher '346 patent's] polymer particles, which are <u>all</u> above 0.2 micron and average 1.1 micron, are far larger than claimed by Appellants i.e. all are below 0.1 micron, not an average." <br><br> (U.S. Application Serial No. 07/552,958, Appeal Brief on Behalf of Appellants dated Sept. 13, 1991, at 8 (emphasis added; underlining in original).) <br><br> The cross-linked polymeric particles of the Flesher '346 patent and the Allen '321 patent meet this particle size limitation. (*See* '321 patent, col. 5, lines 61-63; Example 7; *see also* U.S. Application Serial No. 07/552,958, Appeal Brief on Behalf of Appellants dated Sept. 13, 1991, at 8.) |

-8-

| | |
|---|---|
| a solution viscosity of at least about 1.1 mPa.s, | The composition of Example 12 of the Flesher '346 patent meets this solution viscosity limitation under the solution viscosity conditions set forth in the '808 patent. (*See* '346 patent, Example 12; '808 patent, col. 7, Table 1.)<br><br>The composition of Example 7 of the Allen '321 patent meets this solution viscosity limitation under the solution viscosity conditions set forth in the '808 patent. (*See* '321 patent, Example 7; '808 patent, col. 7, Table 1.) |
| a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer, | A cross-linking agent (methylene bis acrylamide - "MBA") is present in the Flesher '346 patent in the required amount. (*See* '346 patent, Example 12.)<br><br>MBA is present in the Allen '321 patent in the required amount. (*See* '321 patent, Example 7.) |
| and an ionicity of at least about 5 mole percent. | The polymeric particles of the Flesher '346 patent satisfy this ionicity limitation. (*See* '346 patent, Example 12.)<br><br>The polymeric particles of the Allen '321 patent also satisfy the ionicity limitation. (*See* '321 patent, Example 7.) |

As shown in this claim chart, the Flesher '346 patent and the Allen '321 patent both anticipate claim 1 of the '808 patent. Additionally, the combination of the Flesher '346 patent and the Allen '321 anticipates and would have rendered obvious claim 1 of the '808 patent.

Hercules will supplement this response as necessary after further discovery, and reserves the right to modify and/or supplement its response to this interrogatory response.

|  |  |
|---|---|
| | POTTER ANDERSON & CORROON LLP |
| OF COUNSEL: | |
| Ford F. Farabow, Jr.<br>Joann M. Neth<br>Eric J. Fues<br>A. Neal Seth<br>FINNEGAN, HENDERSON, FARABOW,<br>  GARRETT & DUNNER, L.L.P.<br>901 New York Avenue, NW<br>Washington, DC  20001-4413<br>(202) 408-4000 | By: /s/ Richard L. Horwitz<br>    Richard L. Horwitz (#2246)<br>    David E. Moore (#3983)<br>    Hercules Plaza, 6th Floor<br>    1313 N. Market Street<br>    P.O. Box 951<br>    Wilmington, DE  19899-0951<br>    Tel:  (302) 984-6000<br>    rhorwitz@potteranderson.com<br>    dmoore@potteranderson.com |
| Dated:  May 24, 2005 | *Attorneys for Defendant*<br>*Hercules Incorporated* |

683577

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on May 24, 2005, true and correct copies of the within document were caused to be served on the attorney of record at the following addresses as indicated:

### VIA HAND DELIVERY

Frederick L. Cottrell, III
Jeffrey L. Moyer
Chad M. Shandler
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE 19899

### VIA FEDERAL EXPRESS

Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL 60601-6780

Thomas L. Creel, P.C.
Goodwin Procter LLP
599 Lexington Avenue
New York, NY 10022

s/ Richard L. Horwitz
Richard L. Horwitz

666520