# EXHBIIT A

# SEALED DOCUMENT

# EXHBIIT B

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
2003 WL 252124 (D.Del.)
**(Cite as: 2003 WL 252124 (D.Del.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
William MCGURK, Plaintiff,
v.
SWISHER HYGIENE FRANCHISE CORP., Defendant.
**No. Civ.A. 02-1337-SLR.**

Jan. 30, 2003.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington this 30th day of January, 2003, having considered defendant's motion to transfer (D.I.3) and the papers filed in connection therewith;

IT IS ORDERED that the motion to transfer to the District of North Carolina is granted for the reasons that follow:

1. Background. Defendant Swisher Hygiene Franchise Corp. ("Swisher") is a North Carolina corporation, with its principal place of business in Charlotte, North Carolina. (D.I.3, Ex. C) Swisher offers and sells franchises for the restroom hygiene business. Plaintiff William McGurk ("McGurk") is a citizen of Delaware. McGurk instituted this action alleging breach of the franchise agreement with Swisher. (D.I.1) Swisher has moved to transfer contending that the forum selection clause in their franchise agreement mandates that all litigation related thereto be filed in North Carolina. (D.I.3) McGurk concedes that there is a forum selection clause, however, argues there are overwhelming reasons to maintain the action here.

2. Standard of Review. Generally, a motion to transfer is reviewed under 28 U.S.C. § 1404(a), which allows a district court to transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interest of justice. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995). Before engaging in a transfer analysis, however,

an examination of the forum selection clause, in the contract signed by the parties, is necessary.

The United States Supreme Court, in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), announced a general rule that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Id.* at 10; *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988). A party can resist imposition of a forum selection clause if it could demonstrate that the contract resulted from "fraud, undue influence, or overweening bargaining power," *id.* at 12, or that "enforcement would contravene a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision." *id.* at 15. The Third Circuit Court of Appeals has interpreted *Bremen* to mean that

a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or over-reaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202 (3d Cir.1983), *overruled on other grounds by Lauro Lines v. Chasser*, 490 U.S. 495 (1989). As far as unreasonableness, under *Bremen* it is

*2 incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court.

*Bremen*, 407 U.S. at 18. "This standard is satisfied if a litigant can demonstrate that it 'would face blatant prejudice in the foreign forum' or 'if enforcement of the foreign forum selection would be severely impractical.' " *Mobilificio San Giacomo S.P.A. v. Stoffi*, 1998 WL 125534 at *8 (D.Del.1998).

It is undisputed that in April 1997 McGurk signed a contract to purchase a franchise from Swisher. (D.I.3, Ex. A) Pursuant to ¶ 20.2(b) of the contract, the parties agreed that any action brought by the franchisee (McGurk) against the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
2003 WL 252124 (D.Del.)
(Cite as: 2003 WL 252124 (D.Del.))

Page 2

franchisor (Swisher) must be instituted in "Charlotte, North Carolina, or in the judicial district in which the franchisor then has its principal place of business." For approximately four years, McGurk owned and operated the Swisher franchise in Delaware. (D.I.4, Ex. E) In September 2001, however, the terms of the relationship began to change and eventually deteriorated in April 2002, when Swisher terminated McGurk's franchise agreement. Consequently, McGurk filed this action for wrongful termination of their contract. (*Compare* D.I. 3, Ex. C *with* D.I. 4, Ex. E)

The uncontradicted record reflects that the forum selection clause was never altered from the original terms agreed upon by the parties in 1997. There is likewise nothing demonstrating that the terms of the forum selection clause should be invalidated by the court. Although McGurk indicates that he has had surgeries on his knees as well as amputation of part of his foot, and that he is immobile, this does not suggest an impairment that would prevent him from prosecuting this action in the Western District of North Carolina.

3. Conclusion. Having determined that the forum selection clause is valid and enforceable, the motion to transfer (D.I.3) to the Western District of North Carolina is granted.

2003 WL 252124 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02CV01337 (Docket) (Jul. 29, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHBIIT C

MONEYGRAM PAYMENT SYSTEMS, INC., Appellant v. CONSORCIO ORIENTAL, S.A.; ROBERTO LOPEZ; FREDDY LOPEZ; JOHN DOES 1–10

No. 01–4386

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

65 Fed. Appx. 844; 2003 U.S. App. LEXIS 9875

July 19, 2002, Argued

May 21, 2003, Filed

**NOTICE:** **[**1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the District of New Jersey. D.C. Civil No.00–cv–03764. District Judge: Hon. Katharine S. Hayden.

Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff domestic corporation sued defendants, a foreign corporation, two corporate officers, and unidentified individuals, for breach of contract and related torts. The United States District Court for the District of New Jersey sua sponte dismissed the complaint. The domestic corporation appealed.

**OVERVIEW:** The domestic corporation alleged a computer error caused duplicate pre–funding to be made into the foreign corporation's New Jersey bank account and that defendants knew of the error, and rather than returning the money to the domestic corporation, defendants fraudulently converted the excess payments to their own use. Based on a forum selection clause and an arbitration clause in the parties' contract, the district court sua sponte dismissed the lawsuit pursuant to Fed. R. Civ. P. 12(b). The domestic corporation appealed. The domestic corporation should not have been surprised by the district court's order, since the district court reached its conclusion by reviewed the very agreement the domestic corporation sought to enforce and to which the district court had referred in its scheduling order. The domestic corporation did not allege fraud in the inducement, so the forum selection and mandatory arbitration clauses were enforceable against the foreign corporation. They, however, were not enforceable against the corporate officers in their individual capacities. The court, however, lacked personal jurisdiction over those defendants, so dismissal was still proper.

**OUTCOME:** The court affirmed the dismissal of the lawsuit, although in part on different grounds than those relied upon by the district court.

**CORE TERMS:** forum selection clause, personam jurisdiction, forum state, personal jurisdiction, sua sponte, arbitration, motion to dismiss, arbitration clause, bank account, forum–selection, inconvenient, nonresident, allegations of fraud, tortious conduct, public policy, fraudulently, lack of personal jurisdiction, focal point, overreaching, systematic, enforcing, deprived, traveled, concede, raising, brunt, aimed, corporate entity, claim arising, jurisdictional

### LexisNexis(TM) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN1]   A federal appeals court's review of a district court's grant of a Fed. R. Civ. P. 12(b) motion to dismiss is plenary.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*

[HN2]   The United States Court of Appeals for the Third Circuit has stated that a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching; (2) that enforcement would violate strong public policy of the forum; or (3) that enforcement would in the particular circumstances of the case result in jurisdiction so seriously inconvenient as to be unreasonable.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Contracts Law > Defenses > Fraud & Misrepresentation*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*

[HN3]  The concern the United States Supreme Court has expressed regarding enforcing arbitration and forum–selection clauses in suits alleging fraud does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud the clause is unenforceable. Rather, it means that an arbitration or forum–selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Contracts Law > Defenses > Fraud & Misrepresentation*

[HN4]  The mere allegation of fraudulent conduct does not suspend operation of a forum selection clause. Rather, the proper inquiry is whether the forum selection clause is the result of fraud in the inducement of the forum–selection clause itself.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*

[HN5]  A valid forum selection clause should be given controlling weight in all but the most exceptional case.

*Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses*
*Evidence > Procedural Considerations > Burdens of Proof*

[HN6]  The party opposing enforcement of a forum selection clause has a heavy burden of showing not only that the balance of convenience is strongly in favor of a different forum but also that resolution in the selected forum will be so manifestly and gravely inconvenient to it that it will be effectively deprived of a meaningful day in court.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN7]  A court may not sua sponte dismiss for want of personal jurisdiction, at least where a defendant has entered an appearance by filing a motion.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN8]  A federal court has personal jurisdiction over a nonresident defendant to the extent authorized under the law of the forum state in which the district court sits, within constitutional limitations of due process. Fed. R. Civ. P. 4(e).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN9]  New Jersey courts have held that New Jersey's long–arm statute reaches to the "outermost limits permitted by the United States Constitution. Thus, the reach of the New Jersey statute is coextensive with the Due Process Clause of the Fourteenth Amendment.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Evidence > Procedural Considerations > Burdens of Proof*

[HN10]  In all cases where a defendant moves for dismissal for lack of personal jurisdiction the plaintiff bears the burden of demonstrating contacts with the forum state sufficient to give the court in personam jurisdiction. In reviewing a ruling on a motion to dismiss for lack of in personam jurisdiction, the court accepts plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN11]  Personal jurisdiction over a nonresident defendant may be asserted in two contexts. General jurisdiction exists when a defendant has maintained such continuous and systematic contacts with the forum state that the defendant is generally subject to the exercise of a court's jurisdiction there without regard to the relationship between the court action and the forum. Specific jurisdiction is far narrower, however. It arises when the claim is related to or arises out of the defendant's contacts with the forum. Specific jurisdiction arises within the context of the relationship between the defendant, the cause of action, and the forum embodied in the "minimum contacts" analysis announced in International Shoe Co. v. Washington.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN12]  A federal court can only assert personal jurisdiction over a nonresident defendant if the "minimum contacts" between the defendant and the forum do not offend traditional notions of fair play and substantial justice. Those contacts must be sufficient to make it reasonable, in the context of our federal system of government, to require the defendant to defend the particular suit which is brought there.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN13]  The reasonableness of subjecting a nonresident defendant to the courts of a given forum depend upon the "quality and nature of the defendant's activity" in the forum state. The plaintiff must establish that the defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN14]  Ultimately, the existence of minimum contacts turns on the presence or absence of intentional acts of the defendant to avail itself of some benefit of a forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN15]  It is axiomatic that jurisdiction over individual defendants does not exist simply because they are agents or employees of organizations which presumably are amenable to jurisdiction in a particular forum. Rather, each defendant's contacts with the forum state must be assessed individually.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN16]  The United States Court of Appeals for the Third Circuit has stated that allegations of fraud may support in personam jurisdiction where: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum

can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. Under the third prong, the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum.

**COUNSEL:** Kevin M. Mattessich, Esquire (Argued), Cozen & O'Connor, Newark, NJ, Attorney for Appellant.

Richard A. DePalma, Esquire (Argued), Anthony P. Callaghan, Esquire, Coudert Brothers, New York, NY, Attorneys of Appellees.

**JUDGES:** BEFORE: McKee, Fuentes & Aldisert, Circuit Judges.

**OPINIONBY:** Theodore McKee

**OPINION:**   **[*845]**  OPINION OF THE COURT

McKee, Circuit Judge

MoneyGram Payment Services, Inc. appeals the district court's November 13, 2001 Memorandum Order granting defendants' motion to dismiss under Fed. R. Civ. P. 12(b). MoneyGram sought money damages for an alleged breach of contract and related torts. MoneyGram argues that the district court erred in dismissing the suit *sua sponte* on grounds that went beyond the scope of the court's Scheduling Order. We will affirm. n1

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – – –

n1 [HN1] Our review of a district court's grant of a Rule 12(b) motion to dismiss is plenary. *See Wilson v. Quadramed Corp.*, 225 F.3d 350, 353 (3d Cir. 2000).

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – – –

**[**2]**

**I.**

Inasmuch as we write only for the parties who are familiar with the background of this dispute, we need not set forth the underlying facts except insofar as may be helpful to our discussion.

MoneyGram argues that the district court erred in basing its dismissal on the forum selection clause contained in the Agency and Trust Agreement between it and Consorcio Oriental, S.A., a privately held Dominican Republic corporation. That forum selection clause provides, in pertinent part, that "any action or proceeding initiated under this Agreement shall be maintained exclusively in the courts of the State of New York or of the United States of America for the Southern District of New York." (Agreement at P 21).

In addition, P 22 of the Agreement provides that "any unresolved dispute, controversy or claim arising out of *or relating to* [the Agreement] shall be resolved exclusively by final and binding arbitration . . . with the place of arbitration to be New York, New York[]" (emphasis added). An Amendment to P 22 removes all doubt as to the materiality of the arbitration clause to the bargain struck by the contracting parties. The Amendment states that arbitration "IS EXPRESSLY **[**3]** BARGAINED FOR BY THE PARTIES AND IS A MATERIAL INDUCEMENT TO [ENTERING]  **[*846]**  INTO THE AGREEMENT." Additional Terms at P H (emphasis in original).

Despite this explicit language, MoneyGram filed the instant suit in the United States District Court for the District of New Jersey, and now urges that we interpret these broad clauses very narrowly so as to reach a result that would to be in direct contradiction to the contract MoneyGram is trying to enforce. MoneyGram argues that the nature of the defendants' alleged wrongdoing preempts the scope of these provisions, and it insists that the district court's conclusion to the contrary was error. It also argues that the district court "blind sided" n2 it by resting its decision on the forum selection clause *sua sponte* without affording MoneyGram an adequate opportunity to demonstrate why the forum selection clause should not be enforced. We disagree.

- - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 This is our term, not MoneyGram's.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Initially, we note that the Scheduling Order that MoneyGram claims narrowed [**4] the issues that the district court would consider n3 stated:

> IT IS . . . ORDERED that Defendants Roberto Lopez and Freddy Lopez . . . shall file and serve their motion contesting this Court's exercise of personal jurisdiction over them and Defendant . . . Consorcio . . . shall file and serve its motion demanding referral of this matter to arbitration *pursuant to the terms of the parties' agreement.*

A103–104 (emphasis added). The "parties' agreement" clearly included the aforementioned forum selection and arbitration clauses, both of which required MoneyGram to bring any action or proceeding in New York rather than New Jersey where it chose to file suit. Accordingly, we can not accept MoneyGram's claim of "surprise" that the district court, upon reviewing the very agreement referred to in the Scheduling Order, concluded that the action belonged in New York, not in New Jersey.


- - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The Scheduling Order was entered by the Magistrate Judge, not by the District Judge.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

MoneyGram would have us conclude [**5] that filing suit in New Jersey is somehow consistent with provisions requiring "*any* unresolved dispute . . . arising out of" the Agreement, or "any action or proceeding initiated" under the Agreement, to be brought in New York City. MoneyGram attempts to escape the operation of the forum selection clause, in part, by arguing fraud. However, we will not redraft this Agreement, as MoneyGram's argument requires, merely because MoneyGram bottoms its claim for damages on alleged fraud and conversion it claims occurred in New Jersey.

In *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.,* 709 F.2d 190 (3d Cir. 1983), we [HN2] stated that:

> a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching; (2) that enforcement would violate strong public policy of the forum; or (3) that enforcement would in the particular circumstances of the case result in jurisdiction so seriously inconvenient as to be unreasonable.

*Id.* at 202.

Significantly, MoneyGram does not allege that it was fraudulently induced into entering this [**6] Agreement. Indeed, MoneyGram's own Complaint establishes the contrary. MoneyGram alleges: "Between October 1, 1999 and January 6, 2000, *computer error* caused duplicate pre-funding to be made into Consorcio's New Jersey [*847] bank account." Complt at PP 12–15, Appellant's Br. at 8 (emphasis added). According to MoneyGram, the defendants knew of this error and fraudulently converted the excess payments to their own use rather than alerting MoneyGram to the error and repaying the duplicate payments.

In *Scherk v. Alberto–Culver Co.,* the Supreme Court addressed how claims of fraud affect the enforceability of a forum–selection clause. 417 U.S. 506, 513, 41 L. Ed. 2d 270, 94 S. Ct. 2449 (1974). There, Alberto–Culver, an American manufacturer, purchased three German enterprises from Scherk, a German citizen. *Id.* at 508. The purchase contract contained an arbitration clause that the Court described as "a specialized forum–selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Id.* at 519. The clause

provided that any controversy or claim arising under the contract would be referred to arbitration before the International [**7] Chamber of Commerce in Paris, France. *Id.* 416 U.S. at 508 n.1. One year after the contract was finalized, Alberto Culver discovered that certain trademark rights purchased under the contract were encumbered. *Id.* at 509. That was contrary to representations made by Scherk during contract negotiations. *Id.* at 508. Consequently, Alberto–Culver filed suit in federal district court in Illinois alleging, *inter alia*, fraud. *Id.* at 509. Scherk responded with a motion to dismiss for lack of personal jurisdiction. *Id.*

The Court relied upon *M/S Bremen v. Zapata Off–Shore Co., 407 U.S. 1, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972)*, in upholding enforcement of the forum selection clause despite allegations of fraud. *Id.* at 518. The Court noted that [HN3] the concern it had expressed in *M/S Bremen* regarding enforcing such clauses in suits alleging fraud:

> does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum–selection clause in a contract is not enforceable if the inclusion [**8] of that clause in the contract was the product of fraud or coercion.

*Id.* at 519 n. 14.

Thus, contrary to MoneyGram's position here, [HN4] the mere allegation of fraudulent conduct does not suspend operation of a forum selection clause. Rather, the proper inquiry is whether the forum selection clause is the result of "fraud in the inducement of the [forum–selection] clause itself." *Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403–04, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967)*.

MoneyGram does not claim that defendants fraudulently caused it to enter into the forum selection clause, arbitration clause, or the Agreement. Indeed, as mentioned above, MoneyGram argues that fraud occurred after the contractual relationship was formed and it came about as a result of defendants not properly responding to unintentional "computer error." Accordingly, the district court quite properly held MoneyGram to its own agreement by dismissing the action in favor of a New York forum. *See Coastal Steel Corp., 709 F.2d at 202*.

We are similarly not convinced by MoneyGram's claim that the court's *"sua sponte"* reliance on the forum selection clause [**9] deprived it of an opportunity to establish that the clause ought not to be enforced for reasons of public policy and severe burden. As Justice Kennedy noted in his concurring opinion in *Stewart Org. Inc. v. Ricoh Corp., 487 U.S. 22, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)*, [HN5] "a valid forum selection clause [should be] given controlling [*848] weight in all but the most exceptional case." Moreover, [HN6] the party opposing enforcement of a forum selection clause has a "heavy burden of showing not only that the balance of convenience is strongly in favor of [a different forum] but also that [resolution in the selected forum] will be so manifestly and gravely inconvenient to [it] that it will be effectively deprived of a meaningful day in court." *Zapata Off–Shore Co., 407 U.S. at 19*. We are hard pressed to accept MoneyGram's claim that bringing a proceeding in New Jersey, rather than just across a river in New York City is now so inconvenient that it should be excused from the contractual undertaking in which it agreed to do just that.

MoneyGram argues that the district court erred in dismissing its claims without first providing it with an opportunity to [**10] make the requisite "strong showing" that the clause was the result of fraud or overreaching, that enforcement of the clause would violate public policy in the forum, or that enforcement of the clause in a particular case would be so inconvenient as to be unreasonable. MoneyGram claims that it could have developed a record in support of its claim that the clause violated public policy by "exploring State regulation of the money transfer industry, or the State's interest in protecting funds entrusted by customers for transfer." Appellant's Br. at 22–3. Yet, even now, MoneyGram offers nothing to support these vague reference. MoneyGram is, after all, suing to enforce that very Agreement according to its terms, and those terms require MoneyGram to raise its purported claims of unfairness or public policy in a New York court, or before a panel of arbitrators in New York.

MoneyGram cites *Zelson v. Thomforde, 412 F.2d 56, 58–59 (3d Cir. 1969)*, to support its contention that the district court erred in raising the forum selection clause *sua sponte* and impermissibly granting defendants' 12(b) motion to dismiss in reliance on that clause. In *Zelson*, the district court [**11] dismissed the action "without the issue [of personal jurisdiction] having been raised below by defendant–appellees." *Id.* In that context, we stated that [HN7] "a court may not *sua sponte* dismiss for want of personal jurisdiction, at least where a defendant has entered an appearance by filing a motion." *Id.* That is not the case here. Rather, Consorcio and the Lopez brothers filed an Answer raising several affirmative defenses including the arbitration clause, improper venue, and lack of personal jurisdiction over the individual defendants. A42.

**B.**

MoneyGram also faults the district court for failing to rule on whether it had personal jurisdiction over the individual defendants. It argues:

> by entwining the individual Defendants in its *sua sponte* use of the forum selection clause, the District Court failed to

address whether or not it had personal jurisdiction over those Defendants on the grounds briefed by the parties. The record before the Court, however, was sufficient to establish that jurisdiction.

Appellant's Br. at 25. The district court's only response to the defendants' challenge to *in personam* jurisdiction was the following query: "Why [**12] would the Court deal with the issue of jurisdiction . . . over Robeto Lopez and Freddie Lopez, one has to ask, if the parties have already agreed that . . . 'any action . . . under this Agreement shall be maintained exclusively in the courts of the State of New York.'" Dist. Ct. Op. at 8.

However, the district court's reasoning on this issue ignores the fact that the Agreement containing that forum selection clause is between MoneyGram and Consorcio. [*849] Neither Roberto Lopez nor Freddie Lopez signed the Agreement in their individual capacities. Rather, they signed as officers of the corporate entity, Consorcio. MoneyGram's allegations and jurisdictional arguments sweep broadly enough to reach Roberto and Freddie as individuals. Yet, ironically, MoneyGram challenges the court's dismissal of claims against them by arguing "the Agency and Trust Agreement between Consorcio and MoneyGram [] . . . is wholly inapplicable to the individual defendants."

Appellant's Br. at 33. We agree. n4 However, we disagree with MoneyGram's position that the court had *in personam* jurisdiction over those two individuals.

- - - - - - - - - - - Footnotes - - - - - - - - - - - -

n4 The district court's oversight in this regard is clearly understandable since MoneyGram's claims of error evidence a convenient lapse in the distinction between corporate and individual actions and liability.

- - - - - - - - - - End Footnotes- - - - - - - - - - - -

[**13]

[HN8] A federal court has personal jurisdiction over a nonresident defendant to the extent authorized under the law of the forum state in which the district court sits, within constitutional limitations of due process. Fed. R. Civ. P. 4(e); *see also Sunbelt Corp. v. Noble, Denton & Assoc., Inc.*, 5 F.3d 28, 31 (3d Cir. 1993). Therefore, we begin an inquiry into the district court's jurisdiction over the individual defendants by looking to New Jersey's long–arm statute. [HN9] New Jersey courts have held that that statute reaches to the "outermost limits permitted by the United States Constitution." *Avdel Corp. v. Mecure*, 58 N.J. 264, 277 A.2d 207, 209 (N.J. 1971); *see also* N.J. Ct. R. 4:4–4. Thus, the reach of the New Jersey statute is coextensive with the Due Process Clause of the Fourteenth Amendment.

[HN10] In all cases where the defendant moves for dismissal for lack of personal jurisdiction "the plaintiff bears the burden of demonstrating contacts with the forum state sufficient to give the court in personam jurisdiction." *Time Share Vacation Club v. Atlantic Resorts Ltd.*, 735 F.2d 61, 63 (3d Cir. 1984). In reviewing a ruling on a motion to [**14] dismiss for lack of *in personam* jurisdiction, we accept plaintiff's allegations as true and construe disputed facts in favor of the plaintiff. *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992), *cert. denied*, 506 U.S. 817, 121 L. Ed. 2d 29, 113 S. Ct. 61.

[HN11] Personal jurisdiction over a nonresident defendant may be asserted in two contexts. General jurisdiction exists when a defendant has maintained such continuous and systematic contacts with the forum state that the defendant is generally subject to the exercise of a court's jurisdiction there without regard to the relationship between the court action and the forum. *See Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414–415, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984). Specific jurisdiction is far narrower, however. It arises when "the claim is related to or arises out of the defendant's contacts with the forum." *Dollar Sav. Bank v. First Sec. Bank of Utah*, 746 F.2d 208, 211 (3d Cir. 1984). Specific jurisdiction arises within the context of the relationship between the defendant, the cause of action, and the forum embodied in the [**15] "minimum contacts" analysis announced in *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

Under *International Shoe*, [HN12] a federal court can only assert personal jurisdiction over a nonresident defendant if the "minimum contacts" between the defendant and the forum "do not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316. Those contacts must be sufficient to make it "reasonable, in the context of our federal system of government, to require the [defendant] to defend [*850] the particular suit which is brought there." *Id. at 317*.

[HN13] The reasonableness of subjecting a nonresident defendant to the courts of a given forum depend upon the "quality and nature of the defendant's activity" in the forum state. *Hanson v. Denckla*, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958). The plaintiff must establish that the defendant has "purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the

benefits and protections of its laws." *Id.*

[HN14] Ultimately, "the existence of minimum contacts turns on the presence [**16] or absence of intentional acts of the defendant to avail itself of some benefit of a forum state." *Waste Mgmt., Inc. v. Admiral Ins. Co.,* 138 N.J. 106, 649 A.2d 379, 388–89 (N.J. 1994). Here, MoneyGram is asking the federal court to exercise *in personam* jurisdiction over both a corporate entity and two individuals in their individual capacities. As noted above, both of those individuals are officers of the corporate defendant. MoneyGram alleges: "Defendants themselves concede that those individual Defendants have traveled to New Jersey, and Freddy Lopez traveled to the State to establish a bank account in Consorcio's name *specifically for the purpose of doing business in New Jersey* with a business then located in the State." Appellant's Br. at 28. (Emphasis added). However, the "business" that MoneyGram seeks to attribute to Freddie was opening Consorcio's bank account. MoneyGram concedes this. It states: "Fairly read, the Complaint shows additionally, *inter alia,* that the Lopez brothers are officers and owners of Consorcio, and, as such, direct and control the actions of the corporation and its agents." *Id.* at 29. MoneyGram then goes on to argue that the Lopez brothers [**17] used the New Jersey bank account to systematically conduct business with MoneyGram's New Jersey office. However, once again, MoneyGram ignores that the "business" that forms the basis of its claims is the business of the Dominican corporation. It is not the business of the individual officers and shareholders who are Dominican citizens with no identified contact with New Jersey other than in their capacity as corporate agents.

[HN15] It is axiomatic that "jurisdiction over . . . [individual] defendants does not exist simply because they are agents or employees of organizations which presumably are amenable to jurisdiction in" a particular forum. *Nicholas v. Saul Stone & Co.,* 224 F.3d 179, 184 (3d Cir. 2000) (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781, 79 L. Ed. 2d 790, 104 S. Ct. 1473 (1984)). Rather, "each defendant's contacts with the forum state must be assessed individually." *Id.* at 781 n.13.

MoneyGram argues that Roberto and Freddy Lopez used Consorcio's New Jersey bank account "to conduct *regular and systematic* business with MoneyGram," Appellant's Br. at 29. However, MoneyGram's attempt to ensnare Roberto and [**18] Freddie Lopez in a jurisdictional web by reciting Consorcio's contacts with New Jersey both ignores and obfuscates Consorcio's separate legal identity. Although MoneyGram has clearly asserted a sufficient basis for *in personam* jurisdiction over Consorcio, its Complaint falls woefully short of establishing the nexus necessary to extend that jurisdiction to either Freddie or Roberto Lopez. *See Saul Stone & Co.,* 224 F.3d at 184.

Moreover, the deficiencies of MoneyGram's complaint can not be spackled over by MoneyGram's allegations of fraud. In *Imo Indus. Inc. v. Kiekert,* 155 F.3d 254 (3d Cir. 1998), we [HN16] stated that allegations of fraud may support *in personam* jurisdiction where:

> [*851] (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Id.* at 265–66. Under the third prong, "the plaintiff must show that [**19] the defendant knew that the plaintiff would suffer the brunt of harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.*

MoneyGram claims that the Lopez brothers committed a fraud by remaining silent about the excess deposited in the New Jersey account, and then fraudulently conveying that money to other corporate entities. However, the silence emanated from their residence in the Dominican Republic, and nothing suggests that the other entities that they owned were located anywhere else; there is certainly nothing to allow us to conclude that any of them were in New Jersey; and MoneyGram does not argue to the contrary.

II.

Thus, although we agree with MoneyGram that the district court erred in enforcing the forum selection clause and arbitration clause against Roberto and Freddie Lopez, we hold that the Complaint here fails to establish *in personam* jurisdiction over them. Accordingly, we will affirm the district court's dismissal of the Complaint under Fed. R. Civ. P. 12(b).

/s/ Theodore McKee

Circuit Judge

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
TRUEPOSITION, INC. and KSI, Inc., Plaintiffs /
Counterclaim Defendants
v.
ALLEN TELECOM, INC. Defendant / Counterclaim
Plaintiff.
**No. C.A. 01-823 GMS.**

Jan. 21, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.

I. INTRODUCTION

*1 On December 11, 2001, the plaintiffs, TruePosition, Inc. and KSI, Inc. (collectively "TruePosition") filed a complaint against the defendant, Allen Telecom, Inc. ("Allen"). In the complaint, TruePosition alleges that Allen has infringed three of its patents, namely U.S. Patent No. 4,728,959 ("the '959 patent"), U.S. Patent No. 6,108,555 ("the '555 patent"), and U.S. Patent No. 6,119,013 ("the '013 patent"). Each of these patents discloses a technology for locating cellular phones. In its Answer and Counterclaims (D.I.6, 48), the defendant asserted six affirmative defenses to the plaintiffs' claims, as well as five counterclaims.

Presently before the court is TruePosition's Motion to Dismiss and/or Strike the Defendant's Counterclaims III, IV, and V, and Affirmative Defenses III and VI (D.I.58). For the following reasons, the court will grant in part and deny in part the plaintiffs' motion.

II. STANDARDS OF REVIEW

The plaintiffs move to dismiss Counterclaims III, IV, and V pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal is appropriate pursuant to this Rule if the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In this inquiry, the court must accept as true and view in the light most favorable to the non-movant the well-pleaded allegations of the complaint. *Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir.2000).* The court 'need not accept as true "unsupported conclusions and unwarranted inferences." ' *Id.* (quoting *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n. 13 (3d Cir.1998)*) (quoting *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir.1997)*). However, it is the duty of the court 'to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable.' *Id.* at 184 (quoting *City of Pittsburgh, 147 F.3d at 263).*

The plaintiffs rely upon Federal Rules of Civil Procedure 8 and 12(f) for their motion to strike Affirmative Defenses III and VI. Rule 8 requires a "short and plain" statement of a claim or defense. Fed. R. Civ. P. 8(a) and (b). It is well settled that the Federal Rules intend a liberal pleading standard. *See Leatherman v. Tarrant County Narcotic Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)* (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"). Indeed, Rule 8 expressly mandates that "[e]ach averment of a pleading shall be simple, concise, and direct." Fed. R. Civ. P. 8(e).

Rule 12(f) allows a court to strike "any insufficient defense" from any pleading. Fed. R. Civ. P. 12(f). Motions to strike affirmative defenses are disfavored. *Procter & Gamble Co. v. Nabisco Brands, Inc., 697 F.Supp. 1360, 1362 (D.Del.1988).* When ruling on such a motion, "the [c]ourt must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law." *Id.*

III. DISCUSSION

A. Counterclaim III

*2 Counterclaim III alleges tortious interference with a contract. The plaintiffs move to dismiss the counterclaim pursuant to Rule 12(b)(6) on the grounds that it fails to plead an essential element of the alleged tort, namely, a breach of the relevant contract.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

Page 2

The tort of interference with a contract requires "an intentional act that is a significant factor in causing the breach of the contract." [FN1] *Cantor Fitzgerald, L.P. v. Cantor, 724 A .2d 571, 584 (Del. Ch.1998)*. Without a breach, there is no viable tortious interference claim. As to this point, Delaware law is well-settled. *See id.; see also Associated/Acc Int'l, LTD. v. Dupont Flooring Sys. Franchise Co.*, 2002 U.S. Dist. LEXIS 6464, at *27- 28 (D.Del.2002); *DeBakey Corp. v. Raytheon Serv. Co., 2002 WL 1273317 (Del. Ch.2000); Boyer v. Wilmington Materials, 1997 WL 382979 (Del. Ch.1997); Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch.1987)*. There is no discussion in these cases as to behavior that could constitute tortious interference when no breach of contract occurs. Presumably, this is because there is no conduct that could constitute the tort of interference with a contract, unless a breach of that contract results. [FN2]

> FN1. Contrary to the defendant's paraphrasing, the court did not style this element as requiring only some kind of interference and no resultant breach. *See* Answering Brief at 9.

> FN2. Although the defendant acknowledges that "a review of the relevant case law shows that the cases are universally precipitated by a breach of contract," it maintains that "the absence of a total breach does not foreclose recovery for damages caused by improper interference." Answering Brief at 10-11. This assertion is unpersuasive as it applies to interference with a contract, particularly given Allen's conspicuous failure to cite any supporting caselaw for it. Furthermore, Allen's contention that a breach of contract is not required in such a case because "the applicable tort here is, for a reason, labeled 'tortious *interference* with contractual relations' not 'tortious *breach* of contractual relations," ' Answering Brief at 12 n. 5 (emphasis added), is astounding in its fatuity. The tort is not labeled "tortious breach of contractual relations" because a non-party to a contract generally is not bound by the contract and thus can not breach the contract. *See, e.g., Traffas v. Bridge*

*Capital Investors II, 1993 WL 339293 (D.Kan.1993)*, at *3 ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the contract being sued upon.... A party to a contract cannot sue a person who is not a party to that contract for breach of contract."); *Credit Gen. Ins. Co. v. Midwest Indem. Corp., 916 F.Supp. 766, 722 (N.D.Ill.1996)* (finding "ludicrous" the defendants' contention that a non-party to a contract can breach that contract).

In this case, the contract at issue is between AT & T Wireless Services, Inc. ("AT & T") and Allen for the purchase of Allen's wireless location systems, which systems are the subject of the present patent infringement suit. In its counterclaim, Allen alleges that the plaintiffs, by filing the present suit and by publicizing it, intended to cause a breach of the AT & T contract. Answer and Counterclaims (D.I.48) ¶¶ 17-18. This is insufficient to state a claim of tortious interference with a contract because, as the defendant concedes, there has been no breach of the AT & T contract. [FN3] Answering Brief at 10. Therefore, Counterclaim III must be dismissed.

> FN3. The court is mindful of Allen's contention that "much of this may ... be a matter of semantics." Answering Brief at 12 n. 6. Allen argues that, because the original AT & T contract was modified subsequent to TruePosition's initiation of the present suit, it suffered a complete loss of the original anticipated contract. *Id.* Apparently, Allen wishes the court to view this "loss" as a breach. However, a mutual modification of a contract certainly is not a breach. *See, e.g., Anderson v. Golden, 569 F.Supp. 122, 140 (S.D.Ga.1982)* (distinguishing between breach and mutual modification). To the extent such a loss represents the loss of an economic expectation, the corresponding tort is interference with a prospective business opportunity. The court reiterates that Delaware law requires a breach to sustain the tort of interference with a contract.

B. Counterclaim IV

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 3
2003 WL 151227 (D.Del.)
**(Cite as: 2003 WL 151227 (D.Del.))**

Counterclaim IV alleges tortious interference with prospective business opportunities. The elements of this tort are: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.' *DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151, 1153 (Del.1981) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.,* 419 A.2d 942, 947 (Del. Ch.1980)) (citations omitted). The plaintiffs move to dismiss the counterclaim on the grounds that the defendant cannot prove all of the required elements, namely, a prospective business opportunity, or an interference with that opportunity.

The only "prospective business opportunity" at issue in the counterclaim is the AT & T contract. As stated above, the defendant acknowledges a completed and continuing contract with AT & T. Allen's expected business opportunity, thus, appears to have been consummated before the allegedly tortious conduct of the plaintiffs. This is particularly true because "the probability of the business opportunity must be assessed at the time of the alleged interference ." *Malpiede v. Towson,* 780 A.2d 1075, 1099 (Del.2001). In this case, the alleged interference occurred after Allen had been awarded the contract with AT & T. Answer and Counterclaims (D.I.48) ¶ 17.

*3 Allen maintains, however, that the plaintiffs' interference caused a modification of the expected contract terms. Following TruePosition's commencement of a patent infringement action against Allen and a press release announcing the same, Allen allegedly incurred additional legal expenses in renegotiating certain provisions of the AT & T contract, more onerous indemnification terms in the contract, and damages to its reputation. Thus, Allen contends, TruePosition's actions interfered with its expected business opportunity in that the final terms of the AT & T contract differed from the original terms. For purposes of this motion only, this is sufficient to state a claim of tortious interference with prospective business opportunities. *See* *McHugh v. Board of Educ.,* 100 F.Supp.2d 231, 247 n. 15 (D.Del.2000) (noting that the tort requires "a valid business

relationship or expectancy" and citing cases).

Assuming that these facts constitute a sufficient interference, the counterclaim may be challenged on other grounds, namely, that Allen has not shown that the plaintiffs engaged in any wrongful conduct. To sustain the tort of interference with a business opportunity, the interference must have been improper. *Bohatiuk v. Delaware Chiropractic Servs. Network, L.L.C.,* 1997 Del.Super. LEXIS 215, at *8-10 (Del.Super.1997). The conduct at issue is the filing of a patent infringement suit and the public announcement of the suit by a press release. Normally, lawful actions cannot form the basis of a claim of tortious interference, particularly in light of TruePosition's "privilege to compete and protect its own business interests." *Acierno v. Preit-Rubin, Inc.,* 199 F.R.D. 157, 164-65 (D.Del.2001) (dismissing tortious interference with contractual relations claim because defendant corporation and real estate investment trust, in failing to affirmatively suggest to County that competitor plaintiff's property be included in a traffic impact study, committed no wrongful conduct) (citing caselaw). In this case, however, the defendant also has alleged the counterclaim of "sham litigation." In the sham litigation context, the mere initiation of a lawsuit may be wrongful if it constitutes unlawful antitrust activity. Because the court will allow the "sham litigation" counterclaim to stand, *see infra* Section I.C., the tortious interference with a prospective business opportunity claim must survive as well. It is axiomatic that if the defendant can prove that the instant lawsuit is merely a "sham" and violative of antitrust law, then the filing of the lawsuit constitutes improper conduct. Therefore, in the interest of consistency, and viewing the pleadings in the light most favorable to Allen, Counterclaim IV survives the instant motion to dismiss.

C. Counterclaim V

TruePosition moves for the dismissal of Counterclaim V, which alleges "sham litigation," on the grounds that such a cause of action does not exist. The term "sham litigation" refers to an exception to the doctrine of antitrust immunity. Immunity to certain antitrust suits was established by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U .S. 127 (1961), and

Westlaw.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

Page 4

*Mine Workers v. Pennington,* 381 U.S. 657 (1965). These cases established that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr,* 365 U.S. at 136. The Supreme Court refused to "impute to Congress an intent to invade" the First Amendment right to petition. *Id.* at 136. Thus, the *Noerr-Pennington* doctrine protects those who petition the government from antitrust liability.

*4 Later caselaw extended *Noerr* antitrust immunity to "the approach of citizens ... to administrative agencies ... and to courts." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). However, such immunity is not afforded to "sham" petitioning that is only "an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144. Litigation is a mere "sham" if it is objectively baseless and subjectively motivated to interfere with business competition by using a governmental process 'as an anticompetitive weapon.' *Professional Real Estate Investors v. Columbia Pictures Indus.,* 508 U.S. 49 (1993) (quoting *Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380 (1991)).

The plaintiffs urge that "sham litigation" is not a cognizable cause of action. The court cannot agree. A counterclaim of sham litigation is, essentially, an assertion that antitrust law has been violated. Indeed, in litigation leading to the Court's decision in *Professional Real Estate Investors,* Columbia Pictures had sued the defendant, PRE, for copyright infringement. *Id.* at 52. The defendant counterclaimed, accusing Columbia of violations of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. §§ 1-2. *Id.* "In particular, PRE alleged that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade." *Id.* Although the counterclaim did not survive summary judgment on the facts of the case, the Court upheld the validity of the sham counterclaim itself. Indeed, in announcing a two-part test for its application, the Court only clarified the existence and context of the sham litigation exception. [FN4]

FN4. Of course, as already stated, a violation of antitrust law underlies any sham exception to antitrust immunity. Although the defendant has not specifically pled a violation of the Sherman Act in Counterclaim V, the invocation of the sham litigation doctrine is sufficient to give notice of the basis of its claim. This is particularly true in the context of a Rule 12(b)(6) motion to dismiss, and in light of both the liberal pleading philosophy of the Federal Rules and the court's responsibility 'to examine the complaint to determine if the allegations provide for relief on any possible theory.' *O'Boyle v. Jiffy Lube Int'l, Inc.,* 866 F.2d 88, 93 (3d Cir.1989) (quoting C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357, at 601-02 (1969) (footnotes omitted)).

Since *Professional Real Estate Investors,* the sham litigation exception has been invoked in varied contexts. For example, in a recent case, the Supreme Court refused to strip antitrust immunity from an employer who filed a losing and retaliatory lawsuit where the suit was not objectively baseless. *BE & K Constr. Co. v. NLRB,* 122 S.Ct. 2390 (2002). In so doing, the Court implicitly held that the sham litigation exception applies to the National Labor Relations Act in the same way it applies to the Sherman Act. *See id.* at 2402 (Scalia, J., concurring) ("[T]he implication of our decision today is that ... we will construe the National Labor Relations Act ... in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process.") (emphasis in original). Other courts have applied the immunity principles of *Noerr-Pennington* to other contexts. *See, e.g., State of Missouri v. National Organization of Women,* 620 F.2d 1301, 1318-19 (8th Cir.1980) (applying *Noerr-Pennington* liability principles to state tort laws); *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.,* 858 F.2d 1075, 1084 (5th Cir.1988) (holding that *Noerr-Pennington* doctrine applies to Civil Rights Act liability); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 614-15 (8th Cir.1980) (same). It follows that if the *Noerr-Pennington* immunity principles apply in these contexts, the sham

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

litigation exception to immunity applies as well. [FN5] Other cases have explicitly or implicitly accepted the sham exception in the patent infringement context. *See, e.g., Carroll Touch, Inc. v. Electro Mechanical Sys.,* 15 F.3d 1573 (D.C.Cir.1993) (discussing sham litigation counterclaim in patent infringement context); *U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592, 597 (Fed.Cir.1995) (rejecting sham counterclaim on the facts of the case).

> FN5. Unlike the defendant, however, the court recognizes a distinction between the *Noerr-Pennington* doctrine, which shields petitioners from antitrust liability, and the sham litigation exception, which strips this immunity when the petition is meritless and anticompetitive in nature. *See, e.g.,* Answering Brief at 15 ('... the Noerr-Pennington [*i.e.,* "sham litigation"] doctrine ...').

*5 In sum, the court can find no justification for refusing to allow the sham exception to be litigated in the instant case. Indeed, a copyright infringement action, like that at issue in *Professional Real Estate Investors,* and a patent infringement action such as the one at issue here present such analogous contexts regarding the application of the sham litigation exception that it would strain credibility to announce a relevant and dispositive difference between them. Thus, Counterclaim V may remain, to succeed or fail as it may in the ensuing litigation. [FN6]

> FN6. In this vein, the court stresses that the defendant, of course, will be tasked in the ensuing litigation with proving the elements of the sham litigation exception, namely, that the present patent infringement suit is objectively baseless and subjectively motivated by an intent to interfere with competition. *See Carroll Touch,* 15 F.3d at 1583 (holding that sham litigation counterclaim could not survive summary judgment because defendant did not establish a genuine issue regarding whether the patent infringement action was baseless).

D. Affirmative Defense III

As its third affirmative defense, Allen alleges that TruePosition engaged in "fraud and/or inequitable conduct" in acquiring the relevant patents. The plaintiffs move to strike the defense, as well as Counterclaim I, which is predicated on the inequitable conduct defense, on the grounds that the affirmative defense does not meet the pleading requirements of Federal Rule of Civil Procedure 9(b).

Rule 9 requires that all pleadings of fraud or mistake "be stated with particularity." Fed. R. Civ. P. 9(b). [FN7] These averments, however, remain subject to the liberal pleading standard of Rule 8, which requires only a "short and plain" statement of a claim or defense. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 703 (3d Cir.1996) (citing cases); *see generally Leatherman,* 507 U.S. at 168 (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"); 5 Charles Alan Wright & Arthur R. Miller Federal Practice and Procedure § 1281, at 520-21 (1990) (pleading with particularity under Rule 9(b) should be done consistently with the general philosophy of Rule 8); 2A James W. Moore, Moore's Federal Practice ¶ 8.13, at 8-58 (2d ed.1995) (the mandate of Rule 8 applies "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted).

> FN7. Because the court has found that Allen's pleadings satisfy the heightened pleading requirements of Rule 9(b), it need not address the defendant's argument that Rule 9(b) may not apply to allegations of inequitable conduct.

The pleading requirements are satisfied by Allen's third affirmative defense. The defense constitutes one paragraph which names the title and publication date of at least one allegedly withheld material prior art publication. In the context of alleged inequitable conduct before the PTO during a patent prosecution, "pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)." *EMC Corp. v. Storage Tech. Corp.,* 921 F.Supp. 1261, 1263 (D.Del.1996). The third affirmative defense discloses at least this much, and thus suffices "to apprise the other party of what is being alleged in a manner

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 6
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

sufficient to permit responsive pleadings" as Rule 9 requires. 5 WRIGHT & MILLER § 1296 (1990).

TruePosition objects that the named publication is relevant to only certain of their patents and, therefore, the defendant has not sufficiently pled the defense of inequitable conduct as to the other patents. The court declines, however, to weigh the relevance and materiality of the allegedly withheld prior art for purposes of this motion. It is the court's duty for purposes of this motion only to test the sufficiency of the pleading, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). Furthermore, the Third Circuit has made clear that, although "it is certainly true that allegations of 'date, place or time' " satisfy the pleading requirements, "nothing in [Rule 9] requires them." *Seville Industrial Machinery v. Southmost Machinery,* 742 F.2d 786, 791. The affirmative defense, as pled, suffices to place the plaintiffs on notice of the misconduct with which they are charged. *Id.; see also Scripps Clinic and Research Found., et al. v. Baxter Travenol Lab., et al.,* 1988 WL 22602, at *3 (D.Del.) (defense of inequitable conduct sufficiently pled when defendant simply "allege[d] that [the plaintiff] failed to identify to the PTO relevant prior art of which it was aware").

*6 The motion to strike the third affirmative defense, and to dismiss Counterclaim I, which is at least partially premised on the defense of inequitable conduct, is denied.

E. Affirmative Defense VI

Finally, the plaintiffs move to strike Affirmative Defense VI, abuse of process, on the grounds that it is not a defense to a patent infringement action, and that, in any event, it has not been pled properly.

The plaintiffs are correct that abuse of process is not a defense to a patent infringement action. Rather, it is a tort, *see* PROSSER, LAW OF TORTS, § 121 (4th Ed.1971), which should have been pled as a counterclaim. This mistake is not fatal, however. Federal Rule of Civil Procedure 8(c) states that "[w]hen a party has mistakenly designated ... a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed. R. Civ. P. 8(c). The court will view the defendant's averment of the "defense" of abuse of process as a counterclaim.

Abuse of process may be alleged in a patent infringement case as in any other. *See, e.g., Bayer AG v. Sony Elecs., Inc.,* 229 F.Supp.2d 332 (D.Del.2002). A claim of abuse of process is established when "the defendant ... prove[s] that the plaintiff had an 'ulterior purpose' and committed 'a willful act in the use of the process that is not proper in the regular conduct of the proceedings ." ' *Id.* at 368 (quoting *Feinman v. Bank of Delaware,* 728 F.Supp. 1105, 1115 (D.Del.1990), *aff'd,* 909 F.2d 1475 (3d Cir.1990)). "There must be 'some definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of process ... there is no liability where the [plaintiff] has done nothing more than carry out the process to its authorized conclusion ." ' *Id.* (citations omitted).

The defendant has asserted that the "[p]laintiffs have abused the judicial process by bringing the present action based on the [p]atents that [p]laintiffs know are invalid, unenforceable, and/or not infringed." Answer and Counterclaims (D.I.48) at 8. There is no elaboration in the Answer and Counterclaims. The defendant's briefing, however, contends that "the same averments with regard to TruePositions tortious interference with Allen's business contracts and relations also establish a basis to proceed against TruePosition for abuse of process." Answering Brief at 17-18 n. 10.

The defendant's averments are sufficient to sustain a Rule 8, Rule 12(f), or Rule 12(b)(6) motion to strike and/or dismiss. Allen has offered a "short and plain" statement of the claim and has presented a factual context that, viewed in the light most favorable to Allen, states an abuse of process claim. Again, it is the court's duty for purposes of this motion only to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost,* 1 F.3d at 183. Despite the defendant's anemic presentation of its abuse of process claim, the facts presented in the context of its sham litigation and tortious interference claims suffice to state a claim for relief for abuse of process as well. The plaintiffs' motion to dismiss the claim is denied.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                    Page 7
2003 WL 151227 (D.Del.)
**(Cite as: 2003 WL 151227 (D.Del.))**

IV. CONCLUSION

**\*7** The court concludes that the defendant's tortious
interference with a contract claim can not be sustained
because there has been no breach of contract. Allen's other
counterclaims of tortious interference with prospective
business opportunities, sham litigation, declaratory
judgment, and abuse of process survive this motion to
dismiss. Likewise, the defendant's third affirmative defense
of fraud and/or inequitable conduct may remain.

For the foregoing reasons, IT IS HEREBY ORDERED that:
    1. TruePosition's Motion to Dismiss and/or Strike (D.I.58)
    is GRANTED IN PART and DENIED IN PART.
    2. Counterclaim III, alleging tortious interference with a
    contract, is DISMISSED.

2003 WL 151227 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

JOHN F. DILLON & CO. LLC, Plaintiff –v.– FOREMOST MARITIME CORPORATION, JI MAY NAVIGATION CORPORATION, and TRADIGRAIN SHIPPING, S.A., Defendants.

02 Civ. 7803 (SHS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 11383; 2004 AMC 1677

June 18, 2004, Decided

June 21, 2004, Filed

[*1]  Motions for summary judgment of defendants Foremost, Tradigrain, and Ji May granted. Complaint dismissed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, a maritime broker, brought an action under diversity jurisdiction seeking unpaid commissions allegedly due pursuant to a charter party agreement negotiated by the broker among defendants, vessel owner, charterer, and owner's agent. The broker alleged breach of contract, quantum meruit, and tortious interference with contractual re ations. The owner, its agent, and the charterer moved for summary judgment dismissing all claims.

**OVERVIEW:** The charter party agreement provided that the broker would be paid a percentage of "hire earned and paid" under the agreement. During the term of the agreement, the charterer went out of business. The charterer and the owner's agent agreed to a termination of the charter party agreement without penalty. The owner entered into a new charter party agreement with another charterer. The court ruled that the agent was entitled to summary judgment under New York law because it acted as an agent for a disclosed principal. The owner and the charterer were also entitled to summary judgment because the original charter party agreement provided for payment of commission only on hire earned and paid on the charter, or any extension of that charter. Although the two contracts had similar terms, the new contract could not be deemed an extension. The original agreement was terminated, not extended or assigned. Dealing with other brokers in seeking a replacement charterer was not a bad–faith action. The charterer, as a party to the original agreement, could not be liable for tortious interference. The existence of a contract precluded recovery in quantum meruit.

**OUTCOME:** The court granted summary judgment dismissing all claims.

**CORE TERMS:** broker, charter party, charterer, hire, charter, Rule State, replacement, summary judgment, vessel, contractual, negotiation, termination, terminated, tortious interference, negotiated, continuation, disclosed principal, implied covenant, quantum meruit, third party, ship, diversity jurisdiction, sufficient proof, breached, renewal, replace, underlying contract, previous contract, original contract, valid contract

### LexisNexis(TM) Headnotes

*Admiralty Law > Practice & Procedure > Jurisdiction*

[HN1]   A plaintiff who has a cause of action cognizable both under federal admiralty law and under state law may bring (1) a federal admiralty action in federal court, (2) an action in state court, or (3) a diversity action in federal court, assuming the additional requirements for diversity jurisdiction are met. Fed. R. Civ. P. 9(h). There is an exception that requires a plaintiff bringing certain types of in rem actions to do so pursuant to admiralty law.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN2]   Summary judgment may be granted only when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The court must view all facts in the light most favorable to plaintiff and resolve all factual disputes in plaintiff's favor. To overcome such a motion, the non–moving party must offer sufficient proof to allow a reasonable factfinder to decide in its favor. Hence, the court may grant summary judgment only when no reasonable trier of fact could find in favor of the non–moving party.

*Business & Corporate Entities > Agency > Duties & Liabilities > Authorized Acts of Agents*

[HN3]   Pursuant to New York law, a party who signs a contract in his capacity as agent for a disclosed principal, within the authority delegated to him by that principal, is not primarily liable for damages caused by a breach of the contract.

*Business & Corporate Entities > Agency > Disclosure*

[HN4]   A principal is disclosed if, at the time of a transaction conducted by the agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity.

*Business & Corporate Entities > Agency > Disclosure*
*Admiralty Law > Maritime Contracts*

[HN5]   In maritime contracts, the identification of the principal as "the owner of the vessel" is sufficient indication to alert the opposing party to the principal's name; once the vessel is named, it is a simple matter to discover who owns the vessel by consulting industry publications.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

[HN6]   At the summary judgment phase, the non—moving party must offer sufficient evidence on a factual dispute to allow a reasonable finder of fact to find in its favor.

*Business & Corporate Entities > Agency > Duties & Liabilities > Authorized Acts of Agents*
*Contracts Law > Remedies > Equitable Relief*

[HN7]   Any enrichment that results from a contract or the breach of a contract flows to the principal, not the agent. It is not enough that a defendant received a benefit from the activities of a plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.

*Admiralty Law > Charterparties > Liability Generally*

[HN8]   Language stating that a broker will receive a percentage of "hire earned and paid" has been interpreted to mean that a broker is entitled only to a portion of hire actually earned, and not to any sums paid pursuant to the contract if they are not for hire earned. When the contract payments are interrupted either by termination of the contract or by unilateral breach, the broker is not entitled to be paid a commission. Moreover, the broker is not entitled to commission on sums paid in settlement of the contract.

*Admiralty Law > Charterparties > Liability Generally*

[HN9]   Some courts suggest that when a contract providing for a broker's commission is breached or a condition of the contract is not satisfied, but the party owing the compensation to the broker is put in the same or better position than if the contract had been performed, then the broker is owed compensation. However, that doctrine does not apply when the contract is terminated and a new contract is entered into for the mitigation of damages flowing from that termination. Where a charter party agreement is prematurely terminated and a new one established, the doctrine of equivalent performance does not apply.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN10]   The implied covenant of good faith encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the agreement, and prohibits either party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. However, the implied covenant of good faith and fair dealing does not add any new obligations to the underlying contract. The implied covenant does not operate to create new contractual rights. Moreover, no party has an ongoing obligation to preserve a broker's commission. The implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.

*Contracts Law > Third Parties > Assignment of Rights*

[HN11]   The requisite manifestation of a present intent to transfer a right may be accomplished in writing, orally or by conduct, but such manifestation must be sufficient to show a perfected transaction between the parties.

*Real & Personal Property Law > Brokers > Commissions*
*Admiralty Law > Charterparties > Liability Generally*

[HN12]   In a case where a contract provides for commission to a broker upon extension or renewal, and a second contract is subsequently made between the parties to the previous contract, New York real estate law provides a context to analyze whether a broker is entitled to a commission. New York law provides that before the lessor is obligated to pay commissions, the renewal must be for the same term and the same rent as the original lease, or the new lease must have been the result of services performed by the broker.

*Torts > Business & Employment Torts > Interference With a Contract*

[HN13]   In order to state a claim for tortious interference with contractual relations under New York law, a plaintiff must show (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach without justification, (4) breach, and (5) damages.

*Torts > Business & Employment Torts > Interference With a Contract*

[HN14]   A party cannot tortiously interfere with its own contract.

*Torts > Business & Employment Torts > Interference With a Contract*

[HN15]   A claim of tortious interference with contractual relations cannot be brought unless there is in fact a breach of the underlying contract between the plaintiff and a third party.

*Torts > Business & Employment Torts > Interference With a Contract*

[HN16]   A tortious interference with contract claim must plead that a defendant used wrongful means to induce the third party to breach the contract. This has been defined to include physical violence, fraud, or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract.

*Contracts Law > Remedies > Equitable Relief*

[HN17]   A valid contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.

*Real & Personal Property Law > Brokers > Commissions*
*Admiralty Law > Charterparties > Liability Generally*

[HN18]   A broker is only to be compensated where he brings the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made, and until that is done his right to commissions does not accrue. Moreover, a broker is never entitled to commissions for unsuccessful efforts; and if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions. Thus, brokers are not entitled to reimbursement for the value of their efforts to secure a contract unless the parties have specifically agreed otherwise.

*Real & Personal Property Law > Brokers > Commissions*
*Admiralty Law > Charterparties > Liability Generally*

[HN19]   As long as the principal acts in good faith, and does not act solely to avoid the payment of commissions, a broker is not entitled to any payment when negotiations break down, or when the broker fails to secure a buyer.

**COUNSEL:** For John F. Dillon & Co., Ltd, Plaintiff: Manuel A. Molina, Skoufalos, Llorca & Ziccardi, L.L.P., Stamford, CT. Stephan Skoufalos, Skoufalos, Llorca & Ziccardi, L.L.P., Stamford, CT.

For Foremost Maritime Corp., Defendant: Leroy Lambert, Healy & Baillie, New York, NY. Matthew Anderson Marion, Healy & Baillie, LLP (CT), South Norwalk, CT.

For Ji May Navigation Corp., Defendant: Leroy Lambert, Healy & Baillie, New York, NY.

**JUDGES:** Sidney H. Stein, U.S. District Judge.

**OPINIONBY:** Sidney H. Stein

**OPINION:** OPINION AND ORDER

SIDNEY H. STEIN, U.S. District Judge.

John F. Dillon & Co., LLC ("Dillon"), a maritime broker, seeks $ 160,913 in unpaid commissions allegedly due it pursuant to a charter party agreement plaintiff negotiated among defendants Tradigrain Shipping, S.A. ("Tradigrain"), Foremost Maritime Corporation ("Foremost"), and Ji May Navigation Corporation ("Ji May") in 2001. Plaintiff seeks to recover on three causes of action: 1) breach of contract by Foremost and Ji May, 2) quantum meruit, and 3) tortious interference by Tradigrain with contractual relations between Dillon and Foremost.
   [*2]   Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all claims. Defendant Foremost's motion is granted because Foremost acted as an agent for a disclosed principal, Ji May. Ji May and Tradigrain's motions are granted because this action is governed by a contract and that contract confers no rights on plaintiff as to Ji May and Tradigrain.


## I. Background

The facts underlying this motion for summary judgment are largely undisputed and are taken from the complaint, and the parties' affidavits and statements made in opposition to and in support of summary judgment pursuant to Local Rule 56.1. Factual disparities are indicated where they appear.


A. The Parties

Plaintiff Dillon is a maritime brokerage company organized and operating in the state of Connecticut. Defendant Ji May, a Panamanian corporation, is the owner and operator of the M/V JI MAY. Defendant Foremost, organized under the laws of the state of New York, acted as an agent of Ji May by securing charterers for the M/V JI MAY. Defendant Tradigrain is a Swiss Societe Anonyme and operates in, and is organized [*3]  under, the laws of Switzerland. Tradigrain was the charterer of the M/V JI MAY prior to terminating its involvement in the grain shipping business and filing for the Swiss equivalent of bankruptcy.


B. The Underlying Charter Party Agreement

On April 12, 2001, plaintiff, acting as a broker, fixed a charter party agreement between Tradigrain and Foremost ("Tradigrain Charter Party"). (Compl. P7). That agreement provided that Tradigrain would charter the M/V JI MAY for a minimum of thirty-four months and a maximum of thirty-eight months. (Cardozo Aff., Exh. B, "Charter Party Agreement," Clause 91). The daily rate for hire ranged from $ 8,500 to $ 13,000 and fluctuated based on a calculation of the fifteen day average of hire rates on four charter routes, as published by the Baltic Exchange. (Cardozo Aff., Exh. B, "Tradigrain Charter Party," Clause 95; Compl. P8). Dillon was to be paid a 1.25 percent commission. (Tradigrain Charter Party, Clause 43; Compl. P9). The commission is set forth in clause forty-three of the Tradigrain Charter Party ("Clause 43"): "A commission of 1.25 percent is payable by the Vessel and the Owners to John F. Dillon & Co., Stamford on hire earned and paid [*4]  under this Charter, and also upon any continuation or extension of this Charter." (Id.) The parties operated in accordance with that agreement until January 29, 2002, during which time Dillon was paid a 1.25 percent commission on all hire paid. (Ji May Rule 56.1 State. P33).

C. The Charter Party Agreement Terminates

On March 5, 2002, Farmland Industries, Inc., the parent company of Tradigrain, publically announced that Tradigrain would be leaving the grain trading business. (Compl. P12; Cardozo Aff., Exh. C). After learning this fact, all the parties to this action took steps to ensure that the M/V JI MAY would remain in use after Tradigrain exited the business. Foremost employees made inquiries with charterers known to them, and contacted at least one broker. (Depo. James Chao, 35:19; 37: 17–23). Tradigrain continued to charter the vessel and participated in the search for a replacement charterer. (Aff. Ziccardi, Exh. 1, "Aff. Dillon" P10).

Dillon also attempted to locate a company willing to substitute for Tradigrain under the original charter party agreement. (Compl. P15). Dillon composed a list of shipping companies it planned to approach about assuming that contract. [*5] (Aff. Kenney, in Aff. Ziccardi, Exh. 2, P14). A company called Bunge, S.A. was on the list Dillon prepared and a Dillon employee, broker Chris Kenney, telephoned Bunge about the charter party on March 7, 2002. (Id. P14). The next day, before Kenney placed a follow-up call to Bunge on behalf of Dillon, he was informed by Piero Raveno, a Tradigrain employee, that he should "back off" of Bunge. (Compl. P17, Aff. Kenney, in Aff. Ziccardi, Exh. 2, P14). Plaintiff alleges that Ravano had certain familial connections to Bunge and the broker that Bunge worked with, Ifchor, and therefore hoped to secure commissions for them. (Compl. P18, Aff. Kenney in Aff. Ziccardi, Exh. 2, 14–16). Dillon also claims that in the March 8th conversation, when Raveno allegedly told Kenney to "back off" of Bunge, he also assured Dillon that its commission under the April 12, 2001 charter party agreement would be preserved. (Compl. P17). Plaintiff claims that this assurance dissuaded it from contacting Bunge directly, but that Dillon continued to search for a potential charterer.

From March 5th until Dillon learned on March 13th that a charterer had been found, it continued to work on finding a replacement. Christopher [*6] Kenney testified that Dillon contacted Armada Shipping and solicited a charter proposal. (Depo. Kenney 107–108; Aff. Ziccardi, Exh. 2 P19). Armada was prepared to agree to the terms of the original Tradigrain Charter Party provided it was extended for six months. (Id.) Plaintiff offers that proposal to support its position that it did procure a willing and able party to enter into the charter agreement with Foremost.

During this period, for reasons unrelated to the search for a replacement charterer, a Dillon employee met with the Senior Vice President of Foremost, Michael Lee, on March 11, 2002. (Lee Depo. 84: 15–25). At that meeting they discussed the Tradigrain situation. (Id., at 85:14–18). Dillon claims that Foremost, at the time of that meeting, "failed to disclose fully its dealings with Tradigrain and Bunge." (Plt's Rule 56.1 State., P14). Defendants confirm that on March 11, 2002, sometime after the meeting started, Foremost received an offer from Bunge to charter the M/V JI MAY. (Foremost Rule 56.1 State., P16). However, Dillon employee Christopher Kenney stated that Dillon knew at the time of that meeting that it did not have the exclusive right to find a replacement [*7] for the charter party agreement. (Depo. Kenney 19–25). Dillon has not alleged that it had presented any potential charterers to Foremost as of that date.

During the seven days following the March 11 offer, Foremost and Ifchor, on behalf of their principals, negotiated Bunge's offer to charter M/V JI MAY. (Foremost Rule 56.1 State., P18). On March 13, Tradigrain told Dillon that the M/V JI MAY would be redelivered to Bunge. (Compl. P19; Cardozo Decl. Supp. Tradigrain's Mot. Summ. J. ("Cardozo Decl.," Exh. E)). That same day, Tradigrain and Foremost also agreed to a termination of the Tradigrain Charter Party without penalty. (Cardozo Decl. Exh. E & J, Chao Depo., 135:19–137:6). On March 15, 2002, Michel Roduit, a director of Tradigrain, signed a letter memorializing an agreement between Tradigrain and Ji May to "cancel the Charter Party dated 12th of April 2001 . . . simultaneously without any penalty for either side." (Cardozo Aff., Exh. E).

Three days later, a charter party was signed between Bunge and Ji May for the M/V JI MAY ("Bunge Charter Party"). That charter party resembles the Tradigrain Charter Party. However, it has one different party — Bunge — and at least one different [*8] term; the length of hire is twenty-eight to thirty-two months. (Cardozo Aff., Exh. F). The Bunge Charter Party also specifically provides in its Clause 43 that commissions shall be paid to Ifchor, not Dillon. (Id.). Notwithstanding this agreement, plaintiff contends that the redelivery of the vessel to a new charterer was governed by the Tradigrain Charter Party of April 12, 2001 that Dillon brokered and the new charter party was an assignment of the Tradigrain Charter Party. (Plt.'s Rule 56.1 State., P19). Plaintiff alleges that the charter party agreement between Foremost and Bunge is not a new agreement because its underlying substance is the same as the original April 12, 2001 charter party and therefore it is a "direct continuation" of the Tradigrain Charter Party for which it is due commissions. (Plt's Rule 56.1 State., P20).

## II. Analysis

### A. Jurisdiction

[HN1] "A plaintiff who has a cause of action cognizable both under federal admiralty law and under state law . . . may bring (1) a federal admiralty action in federal court, (2) an action in state court, or (3) a diversity action in federal court, assuming the additional requirements for diversity jurisdiction [*9] are met." Dluhos v. Floating and Abandoned Vessel, Known as New York, 162 F.3d 63, 71, 73 (2d Cir. 1998); Fed. R. Civ. P. 9(h). There is an exception that requires a plaintiff bringing certain types of in rem actions to do so pursuant to admiralty law. Id. This is not such a case.

The plaintiff has brought this action before this Court on diversity jurisdiction, pursuant to 28 U.S.C. § 1332. The parties agree that New York substantive law should apply to the claims asserted and have therefore invoked the right to pursue a common law remedy, as set forth in 28 U.S.C. § 1333(1). See American Dredging Co. v. Miller, 510 U.S. 443, 446–47, 127 L. Ed. 2d 285, 114 S. Ct. 981 (1994). Plaintiff has satisfied

the statutory prerequisites to establishing diversity jurisdiction pursuant to 28 U.S.C. § 1332 because plaintiff and defendants do not reside in the same state, and the amount in controversy exceeds $ 75,000. See 28 U.S.C. § 1332. Therefore, subject matter jurisdiction over this action is established pursuant to diversity jurisdiction, [*10] and New York state substantive law shall provide the decisional law of the case.

B. Summary Judgment Standard

[HN2] Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (quoting Fed. R. Civ. P. 56(c)); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The Court must view "all facts in the light most favorable to plaintiff and resolve all factual disputes in plaintiff's favor." Mandell v. The County of Suffolk, 316 F.3d 368, 374 (2d Cir. 2003). "To overcome such a motion, the non-moving party must offer sufficient proof to allow a reasonable factfinder to decide in its favor." Mandell, 316 F.3d at 377. Hence, the Court may grant summary judgment only when "'no reasonable trier of fact could find in favor of the non-moving party.'" Allen, 64 F.3d at 79 (quoting Lund's Inc. v. Chem. Bank, 870 F.2d 840, 844 (2d Cir. 1989)).

C. [*11] Foremost Is Entitled to Summary Judgment Because It Acted as Agent for the Ji May Corporation

Common law principles of agency govern this action. Getty Oil Co. v. Norse Mgmt. Co. (PTE) Ltd., 711 F. Supp. 175, 177 (S.D.N.Y.1989) (citations omitted). [HN3] Pursuant to New York law, a party who signs a contract in his capacity as agent for a disclosed principal, within the authority delegated to him by that principal, is not primarily liable for damages caused by a breach of the contract. O'Sullivan v. Hardy Mach. Corp., 1993 U.S. Dist. LEXIS 7322, No. Civ. 7375, 1993 WL 190342, at *3 (S.D.N.Y. June 2, 1993) (citing Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855, 860 (2d Cir. 1985); Ariel Mar. Group., Inc. v. Zust Bachmeier of Switz., Inc., 762 F. Supp. 55, 59 (S.D.N.Y. 1991)).

Foremost signed the charter party agreement with Tradigrain on April 12, 2001 in its capacity as agent for the owners of the M/V JI MAY. On the first page of the charter party, where the parties are listed, Foremost appears as "Foremost Maritime Corporation as Managing Agents to Owners of the vessel described below." (emphasis in original) (Decl. Cardozo, [*12] Ex. B; Compl. P7). Foremost signed the contract as an agent: the signature line reads "Foremost Maritime Corporation as agents" above the signature of Foremost's president. As in O'Sullivan, because Foremost signed as agent, this notifies all parties that Foremost is not acting for itself. 1993 U.S. Dist. LEXIS 7322, 1993 WL 190342, at *3; Fireman's Fund McGee Marine, Underwriters v. M/V "Caroline", 2004 U.S. Dist. LEXIS 2038, No. 02 Civ. 6188, 2004 WL 287663, at *2-3 (S.D.N.Y. Feb. 11, 2004).

Moreover, Foremost signed as an agent for a disclosed principal. [HN4] A principal is "disclosed" if "at the time of a transaction conducted by the agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity, the principal is disclosed." Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc., 241 F. Supp. 2d 246, 265 (S.D.N.Y. 2002) (citing Restatement (Second) of Agency § 4(a) (1958)). [HN5] In maritime contracts, "the identification of the principal as 'the owner of the vessel' is sufficient indication to alert the opposing party to the principal's name; once the vessel is named, it is a simple matter to discover who owns the vessel by consulting industry publications. [*13] O'Sullivan, 1993 U.S. Dist. LEXIS 7322, 1993 WL 190342, at *4; (citing Getty Oil Co., 711 F. Supp. at 177.

Dillon has claimed alternatively that both Ji May Corp. and Foremost are liable as the owners of the M/V JI MAY at the time the charter party was signed. (Compl. P4; Plt.'s Rule 56.1 State.). Plaintiff further suggests that the Ji May corporation was formed sometime after Foremost signed the charter party as agent for the ship's owner in 2001. (Plt's Mem. Opp. Foremost's Summ. J. Mot., p. 2; Aff. Ziccardi, Exh. 2, P5). If Foremost were in fact the owner of the ship, Foremost would be liable under the charter party agreement as the disclosed principal. However, plaintiff has offered nothing more than an unsupported allegation that Ji May did not exist at the time the charter party was formed and therefore Foremost was acting for itself, not as an agent. Foremost has offered proof of the 1999 date of incorporation of Ji May in response. (Reply Aff. Michael Lee, P4, Exh. 1 "Ji May's Certificate of Incorporation"). [HN6] At the summary judgment phase, the non-moving party must offer sufficient evidence on a factual dispute to allow a reasonable finder of fact to find in its favor. [*14] Mandell, 316 F.3d at 377. Plaintiff has not provided sufficient proof — indeed, it has offered no proof — to allow a reasonable finder of fact to find that Ji May was not the disclosed principal and owner of the ship named in the charter party agreement.

Because Ji May was the principal and Foremost its agent in executing the Tradigrain Charter Party, Foremost is not liable for any damages resulting from a breach of that contract and Foremost's motion for summary judgment dismissing Dillon's first cause of action is granted. Additionally, Foremost's motion for summary judgment in its favor on plaintiff's second cause of action based on quantum meruit is granted. [HN7] Any enrichment that resulted from the contract or the breach of the contract flowed to the principal, not the agent. See e.g. Kagan v. K.-Tel Entm't, Inc., 172 A.D.2d 375, 376, 568 N.Y.S.2d 756 (1st Dep't 1991) ("It is not enough that the defendant received a benefit from the activities of the plaintiff . . . if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.")

D. Breach of Contract Claims

1. Clause 43 [*15] of the Tradigrain Charter Party Entitles Dillon to Hire "Earned and Paid" Pursuant to this Charter Only

Dillon's right to payment flows from Clause 43 of the Tradigrain Charter Party, which states that Dillon will receive 1.25 percent of "hire earned

and paid, and also upon any continuation or extension of this Charter." [HN8] Language identical to that of Clause 43 has been interpreted to mean that a broker is entitled only to a portion of hire actually earned, and not to any sums paid pursuant to the contract if they are not for hire earned. Global Mar. Leasing Panama, Inc. v. M/S North Breeze, 349 F. Supp. 779, 784 (D.R.I. 1972) (citing B.W. Lougheed & Co. Ltd. v. Yone Suzuki, 216 A.D. 487, 215 N.Y.S. 505 (1st Dep't 1926)); see also Tankers Int'l Navigation Corp., v. Nat'l Shipping & Trading Corp., 116 A.D.2d 40, 499 N.Y.S.2d 697 (1st Dep't 1986). When the contract payments are interrupted either by termination of the contract or by unilateral breach, the broker is not entitled to be paid a commission. B.W. Lougheed & Co. 216 A.D. 487, 215 N.Y.S. 505, 509–10 (broker entitled to a commission on "monthly payment of hire" [*16] not entitled to a commission where hire was not paid because vessel was not timely delivered by owner). Moreover, the broker is not entitled to commission on sums paid in settlement of the contract. Takers Int'l Navigation Corp., 116 A.D.2d 40, 499 N.Y.S.2d 697.

Arguably, Kane v. Neptune Shipping Ltd., 274 A.D. 28, 79 N.Y.S.2d 396 (1st Dep't 1948), established a doctrine of "equivalent performance." Following that case, [HN9] some courts suggest that when a contract providing for a broker's commission is breached or a condition of the contract is not satisfied, but the party owing the compensation to the broker is put in the same or better position than if the contract had been performed, then the broker is owed compensation. See, e.g. E.B. Harper & Co., Inc. v. Nortek, Inc. 104 F.3d 913 (7th Cir. 1997). In Kane, a broker was entitled to commission where a charterer remained obliged on the original contract but subcontracted performance to another party. However, that doctrine does not apply when the contract is terminated and a new contract is entered into for the mitigation of damages flowing from that termination. See Tankers Int'l Navigation Corp., 499 N.Y.S.2d at 698; [*17] H. Edwin Anderson, III, Shipbrokers' Commissions: Entitlement, Standing, and Jurisdiction, 24 Tul. Mar. L. J. 55, at 63 (1999). Although Ji May ultimately suffered no harm in lost charter fees, Foremost and Ji May did agree to terminate the Tradigrain Charter Party and find a replacement charterer. Where a charter party agreement is prematurely terminated and a new one established, the doctrine of equivalent performance does not apply. See eg. James L. Parsons, Inc. v. Wales Shipping Co., 1986 U.S. Dist. LEXIS 20710, No. 84 Civ. 8432, 1986 WL 10282 (S.D.N.Y. 1986). Thus, this case is distinguishable from Kane, where the original contract still governed both contracting parties, but one of those parties subcontracted its obligations and profited from that subcontract.

Under the explicit terms of the Tradigrain Charter Party, Dillon was only entitled to 1.25 percent of the hire earned and paid on the charter, or any extension of that charter. As hire was only earned and paid pursuant to the Tradigrain Charter Party through March 19, 2002, Dillon is not entitled to any further payment under the terms of that contract, unless it was extended and hire continued to be earned and paid. [*18]

2. The Charter Party Was Terminated, Not Breached

Dillon has not claimed that the Tradigrain Charter Party itself was breached and does not dispute defendants' contention that it was terminated for legitimate business purposes; namely, Tradigrain was "winding up its operations" and exiting the business. (Plt.'s Rule 56.1 State., P4; Tradigrain Rule 56.1 State., p. 3). Thus, the plain language of the Tradigrain Charter Party does not entitle Dillon to commissions as no further hire was paid after the termination of the contract. However, Dillon has said that Foremost breached the "implied covenant of good faith and fair dealing" inherent in every contract, Aventine Inv. Mgmt. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 513–514, 697 N.Y.S.2d 128 (2d Dep't 1999), and therefore should be liable for resulting damages to Dillon.

[HN10] "The implied covenant of good faith encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included in the agreement, and prohibits either party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the [*19] fruits of the contract." 1–10 Indus. Assocs., LLC v. Trim Corp. of Am., 297 A.D.2d 630, 631, 747 N.Y.S.2d 29 (2d Dep't 2002) (citations and internal quotation marks omitted)). However, the implied covenant of good faith and fair dealing does not add any new obligations to the underlying contract. See Don King Prods. Inc. v. Douglas, 742 F. Supp. 741, 767 (S.D.N.Y. 1990) ("The implied covenant does not . . . operate to create new contractual rights."). Moreover, no party has an ongoing obligation to preserve the broker's commission. See Spero v. Kobler, 245 A.D. 643, 646, 283 N.Y.S. 791 (1st Dep't 1935) ("When the condition on which the plaintiff's right to compensation had failed, the defendant was at liberty to consult his own interest in determining what adjustment to make with the purchaser."). The implied covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." M/A–COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990). Thus, Foremost had no contractual obligation to protect [*20] Dillon's commission after the termination of the contract and Foremost had only an implied contractual obligation not to act fraudulently or in bad faith to deprive Dillon of the benefits due it under the contract. 1–10 Indus. Assocs., 297 A.D.2d at 631.

Plaintiff alleges that Foremost engaged in several incidents of "bad faith" behavior. First, Dillon alleges that it was bad faith for Foremost to complete a charter agreement with Bunge without considering a similar proposal submitted by Armada Shipping, with Dillon as the broker. (Plt.'s Mem. in Opp. to Ji May Corp.'s Mot. Summ. J. p. 21; Plt. Rule 56.1 State. P13). Here, Dillon seeks to draw an inference of Foremost's bad faith from the fact that it accepted Bunge as a charterer when Dillon had presented Armada as a potential charterer. However, Dillon has indicated that Armada was not willing to accept Foremost's time restrictions. In addition, Dillon has not even alleged that it presented Armada to Foremost before Foremost accepted Bunge as a charterer. Thus, Dillon has not provided any evidence to show that Foremost rejected an acceptable charterer introduced by Dillon. Instead, the evidence indicates that Foremost accepted [*21] a charterer presented by Ifchor to serve its own interests, as it is permitted to do. See M/A–COM Security Corp. v. Galesi, 904 F.2d at 136.

Second, Dillon claims that Foremost acted in bad faith by allowing Tradigrain or Bunge to approach Foremost with Ifchor as their broker because "both Foremost and Tradigrain knew that Dillon had been blocked from contacting Bunge." (Plt.'s Rule 56.1 State., P12). Third, Dillon contends that Foremost acted in bad faith when Angela Chao, a Foremost employee, told Tradigrain that Foremost was not constrained to

entering a charter party with Dillon as the broker. (Plt.'s Mem. in Opp. to Ji May Corp.'s Mot. Summ. J. p. 20). Plaintiff's second and third claims of bad faith behavior amount to an assertion that Ji May and Foremost violated an ongoing obligation to protect Dillon's commission after the Tradigrain Charter Party was terminated. There is no such obligation contained in the terms of the contract, and no such terms can be implied. Don King Prods., 742 F. Supp. at 767. Nothing cited by the parties indicates that Foremost was obliged to use Dillon as the agent for fixing a new charter. Plaintiff has not alleged [*22] that Foremost acted to prevent Dillon from securing a charterer. Instead, Foremost gave Dillon a non-exclusive opportunity to replace Tradigrain in the charter party, (Foremost and Ji May Rule 56.1 State., PP11–14; Plt.'s Rule 56.1 State.), but ultimately accepted a charterer presented by a different broker. Therefore, Dillon has not adequately alleged that Foremost acted in bad faith by entertaining offers from other brokers, by accepting an offer from another broker, and by refusing to pay Dillon under the new Bunge Charter Party.

Fourth, Dillon asserts that Foremost acted in bad faith by leading Dillon to believe, on March 11, 2002, that Dillon would be the broker to find a replacement charterer when Foremost had already all but concluded negotiations with Bunge to replace Tradigrain. (Plt.'s Mem. in Opp. to Ji May's Mot. Summ. J. p. 20, Plt. Rule 56.1 State. P14). Dillon bases this allegation on a "recap" agreement faxed to Foremost by Bunge on the afternoon of March 11. Dillon also asserts that Foremost prevented Dillon from procuring a replacement charterer by concealing the fact that substantial progress had been made on that agreement between Bunge and Foremost at the time [*23] of the March 11 meeting. Dillon only makes conclusory allegations to support its inference that Foremost acted in bad faith in failing to keep Dillon abreast of its negotiations with other charterers through other brokers. Foremost was entitled to consult its own best interest in considering offers from different sources, even if that operated to the detriment of Foremost. M/A–COM Security Corp. v. Galesi, 904 F.2d at 136. There is no allegation that Foremost acted with the intention to deprive Dillon of a commission, rather than to serve its own interest by consulting multiple brokers.

Finally, Dillon alleges that Foremost knew it had some liability to pay Dillon's commission based on the conditional assignment of that duty to Tradigrain in the agreement terminating the Tradigrain Charter Party, which states "brokerage compensation, if any, to be for Tradigrain's account." (Lee Aff. Exh. 6). Plaintiff alleges bad faith by Foremost because the clause indicates that Foremost knew it might owe commission payments to Dillon and nonetheless was willing to terminate the contract in order to secure a replacement charterer. Again, even assuming that Foremost did prioritize [*24] the need to find a charterer over its legal concerns about any on–going obligations to pay commissions, that at most indicates that Foremost acted out of a desire to protect its own financial situation, and not out of bad faith to injure Dillon. Foremost was entitled to protect its own interests in pursuing the formation of a new charter party. M/A–COM Security Corp., 904 F.2d at 136. Therefore, neither Ji May Corp. nor Foremost is liable to Dillon for commissions based on the Tradigrain Charter Party or the termination of that contract because none of the allegations set forth by Dillon, if proven, would amount to a breach of the covenant of good faith and fair dealing.

### 3. The Tradigrain Charter Party Was Not Assigned to Bunge

Plaintiff contends that it is entitled to be paid commission pursuant to Clause 43 because the Bunge Charter Party is an assignment to Bunge of Tradigrain's responsibilities under the Tradigrain Charter Party, or that it is a fraudulently disguised assignment presented as a new contract.

The Bunge Charter Party is not an assignment of the Tradigrain Charter Party because there is no indication that Tradigrain assigned its rights and obligations [*25] to Bunge. [HN11] "The requisite manifestation of a present intent to transfer the right may be accomplished in writing, orally or by conduct, but such manifestation must be sufficient to show a perfected transaction between the parties." In re Int'l Eng'rs, Inc., 812 F.2d 78, 80 (2d Cir. 1987) (citing Miller v. Wells Fargo Bank Int'l Corp., 540 F.2d 548, 557–58 (2d Cir. 1976).

Plaintiff offers no evidence to support the theory that the contract is an assignment, except for the allegation that Foremost wanted a "back–to–back" contract to cover their losses, and that Tradigrain sought to "wash out" all of its contractual obligations before it exited the business. (Plt.'s Rule 56.1 State.; Compl. P14). Foremost and Tradigrain's statements about what type of replacement charterer they hoped to secure for the M/V JI MAY is not sufficient to allow a reasonable jury to find that the Bunge Charter Party was in fact an assignment. See Miller v. Wells Fargo, 540 F.2d at 557–58. There is no evidence to indicate that Bunge sought to replace Tradigrain in the charter party as an assignee, nor is there evidence of any contractual dealings between Bunge [*26] and Tradigrain. Moreover, defendants have shown that there was a formal termination of the Tradigrain Charter Party and then a second document creating a new contract between Bunge and Foremost. The Tradigrain Charter Party was not an assignment.

### 3. The Bunge Charter Party Does Not Entitle Dillon to Commissions Merely Because It Is Similar to the Tradigrain Charter Party

Dillon contends that the Bunge Charter Party was a continuation or extension of the Tradigrain Charter Party within the meaning of Clause 43 of that charter party because the second charter party was not the product of serious negotiations and contained many of the same terms as the previous charter party. (Plt.'s Rule 56.1 State.). As proof that the contract is an extension or continuation, plaintiff offers the fact that the Bunge Charter Party was negotiated in only a week, while the Tradigrain Charter Party negotiations continued over many months. Additionally, plaintiff points out that the Foremost/Bunge contract is identical to the Foremost/Tradigrain agreement in all significant terms, including the price and length of hire. (Aff. Kenney, in Aff. Ziccardi, Exh. 2, P20.). Based on these allegations, plaintiff [*27] seeks the commission that the Tradigrain Charter Party provides on any "continuation" or "extension" of the contract.

Defendants respond that the charter party was not the same, but that the arrangement was negotiated more quickly than the April 12, 2001 agreement for various reasons, including that the previous agreement was used as a model. (Reply Aff. Lee, P9). A series of emails discussing the terms of the charter constitute evidence of genuine negotiations between Bunge and Foremost. (Aff. Lee, Exh. 6).

[HN12] In the case where a contract provides for commission to a broker upon extension or renewal, and a second contract is subsequently made between the parties to the previous contract, New York real estate law provides a context to analyze whether a broker is entitled to a commission. New York law provides that "before the lessor is obligated to pay [] commissions, the renewal must be for the same term and the same rent as the original lease, or the new lease must have been the result of services performed by the broker." Stern v. Satra Corp., 539 F.2d 1305, 1310 (2d Cir. 1976) (noting that when the contract is not for real estate services, "any renewal" is not [*28] limited to "carbon copies" and "absurdly harsh" results are rejected) (citing Eastern Assoc., Inc. v. Sarubin, 274 Md. 378, 336 A.2d 765, 770 (1975); Allwin Realty Co. v. Barth, 161 A.D. 568, 146 N.Y.S. 960 (1st Dep't 1914). Here, the new lease is for the same rent as the old lease, but not for the same term. Moreover, the new lease is not the result of services performed by Dillon because Tradigrain and Ifchor, not Dillon, introduced the parties. Therefore, the Bunge Charter Party is not a "renewal" of the original contract.

Dillon has not presented anything beyond conclusory allegations to show that the Bunge Charter Party is an extension of the previous charter party. The mere fact that the Bunge Charter Party uses a pricing scheme employed in the Tradigrain Charter Party is not sufficient to establish that this contract is an extension of the previous one. In James L. Parsons, Inc. v. Wales Shipping Co., 1986 U.S. Dist. LEXIS 20710, 1986 WL 10782, the plaintiff broker with a commission clause very similar to Clause 43 in this case sued for commissions due on the theory that a charter party had been extended, not terminated. In that case, a charter party [*29] had been cancelled when the ship was sold to a new owner. The new owner then negotiated a charter contract with the party who had previously chartered the ship from the previous owner, but the parties were introduced by different brokers. The district court held that where the plaintiff broker had not participated in the second charter party, that broker was not entitled to a commission because the previous contract had not been "extended." Id. 1986 U.S. Dist. LEXIS 20710, [WL] at *2. In making that finding, the court emphasized the fact that the parties and certain terms were different. The court noted that the "most significant term and the essence of a time charter party: the rate of hire" had been changed. Id.

While the rate of hire in the Bunge Charter Party is the same as the hire in the Tradigrain Charter Party, that alone is not enough to show that it is an extension. The emails discussing the formation of the charter party show that genuine negotiations occurred between Bunge and Foremost. Moreover, the terms differ in that the parties to the contracts are different than the parties to the first contract, and plaintiff was not involved in negotiating the contract between Bunge and Foremost, nor did [*30] Dillon introduce Bunge to Foremost. In fact, as the contract was being negotiated, Dillon was working to procure the charter party agreement for a competitor, Armada.

Dillon has no right to be compensated on a contract it did not negotiate when it did not introduce the parties, and where that contract is the product of negotiation and has different terms than the previous contract on which Dillon did have the right to receive commission.

D. Plaintiff Has Not Shown Tortious Interference with Contractual Relations

In Count Three of the complaint, plaintiff claims that Tradigrain is liable for harms suffered by Dillon in lost commissions due to tortious interference by Tradigrain with the contractual relations of Dillon and Foremost. [HN13] In order to state a claim for tortious interference with contractual relations under New York law, a plaintiff must show "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach without justification, (4) breach, and (5) damages." America Online Latino v. Am. Online, Inc., 250 F. Supp. 2d 351, 361 (S.D.N.Y. 2003); [*31] see also Murray v. SYSCO Corp., 273 A.D.2d 760, 710 N.Y.S.2d 179 (3 Dep't 2000).

(1) Existence of a Valid Contract Between Plaintiff and a Third Party

Dillon asserts that there was a separate contract for the commissions to be paid to Dillon by Ji May contained within Clause 43 of the charter party, and that the commissions would have continued over into the assignment and extension of the Tradigrain Charter Party absent Tradigrain's actions. (Compl. P40). Dillon alleges that Tradigrain "deliberately structured the Foremost–Bunge agreement as a new charterparty for Tradigrain's self–interest and for the specific purpose of diverting the commissions due . . ." (Compl. P41), even though it does not allege that Tradigrain had any role to play in forming the Foremost–Bunge agreement. Dillon provides no decisional law or contractual language to support its assertion that the clause providing for commissions was somehow severable from the Tradigrain Charter Party and there is no evidence of a separate agreement between Dillon and Foremost that would survive the termination of the charter party. Moreover, Dillon had no performance due under that contract and there is no [*32] independent consideration for the clause. See e.g. F & K Supply Inc. v. Willowbrook Dev. Co., 288 A.D.2d 713, 732 N.Y.S.2d 734, 2001 N.Y. Slip Op. 09321 (3 Dep't 2001). Because there is no separate clause for commissions that establishes a separate ongoing contractual relationship between Dillon and Foremost, Dillon must assert this action as a third party beneficiary to the Tradigrain Charter Party. Thus, this cause of actions fails because Tradigrain was a party to the Tradigrain Charter Party, including the obligations set forth in Clause 43, and [HN14] a party "cannot tortiously interfere with its own contract." Klein v. Jostens, Inc., 1985 U.S. Dist. LEXIS 18115, No. 83 Civ. 5351, 1985 WL 1865, at *2 (S.D.N.Y. 1985).

(2) Breach of the Underlying Contract

[HN15] A claim of tortious interference with contractual relations cannot be brought unless there is in fact a breach of the underlying contract between the plaintiff and a third party. Here, as discussed above, there was no breach of the Tradigrain Charter Party.

Even if plaintiff could claim that there was a separate contract for commissions between Dillon and Foremost, and that contract would have survived had it not been breached, [*33] plaintiff cannot show that Tradigrain "intentionally procured the third party's breach without

justification." America Online Latino, 250 F. Supp. 2d at 361.

However, [HN16] "a tortious interference with contract claim must plead that a defendant used 'wrongful means' to induce the third party to breach the contract." Brown v. AXA Re, 2004 U.S. Dist. LEXIS 7624, No. 02 Civ. 10138, 2004 WL 941959, at *6 (S.D.N.Y. May 3, 2004) (quoting Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 2001 WL 1448476, at *3 (S.D.N.Y. 2001)). This has been defined to include "physical violence, fraud, or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." Id. (quoting Guard−Life Corp. v. S. Parker Mfg. Corp., 50 N.Y.2d 183, 191, 406 N.E.2d 445, 449, 428 N.Y.S.2d 628, 632 (1980)). See Ivy Mar Co. v. C.R. Seasons, Ltd., 1998 U.S. Dist. LEXIS 15902, No. 95 Civ. 0508, 1998 WL 704112, at *16 (E.D.N.Y. Oct. 7, 1998) (citing Wedeen v. Cooper, 1998 U.S. Dist. LEXIS 10490, No. 97 Civ. 8621, 1998 WL 391117, at *3 (S.D.N.Y. July 24, 1998)). [*34]

Dillon has not alleged that Tradigrain took any actions — wrongful or otherwise — to promote Ifchor as the broker on the Bunge Charter Party or to interfere with Dillon's right to earn commissions. (Tradigrain Rule 56.1 State., P17). The only action Dillon sets forth beyond the conclusory statement that Tradigrain "deliberately structured the charter party . . . for the purpose of diverting commissions" (Compl. P40), is that Tradigrain introduced Bunge and Foremost through Ifchor to "foster the personal economic interests of a family network . . .". (Plt. Mem. Opp. Tradigrain's Summ. J. Mot. p. 16). The most specific action alleged to support the allegation misconduct against Tradigrain is that Raveno warned Dillon to "back off" of Bunge, but Dillon has not alleged that Tradigrain acted fraudulently or illegally. Dillon has not provided sufficient proof to allow a reasonable finder of fact to find that Tradigrain's actions were not taken for economic reasons, nor has it provided sufficient proof to show that Tradigrain acted with malice or fraudulent intent, or by illegal means. Mandell, 316 F.3d at 377.

For the reasons set forth above, plaintiff's claim for tortious [*35] interference with contractual relations against Tradigrain is dismissed.

E. Unjust Enrichment and Quantum Meruit

Dillon cannot claim recovery in quantum meruit based on the Tradigrain Charter Party. This is because [HN17] a valid contract "governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Integral Control Sys Corp. v. Consol. Edison Co. of New York, 990 F. Supp. 295, 303 (S.D.N.Y. 1998); see also Stissi v. Interstate & Ocean Transp. Co. of Phila., 814 F.2d 848, 851 (2d Cir. 1987). Because Dillon was entitled to a commission on the hire paid under the Tradigrain Charter Party, it cannot now claim that it is entitled to some other compensation for the effort spent in arranging that contract.

As an initial matter, Dillon has no right to a commission earned and paid on the Bunge Charter Party because the Bunge Charter Party is not the result of its work. [HN18] A broker is only to be compensated where he "bring the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made, and until that is done his right to commissions does [*36] not accrue." Sibbald v. Bethlehem Iron Co., 83 N.Y. 378, 384, 38 Am. Rep. 441 (1881). Moreover, a "broker is never entitled to commissions for unsuccessful efforts"; and "if he fails, if without effecting an agreement or accomplishing a bargain, he abandons the effort, or his authority is fairly and in good faith terminated, he gains no right to commissions." Id. Thus, brokers are not entitled to reimbursement for the value of their efforts to secure a contract unless the parties have specifically agreed otherwise. See e.g., Sibbald v. Bethlehem Iron Co., 83 N.Y. 378 (1881).

The deposition testimony is clear that Dillon was aware that it was not the exclusive broker working to replace Tradigrain in the Tradigrain Charter Party. Dillon understood that other parties were involved in the search for a new charterer. Because Dillon did not believe that it was the only broker, it cannot claim that an oral contract gave rise to some obligation on the part of Foremost to reimburse or compensate Dillon's efforts to find a suitable replacement charterer. (Depo. Kenney at 19−25). [HN19] As long as the principal acts in good faith, and does not act so ely to avoid [*37] the payment of commissions, a broker is not entitled to any payment when negotiations break down, or when the broker fails to secure a buyer. Sibbald v. Bethlehem Iron Co., 83 N.Y. 378 (1881).

Plaintiff's contention that it is entitled to payment on the Bunge Charter Party also rises from the fact that the paperwork used to fix Bunge to the Foremost vessel is substantially similar to the contract used in the Tradigrain Charter Party. Dillon, in essence, claims that if the contract is not an assignment, it is at least plagiarized and Dillon constructed the contract. No legal principle cited by plaintiff entitles the drafter of a contract to a percentage of every contract made subsequently using that contract as a form or model.

Because Dillon was not involved in negotiating the Bunge Charter Party, Dillon has no claim in quantum meruit to profit from the resulting contract.

III. Conclusion

For the reasons set forth above, the motions for summary judgment of defendants Foremost, Tradigrain, and Ji May are granted. The Clerk of Court is directed to enter judgment dismissing the complaint.

Dated: New York, New York

June 18, 2004

SO ORDERED:

Sidney [*38]  H. Stein, U.S.D.J.

# EXHBIIT F

THE ORIGINAL CREATINE PATENT COMPANY, LTD, Plaintiff, v. KAIZEN, INC., Defendant.

Civil Action No. 02−471−SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 988

January 22, 2003, Decided

[*1] Defendant's motion to dismiss or, in the alternative, to transfer was granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff patentee filed an amended complaint for patent infringement against defendant corporation. The corporation filed an answer and asserted affirmative defenses, including inequitable conduct and bad faith and then moved to dismiss or to transfer. The patentee responded with a motion to strike and/ or dismiss 15 of the corporation's affirmative defenses.

**OVERVIEW:** The court found the balance of private factors weighed in favor of transfer. The record reflected that neither litigant had ties to Delaware. Geographically, Delaware was inconvenient to everyone. All witnesses, documents and employees were located outside of the instant forum. Although the corporation described itself as a world−wide operation, there was nothing presented to corroborate this apparent embellishment. Turning to the public interests, the court found the practical considerations related to trial weighed in favor a transfer. The expense of trial in Delaware weighed more heavily on the corporation. Regardless of the forum, the patentee would incur travel expenses. A transfer to California would have eliminated rather than merely shifting the travel expense of one party. The court was likewise confident that the district court in California was well−equipped to decide the issues implicated, regardless of the pendency of the patentee's other infringement actions before the instant court. Further, considering the corporation was a California corporation conducting business therein, that forum had a more particular interest in the litigation than Delaware.

**OUTCOME:** The corporation's motion to dismiss or, in the alternative, to transfer was granted and the action was transferred.

**CORE TERMS:** patent, convenience, weigh, choice of forum, patents−in−suit, website, fora, motion to dismiss, creatine−containing, world−wide, reside, balance of convenience, deference, patent infringement, motion to strike, third party, store owner, declaration, implicated, embodying, nutrition, invention, internet, inventors, travel

## LexisNexis(TM) Headnotes

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN1]  Under 28 U.S.C.S. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interest of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case−by−case consideration of convenience and the interests of justice.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN2]  The burden of establishing the need to transfer rests with the movant to establish that the balance of convenience of the parties and witnesses strongly favors the defendants. Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN3]  Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its home turf or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN4]  The United States Court of Appeals for the Third Circuit indicates the analysis for transfer is very broad. Although emphasizing that there is no definitive formula or list of factors to consider, it has identified potential factors it characterized as either private

or public interests. The private interests include: (1) a plaintiff's forum preference as manifested in the original choice; (2) a defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). The public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

**COUNSEL:** For ORIGINAL CREATINE PATENT COMPANY, LTD, plaintiff: Richard L. Horwitz, Potter Anderson & Corroon, LLP, W lmington, DE.

For KAIZEN INC., defendant: David L. Finger, David L. Finger, Esq., Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION: MEMORANDUM ORDER**

At Wilmington this 22nd day of January, 2003, having reviewed defendant's motion to dismiss or, in the alternative, to transfer and the papers submitted in connection therewith;

IT IS ORDERED that said motion to transfer (D.I. 14) is granted, for the reasons that follow: n1

– – – – – – – – – – – Footnotes – – – – – – – – – – – –

n1 Because the court is transferring the action to California, Kaizen's motion to dismiss for lack of personal jurisdiction is denied as moot. Kaizen's motions for protective orders (D.I. 25, 31) and OCPC's motion to strike (D.I. 10) are denied without prejudice to renew.

– – – – – – – – – – End Footnotes– – – – – – – – – – – –

1. **Introduction.** On July 11, 2002, plaintiff, The Original Creatine Patent **[*2]** Co., Ltd. ("OCPC"), filed an amended complaint for patent infringement against defendant Kaizen, Inc. ("Kaizen"). n2 (D.I. 7) The patents–in–suit are United States Patent Number 5,757,159 ("the '159 patent") and United States Patent Number 5,968,544 ("the '544 patent"). OCPC alleges that Kaizen has made, used, offered for sale, and continues to do the same, creatine–containing products embodying the invention patented in the '544 patent. OCPC further contends that Kaizen has marketed and sold creatine–containing products embodying the invention in the '159 patent. Kaizen filed an answer and asserted affirmative defenses, including inequitable conduct and bad faith. (D.I. 9) Kaizen then filed this motion to dismiss or transfer to the Central District of California. (D.I. 10) OCPC responded with a motion to strike and/ or dismiss fifteen of Kaizen's affirmative defenses. (D.I. 10)

– – – – – – – – – – – Footnotes – – – – – – – – – – – –

n2 CPC filed the original complaint incorrectly against Kaizen, Inc., a Delaware corporation unrelated to this action. (D.I. 1, 15)

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

[*3]

2. **Background.** OCPC is an English corporation with its principal place of business in Leeds, United Kingdom. (D.I. 7, P2) OCPC is the assignee of the two patents-in-suit, the '159 patent, issued to inventors Eric Hultman and Roger C. Harris, and the '544 patent, issued to inventors Alan N. Howard and Roger C. Harris. (Id. at PP5-6) While Hultman resides in Sweden, Howard and Harris reside in the United Kingdom. (D.I. 19, Ex. 1) The attorneys who prosecuted the patents are located in Washington, D.C. and Chicago, Illinois. OCPC has filed four other actions to enforce the patents-in-suit against different defendants, all of which are pending before this court.

3. Kaizen is a California corporation with only one office located in Los Angeles, California. (D.I. 15, Ex. A) Kaizen is a corporation involved in the advertising, distribution and sales of health food products. (Id. at P2) In 1998, Kaizen entered a licensing agreement to market, distribute and sell creatine-containing products from a German company under the trade-name Creapure <TM>. (Id. at P4) Kaizen claims that all its documents, and employees are located in California. With the exception of two potential **[\*4]** witnesses, n3 Kaizen indicates the remaining reside in California.

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n3 There are two witnesses located in Georgia and Canada. ( D.I. 15 P 9)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

4. **Standard of Review.** [HN1] Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interest of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988); Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp.2d 192, 208 (D. Del. 1998).

[HN2] The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981) [\*5] (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970). "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". ADE Corp. v. KLA-Tencor Corp., 138 F. Supp.2d 565, 567 (D. Del. 2001); Shutte, 431 F.2d at 25.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. C.R. Bard, Inc., v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del 1998); Siemens Medical Systems, Inc. v. Fonar Corporation, C.A. No. 95-261-SLR, 1995 U.S. Dist. LEXIS 22334, slip. op. at 8 (D. Del. Nov. 1, 1995); Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 U.S. Dist. LEXIS 20803, 2001 WL 1617186 (D. Del. Nov. 28, 2001). [HN3] Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its '"home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer. [\*6] " In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993).

[HN4] The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). Although emphasizing that "there is no definitive formula or list of factors to consider," id., the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." Id. (citations omitted).

The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; [\*7] (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." Id. (citations omitted).

5. **Discussion.** Kaizen argues the public and private interests weigh in favor of a transfer of this action to the Central District of California. Specifically, Kaizen argues that OCPC has no parties, witnesses or evidence related to this action in California. Kaizen avers that OCPC instituted this action in Delaware for the sole reason of accommodating the convenience of its lawyers, who practice in this state. Kaizen contends that the action actually emanates from Los Angeles, California, the location of its sales center. California is also the location of all events and evidence related to the litigation. (D.I. 15, Ex. A)

6. OCPC contends its choice of forum should be afforded deference. (D.I. 19) The Delaware forum was selected because Kaizen has committed patent infringement in this state, argues OCPC. Moreover, the evidence and witnesses necessary to defend against Kaizen's affirmative [*8] defenses are located in Sweden, the United Kingdom, Washington, D.C. and Illinois. Although all of these witnesses will have to travel for trial purposes, OCPC asserts that Delaware is a closer forum than California. Further, because there are three other cases involving the same patents pending before this court, judicial economy will be promoted by maintaining this action. (D.I. 19, Ex. 1) The risk of inconsistent results will be reduced by allowing one judge to become proficient in the patent technology and the relevant facts.

OCPC also raises another issue related to Kaizen's business, or lack thereof, in Delaware. On Kaizen's internet website, the company describes itself as maintaining offices "world-wide," in addition to the California office. (D.I. 19, Ex. 2) The Kaizen website does not accept orders for its products. However, the website does provide a link to an internet nutrition store which sells Kaizen products. According to the declaration of an OCPC attorney, she was able to place post-complaint orders for Kaizen products, including those alleged to infringe the patents-in-suit, from the linked nutrition store. (D.I. 19, Ex. 3) The orders were made from a Delaware computer [*9] and she received the products in Delaware. The attorney states that she was able to buy a nationally distributed magazine at a Delaware bookstore that contained advertisements for Kaizen products. She was also able to purchase, in person, noninfringing Kaizen products from a Delaware store. She states that the owner of the store told her that he has received solicitations to sell the entire line of Kaizen products. OCPC plans to call the Delaware store owner as a third party witness.

In response, Kaizen urges the court to strike the declaration as it contains impermissible double hearsay. (D.I. 20) However, even if it were considered, Kaizen contends it does not establish that Kaizen conducts business in Delaware or sells the accused products here. Moreover, the fact that Kaizen's website describes its operations as "world-wide" still does not establish any business relationship with anyone in Delaware. Kaizen also argues that any problems with having third party witness testifying in California, can be solved by taking the depositions elsewhere.

Since the parties do not dispute that this action could have been initiated in the Central District of California, an examination of the [*10] private issues implicated by a transfer is warranted. The court finds the balance of private factors weighs in favor of transfer. The record reflects that neither litigant has ties to Delaware. Geographically, Delaware is inconvenient to everyone. All witnesses, documents and employees are located outside of this forum. Although Kaizen may describe itself as a world-wide operation, there has been nothing presented to corroborate this apparent embellishment.

With regard to compulsory process problems, OCPC indicates that a Delaware store owner will be called as a trial witness. However, it has not established that this individual will be unwilling to testify outside of Delaware. Absent a demonstrable obstacle to obtaining personal jurisdiction over a third-party witness, the court declines to consider this as a problem.

Turning to the public interests, the court finds the practical considerations related to trial weigh in favor a transfer. As noted, the expense of trial in Delaware will weigh more heavily on Kaizen. Regardless of the forum, OCPC will incur travel expenses. A transfer to California would eliminate rather than merely shifting the travel expense of one party. See [*11]  Van Dusen v. Barrack, 376 U.S. 612, 646, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964).

The court is likewise confident that the Central District of California is well-equipped to decide the issues implicated by this case, regardless of the pendency of OCPC's other infringement actions. Further, considering Kaizen is a California corporation conducting business therein, that forum has a more particular interest in the litigation than Delaware. Accordingly, for the reasons stated, this action is transferred to the Central District of California.

Sue L. Robinson

United States District Judge

# EXHBIIT G

ISCO INTERNATIONAL, INC., Plaintiff, v. CONDUCTUS, INC. AND SUPERCONDUCTOR TECHNOLOGIES, INC., Defendants.

C.A. No. 01−487−GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 21706

November 8, 2002, Decided

[*1] Plaintiff's conditional motion for leave to file amended complaint denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff sued for patent infringement. Defendants moved, inter alia, for summary judgment of invalidity of all asserted claims for causes of actions existing prior to the date of a certificate of correction. Plaintiff moved for leave to file an amended complaint to include a certificate of correction issued by the Patent Office on February 19, 2002. Plaintiff's motion was conditioned on the court's ruling on defendant's motion.

**OVERVIEW:** The certificate of correction issued by the Patent Office on February 19, 2002, amended claim 10 of the patent to read, in relevant part, "amplifiers" instead of "planar amplifiers." It was issued pursuant to 35 U.S.C.S. § 254. Plaintiff believed that, if granted leave to amend, the amended pleading would "relate back" to the date of the issuance of the certificate of correction. However, the original complaint was filed on July 17, 2001. The court determined that, for purposes of relating back, July 17, 2001, and no other date, was the relevant reference point. The court believed that plaintiff was attempting to circumvent Federal Circuit precedent holding that a certificate of correction issued pursuant to § 254 was only effective for causes of action arising after it was issued. The court held that, because an amended complaint would have related back to the date of the original complaint, July 17, 2001, and because the certificate of correction was issued after that date, granting leave to amend was utterly futile as a matter of law.

**OUTCOME:** Plaintiff's conditional motion for leave to file amended complaint was denied.

**CORE TERMS:** certificate, correction, patent, effective, planar, summary judgment, amplifiers, amend, issuance, futile, granting leave to amend, leave to file, counterclaim, conditional, utterly, freely, supplemental briefing, typographical error, corrected, printed

### LexisNexis(TM) Headnotes

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

[HN1]    Fed. R. Civ. P. 15(a) provides that a party may amend its pleading by leave of court and leave shall be freely given when justice so requires. Leave should be freely granted unless there is an apparent or declared reason for denial, e.g., undue delay, bad faith, or dilatory motive on the part of the movant; undue prejudice to the opposing party; or futility of the amendment. Absent such grounds for denial, it is an abuse of discretion for a district court to deny leave to amend. However, leave to amend is by no means "automatic," and the liberal policy of granting leave to amend must not be interpreted to permit amendment without restraint. Thus, the decision of whether to grant or deny leave to amend a pleading is fully within the discretion of the court.

*Patent Law > U.S. Patent & Trademark Office Proceedings > Reissues > General Overview*

[HN2]    See 35 U.S.C.S. § 254.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*

[HN3]    See Fed. R. Civ. P. 15(c).

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Examinations > Correction Certificates*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Reissues > General Overview*

[HN4]    A certificate of correction issued pursuant to 35 U.S.C.S. § 254 is only effective for causes of action arising after it was issued.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

[HN5]    Leave to amend a pleading is properly denied when the amendment would be futile.

**COUNSEL:** For Isco International Inc, PLAINTIFF: Robert H Richards, III, Richards, Layton & Finger, Wilmington, DE USA.

For Conductus Inc, DEFENDANT: Richard L Horwitz, David Ellis Moore, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Superconductor Technologies Inc, DEFENDANT: Donald F Parsons, Jr, Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Conductus Inc, COUNTER–CLAIMANT: David Ellis Moore, Richard L Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

For Superconductor Technologies Inc, COUNTER–CLAIMANT: Donald F Parsons, Jr, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Isco International Inc, COUNTER–DEFENDANT: Robert H Richards, III, Richards, Layton & Finger, Wilmington, DE USA.

For Superconductor Technologies Inc, COUNTER–DEFENDANT: Donald F Parsons, Jr, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION: MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On July 17, 2001, the plaintiff, ISCO International, Inc. ("ISCO") filed this [*2] action alleging infringement of United States Patent No. 6,263,215 (D.I. 1). The defendants, Conductus, Inc. ("Conductus") and Superconductor Technologies, Inc. ("STI") (collectively "the defendants"), each filed an Answer and Counterclaim on August 6, 2001 and August 22, 2001, respectively (D.I. 6, 11). Since that time, the plaintiff and the defendants have submitted other counterclaims, as well as numerous motions for summary judgment. These include Conductus' Motion for Summary Judgment of Invalidity of All Asserted Claims for Causes of Action Existing Prior to the Date of a Certificate of Correction and of Invalidity of Claim 13 ("the Conductus motion") (D.I. 205). The plaintiff has filed an answering brief in opposition to the Conductus motion, and conditionally moves for leave to file an amended complaint. The plaintiff's motion for leave to amend is conditional on the court's granting the Conductus motion for summary judgment. Should the court deny the Conductus motion, ISCO will withdraw its conditional motion for leave to amend. For the following reasons, the court will deny the plaintiff's motion for leave to file an amended complaint. This order does not reach the merits [*3] of the Conductus motion for summary judgment.

**II. DISCUSSION**

**A. Leave to Amend Pleadings**

ISCO moves to amend its complaint pursuant to Federal Rule of Civil Procedure 15(a). [HN1] Rule 15(a) provides that a party may amend its pleading "by leave of court ... and leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). Leave should be freely granted unless there is an apparent or declared reason for denial, *e.g.,* undue delay, bad faith, or dilatory motive on the part of the movant; undue prejudice to the opposing party; or futility of the amendment. *Foman v. Davis,* 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir. 1997). Absent such grounds for denial, "it is an abuse of discretion for a district court to deny leave to amend." *Alvin v. Suzuki,* 227 F.3d 107, 121 (3d Cir. 2000) (citations omitted). However, leave to amend is by no means "automatic," and 'the liberal policy of granting leave to amend must not be interpreted to permit amendment without restraint.' *Agere Sys. Guardian Corp. V. Proxim, Inc.,* 190 F. Supp. 2d 726, 732 (D. Del. 2000) [*4]    (quoting *Microsurgical Sys. v. Cooper Companies, Inc.,* 797 F. Supp. 333, 336 (D. Del. 1992)). Thus, the decision of whether to grant or deny leave to amend a pleading is fully within the discretion of the court. *Id.*

B. Effect of the Certificate of Correction

ISCO moves for leave to amend, conditioned on the court's ruling on the Conductus motion for summary judgment. At the heart of both motions is a Certificate of Correction issued by the Patent Office on February 19, 2002. The Certificate amended claim 10 of the patent to read, in relevant part, "amplifiers" instead of "planar amplifiers." It was issued pursuant to 35 U.S.C. § 254, "Certificate of correction of Patent and Trademark Office mistake." n1 The plaintiff seeks to amend its complaint to include the Certificate for two apparent reasons.

— — — — — — — — — — — — Footnotes — — — — — — — — — — — —

n1 [HN2] The entire text of the statute reads:

Whenever a mistake in a patent, incurred through the fault of the Patent and Trademark Office, is clearly disclosed by the records of the Office, the Director may issue a certificate of correction stating the fact and nature of such mistake, under seal, without charge, to be recorded in the records of patents. A printed copy thereof shall be attached to each printed copy of the patent, and such certificate shall be considered as part of the original patent. Every such patent, together with such certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form. The Director may issue a corrected patent without charge in lieu of and with like effect as a certificate of correction.

– – – – – – – – – – – – End Footnotes– – – – – – – – – – – – [*5]

First, ISCO believes that, if granted leave to amend its complaint, the amended pleading then would "relate back" to the date of the issuance of the Certificate of correction. n2 The court is baffled by this suggestion. [HN3] Federal Rule of Civil Procedure 15 dictates that "an amendment of a pleading relates back to the date of the original pleading." FED. R. CIV. P. 15(c). In the instant case, the original complaint was filed on July 17, 2001. For purposes of relating back, July 17, 2001, and no other date, is the relevant reference point. ISCO offers no support whatsoever, and the court has found none, for its suggestion that its amended complaint should relate back to February 19, 2002, the date of the issuance of the Certificate of correction. Presumably, this is because the plain language of the Rule is profoundly clear as to this issue.

– – – – – – – – – – Footnotes – – – – – – – – – –

n2 ISCO's Reply Brief in Support of Conditional Motion for Leave to File Amended Complaint at 2.

– – – – – – – – – – End Footnotes– – – – – – – – – –

Implicit in the plaintiff's suggestion, however, is an attempt to circumvent [*6]     the rule announced in *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280 (Fed. Cir. 2000). In *Southwest*, the court held that [HN4] a Certificate of correction issued pursuant to 35 U.S.C. § 254 "is only effective for causes of action arising after it was issued." *Id. at 1294*; *see also Rambus, Inc. v. Infineon Techs. AG*, 155 F. Supp. 2d 668, 677 at n.6 (E.D. Va. 2001) ("Federal Circuit law clearly holds that a patent holder cannot rely on a certificate of correction in a patent infringement suit filed before the certificate issues"); *Elec. Planroom v. McGraw–Hill Cos., & Estate of Devon Shire*, 135 F. Supp. 2d 805, 827 (E.D. Mich. 2001) ("a certificate of correction has no effect on litigation pending at the time it is issued"); *Adrain v. Hypertech, Inc.*, 2001 U.S. Dist. LEXIS 19182, 2001 WL 740542 at *3 (D.Utah 2001) ("It is clear that the certificates of correction, once issued, have prospective application."). Clearly, and despite the plaintiff's insistence to the contrary, the Certificate of correction which issued on February 19, 2002 is not effective in this case, which arose on July 17, 2001. Were [*7] the court to grant ISCO's request to relate an amended complaint back to the date of the issuance of the Certificate, thereby rendering the Certificate effective for purposes of this litigation, *Southwest* would be stripped of all meaning. The court will not accede to such a transparent and ill–informed invitation to ignore the Federal Circuit's clear mandate, as well as the language of 35 U.S.C. § 254. Because an amended complaint would relate back to the date of the original complaint, July 17, 2001, and because the Certificate of Correction issued after that date, granting leave to amend would be utterly futile as a matter of law.

As a second basis for leave to amend, ISCO maintains that even if the Certificate is not effective for purposes of this action, the term "planar" may be disregarded by the court as a typographical error. Accordingly, ISCO moves to amend its complaint to include the Certificate of correction as evidence that the inclusion of the word "planar" in Claim 10 was a typographical error. As to this point, the court refers the parties to its October 30, 2002 order regarding claim construction. Because the court already has construed the [*8] relevant part of Claim 10 to read "planar amplifiers," ISCO's second argument for leave to amend its complaint is futile as well. n3

– – – – – – – – – – Footnotes – – – – – – – – – –

n3 To the extent questions remain as to the October 30, 2002 order, and per the plaintiff's request, the court has granted supplemental briefing regarding specific issues surrounding the term "planar amplifiers." The court will, of course, address any issues arising from the supplemental briefing after having received and reviewed the same.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

III. CONCLUSION

As stated earlier, [HN5] leave to amend a pleading is properly denied when the amendment would be futile. *See Foman,* 371 U.S. at 182; *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1434; *Site Microsurgical Sys.,* 797 F. Supp. 333 (D. Del. 1992). In this case, the proposed amendment to ISCO's complaint would be utterly fruitless in that the amendment would not render the Certificate of correction effective, nor alter the construction of the claims. Therefore, the plaintiff's [*9] motion is denied.

For the aforementioned reasons, IT IS HEREBY ORDERED that:

1. The plaintiff's Conditional Motion for Leave to File Amended Complaint is DENIED.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

November 8, 2002