# EXHBIIT A

# SEALED DOCUMENT

# EXHBIIT B

Westlaw.

Not Reported in F.Supp.2d                                                                     Page 1
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
THE MILLGARD CORPORATION, Plaintiff,
v.
E.E. CRUZ/NAB/FRONTIER-KEMPER, a joint
venture, E.E. CRUZ & CO., INC., NAB
Construction Corp., Frontier Kemper Construction,
Inc. and Aetna Casualty and
Surety Company, Defendants,
and
LIBERTY MUTUAL INSURANCE COMPANY
Additional Defendant by Counterclaim
E.E. CRUZ/NAB/FRONTIER-KEMPER, a joint
venture, E.E. CRUZ & CO., INC., NAB
Construction Corp., Frontier Kemper Construction,
Inc. and Aetna Casualty and
Surety Company, Third-Party Plaintiffs,
v.
GOLDBERG-ZOINO ASSOCIATES OF NEW
YORK, P.C. d/b/a GZA Geoenvironmental of New
York, GZA Geoenvironmental, Inc., Donald
Goldberg, William Beloff, John Doe 1,
John Doe 2, and John Doe 3, Third-Party Defendants
No. 99 Civ.2952 LBS.
Dec. 12, 2002.

Subcontractor sued contractor, alleging breach of
contract, breach of payment bond, wrongful
termination, quantum meruit, and unjust enrichment,
and contractor filed a third-party complaint against
another subcontractor for contribution, and
counterclaim against surety on plaintiff's performance
bond. On motions by subcontractor to amend, by
contractor and third-party defendant for approval of
settlement of the third-party action, and of surety for
summary judgment, the District Court, Sand, J., held
that: (1) plaintiff unduly delayed before seeking leave
to amend its amended complaint to add a cross-claim
against third-party defendants, and did not adequately
explain its delay, so that leave would be denied
where bad faith and undue prejudice were shown; (2)
leave to amend to add a sixth cause of action and to
increase the request for damages would be allowed;
(3) district court would not stay third-party action and

refuse to approve settlement of that action on *Burford*
abstention grounds; and (4) there were issues of fact
precluding summary judgment on claim against
surety.

Motions granted in part and denied in part and
settlement approved.

West Headnotes

[1] Federal Civil Procedure ☞840
170Ak840 Most Cited Cases
Plaintiff unduly delayed before seeking leave to
amend its amended complaint to add a cross-claim
against third-party defendants, and did not adequately
explain its delay, so that leave would be denied
where bad faith and undue prejudice were shown,
where proposed cross-claim arose out of a
relationship which ended over four years previously,
plaintiff originally filed the action three and one-half
years previously, last amended its complaint one year
previously, and was aware some three years
previously that defendant sought contribution from
third-party defendants, and where record did not
support attempt to explain this delay by arguing that
plaintiff did not learn the facts necessary to assert a
claim against the third-party defendants until
substantial discovery had been completed. Fed.
Rules Civ. Proc. Rule 15(a), 28 U.S.C.A.

[2] Federal Civil Procedure ☞839.1
170Ak839.1 Most Cited Cases
Third-party defendants adequately showed elements
of bad faith, as basis for denial of leave to amend
amended complaint to assert cross-claims against
them, where the first mention of any claim by
plaintiff against the third-party defendants came
approximately one week after the settlement
agreement between defendant and third-party
defendants was disclosed, plaintiff had threatened to
file cross-claim in an effort to obtain favorable
responses to requests for admissions from third-party
defendants, before they exited the case, and plaintiff
did not assert the cross-claims until the imminent
settlement imperiled its litigation strategy. Fed.
Rules Civ. Proc. Rule 15(a), 28 U.S.C.A.

[3] Federal Civil Procedure ☞839.1
170Ak839.1 Most Cited Cases
Third-party defendants adequately showed prejudice,
as basis for denial of leave to amend amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

Page 2

complaint to assert cross-claims against them, where the cross-claims would require third-party defendants to reopen depositions and take further fact and expert discovery, and would, in effect, draw them back into the litigation, after settlement with defendant, thus requiring them to prepare for trial against the plaintiff, delaying resolution of the dispute, and possibly impeding their ability to bring a claim for indemnification from their insurer. Fed. Rules Civ. Proc. Rule 15(a), 28 U.S.C.A.

**[4] Federal Civil Procedure** 🔗841
170Ak841 Most Cited Cases

**[4] Federal Civil Procedure** 🔗843
170Ak843 Most Cited Cases

**[4] Federal Civil Procedure** 🔗851
170Ak851 Most Cited Cases
Leave to amend amended complaint to add a sixth cause of action for breach of contract and to increase the request for damages would be allowed, where defendant alleged no specific prejudice resulting from allowing the amendment
other than conclusory assertion that the proposed cause of action would require additional discovery, and though the sixth cause of action echoed the first cause of action for breach of contract, the court was not prepared to state that the proposed sixth cause of action would be futile. Fed. Rules Civ. Proc. Rules 12(b)(6), 15(a), 28 U.S.C.A.

**[5] Federal Courts** 🔗47.1
170Bk47.1 Most Cited Cases
District court would not stay third-party action and refuse to approve settlement of that action on *Burford* abstention grounds, based on state-controlled liquidation of third-party defendant's insurer, where neither of the parties to the third-party action were the insolvent insurance company, its officers or directors, its parent company, or any state administrative official, the settled claims did not ask the state receiver to act or refrain from taking action, there was no contention that the settlement impeded the state administrative agency from enforcing its regulatory scheme, and the third-party dispute did not involve difficult or unsettled questions of state law.

**[6] Principal and Surety** 🔗75
309k75 Most Cited Cases

**[6] Principal and Surety** 🔗88
309k88 Most Cited Cases
Sole obligation of surety on performance bond was

not to complete construction if subcontractor, its principal, failed to do so, and thus failure of contractor to request that surety perform did not relieve it of its obligation under the bond, under New York law; rather, the contractor had the option of shifting the costs and risks of completion to the surety if it so desired, and when it did not, surety was still bound to payment of the penal sum based on the satisfaction of certain conditions, including subcontractor's failure of performance of the contract, which, by its terms, allowed the contractor to finish the work and to charge the subcontractor for any resulting damages.

**[7] Federal Civil Procedure** 🔗2489
170Ak2489 Most Cited Cases
There was a genuine issue of material fact, precluding summary judgment for subcontractor's surety on claim against its performance bond, as to whether contractor's decision to construct a different type of excavation support system than that which subcontractor was to build rendered surety's performance impossible or constituted a "cardinal change" in the underlying contract, given the lack of any indication that the contractor asked subcontractor to construct a different system or sought to make any material alteration in the subcontract prior to subcontractor's termination, after which the contractor entered into a new contract with another party to complete the system expeditiously. Restatement (Third) of Suretyship & Guaranty § 34.

*MEMORANDUM AND ORDER*

SAND, J.

*1 Three motions are before the Court. First, The Millgard Corporation ("Millgard" or "Plaintiff") moves to amend its amended complaint (a) to assert a claim against third-party defendants Goldberg-Zoino Associates of New York, P.C. d/b/a GZA GeoEnvironmental of New York ("GZANY"), Donald Goldberg, William Beloff, and certain John Does (collectively, "GZA" or "Third-Party Defendants"); (b) to add a sixth cause of action against defendants-third party plaintiffs E.E. Cruz & Company, NAB Construction Corporation, Frontier Kemper Construction, and Aetna Casualty & Surety Company (collectively, "Joint Venture" or "Defendants"); and (c) to increase the damages claimed under the first five causes of action against the Joint Venture. The Defendants and the Third-Party Defendants oppose this motion. Second, the Joint Venture and GZA request the Court's approval of the settlement of their third-party action and its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

Page 3

dismissal, with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2). Millgard opposes this motion. Finally, Liberty Mutual Insurance Company ("Liberty Mutual"), the surety of Millgard, moves for summary judgment on the Defendants' counterclaim, which seeks damages under Liberty Mutual's bond securing Millgard's performance of the subcontract with the Joint Venture.

For the reasons stated below, Millgard's motion for leave to amend its amended complaint is granted in part and denied in part, and the Court approves the settlement of the third-party action. Liberty Mutual's motion for summary judgment is denied.

## I. BACKGROUND

This lawsuit arises out of the construction of the Flushing Bay Combined Sewer Overflow Retention Facility: Storage Tank, Project No. CS4-3 ("Project") for the New York City Department of Environmental Protection ("DEP" or "Owner"). The goal of the Project was the construction of a large underground structure to store water during peak storm runoff events for eventual release and treatment. In 1996 DEP advertised for bids for the Project based on plans, specifications, and general conditions prepared by or on behalf of DEP ("Project Documents"). Due to the extensive excavation required during the course of construction, the Project Documents required an Earth (or Excavation) Support System ("ESS") to be installed for all enclosures on the Project. (Joint Affirmation of Third-Party Defendants ("JA") Ex. 4.) The Project Documents specified a slurry-or concrete diaphragm-wall ESS for this purpose, but also provided that the contractor assigned to build the Project could submit designs for an alternate ESS that conformed to all requirements, as indicated in the Project Documents or as approved by the DEP's own engineer. (Cruz Aff. in Opp. to Motion for Summary Judgment ("Cruz Aff.") Ex. 1.) The parties' attempt to design and construct this alternate ESS, and who bears responsibility for the ultimate failure to do so, lies at the heart of this litigation.

On October 30, 1996, the Joint Venture contracted with GZA GeoEnvironmental, Inc. ("GZAMass") to provide certain pre-bid services in preparation for submitting its bid to act as general contractor for the Project. [FN1] (JA Ex. 1.) These services included preparing a conceptual design for an alternate ESS. (Id.) During the same period, Millgard proposed to the Joint Venture an alternate ESS involving a technique called "soil mixing" and utilizing tools

patented by Millgard. [FN2] In accordance with Millgard's proposal and its contract with the Joint Venture, GZAMass prepared conceptual designs for an alternate ESS that incorporated a gravity soil-mixed wall. (Katz Cert. Ex. B.) In early January 1997, Millgard submitted its bid to the Joint Venture to construct the alternate ESS, and, in turn, the Joint Venture incorporated Millgard's submission into its bid for the overall construction of the Project. The Joint Venture's bid was accepted, and in July 1997 DEP and the Joint Venture executed a contract for construction of the Project.

> FN1. The nomenclature of the various GZA entities risks confusion. According to the second amended third-party complaint, GZANY and GZAMass are affiliates; are owned by the officers, directors, and shareholders of the Delaware corporation GZA GeoEnvironmental Technologies, Inc.; and have common employees and principals. (Second Am. Third-Party Complaint ¶¶ 9-15.) After September 1997, both GZANY and GZAMass performed services for the Joint Venture in connection with the Project. (Id. ¶ 58.) As indicated below, on January 29, 1999 Millgard executed an agreement and mutual release with *GZAMass* of all claims regarding services performed by *GZAMass* during the pre-construction test program. (Joint Affirmation in Support of Approval of Settlement Agreement Ex. C.) The present proposed cross-claim relates only to services performed by *GZANY* and its principals, officers, directors, or employees. (Proposed Second Amended Complaint (Katz Cert. Ex. O) ¶¶ 7-10; *see also* Katz Cert. ¶ 26.) The Court will use the general acronym "GZA" when it is unclear which entity performed services related to the Project.

> FN2. As its name suggests, soil mixing involves the mixture of soil and cement to create a concrete-like substance. (Cruz Aff. ¶ 11.)

*2 Activity involving the alternate ESS began in earnest followed the Joint Venture-DEP contract. In early August 1997, GZA prepared a design concept summary describing the general analytical approach to the soil-mix ESS. (Cruz Aff. Ex. 2.) The summary outlined a pre-construction testing program, consisting of exploratory boring, laboratory, and field testing programs that involved both Millgard and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

Page 4

GZA. (Cruz Aff. Ex. 3; *see also* Katz Cert. ¶ 10.)

The final designs and installation of the alternate ESS were contingent on the approval of the DEP's engineers and satisfactory results of the site-specific pre-construction testing program. (*See* Katz Cert. ¶ 5; JA ¶ ¶ 13, 17.) From September through December 1997, however, problems emerged regarding both aspects of the pre-construction phase. DEP's engineer reviewed and rejected (or otherwise expressed concerns about) GZA's design submittals for various walls of the ESS. (Katz Cert. Ex. F-H, J-K.) One problem cited by DEP's engineers was that the wall deflections in the designs exceeded the 0.5" limit specified in the Project Documents. (*E.g., id.* Ex. F.) At the same time, Millgard encountered problems with the soil conditions at the construction site. Unexpected layers of clay and peat, as well as physical obstructions, injected some uncertainty into the viability of using Millgard's soil-mix method to construct the alternate ESS. (JA Ex. 16, 27-29; Cruz Aff. ¶ 27.)

While the pre-construction program was proceeding, the parties entered into a series of contracts in early December 1997. On December 3, 1997, Millgard, as principal, and Liberty Mutual, as surety, executed a performance bond and payment bond naming the Joint Venture as Obligee. (Maloney Aff. Ex. B.) On December 4, 1997, the Joint Venture contracted with GZANY to provide certain post-bid design services. (JA Ex. 8.) The contract specified that GZANY would, *inter alia,* (1) review certain pre-construction borings and develop soil profiles along the ESS walls and (2) prepare a conceptual design submittal for submission to the DEP's engineer and prepare a final ESS design in overall conformance with the criteria indicated in the Project Documents. (*Id.*) On or about December 10, 1997, Millgard and the Joint Venture entered into a subcontract for Millgard to construct the alternate soil-mix ESS, which would be based on GZAMass's conceptual design, at a total price of $12,337,000. [FN3] (Katz Cert. Ex. A.)

FN3. There is some confusion regarding the date of the Subcontract's execution. The Subcontract itself is dated August 21, 1997. (Katz Cert. Ex. A.) In the Maloney Affidavit supporting the motion for summary judgment, however, the date of execution is identified as on or about December 16, 1997. (Maloney Aff. ¶ 4.) The Cruz Affidavit opposing summary judgment identifies the date of execution as December 10, 1997. (Cruz Aff. ¶ 31.) In light of the

parties' agreement as to the general time-frame, and given that the performance bond was apparently issued in connection with the Subcontract (Maloney Aff. ¶ 5), the Court assumes, without deciding, that the Subcontract was executed some time in early or mid-December 1997.

The problems associated with the pre-construction phase of the Project culminated in late December 1997 and January 1998. According to the Joint Venture, by early January Millgard had not demonstrated its ability to achieve adequate soil-mix design criteria sufficient to allow construction of the alternate ESS to proceed. (Cruz Aff. ¶ 37; *id.* Ex. 5.) Although Millgard assured the Joint Venture that the soil could be stabilized and urged the Joint Venture to address the wall deflection issue (Letter from Millgard of 1/9/98 (JA Ex. 26); Letter from Cardoza of 1/12/98 (JA Ex. 30)), the Joint Venture abandoned the alternate ESS approach and sent a notice-of-termination letter to Millgard. (Cruz Pre-Termination Letter of 1/29/98 (JA Ex. 31).) The Joint Venture stated the reasons for its decision as, *inter alia,* Millgard's failure to meet the performance requirements of the Project Documents and its failure "to provide a uniform mixed rigid soil cement column as required by the Contract Documents." (*Id.*) The Joint Venture ultimately terminated Millgard's contract and completed the Project using a different design.

*3 Millgard filed a complaint against the Joint Venture on April 22, 1999, alleging breach of contract, breach of payment bond, and wrongful termination. The Joint Venture filed a third-party complaint on September 9, 1999 against GZANY only, seeking contribution with respect to Millgard's primary claims against the Joint Venture. On March 30, 2000 the Joint Venture amended the third-party complaint to include additional claims against GZANY, and on October 23, 2001, it amended its third-party complaint again to add GZAMass, William Beloff, and Donald Goldberg as a third-party defendants. Millgard then filed an amended complaint on October 28, 2001. The amended complaint added two causes of action against the Joint Venture for *quantum meruit* and unjust enrichment. It did not add any claims against Beloff, Goldberg, or any of the GZA entities.

After fact discovery spanning 2001 and 2002, and pursuant to negotiations between the parties to the third-party action, the Joint Venture and GZA reached a settlement agreement dated August 20,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

Page 5

2002, which is subject to the Court's approval. (JA Ex. 37.) On August 26, 2002, the Court held a hearing at which Millgard registered its objection to the proposed settlement. Due to a state court stay of any litigation involving the Third-Party Defendants' insurer, Reliance Insurance Company, the Court declined to take any action at the August hearing.

Following the August hearing, counsel for Millgard contacted counsel for GZA, stating that he would be serving GZA with Requests for Admissions ("Requests") related to the reasons for the rejection of the design submittals. (JA ¶ 37.) According to GZA's counsel, during the conversation Millgard's counsel noted the possibility of bringing a cross-claim against the GZA parties depending on their admissions to certain facts. (Postelnik Aff. ¶ 8 (JA Ex. 40).) The parties do not dispute that the Requests were served, that from September 5, 2002 to October 2, 2002 counsel for Millgard and the Third-Party Defendants discussed possible responses to the Requests, and that counsel for Millgard mentioned the possibility of asserting a claim against the Third-Party Defendants depending on the adequacy of their responses to the Requests. (Postelnik Aff. ¶¶ 8-14; Katz Reply Cert. ¶ ¶ 13.) The parties do dispute, however, whether these discussions, specifically the "threat" of asserting a claim against GZA, should be characterized as "coercion" or "settlement negotiations." (Postelnik Aff. ¶ ¶ 8, 13; Katz Reply Cert. ¶ 13.)

On October 9, 2002, Millgard served a cross-motion for leave to amend the amended complaint to add a cross-claim against the Third-Party Defendants and a breach of contract claim against the Defendants. The cross-claim asserts negligence and professional malpractice and alleges that GZANY breached a duty to Millgard by preparing faulty designs for the alternate ESS and providing faulty subsurface soil information. The contractual claim asserts that the Joint Venture was obligated to provide adequate designs and accurate subsurface soil information to Millgard but failed to do so. Millgard seeks recovery on both the proposed cross-claim and the additional contractual claim in the amount of $10,238,772.00.

## II. DISCUSSION

### A. *Amendment to Add a Claim Against the Third-Party Defendants*

*4 Millgard moves to amend its amended complaint pursuant to Federal Rule of Civil Procedure 15(a). Rule 15 provides that leave to amend "shall be freely

given when justice so requires." Fed.R.Civ.P. 15(a); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Leave to amend may be denied, however, if there is evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility. *Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 283 (2d Cir.2000); *see also Krumme v. Westpoint Stevens, Inc.,* 143 F.3d 71, 88 (2d Cir.1998) ("[C]onsiderations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend.") (internal quotation omitted). A district court has discretion whether to grant or deny leave to amend. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994).

In deciding whether to grant or deny a motion under Rule 15(a), the Court first considers whether the movant unduly delayed seeking leave to amend. A court may deny leave to amend "where the motion is made after inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties." *Grace v. Rosenstock,* 228 F.3d 40, 53-54 (2d Cir.2000).

[1] The Court finds that Millgard unduly delayed before seeking leave to amend its amended complaint. Millgard's proposed cross-claim arises out of its relationship with the Joint Venture and GZA, which ended in January 1998, over four years prior to the filing of the present motion. Millgard originally filed this action in April 1999, three and one-half years ago, and last amended its complaint one year ago. Millgard was also aware as early as September 9, 1999 that the Joint Venture sought contribution from GZANY for possible liability arising out of Millgard's claim against the Joint Venture. In this context, the burden is on Millgard to offer a valid explanation for such an inordinate delay before asserting a claim against the Third-Party Defendants. *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990).

Millgard attempts to explain this delay by arguing that it did not learn the facts necessary to assert a claim against the Third-Party Defendants until substantial discovery had been completed. (Plaintiff's Reply Memorandum of Law ("Reply Memo.") at 30-32.) The record does not support this assertion.

Millgard's claim against the Third-Party Defendants rests on two separate factual underpinnings. First, Millgard argues that GZANY was negligent in failing to propose adequate designs for the alternate ESS.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

According to Millgard, it only learned during discovery that the designs were rejected by DEP's engineers because the wall deflection exceeded specifications rather than Millgard's inability to achieve an adequate soil mix. (Reply Memo. at 7-9.) Letters from Millgard's representatives in early January 1998, however, explicitly pin the cause for DEP's rejection of GZA's design submittals on "unrealistic deflection criteria, not failed soil mixing results." (Letter from Millgard of 1/9/98 (JA Ex. 26); *see also* Letter from Cardoza of 1/12/98 (JA Ex. 30).) Second, Millgard maintains that GZANY was negligent in providing incomplete or faulty subsurface soil information as part of the pre-construction test program. (Reply Memo. at 10.) As with the wall deflection issue, however, Millgard was aware as early as October 1997 that the actual subsurface conditions encountered at the Project were different from those expected from the pre-construction subsurface borings. (Letter from Millgard of 10/20/97 (JA Ex. 16); Letter from Cardoza of 12/31/97 (JA Ex. 18); Letter from Millgard of 1/9/98 (JA Ex. 26); Letter from Cardoza of 1/12/98 (JA Ex. 30).) These contemporaneous communications do not support the Plaintiff's explanation that it only recently became aware of the facts and circumstances now forming the basis of its claim against GZA.

*5 Other factors also undermine Millgard's explanation for the delay. In 1999 Millgard executed a release of all claims against GZAMass-GZANY's affiliate that has common employees and principals-arising out of the pre-construction program at the Project, thus evidencing an awareness of GZA's possible liability. Moreover, Millgard's legal theory of liability is based on the extensive contact between Millgard and GZA throughout the pre-construction phase of the Project (Memo. in Support at 6; Katz Aff. ¶ 10), and the Joint Venture impleaded GZA as a third party early on in the litigation based on the failed designs. (Am. Third-Party Comp. ¶¶ 37-38.) In light of the current record, Millgard has not offered a satisfactory explanation for its delay in seeking leave to amend its pleading. *See Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp.,* 53 F.Supp.2d 199, 208-09 (N.D.N.Y.1999) (denying leave to amend when discovery of nonessential additional facts did not provide a reasonable basis for delay); *cf. Gabourel v. Bouchard Trans. Co.,* 901 F.Supp. 142, 145 (S.D.N.Y.1995) (approving a one-year delay in asserting claim because underlying factual basis was discovered only during depositions).

[2] Millgard rightly notes that even unexplained delay does not provide a basis for denial of leave to amend, absent a showing of bad faith or undue prejudice. *Block v. First Blood Assoc.,* 988 F.2d 344, 350 (2d Cir.1993); *Richardson Greenshields Secs., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987). In the present context, the Third-Party Defendants have adequately shown elements of both bad faith and undue prejudice.

Millgard does not identify explicitly when during discovery it learned the facts necessary to assert a claim against the Third-Party Defendants. The first mention of any claim by Millgard against the Third-Party Defendants came approximately one week after the settlement agreement was disclosed. The timing of Millgard's motion, as well as Millgard's counsel's representations to opposing counsel before serving the second amended complaint, are consistent with a prior tactical decision not to assert claims against GZA-that is, until the imminent settlement imperiled this litigation strategy. (Postelnik Aff. ¶ 14 (JA Ex. 40).) Whether the decision not to sue GZA was based on a determination of how to best allocate resources or an attempt to maintain GZA as an ally in the litigation, Millgard threatened to reverse that decision-three years after first filing its complaint-in an effort to obtain favorable responses to the Requests before GZA exited the case. It now seeks to make good that threat. This type of strategic pleading is not encouraged even under the liberal standard of Rule 15. *See State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 418 (2d Cir.1990) (denying leave to amend when party requesting amendment made a tactical decision by not pleading foreign law earlier); *Vine v. Beneficial Fin. Co.,* 374 F.2d 627, 636-37 (2d Cir.1967) (upholding denial of leave to amend when movant delayed filing an amended complaint in order to ascertain how he would fare in a motion to dismiss); *Lee v. Regal Cruises, Ltd.,* 916 F.Supp. 300, 304 (S.D.N.Y.1996) (denying motion to amend when leave was sought after defendant's motion for summary judgment revealed a flaw in plaintiff's legal theory); *PI, Inc. v. Quality Products, Inc.,* 907 F.Supp. 752, 765 (S.D.N.Y.1995) (denying leave to amend when timing of the motion revealed that it was designed to avoid dismissal of the action); *see also Town of New Windsor v. Tuck,* 919 F.Supp. 662, 676 (S.D.N.Y.1996) ("Delay as a predicate for a finding of bad faith is a sufficient reason to deny leave to amend.").

*6 GZA has also demonstrated that allowing leave to amend would be prejudicial. In the context of a

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

motion to amend a pleading, prejudice is generally found when the assertion of the new claim would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Monahan,* 214 F.3d at 284 (citation omitted). "[T]he longer the period of an unexplained delay, the less will be required in terms of a showing of prejudice." *Block,* 988 F.2d at 350.

[3] Here, the first two factors, as well as the length of the delay, weigh in favor of denying the motion to amend as it relates to GZA. The Third-Party Defendants have indicated that they will be required to reopen depositions and take further fact and expert discovery in order to respond to the new claim. (Memo. in Opp. at 21; *see also MacDraw, Inc. v. The CTI Group Equip. Fin., Inc.,* 157 F.3d 956, 962 (2d Cir.1998) *(per curiam )* (upholding district judge's denial of leave to amend to add a proposed negligent misrepresentation claim on the grounds that it would require additional discovery, causing undue prejudice); *cf. New Windsor,* 919 F.Supp. at 677 (finding no prejudice where the non-movant did not allege that discovery would have to be reopened and additional motion practice required)). The Third-Party Defendants' assertion is credible because, unlike the third-party action, the proposed cross-claim invokes entirely different legal theories: negligence, professional malpractice and a relationship of "near privity" between Millgard and GZA. In addition, GZA has settled with the Joint Venture in an effort to exit the case and save the expense of trial. The Plaintiff's second amended complaint would, in effect, draw GZA back into the litigation, thus requiring them to prepare for trial against the Plaintiff, delaying resolution of the dispute, and possibly impeding their ability to bring a claim for indemnification from their insurer before the State Liquidation Board. *See Barrows v. Forest Lab., Inc.,* 742 F.2d 54, 58 (2d Cir.1984) (upholding denial of leave to amend to recast theory of relief two and one-half years after the complaint had been filed). Although the Second Circuit has indicated that the burden of further discovery *standing alone* is insufficient to deny leave to amend, *United States v. Cont'l Ill. Nat'l Bank & Trust Co.,* 889 F.2d 1248, 1255 (2d Cir.1991), *Block* counsels that the level of prejudice to the nonmovant must be evaluated in light of the delay. Here, given the length of delay and the surrounding circumstances, the Third-Party Defendants have shown sufficient prejudice to justify denying leave to amend. Therefore, the motion to amend the amended complaint to add a cross-claim

against GZA is denied. [FN4]

> FN4. As considerations of delay, bad faith, and prejudice are sufficient to deny leave to amend, the Court does not address the Third-Party Defendants' additional argument that the cross-claim would be futile.

*B. Amendment to Add a Sixth Cause of Action and to Adjust the Damages Claims*

*7 [4] Millgard also seeks to amend the amended complaint to add a sixth cause of action against the Joint Venture, sounding in breach of contract, and to increase its request for damages. The Joint Venture opposes the amendment on the grounds that it would be prejudicial and futile. (Tretter Aff. ¶ 5.)

The Court grants this part of Millgard's motion. The Joint Venture alleges no specific prejudice resulting from allowing the amendment other than the possible need to pursue further discovery. (Tretter Aff. ¶¶ 13, 15.) Whether related to the sixth cause of action or the *ad damnum* clauses, however, the conclusory assertion that the proposed cause of action will require additional discovery, without more, is insufficient to deny leave to amend. *Cont'l Ill. Nat'l Bank,* 889 F.2d at 1255.

The Joint Venture also argues that the addition of a sixth cause of action would be futile. *Grace,* 228 F.3d at 53 ("[I]n determining whether leave to amend should be granted, the district court has discretion to consider, *inter alia,* the apparent 'futility of amendment' "). An amendment to a pleading will be futile if the proposed claim could not withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002). In reviewing a motion to dismiss under Rule 12(b)(6), a court must "accept as true the factual allegations of the pleading and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). A complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir.1996).

The Joint Venture argues that Millgard impermissibly wishes to convert a tort cause of action into a contractual cause of action. *See Clark-Fitzpatrick v. Long Island R.R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). Although

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

the sixth cause of action echoes the first cause of action for breach of contract, under the relaxed standard of Rule 12(b)(6), the Court is not prepared to state that the proposed sixth cause of action would be futile. The Court therefore allows Millgard to amend the amended complaint by adding a sixth cause of action against the Joint Venture and changing the amount of damages claimed under the first five causes of the action and included in the *ad damnum* clauses.

C. *GZA's Motion to Approve the Settlement Agreement*

[5] The Joint Venture and GZA have agreed to settle and release all of the subject claims asserted against each other. They now seek the Court's approval of the settlement. Millgard opposes the settlement, citing the state-controlled liquidation of Reliance, GZA's insurer. (Katz Cert. ¶ ¶ 16-20.)

This Court previously stayed the third-party action based on the Reliance liquidation and an accompanying New York state court stay of any action in which Reliance was required to defend an insured party. *In re Reliance Ins. Co.*, No. 405987/01 ¶ 7 (Order of Stallman, J.) (N.Y.Sup.Ct. Dec. 14, 2001). Although the New York stay has now expired, a stay of this third-party action is still possible based on principles associated with *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 719-20, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (noting that a federal court may stay an action for damages on abstention grounds); *Property and Casualty Ins., Ltd. v. Central Nat'l Ins. Co.*, 936 F.2d 319, 321 (7th Cir.1991) (stating that *Burford* abstention is the "doctrine of choice" in analyzing whether to abstain in favor of state insurance liquidation and rehabilitation). The Supreme Court has explained the conditions for *Burford* abstention:

*8 Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans et al.*, 491 U.S. 350, 361, 109 S.Ct.

2506, 105 L.Ed.2d 298 (1989) ("NOPSI") (internal quotations omitted).

A number of courts, including the Second Circuit, have approved abstaining from hearing actions against state liquidation officers and insolvent insurers or their parent companies based on *Burford. Corcoran v. Ardra Ins. Co.*, 842 F.2d 31 (2d Cir.1988); *Law Enforcement Ins. Co. v. Corcoran*, 807 F.2d 38 (2d Cir.1986) ("LEICL"); *Levy v. Lewis*, 635 F.2d 960 (2d Cir.1980); *see also General Rv. Signal Co. v. Corcoran*, 921 F.2d 700, 708 (7th Cir.1991) (collecting cases). This action, however, does not present a compelling case for a *Burford*-based stay. *See Holden v. Connex-Metalna Mgt. Consulting*, 302 F.3d 358 (5th Cir.2002) (denying Reliance's motion to stay action on the grounds that no decisive issue of state law is to be decided and no interference with the administration of Reliance's assets would result); *Gross v. Weingarten*, 217 F.3d 208, 224 (4th Cir.2000) (stating that a stay of "routine contribution and indemnification claims" against an insolvent insurer was unwarranted under either *NOPSI* factor). Most importantly, neither of the parties are the insolvent insurance company, its officers or directors, its parent company, or any state administrative official. *Univ. of Maryland v.. Peat Marwick Main & Co.*, 923 F.2d 265, 271 (3d Cir.1991) ("In our view, *Burford* abstention may be ordered in insurer insolvency cases only when one of the parties to the action in which the federal court abstains is the insolvent insurer or its receiver, trustee, officers, and the like."); *see also Wolfson v. Mutual Benefit Life Ins., Co.*, 51 F.3d 141, 145 (8th Cir.1995) (noting that abstention is usually denied in suits by policyholders or policy beneficiaries against third parties because the state court insolvency proceeding cannot afford plaintiff a remedy against a third party); *Sherbonnet, Ltd. v. Am. Express Bank, Ltd.*, 17 F.3d 46 (2d Cir.1994) (concluding that abstention is not proper when plaintiff has no dispute with the Superintendent of Banks controlling liquidation and asserted a tort claim for damages rather than a demand for specific funds).

In addition, the issues in the third-party action do not implicate either the first or second bases for *Burford* abstention. The Joint Venture-GZA contractual dispute does not involve difficult or unsettled questions of state law. Although the third-party action touches on the state's insurance liquidation scheme, which attempts to establish a coherent policy in a complex area of state concern, the contact with the state liquidation proceedings is incidental at best. The settled claims do not ask the state receiver to act

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

or refrain from taking action; there is no contention that the settlement impedes the state administrative agency from enforcing the regulatory scheme; and they do not seek to make an "end run" and obtain a preference on the assets of Reliance controlled by the State Liquidation Board.

*9 Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," *NOPSI*, 491 U.S. at 359, and requires "extraordinary circumstances." *Quackenbush*, 517 U.S. at 726. Given the general policy favoring the exercise of jurisdiction, the attenuated connection with the state liquidation proceedings, and the relatively mundane nature of the claims underlying the settlement, the Court declines to stay the action between the Joint Venture and GZA.

In the absence of a reason to stay the third-party action, the Court approves the settlement agreement, which was the result of negotiations between represented parties after extensive discovery. In accordance with the request of the Defendants-Third Party Plaintiffs and the Third-Party Defendants, the Court dismisses the third party action, with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2).

D. *Liberty Mutual's Motion for Summary Judgment*

The final motion before the Court is a motion by Liberty Mutual for summary judgment on the Defendants' counterclaim. Pursuant to a requirement in the Millgard-Joint Venture subcontract ("Subcontract") (Maloney Aff. Ex. A, Schedule A), Millgard, as principal, obtained a performance bond ("Performance Bond") from Liberty Mutual, as surety, in the penal sum of $12,347,000. [FN5] (Maloney Aff. Ex. B.) Following Millgard's termination, the Joint Venture engaged a different subcontractor to complete the ESS based on a different design. Alleging that the termination was proper and that Millgard breached its contractual obligations, thus triggering Liberty Mutual's liability as surety, the Joint Venture asserted a counterclaim against Liberty Mutual seeking payment for its costs of completion pursuant to the Performance Bond. Liberty Mutual now moves for summary judgment in response to this counterclaim.

> FN5. The Performance Bond itself apparently contains a typographical error. On the first page, Millgard is identified as the "Surety" that is bound to pay the penal sum. (Maloney Aff. Ex. B.) On the signature

page of the Performance Bond and in the same language in the immediately following Payment Bond, however, Millgard is identified as the Principal, and Liberty Mutual is identified as the Surety. (*Id.*) Given that the designation of Millgard as both surety and principal would be nonsensical, the Court will construe the Performance Bond as identifying Liberty Mutual as Surety and Millgard as Principal, as expressed in the Payment Bond.

Well-settled principles govern Liberty Mutual's motion. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002). In determining whether the movant has met this burden, a court must resolve all ambiguities and draw all inferences in favor of the nonmovant. *E.g., Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir.2002). "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Simon*, 310 F.3d at 286; *see also Anderson v. Liberty Mutual Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A number of similarly well-settled rules also guide the interpretation of surety bonds under New York law, which applies to this dispute. Surety bonds are contracts, and general principles of contract law control their interpretation. *Tri-State Emp. Serv., Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 262 (2d Cir.2002); *Int'l Fid. Co. v. County of Rockland*, 98 F.Supp.2d 400, 405 (S.D.N.Y.2000); *General Phoenix Corp. v. Cabot*, 300 N.Y. 87, 90, 89 N.E.2d 238, 241 (1949). As in all contracts, "[w]ords and phrases are given their plain meaning, and ambiguous language is construed against the party that drafted it." *U.S. Fid. & Guar. Co. v. Braspetro Oil Serv. Co.*, 219 F.Supp.2d 403, 476 (S.D.N.Y.2002). Furthermore, as particular creatures of contract law, surety bonds have spawned their own specific rules of construction. For example, courts call on the rule of *strictissimi juris* to ensure that the surety's obligation will not be construed to cover a new contract. *Terwilliger v. Terwilliger*, 206 F.3d 240, 246-47 (2d Cir.2000); *Becker v. Faber*, 280 N.Y.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

146, 149, 19 N.E.2d 997, 999 (1935). However, this rule is not rigidly applied to compensated sureties like Liberty Mutual. *U.S. Fid. & Guar. Co. v. United States,* 191 U.S. 416, 426, 24 S.Ct. 142, 48 L.Ed. 242 (1903) ("[The rule of *strictissimi juris* ] is one which ought not to be extended to contracts not within the reason of the rule, particularly when the bond is underwritten by a corporation which has undertaken for a profit to insure the obligee against a failure of performance on the part of the principal obligor."); *Braspetro,* 219 F.Supp.2d at 476 ("[U]nder New York law, it is well established that a compensated, corporate surety is not a favorite of the law and its contract of suretyship will be construed in a manner most favorable to the claimant."); *Hunt v. Bankers & Shippers Ins. Co. of N.Y.,* 60 A.D.2d 781, 400 N.Y.S.2d 645, 647 (4th Dep't 1977) ("The rule of *strictissimi juris* is not rigidly to be applied in the case of a compensated surety on a construction contract under either New York law or Georgia law."). In disputes involving surety bonds, the bond and the underlying contract are construed together. *Tri-State Emp. Serv.,* 296 F.3d at 263; *Madawick Contracting Co. v. Traveler's Ins.,* 307 N.Y. 111, 118, 120 N.E.2d 520, 523 (1954).

*1. Failure to Demand Performance*

**\*10** With these principles in mind, the Court turns to Liberty Mutual's first argument for summary judgment, which is based on a strict interpretation of the Performance Bond itself. Under New York law, notice of a principal's default is not a condition precedent to asserting a claim against a surety in the absence of an express contractual provision requiring such notice. *Walter Concrete Const. Corp. v. Lederle Labs. et al.,* 288 A.D.2d 377, 734 N.Y.S.2d 80 (2d Dep't 2001); *Menorah Nursing Home v. Zukov,* 153 A.D.2d 13, 21, 548 N.Y.S.2d 702, 708 (2d Dep't 1989). Here, the Performance Bond contains no provision requiring notice of default, and Liberty Mutual expressly waived such notice in the final paragraph of the Performance Bond.

[6] Conceding that notice of default is not an issue (Liberty Mutual Reply Memo. at 5), Liberty Mutual argues that the language of the Bond contains an express provision imposing an additional type of notice requirement-a demand for performance. Specifically, the first paragraph on the second page-the fourth overall paragraph-of the Bond makes Liberty Mutual's obligation to perform and fully complete the "Work" outlined in the Subcontract conditional on receiving a request from the Joint Venture:

The Surety, for value received, hereby stipulates and agrees, *if requested to do so by the obligee,* to fully perform and complete the Work to be performed under the Contract, pursuant to the terms, conditions, and covenants thereof, if for any cause, the Principal fails or neglects to so fully perform and complete such Work. The Surety further agrees to commence such Work of completion within twenty (20) days after written notice thereof from the Obligee and to complete such Work within such time as the Obligee may fix.

(Maloney Aff. Ex. B (emphasis added).) [FN6]

> FN6. "Work" is defined in the Subcontract as "the earth support system as outlined in Schedule A" of the Subcontract. (Maloney Aff. Ex. A ¶ 1.)

By its terms, this paragraph requires the Joint Venture to make a request before Liberty Mutual must perform and fully complete the Work under the Subcontract. As the Joint Venture never made such a request, it did not trigger Liberty Mutual's obligation to construct the alternate ESS if Millgard failed to do so. Therefore, given the Joint Venture's failure to comply with this condition precedent, Liberty Mutual concludes, as a matter of law, that it is discharged from its surety obligations. *See L & A Contracting Co. v. Southern Concrete Serv., Inc.,* 17 F.3d 106, 110-11 (5th Cir.1994); *Braspetro,* 219 F.Supp.2d at 477.

Neither the language nor the structure of the Performance Bond and the underlying Subcontract support Liberty Mutual's interpretation, namely its key premise that Liberty Mutual's sole obligation as surety is to complete construction of the ESS. Examining first the language of the Performance Bond, the first paragraph binds Liberty Mutual and Millgard, jointly and severally, to pay a penal sum of $12,337,000, the contract price. The second paragraph incorporates the Subcontract into the Performance Bond. The third paragraph states that if Millgard fulfills certain conditions, then Liberty Mutual's obligation to pay the penal sum "shall be null and void, otherwise to remain in full force and effect." (Maloney Aff. Ex. B.) The range of conditions imposed on Millgard by this third paragraph is expansive:
**\*11** NOW, THEREFORE, the conditions of this obligation are such that if the Principal ... shall well and faithfully perform the said Contract and all modifications, amendments, additions and alterations thereto that may hereafter be made,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

according to its terms and its true intent and meaning, including repair and/or replacement of defective work and guarantees of maintenance for the periods stated in the Contract, and shall fully indemnify and save harmless the Obligee from all cost and damage which it may suffer by reason of failure to so to do, and shall fully reimburse and repay the Obligee for all outlay and expense which the Obligee may incur in making good any such default and shall protect the said Obligee against, and pay any and all amounts, damages, costs and judgments which may or shall be recovered against said Obligee or its officers or against or which the said Obligee may be called upon to pay to any person or corporation by reason of any damages arising or growing out of the doing of said work, or the repair or maintenance thereof, or the manner of doing the same, or the neglect of the said PRINCIPAL, or its agents or servants, or the improper performance of the said work by the said PRINCIPAL, or its agents or servants, ... then this obligation shall be null and void, otherwise to remain in full force and effect.

(Maloney Aff. Ex. B.)

To paraphrase, the first three paragraphs establish a simple scheme by which Liberty Mutual is relieved of joint and several liability to pay a certain sum only if Millgard satisfies the conditions outlined in the third paragraph. *See Hetchkop v. Gundolt Carpet Workroom, Inc., 841 F.Supp. 113, 116 (S.D.N.Y.1994)* ("[I]t is well-established that the liability of a surety on a bond is predicated upon a breach of the conditions of the bond which describe the obligation.") (internal quotations omitted); *Franklin Nat'l Bank v. Phoenix Ins. Co., 15 Misc.2d 145, 147, 178 N.Y.S.2d 700, 702 (N.Y.Sup.Ct.1958)* (stating that language similar to the first paragraph of the Performance Bond is "an obligation absolute" binding the insurance company upon default). These conditions include, but are not limited to, the duty to "faithfully perform the said Contract." Only in the fourth paragraph does the Performance Bond mention Liberty Mutual's duty to "perform and fully complete the Work" upon the Joint Venture's request. Although Liberty Mutual emphasizes this language to the exclusion of the preceding paragraphs, in fact, the fourth paragraph does not limit the Joint Venture's remedy to be solely to seek completion from Liberty Mutual. Rather, it gives the Joint Venture the option of shifting the costs (and risks) of completing the ESS to Liberty Mutual if it so desires.

Liberty Mutual apparently would exclude from the scope of its liability anything not associated with the

actual completion of the ESS, including, *inter alia,* post-completion repairs, damages for suits involving third parties, and payments for expenses incurred in making good Millgard's default. This interpretation contradicts the plain language of the third paragraph as well as numerous provisions of the Subcontract calling for indemnification from Millgard in certain circumstances. (Maloney Aff. Ex. A. ¶¶ 33, 39, 42.) By only focusing on whether or not Millgard "performs" and completes the Work of constructing the ESS and ignoring the other duties that Millgard must "perform" in order to void its surety obligations, Liberty Mutual would render the language in the first three paragraphs of the Performance Bond a nullity and violate a "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995).*

*12 A review of the general operation of performance bonds confirms Liberty Mutual's error. The purpose of a performance bond is to protect the obligee against contractor default. *See 11 N.Y. Jur.2d Bonds § 63.* However, the label of "performance bond" is something of a misnomer because not all performance bonds, by their terms, may require a surety to take over and complete the principal's obligations as outlined in the underlying contract. *See Granite Computer Leasing Corp. v. Travelers Indem. Co., 894 F.2d 547, 551 (2d Cir.1990)* ("Under a performance and completion bond, a surety generally has two options upon its principal's default. First, the surety may undertake to complete the principal's work itself[.] ... Second, the surety has the option of paying the obligee under the bond its damages, essentially the obligee's cost of completion."); *see also Hunt v. Bankers & Shippers Ins. Co., 73 A.D.2d 797, 798, 423 N.Y.S.2d 718, 719 (4th Dep't 1979)* ("Had defendant performed its obligation it would not have been liable for damages beyond *its duty to complete or pay for the completion* of construction.") (emphasis added); *see generally Bruner & O'Connor on Construction Law § § 12:13-12:20* (describing different types of performance bonds); *11 Couch on Ins.3d § 164.5.* The type of obligation imposed on the surety-and thus the surety's "menu" of remedial options upon a principal's default-is determined by the language of the bond itself rather than simply the label "performance" bond. For example, a performance bond may give the surety, upon the contractor's default, the option of taking over the contract, arranging for the principal-contractor to complete the project, or arranging for a substitute

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

Page 12

contractor and paying the excess cost of completion. _Braspetro,_ 219 F.Supp.2d at 419 (citing provisions of the American Institute of Architects' standard A312 Performance Bond); _see also Rockland,_ 98 F.Supp.2d at 432 (citing the same performance bond). By contrast, the Federal Standard Form 25 Performance Bond, the model for Miller Act performance bonds mandated in federal construction projects, does not provide an extensive list of remedial options. Similar to the Performance Bond here, it simply directs the surety to pay the penal sum if certain conditions are not met. 40 U.S.C.A. § 270a (West 2002); Federal Standard Form 25 Performance Bond, _available at_ http://www.gsa.gov/Portal/home.jsp (Forms). Although obligees under federal contracts may allow the surety to remedy the principal's default by completing the project themselves, 48 C.F.R. § 49.404 (West 2002), the obligee's ability to consider such options does not eliminate the surety's obligation to pay the costs of completion if the surety declines to negotiate such a takeover agreement. _See Ins. Co. of the West v. United States,_ 243 F.3d 1367, 1370 (Fed.Cir.2001); _Aetna Cas. & Sur. Co. v. United States,_ 845 F.2d 971, 975 (Fed.Cir.1988).

*13 In the present case, the fourth paragraph of the Performance Bond gives the Joint Venture the option of requesting that Liberty Mutual complete construction, which is similar to ¶ 4.1 of the A312 Performance Bond. _Braspetro,_ 219 F.Supp.2d at 419. As in the standard federal bond, however, the first paragraph of the Performance Bond binds Liberty Mutual to _payment_ of the penal sum based on the satisfaction of certain conditions, not _"performance_ of the Construction Contract." _Rockland,_ 98 F.Supp.2d at 432 (citing the first paragraph of the A312 Performance Bond) (emphasis added). Placing the choice of remedial options in the hands of the Joint Venture by requiring Liberty Mutual to complete construction of the ESS only upon request does not, as Liberty Mutual argues, eviscerate the Performance Bond's otherwise broad indemnification provision.

The problems with Liberty Mutual's interpretation increase when one turns to the Joint Venture's rights under the Subcontract. As noted above, the Subcontract imposes a variety of obligations on Millgard, which, as a condition of the Performance Bond, must be "faithfully performed." Furthermore, ¶ 23(B) of the Subcontract, pursuant to which Millgard was terminated, expressly gives the Joint Venture the right "to finish the WORK called for in this contract" and to "charge to the SUBCONTRACTOR's account the cost and expense thereof and all other costs or

expense to which the CONTRACTOR may be put on account of the SUBCONTRACTOR'S failure to carry out and complete this contract." (Maloney Aff. Ex. A ¶ 23(B).) By its terms, ¶ 23(B) allows the Joint Venture to finish the ESS and to charge Millgard for any resulting damages. _See Winston Corp. v., Cont'l Cas. Co.,_ 508 F.2d 1298, 1301 (6th Cir.1975) (construing similar language). Under Liberty Mutual's reading of the Performance Bond, however, in order to acquire any rights as obligee, the Joint Venture must choose between first offering Liberty Mutual the opportunity to complete the ESS in order to acquire any rights under the Performance Bond, and pursuing its own right to finish the ESS according to ¶ 23(B) of the Subcontract. Interpreting the Performance Bond and the Subcontract as placing the Joint Venture in this type of catch-22 situation creates needless tension between the two documents.

When considering a motion for summary judgment on a contractual claim, the language of the contract must be "wholly unambiguous." _Lucente v. Int'l Bus. Mach. Corp.,_ 310 F.3d 243, 257 (2d Cir.2002) (internal quotations omitted). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." _Id._ (internal quotations omitted). In the present case, the Court is not satisfied that the Joint Venture's failure to request that Liberty Mutual complete construction of the ESS unambiguously discharges Liberty Mutual from any liability under the Performance Bond. Therefore, Liberty Mutual's first argument for summary judgment is rejected.

_2. Material Alteration or Cardinal Change_

*14 Liberty Mutual also claims that it was discharged from its obligation as Millgard's surety because the Joint Venture sought either performance of a fundamentally different (or impossible) obligation or materially altered the original contract. The Court rejects these arguments for summary judgment.

After terminating Millgard in late January 1998, the Joint Venture sought bids for completion of the alternate ESS in light of the recent information about the subsurface condition of the site. (Cruz Aff. ¶ 42.) On March 18, 1998, the Joint Venture entered into a subcontract with Bauer of America, a subcontractor that had previously submitted a bid to build the ESS during the initial bidding phase of the Project. (Cruz Aff. ¶ 18.) The Bauer subcontract specified a

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
(Cite as: 2002 WL 31812710 (S.D.N.Y.))

Page 13

continuous concrete pile and jet grout wall as an alternate ESS rather than a soil-mix wall, as originally contemplated in the Millgard Subcontract. (Maloney Aff. Ex. H.) According to the record before the Court, between the time of Millgard's termination and the construction of the ESS, the Joint Venture neither requested that Liberty Mutual complete the ESS nor received any subsequent payments indemnifying the Joint Venture for the additional expense involved in retaining Bauer to complete the ESS.

[7] The parties, of course, draw different conclusions from this sequence of events. Liberty Mutual asserts that the Joint Venture's decision to construct a different alternate ESS rendered Liberty Mutual's performance impossible or constituted a "cardinal change" in the underlying contract. (Liberty Mutual Memo. in Support at 10-11.) The Joint Venture counters that the decision to build a differently designed ESS was made after Millgard's breach of its contractual obligations and subsequent termination, and thus only impacts the measure of damages. (Joint Venture Memo. in Opp. 13-14.)

Liberty Mutual invokes number of defenses to arrive at its preferred destination-discharge from its surety obligations. One type of defense is based on the Performance Bond itself. When a surety executes a bond, it assumes certain risks, and the obligee and principal cannot then change the surety's obligation (and thereby the underlying risks) without the surety's consent. *Becker,* 280 N.Y. at 151, 19 N.E.2d at 999. If the alteration changes the nature of the contract, the surety is discharged. *Bier Pension Plan Trust v. Schneierson,* 74 N.Y.2d 312, 546 N.Y.S.2d 824, 545 N.E.2d 1212 (1989); *In re Liquidation of Union Ind. Ins. Co. (Corcoran v. 43 W. 61st St. Assoc.),* 234 A.D.2d 120, 651 N.Y.S.2d 436 (1st Dep't 1996); *63 N.Y. Jur.2d Guaranty & Suretyship* §§ 194, 197.

Discharge after a material alteration of the underlying contract is analytically distinct from a second type of defense that the surety may assert, which is based on the principal's defenses to performance of the underlying contract. In the former situation, the principal and obligee join in changing the underlying contract or entering a new contract without the consent of the surety. In the latter situation, the principal contends that it is excused from performing its contractual obligations by virtue of the impossibility of performance or the obligee's request for a "cardinal change." If so, a surety may stand in the shoes of the principal and assert-as its own defenses to its surety obligation-the principal's

contractual defenses. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Alexander,* 728 F.Supp. 192, 198 (S.D.N.Y.1989); *Restatement (Third) of Suretyship & Guaranty* § 34 (1996).

*15 Resolving all ambiguity in favor of the nonmovant, Liberty Mutual has not shown that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Liberty Mutual first points to the alternate ESS built by Bauer and argues that it was fundamentally different from the soil-mix ESS contemplated in the Subcontract. Such a change, if instituted, may have materially altered the Subcontract or represented such a fundamental change that the surety would be discharged. *See In re Liquidation of Union Ind. Ins. Co.(Success Const. v. Superintendent of Ins.),* 220 A.D.2d 339, 632 N.Y.S.2d 788 (1st Dep't 1995) (holding that expanding the scope of the work under the original subcontract to include additional stonework and increasing the contract price materially altered the underlying obligation, thus discharging the surety). The problem with Liberty Mutual's position, however, is the lack of any indication that the Joint Venture asked Millgard to construct a different alternate ESS or indeed sought to make any material alteration in the Subcontract prior to Millgard's termination. *See H.P.I. Int'l v. Kronen,* 203 A.D.2d 325, 326, 610 N.Y.S.2d 87, 88 (2d Dep't 1994). Rather than a change in the Joint Venture-Millgard relationship, the Joint Venture's actions *after* Millgard's termination constituted a new contract with another party and represented, at most, a decision how to complete the ESS expeditiously in light of the condition of the subsurface soil, the possibility of further delay on the Project, and the Joint Venture's duty to mitigate damages already incurred as a result of Millgard's breach. *See Tynan Incinerator Co. v. Int'l Fid. Ins. Co.,* 117 A.D.2d 796, 797, 499 N.Y.S.2d 118, 120 (2d Dep't 1986).

Although its position is somewhat unclear, Liberty Mutual may also attempt to invoke the second type of surety defense, which depends on Millgard's defenses, as principal, to liability under the Subcontract. A variety of such defenses may be available. *Cf. Nat'l Contracting Co. v. Hudson River Water Power Co.,* 192 N.Y. 209, 84 N.Y. 965, 967 (1908) (holding that a contractor had the right to abandon a contract for the construction of a masonry dam after the owner decided to change the dam design to an earthen dam with a masonry core). At the present stage of this litigation, however, numerous disputed issues of material fact regarding the actual cause of the failure of the soil-mix alternate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31812710 (S.D.N.Y.)
**(Cite as: 2002 WL 31812710 (S.D.N.Y.))**

ESS make summary judgment inappropriate. _United States v. Seaboard Surety Co., 622 F.Supp. 882, 887 (E.D.N.Y.),_ aff'd _817 F.2d 956 (2d Cir.1985)_ (rejecting sureties' motion for summary judgment, which asserted that performance of the construction contract was impossible or constituted a cardinal change, because it raised fact issues for trial).

III. CONCLUSION

For the foregoing reasons, Millgard's motion to amend to the amend complaint is granted in part and denied in part; the Court approves the settlement and dismisses the third-party action, with prejudice, pursuant to Rule 41(a)(2); and Liberty Mutual's motion for summary judgment is denied. The parties are directed to submit a pre-trial order thirty (30) days from the date of this Memorandum and Order.

**\*16 SO ORDERED**

2002 WL 31812710 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23951680 (Trial Pleading) (Oct. 08, 2003)

• 2003 WL 23671591 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of the Joint Venture Aligned Defendants to Deem the Counterclaims Against Millgard As Claims in The Nature of Recoupment (Apr. 10, 2003)

• 2002 WL 32595616 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Liberty Mutual Insurance Company's Motion for Summary Judgment (Dec. 02, 2002)

• 2002 WL 32595612 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Millgard's Cross-Motion for Leave to Amend Pleadings (Nov. 19, 2002)

• 2002 WL 32595608 (Trial Motion, Memorandum and Affidavit) Memorandum of the Third Party Defendants, Gza Parties, in Support of Their Opposition to the Cross-Motion of the Plaintiff, Millgard Corporation for Leave to Amend to Assert Direct Claims Against the Gza Parties (Nov. 08, 2002)

• 2002 WL 32595603 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion for Summary Judgment (Oct. 28, 2002)

• 2002 WL 32595598 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend Complaint (Oct. 09, 2002)

• 2002 WL 32595600 (Trial Motion, Memorandum and Affidavit) Amended Memorandum of Law in Support of Plaintiff's Motion for Leave to Amend Complaint (Oct. 09, 2002)

• 2002 WL 32595597 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Order to Show Cause to Approve Settlement (Sep. 11, 2002)

• 1999 WL 33885578 (Trial Motion, Memorandum and Affidavit) Reply to Gzany Counterclaims (Dec. 10, 1999)

• _1:99cv02952_ (Docket) (Apr. 23, 1999)

• 1999 WL 33885579 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Liberty Mutual Motion for Summary Judgment (1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHBIIT C

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
TRUEPOSITION, INC. and KSI, Inc., Plaintiffs /
Counterclaim Defendants
v.
ALLEN TELECOM, INC. Defendant / Counterclaim
Plaintiff.
No. C.A. 01-823 GMS.

Jan. 21, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 On December 11, 2001, the plaintiffs, TruePosition, Inc. and KSI, Inc. (collectively "TruePosition") filed a complaint against the defendant, Allen Telecom, Inc. ("Allen"). In the complaint, TruePosition alleges that Allen has infringed three of its patents, namely U.S. Patent No. 4,728,959 ("the '959 patent"), U.S. Patent No. 6,108,555 ("the '555 patent"), and U.S. Patent No. 6,119,013 ("the '013 patent"). Each of these patents discloses a technology for locating cellular phones. In its Answer and Counterclaims (D.I.6, 48), the defendant asserted six affirmative defenses to the plaintiffs' claims, as well as five counterclaims.

Presently before the court is TruePosition's Motion to Dismiss and/or Strike the Defendant's Counterclaims III, IV, and V, and Affirmative Defenses III and VI (D.I.58). For the following reasons, the court will grant in part and deny in part the plaintiffs' motion.

II. STANDARDS OF REVIEW

The plaintiffs move to dismiss Counterclaims III, IV, and V pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal is appropriate pursuant to this Rule if the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In this inquiry, the court must accept as true and view in the light most favorable to the non-movant the well-pleaded allegations of the complaint. Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir.2000). The court 'need not accept as true "unsupported conclusions and unwarranted inferences." ' Id. (quoting City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n. 13 (3d Cir.1998)) (quoting Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir.1997)). However, it is the duty of the court 'to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable.' Id. at 184 (quoting City of Pittsburgh, 147 F.3d at 263).

The plaintiffs rely upon Federal Rules of Civil Procedure 8 and 12(f) for their motion to strike Affirmative Defenses III and VI. Rule 8 requires a "short and plain" statement of a claim or defense. Fed. R. Civ. P. 8(a) and (b). It is well settled that the Federal Rules intend a liberal pleading standard. See Leatherman v. Tarrant County Narcotic Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993) (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"). Indeed, Rule 8 expressly mandates that "[e]ach averment of a pleading shall be simple, concise, and direct." Fed. R. Civ. P. 8(e).

Rule 12(f) allows a court to strike "any insufficient defense" from any pleading. Fed. R. Civ. P. 12(f). Motions to strike affirmative defenses are disfavored. Proctor & Gamble Co. v. Nabisco Brands, Inc., 697 F.Supp. 1360, 1362 (D.Del.1988). When ruling on such a motion, "the [c]ourt must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law." Id.

III. DISCUSSION

A. Counterclaim III

*2 Counterclaim III alleges tortious interference with a contract. The plaintiffs move to dismiss the counterclaim pursuant to Rule 12(b)(6) on the grounds that it fails to plead an essential element of the alleged tort, namely, a breach of the relevant contract.

The tort of interference with a contract requires "an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

intentional act that is a significant factor in causing the breach of the contract." [FN1] *Cantor Fitzgerald, L.P. v. Cantor, 724 A .2d 571, 584 (Del. Ch.1998).* Without a breach, there is no viable tortious interference claim. As to this point, Delaware law is well-settled. *See id.; see also Associated/Acc Int'l, LTD. v. Dupont Flooring Sys. Franchise Co.,* 2002 U.S. Dist. LEXIS 6464, at *27- 28 (D.Del.2002); *DeBakey Corp. v. Raytheon Serv. Co.,* 2002 WL 1273317 (Del. Ch.2000); *Boyer v. Wilmington Materials,* 1997 WL 382979 (Del. Ch.1997); *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del. Ch.1987). There is no discussion in these cases as to behavior that could constitute tortious interference when no breach of contract occurs. Presumably, this is because there is no conduct that could constitute the tort of interference with a contract, unless a breach of that contract results. [FN2]

> FN1. Contrary to the defendant's paraphrasing, the court did not style this element as requiring only some kind of interference and no resultant breach. *See* Answering Brief at 9.

> FN2. Although the defendant acknowledges that "a review of the relevant case law shows that the cases are universally precipitated by a breach of contract," it maintains that "the absence of a total breach does not foreclose recovery for damages caused by improper interference." Answering Brief at 10-11. This assertion is unpersuasive as it applies to interference with a contract, particularly given Allen's conspicuous failure to cite any supporting caselaw for it. Furthermore, Allen's contention that a breach of contract is not required in such a case because "the applicable tort here is, for a reason, labeled 'tortious *interference* with contractual relations' not 'tortious *breach* of contractual relations," ' Answering Brief at 12 n. 5 (emphasis added), is astounding in its fatuity. The tort is not labeled "tortious breach of contractual relations" because a non-party to a contract generally is not bound by the contract and thus can not breach the contract. *See, e.g., Traffas v. Bridge Capital Investors II,* 1993 WL 339293 (D.Kan.1993), at *3 ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the

contract being sued upon.... A party to a contract cannot sue a person who is not a party to that contract for breach of contract."); *Credit Gen. Ins. Co. v. Midwest Indem. Corp.,* 916 F.Supp. 766, 722 (N.D.Ill.1996) (finding "ludicrous" the defendants' contention that a non-party to a contract can breach that contract).

In this case, the contract at issue is between AT & T Wireless Services, Inc. ("AT & T") and Allen for the purchase of Allen's wireless location systems, which systems are the subject of the present patent infringement suit. In its counterclaim, Allen alleges that the plaintiffs, by filing the present suit and by publicizing it, intended to cause a breach of the AT & T contract. Answer and Counterclaims (D.I.48) ¶ ¶ 17-18. This is insufficient to state a claim of tortious interference with a contract because, as the defendant concedes, there has been no breach of the AT & T contract. [FN3] Answering Brief at 10. Therefore, Counterclaim III must be dismissed.

> FN3. The court is mindful of Allen's contention that "much of this may ... be a matter of semantics." Answering Brief at 12 n. 6. Allen argues that, because the original AT & T contract was modified subsequent to TruePosition's initiation of the present suit, it suffered a complete loss of the original anticipated contract. *Id.* Apparently, Allen wishes the court to view this "loss" as a breach. However, a mutual modification of a contract certainly is not a breach. *See, e.g., Anderson v. Golden,* 569 F.Supp. 122, 140 (S.D.Ga.1982) (distinguishing between breach and mutual modification). To the extent such a loss represents the loss of an economic expectation, the corresponding tort is interference with a prospective business opportunity. The court reiterates that Delaware law requires a breach to sustain the tort of interference with a contract.

## B. Counterclaim IV

Counterclaim IV alleges tortious interference with prospective business opportunities. The elements of this tort are: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

Page 3

lawful manner.' _DeBonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1153 (Del.1981)_ (quoting _DeBonaventura v. Nationwide Mut. Ins. Co., 419 A.2d 942, 947 (Del. Ch.1980))_ (citations omitted). The plaintiffs move to dismiss the counterclaim on the grounds that the defendant cannot prove all of the required elements, namely, a prospective business opportunity, or an interference with that opportunity.

The only "prospective business opportunity" at issue in the counterclaim is the AT & T contract. As stated above, the defendant acknowledges a completed and continuing contract with AT & T. Allen's expected business opportunity, thus, appears to have been consummated before the allegedly tortious conduct of the plaintiffs. This is particularly true because "the probability of the business opportunity must be assessed at the time of the alleged interference ." _Malpiede v. Towson, 780 A.2d 1075, 1099 (Del.2001)_. In this case, the alleged interference occurred after Allen had been awarded the contract with AT & T. Answer and Counterclaims (D.I.48) ¶ 17.

*3 Allen maintains, however, that the plaintiffs' interference caused a modification of the expected contract terms. Following TruePosition's commencement of a patent infringement action against Allen and a press release announcing the same, Allen allegedly incurred additional legal expenses in renegotiating certain provisions of the AT & T contract, more onerous indemnification terms in the contract, and damages to its reputation. Thus, Allen contends, TruePosition's actions interfered with its expected business opportunity in that the final terms of the AT & T contract differed from the original terms. For purposes of this motion only, this is sufficient to state a claim of tortious interference with prospective business opportunities. See _McHugh v. Board of Educ., 100 F.Supp.2d 231, 247 n. 15 (D.Del.2000)_ (noting that the tort requires "a valid business relationship or expectancy" and citing cases).

Assuming that these facts constitute a sufficient interference, the counterclaim may be challenged on other grounds, namely, that Allen has not shown that the plaintiffs engaged in any wrongful conduct. To sustain the tort of interference with a business opportunity, the interference must have been improper. _Bohatiuk v. Delaware Chiropractic Servs. Network, L.L.C.,_ 1997 Del.Super. LEXIS 215, at *8-10 (Del.Super.1997). The conduct at issue is the filing of a patent infringement suit and the public announcement of the suit by a press release.

Normally, lawful actions cannot form the basis of a claim of tortious interference, particularly in light of TruePosition's "privilege to compete and protect its own business interests." _Acierno v. Preit-Rubin, Inc., 199 F.R.D. 157, 164-65 (D.Del.2001)_ (dismissing tortious interference with contractual relations claim because defendant corporation and real estate investment trust, in failing to affirmatively suggest to County that competitor plaintiff's property be included in a traffic impact study, committed no wrongful conduct) (citing caselaw). In this case, however, the defendant also has alleged the counterclaim of "sham litigation." In the sham litigation context, the mere initiation of a lawsuit may be wrongful if it constitutes unlawful antitrust activity. Because the court will allow the "sham litigation" counterclaim to stand, _see infra_ Section I.C., the tortious interference with a prospective business opportunity claim must survive as well. It is axiomatic that if the defendant can prove that the instant lawsuit is merely a "sham" and violative of antitrust law, then the filing of the lawsuit constitutes improper conduct. Therefore, in the interest of consistency, and viewing the pleadings in the light most favorable to Allen, Counterclaim IV survives the instant motion to dismiss.

## C. Counterclaim V

TruePosition moves for the dismissal of Counterclaim V, which alleges "sham litigation," on the grounds that such a cause of action does not exist. The term "sham litigation" refers to an exception to the doctrine of antitrust immunity. Immunity to certain antitrust suits was established by the Supreme Court in _Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U .S. 127 (1961)_, and _Mine Workers v. Pennington, 381 U.S. 657 (1965)_. These cases established that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." _Noerr,_ 365 U.S. at 136. The Supreme Court refused to "impute to Congress an intent to invade" the First Amendment right to petition. _Id. at 136._ Thus, the _Noerr-Pennington_ doctrine protects those who petition the government from antitrust liability.

*4 Later caselaw extended _Noerr_ antitrust immunity to "the approach of citizens ... to administrative agencies ... and to courts." _California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972)._ However, such immunity is not afforded to "sham" petitioning that is only "an attempt to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

Page 4

interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144. Litigation is a mere "sham" if it is objectively baseless and subjectively motivated to interfere with business competition by using a governmental process 'as an anticompetitive weapon.' *Professional Real Estate Investors v. Columbia Pictures Indus.,* 508 U.S. 49 (1993) (quoting *Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380 (1991)).

The plaintiffs urge that "sham litigation" is not a cognizable cause of action. The court cannot agree. A counterclaim of sham litigation is, essentially, an assertion that antitrust law has been violated. Indeed, in litigation leading to the Court's decision in *Professional Real Estate Investors,* Columbia Pictures had sued the defendant, PRE, for copyright infringement. *Id.* at 52. The defendant counterclaimed, accusing Columbia of violations of § § 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § § 1-2. *Id.* "In particular, PRE alleged that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade." *Id.* Although the counterclaim did not survive summary judgment on the facts of the case, the Court upheld the validity of the sham counterclaim itself. Indeed, in announcing a two-part test for its application, the Court only clarified the existence and context of the sham litigation exception. [FN4]

> FN4. Of course, as already stated, a violation of antitrust law underlies any sham exception to antitrust immunity. Although the defendant has not specifically pled a violation of the Sherman Act in Counterclaim V, the invocation of the sham litigation doctrine is sufficient to give notice of the basis of its claim. This is particularly true in the context of a Rule 12(b)(6) motion to dismiss, and in light of both the liberal pleading philosophy of the Federal Rules and the court's responsibility 'to examine the complaint to determine if the allegations provide for relief on any possible theory.' *O'Boyle v. Jiffy Lube Int'l, Inc.,* 866 F.2d 88, 93 (3d Cir.1989) (quoting C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357, at 601-02 (1969) (footnotes omitted)).

Since *Professional Real Estate Investors,* the sham litigation exception has been invoked in varied contexts. For example, in a recent case, the Supreme Court refused to strip antitrust immunity from an employer who filed a losing and retaliatory lawsuit where the suit was not objectively baseless. *BE & K Constr. Co. v. NLRB,* 122 S.Ct. 2390 (2002). In so doing, the Court implicitly held that the sham litigation exception applies to the National Labor Relations Act in the same way it applies to the Sherman Act. *See id.* at 2402 (Scalia, J., concurring) ("[T]he implication of our decision today is that ... we will construe the National Labor Relations Act ... in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process.") (emphasis in original). Other courts have applied the immunity principles of *Noerr-Pennington* to other contexts. *See, e.g., State of Missouri v. National Organization of Women,* 620 F.2d 1301, 1318-19 (8th Cir.1980) (applying *Noerr-Pennington* liability principles to state tort laws); *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.,* 858 F.2d 1075, 1084 (5th Cir.1988) (holding that *Noerr-Pennington* doctrine applies to Civil Rights Act liability); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 614-15 (8th Cir.1980) (same). It follows that if the *Noerr-Pennington* immunity principles apply in these contexts, the sham litigation exception to immunity applies as well. [FN5] Other cases have explicitly or implicitly accepted the sham exception in the patent infringement context. *See, e.g., Carroll Touch, Inc. v. Electro Mechanical Sys.,* 15 F.3d 1573 (D.C.Cir.1993) (discussing sham litigation counterclaim in patent infringement context); *U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592, 597 (Fed.Cir.1995) (rejecting sham counterclaim on the facts of the case).

> FN5. Unlike the defendant, however, the court recognizes a distinction between the *Noerr-Pennington* doctrine, which shields petitioners from antitrust liability, and the sham litigation exception, which strips this immunity when the petition is meritless and anticompetitive in nature. *See, e.g.,* Answering Brief at 15 ('... the Noerr-Pennington [*i.e.,* "sham litigation"] doctrine ...').

*5 In sum, the court can find no justification for refusing to allow the sham exception to be litigated in the instant case. Indeed, a copyright infringement action, like that at issue in *Professional Real Estate Investors,* and a patent infringement action such as the one at issue here present such analogous contexts regarding the application of the sham litigation exception that it would strain credibility to announce

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

a relevant and dispositive difference between them. Thus, Counterclaim V may remain, to succeed or fail as it may in the ensuing litigation. [FN6]

> FN6. In this vein, the court stresses that the defendant, of course, will be tasked in the ensuing litigation with proving the elements of the sham litigation exception, namely, that the present patent infringement suit is objectively baseless and subjectively motivated by an intent to interfere with competition. *See Carroll Touch*, 15 F.3d at 1583 (holding that sham litigation counterclaim could not survive summary judgment because defendant did not establish a genuine issue regarding whether the patent infringement action was baseless).

### D. Affirmative Defense III

As its third affirmative defense, Allen alleges that TruePosition engaged in "fraud and/or inequitable conduct" in acquiring the relevant patents. The plaintiffs move to strike the defense, as well as Counterclaim I, which is predicated on the inequitable conduct defense, on the grounds that the affirmative defense does not meet the pleading requirements of Federal Rule of Civil Procedure 9(b).

Rule 9 requires that all pleadings of fraud or mistake "be stated with particularity." Fed. R. Civ. P. 9(b). [FN7] These averments, however, remain subject to the liberal pleading standard of Rule 8, which requires only a "short and plain" statement of a claim or defense. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703 (3d Cir.1996) (citing cases); *see generally Leatherman*, 507 U.S. at 168 (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"); 5 Charles Alan Wright & Arthur R. Miller Federal Practice and Procedure § 1281, at 520-21 (1990) (pleading with particularity under Rule 9(b) should be done consistently with the general philosophy of Rule 8); 2A James W. Moore, Moore's Federal Practice ¶ 8.13, at 8-58 (2d ed.1995) (the mandate of Rule 8 applies "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted).

> FN7. Because the court has found that Allen's pleadings satisfy the heightened pleading requirements of Rule 9(b), it need not address the defendant's argument that Rule 9(b) may not apply to allegations of

inequitable conduct.

The pleading requirements are satisfied by Allen's third affirmative defense. The defense constitutes one paragraph which names the title and publication date of at least one allegedly withheld material prior art publication. In the context of alleged inequitable conduct before the PTO during a patent prosecution, "pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)." *EMC Corp. v. Storage Tech. Corp.*, 921 F.Supp. 1261, 1263 (D.Del.1996). The third affirmative defense discloses at least this much, and thus suffices "to apprise the other party of what is being alleged in a manner sufficient to permit responsive pleadings" as Rule 9 requires. 5 WRIGHT & MILLER § 1296 (1990).

TruePosition objects that the named publication is relevant to only certain of their patents and, therefore, the defendant has not sufficiently pled the defense of inequitable conduct as to the other patents. The court declines, however, to weigh the relevance and materiality of the allegedly withheld prior art for purposes of this motion. It is the court's duty for purposes of this motion only to test the sufficiency of the pleading, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). Furthermore, the Third Circuit has made clear that, although "it is certainly true that allegations of 'date, place or time' " satisfy the pleading requirements, "nothing in [Rule 9] requires them." *Seville Industrial Machinery v. Southmost Machinery*, 742 F.2d 786, 791. The affirmative defense, as pled, suffices to place the plaintiffs on notice of the misconduct with which they are charged. *Id.; see also Scripps Clinic and Research Found., et al. v. Baxter Travenol Lab., et al.*, 1988 WL 22602, at *3 (D.Del.) (defense of inequitable conduct sufficiently pled when defendant simply "allege[d] that [the plaintiff] failed to identify to the PTO relevant prior art of which it was aware").

*6 The motion to strike the third affirmative defense, and to dismiss Counterclaim I, which is at least partially premised on the defense of inequitable conduct, is denied.

### E. Affirmative Defense VI

Finally, the plaintiffs move to strike Affirmative Defense VI, abuse of process, on the grounds that it is not a defense to a patent infringement action, and that, in any event, it has not been pled properly.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 151227 (D.Del.)
(Cite as: 2003 WL 151227 (D.Del.))

The plaintiffs are correct that abuse of process is not a defense to a patent infringement action. Rather, it is a tort, *see* PROSSER, LAW OF TORTS, § 121 (4th Ed.1971), which should have been pled as a counterclaim. This mistake is not fatal, however. Federal Rule of Civil Procedure 8(c) states that "[w]hen a party has mistakenly designated ... a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed. R. Civ. P. 8(c). The court will view the defendant's averment of the "defense" of abuse of process as a counterclaim.

Abuse of process may be alleged in a patent infringement case as in any other. *See, e.g., Bayer AG v. Sony Elecs., Inc.,* 229 F.Supp.2d 332 (D.Del.2002). A claim of abuse of process is established when "the defendant ... prove[s] that the plaintiff had an 'ulterior purpose' and committed 'a willful act in the use of the process that is not proper in the regular conduct of the proceedings .' " *Id.* at 368 (quoting *Feinman v. Bank of Delaware,* 728 F.Supp. 1105, 1115 (D.Del.1990), *aff'd,* 909 F.2d 1475 (3d Cir.1990)). "There must be 'some definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of process ... there is no liability where the [plaintiff] has done nothing more than carry out the process to its authorized conclusion .' " *Id.* (citations omitted).

The defendant has asserted that the "[p]laintiffs have abused the judicial process by bringing the present action based on the [p]atents that [p]laintiffs know are invalid, unenforceable, and/or not infringed." Answer and Counterclaims (D.I.48) at 8. There is no elaboration in the Answer and Counterclaims. The defendant's briefing, however, contends that "the same averments with regard to TruePositions tortious interference with Allen's business contracts and relations also establish a basis to proceed against TruePosition for abuse of process." Answering Brief at 17-18 n. 10.

The defendant's averments are sufficient to sustain a Rule 8, Rule 12(f), or Rule 12(b)(6) motion to strike and/or dismiss. Allen has offered a "short and plain" statement of the claim and has presented a factual context that, viewed in the light most favorable to Allen, states an abuse of process claim. Again, it is the court's duty for purposes of this motion only to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost, 1 F.3d at 183.* Despite the defendant's anemic presentation of its abuse of process claim, the facts presented in the context of its sham litigation and tortious interference claims suffice to state a claim for relief for abuse of process as well. The plaintiffs' motion to dismiss the claim is denied.

IV. CONCLUSION

*7 The court concludes that the defendant's tortious interference with a contract claim can not be sustained because there has been no breach of contract. Allen's other counterclaims of tortious interference with prospective business opportunities, sham litigation, declaratory judgment, and abuse of process survive this motion to dismiss. Likewise, the defendant's third affirmative defense of fraud and/or inequitable conduct may remain.

For the foregoing reasons, IT IS HEREBY ORDERED that:
  1. TruePosition's Motion to Dismiss and/or Strike (D.I.58) is GRANTED IN PART and DENIED IN PART.
  2. Counterclaim III, alleging tortious interference with a contract, is DISMISSED.

2003 WL 151227 (D.Del.)

END OF DOCUMENT

# EXHIBIT D

Westlaw.

Not Reported in A.2d                                                          Page 1
1981 WL 15131 (Del.Ch.)
(Cite as: 1981 WL 15131 (Del.Ch.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
ISSEN & SETTLER
v.
GCS ENTERPRISES, INC.
**CIVIL ACTION No. 5452.**

Submitted: Sept. 29, 1981.
Decided Dec. 7, 1981.

On Plaintiffs' Motion to Vacate A Stay: denied.

John H. Small, William Prickett, Prickett, Jones,
Elliott, Kristol & Schnee, Wilmington.

R. Franklin Balotti, Richards, Layton & Finger,
Wilmington.

HARTNETT, Vice-Chancellor.

**\*1** Plaintiffs Phillip Issen and Maurice Settler moved
to vacate a stay of this litigation entered on December
2, 1977. The stay was originally granted because I
found that there existed a pending action in the
United States District Court for the Northern District
of Illinois (U.S. District Court) involving the same
parties and substantially the same issues which was
filed prior to this Delaware action. *Issen and Settler
v. G.C.S. Enterprises, et al.,* Del.Ch., C.A. No. 5452-
N.C. (December 2, 1977). The present motion, for
the reasons to be discussed, must be denied.

In support of their motion, plaintiffs rely upon a
January 26, 1981, Order of the Illinois U.S. District
Court (January Order) which dismissed all but two of
plaintiffs' claims based on alleged federal securities
violations and denied plaintiffs' request to have the
suit proceed both as a derivative suit and as a class
action. Because of this January Order plaintiffs
contend that the symmetry of parties and issues no
longer exists between the state and federal actions
and therefore urge this Court to vacate the stay.
Defendants, on the other hand, contend that the
stayed action remains unaffected by the January 1981
Order of the U.S. District Court because the plaintiffs

have not yet sought to have adjudicated their state
claims in the U.S. District Court pursuant to that
Court's pendent jurisdiction. See *Maldonado v.
Flynn,* Del.Ch., 417 A.2d 378 (1980). In addition,
defendants contend that plaintiffs' desire for a class
action is quieted by an August 28, 1981, Order of the
U.S. District Court (August Order) certifying a class
for the pre-merger claims and inviting plaintiffs'
participation. After reviewing all the facts and
circumstances, I find that, although the situation has
changed, the changes are not significant enough to
cause me to vacate the stay.

I

The litigation, which has been pending for over
seven and a half years, was first initiated by Phillip
Issen and Seymour Abrams in the U.S. District Court
in Illinois against G.C.S. Enterprises, Inc., (G.C.S.)
and its wholly-owned subsidiary, the Bank of
Lincolnwood (LBI), both of which are Delaware
corporations. Also named as defendants were
various individual directors and major stockholders.
The complaint in the U.S. District Court alleged
various violations of the federal securities laws and
also asserted various pendent state causes of action
for breach of fiduciary duty. The plaintiffs sought
relief individually and as representatives of a class of
GCS stockholders or, in the alternative, derivatively
on behalf of GCS. These actions were consolidated
in the U.S. District Court and represent the so-called
"pre-merger" claims.

During the pendency of the U.S. District Court
action, a merger was effectuated between GCS and
LBI resulting in the cash-out of GCS's minor
shareholders. As a result, in November of 1977,
Issen and Abrams moved to amend their consolidated
complaint to challenge the merger and its
accompanying transactions as violative of both the
federal securities laws and the Delaware law relating
to mergers, (8 *Del.C.* § § 228 and 251). Similarly,
plaintiffs sought relief individually and as
representatives of a class of GCS's minority
shareholders or in the alternative derivatively on
behalf of GCS. These allegations represent the so-
called merger claims.

**\*2** Shortly after plaintiffs moved to amend their U.S.
District Court complaint, Issen and Maurice Settler
filed this suit in this Court. In their Delaware
complaint, the plaintiffs alleged essentially the same

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1981 WL 15131 (Del.Ch.)
(Cite as: 1981 WL 15131 (Del.Ch.))

violations of Delaware law relating to mergers as were then before the U.S. District Court pursuant to its pendent jurisdiction. The Delaware suit also sought relief derivatively on behalf of GCS and sought a class action on behalf of GCS's minority shareholders. As indicated earlier, defendants moved to stay the Delaware action which was granted because the Delaware action essentially mirrored the earlier initiated U.S. District Court action.

At present, discovery in the federal action is complete with respect to the pre-merger claims and substantially complete with respect to the merger claims. All individual defendants are presently before the U.S. District Court, but several of them are apparently beyond the jurisdictional reach of this Court.

## II

The decision whether to stay an action depends upon the facts of each case and is discretionary. In exercising its discretion, the Court is guided by policy considerations which promote the efficient administration of justice. As set forth in *McWane Cast Iron P. Corp. v. McDowell-Wellman E. Co.*, Del.Supr., 263 A.2d 281 (1970):

"... a Delaware action will not be stayed as a matter of right by reason of a prior action pending in another jurisdiction involving the same parties and the same issues; ... such stay may be warranted, however, by facts and circumstances sufficient to move the discretion of the Court; ... such discretion should be exercised freely in favor of the stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues; ... as a general rule, litigation should be confined to the forum in which it is first commenced, and a defendant should not be permitted to defeat the plaintiff's choice of forum in pending suit by commencing litigation involving the same cause of action in another jurisdiction of its own choosing, ... these concepts are impelled by consideration of comity and the necessities of an orderly and efficient administration of justice." 263 A.2d at 283.

Moreover, an absolute identity of issues and participants are not always necessary prerequisites for a stay. *Life Assur. Co. of Pa. v. Associated Invest. Int. Corp.*, Del.Ch., 312 A.2d 337 (1973), and *Western Saving Fund Society of Phil. v. A.U.C. Corp.*, Del.Super., 305 A.2d 632 (1973). Obviously, these same principles must be considered on a motion

to vacate a stay.

## III

Initially it should be noted that it is unnecessary to consider the August 1981 Order entered by the U.S. District Court. That Order merely certified a narrow class for purposes of litigating the pre-merger claims. The class was limited to those GCS shareholders who purchased their stock between January 1, 1969, and April 10, 1970. Conversely, the Delaware action deals exclusively with the merger. Accordingly, any class certified with respect to these latter claims would necessarily include those GCS shareholders owning GCS stock at the time of the merger--October 24, 1977.

*3 To be considered, however, is whether substantially the same issues are still before the U.S. District Court and whether the same parties also remain before the U.S. District Court. Finally, the factors peculiar to this litigation must be considered.

## IV

I am satisfied that substantially the same issues remain before both the U.S. District Court and this Court. The January 26, 1981, Order of the District Court merely tested the alleged federal securities violations against defendants' motion to dismiss. These allegations were of course never before this Court. Nor did the U.S. District Court address the merits of the underlying state claims. That Court did, however, rule that plaintiffs' allegations as to violations of section 10(b) and Rule 10(b)(5) of the Securities and Exchange Commission were sufficient to state a cause of action. Accordingly, the U.S. District Court's pendent jurisdiction to hear the state claims is preserved. It is clear that both the state and federal claims derive from a common nucleus of operative facts and therefore are within the U.S. District Court's power to hear the whole. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Moreover, plaintiffs are compelled to assert their state claims in the U.S. District Court or risk the possibility of having them barred by the doctrine of *res judicata. Maldonado v. Flynn*, supra. This sound policy is premised on the desirability to resolve an entire controversy in a single lawsuit and recognizes that only a plaintiff can place a federal District Court in the position to decide whether to exercise its discretionary pendent jurisdiction. Since the U.S. District Court has not yet considered whether to assert its pendent jurisdiction, plaintiffs' present motion in this Court is at best premature. Thus, at this point, substantially the same issues are still before both the U.S. District

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 3
1981 WL 15131 (Del.Ch.)
**(Cite as: 1981 WL 15131 (Del.Ch.))**

Court and this Court.

V

Next, when considering the effect of the January 1981 U.S. District Court Order upon the identity of the parties, I find that there has been some change. The U.S. District Court denied plaintiffs' standing to sue derivatively on behalf of GCS stating:

"Since the threshold requirment of Abrams' 10(b)(5) action is that he be a "seller" of securities, which requirement is satisfied by the merger that effectively eliminated the minority shareholders from GCS, he does not meet either of the Rule 23.1 requirements. He was not a shareholder at the commencement of the litigation, with respect to the amendment to the complaint, nor during its pendency since he is constructively viewed as having sold his shares in order to invoke this Court's jurisdiction in the first place. Abrams cannot have it both ways by claiming to be a seller of securities for purposes of standing under 10(b)(5) and a shareholder for purposes of derivative standing." 508 F.Supp. at 1295.

Thus, the parties have changed at least in form. However, a change in form under these circumstances is not significant enough to justify a vacation of the stay.

*4 A stockholder's right to sue derivatively is an important one conferred upon him by Delaware law. *Parvin v. Kaufmann*, Del.Supr., 236 A.2d 425 (1967). Of course, this right is not without its limitations. See *Zapata Corp. v. Maldonado*, Del.Supr., 430 A.2d 779 (1981). A shareholder's right to sue derivatively in a forum of his choice is not to be disregarded except for compelling reasons. I find that compelling reasons do exist, however, which necessitate a denial of plaintiffs' motion to lift the stay.

The first of these reasons is that stockholder derivative actions are susceptible of duplicitous and expensive suits for the determination of common issues. 13 *FLETCHER Cyclopedia Corporations* (Perm.Ed.) § 6024. Insofar as the same issues are now before the U.S. District Court, a vacation of the stay in this Court would lead to a gross duplication of judicial resources.

Secondly, the federal action is appreciably more advanced and there exists the possibility of an early disposition of the controlling issues on the merits. The principles of comity should and probably would preclude a relitigation in this Court of issues decided

in the U.S. District Court action.

Thirdly, if this Court vacated the stay and allowed the two suits to proceed simultaneously, there exists the possibility of inconsistent results. This is clearly contra to the concepts of judicial economy and substantial justice.

Fourth, all the individual defendants are presently before the U.S. District Court and several of them are beyond this Court's jurisdictional reach. These individual defendants might be indispensable to this Court's ability to grant complete relief.

Next, in the U.S. District Court action, there have been alleged, derivatively, several federal securities act violations. Therefore, the U.S. District Court, which has exclusive jurisdiction over these matters, is the only forum capable of granting complete relief on all the issues arising out of the transactions which are the subject of this litigation.

Finally, the merits of plaintiffs' allegations are still before the U.S. District Court and will presumably be considered in due time. If the posture of the District Court suit changes so that plaintiffs cannot receive an adjudication on the merits of their claims, then this Delaware action will still be available to them. It is therefore proper for this Court to defer to the U.S. District Court.

VI

With respect to plaintiffs' denial of a class action status concerning the merger claims, I find that the reasons enumerated above likewise mitigate against granting plaintiffs' motion. However, plaintiffs also rely on a portion of the January 1981 Order of the U.S. District Court where plaintiffs' request to represent a class for the merger aspects of the suit was denied and construe this portion of the Order as relegating the class to a state court for relief. The focal point is the following sentence:

"Moreover, at least two shareholders, Phillip Issen and Maurice Settler, have filed a class action in Delaware state court seeking appraisal on behalf of part of the same class of GCS stockholders at the time of the merger that Abrams seeks to represent in this lawsuit." 508 F.Supp. at 1296.

*5 I cannot agree with plaintiffs' interpretation of this Order because I am not sure what the U.S. District Court means by "appraisal". The action stayed in this Court is not an appraisal action brought pursuant to 8 *Del.C.* § 202. Plaintiffs have not and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1981 WL 15131 (Del.Ch.)
(Cite as: 1981 WL 15131 (Del.Ch.))

are not now seeking in this Court an appraisal of their shares after a merger.   Instead they are challenging the validity of the merger.

### VII

Finally, because of the procedural setting of the two litigations, the stay should not be lifted. Chronologically, the U.S. District Court action was filed first and as a general rule litigation should be confined to the forum in which it was first commenced as long as it is still pending and is viable. In addition, the U.S. District Court action is appreciably more advanced both in discovery and in resolution of the issues.   Nor have plaintiffs shown that any hardship to them exists because plaintiffs hold the key to extricate themselves from their predicament.   Procedural avenues are available to them in the federal court which would enable them to have a speedy and adequate remedy if they desire. To lift the stay in Delaware would only cause wasteful duplication of time, effort and expense--not only to the defendants but also to the courts.   A party is entitled to but one lawsuit arising out of but one transaction. *Maldonado v. Flynn,* supra.

The plaintiffs' motion to vacate the stay is therefore denied.   SO ORDERED.

1981 WL 15131 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in A.2d                                                                 Page 1
1978 WL 194996 (Del.Super.)
(Cite as: 1978 WL 194996 (Del.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
IRVIN INDUSTRIES, INC.
v.
GATEWAY INDUSTRIES, INC.
No. 1268 Civ.A.1975.

Submitted March 16, 1978.
Decided April 26, 1978.

Gentlemen:

BIFFERATO, J.

*1 This case is before the Court on plaintiff Irvin
Industries, Inc.'s    ("Irvin") motion to stay the
proceedings in this Court pending the outcome of the
suit it has filed in Federal Court against the defendant
Gateway Industries, Inc. ("Gateway").

Irvin filed suit in this Court on October 21, 1975,
and in its complaint, Irvin sought to enforce the
Agreement of February 7, 1974 ("Agreement") which
gave Gateway a license to manufacture and sell an
Irvin seat belt known as a "low profile" buckle seat
belt. Under the terms of the Agreement, Gateway was
to pay Irvin $100,000 each model year for the model
years 1975, 1976 and 1977 if the seat belt was
accepted by General Motors. The first $100,000 was
paid by Gateway in two installments of $50,000 but
Irvin did not receive any further payments. Irvin then
initiated this suit to recover the $200,000 it claims
Gateway owes under the Agreement. Gateway
answered by denying that any additional money was
owed under the Agreement and counterclaimed for
the return of the $100,000 already paid. Gateway
argues that since none of the Irvin seat belts were
ever sold to General Motors, the Agreement did not
require payment of the second and third year
payments, and Gateway seeks return of the initial
payment on the ground that Irvin failed to timely
supply certain technical information and other data as
required by the Agreement. Discovery has been
undertaker by both parties; pretrial conferences have
been held and trial has tentatively been scheduled for
June, 1978.

During the pendency of this suit, Irvin became aware
of a possible conflict with Gateway over the
manufacture of a new Gateway seat belt, the "900
buckle." The designer of that seat belt was Lou
Romanzi, a former Irvin employee, now a Gateway
employee. Although not entirely clear from the
record before this Court, presumably Irvin felt that
the "900 buckle" was similar to an Irvin seat belt and
thus suspected that Romanzi had misappropriated
some confidential information and/or trade secrets
when he left, or that Gateway had used some of the
technical information they had received under the
Agreement. Accordingly, on November 18, 1977,
Irvin filed an action in Federal Court in Delaware
charging   Gateway   with   patent   infringement,
misappropriation of trade secrets and confidential
information, and breach of various clauses of the
Agreement. [FN1] In its allegations of breach, Irvin
included the allegations presently before this Court as
well as alleging breaches of some other clauses of the
Agreement. Irvin submits that it was forced to wait
until November, 1977 to file its federal action
because Irvin did not receive a patent for the "low
profile" buckle until October, 1977. Irvin has asked
this Court to stay its proceedings on the grounds that
a full and complete disposition of all disputed issues
can be granted by the Federal Court, thus resulting in
judicial economy. Gateway opposes the motion on
the grounds that the issues before this Court are
separate and distinct from the issues facing the
Federal Court; that the litigation in this Court is two
years older than the federal litigation and is presently
ready for trial, and that any decision rendered by this
Court would serve as *res judicata* or collateral
estoppel in the federal action.

FN1. Jurisdiction in Federal Court for the
first two counts dealing with patent
infringement and misappropriation of trade
secrets is predicated on 28 U.S.C. § 1338(a)
and (b) which grant exclusive jurisdiction to
the federal courts to hear actions arising
under the patent laws. Jurisdiction over the
third count dealing with the breach of the
Agreement is presumably based on diversity
jurisdiction. Irvin is a New York corporation
with its principal place of business in
Connecticut and Gateway is a Delaware
corporation with its principal place of
business in Illinois. In addition, the amount

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
1978 WL 194996 (Del.Super.)
(Cite as: 1978 WL 194996 (Del.Super.))

in controversy for that claim exceeds $10,000.

*2 The case law dealing with motions to stay is extensive and, while certain factors are always deemed to be relevant, the application of those factors is on a case-by-case basis. The relevant factors include: (1) the applicability of Delaware law; (2) the relative ease of access to proof; (3) the availability of compulsory process for witnesses; (4) the pendency or nonpendency of a similar action or actions in another jurisdiction, and (5) all other practical considerations which would make the trial easy, expeditious and inexpensive. *Life Assurance Company of Pennsylvania v. Associated Investors International Company,* Del.Ch., 312 A.2d 337 (1973); *Lear Siegler, Inc. v. Sargent Industries,* Del.Super., 374 A.2d 273 (1977). In the present case, the relevance of many of those factors is diminished because the choice presented is litigation in a state court in Delaware or in a federal court in Delaware. By way of contrast, the choice in *Life Assurance Company of Pennsylvania, supra,* was either litigation in a Delaware state court or in England, and in *Lear Siegler, supra,* the choice was between a Delaware state court and a California federal court.

In another way, this case presents an unusual situation. For perhaps the first time, the party seeking the stay is the plaintiff in both the state and federal actions. In *Life Assurance Company of Pennsylvania, supra,* the party seeking the stay was the defendant in the state court action but was the plaintiff in the previously filed action in England, and in *Lear Siegler, supra,* the party asking for the stay was again the defendant in the state action and the plaintiff in the action filed in Federal Court in California 19 days after the suit was begun in Delaware. Similarly, in *McWane Cast Iron Pipe Co. v. McDowell-Williams Engineering Company,* Del.Supr., 263 A.2d 281 (1970), McWane began by suing McDowell-Williams in Federal Court in Alabama and one month later McDowell-Williams filed suit in Delaware against McWane. McWane then sought a stay in the Delaware action. Under the factual situations outlined above, an important consideration for the court is that the plaintiff in the first action should not be deprived of his chosen forum by defendant's motion to stay those proceedings in favor of an action initiated by the latter party in the forum of its choice. *McWane Cast Iron Pipe Co., supra.* That particular consideration is not applicable in the present case since the plaintiff first selected the state court as the forum for its breach of contract action and then brought a patent infringement action in Federal

Court, and it is the defendant who opposes the motion to stay and seeks to impose upon the plaintiff the burden of going forward in the forum chosen by the plaintiff. Under the particular circumstances presented by this case, the prime considerations are judicial economy and fairness to the litigants.

Whenever a decision is made as to whether or not to grant a motion to stay, the Court takes into consideration the need for judicial economy. In *McWane Cast Iron Pipe Co., supra,* the Court stated that it was seeking to avoid the duplication of time, effort and expense that would occur if judges, lawyers, parties and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts. The Court also indicated that it wanted to avoid inconsistent and conflicting judgments if the cases were decided in separate courts. In *Life Assurance Company of Pennsylvania, supra,* the Delaware Court felt that jurisdiction should be retained by the Court that had already been exercising jurisdiction for two years. Judicial economy will still be a consideration even if the two pending cases do not involve exactly the same issues or the same parties. *Lanova Corp. v. Atlas Imperial Diesel Engine Co.,* Del.Super., 64 A.2d 419 (1949). However, the need for judicial economy must be balanced by considerations of fairness to the litigants. *Western Savings Fund Society of Philadelphia v. A.V.C. Corp.,* Del.Super., 305 A.2d 632 (1973). As one of its grounds for opposing the motion to stay, Gateway indicates that it feels that Irvin is only trying to delay the determination of the breach of contract issues by attempting to consolidate those issues with the patent infringement issues.

*3 However, judicial economy will not result unless the issues presented in the two cases are similar. If confusion would result if the two distinct types of action were tried in one court, then in the interest of judicial economy, two trials should be held. In the action filed in this Court, Irvin and Gateway are disputing the interpretation to be given to various clauses in the License Agreement. That Agreement dealt with the manufacture and sale by Gateway of an Irvin "low profile" buckle seat belt to General Motors. Due to a change in the federal regulations as to the requirements for seat belts, General Motors never purchased any of the Irvin seat belts. Irvin contends that it is entitled to payment under the Agreement even though no belts were sold; Gateway claims that it is entitled to the return of money paid under the Agreement. Thus, the state court action revolves around the interpretation that was in effect between the parties in 1974 and early 1975. A review

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1978 WL 194996 (Del.Super.)
**(Cite as: 1978 WL 194996 (Del.Super.))**

of the complaint in the federal action indicates that that action alleges that a seat belt designed by Gateway in 1975 was substantially similar to the Irvin "low profile" buckle seat belt and that the technical information for the design came from information Gateway received under the License Agreement and from a former Irvin employee. While the allegations in both actions are concerned with the "low profile" buckle seat belt, the two actions are separate and distinct and involve different time periods; confusion between these two distinct types of actions would therefore be minimal.

Judicial economy would best be served by granting a stay of these proceedings. Even though a trial date has been set, this Court, acting under a mandate of the Supreme Court, must give preference to any serious pending criminal case. This Court, in April alone, has continued many civil cases in order to try serious criminal cases. Therefore, the June trial date may be unrealistic.

One trial of both causes of action promotes economy and fairness to the litigants. The parties are the same in both lawsuits; many of the witnesses would be the same; technical terminology and information needed by the Court would be similar; pretrial discovery in this case could be used in the District Court, and the preparation time and expense is usually less for one trial. Plaintiff's motion for a stay is therefore GRANTED.

IT IS SO ORDERED.

1978 WL 194996 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHBIIT F

Westlaw.

Not Reported in F.Supp.2d                                           Page 1
2004 WL 502186 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,950
(Cite as: 2004 WL 502186 (S.D.N.Y.))

C

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
Naomi HUNT and William Hunt, Plaintiffs,
v.
STRYKER CORPORATION and Howmedica
Osteonics Corp., Defendants.
No. 03 Civ. 7385(RWS).

March 10, 2004.
Vogel & Rosenberg, New York, NY, By: Stuart
Dimartini, for Plaintiffs, of counsel.

Manatt, Phelps & Phillips, New York, NY, By:
Ronald G. Blum, for Defendants Stryker Corporation
and Howmedica Osteonics Corporation, of counsel.

*OPINION*

SWEET, J.

*1 Plaintiffs Naomi Hunt ("Ms.Hunt") and William
Hunt ("Mr.Hunt") have moved (1) to join additional
defendants pursuant to Fed .R.Civ.P. 20; and (2) to
remand this action to New York State Court pursuant
to 28 U.S.C. § 1447(e). For the reasons set forth
below, the motion is granted.

*Background and Prior Proceedings*

On May 9, 2000, in the Supreme Court of the State
of New York, New York County, the plaintiffs filed a
summons with notice against Steven Stuchin, M.D.
("Dr.Stuchin") and the Hospital for Joint Diseases
(the "Hospital") (collectively, the "medical
malpractice defendants"), describing the case as a
medical malpractice and negligence action. *See
Naomi Hunt and William Hunt v. Steven Stuchin,
M.D. and Hospital for Joint Diseases,* N.Y. County
Index No. 00/110459. On February 6, 2001, plaintiffs
filed a verified complaint.

The complaint alleges that the medical malpractice
defendants were negligent in providing medical
treatment in connection with a total hip replacement
performed on Ms. Hunt in November 1997. On
August 18, 2000, Dr. Stuchin advised Ms. Hunt that

the device implanted during the November surgery
had fractured and failed.

On April 25, 2002, during his deposition, Dr.
Stuchin testified that he would not have expected the
device in Ms. Hunt's hip to have failed within three
years of implementation. Dr. Stuchin suggested that
the product was defective.

The state court action proceeded through the
completion of discovery. By order dated March 19,
2002, New York Supreme Court Justice Ellen
Bransten required that plaintiffs file a note of issue on
or before May 7, 2002 certifying that discovery was
complete and the case ready for trial. By letter dated
November 8, 2002, plaintiffs' counsel sought
adjournment of a court conference in order to
continue investigating a claim against the
manufacturer of the implant. On February 19, 2003,
the parties to the state court action entered into a
stipulation vacating the note of issue.

On August 6, 2003, plaintiffs commenced another
action in the Supreme Court of the State of New
York, New York County, captioned *Naomi Hunt and
William Hunt v. Stryker Corporation and Howmedica
Osteonics Corp.,* Index No. 114092-03. Stryker
removed the case to this Court pursuant to 28 U.S.C.
§ 1441(b) and Local Civil Rule 81.1 on September
22, 2003.

On October 15, 2003, plaintiffs moved to join to this
action defendants Dr. Stuchin and the Hospital.
Plaintiffs' motion also seeks an order remanding the
action to state court on the grounds that joinder of the
state court medical malpractice defendants, who are
New York residents, will divest this Court of subject
matter jurisdiction because complete diversity will be
lacking. After submission of briefs, the motion was
fully submitted on November 19, 2003.

*Discussion*

Section 1447(e) of Title 28 of the United States
Code provides:
   If after removal the plaintiff seeks to join
   additional defendants whose joinder would destroy
   subject matter jurisdiction, the court may deny
   joinder, or permit joinder and remand the action to
   the State court.
*2 28 U.S.C. § 1447(e). "Joinder and remand under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 502186 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,950
(Cite as: 2004 WL 502186 (S.D.N.Y.))

1447(e) must first satisfy Fed.R.Civ.P. 20, which permits a joinder of multiple defendants in one action 'if there is asserted against [the defendants] any right to relief in respect of or arising out of the same transaction or occurrences and if any question of law or fact common to all defendants will arise in the action." ' Nazario v. Deere & Co., 295 F.Supp.2d 360, 363 (S.D.N.Y.2003) (quoting Fed.R.Civ.P. 20(a)). It is clear that those requirements are satisfied, as both suits arise out of Ms. Hunt's November 1997 hip replacement. Further, medical malpractice and product liability claims arising out of the same medical procedure raise common questions of law and fact. See Rodriguez v. Abbott Laboratories, 151 F.R.D. 529, 533 (S.D.N.Y.1993).

While the requirements of Rule 20 are necessary, they are not sufficient when joinder would destroy diversity. District courts in this Circuit will only permit joinder under such circumstances if it is consistent with the principles of fundamental fairness. Id. In making this determination, the factors to be considered include:
    (1) any delay, as well as the reason for delay, in seeking joinder; (2) resulting prejudice to defendant; (3) likelihood of multiple litigation; and (4) plaintiff's motivation for the amendment.
Id. (citing Soto v. Barnitt, 00 Civ. 3453, 2000 WL 1206603 at *3 (S.D.N.Y. Aug. 23, 2000); Gursky v. Northwestern Mutual Life Ins. Co., 139 F.R.D. 279, 282 (E.D.N.Y.1991)).

Defendants argue that plaintiffs have unduly delayed because plaintiffs have known about their potential claims against Stryker for three years, or at least since the Dr. Stuchin's deposition a year before this suit was filed. These delays relate to the length of time plaintiffs took to bring their action against the defendants. The only delay that is relevant to joinder considerations, however, is that between the removal of the case and the plaintiffs' motion for joinder and remand. See id. at 363 ("Delay in seeking amendment is measured from the date of removal."); Juliano v. Toyota Motor Sales, U.S.A., Inc., 20 F.Supp.2d 573, 576 (S.D.N.Y.1998) (same). Plaintiffs moved to join the medical malpractice defendants less than four weeks after this case was removed. Further, plaintiffs have stated that it had intended to consolidate this case with the prior state court action, and has provided a stipulation from the medical malpractice defendants showing their consent to the proposed consolidation. No delay, and therefore no resulting prejudice, has been shown.

Defendants' concerns about delay are more

appropriately interpreted as claims of improper motivation on the part of plaintiffs. If the plaintiff seeking joinder "is motivated primarily by a desire to force a remand to the forum of his choice," joinder may be denied on that basis. Rodriguez, 151 F.R.D. at 533 (quoting Wilson v. Famatex GmbH Fabrik Fuer Textilausruestungsmaschinen, 726 F.Supp. 950, 952 (S.D.N.Y.1989)); b ut see Nazario, 295 F.Supp.2d at 365 n. 11 (reviewing cases in this District in which courts "have granted joinder and remand notwithstanding the possibility that a plaintiff's sole motivation was the elimination of diversity of citizenship.").

*3 The chronology of the case does not suggest an improper motive for joinder. Plaintiffs first filed an action against Dr. Stuchin and the Hospital, and only considered a products liability action following Dr. Stuchin's deposition because Ms. Hunt's "symptomatology commenced immediately after the surgery and not after the failure" of the implant. Pl.'s Reply Mem. at 2. At the April 2002 deposition, Dr. Stuchin indicated that he believed the implant failed earlier than it should have. However, it was only in subsequent conversations with Dr. Stuchin's counsel that plaintiffs became aware that the medical malpractice defendants would seek to attribute Ms. Hunt's injuries to the failed implant. See DiMartini Aff. ¶ 15.

Plaintiffs notified the state court in November 2002 that they would undertake an investigation to determine whether a products liability claim would be commenced. The parties in that action then filed a stipulation in February 2003 vacating the note of issue. Id. ¶ 17. In that stipulation, plaintiffs stated that if they filed a new action they would "promptly seek to consolidate said matters upon the joinder of issue therein." Id. Following the filing of the products liability action in August 2003, Dr. Stuchin's counsel stated that he had no objection to the consolidation of the products liability action with the medical malpractice action. Id. ¶ 19.

Defendants cite several cases in which plaintiffs brought new actions within a month or two after learning of the potential liability of additional parties. See Rodriguez, 151 F.R.D. at 533 (plaintiffs brought action one month after learning of drug company's alleged role in plaintiff's injuries; Young v. Simon Ladder Towers, Inc., No., 96-CV-0189E, 1996 WL 685753 (W.D.N.Y. Nov. 26, 1996) (new action filed "shortly after" discovering potential liability of new party); Dieng v. Smith & Nephew Dyonics, Inc., 02 Civ. 8201, 2003 WL 22240748, at *2 (S.D.N.Y. Sept.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 502186 (S.D.N.Y.), Prod.Liab.Rep. (CCH) P 16,950
(Cite as: 2004 WL 502186 (S.D.N.Y.))

Page 3

29, 2003) (new suit filed two months later). While the
plaintiffs did not bring suit as quickly after discovery
as in those cases, defendants have not provided
evidence to suggest that the delay is the result of
anything but the investigation into the claims.

Defendants also argue that by seeking to join
defendants in federal court, plaintiffs will have made
an end run around what they assert is usual state
procedure: asking the state court for leave to amend
the pleadings under N.Y. CPLR § 3025(b). "While
the Court notes that plaintiff[s] could have avoided
the instant motion by simply joining [defendants] to
the original action, the Court sees no reason why the
two actions should not be consolidated now."
Rodriguez, 151 F.R.D. at 533.

Defendants argue that the state court action against
the medical malpractice defendants would be
significantly delayed by the remand of this action.
Because the case has already been put on hold for
plaintiffs to investigate their products liability action,
any further delay is not a reason to deny joinder. If
anything, the prior state court action may have been
delayed by this motion, as the state court had
scheduled a control date of October 28, 2003, when it
had expected to enter a discovery order for all
defendants in the consolidated action. DiMartini Aff.
¶ 19. The plaintiffs, by contrast,
*4 would be unfairly prejudiced by having to
litigate in two different forums. Indeed, such dual
litigation could result in unnecessary expense and
conflicting results. Moreover, the Court finds that
multiple suits would constitute a clear waste of
judicial resources particularly as common
questions of fact would necessitate utilizing the
same witnesses and documents in both cases.
Rodriguez, 151 F.R.D. at 533; see also Dieng, 2003
WL 22240748, at *3 ("Any prejudice to Defendant
that might remain is outweighed by the danger of
multiple litigation and the concomitant waste of
judicial resources.").

Conclusion

In the interest of avoiding separate actions, as well as
for the convenience of witnesses, counsel and the
courts, plaintiffs' motion to join Dr. Stuchin and the
Hospital is granted, and this action is remanded to
state court for further proceedings.

It is so ordered.

2004 WL 502186 (S.D.N.Y.), Prod.Liab.Rep. (CCH)
P 16,950

Motions, Pleadings and Filings (Back to top)

•          1:03cv07385          (Docket)
(Sep. 22, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.