**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| HERCULES INCORPORATED and CYTEC INDUSTRIES, INC., | ) ) ) |
| Defendants. | ) ) |

C. A. No. 04-293 (KAJ)

**EXPERT REPORT OF CHARLES P. KLASS**

I.    **INTRODUCTION**

I have been retained by counsel for Hercules Incorporated to review certain patents, publications, and other materials related to U.S. Patent No. 5,167,766 ("the '766 patent"), as well as provide expert testimony and opinions regarding the papermaking process and ingredients used in that process. I also expect to testify regarding what one of ordinary skill in the art would have understood about the papermaking process and the ingredients used in that process circa 1990, the time the '766 patent application was filed. I also expect to offer my expert opinion that based on my investigation of the facts and the materials I reviewed, U.S. Patent No. 4,720,346, alone or combined with other information and prior art, discloses all of the elements of the asserted claims in the '766 patent.

II.   **INFORMATION CONSIDERED**

In forming my opinion, I have considered the following:

a.    my training, knowledge, and experience in the field of paper making and paper science

b.    Information provided by Robert K. Prud'homme

c.    U.S. Patent No. 5,167,766 (Exhibit B)

d.    U.S. Patent No. 4,720,346 (Exhibit C)

e.    Avery, L.P.  Evaluation of Retention Aids.  TAPPI 62(2) 43-46 (1979) (Exhibit D)

### III.    COMPENSATION

My compensation rate is my usual consultancy rate of $200 per hour plus expenses.

### IV.    PREVIOUS TESTIMONY

In the last four years, I have provided expert testimony in the following litigations:

- Fibermark, Inc. v. Merrimac Paper Company, Inc. (2003) (deposition provided)
- David Rohs, et al. v. Garlock Inc., et al. (2004) (deposition provided)
- TST/IMPRESSO, Inc. v. Asia Pulp & Paper Trading (USA), Inc. (2005) (deposition provided)
- Fibermark, Inc. v. Brownville Specialty Paper Products, Inc. (2005) (deposition and trial testimony provided)
- United States Gypsum Co. v. Pacific Awards Metals Inc. (2005) (deposition provided)

### V.    QUALIFICATIONS

I am presently the principal of Klass Associates Inc., a consulting firm that primarily does work for the pulp and paper industry and affiliated companies. I earned a bachelor's degree in mathematics with a minor in pulp and paper technology and chemistry in 1962 from Western Michigan University. I subsequently received an MBA from Pace University in 1968. I have been working in the paper industry for over forty-five years. I first started working the night shift at the Hamilton Paper Co. mill during college to help finance my education as a laboratory technician. After graduating, I worked in paper

2

engineering positions at Union Camp Corp. in Savannah, Georgia, and at Westvaco Corp. in Luke, Maryland, where I was a process engineer responsible for the operation of several paper machines with an emphasis on machine optimization.

From 1964-68, I was the associate editor of the *Paper Trade Journal*. Subsequently, I worked at Merck Paper Chemicals as a service sales representative and later became the product manager for the polymers, retention, and drainage aid group. I was later promoted to marketing manager of the entire paper chemicals division.

I worked in the papermaking field in other jobs relating to management and marketing until 1986, when I founded Klass Associates. I have consulted for many of the major U.S., European, Asian, and Latin American papermaking companies on an array of issues ranging from technology consulting to due diligence related to mergers and acquisitions.

I joined the Technical Association for the Pulp and Paper Industry ("TAPPI"), the leading technical association for the pulp and paper industry, in 1958 as a student member. Since then, I have been extremely active within that organization. In 1984, I was recognized as a TAPPI Fellow for my contributions to the field. I have served on its Board of Directors from 1986-1989 and was the chairman of the paper and board manufacture division. I have also served on the papermakers and paper additives committees. In 1994, I received the TAPPI Distinguished Service Award, recognizing lifetime achievement.

I am currently serving on the editorial board of the TAPPI publication, *Solutions*, as well as the *TAAPI Journal*, which is peer-reviewed. I have taught numerous courses in the field, both in the U.S. and abroad, including those dealing with retention and drainage, coating, and recycled fiber processing.

I am also an adjunct professor of paper engineering at Western Michigan University, where my duties include teaching and advising graduate students. In addition, I am the co-director of a research consortium directed to addressing barriers to the recycling process. I have been a trustee of the Paper Technology Foundation at Western Michigan University for the last twelve years, and in 2002, I was named a Fellow of the Foundation.

I am named as a co-inventor on two U.S. patents and four international patents in the papermaking field and have about 150 publications, about twelve of which were peer-reviewed.

My professional experience is more fully detailed in my curriculum vitae, which is attached to this report in Exhibit A. Exhibit A also contains a list of my publications in the last ten years.

## VI.    ANTICIPATED TESTIMONY

### A.    BACKGROUND

Papermaking is a vital technology today. Products ranging from writing paper to tissue paper, and cardboard to food packaging rely on the same basic technology. Wood logs are chopped up into small chips and pressure cooked with water and chemicals to make a pulp. This pulp is a mushy, watery solution that is then spread onto a long-wire screen to allow the drainage of water. As the water is drained, via gravity and vacuum, the pulp fibers that remain on top of the

wire screen begin to form together to make a paper sheet after drying. This process takes place on a moving machine somewhat resembling a conveyor belt that moves at about fifty feet per second. Needless to say, at these speeds, the water, which constitutes about 200 pounds for every pound of paper fiber, must be drained out extremely quickly. Indeed, most commercial applications require this drainage and the beginning of paper formation in about one second.

Additives, such as retention and drainage aids, are common in the papermaking industry. They are used to help drain water from the pulp mixture rapidly by attracting the fibers together, thereby keeping the pulp together on top of the screen, but causing the water to drain out from below faster. Early on, in the 1950's, the most commonly used additive was cationic alum. However, alum is optimally used in relatively harsh acid conditions, which leads to weaker paper. Additionally, the use of alum precludes the use of a calcium carbonate, which is a popular filler used in the industry. Technological advancement led to the development of polymers, such as anionic polyacrylamides, that could be used in combination with alum. Later, through the 1960's and 1970's, cationic polyacrylamides were developed. In the 1980's, silica and bentonite were developed as additives, depending on the type of paper to be made. In the 1990s, the technology developed further to include micropolymer technology, which are basically insoluble, organic microbeads. The '766 patent covers this type of technology.

The analysis of the '766 patent requires a basic understanding of what was known about papermaking at the time when the patent application was filed.

5

A proper analysis must also take into account the perspective of one of ordinary skill in the art, which, in my opinion, would be a person with at least a bachelor's degree in chemistry, chemical engineering, papermaking science, polymer science, or another related discipline, together with about five years experience in the area of papermaking with an emphasis on retention and drainage aids at the time the application leading to the '766 patent was filed.

### B.    ANALYSIS OF THE '766 PATENT

I was asked to evaluate claims 1, 3, 5, 9, 11, 13, 17, 21, 23, and 25 of the '766 patent (attached as Exhibit B), together with prior art, U.S. Patent No. 4,720,346 (attached as Exhibit C), which I will refer to as the Flesher patent. After carefully reviewing the '766 and Flesher patents, I conclude that the Flesher patent discloses all the elements in claims 1, 3, 5, 9, 11, 13, 17, 21 of the '766 patent to one of ordinary skill in the art.  Furthermore, the Flesher patent in combination with the standard knowledge of one skilled in the papermaking art, as shown for example in Avery's TAPPI article entitled "Evaluation of Retention Aids," would have rendered obvious claims 23 and 25 of the '766 patent.

#### a.    Claim 1

Claim 1 of the '766 patent calls for a method of making paper where an ionic, organic, cross-linked polymeric microbead is added to the aqueous paper furnish in an amount of 0.05 to 20 lbs/ton.  Additionally, the unswollen particle size of the microbead should be less than about 750 nanometers and have an ionicity of at least 1%, but at least 5% if anionic and used alone.

The Flesher patent describes claim 1 of the '766 patent.  The first part of claim 1 is well known to those skilled in the art.  Polymeric additives are always

6

added to the aqueous paper furnish, as it would defeat the purpose if they were added after the pulp dries. The Flesher patent mentions a method of making paper where the polymer is added to the aqueous paper furnish (column 5, lines 35-65). When the Flesher patent mentions "flocculation" or "coagulation," one skilled in the art would know that whatever concept is being discussed would apply to papermaking.

The amount of additive claimed, 0.05 to 20 lbs/ton, is a very large range. In my experience, virtually all papermaking processes that use polymer additives would add the polymer in that range. The typical amount of polymer added is usually from about 0.5 to 2 or 3 lbs/ton. This is roughly the same amount that silica and bentonite are added; in general, silica is added in the 1 to 3 lbs/ton range, while bentonite is added in the 2 to 5 lbs/ton range, depending on the application. Since the polymers are being used in place of the silica and bentonite, it makes sense that they are added in approximately the same amount. So, this claim limitation is really without limitation and is not significant from a papermaker's perspective.

Nonetheless, the Flesher patent states that the polymer can be added in the range of 0.01 to 3%, which corresponds to 0.2 to 60 lbs/ton (column 11, lines 9-11). Also, in Example 14, the Flesher patent teaches the addition of the polymer at 6 kg/ton, which is a little more than 13 lbs/ton. Thus, the Flesher patent clearly discloses the addition of the polymer in the claimed range.

As for the particle size, Hercules' expert Robert Prud'homme has advised me that the Flesher patent discloses polymeric particle sizes below 750

7

nanometers. I also rely on his opinion that the Flesher patent discloses the claimed ionicity limitations.

Taking all of this information together, the Flesher patent describes each element of claim 1.

### b.    Claim 3

Claim 3 of the '766 patent discloses adding an ionic, high-molecular weight polymer to the paper furnish, in addition to the polymeric microbead, in an amount ranging from 0.05 to about 20 lbs/ton. The Flesher patent describes claim 3. In my experience, it is a common practice to include a mix of polymers as additives during papermaking. The concept of adding another polymer with the polymeric microbead, therefore, was well known to one skilled in the art. Further, similar to the amount range of microbead added in claim 1, the amount range for the second polymer is so broad that it is broader than virtually all viable amounts.

Even so, the Flesher patent states that a "dissolved linear polymer" may be used in combination with the microbead (column 6, lines 49-52). This polymer is of high-molecular weight, as required by claim 3, because it can be made from the same monomers as the microbead (column 6, lines 66-68). Finally, the Flesher patent also discloses the amount of additional polymer to be added. It states that the "amount of dissolved polymer is usually from 0 to 50% . . . by weight total polymer" (column 7, lines 1-3). This means that the amount of added polymer can be the same as the amount of microbead, i.e., from 0.2 to about 60 lbs/ton.

8

c.    **Claims 5 and 9**

Claim 5 of the '766 patent requires the cross-linked microbead polymer and additional polymer, as discussed above, to have opposite charges. Similarly, claim 9 of the '766 patent specifies that the additional polymer should be cationic. This is taught in the Flesher patent. The concept of adding polymers of a specific charge to the paper furnish is well known to those in the art and is routinely done, depending on the conditions of papermaking and the type of paper to be made. Hence, the addition of an anionic, cationic, or nonionic polymer together with a cross-linked microbead is standard practice.

The Flesher patent states that the "polymers are usually co-ionic or one or both may be non-ionic, or they may be counter ionic" (column 6, lines 64-66). Thus, all ionicities are contemplated. The Flesher patent therefore describes claims 5 and 9 of the '766 patent because it suggests the use of a polymer with opposite charge to the microbead (counter ionic), and a polymer of cationic charge (could be counter ionic or co-ionic, depending on the microbead).

d.    **Claims 11, 13, and 17**

The next group of claims in the '766 patent, claims 11, 13, and 17, discuss the addition of an ionic polysaccharide to the furnish from about 1.0 to about 50 lbs/ton. Claim 13 specifies that the polysaccharide should be cationic, while claim 17 specifies that the polysaccharide is starch. This is completely described in the Flesher patent. I note that polysaccharides are just a general term for starch, in the sense that all starches are polysaccharides. Starch is an extremely common additive in the papermaking process and provides added strength to the formed paper. Starch is usually added in the 10 to 20 lbs/ton range, so again,

9

the range specified in claim 11 is too broad to be significant to one skilled in the art.

In any case, the Flesher patent teaches the addition of a "cationic starch" (column 5, line 60) to the paper furnish. Thus, the Flesher patent discloses an ionic polysaccharide, where it is cationic and specifically starch. Since it discloses adding 0.05 to 20 lbs/ton of anionic micropolymer, one skilled in the art would know to counterbalance this with a similar amount of cationic material. Thus, one of skill in the art would know to add Flesher's cationic starch in approximately the 0.05 to 20 lbs/ton range, which falls within the range claimed in the '766 patent. Hence, the Flesher patent teaches everything that is disclosed in claims 11, 13, and 17 of the '766 patent.

> ### e.    Claim 21

Claim 21 of the '766 patent is directed toward adding additional components to the paper furnish, including a size, a strength additive, a promoter, a polymeric coagulant, a dye fixative, or a mixture thereof. The Flesher patent suggests adding starch, as discussed (column 5, line 60), which is a strength additive. Also as discussed above, the Flesher patent discloses adding another polymer to the cross-linked microbead. This other polymer is considered a polymeric coagulant, a coagulant being simply something that creates flocs, which is necessary in papermaking. Thus, the Flesher patent discloses the requirements of claim 21 of the '766 patent.

### f.    Claims 23 and 25

The addition of soluble aluminum species, as required in Claim 23 of the '766 patent, and more specifically alum, polyhydroxyaluminum chloride, or polyhydroxyaluminum sulfate (specified in Claim 25 of the '766 patent) are common additives in the papermaking process.  These aluminum components have been used since the 1950's in the papermaking, and one skilled in the art would know to add the aluminum species depending on many factors such as the type of paper being made, its desired qualities, and the processing conditions. For example, Avery's publication in the TAPPI Journal dating back to 1979 (Exhibit D) discusses the use and measurement of alum in the paper furnish, long before the '766 patent was filed.  Claims 23 and 25 relate back to Claim 1, and as stated above, the Flesher patent discloses the elements of claim 1 of the '766 patent.

Claim 23 of the '766 patent further requires the addition of 0.1 to 20 lbs/ton of a soluble aluminum species.  This range of addition would be known to one of skill in the art, since this is typically the range in which the soluble aluminum is added.  In my experience approximately 10 lbs/ton is generally used.  Indeed, the Avery publication states that the effectiveness of retention aids increases dramatically as the soluble alum content is reduced below 0.5%, which corresponds to below 10 lbs/ton.

Regarding Claims 23 and 25 of the '766 patent, there is no "one way" or "correct way" to make paper because the technique, machine, ingredients, and additives (among other factors) all vary depending on the desired end product. The Flesher patent is directed towards making paper but is a more general

11

disclosure. One skilled in the art would have to rely on their experience or another piece of information for further details regarding the specific additives used in papermaking. Another resource, such as the Avery publication, exemplifies these relevant specific details. As I stated above, it was common knowledge for one skilled in the art to add aluminum species to the paper furnish. To determine the specific species or amount to use, therefore, it is entirely foreseeable that one skilled in the art would have read both the Flesher patent and the Avery publication in combination and, thus, derive what is taught in Claims 23 and 25 of the '766 patent.

In summary, taking into account discussion with Dr. Prud'homme about particle size and ionicity, the Flesher patent completely discloses everything that is contained within claims 1, 3, 5, 9, 11, 13, 17, and 21 of the '766 patent, either explicitly or as commonly known to those skilled in the art. Given that the Flesher patent and the '766 patent are so close in what they disclose, I would have expected the applicants of the '766 patent to bring this patent to the attention of the Patent Examiner during prosecution of this patent, if they knew about it.

Additionally, the Flesher patent in combination with the knowledge of one skilled in the papermaking art, or that patent in combination with the Avery publication, would have rendered obvious claims 23 and 25 of the '766 patent.

## VII.    EXHIBITS

I understand that demonstrative and summary exhibits may be created to assist in the presentation of my testimony at trial, but none have been created so far.

## VIII.  FUTURE TESTIMONY

I understand that I may testify further regarding other subject matter within my area of expertise that becomes relevant to this case or in rebuttal or response to expert opinions presented by experts retained by Ciba.  I also understand that discovery in this case is ongoing, so I reserve the right to supplement the opinions presented herein as more information becomes available.

Dated:July 22, 2005

*Charles P. Klass*

_____

Charles P. Klass

13

## IIN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on July 22, 2005, the attached

document was hand-delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Jeffrey L. Moyer
Chad M. Shandler
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE  19899

I hereby certify that on July 22, 2005, I have Federal Expressed the

foregoing document(s) to the following non-registered participants:

Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL  60601-6780

Thomas L. Creel, P.C.
Goodwin Procter LLP
599 Lexington Avenue
New York, NY  10022

_____
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
Telephone:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672306