## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIBA SPECIALTY CHEMICALS
CORPORATION,

                Plaintiff,

       v.

HERCULES, INC. and
CYTEC INDUSTRIES, INC.,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 04-293 (KAJ)

**JURY TRIAL DEMANDED**

## EXPERT REPORT OF JOHN T. GOOLKASIAN

    I, John T. Goolkasian, Esq., submit the following expert report at the request of counsel for plaintiff Ciba Specialty Chemicals Corporation (hereinafter "Ciba"). I understand that discovery is ongoing in this case, and I reserve the right to amend or supplement this report or my expected testimony on the basis of new information that I receive.

    In addition, I understand that the Court intends to show the video "An Introduction to the Patent System" to the jurors in connection with its preliminary jury instructions. The information in Section IV of my report on the Patent Office and its procedures is included for the sake of completeness and to provide a context for the discussion of the prosecution history of the patents-in-suit. I do not intend to provide any testimony that would be duplicative of the information provided by the video. However, as I understand Defendant Hercules intends to raise an inequitable conduct defense that alleges fraud was committed during the prosecution of the patents-in-suit in the Patent Office, I would expect to provide a summary of the prosecution of the patents-in-suit and a relevant related patent during Ciba's case-in-chief. I also expect to

provide rebuttal testimony on the inequitable conduct issues. Such rebuttal testimony will be outlined in my rebuttal expert report.

## I.    QUALIFICATIONS

1.    I am a patent attorney specializing in the field of chemical, pharmaceutical, and biotechnology patent practice. Since May, 2005, I have practiced as a sole practitioner.

2.    Prior to May 2005, I was a partner in the law firm of Oblon, Spivak, McClelland, Maier and Neustadt, P.C., one of the largest intellectual property law firms in the country. My curriculum vitae, which summarizes my professional background, experience and publications, is attached as Exhibit A. A listing of all matters in which I have testified as an expert witness either by deposition or at trial in the last four years is attached as Exhibit B.

3.    I have had over twenty-five years of experience working in the United States Patent and Trademark Office ("Patent Office" or "PTO"). I served as an Administrative Patent Judge, previously designated Examiner-in-Chief, on the Board of Patent Appeals and Interferences ("Board") from 1983 to 1994. As a member of the Board I reviewed adverse decisions of Patent Examiners and determined priority of invention in interferences. The decisions of the Board constitute the PTO's final determination of patentability and/or priority of invention. As a member of the Board, I made the Patent Office's final determination of patentability in contested cases well over 3,000 times.

4.    Prior to my appointment to the Board in 1983, I was a Protest and Inter-Partes examiner in the Office of the Assistant Commissioner for Patents (from 1981 through 1983). My primary duties concerned the investigation and review of allegations regarding fraudulent procurement of patents, recommendation of final courses of action in such cases and the preparation of written decisions for signature by the Assistant Commissioner.

- 2 -

5.    I also served for five years as an Assistant Examiner in the Patent Office (1964-69) and for an additional six years as a Supervisory Primary Examiner (1969-72, 1977-80). In the latter capacity, I trained and instructed assistant examiners in the examination of patent applications and served both as an Instructor and Chief Instructor at the Patent Academy of the Patent Office.

6.    In addition to Patent Office experience, I have over seventeen years of professional experience outside of the PTO during which time I have prosecuted numerous patent applications at major law firms and written numerous validity and infringement opinions for major national and international corporations.

7.    I have considerable direct experience in reviewing the work of patent examiners to determine whether they followed existing Patent Office procedures and performed examinations of the required quality. This experience came as a result of my being both a Supervisory Primary Examiner and a Protest and Inter-Partes Examiner in the Office of the Assistant Commissioner for Patents. As a Supervisory Primary Examiner, I was often called upon to review the work of examiners to determine whether those examiners were sufficiently competent to be granted signatory authority by the Commissioner of Patents and Trademarks. Such reviews included a review of the entire prosecution history of an allowed or abandoned application to determine whether the invention was understood by the examiner, whether relevant references were properly applied, whether Patent Office procedures were properly followed and whether the allowed claims were patentable over the art of record. Also, while in the Office of the Assistant Commissioner for Patents, I routinely reviewed the prosecution history of every case on which I worked to ascertain whether examination was being carried out properly.

- 3 -

8.    I have significant experience in reviewing the work of attorneys from the viewpoint of whether they comply with the Patent Office requirements of candor and disclosure in dealing with examiners. This experience comes as a result of having worked directly as a Protest and Inter-Partes Examiner in the office of the Assistant Commissioner for Patents where my primary duties concerned investigation and evaluation of alleged violations of the duty of candor and disclosure by those concerned with the procurement of patents.

9.    I have considerable experience in reviewing patent specifications and interpreting claim language, as a Supervisory Primary Examiner, Administrative Patent Judge on the Board, and as an attorney who has written numerous infringement and validity opinions.

## II.    RETENTION AND COMPENSATION

10.    I have been retained by the law firm of Leydig, Voit & Mayer, LTD., on behalf of Ciba as an Expert Witness on Patent Office practice and procedures and the prosecution of patent applications. I am being compensated at my usual billing rate of $600 per hour for my independent review and study.

## III.    MATERIALS REVIEWED IN FORMULATING OPINIONS

11.    The general materials reviewed by me and which form the basis for my opinions include the materials set forth in Exhibit C attached to this report. As trial approaches I may be made aware of additional documents. Thus, I reserve the right to supplement or clarify the list.

12.    The various topics about which I may testify, my opinions and the reasons supporting those opinions are set forth below. Section IV of my report relates to Patent Office Procedures. The remaining sections relate specifically to particular patent applications and patents involved in this case.

## IV.  THE PATENT OFFICE AND ITS PROCEDURES

13. If necessary, I will testify regarding general Patent Office procedures, including, but not limited to, the role of the Patent Office, the preparation of patent applications, how patents are examined and issued (including use of the Manual of Patent Examination Procedures or MPEP), the statutory requirements of patentability and how these requirements are applied by Patent Examiners, the patent application process, the patent applicant's duty of candor during prosecution and how patent examiners rely on this duty, the examination of patent applications, the qualifications of examiners including "Primary" examiners, the patent search conducted by examiners, the preparation and mailing of official actions by examiners, participation in interviews, agreements reached during interviews, continuation, continuation-in-part and divisional applications, determination of the scope of the prior art search (based upon a review of the claims and specification), the prior art available to an examiner, amending of claims after a rejection, and the examiner's determination regarding the balance between the scope of the claims and the scope of description and enablement afforded by the specification.

14. The Patent Office was established by Congress to administer the patent system contemplated by the Constitution. The Patent Office's main function is to scrutinize patent applications in view of the prior art and make consistent, objective decisions regarding whether each application meets the statutory requirements for patentability. The Patent Office is staffed by patent examiners — individuals who have both technical and patent-law training — whose job it is to review patent applications and, where the record before them indicates the statutory requirements for patentability have been met, to issue patents in the particular technical field to which they are assigned.

15.     A patent attorney or agent may prepare a patent application on behalf of a patent applicant. A patent attorney is a law school graduate who has successfully taken the Patent Bar Examination. A patent agent is a person with requisite technical training who has successfully taken the Patent Bar Examination and is authorized to prosecute patent applications before the Patent Office. Any person with the requisite technical or scientific education may sit for the Patent Bar Examination.

16.     Because patent prosecution is a complex administrative process, the Patent Office has established rules for practitioners to follow in preparing and prosecuting applications. These rules have been enacted into law in the form of Section 37 of the Code of Federal Regulation (C.F.R.). Further, as a guide to examiners, attorneys and agents, the Patent Office publishes an extensive Manual of Patent Examining Procedure (MPEP) which sets forth the proper course of action for the various situations which may arise during prosecution. All patent attorneys and agents are aware of, and very familiar with, the rules and procedures because such familiarity is necessary in order to pass the Patent Bar Examination.

17.     Patent applications contain a "specification" which is required to include a full, clear, concise and exact written description of the invention. The specification will often be accompanied by drawings to illustrate and help the reader to understand the subject matter sought to be patented. The patent application can refer to prior publications to elaborate on the disclosure. The patent application will also contain one or more numbered paragraphs at the end of the application which are called "claims." Patent claims set forth what the inventor regards as his invention and delineate the scope of patent protection to which the inventor believes he is entitled.

A.    **THE DUTY OF CANDOR**

18.    Because patent prosecution is an *ex parte* proceeding, i.e., it takes place only between the examiner and the patent attorney, the Patent Office requires that a patent attorney who prosecutes a patent application before the Patent Office will at all times deal forthrightly and candidly with the Patent Office. Likewise, the Patent Office further requires that the inventor and others associated with the filing and prosecution of the application deal candidly with it.

19.    Examiners are comfortable relying on such candor because they are informed that the withholding of material prior art or making a misrepresentation to the Patent Office, coupled with an intent to mislead the Patent Office as to material information, can be found by a court or jury to be inequitable conduct. They are further taught that, if inequitable conduct is found, it renders the patent unenforceable.

20.    The Patent Office expects that an applicant or attorney will disclose prior art and other information of which they are aware and which a reasonable examiner would consider important when considering whether or not to allow the claims. Such prior art and information is considered "material" information. Typical of such information which may be material are instances of prior public use or sale, references cited during prosecution of a foreign counterpart application, references cited in a related case during prosecution, and references brought to an applicant's attention by third parties. I shall testify that material information which is cumulative to information of record need not be submitted to the Patent Office.

21.    The PTO has had two versions of its rule regarding the duty of candor, i.e., 37 C.F.R. § 1.56. The older version of 37 C.F.R. § 1.56 ("Rule 56"), which controlled cases prior to 1992, set forth a duty to disclose in broad terms. Under old Rule 56, the PTO expected that an

- 7 -

applicant or attorney would disclose prior art and other information of which they were aware and which a reasonable examiner would consider important when considering whether or not to allow the application to issue as a patent. Such important prior art and information was considered "material" information. New Rule 56 defines prior art and information as being "material" if it is not cumulative to information before the Patent Office and it creates a *prima facie* case of unpatentability by itself or in conjunction with the teachings of other references, or if its teachings are inconsistent with arguments made to the examiner by the patent applicants during prosecution. I expect to testify that under both the new and old rules, there has never been an obligation to submit information that is cumulative to the information before the Patent Office. Moreover, the duty has always been an individual duty, not a corporate duty. The duty falls upon the applicants, the attorneys or agents who prepared the patent application, and those associated with the inventors or the assignee and who are substantively involved in the prosecution of the application.

**B.    DETERMINATION OF PATENTABILITY**

22.    The Patent Office assigns each patent application to one or more examiners with knowledge in the relevant field. The examiner then scrutinizes the application to determine whether it meets the statutory requirements for patentability. Among other things, the examiner must determine whether the invention as defined by the claims is novel and non-obvious based on the record developed during the examination process.

23.    Not every invention is patentable. Indeed, the invention must meet stringent statutory requirements such as those set forth in Sections 102, 103 and 112 of Title 35 of the United States Code. Under Section 102, before a patent is issued, the Patent Office must determine that the claimed invention is novel based on the examiner's search and prior art

- 8 -

submitted by the patent applicant. The Patent Office is not permitted to give the inventor a patent if, on the record before it, the claimed invention turns out to be already in the public domain – that is, to have previously been publicly known or used, or described in a patent or printed publication or sold or offered for sale.

24.     If there is a prior art reference before the examiner that does show or describe the claimed invention, the examiner would not grant a patent and would reject the invention as "old" or "lacking novelty." This is called "anticipation." Examiners are taught that for a patent, publication or other prior art to anticipate an invention, all of the elements of the claimed invention must be present in a single reference asserted as prior art. (MPEP 706.2(a), 2131.) At times, claim language may include a physical property, dimension or other limitation which is not explicitly present in the prior art references. In such cases, if the subject matter described by the prior art does not possess the physical property, dimension or other limitation, the prior art does not anticipate the claimed subject matter.

25.     Just being "novel," however, is not enough for an invention to qualify for a patent. A patent will not be granted by the Patent Office if the invention, despite being technically novel, is sufficiently close to the prior art that it can be said to have been an "obvious" invention. The test for obviousness the examiners are instructed to apply is whether the invention as a whole, including the differences between what is taught by the prior art and what is claimed, would have been obvious to a person of ordinary skill in the relevant art at the time of the invention. In making this determination the examiner is instructed to consider: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the relevant art, and, if present, (4) objective evidence of non-obviousness. Obviousness under 35 U.S.C. § 103 may be determined based upon a

- 9 -

combination of prior art teachings and/or references. However, the Patent Office instructs the examiners that before the teachings or references may be combined there must be some suggestion or practical scientific reason which leads one to combine them. That suggestion must stem from the prior art. Indeed, if the teachings of the prior art would teach one to proceed in another direction, that prior art may not be combinable because it teaches away from the claimed invention. (*See*, MPEP § 2143, 2145 X,D (subparagraphs 2 and 3).) Similarly, if a process modification would make a process unsatisfactory for its intended purpose, the modification cannot be said to be obvious. (See MPEP § 2143.01).

26. To help determine whether an invention is obvious, an examiner is permitted to consider, when presented by the applicant, certain evidence known as objective indicia of non-obviousness. Such objective indicia usually take the form of declarations demonstrating one or more of the following: (a) commercial success; (b) failure of others; (c) acquiescence to validity as evidenced by licenses and payment of royalties; (d) solving a long-standing problem; (e) significant and unexpected results; or (f) copying. Although the achievement of significantly superior and unexpected results constitutes one of the prime indicia of unobviousness, the Manual of Patent Examining Procedure advises examiners that the existence of objective evidence does not necessarily require a conclusion that the claimed invention is unobvious. (MPEP 716.01(d).) When objective evidence is presented, the examiner is instructed to look for a nexus between the subject matter of the claims and any asserted objective evidence. To be relevant, the objective evidence (e.g., unexpected results, commercial success) must result from the claimed invention. When considering any such evidence, the examiner relies on the representations of the applicant regard the accuracy and import of the data submitted.

27.    Under 35 U.S.C. §112, ¶ 1, the specification of a patent application "shall contain a written description of the invention … in such full, clear, concise and exact terms" so that a person skilled in the art can make and use the invention. The Patent Office is also not permitted to give the inventor a patent if on the record before it the claimed invention would require undue experimentation to enable one of ordinary skill in the art to practice the invention. With regard to this "enablement" requirement, examiners rely on applicants to communicate about the workings of their invention and to disclose evidence that might cast a negative light on the workability of the invention.

28.    I expect to testify that the Patent Office specifically advises patent practitioners to take care that experimental work submitted to the Patent Office is accurately described. This includes advising the Patent Office about failed as well as operative experiments. Moreover, the Patent Office advises that results should not be represented as actual results unless they have actually been achieved (MPEP 2004).

29.    Similarly, if in an amendment or during an interview an attorney or a potential declarant sets forth graphs and data showing the criticality of the claimed invention, the expectation is that the graphs and data will be accurately set forth in the form of a declaration or affidavit so as to provide hard evidence which the examiner may consider. When considering the declaration or affidavit, an examiner would rely on the applicant's duty of candor and assume that no conflicting or contrary information exists.

30.    Under 35 U.S.C. § 120, an applicant can file a subsequent patent application which "claims priority" from a previously filed U.S. or PCT application. That is, the effective filing date can be prior to the actual filing date of the subsequent application. However, the claims of a subsequently filed patent application can only claim priority from a previous

application if the specification of the previous application provides "written description" and "enablement" for the claims of the subsequent application as required by 35 U.S.C. §112, ¶ 1. I expect to testify that the Patent Office instructs its examiners that "the test for sufficiency of support in a parent application is whether the disclosure of the application reasonably conveys to the skilled artisan that the inventor had possession at that time of the later claimed subject matter" (See MPEP 2163.02). I also expect to testify that a patent applicant does not have possession of an invention unless he or she has a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice. I expect to testify that by "complete" is meant that the invention is so fixed in the inventor's mind that he or she can teach one of ordinary skill in the art how to make and use the invention without undue experimentation.

## C.    THE PROSECUTION OF A PATENT APPLICATION

31.    The Patent Office has extensive search files of U.S. and foreign patents classified to make a manual or computer search thereof thorough, but relatively easy. When deciding whether to grant a patent, the examiner makes a search of these search files to see whether there were any prior patents or publications (references) that show or describe ("anticipate") the invention, or have teachings therein which indicate the claimed invention would have been obvious to one of ordinary skill in the art at the time it was made. Such references are referred to during prosecution as "prior art."

32.    When an examiner considers an invention to be unpatentable for one or more reasons, he or she will "reject" the claims and send the applicant a letter setting forth the reasons for the rejection. This letter is called an "Office Action." Most first official actions on the merits of an application "reject" the claims for one or more reasons. This is because attorneys tend to

draft claims as broadly as possible to ensure that a patent applicant obtains the broadest patent rights to which the applicant is entitled.

33.    In response to a rejection, the patent attorney will file a document presenting arguments against the examiner's rejections.  The attorney may also add or delete some of the patent claims, or change the language of existing claims in response to suggestions or objections raised by the examiner.  This process of office actions, responses and claim amendments is an iterative process known as "patent prosecution."  As a result, the claims that are ultimately allowed by the Patent Office are usually different from and, as a general rule, narrower than the claims that were submitted in the original patent application.  The prosecution of a patent application can involve several such communications between the examiner and the patent attorney.  It often involves refiling the application as a "continuation" in order to continue prosecution.

34.    The communications between the attorney and the examiner during the prosecution of the patent are transacted in writing, or committed to writing, so that a record is made.  These various writings, together with the original application papers, make up what is called the "prosecution history" or "file wrapper" of an issued patent.  Once a patent issues, this prosecution history is open to the public.

35.    Patent attorneys and agents, as well as the inventors, are permitted to have personal or telephonic interviews with the examiner.  The examiner writes a handwritten statement regarding the major points of discussion at the interview.  The examiner's written statement is known as the examiner's Interview Summary Record.  This form, when filled out, becomes part of the prosecution history.

36.    Because the patent examination procedure described above is an exhaustive

- 13 -

process, patents granted by the Patent Office are afforded a presumption of validity in accord with 35 U.S.C. § 282. In other words, the patent statute assumes an examiner has done his or her job and Courts will only overturn the patent grant when the evidence presented in court establishes a clear and convincing case of unpatentability of the subject matter claimed in the patent.

### D.    CONTINUATION APPLICATIONS

37.    Under the Patent Office rules, if further examination of an application is desired, the applicant may file a "continuation application." A continuation application may be filed if the original "parent" application is under final rejection, if the inventor wishes to add or amend claims, or even if a patent will issue on the parent application but the inventor wishes to obtain claims of broader or narrower scope. A significant fee is charged for filing the continuation application, and it is considered to be a proper way of arranging for further prosecution.

38.    The specification of a continuation application must be identical to the disclosure in the parent application, but may contain new or different claims, provided each new claim is supported by the original patent application. A continuation application is entitled to priority based on the filing date of the parent application. It is not unusual for an applicant to accept more limited claims and continue to prosecute broader, or differently limited claims in a continuation application. Indeed, it is not unusual for a patent applicant to file a continuation application and draft the claims thereof such that the claims may be read on a competitor's product. It is essential, however, that (a) the applicant finds full support in the specification for the claim limitations, and (b) that the new language does not make the claims unpatentable.

39.    I expect to testify that at times a patent applicant may wish to narrow or broaden the scope of a claim or change the language used to define elements of the claims. More often

- 14 -

than not the language added to the claims is a limitation which appears in the specification. This does not mean that the exact language must appear in the original specification. Rather, there need only be sufficient description of the claimed invention in the specification such that one of ordinary skill in the art, on reading the original specification, would be aware that the applicant "invented the claimed invention," i.e., was in possession of the claimed invention at the time the original application was filed.

40.    At times the Patent Office may decide that the claims of a patent application are directed to two or more separate and distinct inventions, even though the inventions are related. In such cases, the examiner will explain to the applicant what different inventions are claimed and require restriction to a single invention. The patent applicant must elect to prosecute claims to only one of the inventions. In such case, the examiner will withdraw the remaining claims from prosecution.

41.    A patent applicant is free to file a new application to prosecute claims to the non-elected invention. Such an application is called a divisional application and, if filed during the pendency of the parent application, is entitled to the benefit of the filing date of the parent application.

42.    At times, an applicant may wish to add additional, often newly discovered, subject matter to an application and seek to patent improvements and/or modifications of the original invention. This is often the case when a research and development project is ongoing. This can be done during the pendency of the original application by filing a continuation-in-part application ("CIP"). A CIP has two effective filing dates. Claims which cover only subject matter disclosed in the parent application are entitled to the filing date of the parent. However, claims which cover the newly added matter receive only the filing date of the CIP application.

- 15 -

43.    At times, the claims of a continuation application are sufficiently broad to cover subject matter claimed in a patent owned by the same assignee. In such cases, the examiner will reject the claims for "double patenting of the obviousness type." In such cases, the patent applicant files a "terminal disclaimer" which restricts the term and ownership of the new patent to that of the parent. When a terminal disclaimer is used to obviate a double-patenting (non-statutory) rejection, it does not create an estoppel to asserting an expanded scope of patent protection for subsequently issued co-pending U.S. patents. It is well settled that the filing of a terminal disclaimer (a) is effective only with respect to the application or patent identified in the disclaimer, unless by its terms it extends to continuing applications, and (b) is not an admission of the propriety of a double patenting rejection (if made). Indeed, the Federal Circuit has indicated that the "filing of a terminal disclaimer simply serves a statutory function of removing the rejection of double patenting, and raises neither a presumption nor estoppel on the merits of the rejection." See MPEP § 804.02 and the case law cited therein. See also MPEP § 804 II B and 804.02 II wherein it is said:

> The use of a terminal disclaimer in overcoming a non-statutory double patenting rejection is in the public interest because it encourages the disclosure of additional developments, the earlier filing of applications, and the earlier expiration of patents whereby the inventions covered become freely available to the public. (citations omitted.)

44.    The use of a terminal disclaimer does not constitute an admission that claim limitations of the initial patent are to be read into the claims of the disclaimed patent. The acceptance of a terminal disclaimer by the PTO is an acknowledgement that a statutory double patenting situation does not exist.

V.    **PROSECUTION HISTORY OF U.S.**
       **APPLICATION SERIAL NUMBER 07/536,382**

45.    U.S. Application Serial Number 07/536,382 was filed June 11, 1990.    The
application, titled "Charged Organic Polymer Microbeads in Paper-Making Process", is directed
to a method of making paper which comprises adding to an aqueous paper furnish a specified
amount of an ionic, organic polymer microbead, the microbead having a distinct size, i.e., less
then about 750 nm in diameter if cross-linked.

46.    The background section of the patent application identifies and discusses several
references including European patent application EP 0202780.  Patent applicants often identify
references in the background section that applicants believe are representative of the state of the
art at the time of the invention and over which the invention provides an improvement.
Examiners review the background section of the application in examining patent applications.

47.    The addition of the polymeric microbead to the paper furnish, which is the subject
matter of the application, is said to provide improved drainage, formation and filler retention
values in the papermaking process.

48.    The data in the specification indicates that addition of the ionic microbeads
significantly improves the drainage of the paper during the papermaking process.    The
microbeads are described as preferably being made by a polymerization of the monomers as
disclosed in application serial number 07/535,626 filed June 11, 1990.    Polymerization in
microemulsions and inverse emulsions may be used as is known to those skilled in the art ('766
patent, column 6, lines 63-68).

49.    The background section of the specification notes that the particle size of
polymers prepared by conventional inverse, water-in-oil emulsion, polymerization processes
(i.e., macroemulsion polymerization processes) are typically limited to the range of 1000-5000

nm in diameter since no particular advantage in reducing the particle size had previously been apparent.

50.    The original claims were directed to a method of making paper (claims 1 through 14), a composition of matter comprising a mixture of the polymer microbeads and a higher molecular weight ionic polymer or ionic polysaccharide (claims 15 through 27) and a paper produced by the methods of claims 1 through 14.

51.    The application was not prosecuted but, rather, was abandoned in favor of a continuation-in-part application.

## VI.    PROSECUTION HISTORY OF U.S. APPLICATION
SERIAL NUMBER 07/540,667 (U.S. PATENT NUMBER 5,167,766)

52.    The application which matured into U.S. Patent No. 5,167,766 was filed June 18, 1990 as a continuation-in-part of the '382 application.

53.    On December 26, 1990, the examiner mailed an Office Action which subjected claims 1 through 42 to restriction.  The examiner noted that the applicants had elected to prosecute method claims 1 through 14 and 40.  Product-by-process claims 26 through 29 and 42 were also examined along with the method claims.  The examiner also rejected the claims over Farrar et al., U.S. Patent No. 4,759,856.  The Farrar reference was used alone and together with secondary references.

54.    On March 28, 1991, the applicants filed an amendment which made minor corrections to the specification and which traversed the examiner's rejection.  The applicants noted that the Farrar reference described polymers having particle sizes representative of those achieved using typical emulsion polymerization procedures.  That is to say, normal macro emulsion polymerization procedures result in polymers having particle sizes above 1 micron (1000 nm).  The applicants noted that this type of polymerization had been known for many

years. On this point the applicants directed the examiner's attention to U.S. Patent No. 3,979,348. The applicants noted that microemulsion polymerization technology was a more recent process which produces polymer particles having diameters below 1000 nm.

55. The applicants referred the examiner to Tables 25, 37 and 38, all of which evidence that the use of a microbead of 1,000 to 2,000 nm results in inferior performance characteristics as compared to microbeads falling within the claimed range. In other words, the applicants distinguished the Farrar reference by virtue of the smaller particle size of the ionic microbeads used in applicants' claimed process and the superior performance characteristics achieved.

56. On June 26, 1991, the examiner mailed a second Office Action. The examiner withdrew the rejection over the Farrar reference, but rejected the claims over a new reference Probst, U.S. Patent No. 4,659,431. The examiner noted that the Probst reference teaches the use of a cationic polymer for addition to paper as a _sizing agent_. The polymer of Probst was said to comprise "microbeads" of 20-150 nanometers (Office Action mailed 6/26/91, page 4). The examiner recognized that the Probst reference did not teach whether the microbead was cross-linked. However the examiner noted that it would have been an obvious matter of choice to cross-link the microbeads.

57. On September 23, 1991, the applicants filed an amendment which modified Claim 1 to eliminate that portion of the claim pertaining to non-crosslinked water insoluble polymers. The applicants traversed the rejection over the Probst reference by noting that Probst is directed to a _sizing agent_ and that Probst employs ionic group containing emulsifiers in order to create dispersibility in the solution. The ionic groups of Probst's polymer remain part of the surfactant and were not chemically bonded to the hydrophobic copolymer itself.

58.    The applicants also noted that the Probst polymer is designed to function as a "film former". The applicants noted that if the polymer of Probst was cross-linked, the polymer would undergo a substantial reduction in its film-forming ability.

59.    On December 6, 1991, the examiner mailed a third Office Action which was a Final Rejection.  The examiner again rejected the claims over the Probst reference.  The examiner noted that while the applicants had urged that the microbeads of Probst were not cross-linked, the polymeric mixture of Probst was quarternized with epichlorohydrin, a well known cross-linking agent.

60.    On March 13, 1992, the applicants conducted an interview with the examiner. The interview summary record (Paper No. 10) noted that the examiner would reconsider the applicability of the Probst reference based on Probst's use of epichlorohydrin as a quarternizing agent in conjunction with the use of an acidic solution.

61.    On March 16, 1992, the applicants filed an amendment which modified claim 12 by making minor changes thereto.  The amendment discusses the interview in detail and advises that although the Probst reference has a teaching regarding use of the sizing agent in an "engine sizing" process, every example of Probst teaches addition of the sizing composition to the paper. The applicants urged that one skilled in the art recognizes that sizing agents such as disclosed in the Probst reference are predominantly added to the paper *per se* and not to the furnish. This is because addition of such a sizing polymer to the furnish materially detracts from the efficiency of the size.

62.    The applicants also noted that the Probst mixture is quarternized with epichlorohydrin in the presence of an acid.  According to the applicants, epichlorohydrin would not function as a cross-linking agent under acidic conditions (Applicant's amendment, page 7).

To this effect the applicants cited U.S. Patent No. 3,702,799 which taught that the quarternization with epichlorohydrin must be conducted under acid conditions to "prevent undesirable side reactions," col. 3, lines 54-55, i.e., cross-linking. See the Amendment mailed March 16, 1992, pages 4 and 5.

63.    On March 23, 1992, the examiner withdrew the rejections and mailed a notice of allowability. The notice of allowability includes a citation to two references, one of which was Neff et al., U.S. Patent No. 4,968,435. With regard to the Neff reference, the examiner noted:

> the instant invention is patentable over Neff because Neff provides no indication of how much of the microbead to add to the paper or in what part of the papermaking process it should be added.

64.    A Notice of Allowance was mailed March 23, 1992. The Notice indicated that the issue fee was due June 23, 1992. The issue fee was subsequently paid on June 10, 1992.

65.    On May 6, 1992, the applicants filed an Information Disclosure Statement which cites several references including EP 0202780 and the other references that had been previously identified in the background section of the specification. All the references identified in the Information Disclosure Statement would have been present in the files at the Patent Office and could have been accessed by the Examiner during the prosecution of the application.

66.    On May 13, 1992, the examiner noted that the Information Disclosure Statement had been entered and placed in the file but had not been considered because the Information Disclosure Statement was submitted after allowance and the applicants had not complied with certain formal requirements of 37 CFR 1.97 (e). The requirements of 37 C.F.R. 1.97(e) had just been implemented on March 16, 1992, one week before the mailing of the Notice of Allowance.

67.    The '766 patent issued on December 1, 1992.

- 21 -

## VII.  PROSECUTION HISTORY OF DIVISION OF '766 PATENT (U.S. PATENT NO. 5,274,055)

68.    Applicants filed a division of the application that matured into the '766 patent on May 21, 1992. The divisional application has the same specification as its parent, but the claims are directed to a composition of matter comprising a mixture of an ionic polymer microbead having a particle size less than about 750 nanometers, if cross-linked, and less than about 60 nm if non-cross-linked in combination with either a high molecular weight ionic polymer or an ionic polysaccharide.

69.    The references cited in the Information Disclosure Statement submitted in the parent application including EP 0202780 were cited in an Information Disclosure Statement submitted to the Patent Office in the divisional application. The examiner of the divisional application reviewed all of these references except for Japanese Patent Tokkai JP235596/63. The Examiner noted that he did not review the Japanese reference because a copy of the reference had not been provided by the applicants. This Japanese reference is identified and discussed in the background section of the specification. The Examiner also conducted a computer search to locate additional references.

70.    The divisional application was eventually allowed by the Examiner and issued as U.S. Patent 5,274,055. During the prosecution the examiner did not cite or apply any of the references cited in the Information Disclosure Statement against the claims including EP 0202780.

## VIII.  PROSECUTION HISTORY OF U.S. PATENT NO. 5,171,808

71.    The application which matured into U.S. Patent No. 5,171,808 was filed July 22, 1991 as a continuation of application serial number 07/535,626.

72.    Application serial number 07/535,626 was filed June 11, 1990. The application is directed to structured anionic and amphoteric polymeric microparticles and a method for their preparation. The particles are disclosed as having an unswollen number average particle size diameter of less than about 0.75 micron, preferably less than about 0.5 micron, a solution viscosity of at least 1.1 mPa.s and a cross-linking agent content of above about 4 molar parts per million. The particles are disclosed as having an ionicity of at least about 5 mole percent.

73.    The original application also contained claims to a process for the preparation of the composition. The process comprised admixing an aqueous solution of at least one anionic monomer and at least one cross-linking agent, with an oily phase comprising at least one hydrocarbon liquid and an effective amount of surfactant or surfactant mixture to form an inverse emulsion.

74.    On August 16, 1990, the examiner mailed a first official action which required restriction between claims 1 to 13 directed to the polymers and claims 14 to 22 directed to the process of producing the polymers. The applicants elected to prosecute the claims directed to the polymers and, accordingly, the process claims were withdrawn from further consideration.

75.    The examiner rejected the claims under 35 U.S.C § 102( b) and 35 U.S.C §103 over Durand et al., U.S. Patent No. 5,171,808. The examiner took the position that the Durand et al. reference discloses the preparation of ionic polymeric microparticles by polymerizing sodium acrylate and acrylamide in the presence of an emulsifier which was a hexaoleate. The examiner took the further position that because oleate contains a double bond, it is reasonable to expect the oleate emulsifiers to function to some degree as a cross-linking agent in addition to being a surfactant.

76.    The examiner also rejected claims over Makhlouf et al., U.S. Patent 4,147,688.
The examiner noted that the Makhlouf et al. reference discloses a composition comprising cross-
linked organic polymeric microparticles having particle sizes all from a 0.1 to 10 microns.
Similarly, the examiner also rejected claims over Silver, U.S. Patent No. 3,691,140. The
examiner noted that the Silver reference discloses acrylate copolymer microspheres in which one
of the monomers was an ionic monomer. The lower limit of Silver's microspheres is 1 micron
which the examiner considered very close to (or within the experimental error of) the claimed
particle size of 0.75 micron. Similarly, the examiner rejected claims over a reference titled
Leong et al, a literature article which was assereted to disclose cross-linked polyacrylamide
lattices or microgels which were prepared by using a mixture of acrylamide and a cross-linking
agent. The sizes of the inverse lattices produced by Leong et al. were disclosed in the abstract to
be less than 500 angstroms in diameter.

77.    On January 4, 1991, the applicants filed an amendment which modified claim 1 to
define the polymeric microparticles as being "derived solely from water-soluble monomers".
The applicants traversed the rejection over the Durand et al. reference by pointing out that
Durand et al. fails to indicate the incorporation of a crosslinking agent in the polymer. The
applicants further noted that the oleate surfactants of the Durand et al. reference are
monounsaturated and that if any reaction thereof with the acrylamide would occur, it would
occur linearly because a cross-linking agent must contain two functional groups to act as such.
The applicants distinguished the Durand et al. reference on the basis that it is linear. The
applicants also pointed out that polymers made in the absence of a cross-linking agent are
inferior in properties as compared to the claimed polymer compositions.

- 24 -

78.     The applicants also traversed the rejection over the Maklhouf et al. reference. The applicants noted that the polymers of the Maklhouf et al. reference are primarily composed of water-insoluble monomers. The applicants also strenuously urged that the Maklhouf et al. reference does not produce particles where the number average particle size is only below 0.75 micron. The compositions of Maklhouf et al. reference were said to be particles of all diameters from 0.1-10 microns. The arguments applied to the Makhlouf et al. reference were also said to be applicable to the Silver reference.

79.     With regard to the Leong et al. reference, the applicants noted that the Leong et al. reference does not include an ionic monomer in the polymerization taught therein.

80.     On April 11, 1991, the examiner again rejected the claims over the Makhlouf et al. reference for the same reasons as in the previous Office Action. However, the examiner withdrew the rejections over the Durand et al. and Silver references. The examiner entered a new rejection over Neff et al., U.S. Patent No. 4,968,435 and Whitaker, U.S. Patent No. 4,705,640. The examiner noted that the Neff et al. reference teaches cross-linked ionic polymeric microparticles and that the Whittaker reference teaches the use of cationic, anionic, and/or amphoteric polymers as flocculating agents for different types of dispersions. The examiner took the position that it would have been obvious to produce the cross-linked polymers of Neff in anionic form with the expectation that such polymers would flocculate dispersions.

81.     On July 22, 1991, the applicants filed a petition for extension of time which advised the Patent Office that applicants would abandon the application and file a continuation application.

82.     On July 22, 1991, the applicants filed application Serial Number 07/803,120. The application was accompanied by a preliminary amendment which modified claim 1 to define the

composition as being "derived solely from water-soluble monomers." Claim 1 was also amended to include an upper limit of "4000 ppm" cross-linking agent, based on the monomeric units presents in the polymer. The applicants noted that the Makhlouf et al. reference teaches that the cross-linking monomer content was at least 0.5%, i.e. 5000 ppm. The applicants urged that the claim amendments eliminated the Makhlouf et al. reference.

83.    The applicants also traversed the rejection over the Neff et al. reference in view of the Whittaker reference. The applicants noted that the Whittaker reference does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount. The Whittaker reference indicates that the polymer "must be a water-soluble" polymer. Similarly, the applicants traversed the rejection over the Neff et al. reference in view of the Durand et al. reference.

84.    On February 12, 1992, the examiner mailed an Office Action which was made a final rejection. The examiner maintained the rejection over the Makhlouf et al. reference. The examiner pointed out the similarities between the teachings regarding the polymers of the Makhlouf et al. reference and the polymers of the applicant noting that the higher limit of the claimed range of applicant was very close to the lower limit of the reference's range.

85.    The examiner continued the rejection over Neff et al. in view of Whittaker.

86.    On April 23, 1992, the applicants filed an appeal brief which traversed all the rejections of record.

87.    On July 14, 1992, the applicants conducted an interview with the examiner. This interview was a telephonic interview. Usually such interviews are initiated by the examiner. The examiner suggested amendments to the claims which would put the claims in condition for allowance. One such amendment was to delete the term "vinyl acetate" from claim 12  The

examiner also asked the applicant to modify the term "water-soluble monomers" in claim 1 to read "the polymerization of an aqueous solution of at least one monomer."

88.   On July 16, 1992, the Patent Office mailed a notice of allowance and issue fee due. The issue fee was paid on September 11, 1992 and the patent issued on December 15, 1992.

Dated:  July 20, 2005

_John T. Goolkasian_
John T. Goolkasian

# EXHIBIT A

**CURRICULUM VITAE**

<u>**NAME:**</u>                                       <u>**TELEPHONE:**</u>

John T. Goolkasian, Esq.                   Office –    (301) 460- 2857
                                           Facsimile - (301) 460-3406
                                           Home -     (301) 460-5335


<u>**ADDRESS:**</u>

3810 Glen Eagles Drive
Silver Spring, MD   20906


<u>**PRESENT POSITION:**</u>

Patent Attorney; Consultant – May, 2005 to present.


<u>**EDUCATION:**</u>

Juris Doctorate, Georgetown University
Bachelor of Science, Chemical Engineering, Northeastern University
Graduate Work in Biochemistry, FAES Graduate School at National Institutes of Health


<u>**EXPERIENCE:**</u>

**Law Firm of Oblon, Spivak, McClelland, Maier & Neustadt, P.C. – January 1994 through May, 2005**
   *Partner*
   Involved in a wide variety of patent matters, including patent validity and infringement opinions, providing advice on the prosecution of patent applications, conducting routine patent prosecution, and serving as a patent law expert in litigation.

**United States Patent and Trademark Office (PTO) – 1977 through 1994**

*Examiner-in-Chief and Administrative Patent Judge, Board of Patent Appeals and Interferences – 1983 through 1994*
Served in a quasi judicial capacity to review adverse decisions of patent examiners and to determine priority of invention in interferences. Decisions appealable to the United States Court of Appeals for the Federal Circuit or reviewable by civil action in a United States District Court.

Wrote numerous opinions selected by PTO officials as reflecting the then current state of the law and/or PTO policy. The opinions, as listed below, were published in the *United States Patent Quarterly*.

Selected by PTO officials to be the first Board member sent to a foreign country, South Korea, to participate in the World Intellectual Property Organization's program to assist developing countries in formulating a modern patent law policy.

*Protest and Inter Partes Examiner, Office of the Assistant Commissioner for Patents 1981 through 1983*
Investigated allegations regarding fraudulent procurement of patents, recommended a final course of action and prepared written decisions.

**Law Firm of Schuyler, Birch, Swindler, McKie & Beckett – 1971 through 1977**

*Attorney/Partner*
Handled a well-rounded assortment of patent and trademark matters. Rendered numerous validity and infringement opinions. Wrote numerous briefs in trademark opposition and cancellation proceedings. Drafted and prosecuted patent applications.

**United States Patent Office – 1964 through 1971, 1977 through 1981**

*Patent Examiner to Supervisory Primary Examiner*
Examined patent applications in the technological arts of polymer chemistry, laminating, coatings and semiconductor processing. Trained and instructed junior examiners in the examination of patent applications.

Taught "basic" and "advanced" courses in the Patent Academy. Chief Instructor for the 1980 session of the Patent Academy.

**E.I. du Pont de Nemours & Co., Inc. & U.S. Rubber Company – 1956 through 1964**

*Technical Service Engineer*

Technical service engineer in polymer and coating technologies.

## PROFESSIONAL AFFILIATIONS:

American Bar Association
American Intellectual Property Law Association
Intellectual Property Section – District of Columbia Bar (Steering Committee – 1984)
Federal Circuit Bar Association
Maryland Patent Lawyer's Organization (President – 1998 – 1999)
Patent Lawyers Club of Washington, D.C.

## SPEECHES:

"PTO New Rules of Practice (Duty of Disclosure)", Chartered Institute of British Patent Agents, London, England, 1977

"Current Problems re: PTO Rule 56 – Some Solutions", Association of Corporate Patent Counsel, 1983

"Preparing an Appeal Before the Board of Appeals", Ohio Patent Law Association, 1985

"Conducting Litigation Sensitive Patent Prosecution", New Jersey Patent Law Association 1994

"Patent Law", Glycotechnology Conference, Washington, D.C., 1994

## PUBLICATIONS:

"PTO New Rules of Practice" (Duty of Disclosure), Journal of the Chartered Institute of British Patent Agents, 1977

"Practice in Appeals before the Board of Patent Appeals and Interferences," Chapter 102 of text, Intellectual Property Counseling and Litigation, Matthew Bender & Co., 1990

## PUBLISHED AUTHORED OPINIONS:

Ex parte Skinner, 1986 Pat. App. LEXIS 4, 2 U.S.P.Q.2d 1788 (BPAI, 1986)

Ex parte Kifer, 1987 Pat. App. LEXIS 14, 5 U.S.P.Q. 2d 1904 (BPAI, 1987)

Ex parte Kranz, 1990 Pat. App. LEXIS 29, 19 U.S.P.Q. 2d 1216 (BPAI, 1990)

Ex parte Thim, 1991 Pat. App. LEXIS 36, 22 U.S.P.Q. 2d 1941 (BPAI, 1991)

Ex parte Sudilovsky, 1991 Pat. App. LEXIS 27, 21 U.S.P.Q. 2d 1702 (BPAI, 1991)

Ex parte Aggarwal, 1992 Pat. App. LEXIS 5, 23 U.S.P.Q. 2d 1334 (BPAI, 1992)

Ex parte Ochiai, 24 U.S.P.Q. 2d 1265 (BPAI, 1992)

Ex parte Maizel, 1992 Pat. App. LEXIS 38, 27 U.S.P.Q. 2d 1662 (BPAI, 1992)

Ex parte C, 1992 Pat. App. LEXIS 35, 27 U.S.P.Q. 2d 1492 (BPAI, 1992)

Ex parte Obukowicz, 1992 Pat. App. LEXIS 37. 27 U.S.P.Q. 2d 1063 (BPAI, 1992)

Ex parte Deuel, 1993 Pat. App. LEXIS 5, 27 U.S.P.Q. 2d 1360 (BPAI, 1993)

Ex parte Levengood, 1993 Pat. App. LEXIS 10, 28 U.S.P.Q. 2d 1300 (BPAI, 1993)

Ex parte Anderson, 1993 Pat. App. LEXIS 23, 30 U.S.P.Q. 2d 1866 (BPAI, 1993)

Ex parte Duel, 1993 Pat. App. LEXIS 33 U.S.P.Q. 2d 1445 (BPAI, 1993)

## PUBLISHED OPINIONS:

Ex parte Kimbell, 1985 Pat. App. LEXIS 19, 226 U.S.P.Q. 688 (BPAI, 1985)

Ex parte Breuer, 1986 Pat. App. LEXIS 16, 1 U.S.P.Q. 2d 1906 (BPAI, 1986)

Ex parte McCullough, Jr., 1987 Pat. App. LEXIS 2, 7 U.S.P.Q. 2d 1889 (BPAI, 1987)

Ex parte Karol, 1988 Pat. App. LEXIS 18, 8 U.S.P.Q. 2d 1771 (BPAI, 1988)

Ex parte Fujii, 1989 Pat. App. LEXIS 17, 13 U.S.P.Q. 2d 1073 (BPAI, 1989)

Ex parte Holt, 1991 Pat. App. LEXIS 2, 19 U.S.P.Q. 2d 1211 (BPAI, 1990)

Ex parte Anderson, 1991 Pat. App. LEXIS 12, 21 U.S.P.Q. 2d 1241 (BPAI, 1991)

Ex parte Gelles, 1992 Pat. App. LEXIS 4 (BPAI, 1992)

Ex parte Sorg, 1992 Pat. App. LEXIS 13. 22 U.S.P.Q. 2d 1958 (BPAI, 1992)

Ex parte Thomson, 1992 Pat. App. LEXIS 16, 24 U.S.P.Q. 2d 1618 (BPAI, 1992)

Ex parte Porter, Jr., 1992 Pat. App. LEXIS 27 (BPAI, 1992)

Ex parte Maziere, 1993 Pat. App. LEXIS 9, 27 U.S.P.Q. 2d 1705 (BPAI, 1993)

Ex parte Decastro, 1993 Pat. App. LEXIS 8, 28 U.S.P.Q. 2d 1391 (BPAI, 1993)

Ex parte Phillips, 1993 Pat. App. LEXIS 11, 28 U.S.P.Q. 2d 1302 (BPAI, 1993)

## PUBLISHED INTERFERENCE CASES

*Fiers v. Sugano et al v. Revel et al*, 1991 Pat. App. LEXIS 44 (BPAI, 1991)

*Fiddes et al v. Baird et al*, 1993 Pat. App. LEXIS 21, 30 U.S.P.Q. 2d 1481 (BPAI, 1993)

# EXHIBIT B

## Cases in Which John T. Goolkasian Testified
## By Deposition (D) or at Trial (T) Within Preceding Four Years

Novartis Seeds, Inc., v. Monsanto Company (D. Del.)
C.A.: 97-39 - May 13-14, 1998 (D); June 16, 1998 (T)

Monsanto Company v. Mycogen Plant Science, Inc., and Ciba Geigy
Corporation (Seed Division) (D. Del.)
C.A.: 96-133 - August 29, 1997 (D); June 16, 1998 (T)

Dekalb Genetics Corp v. Ciba-Geigy Corp, and Mycogen Corp. (N.D. Ill.) - (D)
C.A.: 96C-50114; - 4/22, 23/99; 5/17-19/99; 10/00 (D); February 15, 2001 (T)

Biogen, Inc. v. Berlex Laboratories, Inc. (D. Mass.) - (D)
C.A.: 96-10916-MLW- April 7, 1999 (D)

Heidelberg Harris, Inc., v. Mitsubishi Heavy Industries, Ltd.
and Mitsubishi Lithographic Presses U.S.A., Inc. (N.D. ILL.) - (D)
C.A.: 95 C 0673 - March 6, 1998 (D)

Cool Care, Inc. v. Dade Service Corp. (D. Fla.)
C.A.: 98-1456-CIV-MORENO - June 29, 1999 - (D)

Portel Services Network, Inc. v. InteliData Technologies Corp. (E.D. VA.)
C.A.: 97-205-A - 9/26/97 (D); 11/4/97 (T)

Marion Merrell Dow Inc. & Merrell Dow Pharmaceutical, Inc. v. Baker
Norton Pharmaceuticals, Inc. (S.D. Fla.) C.A.: 94-1245

Bionx Implants, Inc., Bionx Implants, Oy, and Dr. Saul N. Schrieber v. Linvatec Corp.
C.A.: 98 CIV 7360(JSR) - (S.D.N.Y.) - June 18, 1999 (D)

Purdue Pharma L.P., The Purdue Frederick Company, The P.F. Laboratories, Inc. and
The Purdue Pharma Company v. Boehringer Ingelheim GmBH et al. (S.D.N.Y.)
C.A.: 99-CIV-3658 - November 30, 1999 (T)

Berlex v. Biogen
C.A.: 96-12487-MLW- July 31, 1998 (D); April 30, 1999 (D)

Amgen Inc. v. Hoechst Marion Roussel Inc.
Civil Action No. 97-10814-WGY (D. Mass.) - February 23, 2000 (D)

Cordis Corporation v. Advanced Cardiovascular Systems, Inc.
Case Nos.: 97-550-SLR, 97-700-SLR, 98-19-SLR (D. Del.) - April 4, 2000 (D)

Novo Nordisk A/S, Novo Nordisk of North American, Inc., and
Novo Nordisk Pharmaceuticals Inc., v. Becton Dickinson and Company
C.A.: 96 Civ.9506 (BSJ) - (S.D.N.Y.)
October 31, 1999 (D); May 18, 2000 (T)

Avery Dennison Corporation v. UCB Films PLC
C.A.: 95CV6351 - (N.D. Ill.) - June 1, 2000 (D)

Union Carbide Chemicals v. Shell Oil Company
C.A.: 99-274(SLR) (D. Del.) - October 12, 2000 (D); February 5, 2001 (T)

Ortho-McNeil Pharmaceutical v. Barr Laboratories
C.A. No. 9-CV-00235 GEB-(D. N.J.); February 12-13, 2001 (D)

Darkprint Imaging, Inc. v. Static Control Components, Inc. (D. Col.)
C.A.: 98-M-2232 – November 14, 2000 (D)

BJ Services Co. v. Halliburton Energy Services, Inc.
C.A.: H-00.0948 (S.D. Tex) – July 26, 2001 (D) – March 26, 2002 (T)

Evident Corporation v. Church & Dwight Co., Inc. v. Peroxydent Group (D. N.J.)
C.A.: 97-3275 (MLC) – August 9, 2001 (T)

Gen-Probe Incorporated v. Vysis, Inc., C.A.: No. 99-CV-2668H AJB (S.D. Calif.) – November 6, 2001 (D)

Bayer AG, Bayer Corp. v. Housey Pharmaceuticals, Inc., (D. DE) (C.A.: 01-148 SLR – June 21, 2002 (D)

U-Fuel v. Highland Tank & Manufacturing, et al. (E.D. PA) (C.A.: 02-CV-2723), July 24, 2002 (T)

Monsanto v. Aventis (E.D. MO) (C.A.: 4:00 CV 01915 ERW) – August 9, 2002 (D)

KLA-Tencor Corp. v. Tokyo Seimitsu Co. and TSK America, Inc. (N.D. Calif.) C.A.: CV-01-2489 SBA – August 13, 2002 (D)

Dictaphone Corporation v. Nice Systems Inc. (D. Conn.) (C.A.: 3:00 CV 1143 (CFD) – November 7, 2002 (D)

Sunny Fresh Foods, Inc. v. Michael Foods, Inc. and North Carolina State University, (D. Minn.)

2

Civil Action No. 00-CV-2117 (DSD/JMM) – December 3, 2002 (D)

Cordis Corp. v. Guidant Corp. & Advanced Cardiovascular (Arbitration Panel Convened by Center for Public Resources Institute for Dispute Resolution) – December 10, 2002 (D)

Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc. (D. DE) – May 2, 2003 (D)

Napro Biotherapeutics Inc. and Abbott Laboratories v. Mylan Laboratories, Inc.
Mylan Pharmaceuticals Inc. and UDL Laboratories, Inc. (W.D. Penn.) – May 27, 2003 (D);
December 8-10 (T).

Sunny Fresh Food, Inc. v. Michael Foods, Inc. and North Carolina State University, (D. Minn.)
Civil Action No. 00-CV-2117 (DSD/JMM) – July 10 and July 21, 2003 (T)

Kal Kan Foods, Inc. v. H.J. Heinz, et al. (D. CA) No. CV-01-10961 JFW (JTLx) – July 16, 2003
(D); December 22, 2004 (D)

IDEC Pharmaceuticals Corp. v. Corixa Corporation, et al., (D. CA), No. 01-CV-1637 (RBB) –
August 27, 2003 (D)

Glaxo Group Ltd. and SmithKline Beecham Corp. v. TEVA Pharmaceuticals USA, Inc. and
TEVA Pharmaceuticals Industries, Ltd., (D. DE), C.A. No. 02-219 (CMS) – September 10, 2003
(D)

Agfa Corporation v. Creo Products Inc., et al., (D. Mass.), C.A. No. 00CV 10836 (GAO) –
October 15, 2003 (D); December 11-12 and 14-15, 2003 (T)

Syngenta Seeds, Inc., v. Monsanto Co.; Dekalb Genetics Corp.; Pioneer Hi-Bred International,
Inc.; Dow Agrosciences, L.L.C.; and Mycogen Plant Science, Inc., and Agrigenetics, Inc., (D.
DE), Civil Action No. 02-1331 (SLR), July 22-23, 2004 (D)

Pfizer Inc. v. Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc., (W.D. PA) Civil Action
No. 02 1628, August 4, 2004 (D)

Pall Corporation v. Cuno, Inc., (E.D.N.Y.) CV 03 0092  (JS/ETB), September 21, 2004 (D)

Mycogen Corporation, Mycogen Plant Science, Inc. v. Monsanto Com., Monsanto Technology,
LLC, (S.D. IN), Case No. 1:04-CV-0573, January 12, 2005 (D)

Inland Empire Foods, Inc. v. Zateca Foods, LLC, (E.D. CA), CV No. EDCV 00-0203 RT  AIJx),
January 19, 2005 (D)

Honeywell International, Inc. and Honeywell Intellectual Properties, Inc. v. Hamilton Sundstrand Corp., (D. DE), CV No. 03-1153-GMS, February 15, 2005 (D)

Smithkline Beecham Corp v. Ranbaxy Laboratories and Ranbaxy Pharmaceuticals,Inc., ( D. NJ), Case No. 03CV2158 (MLC), March 22, 2005 (D)

Cephalon, Inc. v Mylan Pharmaceuticals,Inc., Teva Pharmaceuticals USA. Inc., Barr Laboratories, Inc., and Ranbaxy Laboratories Limited (D. NJ) Case No. 032-CV-1394 (JCL), May 13, 2005 (D)

UCB S.A. and UCB Pharma, Inc. v. Mylan Laboratories, Inc and Mylan Pharmaceuticals, Inc (ND GA), Civil Action No. 1:04-CV-0683, July 6,2005 (D)



# LIST OF DOCUMENTS

| No. | Description |
| --- | --- |
| 1 | Copy of Original Complaint filed May 7, 2004 |
| 2 | Defendant Hercules, Incorporated's Motion for Leave to File Amended Answer and Counterclaims filed June 10, 2005 |
| 3 | File History of U.S. Patent No. 5,167,766 to Honig et al. |
| 4 | File History of U.S. Patent No. 5,171,808 to Ryles et al. |
| 5 | File History of U.S. Patent No. 5,274,055 to Honig et al. |
| 6 | File History of U.S. Patent No. 5,354,481 to Neff et al. |
| 7 | File History of U.S. Patent Application No. 07/535,626 to Ryles et al. |
| 8 | File History of U.S. Patent Application No. 07/536,382 to Honig et al. |
| 9 | File History of U.S. Patent Application No. 07/552,958 to Neff et al. |
| 10 | European Patent No. EP0202780 A2 to Flesher et al. |
| 11 | European Patent No. EP0273605 A2 to Morita et al. |
| 12 | U.S. Patent No. 3,691,140 to Silver |
| 13 | U.S. Patent No. 3,702,799 to Lewis et al. |
| 14 | U.S. Patent No. 4,056,501 to Gibbs et al. |
| 15 | U.S. Patent No. 4,147,688 to Makhlouf et al. |
| 16 | U.S. Patent No. 4,172,066 to Zweigle et al. |
| 17 | U.S. Patent No. 4,178,205 to Wessling et al. |
| 18 | U.S. Patent No. 4,187,142 to Pickelman et al. |
| 19 | U.S. Patent No. 4,189,345 to Foster et al. |
| 20 | U.S. Patent No. 4,225,383 to McReynolds |
| 21 | U.S. Patent No. 4,305,781 to Langley et al. |
| 22 | U.S. Patent No. 4,385,961 to Svending et al. |
| 23 | U.S. Patent No. 4,388,150 to Sunden et al. |
| 24 | U.S. Patent No. 4,445,970 to Post et al. |
| 25 | U.S. Patent No. 4,528,321 to Allen et al. |
| 26 | U.S. Patent No. 4,643,801 to Johnson |
| 27 | U.S. Patent No. 4,659,431 to Probst et al. |
| 28 | U.S. Patent No. 4,681,912 to Durand et al. |
| 29 | U.S. Patent No. 4,705,640 to Whittaker |
| 30 | U.S. Patent No. 4,720,346 to Flesher et al. |
| 31 | U.S. Patent No. 4,750,974 to Johnson |
| 32 | U.S. Patent No. 4,753,710 to Langley et al. |
| 33 | U.S. Patent No. 4,759,856 to Farrar et al. |

## LIST OF DOCUMENTS

| No. | Description |
| --- | --- |
| 34 | U.S. Patent No. 4,798,653 to Rushmere |
| 35 | U.S. Patent No. 4,824,523 to Wagberg et al. |
| 36 | U.S. Patent No. 4,925,530 to Sinclair et al. |
| 37 | U.S. Patent No. 4,968,435 to Neff et al. |
| 38 | Japanese Patent No. JP63-235596 |