# EXHIBIT A

SHEET 1

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF DELAWARE

                              - - -

CIBA SPECIALTY CHEMICALS        : CIVIL ACTION
CORPORATION, INC.,              :
                                :
          Plaintiff and         :
          Counter-defendant     :
                                :
     v                          :
                                :
HERCULES INC., and CYTEC        :
INDUSTRIES INC.,                :
                                :
          Defendants and        : NO 04-293 (KAJ)
          Counter-claimants     :

                              - - -

                    Wilmington, Delaware
              Wednesday, July 13, 2005 at 11:00 a.m.
                    TELEPHONE CONFERENCE

                              - - -

BEFORE:  HONORABLE KENT A. JORDAN, U.S.D.C.J.

                              - - -

APPEARANCES:

          RICHARDS LAYTON & FINGER
          BY: CHAD MICHAEL SHANDLER, ESQ

               and

          LEYDIG, VOIT & MAYER, LTD.
          BY: ELEY O. THOMPSON, ESQ., and
              GREGORY C BAYS, ESQ
              (Chicago, Illinois)

                 Counsel for Ciba Specialty
                 Chemicals Corporation

                              Brian P. Gaffigan
                              Registered Merit Reporter
```

**Page 2**

```
APPEARANCES: (Continued)

          POTTER ANDERSON & CORROON, LLP
          BY: RICHARD L. HORWITZ, ESQ

               and

          FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
          BY: FORD F. FARABOW, JR., ESQ,
              JOANN NETH, ESQ., and
              ERIC J. FUES, ESQ.
              (Washington, District of Columbia)

                 Counsel for Hercules Inc

               and

          GOODWIN PROCTOR, LLP
          BY: THOMAS L. CREEL, ESQ., and
              MARTA E. GROSS, ESQ.
              (New York, New York)

                 Counsel for Cytec Industries Inc

                         - oOo -

                  P R O C E E D I N G S

     (REPORTER'S NOTE: The following telephone
conference was held in chambers, beginning at 11:00 a.m.)
          THE COURT: Hi, this is Judge Jordan. Who do I
have on the line?
          MR. SHANDLER: Good morning, Your Honor. Chad
Shandler for the plaintiff from Richards Layton. With me is
Greg Bays and Eley Thompson from Leydig, Voit & Mayer.
          THE COURT: All right.
          MR. HORWITZ: Good morning, Your Honor. It's
```

**Page 3**

Rich Horwitz from Potter Anderson on behalf of defendants. And with me on the line for Hercules from Finnegan Henderson, we have Ford Farabow, JoAnn Neth and Eric Fues; and also for Cytec from Goodwin Procter, Tom Creel and Marta Gross.

THE COURT: All right.

MS NETH: Good morning, Your Honor.

THE COURT: Good morning.

MR. CREEL: Good morning.

THE COURT: I have the exchange of letters that started on July 11th and concluded on July 12th and we'll just go ahead and go through the issues that have been raised, starting with one from plaintiff and then shifting to one from Hercules.

We'll start with the expert schedule. I assume that is the first one you want to tee up. Am I right about that, Mr Shandler or Mr Bays?

MR. SHANDLER: It's going to be Mr. Thompson I believe for the plaintiffs.

THE COURT: Mr Thompson.

MR. THOMPSON: Yes, Your Honor. The expert schedule would be fine from our perspective to address initially.

The overall schedule we laid out in our brief is in the scheduling order of the case and it says basically

**Page 4**

some dates that involve the Court much later in the year and going into 2006.

October 31st, we end the discovery phase. And the schedule, rather than backing the dates up to the conclusion of discovery, actually back when this was done, leaving open the possibility of discussions later, that is coming out as set forth there in July and then August, and we have proposed that it would be August and September which would allow for plenty of discovery and not change any other dates in the schedule.

THE COURT: Let me ask you a question, Mr Thompson. You noted in the letter that Mr Shandler sent over that is now Docket Item 80 that you think this wouldn't require any other changes in the schedule, but in your last paragraph on this section on page two, you note that there is also, if I'm reading this correctly, time built into the schedule for later supplementation. If I make this shift you're suggesting, what happens to later supplementation? Is that something that you're prepared to tell me is just not going to be an issue?

MR THOMPSON: What we were referring to there is that the concept that if you have the expert reports now, given that there has been an identification of significant characterization testing that was done at Hercules that quantified the number of cross-links that are in the

SHEET 4

**13**

1  in a letter between a lawyer and a client doesn't
2  automatically make that letter discoverable. Now, if you've
3  got a basis for saying that in-house counsel stepped out of
4  their role as lawyer and they were acting in the role of a
5  business person or a scientist and therefore their
6  communications aren't deserving of the attorney-client
7  privilege because of those communications weren't associated
8  with the seeking and the giving of legal advice, if we have
9  to have full blown briefing on it, I guess we'll have full
10 blown briefing on it. But
11        For right now, it sounds to me as if I have a
12 party saying we have given the factual information. And I'm
13 prepared to accept their representation unless you can
14 demonstrate to me, Mr. Hughes, that that is just not so
15 because we know there is this gap in factual information and
16 we're entitled to get it. For example, if there is testing
17 protocol and they're not telling you the testing protocol
18 and the reason they're not telling the testing protocol is
19 because they say their lawyer told us not to tell you what
20 is the testing protocol, I would agree it's not legal
21 advice, it's scientific information and they can't turn it
22 into attorney-client privilege by putting it in the mouth of
23 their lawyer first; but short of something like that, I'm
24 not stripping away the privilege. Do you have something
25 specific like that, sir?

**14**

1         MR. FUES: Well, we have two things, Your Honor.
2  First of all, there are no notebooks about the testing and
3  how it was performed specifically with respect to some of
4  the samples. And again, the witness was instructed not to
5  answer about the involvement of counsel in the preparation
6  of samples, why certain tests were run under some conditions
7  and not others. There were instructions that that was
8  attorney-client privilege. There were a number of
9  instructions we tried to detail in our letter about actual
10 involvement in technical matters that I have to assume
11 counsel was involved in because the witness was instructed
12 not to answer.
13        So I would have to say, yes, we're not getting
14 full discovery. There are facts in that document, that's
15 the only document that lays forward these facts and we've
16 not been provided that information.
17        THE COURT: Not in any other way? Not in
18 interrogatory response or in any other way, is what you're
19 telling me?
20        MR. FARABOW: No, Your Honor. This is Ford
21 Farabow, Your Honor. They never wrote this down. This is
22 found stuff that showed up apparently only in this document
23 that was sent to counsel. It's the only test they have that
24 they claim shows hypermers cross linking and its written
25 down in only one place and that document was sent to counsel

**15**

1  and they're withholding it as privilege for that reason.
2        THE COURT: All right. I can't have double
3  teaming here, though, Mr. Farabow --
4        MR. FARABOW: I'm sorry.
5        THE COURT: -- if Mr. Hughes is on this issue.
6        MR. FARABOW: I beg your pardon, Your Honor.
7        THE COURT: All right? Who is speaking to
8  this?
9        MR. THOMPSON: I will speak to this.
10       What they're saying is not true. We have
11 followed that procedure 100 percent. Any information that
12 relates to testing we have not treated as privileged. The
13 deposition that they took, the witness answered every
14 question they had about the procedures that the tests were
15 done under, about the results of the tests.
16       What they seem to focus on is that there were
17 communications with counsel and they want the documents
18 that are those communications with counsel that related to
19 formulation of the present lawsuit.
20       THE COURT: Okay. Hold up for just --
21       MR. THOMPSON: We're not holding back. He
22 didn't hold back anything.
23       THE COURT: Hold on just a second, Mr. Thompson.
24 Whoa. Do you have me on speakerphone, Mr. Thompson?
25       MR. THOMPSON: I do.

**16**

1         THE COURT: Okay. You may have to pick up, I'm
2  not sure, because sometimes the way just technically these
3  things work, people can't hear when I'm trying to break in,
4  and although I'm not trying to be impolite, I need to be
5  able to break in on counsel at times in order to make the
6  discussion function the way that it's most helpful for me in
7  trying to help you guys resolve your issues.
8         So hold up for just a second and let me ask Mr.
9  Fues something; okay?
10        Mr. Fues, I apologize. I think I was calling
11 you Hughes as opposed to Fues a minute or two ago.
12        MR. FUES: I have been before, Your Honor.
13        THE COURT: I apologize for mispronouncing your
14 name.
15        Mr. Thompson is saying you had an opportunity
16 and did in fact explore fully the testing that went on in
17 the questioning and that that was laid out for you in the
18 deposition. That's the testing protocol, the technical
19 information you are allowed to ask about and you were given
20 full information on. What is your response?
21        MR. FUES: I disagree with that, Your Honor.
22 We, in our letter on the bottom of page two and the top of
23 page three, list specific instances where we asked questions
24 about the testing protocol and the witness was instructed
25 not to answer questions about that.

SHEET 5

**17**

1  THE COURT: All right. Be specific. Now, I'm
2  on page two of Docket Item 81.
3  MR. FUES: Okay.
4  THE COURT: And I have this letter in front of
5  me and Mr. Thompson, I assume you have it in front of you,
6  too. Let's get specific. You give me your best example;
7  all right, Mr. Fues?
8  MR. FUES: All right. One, Your Honor, is at,
9  as we indicated, page 81, 14, to page 82, 21. And I'm
10 flipping through the transcript right now.
11 Let's see, 82, 21. "Why did you prepare the
12 sample at 1 percent polymer and one molar NaCl?"
13 THE COURT: Okay. Hold on just a moment.
14 MR. FUES: That is on page 82, Your Honor.
15 THE COURT: This is page 82? Okay.
16 MR. FUES: That is at lines eight and nine.
17 THE COURT: Right.
18 MR. FUES: Why did you prepare the sample under
19 those conditions?
20 And then again I asked that at line 18.
21 The instruction was: "Object. Calls for
22 attorney-client privileged information. Instruct the
23 witness not to answer the question."
24 THE COURT: All right. Mr. Thompson?
25 MR. THOMPSON: Okay. Looking at this, the

**18**

1  protocol that he is asking about is actually set forth in
2  Defendants' Exhibit No. 3 which was a document that was
3  sitting in front of them at the time. So the protocol is
4  not only in a document, he was ready to talk about exactly
5  how it was done. As a matter of fact, if you look at the
6  further testimony, because he went through the protocol in
7  detail, the protocol as set forth in Defendants' Exhibit
8  No. 3 is set forth at page 75.
9  THE COURT: All right. I'm having a hard time,
10 though, with your answer here. What is it about the
11 question: "Why did you decide to prepare the sample at 1
12 percent polymer and one molar NaCl?" What protocol or
13 basis? Why did you decide to approach it in that fashion?
14 What is it about that that is attorney-client privilege?
15 MR. THOMPSON: The objection was form. First of
16 all, I want to make sure we got the predicate right. The
17 protocol itself, what was done was explained in detail so I
18 don't think their claim is they didn't get that. The
19 question is "why?" And as a time frame, they were working
20 with counsel to develop tests to formulate this lawsuit and
21 the part of that is what they're saying here is that they
22 came from discussions with counsel about the recommendation
23 Those communications which they're trying to get at through
24 this "why" is, is it privileged communication? Is it
25 between attorney and client? It's about the formulation of

**19**

1  the lawsuit and tests that would be done.
2  THE COURT: All right.
3  MR. THOMPSON: Didn't hold back any information
4  about the tests.
5  THE COURT: All right.
6  MR. THOMPSON: None whatsoever.
7  THE COURT: Now, Mr. Fues, your objection or
8  your comment at the deposition was "the experimental
9  conditions that you undertook to test the sample are not
10 privileged." I hear Mr. Thompson saying the experimental
11 conditions were revealed to you. What were you trying to
12 get at with the question?
13 MR. FUES: Well, there is that and other
14 questions, but we're trying to understand why they chose
15 certain conditions and they used -- I mean those were the
16 conditions to prepare the samples upon which they decided we
17 had a cross-linking agent.
18 THE COURT: All right. And what I understand
19 your opponent to be saying, we told you what we did, we told
20 you how we did it, we don't have to tell you why we did it
21 because that bears on our development of a legal strategy.
22 Where is the flaw in that reasoning? That you can know the
23 "what," you can know the "how," you can know the "when," but
24 "why" we chose to do what we did bears on the development of
25 our legal strategy and you are not allowed to get at that?

**20**

1  MR. FUES: Well, Your Honor, okay. There were a
2  series of questions about why weren't samples prepared a
3  certain way? Why weren't they done under the conditions of
4  the patent? Things like that. I guess what my response is,
5  again if counsel is interjecting itself into the testing
6  protocol and they're getting results that they're using
7  affirmatively to assert infringement against us, it's like
8  they're using privilege as a sword but using the results as
9  a shield.
10 And I also think that the fact that counsel has
11 actually gotten involved with sample preparation and things
12 like that and now sample results from that testing, based
13 upon what counsel has talked about, is something that is at
14 issue in this lawsuit. They relied upon their pre-suit
15 testing in answering at least a half dozen interrogatories
16 In this case, the witness testified they're relying upon
17 that testing to say that hypermers are a cross-linking
18 agent, for instance, and I guess that I don't think you can
19 slice the salami that thin. I don't think counsel, on the
20 one hand, can get involved in the testing but, on the other
21 hand, say, wait a minute, why we did things, you are not
22 entitled to know that.
23 THE COURT: Okay.
24 MR. FUES: And the other point, Your Honor, is
25 none of this is written down in notebooks so we're asking a

United States District Court for the District of Delaware
Before the Honorable Kent A. Jordan

SHEET 6

**21**

1  witness to sit there by memory and talk about details of the
2  tests. He doesn't remember the details of the test, and we
3  think it is in this document or at least some of that
4  information is in this document that they're withholding.
5      THE COURT: All right. Well, here is how this
6  is going come out. I'm going to take a look at this
7  specific document in camera and I'm going to take your
8  positions in no more than five pages, double spaced, on
9  whether there is privilege attaching to the "why."
10     MR. FUES: Your Honor, can I interject real
11 quickly? I think there might be more than one document. It
12 wasn't clear from the testimony.
13     THE COURT: Well, I'm responding to you, Mr.
14 Fues. You said it's in this document. If you have some
15 proof that it's in something else, you tell me, but I'm not
16 going to start asking for bankers boxes of documents here.
17 So you've got a document in mind, that's the one I'm looking
18 at. If you have something else in mind, you be specific and
19 we'll deal with it now but I'm not turning myself into a
20 discovery screen here.
21     MR. FUES: Okay. The only point -- I
22 understand, Your Honor. I appreciate that.
23     THE COURT: All right.
24     MR. FUES: I just want to say there is some
25 testimony on page 260 of the deposition where I say: Let me

**22**

1  understand, let me make sure. The information that Ciba is
2  relying upon to say hypermer is a cross-linking agent and in
3  a certain molar range is embodied in a document Ciba asserts
4  is privileged; is that right? And counsel interjects and
5  says he has testified that is one of the places where it's
6  embodied. It was also embodied, he testified about,
7  earlier. And the witness agrees with my question and says
8  yes. So I guess the point is I want the information about
9  hypermer and being a cross-linking agent, the document that
10 it's in.
11     THE COURT: Well, I want you to have the
12 information, too. Whether you get the document or not is
13 another issue. I don't think anybody is disagreeing, Mr.
14 Fues, that you and your client are entitled to the
15 scientific information associated with the assertion that
16 there is cross linking. That is not what people are taking
17 time about here. The question is are you entitled to a
18 specific document that went between an attorney and a client
19 that contains that information?
20     I hear you folks telling me from the Hercules
21 side it wasn't written down anyplace else. This is the
22 only place it was and, therefore, even if we got it through
23 some other means, deposition, et cetera. That we should be
24 entitled to see this because of, I guess, the credibility of
25 the assertions being made outside the context of this

**23**

1  document about what happened.
2      I'm prepared to take a look at the document and
3  see if I agree with you that there is nothing else that
4  happened that gave you this information and that this was
5  the only memorialization and so that in effect the lawyers
6  so limited the record and inserted themselves into the
7  scientific side of this that they should be viewed as having
8  forfeited any right to say this is really attorney-client
9  privilege stuff and it's essentially a substitution for lab
10 notebook. I'll take a look at the document and see if I
11 agree with what I take your argument to be in this regard.
12     MR. FUES: Thank you very much, Your Honor.
13     THE COURT: And I'll take a look at it. And I
14 encourage you, Mr. Thompson, to make sure that you submit to
15 me what you say, based on the quote I have just heard from
16 Mr. Fues, is the other place or places where this same
17 information is memorialized.
18     In other words, you've heard what I take their
19 argument to be, you have a rebuttal for it on a factual
20 basis, i.e., it's just not so that this is the only place
21 it was memorialized, then you make me aware of that, too.
22 But I expect to see something from you folks within a week,
23 cross submissions. I don't need any cross replies. Give
24 me your position, five pages double spaced. And I'm
25 particularly interested in any precedent that either of you

**24**

1  have that bears on the question of whether the "why" of
2  testing is a matter that is typically required to be
3  produced in connection with discovery in a patent case. It
4  doesn't even have to be limited to a patent case -- in
5  relation to what is going on in the case. You'd have to
6  point out to me what is relevant and how it's relevant that
7  you get at the "why." I'm not saying it's not, I'm just
8  saying I want to see your precedent if you've got it that
9  takes it to that level, okay?
10     MR. FUES: Okay. Thank you, Your Honor.
11     THE COURT: I'll look to get that to from you
12 folks on Wednesday the 20th.
13     All right. Next. Mr. Thompson, the next issue
14 is yours.
15     MR. THOMPSON: Our next issue I suppose is a
16 fairly straightforward one. We've asked the defendants to
17 tell us if they're going to rely upon advice of counsel in
18 connection with the defense of willfulness, an issue which
19 comes up all the time; and it's always a timing issue, it's
20 always the thing on the table. We're moving into the phase
21 of a lot of depositions in August and we don't want to have
22 to do them twice so we've asked that the time be set by,
23 say, August 1st or something, I don't know what day of the
24 week that is, but August 1st for them to make that decision.
25 They say oh, no, we want to wait until the depositions have