IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION,<br>　　　Plaintiff,<br><br>　　　　　v.<br><br>HERCULES INC. AND CYTEC INDUSTRIES, INC.,<br>　　　Defendants. | C.A. No. 04-293<br><br>REDACTED<br>PUBLIC VERSION |

## PRELIMINARY EXPERT REPORT OF MICHAEL E. TATE

I have been retained as an expert in this case by Ciba Specialty Chemicals Corporation ("Ciba") and counsel for Ciba.

The following preliminary report summarizes and explains the basis for my expected expert testimony on the amount of financial harm suffered by Ciba as a result of Hercules Inc.'s ("Hercules") and Cytec Industries, Inc.'s ("Cytec") (collectively, "the defendants") infringement of Ciba's U.S. Patent Nos. 5,167,766 ("the '766 patent") and 5,171,808 ("the '808 patent") (collectively "the Ciba patents" or "the patents-in-suit"). I understand that counsel for Ciba is in the process of amending the complaint in this matter to include additional counts against the defendants including breach of contract against Cytec and tortious interference with contractual relations against Hercules. I anticipate that I will evaluate the financial harm suffered by Ciba relating to the additional counts.

This statement is based upon information currently known to me. I understand that discovery in this matter is ongoing and, as a result I expect to supplement this report when additional information becomes available, including the completion of the 30(b)(6) depositions of the

- 1 -

parties-in-suit, the production by the defendants of all requested damages-related documents and at such time recently produced information has been fully analyzed.

## PROFESSIONAL AND EDUCATIONAL BACKGROUND

I am a Vice President of CRA International, Inc. ("CRA") in its Chicago office. CRA is an international business consulting firm focusing on, among other things, intellectual property matters in the context of strategy, licensing, valuation and litigation consulting. CRA is a leading provider of expert damage analysis and testimony for complex intellectual property litigation matters.

I obtained a Bachelor of Business Administration degree, with a concentration in finance, from the University of Houston in Houston, Texas. Thereafter, I obtained a Master of Science degree in Industrial Administration from Purdue University in West Lafayette, Indiana.

I have served as a consultant to a wide variety of business and industrial clients and governmental agencies on matters involving financial and statistical analysis and modeling for the purpose of interpreting and projecting data and evaluating the economic impact of business decisions, transactions and economic events. I have served as an expert witness or consultant in a wide range of litigation matters, including patent, copyright, trademark and trade secret infringement litigation. Although the issues have varied from case to case, most included an analysis and evaluation of financial data for the purpose of determining the extent of financial damages. I have also advised clients on strategic and valuation issues relating to intellectual property and license negotiations.

My curriculum vitae is attached hereto at Tab 1. A list of the cases in which I have testified at trial or by deposition is attached hereto at Tab 2.

CRA is being compensated on a rate times hours basis for the work my staff and I perform. My current rate is $440 per hour. CRA's compensation does not depend in any way on the outcome of this litigation.

## SUMMARY OF CONCLUSIONS

For purpose of my analysis I was asked to assume that the PerForm® SP9232 product and its use in paper making applications will be found to infringe the '766 and '808 patents, and that the '766 and '808 patents will not be found invalid.[1] I was also asked to assume that Cytec breached the Asset Purchase Agreement and that Hercules tortiously interfered with Ciba's contractual relations.

Based on my review and consideration of the information provided by the parties to date (including financial information provided by Ciba), I concluded that the information produced by Cytec and Hercules is not sufficient to prepare a claim for damages at this time. For example, Cytec has produced incomplete information regarding the amount of infringing product it has manufactured for Hercules and the revenue, costs and profits associated with such transactions. While Hercules has produced some information relevant to an assessment of damages, pertinent information regarding Hercules' unit and dollar sales of its infringing product (and associated products) appears to be missing from Hercules' production. In addition, many of the financial documents produced by Hercules are not useable in the format in which they were produced and require an explanation in order to understand the contents. I anticipate that the content of the defendants' financial documents will be the subject of the 30(b)(6) depositions of defendants' personnel. I understand that these depositions are currently scheduled to take place in August 2005.

Once sufficient and useable information is produced by the defendants, I anticipate that I will evaluate the damages owed Ciba for the defendants' infringement of the patents-in-suit, based on the following approaches:

- Ciba's lost profits from lost sales of Polyflex® and associated products;

---

[1] In performing these analyses, I will rely upon various documents produced by Ciba, Cytec and Hercules, as well as publicly available information. In addition, I will rely upon testimony from the depositions taken in this case. I also have had and will rely upon information obtained through discussions with Ciba personnel. A list of the information that I have specifically reviewed to date is attached at Tab 3 or referenced in the text and footnotes of this report.

- Ciba's lost profits from the erosion of its prices on sales of Polyflex® and associated products;

- Reasonable royalty owed Ciba on the defendants' infringing sales not considered as a lost Ciba sale; and,

- Prejudgment interest on Ciba's damages.

As it relates to Cytec's breach of contract and Hercules' tortious interference, I will evaluate the amount of profits Ciba lost as a result of the wrongdoing.

In addition, in connection with my anticipated trial testimony in this action, I may use as exhibits various documents produced, or testimony given, in this litigation, which refer or relate to the matters set forth in this report. I have not yet selected the particular exhibits that may be used. In addition, before my trial testimony, I may create certain demonstrative exhibits to assist me in testifying.

## Background

Ciba markets and manufactures innovative specialty chemicals. Ciba's business is divided into various operating segments, including the Water and Paper Treatment operating segment.[2]

**REDACTED**

---

[2] Ciba 2004 Annual Report.

**REDACTED**

-4-

**REDACTED**

Cytec is a specialty chemicals and materials technology company.[5] Cytec manufactured Polyflex® product and PerForm® SP9232 for Hercules. Cytec also manufactured Polyflex® product for Ciba at various times after Ciba's August 2000 acquisition of the Polyflex® business.

Hercules is a global company involved in selling specialty chemicals. Hercules Pulp and Paper Division supplies specialty chemicals to the pulp and paper industry, including Polyflex® and PerForm® SP9232 retention and drainage products, along with various associated products.[6]

**REDACTED**

## ANALYSES AND CONCLUSIONS

Based on my review of information gathered during the course of work on this matter to date, I anticipate that I will evaluate and consider several approaches to determine the appropriate measure of damages resulting from Cytec's and Hercules' infringement of the '766 and '808 patents. A general discussion of these approaches is as follows:

A. **Ciba's Lost Profits on Hercules' Sales of Infringing and Associated Products**

A lost profits damage award requires a showing that, to a reasonable probability, the patent owner would have made the infringer's sales, but for the infringement. Courts

---

[5] http://www.cytec.com
[6] http://www.herc.com

**REDACTED**

[8] HERC 58406-426.

−5−

often consider the following four factors, set forth in the *Panduit*[9] case, as a starting point for determining the appropriateness of a lost profit award:

- Demand for the patented invention;

- Absence of acceptable non-infringing substitutes;

- Manufacturing and marketing capability to meet the demand; and,

- Quantification of lost profits the patent owner would have made from sales lost as a result of the infringement.

**REDACTED**

Therefore, Ciba may have incurred significant economic loss as a result of the defendants' infringement. However, at this point in time, the defendants have not produced documents and information sufficient to determine the extent of their infringing sales of PerForm® SP9232 and any associated product sales. Once the defendants produce the relevant documents and provide 30(b)(6) testimony on such documents, I will prepare an analysis of the information and quantify the lost profits damages suffered by Ciba. My analysis may include a quantification of Hercules' infringing sales, a determination of the amount of additional Polyflex® product and associated products Ciba would have sold had the defendants not infringed, an analysis of Ciba's manufacturing and marketing capacity and a quantification of Ciba's lost profits.

In order to calculate the additional profits Ciba would have made, but for the defendants' infringement, I will first determine the additional revenue Ciba would have realized by multiplying the volume of additional Polyflex® product and associated products Ciba

---

[9] *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

**REDACTED**

– 6 –

would have sold by the price Ciba would have charged for those products, but for the defendants' infringement.

Next, I will determine the additional costs Ciba would have incurred to manufacture or acquire, package, market, sell and distribute the additional Polyflex® product and associated products.

Finally, I will determine Ciba's lost profits by subtracting the costs Ciba would have incurred to manufacture or acquire, package, market, sell and distribute the additional Polyflex® product and associated products from the revenue that Ciba would have earned from the sale of the additional products.

B. **Ciba's Lost Profits From the Erosion of Its Prices on Its Actual Polyflex® and Associated Product Sales**

In addition to analyzing whether Ciba lost profits on lost sales as a result of the defendants' infringement, I also expect to determine whether Ciba suffered price erosion as a result of the defendants' infringement and, if so, to what degree.

REDACTED

Once Hercules produces documents sufficient to analyze it sales of infringing products, I will continue my analysis of available information and quantify any damages Ciba suffered due to price erosion.

C. **A Determination of Reasonable Royalty Damages**

If the defendants are found to have infringed the patents-in-suit, Ciba is entitled to damages adequate to compensate for that infringement, but in no event less than a reasonable royalty.

In the event the Court determines that an award of lost profits should not be awarded for all or a portion of the defendants' infringing sales, I will determine a reasonable royalty for the defendants' infringing activity.

-7-

In preparing an analysis of a reasonable royalty, I anticipate that I will rely on various information that has been provided by Ciba including financial information and customer site licenses, among other things.

As discussed above, the defendants have not produced sufficient information to prepare an analysis of a reasonable royalty (including a complete and useable record of revenue and profits earned from the infringing sales and associated products and license agreements for comparable technology entered into by the defendants, among other things). Once sufficient information is produced, I anticipate preparing a number of analyses to determine a reasonable royalty including:

1.  **Determination of a Reasonable Royalty for Hercules' and Cytec's Use of the Patents-In-Suit**

    A reasonable royalty is the rate that a willing licensor (the patentee) and a willing licensee (the infringer) would have agreed to if both had been reasonably and voluntarily trying to reach an agreement. The agreement is often characterized as arising from a "hypothetical negotiation" between the parties on the eve of the infringement, or about the time the infringement began. The analysis presumes that the parties to the negotiation would have access to the same information, including the knowledge that the patent was valid and would be infringed by the prospective licensee's product unless the licensee obtained a license.

    In order to determine the reasonable royalty rate that is appropriate for the defendants' use of the patents-in-suit, I anticipate that I will conduct an analysis of information that would be considered by the parties to the hypothetical negotiation, including an income or profit apportionment analysis and an analysis of the factors set forth in the *Georgia-Pacific*[11] case, a commonly used guideline for determining a reasonable royalty in the context of litigation. A general discussion of these analyses follows:

---

[11] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

a.  **Profit Apportionment Analysis**

The profit apportionment analysis is based on the premise that a prospective licensee would be willing to pay the patent owner a royalty representing a portion of the profits it expected to earn from the use of the licensed technology.

A common rule of thumb in determining a "starting point" profit split is referred to as the "25% rule". The 25% rule is a simplified approach which, as a starting point, provides for the licensor to get one quarter of the licensee's actual or anticipated operating profit generated by the patent. The resulting figure is typically adjusted upward or downward based on the specific circumstances of the transaction.

In order to make a determination of the royalty amount that would be reasonable for the defendants to pay Ciba for use of the patents-in-suit using the 25% rule, I will determine the amount of profits that the defendants earned or expected to earn from sales of the accused product.

b.  ***Georgia-Pacific* Analysis**

The *Georgia-Pacific* case reflects commonly used guidelines set forth by a court for determining a reasonable royalty in a litigation context. Often, a reasonable royalty is determined by evaluating these factors in the context of a hypothetical negotiation between the patent owner (the licensor) and the accused infringer (the licensee) in which both parties are assumed to have access to the same information and be willing to enter into a license agreement. I will consider the effects these factors would have on a hypothetical negotiation to determine a reasonable royalty in this case. The hypothetical negotiation to determine a reasonable royalty for the patents-in-suit takes place on or around the date the defendants first infringed the patents-in-suit.

A *Georgia-Pacific* Analysis includes an analysis of the following factors:

- Factor 1: The royalties received by the patentee for the licensing of the patents-in-suit, providing or tending to prove an established royalty.

- Factor 2: The rates paid or received by the licensee for the use of other patents comparable to the patents-in-suit.

- Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

- Factor 4: The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

- Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

- Factor 6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

- Factor 7: The duration of the patents and the term of the license.

- Factor 8: The established profitability of the product made under the patents; its commercial success; and its current popularity.

- Factor 9: The utility and advantages of the patent properties over the old modes or devices, if any, which had been used for working out similar results.

- Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

- Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

- Factor 12: The portion of the profits or of the selling price that may be customary in the particular business or in comparable businesses to allow for use of the invention or analogous inventions.

- Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

- Factor 14: The opinion testimony of qualified experts.

- Factor 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that

>       is, the amount which a prudent licensee – who desired, as a
>       business proposition, to obtain a license to manufacture and
>       sell a particular article embodying the patented invention –
>       would have been willing to pay as a royalty and yet be able to
>       make a reasonable profit and which amount would have been
>       acceptable by a prudent patentee who was willing to grant a
>       license.

D.  **Ciba's Lost Profits Due to the Breach of Contract and Tortious Interference with the Contract**

Ciba is entitled to damages to put it in the same position as if the breach and tortious activities had not occurred. As a quantification of the damages caused by the defendants, I anticipate that I will evaluate and consider the profits lost by Ciba. The lost profits calculation will be based upon the profits that Ciba likely would have made, but for the breach and tortious interference. The quantification of such lost profits would be performed using a methodology substantially the same as that discussed in Section A above.

E.  **A Determination of Prejudgment Interest**

After I have completed my analysis of damages, I expect to determine the prejudgment interest Ciba is entitled to on those damages. Prejudgment interest will be determined by using the defendants' cost of debt and by applying it to the damages owed to Ciba.

Respectfully submitted:

_Michael E. Tate_
Michael E. Tate
Vice President
CRA International, Inc.
July 22, 2005

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2005, I hand delivered the foregoing document to the following persons and electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951

I hereby certify that on August 1, 2005 I have Federal Expressed the foregoing document to the following non-registered participants:

| | |
|---|---|
| Ford F. Farabow, Jr., Esquire<br>Joann M. Neth, Esquire<br>A. Neal Seth, Esquire<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP<br>901 New York Avenue, N.W.<br>Washington, DC  20001-4413 | Thomas L. Creel, Esquire<br>Goodwin Proctor, LLP<br>599 Lexington Avenue<br>New York, NY  10022 |

Steven J. Fineman (#4025)

RLF1-2848132-1