## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIBA SPECIALTY CHEMICALS )
CORPORATION, )
 )      C.A. No. 04-293 (KAJ)
              Plaintiff, )
 )      **JURY TRIAL DEMANDED**
      v. )
 )      **REDACTED**
HERCULES, INC. and )
CYTEC INDUSTRIES, INC., )      **PUBLIC VERSION**
 )
              Defendants. )

## EXPERT REPORT OF CLARENCE A. KING, PHD

I have been retained by plaintiff Ciba Specialty Chemicals Corporation ("Ciba"), and its

attorneys, as an expert consultant and potential testifying witness. This is my written report

concerning issues about which I may be asked to testify and on which Ciba bears the burden of

proof. I understand that I will have an opportunity to submit a further report in response to any

expert offered on behalf of defendants. I specifically reserve the right to form and submit

additional opinions regarding any additional information or discovery that is subsequently

generated or produced. I refer in my report to various documents and specifics. I have not,

however, set forth every relevant fact or document about which I am aware and reserve the right

to supplement if required. Likewise, I reserve the right to supplement my report to clarify

possible ambiguities or to opine further based upon future court rulings, agreements between the

parties, or any further testimony by either party either by deposition or at any hearing, or at trial.

I further reserve the right to supplement my report upon further information being provided by

defendants regarding, without limitation, such things as the operations at customers using

defendants' PerForm® SP9232 product.

- 1 -

This report is divided into three sections. The first is an overview of my credentials. The second details technology for making paper. The last sets forth my opinion regarding defendants' infringement of U.S. Patents 5,167,766 ('766 patent) and 5,171,808 ('808 patent).

## I.    EXPERT CREDENTIALS

1.    I am a Papermaking Process Consultant and I understand that I may be asked to testify as an expert witness on behalf of Ciba Specialty Chemicals Corp. My *curriculum vitae*, including publications authored by me is attached hereto as Exhibit A. During the last four years, I have not testified as an expert witness.

2.    Presently, I am President of Papermaking Process Consulting, LLC, located in Appleton, Wisconsin, where I am involved in consulting for paper mill operating units in the areas of process troubleshooting, wet end process chemistry (including retention, sizing, filler content, deposit control, strength additives, colorants, foam, and incoming/outgoing water chemistry) cost savings, and variation and reduction. I am also a member of the editorial boards for the TAPPI journal and Solutions magazine, both of which are journals of the Technical Association of the Pulp and Paper Industry (TAPPI). My responsibilities include editing papers for publication, contributing journal articles, and supporting the general management of the two journals' businesses. Excluding my retention as an expert witness in this litigation, I have previously been retained by Ciba Specialty Chemicals Corp. in May 2005 for litigation involving Buckman Labs.

3.    From April 1991 to November 2000, I managed the Pulp and Paper Technology Group for Appleton Papers Inc. located in Appleton, Wisconsin. I was responsible for all wet end process optimization and control for all Appleton Paper's paper machines, including retention, sizing, strength additives, filler content, deposit control, colorants, foam control, and

- 2 -

incoming water chemistry. Also, I was responsible for developing alliances between suppliers and Appleton Paper for chemicals used in paper making operations. Furthermore, I was responsible for a program called Process Variation Reduction (PVR) that involved data management, data analysis, and operating procedures to respond to out of control data.

4.    From May 1989 to April 1991, I was a Team Leader and Research Scientist at James River located in Neenah, Wisconsin. There, I was primarily responsible for converting four paper machines from acid to alkaline wet end chemistry. During this time, I was responsible for pulling together teams for the alkaline conversion covering the primary areas of papermaking including retention, sizing, filler content, deposit control, colorants, foam control and strength additives.

5.    From October 1982 to May 1989, I was Manager of Papermaking Technology at S.D. Warren located in Westbrook, Maine. I managed the papermaking process support group responsible for all S.D. Warren paper machines. My responsibilities at S.D. Warren in Westbrook, Maine, included base paper impact on finished product quality, retention, sizing, strength additives, deposit control, foam control, filler content, broke management, and PVR.

6.    From March 1981 to October 1982, I was Technical Services Manager at S.D. Warren located in Mobile, Alabama. I was Technical Services Manager for three paper machines, one alkaline and two acid. My responsibilities at S.D. Warren in Mobile, Alabama, included base paper impact on finished product quality, retention, sizing, strength additives, deposit control, foam control, filler content, colorants, broke management, and PVR.

7.    From February 1980 to March 1981, I was Technical Manager of the Cottonelle Paper Division of Scott Paper located in Chester, Pennsylvania. I was responsible for a new

- 3 -

paper machine making Cottonelle bathroom tissue. I was responsible for all aspects of the paper machine including wet end processes, the finished product quality, and PVR.

8.    From December 1974 to February 1980, I held various positions in the Research Division of Scott Paper located in Philadelphia, Pennsylvania. My responsibilities included being a project leader for the wet end chemistry for a new paper towel (J-Viva), and the start up of the new J-Viva machine in Marinette, Wisconsin. I also managed the pilot paper machine at Scott Research Headquarters in Philadelphia. Through all these projects, the focus was on retention, Yankee adhesion, foam control, deposit control, and biological control.

9.    In 1969, I received a Batchelor of Science degree in Chemistry from Virginia Tech. I received a Masters degree in Surface Chemistry from Virginia Tech. in 1971. I then received a PhD in Paper Science from The Institute of Paper Chemistry, a part of Lawrence University located in Appleton, Wisconsin, in 1974.

10.    I have regularly attended TAPPI's papermaking conferences since 1976 as a representative of the Additives Committee and the Retention/Drainage Subcommittee. I have chaired committees, program sessions, and written papers for conferences and the TAPPI and Solutions journals.

11.    I have considerable direct experience in wet end chemistry and retention in particular in the paper making industry. I was one of the first people to use high molecular weight (HMW), low charge density (LCD) anionic flocculants in tissue manufacturing for retention. I studied, understood and developed control packages for the impact of tissue retention on Yankee adhesion and release. I studied the influence of foam and entrained air on retention and how to control air generation. I determined the impact of wet end dyes on retention systems and how to optimize these systems. I initiated the use of wet end starch as a component

- 4 -

for not only strength but also retention. I was one of the first in the U.S. to implement colloidal silica as a retention component (Composil™). I was one of the first to use low molecular weight (LMW), high charge density (HCD) polymers for broke coagulation and retention improvement. I was involved in the use of Hydrocol® (bentonite) on a recycled fiber paper machine. I helped implement the use of Polyflex® materials on lightweight-coated specialty paper machines and was one of the first to implement online retention measurement instrumentation. Also, I was one of the first to use online charge measurement to optimize wet end retention and paper machine efficiency. I have extensive experience in charge measurement of all types, what each type is capable of doing and how each type is used.

### Compensation

12.    I am being compensated at my usual billing rate of 100 dollars per hour for my independent review and study as an expert on the papermaking process.

### Materials Reviewed

13.    The general materials reviewed by me and which form the basis for my opinions, include the materials set forth in Exhibit B attached to this report. I reserve the right to supplement or clarify the materials I have reviewed as trial approaches.

14.    The various topics about which I may testify, my opinions and the reasons supporting those opinions are set forth below.

## II.    THE COMMERCIAL PAPERMAKING PROCESS

15.    I expect that I may be asked to review how paper is made so that an understanding can be provided as to where the materials described in the patents in suit are used and how materials of this type function.

16.    Paper manufacture is a complex process involving a source of fibers such as trees, bagasse, hemp, and/or rags. These fibers are combined with water and selected additives depending on the end paper product required.

**Water**

17.    Water is the major component of the papermaking process and can be obtained from any fresh water (not salt water) source. Some possible sources include rivers, lakes, or underground wells. The incoming water may or may not contain contaminants such as solids, soluble inorganic chemicals, soluble organic chemicals, color contaminants and contaminants resulting in turbidity. Because of these contaminants, the water is often treated mechanically and chemically to provide as pure a water source as possible. The mechanical treatment systems are generally some form of filtration, usually a sand filter, or a series of screens or basket filters. Less often, one may find a flotation or settling clarifier used to treat incoming water. Since the contaminants are very small or even soluble, coagulant additives are frequently used to help in the removal process as the water passes through the filters.

**Pulping and Bleaching**

**(a)    Pulping and Bleaching in General**

18.    The trees used can be either hardwood or softwood, from a particular region, young or old growth, and all of these variables affect the type of fiber obtained and their use for a particular type of paper. Loggers or a logging company will go into the forest and harvest the trees and replant the trees in a way that there are more trees available today than in the time of George Washington. The trees may be stripped of their limbs or chipped in the field before being shipped to the pulp mill. A whole tree would be sawed into lengths that are more easily transported and that the pulp mill can handle more easily. Therefore, the pulp mill will receive either logs or chips. The chips will go directly into the pulping process, while the logs will be

- 6 -

chipped at the mill. The logs and chips are aged for a certain time depending on the mill in order to assist the pulping process.

### (b)    Additives Used in Pulping and Bleaching

19.    The fibers from the trees are held together by a glue-like material called lignin. This glue can be removed either chemically or mechanically. In the chemical process, dissolving chemicals are added to a large pressure cooker called a digester, where the chips are pressure cooked for a set time and pressure. This process dissolves the glue and leaves the fibers. There is generally a 30-50% recovery of fiber from the starting weight of chips.

20.    As regards the pulp mill, paper makers are primarily interested in the efficiency of fiber generation in their pressure digesters. Generally, additives are inserted before the digester that swell the chips and allow for the penetration of the dissolving liquors more easily. In some of its recovery systems, the pulp mill may also generate foam, thus the need for adding defoamers into those streams. Wood chips contain a natural resin type material called pitch. This pitch is sticky and can (and often will) deposit on surfaces in the pulp mill, bleach plant, and on the paper machine. Talc, a high surface area adsorbent having a natural affinity for pitch, is added at various fiber streams to adsorb pitch and help carry it out of the process. In some cases, wash aids or drainage aids are added to the washing operation to assist the washing efficiency and/or drainage of water from the fibers. These wash aids are usually low molecular weight and high charge density (LMW-HCD) organic polymers. Dispersants are often added to the fiber slurry to separate contaminants from the fiber surfaces to enhance contaminant washing efficiency. Biocides will be added to inhibit biological growth wherever it is found.

21.    The fibers that come out of the digester are colored and low in brightness because of the pulping process. The color can be removed by washing the fibers, which is done by

- 7 -

adding counter current flows of water to dilute, and remove, the color bodies. When the fiber

brightness is still lower than desired, bleaching chemicals can be added to increase the brightness

to a set target value. These bleaching chemicals are usually chlorine, chlorine dioxide, or

peroxide. These are added in different combinations and sequences depending on the end result

desired. These bleaching chemicals are washed out with the same type of washing as described

above. Washing and bleaching can be performed at the same time on the same set of washers.

For low brightness and unbleached grades of paper, the fibers may be used right out of the pulper

and no additional washing or bleaching is needed. The fibers at this stage of the process are

usually at about 10-20% consistency and stored in large chests called high-density towers. The

bleach plant additives are pretty much the same as the pulp mill additives except for the wood

chip swelling chemicals. The bleach plant may also use wash/drainage aids, talc, dispersants,

defoamers, and biocides.

### Stock Preparation and Wet End
#### (a)    Stock Preparation and Wet End Generally

22.    The next stage of the paper making process is generally called stock preparation,

or stock prep. In this stage, the fibers are prepared for use on the paper-forming equipment. The

fibers are washed, screened, refined, and diluted to targeted levels generally between 3 and 5%.

Water used either from the recycled dilution water or from the bleach plant carry-over often

contains contaminants that need to be removed. Thus in the stock prep process, the fibers are

then washed with screens and centrifugal cleaners. Another important function in stock prep is

refining. Refiners cut and brush the fibers to generate desired physical properties not present in

unrefined fibers. These refiners are a series of plates and bars that pass across each other at very

close distances. As the fibers pass between these plates and bars, the fibers are shortened and/or

roughed up.

- 8 -

### (b)    Broke

23.    All along the process of commercial paper making, there is always a possibility of a web break, off-quality paper, paper trim for edge control, trim for customer size needs, off-quality paper, etc. All of these paper sources contain valuable fiber and other additives that can be reused. Thus, a broke system is used to handle unused paper by slushing it up with water, storing, and distributing the broke to the proper location at the proper time. The broke system can involve a series of tanks, pumps, agitators, and deflakers, whose primary task is to break up the paper into fibers that can be reused back in the system.

### (c)    Additives Used in the Stock Prep and Wet End

24.    Stock prep and the wet end are areas within the papermaking process that are physically close, and often share similar additive chemistries. Individual mills may choose what, how, and where to place chemicals within these two areas. Dyes and optical whiteners are added for color and shade control. Defoamers may be added when entrained air may be a problem. Pigments and fillers, such as calcium carbonate and titanium dioxide, are often added. Biocides are often added to the recycled white water to control bug growth. Stock prep may also be the addition location for strength additives, such as starch.

25.    Frequently, the dyes and strength additives of the stock prep area are split 80/20 with the wet end. The 20% added in the wet end is called trim and is used for the last step for fine adjustment before paper formation. Sizing agents are chemicals that impart water resistance to the paper and are either alkyl ketene dimer (AKD), alkyl succinic anhydride (ASA), or alum/rosin. AKD and ASA are used in alkaline systems while alum/rosin are used in acid systems. Biocides and defoamers are usually added when needed to the white water of this

- 9 -

section or the incoming fresh water. Many different types of retention aid packages can be added at this stage.

### Forming Zone

26.     The fibers, diluted in the stock prep phase, are then prepared for forming the web or paper sheet. Since paper is best formed at as low a solids content as possible, the fiber solids content is diluted, in one or two steps, to a consistency of between 0.1 and 1.0%. A series of screens and cleaners are used to further remove and protect the forming equipment from contaminants and fiber bundles. These take the form of vibrating screens, centrifugal cleaners, and pressure screens. A pressure screen is usually the last protection before the web-forming process.

27.     The thus-diluted fiber flow departs the wet end operations and then enters the forming zone, where the paper web is produced by removing water to increase the fiber consistency to about 9 to 12% consistency. Water removal is accomplished by using the head box, a mechanical device that evenly distributes the fiber slurry onto or between a forming fabric or fabrics. Water is removed through pressure, vacuum, and gravity drainage through the forming fabric. The head box places the fiber slurry evenly onto the forming fabric and then pressure and vacuum elements (foils, vacuum foils, flat boxes, and vacuum boxes, and vacuum couch rill) remove water as the fabric progresses towards the next papermaking section. There is significant turbulence imparted to the diluted fiber and other chemicals in this process. On some machines, a dandy roll is used to improve the fiber distribution. This screen-covered roll sits above the forming fabric and disrupts fiber orientation by mechanically moving fibers around. All of the water removed in the forming zone is described as "white water" because this water contains short fibers that have passed through the forming fabric. This water is almost always

recycled back into the process, either as dilution water for consistency control or as feed water to the save all described earlier.

### Pressing/ Drying

28.    The function of the press section is to further dewater the paper web to provide a solids content of 20 to 40% depending on grade. The 9 or 12% solids web is transferred from the forming wire to the wet press felt. This felt, along with other felts, carry the web through a series of presses. Every machine may have a different press configuration and roll surface type. There may be up to four press machines, some with vacuum-assist pressure rolls and some without. Roll cover type and roll hardness are used to remove water to the desired degrees in each press. These felts get saturated with water, and so vacuum boxes are added to remove the water from those felts. High and low pressure water showers are used to clean the felts and doctor blades of differing types are used to keep roll surfaces clean.

29.    From the press section, the paper sheet is next passed through the main bank drying section. This is a series of high-pressure steam dryers that evaporate water from the sheet to varying degrees of solids content, depending on the grade of paper being made. The web is transported through these dryers on dryer felts much as was the case in the press section.

30.    After the main bank drying section there is the pre-coat or size press section that may or may not be used depending on the grade of paper being made. Following this section of the paper mill there are the after dryers. It is my understanding that I may be asked to testify about such subject matter.

- 11 -

### Finishing and Converting

31.     Next, the paper is smoothed and reeled up for the customer. The calendar is a set of high pressure and highly polished, rolls that press and smooth the surface of the paper. These rolls are located just before the take-up reel where the paper is wound for distribution.

### Additives and Their Use in Paper Making

32.     What are sometimes referred to as "Specialty Chemical" additives are added throughout the paper-making process, generally from the pulping stage through the stock preparation and forming stages. These include: strength additives, sizing additives, retention aids, fixatives/promoters, defoamers, deaerators, and biocides. Strength additives impart wet and dry strength, surface strength and z-directional strength and typically can include: starches, synthetic wet strength agents, and synthetic dry strength agents. Sizing additives impart water resistance to the paper and can include: acid rosin size, alkyline alkyl ketene dimer, and alkyline alkyl succinic anhydride. Retention aids are used to hold and retain small particles and soluble materials into the sheet. Fixatives/promoters neutralize negative charge and coagulate interfering substances and include LMW-HCD cationic polymers and inorganic salts. Through this neutralizing of charge, beneficial additives added prior to or subsequent to the addition of the fixatives/promoters absorb more completely to the fiber and fine surfaces. Defoamers added after foam has been generated to knock the foam down to reduce deposit formation, interference with retention, and poor formation. Deaerators prevent air from being a problem by stopping the formation of foams. Biocides are added to kill or inhibit the growth of biologically active substances that, if left unchecked, can result in significant paper spots, defects and breaks. Biocides include chlorine, chlorine dioxide, bromine derivatives, or synthetic toxins.

33.     Additional possible additives include colorants, fillers and pigments. Colorants impart color, optical whiteness, brightness and opacity to the finished paper. Colorants can

- 12 -

include cationic dyes, anionic dyes, pigments, optical brightening agents, and direct dyes. Fillers are additives that add thickness, restriction to light penetration, opaqueness, and formation or uniform visual appearance. Fillers can also impart bulk, opacity, and sheet uniformity and include: Kaolin Clay, ground calcium carbonate (GCC), precipitated calcium carbonate (PPC), titanium dioxide ($TiO_2$), and talc.

### Retention and Drainage Aids

34.     In many paper-making processes, what have been termed "retention and drainage aids" are added to enhance the retention of fines, fibers, fillers and other desired components while improving the drainage of water from the fines, fibers, fillers, and other components. Often, these aids are added prior to a point in the process where the dilute fiber stream is subjected to shear, as by passing through a fan pump or pressure screen, and are generally added to what is often termed the "furnish" (or "paper furnish"), which is the fiber slurry that passes into the head box and to the forming fabric.

35.     Over the years, what have been termed "patch" or "bridge" models have been used to explain the mechanism for how retention is obtained. I may explain how such mechanisms function.

36.     Inorganic particles such as silica and bentonite have been used. In my view, and while these inorganics have been used for several years, how these function as retention aids is not well understood.

37.     Generally speaking, synthetic organic polymers have been used in wet end chemistry for many years, such as linear polyacrylamides. These linear polymers were not always acceptable because of over flocculation and poor formation and thus were limited in their application. I have reviewed the technology tutorial presented by Hercules and Ciba. If asked, I

- 13 -

may testify about subject matter within such presentations. In particular, I may testify regarding the flocculation process as it proceeds through the papermaking process and the functions performed by the PolyFlex® and PerForm® products. More recently, synthetic organic microparticle retention and drainage aids have been developed. These include the Polyflex® and PerForm® SP9232 products. I will discuss these more in the next section.

38.    In some retention aid systems, including the synthetic organic microparticles, cationic chemicals, such as salts, starch, and polymers are used to provide a positive charge to the furnish, as well as to flocculate the furnish components. In such systems, the retention aid "package" used may include anionic chemicals such as the synthetic organic microparticles discussed above.

III.    **Infringement of U.S. patent Nos. 5,167,766 and 5,171,808**

39.    I may be asked to provide my opinion as to certain aspects set forth in the claims of the patents involved in this case. I set forth below those aspects about which I currently understand I may be expected to testify, however, I reserve the right to supplement my report should additional aspects become of issue, particularly regarding any issues raised by any expert retained by either Hercules or Cytec. I may also testify about various aspects of Ciba's interrogatories concerning infringement, such as Ciba's responses to Interrogatory No. 3.


**REDACTED**


- 14 -

REDACTED

**REDACTED**

44.    I reserve the right to supplement this expert report to set forth any opinions relating to these synthetic microparticulates, the PerForm® SP9232 and Polyflex® products, as would be required by any issues raised by any experts of Hercules or Cytec.

Dated:  July 19, 2005

_C. A. (Kasy) King_
C.A. (KASY) KING

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2005, I hand delivered the foregoing document to the

following persons and electronically filed the foregoing document with the Clerk of Court using

CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951

I hereby certify that on August 1, 2005 I have Federal Expressed the foregoing document

to the following non-registered participants:

Ford F. Farabow, Jr., Esquire                    Thomas L. Creel, Esquire
Joann M. Neth, Esquire                           Goodwin Proctor, LLP
A. Neal Seth, Esquire                            599 Lexington Avenue
Finnegan, Henderson, Farabow, Garrett &          New York, NY  10022
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Steven J. Fineman (#4025)