# EXHIBIT 1

# REDACTED

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIBA SPECIALTY CHEMICALS CORPORATION, )
                                     )
                  Plaintiff,          )     C.A. No. 04-293 (KAJ)
                                       )
          v.                           )
                                       )
HERCULES INCORPORATED and             )
CYTEC INDUSTRIES, INC.,                )
                                         )
                 Defendants.     )

## ORDER

The Court, having considered Cytec Industries, Inc.'s Motion For Leave To File Sur-Reply, IT IS HEREBY ORDERED this _____ day of _____, 2005, that:

     (i)       Cytec Industries, Inc.'s Motion is GRANTED; and

     (ii)      the Proposed Sur-Reply of Cytec Industries, Inc., in the form attached as Exhibit 1 to its Motion, is deemed filed and served as of the date of this Order.

                                            _____
                                            United States District Court Judge

693644 / 28118

# EXHIBIT 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531555
**(Cite as: Not Reported in F.Supp.2d)**

▷

Not Reported in F.Supp.2d, 2002 WL 531555
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
ROCKWELL TECHNOLOGIES, LLC, Plaintiff,
v.
SPECTRA-PHYSICS LASERS, INC. and Opto
Power Corporation, Defendants.
No. Civ.A.00-589 GMS.

March 26, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

**\*1** The plaintiff, Rockwell Technologies, LLC ("Rockwell") filed the above-captioned action against Spectra-Physics Lasers, Inc. ("Spectra") and Opto Power Corporation ("Opto") on June 16, 2000. In its complaint, Rockwell alleges that Spectra and Opto are infringing U.S. Patent No. 4,368,098 ("the '098 patent").

Presently before the court is Rockwell's motion for partial summary judgment. In this motion, Rockwell asks the court to find that the '098 patent is not invalid due to alleged inequitable conduct that occurred in the prosecution of the patent application. For the reasons that follow, the court will grant this motion in part and deny it in part.

## II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A

fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-174 (3d Cir.1999).

With these standards in mind, the court will describe the facts and procedural history that led to the motion presently before the court.

## III. BACKGROUND

### A. Prosecution of the '098 Patent

The patent-in-suit relates to a process for forming "an epitaxial film of group III-V semiconductor disposed on a single crystal substrate." Dr. Harold Manasevit ("Manasevit") developed the process described in the '098 patent. On February 13, 1968, Rockwell filed a patent application with the United States Patent and Trademark Office ("PTO"). As the application contained both process and product claims, the PTO required that Rockwell choose one to proceed with first. Rockwell elected to give precedence to the product claims.

In 1978, Rockwell retained the law firm of Staas and Halsey to prosecute the Manasevit patent application with respect to the process claims. Jack Staas ("Staas") was the Staas and Halsey attorney primarily responsible for this prosecution. On April 7, 1978, Rockwell filed a divisional application seeking a patent for the process claims. This application issued as the '098 patent on January 11, 1983. It expired on January 11, 2000.

### B. Alleged Prior Art

**\*2** In 1957, Thomas R. Scott obtained patents from Japan (the "Japanese Scott patent") and the United Kingdom (the "UK Scott patent"). Spectra and Opto allege that the UK Scott patent came to the attention of Rockwell's in-house patent attorneys while Rockwell was prosecuting the Manasevit process

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531555
(Cite as: Not Reported in F.Supp.2d)

Page 2

patent application in Great Britain. In response to that application, the UK Patent Office identified the UK Scott patent and five other prior art references. The UK Patent Office directed Rockwell's attention to those references.

Rockwell's UK patent counsel informed Rockwell's in-house patent counsel Robert Rogers ("Rogers") of the UK Scott patent and the five other references on September 29, 1972. In response to the UK patent counsel's request on how to respond to that information, Rockwell employee Martin E. Gerry prepared detailed instructions for amending Rockwell's claims to avoid the cited references. The UK patent counsel subsequently informed Rogers that it was removing from the application the original prior art cited in the application because the UK Scott patent and the other references constituted "the closest prior art."

Rockwell also applied for a Japanese patent on Manasevit's invention. On that application, Rockwell listed Frederick Hamann ("Hamann") as its representative. Hamann supervised Rockwell's in-house patent department from 1970 to 1995. As in the prosecution of the UK patent application, Scott's work was cited against the Japanese patent application.

On June 18, 1974, the Japanese patent office issued a rejection against the pending claims in Rockwell's Japanese patent application. FN1 Rockwell's Japanese patent counsel sent the rejection to Hamann on July 6, 1974, along with a discussion of the Japanese Scott patent. The Japanese counsel also sent Hamann a copy of this patent. Rockwell's in-house patent counsel G. Donald Weber ("Weber") responded by asking for an English abstract of the Japanese Scott patent. The Japanese patent counsel complied on August 8, 1974. Weber subsequently sent them instructions on how to amend Rockwell's Japanese claims in light of the Scott patent.

> FN1. Spectra and Opto allege that the claims in Rockwell's Japanese patent application were substantively the same as the claims in the '098 patent.

## C. Procedural History

On August 30, 1993, Rockwell brought an action against the United States in the United States Court of Federal Claims. In May 1995, Rockwell initiated an action against Spectra in the Northern District of

California. Spectra then intervened in the Court of Federal Claims action as a third-party defendant. The Northern District of California stayed its action pending a resolution of that action.

In 1998, the United States and Rockwell settled. This settlement deprived the Claims Court of jurisdiction over the dispute between Rockwell and Spectra. Thus, on January 13, 1999, the Northern District of California court lifted its stay and reopened the matter. On July 24, 2001, the court denied Rockwell's motion for partial summary judgment on the issue of inequitable conduct.

Rockwell brought the present infringement action on June 16, 2000.

## IV. DISCUSSION

*3 Spectra and Opto assert that the inventor, Dr. Harold M. Manasevit, and Rockwell's attorney Jack Staas were guilty of inequitable conduct by failing to disclose material references to the PTO. FN2

> FN2. Spectra and Opto deny basing their inequitable conduct claims on the Rule 132 Declaration that Manasevit filed with the PTO (the "Manasevit Declaration") Further, in their opposition papers, Spectra and Opto state that they do not oppose the portion of Rockwell's summary judgment motion directed to the Manasevit Declaration. Likewise, they deny alleging that Rockwell itself, as a corporate entity, could be liable for inequitable conduct. Accordingly, it is undisputed that only Manasevit's and counsel for Rockwell's conduct is at issue.

As an initial matter, Rockwell argues for the first time in its reply brief that Spectra and Opto failed to plead inequitable conduct with particularity in their answer to the complaint and have thus waived their right to assert this affirmative defense. However, Rockwell's tactic of reserving new arguments for its reply brief amounts to impermissible "sandbagging." *See Jordan v. Bellinger*, 2000 U.S. Dist. LEXIS 19233, *18 (D. Del. April 28, 2000) (declining to address new arguments reserved for the reply brief); *see also* D. Del. L.R. 7.1.3(c)(2) (1995). Accordingly, the court declines to address Rockwell's arguments on this issue and will turn instead to the substantive merits of the motion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531555
(Cite as: Not Reported in F.Supp.2d)

Page 3

Patent applicants and their legal representatives have a duty to prosecute applications with candor, good faith, and honesty. *See Molins PLC v. Textrom, Inc., 48 F.3d 1172, 1178 (Fed.Cir.1995).* Breach of this duty can lead to a finding that the applicant engaged in inequitable conduct before the PTO. *See Life Tech., Inc. v. Clontech Lab., Inc., 224 F.3d 1320, 1324 (Fed.Cir.2000).* The effect of such inequitable conduct is to render the affected patent unenforceable. *See id.*

In order to prove inequitable conduct, the defendants bear the burden of providing clear and convincing evidence that: (1) omitted or false information was material; (2) the applicant had knowledge of the existence and material nature of the information; and (3) the applicant intended to deceive the PTO. *See Molins, 48 F.3d at 1178.* "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Tech. 224 F.3d at 1324.* Information is considered material "when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Molins, 48 F.3d at 1179.* The court may infer intent from the facts and circumstances surrounding the applicant's overall conduct. *See Merck & Co. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1422 (Fed.Cir.1989).* However, in making its inferences, the court must be aware that "[a]lthough the intent element of fraud or inequitable conduct may be proven by a showing of acts the natural consequence of which were presumably intended by the actor, this requires the fact finders to evaluate all the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings." *KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571, 1577 (Fed.Cir.1985)* (citation omitted).

In its moving papers, Rockwell declines to address the materiality of the Scott references. The Scott patents, however, were cited by foreign patent offices against Manasevit's process. This raises at least an inference that the references are material. *See Molins, 48 F.3d at 1180.* Further, Rockwell amended the claims in its foreign patents to overcome the Scott references. Accordingly the court finds that there is a triable issue of fact with regard to the materiality of the Scott patents.

**\*4** The court likewise concludes that granting summary judgment on the issue of intent would be improvident. Rockwell submits that Manasevit and Staas have each stated that they were unaware of the

Scott patents. The Federal Circuit has stated, however, that "[f]ailure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional." *Molins, 48 F.3d at 1182.* Moreover, the court expresses concern over Rockwell's argument that the named inventor of the '098 patent, who is also the named inventor of the British and Japanese patents that were amended in light of the Scott patents, was not aware of the Scott patents.

When faced with a similar motion for summary judgment based on inequitable conduct with regard to these parties, the District Court for the Northern District of California explicitly reserved judgment on whether the actions of Staas and his fellow Rockwell attorneys were inequitable. FN3 *See Rockwell v. SDL, Inc., No. C-95-1729, at 12, n. 11 (N.D.Cal. July 24, 2000).* That court further expressed a concern identical to that which the court has in the present case arising from Manasevit's failure to disclose the Scott patents to the PTO.

> FN3. Based on the California court's denial of summary judgment on a similar issue, Spectra and Opto argue that Rockwell is now collaterally estopped from further litigating this issue. The court must disagree because a determination that there remain genuine issues of material fact is not a "final decision." *See Johnson v. Jones, 515 U.S. 304, 313 (1995); see also Whitford v. Boglino, 63 F.3d 527, 530 (7th Cir.1995)* (stating that the denial of summary judgment is not a final judgment, but rather an interlocutory order in the *res judicata* context.)

While mindful of the heavy burden the defendants bear, the court is persuaded that there remain substantial questions regarding Manasevit's and Staas's knowledge and intent that are better left to trial. *See Baker Oil Tools, Inc. v. Geo Vann, Inc., 828 F.2d 1558, 1566 (Fed.Cir.1988)* (noting that, "[i]f the facts of materiality or intent are reasonably disputed the issue is not amenable to summary disposition.")

Finally, Rockwell requests leave to file a further motion for summary judgment on inequitable conduct. Rockwell contends that this is appropriate because it was waiting for Spectra's and Opto's expert reports assessing the materiality of additional prior art references that were allegedly not disclosed to the PTO. However, as Spectra and Opto argue, the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 531555
**(Cite as: Not Reported in F.Supp.2d)**

references at issue are articles that Manasevit himself wrote. Manasevit's and Rockwell's own experts were surely capable of assessing the materiality of Manasevit's work. Accordingly, the court declines to grant Rockwell additional time to file a motion that could have been filed with the instant motion for summary judgment.

## V. CONCLUSION

The parties do not dispute that the corporate entity Rockwell is not being accused of inequitable conduct. Nor do they dispute that the charges of inequitable conduct are not based on the Manasevit Declaration. Thus, the court will grant Rockwell's motion with regard to these issues. However, there remain genuine issues of material fact with regard to the remaining inequitable conduct allegations.

For these reasons, IT IS HEREBY ORDERED that:
    1. Rockwell's motion for partial summary judgment (D.I.149) is GRANTED in part and DENIED in part.
    2. Rockwell's request to file a further motion for summary judgment on inequitable conduct (D.I.149) is DENIED.

D.Del.,2002.
Rockwell Technologies, LLC. v. Spectra-Physics Lasers, Inc.
Not Reported in F.Supp.2d, 2002 WL 531555

Briefs and Other Related Documents (Back to top)

• 1:00CV00589 (Docket) (Jun. 19, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2005 WL 121796, 73 U.S.P.Q.2d 1898
**(Cite as: Not Reported in F.Supp.2d)**

H
Not Reported in F.Supp.2d, 2005 WL 121796, 73
U.S.P.Q.2d 1898
Briefs and Other Related Documents

United States District Court,D. Delaware.
WEBLOYALTY.COM, INC., Plaintiff,
v.
CONSUMER INNOVATIONS, LLC, Defendant.
**No. Civ.A.04-90-KAJ.**

Jan. 13, 2005.

*MEMORANDUM ORDER*

JORDAN, J.

### I. INTRODUCTION

**\*1** Presently before me is a Motion for Summary
Judgment (Docket Item ["D.I."] 91) filed by
defendant Consumer Innovations, LLC ("Consumer
Innovations") and a Motion for Discovery on the
Issue of Personal Jurisdiction (D.I. 27; "Motion for
Discovery") filed by Webloyalty.com, Inc.
("Webloyalty"). Webloyalty filed this action on
February 9, 2004 (D.I.1) and subsequently filed a
First Amended Complaint (the "Complaint") on May
26, 2004 (D.I.52). Webloyalty alleges two counts in
its Complaint. First, that Consumer Innovations
infringed its copyright, Registration No. TX5842219,
"[b]y using strikingly or substantially similar sell
pages in commerce ... without Webloyalty's
permission, license or consent." (*Id* at ¶ ¶ 20, 24,
25.) Second, that Consumer Innovations' "use in
commerce of Webloyalty's advertisements is likely to
cause confusion, mistake or deception as to both
[Consumer Innovations'] affiliation, connection, or
association with Webloyalty ... [and] the origin,
sponsorship or approval of [Consumer Innovations']
goods, services, or commercial activities," such that
Consumer Innovations' activities constitute "unfair
competition and a false designation of origin in
violation of the Lanham Act, 15 U.S.C. § 1125(a)."
(*Id* at ¶ ¶ 31, 32, 33.) This court has jurisdiction
pursuant to 28 U.S.C. § 1331.

For the reasons that follow, Consumer Innovations'
Motion for Summary Judgment (D.I.91) will be
denied and Webloyalty's Motion for Discovery

(D.I.27) will be denied as moot. FN1

> FN1. Webloyalty filed its Motion for
> Discovery in response to Consumer
> Innovations' Motion to Dismiss (D.I.16).
> Webloyalty sought discovery "only if the
> Court determine[d] that [its] opposition to
> Consumer Innovations' motion to dismiss
> for lack of in personam jurisdiction is not
> sufficient by itself to result in denial of
> [Consumer Innovations'] motion." (*Id* at 1.)
> On September 2, 2004, Consumer
> Innovations filed a Notice of Withdrawal of
> its Motion to Dismiss. (D.I.84.) Based on
> Consumer Innovations' withdrawal of its
> motion, I consider Webloyalty's Motion for
> Discovery (D.I.16) to be moot.

### II. BACKGROUND FN2

> FN2. The following rendition of background
> information does not constitute findings of
> fact and is cast in the light most favorable to
> the non-moving party, the plaintiff.

Webloyalty and Consumer Innovations are
businesses engaged in the marketing of online
membership clubs to consumers. (D.I. 92 at 3; D.I. 94
at 3.) Consumers purchasing memberships are able to
purchase goods and/or services offered through the
clubs at a discount. (D.I. 94 at 3.) One of the ways in
which Webloyalty markets these club memberships is
by contracting with other companies ("partner
companies"), who sell goods and services on line, to
place a banner on the partner company's sale
confirmation web page. (D.I. 94 at 3.) Generally, the
marketing of each parties' club memberships occurs
in the following manner:

1. A consumer completes an online purchase from
the partner company and is then directed to the
partner company's "confirmation page."
2. The confirmation page has a "banner
advertisement" with an offer from Webloyalty or
Consumer Innovations.
3. If the consumer clicks on the banner
advertisement, the consumer is then transferred to
the "sell page" on the website for Webloyalty or
Consumer Innovations depending on whose banner
ad appeared.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 121796, 73 U.S.P.Q.2d 1898
(Cite as: Not Reported in F.Supp.2d)

4. The sell page offers the consumer the opportunity to become a member of the particular discount program. It contains the material terms of the program, the offer details, and a description of the program. The sell page also allows the consumer to return to the partner company's website by clicking on a link.
(*See* D.I. 92 at 4.)

*2 In October 2002, FN3 Webloyalty entered into a contract with a company called Walter Drake to promote its services on the Walter Drake confirmation page in the manner described above. (D.I. 94 at 3 .) From that time until August of 2003, Webloyalty was the only company to offer these services through Walter Drake. (*See id.* at 4.) In August of 2003, Walter Drake ran a test to determine whether its consumers preferred the services of Webloyalty or those of one of its competitors, InQ. (*Id.* at 3-4.) At the end of the test period, the Webloyalty banner was again placed on all of the Walter Drake confirmation pages. (*Id.* at 4.)

> FN3. Drawing all reasonable inferences in favor of the non-moving party for the purposes of this motion, I will accept Webloyalty's statement that the date of contract was October, 2002, although Consumer Innovations stated that it was in or about November, 2002. (D.I. 94 at 3.)

In December 2003, FN4 Consumer Innovations entered into a deal with a broker FN5 pursuant to which it would offer its "Traveler Innovations" service on the Walter Drake confirmation page. (D.I. 94 at 4.) The purpose of this arrangement was to test Consumer Innovations' program against Webloyalty's "Reservation Rewards" program. (*Id.*) In this arrangement, customers would alternatively be directed by Walter Drake to either the Consumer Innovations or Webloyalty sell page. (*Id.*) As part of the agreement between Walter Drake and Webloyalty, and the agreement between Walter Drake and Consumer Innovations, consumers joining either the "Reservation Rewards" or "Travelers Innovations" program would be given a $10 credit toward their next Walter Drake purchase. (D.I. 92 at 5.)

> FN4. Drawing all reasonable inferences in favor of the non-moving party for the purposes of this motion, I will accept Webloyalty's statement that the agreement

was made in December, 2003, although Consumer Innovations stated that it was in or about January, 2004. (D.I. 94 at 4.)

> FN5. Webloyalty alleges that the agreement was between Consumer Innovations and a "broker," whereas Consumer Innovations alleges that the agreement was made between it and Walter Drake. (D.I. 94 at 4; D.I. 92 at 5.) Either way, the result, as described above, was the same.

The present dispute centers on Consumer Innovations' sell page. Webloyalty alleges that Consumer Innovations created its sell page by copying portions of Webloyalty's sell page. (*See* D.I. 92 at 4-5.) Several portions of Webloyalty's and Consumer Innovations' sell pages contained identical verbiage. (D.I. 52, Ex. E at 1-2.) Examples of such identical verbiage include: FN6 "Try all the benefits for the next 30 days FREE and see how much you save! There's no obligation to continue. If you are completely satisfied, do nothing and you'll enjoy ongoing savings for only $_ FN7 a month;" "For your convenience __ FN8 will use the contact and credit or debit card information you provided to Walter Drake today for billing and benefit processing;" and "To thank you for your purchase at Walter Drake today, click YES below to get your $10 .00 Cash Back Gift ... on your next Walter Drake purchase plus sign up for all the money-saving benefits of __, FN9 our ... online travel ... discounts ... program!" (*Id.*)

> FN6. Although the full extent of Webloyalty's copyright is not disclosed in the record, the phrases listed above are representative of the information presented on Webloyalty's and Consumer Innovations' sell pages.

> FN7. In Webloyalty's sell page, the cost is $9 a month whereas on Consumer Innovations' sell page, the cost is $7 a month. (D.I. 52, Ex. E at 1-2.)

> FN8. The blank contains the program name, "Reservation Rewards" in Webloyalty's sell page, and "Traveler Innovations" in Consumer Innovations' sell page. (D.I. 52, Ex. E at 1-2.)

> FN9. The blank contains the program names as in footnote 8.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 121796, 73 U.S.P.Q.2d 1898
(Cite as: Not Reported in F.Supp.2d)

Consumer Innovations has since modified its sell page. (D.I. 92 at 4-5.) Webloyalty admits that Consumer Innovations' modified sell page does not infringe its copyright. (Id at 5.)

### III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a triable issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Inds. Co., Ltd., 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### IV. DISCUSSION

*3 Webloyalty alleges that Consumer Innovations infringed its copyright (D.I. 52 at ¶¶ 20, 24, 25) and that Consumer Innovations' activities constitute unfair competition (id. at 31, 32, 33).

#### A. Copyright Infringement

To prove copyright infringement, a plaintiff must establish that it owns a valid copyright and that the copyrighted material was copied by the defendant. Dam Things from Denmark, a/k/a Troll Company ApS v. Russ Berrie & Co., Inc., 290 F.3d 548 at 561 (3d Cir.2002) (citing Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1231 (3d Cir.1986)). Certificates of registration issued by the U.S. Copyright Office constitute prima facie evidence of the validity of the copyright and ownership of the material. Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 290-91 (3d Cir.1991) (internal citations omitted). Consumer Innovations concedes that Webloyalty's "ownership of the copyrighted property is undisputed" and that, therefore, the question is whether it copied protectible material from the Webloyalty sell page. (D.I. 92 at 8.)

Copying is a "shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106." Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 206 (3d Cir.2002) (quoting Ford Motor, 930 F.2d at 291.) Because it is rarely possible to prove copying through direct evidence, Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1110 (9th Cir.1970), "copying may be proven inferentially by showing that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work." Whelan Assocs., 797 F.2d at 1231-32 (internal citations omitted). The test for "substantial similarity" has two considerations: extrinsic and intrinsic. Dam Things from Denmark, 290 F.3d at 562. Extrinsically, experts "may be called upon to determine whether there is sufficient similarity between the works so as to conclude that the alleged infringer 'copied' the work." Id. (citing Whelan Assocs., 797 F.2d at 1232.) Intrinsically, the fact-finder is to determine whether a "lay-observer" would "believe that the copying was of protectible aspects of the copyrighted work." Id. (citing Whelan Assocs., 797 F.2d at 1232.) These two considerations have been described as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." FN10 See id. (quoting Folio Impressions, Inc. v. Byer California, 937 F.2d 759, 765 (2d Cir.1991)).

FN10. In Dam Things From Denmark, the Third Circuit noted that it had previously adopted the Second Circuit's test for substantial similarity, as described in Arnstein v. Porter, 154 F.2d 464, 468-69 (2d

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 121796, 73 U.S.P.Q.2d 1898
(Cite as: Not Reported in F.Supp.2d)

Cir.1946). *Dam Things From Denmark,* 290 F.3d at 562. This test consists of two considerations: " 'actual copying' which focuses on access in conjunction with 'probative' similarity, and 'actionable copying' which considers whether there is 'substantial' similarity between the alleged infringing work and the *protectible elements* of the original work." *Dam Things from Denmark,* 290 F.3d at 562 (internal citations omitted). The test for actual copying can be established by direct evidence or inferred by evidence of access and "similarities that are probative of copying between the works, and expert testimony." *Id.* (internal citations omitted).

The Supreme Court, however, has explained that "[n]ot all copying ... is copyright infringement." *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991). Therefore, the trial court must consider, "whether the copying is actionable, viewing the item through the lay person's eyes, focusing on whether the substantial similarities relate to protectible material." *Dam Things From Denmark,* 290 F.3d at 562 (internal citation omitted.) This test makes clear that "it is only after actual copying is established that one claiming infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to protected expression in the earlier work." *Id.* (internal quotation omitted).

Consumer Innovations makes two arguments as to why there is no genuine issue of material fact. First, it argues that the language common to both Consumer Innovations' and Webloyalty's sell pages is not protectible under the Copyright Act of 1976 because the language is merely functional or standard in the industry and therefore, was not originally created by Webloyalty. (D.I. 92 at 9-10.) Second, it argues that the common language was made up of common expressions which may be lawfully appropriated under the merger and scenes-a-faire doctrines. (*Id* at 10-13.)

*4 Webloyalty counter-argues that Consumer Innovations has failed to show that no genuine issues of material fact exist and, therefore, summary judgment for Consumer Innovations is not appropriate. First, Webloyalty notes that evidence of its copyright registration is *prima facie* evidence of

originality. (D.I. 94 at 6.) Webloyalty argues that Consumer Innovations has failed to overcome this presumption of originality because there is no evidence that Webloyalty's sell page was copied from prior similar works. (*Id.* at 6-7.) Second, Webloyalty argues that the doctrines of merger and scenes-a-faire do not apply because there are "a number of ways" to express the idea of "a $10 incentive for joining a membership club and for instructing individuals how to join." (*Id.* at 11.)

Webloyalty is correct that there are genuine issues of material fact that require denial of Consumer Innovations' Motion for Summary Judgment. Consumer Innovations has failed to rebut the *prima facie* case of originality established by Webloyalty's copyright registration. Certificates of registration constitute *prima facie* evidence of originality. *Blendingwell Music, Inc. v. Moor-Law, Inc.,* 612 F.Supp. 474, 480 (D.Del.1985) (internal citations omitted). Consumer Innovations' argument as to lack of originality is entirely unsupported. FN11 Consumer Innovations argued that the common language of both sell pages was "standard in the industry" or consisted of "functional instructions" such that it was not protectible. (D.I. 92 at 9-10.) Consumer Innovations, however, does not provide any evidentiary or legal support for this argument. Even if Consumer Innovations had such evidence, a defendant cannot offer evidence of prior similar works without evidence that plaintiff copied those works. 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.11[B][1]. Furthermore, "[u]nless the originality vel non of a copyrighted work is determinable as a matter of law, it becomes a question of fact for the fact finder to resolve." *Scientist, Inc v. Lindsey,* No. CIV. A. 95-7960, 1996 WL 278778, at *3 n. 7 (D.Del. May 22, 1996) (quoting *Modern Publ'g v. Landoll, Inc.,* 849 F.Supp. 22, 24 (S.D.N.Y.1994)).

FN11. Consumer Innovations seems to imply that the common language of the sell pages was standard in the industry because the individual who wrote the sell page for Webloyalty, and the individual who allegedly wrote the sell page for Consumer Innovations, were both previously employed by Trilegiant, a company that also used sell pages to conduct business. (D.I. 92 at 9.) Consumer Innovations noted that it was "more than a little ironic" that both men had the same former employer. (*Id*) Consumer Innovations, however, has failed to present

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 121796, 73 U.S.P.Q.2d 1898
(Cite as: Not Reported in F.Supp.2d)

evidence that Webloyalty personnel copied the sell page from the Trilegiant sell page or any other sell page, or, for that matter, whether the Trilegiant sell page was even created before Webloyalty's.

It is not until Consumer Innovations' Reply Brief in support of its Motion for Summary Judgment that it moves past its lack of originality argument and argues that any substantial similarity between the two sell pages is not actionable. (D.I. 98 at 6-8.) It admits, however, as it must, that the determination of the cause of the substantial similarity, "is a question of fact." (*Id.* at 7 (quoting *Whelan,* 797 F.2d at 1232 n. 23.)) Therefore, it is clear that Consumer Innovations has not rebutted the *prima facie* case of originality nor has it established that there are no genuine issues of material fact relating to the originality of the work at issue or the determination of substantial similarity.

Consumer Innovations' second argument is that the functional nature of the language and the cash back feature are "external factors" which limit the number of ways to express the ideas conveyed on the sell page such that the doctrines of merger or scenes-a-faire prevent Webloyalty from claiming an exclusive right to the common language of the sell pages. (D.I. 92 at 10-13.) Under the doctrine of scenes-a-faire, copyright protection is denied "to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." *Dun & Bradstreet Software Servs., Inc.,* 307 F.3d at 215 (quoting *Gates Rubber Co. v. Bando Chem. Indus.,* 9 F.3d 823, 838 (10th cir.1993)). Scenes-a-faire are "incidents, characters or settings which are as a practical matter indispensable ... in the treatment of a given topic." *Whelan Assocs.,* 797 F.2d at 1236 (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607, 616 (7th Cir.1982), *cert. denied,* 459 U.S. 880 (1982)). The scenes-a-faire doctrine denies copyright protection to an idea that is capable of expression only in a stereotyped form. *Atari, Inc.,* 672 F.2d at 616.

*5 The doctrine of merger applies where there is a merger of idea and expression, such that a given idea is inseparably tied to a particular expression. *Educ. Testing Servs. v. Katzman,* 793 F.2d 533, 539 (3d Cir.1986). "The idea and the expression will coincide when the expression provides nothing new or additional over the idea ." *Midway Mfg. Co. v. Bandai-America, Inc.,* 546 F.Supp. 125, 148 (D.N.J.1982) (internal citation omitted). Under such circumstances, protecting the expression would entail

protecting the idea itself, which is impermissible under copyright law. *Atari, Inc.,* 672 F.2d at 612.

Consumer Innovations' arguments based on these doctrines are also insufficient to establish that summary judgment is appropriate. For either doctrine to apply, Consumer Innovations must establish that there is a limited, if not singular, manner to express the ideas presented on the sell page. It has not made any such showing. The evidence presented by Consumer Innovations, if anything, proves the opposite. Consumer Innovations provides two examples of sell pages that offer a $10 incentive for joining a membership club and inform the reader how to join. (D.I. 92 at Ex. I; D.I. 95 at Ex. 14, Dec. Anne M. Sterba.) These sell pages clearly show that there are other ways in which those ideas can be expressed. Neither of these sell pages uses the same text or arrangement as Webloyalty's copyrighted page. While, the "external factors" described by Consumer Innovations may provide the central ideas, there apparently are a number of ways to express them. FN12 Therefore, Consumer Innovations has not established that either doctrine supports their argument for summary judgment on this record.

> FN12. For instance, Webloyalty submitted seven examples of sell or enrollment pages embodying a cash back offer which it admits do not utilize the same text or same look and feel as Webloyalty's sell page. (D.I. 96 at Ex. A, Dec. Tamra Lichtman.)

Because Consumer Innovations has failed to satisfy its burden of proving that no genuine issues of material fact exist as to the issue of copyright infringement, its Motion for Summary Judgment is denied.

### B. Unfair Competition

Consumer Innovations' entire argument for summary judgment on Webloyalty's unfair competition claim in its Opening Brief in support of its Motion for Summary Judgment is contained in two sentences. First, Consumer Innovations states that: "Because the elements common to the Reservation Rewards sell page and the Travelers Innovations sell page relate only to the non-copyrightable language, plaintiff's claims for infringement, unfair competition, and trade dress must be dismissed as a matter of law." (D.I. 92 at 8.) Then Consumer Innovations concludes with a request for "Summary Judgment in favor of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 121796, 73 U.S.P.Q.2d 1898
(Cite as: Not Reported in F.Supp.2d)

Consumer Innovations, LLC, dismissing all claims against it with prejudice." (D.I. 92 at 15.) In its Reply Brief in support of its Motion for Summary Judgment (D.I. 98; "Reply Brief"), however, Consumer Innovations dedicated nearly 10 pages to its argument for why it is entitled to summary judgment on Webloyalty's unfair competition claim. Consumer Innovations' explanation for why it did not earlier address Webloyalty's unfair competition claim was that Webloyalty did not provide any evidence to establish any of the elements of its unfair competition claim throughout discovery. (D.I. 98 at 11-12.)

*6 Delaware Local Rule 7.1.3(c)(2) pertains to Reply Briefs and states: "The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief...." Therefore, if Consumer Innovations had an argument to make as to why summary judgment on Webloyalty's unfair competition claim was appropriate, it should have been raised in their opening brief, unless it was responding to an argument made by Webloyalty in its Answering Brief (D.I.94). Consumer Innovations, however, was not responding to an argument raised in Webloyalty's Answering Brief because Webloyalty's entire argument, presented in its "Summary of Argument," consisted of the following: "Although [Consumer Innovations"] motion formulaically requests dismissal "of any and all claims dismiss it" ... [Consumer Innovations'] Opening Brief ... does not even mention Webloyalty's allegations of unfair competition under the Lanham Act 15 U.S.C. § 1125(a) ... and contains no arguments as to why Count II should be dismissed." (D.I. 94 at 2.)

Because Consumer Innovations' arguments presented on pages 11 through 20 of its Reply Brief should have been presented in its Opening Brief for proper consideration pursuant to Local Rule 7.1.3(c)(2), its Motion for Summary Judgment as to Webloyalty's unfair competition claim is also denied.

## V. CONCLUSION

Accordingly, it is hereby ORDERED that Consumer Innovations' Motion for Summary Judgment (D.I.91) is DENIED and Webloyalty's Motion for Discovery (D.I.27) is DENIED as moot.

D.Del.,2005.
Webloyalty.Com, Inc. v. Consumer Innovations, LLC
Not Reported in F.Supp.2d, 2005 WL 121796, 73 U.S.P.Q.2d 1898

Briefs and Other Related Documents (Back to top)

• 1:04CV00090 (Docket) (Feb. 09, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2000 WL 135129
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Not Reported in F.Supp.2d, 2000 WL 135129
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
AUBREY ROGERS AGENCY, INC., Plaintiff,
v.
AIG LIFE INSURANCE COMPANY, Defendant.
**No. Civ.A.97-529 MMS.**

Jan. 13, 2000.

Jeffrey C. Wisler , of Connolly Bove Lodge & Hutz,
L.L.P. , Wilmington, Delaware, Jeffrey H. Marsh ,
and Michael J. Filla , of Mattingly & Marsh, L.L.P.,
Houston, Texas; for plaintiff, of counsel.
Stephen E. Jenkins , and Regina A. Iorii , of Ashby &
Geddes, Wilmington, Delaware; for defendant.

*MEMORANDUM OPINION*

SCHWARTZ, J.

### I. INTRODUCTION

**\*1** Plaintiff Aubrey Rogers Agency, Inc. ("ARA")
sold credit life insurance and disability policies
underwritten by Defendant AIG Life Insurance
Company ("AIG"). In February 1995, AIG
unilaterally terminated its business relationship with
ARA. Shortly thereafter, AIG exited the credit life
insurance and disability business due to alleged
heavy losses. In July, 1996, ARA filed suit against
AIG in a Texas state court, alleging breach of
contract, fraudulent and negligent misrepresentation,
and tortious interference with contractual and
business relations. AIG removed the action to the
United States District Court for the Southern District
of Texas, and that court later transferred the case to
this Court.

ARA identified George Wise, an actuary, as an
expert witness to testify on the issue of damages. Mr.
Wise wrote his expert report in April 1998, and AIG
took Mr. Wise's deposition on June 16, 1998. In a
proposed Pretrial Order, ARA identified citations
from the transcript of Mr. Wise's deposition that it
intended to offer into evidence in lieu of Mr. Wise's
live appearance at trial.

On November 30, 1999, AIG filed a Motion in
Limine to exclude the deposition testimony of
George Wise. AIG argues that Mr. Wise's deposition
testimony is inadmissible hearsay. ARA counters that
the deposition testimony falls under two hearsay
exceptions: Rule 804 of the Federal Rules of
Evidence  and Rule 32 of the Federal Rules of Civil
Procedure. For the reasons set forth *infra*, the Court
will not permit ARA to introduce into evidence Mr.
Wise's deposition testimony in lieu of his live
testimony at trial.

### II. FACTS

The background facts of this case are as set forth in
the Court's summary judgment opinion, *Aubrey
Rogers Agency, Inc. v. AIG Life Ins., Co.* FN1 Other
pertinent facts are discussed in the body of this
opinion.

FN1. 55 F.Supp.2d 309 (D.Del.1999).

### III. DISCUSSION

Statements made during deposition testimony that are
offered at trial to prove the truth of the matter
asserted are hearsay. FN2 Such hearsay statements
are not admissible except as specifically provided for
by rule prescribed by the Supreme Court or other
statutory authority. FN3 AIG argues that Mr. Wise's
deposition testimony is hearsay and that it is not
admissible as a hearsay exception under either Rule
804 of the Federal Rules of Evidence  or under Rule
32 of the Federal Rules of Civil Procedure. FN4 Rule
804 of the Federal Rules of Evidence  and Rule
32(a)(3)(B) of the Federal Rules of Civil Procedure
provide independent methods of determining whether
a deposition may be admitted into evidence as
hearsay exception. FN5 Therefore, the Court will
evaluate the applicability of each Rule to Mr. Wise's
deposition testimony.

> FN2. *See* Fed.R.Evid. 801(c)(defining
> hearsay).

> FN3. *See* Fed.R.Evid. 802.

> FN4  AIG makes two additional exclusion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 135129
(Cite as: Not Reported in F.Supp.2d)

arguments for the first time in its reply brief. In its answering brief, ARA asserts that Mr. Wise was hired "to review Mr. Loesch's calculations, perform independent calculations of the same type as Mr. Loesch did, and to opine as to whether or not Mr. Loesch's methodology and conclusions were correct." Based on this statement, AIG contends that if Mr. Wise's testimony adds nothing more to the case than buttressing Mr. Loesch's opinions, then his testimony is cumulative under Fed.R.Evid. 403 and therefore should be inadmissible. Because AIG raised this argument for the first time in its reply brief and, thus, ARA has not had an opportunity to respond, this argument is not properly presented to the Court. See D. Del. L.R. 7.1.3(c).

AIG further maintains that Fed.R.Evid. 608 renders it inappropriate to support Mr. Loesch's credibility through Mr. Wise's deposition testimony since Rule 608 provides that a witness' credibility may be rehabilitated by "evidence in the form of opinion or reputation," subject to the limitation that the evidence may refer only to the witness' "character for truthfulness or untruthfulness." The Court finds Rule 608 is inapposite to this case. Rule 608 relates to the admissibility of evidence of character and conduct of a witness. ARA has not purported that the purpose of Mr. Wise's testimony is to rehabilitate Mr. Loesch in terms of Loesch's character for truthfulness. Moreover, since the argument was raised for the first time in reply, it is not properly before the Court. See D. Del. L.R. 7.1.3(c). Furthermore, depending on the outcome of AIG's motion in limine to exclude the report and testimony of ARA's primary expert, Patrick Loesch, that is, if the Court determines that Mr. Loesch is not qualified as an expert and/or that his report is unreliable, such ruling would appear to moot AIG's argument that Mr. Wise's testimony is cumulative or an improper attempt to support Mr. Loesch's credibility.

FN5. See *United States v. Vespe*, 868 F.2d 1328, 1339 (3d Cir.1989) ; *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 888 n .17 (3d Cir.1984); *Polozie v. United States*, 835 F.Supp. 68, 71 (D.Conn.1993).

A. Deposition of Plaintiff ARA's Expert Mr. Wise is

Inadmissible under Federal Rule of Evidence 804

Rule 804(b)(1) provides that, if the declarant is unavailable to be a witness, the former testimony of the declarant is admissible as an exception to the hearsay rule if the testimony was taken in a deposition or hearing and "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." FN6 Thus in order for Mr. Wise's former testimony to be admitted as an exception to the hearsay rule (1) he must be unavailable; (2) the testimony must have been taken at a hearing or deposition, in the same or another proceeding; and (3) AIG must have had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. FN7 Mr. Wise testified under oath in a deposition taken in this action, so there is no dispute that the second element has been satisfied.

FN6. Fed.R.Evid. 804(b)(1).

FN7. See *Kirk v. Raymark Indus.*, 61 F.3d 147, 164 (3d Cir.1995), *cert. denied*, 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996).

*2 Regarding the first element, ARA, the proponent of the deposition testimony, has the burden of establishing that Mr. Wise is unavailable before his deposition may be admitted at trial. FN8 The only definition of "unavailability" that appears applicable to this case is when the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance ... by process or other reasonable means." FN9

FN8. See *id.* at 165.

FN9. Fed.R.Evid. 804(a)(5).

ARA must prove that it has been unable to procure Mr. Wise's attendance at trial by process or other reasonable means. FN10 ARA has demonstrated that Mr. Wise's attendance cannot be secured by process because he resides in Texas, more than 100 miles from this Court and, therefore, beyond its subpoena power. FN11 However, ARA has failed to prove that it has been unable to procure Mr. Wise's attendance "by other reasonable means." FN12 ARA has failed to demonstrate that it used other "reasonable means" to ensure Mr. Wise's presence at

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 135129
(Cite as: Not Reported in F.Supp.2d)

trial. There is nothing in the record to indicate that ARA has made any effort to secure Mr. Wise's attendance at trial or has even contacted Mr. Wise to "offer him his usual expert witness fee, and request his attendance at trial." FN13

> FN10. *See id.; Kirk,* 61 F.3d at 165; *Creamer v. General Teamsters Local Union 326,* 560 F.Supp. 495, 499-500 & n. 6 (D.Del.1983) (declining to follow "the across-the board rule apparently adopted by the Court of Appeals for the Ninth Circuit in *Murray v. Toyota Distributors, Inc.,* 664 F.2d 1377, 1380 (9th Cir.1982), which equates 'by process or other reasonable means' with 'by process' " because "[i]f the words 'or other reasonable means' are to have any meaning at all, ... it is clear that they must be interpreted as meaning something other than by process."); *Polozie,* 835 F.Supp. at 71.

> FN11. *See* Fed.R.Civ.P. 45(c)(3)(A)(ii).

> FN12. Fed.R.Evid. 804(a)(5) ; *Kirk,* 61 F.3d at 165.

> FN13. *Kirk,* 61 F.3d at 165 (dicta).

ARA relies on several cases from other circuits which found a witness unavailable under Rule 804 solely because the witness resided more than 100 miles from the district. FN14 All of these cases are distinguishable in that they involved the unavailability of fact witnesses, rather than an expert, as in this case. Courts that have been asked to address the issue have distinguished between unavailability of fact witnesses and expert witnesses. Parties are expected to use other reasonable means to procure the attendance of their experts because the parties select their experts and arrange for their appearance at trial. FN15 In *Carter-Wallace,* Judge Friendly, writing for the Court of Appeals for the Second Circuit, stated that "there is something unusual about the use of the prior testimony of an expert witness that calls for further scrutiny of his unavailability." FN16 The Court explained:

> FN14. *See Starr v. J. Hacker Co., Inc.,* 688 F.2d 78 (8th Cir.1982) ; *Charles v. Wade,* 665 F.2d 661 (5th Cir.1982), *cert. denied,* 460 U.S. 1036, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983) ; *Hartman v. United States,* 538

F.2d 1336 (8th Cir.1976) ; *Castilleja v. Southern Pacific Co.,* 445 F.2d 183 (5th Cir.1971); *Richard v. Brooks,* 227 F.2d 490 (2d Cir.1955) ; *Texas & P.R. Co. v. Reagan,* 118 F. 815 (5th Cir.1902).

> FN15. *See Carter Wallace, Inc. v. Otte,* 474 F.2d 529, 535-36 (2d Cir.1972), *cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973) ; *Myers v. Alessi,* 80 Md.App. 124, 560 A.2d 59, 66 (Md.App.), *cert. denied,* 566 A.2d 1 (Md.1989) ; *Thompson v. Merrell Dow Pharmaceuticals, Inc.,* 229 N.J.Super. 230, 551 A.2d 177, 189 (N.J.Super.1988). *See also Kirk,* 62 F.3d at 165 (indicating in dicta that an argument that the expert witness was beyond the court's subpoena power was insufficient to prove unavailability and that proponent of expert's deposition testimony needed to show, at a minimum, that expert was contacted and offered usual fee to attend trial).

> FN16. 474 F.2d at 536 (internal citations omitted).

First, unlike the typical witness whose involvement with the case may depend on the fortuity of his observing a particular event and whose presence at trial is often involuntary, a party ordinarily has the opportunity to choose the expert whose testimony he desires and invariably arranges for his presence privately, by mutual agreement, and for a fee. Although a requirement of an attempt to secure the voluntary attendance of a witness who lives beyond the subpoena power of the court is not ordinarily imposed before prior testimony can be used in civil litigation, we think that such a requirement is particularly appropriate when dealing with the testimony of expert witnesses whose earlier attendance is almost invariably secured by such voluntary arrangements. FN17

> FN17. *Id.*

The Second Circuit Court of Appeals went even further, stating that "even the unavailability of a particular expert witness should not without more allow the use of his prior testimony in a second action." FN18

> FN18. *Id.* (internal citation omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 135129
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

**\*3** The Court explained:

It must be recognized that the general preference of the federal rules, as expressed in F.R.Civ. P. 43(a), is for oral testimony so that there will be an opportunity for live cross-examination and observation of the demeanor of the witness. While the use of previous testimony is a well-established exception to this rule, it is an exception based on the necessity of using the prior testimony when the alternative is the loss of that testimony entirely. When the ordinary witness is unavailable, his unique knowledge of the facts will be lost unless the use of his prior testimony is allowed. But the expert witness generally has no knowledge of the facts of the case. Instead, he is called upon to express a professional opinion upon the facts as they are given to him, often expressing his opinions in the form of answers to hypothetical questions. Thus, even if one particular expert is unavailable, there is no need to use his previous testimony to prevent the loss of evidence, because there will usually be other experts available to give similar testimony orally. FN19

> FN19. *Id.* at 536. *See also Thompson v. Merrell Dow Pharmaceuticals, Inc.,* 551 A.2d at 189 ("We agree with the rationale of Judge Friendly in *Carter-Wallace v. Otte,* that expert witnesses are not unavailable simply because they are not subject to service of process.... If the expert is beyond the jurisdiction of the court to compel attendance at trial, it is the responsibility of the party offering the expert to ascertain the willingness and availability of the expert to appear at trial. The proponent of the expert must attempt to arrange a trial date at which the expert can appear. Since the expert is under the control of the offering litigant, due diligence must be used to secure attendance at trial."); *Myers v. Alessi,* 560 A.2d at 66 (prior testimony properly ruled inadmissible where proponent responsible for selecting out-of-state expert and decision not to pay him to attend trial).

The Court finds the reasoning of the Second Circuit Court of Appeals in *Carter-Wallace,* and those courts that have followed it, FN20 to be persuasive and will follow that approach. ARA is responsible for selecting its own expert witnesses and presumably has control over them. ARA has proffered no explanation for Mr. Wise's unavailability other than

that he lives in Texas. ARA has not indicated that it has even asked this chosen expert to appear at trial, nor that ARA has offered to pay for the expert's fee and expenses. Thus, ARA has failed to meet its burden of establishing that Mr. Wise is unavailable within the meaning of Fed.R.Evid. 804(a)(5). FN21

> FN20. *See, e.g., Myers v. Alessi,* 560 A.2d at 66; *Thompson v. Merrell Dow Pharmaceuticals, Inc.,* 551 A.2d at 189.

> FN21. Because ARA had failed to make the threshold showing that Mr. Wise is unavailable within the meaning of Rule 804, *see Kirk,* 61 F.3d at 165, the court need not address whether AIG had "an opportunity and similar motive" to develop Mr. Wise's testimony at the deposition, as required by Rule 804(b)(1).

**B. Deposition of ARA's Expert Mr. Wise is Inadmissible under Rule 32 of the Federal Rules of Civil Procedure**

Because Fed.R.Civ.P. 32(a)(3) constitutes an independent exception to the hearsay rule, FN22 the Court turns to the question of whether Mr. Wise's deposition may be admitted under that rule. Rule 32(a) provides in pertinent part:

> FN22. *See Vespe,* 868 F.2d at 1339; *In re Complaint of Bankers Trust Co.,* 752 F.2d at 888 n. 17.

At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

> ....

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: ... (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition[.] FN23

> FN23. Fed.R.Civ.P. 32(a)(3)(B).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 135129
(Cite as: Not Reported in F.Supp.2d)

ARA contends that, because Mr. Wise resides in Texas, more than 100 miles from the trial, his deposition testimony is admissible under the rule. AIG counters that Mr. Wise's testimony is inadmissible because his absence from trial in this case was "procured" by ARA. The Court acknowledges that, as to fact witnesses, the typical rule applied in federal courts is that depositions are permitted to substitute for the testimony of distant witnesses. However, as to expert witnesses, authorities are split. Some courts do not distinguish between expert witnesses and fact witnesses in applying Fed.R.Civ.P. 32(a)(3)(B). FN24 However, other courts have held that, given the proponent's latitude in selecting experts and the rules' general preference for live testimony, FN25 judges have discretion to exclude depositions of expert witnesses where the party proponent has selected a distant expert and has not made reasonable efforts to assure the expert's presence at trial. FN26 The Court's agrees with the latter approach for the reasons set forth in those cases and in Caron v. General Motors Corp. FN27

FN24. See, e.g., Alfonso v. Lund, 783 F.2d 958, 961 (10th Cir.1986) (factually distinguishable because out-of-state expert was out of the country; also parties did not raise nor did court discuss fact that expert was under the control of offering party); Savoie v. LaFourche Boat Rentals, Inc., 627 F.2d 722, 724 (5th Cir.1980) (same); Pfeiffer v. Eagle Mfg., Co., 137 F.R.D. 352, 354-55 (D.Kan.1991) (factually distinguishable because opposing party knew before deposition was taken that it would be a trial deposition and parties knew expert's employer had a policy of not permitting employees to testify); State v. Long, 344 So.2d 754, 757-59 (Ala.1977) (distinguishable because expert had informed parties he would be unavailable during trial); Lee v. Volkswagon of America, Inc., 688 P.2d 1283, 1290 (Okla.1984) (stating without explanation that deposition of out-of-county expert admissible under Oklahoma rule).

FN25. See, e.g., Fed.R.Civ.P. 43(a).

FN26. See, e.g., Polys v. Trans-Colorado Airlines, 941 F.2d 1404, 1410 (10th Cir.1991) (holding district court was not

automatically required to admit the deposition testimony under Rule 32(a)(3)(B) just because the witnesses were more than 100 miles away; the trial judge appropriately considered surprise to opposing counsel); Hanson v. Parkside Surgery Ctr., 872 F.2d 745, 750 (6th Cir.), cert. denied, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989) (holding not error to exclude expert deposition testimony under Rule 32 where expert's absence "was at least in part due to plaintiff's own lack of diligence"); In re Air Crash Disaster at Stapleton Int'l Airport, 720 F.Supp. 1493, 1502 (D.Colo.1989) (refusing to admit deposition testimony even though the expert witness lived outside the 100 mile radius, in part, because the jury needed to "consider and evaluate the witness's credibility"); Myers v. Alessi, 560 A.2d at 66; Thompson v. Merrell Dow Pharmaceuticals, Inc., 551 A.2d at 189.

FN27. 37 Mass.App.Ct. 744, 643 N.E.2d 471 (Mass.App.1994), review denied, 419 Mass. 1107, 646 N.E.2d 1071 (Mass.1995).

*4 In Caron, as here, the defendant deposed the expert after the plaintiff has designated the witness as his expert for trial. Subsequently, the plaintiff asserted that the expert was unavailable for trial in the case because the expert lived in Arizona, outside the Commonwealth of Massachusetts. There, as in this case, the principal argument of the proponent of the deposition testimony seemed to be that he was entitled by right to present the testimony of an out-of-state witness by deposition. The Caron court determined that under Rule 32(a)(3)(B) of the Massachusetts Rules of Civil Procedure, which is virtually identical to the Federal Rule, the trial court did not err in excluding the expert's deposition testimony. FN28 On the issue of whether a party has a duty to arrange for an expert's appearance at trial, the court looked to federal authorities and noted, "[u]nlike fact witnesses, who are determined by their personal knowledge of relevant facts, regardless of where they live or work, a party normally has broad latitude in selecting his expert witnesses." FN29 Therefore, reasoned the court, "[b]y selecting an expert from Arizona, the plaintiff's counsel 'procured' the absence of his expert from the Commonwealth in the sense that he voluntarily created a situation in which his expert would be out of the Commonwealth unless he should make arrangements for the expert's appearance at trial." FN30 The court found "the trial judge doubtlessly

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 135129
**(Cite as: Not Reported in F.Supp.2d)**

suspected that [plaintiff's] counsel may have made little real effort to obtain [the expert witness'] attendance at the trial," and properly rejected plaintiff's argument that "he was entitled by right to present the testimony of an out-of-State witness by deposition." 31

>FN28. *Id.* at 474.

>FN29. *Id.*

>FN30. *Id.*

ARA's claim here is similar to that of the plaintiff in *Caron.* Because Mr. Wise lives in Texas, ARA maintains, it is entitled to present Mr. Wise's deposition testimony by deposition under Rule 32. However, ARA had latitude in selecting its expert. By selecting an expert in Texas, ARA "procured" that expert's absence from this Court "in the sense that [ARA] voluntarily created a situation in which [such] expert would be [outside the subpoena power of this Court] unless [ARA] should make arrangements for the expert's appearance at trial." FN32 Given the preference of this Court and the Rules for live testimony, the apparent absence of any effort by ARA to secure Mr. Wise's attendance at trial, and the importance for the jury to see and observe the expert's testimony and cross-examination on the issues to determine the expert's credibility and reliability, the Court holds that Mr. Wise's deposition testimony will not be admitted under Rule 32(a)(3)(B).

### IV. Conclusion

ARA has latitude to select its experts and is presumed to have control over such experts. Although Mr. Wise resides beyond the subpoena power of this Court, because there has been no showing ARA used reasonable means, or in fact took any action, to secure Mr. Wise presence at trial, the Court holds in its discretion that Mr. Wise is not unavailable within the meaning of Fed.R.Evid. 804 or Fed.R.Civ.P. 32(a)(3)(B) and, therefore, that his deposition will not be admitted at trial in lieu of live testimony.

>FN31. *Id.* at 475.

>FN32. *Caron,* 643 N.E.2d at 474.

D.Del.,2000.

Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co.
Not Reported in F.Supp.2d, 2000 WL 135129

Briefs and Other Related Documents (Back to top)

• 1:97CV00529 (Docket) (Sep. 16, 1997)

END OF DOCUMENT