IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, </br></br> Plaintiff, </br></br> v. </br></br> HERCULES INC. AND CYTEC INDUSTRIES, INC., </br></br> Defendants. | C.A. No.: 04-293 (KAJ) </br></br> JURY TRIAL DEMANDED </br></br> REDACTED - PUBLIC VERSION |

### REBUTTAL EXPERT REPORT OF
### CLARENCE A. KING, Ph.D.

This is my written report concerning issues about which I may be asked to testify and on which, I understand, Hercules bears the burden of proof. Specifically, this report is in response to the experts reports of Robert K. Prud'homme and Charles P. Klass. As with my initial expert report, I specifically reserve the right to form and submit additional opinions regarding any additional information or discovery that is subsequently generated or produced. I refer in my report to various documents and specifics. I have not, however, set forth every relevant fact or document about which I am aware, and reserve the right to supplement, if required. Likewise, I reserve the right to supplement my report to clarify possible ambiguities or to opine further based upon future court rulings, agreements between the parties, or any further testimony by either party, either by deposition, at any hearing, or at trial.

I.   THE RELEVANT SKILL IN THE ART


REDACTED

REDACTED

based upon my experience, the people that I would consider to be of ordinary skill in the art in the field of paper making in 1990 would have had knowledge of the use of polymer additives in the papermaking process, but not necessarily knowledge of polymer synthesis and characterization.

2.    In my opinion, with respect to the '766 patent, the hypothetical person of "ordinary skill in the art" in 1990 would have been a person with at least a bachelor's degree in chemistry, chemical engineering, paper science, or the like, and would have around five years experience in the application of papermaking chemical additives. While I disagree with Dr. Prud'homme on the precise definition of the hypothetical person of "ordinary skill in the art," my opinions expressed herein would not change if I used his definition as opposed to mine.

## II. SUMMARY

3.    For the reasons set forth herein, I disagree with the conclusions of both Dr. Prud'homme and Mr. Klass



4.    In connection with reaching my opinions which are set forth herein, I have reviewed the various patents involved here and will set forth my understanding as to what these patents disclose and claim. In view of my experience over the years, my opinions reflect my view as to how these patents would have been interpreted and/or understood by people working

in these fields and, in particular, by one of ordinary skill in the art at the time the '766 patent was filed, i.e. June 1990.

## III. THE '766 PATENT

5. Claim 1 of the '766 patent reads:

> A method of making paper which comprises adding to an aqueous paper furnish from about 0.05 to about 20 lbs/ton, based on the dry weight of paper furnish solids, of an ionic, organic, cross-linked polymeric microbead, the microbead having an unswollen particle diameter of less than about 750 nanometers and an ionicity of at least 1%, but at least 5%, if anionic and used alone.

6. The specification of the '766 patent emphasizes the importance of the average particle size of the cross-linked microbead being less than about 750 nanometers to achieving improved retention and drainage. Data is included that shows the substantially inferior drainage that is achieved when the particle size is above 1 micron. In particular, Example 25 of the '766 patent shows that the use of microbeads having diameters of 130 and 220 nanometers reduces drainage times over that of stock without using such microbeads by 33%. However, when the diameters of the microbeads are increased to 1,000 to 2,000 nanometers, drainage as compared to stock without microbeads is not significantly affected. Example 37 of the '766 patent also shows that the use of a cross-linked cationic microbead with a size in the 100 nanometer range reduces drainage times over that of stock without using such microbeads by 25%. A similar trend is shown in Example 38 where microbeads of 100 nanometers reduce drainage times over that of stock using beads ten times as large.

## IV. THE FLESHER '346 PATENT

7. In my opinion, the Flesher '346 patent discloses the use of a synthetic polymer in a flocculation process. The Flesher '346 patent mentions only briefly the use of this synthetic polymer in papermaking processes and provides only a very generalized description of how their

synthetic polymer could be used to flocculate a cellulosic suspension. The Flesher '346 patent also does not provide any specifics regarding the use of their synthetic polymer in papermaking such as addition points, addition sequences or dosages.

8. In my opinion, and unlike the opinion of Mr. Klass (Expert Report of Charles P. Klass, p. 7 (hereinafter "Klass, p.___")), when the Flesher '346 patent mentions "flocculation" or "coagulation," one of ordinary skill in the art of papermaking in 1990 would not have known that the concepts discussed in the '346 patent were necessarily focused on papermaking. At the time, and now for that matter, the wet end chemistry in papermaking has issues and concerns separate from flocculation that would have been considered largely unique to papermaking. One of ordinary skill in the art at the time would not have viewed the Flesher '346 patent as concerning papermaking. Rather, this patent largely concerns use in municipal sludge treatment. The discussion of using their synthetic polymer in papermaking would have been seen as another possible use, an afterthought, and not what the patent principally concerned as none of the Examples concern papermaking.

9. Mr. Klass implies in his report (Klass, p. 7) that the polymers of the '346 patent were to be used as one would use silica or bentonite since these polymers are being used in place of those inorganic retention and drainage aids. However, there is no mention of either silica or bentonite in the '346 patent, even though these were known particulate retention and drainage aids used in papermaking in 1990 and one of ordinary skill in the art would have been familiar with these aids. Therefore, in my opinion, one of ordinary skill in the art in 1990 would have viewed the '346 patent as suggesting, due to their stated shear resistance, the use of particulate polymers in place of water soluble linear polyacrylamides. No one of ordinary skill in wet end papermaking would have seen the '346 patent to be suggesting use as a retention and drainage

aid in place of silica or bentonite. It was not generally required to subject silica retention and drainage aids to shear. Bentonite was in the 1990 time period most typically added after the paper pulp was subjected to shear, as by passing through pressure screens, so shear resistance would be of no use in any bentonite replacement. In summary, one of ordinary skill in the art at the time would have seen no value in using the '346 synthetic polymers as a potential replacement for either silica or bentonite.

10. In 1990, although common practice was to use a mix of cationic and anionic additives during papermaking, including polymers, microbead technology was not known or used in papermaking. Accordingly, Mr. Klass' view that the concept of adding another polymer to the polymeric microbeads was well known in the art (Klass, p. 8) and adding an anionic, cationic, or nonionic polymer with a cross-linked microbead was standard practice (Klass, p. 9) was not true in the papermaking field in 1990.

11. Although Flesher does mention the use of cationic starch as an additive in the overall process of papermaking, the '346 patent does not teach where or in what amounts starch should be added to the furnish.

12. The '766 claims include the addition of 0.05 to 20 lbs/ton of anionic micropolymer in the process. Unlike what Mr. Klass concludes in his report (Klass, p. 10) [REDACTED] one of ordinary skill in the art at the time would not simply have counterbalanced this with a similar amount of a cationic material. Different additives impart different amounts of charge and cannot be added in a simple weight for weight ratio as Mr. Klass suggests in his report.

13. [REDACTED] In reference to claim 21, Mr.

Klass suggests that a polymeric coagulant is "simply something that creates flocs." (Klass, p. 10) Polymeric coagulants, however, are added to the furnish for reasons other than, and far removed from, flocculation, including charge neutralization, turbidity removal, color removal, and attachment of small particles to large particles.

14. The '346 patent also does not include any Examples that are directed to the use of the synthetic polymer in papermaking and does not include any data illustrating the effect that the use of the synthetic polymer would have on retention and drainage.

15. With respect to particle size, the Flesher '346 patent states that the synthetic polymer particles must be below 10 microns in dry size, preferably below 2 microns. No further details regarding particle size are provided. In particular, the Flesher '346 patent does not disclose anything that would have suggested to one of ordinary skill in the art in June 1990 that particular advantages could have been achieved in papermaking applications when the average particles size was below 0.75 microns (750 nanometers). As to the particle sizes in the Flesher '346 patent not disclosing the particle size in the '766 claims, I rely on Dr. Gilbert's opinion.

Date: 8/19/05

_Clarence A. King_
Clarence A. King, Ph.D.

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2005, I hand delivered the foregoing document to the following persons and electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE  19899-0951

I hereby certify that on August 26, 2005, I have Federal Expressed the foregoing document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022

Steven J. Fineman (#4025)
Fineman@rlf.com

RLF1-2848132-1