IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF' DELAWARE

| | | |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C. A. No. 04-293 (KAJ) |
| v. | ) ) | **PUBLIC VERSION** |
| HERCULES INCORPORATED and CYTEC INDUSTRIES, INC., | ) ) ) ) | |
| Defendants. | ) | |

## EXPERT REPORT OF ROBERT K. PRUD'HOMME

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Ford F. Farabow, Jr.
Joann M. Neth
Eric J. Fues
A. Neal Seth
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Attorneys for Defendant*
*Hercules Incorporated*

Dated: July 22, 2005
Public Version Dated: September 7, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C. A. No. 04-293 (KAJ) |
| v. | ) ) ) | |
| HERCULES INCORPORATED and CYTEC INDUSTRIES, INC., | ) ) ) | |
| Defendants. | ) ) | |

## EXPERT REPORT OF ROBERT K. PRUD'HOMME

1.    I, Robert K. Prud'homme, have been retained by Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., counsel for Hercules Incorporated, to serve as an expert in the field of polymer science. My professional experience and publications are set out in my *curriculum vitae*, which is attached as Exhibit A. This report is based on information known to me as of July 22, 2005, and I reserve the right to modify or expand upon my opinions based on new information and in response to additional discovery, reports, and testimony.

## I.    BACKGROUND

2.    I am a tenured professor and Director of the Program in Engineering Biology at Princeton University. I received my BSE in Chemical Engineering from Stanford University in 1969 and after attending the Graduate Studies Program in Environmental Science and Public Policy at Harvard University, I earned a Ph.D. in Chemical Engineering from the University of Wisconsin in 1978. I have conducted research and taught in the field of polymer chemistry, physics, and engineering for approximately twenty-five years. My present research includes investigating solution properties of

complex polymeric systems. Over the years, I have published approximately 200 articles in the field of polymer science, most of which have been peer reviewed.

3.    In addition to my academic duties at Princeton, I have worked at the AT&T Bell Laboratories in the Plastics Research and Development Department, and in the Chemistry Department at the University of Sydney, both while on sabbatical from Princeton.

4.    I have received several honors in my career, including the National Science Foundation Presidential Young Investigator Award. I have served on the Board of Directors of the American Institute of Chemical Engineers Material Science and Engineering Division, the Executive Committee of the United States Society of Rheology, as well as on the editorial boards of several publications.

5.    I presently serve on the Technical Advisory Board for Material Science at Dow Chemical Company. In addition, I have consulted in the field of polymer science with a number of U.S. and international companies.

II.    OPINION

Brief Background of Polymer Science Relating to the Patents-in-Suit

6.    Both patents-in-suit are directed to polymer additives in the papermaking process. These additives help the water drain quickly from the wood pulp and result in faster paper formation.

7.    A polymer is a very long molecule made up of repeating units called monomers. A monomer is simply a compound that can chemically link to itself or other similar monomers, analogous to a strand of pearls. For example, two common monomers widely used are acrylamide (AM) and acrylic acid (AA). They can link together via a chemical bond called a covalent bond, in essentially random order:

(AM)-(AA)-(AA)-(AA)-(AM)-(AA)-(AM)-(AM)

2

This is a linear polymer because there are two distinct ends and the monomers link to each other end-to-end. Another kind of polymer, featured in the patents-in-suit, is a cross-linked polymer, where a cross-linking agent or cross-linker links the monomer units at points other than the ends:

(AM)-AA-(AA)-(AA)-AA-(AM)-(AA)-(AM)-(AM)

B                    B

(AM)-AA-(AA)-(AA)-AA-(AM)-(AA)-(AM)-(AM)

In this cross-linked polymer, the cross-linking agent is methylene bisacrylamide (MBA), which is illustrated as **AA-B-AA**. For this type of cross-link, when the fraction of cross-linking units is approximately greater than 1/(number of monomers), the result is a cross-linked polymer gel. The patents-in-suit both claim cross-linked polymers and, in the case of the '766 patent, the optional addition of other additives to the cross-linked polymers.

8.    There are several ways to make these polymers. One common way is by using an emulsion, which is simply a dispersion of one liquid in another, where the two liquids are immiscible. For example, Italian salad dressing is an oil-in-water emulsion, where oil droplets are suspended in a watery environment. The reverse of that—water droplets suspended in an oil environment—is known as a reverse or inverse emulsion. Polymers are made inside of the suspended water or oil droplets; in this way, it is easy to handle a high concentration of solid material (the formed polymer) in a low viscosity environment because the solid is trapped in a droplet rather than uniformly dissolved in the continuous phase. Additionally, some polymers may expand to whatever volume they are kept in, so the polymers are more easily handled in droplets rather than expanding or dispersing to the volume of an industrial-sized reactor.

3

9.      The polymers described in the patents-in-suit are made using inverse emulsions. These polymers are made when oil containing one or more surfactants or dispersants is mixed with water containing the monomers and a cross-linker. The oil and water are mixed, resulting in the water droplets containing the monomers and cross-linker suspended in oil. The water droplets are stabilized by the surfactant or dispersing agent, which sits at the interface of the water droplet and oil. An initiator is added at this point, which begins the polymerization of the monomers inside of the water droplet. The polymers are formed inside of the droplet.

10.     To use the resultant polymers, a surfactant that promotes inversion of the emulsion can be added to the oil phase. In this case, the emulsion is inverted by adding excess water to release the polymers from the droplet. Alternately, the water can be removed from the droplet phase and the solid polymer particles can be recovered from the emulsion as a dry powder.

## The Relevant Skill in the Art

11.     In this report, I refer to a hypothetical person of ordinary skill in the art. When I use this phrase, I am referring to a person at the time the patents-in-suit were filed (circa 1990) who has at least a bachelor's degree in chemistry, chemical engineering, or the like, and relevant knowledge of polymeric additives in the papermaking process. This person would be knowledgeable regarding polymer synthesis and its chemical and physical characterization, with at least five years experience in the field. Of course, the amount of experience in the field can be moderated by an individual's level of education.

4

## Introduction

12.    I have been asked to review the patents-in-suit, U.S. Patent Nos. 5,167,766 ("the '766 patent") (attached as Exhibit B) and 5,171,808 ("the '808 patent") (attached as Exhibit C), as well as several other patents and material relevant to papermaking. I have been asked to provide an opinion regarding whether these other patents, all filed before the patents-in-suit, contain all of the elements of the claims being asserted against Hercules.

13.    After careful review, I conclude that at least U.S. Patent No. 4,528,321 to Allen et al. ("the Allen '321 patent") (attached as Exhibit D), U.S. Patent No. 4,720,346 to Flesher et al. ("the Flesher '346 patent") (attached as Exhibit E), and U.S. Patent No. 4,172,066 to Zweigle et al. ("the Zweigle '066 patent") (attached as Exhibit F), each separately disclose all of the elements in the claims being asserted against Hercules from the '808 patent. The Flesher '346 patent alone or in combination with knowledge available to one of skill in the art in 1990 and/or other prior art, discloses all of the elements in the claims being asserted against Hercules from the '766 patent.

## The '808 Patent

14.    I understand that Ciba is asserting claims 1, 6-8, 11, 13, 15, 17, and 21 of the '808 patent against Hercules' PerForm® SP9232 product. I have studied these claims in the '808 patent and I find that all of the elements in each of those claims are disclosed in each of the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent.

Claim 1

15.    Claim 1 of the '808 patent states:

A composition comprising cross-linked anionic or amphoteric polymeric microparticles derived solely from the polymerization of an aqueous solution of at least one monomer, said microparticles having an

5

unswollen number average particle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1 mPa·s, a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer, and an ionicity of at least about 5 mole percent.

Each element of this claim is described in the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent.

### A composition comprising cross-linked anionic or amphoteric polymeric microparticles

16.   To begin, I understand from reading the claims, specification, and prosecution history of the '808 patent that "cross-linked" means a three-dimensional gel formed by a cross-linking agent. The '808 patent at col. 4, lines 47-50 indicates that such a cross-linking agent has two double bonds, a double bond and a reactive group, or two reactive groups. For instance, methylenebisacrylamide ("MBA"), a crosslinking agent identified in the '808 patent that has two double bonds, is used in each of the Examples of the '808 patent.

17.   The Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent each disclose compositions. Also, the Flesher '346 patent teaches that its polymeric particles may be cross-linked at col. 6, lines 52-57; col. 7, lines 51-54; and Example 12. Likewise, the Allen '321 patent teaches that its polymeric particles may be cross-linked at col. 4, lines 59-69 and Example 7. The Zweigle '066 patent discloses cross-linked polymers at col. 2, lines 61-64; col. 3, lines 50-55; and Examples 1-6.

18.   Additionally, the Flesher '346 patent teaches anionic polymeric particles at col. 5, lines 63-64; col. 8, lines 40-46; and Example 12. In fact, for papermaking applications, the Flesher '346 patent states that "the flocculant polymer is preferably an anionic polyacrylamide" at col. 5, lines 63-64. The Allen '321 patent also teaches anionic

6

polymeric particles at col. 4, lines 43-48 and Example 7. The Zweigle '066 patent also
teaches anionic polymeric particles at col. 3, lines 35-43, where it states that they are
"more preferred."

> *derived solely from the polymerization of an aqueous solution of at least*
> *of one monomer*

19.     Both the Flesher '346 patent and the Allen '321 patent teach polymerization of an
aqueous solution of at least one monomer, as does the Zweigle '066 patent. The Flesher
'346 patent teaches polymeric particles derived from the reverse phase polymerization of
an aqueous solution of at least one monomer at col. 6, lines 45-47; col. 7, lines 45-54; col.
9, lines 7-10; and Example 12. Similarly, the Allen '321 patent teaches polymeric
particles derived from the reverse phase polymerization of an aqueous solution of at least
one monomer at col. 4, lines 22-27 and Example 7. In the most preferred method of
polymerization, the Zweigle '066 patent teaches reverse phase polymerization of the
monomers in an aqueous solution at col. 4, lines 20-24.

> *said microparticles having an unswollen number average particle size*
> *diameter of less than about 0.75 micron*

20.     Next, claim 1 specifies that the number average particle size diameter of the
polymers should be less than 0.75 microns (μm). At col. 6, lines 31-33 of the Flesher
'346 patent, the polymeric particles "are preferably below 2μm." Indeed, at col. 6, lines
25-26, the Flesher '346 patent states that the polymeric material in suspension should be
a microdispersion, and in my experience, I would expect a microdispersion to contain
particles that are of a diameter of less than 2μm, including particle size diameters less
than 0.75 microns.

21.    Indeed, the Flesher '346 patent at col. 9, lines 21-24 utilizes the polymerization process and conditions described in the Allen '321 patent, which achieves a particle size range of 0.2-2.0 µm (see col. 7, lines 48-50 of the Allen '321 patent.)

22.    Thus, it is clear that the Flesher '346 patent would produce particles in this same size range. The number average particle size of such emulsions is not simply the arithmetic average of a range of 0.2-2.0 µm. Particle size distributions are not bell-shaped or Gaussian; rather, they are skewed such that there are many more smaller particles than larger ones. Indeed, I have experience in measuring particle size distributions of polymers and emulsions of the type described in the Allen '321 patent, and in my opinion, the number average particle size diameter would be less than 0.75 µm. I understand that discovery from Ciba has been requested for particle size data relating to the Allen '321 patent and the Flesher '346 patent. I therefore reserve the right to supplement my opinion regarding this particle size limitation based on review of additional data and other particle size information that I may review.

23.    Turning to the Zweigle '066 patent, at col. 2, lines 55-57, it specifies that the particle sizes can range from 0.5 to about 200 micrometers (microns) in their swollen state. Cross-linked polymers of the type taught in the Zweigle '066 patent will swell several times their dry or unswollen state, so it is my opinion that the Zweigle '066 patent teaches unswollen particle diameters as small as 0.2 microns taught by the Allen '321 patent and the Flesher '346 patent.

*a solution viscosity of at least about 1.1 mPa·s*

24.    Moving on to the next limitation, claim 1 of the '808 patent requires a solution viscosity of at least 1.1 mPa·s. Viscosity measurements can vary depending on several

8

variables, so it is necessary to know the conditions under which a solution viscosity is measured and then subsequently reported. In the experiments reported in Table 1, solution viscosity was measured in a 0.1 weight % polymer in sodium chloride solution at 25°C using a Brookfield UL adapter at 60 rpm. One of ordinary skill in the art would understand these as standard measurement parameters. Using these parameters, the claimed viscosity of 1.1 mPa·s is only a little more viscous than water. Example 12 of the Flesher '346 patent was prepared using 40 weight percent sodium acrylate, 60 weight percent acrylamide, and varying amounts of a cross-linker, methylene bisacrylamide (MBA). The Flesher '346 patent reports intrinsic viscosity (IV) values for the polymers in Table 12 of Example 12. In my opinion, the polymers made in Example 12 would all have a solution viscosity greater than 1.1 mPa·s, as measured by the method disclosed in Table 1 of the '808 patent. This is easily confirmed by substituting values into the following power series:

$$\eta = \eta_{solvent}\,(1 + [\eta]C_p + k_H[\eta]^2 C_p^2 + \cdots)$$

The power series continues indefinitely in the same manner. $\eta_{solvent}$ is the solvent viscosity, which is essentially 1.0 mPa·s because the solvent is water. The leading coefficient in concentration ($C_p$), $[\eta]$, is the intrinsic viscosity. The higher ordered terms in concentration, for these systems, will always cause the viscosity to be larger than the value calculated from the intrinsic viscosity. From the reported intrinsic viscosity values, we can calculate the viscosity at $C_p$ equals 0.1% by weight (essentially 0.1 g/dL) because the density of the solvent phase is essentially 1.0 and Table 1 specifies a 0.1% by weight polymer concentration. $[\eta]$ may be taken from the IV data reported in Example 12 of the

9

Flesher '346 patent. In each case, $\eta$ is greater than the 1.1 mPa·s as required by the '808 patent.

25.    In practice, one skilled in the art would find this solution viscosity claim limitation rather meaningless as applied to most commercial papermaking polymers because they usually all have solution viscosity (as defined in the '808 patent) greater than 1.1 mPa·s at 0.1 weight %.

26.    Similar logic may be applied to the data reported in the Zweigle '066 patent. At col. 6, lines 61-66, gel capacities of between 50 and 120 grams of solution per gram of polymer in salt solutions are reported. This gel capacity would mean that at concentrations of 0.5 to 1.2 weight %, the swollen gel bed would have an infinite viscosity. A dilution from 0.5 or 1.2 weight % to 0.1 weight %, in my experience and the experience of one skilled in the art, would result in highly viscous solutions, with viscosities much higher than 1.1 mPa·s.

27.    The Allen '321 patent discloses the general preparation of a polymer containing MBA. In my experience, under the reaction conditions and methods set forth in this patent, one would measure a solution viscosity of greater than 1.1 mPa·s when using the amount of MBA disclosed in Example 12 of the Flesher '346 patent.

> *a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer*

28.    The next limitation in claim 1 is the amount of cross-linking agent used. The '808 patent at col. 4, lines 47-50 defines cross-linking agent as molecules having at least two double bonds, a double bond and a reactive group, or two reactive groups. The '808 patent identifies MBA, which has two carbon-carbon double bonds, as a cross-linking agent. The Flesher '346 patent in Example 12 discloses a range of amounts of MBA, in

relevant range from 6.76 ppm to 40.53 ppm, which fall within the claimed range. Likewise, Example 7 of the Allen '321 patent uses 250 ppm MBA, which falls within the claimed range. The Zweigle '066 patent also teaches a cross-linker in the range of 5 to 5,000 ppm at col. 4, lines 10-14.

> *and an ionicity of at least about 5 mole percent*

29.    The final limitation in claim 1 is ionicitiy. The Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent all teach a polymer of ionicity of at least about 5 mole percent. For example, Example 12 of the Flesher '346 patent has an ionicity of approximately 40% because 40 weight % sodium acrylate is used. Similarly, Example 7 of the Allen '321 patent has an ionicity of approximately 86%, and Example 4 of the Zweigle '066 patent has an ionicity of approximately 24% mol, based on the weights of acrylic acid and acrylamide monomer. Thus, all three prior art references meet the ionicity claim limitation.

30.    In summary, claim 1 of the '808 patent is fully described by each of, individually, the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent, as described above.

**Claim 6**

31.    Claim 6 of the '808 patent states: "A composition as defined in claim 1 wherein said unswollen diameter is less than 0.5 micron." Like Claim 1, each element of Claim 6 is disclosed in each of the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent. My explanation above applies to this claim limitation as well, since the Flesher '346 patent and the Allen '321 patent both disclose particle sizes in the 0.2-2.0 μm range. Of course, since the Zweigle '066 patent specifies that the swollen particle sizes are in the range from 0.5 to about 200 microns, one skilled in the art would

11

conclude this reference requires unswollen particle sizes of less than 0.5 microns at the lower end of the range, since these types of particles can swell to several times their unswollen state.

### Claim 7

32.    Claim 7 of the '808 patent states: "A composition as defined in claim 1 wherein the organic polymer microparticle is composed of at least one ethylenically unsaturated non-ionic monomer." Each of the elements of claim 7 is met by each of the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent. The Flesher '346 patent at col. 7, lines 48-51 states that its organic polymeric particles "have been made [by] emulsion polymerisation or by reverse phase emulsion or suspension polymerisation of one or more monoethylenically unsaturated monomers." The Flesher '346 patent further states at col. 8, lines 29-35 that "[t]he monoethylenically unsaturated monomers may consist of . . . a blend of ionic and non-ionic monomers." Additionally, Example 12 of the Flesher '346 patent prepares organic polymeric particles from monomers of sodium acrylate, which is anionic, and acrylamide, which is nonionic.

33.    Turning to the Allen '321 patent, at col. 4, lines 37-43, it teaches that its organic polymeric particles may include ethylenically unsaturated nonionic monomers, such as polyacrylamide and copolymers of acrylamide. Also, Example 7 of the Allen '321 patent prepares organic polymeric particles from the monomers of acrylic acid, which is anionic, and acrylamide, which is nonionic. Similarly, Example 4 of the Zweigle '066 patent prepares organic polymeric particles from the monomers of acrylic acid, which is anionic, and acrylamide, which is nonionic (*see also* col. 3, lines 16-27).

### Claim 8

34.    Claim 8 of the '808 patent states:

12

A composition as defined in claim 1 wherein the organic polymer microparticle is composed of at least one anionic monomer selected from acrylic acid, methylacrylic acid, ethylacrylic acid, 2-acrylamido-2-methylpropanesulfonic acid or mixtures or salts thereof.

The anionic monomers required by claim 8 are disclosed in the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent. For example, at col. 8, lines 40-44, the Flesher '346 patent teaches that suitable anionic monomers for its organic polymeric particles include "sodium acrylate, methacrylate, . . . 2-acrylamido 2-methyl propane sulphonate, . . . or other water soluble forms of these or other polymerisable carboxylic or sulphonic acids." Example 12 of the Flesher '346 patent prepares organic polymeric particles from monomers of sodium acrylate, which is anionic.

35.    Likewise, at col. 4, lines 43-48, the Allen '321 patent teaches that its organic polymeric particles may be composed of acrylic acid (which is anionic upon neutralization with sodium hydroxide, as described in Example 2), methylacrylic acid, or 2-acrylamido-2-methylpropanesulfonic acid. Example 7 of the Allen '321 patent also prepares organic polymeric particles from monomers of acrylic acid, which is anionic. Similarly, Example 4 of the Zweigle '066 patent prepares organic polymeric particles from the monomers of acrylic acid, which is anionic (*see also* col. 3, lines 35-39).

**Claim 11**

36.    Claim 11 of the '808 patent states:

A composition as defined in claim 7 wherein said non-ionic ethylenically unsaturated monomer is selected from acrylamide; methacrylamide; N,N-dialkylacrylamides; N-alkylacrylamides; N-vinylmethacetamide; N-vinyl methylformamide; N-vinyl pyrrolidone and mixtures thereof.

The Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent each disclose the elements of Claim 11. The Flesher '346 patent at col. 8, lines 34-39 teaches that suitable nonionic ethylenically unsaturated monomers include acrylamide,

methacrylamide, N-vinylmethylacetamide, and vinyl pyrrolidone. Example 12 of the

Flesher '346 patent also prepares organic polymeric particles from acrylamide

monomers. Similarly, at col. 4, lines 37-43, the Allen '321 patent teaches that its organic

polymeric particles may include ethylenically unsaturated nonionic monomers, such as

polyacrylamide and copolymers of acrylamide, as does Example 7, which prepares

organic polymeric particles from acrylamide monomers. Also, Example 4 of the Zweigle

'066 patent prepares organic polymeric particles from the monomers of acrylic acid,

which is anionic, and acrylamide, which is nonionic (*see also* col. 3, lines 16-27).

**Claim 13**

37.    Claim 13 of the '808 patent states:

> A process for the preparation of a composition as defined in claim 1, said
> process comprising:
>
> (a)    admixing
>
> (i)    an aqueous solution comprising at least one ethylenically
> unsaturated anionic monomer alone or in admixture with a cationic
> monomer, and at least one crosslinking agent and, optionally, at least one
> ethylenically unsaturated non-ionic monomer; (ii) an oily phase
> comprising at least one hydrocarbon liquid; (iii) an effective amount of
> surfactant or surfactant mixture, so as to form an inverse emulsion; and
>
> (b)    subjecting the inverse emulsion obtained in step (a) to
> polymerization conditions.

38.    Claim 13 is fully described by each of the Flesher '346 patent, the Allen '321

patent, and the Zweigle '066 patent. I will address subpart (a)(i) first. The Flesher '346

patent at col. 7, lines 64-67 and col. 8, line 4 discloses making emulsions that contain

cross-linked polymeric particles. To make these emulsions, an aqueous solution is

prepared that includes a cross-linking agent, such as MBA, and an ethylenically

unsaturated anionic monomer, such as sodium acrylate. The Flesher '346 patent further

14

discloses that the aqueous solution may contain at least one ethylenically unsaturated nonionic monomer at col. 8, lines 34-39. The Flesher '346 patent also states at col. 9, lines 18-20 that "[t]he aqueous monomer is emulsified into a suitable non-aqueous liquid, generally in the presence of a water in oil emulsifier." Such emulsification requires admixing. Additionally, Example 12 discloses that cross-linked polymeric particles may be prepared by reverse phase suspension polymerization using an aqueous solution that contains sodium acrylate as a monomer and MBA as a cross-linking agent.

39.     The Allen '321 patent also discloses that the cross-linked polymeric particles prepared by reverse phase suspension polymerization using an aqueous solution may contain acrylic acid as a monomer and MBA as a cross-linking agent at col. 4, lines 43-44 and line 65. The Allen '321 patent further discloses that the aqueous solution may contain at least one ethylenically unsaturated nonionic monomer at col. 4, lines 37-42. Additionally, Example 7 discloses that cross-linked polymeric particles may be prepared by reverse phase suspension polymerization, requiring admixing, using an aqueous solution that contains acrylic acid as a monomer and MBA as a cross-linking agent.

40.     Similarly, Example 4 of the Zweigle '066 patent teaches the use of a reverse phase emulsion requiring admixing to produce cross-linked polymers of acrylic acid (an ethylenically unsaturated anionic monomer) and acrylamide (nonionic) in combination with MBA.

41.     Subparts (a)(ii) and (a)(iii) of claim 13 describe the oil phase and surfactant in an inverse emulsion, respectively. The Flesher '346 patent at col. 9, lines 18-20 states that "[t]he aqueous monomer is emulsified into a suitable non-aqueous liquid, generally in the presence of a water in oil emulsifier." The oil phase of a water-in-oil emulsion would, by

definition, contain at least one hydrocarbon liquid, as one skilled in the art would have known. The details of the polymerization conditions in the Flesher '346 patent are specified in the Allen '321 patent, which at col. 5, lines 3-5, discloses that water immiscible liquids may be used for the reverse phase emulsion polymerization, including "aliphatic, aromatic or naphthenic hydrocarbon solvent or oils, chlorinated hydrocarbons and aromatic or higher aliphatic esters." Additionally, Example 7 of the Allen '321 patent teaches that cross-linked polymeric particles may be prepared by reverse phase suspension polymerization using an oily phase that includes hydrocarbon liquids known to one skilled in the art, specifically Pale Oil 150 and SBP 11.

42. Additionally, Example 4 of the Zweigle '066 patent teaches that cross-linked polymers may be made via a water-in-oil (or inverse) emulsion using deodorized kerosene as the oily hydrocarbon liquid.

43. Addressing the surfactant requirement of claim 13, the Flesher '346 patent at col. 9, lines 7-10 states that "[t]he particle size in the emulsion or reverse phase polymerisation mixture may be controlled by the degree of shear applied to the monomers (admixing) and by the possible presence of emulsifying agent." Emulsifying agents, or emulsifiers, are just another name for surfactants, as is known to one skilled in the art.

44. The Allen '321 patent at col. 5, lines 13-18 teaches that suitable stabilizers (surfactants) may include condensates of polyhydroxy stearic acid and polyethylene glycol, maleic polymers, and copolymers of hydrophilic acrylic monomers with hydrophobic acrylic monomers. At col. 5, line 66 to col. 7, line 4, it also teaches that certain oil-soluble, water-in-oil emulsifiers may be used, such as "sorbitan monostearate,

16

sorbiton [sic] monooleate, glyceryl monooleate and ethoxylated fatty alcohols."
Additionally, Example 7 of the Allen '321 patent uses a polymeric surfactant (Stabiliser
B) to form an inverse emulsion.

45.     Turning to the Zweigle '066 patent, in Example 4, Arquad 2HT-100 is used as the
surfactant to stabilize the inverse emulsion.

46.     Finally, claim 13 requires polymerization. Both the Flesher '346 patent and the
Allen '321 patent subject their aqueous and oil phases to polymerization conditions.
Example 12 of the Flesher '346 patent, as well as Examples 2 and 7 of the Allen '321
patent, disclose the relevant polymerization conditions. Likewise, Example 4 of the
Zweigle '066 patent specifies appropriate polymerization conditions.

Claim 15

47.     Claim 15 of the '808 patent states: "A process as defined in claim 13 wherein
said oily phase of step (a)(ii) comprises a saturated hydrocarbon." The Flesher '346
patent refers to the Allen '321 patent for the details of the polymerization process. The
Allen '321 patent discloses at col. 5, lines 3-5 that oily phase liquids for the reverse phase
emulsion polymerization may include aliphatic hydrocarbon solvent or oils. In addition,
Examples 2 and 7 of the Allen '321 patent teach that the oily phase liquids for the reverse
phase suspension polymerization include SBP 11, a saturated hydrocarbon. Similarly, as
previously mentioned, the Zweigle '066 patent at Example 4 teaches the use of
deodorized kerosene, a saturated hydrocarbon, as making up the oily phase.

Claim 17

48.     Claim 17 of the '808 patent states: "A process as defined in claim 13 wherein
said polymerization conditions of step (b) comprise adding a polymerization initiator."
Examples 2 and 7 of the Allen '321 patent, incorporated in the Flesher '346 patent for the

purpose of disclosing the details of the polymerization process, teach using tertiary-butyl hydroperoxide (t-BHP) as a polymerization initiator. Likewise, Example 4 of the Zweigle '066 patent teaches the use of t-BHP and $Na_2S_2O_5$ as initiators.

**Claim 21**

49.    Claim 21 of the '808 patent states: "A process as defined in claim 13 which also includes step (c), comprising recovering the composition from the emulsion." The Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent each describe recovering the polymers. The Flesher '346 patent at col. 9, lines 30-31 states that "if desired dried polymer particles may be separated from the dispersion in known manner." Example 2 of the Allen '321 patent similarly discloses recovering the polymer dispersions from the emulsion. Example 4 of the Zweigle '066 patent likewise teaches the removal of water to result in dry particles.

50.    In conclusion, each asserted claim of the '808 patent (1, 6-8, 11, 13, 15, 17, and 21) has been completely described by each of the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent.

## The '766 Patent

51.    I will now address the '766 patent, which is directed to the use of the polymeric additive in the papermaking process. I understand that Ciba is asserting claims 1, 3, 5, 9, 11, 13, 17, 21, 23, and 25 of the '766 patent against Hercules' PerForm® SP9232 product and its use in papermaking. I have studied the claims of the '766 patent and find that Claim 1 of the '766 patent is described fully by the Flesher '346 patent. The remainder of the asserted claims of the '766 patent are also fully described by the Flesher '346 patent, alone or in combination with other knowledge in the field or prior art. Many

claim elements of the '766 patent are similar to those of the '808 patent, and the patents

disclose similar subject matter.

## Claim 1

52.    Claim 1 of the '766 patent reads:

> A method of making paper which comprises adding to an aqueous paper
> furnish from about 0.05 to about 20 lbs/ton, based on the dry weight of
> paper furnish solids, of an ionic, organic, cross-linked polymeric
> microbead, the microbead having an unswollen particle diameter of less
> than about 750 nanometers and an ionicity of at least 1% but at least 5% if
> anionic and used alone.

Each element of this claim is disclosed in the Flesher '346 patent. I will discuss each

limitation in turn, as I did in my analysis of the '808 patent.

> *A method of making paper which comprises adding to an aqueous paper*
> *furnish from about 0.05 to about 20 lbs/ton, based on the dry weight of*
> *paper furnish solids*

53.    The Flesher '346 patent discloses a method of making paper where polymer is

added to an aqueous paper suspension at col. 5, lines 35-65. Claim 1 of the '766 patent

calls for adding the polymer to the paper furnish from about 0.05 to about 20 lbs/ton,

which is 0.0025 weight % to 1 weight % on a percentage basis, since there are 2000

pounds in one ton. The Flesher '346 patent states at col. 11, lines 9-11 that "[s]uitable

doses are in the range of 0.01 to 3% [0.2 – 60 lbs/ton], often 0.5 to 3%, by weight

polymer based on dry solids." Similarly, Example 14 of the Flesher '346 patent employs

a polymer dose of 6 kg/ton, which is about 13 lbs/ton. Thus, the Flesher '346 patent

discloses this limitation of claim 1.

> *of an ionic, organic, cross-linked polymeric microbead*

19

54.    The next limitation in claim 1 is an ionic, organic, cross-linked polymeric microbead. At col. 6, lines 52-57, the Flesher '346 patent teaches the use of ionic, organic cross-linked polymeric particles.

55.    I understand from reading the claims, specification, and prosecution history of the '766 patent that "cross-linked" means a three-dimensional gel formed by a cross-linking agent. As in the '808 patent, the '766 patent at col. 6, lines 39-42, defines a cross-linking agent as having at least two double bonds, a double bond and a reactive group, or two reactive groups. Also as in the '808 patent, the '766 patent specifically identifies MBA as a cross-linker and uses it in its Examples.

*the microbead having an unswollen particle diameter of less than about 750 nanometers*

56.    The analysis of the particle size limitation of the '766 patent is identical to my analysis of that same limitation in the '808 patent, as discussed in paragraphs 20 to 22 above. The Flesher '346 patent incorporates the disclosure of the process from the Allen '321 patent and resulting particle size disclosure, i.e., a particle size range of 0.2-2.0 μm (see col. 7, lines 48-50 of the Allen '321 patent), and therefore meets the particle size limitation claimed in the '766 patent. I note that the '766 patent specifies a particle size less than 750 nanometers, which is equivalent to less than 0.75 microns.

*and an ionicity of at least 1% but at least 5% if anionic and used alone*

57.    The last limitation of claim 1 relates to ionicity. The Flesher '346 patent discloses the required ionicity. Example 12 of the Flesher '346 patent has an ionicity of 40%.

## Claim 3

58.     Claim 3 of the '766 patent reads:

> A method according to claim 1 wherein from about 0.05 to about 20 lbs/ton, same basis, of a high molecular weight, ionic polymer is added to said furnish in conjunction with said microbead.

59.     Claim 3 discloses the microbead from claim 1 in combination with another polymer. This is taught in the Flesher '346 patent. The Flesher '346 patent at col. 6, lines 49-68, describes adding a linear dissolvable polymer in addition to the nondissolved, cross-linked particulate polymer. As stated at col. 6, lines 66-68, these polymers are usually made from the same monomers and, hence, one skilled in the art would know that the linear dissolvable polymer would also have a high molecular weight. The Flesher '346 patent further discloses at col. 7, lines 1-3 that the linear polymer can be added in an amount up to 50% by weight of total polymer comprising the linear polymer/cross-linked polymer combination. At col. 11, lines 9-11, the Flesher '346 patent teaches adding 0.01 to 3%, or 0.2 to 60 lbs/ton of cross-linked polymer to achieve optimum floc stability, and since this patent teaches that the same amount of linear polymer may be added, the Flesher '346 patent describes what is disclosed in claim 3 of the '766 patent.

## Claim 5

60.     Claim 5 of the '766 states: "A method according to claim 3 wherein the microbead and the high molecular weight ionic polymer have opposite charges." This is also described in the Flesher '346 patent. The Flesher '346 patent teaches that the linear polymer may be co-ionic or counter-ionic to the particulate polymer at col. 6, lines 64-66. A counter-ionic polymer would have an opposite charge.

Claim 9

61.    Claim 9 of the '766 patent states: "A method according to claim 3 wherein said ionic polymer is cationic." This is disclosed in the Flesher '346 patent. The Flesher '346 patent teaches that linear polymers may be counter-ionic to the particulate polymer at col. 6, lines 64-66. Since the particulate polymer of the Flesher '346 patent is preferably anionic when used in a papermaking process, as described at col. 5, lines 63-65, the counter-ionic linear polymer would be cationic.

Claim 11

62.    Claim 11 of the '766 patent states: "A method according to claim 1 wherein from about 1.0 to about 50 lbs/ton, same basis, of an ionic polysaccharide is added to said furnish in conjunction with said microbead." This is described in the Flesher '346 patent, keeping in mind that all starches are polysaccharides. The Flesher '346 patent teaches adding a cationic starch (which is an ionic polysaccharide) to the paper furnish in conjunction with the microbead during a papermaking process at col. 5, lines 59-63. I understand from discussion with Charles Klass, an expert in papermaking, that when the Flesher '346 patent discloses the addition of 0.05 to 20 lbs/ton of anionic micropolymer, one skilled in the art would know to counterbalance the charge with the addition of an ionic polysaccharide such as starch, in a similar amount, including the claimed range of 1.0 to about 50 lbs/ton.

Claim 13

63.    Claim 13 of the '766 patent states: "A method according to claim 11 wherein said polysaccharide is cationic." This is described in the Flesher '346 patent. The Flesher '346 patent teaches adding to the paper furnish a cationic starch, which is a cationic

polysaccharide, in conjunction with the microbead during a papermaking process at col. 5, lines 59-63.

## Claim 17

64.    Claim 17 of the '766 patent states: "A method according to claim 11 wherein the polysaccharide is starch." The Flesher '346 patent describes this. At col. 5, lines 59-63, the Flesher '346 patent teaches that its papermaking process "is of particular value when cationic starch is also added to the dispersion since the overall process then gives an exceedingly good combination of paper strength and retention and dewatering properties."

## Claim 21

65.    Claim 21 of the '766 patent states: "A method according to claim 1 wherein the furnish contains a size, a strength additive a promotor, a polymeric coagulant, a dye fixative or a mixture thereof." The cationic starch added in the Flesher '346 patent (discussed above) is a strength additive. Additionally, the polymers added to the crosslinked microbead – as in claim 3 of the '766 patent – are polymeric coagulants, so this element is also described in the prior art, as I discussed in paragraph 59.

## Claim 23

66.    Claim 23 of the '766 patent states: "A method according to claim 1 wherein from about 0.1 to about 20 pounds of an active, soluble aluminum species is also added per ton of paper furnish solids to the furnish." I know from my experience consulting in the papermaking field that aluminum species are routinely added to the paper furnish, and have been for decades. I understand from discussion with Charles Klass, an expert in papermaking, that the claimed range of addition is well known to those skilled in the art.

**Claim 25**

67.    Claim 25 of the '766 patent states: "A method according to claim 23 wherein the species is alum, polyhydroxyaluminum chloride and/or sulfate or mixtures thereof." Again, I know that it is very well known in the field to add aluminum species to the paper furnish, particularly alum and other materials related to alum such as polyhydroxyaluminum chloride and polyhydroxyaluminum sulfate.

68.    Thus, every element of each asserted claim of the '766 patent has been previously described by the Flesher '346 patent or was commonly known to those skilled in the art well prior to the date the '766 patent was filed.

<u>Materiality</u>

69.    I have reviewed the file histories of the '766 and '808 patents and understand that the Flesher '346 patent, the Allen '321 patent, and the Zweigle '066 patent were not considered by the PTO. I have some limited experience in dealing with the patenting process. Given the very close similarity between these three references and the claims of the '766 and '808 patents, if the applicants or their patent attorney were aware of these references, I believe they should have been submitted to the PTO.

Redacted

Redacted

### Indefiniteness of the Particle Size Limitations
### in the '808 and '766 Patent Claims

73.     I note that the '808 patent is silent as to the method by which particle size was measured. In contrast, the '766 patent, at col. 11, lines 42-46, reports not only that the number average was measured, but also the technique (i.e., QELS) that was used to make this measurement. Similar information was not disclosed in the '808 patent. Alternative techniques of measuring particle size can give different number averages for the same sample. For example, particle size measured by centrifugation rather than QELS may result in disparate results. The lack of specification of technique in the '808 patent is

25

therefore significant, and one skilled in the art would have to know the technique used to measure particle size before the limitation of less than 0.75 microns is fully meaningful.

74.    Furthermore, the mathematical inversion technique used by QELS to determine a number average size from the autocorrelation function can influence the reported number average. Thus, even the information provided regarding particle size measurement in the '766 patent is incomplete, since the instrument, manufacturer, and software are not specified. To be fully descriptive, therefore, the '808 patent and the '766 patent should describe the technique used to measure the particle sizes (which was done in the case of the '766 patent) and the instrument, manufacturer, and software used to calculate the number average (which was not done in either patent-in-suit).

75.    The variability in measurement resulting from the use of different techniques and analysis software is significant enough for the claim limitation of "an unswollen number average particle size of less than about 0.75 micron" from the '808 patent, and "an unswollen particle diameter of less than about 750 nanometers" from the '766 patent to be indefinite unless more information is provided.

## II.    COMPENSATION

76.    I will be reimbursed for my time spent on this case at my usual fee of $275 per hour and for my out-of-pocket expenses.

## III.    EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR OPINIONS

77.    In addition to documents cited in this report, demonstrative and summary exhibits may be created in accordance with the Court's pretrial scheduling order, based on the information in this report.

IV.    PRIOR TESTIMONY

78.    I have not testified as an expert at trial or by deposition within the last four years.

V.    OTHER TESTIMONY

69.    I may also testify about how polymer science applies generally to the

papermaking process, polymer synthesis and chemistry, and polymer characterization,

including background information regarding what one of ordinary skill in the art would

have known about those subjects around 1990.

VI.    MATERIALS CONSIDERED

In forming my opinions, I relied on my education, training, and experience in the
field of polymer science, as well as the following:

Exhibit B - U.S. Patent No. 5,167,766
Exhibit C - U.S. Patent No. 5,171,808
Exhibit D - U.S. Patent No. 4,528,321
Exhibit E - U.S. Patent No. 4,720,346
Exhibit F - U.S. Patent No. 4,172,066
Exhibit G – Excerpt of transcript of Rule 30(b)(6) Deposition of Cytec (witness
    Paul Waterman)
Exhibit H - U.S. Patent No. 4,339,371
U.S. Patent No. 4,203,877
U.S. Patent No. 5,958,188
U.S. Patent No. 6,310,157
File history of U.S. Patent No. 5,167,766
File history of U.S. Patent No. 5,171,808
Transcript of Rule 30(b)(6) Deposition of Hercules (witness Robert Gelman)
Transcript of Rule 30(b)(6) Deposition of Ciba (witness Michael Heard)
Information provided by Charles P. Klass

VII.    CONCLUSION

70.    I reserve the right to supplement my opinions in light of the fact that a) discovery

in this litigation is ongoing and additional information may become available to me in the

future; and b) I would like the opportunity to address any contrary positions taken by

Ciba's experts in response to the opinions I have expressed in this report. I may rely on

additional documents and testimony in supplementing this report, as necessary, to respond to additional arguments presented by Ciba.

Date: July 22, 2005

_____
Robert K. Prud'homme

Public Version Dated:  September 7, 2005

IIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 7, 2005, the attached

document was hand-delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Jeffrey L. Moyer
Chad M. Shandler
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE 19899

I hereby certify that on September 7, 2005, I have Federal Expressed the

foregoing document(s) to the following non-registered participants:

Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL 60601-6780

Thomas L. Creel, P.C.
Goodwin Procter LLP
599 Lexington Avenue
New York, NY 10022

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672306