IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> HERCULES INCORPORATED and CYTEC INDUSTRIES, INC., <br><br> Defendants. | ) ) ) ) ) C. A. No. 04-293 (KAJ) ) ) **PUBLIC VERSION** ) ) ) ) ) ) |

## SUPPLEMENTAL EXPERT REPORT OF ROBERT K. PRUD'HOMME

OF COUNSEL:

Ford F. Farabow, Jr.
Joann M. Neth
Eric J. Fues
A. Neal Seth
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Hercules Incorporated*

Dated: September 19, 2005
Public Version Dated: September 26, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) | |
| | ) | C. A. No. 04-293 (KAJ) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HERCULES INCORPORATED and | ) | |
| CYTEC INDUSTRIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL REPORT OF ROBERT K. PRUD'HOMME

1. I, Robert K. Prud'homme, filed an initial expert report on July 22, 2005 ("July report") and a rebuttal expert report on August 19, 2005 ("August report"). I am filing this supplemental report in light of new information made available to me.

I.  OPINION

    A.  SUPPLEMENTATION TO MY JULY REPORT

        1. The '808 Patent

2. In my July report, I discussed why the patents-in-suit are invalid. At the time I submitted that report, I had not reviewed CYT0010220-349 (excerpts attached as Exhibit 1), because Cytec had not yet provided these documents at that time. CYT0010220-349 is a process summary of a Cyanamid product, CYANATROL® 920-960 High Solids Emulsions.

## Redacted

3. As an initial matter, this product is not described as being cross-linked or containing a cross-linking agent. **Redacted**
And, as I have stated in my earlier reports, in my opinion, the Hypermer B246SF surfactant is not a cross-linking agent as is described in the '766 and '808 patents.

4. However, even if, as Ciba contends, Hypermer B246SF were a cross-linking agent, then the CYANATROL® 920-960 High Solids Emulsions product fully meets what is claimed in at least claim 1 of the '808 patent:

Claim 1

*A composition comprising cross-linked anionic or amphoteric polymeric microparticles*

**Redacted**

*derived solely from the polymerization of an aqueous solution of at least of one monomer,*

**Redacted**

*said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron,*

**Redacted**
An optical microscope has a lower size resolution of about 0.5 microns. Therefore, the actual distribution would have had particles smaller than 0.5 microns, but these would simply not have been detected by the optical microscope. As I have

stated in my August report, the distribution is actually skewed toward smaller particle sizes. (*See, e.g.*, CIBA 0012679-687, attached as Exhibit 2 and CIBA 004899-905, attached as Exhibit 3.)

> *a solution viscosity of at least about 1.1 mPa·s,*

**Redacted**

> *a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer,*

**Redacted**

> *and an ionicity of at least about 5 mole percent.*

**Redacted**

**Claim 6**

6. Claim 6 of the '808 patent states: "A composition as defined in claim 1 wherein said unswollen diameter is less than 0.5 micron." Like Claim 1, each element of Claim 6 was met by the CYANATROL® product, **Redacted**

3

### Claim 7

7. Claim 7 of the '808 patent states: "A composition as defined in claim 1 wherein the organic polymer microparticle is composed of at least one ethylenically unsaturated non-ionic monomer." Each of the elements of claim 7 was met by the CYANATROL® product

**Redacted**

### Claim 8

8. Claim 8 of the '808 patent states:

> A composition as defined in claim 1 wherein the organic polymer microparticle is composed of at least one anionic monomer selected from acrylic acid, methylacrylic acid, ethylacrylic acid, 2-acrylamido-2-methylpropanesulfonic acid or mixtures or salts thereof.

The CYANATROL® product description stated that        **Redacted**

Therefore, the product meets the limitations of Claim 8.

### Claim 11

9. Claim 11 of the '808 patent states:

> A composition as defined in claim 7 wherein said non-ionic ethylenically unsaturated monomer is selected from acrylamide; methacrylamide; N,N-dialkylacrylamides; N-alkylacrylamides; N-vinylmethacetamide; N-vinyl methylformamide; N-vinyl pyrrolidone and mixtures thereof.

As I stated in paragraph 7, the CYANATROL® product        **Redacted**

so each element of Claim 11 is described by the CYANATROL® product.

### Claim 13

10. Claim 13 of the '808 patent states:

> A process for the preparation of a composition as defined in claim 1, said process comprising:
>
> (a)    admixing

4

(i) an aqueous solution comprising at least one ethylenically unsaturated anionic monomer alone or in admixture with a cationic monomer, and at least one crosslinking agent and, optionally, at least one ethylenically unsaturated non-ionic monomer; (ii) an oily phase comprising at least one hydrocarbon liquid; (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion; and

(b) subjecting the inverse emulsion obtained in step (a) to polymerization conditions.

Claim 13 is fully described by the CYANATROL® product. I will begin with part (a)(i) of Claim 13, since the other claim elements are addressed above.

**Redacted**

11. In part (a)(ii), Claim 13 requires an oily phase comprising at least one hydrocarbon liquid.

**Redacted** Part (a)(iii) of Claim 13 requires an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion.

**Redacted** Finally, this admixture is subjected to polymerization conditions. Thus, every element of Claim 13 is met by the CYANATROL® product.

**Claim 15**

12. Claim 15 of the '808 patent states: "A process as defined in claim 13 wherein said oily phase of step (a)(ii) comprises a saturated hydrocarbon." **Redacted**

5

Redacted

Therefore, the CYANATROL® product met the limitations of Claim 15.

**Claim 17**

13. Claim 17 of the '808 patent states: "A process as defined in claim 13 wherein said polymerization conditions of step (b) comprise adding a polymerization initiator."

Redacted

thus met the limitations of Claim 17.

**Claim 21**

14. Claim 21 of the '808 patent states: "A process as defined in claim 13 which also includes step (c), comprising recovering the composition from the emulsion."

Redacted

15. In conclusion, asserted claims 1, 6-8, 11, 13, 15, 17, and 21 of the '808 patent have been completely described by the CYANATROL® product,     Redacted

16. Further, I am now aware that Ciba is asserting claim 20 of the '808 patent against Hercules (July Gilbert Rep. ¶ 34), in addition to the claims that I discussed in my July report. I believe that claim is fully described by the Flesher '346 patent.

17. Claim 20 of the '808 patent states: "A process as defined in claim 13 wherein said aqueous solution of step (a)(i) additionally contains an effective amount of a chain-transfer agent selected from an alcohol, mercaptan, phosphite, sulfite, or a mixture thereof." At col. 8, lines 9-24, the Flesher '346 patent discusses the use of chain transfer agents. Specifically described is

6

mercaptoethanol, a mercaptan. Therefore, the Flesher '346 patent meets the limitations of claim 20.

### 2. The '766 Patent

18. I am also now aware that Ciba is asserting claims 7 and 19 of the '766 patent against Hercules (July Gilbert Rep. ¶ 35), in addition to the claims that I discussed in my July report. I believe that these two claims are fully described by the Flesher '346 patent.

19. Claim 7 of the '766 patent states: "A method according to claim 3 wherein said ionic polymer is anionic." The particular polymer of the Flesher '346 patent is preferably anionic when used in a papermaking process, as described at col. 5, lines 63-65, so the Flesher '346 patents meets the limitations of claim 7.

20. Claim 19 of the '766 patent states: "A method according to claim 1 wherein said microbead is a polymer of acrylamide." In the list of suitable non-ionic monomers, the Flesher '346 patent mentions acrylamide at col. 8, lines 40-46. Thus, the Flesher '346 patent meets the limitations of claim 19.

### B. SUPPLEMENTATION TO MY AUGUST REPORT

#### 1. Ordinary Skill in the Art

21.

## Redacted

Yet, some of the inventors of the patents-in-suit clearly had knowledge of both. Particularly, Messrs. Harris and Honig are named on both the '808 composition patent and the '766 method-of-use patent. This confirms my opinion as to the knowledge of one skilled in the art, as set forth in my July 22, 2005 report.

       2.       The Flesher '346 and Allen '321 Patents

22.

**Redacted**

I am advised that merely citing a reference in a patent's specification does not mean that the U.S. Patent Office has actually considered the substance of the reference. I am advised that only those references actually before the Examiner will be considered. In any event, both patents-in-suit mischaracterize the European reference. The '766 patent states that EP 0 202 780 "describes the preparation of crosslinked, cationic, polyacrylamide beads by conventional inverse emulsion polymerization techniques" and the '808 patent contains very similar language. (*See* '766 patent at col. 2, lines 47-49 and '808 patent at col. 1, lines 23-25.) The mischaracterization is that EP 0 202 780 describes cross-linked, anionic polyacrylamide beads too. (*See, e.g.*, EP 0 202 780 A2 Example 12, which states "[a] range of anionic copolymers, having composition 40 wt% sodium acrylate, 60 wt% acrylamide, were prepared from monomer mix containing different amounts of methylene bis acrylamide. . ." (col. 33, lines 50-56), and describes those anionic copolymers as "crosslinked" (col. 35, lines 25-31); *see also* col. 7, lines 32-33 stating that the "flocculant polymer is preferably an anionic polyacrylamide.") This is particularly important because the '808 patent is limited to cross-linked anionic or amphoteric polymers.

23. The Flesher '346 patent relies on the European equivalent of the Allen '321 patent (EP 0 126 528) for details referring to emulsifiers, stabilizers, and other process details (Flesher '346 patent at col. 9, lines 7-25.) The process that is followed is specified to produce particles that are below 2 microns (as the Flesher '346 patent states at col. 11, lines 28-42), or, more specifically, between 0.2-2.0 microns (as the Allen '321 patent states at col. 7, lines 37-53) or 0.3-3.0 microns (as the Allen '321 patent states at col. 5, lines 61-66). **Redacted**

## Redacted

No prediction, guesswork, or experimentation is necessary, however. Both the Flesher '346 and Allen '321 patents report particle size. One skilled in the art reading these references would be certain that the particle size disclosed was between 0.2-2.0 microns and between 0.3-3.0 microns

## Redacted

24.

## Redacted

The '808 patent merely refers to the applications from which the '766 patent came when it discusses potential applications for the composition claimed. (*See* '808 patent at col. 3, lines 37-39.) There is absolutely no indication that the applications cited contain important information regarding particle size measurement. Moreover, I note that at the time the initial application which led to the '808 patent was filed, neither the application from which the '766 patent came, nor the '766 patent itself was publicly available.

25.

## Redacted

the amount of water is provided in the '321 Allen patent's Examples and is between 37% and 64%. Example 2 from the Allen '321 patent specifies 233 g monomer to approximately 134 g water, which is approximately 37% water. Example 4 from the Allen '321 patent specifies 100 g monomer to approximately 140 g water, which is approximately 58% water. Example 7 from the same

patent, which I discuss at length in my July report, specifies 432 g monomer to approximately 765 g water, which is approximately 64% water.

26. Upon azeotropic drying, the particle size decreases by the cube root of the ratio of the initial volume divided by the final volume (volume is approximately proportional to mass). Thus, the particle size will decrease between 16% to 40%. Applying this to the particle size range given in Example 1 of the Allen '321 patent, the as-polymerized particle size range would have been 0.23-2.32 microns (16% increase) or 0.28-2.8 microns (40% increase). This later range is remarkably close to and thus presumably what the Allen '321 patent refers to as "preferably 0.3 to 3 microns." (*See* '321 patent at col. 5, lines 60-65.) Even using the 0.28-2.8 micron or 0.3-3.0 micron range does not change my opinion that most of the particles would be less than 0.75 microns in diameter, and the number average of all particles would be less than 0.75 microns and even less than 0.5 microns, as I explained above.

27.

## Redacted

Whether a monomer is anionic, cationic, or nonionic does not affect the emulsion droplet size, nor does the addition of a cross-linking agent. Similarly, regardless of any variation in the emulsion polymerization processes, including degree and time of shear, the Flesher '346 and Allen '321 patents specify that the particle size should be less than 2 microns, or, more specifically, between 0.2-2.0 microns or 0.3-3.0 microns.

   3.

28.       ## Redacted

I understand that further details of this measurement, in addition to the Hercules report in Exhibit 33 of my August

10

report, were as follows: Hypermer B246SF (20 g) was put into water (250 g), along with a 3:1 mixture of Cirrasol G1086 and Tetronic 1301 surfactants (20 g). This mixture was heated and then emulsified using a hand-held blender. The emulsion was then placed in a reactor, heated to 70°C, and stirred for 18 hours at 350 rpm. **Redacted** The sample was then removed from the reactor and freeze-dried to remove water. NMR analysis was performed on the freeze-dried sample and compared to an unheated control sample.

### 4. Hypermer Is Inert

29.

**Redacted**

In fact, the articles that I cited by Hernandez-Barajas and Hunkeler in my August report (and which Dr. Gilbert apparently considered in writing his July report) conclude just the opposite—that Hypermer is inert.

## II. COMPENSATION

30. My compensation arrangement has not changed since my last report.

## III. EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR OPINIONS

31. In addition to documents cited in this report, demonstrative and summary exhibits may be created in accordance with the Court's pretrial scheduling order, based on the information in this report.

## IV. PRIOR TESTIMONY

32. I have not testified as an expert at trial or by deposition since my last report.

## V. OTHER TESTIMONY

33. I may also testify about how polymer science applies generally to the papermaking process, polymer synthesis and chemistry, and polymer characterization, including background

information regarding what one of ordinary skill in the art would have known about those subjects around 1990.

## VI.  MATERIALS CONSIDERED

34. In forming my opinions, I relied on my education, training, and experience in the field of polymer science, as well as the following:

   Exhibit 1 - excerpts from CYT0010220-349

   Exhibit 2 - CIBA 0012679-687

   Exhibit 3 - CIBA 004899-905

   Exhibit 4 - August 19, 2005 Expert Report of Dr. Robert Gilbert

   Exhibit 5- Information from Hercules relating to NMR measurements showing there was no hydrolysis or degradation of PerForm® SP9232 by heating

## VII.  CONCLUSION

35. I reserve the right to supplement my opinions in light of the fact that (a) discovery in this litigation is ongoing and additional information may become available to me in the future; and (b) I would like the opportunity to address any contrary positions taken by Ciba's experts in response to the opinions I have expressed in this report. I may rely on additional documents and testimony in supplementing this report, as necessary, to respond to additional arguments presented by Ciba.

Date: September 19, 2005

*Robert K. Prud'homme*
Robert K. Prud'homme

Public Version Dated:   September 26, 2005

12

IIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, W. Harding Drane, Jr., hereby certify that on September 26, 2005, the attached document was hand-delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Jeffrey L. Moyer
Chad M. Shandler
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE  19899

I hereby certify that on September 26, 2005, I have Federal Expressed the foregoing document(s) to the following non-registered participants:

Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL  60601-6780

Thomas L. Creel, P.C.
Goodwin Procter LLP
599 Lexington Avenue
New York, NY  10022

/s/ W. Harding Drane, Jr.
Richard L. Horwitz
W. Harding Drane, Jr.
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
Telephone:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672306