# Exhibit
# 1

Redacted

# Exhibit 2

Redacted

# Exhibit 3

Redacted

# Exhibit

# 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CIBA SPECIALTY CHEMICALS )
CORPORATION, )
)
Plaintiff, )
) C.A. No.: 04-293 (KAJ)
v. )
) JURY TRIAL DEMANDED
HERCULES INC. AND CYTEC )
INDUSTRIES, INC. )
) REDACTED - PUBLIC VERSION
Defendants. )
)

REBUTTAL EXPERT REPORT OF
ROBERT G. GILBERT, Ph.D.

This is my written report concerning issues about which I may be asked to testify and on

which, I understand, Hercules bears the burden of proof. Specifically, this report is in response

to the expert reports of Robert K. Prud'homme and Charles P. Klass. As with my initial expert

report, I specifically reserve the right to form and submit additional opinions regarding any

additional information or discovery that is subsequently generated or produced. I refer in my

report to various documents and specifics. I have not, however, set forth every relevant fact or

document about which I am aware, and reserve the right to supplement, if required. Likewise, I

reserve the right to supplement my report to clarify possible ambiguities or to opine further based

upon future court rulings, agreements between the parties, or any further testimony by either

party, either by deposition, at any hearing, or at trial.

I.    THE RELEVANT SKILL IN THE ART

REDACTED

REDACTED

I believe that such a person of ordinary skill in the art would either have had knowledge of polymer synthesis, or knowledge of the use of polymer additives in the papermaking process, but not both. I note in this regard that Dr. King agrees with my view.

II.    SUMMARY

2.    For the reasons set forth herein, I disagree with the conclusions of Dr. Prud'homme regarding his view

REDACTED

Likewise, and also for the reasons set forth herein, I disagree with the conclusions of both Dr. Prud'homme and Mr. Klass that

REDACTED

3.    In connection with reaching my opinions which are set forth herein, I have reviewed the various patents involved here and will set forth my understanding as to what these patents disclose and claim to one of ordinary skill in the art at the time. My opinions are based upon my experience, and reflect my view as to how these patents would have been interpreted and/or understood by one of ordinary skill in the art in the 1990 time period. Any such person would be able to read and understand these patents. Additionally, and while some observations concern papermaking, anyone of ordinary skill in the polymer field would be competent to make

these limited observations. Moreover, I am aware that the Rebuttal Expert Report of Dr. King accords with the observations herein regarding papermaking set forth herein.

III.    THE '766 PATENT

4.    The '766 patent claims a method for making paper which comprises adding to the aqueous paper furnish an ionic, organic cross-linked polymeric microbead having an unswollen particle diameter of less than about 750 nanometers and a particular ionicity, which is set forth in Claim 1. The particle sizes described in the '766 patent are stated to be the unswollen number average particle diameter in nanometers as determined by quasi-elastic light scattering spectroscopy (QELS) as carried out on the polymer emulsion, microemulsion or dispersion. ('766 patent, Col. 11, ll. 42-44).

5.    Example 25 of the '766 patent shows that the use of microbeads having diameters of 130 and 220 nanometers reduces drainage times over that of stock without using such microbeads by 33%. However, when the diameters of the anionic microbeads are increased to 1,000 to 2,000 nanometers, drainage is not significantly affected in comparison to systems using no microbeads.

6.    To provide background, the Flesher '346 patent notes that it was recognized that polymers used as flocculants had to be in solution or had to be homogenized so as to put these polymers into solutions (see Col. 1, lines 4-20), and that optimum results require accurate dosing and a minimum of agitation during flocculation. Flesher then states that it would be desirable to provide a flocculation process in which the dosage of the flocculant is less dose sensitive and the flocs are more stable to shear than with conventional dissolved high molecular weight flocculant polymers. (Col. 3, ll. 41-45). The '346 invention is thus said to be based on the discovery that the shear stability of the flocs can be increased by initiating flocculation while some or all of the

- 3 -

polymeric material is in the form of small particles, rather than a true solution. (Col. 3, ll. 58-62).

7.

REDACTED

the '766 patent references European Patent EP 0 202 780 (*see* Col. 2, ll. 47-66). Attached hereto as Exhibit A is a copy of that European patent. Insofar as is applicable here, I view this European patent as having the same disclosure as the '346 patent. REDACTED I have been advised that this European patent is the European counterpart of the '346 patent.

8.    Specifically, both the Flesher '346 patent and the '780 European patent state that the polymer particles must be below 10 microns in dry size, preferably below 2 microns, but preferably swell, *e.g.*, to at least twice their dry diameter and often at least five times their dry diameter in water. (Col. 6, ll. 30-35 of the '346 patent and Col. 8, ll. 16-20 of the European patent).

9.    The '346 patent also notes that the polymer particle size in the emulsion or reverse phase polymerization mixture may be controlled by the degree of shear applied to the monomers and by the possible presence of an emulsifying agent. In this regard, as would have been appreciated by anyone familiar with such processing technology in or about 1990 when the first application leading to the '766 application was filed, oversized particles would not be particularly desired, as these would have a greater tendency to precipitate out of an emulsion. This would be particularly true when a suspension polymerization process is used, which is

likewise referenced in the '346 patent. Also, and while emulsifiers would be used to maintain the stability of an emulsion or stabilizers when a suspension polymerization process is used, it is my opinion that there would have been no incentive for anyone of ordinary skill in this field at the time to provide very small polymer particles in these emulsions or suspensions described in the '346 patent, due (among other reasons) to the cost and process time and energy involved. Here, the '346 patent does not provide any reason as to why one would seek to use polymer particles of any smaller size than would have been required to allow the particles to remain in a stable homogeneous dispersion.

     10.    I have also reviewed U.S. 4,759,856 to Farrar et al. ("the '856 patent"), which I note from the face of the '766 patent, was among the references of record during the prosecution of the '766 patent. The '856 patent relates to technology quite similar to that disclosed in the '346 patent. The '856 patent is stated to be based on the surprising discovery that it is easily possible to shear very high molecular weight cross-linked polymer without reducing the intrinsic viscosity. (*See* the '856 patent at Col. 4, ll. 43-49). Also, the '856 patent states that the particles preferably have a dry particle size of below 10 microns, preferably below 2 microns and have been made by reverse phase polymerization or emulsion polymerization. (Col. 6, l. 60-63).

     11.    It, accordingly, would have been understandable why the '766 inventors stated that, typically, the particle size of polymers prepared by conventional, inverse, water-in-oil emulsion polymerization processes are limited to the range of 1 to 5 microns, since no particular advantage in reducing the particle size had been apparent. (Col. 2, ll. 58-62). Indeed, in this connection, I note that the '766 patent identifies a Japanese patent describing a dual system in which a cationic or anionic organic microbead of 1-100 microns is used with an anionic, cationic

or non-ionic acrylamide polymer. (Col. 2, ll. 9-14). I understand that this Japanese patent is related to U.S. 5,180,473 to Akune et al., which Hercules was once relying upon.

12.    Before proceeding further, while the '346 patent states that in every Example the polymer material had a dry particle size below 2 microns, these Examples omit important process details. These details include, among other things: (1) the emulsifiers and/or stabilizers, if any, which were used; (2) the degree of shear applied and the time, and (3) the oil used as the continuous phase. Only Example 15 sets forth any of those details, but omits the degree of shear and the time. Accordingly, the polymer products made in these Examples could not be duplicated, so any opinion as to the particle sizes that would result would be somewhat speculative, and subjective.

13.    Further, even the observation in the '346 patent that the polymeric materials made in the Examples had a dry particle size below 2 microns involves ambiguities. It is thus unclear whether that was an observation determined analytically, or whether that was an expectation based upon whatever undisclosed polymerization conditions were used (note in Example 1, the reference to the polymerization being carried out "to give" a particle size below 2 microns). ('346 patent, Col. 11, ll. 54-58).

14.    It also would not be entirely clear to one of ordinary skill in the art as to what was meant in the '346 patent by the "dry size" of the polymer particles, particularly as to where and how any such size determination was to be made. From the content of Example 1, one could infer that the dry size referred to the polymer particles in the dispersion that resulted following azeotropic distillation (the details of which are not set forth). Also, no analytical method is set forth as to how the dry size of the particles is to be measured.

- 6 -

15.     Also, anyone reviewing the Flesher '346 patent would readily note that no Example concerns either the use in papermaking, or a demonstration in making paper of the shear resistance that is indicated would be provided.

16.     In view of the foregoing, I do not agree that anyone of ordinary skill in the art at the time would have concluded that the '346 patent includes a disclosure of making paper according to the '766 claims including microbeads having the characteristics that are set forth in the '766 claims. Further, the '346 patent involved simply finding advantage in using particles for flocculation that did not have to be dissolved before use. The Flesher '346 patent does not disclose, much less demonstrate, advantages in performance when used as retention and drainage aids in making paper due to using microparticles as in the '766 patent. Rather, the benefits are said to be due to adding the flocculant at an early stage in the pulp flow so shear is applied to the flocculated pulp. The process is of particular value when cationic starch is also added. This general description leaves much to the imagination as to what is intended and how and what is to be used. While anyone reading the '346 patent would come to the same conclusion, in my view, my opinions here are shared by Dr. King.

17.

REDACTED

REDACTED                                However, and

while I do understand that the '528 European patent is a counterpart to the '321 patent, the

reference in the Flesher '346 patent to that European patent specifically references only

emulsifiers, stabilizers, non-aqueous liquids and other reverse phase polymerization materials

and process details that are described in the European patent.        REDACTED

                        In fact, the '346 patent only contains a very general reference to

those materials and details set forth in the European patent, *i.e.*, an invitation to look at that

European patent.

REDACTED

                        Indeed, if Flesher and his

co-inventors would have desired dry particle sizes in the range of that disclosed in the '528

European patent, it would have been expected that such a disclosure would have been provided

three columns earlier.  That is where the '346 patent describes the size and swelling

characteristics of the polymer particle.  ('346 patent, Col. 6, ll. 25-34).

    18.     Further, as to the size of the particles described as being made in the '346 patent

~~Examples (and in the '780 European patent as well), what is stated is that the dry particle size is~~

below 2 microns.  If it was believed that the dry particle sizes were in the 0.2-2.0 micron range,

then anyone in this field that would have expected that that would have been stated.

    19.     REDACTED

                        What the polymer particle sizes in any emulsion

of the '346 patent, and measured by QELS, may have been is indeterminate.

20.

REDACTED

21.

REDACTED

'766

patent (Col. 3, ll. 40-52), defines the term "microbead" as including many configurations, not

just microgels. Whether a microgel is formed would be expected to be dependent upon the level

of crosslinking agent used.

22.

REDACTED

Even then, the '346 patent is not definite enough to allow such a conclusion to be reached.

As some examples, to provide the amount of the microbead to be added,

REDACTED

For the disclosure of an "ionic, organic, cross-liked polymeric microbead,"

REDACTED

A.    The '808 Patent

1.    The Flesher '346 Patent

23.    I do not agree with the conclusions of Dr. Prud'homme set forth in paragraphs 20-22 of his expert report. REDACTED

.In context, to anyone in this field at the time, the Flesher '346 patent is simply defining how one could determine if any composition is a "microdispersion" or not, *i.e.*, if a layer of the composition is allowed to dry, microscopic examination "readily identifies discrete polymeric particles ..." '346 patent, Col. 6, ll. 27-29). Also, in the '346 patent, the polymer particles of the desired size can be made by crosslinking a preformed linear water soluble polymer in which the polymer is broken up into small particles, below 10 microns and preferably below 2 microns. ('346 patent, Col. 7, ll. 24-35). Anyone in this field reading the '346 patent would thus appreciate that there is considerable latitude in the processes described, so that predicting the size particles in the '346 "microdispersion" would be problematic, particularly given that the definition involves merely determining whether discrete polymer particles are evident under microscopic examination after drying. REDACTED

2.    The Allen '321 Patent

24    By way of background, this patent notes that dispersing systems for water-in-oil emulsions include an emulsifier which assists in breaking down droplets to a smaller size, but that often quite high concentrations of the emulsifier are required to provide stability against settlement and that the use of such high concentrations offers serious disadvantages. Specifically, the '321 patent notes that the high surfactant concentrations make the dispersion much more viscous and in many cases satisfactory distribution is not achieved. (Allen '321 patent, Col. 1, l. 65 – Col. 2, l. 12).

- 10 -

25.     The inventors state that they have surprisingly found that satisfactory results can be achieved with reduced levels of emulsifier if there is included a non-ionic compound of a defined class in the dispersing system or, if present, in the distributing system, or in both the dispersing and distributing system. (Allen '321 patent, Col. 2, ll. 62-67).

26.     The polymer being made can be water soluble, and generally linear, or, if the polymer is to be water swellable, then it will generally be cross-linked. (Allen '321 patent, Col. 4, ll. 57-63).

27.     In the reverse polymerization process as described, the Allen et al. '321 patent states that it is normally desirable for the particle sizes of the monomer and polymer droplets to be less than 5 microns, preferably 0.3 to 3 microns, and the monomer droplets should therefore be homogenized into the water immiscible liquid with sufficient energy to achieve this particle size. (the '321 patent, Col. 5, ll. 61-66). No indication is set forth in the '321 patent as to how the size of the droplets is to be determined. Indeed, there is no indication that Allen et al. ever even measured these droplets.

28.                              REDACTED

~~There, a copolymer dispersion is prepared by an inverse suspension polymerization process. The~~ polymer suspension which results is distilled to give an anhydrous polymer dispersion which is stated to have a particle size range 0.2-2.0 microns in a hydrocarbon liquid. There are several distinctions between the product of Example 1 of this '321 patent and the '808 compositions. In the first place, the copolymer made in '321 Example 1 is not a crosslinked polymer, as in the '808 claims, nor is this an anionic polymer as in other of the '808 claims (claims 8-10 and 12) which include anionic monomers such as acrylic acid or sodium acrylate. Also, the particle size

- 11 -

range attributed to the polymer particles in Example 1 of the '321 patent is to these particles, after distillation. In other words, the attributed size range is for the dry particles. No indication is given as to the size of the monomer or polymer droplets prior to removal of the water. Further, there is no indication that the anhydrous polymer dispersion of the range given (0.2-2.0 microns) in a particular hydrocarbon liquid was determined by any analytical technique (no technique is stated), or whether this was simply what was expected (note the statement that the suspension was distilled "to give an anhydrous suspension"). ('321 patent, Col. 7, ll. 48-53).

29.     As far as can be ascertained, none of the other Examples of the '321 patent set forth the particle size of any polymer prepared, nor set forth the particle size of either the monomer or the polymer droplets involved in the polymerizations described.

30.     The '321 patent does not provide any advantage that would be derived from using microparticles in the nanometer range, as in the '808 claims. As previously noted, the whole thrust of the '321 patent is to the discovery that reduced levels of emulsifier can be used when polymer particles are dispersed in a non-aqueous liquid when a non-ionic compound of a defined class is used. (Col. 2, ll. 62-67).

31.                                REDACTED

32.                                REDACTED

33.

REDACTED

However, the '766 patent concerns making paper using an ionic, organic cross-linked polymeric microbead in which the particle size is determined by the QELS technique on the microemulsion itself. The '808 patent determines the particle size of the crosslinked microparticles similarly to the '766 patent.

REDACTED

What the Allen '321 patent discloses in that Example is not what is claimed in the '766 and '808 patents.

34.    In paragraph 31, with respect to claim 6 of the '808 patent, which includes the limitation that the unswollen number average diameter of the particles is less than 0.5 microns,

REDACTED

Additionally, and as I have previously discussed as well, the disclosure of the particle sizes in the 0.2–2.0 micron range in the Allen '321 patent are set forth in an Example for the

polymer dispersion prepared in an inverse suspension process for making a copolymer in an anhydrous form which is not crosslinked.

### 3.    The Zweigle et al. '066 Patent

35.    The '066 patent concerns microgels which are used as thickening agents, applications requiring rapid sorption of aqueous fluids and for applications wherein the swelling properties of the polymer are important.  Of particular interest, according to the '066 patent, is the application involving the use of these microgels in enhanced oil recovery operations wherein a dry fluid is introduced through a bore hole in the earth into a porous subterranean formation to dry the oil from oil-bearing structures toward a producing well.  (*See* Col. 2 of the '066 patent, ll. 5-30).

36    As to the latter application, it is noted that the particle size of the microgels for these permeability control applications is not particularly critical.  ('066 patent, Col. 7, ll. 23-30).

37.    In describing these microgels, the '066 patent states, that in the dry state, these exist as microbeads having diameters less than 20 micrometers (microns), preferably less than about 4 micrometers and most preferably less than about 1 micrometer.  In their partly or totally water-swollen state, the particle sizes of the microgels can range from about 0.5 to about 200 micrometers preferably from about 1 to about 10 micrometers.  Further, in their partly water-swollen (preinversion) state, the microgels are water-swellable and contain at least 30 wt. percent of the crosslinked polymer and up to about 70 wt. percent of water.  ('066 patent, Col. 2, ll. 51-61).

38.    These microgels are stated to be prepared by microdisperse solution polymerization techniques, e.g., the water-in-oil polymerization method described in U.S. patent 3,284,393.  It is stated that, usually, the agitation in this process is sufficient to provide dispersed

- 14 -

aqueous globules having diameters in the range of from about 0.5 to about 100 micrometers, preferably from about 1 to about 15 micrometers. ('066 patent, Col. 4, ll. 20-38).

39.    In Example 1, it is stated that a cross-linked acrylamide-sodium acrylate copolymer is prepared, but no data is provided as to the size of the particles. Thereafter, Example 1 shows that other chemicals are added to the microgels which are then filtered and dried with heating and by acetone extraction to give what is described as cationic, cross-linked polyacrylamide microgels, ranging in size between 0.2 and 4 microns in diameter.

40.    Example 4 forms acrylamide-acrylic acid microgels which are distilled to remove water and give a product having a particle size less than 2 microns. Example 5 shows a similar water-swellable microgel product in which the mean particle diameter is stated to be about 1 micrometer.

41.

REDACTED

As to the latter two patents, these have been previously discussed REDACTED As is clear from the '766 patent, the unswollen number average particle size are measured using the QELS technique on the microemulsion itself. Anyone of ordinary skill in the art reading the '808 and '766 patents, in my view, would appreciate the relationship between the two, given the cross reference mentioned at Col. 3, ll. 37-39 of the '808 patent. Further, the '766 patent references that the polymeric microbeads are preferably prepared by the polymerization of the monomers in

.an emulsion as disclosed in what I understand was the parent application which led to the '808 patent.

42.    Also, several of the Examples in the '808 patent reference the particle size of the anionic microbeads prepared, the number average particle size in nanometers being set forth for example in Table I. There is no indication that the emulsions prepared in the '808 Examples were dried, and there is no indication that the number average particle size given was for particles which had been removed from an emulsion and dried by whatever means. If the particle size were in fact for dried particles, as opposed to the size of the polymer in the emulsion, the '808 patent itself would have so stated. REDACTED

43.    In summary, it is my opinion that to anyone in this field at the time the Zweigle '066 patent does not disclose a composition as claimed in claim 1 of the '808 patent in which the microparticles have an unswollen average particle size diameter of less than 0.75 microns as measured by the QELS technique on the microemulsion. The specific Examples of the Zweigle et al. patent support my view, see specifically Examples 4 and 5. In each Example, even the dried particles would be expected to have averages by the QELS method that would be in excess of 750 nanometers. Indeed, in the dispersion of Example 5, the mean particle diameter of the microgels is 1 micrometer (micron), certainly more than what is set forth in claim 1, and, as well, claim 6 of the '808 patent (directed to particle sizes of less than 0.5 micron).

IV.    MATERIALITY

44.

REDACTED

REDACTED

Secondly, as I have also previously set forth, the Farrar et al. '856 patent, in my view, is at least as pertinent to the issues here as is the Flesher '346 patent. Also, with regard to the '766 patent, the Japanese patent, JP 235596/63, identified in the Background of the Invention, is, in my view, closer than either the Allen '321 or the Zweigle '066 patents.

V.    HYPERMER® IS A CROSSLINKER

45.

REDACTED

I disagree for the reasons set forth in my prior expert report, specifically paragraphs 14-22.

46.

REDACTED

However, I am unaware that anyone had studied the Hypermer® surfactant and developed the conditions under which the Hypermer® surfactant would function as a crosslinking agent.

VI.    THE PARTICLE SIZE LIMITATIONS IN THE '808 AND '766 PATENT CLAIMS

REDACTED

- 17 -

REDACTED

In the first place, the thrust of the '766 patent is that the claimed microparticles provide significant advantages when used as a retention and drainage aid in papermaking in comparison to the size particles resulting from conventional inverse emulsions. This point is made by providing comparisons in the Examples, as previously discussed.

48.    Accordingly, any of the few instruments I believe were available at the time (*i.e.*, in 1990), could have been used to verify the size of the particles. Even further, if it were necessary to determine which instrument was used, among the few choices available at the time, it would have been simple and straightforward to make that determination. Specifically, one could simply replicate the patent Example and then determine the number average particle size by using the instruments available.

49.    With regard to the '808 patent, as previously discussed, the '808 patent makes reference to the patent applications which correspond to the two applications from which the '766 patent issued. Additionally, the '766 patent makes reference (*see* Col. 6, ll. 63-66) to the first of the two applications from which the '808 patent issued. So, if there were any issue as to the technique used for the number average particle size, anyone in this field would have looked to the '766 patent. Also, as the Tables in the '808 patent providing the particle size data do not indicate that the particle sizes were for dried particles (such as was done in other of the patents

- 18 -

discussed herein); one skilled in the art would have expected that the particle sizes were determined based upon the size in the microemulsion itself. And that point is verified from the '766 patent.

Date: _Aug 18 2005_

_R. Gilbert_
Robert G. Gilbert, Ph.D.

# Exhibit
# 5

Redacted