# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF' DELAWARE

|  |  |  |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C. A. No. 04-293 (KAJ) |
| v. | ) ) | **PUBLIC VERSION** |
| HERCULES INCORPORATED and CYTEC INDUSTRIES, INC., | ) ) ) | |
| Defendants. | ) ) ) ) | |

## <u>EXPERT REPORT OF JAMES E. MALACKOWSKI</u>

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
OF COUNSEL:                              Wilmington, DE 19899-0951
Tel: (302) 984-6000
Ford F. Farabow, Jr.                     rhorwitz@potteranderson.com
Joann M. Neth                            dmoore@potteranderson.com
Eric J. Fues
A. Neal Seth                             *Attorneys for Defendant*
FINNEGAN, HENDERSON, FARABOW,            *Hercules Incorporated*
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000


Dated: September 23, 2005
Public Version Dated: October 5, 2005

# CIBA SPECIALTY CHEMICALS CORP.
## v.
# HERCULES INCORPORATED & CYTEC INDUSTRIES, INC.

### EXPERT REPORT OF JAMES E. MALACKOWSKI

### SEPTEMBER 23, 2005

## OCEAN TOMO

### EXPERT SERVICES

1.     FIRM BACKGROUND AND EXPERT QUALIFICATIONS ...................................................1

2.     ASSIGNMENT ...................................................................................................................2

3.     SUMMARY OF OPINIONS ...............................................................................................3

4.     PARTIES AT ISSUE ...........................................................................................................4
   4.1     HERCULES, INC. ........................................................................................................4
   4.2     CYTEC INDUSTRIES, INC. ...........................................................................................5
   4.3     CIBA SPECIALTY CHEMICALS CORPORATION ...............................................................6

5.     PATENTS AT ISSUE AND RELATED TECHNOLOGY.......................................................7
   5.1     CIBA PATENTS ..........................................................................................................7
   5.2     HERCULES PATENT .....................................................................................................7

6.     MARKET BACKGROUND AND OVERVIEW......................................................................8
   6.1     NORTH AMERICAN PULP AND PAPER CHEMICALS MARKET .......................................... 8
   6.2     NORTH AMERICAN DRAINAGE AND RETENTION AIDS MARKET..................................... 8
   6.3     MICROPARTICLE TECHNOLOGY IN PAPERMAKING ...................................................... 9

7.     PRODUCTS AT ISSUE .......................................................................................................9
   7.1     PERFORM SP9232 ......................................................................................................9
   7.2     POLYFLEX CP.3 ("POLYFLEX") ................................................................................ 10

8.     TIMELINE OF RELEVANT EVENTS ...............................................................................11

9.     LOST PROFITS BACKGROUND........................................................................................11

10.    LOST PROFITS DETERMINATION ..................................................................................12
   10.1    CORRECTION TO MR. TATE'S DAMAGES PERIOD ...................................................... 13
   10.2    CORRECTION TO MR. TATE'S LOST PROFIT ANALYSIS OF PERFORM SP9232 ............. 13
   10.3    CORRECTION TO MR. TATE'S LOST PROFIT ANALYSIS OF ASSOCIATED PRODUCTS....... 14

11.    REASONABLE ROYALTY COMPENSATION ...................................................................17
   11.1    REASONABLE ROYALTY OVERVIEW............................................................................ 17
   11.2    DATE OF HYPOTHETICAL NEGOTIATION..................................................................... 18
   11.3    QUANTITATIVE ROYALTY RATE FACTOR ANALYSIS ................................................... 18
   11.4    GEORGIA PACIFIC FACTOR ANALYSIS ........................................................................ 19
   11.5    REASONABLE ROYALTY RATE CONCLUSION................................................................ 24
   11.6    COMPUTATION OF REASONABLE ROYALTY COMPENSATION ........................................ 24

12.    SUMMARY OF CONCLUSIONS.........................................................................................25

13.    PREJUDGMENT INTEREST ............................................................................................26

14.    COUNTERVAILING FACTS AND RESONABLENESS TESTS ...........................................26
   14.1    DIRECT CONVERSION OF SOME CUSTOMERS .............................................................. 26
   14.2    IMPLIED ROYALTY RATES BASED ON THE CIBA/HERCULES SITE LICENSE AGREEMENT . 26

15.    PROFESSIONAL STANDARDS.........................................................................................27

16.    CONCLUSION..................................................................................................................29

## 1.   FIRM BACKGROUND AND EXPERT QUALIFICATIONS

My name is James E. Malackowski. I am the President and Chief Executive Officer of Ocean Tomo[1], an integrated intellectual capital merchant banc providing expert services, valuation services, asset management, M&A advisory, and risk management services. Ocean Tomo assists clients – corporations, law firms, governments, and institutional investors – in maximizing value from their Intellectual Capital Equity™ broadly defined. Ocean Tomo, on behalf of its clients as well as for its own use, seeks to maximize the value and benefits inherent within the rapid growth of intellectual property as an asset class.

Prior to forming Ocean Tomo (and its predecessor Duff & Phelps Capital Partners), I spent two years with one of Chicago's leading private equity firms and fifteen years as a management consultant and forensic accountant focused on intangible assets. I have consulted with clients and counsel on business valuation issues as well as all phases of the technology licensing process. Clients frequently retain me to consult on a variety of valuation projects including valuations of intangible assets for purposes of licensing, mergers and acquisitions, and tax strategy planning

I have been retained to provide assessments of appropriate royalty rates in preparation for licensing negotiations and have participated in licensing negotiations as both a principal as well as on behalf of clients. Through active involvement in licensing and intellectual property professional associations, I have frequently consulted with other licensing practitioners regarding licensing practice and theory.

I am frequently asked to participate as a member of the Board of Directors for leading technology corporations or firms with critical brand management issues. My expertise extends to intangible asset portfolios as well as business segments and complete entities. I have supervised and participated in the determination of damages in a variety of commercial litigation engagements. Most of those assignments have involved determination of damages related to intellectual property infringement claims.

I am a current and prior Director of numerous corporate entities, both public and private. I am a Past President of The Licensing Executives Society, a Trustee for the National Inventors Hall of Fame, a Director of the International Intellectual Property Institute, and a former Resident Advisor for the U.S. Department of Commerce and U.S. Information Agency on matters relating to intellectual capital. In 1988, I co-founded IPC Group, Inc. (now InteCap, Inc.), the nation's largest consulting firm focused on intellectual capital valuation and strategy. Intecap is now part of Charles River Associates, Inc.

I am a Summa Cum Laude graduate from the University of Notre Dame majoring in accountancy and philosophy. I am also a Certified Public Accountant in the State of Illinois.

I have written several articles and have given numerous presentations related to my profession. A complete list of such articles and presentations are provided in my curriculum vitae, attached as Appendix 1 along with a complete listing of my prior testimony.

Based on this personal experience, I will provide testimony to this Court with respect to the issue of patent damages. In preparing this report, I have utilized similar processes, methodologies, analyses, and principles that I would ordinarily apply in performing Ocean Tomo's extensive non-litigation consulting services.

---

[1] Ocean Tomo is an Intellectual Capital Banc appropriately authorized by the State of Illinois.

Highly Sensitive Confidential – Subject to Protective Order

Ocean Tomo is presently being compensated for my work in this matter at a rate of $495 per hour. Other Ocean Tomo consultants are assisting me in this engagement and are being compensated at various rates under $495.

## 2.    ASSIGNMENT

Ocean Tomo was retained for defendants Hercules Inc. and Cytec Industries, Inc., referred to hereafter as "Hercules" and "Cytec" respectively, by counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, and Goodwin Procter, LLP, respectively, in connection with this matter. Ocean Tomo was asked to review and assess the August 25, 2005 report of Plaintiff's expert, Michael E. Tate (the "Tate Report") and to analyze certain accounting, financial, marketing, and other business data in order to identify the compensation that would be appropriate for Ciba Specialty Chemicals Corporation ("Ciba") to receive in the event liability is found. Nothing in this report is meant to endorse the existence of liability or to endorse Plaintiff's entitlement to compensation.[2]

In order to accurately assess damages that may be recoverable if liability is found, I have relied upon:

- Legal filings and proceedings related to the case, including but not limited to, the complaint and answer, and U.S. Patents Nos. 5,167,766 and 5,171,808.

- Documents produced by Hercules, Cytec, and Ciba relating to damages, including but not limited to, financial records, sales records, agreements, marketing documents, service materials, and promotional materials.

- The expert reports of the following:

    - Robert G. Gilbert, Ph.D.
    - John T. Goolkasian, Esq.
    - Clarence A. King, Ph.D.
    - Michael E. Tate
    - Norman J. Wagner, Ph.D.
    - Robert K. Prud'homme, Ph.D.

- Transcripts of the depositions taken in this action of the following Hercules representatives:

    - Robert A. Gelman, Ph.D. – July 1, 2005
    - James R. Davis – August 9, 2005.

- Transcripts of the depositions taken in this action of the following Cytec representatives:

    - John J. Mangano – August 17, 2005
    - Brian McCall – August 18, 2005
    - Paul S. Waterman – July 7, 2005.

---

[2] The Expert Report of Michael E. Tate dated July 22, 2005 is also being considered in this rebuttal report.

Highly Sensitive Confidential – Subject to Protective Order

▫   Transcripts of the depositions taken in this action of the following Ciba representatives:

  ▫   Michael B. Heard, Ph.D. – June 30, 2005

  ▫   Stephen R. Tremont – September 9, 2005.

▫   Independent research.

A detailed listing of documents reviewed by Ocean Tomo in connection with this litigation to date is attached as Appendix 2.

In addition to the above-referenced documents, I also relied on conversations with Hercules and Cytec personnel and reviewed the technical expert reports filed on behalf of Hercules and Cytec in this matter. Ocean Tomo has had conversations with the following Hercules and Cytec employees, including but not limited to:

▫   James R. Davis – Business Manager, Retention and Drainage area

▫   Brian McCall – Controller, Operation Services for Cytec Performance Specialties Business Unit

▫   Robert A. Gelman, Ph.D. – Research Fellow

▫   Richard D. Royce, Ph.D.

These discussions provided foundation on the parties-in-suit, the patented technologies, the relevant markets, and other information for use in my analyses.

The following report and accompanying analyses summarize my current opinions on the potential damages incurred by Ciba as a result of Hercules' alleged infringement of the following patents: the '766 patent issued December 1, 1992 and the '808 patent issued December 15, 1992. I may also provide background information relating to how one calculates patent infringement damages and reasonable royalties based on my experience summarized in my Curriculum Vitae. The information in this report is based upon discovery to date and the information that is currently available. The analyses and opinions described herein are subject to change based upon additional discovery, expert depositions, the Court's claim construction, or other developments.

3.    **SUMMARY OF OPINIONS**

In the event liability is found, it is my opinion that the proper measure of compensation in this case would be the payment of lost profits for sales of Hercules' allegedly infringing sales of PerForm SP9232 and also a reasonable royalty to Ciba on the remaining sales of PerForm SP9232 product that was made, used, or sold in the United States during the relevant period, as well as several associated products sold by Hercules. At trial, I will offer my opinion that a reasonable royalty that Hercules would be expected to pay for a license of the '766 and '808 patents would be within the range of

## Redacted

I understand that there may be additional discovery that relates to the issues addressed in this report. I also understand that the Court will issue a claim construction order. Accordingly, I may supplement this report as additional information or the Court's claim construction order becomes available. In addition, I reserve the right to provide rebuttal opinion and testimony in response to any expert opinions not in Ciba's opening expert reports or in rebuttal to testimony offered by Ciba's experts, as well as rebuttal testimony to any of Ciba's fact witnesses, and to modify my analysis for minor clerical issues. I further reserve the right to use animations, demonstratives, enlargements of real evidence, and other devices to illustrate my opinions at trial.

## 4.    PARTIES AT ISSUE

### 4.1  Hercules, Inc.

**HERCULES**   Hercules Incorporated (NYSE: HPC), established in 1912, manufactures and markets specialty chemicals in approximately 125 countries. The primary markets Hercules serves include: pulp and paper; paints and adhesives; construction materials; food, pharmaceutical, and personal care; and industrial specialties. The products at issue in this case are part of the pulp and paper segment. Hercules operates four operating divisions through their two business segments; Performance Products and Engineered Materials. The Performance Products segment operates the Pulp and Paper and the Aqualon divisions, with manufacturing plants located throughout Europe, Asia, and North America, and a joint venture in China. The Pulp and Paper division provides multinational manufacturers of consumer paper products and packaging manufacturers with functional additives, processing, and water treatment chemicals. Hercules' paper chemicals products increase the speed and run-ability of paper-making machines, and enhance the quality of the paper products. Hercules sells its products under the trademarks of PerForm®, Reten®, PuraChem®, and Galactasol®.[3]

Major competitors of Hercules include: Akzo Nobel N.V, BASF AG, Ciba Specialty Chemicals Holding, Inc., Dow Chemical Co., Kemira Group, Lubrizol Corp., Nalco Holding Co., and Noveon Inc.[4]

On May 21, 2000, Hercules purchased Quaker Chemical Corp.'s Pulp and Paper Division for an undisclosed amount. Quaker's unit previously had revenues of approximately $8 million.[5]

Hercules emphasizes the importance of innovation and stresses the value in intellectual property,[6] documenting patents and trademarks using a system called Data Master. Each business unit also has Technology Asset Management (TAM) meetings comprised of research, business, and marketing specialists to discuss relevant technology and discuss strategic plans to develop, file, and protect patents.[7]

---

[3] Herc.com
[4] Electronic resource:Capital IQ.
[5] Electronic resource:Capital IQ
[6] Lynch, Heather. "Courting Customer Satisfaction." *Pulp and Paper Canada* (October 2004). 30 June 2005. http://www.pulpandpapercanada.com
[7] Walsh, Kerri. "Taking Stock of Intellectual Capital." *Chemical Specialties* (November 1999). Lexis Nexis Academic

Highly Sensitive Confidential – Subject to Protective Order

| Hercules Inc. (NYSE:HPC) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Millions USD | | | | | | |
| **Entire Company** | | | | | | |
| For the Fiscal Period Ending | 12 months 12/31/2000 | 12 months 12/31/2001 | 12 months 12/31/2002 | 12 months 12/31/2003 | 12 months 12/31/2004 | Annualized 12 months 6/30/2005 |
| Total Revenue | 2,303.0 | 1,776.0 | 1,705.0 | 1,846.0 | 1,997.0 | 2,055.3 |
| Growth Over Prior Year | (30.4%) | (22.9%) | (4.0%) | 8.3% | 8.2% | 7.8% |
| Net Income | 98.0 | (53.0) | (611.0) | 45.0 | 27.0 | 10.7 |
| Margin % | 4.3% | (3.0%) | (35.8%) | 2.4% | 1.4% | 0.5% |

| **By Business Segment** | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| For the Fiscal Year | 2002 12 months | | 2003 12 months | | 2004 12 months | |
| Revenues | | | | | | |
| Performance Products | 1,385.0 | 81.23% | 1,483.0 | 80.34% | 1,617.0 | 80.97% |
| Engineered Materials and Additives | 320.0 | 18.77% | 363.0 | 19.66% | 380.0 | 19.03% |
| Corporate | - | 0.00% | - | 0.00% | - | 0.00% |
| Total | 1,705.0 | 100.00% | 1,846.0 | 100.00% | 1,997.0 | 100.00% |

Exhibit: Hercules Historical Revenues and Net Income (Millions USD)[8]

## 4.2 Cytec Industries, Inc.



**CYTEC**

*Technology ahead of its time •*

Cytec Industries, Inc., founded in 1993 after divesting from its parent American Cyanamid, is headquartered in West Paterson, New Jersey and has manufacturing plants in ten countries. The Company currently is managed by four segments: Water and Industrial Process Chemicals, Performance Products, Specialty Materials, and Building Block Chemicals. Cytec operates within the major markets of aerospace, automotive and industrial coatings, chemical intermediaries, mining, plastics, and water treatments.[9]

In 2003, Cytec sold off its Paper Chemicals unit to two separate strategic buyers. The Paper Sizing and Strength Chemicals division was sold to Bayer for $90 million. Ciba Specialty Chemicals purchased the other portion of the Paper Chemicals business, including the Polyflex, Accurac, Cydrain, and Cypro trade names for $23 million. Subsequent to the sale, Cytec continued to manufacture certain products for Ciba at its own facilities under an existing agreement.[10]

[8] Electronic resource: Capital IQ.
[9] Electronic resource: Capital IQ.
[10] Piccione, Joe. "Cytec Sells Paper Chemicals to Ciba." Pulp and Paper Canada. July 2001. http://pulpandpapercanada.com. 7/1/2005

Highly Sensitive Confidential – Subject to Protective Order

**4.3   Ciba Specialty Chemicals Corporation**



**Ciba**

Ciba Specialty Chemicals Holding, Inc. is a publicly traded company (SWX: CIBN, NYSE: CSB) headquartered in Basel, Switzerland. The Company divested from its parent in 1996 and employs just over 19,000 people globally. The Company supplies customers in 120 countries from their manufacturing facilities in 28 countries, providing specialty chemicals through their four business segments: Plastic Additives, Coating Effects, Water and Paper Treatment, and Textile Effects.[11]  The Water and Paper Treatment unit serves primarily the paper, municipal and industrial water industries, as well as the detergents and hygiene industries. Like Hercules, Ciba's paper chemicals products improve speed in manufacturing and enhance the quality of paper products. This segment features the product line TELIOFORM ® for retention and drainage aids (RDA) and PERGAFAST ™ for color development.[12]  On August 31, 2000, Ciba Specialty Chemicals Water Treatments expanded their business, purchasing Cytec's Polyflex and RDA businesses for   Redacted

Major competitors of Ciba include: BASF AG, Bayer AG, Clariant SA, Cytec Industries, Inc., Degussa AG, Dow Chemical Co., El Dupont de Nemours & Co., Hercules, Inc., Kemira Group, and Nalco Holding Co.[14]

| CIBA Specialty Chemicals Holding, Inc. (NYSE:CSB) | | | | | | |
|---|---|---|---|---|---|---|
| Millions USD | | | | | | |
| **Entire Company** | | | | | | |
| | | | | | | Annualized |
| | 12 months | 12 months | 12 months | 12 months | 12 months | 12 months |
| For the Fiscal Period Ending | 12/31/2000 | 12/31/2001 | 12/31/2002 | 12/31/2003 | 12/31/2004 | 6/30/2005 |
| Total Revenue | 4,876.3 | 4,437.1 | 5,124.1 | 5,373.8 | 6,179.5 | 5,675.6 |
| Growth Over Prior Year | 9.1% | (6.8%) | (3.8%) | (6.2%) | 5.7% | 9.0% |
| Net Income | 278.9 | 230.1 | 293.6 | 278.1 | 273.5 | 199.8 |
| Margin % | 5.7% | 5.2% | 5.7% | 5.2% | 4.4% | 3.5% |

| **By Business Segment** | | | | | |
|---|---|---|---|---|---|
| | 2002 | | 2003 | | 2004 | |
| For the Fiscal Year | 12 months | | 12 months | | 12 months | |
| Revenues | | | | | | |
| Plastic Additives | 1,376.3 | 26.86% | 1,473.2 | 27.41% | 1,666.5 | 26.97% |
| Coating Effects | 1,388.6 | 27.10% | 1,461.1 | 27.19% | 1,598.7 | 25.87% |
| Water and Paper Treatment | 1,242.5 | 24.25% | 1,306.7 | 24.32% | 1,771.1 | 28.66% |
| Textile Effects | 1,116.7 | 21.79% | 1,132.8 | 21.08% | 1,143.2 | 18.50% |
| Corporate and Other | - | 0.00% | - | 0.00% | - | 0.00% |
| Total | 5,124.1 | 100.00% | 5,373.8 | 100.00% | 6,179.5 | 100.00% |

Exhibit: Ciba Historical Revenues and Net Income (Millions USD)[15]

---

[11] NYSE.com "Ciba Specialty Holding Company Profile."
[12] Ciba Specialty Chemicals Form 20-F  Fiscal year ended December 31, 2004          Redacted

[14] Electronic resource: Capital IQ.
[15] Electronic resource: Capital IQ.

Highly Sensitive Confidential – Subject to Protective Order

## 5.     PATENTS AT ISSUE AND RELATED TECHNOLOGY

### 5.1   Ciba Patents

This case relates to the alleged infringement by Defendants of U.S. Patent Number 5,167,766 ('766 patent) and U.S. Patent Number 5,171,808 ('808 patent) to which Ciba claims title.

The '766 patent issued December 1, 1992 entitled "Charged Organic Polymer Microbeads in Paper Making Process."[16]

> *In a papermaking process, improved drainage and retention are obtained when ionic, organic microbeads of less than about 1,000 nm in diameter if crosslinked or less about than 60 nm in diameter if noncrosslinked are added either alone or in combination with a high molecular weight organic polymer, and/or polysaccharide. Further addition of alum enhances drainage formation and retention properties in papermaking stock with and without the present of other additives used in papermaking processes*

It is my understanding that the '766 patent describes a method of improving the drainage and retention properties during wet end papermaking by adding crosslinked or noncrossedlinked organic microbeads. The technology enhances the drainage formation and retention in papermaking stock.

The United States Patent Trademark Office shows that this patent relies upon one independent and twenty-seven dependent claims.[17]

The '808 patent issued December 15, 1992 entitled "Cross-linked Anionic and Amphoteric Ploymeric Microparticles."[18]

> *Novel compositions comprising anionic and/or amphoteric organic polymeric microparticles are disclosed, along with a method for their production. The products are useful in flocculating a wide variety of dispersions of suspended solids and in papermaking*

It is my understanding that the '808 patent describes a method for improving drainage and retention through aiding in flocculating solids and forming aggregate fluffy masses during the papermaking process.

The United States Patent Trademark Office shows that this patent relies upon one independent and twenty dependent claims.[19]

### 5.2   Hercules Patent

Hercules Inc. has also filed a patent application, Number US 2004/0102528 A1 on December 6, 2002 The application is entitled "Anionic Copolymers Prepared in an Inverse Emulsion Matrix and Their Use in Preparing Cellulosic Fiber Compositions."[20]

---

[16] U.S. Patent 5,167,766
[17] USPTO
[18] U.S. Patent 5.171,808
[19] USPTO.
[20] U.S. Patent Application 2004/0102528 A1

Highly Sensitive Confidential – Subject to Protective Order

*A papermaking method and a compsition which utilize, as a drainage aid, a water-soluble anionic copolyer prepared via a water-in-oil polymerization technique that, absent a cross-linking agent, is characterized by a Huggins' constant (k') determined in .01M NaCl greater than .75 and a storage modulus (G') for a 1.5 wt. % actives polymer solution at 4.6 Hz greater than 175 Pa.*

This patent application is pending with the United States Patent & Trademark Office.

## 6.    MARKET BACKGROUND AND OVERVIEW

### 6.1   North American Pulp and Paper Chemicals Market

The North American pulp and paper chemicals market includes over 200 manufacturers, supplying paper producers with chemicals to aid in pulp processing and the functionality of the paper product. The pulp and paper chemicals market faces many of the same challenges seen across the manufacturing industry, including the effect of product commoditization on prices, the competitive strategies employed by other participants, new technologies, and transforming economic conditions. The industry also faces stringent regulations related to chemical use, the development of offshore manufacturers, and the competitive strategies employed by market participants to overcome the declining demand for the end product.[21]

In 2003, the pulp and paper chemicals manufacturers of North America generated revenues of $4.68 billion, selling over 21 billion pounds of product. It is estimated that this market will grow at an average compounded rate of 2.1% to $5.43 billion in 2010.[22]

### 6.2   North American Drainage and Retention Aids Market

The drainage and retention aids market is a segment within the larger pulp and paper chemicals market. The market players provide several products broadly categorized as coagulants, flocculants, and microparticle systems, all improving the process and the quality of the final product. The trend towards the use of recycled materials and fillers while minimizing environmental complications places a high pressure on this market segment.[23]  Major participants presently include BASF, Ciba Specialty Chemicals, EKA Chemicals, Hercules, and Nalco, although acquisitions and restructuring frequently takes place within this market.[24]

The market is driven predominantly by the competitive factors of price, quality, and performance. Although manufacturers face immense pressure from customers to keep their prices low, the varying costs of raw materials, energy, and transportation force manufacturers into price hikes.[25]  In 2003, the market was experiencing medium growth generating $327 million in revenues and selling 262 million

---

[21] "Total North American Pulp and Paper Chemicals Market". Ch. 2. Pgs 3-6. Frost and Sullivan 2004 www.frost.com.
[22] "Total North American Pulp and Paper Chemicals Market". Ch. 2. Pg 7. Frost and Sullivan 2004 www.frost.com.
[23] "Strategic Analysis of North American Pulp and Paper Chemicals Markets: Drainage and Retention Aids Market" Ch. 9, Pgs 1-3. Frost and Sullivan 2004. www.frost.com. Oct. 24, 2004.
[24] "Strategic Analysis of North American Pulp and Paper Chemicals Markets: Drainage and Retention Aids Market" Ch. 9, Pgs 1-3. Frost and Sullivan 2004. www.frost.com. Oct. 24, 2004.
[25] "Strategic Analysis of North American Pulp and Paper Chemicals Markets: Drainage and Retention Aids Market". Ch. 9, Pg 10. Frost and Sullivan 2004. www.frost.com. Oct. 24, 2004.

Highly Sensitive Confidential – Subject to Protective Order

pounds of product. By the year 2010, the market is expected to reach just over $383 million in revenues.[26]

### 6.3  Microparticle Technology in Papermaking

Microparticles or micropolymers function by releasing the water from the fibers or fine particles and create more streamlined paths for the water to flow around the fibers, thus improving the drainage and the ultimate quality of the paper. Several types of microparticles are used within the papermaking industry, mainly colloidal silica, bentonite, and certain organic products, all which have a negative colloidal[27] charge and high surface area. They are usually added downstream from a cationic retention aid or starch, improving the dewatering process.[28]

## 7.    PRODUCTS AT ISSUE

### 7.1  PerForm SP9232

 Hercules' PerForm SP system is a "structured organic particulate" technology, often used with either a cationic[29] or anionic[30] flocculant[31], to provide high levels of retention and drainage in wet end chemistry.[32] The system is comprised of many products, but is lead by the flagship product PerForm SP9232, a product developed and introduced to the market by Hercules in March of 2002. Specifically, PerForm SP9232 combines the drainage benefits of traditional microparticles (silica or bentonite) with the retention capabilities of micropolymers,[33] "providing superior ash retention and controllable drainage with reduce sensitivity to system chemistry variations in neutral and alkaline pH grades."[34] PerForm SP9232 is often sold as a system with anionic and cationic complementary products.

Several competitors offer products that could be considered substitutes for PerForm SP9232 at varying costs and of varying qualities. The table below summarizes some of these alternatives.

---

[26] "Strategic Analysis of North American Pulp and Paper Chemicals Markets: Drainage and Retention Aids Market". Ch. 9, Pgs 10. Frost and Sullivan 2004. www.frost.com Oct. 24, 2004.
[27] A colloidal substance has the following attributes: (a) at least two phases, (b) at least one dimension of a liquid or solid phase than is less than one micro-meter, and (c) properties that are dominated by interactions within and between surfaces. Examples include suspensions, emulsions, foams, and aerosols. (www4.ncsu.edu/~hubbe/Defnitns/Colloid.htm)
[28] "Microparticles." Mini-Encyclopedia of Papermaking Wet-End Chemistry. www4.ncsu.edu/~hubbe/MCRO. 6/30/2005.
[29] A cationic material has a net positive charge (www4.ncsu.edu/~hubbe/Defnitns/Cationic.htm).
[30] An anionic substance has a net negative charge (www4.ncsu.edu/~hubbe/Defnitns/Anionic.htm).
[31] A flocculant is a reagent added to a dispersion of solids in a liquid to bring together the fine particles to form flocs. (www.eionet.eu.int/gemet/concept?cp=3294).
[32] Herc.com.
[33] Herc.com.
[34] Lynch, Heather  "Courting Customer Satisfaction"  Pulp and Paper Canada  October 2004. www.pulpandpapercanada.com.

| Supplier | Product Description | Trade Name(s) |
|---|---|---|
| Eka Chemicals | | |
| | Anionic silica sol | BMA-0, NP 590, NP 670, NP 780, NP 890, NP 090, NP 200, NP 320, NP 442 |
| | Cationic starches | CS Series |
| | Cationic polyacrylamide | PL Series |
| | Cationic polyacrylamide | ATC Series |
| Buckman Labs | | |
| | Cationic polyacrylamide | MP 830, MP 9835 |
| | Anionic inorganic | MP 810 |
| | Cationic boehmite | MP 820, MP825 |
| Ciba | | |
| | Anionic silica sol | Particol Series |
| | Bentonite clay | Hydrocol Series |
| Kemira | | |
| | Amphoteric microparticle | Fennosil FS 158, Fennosil A, Fennosil L, Fennosil 515, Fennopol, FennoREt |
| Ondeo Nalco | | |
| | Anionic silica sol | Positek 8629, Positek 8671 |
| | Anionic polymer | Positek 8677 Plus |
| | Naphthalene Sulphonate | Positek 8678 |
| | Collodial silica | Positek 8691 |
| | Anionic borosilicate | Positek 8692 |

Redacted

## 7.2 Polyflex CP.3 ("Polyflex")

Ciba offers a platform of products and technologies under the trademark Telioform for improved retention, drainage, and formation. This product offering includes Percol, Hydrocol, Particol, Polyflex, Raisarun, Rasafloc, and Raisaform. Specifically, the Polyflex micropolymer technology provides the combined runability, cost performance, and handling ease of a liquid polymer with the high drainage, retention, and formation benefits of an inorganic microparticle.[36]

Polyflex was first introduced to the market by Cytec Industries, Inc. during 1997 and the product line was sold to Ciba on August 31, 2000

Redacted

---

[35] CibaSC.com

Highly Sensitive Confidential – Subject to Protective Order

Redacted

## 8.    TIMELINE OF RELEVANT EVENTS

Redacted

## 9.    LOST PROFITS BACKGROUND

Damages in patent infringement cases are governed by 35 U.S.C. Section 284.

Damages are commonly split into two broad categories: lost profits and reasonable royalties. In order for a claim of lost profits to succeed, the patent owner must generally satisfy a "but-for" test. This is typically done by performing an analysis of the factors derived from the *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.* case.[38] ("*Panduit*") These factors include: (a) demand for the patented product during the period of infringement; (b) absence of acceptable, non-infringing substitutes during the period of infringement; (c) manufacturing and marketing capabilities to supply the patented product; and (d) adequate financial data and analysis to determine the amount of profit the patentee would have made. Mr. Tates's analysis utilizes these factors and I have done the same.

———————————————

Redacted

[38] Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978)

Highly Sensitive Confidential – Subject to Protective Order



In the event that any of the *Panduit* factors are not satisfied and lost profit damages are not available, the appropriate measure of damages is a reasonable royalty to the patent holder for the infringer's use of the technology. I have investigated both forms of damages in this case.

## 10. LOST PROFITS DETERMINATION

It is my understanding that Hercules denies any infringement of its products with regard to the Ciba patents. Additionally, I understand that Hercules spends millions of dollars working with paper mills each year in an attempt to show the quality and value of its chemicals in hopes of attaining trials and ultimately sales to these mills. However, in a patent infringement damages analysis, I must assume infringement in order to calculate damages. This required assumption is not meant to detract from Hercules' evidence and arguments for non-infringement and/or invalidity of the patents-in-suit.

With that prelude, Mr. Tate provides an analysis of the *Panduit* factors in order to support his opinion of                in lost profit damages. In general, I agree with much of Mr. Tate's efforts in this regard, and incorporate the facts he referred to by reference here concerning the allegedly infringing PerForm SP9232 product. However, I believe that Mr. Tate has neglected several facts that significantly change his analysis of the lost profits on associated products. I have taken those facts into account and corrected Mr. Tate's analysis for fact differences and clerical discrepancies, as well as differences of legal opinion between the parties at issue.

Redacted

**10.1 Correction to Mr. Tate's Damages Period**

It is my understanding that the period for which damages are recoverable by a Plaintiff in a patent infringement lawsuit cannot begin until the Defendant receives constructive notice of infringement by the patentee marking its products sold under the patent with the patent numbers, which Ciba has not done, or receives an actual notice of infringement from the patentee. I have been instructed by counsel that Hercules did not receive constructive notice in this matter until the filing of the complaint on May 7, 2004. As such, I have adjusted Mr. Tate's approach to calculating damages to reflect the correct damages period. [39]

**10.2 Correction to Mr. Tate's Lost Profit Analysis of PerForm SP9232**

Generally, I agree with Mr. Tate's determination of lost profits on the sale of the Polyflex CP 3 due to Hercules' sales of PerForm SP9232. [40] I have therefore calculated lost profits on the sales of PerForm SP9232 during the relevant period and agree with Mr. Tate's analysis for the applicable part of 2004 and 2005.

Redacted

This information, and more like it, may very well result in the jury determining that the "but-for" test as measured by the *Panduit* factors has not been sufficiently met by Mr. Tate; thus an award of reasonable royalty only is appropriate. I have therefore, as Mr. Tate did, also included a calculation for reasonable royalty only damages in Appendix 4. My opinion of a reasonable royalty rate for the technology at issue and supporting analysis are outlined later in this report.

Redacted

---

[40] I have some disagreement with Mr. Tate's analysis. However, due to the materiality of those issues, I have chosen not to specifically correct them.

[41] In the event Ciba is able to collect damages beginning in October 2002, the damages due for lost profits from Hercules' sales of PerForm would be approximately          My approach mirrors Mr. Tate's; however, I have corrected for what appears to be several clerical errors in his calculations for 2003. See Appendix 5.

Redacted

Highly Sensitive Confidential – Subject to Protective Order

**10.3 Correction to Mr. Tate's Lost Profit Analysis of Associated Products**

Redacted

In my opinion, the appropriate measurement of damages on these sales is a reasonable royalty, because Mr. Tate's analysis and the facts in this matter do not satisfy the above cited *Panduit* test in the "but-for" world.[48]

First, the actual buying pattern of the customers for these products does not support the requirement for the "demand" for the patented feature.

Redacted

Second, there are numerous alternative products sold by multiple companies.[50]    Redacted

The makeup of the market does not imply that "but-for" these customers' purchase of the associated products from Hercules they would have purchased the equivalent products in the equivalent quantities from Ciba.

Third, Mr. Tate's quantification of Ciba's "but-for" sales of associated products simply assumes all quantities of these associated products sold to a customer that bought PerForm SP9232 would have been sold by Ciba along with Polyflex CP.3.

Redacted

Redacted

---

[48] If the court's claim construction or other rulings or decisions determine that the associated products are not infringing the patent claims; then it is my opinion that these sales would only be considered in the context of determining a reasonable royalty rate and not included in the royalty base.

[50] See table in Section 7.1.    Redacted

Highly Sensitive Confidential – Subject to Protective Order

Redacted

---

Redacted

Finally, Mr. Tate includes several Hercules products in his damages base for lost profits on associated products for which he does not offer a "comparable product" available from Ciba.[54]

Redacted

[55] Mr. Tate's expert report offers no rationale or basis for his inclusion of these products in his calculation of damages due Ciba from lost profits on associated products.

Mr. Tate also ignores several selling price differences between the Ciba products and the allegedly comparable Hercules products which raises a question of whether the price elasticity of demand would alter his number of infringing units.

For at least these material reasons, Mr. Tate's analysis of the *Panduit* quantification factor is materially flawed and renders his conclusion speculative and therefore unacceptable. Thus, I have included all of the revenues associated with Hercules' sales of associated products, along with revenue for Hercules' sales of PerForm SP9232 not included in the calculation of lost profits, in the reasonable royalty base.

---

[53] See Appendix 7.
[54] PA8254, PA8987, PA8989, & PA8128. Expert Report of Michael E. Tate; compare Schedules 10-7 & 10-9.

Redacted

Highly Sensitive Confidential – Subject to Protective Order

## 11.  REASONABLE ROYALTY COMPENSATION

### 11.1 Reasonable Royalty Overview

It is my understanding that in accordance with applicable statutory law, upon a finding of liability in a patent infringement action, the patentee would be entitled to no less than "a reasonable royalty for the use made of the invention by the infringer."[56]

The determination of damages based on reasonable royalty compensation is generally based on a hypothetical negotiation between a willing licensee and a willing licensor around the time the infringement began. The parties to the negotiation would have assumed that the patents-in-suit were valid and would be infringed by the prospective licensee unless it obtained a license.

Reasonable royalty damages are often calculated by applying a royalty base against a reasonable royalty rate during the appropriate compensation period; such a calculation is appropriate in this case.

My assessment of the reasonable royalty rate in this case began with a review of the Tate Report and evidence produced the case relative to the criteria defined in *Mobil Oil Corporation v. Amoco Chemicals Corporation.*[57]

- The agreements must have been entered into prior to infringement;

- The rate must not have been paid under threat of suit or settlement of litigation;

- The rate must be uniform in amount;

- The rate must be paid by enough parties to indicate it is reasonable; and

- The rate must be for comparable rights or activity under the patent.


The criteria for an established royalty rate has not been met in this case.

My use of the term "reasonable royalty" in this matter is consistent with the definition of the term in the *Georgia-Pacific* case, namely, "[t]he royalty that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."[58]

---

[56] 35 U.S.C. §284.

[57] *Mobil Oil Corp v. Amoco Chemicals Corp.*, 915 F. Supp. 1333 (D. Del. 1994).

[58] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

Highly Sensitive Confidential – Subject to Protective Order

In order to assess the proper reasonable royalty, I have relied upon the generally accepted methods typically used in evaluating matters such as patent infringement cases including the *Georgia-Pacific* case with particular attention noted to the following:

□     I have considered the patentee's historical licensing efforts for the patents-in-suit;

□     I have considered relevant industry license agreements to identify a range of accepted rates;

□     I have considered the business considerations of the parties; and

□     I have relied on information known or knowable at the time of the hypothetical negotiation, including the actual profits generated under products that embody the patents at issue.[59]


## 11.2 Date of Hypothetical Negotiation

It is my understanding that the date of first infringement in this case was approximately March 2002 when Hercules first began selling PerForm SP9232.


## 11.3 Quantitative Royalty Rate Factor Analysis

The determination of a reasonable royalty, in simple quantitative terms, involves the valuation of intangible assets and the determination of what a user would pay for the use of those assets. There are a number of common ways to value intangible assets, including the market approach, the income approach, and the cost approach. A brief description of each of these approaches follows along with my respective analysis of these factors for this case.

□     **Market Approach:** The market approach attempts to measure the value of an intangible asset by drawing inferences from actual market transactions involving that asset. In general, the more similar those market transactions are to the transaction in question, the more useful the information. While exactly matching transactions can not always be found, they do exist in some situations. In the absence of an exactly matching transaction, market transactions that share some characteristics with the subject transaction can provide guidance as to the terms and conditions that may be applicable in a particular case. I have considered the terms of 10 license agreements for products or processes used in paper manufacturing from publicly available data sources. All of these agreements had royalty rates stated as a percentage of revenue or sales. The average low end royalty rate and high end royalty rate are 3.5% and 5.5%, respectively. (See Appendix 8).

□     **Income Approach:** The income approach attempts to value an asset by measuring the benefits derived from use of the asset. When used in the context of an intellectual property licensing situation, these benefits are then split in some fashion between the licensee and licensor. The split has the twin effects of giving the licensor reasonable compensation for the use of its

---

[59] *Fromson v. Western Litho Plate and Supply Co.*, 853 F 2d 1568 (Fed. Cir. 1988)

Highly Sensitive Confidential – Subject to Protective Order

intellectual property, and the licensee reasonable compensation for assuming the business risks associated with developing, manufacturing, promoting, and selling the product that embodies the particular technology. At the time of the hypothetical negotiation, PerForm SP9232 was still in its start-up phase incurring significant amounts of R&D and marketing costs; however, I have analyzed Hercules' net income associated with the product over time. I also looked at the "incremental" profit margin calculated by Mr. Tate as a conservative indicator of the profit levels of Ciba. The well-known *Rule-of-Thumb* can then be applied to these profit indicators to obtain a useful royalty benchmark in this matter. Under the *Rule-of-Thumb*, an implied royalty rate can be calculated as 25% of the incremental value associated with a patented product or service. Such a calculation implies a reasonable royalty rate benchmark of between 5% and 7% for the patents at issue in this matter based on both companies profitability. (See Appendix 9)

□ **Cost Approach:** The cost approach attempts to value an asset by determining the cost to construct or purchase a non-infringing technology. Under the cost approach, the licensee would receive some portion of the cost of this alternative product or method. Properly applied, the cost approach considers both out-of-pocket expenditures, as well as risks, lost sales, and other adverse economic impacts connected to the alternative technology. Non-infringing alternatives, like silica, are present here, thus this approach does not result in a meaningful quantitative figure.

### Quantitative Royalty Rates[60]



### 11.4 Georgia Pacific Factor Analysis

As mentioned earlier, a reasonable royalty is generally determined using the construct of a hypothetical negotiation between the patent holder, the prospective licensor, and the alleged infringer, the prospective licensee. The hypothetical negotiation is to be evaluated in the context of the specific business facts and circumstances faced at that time by the patentee and the prospective licensee.

---

[60] Appendices 8, 9, 10. *les Nouvelles*, "Use of the 25 Per Cent Rule in Valuing IP," December 2002

Highly Sensitive Confidential – Subject to Protective Order

*Georgia-Pacific Corp. v. United States Plywood Corp.* provides a fifteen-factor framework to perform such an analysis. For each of the fifteen *Georgia-Pacific* factors, I have identified the relevant information and facts that may have influenced the royalty rate in the hypothetical negotiation, relative to the above-mentioned starting point.

To some extent, many of the *Georgia-Pacific* factors have already been addressed in my earlier discussion of the parties' respective positions going into the hypothetical negotiation. Nevertheless, I chose to adopt the *Georgia-Pacific* factor analysis as a framework for additional aspects pertinent to the determination of a reasonable royalty in this case.

**Factor #1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.**

Redacted            . Mr. Tate analyzes the economics of the Ciba/Hercules Site License Agreement in his discussion of this factor. I have addressed this agreement and his analysis in Section 14.2 of this report.

*Impact on royalty rate: **Neutral***

**Factor #2: The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.**

Redacted

*Impact on royalty rate: **Neutral***

**Factor #3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

A hypothetical license in this case would be limited to activities covered by U.S. patent law, but otherwise unrestricted in terms of territory or customers. It would also be non-exclusive. Therefore, it would be relatively less valuable than an exclusive but otherwise comparable license.

*Impact on royalty rate: **Neutral***

**Factor #4: The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

Redacted

Highly Sensitive Confidential – Subject to Protective Order

Redacted

*Impact on royalty rate: **Neutral***

**Factor #5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.**

Ciba and Hercules would be direct competitors selling the Polyflex CP.3 and PerForm SP9232 products, respectively. This situation tends to increase the negotiated royalty rate as the licensor expects to lose some profits on sales, although the award of lost profits would temper this factor.

*Impact on royalty rate: **Increase***

**Factor #6: The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

Redacted

Thus, I consider this factor to have a neutral impact.

*Impact on royalty rate: **Neutral***

**Factor # 7: The duration of the patent and the term of the license.**

As of the hypothetical negotiation date, the patents in suit had about 8 years of patent life remaining, and a hypothetical license would have provided rights to Hercules for this entire period. In certain instances, long term non-exclusive licenses have lower rates so as not to provide incentive for the licensee to develop or adopt a non-infringing alternative. In this case, the remaining term is essentially in the middle between long and short term. Accordingly, I have considered this factor to be neutral on the reasonable royalty rate

*Impact on royalty rate: **Neutral***

---

Redacted

Highly Sensitive Confidential – Subject to Protective Order

**Factor #8: The established profitability of the product made under the patent; its commercial success; and its current popularity.**

I have specifically considered the profitability of the products at issue in my quantitative analysis; therefore, it has a neutral effect under this factor.

*Impact on royalty rate: **Neutral***

**Factor #9: The utility and advantages of the patented property over old modes or devices, if any that had been used for working out similar results.**

**Factor #10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and benefits to those who have used the invention.**

I agree generally with Mr. Tate as to the advantages of the products; however, I recognize that there are a number of alternative products on the market that make up greater than 90% of the sales volumes.

*Impact on royalty rate: **Increase***

**Factor #11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

Redacted

*Impact on royalty rate: **Increase***

**Factor #12: The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

I am not aware of any customary portion or selling price for use of these specific patents in the industry.

*Impact on royalty rate: **Neutral***

Highly Sensitive Confidential – Subject to Protective Order

**Factor #13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

Redacted

*Impact on royalty rate: **Decrease***

**Factor #14: The opinion testimony of qualified experts.**

I have considered all testimony thus far, including Ciba's experts, as well as Hercules' and Cytec's.

*Impact on royalty rate: **Neutral***

**Factor #15: The royalty that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

Factor #15 describes the integration of the other factors within the willing buyer / willing seller hypothetical negotiation framework. As the name implies, the parties in the negotiation are presumed to be willing. They both seek, as businesspeople, to reach an agreement. Another key factor in this hypothetical negotiation is that both parties are assumed to "lay their cards on the table" so that each has an understanding of the other's position. Lastly, the hypothetical negotiation presumes that the patents-at-issue are valid and infringed by the accused products. Factor #15 also requires a royalty that would allow both the licensor and the licensee to make reasonable economic profits and accumulates all the information cited above.

*Impact on royalty rate: **Neutral***

---

[62] CIBA 027862.

Highly Sensitive Confidential – Subject to Protective Order

**11.5 Reasonable Royalty Rate Conclusion**

Redacted

| Georgia-Pacific Factor | Downward | Neutral | Upward |
|---|---|---|---|
| 1 | | X | |
| 2 | | X | |
| 3 | | X | |
| 4 | | X | |
| 5 | | | X |
| 6 | | X | |
| 7 | | X | |
| 8 | | Quantitative | |
| 9 & 10 | | | X |
| 11 | | | X |
| 12 | | X | |
| 13 | X | | |
| 14 | | X | |
| 15 | | X | |

**11.6 Computation of Reasonable Royalty Compensation**

I have calculated the royalty compensation based on the above cited evidence. Reasonable royalty compensation was calculated by multiplying the pertinent royalty base by the reasonable royalty rate

---

[63] See Appendix 9

Highly Sensitive Confidential – Subject to Protective Order

concluded under the hypothetical negotiation, or 7%.

Redacted

## 12.  SUMMARY OF CONCLUSIONS

The table below summarizes the damages due Ciba in this matter for lost profits on some Hercules sales of PerForm SP9232 and a reasonable royalty on the remaining sales of PerForm SP9232 and other associated products.[65]

| | 2004 (May - Dec.) | 2005 (Jan. - June) | Total |
|---|---|---|---|
| Lost Profits | | | |
| Reasonable Royalty - U.S. & Canada | | Redacted | |
| Reasonable Royalty - Asia & Latin America | | | |
| Total Damages Due | | | |

I have also calculated the damages due Ciba should the Court find that Ciba is not entitled to claim any lost profits in this matter.  The table below summarizes my calculation.[66]

| | 2004 (May - Dec.) | 2005 (Jan. - June) | Total |
|---|---|---|---|
| Reasonable Royalty - U.S. & Canada | | | |
| Reasonable Royalty - Asia & Latin America | | Redacted | |
| Total Damages Due | | | |

---

Redacted

Highly Sensitive Confidential – Subject to Protective Order

## 13. PREJUDGMENT INTEREST

From an economic analysis standpoint, a time-value-of-money award would be necessary to compensate Ciba for the loss of use of funds during the damages period. However, I understand that an award of prejudgment interest is a legal matter and that the Court has substantial discretion in determining the interest rate and compounding method to be awarded.

At the time that prejudgment interest may be considered by the Court, I will present my opinions on an appropriate prejudgment interest rate. In determining such rate, I will consider the relevant information at that time. At the direction of the Court, I will then calculate prejudgment interest based on interest rates and compounding methods specified by the Court.

## 14. COUNTERVAILING FACTS AND RESONABLENESS TESTS

### 14.1 Direct Conversion of Some Customers

I have specifically considered that                                   therefore, I have concluded in this report that lost profits to Ciba maybe the appropriate measure of damages.

Redacted

However, I disagree with his analysis in two respects. First, the product cost to Ciba is understated and therefore Ciba's profits are overstated.

Redacted

---

[65] Expert Report of Michael E. Tate; page 20.
[69] Hercules paid $0.07 more for product in tote when compared to bulk for Polyflex, as well as anionic and cationic products. See the Expert Report of Michael E. Tate; Schedules 11-1 & 11-2.

Redacted

Highly Sensitive Confidential – Subject to Protective Order

Redacted

It is
appropriate to include this revenue in an analysis of an effective royalty rate because it would result in a
synthetic royalty base which would more accurately reflect the royalty base resulting from the
hypothetical negotiation, which in both Mr. Tate's and my opinion includes all associated products.

Redacted

I believe that this analysis, properly completed, confirms the reasonableness of my royalty rate opinion.
It is logical that the result of this analysis would represent the upper end of a reasonable royalty rate
because of the nature and context of the agreement.

Redacted

## 15. PROFESSIONAL STANDARDS

I have reviewed my opinion in this matter to ensure that it is consistent with standards set for by the
AICPA, as well as certain Federal Rules and the standards under *Daubert*. [73]  Specifically, I have
reviewed my report as it relates to the following items:

- AICPA Rules 101, 102, 201, 202, 203, and 301

- Federal Rule of Evidence 702

- The admissibility tests generally referred to under *Daubert* and *Kumho*[74]

AICPA Rules:  I reviewed my opinions as they relate to certain sections of the AICPA Code of
Professional Conduct that have particular applicability to the practice of litigation services.[75]  The Rules
reviewed, and my comments, are as follows:

- *Rule 101, Independence.*  All engagements undertaken by Ocean Tomo are done so only
after it is verified there are no potential conflicts of interest.  Ocean Tomo is compensated

---

[71] Expert Report of Michael E. Tate; page 21.
[72] Appendix 10.
[73] *Daubert v. Merrill Dow Pharmaceuticals, In.*, 509 U.S. 579 (1993).
[74] *Kumho Tire Company, Ltd. v. Patrick Carmichael*, 526 U.S. 137 (1999)
[75] AICPA Consulting Services Special Report 03-1 discusses litigation services and applicable professional standards.

Highly Sensitive Confidential – Subject to Protective Order

on an hourly basis for time spent, and all outstanding bills are required to be paid before trial testimony is given.

- *Rule 102, Integrity and Objectivity.* It is the policy of Ocean Tomo to carry out all litigation assignments with objectivity. The ultimate damages opinion is determined solely by Ocean Tomo.

- *Rule 201, General Standards.* This particular engagement involves a reasonable royalty calculation, which I have performed in excess of 100 times. My other relevant experience in this area is noted on my CV. My work generally complies with the AICPA Code of Professional Conduct, and the data as stated in my report provides a reasonable basis for my conclusions.

- *Rule 202, Compliance with Standards.* Based on my past experience, my work complies with the applicable AICPA standards (SSCS No. 1, Consulting Services: Definitions and Standards).

- *Rule 203, Accounting Principles.* At this time, GAAP accounting is not an issue in this particular matter.

- *Rule 301, Confidential Client Information.* It is Ocean Tomo's policy not to disclose confidential information to other parties unless required to by law.

My efforts in this matter were performed consistent with the AICPA's Code of Professional Conduct

The Federal Rules of Evidence: The Federal Rules of Evidence provide the basis upon which a federal trial judge can determine whether testimony by experts meets the minimum standards, and identify the bases of opinion testimony by experts.

Federal Rule of Evidence 702, "Testimony by Experts", states:

> *If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

In this matter, I am analyzing both lost profits and reasonable royalty compensation, well-established methods of determining damages in a patent infringement case. I have reviewed the document production for evidence of the appropriate infringing sales base, royalty base, and royalty rate and have concluded my opinions above. This method is generally accepted by peers and is described in the Litigation Services Handbook (Third Edition) that was published in 2001. The First and Second Editions of this book were published in 1990 and 1995, respectively. I have applied this method reliably to the facts based on the evidence that I have reviewed to date, as stated in this report.

Highly Sensitive Confidential – Subject to Protective Order

<u>Daubert Tests:</u>  In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*[76], the U.S. Supreme Court established the rule that the federal trial judge has a general "gatekeeping" obligation with respect to the testimony of experts.  In addition, the trial judge must ensure that "an expert's testimony rests on a reliable foundation and is relevant to the task at hand."

Additionally, the Supreme Court has concluded, in *Kumho Tire Company, Ltd. v. Patrick Carmichael*[77], that there is "no distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge", therefore holding financial experts to the same level of scrutiny as technical experts in *Daubert.*  "The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise and the subject of his testimony."

As a result, I understand that the Supreme Court has set forth criteria that the trial judge may consider in incorporated countervailing facts into my analysis.  Further, I have also tested the reasonableness of my opinions by comparing my conclusions to an analysis of the Ciba/Hercules distribution agreement.  I have reviewed and considered the countervailing facts in this case to further test the appropriateness of my opinions

16. **CONCLUSION**

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

_____

James E. Malackowski

_____September 23, 2005_____

Date

Public Version Dated October 5, 2005

---

[76] *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993).
[77] *Kumho Tire Company, Ltd. v. Patrick Carmichael*, 526 U.S. 137 (1999).

Highly Sensitive Confidential -- Subject to Protective Order

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on October 5, 2005, the attached document was hand-delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Jeffrey L. Moyer
Chad M. Shandler
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE 19899

I hereby certify that on October 5, 2005, I have Federal Expressed the foregoing document(s) to the following non-registered participants:

Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL 60601-6780

Thomas L. Creel, P.C.
Goodwin Procter LLP
599 Lexington Avenue
New York, NY 10022


*/s/ David E. Moore*                    
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672306