# EXHIBIT 6



US005171808A

## United States Patent [19]

### Ryles et al.

[11] Patent Number: 5,171,808

[45] Date of Patent: Dec. 15, 1992

[54] CROSS-LINKED ANIONIC AND AMPHOTERIC POLYMERIC MICROPARTICLES

[75] Inventors: Roderick G. Ryles, Milford; Dan S. Honig, New Canaan; Elleth W. Harris, Bridgeport; Roger E. Neff, Stamford, all of Conn.

[73] Assignee: American Cyanamid Company, Stamford, Conn.

[21] Appl. No.: 803,120

[22] Filed: Jul. 22, 1991

### Related U.S. Application Data

[63] Continuation of Ser. No. 535,626, Jun. 11, 1990, abandoned.

[51] Int. Cl.$^5$ ............... C08F 26/10; C08F 20/56; C08F 20/06; C08F 2/24; C08F 8/00

[52] U.S. Cl. ................... 526/264; 526/303.1; 526/317.1; 526/207; 526/213; 525/107; 525/193

[58] Field of Search ............................... 526/264

[56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,147,688 | 4/1979 | Makhlouf et al. | 526/273 |
| 4,705,640 | 11/1987 | Whittaker | 524/922 |
| 4,968,435 | 11/1990 | Neff et al. | 524/922 |

#### OTHER PUBLICATIONS

Susan Budavari, Maryadele J. O'Neil, Ann Smith, and Patricia E. Heckelman, The Merck Index, pp. 21, 935 and 1572, 1989.

Primary Examiner—Joseph L. Schofer
Assistant Examiner—Wu C. Cheng
Attorney, Agent, or Firm—Frank M. Van Riet

[57]    ABSTRACT

Novel compositions comprising anionic and/or amphoteric organic polymeric microparticles are disclosed, along with a method for their production. The products are useful in flocculating a wide variety of dispersions of suspended solids and in paper-making.

21 Claims, No Drawings



DEFENDANT'S EXHIBIT
Van Riet 3
10/25/05 SC
PENGAD 800-631-6989

CIBA 000017

5,171,808

1

## CROSS-LINKED ANIONIC AND AMPHOTERIC POLYMERIC MICROPARTICLES

This is a continuation of co-pending application Ser. No. 07/535,626, filed Jun. 11, 1990 now abandoned.

The present invention relates to structured anionic and amphoteric polymeric microparticles and a method for their preparation.

### BACKGROUND OF THE INVENTION

Cross-linked anionic and amphoteric, organic polymeric compositions are known to those skilled in the art and are useful in a variety of solid-liquid separation applications, particularly in the flocculation of various dispersions of suspended solids, such as sewage sludge, and in the thickening of cellulosic paper pulp suspensions. Modern concerns about environmental pollution and the increasing cost of materials have made it highly desirable to produce flocculating agents which cause higher degrees of separation at lower dosage levels.

EP 0,202,780 describes the preparation of polymeric, crosslinked, cationic acrylamide polymer beads by conventional inverse emulsion polymerization techniques. Crosslinking is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide, into the polymer. This crosslinking technology is well known in the art. The patentee teaches that the crosslinked beads are useful as flocculants.

Typically, the particle size of polymers prepared by conventional inverse water-in-oil emulsion polymerization processes are limited to a range of about 1-5 microns, since no particular advantage in reducing the particle size has hitherto been apparent. The precise particle size which is achievable in inverse emulsions is determined by the concentration and activity of the surfactant(s) employed and these are customarily chosen on the basis of emulsion stability and economic factors.

Leong, et al., in *Inverse Microemulsion Polymerization*, J. of Phys Chem., Vol 86, No. 23, 1982, pp 2271–3, discloses polymerization of acrylamide in an inverse microemulsion. The author, also discloses having prepared crosslinked polyacrylamide latices or microgels by using a 100:1 mixture of acrylamide-methylenebisacrylamide. No anionic or amphoteric monomers are mentioned or is their use as a flocculating agent or paper-making additive.

EPO 0173605 teaches the production of microbeads having a diameter ranging from about 49-87 nm and produced from terpolymers of vinyl acetate (84.6), ethyl acrylate (65.4) and acrylic acid (4.5) or methacrylonitrile (85), butyl acrylate (65) and acrylic acid (3). These polymeric beads are disclosed as added to an LBKP pulp slurry in order to evaluate the resultant paper for sizing degree, paper force enhancement and disintegratability. These polymer beads fall outside the scope of those claimed in the present invention in that the ionic content thereof is too small to impart any appreciable improvement during usage.

Additionally, U.S. Pat. No. 4,681,912 discloses the production of microparticles of acrylamide and acrylic acid, for example, utilizing a microemulsion process. The patent, however, fails to teach the cross-linking of the particles so as to render them water-insoluble or their use in paper-making.

2

### SUMMARY OF THE INVENTION

According to the present invention, there are provided compositions comprising crosslinked, anionic and/or amphoteric, organic, polymeric, microparticles, having an unswollen number average particle size diameter of less than about 0.75 micron, preferably less than about 0.5 micron, a solution viscosity of at least 1.1, preferably from about 1.1 to about 2.0, mPa.s, a crosslinking agent content of above about 4 molar parts per million, based on the monomeric units present in the polymer, and an ionicity of at least about 5%.

The preferred anionic monomers for use in the practice of the present invention comprises acrylic acid, methacrylic acid, ethacrylic acid, 2-acrylamido-2-alkyl-sulfonic acids where the alkyl group contains 1 to 6 carbon atoms, such as 2-acrylamido-2-propane-sulfonic acid or mixtures of any of the foregoing and their alkaline salts. Especially preferred are the sodium salts of acrylic acid, methacrylic acid, and 2-acrylamido-2-methylpropane sulfonic acid.

The preferred amphoteric polymers for the use in the practice of the present invention comprise copolymers of one or more of the foregoing anionic monomers and one or more of the following cationic ethylenically unsaturated monomers selected from, from example, acryloxyethyltrimethylammonium chloride; diallydimethylammonium chloride; 3-(meth)acrylamido-propyltrimethylammonium chloride; 3-acrylamido-propyltrimethylammonium-2-hydroxypropylacrylate methosulfate; trimethylammoniumethyl methacrylate methosulfate; 1-trimethylammonium-2-hydroxypropyl-methacrylate methosulfate; methacryloxyethyltrime-thylammonium chloride; or mixtures of any of the foregoing.

The preferred ethylenically unsaturated non-ionic monomers for use in the practice of the present invention are selected from acrylamide; methacrylamide; N,N-dialkylacrylamides; N-alkylacrylamides; N-vinyl-methacetamide; N-vinyl methylformamide; N-vinyl pyrrolidone and mixtures thereof. Especially preferred is acrylamide.

The preferred compositions encompassed by the present invention are 1) anionic monomers alone or 2) a mixture of anionic and cationic monomers, each copolymerized with the ethylenically unsaturated non-ionic monomers disclosed above. Especially preferred is acrylamide copolymerized with sodium acrylate.

Also, according to the present invention, there is provided a process for the preparation of compositions as defined above, the process comprising:

(a) admixing

    (i) an aqueous solution comprising at least one ethylenically unsaturated anionic monomer alone or in admixture with a cationic monomer and at least one crosslinking agent and, optionally, at least one ethylenically unsaturated non-ionic monomer;

    (ii) an oily phase comprising at least one hydrocarbon liquid; and

    (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion which, when subjected to polymerization conditions, results in a polymer having a particle size of less than about 0.75 micron in unswollen diameter; and

(b) subjecting the inverse emulsion obtained in step (a) to polymerization conditions.

CIBA 000018

5,171,808

3

A preferred feature of the present invention, comprises a process employing an aqueous solution comprising sodium acrylate as the anionic monomer, N,N-methylenebisacrylamide as the crosslinking agent and acrylamide as the non-ionic monomer; an oily phase comprising a saturated hydrocarbon; and an effective amount of a surfactant mixture comprising polyoxyethylene (20) sorbitan monooleate and polyoxyethylene sorbitol hexaoleate, sufficient to produce particles of less than about 0.75 micron in unswollen number average particle size diameter.

Polymerization of the inverse emulsion may be carried out by adding a polymerization initiator, such as sodium metabisulfite or tert-butyl hydroperoxide, or by subjecting the inverse emulsion to ultraviolet irradiation. Also contemplated by the present invention is adding an effective amount of chain-transfer agent to the aqueous solution of the inverse emulsion, such as an alcohol, mercaptan, phosphite, sulfite or mixture of any of the foregoing. The process of the present invention may also comprise a step for recovering the composition from the inverse emulsion.

The resultant organic polymeric particles are useful in a method of making paper from an aqueous suspension of cellulose fibers, whereby the drainage properties of the suspension are improved by including in the suspension 0.1 to 20 lbs/ton, based on the dry weight of paper furnish solids, of the anionic or amphoteric crosslinked organic polymer microbead having an unswollen number average particle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1, preferably about 1.1 to about 2.0 mPa.s, a cross-linking agent content of above about 4 molar parts per million, and at least 5% ionicity, preferably in the presence of a molecular weight Ser. No. 07/536,382 filed Jun. 11, 1990, now abandoned and refiled as Ser. No. 07/540,667, filed Jun. 18, 1990 as a continuation-in-part.

DETAILED DESCRIPTION OF THE INVENTION

Cross-linked, anionic or amphoteric, organic polymeric microbeads having an unswollen number average particle size diameter of less than about 0.75 micron, a solution viscosity of from about 1.1 to about 1.5 mPa.s, a crosslinking agent content of above about 4 molar parts per million, based on the monomeric units present in the polymer, and an ionicity of at least about 5 mole percent, are generally formed by the polymerization of at least 5% of an ethylenically unsaturated anionic monomer and, for amphoteric microparticles, at least about 5% of one cationic monomer, and, optionally at least one non-ionic comonomer in the presence of a crosslinking agent in a water-in-oil inverse emulsion employing an effective amount of surfactant or surfactant mixture to produce microbeads of less than about 0.75 micron.

The amphoteric polymers for the use in the practice of the present invention comprise copolymers of one or more of the foregoing anionic monomers and one or more of the following cationic ethylenically unsaturated monomers (meth)acrylates of dialkylaminoalkyl compounds, and salts and quaternaries thereof and in particular monomers of N,N-dialkylaminoalkyl(meth)acrylamides, and salts and quaternaries thereof, such as N,N-dimethylaminoethyacrylamides; and the acid or quaternary salts thereof and the like. Cationic mono-

4

mers which may be used herein are of the following general formulae:

$$CH_2=C-C-X-A-N^+-R_3 \; Z^-$$ (I)

where $R_1$ is hydrogen or methyl, $R_2$ is hydrogen or lower alkyl of 1-4 carbon atoms, $R_3$ and/or $R_4$ are hydrogen, alkyl of 1-12 carbon atoms, aryl, or hydroxyethyl and $R_2$ and $R_3$, or $R_3$ and $R_4$, can combine to form a cyclic ring containing one or more hetero atoms, and Z is the conjugate base of an acid; X is oxygen or $-NR_1$, wherein $R_1$ is as defined above, and A is an alkylene group of 1-12 carbon atoms, or

$$R_5-C \quad C-R_6$$ (II)

where $R_5$ and $R_6$ are hydrogen or methyl, $R_7$ is hydrogen or alkyl of 1-12 carbon atoms, and $R_8$ is hydrogen, alkyl of 1-12 carbon atoms, benzyl or hydroxyethyl; and Z is as defined above.

These ethylenically unsaturated anionic, cationic and non-ionic monomers may be copolymerized to produce anionic and amphoteric copolymers. Preferably, acrylamide is copolymerized with a anionic monomer. Anionic copolymers useful in the practice of this invention comprise from about 0 to about 95 parts, by weight of non-ionic monomer and about 5 to about 100 parts, by weight, of anionic monomer, based on the total polymer weight. Amphoteric polymers may be produced from about 1-99 parts, by weight, same basis, of anionic monomer and from about 99-1 parts, by weight, of cationic monomer, optionally with from about 0-75 parts, by weight, of a non-ionic monomer, the total weight of the anionic monomer and cationic monomer being at least 5%. Polymerization of the monomers is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition. The polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups. Illustrative of those containing at least two double bonds are N,N-methylenebisacrylamide, N,N-methylenebismethacrylamide, polyethyleneglycol diacrylate, polyethyleneglycol dimethacrylate, N-vinyl acrylamide, divinylbenzene, triallylammonium salts, N-methylallylacrylamide and the like. Polyfunctional branching agents containing at least one double bond and at least one reactive group include, glycidyl acrylate, acrolein, methylolacrylamide and the like. Polyfunctional branching agents containing at least two reactive groups include aldehydes such as glyoxal, diepoxy compounds, epichlorohydrin and the like.

Crosslinking agents are to be used in sufficient quantities to assure a crosslinked composition. Preferably at least about 4 molar parts per million of crosslinking agent, based on the monomeric units present, are employed to induce sufficient crosslinking and preferred is a crosslinking agent content of from about 4 to about

CIBA 000019

5,171,808

5

6000 molar parts per million, more preferably about 20–4000 and most preferably about 50–2000 molar parts per million.

One method of obtaining the polymeric microparticles of this invention is to polymerize the monomers in a microemulsion. Polymerization in microemulsions and inverse microemulsions is known to those skilled in this art. P. Speiser reported in 1976 and 1977 a process for making spherical "nanoparticles" with diameters less than 800Å by (1) solubilization of polymerizable molecules, e.g. acrylamide and methylenebisacrylamide and other materials, e.g drugs, in micelles and (2) polymerizing the monomers in the micelles. J. Pharm. Sa., 65(12), 1763 (1976) and U.S. Pat. No. 4,021,364. Both inverse water-in-oil and oil-in-water "nanoparticles" were prepared by this process. While not specifically called microemulsion polymerization by the author, this process does contain all the features which are currently used to define microemulsion polymerization. These reports also constitute the first examples of polymerization or acrylamide in a microemulsion. Since then, numerous publications reporting polymerization of hydrophobic polymers in the oil phase of microemulsions have appeared. See, for example, Stoffer and Bone, J. Dispersion Sci. and Tech., 1(1), 37, 1980 and Atik and Thomas, J. Am. Chem. Soc'y, 103(14), 4279 (1981); and GB 2161492A.

The ionic and amphoteric microemulsion polymerization process may be conducted by (i) preparing a monomer microemulsion by adding an aqueous solution of the monomers to a hydrocarbon liquid containing appropriate surfactant or surfactant mixture to form an inverse monomer microemulsion consisting of small aqueous droplets which, when polymerized, result in polymer particles of less than 0.75 micron in size, dispersed in the continuous oil phase and (ii) subjecting the monomer microemulsion to free radical polymerization.

In order to obtain an inverse microemulsion, it is generally necessary to use particular conditions whose main parameters are as follows: surfactant concentration, HLB of surfactant or surfactant mixture, temperature, nature of the organic phase and composition of the aqueous phase.

The aqueous phase comprises an aqueous mixture of the monomers, anionic or a mixture of anionic and cationic and optionally non-ionic, and the crosslinking agent, as defined above. The aqueous monomer mixture may also comprise such conventional additives as are desired. For example, the mixture may contain chelating agents to remove polymerization inhibitors, pH adjusters, initiators and other conventional additives.

Essential to the formation of the microemulsion, which may be defined as a swollen, transparent and thermodynamically stable micelle solution without agitation, comprising two liquids insoluble in each other and a surfactant, in which the micelles are much smaller than in an emulsion, is the selection of appropriate organic phase and surfactant.

The selection of the organic phase has a substantial effect on the minimum surfactant concentration necessary to obtain the inverse microemulsion. This organic phase may comprise of a hydrocarbon or hydrocarbon mixture. Saturated hydrocarbons or mixtures thereof are the most suitable in order to obtain inexpensive formulations (lower surfactant content) of inverse microemulsions. Typically, the organic phase will comprise benzene, toluene, fuel oil, kerosene, odorless mineral spirits and mixtures of any of the foregoing.

The ratio by weight of the amounts of aqueous and hydrocarbon phases is chosen as high as possible, so as to obtain, after polymerization, a microemulsion of high polymer content. Practically, this ratio may range, for example from about 0.5 to about 3:1, and usually is about 2:1.

The one or more surfactants are selected in order to obtain an HLB (Hydrophilic Lipophilic Balance) value ranging from about 8 to about 11. In addition to the appropriate HLB value, the concentration of surfactant must also be optimized, i.e. sufficient to form an inverse emulsion having the correct particle size. Typical surfactants useful in the practice of this invention, in addition to those specifically discussed above, may be anionic, cationic or non-ionic and are selected from polyoxyethylene (20) sorbitan trioleate, sorbitan trioleate, sodium di-2-ethylhexylsulfosuccinate, oleamidopropyldimethylamine; sodium isostearyl-2-lactate and the like.

Polymerization of the emulsion may be carried out in any manner known to those skilled in the art. Initiation may be effected with a variety of thermal and redox free-radical initiators including azo compounds, such as azobisisobutyronitrile; peroxides, such as t-butyl peroxide; organic compounds, such as potassium persulfate and redox couples, such as ferrous ammonium sulfate/ammonium persulfate. Polymerization may also be effected by photochemical irradiation processes, irradiation, or by ionizing radiation with a 60 Co source. Preparation of an aqueous product from the emulsion may be effected by inversion by adding it to water which may contain a breaker surfactant. Optionally, the polymer may be recovered from the emulsion by stripping or by adding the emulsion to a solvent which precipitates the polymer, e.g. isopropanol, filtering off the resultant solids, drying and redispersing in water.

The product of this invention is useful in facilitating a wide range of solid-liquid separation operations. The products of this invention may be used to dewater biologically treated suspensions, such as sewage and other municipal or industrial sludges; the drainage of cellulosic suspension, such as those found in paper production, e.g. paper waste; and the settling and dewatering of various inorganic suspensions, e.g. refinery waste, coal waste, etc.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following examples illustrate the present invention. They are not be construed as limitations on the present invention except as set forth in the appended claims.

### EXAMPLES 1–5

#### Procedure for the Preparation of Anionic Microemulsion

The master batch of aqueous phase is made by mixing acrylic acid (AA), as the sodium salt, 200 parts deionized water, 56.5% sodium hydroxide, crystal acrylamide (AMD), 0.3 part 10% pentasodium diethylenetriaminepentaacetate, 39.0 parts additional deionized water, and 1.5 parts of 0.518% copper sulfate pentahydrate together. To 110.2 parts of this aqueous phase solution, 6.5 parts deionized water, 0.25 part 1% t-butyl hydroperoxide and N,N-methylene bisacrylamide (MBA) are added. This aqueous phase is mixed with an oil phase containing 77.8 parts of low odor paraffin oil, 3.6 parts

CIBA 000020

5,171,808

7

sorbitan sesquioleate and 21 4 parts polyoxyethylene sorbitol hexaoleate.

This emulsion is deaerated with nitrogen for 20 minutes. The polymerization is then initiated with gaseous SO$_2$. The polymerization is then allowed to exotherm to 40° C. and is controlled at 40° C. (+5° C.) with ice water. The ice water is removed when cooling is no longer required. The nitrogen is continued for one hours. The total polymerization time is 2.5 hours.

If desired, the polymer may be recovered from the emulsion by stripping or by adding the emulsion to a solvent which precipitates the polymer, e.g. isopropanol, filtering off the resultant solids, drying and redispersing in water.

At the time of use e.g. as a paper-making additive, the recovered polymer may be dispersed in water. The emulsion, microbeads may also be directly dispersed in water. Depending on the surfactant and levels used in the emulsion dispersion may require using high a hydrophilic lipophilic balance (HLB) inverting surfactant such as an ethoxylated alcohol; polyoxyethylated sorbitol hexaoleate; diethanolamine oleate; ethoxylated laurel sulfate etc. as in known in the art.

The procedure for preparing amphoteric emulsions e.g. 15AA/60AMD/25 dimethylaminoethylacrylate (DMEA)/349 ppm MBA, is repeated for the preparation of the anionic emulsions with the exception that the concentration of the individual monomers employed are adjusted accordingly.

Various monomers are polymerized in accordance with the above procedure. The results are set forth in Table I, below.

TABLE I

| | Preparation of Anionic Microbeads | | | | | |
|---|---|---|---|---|---|---|
| | Copolymer Composition (Mole %) | | | MBA | PS | SV |
| Example | AMD | AA | NaAPS | PPM | NM | mPa · S |
| 1 | 70 | 30 | — | 349 | 130 | 1.19 |
| 2 | 40 | 60 | — | 1381 | 120 | 1.10 |
| 3 | 0 | 100 | — | 1985 | 80 | 1.35 |
| 4 | 70 | — | 30 | 995 | — | 1.37 |
| 5 | 70 | — | 30 | 10,086 | — | 1.15 |
| 6 | 70 | 30 | — | 1000 | 464 | — |
| 7 | 70 | 30 | — | 1000 | 149 | 1.02 |
| 8 | 70 | 30 | — | 1000 | 106 | 1.06 |

NaAPS = Sodium 2-Acrylamido-2-methylpropane Sulfonic Acid
PS = Number Average Particle Size in Nanometers
SV = Solution Viscosity (0.1% polymer in M NaCl, 25° C. using a Brookfield UL adapter at 60 rpm

### EXAMPLE 9

In paper making processes it is found that the addition of anionic microbeads, preferably with a high molecular weight cationic polymer to a conventional paper making stock increases the drainage rate of water from the paper. The following examples illustrate this utility but are not to be construed to limit the invention in any manner whatsoever.

A 70/30 hardwood/softwood bleached kraft pulp is used containing 25% CaCO$_3$ for alkaline papermaking at a pH of 8.0 Drainage is a measure of the time required for a certain volume of water to drain through the paper and is here measured as a10X drainage. (K. Britt, TAPPI 63(4) p67 (1980). Hand sheet are prepared on a Noble and Wood sheet machine. In the test examples, the linear cationic copolymer is a 10 mole % of acrylox-yethyltrimethylammonium chloride (AETMAC) and 90 mole % of acrylamide (AMD) of 5,000,000 to 10,000,000 mol. wt. with a charge density of 1.2 meg./g.

8

and SV-4.0 cps. The anionic microbeads in Table II are added separately to the thin paper stock. The cationic polymer is added to the test furnish in a "Vaned Britt Jar" and subjected to 800 rpm stirring for 30 seconds. The anionic microbead is then added and subjected to 800 rpm stirring for 30 seconds and then drainage times are measured. The results of testing are set forth in Table II, below.

TABLE II

| | | Drainage Aid Test Data | | |
|---|---|---|---|---|
| Example | Cationic Polymer | Dosage (lb/ton) | Anionic Polymer Microbead of Example No. | Dosage (lb/ton) | Drainage Time (Sec) |
| 6 | -0- | | — | | 161.1 |
| 7 | 10 AETMAC/90 AMD | 2 | | | 116.9 |
| 8 | 10 AETMAC/90 AMD | 2 | -1- | (0.5) | 75.8 |
| 9 | 10 AETMAC/90 AMD | 2 | -1- | (1.0) | 72.1 |
| 10 | 10 AETMAC/90 AMD | 2 | -1- | (2.0) | 84.3 |
| 11 | 10 AETMAC/90 AMD | 2 | -2- | (0.5) | 66.3 |
| 12 | 10 AETMAC/90 AMD | 2 | -2- | (1.0) | 72.4 |
| 13 | 10 AETMAC/90 AMD | 2 | -2- | (2.0) | 74.7 |
| 14 | 10 AETMAC/90 AMD | 2 | -3- | (0.5) | 78.8 |
| 15 | 10 AETMAC/90 AMD | 2 | -3- | (1.0) | 74.1 |
| 16 | 10 AETMAC/90 AMD | 2 | -3- | (2.0) | 80.2 |
| 17 | 10 AETMAC/90 AMD | 2 | -4- | (0.5) | 95.0 |
| 18 | 10 AETMAC/90 AMD | 2 | -4- | (1.0) | 86.6 |
| 19 | 10 AETMAC/90 AMD | 2 | -4- | (2.0) | 95.5 |
| 20 | 10 AETMAC/90 AMD | 2 | -5- | (0.5) | 119.7 |
| 21 | 10 AETMAC/90 AMD | 2 | -5- | (1.0) | 121.8 |
| 22 | 10 AETMAC/90 AMD | 2 | -5- | (2.0) | 111.4 |

The drainage time for the untreated alkaline paper stock is 161.1 seconds. Addition of the linear, cationic polymer, 10 AETMAC/90 AMD, at a level of 2 lbs/ton decreases the drainage time to 116.9. Further decreases in drainage time are obtained by the joint addition of the anionic microbeads of this invention in doses of 0,5, 1.0 and 2.0 lbs/ton with the 2 lbs/ton of the cationic polymer. The microbead 70 AMD/30 Na AMPS/10,086 ppm MBA has little effect on drainage due to the excessively high degree of cross-linking and is outside the scope of this invention. The higher degree anionicity of 2 microbeads (40 AMD/60 AA/1381 ppm MBA-120nm and 100AA/1985 ppm MBA-80 nm) improves drainage time over those of the lower degree of anionicity microbeads 70 AMD/30 NaAPS/995 ppm MBA. The 1.0 lb/ton dosage of anionic microbead gives better drainage times than either the 0.5 or 2.0 lbs/ton dosage. The only exception is with the microbead 40AMD/60 AA/1,381 ppm MBA where the 0.5 lb/ton dosage is the most desirable.

### EXAMPLES 23-27

Anionic microbeads of 5 and 10 mole percent of anionic charge and amphoteric microbeads with a 5 mole % higher anionic charge than cationic charge are made

CIBA 000021

5,171,808

9

by the procedure of Example 1 and are shown in Table III. The microbeads have a particle size under 0.5 micron in Examples 23–27.

## TABLE III

| | | | | Preparation of Anionic and Amphoteric Microbeads | | | |
|---|---|---|---|---|---|---|---|
| | Copolymer Compositions (Mole %) | | | | MBA | | |
| Example | AMD | NaAc | NaAPS | DMEA | ppm | PS NM | SV mPa · S |
| 23 | 90 | 10 | — | — | 496 | — | 1.34 |
| 24 | 95 | 5 | — | — | 97 | — | 1.89 |
| 25 | 85 | — | 10 | 5 | 1026 | — | 1.40 |
| 26 | 55 | — | 25 | 20 | 5101 | — | 1.59 |
| 27 | 60 | — | — | 40 | 100 | 100 | — |

DMEA = Acryloxylethylmethyl-ammonium Chloride
See Table I for other legends

### EXAMPLE 28

The anionic and amphoteric microbeads of Table III are used in the paper making process described in Example 2. The results are substantially the same.

### EXAMPLES 29–33

The procedure of Example 1 is again followed except that different monomers are employed in the preparation of the microbead. The results are set forth in Table IV, below.

## TABLE IV

| Example | Non-Ionic Monomer (%) | Anionic Monomer (%) | MBA PPM |
|---|---|---|---|
| 29 | AM-50 | MMA-50 | 117 |
| 30 | AM-65 | VSA-35 | 226 |
| 31 | AM-75 | DADM-25 | 198 |
| 32 | — | NaAPS-100 | 316 |
| 33 | MAM-90 | AA-10 | 441 |

MAM = methacrylamide
MMA = methacrylic acid
VSA = vinylsulfonic acid
DADM = diallyldimethylammonium chloride

The above mentioned patents and publications are incorporated herein by reference.

Many variations of the present invention will suggest themselves to those skilled in this art in light of the above detailed description. Chain-transfer agents may be optionally added to the monomer solution. Also contemplated are all methods of polymerization and dewatering processes.

All such obvious modifications are within the full intended scope of the appended claims.

We claim:

1. A composition comprising cross-linked anionic or amphoteric polymeric microparticles derived solely from the polymerization of an aqueous solution of at least of one monomer, said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1 mPa.s, a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer, and an ionicity of at least about 5 mole percent.

2. A composition as defined in claim 1 wherein said crosslinking agent content is from about 20 to about 4,000 molar parts per million.

3. A composition as defined in claim 1 wherein said crosslinking agent content is from about 50 to about 2,000 molar parts per million.

4. A composition as defined in claim 1 wherein said crosslinking agent is a difunctional monomer selected

10

from N,N'-methylenebisacrylamide, N,N'-methylenebismethacrylamide, polyethyleneglycol dimethacrylate, polyethyeneglycol diacrylate, N-vinyl acrylamide, glycidyl acrylate, divinylbenzene, acrolein, glyoxal, diepoxy compounds, epichlorohydrin and mixtures of the foregoing.

5. A composition as defined in claim 4 wherein said crosslinking agent comprises N,N'-methylenebisacrylamide.

6. A composition as defined in claim 1 wherein said unswollen diameter is less than 0.5 micron.

7. A composition as defined in claim 1 wherein the organic polymer microparticle is composed of at least one ethylenically unsaturated non-ionic monomer.

8. A composition as defined in claim 1 wherein the organic polymer microparticle is composed of at least one anionic monomer selected from acrylic acid, methylacrylic acid, ethylacrylic acid, 2-acrylamido-2-methylpropanesulfonic acid or mixtures or salts thereof.

9. A composition as defined in claim 8 wherein said anionic monomer comprises sodium acrylate, sodium methylacrylate, sodium ethylacrylate or sodium 2-acrylamido-2-methylpropanesulfonate.

10. A composition as defined in claim 1 wherein the organic polymer microparticle is amphoteric and is composed of from 1% to 99% of an anionic monomer selected from acrylic acid, methacrylic acid, ethacrylic acid, 2-acrylamido-2-methylpropane sulfonic acid or salts thereof and from 99% to 1% of a cationic monomer selected from acryloxyethyltrimethylammonium chloride, 3-methyacrylamidopropyltrimethylammonium chloride, diallyldimethylammonium chloride and mixtures thereof.

11. A composition as defined in claim 7 wherein said non-ionic ethylenically unsaturated monomer is selected from acrylamide; methacrylamide; N,N-dialkylacrylamides: N-alkylacrylamides; N-vinylmethacetamide; N-vinyl methylformamide; N-vinyl pyrrolidone and mixtures thereof.

12. A composition as defined in claim 1 wherein said organic polymer microbead is composed of sodium acrylate and acrylamide.

13. A process for the preparation of a composition as defined in claim 1, said process comprising:

(a) admixing

  (i) an aqueous solution comprising at least one ethylenically unsaturated anionic monomer alone or in admixture with a cationic monomer, and at least one crosslinking agent and, optionally, at least one ethylenically unsaturated non-ionic monomer;

  (ii) an oily phase comprising at least one hydrocarbon liquid;

  (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion; and

CIBA 000022

5,171,808

11

(b) subjecting the inverse emulsion obtained in step
(a) to polymerization conditions.

14. A process as defined in claim 13 wherein said
monomer solution of step (a)(i) comprises sodium acrylate as said anionic monomer, N,N-methylenebisacrylamide as said crosslinking agent and acrylamide as said
non-ionic monomer.

15. A process as defined in claim 13 wherein said oily
phase of step (a)(ii) comprises a saturated hydrocarbon.

16. A process as defined in claim 13 wherein said
surfactant or surfactant mixture of step (a)(iii) comprises
polyoxythylene sorbitol hexaoleate or a mixture thereof
with sorbitan sesquioleate.

12

17. A process as defined in claim 13 wherein said
polymerization conditions of step (b) comprise adding a
polymerization initiator.

18. A process as defined in claim 17 wherein said
polymerization initiator comprises sodium metabisulfite
or tertiary-butyl hydroperoxide.

19. A process as defined in claim 13 wherein said
polymerization conditions of step (b) comprise subjecting said inverse emulsion to ultraviolet irradiation.

20. A process as defined in claim 13 wherein said
aqueous solution of step (a)(i) additionally contains an
effective amount of a chain-transfer agent selected from
an alcohol, mercaptan, phosphite, sulfite, or a mixture
thereof.

21. A process as defined in claim 13 which also includes step (c), comprising recovering the composition
from the emulsion.

*  *  *  *  *

CIBA 000023

# EXHIBIT 7



## United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

**Assignments on the Web > Patent Query**

# Patent Assignment Details

## *NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.*

**Reel/Frame:** 011523/0825       **Recorded:** 02/05/2001                **Pages:** 2
**Conveyance:** DECLARATION OF ASSIGNMENT

**Total properties: 5**

1  **Patent #:** 4968435   **Issue Dt:** 11/06/1990  **Application #:** 07409366   **Filing Dt:** 09/19/1989
   **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

2  **Patent #:** 5167766   **Issue Dt:** 12/01/1992  **Application #:** 07540667   **Filing Dt:** 06/18/1990
   **Title:** CHARGED ORGANIC POLYMER MICROBEADS IN PAPER MAKING PROCESS

3  **Patent #:** 5152903   **Issue Dt:** 10/06/1992  **Application #:** 07656536   **Filing Dt:** 02/19/1991
   **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

4  **Patent #:** 5171808   **Issue Dt:** 12/15/1992  **Application #:** 07803120   **Filing Dt:** 07/22/1991
   **Title:** CROSS-LINKED ANIONIC AND AMPHOTERIC POLYMERIC MICROPARTICLES

5  **Patent #:** 5274055   **Issue Dt:** 12/28/1993  **Application #:** 07886209   **Filing Dt:** 05/21/1992
   **Title:** CHARGED ORGANIC POLYMER MICROBEADS IN PAPER-MAKING PROCESS

**Assignor**

1  AMERICAN CYANAMID COMPANY                              **Exec Dt:** 12/17/1993

**Assignee**

1  CYTEC TECHNOLOGY CORP.
   300 DELAWARE AVENUE
   WILMINGTON, DELAWARE 19801

**Correspondence name and address**

   CIBA SPECIALTY CHEMICALS CORP.
   JOANN VILLAMIZAR
   P.O. BOX 2005
   540 WHITE PLAINS ROAD
   TARRYTOWN, NY 10591

Search Results as of: 12/28/2005 11:14 AM

If you have any comments or questions concerning the data displayed, contact OPR / Assignments at 571-272-3350

| HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT |

# EXHIBIT 8



## United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > Patent Query

# Patent Assignment Details

## NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Reel/Frame:** 012530/0001          **Recorded:** 01/16/2002          **Pages:** 10

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

### Total properties: 9

1 **Patent #:** 4968435   **Issue Dt:** 11/06/1990   **Application #:** 07409366   **Filing Dt:** 09/19/1989
  **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

2 **Patent #:** 5167766   **Issue Dt:** 12/01/1992   **Application #:** 07540667   **Filing Dt:** 06/18/1990
  **Title:** CHARGED ORGANIC POLYMER MICROBEADS IN PAPER MAKING PROCESS

3 **Patent #:** 5152903   **Issue Dt:** 10/06/1992   **Application #:** 07656536   **Filing Dt:** 02/19/1991
  **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

4 **Patent #:** 5171808   **Issue Dt:** 12/15/1992   **Application #:** 07803120   **Filing Dt:** 07/22/1991
  **Title:** CROSS-LINKED ANIONIC AND AMPHOTERIC POLYMERIC MICROPARTICLES

5 **Patent #:** 5274055   **Issue Dt:** 12/28/1993   **Application #:** 07886209   **Filing Dt:** 05/21/1992
  **Title:** CHARGED ORGANIC POLYMER MICROBEADS IN PAPER-MAKING PROCESS

6 **Patent #:** 5340865   **Issue Dt:** 08/23/1994   **Application #:** 08071821   **Filing Dt:** 06/07/1993
  **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

7 **Patent #:** 5431783   **Issue Dt:** 07/11/1995   **Application #:** 08092859   **Filing Dt:** 07/19/1993
  **Title:** COMPOSITIONS AND METHODS FOR IMPROVING PERFORMANCE DURING SEPARATION OF SOLIDS FROM LIQUID PARTICULATE DISPERSIONS

8 **Patent #:** 5354801   **Issue Dt:** 10/11/1994   **Application #:** 08105266   **Filing Dt:** 08/12/1993
  **Title:** PROCESS FOR PRODUCING SMALL POLYMER PHASE DROPLET MICROEMULSIONS BY MULTISTEP AQUEOUS PHASE ADDITION

9 **Patent #:** 5393827   **Issue Dt:** 02/28/1995   **Application #:** 08106955   **Filing Dt:** 08/17/1993
  **Title:** PREPARATION OF HIGH SOLIDS POLYMERIC MICROEMULSIONS

### Assignor:

1 CYTEC TECHNOLOGY CORP.                                       **Exec Dt:** 11/01/2000

### Assignee:

1 CIBA SPECIALTY CHEMICALS WATER TREATMENTS, INC.
  2301 WILROY ROAD
  SUFFOLK, VIRGINIA 23439

### Correspondence name and address

  CIBA SPECIALTY CHEMICAL CORP.
  JOANN VILLAMIZAR
  540 WHITE PLAINS ROAD
  P.O. BOX 2005 ROAD
  TARRYTOWN, NY 10591

# EXHIBIT 9

 **United States Patent and Trademark Office** 

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Assignments on the Web > Patent Query

# Patent Assignment Details

## NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Reel/Frame:** 013158/0483      **Recorded:** 08/07/2002      **Pages:** 16
**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Total properties: 9**

1   **Patent #:** 4968435   **Issue Dt:** 11/06/1990   **Application #:** 07409366   **Filing Dt:** 09/19/1989
     **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

2   **Patent #:** 5167766   **Issue Dt:** 12/01/1992   **Application #:** 07540667   **Filing Dt:** 06/18/1990
     **Title:** CHARGED ORGANIC POLYMER MICROBEADS IN PAPER MAKING PROCESS

3   **Patent #:** 5152903   **Issue Dt:** 10/06/1992   **Application #:** 07656536   **Filing Dt:** 02/19/1991
     **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

4   **Patent #:** 5171808   **Issue Dt:** 12/15/1992   **Application #:** 07803120   **Filing Dt:** 07/22/1991
     **Title:** CROSS-LINKED ANIONIC AND AMPHOTERIC POLYMERIC MICROPARTICLES

5   **Patent #:** 5274055   **Issue Dt:** 12/28/1993   **Application #:** 07886209   **Filing Dt:** 05/21/1992
     **Title:** CHARGED ORGANIC POLYMER MICROBEADS IN PAPER-MAKING PROCESS

6   **Patent #:** 5340865   **Issue Dt:** 08/23/1994   **Application #:** 08071821   **Filing Dt:** 06/07/1993
     **Title:** CROSS-LINKED CATIONIC POLYMERIC MICROPARTICLES

7   **Patent #:** 5431783   **Issue Dt:** 07/11/1995   **Application #:** 08092859   **Filing Dt:** 07/19/1993
     **Title:** COMPOSITIONS AND METHODS FOR IMPROVING PERFORMANCE DURING SEPARATION OF SOLIDS FROM LIQUID PARTICULATE DISPERSIONS

8   **Patent #:** 5354801   **Issue Dt:** 10/11/1994   **Application #:** 08105266   **Filing Dt:** 08/12/1993
     **Title:** PROCESS FOR PRODUCING SMALL POLYMER PHASE DROPLET MICROEMULSIONS BY MULTISTEP AQUEOUS PHASE ADDITION

9   **Patent #:** 5393827   **Issue Dt:** 02/28/1995   **Application #:** 08106955   **Filing Dt:** 08/17/1993
     **Title:** PREPARATION OF HIGH SOLIDS POLYMERIC MICROEMULSIONS

**Assignor**

1   CIBA SPECIALTY CHEMICALS WATER TREATMENTS INC.              **Exec Dt:** 01/31/2001

**Assignee**

1   CIBA SPECIALTY CHEMICALS CORP.
     540 WHITE PLAINS ROAD
     P.O. BOX 2005
     TARRYTOWN, NEW YORK 10591

**Correspondence name and address**

     CIBA SPECIALTY CHEMICALS CORP.
     JOANN VILLAMIZAR
     540 WHITE PLAINS RD.
     TARRYTOWN, NY 10591

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 13

LEXSEE 2000 U.S. DIST. LEXIS 10123

ACUSHNET COMPANY, Plaintiff, v. DUNLOP MAXFLI SPORTS
CORPORATION, Defendant.

Civ. A. No. 98-717-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2000 U.S. Dist. LEXIS 10123*

June 29, 2000, Decided

NOTICE: [*1]  FOR ELECTRONIC PUBLICATION
ONLY

DISPOSITION: Plaintiff's motion for summary judg-
ment of validity and enforceability of the '428 and '437
patents denied and plaintiff's motion for summary judg-
ment of infringement of claim 6 of the '437 patent de-
nied. (D.I. 41) Defendant's cross motion for summary
judgment of noninfringement of claim 6 of the '437 pat-
ent denied. (D.I. 56) Plaintiff's motion for summary
judgment of infringement of the '365 patent (D.I. 52)
granted and defendant's cross motion for summary judg-
ment of invalidity of that patent and for laches denied.
(D.I. 65).

COUNSEL: William J. Wade, Esquire, Richards,
Layton & Finger, Wilmington, Delaware, for Plaintiff.

Paul J. Zegger, Esquire, Greg P. Roggin, Esquire, and C.
Edward Polk, Jr., Esquire, Of Counsel, Pennie & Ed-
monds LLP, Washington, D.C., for Plaintiff.

David J. Ferry, Jr., Esquire, Ferry & Joseph, P.A., Wil-
mington, Delaware, for Defendant.

David B. Tulchin, Esquire, Robin D. Fessel, Esquire, and
James T. Williams, Esquire, Of Counsel, Sullivan &
Cromwell, New York, New York, for defendant.

Anthony M. Lorusso, Esquire, Of Counsel, Lorusso &
Loud, Boston, Massachusetts, for defendant.

JUDGES: Sue L. Robinson, District [*2]  Judge.

OPINIONBY: Sue L. Robinson

OPINION:

MEMORANDUM OPINION

Dated: June 29, 2000
Wilmington, Delaware

Sue L. Robinson
District Judge

I. INTRODUCTION

Currently before the court are two summary judg-
ment motions filed by plaintiff Acushnet Company (D.I.
41, 52) and two cross motions for summary judgment
filed by defendant Dunlop Maxfli Sports Corporation.
(D.I. 56, 65) Both plaintiff and defendant manufacture,
among other things, golf balls. Plaintiff filed suit against
defendant on December 17, 1998 alleging infringement
of U.S. Patent Nos. 5,733,428 ("the '428 patent") and
4,389,365 ("the '365 patent"). (D.I. 1) The '428 patent
teaches a method for forming a polyurethane cover over
a golf ball core, while the '365 patent discloses a method
and apparatus for stripping molded round cores from a
golf ball core mold. Plaintiff amended its complaint on
March 31, 1999 to allege infringement of U.S. Patent No.
5,888,437 ("the '437 patent"). (D.I. 10) The '437 patent
also teaches a method for forming a polyurethane cover
over a golf ball core. Defendant filed a counterclaim for
a declaratory judgment that the '428, '437, and '365 pat-
ents are not infringed and are invalid. (D. [*3]  I. 14)

Plaintiff is a corporation organized under the laws of
Delaware with a principal place of business in Fairhaven,
Massachusetts. Defendant is a corporation organized
under the laws of Delaware with a principal place of
business in Greenville, South Carolina. Defendant is a
wholly owned subsidiary of Dunlop Slazenger Group, a
United Kingdom Corporation ("Dunlop-UK"). The court
has jurisdiction over this matter by virtue of *28 U.S.C. §
1338*(a), and venue is proper in this judicial district pur-
suant to *28 U.S.C. §§ 1400*(b) and 1391(c).

II. BACKGROUND

Plaintiff's first motion seeks (1) summary judgment of the validity and enforceability of the '428 and '437 patents and (2) summary judgment that defendant's accused process infringes claim 6 of the '437 patent. (D.I. 41) Defendant's cross motion seeks summary judgment of noninfringement of claim 6 of the '437 patent. (D.I. 56) Plaintiff's second motion seeks summary judgment of infringement of claims 1-3 of the '365 patent, while defendant's second cross motion seeks summary judgment of invalidity of the '365 patent. (D.I. 52, 65) The court shall address each of these motions [*4] in turn.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting Fed. R. [*5] Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF VALIDITY AND ENFORCEABILITY OF THE '428 AND '437 PATENTS AND OF INFRINGEMENT OF CLAIM 6 OF THE '437 PATENT AND DEFENDANT'S

## CROSS MOTION FOR NONINFRINGEMENT OF THE '437 PATENT

In its first motion, plaintiff invokes [*6] the doctrine of assignor estoppel to preclude defendant from pursuing its counterclaim for invalidity of the '428 and '437 patents. Plaintiff also seeks summary judgment of infringement of claim 6 of the '437 patent. The court shall address each argument in turn.

### A. Assignor Estoppel

Assignor estoppel "prevents one who has assigned the rights to a patent . . . from later contending that what was assigned is a nullity." *Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220, 1224 (Fed. Cir. 1988)* Courts have applied assignor estoppel to invalidity challenges based on novelty, utility, patentable invention, anticipatory matter, and state of the art. See id. The doctrine "prevents the 'unfairness and injustice' of permitting a party 'to sell something and later to assert that what was sold is worthless.'" *Mentor Graphics Corp. v. Quickturn Design Sys., Inc., 150 F.3d 1374, 1377 (Fed. Cir. 1998)* (quoting *Diamond Scientific, 848 F.2d at 1224)* Assignor estoppel also bars challenges to patents by parties in privity with the assignor. See id. It is undisputed that the inventor of the '428 and '437 patents, John Calabria, assigned [*7] his rights to those patents to plaintiff. It is also undisputed that, after assigning his rights to plaintiff, Calabria left plaintiff's employ to work for defendant. At issue, then, is whether Calabria is in privity with defendant, such that assignor estoppel precludes defendant from pursuing its invalidity counterclaim.

To determine whether privity exists, the court must "balance the equities" in light of the act of infringement. See *Shamrock Techs., Inc. v. Medical Sterilization, Inc., 903 F.2d 789, 793 (Fed. Cir. 1990)* The Federal Circuit has explained that:

> If an inventor assigns his invention to his employer company A and leaves to join company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B.

Id. A court must evaluate all direct and indirect contacts between the assignor and the defendant. See *Intel Corp. v. United States Int'l Trade Comm'n, 946 F.2d 821, 838 (Fed. Cir. 1991)* "What [*8] is significant is whether

the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Id. at 839.*

This broad test for finding privity, however, must be viewed in light of the facts of the cases in which the test has been enunciated. In the handful of cases finding privity between a defendant corporation and an assignor of the patent-in-suit, the assignor has exercised substantial control over, and/or held considerable financial interest in, the defendant corporation. For instance, in Shamrock Technologies, the assignor left the assignee's employ to become the defendant corporation's Vice President of Operations. See *Shamrock Techs., 903 F.2d at 794.* He also owned 50,000 shares of the defendant corporation's stock. See *id.*; see also *Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1579 (Fed. Cir. 1993)* (assignor was founder, president, principal executive officer, and owner of a controlling interest in defendant corporation). It is also notable that, in finding privity between the assignor and defendant, the court in Shamrock Technologies relied upon cases involving [*9] assignors who exercised considerable control over the defendant corporation. See *Shamrock Techs., 903 F.2d at 793* (citing *United States Appliance Corp. v. Beauty Shop Supply Co., 121 F.2d 149, 151 (9th Cir. 1941)* (privity between assignor and co-developer of infringing device with company they formed to advance their interests in infringing device); *Stubnitz-Greene Spring Corp. v. Fort Pitt Bedding Co., 110 F.2d 192, 195 (6th Cir. 1940)* (privity between assignor and company of which he was principal stockholder, president, and general manager); *Buckingham Prods. Co. v. McAleer Mfg. Co., 108 F.2d 192, 195 (6th Cir. 1939)* (privity between assignor and corporation "over which he had control of policy but lacked voting control"); *Mellor v. Carroll, 141 F. 992, 993-94 (C.C.D. Mass. 1905)* (privity found between assignor/other individuals and corporation founded by them to "carry on a business which they would be restrained from carrying on as individuals")).

The assignor also exercised considerable control over the defendant corporation in Intel. In Intel, the assignor of the patent-in-suit was [*10] the largest shareholder and chief executive officer of Atmel Corporation ("Atmel"), which enabled him to control that defendant's business and finances. See *Intel, 946 F.2d at 837-38.* Atmel had entered into a joint venture with co-defendants General Instrument Corporation and Microchip Technology Inc. (collectively, "GI/M"). Significantly, the Federal Circuit in Intel ruled that the assignor's relationship with GI/M was so extensive that "GI/M's dealings with Atmel are also, in substance, dealings with [the assignor]." *Id. at 838.* Consequently, the court found that the assignor also was in privity with

GI/M and estopped both Atmel and GI/M from raising invalidity defenses. *Id. at 838-39.*

Most recently, the Federal Circuit found privity to exist between an assignor company and its wholly owned subsidiary, such that both were precluded from challenging the validity of the patent-in-suit. See *Mentor Graphics, 150 F.3d at 1379.* In Mentor Graphics, the assignor exercised "considerable control" over its subsidiary's operations. Indeed, it shared personnel with the subsidiary, approved its budget, and "established [*11] their relationship so that [the subsidiary] would have the capital it needed to manufacture the accused devices." *Id.*; see also *Eagle Comtronics, Inc. v. Northeast Filter Co., 1991 U.S. Dist. LEXIS 16965, No. 90- CV-573, 1991 WL 247551 (N.D.N.Y. Nov. 22, 1991)* (finding privity where assignor left assignee's employ and founded defendant company for purpose of manufacturing accused devices).

The facts of the case at bar are distinguishable from those cases applying the doctrine of assignor estoppel. In each of these cases, the Federal Circuit found privity to exist where the assignor either controlled the corporation in question or had a significant financial stake in the corporation's success. Extending privity in such situations makes sense because it furthers the policy goal of assignor estoppel. That is, it prevents an assignor from perpetrating in a corporate guise the very injustice that the doctrine precludes him or her from accomplishing in a personal capacity.

In the present case, however, extending the assignor estoppel doctrine to defendant would not accomplish this goal. Defendant is not Calabria's corporate disguise. Calabria owns an insignificant number of defendant's shares, he does [*12] not sit on its board of directors, and he holds no sway over defendant's finances or strategic decisions. Although Calabria is a "Vice President of Research and Development," the record reveals that there are twenty-six "Vice Presidents" in defendant's organizational structure and, far from being second in command as the title suggests, Calabria is subordinate to a "Managing Director of Research and Development." (D.I. 59, Ritchie Decl. P 4)

Moreover, extending the doctrine of assignor estoppel to defendant would punish it for hiring Calabria and using his talents to compete with plaintiff. Assignor estoppel was not designed to prevent companies from competing for talented employees; rather, it was intended to prevent the assignor (whether acting individually or through another entity) from "making [a] representation [of the patent's validity] at the time of assignment (to his advantage) and later . . . repudiating it (again to his advantage)." *Diamond Scientific, 848 F.2d at 1224*; see generally Franklin D. Ubell, Assignor Estoppel: A Wrong Turn From Lear, *71 J. Pat. & Trademark Off.*

Soc'y 26 (Jan. 1989) (noting that employees are a considerable source of [*13] new competition and new business ventures in high-tech industry). Here, the record as it stands reveals no real advantage that would accrue to Calabria from defendant's assertion of an invalidity defense. Consequently, the equities of this case do not favor a finding of privity between Calabria and defendant. Based on the record presented, the court shall deny plaintiff's motion to estop defendant from raising an invalidity defense.

### B. Claim 6 of the '437 Patent

Plaintiff next moves for summary judgment that defendant's accused process literally infringes claim 6 of the '437 patent. n1 Defendant cross moves for summary judgment of noninfringement of the same claim.

> n1 Plaintiff does not argue infringement under the doctrine of equivalents.

A finding of literal infringement requires that the asserted claims read on the accused process. See *Morton Int'l, Inc. v. Cardinal Chem. Co., 5 F.3d 1464, 1468 (Fed. Cir. 1993).* A claim covers, or reads, on an accused process if every limitation recited [*14] in the claim is found in the accused process. See *Kahn v. General Motors Corp., 135 F.3d 1472, 1477 (Fed. Cir. 1998).* Each limitation of the claim must be met exactly by the accused process, and any deviation from the claim precludes a finding of literal infringement. See *Lantech, Inc. v. Keip Mach. Co., 32 F.3d 542, 547 (Fed. Cir. 1994).* If an express claim limitation is absent from an accused process, there can be no finding of literal infringement as a matter of law. See *Kahn, 135 F.3d at 1477.*

The first step in an infringement analysis requires the court to construe the disputed claims. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995),* aff'd, *517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).* The principles of claim construction are well established. The exercise begins with the claim language, which defines the scope of the claim. See *York Prods., Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996).* In analyzing claim language, the court must employ "normal rules of syntax," *Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1553 (Fed. Cir. 1997)* [*15] for "[a] claim must be read in accordance with the precepts of English grammar." *In re Hyatt, 708 F.2d 712, 714 (Fed. Cir. 1983).* The court also must ascribe to any technical term used in a claim "the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different

meaning." *Hoechst Celanese Corp. v. BP Chems., Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996).*

Claim 6 of the '437 patent reads as follows:

> A method of making a golf ball, comprising:
>
> a) providing a first mold member for molding material around part of a golf ball core wherein said first mold member comprises a first mold cavity;
>
> b) providing a mold member alignment unit having alignment members for cooperating with the two side surfaces on the first mold member to align the mold member in a lateral position;
>
> c) providing a frame unit mounted for vertical movement relative to the mold member alignment unit for moving a golf ball core into the first mold cavity, comprising:
>
>> i) a core holder for holding the core while it is moved [*16] into the first mold cavity; and
>>
>> ii) a stop for limiting the vertical movement of the frame unit;
>
> d) positioning the first mold member to a predetermined lateral position with the alignment members such that the core holder will center the golf ball core in the first mold member;
>
> e) placing the golf ball core in the core holder;
>
> f) placing a first portion of polyurethane in the first mold cavity;
>
> g) allowing said polyurethane to partially cure to a selected state of gel in said first mold cavity;
>
> h) moving the frame unit with the core holder and core continuously at a controlled rate towards the polyurethane in

the first mold cavity until the core contacts the polyurethane, when the polyurethane is in said selected state of gel, and the core is centered in the first mold cavity;

i) disengaging the core from the core holder after a selected period of time;

j) placing such core with the polyurethane while still in said first mold cavity against a second mold member having a second mold cavity containing polyurethane at a selected state of gel therein and mating the two mold members together; and

k) curing the polyurethane in the mated mold [*17] members such that the golf ball cover is substantially free of defects of a type caused by a pin mold, and wherein the core center is substantially concentrically aligned with the golf ball cover.

( '437 patent, col. 8, lns. 41-67 to col. 9, lns. 1-15)

As an initial matter, defendant argues that element b of claim 6 is in means plus function form. Plaintiff vigorously disputes this assertion. *35 U.S.C. section 112*, paragraph 6 of Title 35 provides that a patentee may define the structure for performing a function through the use of a means expression, provided that the patentee discloses a specific structure or structures corresponding to that means in the patent specification. See *35 U.S.C. § 112*, P 6. n2 Where, as here, the word "means" is absent from the claim language, a presumption arises that *35 U.S.C. § 112*, P 6 does not apply. See *Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1361 (Fed. Cir. 2000)*. That presumption may be rebutted if the claim limitation does not recite sufficiently definite structure to perform the claimed function. See id. In construing a means plus function claim, the court must look to the language of the claim, [*18] the patent specification, and the prosecution history. See *Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998)*, *United States v. Telectronics, Inc., 857 F.2d 778, 782 (Fed. Cir. 1988)* At present, neither party included the prosecution history as part of the record. Consequently, neither shall the court determine at this point in the proceedings whether element b of claim 6 is in means plus function form nor further construe claim 6.

n2 *35 U.S.C. § 112*, P 6 reads as follows:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The court shall deny without prejudice plaintiff's motion for summary judgment of infringement and defendant's cross motion for [*19] summary judgment of non-infringement of the '437 patent.

## V. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF THE '365 PATENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF THAT PATENT

In the second set of motions before the court, plaintiff seeks summary judgment that defendant's accused apparatus and process for molding solid golf ball cores infringes claims 1-3 of the '365 patent. (D.I. 52) For its part, defendant does not dispute the infringement allegations; however, it seeks summary judgment that the '365 patent is obvious in light of prior art. (D.I. 65) Defendant also argues that plaintiff's infringement claim is barred by the doctrine of laches.

### A. Infringement of the '365 Patent

Plaintiff argues that defendant's accused core molding apparatus infringes claims 1-3 of the '365 patent. The '365 patent is directed to a method and apparatus for compression molding golf ball cores. Defendant neither denies infringement nor disputes plaintiff's proposed construction of claims 1-3. (D.I. 65 at 3 n.2) Nonetheless, the court shall construe each claim and review the evidence asserted in support of plaintiff's infringement argument. [*20] See *Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995)* (noting that, "the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties").

n3 "Dunlop has never contended in this action that its present core molding process would not infringe the '365 patent, were that patent valid."

### 1. Claim 3

Claim 3 reads as follows:

> An apparatus for compression molding spherical objects comprising opposed mold plates, each said mold plate having a plurality of half molds therein, each said half mold having a cavity, the plates being movable towards and away from each other and, when together, the cavities of the said half molds of one plate being in registration with the cavities of the said half molds of the other plate, the cavity in each half mold in one of said plates being a portion of a sphere, said portion being a truncated sphere truncated at said mold parting line so as to be [*21] of greater than hemispherical dimension and the cavity in each half mold of the other plate being a corresponding remaining portion of said sphere truncated at said mold parting line to be of less than hemispherical dimension whereby said cavities in said one of said plates are undercut for retention of the molded spherical objects, and means for simultaneously mechanically releasing all said spherical objects from the half molds of said one mold plate.

( '365 patent, col. 4, lns. 48-66) Claim 3's "opposed mold plates" element requires an upper mold plate positioned above a lower mold plate. Both the upper and lower mold plates contain a plurality of "half molds" that contain "cavities," which hold and shape the core material. When brought together by the apparatus, the "cavities" on the opposing mold plates will form a sphere. However, the hemispherical dimensions of the upper and lower cavities are not equal. Thus, the "mold parting line," where the upper and lower cavities meet, is not at the equator of the molded core material. The "mold parting line" will be either above or below the equator, such that one cavity (either the upper or the lower) will have a greater hemispherical [*22] dimension than the other. The cavities with the greater hemispherical dimensions are thereby "undercut for retention of the molded spherical objects." ( '365 patent, col. 4, lns. 63-64) As noted in the specification, this allows the molded cores to remain in the mold plate with the larger hemispherical dimension. (See '365 patent, col. 1, lns. 22-44)

The above described mold plates must be "moveable towards and away from each other" in such a fashion that the cavities in the upper and lower mold plates are "in

registration." ( '365 patent, col. 4, lns. 51-52, 53-54) The common meaning of registration is "bringing [something] together . . . in complete agreement with respect to position." Webster's Third New Int'l Dictionary 1912 (unabridged ed. 1993). Thus, the term "registration" as used in the '365 patent requires that the mold cavities be in alignment with each other when both mold plates are brought together.

Claim 3 also recites a "means for simultaneously mechanically releasing all said spherical objects from the half molds of said one mold plate." ( '365 patent, col. 4, lns. 64-66) Because this claim language is expressed in means plus function format, n4 the court [*23] must look to the patent specification to "determine what structures have been disclosed . . . that correspond to the means for performing that function." Kemco Sales, 208 F.3d at 1361. The '365 patent specification discloses several means for performing the function of "simultaneously mechanically" releasing the molded cores. The preferred means employs a vacuum system that lifts the cores out of the mold by forming a vacuum between a rubber boot and the mold surface. ( '365 patent, col. 2, lns. 43-68) Although this system is preferred, the specification indicates that it is not essential. (See '365 patent, col. 3, lns. 1-2) The specification also discloses other systems:

> For example, the balls could be ejected before the stripper plate and boots are brought into position. Similarly, the stripper plate and boots could be brought into position above the balls but the balls could be ejected before any vacuum is applied.
>
> . . .
>
> Alternatively a frictional system can be employed by making the rubber boots somewhat larger so they squeeze down over and grip the ball. The balls can then be ejected from the boots by air pressure, ejector pins, or the like. [*24] Other removal systems such as gripping fingers, needles, push rods (for horizontal unloading) or magnetic systems (for balls highly loaded with iron filings or the like) can also be employed.
>
> It will also be appreciated that the oversized cavity mold need not be the lower mold but can rather be the upper mold. In this instance, the ejector pins would be in the upper mold plate and would eject the

balls downward when the mold plates were parted.

( '365 patent, col. 3, lns. 51-63) Figure 2 of the '365 patent depicts the preferred vacuum system along with an ejector pin. Thus, the written description and the accompanying drawing indicate that the disclosed structure corresponding to the "simultaneously mechanically releasing" means is a system employing either a vacuum in combination with an ejector pin or a system employing simply an ejector pin or some other mechanical means such as gripping fingers, needles, or push rods.

> n4 Unlike the alleged means plus function claim element in the '437 patent, there is no dispute that this element of claim 3 is in means plus function form.

[*25]

Given this claim construction, plaintiff's unrefuted evidence establishes that defendant's apparatus infringes claim 3. Plaintiff submitted evidence that defendant's apparatus has mold plates, half molds, and a plurality of cavities. (D.I. 53 Exs. C, D, E, at 200:8-22) The cavities in the upper mold plate of the accused device are of greater hemispherical dimension than the cavities in the lower mold plate. (D.I. 53 Ex. E, at 215:15-22) Thus, these accused upper mold plate cavities are undercut for retention of the molded cores. (D.I. 53 Ex. H, E, at 193:5-18; 203:6-204:2) Furthermore, the upper and lower mold plates of the accused apparatus are moveable towards and away from each other and, once together, the cavities of the half molds in one plate are in alignment, or "in registration," with the cavities of the half molds in the opposing plate. (D.I. 53 Ex. E, at 187:20-188:9; 200:25-201:12) Defendant's accused apparatus also employs "knockout pins" as a "means for simultaneously mechanically releasing" the molded cores. (D.I. 53 Ex. F, E, at 197:9-198:11; 205:13-206:9)

The evidence establishes that defendant's accused apparatus meets every element of claim 3 of the '365 patent [*26] Therefore, plaintiff's motion for summary judgment is granted as to its contention that defendant's apparatus infringes claim 3 of the '365 patent.

### 2. Claims 1 and 2

Plaintiff also argues that defendant's process infringes claims 1 and 2 of the '365 patent. Claim 1 is an independent method claim that discloses a method of molding objects having a curved outer surface. It reads as follows:

A method of molding objects having a curved outer surface comprising:

(a) forming said object in a mold device, said mold device comprising a first set of half molds positioned in a first mold plate and a second set of half molds positioned in a second mold plate, each said half mold in said first set having a cavity therein and each said half mold in said second set having a corresponding cavity which when placed together define the shape of said object and a mold parting line between the cavities, the cavity in each half mold of said first set having a cross-section at the mold parting line whose dimension is from about 0.5% to about 10% less than the dimension of the greatest cross-section of the object to be molded and forming thereby an undercut opening of said cavity,

(b) [*27] separating said first mold plate from said second mold plate whereby each molded object is retained in the first set of half molds by the undercut opening thereof;

(c) mechanically removing said molded object from said first set of half molds.

( '365 patent, col. 4, lns. 25-45) Claim 2 is a dependent claim that teaches, "the method of claim 1 wherein said objects are spherical." ( '365 patent, col. 4, lns. 46-47)

The court shall construe the terms of claims 1 and 2 consistent with claim 3. Construed as such and in light of plaintiff's unrefuted evidence, defendant's accused process infringes claims 1 and 2 of the '365 patent. As noted above, this evidence establishes that defendant's process for manufacturing spherical golf ball cores employs upper and lower mold plates, each containing a plurality of half molds with each half mold containing a cavity. (D.I. 53 Ex. E, at 186:3-25) When combined, these cavities define both the shape of the molded core and the "mold parting line" between the cavities. (D.I. 53 Ex. E, at 215:11-19) Further, the upper mold plate cavities in defendant's process have undercut openings. (D.I. 53 Ex. E, at 193:5-18) Plaintiff also submitted evidence [*28] that the diameter of one of defendant's cores at its mold parting line is 0.9% less than the diameter of that core at its equator. (D.I. 53 Ex. I, at PP 6-7) One of plaintiff's experts testified that this indicates that the cross-section at the cavity opening in defendant's apparatus is about 0.9% less than the greatest cross-section of the core. (D.I. 53

Ex. I, at P 7) Thus, defendant's process meets every element of step (a) of claim 1.

There is also unrefuted evidence that, when defendant's upper and lower mold plates are separated, the molded cores remain in the half molds of defendant's upper mold plate (the "first mold plate") due to the undercut openings of the half-molds of that plate. (D.I. 53 Ex. E, at 193:5-18) Consequently, defendant's accused process meets every element of step (b) of claim 1.

Finally, it is undisputed that defendant employs knockout pins to mechanically remove the cores from the upper, "first set" of half molds. (D.I. 53 Ex. E, at 205:13-206:9) Thus, defendant's process meets every element of step (c) in claim 1 and infringes that claim as a matter of law.

With respect to claim 2, it is undisputed that defendant's upper and lower half molds form a [*29] "spherical" golf ball core. (D.I. 53 Ex. E, at 215:15-22) Accordingly, defendant's process also infringes claim 2 as a matter of law.

## B. Defendant's Cross Motion for Summary Judgment of Invalidity

In its cross motion, defendant argues that claims 1-3 of the '365 patent are obvious and, therefore, invalid. Specifically, defendant contends that the prior art teaches compression molds with off-center mold parting lines, or "undercuts," such as those disclosed in claims 1-3 of the '365 patent.

A patent is invalid under *35 U.S.C. § 103*

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The ultimate determination of obviousness is a question of law based on underlying factual inquiries. See *Richardson-Vicks Inc. v. UpJohn Co., 122 F.3d 1476, 1479 (Fed. Cir. 1997).* Those factual inquiries involve consideration of the four so-called Graham factors: (1) the scope and content of the prior art; (2) the differences [*30] between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; n5 (4) and any secondary considerations of nonobviousness, such as commercial success. See *Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17-18, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966), B.F. Goodrich Co. v. Aircraft Braking Sys.*

*Corp., 72 F.3d 1577, 1582 (Fed. Cir. 1996).* The existence of each element of a claim in the prior art does not, by itself, demonstrate obviousness. Instead, there must be a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Smiths Indus. Med Sys., Inc. v. Vital Signs, Inc., 183 F.3d 1347, 1353 (Fed. Cir 1999).* "Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved." *Id. at 1356.*

> n5 The factfinder must evaluate the invention, "not through the eyes of the inventor, who may have been of exceptional skill, but as by one of 'ordinary skill.'" *Interconnect Planning Corp v. Feil, 774 F.2d 1132, 1138 (Fed. Cir. 1985).*

[*31]

With respect to the first step in the invalidity analysis, the court's prior construction of claims 1-3 of the '365 patent controls. In support of its obviousness argument, defendant offers the following evidence:

. an affidavit from its expert, Dr. Suresh G. Advani, that basic texts in compression molding teach (1) the desirability of retaining the molded object in one of the mold halves and (2) the usefulness of undercuts and ejection devices as a means to do this (D.I. 67, Advani Decl. P 12);

. the Lacaze '692 patent, the diagrams of which allegedly depict mold halves with an "undercut" that would hold a molded object in place after compression (D.I.; D.I. 67, Advani Decl. PP 16-18) and Advani's testimony that the differences between this alleged prior art and the '365 patent are immaterial.

Defendant also asserts that one skilled in the art would find the '365 patent obvious. Defendant argues that one skilled in this particular art would have at least a bachelor's degree in mechanical or chemical engineering. Furthermore, defendant contends that no secondary considerations, such as commercial success, favor plaintiff.

In response, plaintiff offers the testimony [*32] of two experts who dispute the existence of an undercut in the Lacaze '692 patent's upper mold cavity. (D.I. 89 Ex. F, Pocklington Decl., at P 5; Ex. H, Roulston Decl., at PP 11-12) According to these experts, the Lacaze patent does not teach an undercut mold half and, therefore, that patent cannot meet claims 1-3 of the '365 patent. Plaintiff's experts also contend that the compression molding

textbook relied upon by Dr. Advani teaches away from the use of undercuts. (D.I. 89, Ex. F, Pocklington Decl., at P 6; Ex. H, Roulston Decl., at P 14-15) Plaintiff's experts also reject defendant's estimation of the qualifications of one skilled in the art. They argue that five to ten years of practical experience, not necessarily a formal degree, would render one skilled in the relevant art of compression molding. (D.I. 89, Ex. H, Roulston Decl., at P 19)

There are, then, several disputed issues of material fact. Consequently, the court shall deny defendant's motion for summary judgment of invalidity.

## C. Defendant's Cross Motion for Laches

Defendant contends that the doctrine of laches bars plaintiff's claim of infringement of the '365 patent. Specifically, it argues that plaintiff's [*33] delay in bringing suit was "unreasonable and inexcusable" and that this delay caused defendant to suffer material prejudice.

The laches defense is cognizable under *35 U.S.C. § 282* as an equitable defense to a claim of patent infringement. See *A.C. Aukerman Co. v. R. L. Chaides Constr. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992)* "Where a defense of laches is established, the patentee's claim for damages prior to suit may be barred." Id. In A.C. Aukerman Co., the Federal Circuit stated that in order for a defendant to invoke the laches defense, the defendant has the burden to prove two factors:

> 1. The plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant; and
> 2. The delay operated to the prejudice or injury of the defendant.

*Id. at 1032.* The defendant must prove both factors by a preponderance of the evidence. *Id. at 1045.* An accused infringer is entitled to a presumption of laches if the infringer can show that the patentee delayed bringing suit for more than six [*34] years from the date the patentee knew or should have known of the alleged infringement. *Id. at 1028, 1037.*

The laches defense, which is based on equitable principles, is not governed by the application of "mechanical rules." *Id. at 1032.* The length of time that is "deemed unreasonable and inexcusable has no fixed boundaries but rather depends on the circumstances." Id. (citations omitted). Thus, the "court must look at all of the particular facts and circumstances of each case and

weigh the equities of the parties." Id. The court must also consider the patentee's reasons for delay. See id. Some excuses that have been recognized include: "Other litigation; negotiations with the accused; possibly poverty and illness under limited circumstances; wartime conditions; extent of infringement; and dispute over ownership of the patent." Id. (citations omitted).

Prejudice may be either economic or evidentiary in nature. See *id. at 1033* (citations omitted). Economic prejudice "may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by [*35] earlier suit." *Id at 1033.* In determining economic damages, the court "must look for a change in the economic position of the alleged infringer during the period of delay." Id. The court should also consider whether, if the infringer had notice, it could have switched to a noninfringing product and whether the patentee intentionally waited for damages to escalate. See id. Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." Id. (citations omitted).

### 1. Defendant Is Not Entitled to a Presumption of Laches

A presumption of laches arises if defendant can show that plaintiff knew or should have known of defendant's infringement on or prior to December 17, 1992 -- six years prior to plaintiff's initiation of its infringement suit. See *A.C. Aukerman Co., 960 F.2d at 1028, 1037.* Defendant contends that, since 1989, plaintiff has tested the cores of golf balls manufactured by defendant and other competitors. [*36] Defendant asserts that some of these golf ball cores had offset mold parting lines and that, therefore, plaintiff knew of defendant's infringement well over six years prior to filing suit.

Evidence exists, however, that prior to 1990 none of defendant's cores had offset mold parting lines. (D.I. 112 at Ex. D) Indeed, defendant admitted that the accused molds went into service only in "late 1990." (D.I. 112, Williams Aff., Ex. C., at PP 10-13) Obviously, then, plaintiff's tests on defendant's golf ball cores between 1986 and 1990 could not have revealed defendant's infringement of the '365 patent because defendant had not yet begun its infringing process.

Defendant also argues that in late 1991 plaintiff purchased 1100 golf balls (including 49 dozen of defendant's golf balls) and conducted tests on those golf balls that would have revealed defendant's infringement of the '365 patent. (D.I. 68 Ex. H, at A9063-64) According to the documents offered by defendant, these golf balls ap-

pear to have been manufactured by a Japanese third-party, not by defendant at its Greenville, South Carolina manufacturing facility where the accused molds were located. Accordingly, this lot of defendant's [*37] golf balls could not have revealed infringement of the '365 patent.

Defendant also points to a 1992 "ball audit" listing test results on some of defendant's golf balls. (D.I. 68, Ex. E, at A9242) The tests measured physical properties of the cores such as diameter, weight, specific gravity, hardness, and core color. The audit did not test whether or not the cores exhibited mold parting lines. Nonetheless, defendant argues that one of the cores tested (the core of the Dunlop Maxfli DDH III golf ball) had an obvious offset mold parting line, which plaintiff's technicians would have observed while performing the other tests. n6 In support of its assertion that the mold parting line would have been obvious to the naked eye, defendant relies upon disputed evidence that plaintiff's technicians removed the core intact. Plaintiff points to record evidence indicating that its technicians used a method of core extraction that would have left the core severely damaged, thus obscuring the offset mold parting line. (D.I. 112, Morgan Dep., Ex. E, 125:22-25) n7 Because genuine issues of material fact exist with respect to the visibility of this offset mold parting line, defendant is not entitled [*38] at this stage of the proceedings to an inference of laches arising from plaintiff's testing of one of defendant's golf balls in 1992.

n6 The ball audit reveals that the Dunlop Maxfli DDH III had a "grey-white" core. (D.I. 68, Ex. E, at A9242) From this, defendant concludes the core had an offset parting line. This is so, defendant argues, because defendant produced cores using two methods in 1992 -- one method, which did not use a mold with an offset mold parting line, involved a peach-colored core material and the other method, which produced an offset mold parting line, used a grey-white core. (D.I. 116, Lynch Decl., PP 3-6)

n7 "In 1989, we were able to cut a golf ball in half and then into quarters and thereby remove the cover from the core fragments and thereby separate the core and the cover." (See also D.I. 112, Ex. A, Morgan Dep., at 131:17-19) ("On an occasional basis in the early 1990s, the can opener method [a method for removing the cores intact] was used to remove covers from cores.") It is unclear from the record what method plaintiff's technicians used to extract the core tested in the 1992 ball audit.

[*39]

## 2. Defendant Is Not Entitled to a Finding of Unreasonable or Inexcusable Delay

Although a presumption of laches is inappropriate at this stage of the proceedings, this alone does not preclude the possibility of a laches defense. See A.C. Aukerman, 960 F.2d at 1038. If defendant can prove unreasonable delay and prejudice based on the evidence of record, it may yet establish laches. See id. To this end, defendant argues that routine tests performed by plaintiff on defendant's golf balls during the 1990s would have revealed the offset mold parting line to plaintiff's technicians. n8 As noted above, the manner in which the cores were extracted during these tests is in dispute. Further, there is testimony indicating that plaintiff tested its competitors' golf balls only for "performance related" features such as spin and distance. (D.I. 112, Morgan Dep., Ex. A, at 120:20-25) Consequently, the court cannot determine on summary judgment that plaintiff's technicians would have known about the offset mold parting line on defendant's golf ball cores.

n8 Plaintiff claims that it first learned of defendant's infringement of the '365 patent through an anonymous September 26, 1998 e-mail from a "disgruntled ex-Maxfli employee." (D.I. 112 Ex. A, 164:25-165:16; Ex. B) Only then did it begin examining defendant's golf ball cores for offset mold parting lines.

[*40]

Defendant also posits that plaintiff had a duty to police its competitors' cores for infringement of the '365 patent and, therefore, that knowledge of infringement should be imputed to plaintiff. According to defendant, if plaintiff had fulfilled its duty to inspect its competitors' golf ball cores for offset mold parting lines, it would have discovered defendant's infringing activities well before 1998.

In support of this assertion, defendant relies on Wanlass v. General Electric Company, 148 F.3d 1334, 1338-39 (Fed. Cir. 1998). In Wanlass, the Federal Circuit affirmed a district court's grant of summary judgment on laches grounds in a case involving a patent for a type of motor used in air conditioners. The district court applied the presumption of laches to the patentee because General Electric ("GE") had "openly made, sold, and marketed" the allegedly infringing devices for over eighteen years before the patentee filed his infringement suit. Id. at 1334. Moreover, the patentee "was on [actual as opposed to constructive] notice that GE was a potential infringer" well before he tested GE's air conditioners

for infringement *Id. at 1340* [*41] The Federal Circuit reasoned that these facts "overwhelmingly gave rise to a duty to investigate GE's possibly infringing activities." *Id. at 1340.*

In the present case, the facts are not nearly as overwhelming. Unlike GE's alleged infringement in Wanlass, defendant at bar only began using the infringing process in 1990. After 1990, its infringing process "gradually" replaced its older, non-infringing process. (D.I. 64 at 9; D.I. 66 Ex. A) Moreover, plaintiff had no actual notice that defendant was a potential infringer. Given the factual differences between the present case and Wanlass, the court declines to find that plaintiff had a duty to inspect defendant's golf ball cores for possible infringement of the '365 patent.

In several respects, the present case resembles *Wanlass v. Fedders Corp., 145 F.3d 1461 (Fed. Cir. 1998),* where the Federal Circuit reversed the same district court's grant of summary judgment on laches grounds in a related case involving the same patentee. In Fedders, the Federal Circuit found disputed issues regarding what the patentee knew, or should have known, of Fedders' allegedly infringing acts. Significantly, [*42] the court concluded that it would be unreasonable to impose a duty to inspect the entire market of possibly infringing products where the patented device was used in some, but not all, products in the industry and where the patentee had no particular reason to believe the defendant was infringing the patent. See *id. at 1465-66.* As in Fedders, the record at bar demonstrates that not all golf balls have cores with the patented off-center mold part-

ing line. Indeed, not even all of defendant's golf balls have off-center mold parting lines. Moreover, plaintiff at bar had no more reason to believe defendant infringed the '365 patent than any of its other competitors. See *id. at 1465.* The record at bar simply does not support a conclusion that plaintiff should have inspected all of defendant's golf ball cores for an offset mold parting line.

Viewing the evidence in a light most favorable to plaintiff, the court cannot conclude at this time that plaintiff's delay in filing suit was unreasonable or inexcusable. Accordingly, defendant is not entitled to summary judgment on its laches claim. Because disputed issues of material fact exist with respect to [*43] the "unreasonable delay" prong of the laches test, the court need not address the prejudice prong of that test at this time.

## V. CONCLUSION

For the aforementioned reasons, the court shall deny plaintiff's motion for summary judgment of validity and enforceability of the '428 and '437 patents and deny plaintiff's motion for summary judgment of infringement of claim 6 of the '437 patent. (D.I. 41) The court likewise shall deny defendant's cross motion for summary judgment of noninfringement of claim 6 of the '437 patent. (D.I. 56) Further, the court shall grant plaintiff's motion for summary judgment of infringement of the '365 patent (D.I. 52) and deny defendant's cross motion for summary judgment of invalidity of that patent and for laches. (D.I. 65) An appropriate order shall issue.