# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CIBA SPECIALTY CHEMICALS
CORPORATION,

               Plaintiff,

         v.

HERCULES, INC. and CYTEC INDUSTRIES,
INC.,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)

C.A. No.:  04-293 (KAJ)

**REDACTED - PUBLIC VERSION**

---

## PLAINTIFF CIBA SPECIALTY CHEMICALS CORPORATION'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR CLAIM CONSTRUCTION OF THE PATENTS-IN-SUIT

*Of Counsel*:

Gordon R. Coons, Esq.
Eley O. Thompson, Esq.
Gregory C. Bays, Esq.
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601-6780

Frederick L. Cottrell, III (#2555)
(Cottrell@rlf.com)
Jeffrey L. Moyer (#3309)
(Moyer@rlf.com)
Chad M. Shandler (#3796)
(Shandler@rlf.com)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899-0551
(302) 651-7700
Attorneys for Plaintiff

Dated:  January 9, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

I.      INTRODUCTION ............................................................................................ 1

II.     SUMMARY OF ARGUMENT ...................................................................... 1

III.    BACKGROUND LEADING TO THIS SUIT .............................................. 5

IV.     BACKGROUND OF THE RELEVANT TECHNOLOGY ........................... 6

   A.   History of the Technology ........................................................................ 6

   B.   Background of the Polyflex® System ...................................................... 9

V.      DISCLOSURE OF THE '766 PATENT ...................................................... 11

   A.   Discussion of "Cross-linking" in the '766 Patent .................................. 11

   B.   Discussion of Average Size in the '766 Patent ...................................... 13

   C.   Discussion of Ionicity in the '766 Patent ............................................... 14

VI.     DISCLOSURE OF THE '808 PATENT ...................................................... 14

   A.   Discussion of Cross-linking and Cross-linking Agent in the '808 patent ...................... 15

   B.   Discussion of the 4 to 4000 ppm Cross-linking Agent Range in the '808 Patent .......... 15

   C.   Discussion of Average Size in the '808 Patent ...................................... 16

   D.   Discussion of Water Soluble Monomers in the '808 Patent .................. 16

VII.    PROSECUTION OF THE '766 PATENT .................................................... 17

VIII.   PROSECUTION OF THE '808 PATENT .................................................... 19

IX.     APPLICABLE CANONS OF CLAIM CONSTRUCTION ......................... 20

   A.   Ordinary and Customary Meaning Required .......................................... 21

   B.   Limitations from Preferred Embodiments Should Not be Read into Claims ................ 21

C.    Statements Made During Prosecution Do Not Limit The Claims Without Clear Intent to Disclaim Subject Matter ........................................................................................ 23

D.    Unrelated Patents Should Be Interpreted Separately ..................................................... 23

E.    Prior Art Cited in Specification is Intrinsic  Evidence and Public Record ..................... 24

F.    Order of Steps in a Method Ordinarily Not a Limitation ............................................... 24

X.     PROPER CLAIM CONSTRUCTION OF DISPUTED TERMS .................................... 25

   A.    Disputed Elements from the '766 Patent ...................................................................... 26

     1.    "A method of making paper which comprises adding ... from about 0.05 to about 20 lbs/ton ... of ... microbead" ............................................................................ 26

     2.    "Aqueous paper furnish" ..................................................................................... 28

     3.    "An ionic, organic, cross-linked polymeric microbead" .................................... 28

     4.    "The microbead having an unswollen particle  diameter of less than about 750 nanometers" ........................................................................................................ 30

   B.    Disputed Elements From the '808 Patent ..................................................................... 32

     1.    "A composition comprising" ............................................................................... 33

     2.    "Cross-linked anionic or amphoteric  polymeric microparticles" .................... 33

     3.    "Microparticles derived solely from the polymerization  of an aqueous solution of at least one monomer" .............................................................................. 34

     4.    "Said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron" .............................................................. 35

     5.    "A cross-linking agent" ....................................................................................... 36

     6.    "Said microparticles having... a cross-linking agent  content of about 4 molar parts to about 4000 parts per  million, based on monomeric units present in the polymer" ................................................................................................................ 38

     7.    "Admixing (i) an aqueous solution comprising... at  least one cross-linking agent...; (ii) an oily phase...;  (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion" .................................................. 39

XI.    CONCLUSION ............................................................................................................ 40

## TABLE OF AUTHORITIES

PAGE

Cases

*ACTV, Inc. v. Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003) ...................................................... 22, 23

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) .................................................. 25

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) ............... 27, 32, 38

*Arthur A. Collins, Inc, v. Northern Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000)..................... 24

*Autogiro Co. of America v. United States*, 384 F.2d 391 (Ct. Cl. 1967)....................................... 24

*Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998) ........................ 34

*Cytologix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005) .............................. 21

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997) .................................................. 33

*Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004) .............................................. 38

*Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004)............................................ 23

*In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981) ....................................................................... 26

*In re Crish*, 393 F.3d 1253 (Fed. Cir. 2004) ............................................................................... 33

*Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003), *vacated on other grounds*, 125 S.Ct. 2372 (2005)......................................................................................... 23

*Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001)..................... 24

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377 (Fed. Cir. 2000) ............................. 26, 32

*Katz v. AT&T Corp.*, 63 F.Supp.2d 583 (E.D. Pa. 1999) ............................................................. 23

*Kustom Signals, 264 F.3d 1326 (Fed. Cir. 2005)* ............................................................. 27, 32, 33

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004), ............................... 22

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) .......................... 34

*Mitek Surgical Prods., Inc. v. Arthrex, Inc.*, 21 F.Supp.2d 1309 (D. Ut.1998), *aff'd*, 230 F.3d 1383 (Fed. Cir. 2000) (unpublished) ........................................................................................ 24

*Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364 (Fed. Cir. 2005) ............ 21

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) ...................................... 23

*PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359 (Fed. Cir. 2005) .................... 21

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 20, 21

*Sorensen v. ITC*, 427 F.3d 1375 (Fed. Cir. 2005) ...................................................................... 21

*Specialty Composites v. Cabot Corp.*, 845 F.2d 981 (Fed. Cir. 1988) ........................................ 22

*Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1211 (Fed. Cir. 2002) .............................. 24

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ............................ 20, 21, 24

*York Prods., Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568 (Fed. Cir. 1996) ..... 23

**Other Authorities**

MANUAL OF PATENT EXAMINING PROCEDURE ("MPEP") § 608.01(a) ........................................ 13

## I.    INTRODUCTION

Pursuant to this Court's scheduling order, Plaintiff Ciba Specialty Chemicals Corporation

("Ciba") submits this opening brief in support of its construction of the disputed claim terms in

the two patents-in-suit, U.S. Patent Nos. 5,167,766 ("the '766 patent") and 5,171,808 ("the

'808 patent") (collectively, "the patents-in-suit").

## II.    SUMMARY OF ARGUMENT

The subject matter reflected in the '766 and '808 patents was developed by Defendant

Cytec Industries, Inc. ("Cytec"), then operating as American Cyanamid.  The '766 patent relates

to a novel method of making paper using an organic microbead, and the '808 patent relates to the

microparticle itself.  The '766 and '808 patents-in-suit resulted from separate chains of patent

applications having different inventive groups.  As a result, the intrinsic record for the patents is

different in some respects.  In any event, because the patents-in-suit result from separate chains

of patent applications, the interpretation of their respective claims should be considered

separately.

While Hercules has asked for interpretation of almost all of the language of the

independent claims of the patents,[1] the primary areas of dispute are more limited.  As to the '766

patent, the primary dispute between the parties concerns language in the claims referencing

cross-linking and the average size of the microbeads.  As to the '808 patent, the primary dispute

between the parties concerns language in the claims referencing a cross-linking agent, the

---

[1] Pursuant to the Court's scheduling order the parties have exchanged terms for which they seek
interpretation, and responded to the other's assertions.  A combined chart with the respective language
identified and side-by-side interpretations is attached hereto as Exhibit 1 to the Declaration of L. Scott
Beall, filed herewith.  Cytec has not requested interpretation of any language and is presumably relying
on Hercules' assertions and arguments.

- 1 -

measurement of the amount of the cross-linking agent added, the average size of the microparticles, and the requirement of at least one water soluble monomer.

Ciba's position is that the claims should be interpreted based on their plain meaning as would have been understood by one of ordinary skill in the art at the time. Hercules has advanced a position that the reference to cross-linking in the '766 patent should be re-written to require "covalent cross-linking" even though the record is clear that there were many different subsets of cross-linking known to those in the art at the time, including covalent and ionic cross-linking. The '766 patent did not involve the discovery of a new form of cross-linking, and the claims are not limited to any particular form of cross-linking. The "Background" section of the '766 patent states that cross-linking was well known in the art and references a patent that specifically identifies several methods of cross-linking, some of which involve cross-linking agents and some that do not. Where cross-linking agents are involved, the Background section mentions covalent cross-linking agents and ionic cross-linking agents.

During the prosecution history leading to the '766 patent, there was no disavowal of any subset of cross-linking. In particular, the applicants never distinguished hydrophobic cross-linking, which is the actual essence of Hercules' attempt to limit the claims. During the prosecution leading to the '766 patent, hydrophobic cross-linking was never an issue.

As to the size limitation, the '766 patent references the surprising benefits that were achieved when the number average diameter of the microbeads was below 750 nanometers. Comparative Examples are included contrasting samples where the number average diameter was below 750 nanometers, and where it was around 1000 nanometers (i.e., 1 micron). The '766 patent defines the size as being the unswollen number average diameter as determined using quasielectric light scattering spectroscopy technology (QELS).

- 2 -

In an effort to broaden the '766 claims for purposes of its invalidity contentions, Hercules argues that the size language of the claims in the '766 patent should be read so that even one stray microbead below 750 nanometers in the prior art would invalidate the claims. This is clearly not what the '766 patent sets forth as the plain meaning of the claim language and the definition of how to measure the size. The interpretation offered by Hercules would make the surprising results observed in the '766 patent meaningless and would make the claim read on larger microbeads that were considered outside the invention.

The remaining language of the '766 patent referenced in the charts (Exh. 1)[2] is the result of Hercules' efforts to bolster the above arguments. The meaning of such language (e.g., "comprising") is dictated by case law. Thus, Ciba will not address such language here, but will address it in the following sections.

Ciba submits that the '808 patent should also be interpreted based on the plain language of the claims as would be understood by those of ordinary skill in the art. Hercules essentially seeks to inject the same limitations as to cross-linking as with the '766 patent. Hercules wants to re-write the claims to require "covalent cross-linking" and a "covalent cross-linking agent." As with the '766 patent, the "Background" section of the '808 patent specifically refers to the generally known methods of cross-linking. The referenced materials identified include cross-linking agents which are covalent and ionic agents. The claim language of the '808 patent, in distinguishing "cross-linking" from "cross-linking agent," demonstrates that when limiting language was intended (such as to use of an agent) such limiting language was used. There is no limiting language excluding ionic cross-linking agents, nor for that matter any agent that functions to cross-link the microparticle.

---

[2] Hereinafter, "Exh. ___" refers to Exhibits attached to the Declaration of L. Scott Beall dated December 30, 2005, filed herewith.

Hercules also misinterprets the prosecution leading to the '808 patent. In particular, Hercules relies on the part of the prosecution addressing U.S. Patent No. 4,681,912 ("Durand et al."). The only material question regarding the Durand et al. patent is whether the surfactant was incorporated into the polymer chains. The answer, as agreed by Hercules' experts, is that the surfactant of Durand et al. does not react with the polymer chains, and never plays a role in the final product. Thus, Durand et al. does not exhibit any form of cross-linking and was entirely irrelevant. There was no disclaimer of any subset of cross-linking, because Durand et al. does not exhibit any cross-linking properties in the first instance.

Hercules has also raised the argument that the 4 to 4000 ppm limitation in the claims of the '808 patent should require measurement after polymerization. This is contrary to the plain meaning and the methods disclosed in the patent. In the '808 patent, the amount of cross-linking agent is measured as added in the polymerization process and measured against the monomers that become part of the polymer. Thus, Hercules' strained interpretation would improperly exclude the very methods described in the patent.

As to the size limitation, the '808 patent states that the particles are on average below 750 nanometers. The number average size is measured using the same techniques as referenced in the '766 patent. The '808 patent actually "incorporates by reference" the text and definitional language of the '766 patent.

Hercules has also attempted to rely on a passage in the '808 claims requiring at least one monomer which is water soluble. Hercules argues that this passage excludes any product where there is even the smallest amount of initiation or polymerization in the oil phase.[3] Such an

---

[3] As explained in Ciba's technical tutorial, the general nature of inverse emulsions is that there are water droplets suspended in the oil phase. (Exh. 2, slide 38; Exh. 3, Hearing Trans. at 20-21.)

interpretation is directly contrary to the prosecution history, which carefully explained the meaning of the limitation, i.e., as merely requiring water soluble monomers.

As a result, Ciba asks this Court to adopt its suggested claim interpretation, which is based on the plain meaning of the claims and the prosecution history of the patents. Hercules' claim interpretation is strained and inconsistent with the intrinsic record. Hercules' position would usurp the contribution made by the Cytec inventors. The basis for Ciba's position is described more fully below.

## III.   BACKGROUND LEADING TO THIS SUIT

The '766 and '808 patents-in-suit were obtained by Defendant Cytec, then operating as American Cyanimid. The patents name different inventive entities. The '766 patent names Dan Honig and Elieth Harris as inventors. The named inventors of the '808 patent are Roderick Ryles, Dan Honig, Elieth Harris and Roger Neff. The applications leading to these patents were filed separately on June 11, 1990. The '766 patent relates to a novel method of making paper involving a microbead and the '808 patent relates to microparticles and how they are made.

The commercial system covered by the patents-in-suit is referred to as the Polyflex® system. The Polyflex® system was jointly commercialized by Hercules and Cytec for many years. After the patents and the Polyflex® business were sold to Ciba,



REDACTED

REDACTED                                    The present lawsuit asserts that the Perform®

products and their use in making paper infringe the patents-in-suit.

## IV.    BACKGROUND OF THE RELEVANT TECHNOLOGY

On May 27, 2005, Ciba presented a technical tutorial to this Court relating to the

technology involved in the patents-in-suit. Ciba attaches a copy of its slides to the tutorial and

the transcript for the Court's review. (Exhs. 2 and 3, respectively.) In the presentation, Ciba

explained the technology involved in the patents-in-suit and how the chemicals involved in these

patents are useful to improve the making of paper. In particular, the chemicals developed in the

patents demonstrated surprisingly good benefits as drainage and retention aids.

### A. History of the Technology

In commercial papermaking processes, trees are reduced into a pulp slurry that contains

wood fibers, fines and water. This pulp slurry is treated with additives while undergoing further

processing with equipment such as screens, fan pumps, etc. The pulp slurry (or furnish) is spread

on a wire screen of a Fourdrinier machine where it is drained of water so that paper begins to be

formed. An overall schematic of a commercial papermaking process is shown:



(Exh. 2, slide 6; Exh. 3, Hearing Trans. at 7–9.)

The efficiency of the paper making plants is measured by the rate at which the paper can be formed on the Fourdrinier machine while maintaining good quality. The ultimate goal is to make paper with good formation, meaning that the paper has a consistent density and texture.[4] A further goal is to retain the fillers, fines and other additives that are used to make the paper. The water that dilutes the paper furnish and slurry is recycled, so not contaminating the re-circulated water with chemicals is also a goal. In other words, the chemicals added in the process are generally intended to remain with the paper.

As the technology of papermaking has evolved, there has been an effort to increase the processing speeds while maintaining a good quality product. In the 1980s, Eka introduced a Compozil® system that was based on silica. Silica is an inorganic product. The Eka system was patented under U.S. Patent 4,385,961.

---

[4] Poorly formed paper can appear clumpy like artists' paper.

In the late 1980s, Allied Colloids introduced a Hydrocol® system based on bentonite. Bentonite is also an inorganic product. The Hydrocol® system was patented under U.S. Patent No. 4,753,710.

Cytec's efforts in the late 1980s involved developing a product that would be better and different from the pre-existing technologies. Unlike the prior technology, Cytec wanted an organic polymer that would show improved performance. The Polyflex® system was the result. After introduction, the Polyflex® system demonstrated itself as providing an improvement over the pre-existing technologies and it gained wide-spread acceptance.



- 8 -

**B.  Background of the Polyflex® System**

A typical commercial application of the Polyflex® system involves a two-step

flocculation process.  In an initial step, a cationic chemical is added to bind (i.e. flocculate) the

paper fibers, fines, additives, etc.  These chemicals, which are usually linear and relatively long,

bind to the paper components due to their cationic charge.  The paper fibers and other

components are usually anionic in nature, so the cationic chemical tends to attach to the paper

components.[5]  The use of such cationic chemicals tends to make large, tightly bound flocs as

depicted below:



(Exh. 2, slide 22; Exh. 3, Hearing Trans. at 13–15.)  The picture on the right is an actual

photomicrograph of a large floc bound together.  Such flocs are not effective because they tend

---

[5] Such attraction is similar to the electrostatic attractions that can be observed with a child's balloon.
From common experience, if you rub the balloon, it can develop a charge.  That charge is opposite to that
of things like hair and dust.  The opposite charges attract so that the balloon can attach to dust, hair, etc.

RLF1-2964474-1

to retain water, slowing down the papermaking process and producing non-uniform formation of the final paper product.

Thus, in the commercial Polyflex® system, such flocs are sheared to break down their size and loosen the network:



(Exh. 2, slide 24; Exh. 3, Hearing Trans. at 15–16.)

The smaller flocs are then joined by the Polyflex® microparticles to form a relatively open network of smaller flocs. Since the cationic chemicals remain with the smaller flocs, the commercial Polyflex® system is usually anionic in nature. The system of smaller flocs is possible because the Polyflex® product includes microparticles which are small, ionic and constrained by cross-linking to provide a particulate structure:

RLF1-2964474-1



(Exh. 2, slide 28; Exh. 3, Hearing Trans. at 16–17)

## V.    DISCLOSURE OF THE '766 PATENT

The '766 patent is entitled "Charged Organic Polymer Microbeads in Paper Making."
The "Background of the Invention" section of the '766 patent explains that the patented method
was novel in that no one had developed and recognized the benefits of such a process as
developed by Cytec. The "Background of the Invention" section explains how multiple areas of
polymer technology were brought together to make a new product with benefits not previously
seen. The patent explains that the important aspects of the new organic polymer were its size,
that it was ionically charged, and that its structure was constrained by cross-linking.

### A. Discussion of "Cross-linking" in the '766 Patent

The Cytec work was not about developing a new form of cross-linking. Indeed, the
Examples of the patent involve a well-known, and often-used, cross-linking agent called
methylene-bis-acrylamide (MBA). (Exh. 5, '766 patent, Col. 11, line 20 *et seq.*) The

RLF1-2964474-1

Background section explains that "crosslinking technology is well known in the art." (Exh. 5, '766 patent, Col. 2, lines 52–53.) This passage is referring specifically to EP 0,202,780, which describes some various ways of cross-linking. The '780 patent states that:

> [C]ross linking ... may be brought about by controlled spontaneous conditions such as heating or irradiation, provided the degree of chain branching or other cross linking is reproducible and controllable, but preferably is brought about by reaction of the monomer or monomer blend, or the final polymer, with a covalent or ionic cross linking agent.

(Exh. 6, '780 patent, Col. 9, lines 19-27.) A depiction of ionic cross-linking from a college textbook is as follows:



*Figure 7.3 Schematic diagram of clusters in an ionomer.*

(Exh. 7 at CIBA 037951.) As shown, the polymer chains are cross-linked through the clusters held together by ionic forces. "The crucial point here is that the ionic domains phase separate into some form of cluster, as illustrated in figure 7.3, and these do indeed act as cross-links...." (Exh. 7 at CIBA 037949.) The '780 patent specifically references metal salts as being ionic cross-linkers. (Exh. 6, '780 patent, Col. 10, line 28.)

- 12 -

In the section entitled "Detailed Description of the Invention Including Preferred Embodiments," the '766 patent explains that the preferred manner of cross-linking is with a cross-linking agent.[6] The section further explains that the preferred cross-linking agents are "polyfunctional crosslinking agents" that generate covalent bonds. (Exh. 5, '766 patent, Col. 6, line 39 *et seq.*)

The section of the patent entitled "Summary of the Invention" does not include any specific reference to how cross-linking may be obtained or even whether a cross-linking agent is used. (Exh. 5, '766 patent, Col. 3, line 10 *et seq.*) The Summary of the Invention section merely states that: "[t]he microbeads may be made as microemulsions by a process employing an aqueous solution comprising a cationic or anionic monomer and a crosslinking agent." (Exh. 5, '766 patent, Col. 3, lines 40-42.) The same paragraph of the summary notes that the microbeads may also be made by other processes. (Exh. 5, '766 patent, Col. 3, line 46 *et seq.*)

### B.  Discussion of Average Size in the '766 Patent

The '766 patent notes in the "Background of the Invention" that the typical size of microemulsions at the time was larger than 1 micron. The Background section explains:

> [T]he particle size of polymers prepared by conventional, inverse, water-in-oil, emulsion, polymerization processes are limited to the range of 1-5 microns, since no particular advantage in reducing the particle size has hitherto been apparent.

(Exh. 5, '766 patent, Col. 2, lines 58-63.) While the survey of emulsion technology in the Background section notes the existence of sub-micron size emulsions, the '766 patent notes that such emulsions failed to have other necessary qualities of the invention. (Exh. 5, '766 patent, Col. 2, lines 34-39.)

---

[6] Such sections in patents set forth the preferred embodiment of the invention.  See MANUAL OF PATENT EXAMINING PROCEDURE ("MPEP") § 608.01(a) Arrangement of Application (8th Ed., Rev. 4, October 2005) (using advice paragraph (h) for applicants on specification content, "DETAILED DESCRIPTION OF THE INVENTION: See MPEP § 608.01(g). A description of the preferred embodiment(s) of the invention as required in 37 CFR 1.71.").

In the "Summary of the Invention" section of the '766 patent, the inventors explain that they had surprisingly found that the number average diameter (size) of their microbead had a dramatic impact on the effectiveness of the microbead. The patent explains that:

> It was surprisingly found that the cross-linked, organic, polymeric microbeads have a high efficiency as retention and drainage aids when their particle size is less than about 750 nm [nanometers] in diameter…

(Exh. 5, '766 patent, Col. 3, lines 58-51.)  The '766 patent explains that, when it is referring to size, it is referring to the unswollen number average particle diameter. (Exh. 5, '766 patent, Col. 11, lines 42-44.)  Example 25 of the patent sets forth data evidencing the surprising results comparing 1 micron (1000 nanometer) samples with samples of less than 500 nanometers. (Exh. 5, '766 patent, Col. 22, line 59 to Col. 23, line 15.)  Very little benefit is seen for the 1 micron samples, while the small size samples show marked improvement in drainage.

## C. Discussion of Ionicity in the '766 Patent

The other important aspect of the invention relates to ionicity.  The '766 patent explains that the microbead needs to be sufficiently ionic to work properly.  (Exh. 5, '766 patent, Col. 6, line 29 *et seq*.)  Since there are no claim limitations in dispute relative to ionicity, Ciba will not further dwell on this important characteristic of the microbead of the '766 patent.

## VI.    DISCLOSURE OF THE '808 PATENT

The '808 patent includes the same disclosure as is found in the '766 patent.  In fact, the '808 patent incorporates the descriptions of the '766 patent by reference.  (Compare Exh. 8, '808 patent, Col. 3, lines 36-39 with Col. 9, lines 40-41.)  The '808 patent specifically states that "[t]he above mentioned patents and publications are incorporated herein by reference."  (Id.)

- 14 -

### A. Discussion of Cross-linking and Cross-linking
### Agent in the '808 patent

As with the '766 patent, the '808 patent is not directed to the development of a new form

of cross-linking. The Examples of the '808 patent employ MBA, which is a very common cross-

linking agent, as previously noted. The '808 patent specifically states that the Examples "are not

[to] be construed as limitations on the invention except as set forth in the appended claims."

(Exh. 8, '808 patent, Col. 6, lines 51–53.)

In the section of the patent entitled "Background of the Invention," the '808 patent refers

to the '780 patent, stating that "[t]his crosslinking technology is well known in the art." (Exh. 8,

'808 patent, Col. 1, lines 28-29.) As described above, the '780 patent specifically identifies

covalent and ionic cross-linking agents. (Exh. 6, '780 patent, Col. 9, lines 19-27.) For the

purposes of brevity, this Court's attention is invited to section IV.A. above for a discussion of the

various cross-linking techniques mentioned in the '780 patent.

In addition to describing that the microparticle of the '808 patent may be cross-linked, the

'808 patent explains that such cross-linking may be accomplished with a cross-linking agent. Of

course, the '780 patent explains that cross-linking could result without the use of agents. Several

exemplary agents are referenced in the "Background of the Invention" including covalent and

ionic cross-linking agents. The '808 patent also refers to another subset of agents called

"polyfunctional crosslinking agent[s]." (Exh. 8, '808 patent, Col. 4, line 48.) Such polyfuctional

cross-linking agents include the MBA used in the commercial embodiment of Polyflex®.

### B. Discussion of the 4 to 4000 ppm Cross-linking
### Agent Range in the '808 Patent

The '808 patent describes the manner in which to measure the amount of cross-linking

agent. The patent states that "[c]rosslinking agents are to be used in sufficient quantities to

- 15 -

assure a cross-linked composition." (Exh. 8, '808 patent, Col. 4, lines 63-64.) The patent explains that:

> Preferably at least 4 molar parts per million of crosslinking agent, based on the monomeric units present, are employed to induce sufficient crosslinking...

(Exh. 8, '808 patent, Col. 4, lines 64-67.) As made apparent by the passage, the '808 patent specifies the amount of cross-linking agent based on what is added, before any reaction and before cross-linking is "induced."

The '808 patent includes tables identifying various samples made with different levels of cross-link agent in ppm. (See, e.g., Exh. 8, '808 patent, Col. 7, lines 33-45.) The '808 patent explains that the ppm levels are measured from the amount of ingredients added when preparing the samples. (Exh. 8, '808 patent, Col. 7, line 26.) The ppm calculation is based on what is mixed together, before any reaction. (Exh. 8, '808 patent, Col. 6, lines 58-67.)

### C.  Discussion of Average Size in the '808 Patent

In addition to incorporating the disclosure of the '766 patent as noted above, the '808 patent also states that the size measured is the "unswollen number average particle size." (Exh. 8, '808 patent, Claim 1.) This is the same measurement as described above in Section IV.B., supra, and is not repeated here for brevity.

### D.  Discussion of Water Soluble Monomers in the '808 Patent

The '808 patent discloses various monomers that may be used to make the microparticle. Among these monomers are acrylic acid and acrylamide. These are the preferred monomers and the ones used in the commercial Polyflex® product. The acrylic acid provides the ionicity for the microparticle. Both of the monomers are fully soluble in water.

- 16 -

## VII.    PROSECUTION OF THE '766 PATENT

During prosecution in the U.S. Patent and Trademark Office, some of the elements of the claims were discussed. These discussions of the elements demonstrate that the plain meaning of the terms in dispute was upheld by the Patent and Trademark Office.

During prosecution, the Patent Examiner asserted U.S. No. Patent 4,759,856 (the "Farrar et al. patent") against the claims. (Exh. 9, '766 patent prosecution, Paper No. 3 at 3-4.) The Examiner asserted that the Farrar et al. patent discloses cross-linked particles where the sizes could be less than 2 microns. The Farrar et al. patent, like the other background patents mentioned in the '766 patent, explains that cross-linking could occur in several different ways, including by heat or by covalent or ionic cross-linking agents. (Exh. 10, Farrar et al. patent, Col. 10, lines 28-41.) The Farrar et al. patent specifically notes that "the polymer [may be] cross linked by, for instance, excessive heating during drying." (Exh. 10, Farrar et al. patent, Col. 10, line 28.) The Farrar et al. patent also refers to cross-linking by agents stating:

> Added cross linking agents can include ionic cross linking agents such as
> polyvalent metal salts, formaldehyde, glyoxal or, preferably, covalent cross
> linking agents that will copolymerize with the monomers…

(Exh. 10, Farrar et al. patent, Col. 10, lines 38-41.)

In its response, the Cytec applicants did not make any distinction based on cross-linking having any particular meaning, but referred to the Farrar et al. patent as "representative of the prior art." (Exh. 9, '766 patent prosecution, Paper No. 4 at 4.) Cross-linking was not a factor and there was no disavowal. Instead, the Farrar et al. patent was found not be relevant because of the limitations in the claims relating to the average size of the microbeads. The applicants pointed out that the Farrar et al. patent discloses the conventional emulsions where the number average particle size was 1 micron or above. Although the Farrar et al. patent references

- 17 -

particles "having size below 2 microns," the Cytec applicants explained that their work had

uncovered "unexpected results" based on the number average size of the particles being less than

about 750 nanometers. (Exh. 9, '766 patent prosecution, Paper No. 4 at 5.) The applicants

explained that such size distinctions were "representative of a patentable improvement over the

cited Farrar et al. reference." (Id.)

In the same amendment, the Cytec applicants clarified the specification by adding words

to the effect that the size measurements are "defined and used herein" as the unswollen number

average of the particles. (Exh. 9, '766 patent prosecution, Paper No. 4 at 1.) In the

accompanying description, the applicants explained that:

> The specification has been amended so as to clarify how the particle size of the
> polymeric microbeads used in the instant invention is measured in that the QELS
> is carried out on the polymer emulsion, microemulsion or dispersion rather than
> the dry polymer. This amendment is not considered to be new matter in that it
> constitutes a clarification so as to prevent any misunderstanding rather than a
> completely new definition.

(Exh. 9, '766 patent prosecution, Paper No. 4 at 1-2.) The Examiner removed the rejection under

the Farrar et al. patent, accepting the size distinction based on the unswollen number average size

as defined in the '766 patent.

While there were other rejections over other prior patents, such as a Probst patent, such

rejections were ultimately considered improperly asserted. The applicants pointed out to the

Examiner that the chemical Probst was concerned with, epichlorohydrin, was "only a cross-

linking agent when reacted under certain precise conditions." (Exh. 9, '766 patent prosecution,

Paper No. 10 at 4.) The Examiner agreed.

Throughout prosecution, the Examiner and the applicants treated cross-linking as

potentially deriving from any means, so long as it was present in the product during use.

- 18 -

## VIII.  PROSECUTION OF THE '808 PATENT

Hercules has relied on the prosecution and the assertion of U.S. Patent No. 4,681,912 ("Durand et al.") in an attempt to improperly limit the claim language to a "covalent" cross-linking agent.  Indeed, Hercules has attempted to restrict the claims to covalent cross-linking agents that are polyfunctional.

During the prosecution of the applications leading to the '808 patent, the Examiner asserted Durand et al.  The Examiner's rejection was based on the speculation that "it [was] reasonable to expect" that the oleate chemicals referenced in Durand et al. would cross-link. (Exh. 11, '808 patent prosecution, parent '626 application, Paper No. 2 at 5.)  The Cytec applicants did not amend the claims in any way relating to the Examiner's rejection, and no limitation was placed on the original "cross-linking agent" term.  Instead, the applicants asserted that there was no incorporation in Durand et al.  The applicants pointed out that:

> Durand et al. fail to indicate the incorporation of a cross-linking agent into the polymer produced therein.

(Exh. 11, '626 application, paper No. 4 at 6.)



                                             The Examiner ultimately agreed

with the view now expressed by Hercules' expert in this litigation, and removed the rejection

because there was no incorporation of the oleate and there was no cross-linking exhibited in

Durand et al.

During the course of prosecution, the applicants added language to the '808 pending

claims, specifying that the microparticles are "derived solely from water-soluble monomers."

(Exh. 11, '626 application, paper No. 4 at 2.)  This limitation was included to specify that the

monomers used, such as acrylic acid and acrylamide, were water soluble.  As a matter of

clarification in allowing the '808 patent, the Examiner suggested the change of "water soluble

monomers" to "the polymerization of an aqueous solution of at least one monomer." (Exh. 12,

'808 patent prosecution, Paper No. 8 at 2.)  The Examiner explained the change, stating that

"[t]he change of water soluble to aqueous solution prevents the claims from encompassing

partially soluble monomers." (Id.)  This prosecution makes it crystal clear that the limitation was

only intended to specify that the monomers are water soluble.  Hercules has improperly asserted

that the language is intended to restrict where polymerization may occur.

### IX.    APPLICABLE CANONS OF CLAIM CONSTRUCTION

The words of a claim are generally given their ordinary and customary meaning, which is

"the meaning that the term would have to a person of ordinary skill in the art in question at the

time of the invention." *Phillips v. AWH Corp.*, 415 F.3d at 1303, 1313 (Fed. Cir. 2005) (*en

banc).*  In support of the ordinary meaning of the claims, the Court should consider the intrinsic

record. *Id.* at 1315–17. The "intrinsic evidence of record" is defined as "the patent itself,

including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*

RLF1-2964474-1

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). All evidence that is not

"intrinsic" evidence is extrinsic. To the extent that intrinsic evidence reveals the proper claim

construction, reliance on extrinsic evidence to construe a claim term is improper. *Id.* at 1584.

Extrinsic evidence cannot "vary or contradict" the meaning of claim language in view of the

intrinsic evidence. *Id.* at 1584.

### A.  Ordinary and Customary Meaning Required

The Federal Circuit has repeatedly directed that claim terms are generally to be construed

according to their "ordinary and accustomed meaning." *See, e.g., PC Connector Solutions LLC*

*v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005); *Nazomi Communications, Inc. v.*

*ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005). The Federal Circuit has emphasized

that a more narrow construction than the ordinary meaning is appropriate only where the

evidence intrinsic to the patent includes an express statement limiting a claim's scope to

something less than its ordinary and customary meaning. *See, e.g., Sorensen v. ITC*, 427 F.3d

1375, 1379 (Fed. Cir. 2005) (narrow construction unwarranted where "the inventor does not

disclaim, in the specification or claims, any particular difference in characteristic of the materials

used in the sequential molding steps."); *Cytologix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d

1168, 1173–74 (Fed. Cir. 2005) (reversing a narrow construction that "conflicts with the plain

language of the claims" because no intrinsic evidence supported the more narrow construction).

### B.  Limitations from Preferred Embodiments Should Not be Read into Claims

The ordinary and customary meaning of a patent claim is usually broader than the

specific embodiment or embodiments disclosed in the specification of the patent. The *en banc*

Federal Circuit has confirmed that a court should not ordinarily limit a claim to a preferred

- 21 -

embodiment that is disclosed in the patent because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 at 1323. Even where a patent describes only a single embodiment, claims will be given their ordinary meaning, and will not be "read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation omitted). Where the written description does not expressly limit the claim term and otherwise supports a broader interpretation, a court is "constrained to follow the language of the claims and give the claim term its full breadth of ordinary meaning as understood by persons skilled in the art." *ACTV, Inc. v. Disney Co.,* 346 F.3d 1082, 1091 (Fed. Cir. 2003) (internal citation omitted).

In *Liebel-Flarsheim*, the Federal Circuit rejected the accused infringer's argument for narrowly construing the claims even though every embodiment in the specification was limited to the feature in question:

> There are several answers to Medrad's argument. The first is that this court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction."

358 F.3d at 906 (citations omitted). The Federal Circuit cited *Liebel-Flarsheim* with approval in *Phillips* 415 F.3d at 1323. The *Phillips* decision did not change the law on this point. Nor did it reverse the dozens of cases in which the Federal Circuit refused to read limitations from the specification into the claim to limit the "ordinary and customary" meaning. For example, in *Specialty Composites v. Cabot Corp.,* 845 F.2d 981 (Fed. Cir. 1988), at issue was the

- 22 -

interpretation of the term "plasticizer." The District Court interpreted the claims to be limited to external plasticizers. *Id.* at 989. The Federal Circuit held this to be error because nothing in the specification, other claims or the prosecution history indicated that the normal art-recognized meaning of the word "plasticizer," as a general term covering both external and internal plasticizers, should be given a more restrictive meaning. *Id.*

### C. Statements Made During Prosecution Do Not Limit The Claims Without Clear Intent to Disclaim Subject Matter

Claim scope must be clearly disavowed in the intrinsic evidence before a claim's scope will be limited to anything other than its plain meaning. Stated differently, "'[u]nless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage,' that is, by making a statement that concedes or disclaims coverage of the claims at issue based on a piece of prior art." *Katz v. AT&T Corp.,* 63 F.Supp.2d 583, 591 (E.D. Pa. 1999) (*quoting York Prods., Inc. v. Central Tractor Farm & Family Center,* 99 F.3d 1568, 1575 (Fed. Cir. 1996). Thus, as the Federal Circuit recently reiterated, the presumption that claim scope should be determined based on the ordinary meaning of claim terms will prevail in the absence of "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1308–09 (Fed. Cir. 2005) (*quoting ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1091 (Fed. Cir. 2003)).

### D. Unrelated Patents Should Be Interpreted Separately

Patents that are "filed separately," such as the two patents-in-suit, are unrelated patents, which should be interpreted independently of one another. *See Goldenberg v. Cytogen, Inc.,* 373 F.3d 1158, 1167 (Fed. Cir. 2004); *see also Integra Lifesciences I, Ltd. v. Merck KGaA,* 331 F.3d 860, 869 (Fed. Cir. 2003), *vacated on other grounds,* 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005);

- 23 -

*Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1211 (Fed. Cir. 2002) (explaining that an unrelated patent "sheds no light" on the claims in the patent at issue). Thus, such patents may have different intrinsic records.

### E. Prior Art Cited in Specification is Intrinsic Evidence and Public Record

The intrinsic evidence includes an analysis of the prior art cited therein. *See Vitronics*, 90 F.3d at 1583; *Arthur A. Collins, Inc, v. Northern Telecom Ltd.*, 216 F.3d 1042, 1044–45 (Fed. Cir. 2000) ("When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning."); *Autogiro Co. of America v. U. S.*, 384 F.2d 391, 399 (Ct. Cl. 1967). "It is well established that the prior art as cited by the applicant is part of the intrinsic evidence upon which the court must rely on to construe the claims." *Mitek Surgical Prods., Inc. v. Arthrex, Inc.*, 21 F.Supp.2d 1309, 1313–14 (D. Ut. 1998), *aff'd*, 230 F.3d 1383 (Fed. Cir. 2000) (unpublished). Prior art that is not cited in the specification or the prosecution history is extrinsic evidence, though it can often help to demonstrate how a claim term is used by those skilled in the art. *Vitronics*, 90 F.3d at 1584–85.

### F. Order of Steps in a Method Ordinarily Not a Limitation

A two-part test exists to determine if the steps of a method claim that lack a specific order still must be performed in the order that they are written. *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342–43 (Fed. Cir. 2001) First, the claims are examined to see if they must be performed in a certain order as a matter of logic or grammar, for example, where the second step requires something done in a first step. *Id.* If not, then second, the specification is used to determine if a narrowing construction is required. *Id.* If neither of the two parts is met, then the sequence in which such steps are written in the claim is not a limitation

- 24 -

requirement in construction. *Id.* Furthermore, the Federal Circuit has stated that the basic

principles that claims take their ordinary meaning unless the patentee demonstrated intent to

deviate from such, the number of embodiments in the specification is not determinative of claim

scope, and that claims are ordinarily not limited in scope to the preferred embodiment when

method steps are at issue. *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir.

2003) ("These principles apply with equal force where...the limitation to be imported from the

specification is an order of method steps, rather than a limitation on a specific claim term.")

## X.    PROPER CLAIM CONSTRUCTION OF DISPUTED TERMS

Applying the intrinsic evidence to the patents-in-suit reveals that a straightforward

construction of the plain meaning of the claims is warranted based on the public record

encompassing the specification, the prosecution file history, and the prior art cited therein.

RLF1-2964474-1

A.    **Disputed <u>Elements</u> from the '766 Patent**

1.    **"A method of making paper which comprises adding ...
from about 0.05 to about 20 lbs/ton ... of ... microbead"**

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| A method of making paper which comprises adding ... from about 0.05 to about 20 lbs/ton ... of ... microbead | A method of making paper in which a specified amount of a microbead, which is described in other parts of the claim, is added to an aqueous paper furnish. Comprises refers to the steps of the method of making paper, which are required by the claim. | Requires the addition of from about 0.05 to about 20 lbs/ton of microbead, as defined below, having an unswollen particle diameter of less than about 750 nanometers, but permits the addition of other materials including microbeads having other sizes. "The term 'comprises' permits the inclusion of other steps, elements, or materials." *In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981). |

Hercules has identified this language for interpretation, not because it is unclear, but in an effort to emasculate the claim limitation relating to size. The limitation relating to size provides that the number average diameter of the microbeads must be below 750 nanometers. Hercules attempts to read that limitation out of the claim by asking this Court to interpret "comprises" to permit the inclusion of other "materials." Hercules asserts that the Court should interpret the claim generally as "permit[ting] the addition of other materials including microbeads having other sizes." This is not proper and it is not part of the identified claim language. The size limitation is specifically stated in another place in the claim.

Hercules seeks such unfounded interpretation to support its improper invalidity contentions.[7] Hercules has taken the position that, where there are particles that may be on average larger than 750 nanometers, there may still be some small ones in the mix. On this basis, Hercules wants to assert that the claims of the '766 patent are anticipated, if there is even a single small particle. This is wrong. The term "comprises" still means that you must satisfy the limitations of the claims. For example, in *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d

---

[7] Ciba's contention is that Hercules and Cytec are prevented from offering evidence of invalidity due to assignor estoppel and privity.

1377 (Fed. Cir. 2000), the patentee claimed that the defendant's product literally infringed the

patent-in-suit, which contained a limitation to 0–1% cerium oxide. 205 F.3d at 1382. The

defendant's product contained 1.61% cerium oxide. *Id.* The patentee argued, however, that

because the claim at issue used the transition phrase "comprising," the defendant's product

infringed because "a portion of cerium oxide in the claimed range falls within the literal limits

while the remaining portion merely adds to the allegedly infringing matrix." *Id.* The Federal

Circuit rejected this argument, stating that such an interpretation would read the express range

limitation out of the claim. *Id.* at 1382–83. *See also Kustom Signals, Inc. v. Applied Concepts,

Inc.*, 264 F.2d 1326, 1332 (Fed. Cir. 2001) ("The open-ended transition 'comprising' does not

free the claim from its own limitations."); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d

1313, 1345 (Fed. Cir. 2003) (stating that a claim using the transition "comprising" and a

limitation to 166 amino acids does not cover a chain of amino acid missing one of the 166 amino

acids). Thus, if the claims require an average size, then that average must be satisfied.

    Indeed, the challenge now made by Hercules to the patent claim was addressed during

prosecution. As explained above in section VI., the Examiner referenced a patent stating that

there were particles smaller than 2 microns. The concept was that while the number average size

of the microbeads might have been as large as 2 microns, there was a possibility that there were

some small ones. The Examiner agreed that the size limitation requiring the number average size

of the microbeads to be below 750 nanometers prevented such application.

    Ciba's interpretation of the present terms adheres to the plain language and meaning of

the words as supported by the prosecution history. Hercules is attempting to distort the claim by

reading out the size limitation. The Court should reject Hercules improper interpretation and

adopt the interpretation presented by Ciba.

### 2.    "Aqueous paper furnish"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| aqueous paper furnish | An aqueous paper furnish is a slurry of paper-making fibers, fines, etc., which are used in forming paper. | An aqueous suspension of cellulosic papermaking fibers |

In the context of the '766 patent, the aqueous paper furnish is the slurry of paper-making fibers, fines, etc. which are used to form the paper sheet. Hercules has not explained why it has sought interpretation of this term and there is no indication from Hercules as to why Ciba's interpretation should not be adopted. During the tutorial presentation on May 27, 2005, Hercules stated that the "furnish" was the "whole slurry mess" used in forming the paper. (Exh. 3, Hearing Trans. at 33.) Ciba's interpretation is the one that most closely follows the plain meaning of the terms, even as admitted by Hercules.

### 3.    "An ionic, organic, cross-linked polymeric microbead"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| an ionic, organic, cross-linked polymeric microbead | The microbead product results from the polymerization of ionic, organic monomer(s), wherein the polymer chains are linked together by cross-linking to constrain the size of the microbead. Cross-linked merely indicates that the polymer chains are linked together in use, it does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc. | A microbead formed by polymerization of ionic, organic, monomer(s) and a cross-linking agent. The microbead must be an integral unit which can be separated from any emulsifier present. The cross-linking agent must be polyfunctional, i.e., comprise compounds that have either at least two double bonds, a double bond and a reactive group, or two reactive groups, and must be present in sufficient quantity to assure a cross-linked composition. |

Hercules assertion regarding this claim limitation is primarily directed at the word "cross-linked." In essence, Hercules seeks to re-write the claim to read "covalently cross-linked." To reach this strained interpretation, Hercules asks this Court to add to the plain language of the claim the requirement that there is a "cross-linking agent" and that the cross-linking agent is "polyfunctional." These words of significant limitation are simply not present in the claim.

- 28 -

The claim language clearly does not require a "cross-linking agent." The patent uses the terms "cross-linking" and "cross-linking agent" differently. Having a polymer that is "cross-linked" does not mean that it must be cross-linked using an agent. In their Background section, the Cytec applicants note that cross-linking was known in the art. The specific '780 patent referenced in the Background describes cross-linking by certain means, such as heat, that do not require a cross-linking agent at all.

The reference to "cross-linking" in the claim and in the patent was a general one. The '766 patent certainly was not attempting to define a new method of cross-linking. The preferred embodiments in the '766 patent employ a well-known method of cross-linking using MBA, but the Cytec inventors made it clear that any form of cross-linking could be utilized. In fact, during prosecution, the Examiner referenced other patents, such as Farrar et al., that similarly disclose that cross-linking could result from methods not involving cross-linking agents, such as heat, irradiation, etc. (See section VI., *supra*.)

In addition to attempting re-write the claim to require a "cross-linking agent," Hercules asks that this Court insert the added limitation that the agent must be "polyfunctional." There is no basis to add such limiting language which is plainly not there. The Background of the '766 patent and the prosecution explain that there can be subsets of different cross-linking agents. The referenced background patents specifically identify covalent cross-linking agents and ionic cross-linking agents. The patents reference cross-linking, generally stating that it was known in the art. If the Cytec applicants wanted to limit the claim to "covalently cross-linked," they would have done so. If they wanted to require the use of a "cross-linking agent," the claim language would have so specified. If they wanted to require a "polyfunctional" cross-linking agent, such language would have been in the claim. But the language is not there and there is nothing

showing that the Cytec disavowed any method or form of cross-linking.



4.    **"The microbead having an unswollen particle
diameter of less than about 750 nanometers"**

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| the microbead having an unswollen particle diameter of less than about 750 nanometers | This size limitation refers to the unswollen number average particle diameter, which is measured from the aqueous solution droplets in the continuous oil phase after polymerization utilizing quasi-electric light scattering spectroscopy. | The unswollen particle diameter of the microbead, as defined above, is measured from the aqueous droplets dispersed in the continuous oil phase after polymerization and before inversion by adding them to water. |

As explained above in connection with the first identified element of the claim, there is a critical difference between the parties on the interpretation of this size language. The '766 patent defines size as the "number average diameter." As mentioned above, the '766 patent describes the surprising results obtained by the invention based on the "number average diameter" of the particles being compared. When the number average size of the particles is 1 micron or above, the microbeads did not show significantly increased effectiveness. When the average size is below 750 nanometers, surprising results were obtained.

During prosecution, the nature of the size measurement was confirmed in connection with the Farrar et al. patent. The Examiner asserted that the Farrar et al. patent discloses microbeads below 2 microns. The Cytec applicants, in connection with describing what the size references in the patent mean (i.e., number average size) explained that while there might be

some smaller particles in the Farrar et al. patent, the average size is 1 micron or above.  (Exh. 9,

'766 patent prosecution, Paper No. 5 at 4-5.)  This was acknowledged by the Examiner.

This concept of this claim can be illustrated by the following graph of a measurement

using QELS as referenced in the patent:





As can be seen from this example, Hercules' interpretation is improper because it would

emasculate the meaning of the invention and the discovery that a mean size below 750

- 31 -

nanometers showed surprising results. All dispersions of microbeads have some polydispersity. The '766 patent defines that, when it refers to size, it is talking about the "unswollen number average diameter." (See Exh. 5, '766 patent, Col. 10, line 36 – Col. 11, line 17, identifying the microbeads used in the Examples by the "particle diameter" with an asterisk defining that as the unswollen number average particle diameter and the technique used in Col. 11, lines 4-25; and see e.g., the side-by-side use of "particle diameter" and unswollen number average particle diameter at Col. 12, lines 26-30.)

Ciba notes that efforts like that of Hercules to read such limitations out of the claims have been rejected in other contexts. *See e.g., Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377 (Fed. Cir. 2000) (rejecting a claim interpretation which would read out of the claim a limitation to 0-1% cerium oxide). *See also Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326 (Fed. Cir. 2001) (holding that a product which performed both functions identified in a claim which required that one of the other of the functions, but not both, be performed did not infringe); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003) (stating that a claim using the transition "comprising" and a limitation to 166 amino acids does not cover a chain of amino acid missing one of the 166 amino acids).

Thus, this Court should reject Hercules' incorrect interpretation. Ciba's interpretation is consistent with the clear definitions from the patents and explained during prosecution.

### B. Disputed Elements From the '808 Patent

While the '808 and '766 patents are unrelated (*i.e.*, having different parent applications and different inventive entities), the specification of the '776 patent is incorporated by reference into the '808 patent so that it may be considered as part of the intrinsic record of the '808 patent. (See Exh. 8, '808 patent, Col. 3, lines 37-39.)

The claim terms and phrases and the respective position of the parties are set forth below:

- 32 -

1.    "A composition comprising"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| A composition comprising | A composition comprising refers to the composition required by the remainder of the claim. | 'Comprising' is a term of art used in [patent] claim language which means that the named elements are essential, but other elements may be added and still form a [composition] within the scope of the claim. *Genentech Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) |

As with the '766 patent, Hercules has sought interpretation of this term in an attempt to emasculate the requirement relating to size of the microparticle. The meaning of the term "comprising" is the subject of case precedent. Essentially, "comprising" indicates that the stated elements of the claim must be present, though it does not speak to other non-claimed elements. *See, e.g., In re Crish*, 393 F.3d 1253, 1257 (Fed. Cir. 2004) ("it is well-established that "[c]comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.'" (quoting *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997)); *see also Kustom Signals, supra*.

2.    "Cross-linked anionic or amphoteric polymeric microparticles"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| cross-linked anionic or amphoteric polymeric microparticles | The microparticle product results from the polymerization of an aqueous solution of at least one water soluble monomer wherein the polymer chains are linked together by cross-linking to constrain the size of the microparticle. | Small anionic or amphoteric particles formed by the polymerization in the presence of a cross-linking agent, as defined below, in sufficient quantity to assure a cross-linked composition. |

Claim 1 of the '808 patent includes separate requirements of the microparticle being "cross-linked" and that a "cross-linking agent" is employed. This demonstrates the difference explained above in connection with the '766 patent and in the Background section of the '808 patent. (See IX.A.3. supra) The '808 patent indicates that cross-linking was well known in the

- 33 -

art. Such cross-linking can occur with and without the presence of "cross-linking agents." For example, cross-linking can occur by heat or irradiation as referenced in the Background section of the '808 patent.

While Claim 1 of the '808 patent includes the additional language specifying a "cross-linking agent," the language in this part of the claim only specifies that the microparticle is cross-linked. Therefore, Hercules' assertion that the word "cross-linked" requires a "cross-linking agent" is wrong. If this were true, it would make superfluous the other express language in the claim that specifies a "cross-linking agent." Such a reading is clearly disfavored and the Court should construe the claim language in such a way that avoids rendering any claim language superfluous. *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (noting that a "claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so"); *cf. Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (stating that the doctrine of claim differentiation prohibits construing a claim in a manner which would render another claim superfluous).

3. **"Microparticles derived solely from the polymerization of an aqueous solution of at least one monomer"**

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| microparticles derived solely from the polymerization of an aqueous solution of at least one monomer | The polymer chains of the microparticles are derived from monomer(s), which are water soluble. | Microparticles must be derived only from the polymerization of an aqueous solution of at least one monomer. |

The intrinsic record of the '808 patent makes it clear that this language was understood by the Patent and Trademark Office to relate to the "water soluble" nature of the monomers. The prosecution leading to this language is described above in section VII. As explained, the original language specified that the polymerization involved "water soluble" monomers. The language

- 34 -

was changed to its present form to clarify that the monomers needed to be completely water soluble. In specifically addressing the noted language, the Examiner stated that "[t]he change of water soluble to aqueous solution prevents the claims from encompassing partially soluble monomers." (Exh. 12, '808 patent prosecution, Paper No. 8 at 2.)

Hercules' proposal erroneously tries to change this limitation, which only relates to the solubility of the monomers, into a process requirement. Hercules asks this Court to require that there be no polymerization in the oil phase. This is not what this limitation is about, as made evident by the record. It is well recognized that initiation and polymerization can occur in both the oil and the aqueous phases. Thus, Hercules' interpretation should be rejected in favor of the clear record before the Patent and Trademark Office, which illustrates that this claim limitation only requires the use of water soluble monomers.

4.    "Said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron | This size limitation refers to the unswollen number average particle size diameter, which is measured from the aqueous solution droplets in the continuous oil phase after polymerization utilizing quasi-electric light scattering spectroscopy. | Some microparticles in the composition have an unswollen number average particle size diameter of less than about 0.75 micron, which is measured from the aqueous solution droplets dispersed in the continuous oil phase after polymerization and before inversion by adding them to water. |

Hercules' proposed interpretation again attempts to read out the limitation that the "number average" size must be below 750 nanometers. The interpretation presented by Hercules is that only "some microparticles" have the specified average size. Such an interpretation strips the claim of its meaning. The claim says that the "microparticles" have such a size. The claim does not say that "some" of the microparticles have the size.

- 35 -

As explained above, in connection with the '766 patent, Hercules seeks to dilute this limitation in an effort to bolster its improper invalidity challenges. (See IX.A.4., *supra*). In essence, Hercules wants to argue that, while the prior art only shows average diameters above 1 micron, there would have been some stray smaller particles. Hercules thus seeks to recast this limitation as only requiring that some of the microparticles be smaller than 750 nanometers. Hercules seeks to eliminate the requirement that the "number average" size of all of the microparticles should be below 750 nanometers. The impropriety of such eliminations is illustrated above in connection with the polydispersion graph and legal discussion in Section IX.A.1.

The claim language at issue specifies that the "microparticles" have a "number average" size. This Court should not accept Hercules' invitation to strip the language of its meaning. Thus, Hercules' interpretation should be rejected.

### 5.  "A cross-linking agent"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| a cross-linking agent | Cross-linking agent refers to an agent that links the polymer chains together in use to constrain the size of the microparticle. Cross-linking agent does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc. | A chemical agent that is polyfunctional in that it has at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together. |

Hercules attempts to re-write the language specifying the presence of a "cross-linking agent" to require a "covalent polyfunctional" cross-linking agent. "Polyfunctional" was not used in the claim, and there is no requirement of "covalent" cross-linking. The claim language merely requires that an agent be employed. It does not specify what subset of agent.

The "Background of the Invention" in the '808 patent specifies that cross-linking was generally known in the art. The patent does not limit itself to any particular form of cross-

- 36 -

linking. The Background section specifically references "covalent" and "ionic" cross-linking agents. The claim language does not distinguish between different types of agents, or any others for that matter.

There is no basis to re-write the claim as suggested by Hercules. As is required under the patent laws, the Cytec inventors described their preferred embodiments. The Cytec inventors should not be stripped of their rights to a broad interpretation based on their compliance with such laws. Cross-linking is referenced as "well known in the art." The inventors did not disavow this scope of cross-linking or cross-linking agents.

As re-written by Hercules, the claim would read:

> 1. A composition comprising cross-linked anionic or amphoteric polymeric microparticles derived solely from the polymerization of an aqueous solution of at least of one monomer, said microparticles having an unswollen number average panicle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1 mPa.s, a ***polyfunctional*** cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer, and an ionicity of at least about 5 mole percent, ***and wherein said polyfunctional cross-linking agent has at least two double bonds, a double bond and a reactive group, or two reactive groups*** .

There is no support for injecting such additional limitations into the claim. As set forth in Ciba's interpretation, the claim is clear and its ordinary meaning should be adopted. Hercules' overly restrictive re-write of the claim should be rejected.

RLF1-2964474-1

6.  "Said microparticles having... a cross-linking agent
    content of about 4 molar parts to about 4000 parts per
    million, based on monomeric units present in the polymer"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| said microparticles having . . . a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer | The cross-linking agent is added in an amount of about 4 molar parts to about 4000 parts per million, such ratios being based on the monomeric units present in the polymer. | Microparticles must contain between 4 and 4000 parts of cross-linking agent, as defined above, per million monomeric units present in the polymer. |

This claim language merely requires that 4 to 4000 ppm of cross-linking agent be added. Hercules tries to distort the plain meaning of this claim language to require a measurement after polymerization. In some instances, the cross-linking agents cease to exist during polymerization as separate measurable entities. As with common scientific practice, the measurement is clearly taken based on what is added to the mix.

Hercules' proposal is intended to cast doubt on the claim by injecting the requirement of a difficult measurement. When the '808 patent talks about 4 to 4000 ppm, it is talking about the amount of agent added as explained above in section V.B., above. The proposed interpretation asserted by Hercules would make the claims distinguish the methods employed in the specification. This is improper. *See, e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (stating that a claim construction which has the effect of excluding a preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support"). *See also Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1347 (Fed. Cir. 2004) (holding that claim construction which would exclude all preferred embodiments of a claim was not proper); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003)

- 38 -

("A claim interpretation that reads out a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.") (internal quotation omitted).

Hercules' proposed interpretation is contrary to the practices used by those in the art and as employed in the patent. Thus, Ciba's interpretation should be accepted over that proposed by Hercules.

7. **"Admixing (i) an aqueous solution comprising... at least one cross-linking agent...; (ii) an oily phase...; (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion"**

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| (a) admixing<br>(i) an aqueous solution comprising . . . at least one cross-linking agent . . . ;<br>(ii) an oily phase . . . ;<br>(iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion; | Admixing refers to mixing, but not in any particular order, materials which may include a monomer(s), cross-linking agent, oil phase, surfactant, etc. as listed in claim. | Cross-linking agent must be in the aqueous solution before admixing with the oily phase and surfactant or surfactant mixture to form the inverse emulsion. |

Claim 13 describes a process for the preparation of the composition in claim 1. The claimed process includes two steps, "admixing" to form an inverse emulsion and "subjecting the inverse emulsion ...to polymerization conditions." The "admixing" step does not require any particular order to obtain the "inverse emulsion." The inverse emulsion has a cross-linking agent.

Hercules asserts that the cross-linking agent must be part of the aqueous solution before the inverse emulsion is made. The claim does not require such. The claim merely requires that the cross-linking agent of the inverse emulsion be part of the aqueous solution when the emulsion is present. Thus, the claim does not require any particular order of addition. The "admixing" language pertains to the emulsion and not to any particular order of addition.

- 39 -

Hercules attempts to assert that the claim requires that the cross-linking agent and the aqueous solution must first be formed before there can be mixing. This is not required. The claim makes clear that the admixing pertains to the emulsion and it does not matter what is the order of addition that gets to that point.

## XI.    CONCLUSION

For the reasons stated herein, the Court should adopt Ciba's proposed constructions for both the '766 patent and the '808 patent, as being supported by the intrinsic and extrinsic evidence.

December 30, 2005

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Jeffrey L. Moyer (#3309)
Moyer@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
Attorneys for Plaintiff
(302) 651-7700

Of Counsel:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Dated:  December 30, 2005

RLF1-2964474-1

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2005, I hand delivered the foregoing document to

the following persons and electronically filed the foregoing document with the Clerk of Court

using CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951

I hereby certify that on December 30, 2005, I have Federal Expressed the foregoing

document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire          Thomas L. Creel, Esquire
Joann M. Neth, Esquire                 Goodwin Proctor, LLP
A. Neal Seth, Esquire                  599 Lexington Avenue
Finnegan, Henderson, Farabow, Garrett &    New York, NY   10022
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC   20001-4413


Chad M. Shandler (#3796)

RLF1-2848132-1

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2006, I hand delivered the foregoing document to the

following persons and electronically filed the foregoing document with the Clerk of Court using

CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951


I hereby certify that on January 9, 2006, I have Federal Expressed the foregoing

document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022


Chad M. Shandler (#3796)

RLF1-2848132-1