IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>HERCULES, INC. and<br>CYTEC INDUSTRIES, INC.,<br><br>    Defendants. | )<br>)<br>)<br>) C.A. No. 04-293 (KAJ)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>) |

### JOINT CLAIM CONSTRUCTION SUBMISSION[1]

| | |
|---|---|
| Frederick L. Cottrell III (#2555)<br>Jeffrey L. Moyer (# 3309)<br>Chad M. Shandler (#3796)<br>Richards, Layton & Finger, P.A.<br>P.O. Box 551<br>One Rodney Square<br>Wilmington, Delaware 19899-0551<br>(302) 651-7700<br>Cottrell@rlf.com<br>Moyer@rlf.com<br>Shandler@rlf.com<br>Attorneys for Plaintiff<br>Ciba Specialty Chemicals Corp.<br><br>OF COUNSEL:<br>Gordon R. Coons<br>Eley O. Thompson<br>Gregory C. Bays<br>LEYDIG, VOIT & MAYER, LTD.<br>Two Prudential Plaza, Suite 4900<br>Chicago, Illinois 60601 | Richard L. Horwitz (#2246)<br>David E. Moore (#3983)<br>Potter Anderson & Corroon LLP<br>Hercules Plaza, 6th Floor<br>1313 N. Market Street<br>P.O. Box 951<br>Wilmington, DE 19899-0951<br>(302)984-6000<br>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com<br>Attorneys for Defendant<br>Hercules Incorporated<br><br>OF COUNSEL:<br>Ford F. Farabow, Jr.<br>JoannM.Neth<br>Eric J. Fues<br>A.NealSeth<br>FINNEGAN, HENDERSON, FARABOW,<br> GARRETT & DUNNER, L.L.P.<br>901 New York Avenue, NW<br>Washington, DC 20001-4413 |

Dated: January 27, 2006

---

[1] The Joint Appendix including the patents-in-suit and their prosecution histories and certain patents cited therein is being filed contemporaneously herewith. The Joint Appendix includes the full prosecution history so that the Court is able to view the claim terms and phrases in context.

*Chad M. Shandler* by *sk/sh*

Frederick L. Cottrell III (#2555)
Jeffrey L. Moyer (# 3309)
Chad M. Shandler (#3796)
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700
Cottrell@rlf.com
Moyer@rlf.com
Shandler@rlf.com
Attorneys for Plaintiff
Ciba Specialty Chemicals Corp.

OF COUNSEL:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Dated: January 27, 2006

/s/      David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N, Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302)984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
Attorneys for Defendant
Hercules Incorporated

OF COUNSEL:
Ford F. Farabow, Jr.
JoannM.Neth
Eric J. Fues
A.NealSeth
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413

Dated: January 27, 2006

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

U.S. Patent No. 5,167,766

| Claim Terms and Phrases of '766 Patent: Claims 1-28 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| A method of making paper which comprises adding … from about 0.05 to about 20 lbs/ton … of … microbead | Proposed Construction: A method of making paper in which a specified amount of a microbead, which is described in other parts of the claim, is added to an aqueous paper furnish. Comprises refers to the steps of the method of making paper, which are required by the claim.<br><br>Intrinsic Evidence: Exh. 1, '766 patent, Col. 2, lines 58-62 ("Typically, the particle size of polymers prepared by conventional, inverse, water-in-oil, emulsion polymerization processes are limited to the range of 1-5 microns, since no particular advantage in reducing the particle size has hitherto been apparent."); Exh. 1, '766 patent, Col. 3, lines 58-62 ("It was surprisingly found that the crosslinked, organic, polymeric microbeads have a high efficiency as retention and drainage aids when their particle size is less than about 750 nm in diameter…."); Exh. 1, '766 patent, Col. 22, line 54 – Col. 23, line 15 (Example 25: "Both the 130 nm and 220 nm in diameter microbeads reduce drainage times over that of stock without microbeads by 33%. However, when the diameter of the anionic microbead is increased to 1,000 to 2,000 nm, drainage is not significantly effected.")<br><br>Exh. 6, '667 application, '766 patent prosecution, Paper No. 5 at 4–5, HERC0075994–5, Paper No. 7 at 3, HERC0076010 (applicants distinguish the cited Farrar et al. patent on the basis of the particle size limitation recited in the claim). | Proposed Construction: Requires the addition of from about 0.05 to about 20 lbs/ton of microbead, as defined below, having an unswollen particle diameter of less than about 750 nanometers, but permits the addition of other materials including microbeads having other sizes. "The term 'comprises' permits the inclusion of other steps, elements, or materials." *In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981). |
| aqueous paper furnish | Proposed Construction: An aqueous paper furnish is a slurry of paper-making fibers, fines, etc., which are used in forming paper.<br><br>Intrinsic Evidence: Exh. 1, '766 patent, Col. 3, lines 11-13 ("According to the present invention, there is provided a method of making paper from an aqueous suspension of cellulosic papermaking fibers"); Exh. 1, '766 patent, Col. 4, lines 11-37 (discussing that the microbead of the invention can be added to conventional paper | Proposed Construction: An aqueous suspension of cellulosic papermaking fibers.<br><br>Intrinsic Evidence: '766 patent (Exhibit No. 1) at col. 3, lines 10-13 ("According to the present invention, there is provided a method of making paper from [an] aqueous suspension of cellulosic papermaking fibers….") |

**Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction and Their Proposed Constructions with Citations to the Intrinsic Evidence**

| Claim Terms and Phrases of '766 Patent: Claims 1-28 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| an ionic, organic, cross-linked polymeric microbead | **Proposed Construction:** The microbead product results from the polymerization of ionic, organic monomer(s), wherein the polymer chains are linked together by crosslinking to constrain the size of the microbead. Cross-linked merely indicates that the polymer chains are linked together in use, it does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc.<br><br>**Intrinsic Evidence:** Exh. 1, '766 patent, Col. 2, lines 52-53 ("crosslinking technology is well known in the art" referencing EP 0 202 780 ("the '780 patent")); Exh. 12, '780 patent, Col. 9, lines 19-27 ("[C]ross linking ... may be brought about by controlled spontaneous conditions such as heating or irradiation, provided the degree of chain branching or other cross linking is reproducible and controllable, but preferably is brought about by reaction of the monomer or monomer blend, or the final polymer, with a covalent or ionic cross linking agent."); Exh. 12, '780 patent, Col. 10, lines 22-28 (referencing metal salts as being ionic cross-linkers).<br><br>Exh. 6, '667 application, '766 patent prosecution, Paper No. 4 at 4-5, HERC0075983-4 (Examiner asserting U.S. No. Patent 4,759,856 (the "Farrar et al. patent"); Exh. 10, Farrar et al. patent, Col. 10, lines 28-41 (referencing different ways to cross-link including "the polymer [may be] cross linked by, for instance, excessive heating during drying" and "[a]dded cross linking agents can include ionic cross linking agents such as polyvalent metal salts, formaldehyde, glyoxal or, preferably, covalent cross linking agents that will copolymerize with the monomers...")<br><br>Exh. 1, '766 patent, Col. 3, lines 18, 43, 58, 65; Col. 4, line 5; Col. 5, line 14, Col. 6, line 55-60 (referencing "crosslinked," "crosslinking" and "crosslinking agent" without modifiers setting forth the type or form of cross-links or cross-linking agents.) | making stock which can include traditional chemical pulps, fillers and other paper making additives).<br><br>**Proposed Construction:** A microbead formed by polymerization of ionic, organic, monomer(s) and a cross-linking agent. The microbead must be an integral unit which can be separated from any emulsifier present. The cross-linking agent must be polyfunctional, i.e., comprise compounds that have either at least two double bonds, a double bond and a reactive group, or two reactive groups, and must be present in sufficient quantity to assure a cross-linked composition.<br><br>**Intrinsic Evidence:**<br><br>Ex. 1 at col. 2, lines 49-53 ("Polymerization of difunctional monomer, such as methylenebisacrylamide, into the polymer chain. This crosslinking technology is well-known in the art.")<br><br>Ex. 1 at col. 6, lines 36-42 ("Polymerization of the monomers occurs in the presence of a polyfunctional crosslinking agent to form the cross-linked microbead. Useful polyfunctional crosslinking agents comprise compounds having either at least two double bounds [sic], a double bond and a reactive group, or two reactive groups.")<br><br>Ex. 1 at col. 6, lines 42-54 (identifying specific polyfunctional cross-linking agents, including MBA).<br><br>Ex. 1 at col. 6, lines 55-56 ("Crosslinking agents are to be used in sufficient quantity to assure a cross-linked composition.")<br><br>Ex. 1 at col. 7, lines 30-33 (noting that prior to polymerization, the aqueous phase includes "the crosslinking agent, as discussed above").<br><br>Ex. 1 at col. 8, lines 15-22 (noting that after polymerization, the polymeric particles of the patent are either in emulsion form or |

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of '766 Patent: Claims 1-28 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| | Exh. 6, '667 application, '766 patent prosecution, Paper No. 10 at 4, HERC0076039 (in relation to the Probst patent, applicants stating that "It was pointed out to the Examiner that epichlorohydrin is only a cross-linking agent when reacted under certain precise conditions.") | have been recovered from the emulsion through precipitation, filtering, and drying).<br><br>Ex. 1 at col. 10, line 36-col. 11, line 33 and col. 12, lines 1-11 and 31-42 (indicating that all of the cross-linked microbeads used in the Examples of the '766 patent are cross-linked with a polyfunctional cross-linking agent, MBA).<br><br>File History of U.S. Application Serial No. 07/536,382 (Exhibit No. 5), patent application filed Jun. 11, 1990, at CIBA 000657 (original claim 1).<br><br>File History of U.S. Application Serial No. 07/540,667 (Exhibit No. 6), Office Action mailed Jun. 26, 1991, at HERC 0076010-12 (rejecting claims over U.S. Patent No. 4,659,431 to Probst et al. ("the Probst '431 patent"), alone or in combination with other prior art).<br><br>Ex. 6, Amendment received Sept. 23, 2001, at HERC 0076016 (amending claim 1 to require the use of cross-linked microbeads).<br><br>Ex. 6, Amendment received Sept. 23, 2001, at HERC 0076019-20 (arguing that the claim amendment requiring cross-linking overcame the Probst rejection and stating that "Applicants' invention resides in the use of the polymer microbead having an ionic charge covalently bonded to the polymer, whereas, in Probst, the only ionic charge present is on a different molecule i.e. a surfactant which can dissolve out of and/or migrate from the polymer microbeads. Applicants' microbead does not require the use of an emulsifier. It is an integral unit which can be separated from any emulsifier present if made in emulsion form.")<br><br>Ex. 6, Office Action mailed Dec. 6, 1991, at HERC 0076027-28 (maintaining the claim rejections over the Probst '431 patent).<br><br>Ex. 6, Amendment dated Mar. 16, 1992, at HERC 0076038 ("Applicants' microbead has an ionic charge covalently bonded thereto and is an integral unit which can be separated as such.") |

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of '766 Patent: Claims 1-28 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| the microbead having an unswollen particle diameter of less than about 750 nanometers | Proposed Construction: This size limitation refers to the unswollen number average particle diameter, which is measured from the aqueous number average particle diameter in the continuous oil phase after polymerization utilizing quasi-electric light scattering spectroscopy.<br><br>Intrinsic Evidence: Exh. 1, '766 patent, Col. 10, line 36 – Col. 11, line 17, Col. 11, lines 42-47 (using asterisk to correlate references to particle diameter to definition providing that "[t]he unswollen number average particle diameter in nanometers is defined and used herein as that determined by quasi-electric light scattering spectroscopy QELS …"); Exh. 6, '667 application, '766 patent prosecution, Paper No. 5 at 1-2, HERC0075991-2 (amending specification to add the words "defined and used herein . . ." and stating "[t]his amendment is not considered to be new matter in that it constitutes a clarification so as to prevent any misunderstanding rather than a completely new definition.")<br><br>Exh. 1, '766 patent, Col. 12, lines 26-30 (side-by-side use of "particle diameter" and unswollen number average particle diameter.)<br><br>Exh. 6, '667 application, '766 patent prosecution, Paper No. 5 at 4-5, HERC0075994-5, Paper No. 7 at 3, HERC0076010 (applicants distinguishing Farrar et al. and explaining that while there might be some smaller particles in the Farrar et al. patent, the average size is 1 micron or above).<br><br>See also citations listed above for "method of making paper which comprises…" claim term. | U.S. Patent No. 4,659,431 to Probst et al. (Exhibit No. 11)<br><br>Proposed Construction: The unswollen particle diameter of the microbead, as defined above, is measured from the aqueous droplets dispersed in the continuous oil phase after polymerization and before inversion by adding them to water.<br><br>Intrinsic Evidence:<br><br>Ex. 1 at col. 2, lines 9-25 (discussing cross-linked cationic or anionic microbeads of Japanese Patent publication Tokkai JP235596/63:1988 that had particle sizes in the range of 1-100 microns.)<br><br>Ex. 1 at col. 2, lines 58-62 (stating that for "conventional" inverse water-in-oil emulsion polymerization processes, particle sizes "are limited to the range of 1-5 microns since no particular advantage in reducing the particle size has hitherto been apparent.")<br><br>Ex. 1 at col. 2, line 67-col. 3, line 8 (stating with respect to the "present invention" that "[t]he polymer microbeads are also prepared by the optimal use of a variety of high activity- surfactant or surfactant mixtures to achieve submicron size. The type and concentration of surfactant should be chosen to yield a particle size of less than about 750 nm in diameter and more preferably less than about 300 nm in diameter.")<br><br>Ex. 6, Office Action mailed Dec. 26, 1990, at HERC 0075983-86 (rejecting the claims over U.S. Patent No. 4,759,856 to Farrar et al. ("the Farrar '856 patent") alone or in combination with other prior art).<br><br>Ex. 6, Amendment dated Mar. 25, 1991, at HERC 0075994-95 (arguing that the polymers of the Farrar '856 patent were created through macroemulsion processes that produced particle sizes "above about 1 micron.")<br><br>Ex. 6, Office Action mailed June 26, 1991, at HERC 0076010 |

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of '766 Patent: Claims 1-28 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| | | (where the Examiner noted applicants' arguments that the cited references (including the Farrar '856 patent) allegedly did not teach the particle size limitation of the microbead and withdrew the Farrar rejections). |
| | | U.S. Patent No. 4,759,856 to Farrar et al. (Exhibit No. 10) |

**Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction and Their Proposed Constructions with Citations to the Intrinsic Evidence**

**U.S. Patent No. 5,171,808**

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| A composition comprising | Proposed Construction: A composition comprising refers to the composition required by the remainder of the claim.<br><br>Intrinsic Evidence: Exh. 2, '808 patent, Col. 1, lines 31-35 ("Typically, the particle size of polymers prepared by conventional inverse water-in-oil emulsion polymerization processes are limited to a inverse range of about 1-5 microns, since no particular advantage in reducing the particle size has hitherto been apparent.")<br><br>Exh. 3, '626 application, '808 patent prosecution, Paper No. 4 at 7-8, CIBA 000527-8 (distinguishing the cited Makhlouf et al. and Silver patents on the basis of the particle size limitation in the claims). | Proposed Construction: "'Comprising' is a term of art used in [patent] claim language which means that the named elements are essential, but other elements may be added and still form a [composition] within the scope of the claim." *Genentech Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). |
| cross-linked anionic or amphoteric polymeric microparticles | Proposed Construction: The microparticle product results from the polymerization of an aqueous solution of at least one water soluble monomer wherein the polymer chains are linked together by crosslinking to constrain the size of the microparticle.<br><br>Intrinsic Evidence: Exh. 2, '808 patent, Col. 1, lines 28-29 ("crosslinking technology is well known in the art" referring to EP 0 202 780 ("the '780 patent")); Exh. 12, '780 patent, Col. 9, lines 19-27 ("[C]ross linking ... may be brought about by controlled spontaneous conditions such as heating or irradiation, provided the degree of chain branching or other cross linking is reproducible and controllable, but preferably is brought about by reaction of the monomer or monomer blend, or the final polymer, with a covalent or ionic cross linking agent."); Exh. 12, '780 patent, Col. 10, lines 22–28 (referencing metal salts as being ionic cross-linkers). | Proposed Construction: Small anionic or amphoteric particles formed by the polymerization in the presence of a cross-linking agent, as defined below, in sufficient quantity to assure a cross-linked composition.<br><br>Intrinsic Evidence:<br><br>'808 patent (Exhibit No. 2) at col. 1, lines 26-30 ("Crosslinking is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide, into the polymer. This crosslinking technology is well-known in the art.")<br><br>Ex. 2 at col. 4, lines 45-50 ("Polymerization of the monomers is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition. The polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups.")<br><br>Ex. 2 at col. 4, lines 50-62 (identifying specific polyfunctional cross-linking agents, including N,N-methylenebisacrylamide ("MBA")). |

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| | | Ex. 2 at col. 4, lines 63-64 ("Crosslinking agents are to be used in sufficient quantities to assure a crosslinked composition.") |
| | | Ex. 2 at col. 6, lines 30-36 (noting that after polymerization, the polymeric particles of the '808 patent either exist in emulsion form or have been recovered from the emulsion through precipitation, filtering, and drying). |
| | | Ex. 2 at col. 7, Table I; col. 8, Table II; and col. 9, Table III (showing microparticles containing polyfunctional cross-linking agent, MBA, or the use of those microparticles to form the exemplified anionic or amphoteric microparticles). |
| | | Ex. 2 at col. 9, lines 57-59 (where claim 1 recites "a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer."). |
| | | File History of U.S. Application Serial No. 07/535,626 (Exhibit No. 3), patent application filed Jun. 11, 1990 at CIBA 000486, lines 11-16 and CIBA 000489 (claim 1). |
| | | Ex. 3, Office Action mailed Aug. 16, 1990, at CIBA 000515 (rejecting claims over U.S. Patent No. 4,681,912 to Durand et al. ("the Durand '912 patent")). |
| | | Ex. 3, Amendment dated Jan 4, 1991, at CIBA 000526 ("Durand etal fail to indicate the incorporation of a cross-linking agent into the polymer produced therein. . . . [T]he oleates of Durand etal are monounsaturated and if any reaction thereof with the acrylamide and/or acrylate were to occur it would occur linearly because a cross-linking agent must contain two functional groups to act as such, see page 7, lines 11-26 of the instant specification." (emphasis in original)). |
| | | Ex. 3, Office Action mailed Apr. 11, 1991, at CIBA 000532-34 (withdrawing initial rejection over the Durand '912 patent and rejecting claims over the combination of U.S. Patent No. 4,968,435 to Neff et al. ("the Neff '435 patent") and U.S. Patent No. 4,705,640 to |

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| microparticles derived solely from the polymerization of an aqueous solution of at least one monomer | **Proposed Construction:** The polymer chains of the microparticles are derived from monomer(s), which are water soluble.<br><br>**Intrinsic Evidence:** Exh. 3, '626 application, '808 patent prosecution, Paper No. 4 at 2, CIBA 000522 (applicants adding language to the '808 pending claims, specifying that the microparticles are "derived solely from water-soluble monomers"); Exh. 4, '120 application, '808 patent prosecution, Paper No. 8 at 2, HERC0076145 (Examiner addressing the change of claim language to "the polymerization of an aqueous solution of at least one monomer" by stating that "[t]he change of water soluble to aqueous solution prevents the claims from encompassing partially soluble monomers.") See e.g., Exh. 2, '808 patent, Col. 6, line 58 to Col. 7, line 3 (an example including the addition of acrylic acid and acrylamide in an aqueous solution). | **Proposed Construction:** Microparticles must be derived only from the polymerization of an aqueous solution of at least one monomer.<br><br>**Intrinsic Evidence:**<br><br>Ex. 2 at col. 5, lines 21-27 (stating that the prior art contained "numerous publications reporting polymerization of hydrophobic polymers in the oil phase of microemulsions" and providing citations).<br><br>U.S. Patent No. 4,681,912 to Durand et al. (Exhibit No. 7)<br><br>U.S. Patent No. 4,705,640 to Whittaker (Exhibit No. 9)<br><br>Whittaker ("the Whittaker '640 patent").<br><br>File History of U.S. Application Serial No. 07/803,120 (Exhibit No. 4), Preliminary Amendment received Jul. 22, 1991, at HERC 0076113 ("Whittaker does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount").<br><br>Ex. 2 at col. 5, lines 44-51 (describing the monomers and cross-linking agents as residing in the aqueous phase prior to polymerization).<br><br>Ex. 3, Office Action mailed Aug. 16, 1990, at CIBA 000515-16 (rejecting claims over U.S. Patent No. 4,147,688 to Makhlouf et al. ("the Makhlouf '688 patent")).<br><br>Ex. 3, Amendment dated Jan 4, 1991, at CIBA 000527 (responding to the rejection over the Makhlouf '688 patent and stating that "the polymers hereof are produced solely from water-soluble monomers." (emphasis in original)).<br><br>Ex. 3, Office Action mailed Apr. 11, 1991, at CIBA 000531 (maintaining prior art rejection over the Makhlouf '688 patent).<br><br>Ex. 4, Preliminary Amendment received Jul. 22, 1991, at HERC 0076111-13 (further amending claim 1 to specify a cross-linking agent content range and arguing that this amendment overcame the |

**Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction and Their Proposed Constructions with Citations to the Intrinsic Evidence**

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| | rejection in view of the Makhlouf '688 patent). | |
| | Ex. 4, Office Action mailed Feb. 10, 1992, at HERC 0076118-20 (maintaining the rejection of the claims for indefiniteness in view of the Makhlouf '688 patent and rejecting the claims for indefiniteness over the "water-soluble monomers" limitation). | |
| | Ex. 4, Brief for Appellants dated Apr. 27, 1992, at HERC 0076129-30 (asserting that "Makhlouf et al. fail to teach the necessity of using only water-soluble monomers and fail to teach the claimed, critical range of cross-linking agent" and arguing against the indefiniteness rejection). | |
| | Ex. 4, Examiner Interview Summary Record mailed Jul. 14, 1991, at HERC 0076142 (where applicants' patent attorney authorized amending the claim language from requiring that the microparticles be "derived solely from water soluble monomers" to the requirement that they be "derived solely from the polymerization of an aqueous solution of at least one monomer."). | |
| | Ex. 4, Notice of Allowability mailed Jul. 16, 1992, at HERC 0076145 (where the Examiner states in the Statement of Reasons for Allowance that "[t]he change of water soluble to aqueous solution prevents the claims from encompassing partially soluble monomers" and that the numerical cross-linking agent content limitation in combination with the change to aqueous solution would result in "few monomers among many that meet the claims"). | |
| | Ex. 4, Notice of Allowability mailed Jul 16, 1992, at HERC 0076146 (where applicants were instructed to provide any comments regarding the Statement of Reasons for Allowance no later than the payment of the Issue Fee) | |
| | U.S. Patent No. 4,147,688 to Makhlouf et al. (Exhibit No. 8). | |
| said microparticles having an unswollen number average particle | Proposed Construction: This size limitation refers to the unswollen number average particle size diameter, which is measured from the aqueous solution droplets in the continuous oil phase after | Proposed Construction: Some microparticles in the composition have an unswollen number average particle size diameter of less than about 0.75 micron, which is measured from the aqueous solution droplets |

RLF1-2974995-1

**Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction and Their Proposed Constructions with Citations to the Intrinsic Evidence**

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| size diameter of less than about 0.75 micron | polymerization utilizing quasi-electric light scattering spectroscopy. Intrinsic Evidence: See Exh. 2, '808 patent, Col. 3, lines 37-39; see also Exh. 3, '626 application, '808 patent prosecution, Paper No. 4 at 1, CIBA060521 (cross-referencing Application Ser. No. 07/536,382 which is the application that matured into '766 patent); Exh. 2, '808 patent, Col. 9, lines 40-41 (incorporating by reference the references cited in the specification). See also citations listed above for the "composition comprising" limitation. | dispersed in the continuous oil phase after polymerization and before inversion by adding them to water. Intrinsic Evidence: Ex. 2 at col. 5, lines 28-38 ("The ionic and amphoteric microemulsion process may be conducted by . . . form[ing] an inverse monomer microemulsion consisting of small aqueous droplets which, when polymerized, result in polymer particles of less than 0.75 micron in size, dispersed in the continuous oil phase . . . .") Ex. 2 at col. 6, lines 30-32 (explaining that an aqueous product may be prepared by adding the emulsion to water to invert it). Ex. 2 at col. 7, Table I and col. 9, Table III (relating to preparations of microbeads and providing particle size information). Ex. 2 at col. 8, Table II (depicting information regarding drainage aid testing with inverted, swollen particles and not providing particle size information). |
| a cross-linking agent | Proposed Construction: Cross-linking agent refers to an agent that links the polymer chains together in use to constrain the size of the microparticle. Cross-linking agent does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc. Intrinsic Evidence: See citations listed above for the "cross-linked...microparticles" limitation. Exh. 2, '808 patent, Col. 2, lines 9-10, 56; Col. 3, lines 33-34, 47; Col. 4, lines 63, 65-66, 68 (referencing "crosslinking agent" without modifiers setting forth the type or form cross-linking agents); see also, Exh. 2, '808 patent, Col. 4, lines 44-62 (setting forth the preferred "polyfunctional" crosslinking agent). See Exh. 3, '626 application, '808 patent prosecution, Paper No. 4 at 6, CIBA 000526 (relative to the citation of Durand et al. "[T]he Examiner's attention is respectfully directed to Table II of the | Proposed Construction: A chemical agent that is polyfunctional in that it has at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together. Intrinsic Evidence: Ex. 2 at col. 1, lines 35-40 (stating that "[t]he precise particle size which is achievable in inverse emulsions is determined by the concentration and activity of the surfactant(s) employed and these are customarily chosen on the basis of emulsion stability and economic factors.") Ex. 2 at col. 3, lines 6-9 (discussing how a certain surfactant mixture produces particles having a certain unswollen size). Ex. 2 at col. 4, lines 45-50 ("Polymerization of the monomers is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition. The polyfunctional crosslinking |

- 10 -

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| | instant specification. As can be seen, Example 7 is representative of a polymer produced in the absence of a cross-linking agent i.e. it is linear, see page 16, line 2, as is that of Durand et al." | agent comprises molecules having either at least two double bounds, a double bond and a reactive group, or two reactive groups.")<br><br>Ex. 2 at col. 4, lines 50-62 (identifying specific polyfunctional cross-linking agents, including MBA).<br><br>Ex. 2 at col. 6, lines 7-18 (discussing the properties of surfactants useful in practicing the alleged invention and providing examples).<br><br>Ex. 2 at col. 6, lines 30-36 (noting that after polymerization, the polymeric particles of the '808 patent either exist in emulsion form or have been recovered from the emulsion through precipitation, filtering, and drying).<br><br>Ex. 2 at col. 6, lines 9-12 ("In addition to the appropriate HLB value, the concentration of surfactant must also be optimized, i.e. sufficient to form an inverse emulsion having the correct particle size.")<br><br>Ex. 2 at col. 8, Table II; and col. 9, Table III (showing microparticles containing polyfunctional cross-linking agent, MBA, or the use of those microparticles to form the exemplified anionic or amphoteric microparticles).<br><br>Ex. 3, patent application filed Jun. 11, 1990, at CIBA 000486, lines 11-16 (defining cross-linking agents).<br><br>Ex. 3, Office Action mailed Aug. 16, 1990, at CIBA 000515 (rejecting claims over the Durand '912 patent).<br><br>Ex. 3, Amendment dated Jan. 4, 1991, at CIBA 000526 ("The Examiner apparently recognizes the deficiency of Durand etal in that he points out that the oleate surfactants of Durand etal contain an unsaturated group and thus would reasonably be expected to function as a cross-linker. This assumption is erroneous in that the oleates of Durand etal are monounsaturated and if any reaction thereof with acrylamide and/or acrylate were to occur it would occur linearly because a cross-linking agent must contain two functional groups to act as such, see page 7, lines 11-26 of the instant specification." |

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| said microparticles having . . . a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer | Proposed Construction: The cross-linking agent is added in an amount of about 4 molar parts to about 4000 parts per million, such ratios being based on the monomeric units present in the polymer.<br><br>Intrinsic Evidence: See Exh. 2, '808 patent, Col. 4, lines 63-64 ("[c]rosslinking agents are to be used in sufficient quantities to assure a cross-linked composition."); Exh. 2, '808 patent, Col. 4, lines 64-67 ("Preferably at least 4 molar parts per million of crosslinking agent, based on the monomeric units present, are employed to induce sufficient crosslinking. . ."); Exh. 2, '808 patent, Col. 7, lines 33-45 (tables identifying various samples made with different levels of cross-link agent in ppm); Exh. 2, '808 patent, Col. 7, line 26 (noting the amount of MBA cross-linking agent added to prepare the samples in ppm); Exh. 2, '808 patent, Col. 6, lines 58-67 (illustrating the ppm calculation for the cross-linking agent is based on what is mixed together, before any reaction.)<br><br>Exh. 4, '120 application, '808 patent prosecution, Paper No. 3 at 3, HERC0076112 (applicants distinguishing cited Makhlouf et al. patent stating: "Claim 1 has been amended so as to indicate that the cross-linking agent content ranges from about 4 to about 4000 parts per million. This limitation clearly distinguishes the instant compositions over those of Makhlouf et al in that the patentee indicates at col. 4, lines 17-20 that the crosslinking monomer content is at least 0.5% i.e. 5000 parts per million."); Exh. 8, U.S. Patent 4,147,688 to Makhlouf et al., Col. 4, lines 17-20 ("The proportion of such crosslinking monomer employed in the process of the invention may range from 0.5 percent to 15 percent by weight of the monomers used in the copolymerization process.")<br><br>Exh. 3, '626 application, '808 patent prosecution, Paper No. 4 at 6, CIBA 000526 (Durand et al. "is linear"); Exh. 4, '120 application, | Proposed Construction: Microparticles must contain between 4 and 4000 parts of cross-linking agent, as defined above, per million monomeric units present in the polymer.<br><br>Intrinsic Evidence:<br><br>Ex. 2 at col. 1, lines 26-29 ("Crosslinking is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide, into the polymer. This crosslinking technology is well known in the art.")<br><br>Ex. 2 at col. 2, lines 9-12 and col. 3, lines 47-49 (stating that the cross-linked microparticles have "a crosslinking agent content of above about 4 molar parts per million, based on the monomeric units present in the polymer").<br><br>Ex. 2 at col. 4, line 64-col. 5, line 3 (indicating that the amount of cross-linking agent "employed" becomes part of the "content" of the polymeric microparticles).<br><br>Ex. 2 at col. 7, Table I and col. 9, Table III (indicating that the copolymer compositions corresponding to the Examples of the patent have a specified MBA content).<br><br>Ex. 2 at col. 9, lines 61-63 (claim 2) and 64-66 (claim 3) (both reciting narrower ranges of "crosslinking agent content" than claim 1).<br><br>Ex. 3, Office Action mailed Aug. 16, 1990, at CIBA 000515 (rejecting claims over the Durand '912 patent).<br><br>Ex. 3, Amendment dated Jan. 4, 1991, at CIBA 000526 ("Durand et al fail to indicate the incorporation of a cross-linking agent into the polymer produced therein.") |
| | (emphasis in original)).<br><br>Ex. 3, Office Action mailed Apr. 11, 1991, at CIBA 000532 (withdrawing initial rejection over the Durand '912 patent). | |

Ciba's and Hercules' List of Claim Term(s)/Phrase(s) That Need Construction
and Their Proposed Constructions with Citations to the Intrinsic Evidence

| Claim Terms and Phrases of the '808 Patent: Claims 1-21 | Ciba's Positions | Hercules' Positions |
|---|---|---|
| (only as to Claims 13-21)<br><br>(a) admixing<br>  (i) an aqueous solution comprising . . . at least one crosslinking agent . . . ;<br>  (ii) an oily phase . . . ;<br>  (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion; | Proposed Construction: Admixing refers to mixing, but not in any particular order, materials which may include a monomer(s), crosslinking agent, oil phase, surfactant, etc. as listed in claim.<br><br>Intrinsic Evidence: Exh. 2, 808 patent, Col. 5, lines 6-8 (noting that "solubilization of polymerizable molecules...in micelles and...polymerizing the monomers in the micelles" was known in the art.) | '808 patent prosecution, Paper No. 3 at 4-5, HERC0076113-4 ("Whittaker at col. 6, line 23-26 indicates that the polymer must be water-soluble and the monomers are preferably free of cross-linking agent.")<br><br>Ex. 3, Office Action mailed Apr. 11, 1991, at CIBA 000532-33 (withdrawing initial rejection over the combination of the Durand '912 patent and rejecting claims over the combination of the Durand '912 patent and the Whittaker '640 patent).<br><br>Ex. 4, Preliminary Amendment received Jul. 22, 1991, at HERC 0076113 ("Whittaker does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount.")<br><br>Proposed Construction: Cross-linking agent must be in the aqueous solution before admixing with the oily phase and surfactant or surfactant mixture to form the inverse emulsion.<br><br>Intrinsic Evidence:<br><br>Ex. 2 at col. 5, lines 44-47 ("The aqueous phase comprises an aqueous mixture of the monomers, anionic or a mixture of anionic and cationic and optionally non-ionic, and the crosslinking agent, as defined above.")<br><br>Ex. 2 at col. 6, line 64-col. 7, line 2 (discussing the components used to form the Anionic Microemulsions and indicating that the cross-linking agent resides in an aqueous solution before admixing). |

- 13 -