## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) |
| | ) |
| | ) C.A. No. 04-293 (KAJ) |
| Plaintiff, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) **REDACTED - PUBLIC VERSION** |
| HERCULES, INC. and | ) |
| CYTEC INDUSTRIES, INC., | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF CIBA SPECIALTY CHEMICALS
## CORPORATION'S RESPONSE TO
## HERCULES' OPENING CLAIM CONSTRUCTION BRIEF

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Jeffrey L. Moyer (# 3309)
Moyer@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302)651-7700
Attorneys for Plaintiff

Of Counsel:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Dated: February 3, 2006

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

I.      INTRODUCTION ..........................................................................................1

II.     SUMMARY OF ARGUMENT ......................................................................1

III.    RESPONSE TO HERCULES' STATEMENT OF FACTS...............................6

     A.     Prosecution History of '766 Patent.....................................................6

     B.     Prosecution History of the '808 Patent ................................................7

ARGUMENT ..............................................................................................................9

IV.     BASIC PRINCIPLES OF CLAIM CONSTRUCTION .....................................9

V.      RESPONSE TO HERCULES' CLAIM CONSTRUCTION OF DISPUTED TERMS....10

     A.     Disputed Elements from the '766 Patent ............................................10

          1.     "A method of making paper which comprises adding ... from about 0.05 to about 20 lbs/ton ... of ... microbead"...................................10

          2.     "Aqueous paper furnish"...........................................................13

          3.     "An ionic, organic, cross-linked polymeric microbead" .........................13

          4.     "The microbead having an unswollen particle diameter of less than about 750 nanometers" ...................................................................19

     B.     Disputed Elements From the '808 Patent ............................................21

          1.     "A composition comprising" ....................................................21

          2.     "Cross-linked anionic or amphoteric polymeric microparticles" .............22

          3.     "Microparticles derived solely from the polymerization of an aqueous solution of at least one monomer" ............................................24

          4.     "Said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron" ...................................26

          5.     "A cross-linking agent"...........................................................27

          6.     "Said microparticles having... a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on monomeric units present in the polymer" ...........................................................29

RLF1-2974984-1

7.    "Admixing (i) an aqueous solution comprising… at least one cross-linking agent…; (ii) an oily phase…; (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion"..............................31

VI.    CONCLUSION.....................................................................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) ............... 11, 21, 25

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003) ...................... 15

*Callicrate v. Wadsworth Mfg. Inc.*, 427 F.3d 1361 (Fed. Cir. 2005) ........................................ 2, 15

*Electro Sci. Indus., Inc. v. Dynamic Details, Inc.*, 307 F.3d 1343 (Fed. Cir. 2002) ..................... 15

*Gemstar-TV Guide v. I.T.C.*, 383 F.3d 1352 (Fed. Cir. 2004) ...................................................... 18

*Genentech Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997) .................................................. 21

*Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004) ............................................. 25

*In re Baxter*, 656 F.2d 679 (C.C.P.A. 1981) ............................................................................... 10

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111 (Fed.
    Cir. 2004) ............................................................................................................................ 15, 19

*Katz v. AT&T Corp.*, 63 F.Supp.2d 583 (E.D. Pa. 1999) ............................................................ 17

*Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326 (Fed. Cir. 2001) .............. 4, 11, 21

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) .......................... 22

*Northern Telecom Ltd. v. Samsung Electronics Company*, 215 F.3d 1281 (Fed. Cir. 2000) ....... 18

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) ............................. 3, 18, 28

*Nystrom v. Trex Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) .................................................... 15, 28

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..................................................... 2, 9, 27

*RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255 (Fed. Cir. 2003) ....... 15

*SuperGuide Corp. v. DirecTV Enterprises Inc.*, 358 F3d 870 (Fed. Cir. 2004) ........................... 15

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ................................... 10, 25

## I.    INTRODUCTION

Pursuant to this Court's scheduling order, Plaintiff Ciba Specialty Chemicals Corporation ("Ciba") submits this response to Hercules' Opening Claim Construction Brief ("Hercules' Opening Brief") that discloses Hercules' proposed construction of the disputed claim terms in the two patents-in-suit, U.S. Patent Nos. 5,167,766 ("the '766 patent") and 5,171,808 ("the '808 patent") (collectively, "the patents-in-suit"). As necessary, Ciba incorporates its other briefs and evidence.

## II.    SUMMARY OF ARGUMENT

From Hercules' Opening Brief, there appear to be four major areas of general disagreement between the parties regarding the claim construction of the patents in suit. The first concerns the "cross-linked" limitation in the '766 patent claims as well as the "cross-linked" and "cross-linking agent" limitations in the '808 patent claims. Despite the different intrinsic records for the '766 and '808 patents, Hercules comes up with the same interpretation for both patents, namely that the cross-linked structure results from the use of a polyfunctional cross-linking agent that comprises compounds having at least two double bonds, a double bond and a reactive group, or two reactive groups.

The plain language of the claims of the two patents does not include any language limiting the cross-linking to any particular form or type. For instance, the '766 patent claims do not say "cross-linked using a polyfunctional cross-linking agent." In fact, the '766 patent claims do not even require the use of a cross-linking agent. The '808 patent claims do require the use of a cross-linking agent, but the claims by their plain language do not place any limitations on the type of cross-linking agent or the form of the cross-links.

- 1 -

The terms "cross-linked" and "cross-linking agent" were well known to those of skill in the art at the time of the inventions. A new form of cross-linking was not invented. Both the '766 and '808 patents explicitly recognize this, stating in their respective Background sections that cross-linking technology was well known in the art. Accordingly, the plain and ordinary meaning of the terms "cross-linked" and "cross-linking agent" should be used.

While alleging that the patent specifications "define" these terms, Hercules is in fact arguing that the these terms should be limited to the preferred embodiments disclosed in the respective patents. It is hornbook patent law that the ordinary and customary meaning of a patent claim is usually broader than the specific embodiment or embodiments disclosed in the specification of the patent. In *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005), the *en banc* Federal Circuit confirmed that a court should not limit a claim to a preferred embodiment that is disclosed in the patent because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." Most recently, the Federal Circuit reversed a district court for doing exactly what Hercules encourages the Court to do here, *i.e.*, read limitations from the specification into the claims. *Callicrate v. Wadsworth Mfg. Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005) ("While claims are indeed to be construed in light of the specification, as in the *Phillips* case itself, the district court in this case improperly imported limitations from the specification into the claims, thereby restricting the claims to coverage of a single embodiment.").

Claims are construed primarily in light of the intrinsic evidence, which is comprised of the claims, specification and prosecution history of the patent in suit. *Phillips*, 415 F.3d at 1317-19. However, the instruction to interpret the claims in light of the intrinsic evidence is not an open invitation to read portions of the intrinsic evidence into the claims. It is well established

- 2 -

that a more narrow construction than the ordinary meaning is appropriate only where the evidence intrinsic to the patent includes an express "disavowal." *See, e.g., NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1308-09 (Fed. Cir. 2005). No such express disavowal of claim scope can be found in the intrinsic evidence associated with either the '766 or the '808 patent. For instance, the prior art was never distinguished based on the type or form of the cross-linking.

The second major area of disagreement between the parties on claim construction relates to the particle size limitations in the '766 and '808 patent claims. The '766 patent claims recite a microbead having "an unswollen particle diameter of less than about 750 nanometers." The '808 patent claims recited the microparticles "having an unswollen number average particles size diameter of less than about 0.75 micron." The disclosures of both patents reference the surprising benefits that were achieved when the number average diameter of the microbeads was below 750 nanometers (*i.e.*, 0.75 micron). The patents include comparative examples contrasting samples where the number average diameter was below 750 nanometers, with samples having a number average diameter around 1000 nanometers. The particle size limitations served as a basis for distinguishing the prior art in the disclosure and prosecution history of both patents.

This second area of disagreement has two aspects. First, as to the '766 patent, Hercules argues that the "number average" terminology is not set forth in the claims, implicitly arguing for the plain meaning of the term. However, in contrast to the situation regarding the term "cross-linked," the "number average" and the manner in which that measurement is determined is not the preferred type of "particle size" and method of measurement. This is how particle size is defined in the '766 specification, and the '766 specification calls it a "definition."

Secondly, and despite the obvious importance that the intrinsic evidence places on the particle size limitations, Hercules argues that such limitations should be effectively read out of the claims. Hercules justifies this not by reference to the claim language or the intrinsic evidence, but through its proposed construction of "comprising," which is used as a transition in the claims. Hercules does this in an effort to broaden the patent claims so that even one stray microbead below 750 nanometers in the prior art could invalidate the claims.

However, as the Federal Circuit has stated, "[t]he open-ended transition 'comprising' does not free the claim from its own limitations." *Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001). The simple use of "comprising" as a transition cannot bring within the scope of a claim that which is expressly outside of it. *Id.* The precise particle size limitations in the claims are rendered completely meaningless by Hercules' construction allowing the claim to read on larger microbeads that were considered outside the invention. Moreover, Hercules' construction ignores the intrinsic evidence including the surprising results with small particles sizes observed in the patents and the use of the particle size limitations to distinguish the prior art.

The third major area of disagreement between the parties involves the limitation in the '808 patent claims that the microparticles are "derived solely from the polymerization of an aqueous solution of at least one monomer." This limitation was added to the claim during prosecution in order to distinguish monomers that are not water soluble as well as those that are partially water soluble. Hercules casts its argument regarding this claim limitation not in terms of what the limitation means, but in terms of what it excludes. In particular, Hercules argues that the limitation excludes from the scope of the claims all systems in which even the smallest amount of polymerization occurs outside of the water droplet in the oil phase. Such a broad

- 4 -

exclusion, which in fact would take the preferred embodiments outside of the claim scope, has no basis in the plain language of the claim or the intrinsic evidence. The plain and ordinary meaning of the limitation is that the microparticles result from a polymerization reaction involving an aqueous solution of at least one monomer. This is evident from the prosecution history. Whether the polymerization takes place in the water phase or the oil phase is immaterial.

The fourth area of disagreement involves Hercules' construction of the limitation of the '808 patent claims relating to the cross-linking agent content. This limitation provides that the claimed microparticles have "a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer " Hercules' argues that this limitation requires measurement of the cross-linking agent content after polymerization. However, Hercules' construction ignores intrinsic evidence. In every instance in which the '808 patent specification sets forth the cross-linking agent content, it does so in terms of what is added before any polymerization reaction, not what exists after polymerization. Moreover, when the Cytec applicants used the cross-linking agent content limitation during the prosecution to distinguish the prior art, they compared the claimed cross-linking agent content to the amount of cross-linking agent added in the prior art process. Thus, the intrinsic evidence shows that this limitation merely requires that 4-4000 ppm of cross-linking agent be added.

There are several other areas where the parties differ on claim construction as described more fully below. In general, Hercules' constructions of the various claim limitations are inconsistent with the plain language of the claims and ignore the intrinsic record. As such, Hercules' constructions should not be adopted.

RLF1-2974984-1

## III.    RESPONSE TO HERCULES' STATEMENT OF FACTS

The events leading to the present suit and the background of the relevant technology were set forth in Ciba's Opening Brief. Ciba's Opening Brief also summarized the disclosures of the '766 and '808 patents as well as their prosecution histories. Accordingly, such information will not be repeated herein. Ciba, however, will address certain key aspects of the prosecution histories of the patents in suit that either is mischaracterized by Hercules or directly relevant to one of the key areas of disagreement between the parties on claim construction.

### A.    Prosecution History of '766 Patent

The term "cross-linked" was in the claims from the beginning of the prosecution. During prosecution, several references were cited by the patent examiner. None of the references showed any particle having the elements required in the claims concerning structure, size and ionicity. No form of cross-linking was ever disclaimed. The prior art was either not cross-linked at all, or was inapplicable due to other qualities identified in the claims (*e.g.*, size, ionicity, etc.).

For example, during prosecution, the patent examiner raised the Probst patent which is extensively relied upon by Hercules. The Probst patent does not describe a drainage and retention aid. Instead, Probst discloses a sizing agent that is applied to the paper after it is formed. With respect to cross-linking, the patent examiner asserted that a chemical epichlorohydrin was present in the polymerization of the Probst material and that epichlorohydrin was identified by the Cytec applicants as a cross-linking agent in the '766 patent

disclosure. (Def. Opening Brief, Exh. 11,[1] '766 patent prosecution, Paper No. 9 at 4, CIBA 000162.)

In response, the applicants explained that the issue was not whether something could be used as a cross-linking agent, but whether it produced cross-linking in the particular circumstances. In the circumstances of Probst, cross-linking did not occur. As the Cytec applicants explained in describing a discussion with the Examiner during an interview:

> It was pointed out to the Examiner that epichlorohydrin is only a cross-linking agent when reacted under certain precise conditions.

(Id., '766 patent prosecution, Paper No. 9 at 4, CIBA 000162.) The applicants explained that such conditions did not exist in the system identified by Probst and, therefore, there was no cross-linking. (Id., '766 patent prosecution, Paper No. 11 at 4-5, CIBA 000170-71.) Having previously noted that the Cytec applicants needed only to "[p]rovide documentation that epichlorohydrin in acid won't work," the Examiner allowed the application to issue. (Id., '766 patent prosecution, Paper No. 10 at 1, CIBA 000164.)

## B. Prosecution History of the '808 Patent

Hercules relies heavily on the consideration of the Durand et al. patent during the prosecution of the '808 patent in its Opening Brief. During prosecution, the Cytec applicants contrasted the Durand et al. product explaining that:

---

[1] Hereinafter, "Plaintiff's Opening Brief" refers to Plaintiff Ciba Specialty Chemicals Corporation's Opening Brief in Support of Its Motion for Claim Construction of the Patents-In-Suit, filed 12/30/2005, D.I. 275; "Defendant's Opening Brief" refers to Hercules' Opening Claim Construction Brief, filed 12/30/2005, D.I. 286; "Def. Opening Brief, Exh. __" refers to the exhibits attached to the Appendix in Support of Hercules' Opening Claim Construction Brief, filed 12/30/2005, D.I. 287-8; "Beall I, Exh. __" refers to the exhibits attached to the Declaration of L. Scott Beall in Support of Ciba's Motion for Partial Summary Judgment that the Accused Perform® System Infringes U.S. Patent Nos. 5,167, 766 and 5,171,808, filed 12/30/2005, D.I. 279-281; "Def. Non-Infringement Brief, Exh. __" refers to the Appendix in Support of Hercules' Opening Brief in Support of Its Motion for Summary Judgment of Non-Infringement, filed 12/30/2005, D.I. 291-2; "Pl. Opp. to Def. Non-Infringement Brief, Exh. __" refers to the exhibits attached to the Declaration of Thomas K. McBride, Jr. in Support of Ciba Specialty Chemicals Corporation's Opposition to Hercules' Motion for Summary Judgment of Non-Infringement, filed 1/27/2006.

> [T]he Examiner's attention is respectfully directed to Table II of the instant specification. As can be seen, Example 7 is representative of a polymer produced in the absence of a cross-linking agent i.e. **it is linear, see page 16, line 2, as is that of Durand et al.**

(Def. Opening Brief, Exh. 3, '626 application, Paper No. 4 at 6, CIBA 000526, emphasis added.)

The applicants further stated that:

> Durand et al fail to indicate the incorporation of a cross-linking agent into the polymer produced therein.

(Id., '626 application, Paper No. 4 at 6, CIBA 000526.)

In its Opening Brief, Hercules distorts the comments made by the Cytec applicants in response to the Examiner's citation of the Durand et al. patent. In the Office Action citing the Durand et al. patent, the examiner hypothesized that "it [was] reasonable to expect" cross-linking, if there was an unsaturation. (Id., '626 application, Paper No. 2 at 5, CIBA 000515.) The examiner assumed a single unsaturated carbon/carbon bond in the surfactants of the Durand et al. patent. In response to this statement, the Cytec applicants merely explained that the examiner's assumption that the surfactants were monounsaturated would not lead to cross-linking under the examiner's theory. (Id., '626 application, Paper No. 4 at 6, CIBA 000526.) It is clear from the context that the comment by the applicants did not involve any disclaimer of claim scope and did not relate to the actual reactions of Durand et al. or the actual structures of the surfactants employed by Durand et al. The comment merely stated that if there were only monounsaturation as hypothesized by the examiner, then a reaction to that monounsaturation would not form cross-links. (Id.)

Hercules also mischaracterizes the portion of the prosecution history of the '808 patent where the claims were amended to distinguish monomers that were not water soluble. The language that was originally added provided for cross-linked anionic or amphoteric polymeric microparticles "derived solely from water-soluble monomers." (Def. Opening Brief, Exh. 8,

- 8 -

'808 patent prosecution, the '120 application, Paper No. 3 at 2, HERC0076111.) Such limitation

distinguished the prior art being considered, but the examiner indicated that the language was

unclear and objected to the new language under Section 112 of the patent statute. (Id., '808

patent prosecution, the '120 application, Paper No. 4 at 3, HERC0076119.)

The Cytec applicants appealed stating that "[t]he term in question is well known to those

skilled in the art of polymers." (Id., '808 patent prosecution, the '120 application, Paper No. 5 at

6, HERC0076129.) This non-substantive objection was thereafter resolved by the examiner's

suggestion to "change 'water soluble monomers' to -- an aqueous solution of anionic or

amphoteric monomers--." (Id., '808 patent prosecution, the '120 application, Paper No. 7 at 1,

HERC0076142.) The examiner explained his logic: "[t]he change of water soluble to aqueous

solution prevents the claims from encompassing partially soluble monomers." (Id., '808 patent

prosecution, the '120 application, Paper No. 8 at 2, HERC0076145.)

## ARGUMENT

### IV.    BASIC PRINCIPLES OF CLAIM CONSTRUCTION[2]

"It is a 'bedrock principle' of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312. The words of a

claim are thus generally given their ordinary and customary meaning, which is "the meaning that

the term would have to a person of ordinary skill in the art in question at the time of the

invention." *Id.* at 1313.  To ascertain the meaning of a claim term, "the court looks to 'those

sources available to the public that show what a person of skill in the art would have understood

disputed claim language to mean.'" *Id.* at 1314 (*quoting Innova/Pure Water, Inc. v. Safari Water

Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). The intrinsic evidence of record

---

[2] A complete recitation of all of the applicable claim construction canons is provided in Ciba's Opening
Brief and accordingly is not repeated herein.

is defined as the patent itself, including the claims, the specification and, if in evidence, the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). All evidence that is not "intrinsic" evidence is extrinsic. To the extent that intrinsic evidence reveals the proper claim construction, reliance on extrinsic evidence to construe a claim term is improper. *Id.* at 1584. Extrinsic evidence cannot "vary or contradict" the meaning of claim language in view of the intrinsic evidence. *Id.* at 1585.

## V.    RESPONSE TO HERCULES' CLAIM CONSTRUCTION OF DISPUTED TERMS

Through its construction of the various disputed claim limitations in the two patents in suit, Hercules encourages the Court to ignore the plain language of the claims and the clear import of the intrinsic evidence in an attempt to recast some limitations in terms of the preferred embodiments while reading others completely out of the claims. Hercules' constructions are strained and against the clear weight of the intrinsic evidence and should not be adopted.

### A.    Disputed Elements from the '766 Patent

1.    **"A method of making paper which comprises adding ... from about 0.05 to about 20 lbs/ton ... of ... microbead"**

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| A method of making paper which comprises adding ... from about 0.05 to about 20 lbs/ton ... of ... microbead | A method of making paper in which a specified amount of a microbead, which is described in other parts of the claim, is added to an aqueous paper furnish. Comprises refers to the steps of the method of making paper, which are required by the claim. | Requires the addition of from about 0.05 to about 20 lbs/ton of microbead, as defined below, having an unswollen particle diameter of less than about 750 nanometers, but permits the addition of other materials including microbeads having other sizes. "The term 'comprises' permits the inclusion of other steps, elements, or materials." *In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981). |

Hercules' proposed construction uses the transitional phrase "comprising" to read the later limitation on the size of the microbead completely out of the claim. The limitation relating to size provides that the number average diameter of the microbeads must be below 750

- 10 -

nanometers. Hercules asserts that the Court should interpret the claim generally as "permit[ting] the addition of other materials including microbeads having other sizes." (Defendant's Opening Brief at 31.) Thus, under Hercules' construction just a single particle below 750 nanometers could meet the size limitation of the claim. Hercules takes this position to bolster its invalidity defense.

The term "comprising" is a term of art that generally functions as an open-ended transition in patent claims. The use of the term "comprising" generally means that the claims do not necessarily recite all the limitations of a device or steps of a method. However, the use of "comprising" in a claim does not free the claim from its own express limitations such that it would cover subject matter otherwise excluded from the claim. *See Kustom Signals*, 264 F.3d at 1332. The claim precisely sets forth what the average size of the microbeads must be. Yet, Hercules' construction effectively ignores these precise limitations under the guise of giving meaning to "comprising." The Federal Circuit has repeatedly rejected attempts to use "comprising" to read express limitations out of claims. *See, e.g., Kustom Signals*, 264 F.3d at 1332 ("The open-ended transition "comprising" does not free the claim from its own limitations."); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003) (stating that a claim using the transition "comprising" and a limitation to 166 amino acids does not cover a chain of amino acid missing one of the 166 amino acids).

Hercules' attempt to read the size limitation out of the claims also ignores the clear import of the intrinsic evidence. The '766 patent disclosure specifically references the surprising benefits that were achieved when the number average diameter of the microbeads was below 750 nanometers (i.e., 0.75 micron). (See, *e.g.*, Def. Opening Brief, Exh. 2, '766 patent, Col. 3, lines 58-62 ("It was surprisingly found that the crosslinked, organic, polymeric microbeads have a

- 11 -

high efficiency as retention and drainage aids when their particle size is less than about 750 nm

in diameter....")) The '766 patent also includes data showing the substantially inferior drainage

is achieved when the particle size is above 1 micron.  For example, Example 25 of the '766

patent shows that the use of microbeads having number average particle sizes of 120 and 220

nanometers substantially improves drainage times as compared to microbeads having number

average particles sizes of 1000 to 2000 nanometers.  (Id., '766 patent, Col. 22, line 55 to Col. 23,

line 15.)

In both the '766 patent itself and the prosecution history, the particle size limitation

served as a basis for distinguishing the prior art.  For example, in the Background section of the

patent, the invention was distinguished from conventional inverse emulsion polymerization

processes on the basis that such processes typically yield particle sizes in the range of 1-5

microns.  (Id., '766 patent, Col. 2, lines 58-62.)  Likewise, during prosecution, the Examiner

asserted the Farrar et al. patent against the claims, stating that it disclosed particles smaller than 2

microns.  (Def. Opening Brief, Exh. 11, '766 patent prosecution, Paper No. 4 at 4,

HERC0075983.)  The concept was that while the number average size of the microbeads might

have been as large as 2 microns, there was a possibility that there were some small particles.  The

patent applicants distinguished the Farrar et al. patent on the basis that the size limitation

requiring the number average size of the microbeads to be below 750 nanometers prevented such

application.  (Id., '766 patent prosecution, Paper No. 5 at 5, HERC0075995.)  The Examiner

agreed and withdrew the rejection.  (Id., '766 patent prosecution, Paper No. 7 at 3,

HERC0076010.)

Ciba's interpretation of the present terms adheres to the plain language and meaning of

the words as supported by the prosecution history.  Hercules is attempting to distort the claim by

reading out the size limitation.  The Court should reject Hercules improper interpretation and adopt the interpretation presented by Ciba.

### 2.    "Aqueous paper furnish"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| aqueous paper furnish | An aqueous paper furnish is a slurry of paper-making fibers, fines, etc., which are used in forming paper. | An aqueous suspension of cellulosic papermaking fibers |

Hercules failed to explain why this limitation requires any particular construction beyond its plain meaning.  Ciba's interpretation is the one that most closely follows the plain meaning of the terms and should be adopted.

### 3.    "An ionic, organic, cross-linked polymeric microbead"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| an ionic, organic, cross-linked polymeric microbead | The microbead product results from the polymerization of ionic, organic monomer(s), wherein the polymer chains are linked together by cross-linking to constrain the size of the microbead. Cross-linked merely indicates that the polymer chains are linked together in use, it does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc. | A microbead formed by polymerization of ionic, organic, monomer(s) and a cross-linking agent.  The microbead must be an integral unit which can be separated from any emulsifier present.  The cross-linking agent must be polyfunctional, i.e., comprise compounds that have either at least two double bonds, a double bond and a reactive group, or two reactive groups, and must be present in sufficient quantity to assure a cross-linked composition. |

The dispute between the parties regarding the construction of this limitation is focused on the term "cross-linked."  Under the guise of referring to the intrinsic evidence, Hercules contends that the specification defines this term.  Yet, what Hercules is in fact doing is reading preferred embodiments into the claims, specifically adding to the claims the requirements that there is a "cross-linking agent" and that the cross-linking agent is "polyfunctional."

It almost goes without saying that Hercules' construction finds no support in the plain language of the claims.   The claim language clearly does not require even a "cross-linking

agent," let alone a "polyfunctional" one. The patent uses the terms "cross-linking" and "cross-linking agent" differently. Having a polymer that is "cross-linked" does not mean that it must be cross-linked using an agent. If the invention was intended to be limited to cross-linking by use of a cross-linking agent of any type, the claims would have said so. They clearly do not.

The '766 patent disclosure also does not support Hercules' construction. It is true that the '766 patent discloses that the preferred embodiments utilize polyfunctional cross-linking agents. (Def. Opening Brief, Exh. 2, '766 patent, Col. 6, lines 36-39). The '766 patent further discloses that "[u]seful polyfunctional crosslinking agents comprise compounds having either at least two double bonds, a double bond and a reactive group, or two reactive groups." (Id., '766 patent, Col. 6, line 39-42). It is equally true, however, that the '766 patent disclosure does not exclude the use of any type of cross-linking. The portion of the specification cited to by Hercules does not amount to a definition of cross-linking or cross-linking agent, rather it is description of how cross-linking is achieved in the preferred embodiments. The '766 patent certainly was not attempting to define a new method of cross-linking. The applicants were required under patent procedures to disclose their preferred embodiments.

REDACTED

Notably, the '766 patent disclosure uses the terms cross-linking, cross-linked and cross-linking agent literally dozens of times, yet the only time the modifier "polyfunctional" is used with those terms is in the two sentences cited by Hercules. The Cytec applicants were aware of "polyfunctional cross-linking agents" and deliberately chose not to use that language in the claims. Instead, the reference to "cross-linked" in the claim and in the patent is a general one. The preferred embodiments in the '766 patent employ a well-known method of cross-linking

using MBA, but the Cytec inventors made it clear that any form of cross-linking could be utilized. For example, in the Background section, the Cytec applicants note that cross-linking was known in the art. (Def. Opening Brief, Exh. 2, '766 patent, Col. 1, lines 52-3.)

The Federal Circuit has repeatedly rejected efforts by accused infringers to avoid a charge of infringement by requiring limitations that nowhere appear in the claims. Most recently the Federal Circuit reversed a district court for doing exactly what Hercules encourages the Court to do here, *i.e.*, read limitations into the specification. *Callicrate*, 427 F.3d at 1368; *see also Innova*, 381 F.3d at 1121 ("operatively connected" does not require a "tenacious physical engagement"); *SuperGuide Corp. v. DirecTV Enterprises Inc.*, 358 F.3d 870, 881 (Fed. Cir. 2004) ("regularly received television signal" does not exclude digital signals); *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("remote location" does not mean "a location outside the operating room"); *RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1265 (Fed. Cir. 2003) ("filter layer" does not require "multiple" layers); and *Electro Sci. Indus., Inc. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1349 (Fed. Cir. 2002) ("circuit boards" does not mean "separated" circuit boards). The specification of the '766 patent offers no reason to deviate from this well-established rule.

Hercules reliance on *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) is misplaced. Hercules misreads, and ignores, the actual holding of this decision. Instead of using the specification to limit the ordinary meaning of the disputed claim term ("board"), the Court in *Nystrom* actually adopted the "ordinary meaning" to which both parties agreed. *See Nystrom*, 424 F.3d at 1145-46. What the Federal Circuit rejected in *Nystrom* was an attempt by the patent holder to **broaden** the claim term beyond its ordinary meaning by reference to an "obscure" dictionary definition. *Id.* This is not, however, what Ciba has proposed in this case. Ciba

- 15 -

proposes interpreting "cross-linked polymeric microbead" in accordance with its ordinary meaning, i.e. that the polymer chains of the microbead are linked together by a series of links that extend between the polymer chains to constrain the size of the particle.

Hercules also argues that Ciba's "constrain" language appears nowhere in either the '766 patent specification or its file history. It is true that there is no explicit reference. However, one of ordinary skill in the art understands what is involved when he reads the term "cross-linked" in the '766 specification. In particular, one of ordinary skill in the art knows that what cross-linking does is link polymer chains together. One of ordinary skill in the art also knows that in the context of the invention of the '766 patent these links constrain the size of the microbead.



Anyone in the polymer field would understand that the links constrain the size, just as they would understand what "polymeric" means even though the specification does not explicitly describe that a polymer is made up of a series of monomer units.

In its proposed construction, Hercules also asserts that the term microbead must be construed to cover only an integral unit which can be separated from any emulsifier present. Hercules does not point to any basis in the actual claim language or the patent disclosure to

support such a construction, nor is there any. Instead, Hercules relies on the portion of the prosecution history dealing with the Probst patent.

As explained above, the Probst patent does not involve cross-linking because the epichlorohydrin chemical is not active in the particular conditions present in Probst. (See Section III.A., supra.) The examiner acknowledged that there was no cross-linking, even though epichlorohydrin was listed as a potential cross-linking agent in the patents. Hercules ignores this part of the discussion of Probst and instead attempts to rely on the discussion of ionicity. In this regard, the Cytec applicants noted that the ionic chemicals in Probst stay with the emulsifier and do not become associated with the microbead. Thus, the microbeads of Probst are not ionic as in the '766 claims. Hercules distorts this observation, arguing that the Cytec inventors disclaimed cross-linking deriving from any type of surfactant. The two concepts have nothing to do with one another. One relates to ionicity, the other relates to whether epichlorohydrin caused the product to be cross-linked. The examiner agreed that, under the conditions in Probst, epichlorohydrin does not cause cross-linking.

Hercules is attempting to take an observation about the Probst patent and turn it into a disavowal of claim coverage. This is legally improper. "'Unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage,' that is, by making a statement that concedes or disclaims coverage of the claims at issue based on a piece of prior art." *Katz v. AT&T Corp.*, 63 F.Supp.2d 583, 591 (E.D. Pa. 1999) (*quoting York Prods., Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1575 (Fed. Cir. 1996)). Thus, as the Federal Circuit recently reiterated, the presumption that claim scope should be determined based on the ordinary meaning of claim terms will prevail in the absence of "'words or expressions of manifest exclusion or restriction, representing a clear

- 17 -

disavowal of claim scope.'" *NTP*, 418 F.3d at 1308–09 (*quoting ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1091 (Fed. Cir. 2003)).

Most prosecution disclaimers spawn from amendments to the claims where narrowing language is added. Where the claims are not amended and the accused infringers are arguing for a limited reading of the claims based on a discussion of the prior art, there is a potential for error. *Gemstar-TV Guide Int'l, Inc. v. I.T.C.*, 383 F.3d 1352, 1375 (Fed. Cir. 2004). In *Gemstar*, the district court erred by importing limitations based on a discussion of the prior art. The court noted that "Gemstar stated only that the Kram reference was incapable of performing a certain type of search, not that the scope of the claimed invention was limited to that particular type of search." *Id.* Where the alleged disclaimer is ambiguous, *i.e.*, capable of multiple reasonable interpretations, the courts will not limit the claims. *See e.g., Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000).

In this instance, the claims were not amended to distinguish the Probst patent. There was no need. The use of the epichlorohydrin in Probst does not result in a cross-linked microbead. The Cytec applicants could not have given up coverage of any type of cross-linked microbead when Probst did not teach a crosslinked microbead in the first instance and that was what was argued to the Patent Office.

Hercules' construction ignores the plain meaning of the claims and improperly imports numerous limitations into the claims from the specification and prosecution history and should not be adopted.

4.    "The microbead having an unswollen particle diameter of
less than about 750 nanometers"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| the microbead having an unswollen particle diameter of less than about 750 nanometers | This size limitation refers to the unswollen number average particle diameter, which is measured from the aqueous solution droplets in the continuous oil phase after polymerization utilizing quasi-electric light scattering spectroscopy. | The unswollen particle diameter of the microbead, as defined above, is measured from the aqueous droplets dispersed in the continuous oil phase after polymerization and before inversion by adding them to water. |

As noted above, Hercules argues that the size limitation should be effectively read out of the claim because the claim uses the transition "comprising." However, apparently to maintain a fall-back position, Hercules also proposes a construction directed toward the specific language of the limitation. However, Hercules' construction ignores the special definition given particle diameter in the specification of the '766 patent.

Unlike the "cross-linked microbead" limitation discussed above, the term "unswollen particle diameter" in and of itself does not have a precise generally understood meaning in the art. In such circumstances, it is entirely appropriate to refer to the specification of the patent and other extrinsic evidence for guidance as to the meaning of the term. *See Innova*, 381 F.3d at 1116 (where the meaning of a term is not immediately apparent the court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean"). Here, the '766 patent explicitly defines that, when it refers to particle size, it is talking about the "unswollen number average diameter" and that it is measured using quasi-electric light scattering spectroscopy (QELS). Specifically, in the discussion of the microbeads used in the examples at approximately column 10, line 36 through column 11, line 17 of the patent an asterisk is used to correlate the description of the particle diameter to a definition of particle diameter at approximately column 11, lines 42-47. (See Def. Opening Brief, Exh. 2.) The definition provides that particle diameter is the unswollen number average

- 19 -

particle diameter as determined by QELS. (See also, the side-by-side use of "particle diameter" and unswollen number average particle diameter, *Id.*, Col. 12, lines 26-30.)

That the '766 patent specification provides a specific definition for "unswollen particle diameter" is also evident from the prosecution history. As noted in Ciba's Opening Brief, the Patent Examiner asserted the Farrar et al. patent against the claims during the '766 prosecution. (Def. Opening Brief, Exh. 11, '766 patent prosecution, Paper No. 3/4 at 4-5, HERC0075983-4.) The Examiner asserted that the Farrar et al. patent discloses cross-linked particles where the sizes could be less than 2 microns. In response, the Cytec applicants did not make any distinction based on cross-linking having any particular meaning, but rather distinguished the reference on the basis that it disclosed conventional emulsions where the number average particle size was 1 micron or above. (Id., '766 patent prosecution, Paper No. 5 at 4-5, HERC0075994-5.)

In the same amendment, the Cytec applicants clarified the specification by adding words to the effect that the size measurements are "defined and used herein" as the unswollen number average of the particles. (Id., '766 patent prosecution, Paper No. 5 at 1, HERC0075991.) In the accompanying description, the applicants explained that:

> The specification has been amended so as to clarify how the particle size of the polymeric microbeads used in the instant invention is measured in that the QELS is carried out on the polymer emulsion, microemulsion or dispersion rather than the dry polymer. This amendment is not considered to be new matter in that it constitutes a clarification so as to prevent any misunderstanding rather than a completely new definition.

(Id., '766 patent prosecution, Paper No. 5 at 1-2, HERC0075991-2.) The Examiner removed the rejection under the Farrar et al. patent, accepting the size distinction based on the unswollen number average size as defined.

Ciba's proposed construction recognizes the specific definition provided in the specification, Hercules' proposed construction does not and thus should be rejected.

- 20 -

### B.    Disputed Elements From the '808 Patent

While the '808 and '766 patents are unrelated (*i.e.*, having different parent applications and different inventive entities), the specification of the '776 patent is incorporated by reference into the '808 patent so that it may be considered as part of the intrinsic record of the '808 patent. (See Def. Opening Brief, Exh. 1, '808 patent, Col. 3, lines 37-39.)

The claim terms and phrases and the respective position of the parties are set forth below:

#### 1.    "A composition comprising"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| A composition comprising | A composition comprising refers to the composition required by the remainder of the claim. | 'Comprising' is a term of art used in [patent] claim language which means that the named elements are essential, but other elements may be added and still form a [composition] within the scope of the claim. *Genentech Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) |

In the same way it has done with the '766 patent, Hercules' claim construction uses the transitional phrase "comprising" in the claim to read later limitations relating to the size of the microparticle out of the claim. In doing so, Hercules ignores the Federal Circuit case precedent that provides that the term "comprising" cannot be used to read express limitations out of the claims. *See Kustom Signals*, 264 F.2d at 1332 ("The open-ended transition "comprising" does not free the claim from its own limitations."); *Amgen*, 314 F.3d at 1345 (stating that a claim using the transition "comprising" and a limitation to 166 amino acids does not cover a chain of amino acid missing one of the 166 amino acids).

The intrinsic evidence indicates the importance of particle size to the invention. For example, the '808 patent specifically distinguishes conventional inverse emulsion polymerization processes on the basis that such processes typically can only yield particle sizes in the range of 1-5 microns and states that prior to the invention no particular advantage in reducing particle size

had been apparent. (Def. Opening Brief, Exh. 1, '808 patent, Col. 1, lines 31-35.) Likewise, during prosecution, the Examiner asserted the Makhlouf and Silver patents against the claims which applicants distinguished, at least partially, on the basis of the size of the particles disclosed in the patents. (Def. Opening Brief, Exh. 3, '626 application, Paper No. 4 at 7-8. CIBA 000527-8; See also Plaintiff's Opening Brief Section X.B.1.)

Hercules' construction is legally improper and ignores the intrinsic evidence and thus should be rejected.

### 2.    "Cross-linked anionic or amphoteric polymeric microparticles"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| cross-linked anionic or amphoteric polymeric microparticles | The microparticle product results from the polymerization of an aqueous solution of at least one water soluble monomer wherein the polymer chains are linked together by cross-linking to constrain the size of the microparticle. | Small anionic or amphoteric particles formed by the polymerization in the presence of a cross-linking agent, as defined below, in sufficient quantity to assure a cross-linked composition. |

In contrast to claim 1 of the '766 patent, claim 1 of the '808 patent explicitly recites the microparticle being "cross-linked" and that a "cross-linking agent" is employed. While Claim 1 of the '808 patent includes the additional language specifying a "cross-linking agent," the language in this part of the claim only specifies that the microparticle is cross-linked. Therefore, Hercules' assertion that the word "cross-linked" requires a "cross-linking agent" is improper because it renders superfluous the later express recitation of a "cross-linking agent." Such a reading is disfavored. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) (noting that a "claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so").

Hercules' argument relative to this claim term focuses on elements of the intrinsic evidence that, at best, are relevant to the construction of the "cross-linking" agent. For instance,

- 22 -

Hercules cites to portions of the '808 patent specification dealing with choice of a polyfunctional cross-linking agent as the preferred cross-linking agent and the use of MBA as the cross-linking agent in the examples. (Defendants' Opening Brief at 16.) It is difficult to see how such sections of the specification relate to the construction of "cross-linked."

The result of Hercules' focus on the use of a cross-linking agent is that they end up reading process limitations into a claim limitation that relates to a final structure. In particular, Hercules asserts that cross-linked means formed by polymerization in the presence of a cross-linking agent. That is contrary to the plain language of the limitation which only states that the microparticle has a cross-linked structure, *i.e.*, the polymer chains are linked together by cross-links. This particular limitation does not say anything about how that cross-linked structure is achieved, and it is improper to read such limitations into the claims.

Hercules' argument on this claim term also relies on the consideration of the Durand et al. patent during the prosecution history. But, Hercules distorts the prosecution history. The polymer of Durand et al. patent is not cross-linked, and was not relevant on that basis alone. The same is true of the polymer of Whittaker (U.S. Patent 4,705,640):

> Whittaker does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount. Whittaker at col. 6, line 23-26 indicates that the polymer <u>must</u> be water -soluble and the monomers are **preferably free of cross-linking agent.**

(Def. Opening Brief, Exh. 8, '808 patent prosecution, the '120 application, Paper No. 3 at 4-5, HERC0076113-4, emphasis added.) In both instances, the distinction was that the polymers were not cross-linked at all. Thus, whether there was "incorporation" of a "cross-linking agent" never was an issue.

Hercules' construction ignores the context of the limitation within the claim, applies intrinsic evidence unrelated to the claim term and distorts this unrelated intrinsic evidence so as

- 23 -

to impose process limitations on what is clearly a simple structural limitation. Accordingly, Hercules' construction should be rejected.

### 3.    "Microparticles derived solely from the polymerization of an aqueous solution of at least one monomer"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| microparticles derived solely from the polymerization of an aqueous solution of at least one monomer | The polymer chains of the microparticles are derived from monomer(s), which are water soluble. | Microparticles must be derived only from the polymerization of an aqueous solution of at least one monomer. |

Hercules' argument regarding construction of this phrase is flawed more in terms of what Hercules asserts the limitation does not cover than what Hercules asserts that it means. Specifically, reaching way beyond the language of the claim and the intrinsic evidence, Hercules asserts that this limitation excludes all systems in which even the smallest amount of polymerization occurs outside of the water droplet in the oil phase. Thus, Hercules turns this limitation from one that by its plain language relates to the constituent polymers used in the polymerization reaction to one that relates to where the actual polymerization reaction takes place. There is no basis for Hercules' construction, and it should be rejected.

The intrinsic record shows that this limitation was added to the claim during prosecution in order to distinguish monomers that are not water soluble as well as those that are partially water soluble. As detailed in Section X.B.3. of Ciba's Opening Brief, the original language of the claim specified that the polymerization involved "water soluble" monomers. The language was changed to its present form to clarify that the monomers needed to be completely water soluble. In specifically addressing the noted language, the Examiner stated that "[t]he change of water soluble to aqueous solution prevents the claims from encompassing partially soluble monomers." (Def. Opening Brief, Exh. 8, '808 patent prosecution, Paper No. 8 at 2,

- 24 -

HERC0076145.) Thus, the Patent and Trademark Office obviously understood this limitation to relate to the "water soluble" nature of the monomers.

Hercules' proposal erroneously tries to change this limitation into a process requirement that limits where the polymerization reaction can take place. Such a broad exclusion would in fact take the preferred embodiments outside of the claim scope as well as Ciba's commercial Polyflex® product, which Hercules admits is covered by the patent claims. (Pl. Opp. to Def. Non-Infringement Brief, Exhs. 1 and 2.) The Federal Circuit has said that claim constructions that exclude preferred embodiments are rarely correct. *See, e.g., Vitronics*, 90 F.3d at 1583-84 (interpretations excluding preferred embodiments are "rarely, if ever, correct and would require highly persuasive evidentiary support"); *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1347 (Fed. Cir. 2004) (holding that claim construction which would exclude all preferred embodiments of a claim was not proper); *Amgen*, 314 F.3d at 1349 ("A claim interpretation that reads out a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.") (internal quotation omitted).

The plain and ordinary meaning of the limitation is that the microparticles result from a polymerization reaction involving an aqueous solution of at least one monomer. Whether the polymerization takes place in the water phase or the oil phase is immaterial. Thus, Hercules' interpretation should be rejected.

4.    "Said microparticles having an unswollen number
average particle size diameter of less than about 0.75
micron"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron | This size limitation refers to the unswollen number average particle size diameter, which is measured from the aqueous solution droplets in the continuous oil phase after polymerization utilizing quasi-electric light scattering spectroscopy. | Some microparticles in the composition have an unswollen number average particle size diameter of less than about 0.75 micron, which is measured from the aqueous solution droplets dispersed in the continuous oil phase after polymerization and before inversion by adding them to water. |

As noted above, Hercules seeks to read the limitation that the "number average" size of

the microparticles must be below 750 nanometers completely out of the claim through a sleight

of hand relative to the use of the transitional term "comprising." The interpretation presented by

Hercules is that only "some microparticles" have the specified average size. Yet, the claim does

not say that "some" of the microparticles have the size. Nor does the limitation use an open-

ended transition between the recitation of the microparticle and the precise size. For instance,

the claim does not say that the "microparticles include microparticles having an unswollen

number average particle size diameter of less than about 0.75 micron." Instead, the limitation

says that the "microparticles" **have** such a size. Considering all particles present, the number

average particle size diameter must be less than about 0.75 micron. Hercules' use of

"comprising" to eliminate this claim requirement is improper as detailed in Sections V.A.1. and

X.B.1., above.

The number average size is measured using the same QELS technique referenced in the

'766 patent. The '808 patent "incorporates by reference" the text and definitional language of

the '766 patent. (Def. Opening Brief, Exh. 1, '808 Patent, Col. 9, line 40-41.)

Hercules attempts to effectively read this limitation out of the claim are without support

in either claim language or the intrinsic record and should be rejected.

- 26 -

5.    "A cross-linking agent"

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| a cross-linking agent | Cross-linking agent refers to an agent that links the polymer chains together in use to constrain the size of the microparticle. Cross-linking agent does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc. | A chemical agent that is polyfunctional in that it has at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together. |

Hercules' construction re-writes the language specifying the presence of a "cross-linking agent" to limit the invention to the preferred embodiment of a "polyfunctional" cross-linking agent that has at least two double bonds, a double bond and a reactive group or two reactive groups. The ordinary and customary meaning of a patent claim is usually broader than the specific embodiment or embodiments disclosed in the specification of in the patent. In *Phillips v. AWH Corp.*, the *en banc* Federal Circuit confirmed that a court should not limit a claim to a preferred embodiment that is disclosed in the patent because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323 (Fed. Cir. 2005). Here, there is no reason anywhere in the intrinsic evidence to limit the claim to the preferred embodiment.

By their plain language, the claims do not place any limitations on the type of cross-linking agent or the form of cross-links. The claim language merely requires that an agent be employed. The '808 patent does not involve the invention of any new cross-linking agent or form of cross-links. In fact, the "Background of the Invention" in the '808 patent specifies that cross-linking was generally known in the art. The plain and ordinary meaning of "cross-linking agent" is an agent that in use produces links that extend between polymer chains. (See IUPAC definition in section V.A.3., p. 15, supra.) The patent specification does not provide any special definition of "cross-linking agent" that justifies deviating from this plain and ordinary meaning.

The specification merely discloses preferred embodiments as is required under the Patent Laws. By the same token, Ciba is not seeking an interpretation broader than the ordinary meaning and thus, Hercules' citation of the *Nystrom* case is misplaced as discussed in Section V.A.3. above. (Hercules' Opening Brief at 22.)

The prosecution history also does not evidence the adoption of any special definition of "cross-linking" agent different than the ordinary meaning. Likewise, the prosecution history does not include any "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *NTP*, 418 F.3d at 1308–09 (*quoting ACTV*, 346 F.3d at 1091). In this regard, Hercules misinterprets the portion of the prosecution addressing the Durand et al. patent. Hercules asserts that the Durand et al. patent was distinguished on the basis that it did not contain "the necessary two functional groups." (Hercules' Opening Brief at 20.) However, as explained above in section III.B. at supra page 7-8, the applicants actually distinguished Durand et al. because the product was not cross-linked. The Cytec applicants explained that Durand et al. was "linear." (Def. Opening Brief, Exh. 3, '626 application, Paper No. 4 at 6, CIBA 000526.)

The passage from the prosecution relied on by Hercules is taken out of context. The Cytec applicants were merely responding to the position taken by the examiner. Specifically, the Cytec applicants observed that the examiner had argued that the oleate surfactants of Durand et al. are monounsaturated, and, based on that assumption, any reaction would result in a linear polymer. (*Id.*, '626 application, Paper No. 4 at 6, CIBA 000526.) This does not mean that the Cytec applicants disclaimed particular forms of cross-linking. At most, all that could be said is that the applicants disclaimed the type of cross-linking found in the Durand et al. patent. Yet, Durand et al. does not exhibit any form of cross-linking, and, as such, nothing was disclaimed.

There is no support in the intrinsic record for injecting the additional limitations proposed

by Hercules into the claims. Accordingly, Hercules' claim construction should be rejected.

> 6.     **"Said microparticles having... a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on monomeric units present in the polymer"**

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| said microparticles having . . . a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer | The cross-linking agent is added in an amount of about 4 molar parts to about 4000 parts per million, such ratios being based on the monomeric units present in the polymer. | Microparticles must contain between 4 and 4000 parts of cross-linking agent, as defined above, per million monomeric units present in the polymer. |

Hercules' construction provides that the 4 to 4000 ppm limitation requires measurement

of the cross-linking agent content after polymerization. This is contrary to the ordinary meaning

of the claim as well as the intrinsic evidence. For instance, the specification of the '808 patent

states that "[c]rosslinking agents are to be used in sufficient quantities to assure a cross-linked

composition." (Def. Opening Brief, Exh. 1, '808 patent, Col. 4, lines 63-64.) The patent

explains that:

> Preferably at least 4 molar parts per million of cross-linking agent, based on the monomeric units present, are employed to induce sufficient cross-linking...

(Id., '808 patent, Col. 4, lines 64-67.) As made apparent by this passage, the '808 patent

specifies the amount of cross-linking agent based on what is added, before any reaction and

before cross-linking is "induced."

The '808 patent also includes tables identifying various samples made with different

levels of cross-linking agent in ppm. (See, e.g., Id., '808 patent, Col. 7, lines 33-45.) The

'808 patent explains that the ppm levels are measured from the amount of ingredients added

- 29 -

when preparing the samples. (Id., '808 patent, Col. 7, line 26.) The ppm calculation is based on what is mixed together, before any reaction. (Id., '808 patent, Col. 6, lines 58-67.)

Moreover, during prosecution, the relevant claim language was applied in connection with the Makhlouf et al. patent, which does not have a cross-linking agent content below the upper limit of about 4000 ppm. The Cytec applicants explained:

> Claim 1 has been amended so as to indicate that the cross-linking agent content ranges from about 4 to about 4000 parts per million. This limitation clearly distinguishes the instant compositions over those of Makhlouf et al in that the patentee indicates at col. 4, lines 17-20 that the cross-linking monomer content is at least 0.5% i.e. 5000 parts per million.

(Def. Opening Brief, Exh. 8, '808 patent prosecution, the '120 application, Paper No. 3 at 3, HERC0076112.) The cited disclosure of the Makhlouf et al. patent stated:

> The proportion of such crosslinking monomer employed in the process of the invention may range from 0.5 percent to 15 percent by weight of the monomers used in the copolymerization process.

(Def. Opening Brief, Exh. 5, U.S. Patent 4,147,688 to Makhlouf et al., Col. 4, lines 17-20.) The cited passage from the Makhlouf et al. patent relates to the amount that is added, not the number of resulting cross-linked junctions after polymerization. Following the claim language essentially verbatim, the Cytec applicants stated that the "cross-linking monomer content" in Makhlouf et al. was about 5000 parts per million. This refers to the amount of "cross-linking monomer employed" in Makhlouf et al. Thus, the patent specification and the prosecution consistently apply the 4-4000 ppm cross-linking agent content language to the amount of cross-linking agent that is added.

Hercules relies on the consideration of the Durand et al. and Whittaker patents in the prosecution history to support its construction. However, applicants' statements regarding the Durand et al. and Whittaker patent were directed to whether the polymers disclosed in those patents were cross-linked at all, not an amount of added cross-linking agent as also discussed

- 30 -

above in Section V.B.2. Thus, they have not bearing on the interpretation of this claim limitation.

This claim limitation merely requires that 4-4000 ppm of cross-linking agent be added. Hercules' construction, which requires the determination of cross-linking agent content after polymerization, is contrary to the intrinsic evidence and thus should be rejected.

7.    **"Admixing (i) an aqueous solution comprising... at least one cross-linking agent...; (ii) an oily phase...; (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion"**

| Claim Terms and Phrases | Proposed Ciba Construction | Proposed Defendants' Construction |
|---|---|---|
| (a) admixing (i) an aqueous solution comprising . . . at least one cross-linking agent . . . ; (ii) an oily phase . . . ; (iii) an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion; | Admixing refers to mixing, but not in any particular order, materials which may include a monomer(s), cross-linking agent, oil phase, surfactant, etc. as listed in claim. | Cross-linking agent must be in the aqueous solution before admixing with the oily phase and surfactant or surfactant mixture to form the inverse emulsion. |

Hercules' construction of this limitation provides that the cross-linking agent must be part of the aqueous solution before the inverse emulsion is made. Hercules also asserts that the claim language requires the aqueous solution to be separate from the surfactant prior to mixing. Such requirements are not found anywhere in the claim language. Instead, the claim makes clear that the admixing pertains to the emulsion and it does not matter what order of addition that gets to that point. This claim, as with the claims that it depends from, relates to a recipe, not a time line. As long as there comes a point where there is admixing of the components, this claim is satisfied. The claim simply does not recite a precise sequential series of steps. The claim only provides that at some point the named components are admixed together. It can be early in the

steps or later. Hercules' construction should be rejected as it is counter to the ordinary meaning of the claim.

## VI.    CONCLUSION

For the reasons stated herein, the Court should reject Hercules' proposed constructions for both the '766 patent and the '808 patent, as being counter to the ordinary meaning of the claim and unsupported by the intrinsic and extrinsic evidence.

_Frederick L. Cottrell, III (#2555)_
Cottrell@rlf.com
Jeffrey L. Moyer (# 3309)
Moyer@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700
Attorneys for Plaintiff
 Ciba Specialty Chemicals Corporation

Of Counsel:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Dated:  January 27, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2006 I hand delivered the foregoing document to the

following persons and electronically filed the foregoing document with the Clerk of Court using

CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951


I hereby certify that on January 27, 2006, I have Federal Expressed the foregoing

document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022


Steven J. Eineman (#4025)

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2006 I hand delivered the foregoing document to the

following persons and electronically filed the foregoing document with the Clerk of Court using

CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951


I hereby certify that on February 3, 2006, I have Federal Expressed the foregoing

document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022


Steven J. Fineman (#4025)