IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) ) C.A. No. 04-293 (KAJ) |
| Plaintiff, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) **REDACTED -** |
| | **PUBLIC VERSION** |
| HERCULES, INC. and CYTEC INDUSTRIES, INC., | ) ) |
| | ) |
| Defendants. | ) |

## CIBA'S OPPOSITION TO HERCULES' MOTION FOR
## SUMMARY JUDGMENT OF NON-INFRINGEMENT

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Jeffrey L. Moyer (# 3309)
Moyer@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700
Attorneys for Plaintiff
Ciba Specialty Chemicals Corporation

Of Counsel:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Dated: February 3, 2006

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... iii

I.    INTRODUCTION................................................................................................ 1

II.   SUMMARY OF THE ARGUMENT.................................................................. 1

III.  STATEMENT OF FACTS.................................................................................. 4

    A.    Commercial Background and Use of the Patents.................................... 4

    B.    General Background of the Polyflex® System ........................................ 5

    C.    Background of the '766 Patent............................................................... 8

        1.    The '766 Patent's Reference to a Cross-linked Microbead........................ 9

    D.    Background of the '808 Patent............................................................. 13

        1.    The '808 Patent's Reference to a Cross-linked Microparticle ................. 13

        2.    The '808 Patent's Reference Concerning 4 to 4000 ppm Cross-linking Agent............................................................................................... 15

        3.    The '808 Patent's Reference to Water Soluble Monomers....................... 16

    E.    Background of the Perform® System ................................................... 17

IV.   ARGUMENT .................................................................................................... 23

    A.    To Determine Infringement, the Court Must Construe the Claims and Then Compare Them With the Accused Products and Methods ......................... 24

    B.    Hercules Misstates the Doctrine of Prosecution Disclaimer and Its Role in Claim Interpretation ...................................................................... 24

    C.    There Is Substantial Evidence That The Defendants Literally Infringe the '766 Patent.......................................................................................... 26

    D.    There Is Substantial Evidence That Defendants Infringe the '766 Patent Under the Doctrine of Equivalents....................................................... 29

    E.    There Is Substantial Evidence That Defendants Literally Infringe Claim 1 of the '808 Patent .................................................................................. 31

RLF1-2974935-1

|   |   | 1. | There Is Substantial Evidence That The Perform® Product is Cross-Linked by a Cross-Linking Agent ................................................. 31 |
|---|---|---|---|
|   |   | 2. | The Perform® Product Uses 4 to 4000 ppm Cross-Linking Agent .......... 35 |
|   |   | 3. | The Perform® Product is Made From Water Soluble Monomers ............ 36 |
|   | F. | | Defendants Infringe the '808 Patent Under the Doctrine of Equivalents ............. 37 |
| V. | CONCLUSION | | ............................................................................................................. 39 |

RLF1-2974935-1

## TABLE OF AUTHORITIES

**Cases**

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831
(Fed. Cir. 1984)..............................................................................................................23

*Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241 (Fed. Cir. 2000)................................38

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) .......................................24

*Corning Glass Works v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251
(Fed. Cir. 1989)..............................................................................................................29

*Everpure, Inc. v. Cuno, Inc.*, 705 F. Supp. 725 (D. Conn. 1988), *aff'd*,
875 F.2d 100 (Fed. Cir. 1989) ......................................................................................24

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n.*, 383 F.3d 1352,
1375 (Fed. Cir. 2004)................................................................................................25, 27

*Graver Tank & Mfg. v. Linde Air Products*, 339 US 605 (1960)...........................................30, 38

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989) ..................25, 34

*Katz v. AT&T Corp.*, 63 F. Supp. 2d 583 (E.D. Pa. 1999) ............................................................25

*Lemelson v. TRW, Inc.*, 760 F.2d 1254 (Fed. Cir. 1985)...............................................................24

*Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364
(Fed. Cir. 2005)..............................................................................................................24

*Northern Telecom Ltd. v. Samsung Electronics Co.*, 215 F.3d 1281
(Fed. Cir. 2000)..............................................................................................................25

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005)........................................25

*PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359
(Fed. Cir. 2005)..............................................................................................................24

*Rambus Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1089–90 (Fed. Cir. 2003)........................25, 34

*Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570
(Fed. Cir. 1995)..............................................................................................................34

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997)........................................38

### STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56 .........................................................................................................................23

RLF1-2974935-1

## I.    INTRODUCTION

Hercules, Inc. ("Hercules") has filed three separate motions for summary judgment. Ciba Specialty Chemicals Corporation ("Ciba") submits this brief in opposition to the motion for summary judgment of non-infringement of the patents in suit, *i.e.*, U.S. Patents 5,167,766 and 5,171,808 (the '766 and '808 patents). This opposition is being submitted concurrently with Ciba's oppositions to the other motions and with Ciba's responsive brief relating to claim construction, which are incorporated herein by reference. (Beall I, Exh. 1,[1] ¶ 12.)

## II.    SUMMARY OF THE ARGUMENT

The two-part analysis of infringement requires first, the interpretation of the relevant patent claims, and then the application of the properly interpreted claims to the accused system. Such infringement can be literal or under the doctrine of equivalents.

Hercules' motion for summary judgment of non-infringement is predominantly based upon a misapplication of the doctrine of prosecution disclaimer.

REDACTED

No such requirement is set forth in the '766 claims. Hercules is improperly attempting to take an observation about a particular prior art reference and turn it into an unequivocal

---

[1] Hereinafter, "Beall I, Exh. ____" refers to the exhibits attached to the Declaration of L. Scott Beall in Support of Ciba's Motion for Partial Summary Judgment that the Accused Perform® System Infringes U.S. Patent Nos. 5,167, 766 and 5,171,808, filed 12/30/2005, D.I. 279–81; "Beall II, Exh. __ "refers to exhibits attached to Declaration of L. Scott Beall in Support of Ciba's Motion for Claim Construction of the Patents-In-Suit, filed 12/30/2005, D.I. 276; "Def. Opening Brief, Exh. ___" refers to the exhibits attached to Defendant Hercules' Opening Brief In Support Of Motion For Summary Judgment of Non-infringement, filed 12/30/2005, D.I. 291-2; "Robinson, Exh. __" refers to the exhibits attached to the Declaration of Douglas A. Robinson In Support of Ciba's Opposition to Hercules' Motion for Partial Summary Judgment Holding that Hercules Is Not Precluded From Asserting Invalidity and Unenforceability Due to Privity, dated 1/27/2006, filed herewith; and "Exh. ___" refers to the exhibits attached to the Declaration of Thomas K. McBride Jr. dated 1/27/2006, filed herewith.

RLF1-2974935-1

disavowal of claim coverage. Hercules' portrayal is a distortion of the prosecution. No

disavowal occurred.



Nothing in the prosecution history supports importing this additional

requirement into the '766 claims. Hercules' argument amounts to an importation of the preferred

embodiment into the claims, which is improper.

Even if the '766 claims were limited, as requested by Hercules, there are genuine issues

of material fact in dispute preventing summary judgment. The Hypermer® B246SF agent that

Defendants use in making the infringing product includes polyfunctional reactive groups. The

Hypermer® agent covalently crosslinks the Perform® product.

With regard to the '808 claims, Hercules puts forth a three-pronged attack. First,

Hercules incorrectly contends that oleate surfactants, as a whole, were disclaimed during the

'808 prosecution. There was no such disavowal. The real issue during prosecution was whether

the Durand et al. patent resulted in a cross-linked product. It did not.

REDACTED                                                        Even

if the claims are restricted as requested by Hercules, there is still the substantial fact that

Hypermer® is not like the surfactants considered during prosecution. Hypermer® acts

differently and has different structures and properties. It crosslinks, where the prior patents did

not.

Second, Hercules contends that, even if the Court accepts that the Hypermer B246SF is

acting as a cross-linking agent, there is no evidence that the cross-linking agent is present in the

RLF1-2974935-1

accused Perform® product in the amount required by the claims. This contention is based upon an improper claim construction which totally ignores the intrinsic evidence, i.e., the'808 specification and the prosecution leading to the '808 patent. The '808 specification and file history make it clear that the cross-linking agent content is the amount added, not the number of crosslinked junctions formed. Even if the '808 claims were to be so limited, there is a genuine issue of material fact as to whether Hypermer® is involved in the number of crosslinked junctions that would be required. There is substantial evidence that significant numbers of junctions, well above 4 ppm, are established by the Hypermer® agent.

Lastly, Hercules contends that, even if the Hypermer® B246SF were acting as a cross-linking agent, the requirement in the '808 claims that the "microparticles derived solely from the polymerization of an aqueous solution of at least one monomer," requires a locus of polymerization only in the water phase. Hercules claims this is not met, because there might be some polymerization in the oil phase. Hercules' interpretation is incorrect and the language of the '808 claim does not state such a requirement. The '808 patent and its prosecution history makes clear that the "aqueous solution" language merely requires water soluble monomers. In both the Polyflex® system and the Perform® system, the acrylic acid and acrylamide monomers are added in an aqueous solution and the microparticles are derived solely from the polymerization of such monomers. Hercules' interpretation would distinguish Polyflex®, which Hercules has admitted is covered by the claims.

Even if the Court were to adopt Hercules' incorrect interpretation as to this '808 claim limitation, there is a factual dispute as to where the polymerization takes place when Perform® is produced.

REDACTED

- 3 -

REDACTED

Hercules' attempts to exclude consideration of the doctrine of equivalents are improper. As stated by Ciba, there is literal infringement under the properly construed claims. Should any differences exist between the literal language of the claims and the Perform® product after claim construction, those differences would be insubstantial. There is abundant evidence specifically addressing the equivalence of the Polyflex® product (admitted to be a product within the claims) and the Perform® product, ranging from how they act as drainage aids in making paper to specific characteristics such as their equivalent cross-links. Were a jury to find infringement by equivalents, it would be fully supported by the evidence.

## III.    STATEMENT OF FACTS

### A.    Commercial Background and Use of the Patents

Two separate patent applications were filed in 1990 by Cytec, then American Cyanamid. The separate applications, which are distinct and do not share the same intrinsic record, eventually issued as the patents in suit. The '766 patent relates to a new product that showed surprising benefits in facilitating the manufacture of paper and the '808 patent relates to the product itself. This so-called Polyflex® system permits paper mills to make paper better and faster.

REDACTED

The Defendants established a customer base using the Polyflex® system.

- 4 -

In 2000, the Polyflex® business and the patents were offered for sale by Cytec.

REDACTED

Instead of ceasing their use of the technology as contemplated by the expiration of the licenses and in respect of the patent rights now owned by Ciba,

REDACTED

The difference is the substitution of a Hypermer® agent for the MBA agent used in the commercial Polyflex® system.



**B.    General Background of the Polyflex® System**

Pursuant to the Court's scheduling order, the parties presented a tutorial on the technology involved in this case on May 27, 2005. Ciba provided this Court with a slide presentation at that time which is attached hereto for the Court's convenient reference. (Beall I, Exh. 6.) The following discussion covers some of the salient points of the tutorial. If the Court

wishes a more detailed discussion, Ciba invites the Court's attention to the transcript of the

tutorial.[2] (Beall I, Exh. 7.)

As explained in the tutorial, the papermaking process involves removing water from a

slurry (or furnish) of paper making fibers and other constituent parts, while maintaining good

and even formation of the final paper product. (Beall I, Exh. 7 at 5-7.) A schematic flow chart

of a typical paper mill is presented below:



(Beall I, Exh. 6, slide 6; Beall I, Exh. 7, Hearing Trans. at 7-9.) As depicted, a furnish of paper

fibers and fines is treated with additives and then delivered to a machine called a Fourdrinier.

The Fourdrinier machine includes a large belt formed of a screen mesh where water is drained so

that the fibers and other constituents left behind become the final paper product.

The objective of the Polyflex® system is to permit fast and controlled drainage of the

water, while maintaining good formation and retention of chemical additives and other



constituent parts. In practicing the invention, a series of preparation steps are performed on the paper furnish in many instances. As depicted in the following photomicrograph, a paper slurry generally includes wood fiber, fines and fillers (as well as, often, other materials):



(Beall I, Exh. 6, slide 17; Beall I, Exh. 7, Hearing Trans. at 7-8.) The fibers, fillers and other materials are often anionic in nature, which means that they carry a negative electrostatic charge.[3] Thus, when a cationic material is added, the fibers and other components tend to floc or bond together, something generally referred to as flocculation. The initial flocculation is typically instituted by a cationic polymer that is linear.[4] The linear cationic polymer tends to bond together all of the materials into large and dense flocs. These flocks do not drain very efficiently and also provide poor formation.

---

[3]     This charge is much like the static charge that can be imparted to a balloon, which then can attract dust particles of the opposite charge. Often times, people rub the balloon to generate the charge and then observe as the balloon attracts other objects.

[4]     A polymer is a chain of chemical units called monomers. The word polymer means "poly" or multiple (mono)mers. In the present case, the polymers are made of acrylic acid monomers and acrylamide monomers. A linear polymer is a chain of monomers where the monomers are bonded end to end like a chain of pearls.

RLF1-2974935-1

In the typical Polyflex® commercial process, the large flocs are sheared to make small flocs. (See Beall I, Exh. 6, slide 24; Beall I, Exh. 7, Hearing Trans. at 15-16.) Because the larger flocs are treated with cationic chemicals, their surface charge is substantially cationic, even after shearing. As depicted in the following, the Polyflex® product operates to bind the smaller flocs together without reforming the larger flocs:



(Beall I, Exh. 6, slide 28; Beall I, Exh. 7, Hearing Trans. at 16-17.)

### C.    Background of the '766 Patent

The '766 patent is directed to a novel organic polymer with certain features that provide for a surprisingly effective drainage and retention aid. The claims of the '766 patent identify that the organic microbead is to be small, ionic and cross-linked. (*See* Beall I, Exh. 9, '766 patent, Claim 1.) This combination of qualities provides dramatic benefits in papermaking. The invention and the patents were not about developing a new form of cross-linking.

The Cytec applicants recognized that surprisingly good drainage and retention could be obtained if the microbeads were kept small. The '766 patent reflects this in the claims,

RLF1-2974935-1

specifying that the number average particle size of the product is less than 750 nanometers. (*See* Beall I, Exh. 9, '766 patent, Claim 1.) In describing the surprising discovery that the number average diameter (size) of the microbead has a dramatic impact on performance, the patent states:

> It was surprisingly found that the cross-linked, organic polymeric microbeads have a high efficiency as retention and aids when their particle size is less than about 750 nm [nanometers] in diameter...

(*Id.* at Col. 3 ll. 58–61; *see also id.* at Col. 2., ll. 58-63.)

### 1.    The '766 Patent's Reference to a Cross-linked Microbead

The surprising benefits of the microbead developed by Cytec are not dependent on any particular form of cross-linking or how the microbead might become cross-linked. In the "Background of the Invention," the Cytec applicants explain that "cross-linking technology is well known in the art." (*Id.* at Col. 2, ll. 52-53.) The passage refers to EP 0,202,780 ("the '780 patent") which describes various ways of cross-linking:

> [C]ross linking ... may be brought about by controlled spontaneous conditions such as heating or irradiation, provided the degree of chain branching or other cross-linking is reproducible and controllable, but preferably is brought about by reaction of the monomer or monomer blend, or the final polymer, with a covalent or ionic cross linking agent.

(Beall I, Exh. 11, '780 patent, Col. 9, ll. 19-27.)

The '766 patent claim at issue merely uses the word "cross-linked" and no further limiting language. The claims do not restrict the form of cross-linking, such as by requiring "*covalent* cross-linking." Covalent cross-linking refers to a subset of cross-linking where covalent bonding is involved. Ionic cross-linking, as mentioned in the '780 patent, refers to another subset where ionic associations are involved, and there are no covalent bonds. Ionic cross-linking is depicted in one college text as follows:

- 9 -



*Figure 7.3 Schematic diagram of clusters in an ionomer.*

(Beall I, Exh. 12 at CIBA 037951.) Here, ionic domains constituted by ionic associations make clusters that form cross-links among the polymer chains. (*Id.* at CIBA 037949.)



Various forms of cross-linking are also identified in the Farrar et al. patent that was considered during the prosecution leading to the '766 patent. (Exh. 5, '766 patent prosecution, Paper No. 3 at 3-4, at CIBA 038952-953; CIBA 038903.) The Farrar et al. patent notes that "the polymer [may be] cross linked by, for instance, excessive heating during drying." (Beall II, Exh. 10, Farrar et al. patent, Col. 10, l. 28.) The Farrar et al. patent also refers to different cross-linking agents:

> Added cross linking agents can include ionic cross-linking agents such as polyvalent metal salts, formaldehyde, glyoxal or preferably, covalent cross-linking agents that will copolymerize with the monomers...

- 10 -

(*Id.* at Col. 10, ll. 38-41.) The Farrar et al. patent is not relevant to the '766 patent claims because it discloses particles having a number average size that is too large to show the benefits recognized by the claimed invention.

The witnesses in this case have confirmed that cross-linking has a broad meaning.



During prosecution, many references were cited by the patent examiner. None of the references show a particle having the claim elements concerning structure, size and ionicity. No form of cross-linking was ever disclaimed. The term "cross-linked" was in the '766 claims from the beginning of the prosecution. The prior art cited during prosecution is either not cross-linked at all, or is inapplicable due to other qualities identified in the claims (*e.g.*, size, ionicity, etc.).

For example, the patent examiner raised the Probst patent which is extensively relied upon by Hercules. The Probst patent does not describe a drainage and retention aid. Instead, Probst discloses a sizing agent that is applied to the paper after it is formed. The purpose of the sizing aid is to spread out over the surface of the paper. While the emulsifiers in Probst are

- 11 -

ionic, they do not form part of the microbeads. Further, the Probst microbeads are not cross-linked even through a chemical.

In their first response to the assertion of Probst, the Cytec applicants explained that the Probst patent was not relevant for three separate reasons:

1.  The Probst microbeads are preferably added to the paper rather than the furnish;

2.  The Probst microbeads are not ionic; and

3.  The Probst microbeads are not cross-linked.

(*See* Exh. 5, '766 patent prosecution, Paper No. 8 at 7, CIBA 038984.) Each of the points relates to a different aspect of the claims. Relative to cross-linking, the patent examiner pointed out that a chemical, epichlorohydrin, was present in the polymerization of the Probst material and that epichlorohydrin was identified by the Cytec applicants as a cross-linking agent. (*Id.,* Paper No. 9 at 4, CIBA 038989.) In response, the applicants explained that the point was simply whether cross-linking occurred; and, in the circumstances of Probst, cross-linking did not occur:

> It was pointed out to the Examiner that epichlorohydrin is only a cross-linking agent when reacted under certain precise conditions.

(*Id.,* Paper No. 11 at 4, CIBA 038997.) The applicants explained that the necessary precise conditions did not exist in the Probst system and, therefore, there was no cross-linking. (*Id.,* Paper No. 11 at 4-5, CIBA 038997-998.) Having noted that the Cytec applicants needed only to "[p]rovide documentation that epichlorohydrin in acid won't work," the examiner allowed the application to issue as the '766 patent. (*Id.,* Paper No. 10 at 1, CIBA 038991.) The way that the patent examiner dealt with Probst and the use of epichlorohydrin illustrates that the issues during prosecution were not about what chemicals were present, but rather whether the final product was cross-linked.

- 12 -

### D.    Background of the '808 Patent

The '808 patent derived from a separate chain of applications from those leading to the '766 patent. Like the '766 patent, the '808 patent is directed to a novel microparticle that is small, cross-linked and ionic.

#### 1.    The '808 Patent's Reference to a Cross-linked Microparticle

Claim 1 of the '808 patent requires that the microparticle is "cross-linked" and that a "cross-linking agent" is used. The '808 patent references the '780 patent and notes that "[t]his cross-linking technology is well known in the art." (Beall I, Exh. 10, '808 patent, Col. 1, ll. 28-29.) The '780 patent explains that cross-liking could result with and without the addition of cross-linking agents. (Beall I, Exh. 11, '780 patent, Col. 9, ll. 19-27.) For the purpose of brevity, this Court's attention is directed to section III.C.1. above for a discussion of the various cross-linking techniques known to those in the art at the time.

The '808 patent describes its preferred cross-linking agents as being "polyfunctional cross-linking agents." (Exh. Beall I, 10, '808 patent, Col. 4, ll. 45-62.) However, claim 1 of the '808 patent does not use such limiting language and merely provides for the presence of a "cross-linking agent." The Cytec applicants deliberately omitted the limiting word "polyfunctional." Those of ordinary skill in the art understand that the added limitation requiring a cross-linking agent distinguishes those well known systems where cross-linking is accomplished without an agent, such as by heat or irradiation. (*Compare,* Beall I, Exh. 11, '780 patent, Col. 9, ll. 19-27 *with* Beall I, Exh. 10, '808 patent, Claim 1.)

Hercules relies heavily on the consideration of the Durand et al. patent in its motion. Durand et al. is not crosslinked and, therefore, was not relevant to the prosecution. The Cytec applicants contrasted the Durand et al. product explaining that:

- 13 -

[T]he Examiner's attention is respectfully directed to Table II of the instant specification. As can be seen, Example 7 is representative of a polymer produced in the absence of a cross-linking agent i.e. **it is linear, see page 16, line 2, as is that of Durand etal.**

(Exh. 8, '808 patent prosecution, parent '626 application, Paper No. 4 at 6, CIBA 038183,

emphasis added.)  The applicants further stated that:

Durand etal fail to indicate the incorporation of a cross-linking agent into the polymer produced therein.

(*Id.*)



RLF1-2974935-1

2.    The '808 Patent's Reference Concerning 4 to 4000 ppm Cross-linking Agent

Claim 1 of the '808 patent requires an amount of 4 to 4000 ppm cross-linking agent. This limitation is not present in any form in the claims of the '766 patent. The '808 patent states that "[c]rosslinking agents are to be used in sufficient quantities to assure a cross-linked composition." (Beall I, Exh. 10 '808 patent, Col. 4, ll. 63-64.) The patent explains that:

> Preferably at least 4 molar parts per million of cross-linking agent, based on the monomeric units present, are employed to induce sufficient cross-linking...

(*Id.* at Col. 4, ll. 64-67.) As made apparent by the passage, the '808 patent specifies the amount of cross-linking agent based on what is added, before any reaction and before cross-linking is "induced."

The '808 patent includes tables identifying various samples made with different levels of cross-linking agent in ppm. (*See, e.g., id.* at Col. 7, ll. 33-45.) The '808 patent explains that the ppm levels are measured from the amount of ingredients added when preparing the samples. (*Id.* at Col. 7, l. 26.) The ppm calculation is based on what is mixed together, before any reaction. (*Id.* at Col. 6, ll. 58-67.)

During prosecution, the relevant claim language was applied in connection with the Makhlouf et al. patent, which has cross-linking agent content above the claimed upper limit of about 4000 ppm. The Cytec applicants explained:

> Claim 1 has been amended so as to indicate that the cross-linking agent content ranges from about 4 to about 4000 parts per million. This limitation clearly distinguishes the instant compositions over those of Makhlouf et al in that the patentee indicates at col. 4, lines 17-20 that the cross-linking monomer content is at least 0.5% i.e. 5000 parts per million.

- 15 -

(Exh. 9, '808 patent prosecution, the '120 application, Paper No. 3 at 3, CIBA 038648.)[5] The

cited disclosure of the Makhlouf et al. patent states:

> The proportion of such cross-linking monomer employed in the
> process of the invention may range from 0.5 percent to 15 percent by
> weight of the monomers used in the copolymerization process.

(Exh. 10, U.S. Patent 4,147,688 to Makhlouf et al., Col. 4, ll. 17-20.)  The cited passage from the

Makhlouf et al. patent relates to the amount of cross-linking monomer that was added, not the

number of resulting cross-linked junctions.  Following the claim language essentially verbatim,

the Cytec applicants stated that the "cross-linking monomer content" in Makhlouf et at. was

about 5000 parts per million.  Such language and its application related to the amount of "cross-

linking monomer employed."

### 3.    The '808 Patent's Reference to Water Soluble Monomers

The claims leading to the '808 patent were amended to distinguish monomers that were

not water soluble.  The language that was originally added provided for cross-linked anionic or

amphoteric polymeric microparticles "derived solely from water-soluble monomers." (Exh. 9,

'808 patent prosecution, the '120 application, Paper No. 3 at 2, CIBA 038647.)  This limitation

distinguished the prior art being considered, but the examiner indicated that the language was

unclear and objected to the new language under Section 112 of the patent statute as indefinite.

The Cytec applicants appealed stating that "[t]he term in question is well known to those

skilled in the art of polymers."  (*Id.*, Paper No. 5 at 6, CIBA 038705.)  The examiner's non-

substantive objection was thereafter resolved by the examiner's suggestion to "change 'water

soluble monomers' to -- an aqueous solution of anionic or amphoteric monomers--."  (*Id.*, Paper

---

[5]    The lower limit of about 4 ppm was present in the original claims and was never amended or applied to distinguish prior art.  Hercules relies in its brief on the erroneous assertion that "[t]his cross-linking agent content limitation was added to the claims in order to overcome a prior art rejection." (*See* Hercules' Brief at 2.)

No. 7 at 1, CIBA 038729.) The examiner explained that "[t]he change of water soluble to aqueous solution prevents the claims from encompassing partially soluble monomers." (*Id.*, Paper No. 8 at 2, CIBA 038731.) The preferred acrylic acid monomers and acrylamide have always been considered water soluble monomers.

### E.     Background of the Perform® System



:As to size and ionicity, Hercules maintained essentially the same formulation as Polyflex®. As to cross-linking, Hercules substituted a chemical called Hypermer® B246SF for the MBA that is used to cross-link the commercial Polyflex® product.



- 17 -

**REDACTED**

**PAGES 18 - 22**



## IV.    ARGUMENT

This court may grant motions for summary judgment in accordance with the principles of

Federal Rule of Civil Procedure 56. *Barmag Barmer Maschinenfabrik AG v. Murata Mach.,*

*Ltd.,* 731 F.2d 831, 835 (Fed. Cir. 1984). The summary judgment procedure is reserved for

situations where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56. As one

court explained:

RLF1-2974935-1

> A court is not authorized to resolve factual questions on such a motion;
> rather, its task is to determine if any such factual questions exist. If
> such questions exist, and if they are material to the claims in issue,
> then the non-moving party has met its burden and summary judgment
> is improper.

*Everpure, Inc. v. Cuno, Inc.,* 705 F. Supp. 725, 728 (D. Conn. 1988), *aff'd*, 875 F.2d 100 (Fed.

Cir. 1989). Courts have further recognized that:

> [A]s an additional precaution against denying a party its chance to
> prove a worthy case, any doubt as to the presence or absence of
> disputed issues of material fact must be resolved in favor of the
> presence of disputed issues, or in other words, in favor of the party
> opposing summary judgment.

*Lemelson v. TRW, Inc.,* 760 F.2d 1254, 1260-61 (Fed. Cir. 1985).

### A.    To Determine Infringement, the Court Must Construe the Claims and Then Compare Them With the Accused Products and Methods

"Patent infringement requires a two-step analysis." *CCS Fitness, Inc. v. Brunswick*

*Corp.,* 288 F.3d 1359, 1365 (Fed. Cir. 2002) (citation omitted). "First, a court must determine as

a matter of law the correct scope and meaning of a disputed claim term." *Id.* "Second, the

analysis requires a comparison of the properly construed claims to the accused device, to see

whether that device contains all of the limitations." *Id.*

### B.    Hercules Misstates the Doctrine of Prosecution Disclaimer and Its Role in Claim Interpretation

Hercules attempts to cast the claim interpretation issues as being solely driven by its

incorrect assertion of prosecution disclaimer. The law is clear that claims are to be interpreted

for their "ordinary and accustomed meaning," starting with the claim language itself. *See, e.g.,*

*PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1363 (Fed. Cir. 2005); *Nazomi*

*Communications, Inc. v. ARM Holdings, PLC,* 403 F.3d 1364, 1369 (Fed. Cir. 2005). As one

court explained, "'[u]nless altering claim language to escape an examiner rejection, a patent

applicant only limits claims during prosecution by clearly disavowing claim coverage,' that is, by making a statement that concedes or disclaims coverage of the claims at issue based on a piece of prior art." *Katz v. AT&T Corp.*, 63 F. Supp. 2d 583, 591 (E.D. Pa. 1999) (*quoting York Prods., Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1575 (Fed. Cir. 1996)). Thus, as the Federal Circuit recently reiterated, the presumption that claim scope should be determined based on the ordinary meaning of claim terms will prevail in the absence of "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1308–09 (Fed. Cir. 2005) (*quoting ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1091 (Fed. Cir. 2003)).

Most prosecution disclaimers spawn from amendments to the claims where narrowing language is added. Where the claims are not amended and the accused infringers are arguing for a limited reading of the claims based on a discussion of the prior art, there is a potential for error. *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n.*, 383 F.3d 1352, 1375 (Fed. Cir. 2004). In *Gemstar*, the district court erred by importing limitations based on a discussion of the prior art. In reversing the trial court, the Federal Circuit noted that "Gemstar stated only that the Kram reference was incapable of performing a certain type of search, not that the scope of the claimed invention was limited to that particular type of search." *Id.* Where the alleged disclaimer is ambiguous, i.e. capable of multiple reasonable interpretations, the courts will not limit the claims. *See e.g., Northern Telecom Ltd. v. Samsung Electronics Co.,* 215 F.3d 1281, 1293-95 (Fed. Cir. 2000). Where the applicants make a clear but erroneous statement, the claims are not restricted. *Rambus Inc. v. Infineon Tech. AG,* 318 F.3d 1081, 1089–90 (Fed. Cir. 2003); *see also, Intervet Am., Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1054 (Fed. Cir. 1989).

- 25 -

C.    **There Is Substantial Evidence That The Defendants Literally Infringe the '766 Patent**

Hercules' noninfringement argument relating to the '766 patent is premised on an incorrect interpretation of a single word in the claims -- "cross-linked." Claim 1 of the '766 patent provides as follows:

> A method of making paper which comprises adding to an aqueous paper furnish from about 0.05 to about 20 lbs/ton, based on dry weight of paper furnish solids, of an ionic, organic, **cross-linked** polymeric microbead, the microbead having an unswollen particle diameter of less than about 750 nanometers and an ionicity of at least 1%, but at least 5%, if anionic and used alone.

(Beall I, Exh. 9, '766 patent, Claim 1, emphasis added.) Hercules does not contest that it has appropriated the remainder of the claim when its Perform® product is used in making paper.

Relative to the requirement that the microbead be "cross-linked," Hercules, first asks this Court to limit the language to a subset of cross-linking.



There is no mention of a "cross-linking agent" in the claims. The claims are not about the process for making the microbead as is apparent from reading them as a whole. Further, the background of the patent identifies the general knowledge in the art that there were other forms of cross-linking such as referenced in the '780 patent. (*See supra* at 9.) The Farrar et al. patent that was cited during prosecution similarly refers to other forms of cross-linking. (*See supra* at 10-11.)



There was never any time that the applicants said in words or substance that any certain form of cross-

- 26 -

linking was not applicable or was excluded from the scope of the claims, or that the cross-links had to be formed in a specific manner.

Based on the erroneous premise that the '766 patent claims are limited to cross-linking only by using a "polyfunctional cross-linking agent", Hercules also asks this Court to read in further limitations, excluding cross-linking deriving from any chemicals that act as emulsifiers. Hercules' arguments are based on the discussion of the Probst patent during prosecution leading to the '766 patent. As explained above, Probst did not involve cross-linking because the epichlorohydrin chemical is not active in the particular conditions present in Probst. (*See* Section III.C.I., *supra* at 11-13.) The examiner acknowledged that there is no cross-linking in Probst, even though epichlorohydrin is listed as a potential cross-linking agent in the specification of the '766 patent.

Hercules ignores this part of the discussion of Probst and instead attempts to rely on the discussion of ionicity. In this regard, the Cytec applicants noted that the ionic chemicals in Probst stay with the emulsifier and do not become associated with the microbead. (*See supra* at 11-12.) Thus, the microbeads of Probst are not ionic as in claim 1 of the '766 patent. Hercules distorts this observation, arguing that the Cytec inventors disclaimed cross-linking deriving from any type of surfactant. The two concepts have nothing to do with one another. One relates to ionicity, the other relates to whether epichlorohydrin caused the product to be cross-linked. The examiner agreed that, under the conditions in Probst, epichlorohydrin does not cause cross-linking.

Hercules is attempting to do what lead to reversible error in the *Gemstar* case. *See Gemstar*, 383 F.3d at 1375. In particular, Hercules is attempting to take an observation about a

particular prior art reference and turn it into a disavowal of claim coverage.  This is simply not what happened here.[9]



---

[9]    Hercules reliance on *Springs Window* is misplaced.  In that case, the claims were amended.  The amendment distinguished both the prior art and the accused product, which was the same as the prior art.  Here, no relevant amendment was made by Cytec and the prior art Probst product is nothing like Hercules' Perform® product.

RLF1-2974935-1



**D.    There Is Substantial Evidence That Defendants Infringe the '766 Patent Under the Doctrine of Equivalents**

Whatever claim interpretation is given to the term "cross-linked," Defendants infringe because they cannot reasonably contest that the structure in the Perform® product is equivalent to the cross-linked structure claimed. Where a component of a larger system is substituted with another that is equivalent, then the Court should find infringement. *Corning Glass Works v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251 (Fed. Cir. 1989). Here, the substitution of Hypermer® agent for the MBA agent results in the same structure restrained by cross-links. Because of the unique nature of Hypermer®, the structure that is formed is permanent regardless of whether it is characterized as being hydrophobic or covalent in nature REDACTED

- 29 -

REDACTED

: Thus, these "associations" are permanent in the relevant time and directly equivalent to the covalent cross-links made by adding MBA in the commercial Polyflex® product.

Hercules has presented no evidence or even argument that the term "cross-linked" should be subject to limited equivalents due to prosecution history estoppel, nor could it do so. The claims were never amended relative to the term "cross-linked." Thus, Hercules tries to foreclose consideration of infringement under the doctrine of equivalents based on the flawed argument that only expert reports may be considered. The Supreme Court has rejected Hercules' position stating:

> A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art.

*Graver Tank & Mfg. v. Linde Air Products*, 339 US 605, 609-610 (1960).

Here, the only issue relevant to infringement is whether the small particles in the Perform® product are "cross-linked."



RLF1-2974935-1



The evidence of record thus far would fully support a jury verdict of infringement under the doctrine of equivalents.

### E.  There Is Substantial Evidence That Defendants Literally Infringe Claim 1 of the '808 Patent

Hercules attempts to distinguish Perform® from claim 1 of the '808 patent based on the following claim language:

> A composition comprising **cross-linked** anionic or amphoteric polymeric **microparticles derived solely from the polymerization of an aqueous solution of at least one monomer**, said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1 mPa.s, **a cross-linking agent content of about 4 molar parts to about 4000 parts per million**, based on the monomeric units present in the polymer, and an ionicity of at least about 5 mole percent.

(Beall I, Exh. 10, '808 patent, Claim 1.)  Hercules does not contest that it has appropriated the remainder of the claim in its Perform® product.

#### 1.  There Is Substantial Evidence That The Perform® Product is Cross-Linked by a Cross-Linking Agent

There are separate limitations in claim 1 of the '808 patent relating to cross-linking.  One limitation merely requires that the microparticle is "cross-linked."  The other requires a "cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer."  Hercules asks this Court to re-write the claim as regards the presence of a cross-linking agent to require a "polyfunctional" cross-linking agent.  The substance of Hercules' request is a re-write of the claims to require "covalent" cross-linking.

- 31 -

The limitations sought by Hercules are not in the claims. As indicated in the background of the patent and in the referenced '780 patent, those of ordinary skill in the art recognized that there could be different forms of cross-linking agents. (*Supra* at 9-10,13.) While claim 1 includes the additional limitation that a cross-linking agent should be added, the claim does not require a "polyfunctional" cross-linking agent. The referenced '780 patent identifies both covalent and non-covalent cross-linking agents. Hercules asks the Court to import the preferred embodiment into the claim by requiring a "polyfunctional" cross-linking agent. (Hercules' Brief at 22.) As is readily apparent, the Cytec applicants chose not to limit their claim in this manner. If they had desired such limitation, they would have used the "polyfunctional" language.

Additionally, Hercules asks this Court to even further restrict the claims to exclude certain covalent cross-linking based on the Cytec applicants' alleged disclaimer of oleate surfactants. This allegation is based upon a distorted reading of the prosecution leading to the '808 patent.

REDACTED

As explained above in section III.D.1. at *supra* page 14, the Cytec applicants actually distinguished Durand et al. because the polymer is not cross-linked. The Cytec applicants explained that Durand et al. is "linear."

REDACTED

In its motion, Hercules also distorts comments made by the Cytec applicants addressing hypothetical assumptions of the patent examiner. In the office action citing the Durand et al. patent, the examiner hypothesized that "it [was] reasonable to expect" cross-linking, if there was an unsaturation. (Exh. 9, '808 patent prosecution, parent '626 application, Paper No. 2 at 5,

- 32 -

CIBA 038173.) In doing so, the examiner assumed a single unsaturated carbon/carbon bond. In response, the Cytec applicants explained that if the examiner's assumption that the surfactants were monounsaturated were true, it would not lead to cross-linking without other information. This comment does not amount to a disclaimer of claim scope and, in fact, does not even relate to the actual reactions of Durand et al. or the actual structures of the surfactants employed by Durand et al.[10] The Cytec applicants merely commented that, if there were only monounsaturation as assumed by the examiner, then a reaction to that monounsaturation would not form cross-links. Under Hercules' flawed logic, the comment by the Cytec applicants would disclaim most of the preferred polyfunctional cross-linking agents listed in the patent, *e.g.*, those that have only reactive groups and no unsaturation. (Beall I, Exh. 10, '808 patent, Col. 4, l. 50.) For example, epichlorohydrin is listed as not having any unsaturations. But this does not mean that epichlorohydrin cannot act as a cross-linking agent under the right conditions, as is, for example, apparent from the prior discussion in connection with the prosecution leading to the '766 patent. (*Supra* at 12.)



Unlike the Perform® product and the admitted cross-linking resulting from Hypermer®, the chemicals involved in Durand et al. do not result in a cross-linked product. The surfactants in Durand et al. are more

REDACTED

akin to the Arlacel 80AC surfactant which is employed by Hercules.

REDACTED

/Unlike Arlacel 80AC and the surfactants in Durand et al., the Hypermer® surfactant results in covalent cross-linking when using the process conditions employed in making the Perform® product.

Hercules' reliance on the *Southwall* decision is unfounded. *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570 (Fed. Cir. 1995). The accused infringers in *Southwall* practiced the same two-step method of the prior art which led to the claims being amended. Here, there was no amendment of the claims, and Hercules is not practicing the Durand et al. prior art. Hercules' infringement is not premised on any chemicals present in Durand et al., nor are the conditions in the systems the same.

Cross-linking depends on the conditions of the reaction. In Durand et al., there is no cross-linking. REDACTED Hercules' arguments are more similar to the erroneous arguments made in the *Gemstar* case. As occurred there, Hercules is attempting to transform comments about the examiner's incorrect hypothetical into a sweeping disclaimer. *See Gemstar,* 383 F.3d at 1375; *see also, Rambus,* 318 F.3d at 1089–90; *Intervet* 887 F.2d at 1054.

Even if Hercules' improper interpretation were adopted, there would still be material facts in dispute. REDACTED

'Further, Durand et al. does not involve the

- 34 -

Hypermer® agent. The evidence is that Hypermer® reacts differently from other surfactants as explained above. In Hypermer®, the middle block is hydrophilic, bringing the center of the molecule closer to the water droplet.

REDACTED

Therefore, the Hypermer® agent and the cross-linking generated by it could be found to be a literal infringement of the '808 claims even under Hercules' unfounded claim construction.

### 2. The Perform® Product Uses 4 to 4000 ppm Cross-Linking Agent

Claim 1 of the '808 patent recites "a cross-linking agent content of about 4 molar parts to about 4000 parts per million." Such language refers to the amount of cross-linking agent added, not to the amount of junctions in the resulting product. The specification of the '808 patent and the prosecution consistently applied the language to the amount of the cross-linking agent that was added, as explained in section III.D.2., *supra* at 15-16. Such discussion is not repeated for brevity.

In support of its construction, Hercules relies on overly cropped statements by the Cytec applicants regarding Durand et al. and Whittaker. (*See* Hercules' Brief at 24-25.) As explained in Section III.D.1. *supra*, Durand et al. does not include a cross-linking agent and is not cross-linked at all, so "amount" was not even an issue. The same is true relative to Whittaker. While Hercules cropped the passage from the prosecution relating to Whittaker, the more complete passage readily demonstrates that the issue was whether there was cross-linking at all in Whittaker, not an amount of added cross-linking agent:

> Whittaker does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount. Whittaker at col. 6, line 23-26 indicates that the polymer must be water -soluble and the monomers are **preferably free of cross-linking agent**.

- 35 -

(Exh. 9, '808 patent prosecution, the '120 application, Paper No. 3 at 4-5, CIBA 038649-650, emphasis added.)

Even if Hercules' improper claim interpretation were to be adopted, there is still evidence sufficient for the jury to find that the Hypermer® agent content is within the range of 4 to 4,000 ppm.



Hercules' reference to Ciba's patents not in suit serves to underscore the factual issues in dispute.

### 3. The Perform® Product is Made From Water Soluble Monomers

Claim 1 of the '808 patent states that the microparticle is "derived solely from the polymerization of an aqueous solution of at least of one monomer."



The result is the Perform® product. (*See* Exh. 20, PDX 9.)



monomers are added in both Perform® and Polyflex® in the same way.

Hercules asserts in its motion that this language is about the locus of polymerization. But, the claim merely recites that the microparticle derives solely from the polymerization of an aqueous solution of monomers. It does not say that polymerization must occur only in the water droplet. As is apparent from the prosecution history, and as previously discussed, the language relates to the water solubility of the monomers. No issue was raised as to where the polymerization needed to take place.

Indeed, even if Hercules' distorted reading of the '808 claim language were adopted, the locus of polymerization in the process used to make Perform® is in dispute.



F.     **Defendants Infringe the '808 Patent Under the Doctrine of Equivalents**

As was the case with the '766 patent, Hercules' argument is based upon what it considers to be insufficient disclosures in Ciba's expert reports.



- 37 -

RLF1-2974935-1

REDACTED

Furthermore, the Supreme Court has stated that all evidence is to be considered.  *Graver Tank & Mfg.*, 339 US at 609–610.

REDACTED

Any differences raise factual disputes.  The doctrine of equivalents is a fact-based inquiry.  *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1251 (Fed. Cir. 2000).

Hercules also argues that the all elements rule requires that the scope of equivalents be limited relative to the water soluble monomer language.  There is no basis to foreclose equivalence.  Where language is not added to overcome the prior art, equivalence is broad.  (*See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 30-32 (1997).)  Here, the particular language relied upon by Hercules had nothing to do with the prior art, but rather involved a Section 112 objection based on the alleged indefiniteness of the claim language.  (*Supra* at 16-17.)

Thus, the scope of equivalents assuming a locus of polymerization limitation would encompass the possibility of insignificant reactions in the oil phase.  Hercules claims that such reactions do not even exist.

RLF1-2974935-1

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Hercules' motion for summary

judgment of noninfringement. The facts establish that there is infringement, either literally or

under the doctrine of equivalents, or at least a dispute of material fact.

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Jeffrey L. Moyer (# 3309)
Moyer@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
(302) 651-7700
Attorneys for Plaintiff
Ciba Specialty Chemicals Corporation

Of Counsel:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Dated:  January 27, 2006

RLF1-2974935-1

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2006 I hand delivered the foregoing document to the

following persons and electronically filed the foregoing document with the Clerk of Court using

CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE  19899-0951

     I hereby certify that on January 27, 2006, I have Federal Expressed the foregoing

document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC 20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022

Jeffrey L. Moyer (#3309)

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2006 I hand delivered the foregoing document to the following persons and electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951

I hereby certify that on February 3, 2006, I have Federal Expressed the foregoing document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022

Steven J. Fineman (#4025)