# United States Patent [19]

## Wagberg et al.

[11] **Patent Number:** **4,824,523**

[45] **Date of Patent:** **Apr. 25, 1989**

[54] **METHOD OF MAKING PAPER WITH HIGH FILLER CONTENT**

[75] Inventors: **Lars E. R. Wågberg**, Kungsängen; **Tom S. C. Lindström**, Sollentuna, both of Sweden

[73] Assignee: **Svenska Traforskningsinstitutet**, Stockholm, Sweden

[21] Appl. No.: **57,720**

[22] Filed: **Jun. 1, 1987**

### Related U.S. Application Data

[63] Continuation of Ser. No. 763,439, filed as PCT SE84/00406 on Nov. 28, 1984, published as WO85/02635 on Jun. 20, 1985, abandoned.

[30] **Foreign Application Priority Data**

Dec. 6, 1983 [SE] Sweden .......................... 8306739

[51] Int. Cl.⁴ ............................ D21H 3/28; D21H 3/36
[52] U.S. Cl. ............................. 162/164.1; 162/164.3; 162/164.6; 162/166; 162/168.2; 162/168.4; 162/169; 162/175; 162/183
[58] Field of Search ............ 162/164.3, 164.6, 168.2, 162/168.3, 168.4, 169, 175, 183, 164.1, 166

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,592,731 | 7/1971 | Griggs . |
| 3,790,514 | 2/1974 | Economou . |
| 4,066,495 | 1/1978 | Voigt et al. . |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 25463 | 3/1981 | European Pat. Off. . |
| 1497280 | 1/1978 | United Kingdom . |

#### OTHER PUBLICATIONS

Casey, *Pulp and Paper*, vol. III, 3rd ed. (1981), pp. 1456–1461, 1570, 1597, 1598, 1602–1604, 1622.

*Primary Examiner*—Peter Chin
*Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis

[57] **ABSTRACT**

The invention relates to a method for producing paper by the addition of a retention - dry strength agent system. The system consists of

cationic starch with a substitution degree of at least 0.005 in an amount of at least 1%,

anionic high-polymer with a molecular weight greater than $10^6$ and in an amount of 0.003–0.5%, and

cationic synthetic polymer in an amount of 0.005–0.5%.

**9 Claims, No Drawings**

CIBA 038929

4,824,523

# METHOD OF MAKING PAPER WITH HIGH FILLER CONTENT

This application is a continuation of application Ser. No. 763,439, filed as PCT SE84/00406 on Nov. 28, 1984, published as WO85/02635 on Jun. 20, 1985, now abandoned.

## BACKGROUND OF THE INVENTION

This invention relates to a method of papermaking, which renders it possible to make paper with a high filler content (>15%), a high retention of the filler, and substantially improved mechanical and optical properties.

In order to reduce papermaking costs, it is tried at present to increase the content of mineral fillers in the paper. Examples of such fillers also are kaolin, different types of calcium carbonate and talcum. The fillers improve the opacity and printability properties of the paper. In addition, for various reasons it is often desired to make paper with bentonite, titanium oxide, wollastonite, glass fibres, zinc pigment etc. The present invention comprises either an addition of a filler type or of mixtures of different fillers and pigment types.

Addition of fillers give rise to the technical problem that they, to an unsatisfactory degree, deteriorate the strength properties of the wet web as well as the dry paper. Traditionally different types of starches were typically added, into the stock, into the size press, or as a spray method in order to improve the strength properties. Cationic or amphoteric starches normally are used as additives to the stock at present. By derivatization of the starch it is sought to obtain a good retention of filler, pigment and other fine material on the wire and also to obtain maximum dry strength effect of the additives. It is important in this connection that the starch derivative have good affinity to fibres and fillers in the stock. This is normally achieved by cationization of the starch so that it is adsorbed to the negatively charged fibres. It is generally known that a high retention effect in a papermaking machine can be obtained by consecutively adding to the stock both a cationic starch and an anionic polymer, for example polyacrylamide. The synergistic effect is due to the fact that the two oppositely charged polymers interact with each other, although the mechanism in detail is unknown.

When it is desired that large amounts (>2%) of starch be adsorbed to fibres and fillers, it is favourable to use a relatively low-substituted cationic starch (D.S.=substitution degree of cationic groups). D.S.<0.03. There is in fact an optimum charge density of the starch corresponding to a maximum adsorption to a given stock under given chemical conditions. When such a low-substituted cationic starch is used in combination with an anionic high-polymer, however, in most cases an inferior retention effect obtained is inferior to that obtained if a high-charged starch type is chosen. While this can be counteracted to a certain degree by choosing a high-charged anionic high-polymer, but in most of the cases this does not help.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

We have now found that by using a low-charged cationic starch (D.S.≦0.03) in combination with an anionic high-polymer it is possible to obtain a strong synergistic effect on the retention fillers and fine mate-

rial when, in addition, a cationic polymer is added. This amounts to a 3-component retention and dry strength agent system for paper with high filler contents (>15%).

The cationic starch utilized in the process can be produced from any one of the starch-producing plant species, for example maize starch, wheat starch, potato starch, rice starch, tapioca starch and the like. As the cationic substituent in our additive a tertiary amine or a quarternary ammonium ether group is preferred.

It is expected, however, that other cationic groups, for example primary and secondary amines, sulphonium and phosphonium groups bound with ether or ether groups to the starch, can also be used. We prefer the use of 3-chloro-2-hydroxypropyltrimethyl ammonium chloride to form cationic starch with a degree of substitution of at least 0.005, preferably between about 0.01 and 0.035 and most preferably between about 0.01 and about 0.025. The cationic starch should be present in a proportion of 1 to 7% by weight of the stock. The three components are added to the stock before the point at which the product is formed on the web. We prefer that the cationic starch be added first to the stock, whereafter the anionic high-polymer and the cationic polymer are added separately. The anionic polymer should have a mean molecular weight (Mw) greater than $10^6$ and should comprise from about 0.003 to about 0.5% and preferably from about 0.003 to about 0.3% of the stock. The anionic polymer may be a copolymer of acrylamide and acrylic acid or 2-acrylamide 2-alkylpropane sulfonic acid.

The cationic synthetic polymer should comprises from about 0.005 to about 0.5% by weight and preferably from about 0.005 to about 0.5% by weight and preferably from about 0.005 to about 0.3% by weight of the system. Suitable cationic synthetic polymers include:

(A) Chain-reaction polymers prepared from monomers with the following structure:

$$CH_2\!=\!C\!-\!C\!-\!O\!-\!CH_2\!-\!CH_2\!-\!\overset{\oplus}{N}\!-\!R_2 \quad X^{\ominus}$$

in which $X^{31}$ signifies $-I^{31}$, $-CH_3SO_4{}^-$ or $-Cl^-$ and $R_1$, $R_2$, $R_3$ and $R_4$ signify $-H$, $-CH_3$ or some other short-chain alkyl group.

(B) Modified polyacrylamides in which the polyacrylamide is reacted with HCHO and dimethylamine in accordance with the following reaction:

$$-CH_2\!-\!R_1\!-$$
$$\overset{|}{C}\!=\!O + HCHO + (CH_3)_2NH$$
$$\overset{|}{N}H_2$$

$$-CH_2\!-\!CH\!-$$
$$\overset{|}{C}\!=\!O$$
$$\overset{|}{N}\!-\!H$$
$$\overset{|}{C}H_2$$
$$\overset{|}{N}(CH_3)_2$$

in which $R_1$ signifies $-H$ or $-CH_3$

(C) Polydiallyldialkyl-ammonium halides prepared from monomers with the following structure:

$$(CH_2\!-\!CH\!-\!CH_2)_2\!-\!N^+R_1R_2X^{31}$$

CIBA 038930

4,824,523

**3**

in which $R_1$ and $R_2$ signify —H, —CH$_3$ or some other short-chain alkyl group,

(D) Cationic amido-amines prepared by condensation of a dicarboxylic acid, e.g., adipic acid and a polyalkylenepolyamine e.g. diethylenetriamine, forming a polyamide of the following structure:

$$-NH(C_nH_{2n}HN)_x-CORCO-$$

in which n and x ≥ 2 and R is the divalent hydrocarbon chain of the dicarboxylic acid, which is then reacted with epichlorohydrin, forming a cationic polyelectrolyte,

(E) Condensation products formed between dicyandiamide, formaldehyde and an ammonium salt,

(F) Reaction products formed between epichlorohydrin or polyepichlorohydrin and ammonia or primary or secondary amines, e.g., dimethylamine,

(G) Polymers formed by reaction between ditertiary amines or secondary amines and dihalo-alkanes,

(H) Polymers formed by polymerization of ethylimine, known as polyethylimines, or

(I) Polymers formed by polymerization of N-(dialkylaminoalkyl)-acrylamide monomers.

The pH of the stock can vary between pH 4–9. The paper stock consists of at least 15% filler and cellulose fibres. The stock additionally can contain wet strenth agents, hydrophobization agents, waxes, antifoam agents, cleaning compounds, anti-resin agents etc. These additives normally are not critical for the function of the system. The term cellulose fibres refers either to so-called chemical pulp, for example sulphate or sulphite pulp from hardwood or softwood, or co-called mechanical pulps, groundwood pulps, refiner pulps, thermo-mechanical pulps or so-called chemical-mechanical pulps.

What is claimed is:

1. A method for manufacturing paper comprising the step of adding a dry-strength retention agent system to paper stock prior to forming the paper, said system comprising:

    (i) from about 1% to about 7% by weight of a cationic starch having a degree of substitution between about 0.01 to about 0.035;

    (ii) from about 0.003 to about 0.5% by weight of an anionic polymer having a mean molecular weight greater than about 10$^6$, comprising a copolymer of acrylamide with acrylic acid or 2-acrylamide 2-alkyl-propane sulfonic acid; and

    (iii) from about 0.005 to about 0.5% by weight of a non-starch cationic synthetic polymer; selected from the group consisting of:

        (i) a cationic acrylic polymer;

        (ii) a cationic polyacrylamide;

        (iii) a polydiallyldiakyl-ammonium polymer;

        (iv) a cationic condensation amido-amine polymer;

        (v) a condensation product formed between dicyandiamide, formaldehyde, and an ammonium salt;

        (vi) a reaction product formed between epichlorohydrin or polyepichlorohydrin and ammonia, a primary amine or a secondary amine;

        (vii) a polymer formed by reacting a di-tertiary amine or secondary amine and dihalo-alkanes;

        (viii) a polyethylamine formed by polymerization of ethylimine; and

**4**

        (ix) a polymer formed by polymerization of a N-(dialkyl-aminoalkyl)-acrylamide monomer;

wherein said paper stock comprises at least 15% by weight of a mineral filler.

2. The method of claim 1 wherein said cationic starch has a degree of substitution ranging from about 0.01 to about 0.025.

3. The method of claim 1 wherein said system comprises from about 0.003 to about 0.3% by weight of said anionic polymer.

4. The method of claim 1, wherein said system comprises from about 0.005 to about 0.3% by weight of said cationic synthetic polymer.

5. The process of claim 1 wherein said secondary amine in (vi) is dimethylamine.

6. The method of claim 1 wherein the filler is CaCO$_3$.

7. The method of claim 1 wherein said cationic synthetic polymer is:

    (i) a chain reaction polymer prepared from a monomer of the formula:

$$CH_2=C-C-O-CH_2-CH_2-N-R_3$$

wherein X is —I—, —CH$_3$SO$_4$— or —Cl— and R$_1$, R$_2$, R$_3$ and R$_4$, which are identical or different, are —H or —CH$_3$;

    (ii) a modified polyacrylamide wherein polyacrylamide is reacted with formaldehyde and dimethylamine in accordance with the reaction:

$$-CH_2-R_1-$$
$$C-O + HCHO + (CH_3)_2NH$$
$$NH_2$$
$$-CH_2-CH-$$
$$C=O$$
$$N-H$$
$$CH_2$$
$$N(CH_3)_2$$

wherein R is —H or —CH$_3$;

    (iii) a polydiallyldialkyl-ammonium halide prepared from a monomer of the formula:

$$(CH_2=CH-CH_2)_2-N^+R_1R_2d\ 2X-$$

wherein R$_1$ and R$_2$, which are identical or different are —H or —CH$_3$ and;

    (iv) a cationic amido-amine prepared by condensation of a dicarboxylic acid and a polyalkylene-polyamine, said amidoamine being of the formula:

$$-NH(C_nH_{2n}HN)_x-CORCO-$$

wherein n and X are at least 2 and R is a divalent hydrocarbon derived from said dicarboxylic acid; the amido-amine then being reacted with epichlorohydrin to form a cationic polyelectrolyte.

8. The process of claim 7 wherein said dicarboxylic acid in (iv) is adipic acid.

9. The process of claim 7 wherein said polyalkylene-polyamine in (iv) is diethylenetriamine.

* * * * *

CIBA 038931

# United States Patent [19]

**Rushmere**

[11] Patent Number: **4,798,653**

[45] Date of Patent: **Jan. 17, 1989**

[54] RETENTION AND DRAINAGE AID FOR PAPERMAKING

[75] Inventor: **John D. Rushmere,** Wilmington, Del.

[73] Assignee: **Procomp, Inc.,** Marietta, Ga.

[21] Appl. No.: **165,634**

[22] Filed: **Mar. 8, 1988**

[51] Int. Cl.⁴ ............................ D21H 3/58; D21H 3/78
[52] U.S. Cl. ............................ 162/168.3; 162/181.6; 162/183
[58] Field of Search ................ 162/168.3, 181.6, 183

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,007,878 | 11/1961 | Alexander et al. | 252/313 |
| 3,052,595 | 9/1962 | Pye | 162/164 |
| 3,620,978 | 11/1971 | Moore, Jr. | 252/313 |
| 3,719,607 | 3/1973 | Moore, Jr. | 252/313 |
| 3,956,171 | 5/1976 | Moore, Jr. et al. | 252/313 |
| 4,006,495 | 2/1977 | Jones | 2/93 |
| 4,305,762 | 12/1981 | Ostreicher et al. | 162/181 |
| 4,305,781 | 12/1981 | Langley et al. | 162/164 |
| 4,309,247 | 1/1982 | Hou et al. | 162/149 |
| 4,385,961 | 5/1983 | Svending et al. | 162/175 |

| | | | |
|---|---|---|---|
| 4,388,150 | 4/1983 | Sunden et al. | 162/175 |
| 4,578,150 | 3/1986 | Hou | 162/164.3 |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| 67735 | 1/1985 | Finland . |
| 67736 | 1/1985 | Finland . |
| 8600100 | 1/1986 | Sweden . |
| 8605826 | 10/1986 | Sweden . |
| 1265496 | 3/1972 | United Kingdom . |
| 1387744 | 3/1975 | United Kingdom . |

*Primary Examiner*—Peter Chin
*Attorney, Agent, or Firm*—Luedeka, Hodges & Neely

[57] **ABSTRACT**

A papermaking stock comprising cellulose fibers in an aqueous medium at a concentration of preferably about 50% by weight of the total solids in the stock including a retention and dewatering aid comprising a two component combination of an anionic polyacrylamide and a cationic colloidal silica sol. The stock exhibits enhanced resistance to shear forces during the papermaking process. A papermaking process is also described.

10 Claims, No Drawings

CIBA 038932

1

## RETENTION AND DRAINAGE AID FOR PAPERMAKING

This invention is directed to an aid for use in enhancing the resistance to shear and the retention of fibrous fines and/or particulate fillers in a paper web formed by vacuum felting of a stock on a wire or the like, and enhancing the dewatering of the web in the course of its formation.

Various aids have been proposed heretofore which enhance the retention and/or dewatering characteristics of a paper web. Specifically, U.S. Pat. Nos. 4,578,150 and 4,385,961 disclose the use of a two-component binder system comprising a cationic starch aid an anionic colloidal silicic acid sol as a retention aid when combined with cellulose fibers in a stock from which is formed a paper web by vacuum felting on a wire or the like. Finnish Published Specifications Nos. 67,735 and 67,736 refer to cationic polymeric retention agent compounds including cationic starch and polyacrylamide as useful in combination with an anionic silicon compound to improve the reception of a sizing. In Specification No. 67,735, the sizing agent is added in the furnish, whereas in Specification No. 67,736, the sizing is applied after the paper web is formed. These documents do not propose nor suggest enhanced resistance of the stock to shear or dewatering enhancement.

Many other prior publications have suggested different combinations of cationic and anionic substances as useful in papermaking. Most frequently, such combinations are specific as regards their relative proportions as in U.S. Pat. No. 4,578,150, or as regards their sequence of addition to the pulp slurry as in U.S. Pat. No. 4,385,961. They further often are limited, as regards their effectiveness, to specific pulps, e.g. chemical, mechanical, thermomechanical, etc.

In International Publication No. W086/05826 there is disclosed the use of anionic colloidal silica sol together with cationic polyacrylamide as a retention aid in a papermaking stock. This disclosure is diametrically opposite to the combination of the present invention.

The basic mechanism by which the cationic and anionic component aids function is often stated in terms of the components forming agglomerates, either alone or in combination with the cellulose fibers, that result in retention of fiber fines and/or mineral fillers. It is well recognized in the papermaking art that a pulp slurry, i.e. stock, undergoes severe shear stress at various stages in the papermaking process. After digestion, the stock may be beaten or refined in any of the several ways well known in the papermaking industry or it may be subjected to other similar treatments prior to the deposition of the stock onto a papermaking wire or the like for dewatering and web formation. For example, in a typical papermaking process, after digestion (and possibly bleaching), and even after beating and refining steps, the stock is subjected to shear forces associated with mixing and particularly to hydrodynamic shear associated with flow of the stock through such equipment as distribution devices, some of which divide the pulp stream and then recombine the streams at high velocities and in a manner that promotes mixing by means of high turbulence prior to the stock entering the headbox. Each time the stock is caused to flow from one location to another, it encounters shear, as when flowing through a conduit. Such shear is exacerbated by the high flow velocities encountered in the more modern mills where the paper

2

web is formed as speeds in excess of 4000 feet per minute, thereby requiring larger volumes of stock flow which often translates into greater flow velocities and greater hydrodynamic shear. All of these sources of shear tend to diminish or destroy the flocs or agglomerates developed by the added aids.

Shear stress continues to be experienced by the stock, and in fact is more severe in many instances, as it leaves the headbox, flows onto the wire, and is dewatered. Specifically, as the stock is discharged from the headbox through a manifold, thence a slice, onto the moving wire, there are very strong shear forces exerted upon both the liquid and the solids content of the stock. For example, in those papermaking mechanisms which employ slice jets, there is boundary shear between the stream flowing through each jet and the jet walls. The slice lips can be considered as flat plates held parallel to the main direction of flow; as the fluid travels farther along the plate, the shearing forces, due to the region of viscous action, accomplish the retardation of a continually expanding portion of the flow. As the velocity gradient at the boundary surface is reduced, the growth in boundary layer thickness along the plate is paralleled by a steady increase in boundary shear.

The stock on the wire is subjected to still further hydrodynamic, including shear, forces. Paper sheet forming is predominantly a hydrodynamic process which affects all the components of the stock including fibers, fines, and filler. The fibers may exist as relatively mobile individuals or they may be connected to others as part of a network, agglomerate or mat. The motions of the individual fibers follow the fluid motions closely because the inertial force on a single fiber is small compared with the viscous drag on it. However, the response of the fibers to fluid drag may be drastically modified when they are consolidated in a network or fiber mat. Chemical and colloidal forces are recognized to play a significant part in determining whether the fibers assume a network or mat geometry, such being particularly true with respect to fines and fillers. In commercial systems, heretofore, it has been generally conceded that the hydrodynamic forces exert a significant influence upon the sheet formation and that the degree of this influence is in proportion to the geometry of the fibers, fines and fillers in the stock as the stock reaches the wire and the degree to which this geometry is maintained during the sheet forming stage. Examples of the shear forces experienced by a stock during sheet forming include oriented shear due to velocity differences between the flow of stock and the speed of the wire at the instant the stock contacts the wire. Other shear forces arise as a consequence of the several water removal devices associated with the sheet forming including the application of vacuum at table rolls, drainage foils, etc.

These shear forces encountered by the stock tend toward deflocculation or deagglomeration of the fiber-fines-fillers-aids complexes whose intended function is to maintain their identity in order to obtain the desired intended results of filler and fines retention, good dewatering during web formation, etc. with improved, or no substantial loss of strength and like properties in the paper product. In the prior art it is not known precisely what mechanisms take place as respects the complexing of cellulose fibers, fillers and cationic and anionic aids, but in any event, the present inventor has found that the deleterious effects of shear upon the complexes is re-

CIBA 038933

4,798,653

**3**

duced or substantially eliminated through the use of the aid and process disclosed herein.

It is therefore an object of the present invention to provide a papermaking stock having improved resistance to shear forces that arise in the course of the papermaking process.

It is another object of the invention to provide an improved combination of additives for a papermaking stock.

It is another object of the present invention to provide a papermaking stock having improved drainage and retention properties.

It is another object of the present invention to provide a papermaking stock which exhibits improved resistance to shear forces and improved retention and drainage properties over a substantial range of pH values.

It is another object to provide an improved papermaking process.

Other objects and advantages will be apparent from the disclosures provided herein.

In accordance with the present invention, a papermaking stock comprising cellulose fibers in an aqueous medium at a concentration of preferably at least about 50 percent by weight of the total solids in the stock is provided with a retention and dewatering aid comprising a two-component combination of an anionic polyacrylamide and a cationic colloidal silica sol in advance of the deposition of the stock onto a papermaking wire. The stock so combined has been found to exhibit good dewatering during formation of the paper web on the wire and desirably high retention of fiber fines and fillers in the paper web products under conditions of high shear stress imposed upon the stock.

The present invention has been found to be effective with pulps of both hardwoods or softwoods or combinations thereof. Pulps of the chemical, mechanical (stoneground), semichemical, or thermomechanical types are suitable for treatment in accordance with the present process. In particular, the present invention has been found to provide shear-resistant complexed stocks where there is present in the stock substantial lignosulfates or abietic acid as might be encountered especially in unbleached mechanical pulps or in other pulps due to accumulation of these substances in recirculated white water.

Inorganic fillers such as clays, calcium carbonate, titanium oxide, and/or recycled broke or other cellulosic waste may suitably be incorporated in stocks processed in accordance with the present invention.

The cationic component supplied to the stock is of a colloidal silica sol type such as colloidal silicic acid sol and preferably such a sol which has at least one layer of aluminum atoms on the surface of the siliceous component. A suitable sol is prepared according to the methods such as described in U.S. Pat. Nos. 3,007,878; 3,620,978; 3,719,607 and 3,956,171, each of which is incorporated herein by reference. Such methods involve the addition of an aqueous colloidal silica sol to an aqueous solution of a basic aluminum salt such that the silica surface is coated with a positive aluminum species rendering the sol cationic. This sol is unstable under normal conditions of storage and, therefore, is preferably stabilized with an agent such as phosphate, carbonate, borate, magnesium ion or the like as is known in the art. Surface aluminum to silicon mol ratios in the sol may range from between about 1:2 to about 2:1, and

**4**

preferably 1:1.25 to 1.25:1 and most preferable 1:1, the latter being desirably more stable.

Particle size of the sol particulates appears to exhibit a lesser effect in determining the efficacy of the sol as used in the present process than other properties such as aluminum/silicon mol ratio, etc. Particle sizes of between about 3 and 30 nm can be employed. The smaller size ranges are preferred because of their generally superior performance.

The anionic component of the present invention comprises a polyacrylamide having a molecular weight in excess of 100,000, and preferably between about 5,000,000 and 15,000,000. The anionicity (degree of carboxyl fraction present) of the polyacrylamide may range between about 1 to about 40 percent, but polyacrylamides having an anionicity of less than about 10 percent, when used with the cationic colloidal silica sols, have been found to give the best all-around balance between freeness, dewatering, fines retention, good paper formation and strength, and resistance to shear.

Suitable anionic polyacrylamides may be obtained either by hydrolysis of a preformed polyacrylamide or by copolymerization of acrylamide with acrylic acid. Anionic polyacrylamides and anionic copolymers derived from the copolymerization of acrylamide with methacrylamide also may be employed in the present invention. The polymer products of either of these methods of production appear to be suitable in the practice of the present invention. As noted hereinabove, the lesser degrees of anionicity are preferred for all-around benefits but optimum shear resistance with acceptable accompanying retention and dewatering properties has been found to occur with those polyacrylamides having an anionicity of between about 1 to 10 percent. Suitable anionic polyacrylamides are commercially available from Hitek Polymers, Inc., Louisville, Ky., (Polyhall brand), from Hyperchem, Inc., Tampa, Fla. (Hyperfloc brand), or Hercules, Inc., Wilmington, Del. (Reton brand) as indicated in the following Table A:

TABLE A

| Polymer | Average Molecular Weight Range (MM) | % Carboxyl |
|---|---|---|
| Polyhall 650 | 10 | 5 |
| Polyhall 540 | 10 | 15-20 |
| Polyhall 2J | 10-15 | 2 |
| Polyhall 7J | 10-15 | 7 |
| Polyhall 21J | 10-15 | 21 |
| Polyhall 33J | 10-15 | 33 |
| Polyhall 40J | 10-15 | 40 |
| Polyhall CFN020 | 5 | 5 |
| Polyhall CFN031 | 10 | 12 |
| Hyperfloc AF302 | 10-15 | 2-5 |
| Reton 521 | 15 | 10 |
| Reton 523 | 15 | 30 |

Of these polymers, the Polyhall 650 provides a combination of good dewatering retention, and shear resistance, while minimizing floc size, and therefore is a preferred polymer for use in the present invention. For addition to the stock, the anionic polymer is prepared as a relatively dilute solution containing about 0.15 percent by weight or less.

In the papermaking process, the cationic colloidal silica sol and the anionic polyacrylamide are added sequentially directly to the stock at or briefly before the stock reaches the headbox. Little difference in fines retention or shear resistance is noted when the order of component introduction is alternated between cationic

CIBA 038934

4,798,653

5

component first or anionic component first although it is generally preferred to add the cationic component first. As noted above, in the practice of the invention, the sol and polymer preferably are preformed as relatively dilute aqueous solutions and added to the dilute stock at or slightly ahead of the headbox in a manner that promotes good distribution, i.e. mixing, of the additive with the stock.

Acceptable dewatering, retention and shear resistance properties of the stock are obtained when the cationic and anionic components are added to the stock in amounts representing between about 0.01 and about 2.0 weight percent for each component, based on the solids content of the treated stock. Preferably, the concentration of each component is between about 0.2 to 15 about 0.5 weight percent.

In the following Examples, which illustrate various aspects of the invention, the cationic component was a cationic colloidal silica sol prepared according to the teachings of U.S. Pat. No. 3,956,171. Specifically, in the production of the sol, conditions are selected to provide a surface aluminum/silicon mol ratio of from about 1:2 to 2:1, preferably about 1:1.25 to 1.25:1. It has been found that a sol having a surface aluminum/silicon mol ratio of 1:1 is most stable under those conditions existing in papermaking, so that sols with the 1:1 mol ratio are most suitable.

The anionic component used in the Examples comprised various anionic polyacrylamides, each of which is commercially available and identified hereinabove. For addition to the stock, the anionic polyacrylamides were prepared as dilute solutions of 0.15 weight percent or less as noted. Whereas the pH of the stock in the several Examples was chosen to be pH 4 and pH 8, it is to be recognized that the present invention is useful with stocks having a pH in the range of about pH 4 to pH 9.

## EXAMPLE 1

### DEWATERING OF GROUNDWOOD PULP

Groundwood pulp is characterized by having a high percentage of fines and low dewatering (freeness). For these tests a 0.3 wt. % stock was prepared from 100% stoneground wood (40% poplar, 60% black spruce). To the stock was added 1.5g/l of sodium sulfate decahydrate to provide a specific conductivity of 115mS/cm similar to that of a typical papermaking process. The pH of the stock was adjusted to either pH 4 or pH 8 by means of dilute sodium hydroxide and sulfuric acid solutions and Canadian Standard Freeness Tests were then run to determine drainage in the presence of various amounts of polyacrylamide and cationic sol.

The polyacrylamide used was Polyhall 650 and was added in amounts up to 1.0 wt % (20 lbs./ton) based on the pulp content of the stock. The cationic sol used is described above and was used in amounts up to 1.5 wt. % of the pulp.

In conducting the tests, one liter of stock was first measured into a Britt Dynamic Drainage Jar as described by K. Britt and J. P. Unbehend in Research Report 75, 1/10, 1981, published by Empire State Paper Research Institute (ESPRI), Syracuse, N.Y. 13210. The bottom of the jar had been blocked off to prevent drainage but to maintain mixing conditions similar to those used in subsequent retention and shear force tests described in later examples. The stock was agitated at 800 rpm for 15 seconds and excellent agitation obtained by means of this and the vanes on the side of the jar. The

6

cationic silica sol was next added as dilute solution with 15 seconds allowed for mixing followed by addition of the dilute polyacrylamide solution. After a further 15 seconds of mixing the contents of the jar were transferred to the hold cup of a Canadian Standard Freeness Tester and the freeness measured.

The results of these tests are presented in Table 1 where it may be seen that the polyacrylamide by itself showed no beneficial effect in increasing the drainage of the stock either at pH 4 or pH 8 (Tests 1–3). Addition of papermakers alum to the system produced no beneficial effect at pH 4. At pH 8, lower loadings of alum increased drainage but this benefit was lost as alum loading was increased (Tests 4–7). In contrast to this, use of the cationic sol in increasing amounts produced a steady increase in drainage both at pH 4 and pH 8 (tests 8–12). Significant improvements in drainage were maintained at both pH levels as the polyacrylamide loading was reduced (Tests 13–15).

In Tests 16–20, the polyacrylamide and the cationic sol were increased to very high loadings to demonstrate that further gains in drainage could be obtained and that the system has a broad range of operability.

#### TABLE 1

DRAINAGE AS A FUNCTION OF
SOL AND POLYMER LOADING
100% Stoneground Wood (40% poplar, 60% Black Spruce)
Polyhall 650 Polyacrylamide

| Test No. | % Polymer Loading | % Cationic Sol Loading | % Alum Loading | Freeness, ml pH 4 | pH 8 |
|---|---|---|---|---|---|
| 1 | — | — | — | 94 | 81 |
| 2 | 0.1 | — | — | 68 | 53 |
| 3 | 0.2 | — | — | 58 | 38 |
| 4 | 0.2 | — | 0.5 | 80 | 150 |
| 5 | 0.2 | — | 1.0 | 75 | 163 |
| 6 | 0.2 | — | 2.0 | 68 | 84 |
| 7 | 0.2 | — | 5.0 | 66 | 82 |
| 8 | 0.2 | 0.25 | — | 74 | 80 |
| 9 | 0.2 | 0.5 | — | 106 | 116 |
| 10 | 0.2 | 0.6 | — | 130 | 134 |
| 11 | 0.2 | 0.75 | — | 190 | 180 |
| 12 | 0.2 | 1.0 | — | 200 | 246 |
| 13 | 0.1 | 1.0 | — | 192 | 205 |
| 14 | 0.05 | 1.0 | — | 160 | 156 |
| 15 | 0.025 | 1.0 | — | 144 | 130 |
| 16 | 0.4 | 1.0 | — | 205 | 265 |
| 17 | 0.6 | 1.0 | — | 220 | 310 |
| 18 | 0.8 | 1.0 | — | 235 | 320 |
| 19 | 1.0 | 1.0 | — | 240 | 330 |
| 20 | 1.0 | 1.5 | — | 335 | 376 |

## EXAMPLE 2

### DRAINAGE AS A FUNCTION OF POLYMER ANIONICITY

In this series of tests, the freeness resulting from the use of a variety of anionic polyacrylamides together with cationic sol was examined in a similar manner to that described in Example 1. The stock was again 100% stoneground wood (40% poplar, 60% black spruce). It may be seen from the results in Table 2 that all of the cationic sol/polymer combinations show improved drainage but that the changes in anionicity only show significant variations under alkaline conditions.

CIBA 038935

4,798,653

**7**

### TABLE 2

DRAINAGE AS A FUNCTION OF POLYMER ANIONICITY
100% Stoneground Wood (40% poplar, 60% Black Spruce)
Various Polyhall Polyacrylamides

| Test No. | Polyhall Polymer Used | Wt.% Polymer Loading | Wt.% Cationic Sol Loading | Freeness, ml pH 4 | pH 8 |
|---|---|---|---|---|---|
| 1 | — | — | — | 94 | 81 |
| 2 | 2J | 0.1 | 0.3 | — | 72 |
| 3 | 7J | 0.1 | 0.3 | — | 72 |
| 4 | 21J | 0.1 | 0.3 | — | 110 |
| 5 | 33J | 0.1 | 0.3 | — | 160 |
| 6 | 40J | 0.1 | 0.3 | — | 140 |
| 7 | 54J | 0.1 | 0.5 | — | 124 |
| 8 | 2J | 0.1 | 0.5 | — | 100 |
| 9 | 7J | 0.1 | 0.5 | — | 118 |
| 10 | 21J | 0.1 | 0.5 | — | 210 |
| 11 | 33J | 0.1 | 0.5 | — | 245 |
| 12 | 40J | 0.1 | 0.5 | — | 165 |
| 13 | 2J | 0.1 | 1.0 | — | 320 |
| 14 | 7J | 0.1 | 1.0 | — | 350 |
| 15 | 21J | 0.1 | 1.0 | — | 355 |
| 16 | 33J | 0.1 | 1.0 | — | 355 |
| 17 | 40J | 0.1 | 1.0 | — | 320 |
| 18 | 33J | 0.05 | 1.0 | — | 258 |
| 19 | 33J | 0.10 | 1.0 | — | 355 |
| 20 | 33J | 0.15 | 1.0 | — | 415 |
| 21 | 33J | 0.20 | 1.0 | — | 410 |
| 22 | 33J | 0.30 | 1.0 | — | 360 |
| 23 | 54J | 0.2 | 1.0 | 207 | — |
| 24 | 2J | 0.2 | 1.0 | 192 | — |
| 25 | 7J | 0.2 | 1.0 | 233 | — |
| 26 | 21J | 0.2 | 1.0 | 218 | — |
| 27 | 33J | 0.2 | 1.0 | 182 | — |
| 28 | 40J | 0.2 | 1.0 | 207 | — |

### EXAMPLE 3

#### DRAINAGE OF CHEMICAL PULP

In this example a series of tests was conducted using a bleached chemical pulp comprised of 70% hardwood and 30% softwood. A 0.3 wt.% stock was prepared and 1.5 g/l of sodium sulfate decahydrate was again added to provide a specific conductivity similar to that of a typical white water. Drainage tests were conducted using various amounts of Polyhall 650 anionic polyacrylamide, cationic sol and alum at both pH 4 and pH 8.

It may be seen from the results in Table 3 that at pH 4 the combination of the anionic polyacrylamide with the cationic sol is far more effective in increasing drainage (freeness) than the combination of the polyacrylamide with papermakers alum (of Tests 4–7 with Tests 8–13). At pH 8 the differences are not as large but higher freeness is still obtainable with the cationic sol. Tests 17–21 show that very high freeness can be obtained by using larger quantities of the anionic polyacrylamide and the cationic sol.

### TABLE 3

DRAINAGE OF CHEMICAL PULP
(70% Hardwood, 30% Softwood)

| Test # | Wt.% Polyhall 650 Loading | Wt.% Cationic Sol Loading | Wt.% Alum Loading | Freeness pH 4 | pH 8 |
|---|---|---|---|---|---|
| 1 | — | — | — | 295 | 280 |
| 2 | 0.1 | — | — | 265 | 195 |
| 3 | 0.2 | — | — | 230 | 145 |
| 4 | 0.2 | — | 0.5 | 325 | 500 |
| 5 | 0.2 | — | 1.0 | 215 | 460 |

**8**

### TABLE 3-continued

DRAINAGE OF CHEMICAL PULP
(70% Hardwood, 30% Softwood)

| Test # | Wt.% Polyhall 650 Loading | Wt.% Cationic Sol Loading | Wt.% Alum Loading | Freeness pH 4 | pH 8 |
|---|---|---|---|---|---|
| 6 | 0.2 | — | 1.0 | 212 | 405 |
| 7 | 0.2 | — | 5.0 | 215 | 365 |
| 8 | 0.2 | 0.25 | — | 495 | 460 |
| 9 | 0.2 | 0.5 | — | 530 | 560 |
| 10 | 0.2 | 0.5 | 1.0 | 440 | 530 |
| 11 | 0.2 | 0.6 | — | 540 | 550 |
| 12 | 0.2 | 0.75 | — | 535 | 565 |
| 13 | 0.2 | 1.0 | — | 547 | 540 |
| 14 | 0.1 | 0.5 | — | 460 | 460 |
| 15 | 0.05 | 0.5 | — | 375 | 370 |
| 16 | 0.025 | 0.5 | — | 325 | 335 |
| 17 | 0.4 | 0.5 | — | 600 | 565 |
| 18 | 0.6 | 0.5 | — | 540 | 563 |
| 19 | 0.8 | 0.5 | — | 610 | 565 |
| 20 | 1.0 | 0.5 | — | 610 | 560 |
| 21 | 1.0 | 1.0 | — | 700 | 650 |

### EXAMPLE 4

#### DRAINAGE OF THERMOMECHANICAL PULP

In this example a 0.3 wt. % stock from a thermomechanical pulp of 100% Aspen origin was prepared. 1.5 g/l of sodium sulfate decahydrate was added to simulate electrolytes. The Canadian Standard Freeness Tests listed in Table 4 show that with this stock, improved drainage at both pH 4 and pH 8 was obtained using Polyhall 7J anionic polyacrylamide with cationic sol versus the use of the same polyacrylamide with alum.

### TABLE 4

DRAINAGE OF THERMOMECHANICAL PULP
(100% Aspen)

| Test # | Wt.% Polyhall 7J Loading | Wt.% Cationic Sol Loading | Wt.% Alum Loading | Freeness, ml pH 4 | pH 8 |
|---|---|---|---|---|---|
| 1 | — | — | — | 240 | 210 |
| 2 | 0.2 | — | — | 92 | 50 |
| 3 | — | — | — | 64 | 25 |
| 5 | 0.2 | — | 0.5 | 66 | 200 |
| 6 | 0.2 | — | 1.0 | 60 | 270 |
| 7 | 0.2 | — | 2.0 | 66 | 265 |
| 8 | 0.2 | 0.25 | — | 225 | 230 |
| 9 | 0.2 | 0.50 | — | 375 | 415 |
| 10 | 0.2 | 0.75 | — | 475 | 526 |
| 11 | 0.2 | 1.0 | — | 535 | 550 |
| 12 | 0.1 | 0.5 | 1.0 | 365 | 490 |

### EXAMPLE 5

#### DRAINAGE/RETENTION OF CHEMICAL THERMOMECHANICAL PULP

In this example, the freeness of a chemical thermomechanical pulp was examined. In addition, to obtain a measure of fines retention, turbidity measurements were made on the white water drainage from the freeness tests. The furnish was of 0.3 wt.% consistency with 1.5 g/l sodium sulfate decahydrate as electrolyte. The combination of anionic polyacrylamide with cationic sol at pH 4 showed a greater response to both improved freeness and improved retention (lower turbidity) than did the polyacrylamide combined with alum. At pH 8, the freeness of both combinations remained at comparable values although the cationic sol system showed better retention. The results are given in Table 5.

CIBA 038936

4,798,653

9 10

### TABLE 5

| | DRAINAGE/RETENTION OF CHEMICAL THERMOMECHANICAL PULP | | | | | | |
|---|---|---|---|---|---|---|---|
| Test # | Wt. % Hyperfloc AF 302 Loading | Wt. % Cationic Sol Loading | Wt. % Alum Loading | pH 4 Freeness | pH 4 Turbidity | pH 8 Freeness | pH 8 Turbidity |
| 1 | 0.025 | — | — | 325 | 124 | | |
| 2 | 0.025 | — | 0.25 | 325 | 150 | | |
| 3 | 0.025 | — | 0.5 | 320 | 140 | | |
| 4 | 0.025 | — | 1.0 | 320 | 140 | | |
| 5 | 0.025 | 0.25 | — | 345 | 66 | | |
| 6 | 0.025 | 0.5 | — | 365 | 43 | | |
| 7 | 0.025 | 1.0 | — | 360 | 42 | | |
| 8 | 0.05 | — | — | 285 | 170 | 175 | 240 |
| 9 | 0.05 | — | 0.25 | 280 | 160 | 250 | 182 |
| 10 | 0.05 | — | 0.5 | 280 | 160 | 445 | 44 |
| 11 | 0.05 | — | 1.0 | 285 | 142 | 335 | 60 |
| 12 | 0.05 | 0.25 | — | 355 | 49 | 375 | 49 |
| 13 | 0.05 | 0.5 | — | 395 | 28 | 390 | 26 |
| 14 | 0.05 | 0.1 | — | 410 | 28 | 395 | 24 |

### EXAMPLE 6
### FINES RETENTION AND DRAINAGE OF FILLED PULP

For these tests a 0.5 wt. % filled pulp stock comprising 70% chemical pulp (70% hardwood, 30% softwood), 29% Klondyke clay and 1% calcium carbonate was prepared. 1.5 g/l sodium sulfate decahydrate was added as electrolyte.

Britt Jar Tests for fines retention were then conducted using various loadings of Polyhall 650 anionic polyacrylamide with either alum or cationic sol. A constant stirrer speed of 800 rpm was used and tests were made at both pH 4 and pH 8. Table 6 lists the results.

It may be seen that at Polyhall 650 anionic polyacrylamide loadings of 0.1 wt. %, use of the cationic sol gives superior retentions to the use of reference alum at both pH 4 and pH 6 (cf Tests 9–12 with Tests 3–5). At higher Polyhall 650 loadings of 0.2 wt. % superiority of the cationic sol over alum is maintained at pH 4. At pH 8 the differences are no longer marked.

Also included in Table 6 are some freeness values for the same pulp system (diluted to 0.3 wt. % consistency) at additive loadings corresponding to high fines retention levels. A clear superiority in drainage for the use of cationic sol versus alum is demonstrated.

### TABLE 6

| | FINES RETENTION AND DRAINAGE OF FILLED PULP | | | | |
|---|---|---|---|---|---|
| Test # | Wt. % Polyhall 650 Loading | Wt. % Cationic Sol Loading | Wt. % Alum Loading | pH 4 | pH 8 |
| | | | | % Fines Retention | |
| 1 | 0.1 | — | — | 44.3 | 49.9 |
| 2 | 0.2 | — | — | 56.0 | 72.4 |

### TABLE 6-continued

| | FINES RETENTION AND DRAINAGE OF FILLED PULP | | | | |
|---|---|---|---|---|---|
| Test # | Wt. % Polyhall 650 Loading | Wt. % Cationic Sol Loading | Wt. % Alum Loading | pH 4 | pH 8 |
| 3 | 0.1 | — | 0.5 | 44.1 | 47.9 |
| 4 | 0.1 | — | 1.0 | 44.5 | 42.7 |
| 5 | 0.1 | — | 2.0 | 44.4 | 46.1 |
| 6 | 0.2 | — | 0.5 | 55.2 | 39.7 |
| 7 | 0.2 | — | 1.0 | 55.6 | 86.5 |
| 8 | 0.2 | — | 2.0 | 54.0 | 73.0 |
| 9 | 0.1 | 0.25 | — | 72.8 | 69.5 |
| 10 | 0.1 | 0.50 | — | 63.3 | 70.2 |
| 11 | 0.1 | 0.75 | — | 62.4 | 63.2 |
| 12 | 0.1 | 1.00 | — | 55.5 | 61.3 |
| 13 | 0.2 | 0.25 | — | 81.7 | 90.6 |
| 14 | 0.2 | 0.50 | — | 86.6 | 90.4 |
| 15 | 0.2 | 0.75 | — | 86.6 | 88.4 |
| 16 | 0.2 | 1.00 | — | 88.9 | 88.0 |
| | | | | Freeness, ml | |
| 17 | 0.2 | — | 1.0 | 265 | 330 |
| 18 | 0.2 | — | 2.0 | 260 | 310 |
| 19 | 0.2 | 0.25 | — | 475 | 450 |
| 20 | 0.2 | 0.50 | — | 475 | 485 |

### EXAMPLE 7
### ADDITIVE EFFECT OF CATIONIC SOL ON DRAINAGE AND RETENTION

In this example the benefits of adding both cationic sol and anionic polyacrylamide versus anionic polyacrylamide alone to a filled pulp system containing alum was demonstrated. Freeness and white water turbidity measurements were made on a stock similar to that described in Example 6. Two commercial anionic polyacrylamide retention aids were used. Table 7 shows a significant enhancement in both freeness and fines retention (lower white water turbidity) on adding cationic sol in addition to alum and polyacrylamide (cf Tests 7–10 with Test 4, and Tests 18–19 with Test 17).

### TABLE 7

| | ADDITIVE EFFECT OF CATIONIC SOL ON DRAINAGE AND RETENTION (Filled Chemical Pulp at pH 4.0) | | | | |
|---|---|---|---|---|---|
| Test # | Wt. % Polymer Loading | Wt. % Alum Loading | Wt. % Cationic Sol Loading | Freeness ml | Turbidity N.T.A. Units |
| Using Reten 521 | | | | | |
| 1 | 0.05 | — | — | 290 | 90 |
| 2 | 0.05 | 0.25 | — | 290 | 97 |
| 3 | 0.05 | 0.5 | — | 295 | 95 |
| 4 | 0.05 | 1.0 | — | 295 | 92 |
| 5 | 0.05 | 1.5 | — | 295 | 93 |
| 6 | 0.05 | 2.0 | — | 295 | 93 |
| 7 | 0.05 | 1.0 | 0.125 | 410 | 39 |

CIBA 038937

4,798,653

11                                                        12

TABLE 7-continued

ADDITIVE EFFECT OF CATIONIC SOL ON DRAINAGE AND RETENTION
(Filled Chemical Pulp at pH 4.0)

| Test # | Wt. % Polymer Loading | Wt. % Alum Loading | Wt. % Cationic Sol Loading | Freeness ml | Turbidity N.T.A. Units |
|---|---|---|---|---|---|
| 8 | 0.05 | 1.0 | 0.25 | 455 | 33 |
| 9 | 0.05 | 1.0 | 0.5 | 435 | 41 |
| 10 | 0.05 | 1.0 | 1.0 | 385 | 45 |
| Using Retea 523 | | | | | |
| 15 | 0.05 | — | — | 285 | 98 |
| 16 | 0.05 | 0.5 | — | 275 | 99 |
| 17 | 0.05 | 1.0 | — | 290 | 96 |
| 18 | 0.05 | 1.0 | 0.25 | 360 | 68 |
| 19 | 0.05 | 1.0 | 0.5 | 335 | 86 |
| 20 | 0.05 | 1.0 | 1.0 | 285 | 134 |

## EXAMPLE 8

### RESISTANCE OF FINES RETENTION TO TURBULENCE

The improved resistance of pulp fines flocs formed from the co-use of anionic polyacrylamide with cationic sol to the effects of machine shear forces was demonstrated by further Britt Jar Tests using a filled pulp system similar to that of Example 6, but with variations in the speed of the stirrer. Higher stirring speed corresponds to higher shear. The tests were conducted at both pH 4 and pH 8 at two loadings of Polyhall 650 anionic polyacrylamide but at constant loadings of either 1.0 wt. % alum or 0.5 wt. % cationic sol. The superior performance of cationic sol versus alum is clearly shown at pH 4 in Table 8.

TABLE 8

RESISTANCE OF FINES RETENTION TO TURBULENCE
Filled Chemical Pulp.

| | Wt. % | | % Fines Retention | | | |
|---|---|---|---|---|---|---|
| | | | pH 4 | | pH 8 | |
| Test # | Polyhall 650 Loading | Turbulence r.p.m. | Alum | Cat. Sol | Alum | Cat. Sol |
| 1 | 0.1 | 600 | 89.4 | 90.5 | 94.9 | 95.1 |
| 2 | 0.1 | 800 | 43.7 | 70.9 | 56.2 | 67.8 |
| 3 | 0.1 | 1000 | 34.5 | 50.8 | 56.2 | |
| 4 | 0.2 | 600 | 82.1 | 98.3 | 97.8 | 99.2 |
| 5 | 0.2 | 800 | 56.3 | 87.1 | 87.0 | 90.4 |
| 6 | 0.2 | 1000 | 30.4 | 71.2 | 76.0 | 82.0 |

Constant alum loading of 1.0 wt. %
Constant cationic sol loading of 0.5 wt. %

Further tests were conducted to demonstrate the retention, under conditions of increased shear, of the present invention versus a commercial prior art system employing colloidal silica. In these tests, the stock used was a fine paper stock comprising 70% pulp (70% hardwood and 30% softwood), 29% clay and 1% calcium carbonate. The pH of the stock was adjusted to 4.5. In these tests, the loadings of the anionic polyacrylamide was selected at the equivalent of 3 lb/ton (0.15 wt. %) and the cationic sol at 12 lb/ton (0.6 wt. %). Britt Jar tests were conducted at different agitation speeds to simulate different magnitudes of shear. The order of addition of the cationic and anionic components were reversed in certain of the tests to illustrate the effect of order of component addition. The results of these tests are given in Table 9. Further tests were conducted in like manner except that 100 ppm of lignin sulfonate, a representative anionic impurity, was added to the stock. The Table 10 shows the results of these tests and shows the superiority of the present invention. The "prior art" referred to in Tables 9 and 10 comprised anionic colloidal silica sol plus cationic starch marketed under the

tradename Compozil by Procomp of Marietta, Ga.. The loadings employed in all tests were of 8 lb/ton (0.4 wt. %) of anionic colloidal silica plus 20 lb/ton (1.0 wt. %) of cationic starch. The loadings stated for each system had been established as giving nearly optimum values in fines retention for that system.

TABLE 9

RESISTANCE TO SHEAR FORCES

| | | % Fines Retention | | |
|---|---|---|---|---|
| Component Added First | Turbulence r.p.m. | Polyhall 25/ Cationic Sol | Polyhall 71/ Cationic Sol | Prior-Art |
| Cationic | 600 | 90 | 73 | 87 |
| Cationic | 800 | 87 | 75 | 69 |
| Cationic | 1000 | 85 | 74 | 54 |
| Anionic | 600 | 99 | 95 | 93 |
| Anionic | 800 | 100 | 80 | 61 |
| Anionic | 1000 | 96 | 65 | 51 |

TABLE 10

RESISTANCE TO SHEAR FORCES

| | | % Fines Retention | | |
|---|---|---|---|---|
| Component Added First | Turbulence r.p.m. | Polyhall 25/ Cationic Sol | Polyhall 71/ Cationic Sol | Prior Art |
| Cationic | 600 | 96 | 90 | 57 |
| Cationic | 800 | 94 | 85 | 38 |
| Cationic | 1000 | 85 | 84 | 36 |
| Anionic | 600 | 87 | 80 | 72 |
| Anionic | 800 | 81 | 70 | 43 |
| Anionic | 1000 | 52 | 58 | 38 |

What is claimed is:

1. In a papermaking stock including cellulose fibers in a concentration of at least about 50% by weight of such fibers in an aqueous medium the improvement comprising:

a cationic component comprising a colloidal silica sol compound selected from the group consisting of colloidal silicic acid sol, colloidal silicic acid sol modified with at least one surface layer of aluminum atoms,

an anionic component selected from the group consisting of polyacrylamide prepared by the hydrolysis of polyacrylamide, polyacrylamide prepared by the copolymerization of acrylic acid with acrylamide, and polyacrylamide derived from the copolymerization of acrylamide with methacrylamide,

said cationic component being present in the stock in a concentration between about 0.01 to about 2.0 weight percent based on the solids content of the stock.

CIBA 038938

4,798,653

13

said anionic component being present in said stock at a concentration from about 0.01 to about 1.0 weight percent based on the solids content of the stock,

whereby said stock is rendered effectively resistant to destruction of its retention and dewatering properties by shear forces incurred by said stock in the course of forming of the stock into a paper web.

2. The papermaking stock of claim 1 wherein said cationic component and said anionic components are present in a ratio of between about 1:100 and 100:1.

3. The papermaking stock of claim 2 wherein said cationic component and said anionic components are present in a ratio of between about 1:10 and 10:1.

4. The papermaking stock of claim 1 wherein the pH of said stock is between about 4 and about 9.

5. The papermaking stock of claim 1 wherein said anionic component exhibits an anionicity of between about 1 and about 40 percent.

6. The papermaking stock of claim 5 wherein said anionic component exhibits are anionicity of less than about 10 percent.

7. The papermaking stock of claim 1 wherein said anionic component has a molecular weight in excess of between about 100,000 and about 15,000,000.

14

8. The papermaking stock of claim 7 wherein said anionic component has a molecular weight between about 5,000,000 and 15,000,000.

9. The papermaking stock of claim 1 wherein said cationic component has a particle size of between about 3 and 30 nanometers.

10. A papermaking process employing a stock comprising at least about 50% by weight of cellulose fibers in an aqueous medium having a pH between about 3 and about 9, introduced from a headbox containing said stock onto a moving papermaking wire and vacuum felted thereon including the steps of:

introducing to said stock prior to its removal from said headbox onto said wire, a cationic colloidal silica sol component,

separately introducing to said furnish prior to its removal from said headbox onto said wire an anionic polyacrylamide component,

said cationic and said anionic components being present in a ratio of between about 1:10 and 10:1 based on weight and each component representing between about 0.01 and 1.0 weight percent of said stock based on total solids of said stock, and

providing a time lapse between said introductions of said components sufficient to permit good mixing of said components with said stock.

* * * * *

CIBA 038939

07/540,667   06/18/90      **UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|

FRANK M. VAN RIET
C/O AMERICAN CYANAMID COMPANY
1937 WEST MAIN STREET
STAMFORD, CT 06904-0060

EXAMINER

| ART UNIT | PAPER NUMBER |
|---|---|
| | 3 24 |

DATE MAILED:

**MAILED**

DEC 2 6 1990

GROUP 130

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☑ This application has been examined   ☐ Responsive to communication filed on _____   ☐ This action is made final.

A shortened statutory period for response to this action is set to expire **3** month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I**   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:
1. ☑ Notice of References Cited by Examiner, PTO-892.   2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.   4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.   6. ☐ _____

**Part II**   SUMMARY OF ACTION

1. ☑ Claims _1-42_ are pending in the application.

Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☑ Claims _1-14, 26-40, and 42_ are rejected.

5. ☐ Claims _____ are objected to.

6. ☑ Claims _1-42_ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings which are acceptable for examination purposes until such time as allowable subject matter is indicated.

8. ☐ Allowable subject matter having been indicated, formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. These drawings are ☐ acceptable;
☐ not acceptable (see explanation).

10. ☐ The ☐ proposed drawing correction and/or the ☐ proposed additional or substitute sheet(s) of drawings, filed on _____
has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved. ☐ disapproved (see explanation). However, the Patent and Trademark Office no longer makes drawing changes. It is now applicant's responsibility to ensure that the drawings are corrected. Corrections MUST be effected in accordance with the instructions set forth on the attached letter "INFORMATION ON HOW TO EFFECT DRAWING CHANGES", PTO-1474.

12. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has ☐ been received ☐ not been received
☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

PTOL-326 (Rev. 7 - 82)   EXAMINER'S ACTION

Serial No. 07/540667                        -2-

Art Unit   133


        Restriction to one of the following inventions is required

under 35 U.S.C. § 121:

        I.   Claims 1-14 and 40, drawn to a method of making paper,

classified in Class 162, subclass 168.3.

        II.   Claims 15-25 and 41, drawn to a composition of matter,

classified in Class 252, subclass 351.

        The inventions are distinct, each from the other because of

the following reasons:

        Inventions Group I and Group II are related as process of

making and product made.   The inventions are distinct if either

or both of the following can be shown: (1) that the process as

claimed can be used to make other and materially different

product or (2) that the product as claimed can be made by another

and materially different process (M.P.E.P. § 806.05(f)).   In the

instant case the product as claimed can be made by a materially

different process such as one that does not require papermaking,

e.g. making cement.

        Because these inventions are distinct for the reasons given

above and have acquired a separate status in the art as shown by

their different classification and because of their recognized

divergent subject matter restriction for examination purposes as

indicated is proper.

        During a telephone conversation with Mr. Van Reit on October

CIBA 038941

Serial No. 07/540667                          -3-

Art Unit    133

17, 1990 a provisional election was made with traverse to
prosecute the invention of Group I, claims 1-14 and 40.
Affirmation of this election must be made by applicant in
responding to this Office action.   Claims 15-25 and 41 are
withdrawn from further consideration by the Examiner, 37 C.F.R.
§ 1.142(b), as being drawn to a non-elected invention.

Product by process claims 26-39 and 42 are examinable with
Group I, which has been elected.

Applicant is reminded that upon the cancellation of claims
to a non-elected invention, the inventorship must be amended in
compliance with 37 C.F.R. § 1.48(b) if one or more of the
currently named inventors is no longer an inventor of at least
one claim remaining in the application.   Any amendment of
inventorship must be accompanied by a diligently-filed petition
under 37 C.F.R. § 1.48(b) and by the fee required under 37 C.F.R.
§ 1.17(h).

Applicant has not complied with one or more conditions for
receiving the benefit of an earlier filing date under 35 U.S.C.
§ 120 as follows:

The continuing application must contain a specific reference
to the parent application(s) in the specification.
The serial number and the filing date of the earlier application
(attorney docket number 31,043) need to be provided.

The oath or declaration is defective.   A new oath or
declaration in compliance with 37 C.F.R. § 1.67(a) identifying

CIBA 038942

Serial No. 07/540667                          -4-

Art Unit   133

this application by its Serial Number and filing date is

required.  See M.P.E.P. §§ 602.01 and 602.02.

The oath or declaration is defective because:

It does not state the application number and filing date of
the parent application (attorney docket 31,043).

The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

A patent may not be obtained though the invention is not
identically disclosed or described as set forth in section
102 of this title, if the differences between the subject
matter sought to be patented and the prior art are such that
the subject matter as a whole would have been obvious at the
time the invention was made to a person having ordinary
skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which
the invention was made.

Subject matter developed by another person, which qualifies
as prior art only under subsection (f) or (g) of section 102
of this title, shall not preclude patentability under this
section where the subject matter and the claimed invention
were, at the time the invention was made, owned by the same
person or subject to an obligation of assignment to the same
person.

This application currently names joint inventors.  In
considering patentability of the claims under 35 U.S.C. § 103,
the examiner presumes that the subject matter of the various
claims was commonly owned at the time any inventions covered
therein were made absent any evidence to the contrary.  Applicant
is advised of the obligation under 37 C.F.R. § 1.56 to point out
the inventor and invention dates of each claim that was not
commonly owned at the time a later invention was made in order
for the examiner to consider the applicability of potential 35
U.S.C. § 102(f) or (g) prior art under 35 U.S.C. § 103.

Claims 1, 13, 26, and 38 are rejected under 35 U.S.C. § 103

as being unpatentable over Farrar etal.

Farrar teaches that adding to the papermaking stock a cross-

CIBA 038943

Serial No. 07/540667                              -5-

Art Unit   133

linked anionic or cationic acrylamide of particle size less than
2 microns improves retention and dewatering properties of paper
(column 3, lines 42-43, column 5, lines 7-14, column 6, line 62,
and column 9, line 52). Farrar also teaches, at columns 9 and
10, that the additive can be copolymerized with 0-95% acrylamide;
thus, it would have been obvious to one of ordinary skill in the
art that the additive polymer can have a 0-95% ionicity. At
column 14, line 58 Farrar teaches that 6 kg/ton of polymer are
added to the paper. This amount taught by Farrar is in the range
of polymer additive claimed by the applicant. Further, addition
of the claimed amount of polymer is conventional to enhance
drainage and retention properties.

     Claims 1-5, 7, 8, 10-14, 26-30, 32, 33, 35-40, and 42 are
rejected under 35 U.S.C. § 103 as being unpatentable over Farrar
in view of Johnson et al or vice versa.

     Johnson teaches improving retention and dewatering
properties of paper by adding .1-.15% of a binder of a cationic
starch (a high molecular weight ionic polymer), an anionic
polymer of acrylamide and a dispersed silica to the headbox of a
papermaking machine (column 1, lines 15-16 and 41, column 2,
lines 15-24, and column 3, lines 50-52). At Figures 3 and 4
Johnson teaches the use of all components within the range of the
presently claimed amounts. The use of alum is shown to increase
drainage and retention (shown in Figure 4 as decreased

CIBA 038944

Serial No. 07/540667                              -6-

Art Unit   133

turbidity).  The degree of substitution, i.e. ionicity, of the
acrylamide is taught by Johnson as being from 1 to 40% (column 2,
lines 5-15).

When Farrar is taken in light of Johnson, it would have been
obvious to one of ordinary skill in the art to add cationic
starch and alum in the claimed amounts to the anionic acrylamide
of Farrar to further improve the drainage and retention
properties.

The teachings not provided by Johnson in reference to the
above claims are the particle size of the acrylamide and that it
is cross-linked.  As noted above Farrar teaches a particle size
of less than 2 microns and that the acrylamide is cross-linked.

When Johnson is taken in view of Farrar, it would have been
obvious to one of ordinary skill in the art to utilize a cross-
linked acrylamide of particle size less than 2 microns, e.g. in
the claimed amounts, in the process of Johnson because Farrar
teaches that the addition of these particles to the papermaking
furnish improves retention and dewatering properties.  Further,
the skilled artisan would have found it obvious to use acrylamide
in this small particle range to increase the surface area, i.e.
reactivity, of the acrylamide relative to the amount used.
Rejection of the method claims necessarily precludes
patentability of the product by process claims.  Compare in re Thorpe, 227
USPQ 964 (CAFC 1985).

CIBA 038945

Serial No. 07/540667                    -7-

Art Unit   133

Claims 6, 9, 31, and 34 are rejected under 35 U.S.C. § 103
as being unpatentable over Farrar in view of Johnson or vice
versa as applied to claims immediately above, and further in view
of Sinclair etal.

To further support the above noted teachings of a high
molecular weight polymer of opposite charge to the microbead, it
is noted that Sinclair teaches starches as the cationic polymer
in a process to provide paper with improved properties.  Sinclair
teaches that starch (polysaccharide) or another polymer can be
used as either a cationic or anionic polymer and acrylamide can
be selected in either ionicity such that the two polymers have
opposite charges (see column 8, lines 24-44).

It would have been obvious to the skilled artisan to use
either anionic or cationic starch (high molecular weight polymer)
of opposite charge in the process of Farrar and Johnson because
Sinclair teaches such as conventional in improving retention and
dewatering properties.  Further, the selection being merely a
matter of choice, the skilled artisan would have found it obvious
to choose the additives based on economy and availability.  It is
noted, as above, that rejections of the paper product claims
necessarily follow from the rejection of the process claims.

The prior art made of record and not relied upon is
considered pertinent to applicant's disclosure.

Langley etal teaches the addition of bentonite to improve

CIBA 038946

Serial No. 07/540667                    -8-

Art Unit   133

drainage and retention (see especially Table 4).

Wagberg etal teaches treating paper in a three-stage process to improve retention properties. Wagberg teaches a cationic starch followed by an anionic polymer and a cationic polymer in the amounts claimed in the instant application. Wagberg also teaches that either the anionic or the cationic polymer can be a polymer of acrylamide (see entire document).

Rushmere teaches anionic polyacrylamide as a drainage and retention aid in papermaking. Rushmere teaches that the polyacrylamide has an anionicity of between 1 and 10%, column 4, lines 34-36.

Any inquiry concerning this communication should be directed to Charles Friedman at telephone number (703) 308-0477.

RICHARD V. FISHER
SUPERVISORY PATENT EXAMINER
ART UNIT 136

11-16-90

Charles Friedman
November 15, 1990

CIBA 038947



Docket No.: 31,043-01

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:
Dan S. Honig
Elieth Harris

Serial No: 07/540,667                    Group Art Unit: 133
Filed: June 18, 1990
For: Charged Organic Polymer            Examiner: C. Friedman
     Microbeads In Paper
     Making Process

Commissioner of Patents
 and Trademarks

Washington, D.C. 20231                   March 25, 1991

## AMENDMENT

In response to the Office Action mailed December 26, 1990, please amend the instant application as follows:

### In The Specification:

On the title page, last two lines, cancel the words "(Attorney Docket No. 31043 filed" and substitute therefor the words --7/536,382, filed June 11, 1990--.

Page 12, line 1, cancel "(Attorney Docket 31320)" and substitute therefor --07/535,626, filed June 11, 1990--.

Page 20, line 14, after the word "is" insert the words --defined and used herein as that--.

Page 20, line 15, after the word "(QELS)" insert the words --as carried out on the polymer emulsion, microemulsion or dispersion--.

### Remarks

The specification has been amended so as to clarify how the particle size of the polymeric microbeads used in the instant invention is measured in that the QELS is carried out on the polymer emulsion, microemulsion or dispersion rather than the dry polymer. This amendment is

- 1 -

CIBA 038948

not considered to be new matter in that it constitutes a clarification so as to prevent any misunderstanding rather than a completely new definition. Entrance of the amendment is respectfully requested.

The Examiner has required restriction to one of the following inventions under 35 USC 121:

    I.   Claims 1-14 and 40 drawn to a method of making paper and classified in Class 162; Sublcass 168.3 and

    II.  Claims 15-25 and 41 drawn to a composition of matter and classified in Class 252; Subclass 351.

The inventions are distinct, each from the other, the Examiner continues, because Inventions I and II are related as process of making and product made and the inventions are distinct if either or both of the following can be shown: 1) that the process, as claimed, can be used to make another and materially different product or 2) that the product, as claimed, can be made by another and materially different process, citing M.P.E.P. 806.05(f). In the instant case, the Examiner explains, the product, as claimed, can be made by a materially different process such as one that does not require papermaking, e.g. making cement.

Because the inventions are therefore distinct and have acquired a separate status in the art as shown by their different classification and because of their recognized divergent subject matter, restriction for examination purposes is indicated as proper by the Examiner.

This requirement for restriction is respectfully traversed. It is respectfully submitted that the Examiner is in error with regard to the relationship of the

- 2 -

CIBA 038949

inventions in question. The inventions are not related as process of making and product made. The process of making of Groups I is a process of making paper whereas the products of Group II are used in the process of making paper. Thus, if anything, the inventions are related as product and process of using. The Group I process does not make the Group II compositions.

Furthermore, ex parte Coe, 1889 CD 191, and U.S. ex rel Steinmetz v Allen, 1904 CD 703, establish that a separation of classification is not determinative of the separateness of invention. Accordingly, withdrawal of the restriction requirement is earnestly solicited.

Applicants, however, hereby affirm the provisional election of Group I, i.e. Claims 1-14 and 40. Retention of the non-elected Claims 15-25 and 41 in the application for the purpose of filing a subsequent divisional application or appeal is respectfully requested.

It is understood that product-by-process Claims 26-39 and 42 will be examined with the invention represented by elected Group I.

The Title page of the instant specification has been amended so as to provide a specific reference to the parent application as required by the Examiner.

A new declaration is provided herewith identifying the parent application by its Serial Number and filing date as required by the Examiner.

Claims 1, 13, 26 and 38 have been rejected under 35 USC 103 as being unpatentable over Farrar et. al., the Examiner stating that Farrar et. al. teaches that adding to the paper-making stock a cross-linked anionic or cationic acrylamide of particle size less than 2 microns improves retention and dewatering properties of paper, citing col. 3,

- 3 -

lines 42-43; Col. 5, lines 7-14; col. 6, lines 62 and col. 9, line 52. Farrar et. al. also teaches, at columns 9 and 10, the Examiner continues, that the additive can be copolymerized with 0-95% of acrylamide and thus, it would have been obvious to one of ordinary skill in the art that the additive polymer can have 0-95% ionicity. At col. 14, line 58, Farrar et. al. teaches that 6 kg/ton of polymer are added to the paper i.e. in the range of polymer additive claimed, the Examiner concludes, and further, addition of the claimed amount of polymer is conventional to enhance drainage and retention properties.

This ground of rejection is respectfully traversed. The Farrar et. al. patent is representative of the prior art over which the instant process is a patentable improvement. Farrar et. al. disclose the use of sheared polymers as retention or dewatering aids in the production of paper. The sheared polymers are made by shearing polymers made by reverse phase or emulsion polymerization (col. 6, line 63), the particles having a size below about 2 microns. The Examiner has apparently taken the position that the disclosure of Farrar et. al. with regard to the particle size is such as to include that of Applicants' claims i.e. , < 750 nanometers if the particles are cross-linked and < 60 nanometers if they are water-insoluble but not cross-linked. This position is strenuously urged as erroneous in that the disclosure of Farrar et. al. regarding the polymer particle sizes is that representative of typical emulsion polymerization procedures. That is to say, normal macroemulsion polymerization procedures result in polymers having particle sizes above about 1 micron i.e. 1000 nanometers. This type of polymerization has been known for many years e.g. see U.S. Patent No. 3,979,348. However,

- 4 -

CIBA 038951

microemulsion polymerization technology is more recent and produces polymer particles having diameters below 1000 nanometers. It is these polymers to which the instant claims are directed and it is these polymers which have been shown by Applicants to be superior to those produced using conventional emulsion polymerization techniques such as taught by Farrar et. al. In this regard, the Examiner's attention is respectfully directed to Tables 25, 37 and 38 of the instant specification. As can be seen in Table 25, page 43, the use of an anionic microbead having a particle size of 1000-2000 nanometers (i.e. as in Farrar et. al.) results in Drainage values of 98.9 secs. and 103.6 secs. whereas the microbeads of the present invention having sizes of 200 nanometers and 130 nanometers result in Drainage values of 71.7 secs. and 72.2 secs., respectively. Similarly, in Table 37, page 53, the 100 nanometer particle diameter microbeads of the instant invention result in a Drainage value of 93.3 seconds whereas the 1000 nanometer particles of Farrar et. al. result in a Drainage value of 113.9 secs. which is even worse that a linear polymer which is not a microbead i.e. 98.7 secs. Similarly, on page 54, Table 38 makes a direct comparison of polymers having a particle size of 100 nanometers to those having a particle size of 1000 nanometers and in each instance, regardless of pH, the smaller particle polymers of the present invention surpass the larger particle polymers of Farrar et. al.

Thus, the unexpected results shown by the instant examples are respectfully submitted as representative of a patentable improvement over the cited Farrar et. al. reference. Reconsideration and withdrawal of this ground of rejection are therefore earnestly solicited.

Claims 1-5, 7, 8 10-14, 26-30, 32, 33, 35-40 and

- 5 -

CIBA 038952

42 have been rejected under 35 USC 103 as unpatentable over Farrar et. al. in view of Johnson et. al. or vice versa, the Examiner stating that Johnson et. al. teaches improving retention and dewatering of paper by adding 0.1-.15% of a binder of a cationic starch (a high molecular weight ionic polymer), an anionic polymer of acrylamide and a dispersed silica to the headbox of a papermaking machine, citing col. 1, lines 15-16 and 41; col. 2, lines 15-24 and col. 3, lines 50-52. At Figures 3 and 4, the Examiner continues, Johnson et. al. teaches the use of all components within the range of the presently claimed amounts. The use of alum is shown to increase drainage and retention (shown in Figure 4 as decreased turbidity), the Examiner explains, the degree of ionicity being 1-40%, col. 2, lines 5-15.

When Farrar et. al. is taken in light of Johnson et. al., the Examiner indicates that it would have been obvious to one of ordinary skill in the art to add cationic starch and alum in the claimed amounts to the anionic acrylamide of Farrar et. al. to further improve the drainage and retention.

The teachings not provided by Johnson et. al. are the particle size of the polymer and that it is cross-linked, the Examiner states, however, notes that Farrar et. al. teaches a particle size of less than 2 microns and that the acrylamide is cross-linked.

When Johnson et. al. is taken in view of Farrar et. al., the Examiner explains that it would have been obvious to one of ordinary skill in the art to utilize a cross-linked acrylamide of particle size less than 2 microns in the process of Johnson et. al. because Farrar et. al. teaches that the addition of these particles to the papermaking furnish improves retention and dewatering

- 6 -

CIBA 038953

properties. Further, the Examiner concludes, the skilled artisan would have found it obvious to use acrylamide in this small particle range to increase the surface area i.e. reactivity, of the acrylamide relative to the amount used. Rejection of the method claims necessarily precludes the patentability of the product-by-process claims, the Examiner concludes, citing in re Thorpe 227 USPQ964.

These grounds of rejection are also respectfully traversed. The arguments presented hereinabove with regard to Farrar et. al. apply equally to this rejection. The Examiner has admitted that Johnson et. al. fails to teach the particle size polymers employed in the instant claims and in view of the unexpected results of the smaller particle size polymers of Applicants vis-a-vis the larger particle size polymers of Farrar et. al., the use of cationic starch, anionic acrylamide polymer and dispersed silica of Johnson et. al., and their quantities, in the Farrar et. al. process still will not result in the process of the instant invention. The large particle size polymers of Farrar et. al. have been shown to be inferior and the inclusion of the additives of Johnson et. al. therewith will not overcome that inferiority.

Similarly, the use of the large particle size polymer of Farrar et. al. in the Johnson et. al. process will not anticipate Applicants' process because the resultant process will still result in the inferior drainage values shown by Applicants in Tables 25, 37 ad 38 of the instant specification, as discussed above. Accordingly, reconsideration and withdrawal of these grounds of rejection are respectfully urged as warranted.

Claim 6, 9, 31 and 32 have been rejected under 35 USC 103 as patentable over Farrar et. al. in view of Johnson et. al. or vice versa and further in view of Sinclair et.

- 7 -

CIBA 038954

al., the Examiner noting that Sinclair et. al. teaches starches as the cationic polymer in a process to provide paper with improved properties. Sinclair et. al. teaches that starch or another polymer can be used as either a cationic or anionic polymer and acrylamide can be selected in either ionicity such that the two polymers have opposite charges, the Examiner explains, and therefore it would have been obvious to the skilled artisan to use either anionic or cationic starch of opposite charge in the process of Farrar et. al. and Johnson et. al. because Sinclair et. al. teaches such as conventional in improving retention and dewatering properties. Further, the selection merely being a matter of choice, the artisan would have found it obvious to choose the additives based on economy and availability.

This ground of rejection is also respectfully traversed. The Sinclair et. al. reference fails to overcome the deficiencies of Farrar et. al. and Johnson et. al. discussed above. Sinclair et. al. does not teach, disclose or suggest the use of polymer particles having diameters of less than 750 nanometers and, as a result, the combination process would still be devoid of such polymers because those of Farrar et. al. are understood by those skilled in the art to be far greater than 1000 nanometers. In view of the unexpected results shown by the smaller particles, which are clearly far better than one skilled in the art would expect merely as a result of any increased surface area or reactivity, the reference combination is respectfully submitted as failing to teach, disclose or suggest the instant invention. Reconsideration of this ground of rejection is earnestly solicited.

The Langley et. al. Wagberg et. al. and Rushmere references, cited as pertinent to Applicants' disclosure, have been carefully considered but are not seen to

- 8 -

CIBA 038955

anticipate the invention represented by the instant claims. Since these references were not cited against the claims under consideration, further discussion thereof at this time is not deemed to be necessary.

In view of the above Remarks, this application is believed to be in condition for allowance and such action is earnestly requested at an early date.

Respectfully submitted,

Frank M. Van Riet
Attorney for Applicants
Registration# 19933

oc/
A-310431

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231, on _March 26, 1991_
(Date of Deposit)

FRANK M. VAN RIET
Name of Applicant, Assignee, or Registered Representative

Signature
3-26-91
Date of Signature

- 9 -

CIBA 038956

#6/4-2-91

[REV.4Apr89/MB1-1]                    Docket No. 31,043-01
                                                    PATENT

COMBINED DECLARATION AND POWER OF ATTORNEY
(Original,Design,Supplemental,Divisional,Continuation,CIP)

As the below named inventor, I hereby declare that:

TYPE OF DECLARATION

This declaration is of the following type:

    [   ] original

    [   ] design

    [   ] supplemental

    [   ] divisional

    [   ] continuation

    [ X ] continuation-in-part (CIP)

INVENTORSHIP IDENTIFICATION

My residence, post office address and citizenship are as stated
below next to my name, I believe I am the original, first and
sole inventor (if only one name is listed below) or an original,
first and joint inventor (if plural named are listed below) of
the subject matter which is claimed for, for which a patent is
sought on the invention entitled:

TITLE OF INVENTION

Charged Organic Polymer Microbeads in Paper-Making Process


SPECIFICATION IDENTIFICATION

the specification of which: (complete (a), (b), or (c))

    (a) [   ] is attached hereto.

    (b) [ X ] was filed on June 18, 1990    as

        [ X ] Serial Number 07/540,667

        [   ] Express Mail No., as Serial Number not
             yet known

    (c) [   ] was described and claimed in PCT International
        Application No. _____ filed on
        _____ and as amended under PCT
        Article 19 on _____ (if any).

CIBA 038957

[REV.4Apr89/MB1-1]          -2-

### ACKNOWLEDGEMENT OF REVIEW OF PAPERS AND DUTY OF CANDOR

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37 CFR 1.97.

### PRIORITY CLAIM

I hereby claim foreign priority benefits under Title 35, United States Code, Section 119 of any foreign application(s) for patent or inventor's certificate or of any PCT International application(s) designating at least one country other than the United States of America listed below and have also identified below any foreign application(s) for patent or inventor's certificate of any PCT International application(s) designating at least one country other than the United States of America filed by me on the same subject matter having a filing date before that of the application(s) of which priority is claimed.

(d) [ X ] no such applications have been filed.

(e) [    ] such applications have been filed as follows.

Note: Where item (c) is entered above and the International Application which designated the U.S. claimed priority check item (e), enter the details below and make the priority claim.

Earliest Foreign Application(s), if any, filed within 12 months
(6 months for Design) prior to this U.S. Application

| COUNTRY | APPLICATION NUMBER | DATE OF FILING (DAY,MONTH,YEAR) | PRIORITY CLAIMED 35 USC 119 |
|---------|--------------------|----------------------------------|------------------------------|
|         |                    |                                  |                              |
|         |                    |                                  |                              |
|         |                    |                                  |                              |
|         |                    |                                  |                              |

CIBA 038958

[REV.4Apr89/MB1-1]          -3-

All Foreign Application(s), if any, Filed More Than 12 Months
    (6 Months for Design) Prior to This U.S. Application

_____

_____

_____

_____

## POWER OF ATTORNEY

As a named inventor, I hereby appoint the following
attorney(s) and/or agent(s) to prosecute this application and
transact all business in the Patent and Trademark Office
connected therewith.

Frank M. Van Riet_____    19933_____
        (Name)                      (Reg. No.)

Roger S. Benjamin_____    27025_____
        (Name)                          (Reg. No.)

Michael J. Kelly_____    27910_____
        (Name)                          (Reg. No.)

Steven H. Flynn_____    29639_____

[ X ]   Attached as part of this declaration and power of
        attorney is the authorization of the above-named
        attorney(s) to accept and follow instructions from my
        representative(s).

-----------------------------------------------------------

SEND CORRESPONDENCE AND TELEPHONE CALLS TO:
Frank M. Van Riet_____
American Cyanamid Company_____
1937 West Main Street_____
Stamford, CT  06904-0060_____
Telephone No. (203) 321-2614

-----------------------------------------------------------

CIBA 038959

[REV.4Apr89/MB1-1]          -4-

## DECLARATION

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

### SIGNATURE(S)

Full name of SOLE OR FIRST INVENTOR Dan S. Honig

Inventor's signature _Dan S. Honig_____
Date   3/26/91_____
Country of Citizenship United States_____
Residence 12 Conrad Road, New Canaan, CT 06840___
Post Office Address Same_____

Full name of SECOND JOINT INVENTOR, if any Elieth Harris_____

Inventor's signature _Elieth Harris_____
Date   3 | 26 | 91_____
Country of Citizenship Antigua_____
Residence 484 Colorado Avenue, Bridgeport, CT 06605____
Post Office Address Same_____

Full name of THIRD JOINT INVENTOR, if any _____

Inventor's signature _____
Date _____
Country of Citizenship _____
Residence _____
Post Office Address _____

CIBA 038960

[REV.4Apr89/MB1-1]                    -5-

## THE FOLLOWING 'ADDED PAGES' FORM A PART OF THIS DECLARATION

[ X ] Signature for fourth and subsequent joint inventors on
      ADDED PAGES.

[    ] ADDED PAGES TO COMBINED DECLARATION, POWER OF ATTORNEY
       for divisional, continuation, or continuation-in-part (CIP)
       application.

       [ X ] Number of ADDED PAGES: ___1___

       [    ] Declaration ends with this page.

CIBA 038961

[REV.4Apr89/MB1-1]                  -7-

ADDED PAGE TO COMBINED DECLARATION AND POWER OF ATTORNEY FOR
DIVISIONAL, CONTINUATION OR CIP APPLICATION

(complete this only if this is a divisional,
continuation or CIP application)

CLAIM FOR BENEFIT OF EARLIER U.S./PCT APPLICATION(S)
UNDER 35 U.S.C. 120

    I hereby claim the benefit under Title 35, United States
Code, Section 120 of any United States application(s) or PCT
International application(s) designating the United States of
America that is/are listed below and, insofar as the subject
matter of each of the claims of this application is not disclosed
in that/those prior application(s) in the manner provided by the
first paragraph of Title 35, United States Code, Section 112, I
acknowledge the duty to disclose material information as defined
in Title 37, Code of Federal Regulations, Section 1.56(a) which
occurred between the filing date of the prior application(s) and
the national or PCT International filing date of this
application.

| PRIOR U.S. APPLICATIONS OR PCT INTERNATIONAL APPLICATIONS DESIGNATING THE U.S. FOR BENEFIT UNDER 35 USC 120 | | | | | |
|---|---|---|---|---|---|
| U.S. APPLICATIONS | | | STATUS (check one) | | |
| U.S. APPLICATIONS | U.S. FILING DATE | | patented | pending | abandoned |
| 1. Serial Number 07/536,382 | June 11, 1990 | | | | X |
| 2.  / | | | | | |
| 3.  / | | | | | |
| PCT APPLICATIONS DESIGNATING U.S. | | | | | |
| PCT APPIN. NO. | PCT FILING DATE | U.S. SERIAL NOS ASSIGNED (if any) | | | |
| 4. | | / | | | |
| 5. | | / | | | |
| 6. | | / | | | |

CIBA 038962



MAIL ROOM
88 MAR 28 1991
PAT. & TRADEMARK OFF.

CIBA 038963



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/540,667 | 06/18/90 | HONIG | | 31-043-01 |

EXAMINER
FRIEDMAN, C

FRANK M. VAN RIET
C/O AMERICAN CYANAMID COMPANY
1937 WEST MAIN STREET
STAMFORD, CT 06904-0060

| ART UNIT | PAPER NUMBER |
|---|---|
| 133 | 7 |

DATE MAILED: 06/26/91

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined ☒ Responsive to communication filed on _3-28-91 (Amdt)_ ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _3_ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner, PTO-892.    2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.    4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.    6. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☒ Claims _1-42_ are pending in the application.
   Of the above, claims _15-25 and 41_ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _1-14, 26-40, and 42_ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
    are ☐ acceptable; ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____, has (have) been ☐ approved by the
    examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____ ; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

PTOL-326 (Rev.9-89)

CIBA 038964

Serial No. 07/540667                          -2-

Art Unit  133

Restriction to one of the following inventions is required
under 35 U.S.C. § 121:

I.   Claims 1-14 and 40, drawn to a method of making paper,
classified in Class 162, subclass 168.3.

II.  Claims 15-25 and 41, drawn to a composition of matter,
i.e. microbeads, classified in Class 252, subclass 351.

The inventions are distinct, each from the other because of
the following reasons:

Inventions Group II and Group I are related as product and
process of use.  The inventions can be shown to be distinct if
either or both of the following can be shown: (1) the process for
using the product as claimed can be practiced with another
materially different product or (2) the product as claimed can be
used in a materially different process of using that product
(M.P.E.P. § 806.05(h)).  In the instant case the product as
claimed can be used in a materially different process such as one
that does not require papermaking, e.g. making cement.

Because these inventions are distinct for the reasons given
above and have acquired a separate status in the art as shown by
their different classification and because of their recognized
divergent subject matter restriction for examination purposes as
indicated is proper.

It is noted that the applicant has elected to prosecute the
invention of Group I, along with which product by process claims

CIBA 038965

Serial No. 07/540667                           -3-

Art Unit   133

26-39 and 42 are examinable.

Applicant correctly points out that different classifications do not alone establish separate and restrictable inventions; however, the different classifications demonstrate the burden on the examiner of searching the composition along with the method of using it.

Claims 12 and 37 are rejected under 35 U.S.C. § 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

There is no antecedent basis for "species" as recited in claim 12.

Applicant's argument that the references cited in the previous office action do not teach the critical limitation of the particle size of the microbead is noted. Accordingly, the 35 U.S.C. § 103 rejections in the previous action have been reconsidered and new rejections formulated.

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section
> 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such that
> the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary
> skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which

CIBA 038966

Serial No. 07/540667                    -4-

Art Unit  133

the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

This application currently names joint inventors.  In considering patentability of the claims under 35 U.S.C. § 103, the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary.  Applicant is advised of the obligation under 37 C.F.R. § 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of potential 35 U.S.C. § 102(f) or (g) prior art under 35 U.S.C. § 103.

Claims 1-3, 5, 7, 8, 10-14, 26-28, 30, 32, 33, 35-40, and 42 are rejected under 35 U.S.C. § 103 as being unpatentable over Probst etal either alone or in view of Johnson etal.

Probst teaches a cationic polymer for addition to paper as a sizing agent. He teaches that the polymers, i.e. microbeads are 20-150 nm (column 5, lines 2-6). Probst does not teach if the microbead is cross-linked; however, it would have been an obvious matter of choice based on the availability, cost, and effectiveness of cross-linked versus non-cross-linked microbeads. At column 8, lines 58-62 Probst teaches mixing a solution of starch (a cationic polymer) with the sizing agent. The addition of the claimed amounts of microbeads and starch (cationic polymer) is conventional to enhance drainage and retention properties, and it would have been obvious for one to utilize the

CIBA 038967

Serial No. 07/540667                                    −5−

Art Unit  133

claimed amounts to achieve such.  Finally, it would have been
obvious to add a size or strength additive to the paper furnish
to increase the desirability of the final product.

To further support the above discussion, the teachings of
Johnson are considered.  Johnson teaches improving retention and
dewatering properties of paper by adding .1-.15% of a binder of a
cationic starch (a high molecular weight ionic polymer), an
anionic polymer of acrylamide and a dispersed silica to the
headbox of a papermaking machine (column 1, lines 15-16 and 41,
column 2, lines 15-24, and column 3, lines 50-52).  At Figures 3
and 4 Johnson teaches the use of all components within the range
of the presently claimed amounts.  The use of alum is shown to
increase drainage and retention (shown in Figure 4 as decreased
turbidity).  It would have been obvious to one of ordinary skill
in the art to add cationic starch and alum in the claimed amounts
to the microbeads of Probst to further improve the drainage and
retention properties because Johnson teaches that such improves
drainage.

Rejection of the method claims necessarily precludes
patentability of the product by process claims.  Compare in re
Thorpe, 227 USPQ 964 (CAFC 1985).

Claims 4, 6, 9, 29, 31, and 34 are rejected under 35 U.S.C.
§ 103 as being unpatentable over Probst etal either alone or in
view of Johnson as applied to claims above, and further in view

CIBA 038968

Serial No. 07/540667                              -6-

Art Unit    133

of Sinclair etal.

To further support the above noted teachings of a high molecular weight polymer, it is noted that Sinclair teaches starches as the cationic polymer in a process to provide paper with improved properties. Sinclair teaches that starch (polysaccharide) or another polymer can be used as either a cationic or anionic polymer and the acrylamide, i.e. microbead, can be selected in either ionicity such that the two polymers have opposite charges (see column 8, lines 24-44).

It would have been obvious to the skilled artisan to use either anionic or cationic starch (high molecular weight polymer) of opposite charge in the process of Probst either alone or taken with Johnson because Sinclair teaches such as conventional in improving retention and dewatering properties. Further, the selection being merely a matter of choice, the skilled artisan would have found it obvious to choose the additives based on economy and availability. It is noted, as above, that rejections of the paper product claims necessarily follow from the rejection of the process claims.

Any inquiry concerning this communication should be directed to Charles Friedman at telephone number (703) 308-0477.

*CKF*
Charles K. Friedman

June 11, 1991

*R.W. Fisher*
RICHARD V. FISHER
SUPERVISORY PATENT EXAMINER
ART UNIT 133
6-26-91

CIBA 038969

AND BOTTOM EDGES, SNAP—APART AND DISCARD CARBON

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 540667 | GROUP ART UNIT 133 | ATTACHMENT TO PAPER NUMBER | 7 |
|---|---|---|---|---|---|
| | NOTICE OF REFERENCES CITED | APPLICANT(S) | | | |

### U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|
| A | 4 6 5 9 4 3 1 | 4/87 | Probst et al | 162 | 168.2 | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |
| F | | | | | | |
| G | | | | | | |
| H | | | | | | |
| I | | | | | | |
| J | | | | | | |
| K | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG. | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|
| L | | | | | | | | |
| M | | | | | | | | |
| N | | | | | | | | |
| O | | | | | | | | |
| P | | | | | | | | |
| Q | | | | | | | | |

### OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | |
| S | |
| T | |
| U | |

| EXAMINER Charles K. Friend | DATE 6-11-91 |
|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

CIBA 038970

# United States Patent [19]

Probst et al.

[11] Patent Number: 4,659,431

[45] Date of Patent: Apr. 21, 1987

[54] CATIONIC SIZING AGENT FOR PAPER, AND A PROCESS FOR ITS PREPARATION

[75] Inventors: Joachim Probst, Leverkusen; Ulrich Beck, Bornheim; Heinz Bäumgen, Leverkusen, all of Fed. Rep. of Germany

[73] Assignee: Bayer Aktiengesellschaft, Leverkusen, Fed. Rep. of Germany

[21] Appl. No.: 691,991

[22] Filed: Jan. 16, 1985

[30] Foreign Application Priority Data

Jan. 18, 1984 [DE] Fed. Rep. of Germany ...... 3401573

[51] Int. Cl.$^4$ ........................... D21H 3/38
[52] U.S. Cl. ...................... 162/168.2; 162/158; 162/169; 524/538; 524/829
[58] Field of Search .............. 162/164.6, 168.1, 168.3, 162/168.2, 169, 168.7, 158; 524/538, 829, 460

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,152,201 | 5/1979 | Killiam | 162/168.2 |
| 4,200,562 | 4/1980 | Yoshioka et al. | 162/168.7 |
| 4,434,269 | 2/1984 | Probst | |

FOREIGN PATENT DOCUMENTS

3103917 8/1982 Fed. Rep. of Germany ... 162/164.6

Primary Examiner—Peter Chin

Attorney, Agent, or Firm—Sprung Horn Kramer & Woods

[57] ABSTRACT

New, highly effective cationic sizing agents for paper have been provided. They can be obtained by a method in which a water-soluble cationic chemically pure terpolymer compound consisting of

(a) 7–40% by weight of N,N-dimethylaminoethyl acrylate and/or methacrylate,
(b) 40–80% by weight of styrene and
(c) 4–40% by weight of acrylonitrile

is dissolved in an aqueous medium, the sum of the components (a) to (c) always being 100% by weight and at least 10% of the N,N-dimethylamino groups of the terpolymer being quaternized and the remainder being protonated, and, in the presence of 10 to 70% by weight, relative to the monomer mixture below, of this emulsifier,

(d) 0 to 90% by weight of acrylonitrile and/or methacrylonitrile,
(e) 5 to 95% by weight of styrene and
(f) 5 to 95% by weight of acrylates and/or methacrylates having 1 to 12 C atoms in the alcohol radical,

the sum of the components (d) to (f) always being 100% by weight, are emulsified, and the emulsion thus obtained is subjected to free radical-initiated emulsion polymerization at temperatures from 20° to 150° C.

8 Claims, No Drawings

CIBA 038971

4,659,431

1

## CATIONIC SIZING AGENT FOR PAPER, AND A PROCESS FOR ITS PREPARATION

The present invention relates to aqueous colloidal paper sizing agents based on copolymers of acrylonitrile and/or methacrylonitrile, styrene and acrylates or methacrylates, which are polymerised in the presence of, as emulsifiers, chemically pure, quaternised terpolymers of N,N-dimethylaminoethyl(meth)acrylate, styrene and acrylonitrile.

It has been disclosed (see German Offenlegungsschrift No. 1,621,688) that cationic paper sizing agents can be prepared by mixing an aqueous solution of a polycation, present in salt form and based on maleic anhydride and other comonomers, with an aqueous emulsion homopolymer or emulsion copolymer. However, the mixtures prepared in this manner are in general unstable and tend to deposit sediment which are troublesome in the manufacture of paper, since this can, inter alia, result in inhomogeneous sizing of the paper.

German Offenlegungsschrift No. 2,814,527 describes the preparation of a sizing agent for paper, which has been prepared in the presence of a polymeric cationic emulsifier which is quaternised with an epihalohydrin and consists of an N,N-dimethylaminoalkyl(meth)acrylate and substituted or unsubstituted styrene, if appropriate with the addition of an auxiliary emulsifier of the formula

$$R-O-(CH_2-CH_2-O)_n SO_3^\ominus M^\oplus \qquad (I)$$

wherein

R denotes a higher aliphatic or cycloaliphatic hydrocarbon radical,

$M^\oplus$ denotes a monovalent metal cation or ammonium and

n denotes an integer $\geqq 2$.

In the presence of special polymeric emulsifiers, hydrophobic monomers, such as styrene, styrene derivatives, acrylates and/or methacrylates are polymerised in an aqueous medium. In a preferred embodiment, a mixture of 23.5% by weight of dimethylaminoethyl methacrylate and 76.5% by weight of styrene in isopropanol is polymerised. Thereafter, the mixture is acidified with acetic acid, and the product is dissolved in water and then quaternised with epichlorohydrin at a temperature of 80° to 85° C. The emulsifiable polycation prepared in this manner is then employed for the aqueous emulsion polymerisation of a mixture of styrene and 2-ethylhexyl acrylate (weight ratio 3:1), the weight ratio of the emulsifier to the monomer mixture being 1:2. A compound (I) in which $M = NH_4$ is employed as an anionic auxiliary dispersant, and aqueous hydrogen peroxide is employed as an initiator. The polymers thus obtained constitute dispersions which are optically cloudy but nevertheless relatively stable. However, if it is desired to reduce the content of basic monomers in the polymeric cationic emulsifier component to 20% by weight or less, the dispersions very rapidly become more coarse-particled and more unstable, and tend to precipitate polymer. The polymer precipitates produced generally result in a substantial deterioration in the sizing effect and lead to breakdowns in the course of operations during paper production.

European Patent Specification No. 0,058,313 describes stable colloidal solutions which are generally translucent and in which acrylonitrile or methacrylonitrile is polymerised with acrylates or methacrylates in

2

the presence of special polymeric cationic emulsifiers in an aqueous system. These emulsifiers are quaternisation products of terpolymers which are chemically very pure, consist of N,N-dimethylaminoethyl(meth)acrylate, styrene and acrylonitrile and contain not more than 40% by weight of basic comonomer. The mean particle diameter of these colloidal solutions is between 15 and 200 nm, preferably between 20 and 150 nm. A disadvantage of these colloidal sizing agents is the fact that their efficiency on special grades of paper, such as, for example, the so-called low-quality papers, is not completely satisfactory. These low-quality papers are grades of old paper which are obtained mainly from waste cardboard and newspaper and once again processed to cardboards. They are generally employed as so-called liners, which have to be treated with starch and cationic surface-sizing agents in order to attain high strength and water-repellant properties.

Surprisingly, it has now been found that stable colloidal paper sizing agents which are extremely effective for low-quality paper are obtained when either mixtures of (meth)acrylonitrile, styrene and acrylates or methacrylates, or mixtures of styrene and acrylates or methacrylates, are polymerised in the presence of the above-mentioned chemically pure quaternised terpolymers.

The paper sizing agent according to the invention is obtained as a colloidal solution having mean particle diameters of 15 to 200 nm, by a method in which a water-soluble cationic chemically pure terpolymer compound consisting of

(a) 7 to 40, preferably 8 to 30, % by weight of N,N-dimethylaminoethyl acrylate and/or methacrylate,

(b) 40 to 80% by weight of styrene and

(c) 40 to 40, preferably 5 to 35, % by weight of acrylonitrile

is dissolved in an aqueous medium, the sum of the components (a) to (c) always being 100% by weight and at least 10% of the N,N-dimethylamino groups of the terpolymer being quaternised and the remainder being protonated, and, in the presence of 10 to 70% by weight, relative to the monomer mixture below, of this emulsifier,

(d) 0 to 90, preferably 0 to 70, % by weight of acrylonitrile and/or methacrylonitrile,

(e) 5 to 95, preferably 10 to 80, % by weight of styrene and

(f) 5 to 95, preferably 10 to 80, % by weight of acrylates and/or methacrylates having 1 to 12 C atoms in the alcohol radical,

the sum of the components (d) to (f) always being 100% by weight, are emulsified, and the emulsion thus obtained is subjected to free radical-initiated emulsion polymerisation at temperatures from 20° to 150° C.

Preferably, the weight ratio of the polymeric cationic emulsifier to the monomer mixture consisting of (d), (e) and (f) is 1:4 to 1:1.

The paper sizing agent according to the invention is also obtained when, in addition to the stated cationic emulsifier, a cationic and/or non-ionic auxiliary emulsifier is employed in amounts of 1 to 40% by weight, preferably 3 to 20% by weight, relative to the above cationic emulsifier, the non-ionic emulsifier being of the formula

$$R_1-X-(CH_2-CH_2-O)_m-H \qquad (III)$$

wherein

CIBA 038972