--1. (Amended)  A composition comprising cross-linked anionic or amphoteric polymeric microparticles derived solely from water-soluble monomers, said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1. mPa.s, [and] a cross-linking agent content of above about 4 molar parts per million, based on the monomeric units present in the polymer, and an ionicity of at least about [5%] 5 mole percent--.

Claim 5, line 6, cancel the word "aldehydes".

Claim 10, line 2, cancel the word "cationic" and substitute therefor the word --anionic--.

## Remarks

The Examiner has required restriction to one of the following inventions under 35 USC 121:

Group I, claims 1-13, drawn to polymers and classified in Class 526; Subclass 264.

Group II, Claims 14-22 drawn to a process and classified in Class 522; Subclass 184.

Inventions I and II are related as process of making and product made, the Examiner explains, and are distinct if either or both of the following can be shown:  (1) that the process, as claimed, can be used to make another and materially different product or (2) that the product, as claimed, can be made by another and materially different process.  In the instant case, the Examiner contends, the process, as claimed, can be used to make a materially different product such as polymer dispersion stabilizer.

Because the Inventions are therefore distinct, and have acquired a separate status in the art as shown by their different

- 2 -

CIBA 038179

classification, the restriction for examination purposes has been indicated as proper.

The requirement for restriction is strenuously urged as improper. Contrary to the Examiner's contention, it is not seen how the process of Invention II can be used to make a materially different product than represented by Invention I in that the process, of necessity, must make a polymer and the polymer, of necessity, must be that of Invention I. The fact that the polymer may be a polymer dispersion stabilizer is irrelevant. It will still be the polymer represented by Claims 1-13 and thus will not be a materially different product.

Additionally, ex parte Coe 1889 CD 191 and U.S. ex rel. Steinmetz v. Allen 1904 CD 703 clearly establish that a separation of classification is not determinative of the separateness of invention. Reconsideration of the requirement for restriction is therefore earnestly solicited.

In order to comply with the requirement, however, Applicants hereby acknowledge their previous telephonic election of Invention I i.e. Claims. 1-13. Retention of non-elected Claims 14-22, withdrawn from further consideration, in the application for the purpose of filing a subsequent divisional application or appeal is respectfully requested.

The specification has been objected to under 35 USC 112, first paragraph, as failing to provide an adequate written description of the invention.

This objection is not understood in that the Examiner has not expressed any reasons why the specification is insufficient. Applicants have carefully considered the specification and find no reason why it does not contain such full, clear, concise and exact terms as to enable any person

- 3 -

CIBA 038180

skilled in the art to which it pertains to make and use the same. Clarification of this objection is respectfully requested.

Claim 5 has been rejected under 35 USC 112, first paragraph, the Examiner stating that the claim contains the term "aldehydes" which is generic to the terms "acrolein" and "glyoxal" which are species.

This rejection has been overcome by the instant amendment, as suggested by the Examiner, by cancellation of the term "aldehydes", which compounds, however, are still clearly included in the generic claims as a possible cross-linking agent.

Claim 10 has been rejected under 35 USC 112, first paragraph, the Examiner questioning whether the claim involves a cationic or an anionic monomer, the compounds listed being anionic.

This ground of rejection has been overcome by the instant amendment in that the term "cationic" has been replaced by the term --anionic--, as obviously intended. The error is regretted.

Claims 8 and 12 have also been rejected under 35 USC 112, first paragraph, in that they involve non-ionic monomers, the Examiner questioning how they can be expected to produce polymers with an ionicity of at least about 5 mole percent.

This ground of rejection is respectfully traversed. All that is required by Claims 8 and 12 is that a non-ionic monomer be present in the final polymer composition. Since Claims 8 and 12 are dependent upon Claim 1 and Claim 1 requires that the polymer composition have an ionicity of at least about 5 mole percent, it is believed to be clear that the polymer must also be additionally composed of either anionic or anionic and cationic monomer(s). Thus, Claims 8 and 12 cover anionic or

- 4 -

CIBA 038181

amphoteric polymer compositions which are also produced from a non-ionic monomer, e.g. acrylamide, see Example 1 vis-a-vis Example 3. Reconsideration of this rejection is earnestly solicited.

Claims 1-13 have been rejected under 35 USC 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which Applicants regard as the invention, the Examiner stating that the term "ionicity" is not defined, thus making the claims vague and indefinite since when "percentage" is mentioned, there is no designation of the basis therefor.

This ground of rejection has been overcome by the instant amendment whereby the ionicity of the polymer composition, both in the specification at page 5 and the claims, has been indicated as a "mole percentage". Basis for this limitation can be found in Table I, page 13, and Table III, page 17, see, for example, Example 25. Withdrawal of this ground of rejection is respectfully requested.

Claims 1-4, 7-10, 12 and 13 have been rejected under 35 USC 102(b) as anticipated by or, in the alternative, under 35 USC 103, as obvious over, Durand etal, the Examiner stating that Durand etal, in Example 1, discloses anionic, organic, polymeric microparticles by polymerizing sodium acrylate and acrylamide in the presence of polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate. Since the oleate contains a double bond, the Examiner argues that it is reasonable to expect the oleate to function to some degree as a cross-linking agent in addition to being a surfactant. Specifically, the Examiner continues, Example 2 reports the viscosity of the polymer to be 1.30 $mm^2$/s while col. 3, line 67 mentions that particles of a radius of 20-40 nanometers result. Since 20.7g of acrylic acid was used to

- 5 -

CIBA 038182

produce 82.0g of copolymer, the Examiner indicates that the weight percent of acrylate ion was about 25%.

This ground of rejection is respectfully traversed. The Durand etal, reference has been carefully considered but is not seen to teach, disclose or suggest the instant invention. Durand etal fail to indicate the incorporation of a cross-linking agent into the polymer produced therein. Only sodium acrylate and acrylamide are used. The Examiner apparently recognizes the deficiency of Durand etal in that he points out that the oleate surfactants of Durand etal contain an unsaturated group and thus would reasonably be expected to function as a cross-linker. This assumption is erroneous in that the oleates of Durand etal are monounsaturated and if any reaction thereof with the acrylamide and/or acrylate were to occur it would occur linearly because a cross-linking agent must contain two functional groups to act as such, see page 7, lines 11-26 of the instant specification. Thus, the particulate polymer compositions produced by Durand etal clearly do not anticipate the instant claims in the sense of ·'5 USC 102.

Durand etal also fails to render the instant invention obvious in that the particles of Durand etal clearly would not function as do the instant compositions. In this regard, the Examiner's attention is respectfully directed to Table II of the instant specification. As can be seen, Example 7 is representative of a polymer produced in the absence of cross-linking agent i.e. it is linear, see page 16, line 2, as is that of Durand etal. The cross-linked polymer compositions, while beneficial, are clearly outclassed by the Applicants' compositions as represented by Examples 8-19. It is Applicants' position that it would not be expected from a perusal of the Durand etal application that the use of a cross-linking agent in

- 6 -

CIBA 038183

the preparation of the instant compositions would result in compositions which function in a manner unexpectedly superior to those produced in the absence of a cross-linking agent. Reconsideration of this ground of rejection is earnestly solicited.

Claims 1-5, 7-9 and 12 have been rejected under 35 USC 102(b) as anticipated by, or, in the alternative, under 35 USC 103, as obvious over, Maklhouf etal, the Examiner stating that Maklhouf etal discloses a composition comprising cross-linked, organic, polymeric microparticles having particle sizes of from 0.1-10 microns, at least one monomethylenically unsaturated monomer and a cross-linking agent being used. The cross-linking agent can be an epoxy-group containing compound like glycidyl methacrylate, the Examiner continues, and the unsaturated monomers include acrylic acid.

This ground of rejection has been overcome the instant amendment whereby Claim 1 has been rewritten to include the limitation that the polymers hereof are produced solely from water-soluble monomers. Basis for this limitation can be found in the specification at page 3, line 1 et seq. and all the Examples wherein, it can be seen, only water-soluble monomers are disclosed. The polymers of Maklhouf etal contain only 0.5-15% of water-soluble monomer, the remaining 70-99% being water-insoluble monomer, see col 2, linear 41-63. Furthermore, although Maklhouf etal disclose a particle diameter range which overlaps the maximum particle size diameter of Applicants, it is strenuously urged that Maklhouf etal do not produce particles where the number average particle size is only below 0.75 microns. The compositions of Maklhouf etal are particles of all diameters from 0.1-10 microns as is recognized in the art where this type of dispersion polymerization is used in the polymer production. All

- 7 -

CIBA 038184

of Applicants' particles fall within the claimed range whereas only some of the composition of Maklhouf etal fall within said range.

Furthermore, as discussed above, the compositions of the instant invention have been shown to be unexpectedly superior to closely related compositions and thus, are clearly unobvious over the teachings of Maklhouf etal.

Claims 1-4,7, 9-11 and 13 have also been rejected under 35 USC 102(b), as anticipated by, or, in the alternative, under 35 USC 103, as obvious over, Silver, the Examiner stating that Silver discloses acrylate copolymer microspheres of at least one alkyl acrylate ester and one ionic monomer or maleic anhydride. Ionic monomers listed include both anionics and cationics, the Examiner continues, the lower limit of the particle size being one micron which is very close to, or within experimental error, of the claimed 0.75 micron maximum.

This ground of rejection has also been overcome by the instant amendment whereby Claim 1 has been limited to polymer compositions produced solely from water-soluble monomers. The arguments applied to Maklhouf etal above also apply to Silver which also fails to teach the use of water-soluble monomers alone and produces polymer particles of a range too large to fall within those claimed herein, a 25% differential in size being considered more than within experimental error. Silver, in fact, indicates that a smaller particle size is undesirable, see col 4, lines 23-27. From 90-99.5% of the Silver compositions are made from water-insoluble monomers, see col 1, lines 45-52. Additionally, no cross-linking agent is employed and no suggestion can be found that the unexpected results, shown in Table II hereof, can be achieved. Accordingly, reconsideration of this ground of rejection is also strenuously urged.

- 8 -

CIBA 038185

Claim 5 has been rejected under 35 USC 102(b), as anticipated by, or, in the alternative, under 35 USC 103, as obvious over, Leong etal, the Examiner stating that Leong etal disclose cross-linked polyacrylamide latices or microgels which are prepared using a mixture of acrylamide and ethylene bisacrylamide, the sizes of the latices being less than 500A in diameter.

This ground of rejection is also respectfully traversed. Leong etal is acknowledged in Applicants' specification as prior art over which the instant invention is a patentable improvement. Leong etal fails to include an ionic monomer in the polymerization taught therein and thus, the polymer compositions produced therein do not contain the 5 mole percent ionicity required by the instant claims. Nor are the instant claims obvious therefrom in view of the unexpectedly superior results achieved as shown in Applicants' specification. Withdrawal of this ground of rejection is also earnestly solicited.

It is noted that the Examiner failed to include Claim 6 in any of the above-discussed rejections. It is therefore assumed that Claim 6 contains allowable subject matter. Confirmation of this assumption is hereby requested from the Examiner.

In view of the above Remarks, this Application is believed to be in condition for allowance and such action is earnestly requested at an early date.

Respectfully submitted,

*Frank M. Van Riet*

Attorney for Applicants
Frank M. Van Riet
Registration# 19933

oc/
AM-31320

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231, on _January 7, 1991_
(Date of Deposit)

FRANK M. VAN RIET

Name of Applicant, Assignee, or Registered Representative

*Frank M. V...*

Signature

1-7-91

Date of Signature

- 9 -

CIBA 038186

HPD



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/535,626 | 06/11/90 | RYLES | | R 31,320 |

| | | EXAMINER |
|---|---|---|
| | | CHENG,W |

FRANK M. VAN RIET
C/O AMERICAN CYANAMID CO.
1937 WEST MAIN STREET
STAMFORD, CT 06904-0060

| ART UNIT | PAPER NUMBER |
|---|---|
| 155 | |

DATE MAILED: 04/11/91

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined    ☒ Responsive to communication filed on _1-10-91_    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire __3__ month(s), ___ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I** THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.       2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.             4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.  6. ☐ _____

**Part II** SUMMARY OF ACTION

1. ☒ Claims _1 - 22_ _____ are pending in the application.

Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _1 - 22_ _____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
are ☐ acceptable; ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____, has (have) been ☐ approved by the
examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

PTOL-326 (Rev.9-89)

CIBA 038187

TO SEPARATE, H??? TOP AND BOTTOM EDGES, SNAP-APART AND ??? CARD CARBON

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 07/535 626 | GROUP ART UNIT 155 | ATTACHMENT TO PAPER NUMBER 5 |
|---|---|---|---|---|
| | NOTICE OF REFERENCES CITED | APPLICANT(S) R. G. Ryles, D. S. Honig, E. W. Harris, and R. E. Neff | | |

### U.S. PATENT DOCUMENTS

| | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| A | | 4 7 0 5 6 4 0 | 11-10-87 | Whittaker | 210 | 733 | |
| B | | 4 9 6 8 4 3 5 | 11-6-90 | Neff et al. (effective filing date was 12-19-88) | 210 | 734 | |
| C | | | | | | | |
| D | | 4 6 8 1 9 1 2 | 7-21-87 | Durand et al. | 524 | 827 | |
| E | | | | | | | |
| F | | | | | | | |
| G | | | | | | | |
| H | | | | | | | |
| I | | | | | | | |
| J | | | | | | | |
| K | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|
| L | | | | | | | | |
| M | | | | | | | | |
| N | | | | | | | | |
| O | | | | | | | | |
| P | | | | | | | | |
| Q | | | | | | | | |

### OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | |
| S | |
| T | |
| U | |

| EXAMINER CHENG, W. C. | DATE 4-4-91 |
|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

CIBA 038188

# United States Patent [19]

## Durand et al.

[11]  Patent Number:  4,681,912

[45]  Date of Patent:  Jul. 21, 1987

[54]  PROCESS FOR MANUFACTURING INVERSE MICROLATICES OF WATERSOLUBLE COPOLYMERS, THE RESULTANT INVERSE MICROLATICES AND THEIR USE FOR IMPROVING THE PRODUCTION OF HYDROCARBONS

[75]  Inventors:  Jean-Pierre Durand, Chatou; Denise Nicolas, Maurepas; Norbert Kohler, Saint Germain en Laye; Francois Dawans, Bougival; Françoise Candau, Strasbourg, all of France

[73]  Assignee:  Institut Francais du Petrole, Rueil-Malmaison, France

[21]  Appl. No.:  742,445

[22]  Filed:  Jun. 7, 1985

[30]  Foreign Application Priority Data

Jun. 7, 1984 [FR] France ................. 84 08906
Jun. 7, 1984 [FR] France ................. 84 08907

[51]  Int. Cl.$^4$ ....................................... C08J 0/00
[52]  U.S. Cl. ...................... 524/827; 524/829; 524/831
[58]  Field of Search ............ 524/827, 829, 831

[56]  References Cited

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 28,474 | 7/1974 | Anderson et al. | 523/336 |
| 3,284,393 | 11/1966 | Vanderhoff et al. | 526/207 |
| 3,826,771 | 7/1974 | Anderson et al. | 524/817 |
| 4,021,399 | 5/1977 | Hunter et al. | 524/827 |
| 4,022,731 | 5/1977 | Schmitt | 524/166 |
| 4,070,321 | 1/1978 | Goretta et al. | 524/829 |
| 4,077,930 | 3/1978 | Lim et al. | 524/829 |
| 4,147,681 | 4/1979 | Lim et al. | 524/831 |

| | | | |
|---|---|---|---|
| 4,242,247 | 12/1980 | Pellon et al. | 260/29.6 |
| 4,330,450 | 5/1982 | Lipowski et al. | 524/547 |
| 4,435,528 | 3/1984 | Domina | 524/827 |
| 4,464,508 | 8/1984 | Easterly, Jr. | 524/801 |
| 4,521,317 | 6/1985 | Candau et al. | 252/8.55 D |
| 4,524,175 | 6/1985 | Stanley, Jr. | 524/831 |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0074661 | 3/1983 | European Pat. Off. | 524/831 |
| 0119078 | 9/1984 | European Pat. Off. | 524/831 |
| 2354006 | 5/1975 | Fed. Rep. of Germany . | |
| 0841127 | 7/1960 | United Kingdom | 524/801 |
| 2093464 | 9/1982 | United Kingdom | 524/827 |
| 2118200 | 10/1983 | United Kingdom | 524/827 |
| 2140433 | 11/1984 | United Kingdom | 524/831 |

Primary Examiner—Joseph L. Schofer
Assistant Examiner—J. M. Reddick
Attorney, Agent, or Firm—Millen & White

[57]  ABSTRACT

By a new process, inverse microlatices of watersoluble copolymers are prepared by copolymerization within an inverse microemulsion obtained by admixing an aqueous phase containing the hydrosoluble monomers to be copolymerized, an organic phase and a non-ionic surfactant or a mixture of non-ionic surfactants, whose H L B ranges from 8 to 11.

The resultant microlatices can be diluted in water so as to form thickened solutions, which can be used to improve the production of hydrocarbons from oil formations, particularly in enhanced recovery methods or methods for preventing water inflows in producing wells.

13 Claims, 1 Drawing Figure

CIBA 038189

**U.S. Patent**          Jul. 21, 1987          **4,681,912**



CIBA 038190

4,681,912

1

## PROCESS FOR MANUFACTURING INVERSE MICROLATICES OF WATERSOLUBLE COPOLYMERS, THE RESULTANT INVERSE MICROLATICES AND THEIR USE FOR IMPROVING THE PRODUCTION OF HYDROCARBONS

The invention relates to a process for manufacturing inverse microlatices by copolymerization, in an inverse microemulsion, of at least two hydrosoluble vinyl monomers, and to the inverse microlatices obtained by this process by "hydro-soluble" is meant "water-soluble" throughout.

It also concerns the use of these inverse microlatices in the preparation of thickened aqueous solutions for improving the production of hydrocarbons.

### BACKGROUND OF THE INVENTION

The energy crisis has led to the development of numerous surveys in order to recover a maximum amount of the oil present in the fields. Among the various considered methods, one of them consists of flooding the oil field by means of an injection of salt water in order to force petroleum out of the pores of the rock where it is adsorbed. However, the difference in mobility between oil and water considerably reduces the efficiency of said method. In order to improve this technique, it is known to thicken the injection water by means of hydrosoluble polymers, such as partially hydrolized polyacrylamides, acrylamide-sodium acrylate copolymers or polysaccharides.

On the other hand, it has been found that aqueous solutions, thickened by means of polymers, injected in wells simultaneously producing water and oil, limit the water production sufficiently without changing the oil production. However, the use of hydrosoluble polymers under actual conditions of use on the field, is often a delicate operation. As a matter of fact, the handling, storing and dissolution of polyacrylamides, as powder, gives rise to certain problems, particularly those due to absorption of moisture causing, formation of agglomerates, whose dissolution is time-consuming.

For this reason, new modes of conditioning hydrosoluble polymers have been proposed, particularly with inverse latices offering as a rule, all the advantages associated with liquids handling. In this connection U.S. Pat. Nos. 3,284,393, 3,624,019, 3,826,771 and 4,022,731, as well as German patent application No. DE-A-2.554.082 and British Pat. No. 2.030.578, are of particular interest.

In the formulations disclosed in these documents, the surfactant is most often selected from non-ionic surfactants having a low HLB (Hydrophilic Lipophilic Balance), providing a water-in-oil emulsion. It consists usually of a sorbitan monooleate or monostearate. On the other hand, it has been stated that certain surfactants of higher HLB are also liable to give water-in-oil emulsions (French Pat. No. 2 245 671).

However, inverse latices obtained according to the prior art methods suffer from different disadvantages, particularly an instability which results in a strong tendency to settle and in the requirement of intense and delicate shearing during their dissolution in aqueous phase, i.e. during their inversion.

More recently, it has been proposed to use inverse microlatices of hydrosoluble polymers of improved stability (French patent application No. 2 524 895),

2

prepared by using anionic or cationic surface-active agents.

### SUMMARY OF THE INVENTION

A new process for preparing stable, transparent inverse microlatices, of hydrosoluble copolymers, using certain proportions of non-ionic surfactants and resulting in increased contents of copolymers, has now been discovered. This is of particular interest in view of the use of these microlatices to form thickened solutions used for improving the production of oil fields.

The microlatices prepared by the process of the invention further have the advantage of being auto-inversable.

The process for manufacturing inverse microlatices according to the invention is generally defined by the following steps of:

(a) preparing a microemulsion (stable and transparent) of the water-in-oil type, by admixing:

(i) an aqueous solution of the acrylic monomers to be copolymerized with

(ii) an oily phase, comprising at least one hydrocarbon liquid,

(iii) in the presence of at least one non-ionic surfactant whose HLB value ranges from 8 to 11 (when using a mixture of surfactants, the resultant HLB is considered).

(b) subjecting the obtained inverse microemulsion of step (a) to polymerization conditions up to complete polymerization and production of a stable, transparent, inverse microlatex of high molecular weight (the term transparent also meaning translucent).

It will be recalled that an emulsion is a diphasic, turbid, unstable medium. Under stirring, particles, dispersed either in water or in oil, are observed which have a wide size distribution about an average value of the order of a micron. When polymerizing an emulsion, the polymer is dispersed in the large emulsion drops (diameter of about 1 to 10 microns) as well as in the small emulsifier micelles (diameter of about 5 to 10 nm).

A microemulsion is also formed of two liquids insoluble in each other and a surfactant, but, in contrast with the emulsion, the mere mixture of the constituents gives, without any agitation, a transparent or translucent thermodynamically stable medium.

In the formulations of inverse microemulsions leading to the microlatices of the invention, the aqueous phase contains at least two hydrosoluble acrylic monomers: on the one hand, acrylamide and/or methacrylamide and, on the other hand, at least another acrylic monomer selected from acrylic acid, methacrylic acid and alkali salts of these acids. In the mixture of acrylic monomers, the second acrylic monomer content may range from 15 to 60% by weight and preferably from 20 to 45% by weight.

In order to obtain an inverse microemulsion, it is generally necessary to use particular conditions whose main parameters are as follows: surfactant concentration, HLB of the surfactant or of the surfactant mixture, temperature, nature of the organic phase and composition of the aqueous phase.

The monomers content of the aqueous phase is generally 20–80% and usually 30–70% by weight.

Generally the pH of the monomers aqueous solution ranges from 8 to 13 and advantageously from 9 to 11.

The selection of the organic phase has a substantial effect on the minimum surfactant concentration necessary to obtain the inverse microemulsion. This organic

CIBA 038191

4,681,912

3

phase may consist of a hydrocarbon or a hydrocarbon mixture. Isoparaffinic hydrocarbons or mixtures thereof are the best suitable in order to obtain inexpensive formulations (lower content of surfactants) of inverse microemulsions.

The ratio by weight of the amounts of aqueous phase and hydrocarbon phase is chosen as high as possible, so as to obtain, after copolymerization, a microlatex of high copolymer content. Practically, this ratio may range, for example, from 0.5 to 3/1; usually it is close to 2/1.

The one or more surfactants are selected in view to obtain a H L B value ranging from 8 to 11. As a matter of fact, outside this range, the inverse microemulsions either cannot be obtained, or require a considerable amount of surfactants incompatible with an economical process. In addition, in the so-defined H L B range, the surfactant content must be sufficient to obtain an inverse microemulsion. Too low concentrations of surfactants lead to inverse emulsions similar to those of the prior art and form no part of this invention.

Within the H L B range, the surfactant concentration, in proportion to all of the constituents of the microemulsion is preferably higher than a value y (in % by weight) approximately defined by the following empirically determined equation:

$$y = 5.8 \, x^2 - 110 x + 534$$

wherein x is the H L B value of the surfactant or surfactant mixture.

BRIEF DESCRIPTION OF THE DRAWING

The accompanying drawing shows a curve representing the surfactant concentration versus the H L B value. On this figure, the preferred domain of the invention has been hachured.

With respect to the upper limit of the surfactant concentration, it is desirable, for economical reasons, to limit said concentration to 25% by weight of all the constituents of the inverse microemulsion.

When preparing the inverse microemulsion, the temperature of the mixture must be carefully controlled, in view of the sensitivity to temperature of the inverse microemulsions in the presence of non-ionic surfactants. This temperature influence is increased as the surfactant concentration is closer to the minimum content required for obtaining an inverse microemulsion.

In order to reduce the required surfactant content, and to limit to a minimum the temperature influence on the stability of the inverse microemulsions, the latter will be, as much as possible, prepared at a temperature as close as possible to that selected for the copolymerization.

The hydrosoluble acrylic monomers present in the above-described inverse microemulsion are polymerized photochemically or thermally: the method consists of photochemically initiating the copolymerization, for example by ultraviolet radiation or thermally by means of a free radical generator, either hydrophobic, such as, for example, azobisisobutyronitrile, or hydrophilic, such, for example, as potassium persulfate.

The copolymerization is performed very quickly, for example in a few minutes, in a photochemical way, quantitatively, and leads to the formation of stable and transparent microlatices whose particles radius is of the order of 20–40 nanometers with a narrow distribution range.

4

The size of the particles dispersed in the inverse microlatices according to the invention may be determined by means of the quasi-elastic light scattering. The optical source on the light scattering apparatus consists of a Spectra Physics argon-ion laser operating at 488 nm. The time dependant correlation function of the scattered intensity is derived by using a digital correlator with 72 channels. The intensity correlation data have been treated by using the method of cumulants, giving the average decay rate $<\Gamma^{-1}>$ of the correlation function and the variance V. The latter measures the amplitude of the distribution of the decay rate and its value is given by the formula:

$$V_m = (<\Gamma>^2 - <\Gamma^2>)/<\Gamma>^2$$

wherein $<\Gamma^2>$ is the second moment of the distribution.

For copolymer solutions of low polydispersity, the variance V, as a first approximation, is related to the polydispersity index Mw/Mn (weight average molecular weight/number average molecular weight) by the relationship:

$$Mw/Mn = 1 + 4 \, V$$

The molecular weight of the obtained copolymers depends to a large extent on the copolymerization temperature. Temperatures lower or equal to about 30° C. are always preferred when very high molecular weights are desired, as for inverse microlatices destined to be used in Enhanced Oil Recovery.

The process of the invention provides stable and transparent inverse microlatices of high hydrosoluble copolymer content (20 to 35% by weight). The inverse microlatices, prepared in the presence of non-ionic surfactants, have a remarkable stability to temperature in contrast with the inverse microemulsions from which they are prepared.

Inverse microlatices obtained by the process of the invention, can be used in many applications, particularly in the techniques of oil production: Hydrocarbons Enhanced Recovery, ground consolidation, manufacture of drilling muds, prevention of water inflows during the bringing in production of oil wells, and as completion or fracturation fluids.

Generally, the Enhanced Oil Recovery methods with the use of polymer aqueous solutions consist of injecting said solutions in the field through at least one injection well, to circulate it through the formation and recover the displaced hydrocarbons through at least one producing well.

The methods using inverse microlatices of the invention for Enhanced Recovery are not substantially different from those above-described for the water-in-oil emulsions. The inverse microlatices considered in this invention are auto-inversable and it is not necessary generally to add an additional surfactant to favor the inversion, as in certain above-described methods. These microlatices are used, for example after dilution in water, in a proportion on of 50 to 5000 ppm, preferably 100 to 2000 ppm by weight of copolymer with respect to the resultant aqueous phase. Tests conducted in laboratory have shown the efficiency of the inverse microlatices used.

The method for preventing water inflows in producing wells, consists of injecting into the producing well, in the part of the field to be treated, an aqueous solution

CIBA 038192

4,681,912

| 5 | 6 |

of polymer, prepared according to the invention by inverse microlatex dissolution in water. The polymer is adsorbed to a large extent on the walls of the formation surrounding the well where it is injected. When said well is then brought again in production, the oil and/or the gas selectively traverse the treated zone whereas the water passage is reduced.

In addition to these applications, the hydrosoluble polymers, prepared as a microemulsion, may be used as:

coagulants for separating solids suspended in liquids floatation and draining adjuvants in the manufacture of paper pulp; or

flocculants in water treatment

The inverse microlatices obtained by the process of the invention may also be used in assembling of glass fibers, in the leather industry or in the field of paints.

## EXAMPLES

The following examples illustrate the invention, but must not be considered as limiting in any way the scope thereof. Examples 1, 10 and 14 to 17 are given by way of comparison and form no part of the invention.

### EXAMPLE 1 (comparative)

77.8 g of SOLTROL 220 (inorganic paraffinic oil having an distillation point of 244° C. and a final point of 287° C.), 25 g of a mixture of 21.4 g of polyoxyethylene sorbitol hexaoleate (ATLAS G 1086) and 3.6 g of sorbitan sesquioleate (ARLACEL 83) whose H L B (hydrophilic, lipophilic balance) is 9.25, are admixed under stirring. 61.3 g of acrylamide and 20.7 g of glacial acrylic acid are dissolved in a mixture of 42.2 g of distilled water with 23.0 g of a 50% by weight sodium hydroxide solution and this solution is added to the oil/surfactant mixture. The amount of surfactants corresponds to 10% by weight of all the constituents. After one hour of purging with nitrogen at room temperature, the resultant emulsion (turbid and unstable) is heated to 40°C. and 6.5 $10^{-4}$ mole of t-butyl peroxypivalate per mole of monomer are added thereto, the temperature being maintained between 40° and 50° C. for about 1 hour.

The so-obtained latex is turbid and decantation takes place during storage.

### EXAMPLE 2

When example 1 is repeated, but with the use of 63.5 g of surfactants mixture, which corresponds to 22% by weight of all the constituents, the resultant mixture, in contrast to example 1, is limpid and monophasic (microemulsion) and remains as such after copolymerization. By precipitation in acetone and successive washings with acetone and methanol, an acrylamine-sodium acrylate copolymer is obtained. Its viscosity in aqueous solution (400 ppm of copolymer and 5000 ppm of NaCl), measured at 30° C., is 1.30 mm²/s.

### EXAMPLE 3

Example 1 is repeated but as the organic solvent an isoparaffinic cut (ISOPAR M) having an initial distillation point of 207° C. and a final point of 254° C. is used and a mixture of surfactants (36.6 g) corresponding to 14% of the weight of all the constituents is used. The resultant mixture is limpid and monophasic.

After copolymerization, a monophasic mixture (microlatex) containing 35.3% by weight of acrylamide-sodium acrylate copolymer is obtained. An aqueous solution containing 400 ppm of said copolymer and 5000 ppm of NaCl, measured at 30° C. has a viscosity of 1.4 mm²/s.

### EXAMPLE 4

255 g of ISOPAR M and 90 g of a mixture of surfactants consisting of 12.6 g of sorbitan sesquioleate and 77.4 g of polyoxyethylene sorbitol hexaoleate (resultant H L B: 9.3) are added to an aqueous solution containing 38.25 g of acrylic acid and 89.25 g of acrylamide neutralized with sodium hydroxide to a pH close to 10. This amount corresponds to 15% by weight of all the constituents. 0.21 g of azobisisobutyronitrile is added to the resultant monophasic mixture which is degased for 1 hour and heated for 2 hours at 60° C., giving a stable and transparent microlatex whose particle radius, determined by quasi-elastic light scattering, is about 25nm, with a variance of 3%.

By precipitation in acetone and successive washings with acetone and methanol, an acrylamide-sodium acrylate copolymer is obtained (with a total conversion) whose viscosity, determined at 30° C. in a 400 ppm copolymer and 5000 ppm NaCl aqueous solution, is 1.5 mm²/s.

### EXAMPLE 5

Example 4 is repeated, except that azobisisobutylonitrile is omitted and the copolymerization is conducted under U.V. radiation for 5 minutes, the temperature being maintained at 20° C. With a total conversion, an acrylamide-sodium acrylate copolymer is obtained whose viscosity, measured at 30° C. in a 400 ppm copolymer and 5000 ppm NaCl aqueous solution, is 3.15 mm²/s. On the other hand, the intrinsic viscosity of said copolymer, dissolved in water containing 20 g/1 of NaCl, has been found equal to 3250 cc/g on the basis of measurements effected with a LS 30 viscosimeter of CONTRAVES Company and extrapolated to zero concentration and shear rate.

### EXAMPLE 6

In the conditions of example 4 for carrying out the inverse microemulsion, the proportions of each of the two surfactants are varied and the minimum amount of surfactants for obtaining, after copolymerization, a stable and transparent inverse microlatex, is determined in each case.

The results are reported in the following table:

#### TABLE I

| HLB | Minimum surfactant concentration to obtain a stable and transparent inverse microlatex (% by weight) |
|---|---|
| 8.5 | 18 |
| 9 | 14 |
| 9.5 | 12 |
| 10.2 | 16 |

### EXAMPLE 7

200 g of ISOPAR M and 92 g of the surfactant mixture of example 5 are added to 400 g of an aqueous solution containing 60 g of acrylic acid, 140 g of acrylamide and the sodium hydroxide amount required to attain a pH close to 10. This amount corresponds to 13.3% by weight of all the constituents. The copolymerization, conducted under the same conditions as described in example 5, provides a stable and transparent microlatex whose particles radius, determined by

CIBA 038193

7

4,681,912

8

quasi-elastic light scattering, is about 40 nm, with a variance of 5%. This inverse microlatex contains 31.6% by weight of an acrylamidesodium acrylate copolymer containing 35.9% by weight of sodium acrylate.

The intrinsic viscosity of said polymer is 3520 cc/g (solution at 20 g/l of NaCl).

## EXAMPLE 8

200 g of ISOPAR M and 106 g of the mixture of surfactants of example 4 are added to 400 g of an aqueous solution containing 40 g of acrylic acid, 160 g of acrylamide and the sodium hydroxide amount required to attain a pH of 9. This amount corresponds to 15% by weight of all the constituents. The copolymerization, conducted in the same conditions as in example 5, gives a monophasic mixture containing 30.1% by weight of acrylamidesodium acrylate copolymer containing 24.6% by weight of sodium acrylate.

The viscosity of an aqueous solution containing 400 ppm of said copolymer, determined at 30°. C. in the presence of 5 g/l of NaCl, is 2.7 mm²/s.

## EXAMPLE 9

When, in example 8, ISOPAR M is replaced with trimethyl-pentane, everything else being unchanged, an inverse microlatex of similar characteristics as in example 8 is obtained.

## EXAMPLE 10 (comparative)

When, in example 8, the isoparaffinic solvent (ISO-PAR M) is replaced with an aromatic solvent (toluene), everything else being unchanged, it is impossible to obtain an inverse microemulsion, even with the addition of high amounts of surfactants (31% weight).

## EXAMPLE 11

200 g of ISOPAR M and 115 g of a mixture of surfactants containing 11% by weight of sorbitan trioleate (Montane 85) and 89% by weight of ethoxylated sorbitan trioleate (Montanox 85) are added to 400 g of an aqueous solution containing 60 g of acrylic acid and 140 g of acrylamide, whose pH has been brought to 10 by addition of sodium hydroxide. The H L B of the surfactants mixture is 10 and the surfactant amount corresponds to 16% by weight of all the constituents.

The copolymerization, conducted in the same conditions as described in example 5, gives a monophasic mixture containing 30.5% by weight of an acrylamidesodium acrylate copolymer containing 35.9% by weight of sodium acrylate.

The intrinsic viscosity of said polymer is 3200 cc/g (in aqueous solution at 20 g/l of NaCl).

## EXAMPLE 12

200 g of ISOPAR M and 115 g of the mixture of surfactants of example 11 are added to 400 g of an aqueous solution containing 170 g of acrylamide and 30 g of acrylic acid, whose pH has been brought to 9 by addition of sodium hydroxide. This amount corresponds to 16% by weight of all the constituents.

The copolymerization, achieved in the same conditions as in example 5, gives a monophasic mixture containing 29.3% by weight of an acrylamide-sodium acrylate copolymer containing 18.7% by weight of sodium acrylate.

## EXAMPLE 13

200 g of ISOPAR M and 100 g of polyoxyethylene sorbitol oleate (ATLAS G 1087; H L B=9.2) are added to 400 g of an aqueous solution containing 50 g of acrylic acid and 150 g of acrylamide, whose pH has been brought to 10 by addition of sodium hydroxide. This amount corresponds to 14.3% by weight of all the constituents.

The copolymerization so-obtained copolymerization of the inverse microemulsion, conducted in the conditions described in example 5, gives a stable and transparent inverse microlatex containing 30.7% by weight of an acrylamide-sodium acrylate copolymer containing 30.3% by weight of sodium acrylate.

## EXAMPLE 14 (comparative)

When example 7 is repeated, except that the proportions of the two surfactants are modified so as to obtain the resultant H L B of 7.6, it is not possible to obtain, under these conditions, any inverse microemulsion, even when adding high amounts of surfactants (more than 31% by weight).

## EXAMPLE 15 (comparative)

When, in example 7, the mixture of surfactants is replaced with ethoxynonylphenol containing 8 ethylene oxide recurrent units per molecule and having a H L B of 12.3, everything else being unchanged, it is not possible to obtain in these conditions, any inverse microemulsion, even when adding high surfactant amounts (more than 35% by weight).

## EXAMPLE 16 to 22

255 g of ISOPAR M and a variable amount of a mixture of surfactants having a H L B value of 9.3, already used in certain of the preceding examples (14% by weight of sorbitan sesquioleate and 86% by weight of polyethoxylated sorbitol hexaoleate are added to 255 g of an aqueous solution containing 44 g of acrylic acid and 82 g of acrylamide, neutralized with sodium hydroxide up to a pH close to 10. The amount of surfactant mixture is reported in table II hereinafter. The resultant mixture is degased and then heated at 45° C. for 45 minutes in order to copolymerize the monomers. There is thus obtained a series of inverse latices whose final copolymer concentration is about 22 to 25% by weight with respect to all the constituents. The proportion of sodium acrylate in the copolymers is 42% by weight. Table II hereinafter reports, for the final latices, the values of optical transmission measured by turbidimetry, the hydrodynamic radii $R_H$ of the particles, determined by the quasi-elastic diffusion of light and an evaluation of the stability of said latices.

### TABLE II

| Exam-ples | Surfactant concentration (% by weight) | Optical transmission (%) | $R_H$ (nm) | Stability |
|---|---|---|---|---|
| 16* | 8.2 | 1.1 | >89 | Sedimentation after a few hours |
| 17* | 11.0 | 1.2 | >60 | |
| 18 | 13.4 | 82 | 37 | Stable |
| 19 | 15.5 | 82 | 35 | even |
| 20 | 18.0 | 85 | 27.5 | after |
| 21 | 20.2 | 88 | 25 | several |
| 22 | 21.1 | 91 | 24 | months |

*comparative examples.

CIBA 038194

4,681,912

9.

From this table, it appears that microlatices obtained in examples 18 to 22 are stable and have a high optical transmission and a small particle radius, in contrast with the results obtained in examples 16 and 17.

The values of surfactants or surfactant mixtures concentrations, taking into account the corresponding H L B values, were used to draw a curve shown in the accompanying FIGURE, indicating the approximative limit between a zone wherein no stable inverse microlatex is obtained and a zone wherein stable inverse microlatices can be obtained. On this FIGURE, the preferred domain of the invention has been hachured.

## EXAMPLES 23 to 25

100 g of ISOPAR M and 53 g of the same surfactant mixture as in the preceding examples (H L B=9.3) are added to 200 g of an aqueous solution containing 30 g of acrylic acid and 70 g of acrylamide, neutralized with sodium hydroxide up to a pH close to 9.

The obtained monophasic mixture, to which is added 0.15 g of azobisisobutyronitrile, is degased and maintained for 5 hours at a temperature differing according to the considered example. A stable and transparent inverse microlatex is always obtained and the copolymerization is complete.

By precipitation in acetone and successive washings with acetone and methanol, acrylamide-sodium acrylate copolymers are separated and their viscosity determined, at 30° C., in aqueous solutions containing 1000 ppm of copolymer and 5000 ppm of sodium chloride. The viscosity values are different according to the co-polymerization temperature:

| | | |
|---|---|---|
| Example 23 | T° = 60° C. | Viscosity: 2.4 mm²/s |
| Example 24 | T° = 40° C. | Viscosity: 4.9 mm²/s |
| Example 25 | T° = 25° C. | Viscosity: 7.4 mm²/s |

## EXAMPLE 26

Test of injectivity of porous medium

A porous medium is prepared by packing, in a glass cylinder, sand from ENTRAIGUES EN 38, of granulometry ranging from 28 to 50 µm. The characteristics of the so-obtained porous medium are as follows: L=60 mm, Φ=20 mm, Vp=8.6 cc, k=2.04 D, φ=45% (k=permeability to water expressed in Darcy ; φ=porosity)

A solution of acrylamide-sodium acrylate copolymer (1000 ppm) is prepared by dispersing the inverse microlatex obtained in example 7 in a field brine of total salt content close to 3 g/l. The rheological curve of said copolymer solution, as determined by means of LS 30 viscosimeter, makes apparent the presence of a plateau in the values of relative viscosity versus shear rate (relative viscosity at zero shear rate: ηR₀=20, at 30° C.).

The polymer solution is then injected at constant rate (q=1.5 cc/h by means of a piston pump of perfuser type; the pressure losses are measured at the terminals of the porous medium for the polymer solution and expressed in proportion to the values initially obtained with the field brine. Thus, a mobility ratio is defined which, in the experimental conditions, becomes stabilized at a value of 21.6. It is further observed that the stabilization of the mobility decrease corresponds to an equalization of the polymer concentrations, determined by viscosimetry, between the input and the output of the core. The comparison of the mobility decrease val-

10

ues with the plateau viscosity on the one hand, and the absence of polymer losses between the input and the output of the porous medium on the other hand, shows that for the selected porous medium, the injectivity of the microlatex dispersion is satisfactory. Particularly, no indication of clogging was observed.

When injecting field brine after the polymer solution, a value of the permeability reduction of 2.36 is obtained, which characterizes the presence of an adsorbed polymer layer on the walls of the porous medium. This behavior is characteristic of an acrylamide-sodium acrylate copolymer of high molecular weight.

On the other hand, the fact that the permeability to water is permanently reduced makes it possible to contemplate the use of the inverse microlatices of the invention in the prevention of water inflows in producing wells, as illustrated in the following example.

## EXAMPLE 27

A porous medium (L=20 cm; Φ=5 cm) is prepared by coring a Vosges sandstone containing about 10% of clay. The permeabilities of this Vosges sandstone to sea water (total salt content ≈37 g/l and to the field water (total salt content ≈8 g/l) are respectively 0.478 D and 0.467 D. The porosity is 18%.

From the microlatex of example 13, a solution is separately prepared which contains 500 ppm of active copolymer in sea water and in field water. The relative viscosities obtained in the Newtonian zone of said microlatex dispersed in both water types are respectively ηR₀=5.1 (field water) and ηR₀=3.1 (sea water), the ratio of the two viscosities being equal to 1.65.

In conformity with the teaching of the French Pat. No. 2 325 797 (corresponding to U.S. Pat. No. 4,095,651) issued to the name of the applicant and concerning the prevention of water inflows in producing wells, the microlatex solution (Cp=500 ppm) is injected at constant rate q=3 cm³/h ( γ=2.1 sec⁻¹) in sea water (t=30° C.). After injection of about 5 Pv (Pv=pores volume) of said microlatex solution, the polymer injection is discontinued and sea water is injected by the inlet face of the core in view to determine, on the one hand, the decrease of permeability Rk to sea water before and after the polymer introduction and, on the other hand, to deduce therefrom a thickness of the adsorbed layer, calculated by the formula

$$\delta = R_p \left( 1 - \frac{1}{\sqrt[4]{R_k}} \right)$$

wherein Rp designating the average pore radius is equal to

$$\sqrt{\frac{8z}{\gamma}}$$

The obtained values are as follows: Rk=1.80, δ=0.62 µm.

Through the outlet face of the core, field water is injected in opposite direction, thus simulating the water production in the producing well. New values of the permeability reduction and of the thickness of the adsorbed layer are thus respectively obtained: Rk=2.92, δ=0.90 micron. The ratio of the respective thicknesses of adsorbed layers respectively with the field water and

CIBA 038195

4,681,912

11

the sea water is 1.61, value which is very close to 1.65, representing the ratio of the plateau viscosities in said two waters. This indicates that the introduction of the copolymer took place in such conditions that the thickness of the adsorbed layer varied in the same ratio as the viscosities. Accordingly, the production of soft water from the field is decreased, thereby decreasing the production water/oil ratio (WOR).

What is claimed as the invention is:

1. A process for producing a stable inverse microlatex comprising the steps of:

(a) admixing:
   an aqueous solution containing at least one acrylic monomer (i) selected from acrylamide and methacrylamide and at least another acrylic monomer (ii) selected from acrylic acid, methacrylic acid and alkali salts of said acids, at a concentration from 20 to 80% by weight in said aqueous solution;
   an oily phase comprising at least one hydrocarbon liquid, the ratio by weight between said aqueous solution and said oily phase being from 0.5/1 to 3/1; and
   a non-ionic surfactant or a non-ionic surfactant mixture having a H L B from 8 to 11, in a proportion, with respect to all the involved constituents, higher than about a value y, given, in percent by weight, by the relationship:

$$y = 5.8 \, X^2 - 110 \, X + 534$$

   wherein X is the H L B of said surfactant or said surfactant mixture, so as to form an inverse microemulsion, and

(b) subjecting the inverse microemulsion obtained in step (a) to copolymerization conditions.

12

2. A process according to claim 1, wherein said acrylic monomer (ii) is sodium acrylate.

3. A process according to claim 1, wherein said acrylic monomer (ii) amounts to 15–60% by weight of the acrylic monomer mixture.

4. A process according to claim 3, wherein said acrylic monomer (ii) amounts to 20–45% by weight of the acrylic monomer mixture.

5. A process according to claim 1, wherein, in step (a), the pH of said aqueous solution is from 8 to 13.

6. A process according to claim 1, wherein, in step (a), the oily phase comprises at least one isoparaffinic hydrocarbon.

7. A process according to claim 1, wherein, in step (a), the ratio by weight between the monomers aqueous solution and the oily phase is about 2/1.

8. A process according to claim 1, wherein, in step (a), the proportion of surfactant or surfactant mixture is at most 25% by weight of all the constituents of said inverse microemulsion.

9. A process according to claim 1, wherein, in step (b), the polymerization is conducted by heating in the presence of a radical reactions initiator.

10. A process according to claim 1, wherein, in step (b) the polymerization is initiated by radiation.

11. An inverse microlatex obtained by the process according to claim 1 having a copolymer content from 20 to 35% by weight.

12. In a method for preparing a thickened aqueous solution, comprising diluting in water an inverse microlatex in such a proportion that the resultant aqueous solution has a copolymer concentration from 50 to 5000 ppm by weight the improvement wherein the inverse microlatex is one of claim 11.

13. A thickened aqueous solution, obtained by the method of claim 12.

* * * * *

40

45

50

55

60

65

CIBA 038196

523-319     AU 155     EX
11/10/87     XR     4,705,640

## United States Patent [19]

### Whittaker

[11] **Patent Number:** **4,705,640**

[45] **Date of Patent:** **Nov. 10, 1987**

[54] **FLOCCULANTS AND PROCESSES FOR THEIR PREPARATION**

[75] Inventor: Tony Whittaker, South Yorkshire, England

[73] Assignee: Allied Colloids Limited, United Kingdom

[21] Appl. No.: 728,782

[22] Filed: Apr. 30, 1985

[30]     Foreign Application Priority Data

Apr. 30, 1984 [GB]  United Kingdom ............... 8410971

[51] Int. Cl.⁴ ........................................... C02F 1/56
[52] U.S. Cl. ........................... 210/733; 210/732; 210/734; 210/735; 210/738; 523/319; 524/922
[58] Field of Search ............... 210/725, 727, 728, 730, 210/732-736, 738; 523/319, 322, 323; 524/922; 525/326.1, 329.4

[56]     **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,210,308 | 10/1965 | Garms et al. | 210/736 |
| 3,278,506 | 10/1966 | Chamot et al. | 210/734 |
| 3,380,947 | 4/1968 | Galgoczi et al. | 523/323 |
| 3,480,761 | 11/1969 | Kolodny et al. | 210/734 |
| 3,536,646 | 10/1970 | Hatch et al. | 210/736 |
| 3,719,748 | 3/1973 | Manfroy et al. | 210/738 |
| 3,917,529 | 11/1975 | Madole et al. | 210/736 |
| 3,926,662 | 12/1975 | Rundell et al. | 210/734 |
| 3,977,971 | 8/1976 | Quinn et al. | 210/732 |
| 4,105,558 | 8/1978 | Heinrich et al. | 210/401 |
| 4,470,907 | 9/1984 | Seneza | 210/192 |
| 4,479,879 | 10/1984 | Hashimoto et al. | 210/738 |
| 4,529,794 | 7/1985 | Sortwell | 528/499 |
| 4,537,513 | 8/1985 | Flesher et al. | 422/278 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 53-140275 | 12/1978 | Japan | 210/734 |
| 1310491 | 3/1973 | United Kingdom | 210/609 |

*Primary Examiner*—Peter Hruskoci
*Attorney, Agent, or Firm*—Ostrolenk, Faber, Gerb & Soffen

[57]     **ABSTRACT**

The flocculation performance, for instance on low pressure or other pressure filtration (such as a belt press), of a solution of a high molecular weight organic polymeric flocculant having IV above 4 is improved by subjecting the solution to degradation, preferably by mechanical shear such as through a Silverson mixer or by a fast rotating blade.

**12 Claims, No Drawings**

CIBA 038197

4,705,640

1

## FLOCCULANTS AND PROCESSES FOR THEIR PREPARATION

It is standard practice to flocculate a suspension of particulate material by addition to the suspension of a solution of organic polymeric flocculant. The step of flocculation may be used to facilitate various solids-liquids separation processes such as filtration (for instance high pressure or low pressure filtration), drainage (for instance of paper suspensions), settlement (for instance of various inorganic suspensions) or other dewatering, for instance dewatering of sewage sludges.

It is accepted as being essential that the flocculant polymer should be in the form of a stable solution, referred to herein as the flocculant solution, before it is contacted with the particulate material. Thus the polymer much reach a steady state of hydration and dissolution before the flocculant solution is mixed with the suspension. It is wholly unsatisfactory to add the flocculant solution to the suspension while the polymer in the solution is still changing from, for instance, a solid state to a dissolved state. Thus it is common practice to mix the polymer with most or all of the water that is to be present in the flocculant solution and then to allow this solution to age for a substantial time, for instance 30 minutes to 2 hours or longer, to allow dissolution to be completed and reach equilibrium. The resultant flocculant solution is then mixed with the suspension that is to be flocculated. Accordingly the overall process consists of the formation of the flocculant solution and, separately, the addition of this solution to the suspension, and often the stage of forming the flocculant solution includes a mixing stage followed by an ageing stage.

Organic polymeric flocculants first became significant in the industry in the 1950's. Initially they had a relatively low molecular weight because the quality of the monomers inhibited the formation of water soluble high molecular weight polymers of the types that are now available (initially typically below 500,000 on a commercial scale), the desirability of being able to use commercially, as flocculants, polymers having the highest possible molecular weight was well recognised, and there were frequent references in the literature to the organic polymer having a molecular weight as high as possible, typically having Intrinsic Viscosity (IV) above 6 dl/g. Modern techniques of monomer purification and polymerisation do permit the production of polymers having IV as high as, for instance, 30 (or up to 15 for cationics) provided processing and use conditions are controlled carefully.

It has been well recognised throughout this gradual development of high IV values that they would not be obtained if the polymer solution was subjected to chemical or physical forces that might degrade it, and in particular if it was subjected to mechanical shear. The fact that polymers could be degraded by such forces was known from, for instance, U.S. Pat. No. 3,021,269. In this disclosure, cross linked polymeric gels that are insoluble in water are subjected to ultrasonic energy to degrade them chemically to such an extent that they become soluble. The resultant polymers are said to have molecular weights up to 630,000, IV up to 2.54.

Accordingly, it has become conventional practice to synthesize the polymers very carefully so as to obtain the highest possible molecular weight and to handle the

2

polymers carefully so as to avoid degrading them, and losing the difficulty obtained high molecular weight.

The polymers are initially synthesized, and supplied to the user, as a concentrated aqueous solution, a dispersion, or a powder and have to be converted into a dilute flocculant solution before they could be added to the suspension. A solution grade polymer is merely mixed with water and usually aged in a tank until required.

A powder grade polymer must be converted into a solution, precautions being taken to avoid agglomeration of the powder particles. The solution may be formed simply by stirring the powder vigorously into water or by, for instance, initially wetting the powder particles while suspended in air and then stirring the wetted particles into water. Whatever the method, this forms a dispersion in water of hydrating particles and this dispersion is left to stand, optionally with gentle agitation or stirring, to allow complete hydration and solution to occur.

Dispersions of polyelectrolyte in non-aqueous, water immiscible, liquid are stirred into water, sometimes with considerable agitation, to initiate hydration of the particles to form a suspension in water of hydrating particles, which is left to stand, optionally with gentle agitation, until the desired solution is formed.

The preparation of the solution therefore necessarily involves agitation and it was recognised that this had to be tolerated, especially when starting from powders or dispersions, in order to achieve a solution. However it was always kept to a minimum, to avoid damaging the polymer. For instance in U.S. Pat. No. 3,468,322 a suspension is mixed with water in a turbulence inducer which is said to provide good results without the use of severe or shearing agitation. In EP No. 0102759 a solution is made by blending a dispersion and water in an orifice mixer under shear but it is stated that the optimum conditions would apply the shear for an infinitely short time. In practice the shear is applied for a period of much less than 1 second. The amount of polymer degradation that might occur during this very short period is extremely low.

If there is an ageing stage in the formation of the flocculant solution, it is conventional for the solution to be under static or only gently moving conditions during the ageing.

Having formed the flocculant solution, it is necessary to combine it thoroughly with the suspension that is to be flocculated. It is essential that there should be rapid and intimate mixing of the solution with the suspension in order that there is a uniform polymer concentration throughout the suspension, so that uniform floc formation occurs. Inadequate mixing of the solution into the suspension would lead to variable concentration of polymeric flocculant and, in turn, very unsatisfactory results. It is therefore necessary to apply vigorous agitation and this is often described as involving shear, although it has been recognised that shear at this stage is a necessary evil and can itself damage the final results. For instance, BP 1,346,596 warns that shear at this stage may reduce flocculation. In practice, therefore, any shear that is applied has normally been of a very low value and applied for the shortest possible time consistent with the need to achieve intimate mixing.

Against this background it has been the assignee's practice, and it is believed the practice of all suppliers of high molecular weight organic polymeric flocculants, to aim for the highest possible molecular weight and

CIBA 038198

4,705,640

3

then to avoid subjecting the polymer to process conditions that might reduce the molecular weight.

It has now surprisingly been found that it is possible to improve the flocculation performance of a high molecular weight organic polymeric flocculant by subjecting the polymer to degradation after it is in the form of a stable solution in water. For instance, it was found that the flocculation performance can be improved by degrading the polymer to a lower IV, provided the IV of the final polymer is still high, generally above 4. This discovery is directly contrary to all commercial practice with modern, high molecular weight, polymeric flocculants.

In the invention, a flocculant solution of a high molecular weight organic polymeric flocculant having IV above 4 is formed and a suspension of particulate material is flocculated by addition of the solution to the suspension, and the flocculant solution is formed by blending high molecular weight organic polymeric flocculant in water to form an initial solution having a polymer concentration below 3% by weight and then the flocculation performance of the dissolved polymer is improved by subjecting the dissolved polymer to degradation. Since the polymer in the flocculant solution, that is to say the solution that is added to the suspension, has IV above 4 the extent of degradation is such that IV is above 4.

Each high molecular weight polymer is inevitably formed of a blend of molecules of a range of chain lengths and the degradation in the invention preferably reduces this range. The range of chain lengths can be defined in various ways. For instance it is termed polydispersity when it is defined by the weight average molecular weight divided by the number average molecular weight. A theoretical polymer consisting of molecules of a single chain length has a polydispersity value of 1 but in practice commercial polymers have values much higher than this. It had previously been assumed that high polydispersity values were acceptable, and indeed probably very desirable, for flocculation in view of the various mechanisms involved in achieving satisfactory flocculation. However in the invention, the degradation preferably reduces polydispersity by at least 5%, preferably at least 15%.

In preference to measuring polydispersity, it has been found convenient to define the spread of molecular weights by (Mw/Mv) or (Mz/Mw) where Mw is the weight average molecular weight, Mv is the viscosity average molecular weight and Mz is the z-average molecular weight, for instance as defined on pages 182 and 183 of volume 9 of Encyclopedia of Polymer Science & Technology published by Interscience. The values for (Mw/Mv) and for (Mz/Mw) can be derived from dynamic quasielastic light scattering methods. Although these methods are primarily designed for analysis of lower molecular weight polymers, they do give values showing the relationship between the molecular weight distribution of the molecules in a polymer before and after the degradation. Preferably the degradation results in (Mw/Mv) being reduced by at least 5%, typically 10 to 30% or more. Preferably the degradation results in (Mz/Mw) being reduced by at least 10%, typically 15 to 50% or more.

Although it is believed that reduction in the spread of molecular weights within the polymeric product is of particular importance in the invention, it has been surprisingly found that some reduction in IV (and therefore in molecular weight) generally is tolerable and that

4

in many instances reduction in IV is beneficial, particularly if it is accompanied by a reduction in the spread of chain lengths of the polymer. The degradation is therefore often conducted under conditions such that the IV is reduced by at least 5% and often 10 to 30% or more, for instance up to 50 or 60%.

The ionicity of a polymer can be determined on a 0.1% aged solution by a Colloid Titration as described by Koch-Light Laboratories Ltd. in their publication 4/77 KLCD-1 (or alternatively a method as in BP No. 1,579,007 could possibly be used).

As explained in BP No. 1,579,007 ionic polymers often have a value less than 100% of the theoretical ionicity value. Although BP No. 1,579,007 associates inferior ionicity with non-random distribution of monomer units within the polymeric chain, it was surprisingly found that it is possible, particularly when the polymer includes some degree of chain branching or cross linking, to improve the ionicity value towards the theoretical maximum by the degradation step. We term this improvement ionicity regain (IR). $IR = (IAD - IBD)/IAD \times 100$ where IAD is the ionicity measured by the above-defined method after the degradation step of the invention and IBD is the ionicity before the degradation step. Especially when the polymer includes chain branching or cross linking the degradation step is preferably such that IR is greater than 5%, typically up to 20 or 30%. Preferably this IR is accompanied by a reduction in the spread of chain lengths within the polymer.

The degree of degradation must not be so high as to make the flocculation performance of the dissolved polymer worse than its performance before degradation. Very low amounts of degradation will have no measurable effect on the flocculation performance and too much degradation, for instance to reduce IV below 4, will make the flocculation performance worse but the flocculation performance will pass through a peak. Thus by subjecting the solution to the chosen method of degradation for varying periods and observing the flocculation performance it is easy to plot the performance against various levels of degradation and to select the optimum level of degradation.

The degradation can be by ultrasonic degradation or by chemical degradation. However these methods sometimes have the tendency to reduce molecular weight significantly without achieving the desired reduction in the spread of molecular weights within the polymer. Preferably the degradation is by mechanical degradation since this appears to reduce the spread of molecular weights, as well as often reducing IV and/or increasing ionicity for branched or cross linked polymers.

The mechanical degradation may be applied by subjecting the initial solution to the effect of fast moving blades, for instance blades having a velocity of at least 500 meters per minute, typically 750 to 5,000 meters per minute. If the blades rotates, then these velocities are the peripheral velocities of the blades. It is particularly preferred to use blades that rotate at high speed, generally above 2,000 rpm preferably 3,000 to 20,000 rpm. Suitable apparatus for this is the Waring blender or apparatus similar to large scale versions of kitchen blenders such as the Moulinex, Kenwood, Hamilton Beach, Iona or Osterizer blenders. Routine experimentation, as mentioned above, will easily determine the optimum duration at a given speed, or the optimum

CIBA 038199

4,705,640

5

speed for a given duration, or the optimum combination of speed and duration.

Another suitable method of applying mechanical degradation is by forcing the solution by impellers through a screen, for instance as in a Silverson mixer or other mixer having a similar method of operation. For instance there may be an impellor 4 to 10 cm in diameter rotating at 1500 to 6000 rpm to force the solution under high shear through a screen. Preferably a Silverson 120L mixer is used and has a square hole high shear screen and an impellor of 6.8 cm diameter rotating at 3000 rpm. Mechanical agitation methods that do not generate a high degree of chopping are less satisfactory and, if used, must be used for prolonged periods in order to achieve any significant mechanical degradation. For instance extrusion of the solution through an orifice mixer or forcing it through centrifugal pump generally is unsatisfactory unless the solution is subjected to repeated passes through the mixer or pump.

In order to obtain optimum improvement in flocculation properties in a convenient manner, it is essential to conduct the degradation on the polymer while it is present as a solution having a polymer concentration below 3% by weight, i.e., while it is present as the said initial solution. Degradation conducted on polymer solutions of a higher concentration is difficult to perform, because of the viscous nature of the solutions, and is less satisfactory. Degradation conducted on the polymer before it is fully dissolved is also less satisfactory. Even though some shear may be applied during the preparation of the initial solution (for instance to facilitate dispersion of polymer particles into water) the shear applied at this stage is preferably inadequate to improve flocculation performance and, in any event, further improvement can be achieved, in accordance with the invention, by subjecting the resultant initial solution to the defined degradation. Preferably the initial solution is made by blending solid (e.g., bead or powder), dispersed or dissolved polymer with water to form a mixture containing below 3% by weight of the polymer, allowing this solution to age in a storage vessel for sufficient time for the dissolution to reach equilibrium (so that its flocculation properties no longer change with time) and then subjecting the aged solution to the degradation. The ageing period is usually at least 30 minutes, typically 1 to 5 hours, often about 2 hours. During ageing, the solution may be static or may be subjected to gentle stirring or other agitation.

The flocculation treatment of the invention is conducted with novel apparatus that includes means for applying the degradation. In particular, novel apparatus for dosing the flocculant solution into a suspension comprises a vessel for holding the aqueous suspension that is to be flocculated and having a dosing inlet for dosing the aqueous solution of flocculant into the suspension and supply means for supplying the flocculant solution to the inlet, the supply means including means for mechanically or otherwise degrading the solution after its formation and before it reaches the inlet. The vessel may be a tank or a line through which the suspension flows. Generally the solution has the desired solids content before it is subjected to degradation but means can be provided for diluting the solution after the degradation and before entry to the vessel.

The means for supplying the solution generally comprise a pipe leading from a tank in which solution is aged. The means for degrading the solution may be in-line. In-line means for mechanically degrading a solu-

6

tion may comprise a pump that will both provide the shear and force the flocculant solution to the dosing point, in particular it may be a silverson mixer that serves to degrade the solution and to force it to the dosing point. Alternatively the degradation may be applied in a tank or other vessel between the ageing tank and the dosing point.

The flocculant solution, at the dosing point, generally has a concentration of from 0.01 to 1%, often 0.05 to 0.3%, and if the initial solution, that is subjected to the degradation, has a higher concentration it is necessary to dilute it with water after the degradation step.

The polymer must initially have an intrinsic viscosity (IV), of a value such that, after degradation, IV is still above 4 and in practice this means that the polymer will generally have a molecular weight above 1 million, typically up to 30 million. Before the degradation, the polymer generally has IV at least 5, and preferably at least 9, for instance up to 15 or higher, e.g., up to 25 for anionics. In the flocculant solution, after the degradation, the IV is preferably at least 5 and generally in the range 6 to 12, often 6 to 9.

The polymer must be water soluble and is preferably substantially linear. The monomers from which it is formed are preferably substantially free of cross linking agent. It may be based on a natural or modified natural polymer. For instance it may be a cellulosic or gum polymer such as a cationic or other ionic derivative of a cellulose or an ionic derivative of guar gum.

Preferably however the polymer is a substantially linear synthetic polymer formed by polymerisation of one or more ethylenic, preferably vinyl, water soluble monomers. Broadly any monomer or monomer blend that can be polymerised to yield a water soluble flocculant polymer may be used. The monomers are generally acrylic (including methacrylic) monomers. The polymer may be non-ionic, being formed wholly from non-ionic monomers, but preferably is ionic since even non-ionic monomers generally include some ionic groups, for instance acrylic acid groups are often present in acrylamide. The amount and type of ionic charge in the monomers will be selected such that the polymer has the ionic charge suitable for the particular dispersion that it is to flocculate.

Suitable non-ionic monomers are acrylamide, methacrylamide, N-vinylmethylacetamide or formamide, vinyl acetate or vinyl pyrrolidone.

Suitable anionic monomers are sodium acrylate, methacrylate, itaconate, 2-acrylamidomethyl propane sulphonate, sulphopropylacrylate or methacrylate or other water soluble forms of these or other polymerisable carboxylic or sulphonic acids or sulphomethylated acrylamide may be used:

Suitable cationic monomers are dialkylaminoalkyl acrylates and methacrylates, especially dialkylaminoethyl acrylate, and their quaternary or acid salts, and dialkylaminoalkylacrylamides and methacrylamides and their quaternary or acid salts for instance methacrylamidopropyl trimethyl ammonium chloride and Mannich products, such as quaternised dialkylaminomethylacrylamides. Other suitable monomers include diallyldimethyl ammonium chloride, especially when copolymerised with acrylamide, and vinyl pyridine (as acid addition or quaternary salt) and Hofman degradation products such as polyvinylamine.

The suspension may be an inorganic aqueous suspension but preferably is an organic aqueous suspension, with the organic particles most preferably being sewage

CIBA 038200

4,705,640

7

but others, such as paper, can also be treated. The invention is of particular value in the treatment of sewage sludge.

The invention is generally used as part of a process for dewatering the suspension and so the flocculated suspension is normally subjected to dewatering. Although this can be by various methods, the invention is of particular value when applied to pressure filtration. This pressure filtration may be by high pressure filtration, for instance on a filter press at 5 to 15 bar for, typically, ½ to 5 hours but preferably is low pressure filtration, for instance on a belt press, generally at a pressure of 0.5 to 3 bar, typically 1 to 15 minutes.

The flocculation performance in such filtration techniques can be manifested by increased solids content in the filter cake. It has, however, been found that there is a close correlation between the capillary suction time (CST) of the flocculated suspension and its ultimate suitability for low or high pressure filtration and so in the invention it is convenient to determine flocculation performance by reference to CST, the best products having the lowest values.

CST is measured as described in Journal of Institute of Water Pollution Control Vol. 67, 1968, No. 2 page 233. This method involves adding a measured dose of 25 flocculant solution to the suspension and applying a defined amount of shear for a measured time. The results are quoted at various dose/shear combinations, the dose being in g/m³ and the shear being the time in seconds for which the shear was applied after addition of 30 the flocculant solution. In this specification, IV is measured as described on page 13 of Water Research Centre Technical Report No. 6 "The Examination of Organic Flocculants and Coagulated Acids" but using 1M NaCl 35 and a Na₂HPO₄/citric acid buffer instead of acid or alkali for pH adjustment.

By the invention it is possible to obtain an improvement in the flocculation performance and in the dewatering ability of many types of suspensions although of 40 course it is necessary to select the polymer to be suitable for the particular suspension being dewatered. If the polymer that is being used is inherently unsuitable for that suspension then the degradation treatment of the invention may be of little or no value.

A particular advantage of the invention is that it is 45 possible, at a given IV, to obtain improved flocculation performance if that IV is achieved by degradation of a higher IV polymer than if the IV is achieved by direct synthesis. Accordingly, for a dispersion or apparatus where it is necessary for the polymer to have, for instance, IV 7 better results are generally obtained by mechanically shearing a higher IV polymer down to IV 7 than by synthesizing a polymer from the same monomers to that IV value.

The following are some examples of the invention. In 55 these DMAEA is dimethylaminoethyl acrylate, q indicates that it is quaternised by methyl chloride, AM is acrylamide and Mannich products are dimethylaminomethyl acrylamide formed from acrylamide, formaldehyde and dimethylamine. IV and CST are 60 recorded as defined above.

Low pressure piston press cake solids are recorded on a piston press operated to reproduce belt pressure filtration, wherein 0.7 bar is applied for 1 minute, 1.4 bar for 1 minute, 2.1 bar for 1 minute and then 2.8 bar for 6 65 minutes. Increased cake solids measured by this technique indicate that increased cake solids would be obtained on a belt press. High pressure piston press cake

8

solids are recorded using the same piston press with the pressure being increased over 30 minutes up to 7 bar and then held at 7 bar for a further 30 minutes. Increased cake solids on this test indicates that increased solids would be obtained on a filter press.

Wherever reference is made to shearing a solution with a Moulinex homogeniser this is effected by providing 400 ml of the polymer solution in a substantially cylindrical pot having a diameter of about 8 cm and with a blade about 6 cm in diameter and about 1 mm thick rotating at 16,500 rpm in the base of the pot. One arm of the blade is inclined upwardly by about 45° and the other arm downwardly by about the same amount.

### EXAMPLE 1

A dispersion grade DMAEAq/AM copolymer, was dissolved in deionised water and aged to give a 1% w/w active polyelectrolyte solution. The solution was then sheared in a Moulinex homogeniser with samples being taken after 6, 8, 10, 15 and 60 seconds. The results are shown in Table 1.

TABLE 1

| SHEARING TIME (SECS) | I.V. dl/g | CST (secs) | | |
| | | 80/10 | 80/25 | 80/40 |
|---|---|---|---|---|
| NIL | 9.8 | 145 | 301 | 375 |
| 6 | 9.5 | 53 | 122 | 201 |
| 8 | 9.7 | 34 | 112 | 188 |
| 10 | 9.9 | 29 | 82 | 138 |
| 15 | 9.4 | 23 | 76 | 119 |
| 60 | 7.3 | 15 | 50 | 77 |

### EXAMPLE 2

Four products, identified as A, B, C and D, having intrinsic viscosity 7.3, 6.8, 12.0 and 11.4 dl/g respectively and all known to be identical composition DMAEA/AM copolymers were made up as 1% w/v solutions and allowed to age. Two further solutions were prepared from products C and D by taking portions of the original solutions and subjecting them to 100 seconds of shearing in the Moulinex blender; these were labelled E & F and were subsequently found to be of I.V. 6.6 and 7.0 dl/g respectively. The six solutions were compared on three sludges by CST and by observing the solids content of piston press cakes. Sludge 1 was a Rotherham digested primary/activated sludge. Sludge 2 was a raw primary/activated sludge. Sludge 3 was a digested primary/humus sludge. The results are shown in Table 2.

TABLE 2

| Sludge Type | Product | IV | CST (secs) | | | Low Pressure Piston Press Cake Solids (%) |
| | | | 125/10 | 125/25 | 125/40 | |
|---|---|---|---|---|---|---|
| 1 | A | 7.3 | 20 | 46 | 58 | 12.1 |
| 1 | B | 6.8 | 14 | 35 | 54 | |
| 1 | C | 12.0 | 14 | 45 | 69 | 12.6 |
| 1 | D | 11.4 | 13 | 34 | 52 | 13.4 |
| 1 | E | 6.6 | 9 | 15 | 27 | 12.8 |
| 1 | F | 7.0 | 9 | 15 | 24 | 13.5 |
| 2 | A | 7.3 | 15 | 40 | 60 | |
| 2 | B | 6.8 | 13 | 30 | 55 | 14.8 |
| 2 | C | 12.0 | 17 | 40 | 63 | 14.3 |
| 2 | D | 11.4 | 19 | 32 | 56 | 13.8 |
| 2 | E | 6.6 | 14 | 17 | 28 | 15.1 |
| 2 | F | 7.0 | 16 | 14 | 26 | 15.4 |
| 3 | A | 7.3 | 16 | 42 | 64 | 14.0 |
| 3 | B | 6.8 | 12 | 32 | 46 | 15.1 |
| 3 | C | 12.0 | 17 | 46 | 69 | 14.2 |
| 3 | D | 11.4 | 12 | 28 | 48 | 15.2 |

CIBA 038201

4,705,640

9

## TABLE 2-continued

| Sludge Type | Product | IV | CST (secs) 125/10 | 125/25 | 125/40 | Low Pressure Piston Press Cake Solids (%) |
|---|---|---|---|---|---|---|
| 3 | E | 6.6 | 10 | 18 | 28 | 15.9 |
| 3 | F | 7.0 | 11 | 19 | 31 | 16.7 |

These results show the improvement in performance when the IV is obtained by shearing rather than by synthesis (compare polymers E and F with B and A) and the improvement in performance that is obtained when polymers are sheared to reduce their IV (compare polymers C and D with E and F).

When Mw, Mv and Mz values were recorded for polymers A and E by light scattering techniques, a reduction of about 15% in (Mw/Mv) is observed and a reduction of about 30% is observed in (Mz/Mw). On the scale used for the particular apparatus for this test (Mw/Mv) for polymer D was 1.574 and for polymer F 1.324 whilst (Mz/Mw) for polymer D was 3.296 and for polymer F 2.296. These values may, depending upon the theoretical assumptions required in their calculation, need multiplication by a factor X or X may be 1, the values then being absolute values. If the values are absolute values it indicates that novel polymers according to the invention should have (Mw/Mv) below 1.5, preferably below 1.4, and/or should have (Mz/Mw) below 3 and preferably below 2.5.

### EXAMPLE 3

A further sample of solution C was degraded by subjecting it to 30 minutes of U.V. radiation in the presence of 2 ppm ferric ions (as FeCl$_3$). The resulting solution, labelled G, was found to have an intrinsic viscosity of 7.0 dl/g.

The solutions A, B, C, E and G were evaluated on a Digested primary/activated sludge using the C.S.T. technique. The results are shown in Table 3.

### TABLE 3

| Product | IV | CST (secs) at the Dose/Shear shown 150/10 | 150/25 | 150/40 |
|---|---|---|---|---|
| A | 7.3 | 24 | 50 | 87 |
| B | 6.8 | 17 | 39 | 66 |
| C | 11.4 | 24 | 91 | 155 |
| E | 6.6 | 12 | 16 | 33 |
| G | 7.0 | 16 | 39 | 63 |

The results show that the chemically degraded sample G does not give as great an improvement in effectiveness as the sheared product E, but is better than the starting polymer.

### EXAMPLE 4

A dispersion grade DMAEA/AM copolymer was dissolved in deionised water to give a 1% w/w solution. A portion of the solution was sheared in a Moulinex blender for 8 seconds.

Both solutions were compared over a dosage range on a 2% china clay suspension using jar tests. The results are shown in Table 4.

### TABLE 4

| Product | IV dl/g | Settlement time (secs) at dose indicated (ppm) 0.5 | 0.75 | 1.0 | 1.25 |
|---|---|---|---|---|---|
| Unsheared | 10.8 | 117 | 73 | 53 | 40 |

10

### TABLE 4-continued

| Product | IV dl/g | Settlement time (secs) at dose indicated (ppm) 0.5 | 0.75 | 1.0 | 1.25 |
|---|---|---|---|---|---|
| Sheared | 8.6 | 107 | 70 | 43 | 30 |

Products B and F from Example 2 were compared on a 2% china clay suspension as above. The results are shown in Table 5.

### TABLE 5

| Product | Settlement time (secs) at dose indicated (ppm) 0.1 | 0.3 | 0.4 | 0.5 |
|---|---|---|---|---|
| B | 218 | 144 | 124 | 90 |
| F | 200 | 125 | 110 | 78 |

These results show that shearing cationic polyelectrolytes gives improved flocculation of inorganic suspensions, but the improvement may not be as great as with organic suspensions.

### EXAMPLE 5

Two solid grade NaAc/AM copolymers labelled H and I and having intrinsic viscosities of 12.1 dl/g and 10.1 dl/g respectively were prepared as 0.5% w/w solutions.

A product of identical composition to the above with an intrinsic viscosity of 25.0 dl/g was also prepared as a 0.5% w/w solution. Two portions of this solution were sheared in a Moulinex blender for 40 seconds and 70 seconds; these were labelled J and K and were found to have intrinsic viscosities of 12.1 and 10.5 respectively.

Products H, I, J and K were compared on a 2% china clay suspension over a dosage range using jar tests. The results are shown in Table 6.

### TABLE 6

| | IV | Settlement time (secs) at dose indicated (ppm) 0.1 | 0.3 | 0.4 | 0.5 |
|---|---|---|---|---|---|
| H | 12.1 | 183 | 89 | 59 | 41 |
| I | 10.1 | 183 | 104 | 80 | 57 |
| J | 12.1 | 180 | 69 | 44 | 27 |
| K | 10.5 | 180 | 72 | 46 | 33 |

This demonstrates the benefit of shearing upon flocculation performance of an anionic polymer on an inorganic suspension.

### EXAMPLE 6

A portion of solution C was diluted to a 0.1% w/v solution with deionised water.

The original and diluted solution were in turn degraded in a Moulinex blender with samples being taken at suitable time intervals and evaluated on a digested primary/activated sludge. The results are in Table 7.

### TABLE 7

| 1% w/v solution | | | 0.1% w/v solution | | |
|---|---|---|---|---|---|
| Shear (secs) | IV (dl/g) | CST at 80/25 | Shear (secs) | IV (dl/g) | CST at 80/25 |
| 0 | 11.4 | 63 | 0 | 11.4 | 63 |
| 30 | — | 43 | | | |
| 60 | — | 37 | 2 | — | 40 |
| 90 | — | 35 | 4 | — | 36 |
| 120 | 6.8 | 28 | 6 | 6.9 | 29 |

A 1.5% solution required shearing for 240 seconds to achieve similar IV and CST values.

CIBA 038202

4,705,640

11

This demonstrates that the desired results can be achieved much more quickly when shearing more dilute solutions.

### EXAMPLE 7

Two parts by weight of a dispersion of 50% q DMA-EA/AM copolymer in 50% oil containing stabiliser and surfactant was dispersed into 98 parts water using the Moulinex homogeniser. Once the aqueous system appeared to be of uniform composition, the shearing was stopped and the solution aged with tumbling for 2 hours. It was then sheared in accordance with the invention for various times and the CST values recorded, as shown in Table 8.

TABLE 8

| Shear (secs) | CST at 100/25 |
| --- | --- |
| 0 | 114 |
| 3 | 104 |
| 6 | 70 |
| 9 | 48 |
| 12 | 28 |

This clearly demonstrates the beneficial effect of applying shear to the aged flocculant solution, even though some shear may have been used in its initial manufacture.

### EXAMPLE 8

A sample of solution C diluted to 0.1% was given one pass through an in-line Silverson mixer at a flow rate of one liter/min, this being 10% of the pumps maximum throughput. The resulting sheared solution was compared with the original sample and also sample B (IV 6.8) on a digested primary/activated sludge.

TABLE 9

| Product | IV dl/g | | CST (secs) | |
| --- | --- | --- | --- | --- |
| | | 125/10 | 125/25 | 125/40* |
| C | 11.4 | 28 | 65 | 82 |
| C(sheared) | 7.0 | 12 | 28 | 47 |
| B | 6.8 | 26 | 69 | 89 |

This shows that this shearing technique is also effective.

### EXAMPLE 9

A solution of 41:59 wt % DMAEAq/AM polymer was sheared in a Moulinex blender with samples taken at suitable intervals to test their effectiveness.

TABLE 10

| Shear time (secs) | IV (dl/g) | CST (secs) at 100/25* |
| --- | --- | --- |
| 0 | 7.8 | 171 |
| 2 | — | 117 |
| 4 | — | 100 |
| 6 | — | 89 |
| 10 | — | 71 |
| 15 | 6.4 | 48 |
| 30 | — | 51 |
| 45 | — | 53 |
| 90 | 5.2 | 67 |

*Average of three readings

This shows that effectiveness reaches a maximum after a certain duration of shear and that continued shearing (and continued reduction of IV) can lead to reduced effectiveness.

12

### EXAMPLE 10

Two liquid grade Mannich products (dimethylaminomethylacrylamide polymer quaternised with dimethyl sulphate) A and B of identical composition were diluted in deionised water to give 1% w/v solutions and found to have 1% solution viscosities of 71 cps and 55 cps respectively.

A portion of solution A was then sheared in a Moulineux blender and samples taken after 6 seconds, 16 seconds and 22 seconds.

Each of the samples was then evaluated on a digested primary/activated sludge for effectiveness by CST. The viscosity was recorded of the 1% solutions using spindle No 2 at 100 rpm. The results are shown in Table 11.

TABLE 11

| Product | Viscosity | CST | | |
| --- | --- | --- | --- | --- |
| | | 150/10 | 150/25 | 150/40 |
| A | 71 | 34 | 83 | 107 |
| + 6s shear | 66 | 23 | 59 | 97 |
| + 16s shear | 58 | 20 | 43 | 67 |
| + 22s shear | 55 | 15 | 32 | 50 |
| B | 55 | 35 | 80 | 106 |

This shows that better results are obtained at a given viscosity when the solution has been sheared.

### EXAMPLE 11

40 g newsprint, 10 g Manilla and 5 g corrugated paper were disintegrated in 2 l of water to give a standard waste stock of 2.5% consistency. This stock was diluted to 0.5% d/d solids and one liter aliquots treated with 200 g per ton d/d flocculant. Three different chemical types of copolymer were used. Each type was used unsheared, sheared to a lower I.V. and unsheared but having a similar low I.V., shearing in each instance was by a Moulinex homogeniser.

The flocculated stock was transferred into a Schopper-Riegler Freeness tester whose back orifice had been blocked off. The drainage rate was measured by timing the collection of 500 cm³ water. The results are shown in Table 12.

TABLE 12

| Product | I.V. (dl/g⁻¹) | Drainage time for 500 cm³ (secs) |
| --- | --- | --- |
| 60/40 w/w DMAEAq/AM | 12.0 | 16 secs |
| 240 secs shear | 6.5 | 21 secs |
| No shear | 6.6 | 25 secs |
| 40/60 w/w DMAEAq/AM | 11.3 | 16 secs |
| 100 secs. shear | 7.5 | 21 secs |
| No shear | 7.8 | 26 secs |
| 27.6/72.2 w/w DMAEAq/AM | 14.0 | 20 secs |
| 40 secs. shear | 7.0 | 22 secs |
| No shear | 7.1 | 25 secs |

This shows that the sheared products give much improved results compared to unsheared products of similar I.V.

### EXAMPLE 12

A solid grade DMAEA/ACM copolymer having IV 11.8 was made up as solution A at 1% w/v. Part of this solution was sheared for 100 seconds in the Moulineux blender to produce solution B. The solutions were compared for high pressure filtration by adding 125 g/m³ of the polymer to a primary/activated sludge and then

CIBA 038203

4,705,640

13

dewatering this at high pressure on a piston press. Solution A gave 21.8 solids content and solution B 25.6% solids content. This demonstrates the better dewatering effect obtained at high pressure using the sheared solution.

## EXAMPLE 13

qDMAEA/AM copolymer is made by copolymerisation of monomers contaminated with cross linking agent. The polymer has IV 10. A 0.1% solution of the polymer in water is sheared in the Moulinex mixer for 5 minutes. The cationicity of the polymer is measured before and after the shearing and the cationicity regain is calculated, all as defined above. After shearing for one minute the regain is 5% and after shearing for 5 minutes it is 9%. The sheared solution is a very effective flocculant.

I claim:

1. A process for flocculating an aqueous suspension of particulate material comprising forming a flocculant solution of a water soluble substantially linear organic polymeric flocculant having intrinsic viscosity (IV) greater than 4 dl/g and a molecular weight about 1 million by blending a water soluble substantially linear organic polymeric flocculant having IV greater than 5 dl/g with water to form an initial solution having a polymer concentration below 3% by weight, in which the polymeric flocculant is a soluble polymer formed from one or more ethylenically unsaturated monomers selected from the group consisting of acrylamide, methacrylamide, N-vinyl methyl acetamide, N-vinyl methyl formamide, vinyl acetate, vinyl pyrrolidone, water soluble forms of carboxylic or sulphonic acids selected from acrylic acid, methacrylic acid, itaconic acid, and 2-acrylamido methyl propane sulphonic acid, sulpho propyl acrylate, sulpho propyl methacrylate, sulpho methylated acrylamide, dialkylaminoalkyl acrylates and methacrylates and their quaternary or acid salts, and dialkylaminoalkyl acrylamides and methacrylamides and their quaternary or acid salts, then improving the flocculation performance of the polymer by subjecting the dissolved polymer to degradation while dissolved in the solution for a period sufficient to improve said flocculation performance, flocculating said particulate material by addition of an effective amount of the flocculant solution to said aqueous suspension and separating the flocculated particulate material from the suspension.

14

2. A process according to claim 1 in which the dissolved polymer is subjected to chemical, ultrasonic or mechanical degradation while dissolved in the solution.

3. A process according to claim 1 in which the degradation is effected by subjecting the initial solution to mechanical shear for a period sufficient to improve flocculation performance.

4. A process according to claim 1 in which the degradation is effected by forcing the initial solution through a Silverson-type mixer or by chopping the initial solution with a blade that rotates at a peripheral velocity above 500 m/min.

5. A process according to claim 1 in which the initial solution of the polymer is formed by blending the polymeric flocculant in solid, dispersed or dissolved form with water and then allowing the resultant solution to age for at least 30 minutes.

6. A process according to claim 1 in which the degradation reduces the IV of the polymeric flocculant by at least 5%.

7. A process according to claim 1 in which the degradation reduces the IV of the polymeric flocculant by 10 to 50%.

8. A process according to claim 1 in which the degradation reduces weight average molecular weight/viscosity average molecular weight by at least 5%.

9. A process according to claim 1 in which the solution of organic polymeric flocculant having IV above 4 is formed by blending the polymeric flocculant in solid, dispersed or dissolved form with water to form a solution containing below 2% by weight of the polymer, allowing the solution to age, and then subjecting the solution to mechanical shear for a period sufficient to reduce weight average molecular weight/viscosity average molecular weight by at least 5%.

10. A method according to claim 9 in which the flocculated particulate material is separated by pressure filtration or belt press filtration.

11. A process according to claim 1 in which the water soluble substantially linear organic polymeric flocculant is formed from one or more monomers selected from the group consisting of dialkylaminoalkyl(meth)acrylates and their quaternary or acid salts, dialkylaminoalkyl(meth)acrylamides and their quaternary or acid salts, water soluble salts of acrylic acid, water soluble salts of 2-acrylamidomethyl propane sulfonic acid and acrylamide.

12. A method according to claim 1 in which the flocculated particulate material is separated by pressure filtration or filtration on a belt press.

*  *  *  *  *

Serial No. 535,626                           --2--

Art. Unit   155

15.

    Applicants' arguments, filed on January 10, 1991, have been carefully considered.

16.

    The restriction requirement is withdrawn in view of the arguments.

17.

    The corrections in claims 5 and 10 are noted.  The rejection under 35 U.S.C. 112, first paragraph, has been overcome.

18.

    The rejection of claims 8 and 12 under 35 U.S.C. 112, first paragraph, is withdrawn in view of arguments.

19.

    The rejection of claims 1-13 under 35 U.S.C. 112, second paragraph, has been overcome by the amendment.

20.

    The rejection of claims 1-5, 7-9, and 12 under 35 U.S.C. 102(b) or under 35 U.S.C. 103 over Makhlouf et al on record is repeated.

    On page 7 of the amendment, the applicants argued that the polymers of Markhouf et al contain 70-99% water-insoluble monomer.  The list of monomers in lines 41-63 column 2 of the reference included vinyl acetate which is soluble in water.

CIBA 038205

Serial No. 535,626                                -3-

Art Unit   155

There is also a statement that essentially any copolymerizable
mono ethylenic monomer may be utilized.

21.

    The rejection on record of claims 1-4, 7-10, 12 and 13 under
*over Durand et al.*
35 U.S.C. 102(b) or 35 U.S.C. 103 is withdrawn in view of the
arguments.

22.

    The rejection on record of claims 1-4, 7, 9-11 and 13 under
*over Silver*
35 U.S.C. 102(b) or 35 U.S.C. 103 has been overcome by the
amendment.

23.

    The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section
> 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such that
> the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary
> skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which
> the invention was made.

> Subject matter developed by another person, which qualifies
> as prior art only under subsection (f) or (g) of section 102
> of this title, shall not preclude patentability under this
> section where the subject matter and the claimed invention
> were, at the time the invention was made, owned by the same
> person or subject to an obligation of assignment to the same
> person.

CIBA 038206

Serial No. 535,626                                    -4-

Art Unit   155


    Claims 1-13 are rejected under 35 U.S.C. § 103 as being

unpatentable over Neff et al (U.S. 4,968,435) in view of

Whittaker.

    In the primary reference, Neff et al disclosed crosslinked

cationic polymeric microparticles and its method of preparation.

    Whittaker taught the use of cationic, anionic, and/or

amphoteric polymers as flocculating agents for different types of

dispersions.

    Thus it would be obvious because crosslinked anionic (and/or

amphoteric) polymeric microparticles would be expected to

flocculate that type of dispersions which Whittaker's anionic

(and/or amphoteric) polymers will flocculate.

24.

    The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

    A patent may not be obtained though the invention is not
    identically disclosed or described as set forth in section
    102 of this title, if the differences between the subject
    matter sought to be patented and the prior art are such that
    the subject matter as a whole would have been obvious at the
    time the invention was made to a person having ordinary
    skill in the art to which said subject matter pertains.
    Patentability shall not be negatived by the manner in which
    the invention was made.

    Subject matter developed by another person, which qualifies
    as prior art only under subsection (f) or (g) of section 102
    of this title, shall not preclude patentability under this
    section where the subject matter and the claimed invention
    were, at the time the invention was made, owned by the same
    person or subject to an obligation of assignment to the same
    person.

CIBA 038207

Serial No. 535,626                                    -5-

Art Unit  155

   Claims 14-22 are rejected under 35 U.S.C. § 103 as being
unpatentable over Neff et al (U.S. 4,968,435) in view of Durand
et al.

   Neff et al disclosed the method of preparing crosslinked
cationic polymeric microparticles.

   Durand et al showed that anionic monomers are polymerizable
under the inverse emulsion polymerization conditions of Neff.
Thus it would be obvious.

25.

   Applicant's amendment necessitated the new grounds of
rejection.  Accordingly, THIS ACTION IS MADE FINAL.  See M.P.E.P.
§ 706.07(a).  Applicant is reminded of the extension of time
policy as set forth in 37 C.F.R. § 1.136(a).


   A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL
ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS
ACTION.  IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS
OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION
IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED
STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE
ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE
PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE
MAILING DATE OF THE ADVISORY ACTION.  IN NO EVENT WILL THE
STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM
THE DATE OF THIS FINAL ACTION.

*WCC*

W. Cheng:amw
April 09, 1991
703-308-2351

April 09, 1991

JOSEPH L. SCHOFER
SUPERVISORY PATENT EXAMINER
ART UNIT 155

CIBA 038208

150  8/29/91  155

[4Apr89/MBll-2]                                      Docket No. 31,320-00

                                                                        PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

    MAIL ROOM
    JUL
    73  22
    1991
    PAT & TRADEMARK OFF

Application of:                          Date: July 18, 1991
RODERICK GLYN RYLES                              154   7/30/91
DAN S. HONIG                                     152
ELIETH W. HARRIS                                       061 Cheng, WU
ROGER E. NEFF
                                         RECEIVED
Serial No.: 07/535,626 ✓
Filed:  June 11, 1990                    JUL 2 0 1991   A6
For:  CROSS-LINKED ANIONIC AND
      AMPHOTERIC POLYMERIC                GROUP 150
      MICROPARTICLES

Commissioner of Patents and Trademarks
Washington, D. C.  20231

        PETITION FOR EXTENSION OF TIME (37 CFR 1.36(a))

1.   This is a petition for an extension of the time for a total
     period of  1  month(s) to respond to the Office Letter
     mailed on  April 11, 1991    by   filing a continuation
     application.

2.   A response in connection with the matter for which this
     extension is requested:      /
     [   ] is filed herewith
     [   ] has been filed
          (complete the following if applicable)
     [   ] the response is the filing of a continuation
          application having an express abandonment conditioned
          on the granting of a filing date to the continuing
          application.

-----------------------------------------------------------------------
                 CERTIFICATE OF MAILING [37 CFR 1.8(a)]

     I hereby certify that this paper (along with any referred to as
     being attached or enclosed) is being deposited with the United
     States Postal Service on the date shown below with sufficient
     postage as first class mail in an envelope addressed to the:
     Commissioner of Patents and Trademarks, Washington, D.C. 20231.

     DS20155  07/24/91  07535626      01-1300  020  115    100.00CH

     Date: _____
                            _____
                            (Signature of person mailing paper)
-----------------------------------------------------------------------

CIBA 038209

[REV.4Apr89/MB11-2]          -2-

3.   Calculation of extension fee (37 CFR 1.17(a)-(d):

   [ X ] One Month.     Fee in the amount of $100.00
   [   ] Two Months.    Fee in the amount of $300.00
   [   ] Three Months.  Fee in the amount of $730.00
   [   ] Four Months.   Fee in the amount of $1,150.00

                                        FEE $ 100.00

If an additional extension of time is required, please consider
this a petition therefor.

        (check and complete the next item, if applicable)

   [   ] An extension for ____ months has already been secured
         and the fee paid therefor of $_____ is deducted
         from the total fee due for the total months of
         extension now requested.

        Extension fee due with this request $ 100.00

4.   FEE PAYMENT
   [ X ] Charge fee to Account No. 01-1300 and this is a
         request to charge for any additional extension and/or
         fee required or credit for any excess fee paid. A
         duplicate of this petition is attached.

                         _____
                         (Signature of Attorney)

Reg. No. 19933           Frank M. Van Riet
                         (Type name of Attorney)

Tel. No. (203) 321-2614  American Cyanamid Company
                         1937 West Main Street
                         P.O. Box 60
                         Stamford, CT 06904-0060

CIBA 038210



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/535,626 | 06/11/90 | BYLES | R 31,320 |

| EXAMINER |
|---|
| CHENG, W |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1505 | |

```
FRANK M. VAN RIET
C/O AMERICAN CYANAMID CO.
1937 WEST MAIN STREET
STAMFORD, CT 06904-0060
```

DATE MAILED:
11/19/91

### NOTICE OF ABANDONMENT

This application is abandoned in view of:

1. ☒ Applicant's failure to respond to the Office letter, mailed  *4-11-91*  .

2. ☐ Applicant's letter of express abandonment which is in compliance with 37 C.F.R. 1.138.

3. ☐ Applicant's failure to timely file the response received _____ within the period set in the Office letter.

4. ☐ Applicant's failure to pay the required issue fee within the statutory period of 3 months from the mailing date of _____ of the Notice of Allowance.

   ☐ The issue fee was received on _____ .

   ☐ The issue fee has not been received in Allowed Files Branch as of _____ .

   In accordance with 35 U.S.C. 151, and under the provisions of 37 C.F.R. 1.316(b), applicant(s) may petition the Commissioner to accept the delayed payment of the issue fee if the delay in payment was unavoidable. The petition must be accompanied by the issue fee, unless it has been previously submitted, in the amount specified by 37 C.F.R. 1.17 (i), and a verified showing as to the causes of the delay.

   If applicant(s) never received the Notice of Allowance, a petition for a new Notice of Allowance and withdrawal of the holding of abandonment may be appropriate in view of Delgar Inc. v. Schuyler, 172 U.S.P.Q. 513.

5. ☐ Applicant's failure to timely correct the drawings and/or submit new or substitute formal drawings by _____ as required in the last Office action.
   ☐ The corrected and/or substitute drawings were received on _____ .

6. ☐ The reason(s) below.

*[signature]*

EDWARD J. SMITH
PRIMARY EXAMINER
ART UNIT 1505

PTO-1432 (REV. 5-83)

CIBA 038211

#8

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:                          )
                                               )
APPLICANT:    RYLES                            )
                                               )
SERIAL NO:    535,626                          )
                                               )
FILED:        June 11, 1991                    )
                                               )
                                               )
                                               )

POWER TO INSPECT AND MAKE COPIES

HONORABLE COMMISSIONER OF PATENTS
  AND TRADEMARKS
WASHINGTON, D.C.   20231


SIR:

          The undersigned is the attorney of record in the subject

application, and therefore grants the power to inspect and make copies

to Rita M. Stark, of Landon & Stark Associates, Inc.

                              Respectfully submitted,

                              _Frank M Van Riet_
                              Frank M. Van Riet
                              Registration No. 19933


DATED:  December 6, 1991

AMERICAN CYANAMID COMPANY
1937 West Main Street
P. O. BOX 60
STAMFORD,   CT  06904-0060

TEL.: (203) 348-7331

CIBA 038212