## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 04-293 (KAJ) |
| | ) | |
| HERCULES INCORPORATED and | ) | **PUBLIC VERSION** |
| CYTEC INDUSTRIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## HERCULES' RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Ford F. Farabow, Jr.
Joann M. Neth
Eric J. Fues
A. Neal Seth
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: January 27, 2006
Public Version Dated: February 3, 2006

*Attorneys for Defendant*
*Hercules Incorporated*

## TABLE OF CONTENTS

I.   Nature and Stage of the Proceedings ............................................................1

II.  Summary of Argument .............................................................................1

III. Argument .............................................................................................3

     A.   Ciba's Legal Analysis is Incorrect ....................................................3

     B.   Construction of the '808 Patent Terms .............................................3

          1.   "A composition comprising" .................................................3

          2.   "Cross-linked anionic or amphoteric polymeric
               microparticles" ................................................................4

          3.   "A cross-linking agent" .....................................................10

          4.   "Microparticles derived solely from the polymerization of
               an aqueous solution of at least one monomer" ........................12

          5.   "Said microparticles having an unswollen number average
               particle size diameter of less than about 0.75 micron" ..............15

          6.   "Said microparticles having . . . a cross-linking agent
               content of about 4 molar parts to about 4000 parts per
               million based on the monomeric units present in the
               polymer" ........................................................................17

          7.   "(a) admixing  (i) an aqueous solution comprising . . . at
               least  one crosslinking agent . . . ; (ii) an oily phase . . . ;
               (iii) an effective amount of surfactant or surfactant mixture,
               so as to form an inverse emulsion; . . . ." ............................20

     C.   Construction of the '766 Patent Terms ............................................21

          1.   "A method of making paper which comprises adding . . .
               from about 0.05 to about 20 lbs/ton . . . of . . . microbead" ........21

          2.   "Aqueous paper furnish" ...................................................24

          3.   "An ionic, organic, cross-linked polymeric microbead" ............24

          4.   "The microbead having an unswollen particle diameter of
               less than about 750 nanometers" .........................................31

IV.  Conclusion ............................................................................................33

i

## TABLE OF AUTHORITIES

**Cases**

*Advanced Display Systems, Inc. v. Kent State University*,
  212 F.3d 1272 (Fed. Cir. 2000) ................................................................................ 7, 25

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) .................................................................................. 16, 23

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
  132 F.3d 701 (Fed. Cir. 1997) ...................................................................................... 9

*Cephalon, Inc. v. Barr Labs., Inc.*,
  389 F. Supp. 2d 602 (D. Del. 2005) .............................................................................. 3

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
  64 F.3d 1553 (Fed. Cir. 1995) ...................................................................................... 19

*Genentech, Inc. v. Chiron Corp.*,
  112 F.3d 495 (Fed. Cir. 1997) ................................................................................ 3, 4, 16

*In re Crish*,
  393 F.3d 1253 (Fed. Cir. 2004) .................................................................................... 4

*Jeneric/Pentron Inc., v. Dillon Co. Inc.*,
  205 F.3d 1377 (Fed. Cir. 2000) .................................................................................... 22

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) .................................................................................... 15

*Kustom Signals, Inc. v. Applied Concepts, Inc.*
  264 F.3d 1326 (Fed. Cir. 2001) .................................................................................... 23

*Mars, Inc. v. H.J. Heinz Co.*,
  377 F.3d 1369 (Fed. Cir. 2004) .................................................................................... 16

*Nystrom v. Trex Co.*,
  424 F.3d 1136 (Fed. Cir. 2005) .................................................................................... 3

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) .................................................................................... 30

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................................................................... 2

*Regents of the Univ. of California v. Eli Lilly and Co.*,
  119 F.3d 1559 (Fed. Cir. 1997) .................................................................................. 9, 16

*See In re Baxter*,
  656 F.2d 679 (C.C.P.A. 1981) ...................................................................................... 21

*Tate Access Floors v. Interface Architectural Resources, Inc.*,
  279 F.3d 1357 (Fed. Cir. 2002) .................................................................................... 26

*Warner-Jenkinson Co. Inc. v. Hilton Davis Chemical Co.*,
  520 U.S. 17 (1997) ...................................................................................................... 9

**Statutes**

35 U.S.C. § 112............................................................................................................. 6, 13

**Other Authorities**

Manual of Patent Examining Procedure § 608.01(p)................................................................ 7

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Ciba Specialty Chemicals Corp. ("Ciba") has sued Hercules Incorporated ("Hercules") and Cytec Industries Inc. ("Cytec") for allegedly infringing claims of U.S. Patent Nos. 5,171,808 ("the '808 patent," Ex. 1)[1] and 5,167,766 ("the '766 patent," Ex. 2). Hercules and Cytec have denied infringement of the asserted claims[2], and Hercules has counterclaimed that Ciba's patent claims are invalid and unenforceable.

The issue of claim construction is before the Court. On December 30, 2005, Hercules and Ciba submitted initial claim construction briefs. This is Hercules' responsive brief in support of its proposed construction of the disputed claim terms.

## II.    SUMMARY OF ARGUMENT

1.    Ciba's opening brief ("Ciba Br.") (D.I. 275) dwells on matters that are largely irrelevant to the central issue before the Court--the proper construction of the disputed patent terms based on the intrinsic evidence of record. Ciba discusses the background of the development of the accused product, Hercules' PerForm® SP9232 (*see* Ciba Br. at 5), reproduces slides and argument already presented at the May 27, 2005 Tutorial (*see* Ciba Br. at 6-11), and cites to an internal Hercules document dated long after the prosecution and issuance of the patents-in-suit (*see* Ciba Br. at 8). In contrast, Ciba devotes less than four pages of its brief to discussing the prosecution histories of both patents-in-suit. (*See* Ciba Br. at 17-20.) Ciba clearly seeks to evade the significant and limiting concessions that the applicants made to the United States Patent & Trademark Office ("PTO") in order to gain allowance of the '808 and '766 patent claims. Ciba also glosses over the patents' written

---

[1] References to "Ex. __" refer to Exhibit Nos. 1-14 in the Appendix in Support of Hercules' Opening Claim Construction Brief (D.I. 287, 288) and to Exhibit Nos. 15-16 attached hereto.

[2] Ciba has asserted against Hercules and Cytec claims 1, 6-8, 11, 13, 15, 17, and 20-21 of the '808 patent and claims 1, 3, 5, 7, 9, 11, 13, 17, 19, 21, 23, and 25 of the '766 patent.

descriptions and relies on extrinsic evidence in seeking broad claim constructions. (*See* Ciba Br. at 11-16.)

2. Ciba's claims should be construed within the context of "what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc). The '808 and '766 patent claims should be evaluated in light of the narrow written descriptions and prosecution disclaimers of record. Accordingly, the claimed cross-linked microparticles and microbeads should be construed to have polyfunctional cross-linking agents incorporated into their structures because that is what applicants disclosed and exemplified in their patents.

3. Ciba's discussion of the written descriptions and prosecution histories of the patents-in-suit is largely conclusory attorney argument. (*See* Ciba Br. at 11-20). Hercules responds to these inaccuracies below in its discussion of the specific claim terms the Court is asked to define.

4. Hercules specifically disagrees with the relevance and accuracy of much of Ciba's background information. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Hercules' PerForm® SP9232 product and its use fall well outside of the proper scope of Ciba's claims.

III.    ARGUMENT

A.    Ciba's Legal Analysis is Incorrect

Ciba discusses several cases standing for the proposition that claims should be construed according to their ordinary meaning as reflected in the intrinsic record. (Ciba Br. at 20-22.) Hercules agrees and has proposed constructions that reflect the ordinary meaning of the disputed claim terms *in light of the intrinsic record.* Hercules disagrees, however, with Ciba's attempts to evade the intrinsic record and the context of statements made during patent prosecution in seeking broad, unsupported, alleged "ordinary meaning" claim constructions. *See Nystrom v. Trex Co.,* 424 F.3d 1136, 1145 (Fed. Cir. 2005) (rejecting a proposed claim construction "divorced from the context of the written description and prosecution history"); *Cephalon, Inc. v. Barr Labs., Inc.,* 389 F. Supp. 2d 602, 606 (D. Del. 2005) (refusing "to broaden the inventors' use of the disputed phrases and construe them" expansively in light of the intrinsic record).

B.    Construction of the '808 Patent Terms

1.    "A composition comprising"

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "A composition comprising" | "'Comprising' is a term of art used in [patent] claim language which means that the named elements are essential, but other elements may be added and still form a [composition] within the scope of the claim." *Genentech, Inc. v. Chiron Corp.,* 112 F.3d 495, 501 (Fed. Cir. 1997). | A composition comprising refers to the composition required by the remainder of the claim. |

Ciba contends that Hercules' proposed construction would "emasculate" the size limitation of the claims even though Ciba relies on case authority that fully agrees with, and

3

even quotes from, the Hercules case law definition.  Like Hercules' proposed construction, Ciba's cases hold that the claim term "comprising" permits the inclusion of other elements in addition to those specifically enumerated in the claims.  *See In re Crish*, 393 F.3d 1253, 1257 (Fed. Cir. 2004); *Genentech*, 112 F.3d at 501.

Ciba does not adhere to this authority by failing to acknowledge the open-ended nature of its "comprising" claim term.  To the contrary, Ciba maintains that this term "refers to the composition required by the remainder of the claim" in an attempt to limit its claim to only those elements specifically recited therein.  Neither the specification nor prosecution history of the '808 patent require the open-ended phrase "a composition comprising" to be construed in the narrow manner proposed by Ciba.  To the contrary, this open-ended claim term signals that the composition of the '808 patent can include constituents in addition to those enumerated in the remainder of the claim, including microparticles having sizes different than those claimed.

       2.       **"Cross-linked anionic or amphoteric polymeric microparticles"**

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "cross-linked anionic or amphoteric polymeric microparticles" | Small anionic or amphoteric particles formed by polymerization in the presence of a cross-linking agent, as defined below, in sufficient quantity to assure a cross-linked composition. | The microparticle product results from the polymerization of an aqueous solution of at least one water soluble monomer wherein the polymer chains are linked together by cross-linking to constrain the size of the microparticle. |

Ciba contends that cross-linking and cross-linking agents are different and, therefore, "cross-linking can occur with and without the presence of 'cross-linking agents.'"  (Ciba Br. at 34.)  Hercules disagrees because the remaining claim language, the written description, and the prosecution history of the '808 patent uniformly indicate that the cross-linked

4

microparticles have polyfunctional cross-linking agent incorporated into their polymeric structures.

The '808 specification dispels Ciba's argument that a cross-linked microparticle does not require a cross-linking agent. The '808 patent explains that "[p]olymerization of the monomers is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition." (Ex. 1 at col. 4, ll. 45-47.) The patent further instructs that "[c]rosslinking agents are to be used in sufficient quantities to assure a crosslinked composition." (*Id.* at col. 4, ll. 63-64.) Additionally, as Ciba admits in its opening brief, "[t]he Examples of the '808 patent employ MBA, which is a very common cross-linking agent." (Ciba Br. at 15.) MBA contains two double bonds that open up during polymerization, creating two reactive sites that then react with and link together polymer chains and become incorporated into the resulting polymer structure. (*See* Ex. 1 at col. 1, ll. 26-30 (acknowledging that during polymerization with MBA, "[c]rosslinking is accomplished *by the incorporation of a difunctional monomer*, such as methylenebisacrylamide, *into the polymer*. This crosslinking technology is well known in the art." (emphasis added)).)

According to Ciba, a foreign patent mentioned in the Background section of the '808 and '766 patents, EP 0,202,780 to Flesher *et al.* ("the Flesher '780 patent"), teaches "ionic" as well as polyfunctional cross-linking agents.[3] Ciba asserts that this information is significant for claim construction purposes. (Ciba Br. at 12, 15.) Ciba also contends the

---

[3] Ciba continues with this argument in the opening brief supporting its motion for summary judgment of infringement ("Ciba S.J. Br.") (D.I. 278). There Ciba argues that "ionic" cross-linking (not the polyfunctional cross-linking disclosed) is "similar" to the hydrophobic association ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ciba S.J. Br. at 11.) But neither ionic cross-linking nor hydrophobic association are described in Ciba's patents, as explained herein.

entire disclosure of the Flesher '780 patent is incorporated into the '808 patent. (Ciba Br. at 14.)

Ciba's argument fails on two counts. First, the '808 and '766 specifications make no reference to the "ionic" cross-linking allegedly described in the Flesher '780 patent and repeatedly discussed in Ciba's claim construction brief. Instead, both patents limit their discussion of the Flesher '780 patent to polyfunctional cross-linking:

> EP 0,202,780 describes the preparation of polymeric, crosslinked, cationic acrylamide polymer beads by conventional inverse emulsion polymerization techniques. Crosslinking is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide, into the polymer. *This*[4] crosslinking technology is well known in the art. The patentee teaches that the crosslinked beads are useful as flocculants.

(Ex. 1 at col. 1, ll. 23-30 (emphasis added); *see also* Ex. 2 at col. 2, ll. 47-57 (using virtually identical language).)

Having so limited its definition of cross-linked and cross-linking agents, Ciba next seeks to expand this definition by an alleged "incorporation by reference." Ciba seeks to belatedly incorporate the Flesher '780 patent into the '808 patent by reference to an alleged incorporation of "patents and publications." (*See* Ex. 1 at col. 9, ll. 40-41.) This attempt to modify the intrinsic record fails.

The PTO's Manual of Patent Examining Procedure ("MPEP") explains that in order to comply with 35 U.S.C. § 112, a patent application can only incorporate "essential

---

[4] Ciba conveniently omits the word "This" from its quote of the '766 patent's specification. (*See* Ciba Br. at 12). Ciba uses the full quotation--"[t]his crosslinking technology is well known in the art"--in its discussion of the '808 patent specification but incorrectly implies that the quote relates cross-linking with ionic agents. (*See* Ciba Br. at 15.) Instead, the reference in the '808 specification relates only to the preceding, quoted sentence and cross-linking brought about by incorporation of a difunctional monomer into the polymer.

material" by referring to a United States patent or an allowed U.S. application. (*See* Ex. 15, MPEP § 608.01(p)(B.) The Flesher '780 patent is neither--it is a foreign patent.

The case law also holds that to be effective, the incorporating statement must clearly identify subject that is incorporated and where it is found. *See Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) ("To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where the material is found in the various documents."). Here the subject matter, limited to polyfunctional cross-linking monomers, is spelled out in detail as quoted above. Hence, information from Flesher '780 patent beyond that described in the specification is not available to Ciba to broaden the '808 patent disclosure.

Applicants prosecuted two patent applications, initiated an appeal of their claim rejections to the PTO's Board of Patent Appeals and Interferences, and negotiated with the Examiner for over two and one half years before the '808 patent issued. Ciba discusses none of this in its recitation of the '808 patent's prosecution history. (*See* Ciba Br. at 19-20.)

The Examiner rejected applicants' claims during prosecution of the '808 patent over U.S. Patent No. 4,681,912 issued to Durand et al. ("the Durand '912 patent"). (*See* Office Action, Ex. 3 at CIBA 000515.) The Examiner noted that Example 1 of the Durand '912 patent disclosed anionic organic polymeric microparticles formed by polymerizing the monomers of sodium acrylate and acrylamide in the presence of two oleate surfactants. (*Id*) The Examiner reasoned that since the oleate portion of these surfactants contained a double bond, these oleate surfactants could be expected to function as cross-linking agents.

Applicants responded by arguing that a cross-linking agent was not used in Example 1 of the Durand '912 patent. (*See* Amendment, Ex. 3 at CIBA 000526.) They asserted that

Durand's surfactants could not function as cross-linking agents because they did not contain the necessary two functional groups:

> The Examiner apparently recognizes the deficiency of Durand etal in that he points out that the oleate surfactants of Durand etal contain an unsaturated group and thus would reasonably be expected to function as a cross-linker. This assumption is erroneous in that the oleates of Durand etal are monounsaturated and if any reaction thereof with the acrylamide and/or acrylate were to occur it would occur linearly *because a cross-linking agent must contain <u>two</u> functional groups to act as such*, see page 7, lines 11-26 of the instant specification.

(*Id.* (underlining in original; other emphasis added).)  In making this argument, applicants pointed to the passage of their application defining a cross-linking agent: "Polymerization of the monomers is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition. The polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups." (Ex. 1 at col. 4, ll. 45-50.) (*Compare* Ex. 3 at CIBA 000486, ll. 11-14 *with* Ex. 1 at col. 4, ll. 47-50.)

No matter how Ciba seeks to recast this discussion (*see* Ciba Br. at 19-20), the applicants actually pointed to their definition of a cross-linking agent and relied on this definition to overcome a prior art rejection. Ciba cannot not escape this disclaimer.

Later in the prosecution history the applicants repeated this argument in attempting to distinguish other prior art: "Whittaker does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount." (Preliminary Amendment, Ex. 8 at HERC 0076113.) Applicants thus emphasized that a cross-linked polymeric microparticle is formed by incorporating a cross-linking agent into the polymer. Ciba improperly attempts to ignore this intrinsic evidence.

8

Ciba's discussion of both the technical propriety of the Examiner's rejection and Hercules' expert's discussion thereof, misses the point. The time for addressing the technical propriety of a rejection is during patent prosecution, not during subsequent litigation. *See Regents of the Univ. of California v. Eli Lilly and Co.*, 119 F.3d 1559, 1572 n.6 (Fed. Cir. 1997) (affirming the district court's acceptance of the Examiner's arguments for purposes of construing the claims in view of the prosecution history without inquiring into the correctness of the Examiner's position); *see also Warner-Jenkinson Co. Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 33 n.7 (1997) ("We do not suggest that, where a change is made to overcome an objection based on the prior art, a court is free to review the correctness of that objection when deciding whether to apply prosecution history estoppel. As petitioner rightly notes, such concerns are properly addressed on direct appeal from the denial of a patent, and will not be revisited in an infringement action.").

Ciba also argues that a construction requiring a cross-linking agent would "make superfluous other express language in the claim." (Ciba Br. at 34.) Since claim 1 of the '808 patent additionally requires *a specified amount* of cross-linking agent to be incorporated into the microparticle, Hercules' proposed construction would not render superfluous other portions of the claim. In any event, allegations of "superfluous" claim language are not controlling where a mutually reinforcing construction assists with better understanding the claim language. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 707 (Fed. Cir. 1997).

### 3.    "A cross-linking agent"

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "a cross-linking agent" | A chemical agent that is polyfunctional in that it has at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together. | Cross-linking agent refers to an agent that links the polymer chains together in use to constrain the size of the microparticle. Cross-linking agent does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc. |

Ciba devotes most of its cross-linking agent discussion to attacking Hercules' proposed construction. (*See* Ciba Br. at 36-37.) But in asserting that "the claim is clear and its ordinary meaning should be adopted" (Ciba Br. at 37), Ciba ignores the definition provided in the '808 patent specification (*see* Ex. 1 at col. 4, ll. 47-50), and applicants' unequivocal reliance this definition during patent prosecution (*see* Ex. 3 at CIBA 000526). Ciba is not entitled to a free pass on the intrinsic evidence.

The '808 patent specification defines a cross-linking agent as a polyfunctional chemical that includes "molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups." (Ex. 1 at col. 4, ll. 47-50.) The preferred cross-linking agent of the '808 patent, MBA, meets this definition with its two double bonds. (*See id.* at col. 4, ll. 51-52.) So do all of the other cross-linking agents described in the '808 patent. (*See id.* at col. 4, ll. 50-62.)

Applicants relied on their definition of a polyfunctional cross-linking agent during patent prosecution. (See discussion of the prosecution history dealing with the Durand prior art at pages 7-8, *supra*.) Applicants asserted that Durand's surfactants could not function as cross-linking agents because they did not contain the necessary two functional groups:

10

> [T]he oleates of Durand etal are monounsaturated and if any reaction thereof with the acrylamide and/or acrylate were to occur it would occur linearly *because a cross-linking agent must contain <u>two</u> functional groups to act as such*, see page 7, lines 11-26 of the instant specification.

(Ex. 3 at CIBA 000526 (underlining in original; other emphasis added).)  In making this argument, applicants pointed to a passage of their application containing the same cross-linking agent definition that Hercules proposes for this claim term.  (*Compare* Ex. 3 at CIBA 000486, ll. 11-14 *with* Ex. 1 at col. 4, ll. 47-50.)

Ciba proposes construing "a cross-linking agent" as "an agent that links the polymer chains together in use to constrain the size of the microparticle."  Ciba's proposal lacks support in the intrinsic record.  Neither the specification nor the prosecution history discusses the cross-linking agent "constraining" the polymer chains to have a certain size.  To the contrary, the '808 patent indicates that the *surfactant* is responsible for limiting the size of the claimed microparticle, not the cross-linking agent:

> The precise particle size which is achievable in inverse emulsions is determined by the concentration and activity of the surfactant(s) employed and these are customarily chosen on the basis of emulsion stability and economic factors.

(Ex. 1 at col. 1, ll. 35-40.)  The specification of the '808 patent also discusses surfactants separately from cross-linking agents and never suggests that they can be the same.  (*See, e.g.*, *id.* at col. 4, ll. 47-62 (defining a cross-linking agent and providing examples); *id.* at col. 3, ll. 6-9 and col. 6, ll. 7-18 (discussing the properties of surfactants useful in practicing the alleged invention and providing examples).)

Ciba's further construction that "[c]ross-linking agent does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc." lacks intrinsic record support and contravenes other claim language.  Claim 1 recites cross-linked polymeric microparticles "having an *unswollen* number average particle size."  This

11

requires that the microparticles are cross-linked in their unswollen state. (*See* Ex. 1 at col. 6, ll. 30-36 (noting that after polymerization, the polymeric particles of the '808 patent either exist in emulsion form or have been recovered from the emulsion through precipitation, filtering, and drying).) Hydrophobic associations cannot form until the emulsion is inverted into water and the particles become swollen, or until the recovered particles are added to water. Consequently, Ciba's argument that its claim covers hydrophobic association cannot be correct since the cross-linked microparticles are swollen by the time hydrophobic association could occur.

The intrinsic record also contains no discussion of cross-linking agents beyond those defined and exemplified in the specification or discussed in connection with the Durand and Whittaker prior art rejections. And neither the intrinsic record nor Ciba's discussion of a "cross-linking agent" in its brief justify construing this claim term to encompass hydrophobic association. Accordingly, Ciba's "ordinary meaning" construction itself lacks support and should be rejected. *See Nystrom*, 424 F.3d at 1145-46 ("Broadening of the ordinary meaning of a term in the absence of support in the intrinsic record indicating that such a broad meaning was intended violates the principles articulated in *Phillips* "); *accord Cephalon*, 389 F. Supp. 2d at 605-06 (citing *Nystrom*).

**4.    "Microparticles derived solely from the polymerization of an aqueous solution of at least of one monomer"**

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "microparticles derived solely from the polymerization of an aqueous solution of at least of [sic] one monomer" | Microparticles must be derived only from the polymerization of an aqueous solution of at least one monomer. | The polymer chains are derived from monomer(s), which are water soluble. |

Ciba's proposed construction is even broader than the claim language thrice rebuffed by the PTO. During prosecution of the first-filed application leading to the '808 patent, applicants' claims were rejected over U.S. Patent No. 4,147,688 to Makhlouf *et al.* ("the Makhlouf '688 patent," Ex. 5). (*See* Office Action, Ex. 3 at CIBA 000515-16.) The Examiner contended that the Makhlouf '688 patent disclosed a composition of cross-linked organic microparticles having the required size, along with a cross-linking agent. (*Id.* at CIBA 000516.) Applicants responded by amending claim 1 to require "that the polymers hereof are produced solely from water-soluble monomers" and argued for the patentability of their amended claims. (*See* Amendment, Ex. 3 at CIBA 000527 (underlining in original).) The Examiner did not agree and maintained the rejection.

In response, applicants filed a continuation application along with a preliminary amendment. In the preliminary amendment, the applicants urged reconsideration of the rejection. (*See* Preliminary Amendment, Ex. 8 at HERC 0076112.) The Examiner was not persuaded and maintained the rejections. The Examiner also rejected the amended claims as indefinite under 35 U.S.C. § 112 second paragraph, because the added limitation directed to solely "water-soluble monomers" was ill-defined. (*See* Final Office Action, Ex. 8 at HERC 0076119.)

Applicants initiated the appeal process within the PTO to further pursue their claims. In their initial appellate brief, they again argued that the Makhlouf '688 patent compositions failed to satisfy the claim limitations of the polymeric microparticle being prepared solely from water soluble monomers. (*See* Brief for Appellants, Ex. 8 at HERC 0076129.) Applicants also argued that the indefiniteness rejection was improper because a person of skill in the art allegedly would have been familiar with the amended claim term "water soluble monomers." (*Id.* at HERC 0076129-30.) Before the Examiner filed a responsive brief, applicants' patent attorney, Frank Van Riet, discussed the pending claims with the

Examiner in a telephonic interview. During that interview, the Examiner and Mr. Van Riet reached agreement regarding the claims. (*See* Examiner Interview Summary Record, Ex. 8 at HERC 0076142.) As part of this agreement, Mr. Van Riet authorized amending the claim language, changing the requirement that the microparticles be "derived solely from water soluble monomers" to the requirement that they be "derived solely from the polymerization of an aqueous solution of at least one monomer." (*Id.*)

In light of the above, it is not "crystal clear" as asserted by Ciba that this claim amendment "was only intended to specify that the monomers are water soluble." (Ciba Br. at 20.) To the contrary, the Examiner rejected this proposed language on numerous occasions and found it indefinite.

Ciba asserts that the amendatory claim language was added during prosecution "to clarify that the monomers needed to be completely water soluble." (Ciba Br. at 35.) But Ciba's construction does not require complete monomer solubility in water. And in any event, the Examiner rejected the phrase "water-soluble monomers" as indefinite. (*See* Ex. 8 at HERC 0076119.) Adding the adjective "completely" to this phrase would not cure this indefiniteness and only goes back to language specifically rejected by the Examiner. (*See* Ex. 3 at CIBA 000522) Furthermore, Ciba's contention that "[i]t is well recognized that initiation and polymerization can occur in both the oil and aqueous phases" (Ciba Br. at 35) both lacks support in the intrinsic record and utterly ignores the claim language.

Hercules' proposed construction is consistent with the specification of the '808 patent, which describes the chemical components that form the microparticles--the monomers and cross-linking agents--as residing in the aqueous phase prior to polymerization. (*See* Ex. 1 at col. 5, ll. 44-51.) Applicants ultimately chose claim language requiring the microparticles to be derived solely from an aqueous solution. In commenting on why he allowed this claim language, the Examiner stated his belief that (1) partially water soluble

monomers would be excluded from the claim and (2) "few monomers among many may meet" the final claim language. (Ex. 8 at HERC 0076145.) Hercules' interpretation of requiring the microparticles to be derived only from the polymerization of an aqueous solution of at least one monomer is consistent with the Examiner's Statement of Reasons for Allowance, whereas Ciba's broad "water-soluble monomers" proposal is not. And in any event, the applicants accepted the plain language of the claims and Ciba must live with that. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

>        5.    **"Said microparticles having an unswollen number**
>              **average particle size diameter of less than about**
>              **0.75 micron"**

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron" | Some microparticles in the composition have an unswollen number average particle size diameter of less than about 0.75 micron, which is measured from the aqueous solution droplets in the continuous oil phase after polymerization and before inversion by adding them to water. | This size limitation refers to the unswollen number average particle size diameter, which is measured from the aqueous solution droplets in the continuous oil phase after polymerization utilizing quasi-electric light scattering spectroscopy. |

Ciba attacks Hercules' proposed construction but provides no justification for its own interpretation of this claim term. (Ciba Br. at 35-36.) In particular, Ciba fails to justify why this particle size limitation must only be determined "utilizing quasi-electric light scattering spectroscopy." This QELS technique is not discussed in the specification or prosecution history of the '808 patent. And while the applications that led to the '766 patent mention the use of QELS, the '808 patent never indicates that it relies on the '766 applications for particle size measurement technique.

Ciba asserts that Hercules' proposed construction would strip the claim of its meaning. (Ciba Br. at 35.) But Hercules' proposed construction results from the straightforward interpretation of Ciba's open-ended "comprising" and "having" claim language. *See Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004) ("'[C]omprising,' . . . is open-ended and does not exclude additional, unrecited elements or method steps.") (quoting M.P.E.P. § 2111.03 (8th ed., rev. 1, 2003) (citing *Genentech*, 112 F.3d at 501); *see also Regents of the Univ. of Cal.*, 119 F.3d at 1573 ("The word 'having' still permit[s] inclusion of other [elements or steps].")). Applicants could have chosen different claim language but they did not.

Ciba complains that Hercules seeks its claim interpretation in an effort to bolster its invalidity challenge. (Ciba Br. at 36.) But the claims are construed in the same manner for the purposes of assessing both validity and infringement. *See Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003). Ciba also accuses Hercules of seeking "to eliminate the requirement that the 'number average' size of *all* the microparticles should be below 750 nanometers." (Ciba Br. at 36 (emphasis added).) But Ciba's own proposed construction does not mention this so-called requirement. Additionally, as discussed in Section III.C.1. at pages 22-23, *infra*, Ciba inaccurately describes its cited legal authority regarding the disputed "comprising" claim term.

Ciba does not acknowledge that the open-ended comprising language only requires that some of the cross-linked microparticles have the recited size. Ciba's attempt to overlook this straight-forward interpretation of its claim should be rejected.

16

6.    **"Said microparticles having . . . a cross-linking agent content of about 4 molar parts to about 4000 parts per million based on the monomeric units present in the polymer"**

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "said microparticles having . . . a cross-linking agent content of about 4 molar parts to about 4000 parts per million based on the monomeric units present in the polymer" | Microparticles must contain between 4 and 4000 parts of cross-linking agent, as defined above, per million monomeric units present in the polymer. | The cross-linking agent is added in an amount of about 4 molar parts to about 4000 parts per million, such ratios being based on monomeric units present in the polymer. |

Ciba seeks to re-draft the claim language requiring "a cross-linking agent content of" to read "a cross-linking agent is added in an amount of." (Ciba Br. at 38.) Ciba then accuses Hercules of attempting to distort the plain meaning of this claim limitation. (*Id.*) Ciba has it backwards. Hercules' construction of the "microparticles having . . . *a cross-linking agent content*" faithfully follows the ordinary meaning of the claim language whereas Ciba's proposal does not.

Ciba asserts that "common scientific practice" supports its construction and that Hercules' proposal "is intended to cast doubt on the claim by injecting the requirement of a difficult measurement." (*Id.*) Ciba's alleged common scientific practice is not expressed in the claim language or in the intrinsic record, and difficulties in measurement (for infringement purposes) do not justify ignoring claim language.

The claim language defines the amount of cross-linking agent present in the cross-linked microparticles. The discussion in the specification of how MBA becomes *incorporated into* the polymer chains according to *well known cross-linking technology* (*see* Ex. 1 at col. 1, ll. 26-30) likewise supports Hercules' proposed construction. Furthermore, the specification of the '808 patent repeatedly references the "cross-linking agent content" of applicants' cross-linked microparticles. (*See* Ex. 1 at col. 2, ll. 9-12 (stating that in the

17

composition of "the present invention," the cross-linked microparticles have "a cross-linking agent content of above about 4 molar parts per million, based on the monomeric units present in the polymer"); col. 3, ll. 47-48 (stating in the Detailed Description of the Invention that applicants' cross-linked, organic, polymeric microbeads have "a cross-linking agent content of above about 4 molar parts per million, based on the monomeric units present in the polymer"); claim 1 (claiming "a crosslinking agent content); claim 2 (claiming a narrower range of "crosslinking agent content" than in claim 1); and claim 3 (same).)

The prosecution history further supports Hercules' proposed construction. In responding to the rejection over the Durand '912 patent, applicants argued that "Durand etal fail to indicate *the incorporation of a cross-linking agent into the polymer produced therein*." (Ex. 3 at CIBA 000526 (emphasis added).) In response to the rejection over the Whittaker '640 patent, applicants similarly contended that "Whittaker does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount." (Ex. 8 at HERC 0076113.) Hence, the ordinary meaning of the claims, the specification, and the prosecution history all support Hercules' interpretation.

Ciba wrongly asserts that "[t]he '808 patent describes the manner in which to measure the amount of cross-linking agent." (Ciba Br. at 15.) In support, Ciba takes half a sentence from the specification out of context. (*See* Ciba Br. at 16.) In the complete sentence, the '808 patent indicates that the amount of cross-linking agent "employed" also becomes incorporated into the resulting polymer:

> Preferably at least about 4 molar parts per million of crosslinking agent, based on the monomeric units present, are employed to *induce* sufficient crosslinking and preferred is a crosslinking agent *content* of from about 4 to about 6000 molar parts per million, more preferably about 20-4000 and most preferably about 50-2000 molar parts per million.

(Ex. 1 at col. 4, l. 64-col. 5, l. 3 (emphasis added).) Ciba likewise ignores applicants'

discussion of how a difunctional monomer, such as MBA, becomes incorporated into the resulting polymer. (*Id.* at col. 1, ll. 26-28.) And contrary to Ciba's assertions, the Tables of the patent discuss the "results" of the polymerization reactions and list attributes of the resulting "copolymer compositions" (*see* Ex. 1 at Tables I and III), and the '808 patent never states that "[t]he ppm calculation is based on what is mixed together, before any reaction" as claimed by Ciba (*see* Ciba Br. at 16). Instead, the specification of the '808 patent contains multiple references to cross-linking agent content and to the incorporation of specified levels of cross-linking agent into the resulting polymer and by no means contradicts the specific claim language "a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer."

Tables I and III of the '808 patent indicate that the copolymer compositions corresponding to the Examples of the '808 patent have a specified MBA content. Consequently, the preferred embodiments of the '808 patent are not excluded under Hercules' proposed claim interpretation. Ciba also ignores Federal Circuit precedent requiring the ingredients of a claimed composition to exist in the specifically claimed amounts in an accused composition. *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1558 (Fed. Cir. 1995). Ciba cannot re-write its composition claim simply to facilitate its infringement proofs.

19

7.    "(a)  admixing
          (i)  an aqueous solution comprising . . . at least
    one crosslinking agent . . . ;
          (ii)  an oily phase . . . ;
          (iii)  an effective amount of surfactant or
    surfactant mixture, so as to form an inverse
    emulsion; . . . ."

| Claim Term - claim 13 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "(a)  admixing<br>    (i)  an aqueous solution comprising . . . at least one crosslinking agent . . . ;<br>    (ii)  an oily phase . . . ;<br>    (iii)  an effective amount of surfactant or surfactant mixture, so as to form an inverse emulsion; . . .." | Cross-linking agent must be in the aqueous solution before admixing with the oily phase and surfactant or surfactant mixture to form the inverse emulsion. | Admixing refers to mixing, but not in any particular order, materials which may include a monomer(s), crosslinking agent, oil phase, surfactant, etc. as listed in the claim. |

Ciba asserts that the admixing step of claim 13 does not require the listed ingredients to be mixed in any particular order. (Ciba Br. at 39-40.) Ciba contends that since all of the ingredients eventually form an emulsion, it does not matter that claim 13 separately lists the aqueous solution, the oily phase, and the surfactant or surfactant system. Ciba provides no justification for ignoring the claim language separately relating the aqueous solution and the oily phase. And Ciba's case law regarding the order of performing method steps (*see* Ciba Br. at 24-25) is inapposite because those cases dealt with structurally different claims.

Here, the discrete ingredients (separately listed as limitations (a)(i), (a)(ii), and (a)(iii)) are mixed together "so as to form an inverse emulsion."  Hence, the aqueous solution containing the cross-linking agent must exist separately prior to admixture, as reflected in Hercules' proposed construction.

C.    Construction of the '766 Patent Terms

1.    "A method of making paper which comprises adding . . . from about 0.05 to about 20 lbs/ton . . . of . . . microbead"

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "A method of making paper which comprises adding . . . from about 0.05 to about 20 lbs/ton . . . of . . . microbead" | Requires the addition of from about 0.05 to about 20 lbs/ton of microbead, as defined below, having an unswollen particle diameter of less than about 750 nanometers, but permits the addition of other materials including microbeads having other sizes. "The term 'comprises' permits the inclusion of other steps, or materials." *In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981). | A method of making paper in which a specified amount of microbead, which is described in other parts of the claim, is added to an aqueous paper furnish. Comprises refers to the steps of the method of making paper, which is required by the claim. |

Ciba contends that its proposed construction follows the ordinary meaning of the claim language and that Hercules' proposed construction would "emasculate the claim limitation relating to size." (Ciba Br. at 26.) But Ciba never addresses the open-ended term "comprises" or how that term affects the scope of the claimed method. Ciba also mischaracterizes Hercules' position in an attempt to bolster its proposed interpretation.

The term "comprises" allows for the inclusion of other steps or materials in Ciba's claim. *See In re Baxter*, 656 F.2d 679, 686 (C.C.P.A. 1981) ("The term 'comprises' permits the inclusion of other steps, elements, or materials."). This does not mean that the stated limitations of Ciba's claims can be ignored. But it does signal that if the claim terms are satisfied, other ingredients can be used or steps can take place. For example, if a prior art process disclosed adding cross-linked polymeric microbeads having a distribution of sizes, as long as those cross-linked microbeads having sizes of 750 nm or less are added in an amount

21

of at least 0.05 to 20 lbs/ton, the "comprises" language of Ciba's claim would permit the addition of larger particles. This does not mean, as asserted by Ciba, that "even a single small particle" would anticipate the claim or that claim language would be ignored. (*See* Ciba Br. at 26.)

The *Jeneric/Pentron* decision cited by Ciba does not hold otherwise. In that case, the claim at issue recited "said porcelain composition comprising . . . [0-1 wt % $CeO_2$]." *Jeneric/Pentron Inc., v. Dillon Co. Inc.*, 205 F.3d 1377, 1379 (Fed. Cir. 2000). Jeneric argued that the accused product, containing 1.61% $CeO_2$ (cerium oxide) literally infringed because the total amount of $CeO_2$ could be separated into two components--an antigreening agent containing 0.92% $CeO_2$ and a fluorescing or opacifying agent containing 0.69% $CeO_2$. *Id.* at 1382. Jeneric contended that the 0.92% antigreening portion fell within the claimed range and that the remaining 0.69% portion performed a different function and could be disregarded for literal infringement purposes. *Id.* at 1382. Jeneric argued that the "comprising" claim language allowed for the presence of this additional cerium oxide.

The Federal Circuit held that the claim simply specified "0-1% $CeO_2$" and would not be broadened by providing functional limitations on the amount of $CeO_2$. *Id.* at 1382-83. Accordingly, the court rejected Jeneric's attempt to "carve out a portion of cerium oxide according to functions not recited in the claim. Jeneric's infringement theory essentially proposes that the precisely claimed ranges do not limit the amount of porcelain compositions." *Id.*

Unlike the patentee in *Jeneric*, Hercules does not propose a claim construction that segregates microparticles based on different functions. Nor does Hercules propose construing the claim where the claimed lower or upper weight limits do not matter. But Hercules does propose construing the term "comprises" according to its well understood open-ended nature.

Ciba also misconstrues the holding in *Kustom Signals, Inc. v. Applied Concepts, Inc.* 264 F.3d 1326 (Fed. Cir. 2001). In *Kustom Signals*, the claim construction turned on the word "or." The claims at issue encompassed methods of processing radar information or radar apparatuses that searched on the basis of magnitude *or* frequency criteria. *Id.* at 1329-30. By contrast, the accused device always automatically performed *both* magnitude/amplitude and frequency searches. *Id.* at 1332. Kustom asserted that the accused device literally infringed because although it performed an additional search, *i.e.*, an amplitude search after a frequency search, the performance of the additional step was irrelevant in light of the "comprising" claim language. *Id.* The *Kustom Signals* Court rejected this argument, noting that the term "or" specifically limited the claim to exclude devices that search both magnitude and frequency. *Id.*

The "or" claim limitation in *Kustom Signals* excluded devices that performed both of the mutually exclusive searches. In contrast, there is nothing in the '766 claims that precludes the presence of larger particles so long as the less than 750 nanometer particles are present in the required amount. The Examples of the '766 patent themselves show no deleterious effect of larger particles. (*See* Ex. 2 at col. 28, Tables XXXVII and XXXVIII.)

Ciba's reliance on *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, is similarly misplaced. The *Amgen* Court held that a claim using the transition "comprising" that included a limitation to 166 amino acids did not cover a chain of amino acids missing one of the 166 amino acids. *Amgen,* 314 F.3d at 1345. Hercules agrees with this holding and does not urge a construction of Ciba's claim that does not require the presence of the recited claim elements. But Hercules disagrees with Ciba's refusal to acknowledge the open-ended nature of its claim term. As the *Amgen* Court noted, "[c]omprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Id.* at 1344-45.

23

### 2. "Aqueous paper furnish"

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "aqueous paper furnish" | An aqueous suspension of cellulosic papermaking fibers. | An aqueous paper furnish is a slurry of papermaking fibers, fines, etc., which are used in forming paper. |

As Hercules noted at page 33 of its initial brief, Hercules does not believe there is a meaningful distinction between the definitions proposed by the parties.

### 3. "An ionic, organic, cross-linked polymeric microbead"

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "an ionic, organic, cross-linked polymeric microbead" | A microbead formed by polymerization of ionic, organic, monomer(s) and a cross-linking agent. The microbead must be an integral unit which can be separated from any emulsifier present. The cross-linking agent must be polyfunctional, i.e. comprise compounds that have either at least two double bonds, a double bond and a reactive group, or two reactive groups, and must be present in sufficient quantity to assure a cross-linked composition. | The microbead product results from the polymerization of ionic, organic monomer(s), wherein the polymer chains are linked together by crosslinking to constrain the size of the microbead. Cross-linked merely indicates that the polymer chains are linked together in use, it does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc. |

Ciba contends that the '766 patent uses the terms "cross-linked" and "cross-linking agent" differently, and that "[t]he reference to 'cross-linking' in the claim and in the patent was a general one." (Ciba Br. at 29.) Ciba admits, however, that "[d]uring the prosecution leading to the '766 patent, hydrophobic cross-linking was never an issue." (Ciba Br. at 2.) Despite the fact that the '766 patent only describes and exemplifies cross-linking brought

about by polyfunctional cross-linking agents, Ciba asserts that "the specific method by which the link is established, e.g. covalently, hydrophobically, ionically, etc." does not matter. (Ciba Br. at 28.)

Ciba's argument that its claim covers hydrophobically linked microbeads contravenes the claim language. Claim 1 recites a "cross-linked polymeric microbead . . . having an *unswollen* particle diameter." This requires that the microbead is cross-linked in its unswollen state. (*See* Ex. 2 at col. 8, ll. 15-22 (noting that after polymerization, the polymeric particles of the '766 patent are either in emulsion form or have been recovered from the emulsion through precipitation, filtering, and drying).) Hydrophobic associations cannot form until the water-in-oil emulsion is inverted into water and becomes swollen, or until the recovered particles are added to water. Consequently, Ciba's argument that its claim covers hydrophobic association cannot be correct since the cross-linked microbeads are swollen by the time hydrophobic association could occur.

Ciba's discussion of the '766 patent disclosure relies almost exclusively on extrinsic evidence. (Ciba Br. at 11-13.) Ciba notes that the Background section of the '766 patent refers to the '780 Flesher patent. (Ciba Br. at 12.) But Ciba proceeds to quote from a passage of the '780 Flesher patent regarding cross-linking brought about by heating or irradiation that is not discussed or referenced in the '766 patent-in-suit. Unlike the '808 patent, no attempt was made in the '766 specification to incorporate the Flesher '780 patent by reference, and even if such an attempt had been made, it would have been unsuccessful. *See Advanced Display Systems*, 212 F.3d at 1282; *see also* discussion above at pages 6-7.

Ciba ignores the '766 patent's actual discussion of the Flesher '780 patent, which explains that:

> Crosslinking is accomplished by the incorporation of difunctional monomer, such as methylenebisacrylamide, into the polymer chain. This crosslinking technology is well known in the art.

(Ex. 2 at col. 2, ll. 49-53.) Ciba instead relies on portions of the Flesher '780 patent that are not described in the specification and were not considered by the Examiner during prosecution. Ciba improperly attempts to subvert the intrinsic record with inconsistent extrinsic evidence. *See Tate Access Floors v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1371 n.4 (Fed. Cir. 2002) ("Prior art the examiner failed to consider is extrinsic"); *see also* discussion in Section III.B.2. above at pages 5-7.

In making its broad "ordinary meaning" argument, Ciba fails to acknowledge that the '766 patent only describes the polymerization reaction taking place in the presence of a polyfunctional cross-linking agent:

> Polymerization of the monomers occurs in the presence of a polyfunctional crosslinking agent to form the cross-linked microbead. Useful polyfunctional crosslinking agents comprise compounds having either at least two double bounds, a double bond and a reactive group, or two reactive groups.

(*Id.* at col. 6, ll. 36-42.) The '766 patent also indicates that the cross-linked polymeric microbeads of the '766 patent are made by polymerizing organic monomers and a cross-linking agent that satisfies applicants' polyfunctional definition. (*See, e.g.*, Ex. 2 at col. 6, ll. 36-42, 55-56; col. 10, l. 36-col. 11, l. 18 (where the "Microbeads used in the examples" are all synthesized with MBA cross-linker).) The patent further requires the cross-linking agent to be present in a sufficient amount to assure a cross-linked composition. (*See id.* at col. 6, ll. 55-56.)

Ciba proposes a broad "ordinary meaning" construction (based on its improper reliance on extrinsic portions of the Flesher '780 patent[5] or on portions of the Farrar '856 patent that were never discussed during prosecution) and then argues that the intrinsic record does not compel limiting this construction. The applicants did not discuss cross-linking in response to the Farrar rejection, as Ciba admits at page 17 of its brief, and Ciba's reliance on content of the Farrar '856 patent never discussed during prosecution is misplaced. Ciba is stuck with the definition of cross-linked and cross-linking agent set forth in the intrinsic record.

The Federal Circuit rejected the approach proposed by Ciba in *Phillips* and instructed that rather than presuming a broad construction at the beginning of the claim construction process, the proper approach is to focus "at the outset on how the patentee used the claim term in the claims, specification, and prosecution history." *Phillips*, 415 F.3d at 1321. This Court recently followed this methodology in *Cephalon*. The *Cephalon* Court did so because "a claim term can be given its correct construction only within the context of 'what the inventors actually invented and intended to envelop with the claim.'" *Cephalon*, 389 F. Supp. 2d at 604 (*quoting Phillips*, 415 F.3d 1316).

In *Cephalon*, the parties disputed whether the claimed method of producing a drug-containing lollipop, and the claimed lollipop itself, should be construed to require the absence

_____

[5] Ciba fails to inform the Court that the '780 Flesher patent upon which Ciba so heavily relies was not properly provided to, or considered by, the PTO during patent prosecution. After the PTO mailed a Notice of Allowance for the '766 patent on March 23, 1992 (*see* Ex. 11 at HERC 0076046-50), applicants and their patent attorney (Mr. Van Riet) waited until April 27, 1992 and then cited the Flesher '780 patent (referred to in the Information Disclosure Statement as "EP 0,202,780") to the PTO along with 15 other references (*see id.* at HERC 0076052-56.) At this point in patent prosecution (*i.e.*, after claim allowance), the PTO's Rules precluded it from considering additional references and the PTO therefore refused to consider the Flesher '780 patent. (*See id.* at HERC 0076058.) Hence, the very reference that Ciba claims to be "intrinsic evidence" and upon which it predicates its claim construction was never considered by the Examiner.

of free liquid. *Id.* at 605. The patentee argued that the plain and ordinary meaning of the claim language did not require the absence of free liquid, and that neither the specification or prosecution history showed a clear disclaimer of the presence or use of free liquid. *Id.* The *Cephalon* Court rejected the argument that such an explicit disclaimer was necessary:

> Whether or not there was an explicit disclaimer, the consistent use of a claim term by the inventor in the specification may serve to limit the scope of a claim.

*Id.* at 606 (citing *Nystrom*, 424 F.3d at 1144-45). The *Cephalon* Court found "nothing in the written description or prosecution history to suggest that [the inventors] intended the disputed phrases to cover methods or articles using free liquid. Therefore, it would be improper for this Court to broaden the inventors' use of the disputed phrases . . ." *Id.*

As in *Cephalon* and *Nystrom*, the specification and prosecution history are not in accord with the broad definition of a cross-linked microbead proposed by Ciba. Instead, the applicants discussed and exemplified using a polyfunctional cross-linking agent. As articulated in at least the *Phillips*, *Nystrom*, and *Cephalon* decisions, the construction of Ciba's claims should be limited to no more than what the inventors actually invented and intended to encompass within their claims.

As with the '808 patent, Ciba's abbreviated presentation regarding the '766 patent prosecution history (*see* Ciba Br. at 17-18) omits several meaningful events that occurred during the prosecution of the '766 patent. Ciba glosses over the Examiner's repeated claim rejections over U.S. Patent No. 4,659,431 to Probst *et al.* ("the Probst '431 patent," Ex. 12). (*See* Ciba Br. at 18.) During prosecution, the Examiner rejected applicants' claims for obviousness over the Probst '431 patent, alone or in combination with other prior art. (*See* Office Action, Ex. 11 at 0076011.) The Examiner stated that while the Probst '431 patent taught a microbead of the requisite small size, it did not disclose whether or not that

microbead was cross-linked. (*Id.*) Nonetheless, the Examiner asserted that it would have been an obvious matter of choice to employ cross-linking. (*Id.*)

Applicants responded by narrowing their claim to encompass a method of making paper that *required the use of* <u>*cross-linked microbeads*</u>. (*See* Amendment, Ex. 11 at HERC 0076016.) Applicants then argued "that Probst does not teach, disclose or suggest the instant invention especially in view of the amendment made to Claim 1 herein." (*Id.* at HERC 0076019.) Next, applicants urged that their organic, polymeric microbeads had to be ionic, whereas the ionic groups in the Probst microbeads were attached to the emulsifier (*i.e.*, the surfactant) instead of to the microbeads themselves. (*See id.* at HERC 0076020.) Applicants explained that in contrast to this prior art, their microbead was separate and distinct from the surfactant: "*It is an integral unit which can be separated from any emulsifier present if made in emulsion form.*" (*Id.* (emphasis added).)

The Examiner maintained the Probst rejections. (*See* Office Action, Ex. 11 at HERC 0076027.) Applicants submitted a written response and once again argued that the Probst microbeads were not ionic. (*See* Amendment, Ex. 11 at HERC 0076037-38.) They reiterated that in contrast to the ionic emulsifier in the Probst patent, "[a]pplicants' microbead has an ionic charge covalently bonded thereto *and is an integral unit which can be separated as such*." (Ex. 11 at HERC 0076038 (emphasis added).) The Examiner thereafter allowed the '766 patent claims.

Thus during prosecution of the '766 patent, applicants twice asserted that in contrast with the prior art, their cross-linked microbead must be an integral unit that can be separated from any emulsifier present. (*See* Ex. 11 at HERC 0076020 ("Applicants' microbead does not require the use of an emulsifier. It is an integral unit which can be separated from any emulsifier present if made in emulsion form"); *id.* at HERC 0076038 ("Applicants' microbead has an ionic charge covalently bonded thereto and is an integral unit which can be

separated as such.").) The claim construction proposed by Hercules properly recognizes this prosecution disclaimer by applicants. *See Omega Eng'g., Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003).

A final issue in dispute is whether the cross-linked microbeads of the '766 patent should have the same general construction as the cross-linked microparticles of the '808 patent. The patents use virtually identical language to describe cross-linking and cross-linking agents:

| '808 Patent | '766 Patent |
|---|---|
| Crosslinking is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide, into the polymer. (Ex. 1 at col. 1, ll. 26-29.) | Crosslinking is accomplished by the incorporation of difunctional monomer, such as methylenebisacrylamide, into the polymer chain. (Ex. 2 at col. 2, ll. 49-52.) |
| Polymerization of the monomers is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition. The polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups. (Ex. 1 at col. 4, ll. 45-50.) | Polymerization of the monomers occurs in the presence of a polyfunctional crosslinking agent to form the cross-linked microbead. Useful polyfunctional crosslinking agents comprise compounds having either at least two double bounds [sic], a double bond and a reactive group, or two reactive groups. (Ex. 2 at col. 6, ll. 36-42.) |



Ciba asserts that since the patents are not formally related and do not have complete overlap of inventors, the interpretation of the claim terms should be considered separately.

(Ciba Br. at 1.) Hercules submits that at least with respect to the incorporation of a polyfunctional cross-linking agent, the terms cross-linked "microparticle" and cross-linked "microbead" should have the same construction, for the reasons set forth above.

4.    **"The microbead having an unswollen particle diameter of less than about 750 nanometers"**

| Claim Term - claim 1 | Hercules' Proposed Construction | Ciba's Proposed Construction |
|---|---|---|
| "the microbead having an unswollen particle diameter of less than about 750 nanometers" | The unswollen particle diameter of the microbead, as defined above, is measured from the aqueous droplets dispersed in the continuous oil phase after polymerization and before inversion by adding them to water. | This size limitation refers to the unswollen number average particle diameter, which is measured from the aqueous solution droplets in the continuous oil phase after polymerization utilizing quasi-electric light scattering spectroscopy. |

Ciba proposes reading the limitations of a "number average" particle diameter that must be measured "utilizing quasi-electric light scattering spectroscopy" into this claim term. (Ciba Br. at 30-32.) Ciba again asserts that Hercules' proposed construction, which does not read these limitations into the claims, "would emasculate the meaning of the invention . . ." (Ciba Br. at 31.) Ciba then contends that the same cases it cited at pages 26-27 of its brief regarding the "comprising" issue also stand for the proposition that limitations should not be read *out* of claims. (Ciba Br. at 32.) Ciba cites no case justifying its attempt to import two substantial limitations into its claims.

The claim language neither states nor requires measuring a specific type of particle diameter (*e.g.*, volume average, number average, etc.) or using a specific measurement technique (such as QELS). The patent contains numerous passages discussing the sizes of prior art cross-linked polymeric microbeads (*see* Ex. 2 at col. 2, ll. 9-13 and ll. 58-62) and the sizes of microbeads according to the "present invention" (*see id.* at col. 3, ll. 2-8). In these passages, applicants do not specify what particle dimension was specifically measured, what

31

technique was used for the measurement, or why applicants' size measurements can be properly compared with particle size data of the prior art.    Furthermore, applicants deliberately argued during patent prosecution that their claimed particle size (of less than 750 nanometers) allegedly distinguished their claims from the prior art, again without regard to what particle size measurement was disclosed in that prior art, what technique was used to obtain that measurement, or why applicants' claimed particle size could be properly compared with this prior art.    (*See*, *e.g.*, Ex. 11 at HERC 0075994-95.)    Applicants *did not*, contrary to Ciba's assertion, point out that the Farrar '856 patent disclosed conventional emulsions "where the *number average* particle size was 1 micron or above."    (Ciba Br. at 17 (emphasis added).)    Indeed, the Farrar '856 patent does not discuss whether its particles have "number average" sizes, "volume average" sizes, or some other size measurement, nor does the Farrar '856 patent indicate what technique was used to determine particle sizes.    (*See* Ex. 10.)

Ciba asserts that the "Summary of the Invention" discusses how the applicants "had surprisingly found that the number average diameter (size) of their microbead had a dramatic impact on the effectiveness of the microbead."    (Ciba Br. at 14.)    In fact, the passage Ciba cites regarding alleged "surprising results" does not mention "number average diameter."    (*See* Ex. 2 at col. 3, ll. 58-65.)    Instead, it simply refers a "particle size" having a certain "diameter."    (*See id.* at col. 3, ll. 60-61.)

Hercules acknowledges that in other passages, the '766 patent discusses measuring number average particle size using the QELS technique.    (*See*, *e.g.*, *id.* at col. 11, ll. 42-44.)    Applicants also discussed using the QELS technique to measure particle sizes during patent prosecution.    (*See* Ex. 11 at HERC 0075991-92.)    Consequently, Hercules does not dispute that the QELS technique may be used to measure the particle diameter of this claim.

Hercules disagrees that QELS *must* be used and that the "particle diameter" must be construed as the "number average particle diameter" as proposed by Ciba.

## IV.    CONCLUSION

Hercules' proposed constructions for the '808 and '766 patent claim terms are consistent with the intrinsic evidence of record, whereas Ciba's are not.    Accordingly, Hercules respectfully requests that the Court adopt Hercules' constructions proposed herein.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  */s/ David E. Moore*
Richard L. Horwitz (#2246)

Ford F. Farabow, Jr.                        David E. Moore (#3983)
Joann M. Neth                               Hercules Plaza, 6th Floor
Eric J. Fues                                1313 N. Market Street
A. Neal Seth                                P.O. Box 951
FINNEGAN, HENDERSON, FARABOW,               Wilmington, DE  19899-0951
    GARRETT & DUNNER, L.L.P.                Tel:  (302) 984-6000
901 New York Avenue, NW                     rhorwitz@potteranderson.com
Washington, DC  20001-4413                  dmoore@potteranderson.com
Tel: (202) 408-4000

Dated:  January 27, 2006                    *Attorneys for Defendant*
Public Version Dated:  February 3, 2006     *Hercules Incorporated*

718342

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on February 3, 2006, the attached

document was hand-delivered to the following persons and was electronically filed with the

Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Jeffrey L. Moyer
Chad M. Shandler
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE  19899

I hereby certify that on February 3, 2006, I have Federal Expressed the foregoing

document(s) to the following non-registered participants:

Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL  60601-6780

Thomas L. Creel, P.C.
Goodwin Procter LLP
599 Lexington Avenue
New York, NY  10022

 /s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
Telephone:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672306