**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

CIBA SPECIALTY CHEMICALS )
CORPORATION, )
 )
Plaintiff, ) C. A. No. 04-293 (KAJ)
 )
v. )
 ) **PUBLIC VERSION**
HERCULES INCORPORATED and )
CYTEC INDUSTRIES, INC., )
 )
Defendants. )

**HERCULES' ANSWERING BRIEF IN OPPOSITION TO THE MOTION
OF CIBA FOR PARTIAL SUMMARY JUDGMENT THAT THE ACCUSED
PERFORM® SYSTEM INFRINGES U.S. PATENT NOS. 5,167,766 AND 5,171,808**

                                    Richard L. Horwitz (#2246)
                                    David E. Moore (#3983)
                                    POTTER ANDERSON & CORROON LLP
                                    Hercules Plaza, 6th Floor
                                    1313 N. Market Street
                                    P.O. Box 951
                                    Wilmington, DE 19899-0951
                                    Tel: (302) 984-6000
                                    rhorwitz@potteranderson.com
OF COUNSEL:                         dmoore@potteranderson.com

Ford F. Farabow, Jr.               *Attorneys for Defendant*
Joann M. Neth                      *Hercules Incorporated*
Eric J. Fues
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: January 27, 2006
Public Version Dated: February 3, 2006

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................1

II.     STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ....................2

III.    SUMMARY OF THE ARGUMENT ...................................................................2

IV.     STATEMENT OF MATERIAL FACTS .............................................................4

        A.      The '766 Patent ..................................................................................4

        B.      Prosecution History of the '766 Patent ...............................................5

        C.      The '808 Patent ..................................................................................6

        D.      Prosecution History of the '808 Patent ...............................................7

        E.      ████████████████████████████████
                ██████ ...........................................................................................10

        F.      ████████████████████████████████
                ██████ ...........................................................................................12

        G.      Hercules' PerForm® Product .............................................................13

V.      ARGUMENT ................................................................................................17

        A.      Applicable Law ................................................................................17

        B.      Hercules' PerForm® SP9232 Does Not Infringe The Asserted
                Claims Of The Patents-In-Suit Because It Is Not "Cross-linked"
                As That Term Is Used In Their Intrinsic Record ...............................19

        C.      Under Ciba's Claim Construction This Motion Raises A
                Genuine Issue Of Material Fact As To Whether PerForm®
                SP9232 Is Cross-linked .....................................................................21

        D.      Making Paper With Hercules' PerForm® SP9232 Does Not
                Infringe The Asserted Claims Of The '766 Patent Because
                PerForm® SP9232 Is Not A "Cross-linked Polymeric
                Microbead" As That Term Was Used In The Intrinsic Record
                Of The '766 Patent .............................................................................28

        E.      The '766 Patent Is Not Infringed Under The Doctrine Of
                Equivalents ........................................................................................30

        F.      Hercules' PerForm® SP9232 Does Not Infringe The Asserted
                Claims Of The '808 Patent Because It Does Not Have The
                Requisite Cross-linking Agent Content ..............................................33

i

G.    █████████████████████████████████
      ████████████████████████████████
      ███████████████████████.............................................................36

H.    The '808 Patent Is Not Infringed Under The Doctrine Of
      Equivalents.............................................................................................39

VI.   CONCLUSION .................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Alloc, Inc. v. International Trade Commission,*
   342 F.3d 1361 (Fed. Cir. 2003) ................................................................................ 29

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................................ 22

*Asyst Technologies, Inc. v. Emtrak,*
   402 F.3d 1188 (Fed. Cir. 2005) ........................................................................ 33, 39

*Cephalon Inc. v. Barr Labs,*
   389 F. Supp. 2d 602 (D. Del. 2005) ....................................................................... 20

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.,*
   64 F.3d 1553 (Fed. Cir. 1995). ............................................................................... 35

*Festo Corp. v. Shoketsu Kinzoki Kogyo Kabushiki Co., Ltd.,*
   344 F.3d 1359 (Fed. Cir. 2003) ........................................................................ 32, 39

*Freedman Seating Co. v. Am Seating Co.,*
   420 F.3d 1350 (Fed. Cir. 2005) ........................................................................ 33, 39

*Glass Works v. Sumitomo Electric, U.S.A. Inc.,*
   868 F.2d 1251 (Fed. Cir. 1989) ............................................................................. 31

*K-2 Corp. v. Salomon S.A.,*
   191 F.3d 1356 (Fed. Cir. 1999) ........................................................................ 17, 18

*Lantech, Inc. v. Keys Machine Co.,*
   32 F.3d 542 (Fed. Cir. 1994) .................................................................................. 37

*Moore U.S.A., Inc. v. Standard Register Co.,*
   229 F.3d 1091 (Fed. Cir. 2000) ........................................................................ 33, 40

*Network Com., Inc. v. Microsoft Corp.,*
   422 F.3d 1353 (Fed. Cir. 2005) ............................................................................. 30

*Nystrom v. Trex Co., Inc.,*
   425 F.3d 1136 (Fed. Cir. 2005) ............................................................................. 20

*Omega Engineering, Inc, v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003) .................................................................. 28, 34, 37

*PC Connector Solutions LLC v. SmartDisk Corp.,*
   406 F.3d 1359 (Fed. Cir. 2005) ............................................................................. 30

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................................. 17, 20

*Springs Window Fashions LP v. Novo Industries, L.P.*,
   323 F.3d 989 (Fed. Cir. 2003). ............................................................................. 18

*Zenith Labs v. Bristol-Myers Squibb*,
   19 F.3d 1418 (Fed. Cir. 1994). ............................................................................. 17

## **Statues and Rules**

35 U.S.C. § 112 ............................................................................................................ 9

37 C.F.R. § 1.312 ......................................................................................................... 9

## I.    INTRODUCTION

Defendant Hercules Incorporated ("Hercules") respectfully submits this answering brief in opposition to the motion of Ciba Specialty Chemicals Corporation ("Ciba") for partial summary judgment that the accused PerForm® system infringes U.S. Patent Nos. 5,167,766 ("the '766 patent") and 5,171,808 ("the '808 patent")[1]. Ciba limits its motion to claim 1 of the '766 patent and claim 1 of the '808 patent but largely ignores the actual language of these claims. Ciba's brief is also devoid of any discussion of the specifications and prosecution histories of these patents. Rather, Ciba misdirects the Court's attention to irrelevancies having nothing to do with the infringement issues raised by its motion.

As explained herein, by focusing on the actual language of the asserted claims, the specifications describing the claimed inventions and the prosecution histories evidencing how the U.S. Patent and Trademark Office ("PTO") and the applicants understood the patents, the conclusion is inescapable that Hercules is not infringing the patents-in-suit. For this reason, Ciba's motion for summary judgment of infringement should be denied.

Ciba's summary judgment motion should also be denied because it raises a genuine issue of material fact as to whether PerForm® SP9232 is "cross-linked."



Because, based on

---

[1]    In its Opening Brief, Ciba often refers to the accused product as simply PerForm®. Based on the evidence Ciba relies on, however, it is clear that the product Ciba is accusing of infringement is PerForm® SP9232. [*See, e.g.*, Ciba Ex. 18 (B651-54)]

[2]    Citations herein (B__) are to the Appendix to Hercules' Answering Brief in Opposition to the Motion of Ciba for Partial Summary Judgment (B1-B1395), filed contemporaneously herewith.

the evidence, a reasonable jury could return a verdict for Hercules, even under Ciba's claim construction, summary judgment in favor of Ciba should be denied.

## II.     STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

This answering brief and the accompanying declaration of Dr. Prud'homme (B1-18) and affidavit of Dr. Gelman (B644-654) in support thereof are submitted pursuant to paragraph 10 of the Court's Scheduling order.  A claim construction/summary judgment hearing is scheduled for March 17, 2006.  Trial of this matter is scheduled to commence on August 14, 2006.

## III.    SUMMARY OF THE ARGUMENT

1.     Hercules' PerForm® SP9232 does not infringe the patents-in-suit because it is not "cross-linked" as that term is used in the intrinsic record and as Hercules proposes in its claim construction briefs.  According to the patent specifications and prosecution histories, "cross-linked" means polymerized in the presence of a polyfunctional crosslinking agent to form a cross-linked composition.  During prosecution, the applicants explained that the inclusion of such a polyfunctional cross-linking agent materially affects the product produced. ██████████████████████████████████ ██████████████████████████████████  Thus, there is no infringement.  For this reason, in and of itself, Hercules' PerForm® SP9232 does not infringe the patents-in-suit.

2.     Even if the Court were to adopt Ciba's claim construction of the term "cross-linked," this motion should still be denied because it raises a genuine issue of material fact as to whether PerForm® SP9232 is "cross-linked." ██████████████████████ ████████████████████  In view of the evidence presented herein, a reasonable jury could return a verdict for Hercules even under the Ciba's claim construction.  Therefore, summary judgment in favor of Ciba should be denied for this reason as well.

2

3.      Additionally, making paper with Hercules' PerForm® SP9232 cannot infringe the '766 patent because PerForm® SP9232 is not a "cross-linked polymeric microbead" as that term was used in the '766 patent intrinsic record.  To distinguish the claimed invention from the prior art Probst reference, the applicants argued to the PTO that the claimed cross-linked polymeric microbead "is an integral unit which can be separated from any emulsifier present if made in emulsion form."  [B776]  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

4.      Ciba presents only conclusory statements without supporting testimony in urging that the '766 patent claim limitation "cross-linked polymeric microbead" is satisfied under the doctrine of equivalents.  This is fatal because the doctrine of equivalents requires particularized testimony and linking argument on a limitation-by-limitation basis.  The doctrine of equivalents is also precluded with respect to the '766 patent "cross-linked polymeric microbead" limitation by the doctrine of prosecution history estoppel and the all limitations rule.

5.      Ciba's motion must fail with respect to the '808 patent because Ciba has not proven that Hercules' PerForm® SP9232 has the requisite cross-linking agent content.  In that regard, it is not enough for Ciba to show the amount of an alleged cross-linking agent that is added to the reaction mixture.  Rather, Ciba must prove that the requisite amount of cross-linking agent is found in the microparticles after they are created out of the starting ingredients.  Ciba has not even attempted to meet this burden.

6.    ███████████████████████████

████████████████████████████████████████████████

███████████ This limitation was added to the asserted claim to secure its allowance. The doctrine of prosecution history disclaimer precludes patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution. Thus, Ciba cannot urge that this limitation has the same meaning as a limitation specifically rejected by the patent examiner. ██████████████████████████████

████████████████████████████████████████████████

██████████████████ For this additional reason, the '808 patent is not infringed.

7.    ██████████████████████████████

███████████████████████████████████████ Nor could it because the doctrine of equivalents is precluded by both the doctrine of prosecution history estoppel and the all limitations rule.

## IV.    STATEMENT OF MATERIAL FACTS

### A.    The '766 Patent

Ciba has confined its motion to claim 1 of the '766 patent, which reads as follows:

> 1.    A method of making paper which comprises adding to an aqueous paper furnish from about 0.05 to about 20 lbs/ton, based on the dry weight of paper furnish solids, of an ionic, organic, **cross-linked polymeric microbead, the microbead having an unswollen** particle diameter of less than about 750 nanometers and an ionicity of at least 1%, but at least 5%, if anionic and used alone.

[B204, col. 29, lines 39-46]  Emphasis has been added to the claim to highlight the claim language relevant to the dispute here.

In the "BACKGROUND OF THE INVENTION" section of the patent specification the patentees teach that "[c]rosslinking is accomplished by the incorporation of difunctional monomer, such as methylenebisacrylamide [MBA], into the polymer chain" and that "[t]his

crosslinking technology is well known in the art." [B190, col. 2, lines 49-53] Similarly, in the "DETAILED DESCRIPTION OF THE INVENTION" section the patentees explain that "[p]olymerization of the monomers occurs in the presence of a polyfunctional crosslinking agent to form the cross-linked microbead" and that "[u]seful polyfunctional crosslinking agents comprise compounds having either at least two double bounds [sic], a double bond and a reactive group, or two reactive groups." [B192, col. 6, lines 36-42] Illustrative examples of polyfunctional cross-linking agents are listed. [*Id.* at col. 6, lines 42-54]

### B.    Prosecution History of the '766 Patent

During prosecution of the '766 patent, the Examiner rejected several of the applicants' claims, including claim 1, for obviousness over Probst [B767] The Examiner contended that Probst taught the use in a papermaking process of a microbead of the requisite small size. [*Id.*] However, the Examiner admitted that it did not teach whether or not that microbead was cross-linked. [*Id.*]

Applicants responded by narrowing their claimed method of making paper to require the use of "cross-linked, polymeric microbead[s]," abandoning all claims to the use of non-crosslinked microbeads. [B772] Applicants then argued "that Probst does not teach, disclose or suggest the instant invention especially in view of the amendment made to Claim 1 herein." [B775] Applicants also argued that in contrast to the Probst prior art, the cross-linked microbead of their alleged invention was separate and distinct from the emulsifier:

> Applicants' invention resides in the use of the polymer microbead having an ionic charge covalently bonded to the polymer, whereas, in Probst, the only ionic charge present is on a different molecule i.e. a surfactant which can dissolve out of and/or migrate from the polymer microbeads. *Applicants' microbead does not require the use of an emulsifier. It is an integral unit which can be separated from any emulsifier present if made in emulsion form.*

[B776 (emphasis added)]

The Examiner maintained the Probst rejection and issued a Final Office Action. [B783-84]  The American Cyanamid Company ("AmCy") applicants responded by once again arguing that in contrast to the ionic emulsifier in Probst, "[a]pplicants' microbead has an ionic charge covalently bonded thereto *and is an integral unit which can be separated as such*."  [B794 (emphasis added)]  After another telephonic interview, the Examiner allowed the claims to issue as the '766 patent.  [B802]  All of the allowed claims require the use of a "cross-linked polymeric microbead."

### C.    The '808 Patent

Ciba has also confined its motion to claim 1 of the '808 patent, which reads as follows:

> 1.  A composition comprising **cross-linked** anionic or amphoteric **polymeric microparticles derived solely from the polymerization of an aqueous solution of at least of one monomer, said microparticles having** an **unswollen** number average particle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1 mPa.s, **a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer**, and an ionicity of at least about 5 mole percent.

[B187, col. 9, lines 51-60]  Here too, emphasis has been added to the claim to highlight the limitations in dispute.

The parent applications of the '766 and '808 patents were filed on the same day (June 11, 1990).  The inventors named on the '766 patent application were two of the four inventors named on the '808 patent application.  Both applications included common disclosure, particularly with respect to cross-linking.

As in the '766 patent, the BACKGROUND OF THE INVENTION section of the '808 patent specification explains that "[c]rosslinking is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide [MBA], into the polymer" and that "[t]his crosslinking technology is well known in the art."  [B183, col. 1, lines 26-29]

Also, like the '766 patent, the DETAILED DESCRIPTION OF THE INVENTION section of the '808 patent discloses that "[p]olymerization of the monomers is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition" and "[t]he polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups." [B184, col. 4, lines 45-50] The '808 patent also lists the same illustrative examples of polyfunctional cross-linking agents as are listed in the '766 patent. [*Id.* at col. 4, lines 50-62]

### D.    Prosecution History of the '808 Patent

During prosecution of the '808 patent's parent application, the Examiner rejected several of the claims, including independent claim 1, over a Durand reference, stating that "Durand et al. disclosed anionic organic polymeric microparticles by polymerizing sodium acrylate (or acrylic acid plus sodium hydroxide) and acrylamide in the presence of poly-oxyethylene sorbitol hexaoleate and sorbitan sesquioleate." [B863] In making this rejection, the Examiner reasoned that "[s]ince oleate contains a double bond, it is reasonable to expect these oleates functioning to some degree as a cross-linking agent in addition to being a surfactant." [*Id.*]

The applicants disagreed, arguing in response that Durand failed "to indicate the incorporation of a cross-linking agent into the polymer produced therein." [B874] Applicants explained that the oleate surfactants in Durand would not act as cross-linking agents because they were only "monounsaturated," *i.e.*, had only one reactive functional group. Applicants argued that "if any reaction thereof with the acrylamide and/or acrylate were to occur it would occur linearly because a cross-linking agent must contain two functional groups to act as such." [*Id.* (underlining in original)] The applicants based this argument on their specification that described a cross-linking agent as being "polyfunctional", *i.e.*, "having either at least two double bonds, a double bond and a reactive

7

group, or two reactive groups." [*Id.* (citing "page 7, lines 11-26 of the instant specification," *i.e.*, B834)]

This argument was found persuasive. The Examiner accepted the applicants' explanation that the oleate surfactants of Durand were not cross-linking agents because they did not have enough reactive functional groups and withdrew the rejection over Durand. [B880]

Also during prosecution of the '808 parent application, the Examiner rejected several claims, including claim 1, over the Makhlouf reference. [B863-64] The Examiner contended that Makhlouf disclosed a composition of cross-linked organic microparticles having the required size, along with a cross-linking agent. [B864] In response, the applicants amended independent claim 1 to require "that the polymers hereof <u>are produced solely from water-soluble monomers.</u>" [B875-76 (underlining in original)] This amendment was not found to be convincing. The Examiner maintained the rejection over Makhlouf (B879-80) as well as another rejection over Neff in view of Whittaker. [B881] In response to the rejection, applicants filed the '120 continuation application which ultimately matured into the '808 patent. [B892]

As part of a preliminary amendment filed along with their continuation application, the applicants amended the claims to require "a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer." [B937] Applicants urged reconsideration of the rejection over Makhlouf arguing that "[a]pplicants have clearly distinguished the instant claims over the Makhlouf etal reference by the limitation of the cross-linking monomer concentration to about 4-4000 ppm and [by limiting] the monomers to those which are water-soluble." [B938] Applicants also argued against the rejection over Neff in view of Whittaker pointing out that "Whittaker does not

8

recognize the need to incorporate cross-linking agent into the polymer in a critical amount."
[B939]

Again, the Examiner was not persuaded and maintained the rejections. [B944-46]
The Examiner also added a rejection of the claims under 35 U.S.C. § 112, second paragraph,
because the added limitation that the "microparticles [be] derived solely from water-soluble
monomers" was indefinite. [B945]

Applicants' patent attorney discussed the pending claims with the Examiner in a
telephonic interview. As a result of the interview, the Examiner agreed to allow the patent to
issue if the claims were further amended. [B968] Specifically, the Examiner found that the
limitation that the microparticles were "derived solely from water-soluble monomers" was
unacceptable. Instead, to obtain allowance of the claims, the Examiner insisted that claim 1
be amended to require that the microparticles were "derived solely from the polymerization
of an aqueous solution of at least one monomer." [*Id.*]

The Examiner then entered an Examiner's Amendment so changing the claim. In his
Statement of Reasons for Allowance, the Examiner stated: "[t]he change of water soluble to
aqueous solution prevents the claims from encompassing partially soluble monomers" and
that there were "few monomers among many that may meet the claims." [971] Finally, the
examiner noted that "[s]hould the changes and/or additions be unacceptable to applicant, an
amendment may be filed as provided by 37 C.F.R. §1.312." [*Id.*] The applicants did not file
any such amendment. Thus, by amending their claims to obtain allowance of their patent, the
applicants made a concession to the PTO, limiting the '808 patent claims to require cross-
linked polymeric microparticles "**derived solely** from the polymerization of an aqueous
solution of at least of [sic] one monomer."













████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

## V.    ARGUMENT

### A.    Applicable Law

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corporation*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (citations omitted). Ciba's Opening Brief attempts to lead this Court away from this "bedrock principle" by making fifty-one references to Ciba's own Polyflex® system. Ciba's Polyflex® system, however, is irrelevant to the infringement issues raised by this motion. As the Federal Circuit has "repeatedly said, it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent." *Zenith Labs v. Bristol-Myers Squibb*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) (citations omitted).

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999) (citations omitted).

The proper construction of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. "Importantly, the

person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (citations omitted).

"In addition to consulting the specification, [the Court] 'should also consider the patent's prosecution history.'" *Id.* at 1317 (citations omitted). "[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* "It is well established that 'the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.'" *Springs Window Fashions LP v. Novo Industries, L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) (citations omitted). "That the applicant could possibly have added terms other than [those chosen] to create a patentable distinction with the asserted prior art is simply irrelevant to [the] claim construction task." *K-2*, 191 F.3d at 1364. "Courts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee." *Id.*

"The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window*, 323 F.3d at 995. "A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement." *Id.* Rather, "'[t]he prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct.'" *Id.* (citations omitted).

**B.    Hercules' PerForm® SP9232 Does Not Infringe The Asserted Claims Of The Patents-In-Suit Because It Is Not "Cross-linked" As That Term Is Used In Their Intrinsic Record**

In order to distinguish their invention from the Durand prior art cited against them during prosecution of the '808 patent, the AmCy applicants asserted that "a cross-linking agent must contain <u>two</u> functional groups to act as such, . . . " (B874 (underlining in original)) and that "[t]he inclusion of such an agent materially affects the product produced." [B941] For support, the AmCy applicants cited the teachings of their patent application that polymerization "is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition" and that "[t]he polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups." [B874 (citing "page 7, lines 11-26 of the instant specification," *i.e.*, B834)] This same disclosure is included in the patent specifications of both patents-in-suit. [*See* B184, '808 patent, col. 4, lines 45-50 and B192, '766 patent, col. 6, lines 35-41]



To get around this failure of proof, Ciba urges this Court to construe the term "cross-linked" without regard to the intrinsic record of the patents-in-suit. That is, Ciba argues that "[c]ross-linked merely indicates that the polymer chains are linked together in use" and "does not dictate the specific method by which the link is established." [Ciba Initial Claim

19

Construction Brief at 28]  However, such a construction is not proper because it ignores the

intrinsic record of the patents-in-suit. *Phillips*, 415 F.3d 1303.[7]

As the Federal Circuit explained in *Phillips*, "[i]n light of the statutory directive that

the inventor provide a 'full' and 'exact' description of the claimed invention, the

specification necessarily informs the proper construction of the claims."  *Id.* at 1316.  Here

both patent specifications describe the respective inventions as cross-linked compositions

formed from polyfunctional crosslinking agents.  In the '808 patent, the AmCy applicants

explained:

> Polymerization of the monomers is conducted in the presence of a
> polyfunctional crosslinking agent to form the crosslinked composition.

[B184, col. 4, lines 45-47]  Similarly, in the '766 patent the AmCy applicants wrote:

> Polymerization of the monomers occurs in the presence of a polyfunctional
> crosslinking agent to form the cross-linked microbead.

[B192, col. 6, lines 36-39]  These patent specifications, thus, necessarily inform those in the

art that the proper construction of the claim term "cross-linked" means a composition cross-

linked by a polyfunctional crosslinking agent.

The correctness of this claim construction is also confirmed by the '808 patent

prosecution history.  *See Phillips*, 415 F.3d at 1317 ("the prosecution history provides

---

[7] *See also Nystrom v. Trex Co., Inc.*, 425 F.3d 1136, 1145-46 (Fed. Cir. 2005) (In the intrinsic record, "Nystrom consistently used the term 'board' to refer to wood cut from a log. . . .  Nystrom, however, seeks to broaden the term 'board' to encompass relatively obscure definitions that are not supported by the written description or prosecution history.  Broadening of the ordinary meaning of a term in the absence of support in the intrinsic record indicating that such a broad meaning was intended violates the principles articulated in *Phillips*"); *Cephalon Inc. v. Barr Labs*, 389 F. Supp. 2d 602, 606 (D. Del. 2005) ("Here, the inventors consistently referred to the present invention as teaching the formation of drug-containing lollipops through the compression of 'dry' or 'solid' powders.  There is nothing in the written description or the prosecution history to suggest that they intended the disputed phrases to cover methods or articles using free liquid.  Therefore, it would be improper for this Court to broaden the inventor's use of the disputed phrases and construe them to encompass the use of free liquid.")

evidence of how the PTO and the inventor understood the patent."). During prosecution of the '808 patent, the AmCy applicants disclaimed cross-linked compositions not formed by polyfunctional cross-linking agents when they argued that "a cross-linking agent must contain <u>two</u> functional groups to act as such" and that "[t]he inclusion of such an agent materially affects the product produced" in order to distinguish the claimed invention from the compositions of Durand.

Ciba does not submit any evidence that PerForm® SP9232 is "cross-linked" as that term was used in the specifications and prosecution histories of the patents-in-suit. Unlike the inventions described in the patents-in-suit, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Because the "cross-linked" limitation is included in every asserted patent claim of the patents-in-suit and Hercules' PerForm® SP9232 is not "cross-linked" as that term was used in the intrinsic record of the patents-in-suit, there can be no infringement and, for this reason in and of itself, Ciba's motion should be denied. Indeed Hercules has filed its own motion for summary judgment of noninfringement on this basis (D.I. 290).

**C.    Under Ciba's Claim Construction This Motion Raises A Genuine Issue Of Material Fact As To Whether PerForm® SP9232 Is Cross-linked**

Ciba's motion also raises a genuine issue of material fact as to whether PerForm® SP9232 is cross-linked under Ciba's claim construction. This genuine issue of material fact

precludes summary judgment in Ciba's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")











Thus, summary judgment in favor of Ciba should be denied for this reason as well.

**D. Making Paper With Hercules' PerForm® SP9232 Does Not Infringe The Asserted Claims Of The '766 Patent Because PerForm® SP9232 Is Not A "Cross-linked Polymeric Microbead" As That Term Was Used In The Intrinsic Record Of The '766 Patent**

Ciba's motion should also be denied with respect to the '766 patent because Hercules does not make paper and Hercules' customers who use PerForm® SP9232 to make paper are not using a "cross-linked polymeric microbead" as that term was defined in the intrinsic record of the '766 patent. '766 patent claim 1 covers "[a] method of making paper," which includes the step of adding a "cross-linked polymeric microbead . . . ." During the prosecution of the '766 patent, the applicants distinguished their invention from the methods and compositions disclosed in the prior art Probst reference by twice arguing in the context of a claim amendment narrowing the claims to the use of a "cross-linked, polymeric microbead" that applicants' microbead does not require the use of an emulsifier but rather "is an integral unit which can be separated from any emulsifier present if made in emulsion form." [B776 and B794]

Ciba's Opening Brief simply ignores this disclaimer and the prosecution history relating thereto. However, "[t]he doctrine of prosecution history disclaimer . . . [precludes] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Engineering, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citations omitted).

Here, the applicants disclaimed cross-linked compositions that cannot be "separated from any emulsifier present if made in emulsion form" to obtain allowance of their patent.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████

Accordingly, since Hercules' PerForm® SP9232 is not a "cross-linked polymeric microbead" as that term was defined in the intrinsic record of the '766 patent, Hercules' customers do not infringe the '766 patent when they use it to make paper. Thus, Hercules cannot be inducing infringement of that patent by selling PerForm® SP9232. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1374 (Fed. Cir. 2003) (" '[T]here can be no inducement of infringement without direct infringement by some party.' " (quoting *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986)). For this reason as well, Ciba's motion should be denied.[9]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

_____

[9] Hercules has filed its own motion for summary judgment of noninfringement on this basis (D.I. 290).

Another reason why PerForm® SP9232 cannot satisfy the "cross-linked polymeric microbead" limitation of claim 1 of the '766 patent is that this claim requires that the cross-linked microbead have a specified "unswollen" particle size. [B204, col. 29, line 43-44] This requires that the microbead must already be cross-linked in its unswollen state. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Thus, PerForm® SP9232 cannot be a "cross-linked polymeric microbead" having the specified "unswollen" particle size. This is yet another reason why there cannot be infringement of the '766 patent and Ciba's motion should be denied.[10]

**E.    The '766 Patent Is Not Infringed Under The Doctrine Of Equivalents**

Ciba presents only conclusory statements unsupported by expert testimony in urging that the limitation "cross-linked polymeric microbead" is satisfied under the doctrine of equivalents. [Ciba Brief at 19-20] This is inadequate because the doctrine of equivalents requires particularized testimony and linking argument on a limitation-by-limitation basis. *See Network Com., Inc. et al. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005) ("The expert declaration and other evidence relied on by Network Commerce supporting infringement by equivalents are generalized and do not provide particularized testimony and linking argument on a limitation-by-limitation basis.") *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) ("Having presented the district court with only conclusory statements regarding equivalence, without any particularized evidence

---

[10] This defense to Ciba's motion also holds true for claim 1 of the '808 patent, which likewise requires that the cross-linked polymeric microparticle have a specified "unswollen" particle size. [B187, col. 9, line 54-56]

and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device, or with respect to the 'function, way, result' test, PC Connector is now foreclosed from invoking the substantive application of the doctrine of equivalents.").

Ciba cites *Corning Glass Works v. Sumitomo Electric, U.S.A. Inc.*, 868 F.2d 1251 (Fed. Cir. 1989) to support its doctrine of equivalents argument. However, in *Corning* the substituted element was found to perform "substantially the same function in substantially the same way to obtain the same result" as the claimed element. *Id.* at 1258. Ciba does not attempt to make such a showing here. Rather Ciba only cites to Dr. Prud'homme's testimony to urge that the hydrophobic associations formed by Hypermer B246 "are permanent during the relevant time period, i.e., time in use." [Ciba Brief at 20][11]  At best, this would only evidence a similar result. This does not establish the first two prongs of the doctrine of equivalents test, i.e., that the substituted element performs substantially the same function in substantially the same way as the claimed element.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

The doctrine of equivalents is also precluded for the '766 patent by the doctrine of prosecution history estoppel. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359 (Fed. Cir. 2003) (*en banc*). Under the doctrine of prosecution history estoppel, a narrowing amendment made for a substantial reason relating to patentability precludes application of the Doctrine of Equivalents unless "at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent." *Id.* at 1368. However, if the alleged equivalent is in the prior art, then the doctrine of equivalents is barred because "there can be no other reason [besides a desire to give up the subject matter] for patentee [to] not have described the substitute in question." *Id.* at 1370.

During prosecution of the '766 patent, the claims were narrowed to require that the method of making paper used a "cross-linked, polymeric microbead" in order to avoid the prior art Probst reference. [B772] Thus, this was a narrowing amendment made for a substantial reason relating to patentability. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Accordingly, the doctrine of prosecution history applies and infringement under the doctrine of equivalents is precluded with respect to the '766 patent's "cross-linked polymeric microbead" limitation.

The doctrine of equivalents is also precluded because of the "all limitations rule." Under that rule, "an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." *Freedman Seating Co. v. Am Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005). Here finding a non-cross-linked material equivalent to the claimed "cross-linked polymeric microbead" material would entirely vitiate the "cross-linked" limitation. Thus, infringement under the doctrine of equivalents is precluded. *Freedman*, *supra*; *see also Asyst Technologies, Inc. v. Emtrak*, 402 F.3d 1188, 1195 (Fed. Cir. 2005) (holding that unmounted could not be an equivalent to the claim limitation "mounted" because it would read the limitation out of the patent). *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106-07 (Fed. Cir. 2000) (holding that the claim term "majority" was not entitled to a scope of equivalents covering a minority because it would vitiate the limitation). Thus, for this reason as well the doctrine of equivalents does not apply to the '766 patent.

Ciba's motion should also be denied with respect to the '808 patent because

The '808 patent claim 1 requires "a cross-linking agent content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer." [B187, col. 9, lines 57-59]

Rather, Ciba argues that "the specification makes it clear that the amount of cross-linking agent [referred to in the claim] is that which is added." [Ciba Brief at 21, n. 7] However, the plain meaning of the claim language requires "**microparticles . . . having a cross-linking agent content** of about 4 molar parts to about 4000 parts per million,

based on the monomeric units presented in the polymer." [B187, col. 9, lines 54-59, emphasis added] In other words, the microparticles claimed in the '808 patent must contain the requisite amount of cross-linking agent and not merely be made by adding that amount.

That the cross-linking agent must be incorporated into the polymeric microparticle is also apparent from the '808 patent specification, which explains that "[c]rosslinking is accomplished **by the incorporation** of a difunctional monomer, such as [MBA], into the polymer." [B183, col. 1, lines 26-28, (emphasis added); *see also*, *id.* at col. 2, lines 9-12, col. 3, lines 47-49, claim 2, and claim 3 (referencing the "cross-linking agent content" of applicants' cross-linked microparticles)]

This is also clear from the '808 prosecution history. In distinguishing the Durand prior art compositions from the claimed invention, the AmCy applicants pointed out that Durand did not disclose the claimed invention because it did not "indicate the incorporation of a cross-linking agent into the polymer produced:"

> The Durand et al. reference has been carefully considered but is not seen to teach, disclose or suggest the instant invention. Durand et al. fail to indicate the incorporation of a cross-linking agent into the polymer produced therein.

[B874] The applicants also made this same argument in distinguishing the claimed invention from the prior art Whittaker reference:

> Whittaker does not recognize the need to incorporate cross-linking agent into the polymer in a critical amount.

[B939]

Because the applicants disclaimed microparticles that did not have the critical amount of cross-linking agent incorporated into the polymer to distinguish their invention from Durand and Whittaker, the doctrine of prosecution history disclaimer attaches and precludes Ciba from recapturing through claim construction this disclaimed subject matter. *Omega*, 334 F.3d at 1323-24. Accordingly, properly construed, the claims of the '808 patent require

the claimed amount of cross-linking agent be incorporated into the polymeric microparticles.

S█████████████████████████████████████████████████████████████

█████████████████████████████████████████        *Exxon Chemical Patents, Inc.*

*v. Lubrizol Corp.*, 64 F.3d 1553, 1560 (Fed. Cir. 1995).

Indeed, the Federal Circuit's decision in *Exxon* is controlling here. In *Exxon,* the claimed composition required ashless dispersant in a specified amount. *Id.* at 1562. However, "Exxon [the patentee] offered no testimony on the amounts of ashless dispersant present in Lubrizol's [the accused infringer's] products." *Id.* at 1560 (emphasis in original). "Nor did Exxon provide the jury with direct evidence from which it could have inferred that the required percentages [were] found in the composition after it [was] created out of its specified starting ingredients." *Id.* Rather, "Exxon argued only that Lubrizol started with the requisite amount of ashless dispersant" and, that "under its theory, ashless dispersant [was] still present in Lubrizol's final product, albeit in ever-changing form." *Id.* On these facts, the Federal Circuit concluded that there was a failure of proof with respect to the presence of the required quantity of ashless dispersant. Accordingly, the Federal Circuit reversed the district court and found as a matter of law that there was no infringement. *Id.*

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████ As the Federal Circuit held in *Exxon,* such proof is inadequate to prove infringement of a composition claim requiring a component in a specified amount. Moreover, this failure of proof dictates a finding of no infringement of the '808 patent as a

matter of law.  *Id.*  For this reason as well, summary judgment in favor of Ciba should be denied.[12]

███████████████████████████████████████

███████████████████████████████████████  This limitation is required by asserted claim 1 of the '808

patent.

    Here again Ciba's Opening Brief ignores the actual language of the claim.  Rather, Ciba pretends that this claim language only requires "that the polymerization must include a water soluble monomer."  [Ciba Brief at 22]  This is not what the claims says.  Nor is Ciba's proposed claim construction consistent with the '808 patent's prosecution history.

    During prosecution of the '808 patent, the patent examiner rejected the original patent application claims over Makhlouf.  [B863-64]  The applicants first tried to overcome this rejection by limiting their claims to microparticles "derived solely from water-soluble monomers."  [B870]  This amendment, however, was **unsuccessful**.

    The examiner maintained his rejection over Makhlouf (B879-80) and added an indefiniteness rejection as well:

> The term "water-soluble monomers" makes the claims indefinite, because some monomers are partially soluble in water.  The examiner queries about the criteria for determining whether a monomer is water-soluble or not.

[B945]  Both the rejection over Makhlouf and the indefiniteness rejection were maintained by the examiner until the AmCy applicants agreed to amend their claims to their present

---

[12] Hercules has filed its own motion for summary judgment of noninfringement on this basis (D.I. 290).

form, which requires "polymeric microparticles derived solely from the polymerization of an aqueous solution of at least of one monomer." [B187, col. 9, lines 52-54]

In other words, the claim construction now proposed by Ciba, that the polymerization include a water soluble monomer, was actually rejected by the patent examiner during the prosecution of the '808 patent. Not only did he conclude that it did not overcome Makhlouf, but he also found that it was indefinite. Because the AmCy applicants gave up on obtaining this claim language during prosecution, Ciba cannot resurrect such language now. To the contrary, "[t]he doctrine of prosecution history disclaimer . . . [precludes] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega*, *supra*, 334 F.3d at 1323. Thus, Ciba is stuck with the actual language of the claim that was relied on to obtain allowance of the '808 patent, i.e., "polymeric microparticles derived solely from the polymerization of an aqueous solution of at least of one monomer."

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████ As a result, Hercules' PerForm® SP9232 does not infringe the '808 patent, as infringement requires each limitation of the claim to "be met by the accused device exactly, [and] any deviation from the claim [precludes] a finding of infringement." *Lantech, Inc. v. Keys Machine Co.,* 32 F.3d 547 (Fed. Cir. 1994) (citations omitted).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

37



---

[14] Hercules has filed its own motion for summary judgment of noninfringement on this basis (D.I. 290).

**H.    The '808 Patent Is Not Infringed Under The Doctrine Of Equivalents**

Ciba does not argue that the "cross-linking agent content" and "derived solely from" limitations of the '808 patent are met under the doctrine of equivalents. Nor could it. To the contrary, the doctrine of equivalents is precluded by prosecution history estoppel. *Festo*, 344 F.3d 1359. In order to obtain allowance of the '808 patent, applicants amended their claims to add the "cross-linking agent content" and "derived solely from" limitations. These were narrowing amendments made for a substantial reason relating to patentability. They were critical in overcoming the prior art and the indefiniteness rejections.

At the time of these amendments, polymerization in the oil phase was known in the prior art. [*See* B185, '808 patent, col. 5, lines 21-27] So was varying a polymer's cross-linking agent content. [*See* B1390, US Patent 4,968,435, at col. 2, lines 16-22] Accordingly, one skilled in the art could reasonably have been expected to draft a claim that would have literally encompassed the accused material. Thus, a desire to give up such subject matter was the only possible reason for narrowing the claim. Given these facts, prosecution history estoppel bars application of the doctrine of equivalents with respect to the '808 patent's "derived solely from" and "cross-linking agent content" limitations.

The doctrine of equivalents is also precluded by the "all limitations rule." *Freedman*, 420 F.3d at 1358. ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ *Asyst*, 402 F.3d at 1195 (holding that unmounted could not be an equivalent to the

claim limitation "mounted" because it would read the limitation out of the patent); *Moore*, 229 F.3d at 1106-07 (holding that the claim term "majority" was not entitled to a scope of equivalents covering a minority because it would vitiate the limitation).

## VI.     CONCLUSION

For all of the above reasons, Ciba's motion for partial summary judgment of infringement should be denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Ford F. Farabow, Jr.
Joann M. Neth
Eric J. Fues
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC  20001-4413
Tel:  (202) 408-4000

Dated:  January 27, 2006
Public Version Dated:  February 3, 2006

718289

By: */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE  19899-0951
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendant*
*Hercules Incorporated*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on February 3, 2006, the attached

document was hand-delivered to the following persons and was electronically filed with the

Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Frederick L. Cottrell, III
Jeffrey L. Moyer
Chad M. Shandler
Richards, Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE  19899

I hereby certify that on February 3, 2006, I have Federal Expressed the foregoing

document(s) to the following non-registered participants:

Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL  60601-6780

Thomas L. Creel, P.C.
Goodwin Procter LLP
599 Lexington Avenue
New York, NY  10022

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
Telephone:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

672306