## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) | |
| | ) | C.A. No. 04-293 (KAJ) |
| Plaintiff, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **REDACTED - PUBLIC VERSION** |
| HERCULES, INC. and CYTEC INDUSTRIES, INC., | ) ) ) | |
| Defendants. | ) | |

## CIBA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE ACCUSED PERFORM® SYSTEM INFRINGES U.S. PATENT NOS. 5,167,766 AND 5,171,808

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Jeffrey L. Moyer (#3309)
Moyer@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551

Attorneys for Plaintiff
Ciba Specialty Chemicals Corporation

Of Counsel:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Date: February 27, 2006

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

I.    INTRODUCTION ..................................................................................................... 1

II.   SUMMARY OF THE ARGUMENT ....................................................................... 1

III.  FACTS UNCONTESTED BY DEFENDANTS ....................................................... 2

IV.   OTHER FACTUAL POSITIONS URGED BY HERCULES ................................... 5

V.    ARGUMENT ............................................................................................................ 7

      A. Defendants Literally Infringe The '766 Patent ................................................. 7

          1.  Perform® is a "cross-linked … microbead" ................................................ 7

          2.  Hercules' arguments regarding inducement are erroneous.......................... 12

          3.  Hercules' further efforts to add limitations to the '766 patent
              are unfounded............................................................................................. 14

      B. Defendants Literally Infringe The '808 Patent ................................................. 14

          1.  Perform® is a "cross-linked … microparticle" ......................................... 14

          2.  Perform® employs a "cross-linking agent content of about 4 molar
              parts to about 4000 parts per million"...................................................... 16

          3.  Perform® is "derived solely from the polymerization of an aqueous
              solution of at least one monomer" ............................................................ 17

      C. Defendants Infringe Under The Doctrine Of Equivalents ................................ 18

VI.   CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*ACTV, Inc. v. Walt Disney Co.*,
 346 F.3d 1082 (Fed. Cir. 2003) .................................................................................. 12, 15, 16

*Alloc, Inc. v. I.T.C.*,
 342 F.3d 1361 (Fed. Cir. 2003) .............................................................................................. 13

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
 119 F.3d 953 (Fed. Cir. 1992) ................................................................................................. 7

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
 73 F.3d 1573 (Fed. Cir. 1996) ................................................................................................. 7

*Biacore v. Thermo Bioanalysis Corp.*,
 79 F.Supp.2d 422 (D.Del. 1999), *aff'd*, 30 Fed. Appx. 994 (Fed. Cir. 2002) ........................... 13

*FMC Corp. v. Up-Right, Inc.*,
 816 F.Supp. 1455 (N.D.Cal. 1993) ......................................................................................... 13

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
 83 F.3d 1352 (Fed. Cir. 2004) .......................................................................................... 12, 16

*Goldenberg v. Cytogen, Inc.*,
 373 F.3d 1158 (Fed. Cir. 2004) .............................................................................................. 11

*K-2 Corp. v. Salomon S.A.*,
 191 F.3d 1356 (Fed. Cir. 1999) .............................................................................................. 11

*Key Pharmaceuticals v. Hercon Labs, Corp.*,
 981 F.Supp. 299 (D.Del. 1997) ................................................................................................ 4

*Kumar v. Ovonic Battery Co., Inc.*,
 351 F.3d 1364 (Fed. Cir. 2003) .............................................................................................. 10

*Marley Mouldings Ltd. v. Mikron Industries, Inc.*,
 66 U.S.P.Q.2d 1701, 2003 WL 1989640 (N.D. Ill. 2004) ........................................................ 13

*MEMC Electronic Mat. v. Mitsubishi Mater. Silicon*,
 420 F.3d 1369 (Fed. Cir. 2005) .............................................................................................. 13

*Nazomi Communications, Inc. v. Arm Holdings, PLC*,
 403 F.3d 1364 (Fed. Cir. 2005) ................................................................................................ 9

RLF1-2982536-1

*NTP, Inc. v. Research In Motion, Ltd.,*
   418 F.3d 1282 (Fed. Cir. 2005) ................................................................................. 16

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... 8, 11, 12

*Relume Co. v. Dialight Co.,*
   63 F. Supp.2d 788 (E.D. Mich. 1999), *aff'd,* 4 Fed. Appx. 893 (Fed. Cir. 2001) ...................... 10

*SRI Intern. v. Matsushita Elec. Corp. of America,*
   775 F.2d 1107 (Fed. Cir. 1985) ..................................................................................... 8

*Superguide Corp. v. DirectTV Enterprises, Inc.,*
   358 F.3d 870 (Fed. Cir. 2004) ..................................................................... 8, 12, 15

*Verve, LLC v. Crane Cams, Inc.,*
   311 F.3d 1116 (Fed. Cir. 2002) ..................................................................................... 8

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
   520 U.S. 17 (1997) ...................................................................................................... 18

RLF1-2982536-1

## I.    INTRODUCTION

Ciba submits this reply in support of its motion for partial summary judgment of infringement of each of the patents-in-suit, i.e., U.S. Patents 5,167,766 and 5,171,808. Hercules submitted an opposition to which Cytec joined. (D.I. 314.)

## II.    SUMMARY OF THE ARGUMENT

Hercules devotes much of its opposition in an attempt to create an issue of material fact. However, Ciba's motion is based on the structure postulated by Hercules. Thus, the issue before the Court collapses into one of claim construction and this Court may enter summary judgment because the Defendants cannot prevail even on their own version of the facts.

Relative to the '766 patent, the accustomed meaning of "cross-linked" covers the structure postulated by Hercules. While Hercules seeks to limit the claims to the preferred embodiments of the patent, Federal Circuit law rejects limiting claims in such a manner and dictates that patentees are not required to set forth every conceivable and possible future embodiment. Cross-linking was well established technology and was not the focus of the invention. It was referenced generally. There was no limitation placed on the forces that held the cross-link in place. They could be covalent, ionic, or whatever else held the polymer chains together. REDACTED The treatment of Probst shows that it was considered a linear product, which creates no special definitions. Hypermer was not used, and there was no disavowal of the use of Hypermer.

Hercules further raises two technical arguments regarding induced infringement, ignoring that Hercules is accused of direct infringement because of its participation in executing the process. Hercules' first argument is merely that there is no direct infringement, which is something subsumed in its overall arguments regarding claim construction. Hercules' second

1

argument is that it did not "knowingly" induce others. However, Hercules has admitted all that is required for inducement, i.e., that Hercules knew about the patents and that Hercules intended its customers to use Perform® in the infringing manner.

REDACTED

With respect to the '808 patent, Hercules argues that Ciba is attempting to recapture "cross-linking" subject matter through claim construction. This is untrue. The Durand et al. patent relied upon by Hercules discloses a linear product. Hercules is not practicing the process of Durand et al. Thus, as with the '766 patent, the "cross-linking" language in the '808 patent is equally applicable to the structure postulated by Hercules.

As to Hercules' arguments regarding the level of cross-linking agent, its position is directly contrary to what is described in the '808 patent and how the claims were treated during prosecution. With respect to Hercules' position regarding the "derived solely" terminology, Hercules' postulated system infringes regardless of the claim interpretation.

Even if the claims of the patents were limited as suggested by Hercules, there is still infringement under the doctrine of equivalents based on uncontested facts. In normal use, the characteristics of Perform® are indistinguishable from Polyflex®.

## III. FACTS UNCONTESTED BY DEFENDANTS

As to the structure of their Perform® material, Hercules admits that:



REDACTED

---

[1] "Herc. Opp. at ___" refers to Hercules' opposition to Ciba's motion for summary judgment of infringement as joined by co-defendant, Cytec (D.I. 309).



Hercules did not object to the following depiction as representing the structure of Perform® that

would be held together permanently by the hydrophobic and covalent forces:

REDACTED

---

[2] "Exh. ___" refers to the exhibits submitted with the Declaration of L. Scott Beall in support of Ciba's motion for summary judgment of infringement, D.I. 279–81. "Beall Exh. ___" refers to exhibits submitted with Declaration of Dr. Beall in support of Ciba's Motion For Claim Construction of the Patents-In-Suit, filed December 30, 2005, D.I. 276. "McBride Exh. ___" refers to the exhibits submitted with Mr. McBride's declaration dated January 27, 2006 in opposition to Hercules' motion for noninfringement of January 27, 2006, D.I. 318–9. "Def. Opening Br. Exh. ___" refers to the exhibits attached to the Appendix in Support of Hercules' Opening Claim Construction Brief, filed December 30, 2005, D.I. 287–8. "Def. Opening Br. II, Ex. ___" refers to the exhibits attached to the Appendix In Support of Hercules' Motion For Non-Infringement of December 30, 2005, D.I. 291–2. "Ciba's Opp. ___" refers to Ciba's opposition to Hercules' motion for summary judgment of noninfringement, D.I. 317.

RLF1-2982536-1

Relative to the use of cross-linking in the '766 and '808 patents, Hercules does not contest the fact that cross-linking was not the focus of the inventions in the '766 and '808 patents. Indeed, this Court has observed in another case that "[c]ross-linking of polymers, including acrylic polymers, [is] almost as old as polymer chemistry itself." *Key Pharmaceuticals v. Hercon Labs, Corp.*, 981 F.Supp. 299, 303 (D.Del. 1997). In this regard, Hercules does not contest that the prior art cited in the background of the patents-in-suit refers to cross-linking by various methodologies, including instances where the cross-links are held in place by forces other than covalent forces. (*Compare* Ciba Br. at 10-11 *with* no mention by Hercules.) The '780 patent, which is referenced in the '766 and '808 patents as describing a "cross-linked ... bead," refers to cross-links formed with and without agents and held in place by covalent forces and other forces including those that are ionic in nature. (Exh. 11, '780 patent at Col. 9, lines 19–27; see also, Exh. 9, '766 patent at Col. 2, lines 48 and 53–4; Exh. 10, '808 patent at Col. 1, lines 23–30.) Hercules does not contest the following depiction of ionic cross-linking referred to in the '780 patent:



*Figure 7.3 Schematic diagram of clusters in an ionomer.*

4

(Exh. 12 at CIBA 037951.) The clustered (shaded) areas are junctions held in place by ionic forces, not covalent forces. Hercules does not contest that the same general disclosures are contained in the Farrar et al. patent that was cited by the patent examiner in the '766 file history. (Beall Exh. 10, Farrar et al. patent, Col. 10, lines 28, 38–41.) The similarity between the cross-links created by ionic associations and Hercules' depiction of hydrophobic associations is apparent.

Hercules also has not meaningfully contested the accuracy of the international definition offered by Dr. Gilbert from the International Union of Pure and Applied Chemistry which states in part:

> In the majority of cases, a crosslink is a covalent structure, but the term is also used to describe sites of weaker chemical interactions, portions of crystallites, and even physical interactions and entanglements.

(McBride Exh. 6, IUPAC Glossary 1.59, note 2.) Dr. Gilbert testified that this definition was applicable at the time leading up to the filing of the applications leading to the '766 and '808 patents. (Def. Opening Brief, Exh. D, Gilbert at 103-104; Beal I, Exh. 28, Expert Report at ¶ 14-15; McBride Exh. 7, affirming declaration of Dr. Gilbert.) The inventor, Mr. Honig, testified as follows:

> *Mr. Fues (Hercules): ... It was your testimony that, I believe, anything that would keep the polymer chains together during use you would consider to fall within the scope of this cross-linked polymeric microbead of your claim 1 of your 766 patent?*
>
> *A: Yes.*

(McBride Exh. 4, Honig Trans. at 357-58; see also, Honig Trans. 341-42.)

## IV.    OTHER FACTUAL POSITIONS URGED BY HERCULES

Because they are immaterial to the present motion, Ciba will not respond to many of Hercules' assertions, such as at pages 21-28 of its opposition. The factual contentions and

disagreements raised by Hercules are primarily directed at whether the forces holding the

polymer chains of Perform® together are only covalent. If, as a result of the Court's claim

interpretation, the Court finds it necessary to determine the underlying forces involved in the

cross-linking, then Ciba acknowledges that there are many facts in dispute so that summary

judgment – for or against – infringement would be inappropriate.

 Defendants obviously knew of the patents

and the Polyflex® product.

REDACTED

REDACTED

## V.  ARGUMENT

In the present case, there is significant evidence that the cross-links present in the

Perform® system are held in place by covalent forces.  (See Ciba's Opp. at 17–23, 36.)

However, this Court need not resolve the question of what forces hold the cross-links in place.

In instances where an accused infringer advances a characterization of an accused product, the

Court may enter infringement on summary judgment if the accused infringer cannot prevail

based on that characterization. *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 955

(Fed. Cir. 1992). Thus, the Court's inquiry may "collapse into one of claim construction" and

summary judgment is appropriate in such instances. *Athletic Alternatives, Inc. v. Prince Mfg.,*

*Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

### A.  Defendants Literally Infringe The '766 Patent
#### 1.  Perform® is a "cross-linked ... microbead"

Hercules' defense against infringement of claim 1 of the '766 patent substantially focuses

on a single term "cross-linked," which is part of a larger phrase referring to "an ionic, organic,

**cross-linked** polymeric microbead." (emphasis added.)  Essentially, Hercules' position is that

the specification of the '766 patent did not specifically disclose cross-links held in place solely

by hydrophobic forces, so the Perform® product cannot be considered to be crosslinked.  This is

not the law.  The ordinary and accustomed meaning of "cross-linked", which was well known to

those in the art, is controlling.  The Federal Circuit observed in the *Phillips* decision that:

> [W]e have expressly rejected the contention that if a patent describes only one
> embodiment, the claims of the patent must be limited to that embodiment.  This is
> not just because section 112 of the Patent Act requires that the claims themselves
> set forth the limits of the patent grant, but also because persons of ordinary skill in

7

the art rarely would confine their definitions of terms to the exact representations
depicted in the embodiments.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). The Federal Circuit has

recognized that it would be impossible for a patent specification to include a full description of

every background fact or every alternative embodiment:

> The law does not require the impossible. Hence, it does not require that the
> applicant describe in his specification every conceivable and possible future
> embodiment of his invention. The law recognizes that patent specifications are
> written for those *skilled in the art*, and requires only that the inventor describe the
> "best mode" known at the time to him of making and using the invention.

*SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)(en

banc); *Superguide Corp. v. DirectTV Enterprises, Inc.*, 358 F.3d 870, 881 (Fed. Cir. 2004). The

Federal Circuit has also noted that, if the law required such detail in the specification, there

would be no need for claims. *Id.* ("If everything in the specification were required to be read

into the claims, or if structural claims were limited to devices operated precisely as a

specification-described embodiment is operated, there would be no need for claims.")

    The claim construction procedure advocated by Hercules ignores this fundamental

principle. Under Hercules' approach, patents would become treatises for all background

technology. They would become huge documents. Such an approach has been rejected by the

Federal Circuit:

> [T]he patentee is not required to include in the specification information readily
> understood by practitioners, lest every patent be required to be written as a
> comprehensive tutorial and treatise for the generalist, instead of a concise
> statement for persons in the field.

*Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002), *cited approvingly*,

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

8

Here, there is little doubt but that those of skill in the art at the time would have understood "cross-linked" as a term with an ordinary and accustomed meaning. Hercules has not contested the fact that the Cytec inventors were not trying to develop a new form of cross-linking. Cross-linking was not new. The Cytec applicants' reference to cross-linking was general because any form of cross-linking was sufficient. The applicants were interested in the microbead and its use. That was the improvement in the technology. The nature of the microbead required that it be cross-linked; the particular forces holding the cross-links together were not important.

In the background of the '766 patent, the Cytec applicants make no distinctions or disclaimers to the breadth of cross-linking in the art. In fact, the Cytec applicants cite the '780 patent as disclosing "**cross-linked**, cationic, polyacrylamide beads." (Exh. 9, '766 patent, Col. 2, lines 47-49, emphasis added.) The '780 patent describes that such "cross-linked ... beads" could be made in a number of ways including with and without agents and with and without covalent bonds. (Exh. 11, '780 patent, Col. 9, lines 19-27.) The same understanding is evidenced by the Farrar et al. patent that was cited by the examiner and distinguished on other grounds during prosecution. (Beall Exh. 10, Farrar et al. patent Col. 10, lines 28 and 38-41.)

The Federal Circuit has recognized that "prior art is often a reliable source of the understanding of one of ordinary skill in the art." *Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005). The Federal Circuit has further observed that "[o]ur cases establish that prior art cited in a patent or cited in the prosecution history of the

9

patent constitutes intrinsic evidence." *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).[3]

Hercules asks this Court to look only at whether the applicants included the infringing system as an example in their specification. The uncontested evidence is that one of ordinary skill in the art would recognize that the term "cross-linked" simply refers to the linking of polymer chains during use. By analogy, a ladder having "rungs" does not specify the manner in which the rungs are attached to the legs. These could be attached by welding if the rungs were metal, screws if the rungs were wood, glue, etc. Saying that the ladder has rungs does not specify how the rungs are held in place.

REDACTED

But the question is not whether these are theoretically permanent, only whether they stay in place during application. All cross-links are temporary when looked at metaphysically as advocated by Hercules. Even the cases relied upon by Hercules reject such impractical approaches to claim interpretation:

> Indeed, we would be hard pressed to describe *anything* as "permanent" if that term is understood to require an infinite duration. But claim construction is not philosophy....

---

[3] Hercules has asserted in its claim construction response that the prior art has to be submitted during prosecution to be considered intrinsic evidence. This is not so. Prior art cited in the text of the patent is always part of the intrinsic record, regardless of whether a separate copy is also provided during prosecution. *Relume Co. v. Dialight Co.*, 63 F. Supp.2d 788, 799 n. 10 (E.D. Mich. 1999), *aff'd*, 4 Fed. Appx. 893 (Fed. Cir. 2001) (The face of the '645 patent does not show the Power Supply Cookbook as a reference, though it is mentioned in the background at column 3, line 15. *See*, www.uspto.gov.) Moreover, the file history of the '808 patent shows that the patent examiner considered the '780 patent and noted its U.S. equivalent, U.S. Patent 4,710,346. (McBride Exh. 8 at CIBA 038167).

*K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999).[4]

As explained in earlier briefs, the specification of the '766 patent fully supports the ordinary and accustomed meaning of "cross-linked," especially given that it was not a central focus of development. The specification does not exclude or distinguish any form of cross-linking, nor was there any reason to do so considering the role played by cross-linking.



The claims do not include such limiting modifiers. As the *Phillips* Court observed:

> To take a simple example, the claim in this case refers to steel baffles, which strongly implies that the term baffles does not inherently mean objects made of steel.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Here, the applicants claimed their microbead as being "cross-linked", not "covalently cross-linked" nor any of the other variations advocated by Hercules. The applicants' failure to use such language strongly implies that the applicants did not wish to limit their claims in such a manner.

Hercules also attempts to limit the broader meaning of "cross-linked" by relying on the treatment of Probst in the prosecution history leading to the '766 patent.[5] However, Hercules misapplies and misinterprets the prosecution. The passages relied upon by Hercules actually relate to the ionicity of the product in Probst. (*See* McBride Exh. 5, '766 patent prosecution, Paper No. 8 at 7, CIBA 038984.) The ionic surfactants in the Probst system do not become associated with the final commercial product, therefore, they are not relevant.

---

[4] The claim term in *K-2* included the term "permanently affixed" as opposed to merely "affixed" and there was significant prosecution history estoppel based on prior art that employed a screw. *Id.* at 1363. Thus, while the cited observation is applicable, the case is generally inapposite.

[5]



Such arguments are legally erroneous because the patents were separately filed and do not share the same prosecution history. *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004).

11

REDACTED

There is simply no support for such a hypothesis. The final product of Probst is not ionic. That is the end of the story as regards the surfactants in Probst.

The analysis concerning the ionicity of Probst had nothing to do with cross-linking. Probst is not cross-linked because the epichlorohydrin is inactive in the particular chemistry of Probst. (*Id.* Paper No. 11 at 4, CIBA 038997.) The Probst product is linear.

There was no clear disavowal of claim scope in connection with Probst. Hercules' attempts at twisting the statements made regarding Probst highlight why the Federal Circuit considers the prosecution history to be of lesser relevance to claim construction. *Phillips v. AHW Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (the prosecution "is less useful for claim construction purposes"). The prosecution is often misinterpreted to restrict the claims leading to error on appeal. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1091-93 (Fed. Cir. 2003); *Superguide Corp. v. DirectTV Enterprises, Inc.*, 358 F.3d 870, 882-3 (Fed. Cir. 2004); *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1375 (Fed. Cir. 2004).

When properly construed for the ordinary and accustomed meaning, there is no doubt but that the "cross-linked … microbead" language covers the structure postulated by Hercules.

REDACTED

This is sufficient to find infringement.

### 2.    Hercules' arguments regarding inducement are erroneous

Hercules makes two rather technical arguments regarding induced infringement. No similar arguments are raised relative to Cytec. REDACTED

Before addressing Hercules' particular arguments, Ciba notes that Hercules misses the point that Hercules is accused of direct infringement because of its participation in executing the

12

RLF1-2982536-1

process.

assistar     REDACTED

This makes the Defendants direct co-infringers under 35 U.S.C. §271(a). *Marley Mouldings Ltd. v. Mikron Industries, Inc.*, 66 U.S.P.Q.2d 1701, 1703, 2003 WL 1989640 at *2-3 (N.D. Ill. 2004); *see, FMC Corp. v. Up-Right, Inc.*, 816 F.Supp. 1455, 1461 (N.D.Cal. 1993).

Hercules' first argument on pages 28 to 30 of its opposition is that there must be direct infringement for there to be inducement.  If this Court finds that the properly construed term "cross-linked…microbead" covers the use of the Perform® system, then Defendants do not contest that the remaining elements of the claimed invention are practiced. Thus, there is direct infringement and inducement by the Defendants.

REDACTED

. This is not the law. *Biacore v. Thermo Bioanalysis Corp.*, 79 F.Supp.2d 422, 458-59 (D.Del. 1999), *aff'd,* 30 Fed. Appx. 994 (Fed. Cir. 2002). Ciba need only show that there was knowledge of the patents and that Hercules intended its customers to use the Perform® system in the manner in which it was used. *Id.* REDACTED Hercules certainly knows how its Perform® system in being practiced.[6]

---

[6] The *Alloc* decision relied upon by Hercules is inapposite in that the decision relied entirely on a finding of no direct infringement. *Alloc, Inc. v. I.T.C.*, 342 F.3d 1361, 1374 (Fed. Cir. 2003). Hercules has failed to cite any law from this district requiring the heightened level of intent it postulates. The Federal Circuit has declined to invoke such a heightened standard. *MEMC Electronic Mat. v. Mitsubishi Mater. Silicon*, 420 F.3d 1369, 1378 (Fed. Cir. 2005).

13

3.   **Hercules' further efforts to add limitations to the '766 patent are unfounded**

REDACTED

However, this requirement is not found anywhere in the claim and was not even part of Hercules' claim construction briefs. Relative to the size determination, the specification of the '766 patent states that:

> The unswollen number average particle diameter in nanometers is defined and used here as that determined by the quasi-elastic light scattering spectroscopy (QELS) as carried out on the polymer emulsion, microemulsion or dispersion.

(Exh. 9, '766 patent, Col. 11, lines 42-45.)



B.   **Defendants Literally Infringe The '808 Patent**

1.   **Perform® is a "cross-linked ... microparticle"**

Hercules denies infringement of the '808 patent based on the language in the claim requiring a "cross-linked ... microparticle." Although the '766 and the '808 patents are separate, both patents include the same reference to cross-linking as a general mechanism. (See Exh. 10, '808 patent, Col. 1, lines 23-25.) The ordinary and accustomed meaning of "cross-linked" as would be understood by those of skill in the art is explained above, *supra 5 et seq.* Hercules attempts to limit this meaning in connection with the Durand et al. patent that was considered

14

during prosecution of the '808 patent. However, the Durand et al. patent was not relevant because it is a linear product as is plainly explained in the file history:

> [T]he Examiner's attention is respectfully directed to Table II of the instant specification. As can be seen, Example 7 is representative of a polymer produced in the absence of a cross-linking agent i.e. **it is linear**, see page 16, line 2, as is that of Durand et al.

(Def. Opening Br. Exh. 3, '626 application, Paper No. 4 at 6, CIBA 000526, emphasis added.)

At times, Hercules has argued that Ciba is attempting to recapture subject matter given up during prosecution. This is not true. Applying the ordinary and accustomed meaning of "cross-linked ... microparticle" does not change the applicability of the Durand et al. patent.

REDACTED A linear polymer is not cross-linked. Furthermore, Hercules is not practicing Durand et al. The Hypermer used by Defendants in the manufacture of Perform® is not the same as the surfactants used in Durand et al.

Hercules often cites the Durand et al. patent as if it discloses cross-linking held in place by hydrophobic forces. The Examiner never made such an assertion, and there is no such teaching in Durand et al.

REDACTED

The statement did not involve agents where there were other functional groups such as ionic groups, hydrophobic groups, etc. The Courts uniformly find that such statements do not amount to a clear and unequivocal disavowal of claim scope. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1091-93 (Fed. Cir. 2003); *Superguide Corp. v. DirectTV Enterprises, Inc.*, 358 F.3d 870, 882-3 (Fed. Cir.

15

2004); *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1375 (Fed. Cir.

2004); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1308-09 (Fed. Cir. 2005).

For example, in the *ACTV* case, the court evaluated a TV system where web site

information was sent from the cable company to the user's TV. The accused infringer alleged

that the web site information had to include the transfer protocol-type identification (i.e., http://

or ftp://, etc.). The applicants had distinguished prior art where actual raw content was

transmitted stating "they do not provide uniform resource locators (URL) which are addresses

designated [sic] Web sites." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1092 (Fed. Cir.

2003). The Federal Circuit found that such statements were not a clear disavowal because:

> The contrast drawn by the patentee is between raw data and a method of
> identification, and not between different methods of identification, i.e., relative
> versus absolute URLs.

*Id.* at 1092.

Here, the Durand et al. reference was distinguished because it is linear, not because it has

hydrophobic cross-linking (which it does not). From the beginning, the Cytec applicants

intended to cover the claimed microparticles generally as regards any form of cross-linking.

Only linear systems were distinguished. Cross-links held in place by forces other than covalent

forces were never disclaimed. As a result, the Perform® product literally satisfies these

limitations.

### 2. Perform® employs a "cross-linking agent content of about 4 molar parts to about 4000 parts per million"



However,

this interpretation is directly counter to the manner in which the language was applied in the

patent and prosecution. In every Example in the '808 patent, the ppm measurement of the cross-

16

linking agents is done based on the content that was employed in preparing the aqueous phase mixture that is used in the polymerization process. (Exh. 10, '808 patent, Col. 6, lines 58-67.) In the passage beginning at Col. 4, line 63, the patent specification talks about the amount "employed to induce sufficient crosslinking" being the same as the "content." This discussion is in the context of a description of the preferred polymerization process in the patent specification.

REDACTED

3-

In both cases, the applicants were merely stating that the patents describe linear systems. (Def. Opening Br. Exh. 3, '626 application, Paper No. 4 at 6, CIBA 000526, Durand is "linear"; Id., Exh. 8, '808 patent prosecution, the '120 application, Paper No. 3 at 4-5, HERC0076113-4, Whittaker is "preferably free of cross-linking agent.") Hercules has not contested the facts showing that over 600 ppm of Hypermer content is employed. (Ciba Opening Br. at 22.)

**3.    Perform® is "derived solely from the polymerization of an aqueous solution of at least one monomer"**

REDACTED

17

REDACTED

Based upon these admitted conditions, this Court can find that the noted language is satisfied regardless of its interpretation. Thus, this Court need not resolve the claim interpretation to find that Hercules' postulated system satisfies this language.

### C.     Defendants Infringe Under The Doctrine Of Equivalents

In the event that the Court interprets the claims to of the '766 patent or the '808 patent to be limited to a "covalently cross-linked" product, there is still infringement under the doctrine of equivalents.

REDACTED

By definition, if the cross-links cannot be differentiated, they are equivalent.

REDACTED     It does more than this. The presence of a permanent junction that cannot be differentiated shows that the same function (e.g. constraining the microparticle) is accomplished in the same way (e.g., linking polymer chains together) to accomplish the same result (e.g., providing a microparticle for use as a drainage and retention aid). The differences in application are insubstantial, which is all that is required for infringement under equivalents. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39–40 (1997).

18

Hercules also invokes the "all limitations rule" with respect to the cross-linked claim limitations, asserting that it precludes a finding of equivalence. Yet, this is not a case where a finding of equivalence would vitiate an entire claim limitation. The Perform® product would have an equivalent to the "cross-linked" limitations, namely the crosslinks held together by hydrophobic forces in the Perform® product. There is clearly no need to read the "cross-linked" limitations out of the claims to find infringement by equivalence.

REDACTED

Thus, the substance of this limitation is satisfied under the doctrine of equivalents.

Hercules also asserts that the '808 patent cannot be satisfied relative to the aqueous solution language.

REDACTED

In each case, the monomers are added in aqueous solution and the final product derives solely from the polymerization of such monomers.

Hercules' attempts to differentiate equivalence are not based on evidence, but only supposition. The facts establish equivalence.

19

## VI.    **CONCLUSION**

For the foregoing reasons, this Court should enter partial summary judgment that claim 1

of the '766 patent and claim 1 of the '808 patent are infringed, either literally or under the

doctrine of equivalents.

February 17, 2006

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Jeffrey L. Moyer (#3309)
Moyer@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square
Wilmington, Delaware 19899-0551
Attorneys for Plaintiff

Of Counsel:
Gordon R. Coons
Eley O. Thompson
Gregory C. Bays
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
Chicago, Illinois 60601

Dated:  February 17, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2006 I hand delivered the foregoing document to the

following persons and electronically filed the foregoing document with the Clerk of Court using

CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951


I hereby certify that on February 17, 2006, I have Federal Expressed the foregoing

document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022


Chad M. Shandler (#3796)

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2006 I hand delivered the foregoing document to the

following persons and electronically filed the foregoing document with the Clerk of Court using

CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951


I hereby certify that on February 27, 2006, I have Federal Expressed the foregoing

document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire                Thomas L. Creel, Esquire
Joann M. Neth, Esquire                       Goodwin Proctor, LLP
A. Neal Seth, Esquire                        599 Lexington Avenue
Finnegan, Henderson, Farabow, Garrett &      New York, NY  10022
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Chad M. Shandler (#3796)