# EXHIBIT A

LEXSEE 1997 U.S. DISTRICT LEXIS 8016

**SUSAN ALLEN, GEORGE P. ALLEN, and PATRICIA MATHIS, Plaintiffs, v. INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**Civil Action No. 94-264-LON**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1997 U.S. Dist. LEXIS 8016*

**May 19, 1997, Decided**

**DISPOSITION:** [*1] Defendant's motion to exclude plaintiffs' experts GRANTED in part and DENIED in part. Defendant's motion for summary judgment GRANTED. Plaintiffs' entire action DISMISSED.

**COUNSEL:** Robert Jacobs, Esquire, Jacobs & Crumplar, Wilmington, Delaware, attorney for plaintiffs.

Allen M. Terrell, Jr., Esquire, Frederick L. Cottrell, III, Esquire and John T. Dorsey, Esquire, Richards, Layton & Finger, Wilmington, Delaware, attorneys for defendant.

**JUDGES:** Mary Pat Trostle, U.S. Magistrate-Judge

**OPINIONBY:** Mary Pat Trostle

**OPINION:**

**MAGISTRATE'S REPORT AND RECOMMENDATION**

Dated: May 19, 1997

Wilmington, Delaware

Mary Pat Trostle, U.S. Magistrate-Judge

**PROCEEDINGS**

On June 22, 1992, plaintiffs Patricia Bowers Mathis n1 ("Bowers") and Susan and George Allen n2 ("Allen") filed this product liability action against defendant International Business Machines Corporation ("IBM") in United States District Court for the Eastern District of New York, alleging that plaintiffs suffered wrist injuries solely as the result of typing on computer keyboards manufactured by defendant. D.I. 1. n3 Specifically, the Complaint included claims of negligence, strict liability, loss of consortium and punitive [*2] damages. D.I. 1. n4

IBM filed its Answer on September 21, 1992. D.I. 3. On April 20, 1994, the action was transferred to the U.S. District Court for the District of Delaware (D.I. 10), with the case filed in this District on May 19, 1994. D.I. 12. Discovery thereafter ensued.

n1 Plaintiff Mathis initially filed under her maiden name of Bowers. For the purposes of this opinion, plaintiff is referred to by her maiden name of Bowers. D.I. 322 at 1.

n2 Plaintiff Susan Allen is joined by her husband, George, in this action. For the purposes of this Report and Recommendation, the Court solely refers to Ms. Allen as the plaintiff, addressing her as "Allen."

n3 Plaintiffs' alleged medical conditions are commonly classified as "repetitive stress injuries" ("RSI"), currently the subject of numerous actions against computer manufacturers across the nation.

n4 The claims for loss of consortium and punitive damages are dependent upon the survival of the negligence claim. See, e.g., *Farrall v. Armstrong Cork Co., 457 A.2d 763, 770 (Del.Super. 1983)* (consortium claim is derivative); E.I. dul. duPont de Nemours and Co. v. Admiral Ins. Co., C.A. No. 89C-AV-99 slip op. at 21 (Del.Super. July 14, 1994) (punitive damages is derivative).

[*3]

On May 16, 1995, the Court signed a stipulated Order dismissing all claims based on breach of warranty and strict liability. D.I. 209. Thus, the only remaining liability claim is premised on the alleged negligence of defendant.

On October 10, 1995, the Court signed an Order setting forth the procedure for filing motions for summary judgment. D.I. 247. Defendant now moves for summary judgment, arguing that: (1) plaintiffs' proffered expert testimony is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, as applied by *Schneck v. IBM, 1996 U.S. Dist. LEXIS 17486*, C.A. No. 92-4370(GEB), (D.N.J. June 25, 1996); (2) plaintiffs have failed to establish negligence on the part of IBM under either of the proposed theories of defective design or failure to warn; and (3) Bowers' claims are untimely. D.I. 309. Plaintiffs counter that: (1) their expert witnesses satisfy Daubert's criteria for admissibility of testimony; (2) IBM was cognizant of the deleterious flaws in the design of its keyboards, yet failed to correct the defects or, in the alternative, provide appropriate warnings to consumers, as did other similarly situated keyboard manufacturers; [*4] and (3) the filing of Bowers' suit was within the applicable statute of limitations, as evidenced by her medical records and controlling case law. D.I. 322. Briefing was completed and oral argument on defendant's motion occurred on September 4, 1996. *In limine* hearings addressing the qualifications and admissibility of plaintiffs' proffered experts and their testimony were conducted on November 20, 23 and 27, and December 4 and 6, 1996.

## BACKGROUND FACTS

Plaintiff Allen is a 34-year-old mother of two who now works as a part-time receptionist for The News Journal Company ("News Journal"). Allen has accomplished raising her family, including attending to household chores and pursuing hobbies to varying degrees, while working throughout in a variety of jobs. For instance, while in high school in 1978, Allen was employed part-time by Woolco Department Store as a clerk, stocking shelves, tagging merchandise, and ringing up customers' purchases on a manual cash register of unknown manufacture. Thereafter, Allen worked part-time for several months at Mister Donut, filling donuts, lifting trays and operating a cash register of unknown origin. D.I. 311, Ex. A-688-94.

In late [*5] 1980 or early 1981, Allen assumed a position as salad maker for the restaurant Royal Exchange, primarily cutting vegetables. In 1981 or 1982, she was employed full-time n5 as prep cook for H.A. Winstons, preparing soups and sauces, cole slaw and carrot salad. D.I. 311, Ex. A-699-702.

> n5 As prep cook for H.A. Winstons, Allen worked seven hours a day, five days a week. D.I. 311, Ex. A-694-96.

Allen's professional relationship with the News Journal began in 1983, when she commenced part-time employment as a clerk in the Circulation Department. In this position, Allen answered phones and hand-wrote complaints about the newspaper's delivery service, averaging between 25 and 50 calls per day. No computer was utilized in this capacity. D.I. 311, Ex. A-702-706. After several months, plaintiff changed jobs within the Department, assuming work as a verifier. As such, she used a pen and paper to complete forms after receiving calls from customers. D.I. 311, Ex. 706-708.

After working approximately six months as a verifier, [*6] Allen commenced the new position of verifier/clerk, initially working five days per week, but sometime thereafter decreasing hours to four days per week. As verifier/clerk, Allen used a computer. D.I. 311, Ex. A-709-11.

In approximately 1991, Allen began experiencing pain, numbness and tingling in her hands which ultimately necessitated bilateral carpal tunnel syndrome ("CTS") releases in March and June of 1992. D.I. 311, Ex. A-713-14, Ex. A-719. After the surgery, plaintiff returned to the News Journal, first as a typist, and then in her current post as receptionist, a part-time position held since approximately November 1992. n6 In her capacity as receptionist, Allen answers telephone calls and hand-writes messages. She recently has resumed typing. D.I. 311, Ex. A-720-21, 774-75. Plaintiff denies additional injury to her wrists other than a winter 1994 sprain to her right wrist due to a fall on the ice. D.I. 311, Ex. A-723-24.

> n6 As a receptionist, Allen works four-and-a half hours per day, five days a week. D.I. 311, Ex. A-721-22.

[*7]

As previously noted, besides her professional employment, Allen has been raising a family, for whom she did most of the cooking. Plaintiff's outside hobbies and interests include gardening and bowling in a league for several years. D.I. 311, Ex. A-715-17.

Plaintiff Bowers is a 50-year-old mother of four currently working as a verifier/clerk for the News Journal. D.I. 311, Ex. A-760-61. Like Allen, Bowers has raised a family while working in a number of different jobs throughout the years, commencing her employment as a part-time housekeeper at nine years of age. At age 12, Bowers began work at a mushroom factory, picking mushrooms. Two years later, she switched to canning the mushrooms. D.I. 311, Ex. A-726-29.

After marriage, Bowers took a hiatus from the workforce to raise her children, returning in 1972 to part-time work as floor person and cashier for J.C Penneys, with whom she remained until 1980. D.I. 311, Ex. A-730-32. While with that store, plaintiff used a "very old standard type of [cash] register [which] was nothing to my knowledge like IBM or anything. It just had regular keys that you would hit for ringing up a sale." D.I. 311, Ex. A-731.

Bowers next job was as [*8] a part-time customer service representative and cashier for Strawbridge and Clothier, a position held until she rejoined J.C Penneys in 1989. D.I. 311, Ex. A-733-35. She could not recall the manufacturer of Strawbridge's "electronic-type" cash register. D.I. 311, Ex. A-734.

In 1981, plaintiff Bowers also began weekend work in the Circulation Department at the News Journal, answering telephone calls from customers, and writing down their orders and comments/complaints. Her work hours and responsibilities ultimately increased. In 1985, Bowers started to use a computer of unknown manufacture at her job. D.I. 311, Ex. A-734, Ex. A-740-45.

Plaintiff Bowers first noticed symptoms associated with carpal tunnel syndrome in her hands and wrists in 1989, characterizing the sensations as "aching," "tingling" and "numbness," progressing to "severe pain" which woke her up at night. D.I. 311, Ex. A-756. She consulted an HMO about the complaints on March 10, 1990 and ultimately underwent bilateral CTS surgery. Since that time, she has returned to work as a customer service representative with the News Journal, and continues to use a computer in her job. D.I. 311, Ex. A-758-61.

Although Bowers [*9] attributes her CTS symptoms to her utilization of IBM computer equipment at the newspaper, she also worked an unidentified cash register at Acme Markets for approximately two years (1992 until 1994), until she left the position due to a back injury resulting from a fall at the News Journal. D.I. 311, Ex. A-736-39, Ex. A-772, A-781. Like Allen, she has pursued a variety of hobbies/activities involving extensive hand movement, including gardening, every day meal preparation and bowling. Bowers also is an accomplished seamstress, having learned to sew at approximately age 15, sewing daily both by machine and by hand. D.I. 311, Ex. A-746-54.

Both plaintiffs argue that their CTS impairments are a result of defendant's negligence, where IBM's keyboards used by plaintiffs were of a defective design, and the company further failed to warn of possible injuries as a result of their use. D.I.2. Plaintiffs also contend that there is no "precise moment of injury," but rather that the injuries represent a "cumulative and prolonged process." D.I. 2.

IBM counters that the keyboards at issue did not proximately cause plaintiffs' medical problems, that the company did not have a duty to warn of any [*10] consequences of use of the computer equipment, and that Bowers' claim is precluded by the applicable statute of limitations, where her symptoms were discernable and in fact reported over two years prior to the filing of this action. D.I. 309, 334.

## STANDARDS OF REVIEW

### Summary Judgment

*Federal Rule of Civil Procedure 56(c)* provides that a party is entitled to summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Although the party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the pleadings, papers and documents on file, including affidavits, which demonstrate the absence of a genuine issue of material fact, where the non-moving party opposing summary judgment has the burden of proof at trial on the issue for which summary judgment is sought, he must then make a showing sufficient to establish the existence of an element essential to his case. *Celotex Corp v.* [*11] *Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* In other words, that ". . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (emphasis added). If the non-moving party fails to make such a showing, then the moving party is entitled to judgment as a matter of law. *Celotex Corp., 477 U.S. at 322-23.*

Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson, 477 U.S. at 248.* The mere existence of a scintilla of evidence in support of the non-moving party will not prevent the grant of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on that issue. *Id. at 249.* Mere speculation or conjecture by the non-moving party clearly cannot preclude the granting of summary judgment. Thus, a court may render summary judgment as a matter of law only in those instances where there are no issues of fact and no conflicting inferences. Id.

### 1. Admissibility of [*12] Expert Testimony

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court delineated the standards and reasoning applied in determining the admissibility of expert

scientific testimony. *509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).* The Third Circuit has interpreted Daubert as characterizing the district court's role as that of "gatekeeper," ensuring that the methodology upon which the expert opinion is based is reliable; that is, that the expert's conclusion is premised upon the methods and principles of science. *In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 732 (3rd Cir. 1994)* ("Paoli II"), cert. denied sub nom., *115 S. Ct. 1253 (1995).*

*Rule 702 of the Federal Rules of Evidence,* which governs testimony by experts, requires that: (1) the proffered witness must be an expert (qualified); (2) the expert must testify to scientific, technical or specialized knowledge (reliable); and (3) the expert's testimony must assist the trier of fact (relevance). n7 *United States v. Velasquez, 33 V.I. 265, 64 F.3d 844, 849 (3rd Cir. 1995)* (citing *Paoli II, 35 F.3d at 741-42). Federal Rule of Evidence 104(a)* mandates that district courts make preliminary determinations "concerning [*13] the qualification of a person to be a witness, [and] . . . the admissibility of evidence." Id. (citing *Daubert, 113 S. Ct. at 2796).* Thus, a district court faced with a proffer of expert testimony must make a preliminary determination of all of the aforementioned elements of *Fed.R.Evid. 702,* in an effort to ensure both the reliability and relevance of the expert testimony. Id. (citing *Daubert, 113 S. Ct. at 2795-96; United States v. Downing, 753 F.2d 1224, 1237 (3rd Cir. 1995)).*

n7 *Fed.R.Evid. 702* specifically provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Requisite one of *Fed.R.Evid. 702,* that the proposed witness be an expert, has been construed liberally by the Third Circuit. *Velasquez, 64 F.3d at 849* (citing [*14] *Paoli II, 35 F.3d at 741).* In fact, this Circuit has "held that a broad range of knowledge, skills, and training qualify an expert as such," and has "eschewed imposing overly rigorous requirements of expertise." Id. (quoting *Paoli II, 35 F.3d at 741).* See also *Hammond v. International Harvester Co., 691 F.2d 646, 653 (3rd Cir. 1982)*

(an engineer with sales experience in automotive and agricultural equipment, who also taught high school automobile repair, was permitted to testify in a products liability case involving tractors). However, the level of expertise may affect the reliability of an expert's opinions under the second and third elements of Rule 702.

Rule 702's second requirement, that the expert testify to scientific, technical or other specialized knowledge, is designed to ensure the trustworthiness or reliability of the expert's testimony. *Velasquez, 64 F.3d at 849.* Under Daubert, a district court presented with a proffer of expert "scientific" testimony must make a "preliminary assessment of whether the reasoning or methodology of the underlying testimony is scientifically valid" by considering all factors related to the proffered testimony's reliability. [*15] n8 Id. (quoting *Daubert, 113 S. Ct. at 2796-97).* Where an expert has "good grounds" for his testimony, thus basing his opinion "on the 'methods and procedures of science' rather than on 'subjected belief or unsupported speculation'," that scientific evidence is deemed sufficiently reliable. *Paoli II, 35 F.3d at 742* (quoting *Daubert, 113 S. Ct. at 2795).* The Third Circuit has specifically admonished against applying the reliability requirement too strictly, explaining that "the requirement must not be used as a tool by which the court excludes all questionably reliable evidence. The ultimate touchstone [of admissibility] is helpfulness to the trier of fact." *Velasquez, 64 F.3d at 850* (quoting *Paoli II, 35 F.3d at 744).*

n8 The Paoli II court identified several factors to consider in the preliminary determination of the reliability of scientific testimony, including, but not limited to:

> (1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Velasquez, 64 F.3d at 849 n.8* (quoting *Paoli II, 35 F.3d at 742 n.8*). As noted by the Third Circuit, Daubert includes two factors not previously applied by the court in *Downing* (cited in the body of this Report and Recommendation at 12), those being whether a method produces a testable hypothesis and the existence of standards controlling the technique's operation. However, Daubert fails to include in its list a number of factors applied in *Downing* -- the extent of the expert's qualifications, the relationship of a technique to "more established modes of scientific analysis," and the "non-judicial uses to which the scientific techniques are put." *Downing, 753 F.2d at 1238-39; Daubert, 113 S. Ct. at 2796-97.* Since Daubert did not specifically disavow any factors contained in *Downing*, a district court is directed to consider all factors included in Daubert and Downing "as well as any others that are relevant." *Paoli II, 35 F.3d at 742.*

[*16]

The final requirement of *Fed.R.Evid. 702* addresses the relevancy of the evidence, ensuring that the evidence "fits" under the facts of the case -- i.e., that there is a valid connection between the "scientific research or test result to be presented (expertise) and the particular disputed factual issues in the case." *United States v. Downing, 753 F.2d at 1237.* See also *Velasquez, 64 F.3d at 850; Paoli II, 35 F.3d at 742-43.* Therefore, to satisfy the helpfulness standard under Rule 702, a valid scientific bridge must exist under this pertinent inquiry as a precondition for the evidence to be admissible. The fit standard requires more than bare relevance -- a *prima facie* showing that the technique is reliable is insufficient. *Paoli II 35 F.3d at 743.* To meet this requirement, the party introducing the proffered testimony must demonstrate by a preponderance of the evidence that its experts' opinions are reliable. In other words, that they are based on "good grounds." *Id. at 743-44.* Therefore, the Daubert analysis focuses "solely on the principles and methodology, and not on the conclusions" generated. *Id. at 744,* quoting *Daubert, 113 S. Ct. at 2797.* [*17]

Although such evidence meets the parameters of *Fed.R.Evid. 702*, it still must satisfy *Fed.R.Evid. 403*, which mandates that a district court consider whether the admission of proffered testimony might confuse or overwhelm the jury. n9 As a result, the balancing test of probative versus judicial value of evidence under Rule 403 is particularly significant when evaluating expert testimony. *Paoli II, 35 F.3d at 747.* As the Third Circuit commented in Paoli II:

[A] district court cannot exclude a scientific technique as too confusing and overwhelming simply based on its conclusion that scientific techniques by their very nature confuse and overwhelm the jury. There must be something about the particular scientific technique such as its posture of mythic infallibility that makes it especially overwhelming.

*35 F.3d at 746.* n10

Consequently, "in order for a district court to exclude scientific evidence, there must be something particularly confusing about the scientific evidence at issue . . ." Id.

n9 As noted by the Third Circuit in Downing, the analysis under Rule 702 overlaps with the considerations under Rule 403, but allows "some room for Rule 403 to operate independently." *Paoli II 35 F.3d at 746.* As will be addressed later in this Report and Recommendation, the application of Rule 403 in a pre-trial setting is somewhat limited.

[*18]

n10 However, as noted in Paoli II, the Daubert holding that Rule 702 operates as the primary focus of a court's gatekeeping function indicates that exclusion of an expert's testimony under Rule 403 would be rare in spite of the Third Circuit's finding that Rule 403 provides judges with greater power over experts than ordinary witnesses. Both rules provide slightly more judicial substantive power than usually exists under Rule 403 to determine that the evidence is more prejudicial than probative. *Paoli II, 35 F.3d at 747 n.16.*

Regarding the application of Rule 703 to the analysis required of expert testimony, in Paoli II, as a result of Daubert, the Third Circuit modified its previous holding in *DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941 (3rd Cir. 1990)* (although a district judge makes a factual finding as to what data *experts* find reliable, if an expert avers that his testimony consists of data upon which other experts in the field find reasonable, such averment was generally sufficient to survive a Rule 703 inquiry). *Paoli II, 35 F.3d at 747.* Although [*19] a court's gatekeeping role is the primary focus of Rule 702, this purpose permeates the other Rules of Evidence.

Therefore, when a trial judge is required to analyze whether an expert's data is the kind upon which other experts would reasonably rely, to satisfy Rule 703 the court now must

> assess whether there are good grounds to rely on this data to draw the conclusion reached by the [testifying] expert. Whether experts in the field rely on this type of data will simply continue to be part of the judge's analysis.

*Paoli II, 35 F.3d at 748-49.*

Therefore, the dichotomy of admissibility between Rules 702 and 703 has been eliminated.

### 2. Delaware Statute of Limitations pertaining to Personal Injury Actions

According to 10 Del. C. § 8119, the statute addressing time limitations for the filing of personal injury claims,

> No action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years from the date upon which it is claimed that such alleged injuries were sustained; subject, however, to the provisions of § 8127 of this title.

### DISCUSSION

**I. Is plaintiff Bowers' personal injury [*20] claim timely under the applicable statute of limitations?**

As noted, in Delaware the statute of limitations applicable to personal injury claims provides that all such actions for recovery must be brought within 2 years from the date upon which it is claimed that the alleged injuries were sustained. 10 Del. C. § 8119. In light of this time limitation, defendant argues that Bowers' claim is barred where the evidence indicates that she experienced symptoms in her hands and wrists as early as March 10, 1990, but did not file her complaint against IBM until June 22, 1992. D.I. 309. Plaintiffs maintain that Bowers' current action falls within the confines of 10 Del. C. § 8119, as interpreted by the Delaware Supreme Court in Collins v. Pittsburg Corning Corporation, because the statutory period began to run when Bowers was chargeable with the knowledge that her condition was attributable to the repetitive use of the IBM computer. *673 A.2d 159 (Del.*

*1996).* According to Bowers, she became cognizant of that fact only after a July 26, 1990 consultation with her neurosurgeon, Dr. Magdy Boulos ("Boulos"), and therefore, the statutory period began to toll as of the date of that [*21] examination. D.I. 322 at 50.

Plaintiff Bowers incorrectly applies the provisions of 10 Del. C. § 8119, misinterpreting the relevant case law. In Layton v. Allen, the Delaware Supreme Court found the plaintiff's *1966* medical malpractice claim timely, where in *1965*, the plaintiff first experienced pain caused by a hemostat allegedly negligently left in her abdomen during a *1958* surgery. *246 A.2d 794, 798 (Del. 1968).* The court held that:

> . . .when an inherently unknowable injury, such as is here involved, has been suffered by one blamelessly ignorant of the act or omission and injury complained of, and the harmful effect thereof develops gradually over a period of time, *the injury is 'sustained' under [section] 8118 when the harmful effect first manifests itself and becomes physically ascertainable.* Translated in the terms of this case, we hold that the limitations period commenced to run when the plaintiff first experienced pain caused by the unknown foreign object.

Id. (emphasis added).

Thus, in Layton, the plaintiff's claim was not time barred where she first experienced the pain associated with defendant's negligence and filed [*22] her claim within two years thereafter. Delaware courts expounding upon the principle espoused by Layton consistently have held that a plaintiff's first manifestation of pain -- rather than the date of a definitive diagnosis -- triggers the statute of limitations clock. See *Greco v. University of Delaware, 619 A.2d 900, 905 (Del. Supr. 1993); Cole v. Delaware League for Planned Parenthood, Inc., 530 A.2d 1119, 1124 (Del. 1987)* ("For the statute of limitations to begin to run, plaintiff is not required to have knowledge of a causal relationship between the initial injury and the defendants' tortious conduct"). Indeed, the court in Collins v. Wilmington Medical Center specifically rejected the theory that the Section 8119 statute of limitations would not commence until a diagnosis was made:

> Commencement of the running of the statute does not depend on when a diag-

nosis is made or a "cure" effected. If it did, the statute would never start in some cases. The statute starts, rather, when a harmful effect first manifests itself and becomes physically ascertainable. In short, manifestation of the problem, not its cure, is the test under Layton.

*319 A.2d 107, 108* [*23] *(Del. Supr. 1974).* n11

n11 Plaintiffs' citations to personal injury "asbestos cases," where Delaware courts have held that the Section 8119 statute of limitations is triggered when the plaintiff is chargeable with the knowledge that his condition is attributable to asbestos exposure are inapplicable to the case at bar. See e.g., *Collins v. Pittsburgh Corning Corporation, 673 A.2d 159, 162 (Del. 1996).* Asbestos-related medical conditions, of which there are a variety, can manifest symptoms, such as shortness of breath or coughing, well in advance of the detection of asbestos in the lungs. Asbestosis is thus a "latent" disease which cannot be traced to an asbestos manufacturer until the asbestos is discovered in the lungs. Further, under Delaware law the courts have recognized that a different beginning of the limitation period may be applicable for different conditions (e.g., pleural thickening, asbestosis, lung cancer) having different manifestation dates. As a result, Section 8119 may operate to bar a claim for one type of asbestos-related condition, such as pleural thickening, but not for another, that is, asbestosis. *Sheppard v. AC&S Company, 498 A.2d 1126 (Del. Super. 1985),* aff'd sub nom., *Keene v. Sheppard, 503 A.2d 192 (Del. 1986).*

[*24]

Plaintiff Bowers clearly experienced the symptoms now at issue more than two years prior to the June 22, 1995 filing date of the complaint, as evidenced by the following colloquy between Bowers and defendant's counsel at her deposition:

Q: When was the first time that you were aware of any type of symptoms in your wrists or hands?

A: What year are you saying?

Q: Yes.

A: Probably around '89. You know how well -- with myself, when I'm in pain I'll endure it for a while before I think it's something serious.

D.I. 310, Ex. A-755.

This testimony is confirmed by Bleeker in her November 11, 1994 occupational neurology evaluation, wherein the doctor recorded that Bowers "began experiencing symptoms in her hands in 1989," (D.I. 310, Ex. A-113), and is also confirmed by Bowers' neurosurgeon, Magdy Boulos, in a follow-up letter after her July 26, 1990 examination. n12 Indeed, the June 20, 1990 physician progress notes from Bowers' HMO indicate that plaintiff had been experiencing "arm numbness" including "1 month [history] of intermittent lower left arm and hand paresthesias when waking from sleep or after brushing hair," with similar symptoms in the right [*25] arm. D.I. 310, Ex. A-799. Moreover, in March 10, 1990 HMO progress notes, Bowers' physician raised the possibility of "DeQuervein" or "Tenosynovitis." D.I. 310, Ex. A-780.

n12 In his July 31, 1990 letter to Dr. Theodore Michel, Bowers' HMO physician, Boulos recounted Bowers' July 26, 1990 reported medical history of the pain in question: "About two months ago [Bowers] started experiencing numbness, paresthesias and pain in both her hands. . .." D.I. 310, Ex. A-777.

The fact that Bowers may have been diagnosed *definitively* within the two-year period prior to her filing this action is *not* the controlling factor according to relevant case law, despite plaintiff's protests to the contrary. What is of consequence is the unrefuted testimony by plaintiff herself, corroborated by the medical evidence, that plaintiff suffered discernable symptoms of her medical condition at issue *prior* to two years before this suit was filed. As such, under *10 Del. C. § 8119*, plaintiff Bowers' claim is time-barred and [*26] this Court recommends that her action be dismissed.

## II. Do plaintiffs' proposed witnesses satisfy the Daubert test?

Plaintiffs submit four liability expert witnesses to establish that (1) the existence of design defects in IBM's keyboards at issue (2) caused plaintiffs' repetitive stress injuries, which (3) could have been prevented had proper warnings as to the use of the *inherently dangerous* instrumentalities been provided, as IBM was obliged to so do. To this end, Drs. Karl Kroemer ("Kroemer") n13 and Robert Cunitz ("Cunitz") would proffer on, respectively,

the state-of-the-art and design defects in the keyboards and the appropriate warnings and instructions negligently omitted by IBM, while Drs. Margit Bleeker and Laura Punnett addressed the element of causation. As provided by the Court, with concurrence of the parties, Drs. Kroemer and Punnett's depositions taken during the similar Schneck action now serve as their proffered expert testimony, supplemented as necessary to address the specifics of this action. Schneck, C.A. No. 92-4370(GEB), (D.N.J. June 25, 1996). n14

n13 Dr. Kroemer, a generic and not plaintiff-specific expert, was originally assumed by defendant as being offered as a "state-of-the-art" expert, who would not be addressing design defects, and would limit his opinions to those allowed and testified to in Schneck. During his *in limine* hearing, two additional reports by him were identified by plaintiffs' counsel as part of his opinion -- the reports of August 17, 1995 and September 15, 1995 -- both of which dealt with his analysis of alleged defects in the design of generic keyboards. D.I. 303 at 28-57. A substantial amount of the Kroemer *in limine* transcript is devoted to plaintiff's counsel's failure to adequately identify the areas (state-of-the-art and design defects) on which Kroemer would testify, and counsel's similar failure to identify these two reports. D.I. 359 at 28-57, 118-144, 177-182. During this colloquy, it was learned that plaintiffs' counsel had provided a copy of reports to the Court, after the September 16, 1996 hearing on whether the *in limine* hearings were required, but provided the defense with only a copy of the August 17, 1995 report. D.I. 359 at 178. Of note, neither report was specifically referenced in plaintiffs' brief.

The previous information provided regarding Kroemer's proffer included a March 30, 1992 report expressing his opinion on the state-of-the-art or cumulative trauma disorders, attached to which was a CTD bibliography review, an updated bibliography review on keyboarding dated February 5, 1994 (D.I. 310, Ex. A-313-462), and another bibliography update of February 28, 1995 on articles relating to keyboards. D.I. 329, Ex. 53. Neither the March 30, 1992 report nor literature abstracts contained any opinion by Kroemer on alleged defective design of any keyboards, including the abstract of his own 1964 and 1972 articles. None of this material contained or referenced any opinion expressed by Kroemer as to defective design nor the measures/methods available for improvement. As a result, neither his

methodology nor the scientific reliability regarding these issues were provided.

However, the August 1995 report titled *Ergonomic Deficiencies of Conventional Keyboards* appears to express his opinions on keyboard designs. D.I. 352, Ex. 77. Similarly, his subsequent report of September 15, 1995 (*Design Deficiencies of Conventional Keyboards*) contained Kroemer's opinions on design defects. Since Kroemer had previously been identified or described as an ergonomist and human factors engineer, concerned with biomechanical and applied physical aspects involved in workplace design, planning, set-up and psychology, and since his August 1995 report had been provided, he was allowed to testify as to his opinion on design defects limited to his August 1995. Kroemer's September 1995 report was not admitted and no examination on that report was permitted.

[*27]

n14 The Schneck decision is now on appeal to the Third Circuit.

The Schneck case stands as precedent on the issues correctly raised. n15 In Schneck, the plaintiff allegedly developed bilateral carpal tunnel syndrome after working on IBM punch and data entry machines. Her action against IBM was premised upon the theories of strict liability, negligence and breach of warranty, with testimony from expert liability witnesses offered. As here, IBM moved for summary judgment, arguing in part that plaintiff's experts were inadmissible under Daubert. Focusing on *Fed.R.Evid. 702*'s expert witness testimony requirements, the Schneck court analyzed whether the proffered experts could provide "scientific, technical, or other specialized knowledge" to "ensure the reliability or trustworthiness of the expert's testimony," finding that plaintiff's retained experts on the issues of design defect and failure to warn (Drs. Karl Kroemer and Samuel Glucksberg, respectively) did not satisfy Daubert's scrutiny. Schneck at 15, 25 (citation omitted). Specifically, the Schneck court concluded, [*28] upon conducting an *in limine* hearing, that "there is no 'connection between the scientific research and test result to be presented, and particular disputed factual issues in the case.'" Id. at 25 (citation omitted).

n15 The Court will, however, address plaintiffs' references to court decisions on this issue in other jurisdictions which allowed plaintiffs' experts' testimony-- to this limited degree. Plain-

tiffs' references to Smith v. IBM and Davis v. NCR essentially are inapplicable to the matter at hand. Smith, Civ. No. 94-34-P-C, U.S.D.C. (D.Me. Jan. 19, 1996); Davis, No 9496092/CL183437 slip op. (Cir.Ct.Balt City May 3, 1996). Neither case presents a detailed Daubert analysis as does Schneck, and both fail to address Frye. Moreover, the Smith court entertained several arguments rejected by the court in Schneck, such as defective design and duty to warn. In addition, contrary to plaintiffs' argument, the Davis court rejected plaintiffs' claim of punitive damages against IBM. Finally, plaintiffs' reliance on Davies v. Datapoint also is misplaced in light of that court's exclusion of Kroemer's testimony and finding that no design defect existed in the computer keyboards in question. *Davies, 1995 U.S. Dist. LEXIS 21739*, Civ. No. 94-56-P-DMC (D.Me. Oct. 31, 1995).

[*29]

While this Court was inclined to find similarly in the case at bar, based upon submitted materials, plaintiffs maintained that an *in limine* hearing is essential prior to the rendering of a decision regarding the qualifications and admissibility of the testimony of plaintiffs' expert witnesses. And, indeed, upon careful review of the parties' arguments and relevant case law on the matter, the Court determined that while the circumstances of this action do not necessarily mandate an *in limine* hearing for the Court's exclusion of the expert testimony under Rules 702 and 703, Third Circuit case law and the principle that "discretion is the better part of valor" *suggested* that such a hearing at this stage of the proceeding was an appropriate action.

In the interest of avoidance of a lengthy discourse on the issue, this Court cites the Third Circuit's controlling analysis of the evidentiary matter in Paoli II. In that case, the Third Circuit did not clearly address the need for an *in limine* hearing when testimony exclusion is based upon Rule 702. However, it did state unequivocally that Rule 403 is rarely appropriate for pre-trial exclusion, because a judge cannot ascertain [*30] potential relevance until that judge has a virtual surrogate for a trial record. *Paoli II, 35 F.3d at 747, Paoli I, 916 F.2d at 859-60*. In fact, the appellate court noted in its discussion of Rule 403 that "it is important to determine whether the *in limine* hearing in the district court created the 'virtual surrogate for a trial record' that we have required before exclusion is permissible." *Paoli II, 35 F.3d at 746-47*. Recognizing that the Supreme Court's analysis in Daubert in essence "blended" the balancing tests (confusing/overwhelming prong) of Rules 403 and 702, the Paoli II court held that for exclusion of scientific evidence under Rule 403, "there must be something *particularly* confusing about the scientific evidence at issue," with "that something" being more than the complexity of such scientific evidence in general. *Id. at 747*. Consequently, to the extent that the balancing "helpfulness" test of Rules 702 and 403 overlap, when that test is employed under Rule 702, as with under Rule 403, it would appear that an *in limine* hearing is required. And thus, while there is no doubt that this Court has been *inundated* with depositions, affidavits [*31] and expert reports relating to the proffered experts' qualifications and the admissibility of their testimony, and upon which a reasoned decision may have been discharged, it nonetheless chose to err on the side of caution by conducting *in limine* hearings on these issues on November 20, 23 and 27, and December 4 and 6, 1996.

In light of this background and with consideration of all submitted materials and *in limine* testimony, this Court now individually addresses the merits of defendant's motion to exclude plaintiffs' proffered experts.

**A. Dr. Karl Kroemer.**

An industrial engineer, Dr. Karl Kroemer ("Kroemer") is proffered by plaintiffs as an expert on the relationship between the design and use of keyboards and "cumulative trauma disorders" -- defined by Kroemer as "those disorders stemming from often repeated actions whose cumulative effects finally result in an injury as well as the state-of-the-art in that regard." D.I. 310, Ex. A-313-15. Upon purported review of the relevant literature on the subject, Kroemer concludes that "the relation between [cumulative trauma disorders] and design and use of keyboard devices was well established." D.I. 310, Ex. A-352. However, [*32] during deposition testimony in the Schneck case as well as the December 4, 1996 *in limine* hearing, Kroemer acknowledged that even today, there is limited knowledge of this hypothesized relationship. D.I. 310, Ex. A-290-91; D.I. 359, Kroemer *In Limine* Hearing, Dec. 4, 1996. In fact, Kroemer wrote a January 5, 1993 letter, referred to in the deposition transcript, which states in relevant part: "there are many different possible causes for [cumulative trauma disorders], some of them related to off-duty activities, some possibly related to activities on-the-job. Of those on-the-job, keyboarding is probably the most prevalent. However, which keyboarding factors contribute under what condition is still largely unknown . . ." D.I. 310, Ex. A-463.

Moreover, as noted in Schneck, while Kroemer's conclusion includes a reference to QWERTY keyboard design, such as that of the keyboards at issue, his criticisms are *generic*; i.e., the binary key use, the arrangement (geometry) and placement of keys (including improper spacing of the keys, necessitating large force and displacement to operate), and the use of the keyboard

(keyboard displacement). In support of his conclusion [*33] beyond his years of personal experience, Kroemer has cited a number of scientific, peer-reviewed articles discussing keyboard problems and proposing alternative keyboard designs which comply better with the natural location and motion of fingers, such as the split keyboard. n16 D.I. 352, Ex. 78. However, Kroemer failed to cite any studies which indicate that alternative keyboard designs to the QWERTY keyboard now commonly used actually serve to reduce the incidence of relevant musculoskeletal disorders. D.I. 352, Ex. 78.

n16 However, Kroemer's abstracts of his literature search clearly includes articles that have not been subject to any peer review process. D.I. 359 at 60.

During his deposition and *in limine* testimony for the Schneck case, Kroemer was examined about the methodology employed in reaching his conclusions. n17 Concerning his methodology for selecting the literature upon which he based his conclusion, Kroemer provided the following description:

Q: I guess what I want to know from you [*34] is, how did you decide what to include and what not to include in Exhibits 5 [Kroemer Report] and 6 [Kroemer Supp. Report]?

A: The general issue is the design and use of keyboard and related entry devices. So such papers would be included that directly or indirectly related to this topic. Secondly, I tried to apply some judgment as to the validity of any given publication and such that it would either be contributing towards an assessment of what was known at the time or it would set certain highlights.

Q: So, as I understand it correctly, you look not only at the topic of what a paper was about, but also you read it and analyze its validity before including it in [Exhibits] 5 or 6?

A: Yes.

Q: And therefore you made some judgments as to the validity or lack of validity of what the author or authors were saying in a particular article that was on a topic

that dealt with design and use of keyboard and related entry devices?

A: Yes, sir.

Q: And I also take it then that if the author's statements were valid they would be included in these summaries here, Exhibit [sic] 5 and 6, correct?

MR. PHILLIPS: Objection.

A: Valid only [*35] in the sense that they would shed a given light on a topic and perhaps regarding conclusions. But the term "valid," as I understand it, doesn't necessarily mean that I feel that the author would be correct.

D.I. 310, Ex. A-199.

Upon plaintiffs' counsel's objection, Kroemer then retracted his testimony and conceded that a paper or article was considered in his reports solely if it was "relevant." D.I. 310, Ex. A-200. n18 Kroemer maintained that a publication was included in his report regardless of his views on whether the publication was correct from a scientific, engineering, or medical point of view, however, he excluded articles that were "purely journalistic." D.I. 310, Ex. A-200, A-242.

n17 In Schneck, Kroemer's conclusion included a reference to keyboard design. However, he failed to specify any design defect in the IBM machines which would support plaintiffs' claim that they caused injury. See Schneck Op. at 24-25. Thus, with particular regard to plaintiffs' failure to warn claim, Kroemer's testimony in the Schneck case was limited to the proposition that it was "well-established" that typing itself causes "cumulative trauma disorders." D.I. 310, Ex. A-352.

[*36]

n18 IBM argues that Kroemer's testimony that scientific validity means simply "shedding light on a notion," highlights the unreliability of his testimony and the methodology used in pre-

paring his reports. D.I. 310, Ex. A-200, D.I. 309 at 12. See also, D.I. 359 at 9,77.

During the subsequent course of his *in limine* testimony in Schneck directed to his state-of-the-art opinion, Kroemer was queried about the interim steps between the collection of data and his final analysis:

> Q: And can you tell me, how did you get from the collection of articles, where some are in favor of that opinion, and some are against that opinion, and some are in between, how did you get from there, that body of literature, to that conclusion, what criteria did you use?
>
> A: The criteria --
>
>> MR. MAIMON: Object to the form. Compound.
>>
>> THE COURT: Sustained.
>
> BY MR. D'AVANZO (CONTINUED):
>
> Q: How did you --
>
>> MR. MAIMON: I have no objection to how do you -- how did you get there, I --
>>
>> MR. D'AVANZO: I'm going to amend the question.
>>
>> THE COURT: Okay.
>
> Q: How did [*37] you get from this body of literature, that was either supportive, or critical or non committal, or in between, with respect to your conclusion, that the relationship was well established?
>
> A: I wish you had left out -- left out the last few words, of your question.
>
> Q: Let me try it again. Let me withdraw. How did you get from this body of literature, to your conclusion?

> A: Okay. Now, keep in mind that I worked for -- the first years of my professional life, in a -- in a research institute that had engineers, psychologists, and physiologist, mostly, Mds.
>
> It was quite well established then, that typing was often associated with what we call now, CTDs.
>
> So there was no question even, in the 50's, about it. Or in the 60's. The -- question is, what are the specific relations, and this is of course, a biomechanical problem, as far as I can judge. I cannot medical -- judge it on a medical side, for example.
>
> But whether you do unaccustomed farm work, or whether you do meat cutting, or whether you do keyboarding, it all involves in essence the same so to speak mechanical or biomechanical structures of the body.
>
> So, as -- as you put all that evidence together, it -- it makes [*38] clear and imminent sense to say that the posture, the motion, the forces, the repetitions, the way -- the frequency of -- of doing it, is clearly related to an over exertion of -- of parts of the human body.
>
> Q: And can you tell me what -- withdrawn. Is there a particular methodology that you utilized to go from the knowledge expressed in these articles, to your conclusion?
>
> A: *The methodology would be -- is it plausible according to what we know, about how the body reacts to repetitive exertions of that kind.*
>
> Q: *And now, that -- that criteria, or methodology that you followed, is that something that's normally followed by engineers and ergonomists? In making drawing conclusions from literature?*
>
> A: *Well, I don't know about others, but I would think that is a -- a logical and -- and -- and reasonable way of going about drawing conclusions.*

Schneck Op. at 18-20 (citing Kroemer Tr. at 43-46 (emphasis added)).

During his more recent *in limine* testimony (on both direct and cross-examination), Kroemer similarly articulated the general methodology that he would apply to a state-of-the-art search on a particular ergonomic topic and the subsequent [*39] analysis of the material selected, as well as the specific approach employed to reach his conclusions for these personal injury cases against IBM:

1997 U.S. Dist. LEXIS 8016, *

Q: . . . Let's focus in a decade of the 1980's. If one in ergonomics wished, then, to do a search of the available state-of-the-art knowledge of -- in an area, how would one go about it?

A: One would try to collect all information that is relevant to the topic in question and sift through the information available with respect to what appears to be valid and important.

Q: Okay. How would one go about trying to locate the whole arena of knowledge? You know, what type of search would one do, say in the decade of the eighties?

A: If the topic is one in which one has worked before, one probably has a stock of -- of information available already. If the topic would be completely new, one would probably start out with a computerized search of the literature and from there go into specific journals and articles as they become mentioned in the literature.

* * *

THE WITNESS:

　　　If the question were simply scientific and specific, one might want to limit one's self to the scientific literature. If it is a matter of the [*40]　general state of knowledge,　then　one would go beyond the scientific literature and include items that shed light on the topic in question.

Q: Okay. I think you said, then, that one would sift through and review. Can you explain to the Court what you mean by that?

A: I would go ahead to -- in this procedure, as I find a published article, I would look at the author, at the source of printing the journal or whatever it might be. And from there, proceed to determining what the specific procedures were applied by the author, what the experimental re-

sults are, how they are described, and how they are interpreted.

* * *

A: I would include any article that provides reliable or believable or valid information.

* * *

A: If I want to determine the state-of-the-art about a topic, I would include everything, given those criteria fulfilled, regardless of what the outcome or opinion of the author is.

* * *

THE COURT:

　　　How do you determine, Doctor, and what methods or what standards do you use to determine whether an article is valid or important of the topic that you are working on?

THE WITNESS:

　　　After having determined that this is -- a credible author, [*41] institution and journal published, I would go into the question, what are the experimental hypotheses, how were they tested, if subjects involved, how many, how selected. What are -- how -- what data are reported, how were they treated statistically, and, finally, what conclusions were drawn from -- from the data in their statistical evaluation.

THE COURT:

　　　And when you go through that analysis, those standards that you use, those questions that you ask yourself, what is important

for you, in your methodology, fact -- what factors are important in those questions in your methodology to analyze whether an article is valid and important for your purposes?

THE WITNESS:

Beyond the -- the items that I already indicated --

THE COURT

I'm trying to find out those standards or those factors within those items that you would be -- for example, one of the things you said was the number of subjects that were studied. I don't know whether there's a breaking point for too little or not enough to be considered a study that you could say, yes, this would be a valid hypothesis or a valid conclusion.

THE WITNESS:

That would depend on the specific experiments [*42] conducted. If you want to do a general population statement, then you probably need a large number of subjects. If you wanted to look at within subject, then you might, for instance, need a small number of subjects.

So the number of subjects as an example would depend on the specific hypotheses to be tested.

* * *

Q: . . . In your mind, what is a review article, when we are talking about this area of knowledge in ergonomics?

A: A review article would be one in which several or possibly many studies or other pieces of information are compiled, reviewed, possibly abstracted, and a -- in most cases, a general conclusion is given about what the overall information is on the topic that is being reviewed.

Q: Okay. And how do you apply your criteria to those types of articles?

A: Well, of course, the criteria are somewhat different now, because we don't have a report on an experimental study.

In this case, one would probably look for inclusive necessary, completeness, non-biased reporting, proper abstracting of the original articles. In other words, credibility and validity would be the main criteria.

Q: Okay.

THE COURT:

Okay, Doctor. Before [*43] you go on about that, in the review article scenario that you just discussed, how do you determine credibility of that review article, since part of your analysis includes proper abstracting of original articles.

THE WITNESS:

One is probably not completely naive on the topic. Even if one were, one would have to go back, in many cases, look at some of the originals that are being abstracted and reviewed, determine from there whether the reviewer has done a fair job.

1997 U.S. Dist. LEXIS 8016, *

However, this is quite often helped by the fact that the -- the authors are -- there are probably not too many authors in the field. So one has already a feeling for the reputation of the author, the reputation of the institution that the author is associated with. And if it is a published work, what publisher, what journal, does this?

There are a number of journals that specialize, for instance, in annual reviews of certain topics. In such a case, one can be almost assured that this is a solid piece of work.

D.I. 359 at 8-17.

* * *

Q: And can you give me your understanding of what peer review is?

A: Peer review usually occurs if you submit an article or other piece of work [*44] for publication in a journal, in which case the draft manuscript is reviewed by other persons in the field; that is the peers. And their recommendation is then usually used by the publisher to either accept, reject or recommend revision before publication.

* * *

THE COURT:

Did you feel when you were doing that review [on the state-of-the-art knowledge of issues related to keyboard design, use and possible consequences of injury], that you were limited to cumulative stress trauma-type injuries?

THE WITNESS:

No, I did not feel that I was limited. The judgment was to -- was left to me.

* * *

THE WITNESS:

I would include [in his reports of his conclusions] all information that would pass the criteria that we discussed earlier this morning. I would exclude pieces that would not survive that selection criteria.

THE COURT:

So that whether or not cumulative stress trauma was mentioned in any report, that wasn't one of the bases you used to include or exclude?

THE WITNESS:

The pure mentioning would not be sufficient. It would have to be substantiated.

* * *

Q: And so throughout this review of articles, there are articles, [*45] are there not, that do not deal with keyboards, that is, typewriter or computer keyboards per se; correct?

A: Yes. In some cases, this is the -- it is true. However, the reason why they are in there, because they refer to biomechanical, or the ergonomic aspects that are directly involved in the problems associated with the operation of keyboards.

D.I. 359 at 79.

* * *

1997 U.S. Dist. LEXIS 8016, *

A: I would include occasionally trade journal publications like the one we are looking at, which is Rosch, R-o-s-c-h, 1984, on Page A-000422. If they would indicate -- or if they would highlight the state-of-the-art, the state of knowledge, the state of technology available. . .

* * *

THE COURT:

. . . Doctor, when, you review or look over scientific journals, is it your expectation that the information contained in the scientific journals have already been reviewed for accuracy?

THE WITNESS:

If it is a well-known, established journal, such as Human Factors or Ergonomics or some others, of which I know there is a critical review process going on, then my presumption would be of correctness. I don't recall ever having found it was incorrect. It could be the case. I would presume [*46] it is correct.

THE COURT:

Do you operate on the same presumption when reviewing trade journals?

THE WITNESS:

No, I'm not.

* * *

Q: Dr. Kroemer, I just have one question, perhaps. And that is the methodology and criteria that you utilized in doing your report and your literature review, is that a

methodology or criteria that is normally followed by industrial engineers and ergonomists?

A: Which reports are you referring to?

Q: The March 1992 report and the February 1994 review of publications.

A: Of course, I can't speak for everybody else, but I would think that is a normal procedure.

Q: Isn't it true that when I asked you that question in front of Judge Brown at the Schneck hearing in August of 1995, that you told me that you didn't know about whether others utilized that criteria, but that you thought that it was a reasonable way to go about drawing conclusions?

A: You apparently have notes in front of you that I don't have. But I though I just gave you, in essence, the same answer, even before you read from your notes.

Q: So you don't know if anyone else follows the criteria that you utilized in this case; correct?

A: [*47] That's not what I said. I said I can't speak for others; but I assume this is a method that would be used by others as well.

D.I. 359 at 116-117.

With specific regard to the conclusions purported by Kroemer on design defect, the doctor described his methodology to the keyboard design critique as follows:

Q: . . . Now, if a person who has your experience in keyboards and key -- keyboard design is presented with a keyboard to critique with respect to any design deficiencies, how do you approach critique [on] that? On what do you rely?

A: Well, you might say certain levels of evaluation. The first one is simply a visual inspection, in terms of size, number of keys, arrangement of keys, maybe angles, slopes, whether or not there is a split and so forth.

And a second level of evaluation, then, would be followed by distinct measurements, such as of key force displacement characteristics and other issues that would not be obvious to the naked eye.

     * * *

D.I. 359 at 158-59.

    A: . . . Having been in the field so long, it's rather difficult to try to separate out a continuous assessment procedure. But, first of all, I've seen many keyboards and I've [*48] used many keyboards, so I have, I think, a lot of experience.

    The experience then relates to the issues that I have indicated before, which is zig-zag columns or -- sorry -- straight columns, straight rows, horizontal rows, large number of keys, keys in one row in a horizontal plan, so forth. So these are the same issues that I have mentioned before.

    Secondly, one would probably go ahead and, as appropriate, try to compare the keyboard in question with certain literature, if this is an issue. It might be a special use keyboard as opposed to a general use keyboard.

    Q: We're assuming this is a very general-use PC keyboard.

    A: Then I don't think I have to go to much literature, although I could go ahead and compare it with and see 100 of 1988 or something of that kind. So I would find, if needed, some reference publications to compare it to.

    And then the third step, as I've said, is to take specific measurements that cannot be done by simply looking and visually examining the keyboard.

    Q: Okay. And with respect to keyboard geometry, would you use the same procedure?

    A: Yes, that would be very much the same procedure.

D.I. 359 at 164-65.

When [*49] Kroemer was queried by the Court about the type of measurement analysis conducted with regard to his criticisms of keyboard placement and keyboard use in the typical QWERTY keyboard, the following colloquy resulted:

    THE COURT:

        All right. Could you please turn to item No. 4? Keyboard placement, Concern No. 4. Why are measurements taken under that circumstance?

    THE WITNESS:

        The keyboard placement should be done in such a way that is comfortable and healthy for the operator to operate the keyboard.

        A general rule would be to have the majority of the keys at about elbow height of the operator. One could look at an operator and determine in the side-view whether the keyboard is about at that angle. If one does not know who might be the potential operators, one would have to take a measurement about adjustment ranges and compare this with different elbow measurements.

    THE COURT:

        Were measurements taken -- are measurements -- strike that. Would the measurement analysis be

applied to Concern No. 5, keyboard use?

THE WITNESS:

Yes and no.

THE COURT:

Okay.

THE WITNESS:

There is a yes and no answer. There's some general [*50] keyboard use issues, such as does the person hold their [sic] wrists straight and as grandmother always suggested, and she was right.

So some of these are clearly identifiable by pure observation.

Others would require measurement over a period of time. For example, how long would be a working bout, how long might be rest breaks between such bouts of keyboard operation. How many key strokes were performed over a period of time.

Perhaps even how large are the actual activation forces being applied by the subject as opposed to design values, which are not necessarily the ones that operate as used.

So there are some issues that can be resolved by observation. There are some issues that need to be resolved by measurement.

D.I. 359 at 170-71.

IBM contends that Kroemer's conclusions are unreliable because: (1) his methodology was unscientific; n19 (2) he was unable to cite a single study which demonstrates that the use or design of keyboards results in some injury (such as CTS, as in the case at bar); and (3) he did not describe any specific design defect in the IBM keyboard which *caused plaintiffs' injuries.* D.I. 309 at 13.

n19 As evidence of Kroemer's unscientific methodology, defendant highlights the "catchbasin" nature of his report on "keyboard design," "keyboard use," and "cumulative trauma disorders," whereby a piece of literature was not required to discuss both "keyboard design" and "cumulative trauma disorders" to be included in his reports. D.I. 309 at 12, D.I. 310, Ex. A-322 (citing Flowerdew, R.E. and Bode, O.B., Tenosynovitis in Untrained Farm-Workers, Medical Memoranda, Bawan [sic] Medical Journal (1942)); (see also, D.I. 310, Ex. A-329) (citing Conrad, R. and Longman, D.J.A., Standard Typewriter v. Chord Keyboard-An Experimental Comparison, 8 Ergonomics 77-88 (1965)). Further, criticisms by IBM of Kroemer's unscientific approach to the issue at hand center on the witness' deposition response (cited in relevant part) to the inquiry of whether any of the examined literature concludes that keying causes "cumulative trauma disorders":

. . . my point of interest in this whole procedure is what are the ergonomic aspects of keyboards that may lead -- that have suspected symptoms or, in fact, may have been fact to [sic] lead to cumulative trauma disorders. If we then depart with the -- depart from that ergonomic point of view, all we need to do is start, in fact, in page 1 of Exhibit No. 6 [Kroemer Supp. Report] and read the synopsis of what Osler said in 1892. And if you read this, it says: The continuous and excessive use of muscles in performing a certain movement may be followed by an irregular, involuntary spasm, cramp and so forth. How much more clearly can it be established . . . that more than one hundred years ago that certain activities

such as might be required on a keyboard can constitute a continuous and excessive use of muscles that result in a disorder. And that will be a typical example in the way of which I would try to answer your question in terms of what does [sic] ergonomists read out of that literature.

D.I. 309 at 13; D.I. 310, Ex. A-206.

[*51]

Having set forth Kroemer's methodology and with the acknowledgment that Kroemer is an expert in his field, this Court will now determine whether it satisfies Daubert/Paoli II, with consideration of the Schneck court's analysis on the matter. See Schneck Op. at 21-25.

(1) Daubert/Paoli II Factors

(i) Does the Methodology Consist of a Testable Hypothesis?

Defendant does not challenge the testimony of Kroemer's hypothesis, that "the relation between [cumulative trauma disorders] and design and use of keyboards as input devices was well established." Rather, defendant argues that Kroemer's *conclusions* are unreliable, in light of his unscientific methodology, his inability to cite a single study demonstrating that the use or design of keyboards causes some injury (such as CTS, as in the case at bar), and his further failure to describe any specific design defect in the IBM keyboard which caused plaintiffs' injuries. D.I. 309 at 13. Accordingly, this factor will weigh in favor of the admissibility of the proffered testimony.

(ii) Has the Methodology Been Subject to Peer Review?

At the *in limine* hearing in Schneck, as well as in this matter, Kroemer [*52] testified that the particular reports at issue (his pre-August 1995 reports) have not been subject to peer review. See Schneck Op. at 21 (citing Kroemer Tr. at 41); D.I. 359 at 60. Further, he was uncertain whether the methodology leading to his conclusion has been utilized or recognized by others. Id. (citing Kroemer Tr. at 45-46); D.I. 359 at 116-17. While with particular respect to design defect, several scientific articles relied upon by Kroemer were purportedly subject to peer review, Kroemer's more recent *in limine* testimony never addressed whether his analysis or methodology has been followed by others in his field. n20 As such, this factor militates against the admissibility of the proffered testimony.

n20 To the extent, if at all, that the August 1995 report is dependent upon his prior report and abstracts, Kroemer is still uncertain whether his methodology has been followed within his profession.

(iii) Is There a Known or Potential Rate of Error?

No known or potential rate of [*53] error in Kroemer's methodology has been provided and therefore, the Court cannot evaluate this element. As a result, this weighs against the admission of the proffered testimony.

(iv) Were There Standards Controlling the Technique's Operation?

In his analysis, Kroemer accepts the conclusions reached in the various articles collected by him and compares them with his understanding of how the body reacts to repetitive exertions of the kind described in the articles. The Court does not regard this as a "standard." Therefore, this factor counts against the admissibility of Kroemer's proffered testimony.

(v) Is the Methodology Generally Accepted?

As previously discussed, Kroemer is unaware of any followers of his methodology. See Schneck Op. (citing Kroemer Tr. at 45-46); D.I. 359. Nor have plaintiffs identified any such followers. This factor thus weighs against the admissibility of his proffered testimony.

(vi) Is There a Relationship Between the Technique and Other Methods Established to be Reliable?

No clearly definable technique has been provided enabling this Court to ascertain the relationship between such a technique and other methods of established reliability [*54] for his analysis of state-of-the-art and design defects. Accordingly, this component weighs against the admissibility of proffered testimony.

(vii) Are the Qualifications of the Expert Based Upon the Methodology Appropriate?

Defendant has not challenged Kroemer's qualifications. This factor therefore supports the admission of the proffered testimony.

(viii) Non-Judicial Uses

No distinct parameters have been identified to determine whether Kroemer's methodology would have any application outside of the current judicial setting. As a result, this consideration also weighs against the admissibility of his proposed testimony.

(ix) Other Factors

As previously noted, Kroemer admitted in his deposition that scientists' current knowledge about the hypothesized relationship between keyboard design/use and cumulative trauma disorders is limited D.I. 310, Ex. A-290-91, 463-64. Moreover, plaintiffs' proposed expert has failed to cite a single study which demonstrates that use or design of keyboards causes some injury (or, as is relevant to this case, carpal tunnel syndrome). Notwithstanding his incertitude and absence of literative support, Kroemer maintains that the "relation" [*55] between "cumulative trauma disorders" and "design and use of keyboards" is "well established." D.I. 310, Ex.A-352. Although a finding that an expert's opinion is unreliable cannot be made merely because the concept is novel or differs from that of other experts, Kroemer nonetheless must provide a detailed rationale for reaching his firm conclusion, and in so doing, address how he overcame the aforementioned concerns. Without such evidence, this factor militates against the admissibility of the proffered testimony.

(x) Conclusion

This Court concurs with Schneck's holding that the Daubert/Paoli II analysis weighs decisively in favor of excluding the proffered testimony. Daubert's standards are clear: "the expert [must] testify to scientific knowledge -- conclusions supported by good grounds for each step in the analysis -- meaning that any step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*" *Paoli II, 35 F.3d at 745* (footnote omitted) (emphasis in original). In light of his unscientific [*56] methodology and inability to produce a single study demonstrating that the use or design of keyboards causes some injury (such as CTS), Kroemer's conclusions must be deemed unreliable.

(2) Fit

*Fed. R. Evid. 702*'s third requirement -- that the evidence is relevant or "fits" under the facts of the case- also must be satisfied before an expert's proffered testimony may meet the Daubert test

In the case at bar, Kroemer's testimony has been offered for the proposition that keyboard use can cause "cumulative trauma disorders," defined as a "collective term for syndromes characterized by discomfort, impairment, disability or persistent pain in joints, muscles, tendons and other soft tissues, with or without physical manifestations." D.I. 310, Ex. A-314. Yet, Kroemer has offered no scientific research which proves that keyboard use can cause the medical conditions claimed in this action. Furthermore, while Kroemer did offer some specific criticisms of the generic QWERTY keyboard design and proposed what is theoretically a more ergonomically

appropriate alternative (i.e., the split keyboard design), no evidence was proffered that such an alternative design actually reduces the incidence [*57] of any musculoskeletal disorders purportedly associated with repeated keyboard use. Accordingly, as. in Schneck, this Court finds that Kroemer's testimony regarding the "defective" design of keyboards and its resulting adverse medical implications must be excluded, where there is no "connection between the scientific research or test result to be presented, and particular disputed factual issues in this case." n21 *Velasquez, 64 F.3d at 850* (quoting *Downing, 753 F.2d at 1237*) See also Schneck Op. at 25.

n21 In Dennis v. Pertec Computer Co., a similar product liability action, plaintiffs proffered Kroemer's expert testimony regarding "the relationship between the biomechanics of keystroking and upper extremity disorders." *927 F. Supp. 156, 160 (D.N.J. 1996)*. The court excluded Kroemer's testimony, concluding that "Kromer's (sic) unrecorded mental methodology amounts to nothing more than unsupported speculation." *Id. at 161*. While plaintiffs in the case sub judice argue that the Dennis court's decision was "clearly overreaching" (D.I. 322), and that the record indicates the reliability and peer review of Kroemer's research and opinions, this Court holds otherwise for the reasons discussed herein.

[*58]

(d) Conclusion

Based on the foregoing analysis, this Court recommends Dr. Kroemer's testimony be excluded in its entirety.

B. Dr. Laura Punnett

Laura Punnett, Sc. D., is an occupational epidemiologist and ergonomist. In Schneck, as in the case at bar, plaintiffs offer her opinion to establish general causation between VDT (video display terminal) use and "musculoskeletal disorders." While also asked to opine on causation with respect to the Schneck plaintiff's individual claim, Punnett serves as a "generic" expert in the case at bar, where her opinion does not specifically address either Allen's or Bower's particular assertions of injury. Indeed, Punnett's report submitted for the purposes of this action is identical to that considered in Schneck v. IBM, with the current parties utilizing, her deposition testimony from the earlier case, supplemented by her November 27, 1996 *in limine* hearing testimony. (Punnett *In Limine* Hearing, November 27, 1997, D.I. 350).

According to her *in limine* testimony, Punnett began her research by conducting an unbiased literature review

for articles directly bearing on video display terminal use and upper extremity [*59] musculoskeletal injury, n22 the standard operating procedure in the scientific community. Each study was then reviewed to ensure that it met the minimum quality of methodological criteria for a sound epidemiological study. To wit, Punnett considered: (1) the potential for selection and information bias; (2) whether potential confounders were measured and included in the analysis; (3) the size of the study and the statistical power involved; and (4) the nature of the contrast and exposure, and whether there was likely to be a big enough spread and exposure to plausibly show a difference in health effects, if one existed. Punnett then grouped the studies according to their "strength," ensuring that even the weakest met the minimum threshold of the search criteria. The studies were next grouped systematically, with Punnett organizing them by body region and identifying each study's respective results for the assessed physical dimensions of exposure. D.I. 350 at 4-13.

> n22 This review was conducted via a key word search on a computerized database of literature on occupational safety and health, and supplemented by consultation with other experts in the subject field. D.I. 350 at 11-12.

[*60]

Punnett testified that she did not conduct a meta-analysis of the studies' data -- that is, "a calculation of common or pooled odds ratios or relative risk estimates" *sometimes* made by epidemiologists. D.I. 311, Ex. A-594. She did, however, examine the data of each study for its consistency and evaluated each study on its own merits. Punnett further conducted independent analyses of the internal data of the selected studies, including comparison to an external source of data. Specifically, Punnett used the set of data for the low force, low repetition group in the Silverstein papers (part of the included scientific literature) to estimate gender-specific expected rates of disease, and then standardized the expected rate to the mix of male and female workers in each of two other prominent studies. She further calculated gender-standardized odds ratios -- estimates of relative risk -- for the health end point (which in one case was the hand-wrist disorders defined by symptoms and physical examination, and in two other cases was for the symptom-based case definition). A comparison of the age distribution amongst all the populations also was conducted. D.I. 350 at 23-34, 36-43. [*61]

With regard to supplemental external analyses, Punnett compared an external "background" group of people who were employed in jobs that were measured quantitatively and objectively and found to be "low" in the manual force and repetition requirements associated with job duties. n23 Establishing such a background level of disease -- i.e., the rate of disease expected in the general population with minimal or no exposure to the relevant risk factors -- permits the determination of whether an elevation of the disease and its symptoms are, in fact, a consequence of risk factor exposure. D.I. 350 at 23-34,36-43.

> n23 This reference group was utilized by one of the studies upon which Punnett relied. D.I. 350 at 23-34, 36-43.

Based on twenty studies n24 found in the open epidemiological literature, Punnett concluded in Schneck (as well as in the matter under consideration) that such:

> literature provides reasonably convincing evidence that VDT work *per se*, whether measured in hours worked per week, years [*62] duration of employment, typing speed, or intensity of keying (data entry vs. interactive tasks), is causally related to an elevated risk of musculoskeletal disorders [and related soft-tissue disorders]. n25 n26

D.I. 311, Ex. A-652.

In reaching her conclusion on the causation of keyboard induced injury, Punnett discussed eight criteria, including types of error and bias, commonly considered by epidemiologists in determining causality: (1) random misclassification of exposure or of health status; (2) selection bias; (3) information or recall bias; (4) confounding; (5) temporal sequence of cause and effect; (6) strength of association; (7) exposure-response relationships; and (8) biological, plausibility and external validity. D.I. 311, Ex. A-632-37, Ex. A-652-54.

> n24 Although Punnett began her review with twenty studies, she relied on only eleven. Of those, Punnett deemed the following seven studies to have "no or only very minor methodological flaws that might affect interpretation of their results": *LA Times, Newsday, US West, Knave, Rossignol,* and *Sauter. D.I 311, Ex. A-651, Ex A-655-58.* The remaining four of the eleven, conducted by *Hunting, Kamwendo, Maeda,* and *Starr,* "had relatively minor weaknesses, not seri-

1997 U.S. Dist. LEXIS 8016, *

ous enough to invalidate them completely or that only affected some of the study findings." D.I. 311, Ex. A-651, A-656-59.

[*63]

n25 Under Punnett's definition, such disorders are "a group of clinical syndromes including nerve compression disorders (such as carpal tunnel syndrome), tendon inflammations and related conditions (tenosynovitis, epicondylitis, bursitis of the shoulder, etc.), as well as non-specific pain or paresthesia and conditions that some clinicians describe as myositis, fibromyalgia, focal dystonia, and other diagnoses that are less well standardized." D.I. 311, Ex. A-629. Defendant argues that Punnett's definition excludes any reference to, or discussion of, a scientifically defined disease entity. D.I. 309 at 14.

n26 Punnett's additional analyses with the aforementioned low-risk external group displayed an even stronger contrast in risk of hand and wrist symptoms and physical findings between the exposed group and "non-exposed," low-risk external group. D.I. 350 at 23-34, 36-43.

Rather than argue that the set of criteria employed by Punnett in reaching her conclusion is unsound, IBM submits that Punnett's opinions should be excluded because *none* of the eleven "strongest" studies relied upon [*64] specifically discusses an association, much less a causal relationship, between CTS and video display terminal use. D.I. 309 at 19. Moreover, the following methodological flaws in the studies cited "render [Punnett's] opinions regarding causation unreliable and unhelpful to the trier of fact": (1) the studies discuss subjective symptoms rather than disease entities; (2) the studies have poorly conceptualized objectives -- i.e., ones that are unclear and not stated quantitatively; (3) all but one of the twenty studies are cross-sectional in design, thereby potentially limiting results to the identification of an exposure and an outcome, rather than a cause and effect relationship; (4) almost all of the cross-sectional studies are self-reported, and consequently susceptible to study subject misclassification and over-report "response bias"; (5) two of the top eleven studies have potential bias in subject selection, therefore limiting the studies' conclusions; (6) all of the eleven top studies fail to take into account the fact that "musculoskeletal disorders" are not unique to office and manufacturing workers; and (7) the studies do not account for other possible causes. D.I. 309 at [*65] 15-19. n27 Finally, defendant maintains that Punnett's literature review conclusions are vague and unsubstantiated, as evidenced by the doctor's own admis-

sion that no meta-analysis or calculation has been conducted, but yet she "estimates" that the "relative risk of shoulder, arm and hand disorders is at least two for the keyboard work of at least four hours per day . . . ." D.I. 309 at 19, D.I. 311, Ex. A-652. As Punnett is unable to quantify the relative risk of use of keyboards versus the "risk" of any person within the general population getting a musculoskeletal disorder, it is impossible for a jury to conclude that the keyboard user's "risk" presents an unreasonable risk of harm or one so probable as to render the instrument as defective. D.I. 309 at 19-20. In light of these considerations, and where the epidemiologist fails to establish an association between the injuries allegedly suffered by plaintiffs and any amount of typing, it must be held that Punnett's conclusions are "unfounded and unreliable and . . . completely unhelpful to the trier of fact" D.I. 309 at 20.

n27 In Schneck, the defendant made the same arguments now cited. See Schneck Op. at 27-28.

[*66]

In support of this contention, defendant submits corroborating affidavit testimony by expert epidemiologist Dr. Dimitrious E. Trichopoulous ("Trichopoulous") n28 Trichopoulous, a physician and epidemiologist, is currently the Chairman of the Department of Epidemiology at the Harvard School of Public Health, as well as the Director of the Center for Cancer Prevention at Harvard. More than one hundred of his professional publications focus on occupational or environmental epidemiology. Aff. of Trichopoulous at P1.

n28 Trichopoulous' testimony stems from the Schneck case, during which IBM offered the doctor's expert opinion to challenge the quality and reliability of the studies upon which Punnett based her report at issue. D.I. 334 at 15. Currently submitted correspondence between the parties in that action indicate that the Schneck plaintiffs chose to forego cross-examination of Trichopoulous in favor of submitting a responsive supplemental report by Punnett herself. D.I. 344, Ex. D-G. In the case at bar, defendant included the aforementioned correspondence as exhibits to the Reply Brief (D.I. 334, Ex. D-G), but inexplicably failed to submit Trichopoulous' actual affidavit and deposition until this Court queried as to their location in the exhibits, where the documents were alluded to on a number of occasions and are apparently relevant to the matter at hand. While it may be argued that defendant's late submission of

these materials is inappropriate, the Court will consider this evidence, which has no docket entry number and is instead cited as "Aff. of Trichopoulous," deeming such latitude in the interest of justice. Attached to Trichopoulous' affidavit dated January 30, 1994 as Exhibit A is a 17-page assessment of the evidence concerning a possible link between keyboard operation and data entry tasks and musculoskeletal disorders, which includes his criticism of Punnett's analysis, as Exhibit B, his deposition of September 13, 1994 and as Exhibit C a supplement dated July 7, 1995 to his original report contained in Exhibit A.

[*67]

In formulating his "assessment of the evidence concerning a possible link between keyboard operation and data entry tasks and musculoskeletal disorders in video display terminal-related work," Trichopoulous reviewed Punnett's report, as well as the twenty studies upon which she based her conclusions. Aff. of Trichopoulous at P2-3. As a result, IBM's expert unequivocally disagrees with Punnett's conclusions, based on differences in both the basic premises n29 and the weighing and interpretation of the existing evidence. Specifically, Trichopoulous states the following criticisms, in addition to providing a brief critique of each individual study:

> . . .It is essential to note that the musculoskeletal disorders under consideration in Dr. Punnett's report and the relevant studies do not concern disease entities or clinical syndromes as defined in the medical and epidemiological literature, but rather a collection of symptoms (subjective) and occasionally signs (objective). *I submit that the concerned scientists should focus on the understanding of the etiology of a scientifically defined disease entity, rather than on the attribution of symptoms that may represent physiological [*68] responses to extreme exposures of particular organs or systems in the process of particular occupational activities.* I have little difficulty accepting that any occupation involving intense use of any particular organ will be associated with symptomatology from that organ; the problem is whether symptomatology can develop into an independently defined and generally recognized (World Health Organization 1977) disease entity.

* * *

Aff. of Trichopoulous, Ex. A at 3-4.

> *No study has examined individuals with clearly defined disease or an a priori determined clinical syndrome* (Morris 1975). Five of the studies (Bernard et al. 1992, Hunting et al. 1981, Kamwendo et al. 1991b, Nathan et al. 1988, Onishi et al. 1982) have used some objective examination or measurement and these measurements were "negative" (indicating no association) in two studies (Bernard et al. 1992, Nathan et al. 1988), equivocal in two others (Hunting et al. 1981, Kamwendo et al. 1991b), and positive in only one (Onishi et al. 1982).

> Eighteen studies have used questionnaire-ascertained symptomatology as outcome variables and of these nine are reported as clearly or suggestively positive (Bernard et [*69] al. 1992, Burt et al. 1990, Duncan and Ferguson 1974, Heyer et al. 1990, Kamwendo et al. 1991a, Maeda et al. 1980, Rossignol et al. 1987, Smith et al. 1981, Stellman et al. 1987) whereas in three studies (Hunting et al. 1981, Kamwendo et al. 1991b, Knave et al. 1985) the results were equivocal and in six studies (Fahrbach and Chapman 1990, Hales et al. 1992, Sauter et al. 1991, Starr et al. 1989, Starr et al. 1985, Star 1984) the results were essentially "negative" (no association). *It appears that VDT work has not been shown to be causally associated with an a priori defined disease or clinical syndrome, and there is very little evidence for an association based on objective pathophysiologic measurements.* By contrast, studies based on questionnaire-ascertained symptoms are more often than not positive for an association between VDT related work and musculoskeletal symptomatology, although the results are by no means uniform across studies. When associations are reported they are usually weak, with odds ratios below 2 and squared partial correlation coefficients below 0.05. Indeed, these associations with VDT related work, are, as a rule, weaker than the corresponding associations [*70] with gender (e.g. Knave et al. 1985) or variously operationalized

psychosocial variables (eg. Burt et al. 1990, Hales et al. 1992).

*The existing evidence does not support a casual link between VDT related work and a clinically defined musculoskeletal disease or syndrome.* There is circumstantial evidence for an association between VDT related work and subjective musculoskeletal symptomatology, but it is difficult to establish whether, and to what extent, the latter association reflects a psychosocially modulated selection process.

Biomedical considerations and other paradigms indicating that excessive functioning can lead to adverse symptomatology suggest that VDT related work may indeed generate musculoskeletal symptoms, although there is no evidence that these symptoms are based on objectively ascertainable pathology or otherwise objectively defined clinical disease. The odds ratios linking VDT related work with musculoskeletal symptoms are generally below 2 and they are, as a rule, lower than those reflecting the influence of several demographic and psychosocial variables.

Aff. of Trichopoulous, Ex. A at 11-13 (emphasis added) (internal citations omitted).

n29 According to Trichopoulous' deposition testimony, the doctor characterizes the aforementioned differences in basic premises as what he considers to be the lack of an independently defined and generally recognized disease entity that is being studied, as well as the criteria for causation as they were applied in a particular situation. Aff. of Trichopoulous, Ex. B at 62.

[*71]

In a supplement to the previously cited report, Trichopoulous expands on his critique of the Punnett report, asserting, in relevant part:

. . . There is extensive literature on the methodology for quantitative summarization of study results frequently referred to as meta-analysis. Most researchers agree that meta-analysis plays a central role in the summarization of *randomized clinical trials.* The characteristics of clinical trials that make them amenable to meta-analysis are: (a) they refer to a disease; (b) they focus on an agreed explicit outcome as, for example, survival or metastasis-free time; (c) the randomization process allows control of both identifiable and elusive confounding factors since, within the constraints of chance, confounding factors are equally distributed among persons exposed and non-exposed to the treatment under evaluation; (d) selection forces are accommodated through randomization, complete follow-up and allowance for competing causes for the outcome under study (e.g. death); (e) information bias is accounted for through blinding of both study participants and investigators (double-blind, placebo-controlled studies).

By contrast, epidemiologist [*72] are divided on the utility of meta-analysis for *observational (non-expedmental) investigations:* some consider it useless or even misleading, whereas others believe that it can provide an additional insight to what can be obtained from critical evaluation of individual studies. However, most epidemiologists would agree that meta-analysis is a blunt tool in observational (non-experimental) research, and can only be useful if it is based on the sound epidemiological studies that had similar designs, evaluated similar exposures, focused on similar outcomes, addressed similar sets of potential confounders and have excluded with reasonable confidence selection and information bias.

In this light, it is clearly unrealistic to attempt a proper meta-analysis of the studies that have examined the relation, if any, between keyboard operation and musculoskeletal disorders. . . . The operational definition of exposure(s) varies by study, from meat-cutting, to cake decoration, to operating posture, to job dissatisfaction, to psychosocial work environment, to video display terminal work; the outcome varies from self-reported discomfort, to (unadjusted for age) median nerve sensory velocity, [*73] to (rarely) clinically indicated carpal tunnel syndrome, to *ad hoc* defined conditions "cumulative trauma disorder" (notwithstanding the absence of evidence of trauma);

confounding factors are inconsistently considered and inadequately addressed; selective participation is frequently acknowledged but the resulting bias is rarely evaluated; scant attention is paid to the high likelihood for information bias; and different measures of alleged effect are used, depending on study circumstances and expertise of the investigators (prevalence ratio, odds ratio, incidence ratio, difference of mean values, etc.).

* * *

Aff. of Trichopoulous, Ex. C. at 1-2.

It is generally acknowledged that establishment of causation hinges either (1) on experimental evidence from humans or an appropriate animal model (neither of which is at present available for the issue under consideration) or (2) more frequently, on observational human evidence ascertained through epidemiological studies. In strict terms, none of the 20 studies reviewed by Dr. Punnett in her 1993 report is a bona fide epidemiologic investigation, and none has been reported in a peer-reviewed epidemiologic journal (books, [*74] reports, and conference proceedings are not considered as peer-reviewed publications). This does *not* indicate that these studies are of no value: they do highlight ergonomic issues and relevant psychosocial factors and they may even help to identify the exposure and outcome parameters that deserve proper epidemiologic scrutiny in subsequent investigations. Only the three recent papers by Bergqvist can be considered as epidemiological and their results do not provide support for an overall association between video display terminal work and musculoskeletal problems.

In rare occasions, associations are so strong that causality may be established even when the data were generated from imperfect studies. However, when a causal link is absent, weak, or questionable the empirical evidence should be based on demonstrably valid studies and should be supported by convincing biological arguments. With respect to the alleged link between keyboard operation and musculoskeletal disorders none of

these conditions is met. Meta-analysis can summarize valid data but it is not a remedy for data of poor or questionable validity.

The attempts of Dr. Laura Punnett to derive summary quantitative [*75] estimates from the studies she has reviewed are grossly inadequate and, in fact, misleading. This does *not* imply that Dr. Punnett lacks the necessary expertise to undertake a meta-analysis; on the contrary, I believe that Dr. Punnett is a qualified and competent colleague. However, the studies on VDT work and musculoskeletal disorders are so diverse in design, have so limited control on information bias, focus on so different outcomes and use so different effect estimators that no methodology can abstract a reasonably meaningful conclusion for the issue under investigation. The only statement that can be made is that studies that have stronger methodological safeguards and use more objective outcome measurements tend to show no association between VDT work and musculoskeletal disease in the upper extremities- and *vice versa*.

Aff. of Trichopoulous, Ex. C at 6-7 (emphasis in original).

In response to these criticisms, plaintiffs have provided the affidavit of Dr. Stephan Zoloth (D.I. 327, Ex. 40), a professor of Epidemiology and Public Health at Hunter College in New York, as well as the Director of Hunter College Center for Occupational and Environmental Health. [*76] n30 D.I. 327, Ex. 40 at P1. This affidavit originally was submitted in the Schneck case and is now proposed for the same purpose.

n30 While defendant in this action argues that the Schneck Court improperly considered Zoloth's testimony, where the expert earlier had been withdrawn by plaintiffs in that case, this Court finds that plaintiffs Allen and Bowers properly submitted Zoloth's affidavit for consideration on the issue of the admissibility of Punnett's expert witness testimony.

As part of his professional activities, Zoloth acts as a peer reviewer for the American Journal of Public Health and the American Journal of Industrial Medicine, cus-

tomarily reviewing articles submitted to these periodicals for publication. Id. at P2. According to his affidavit, Zoloth is familiar with Punnett's Report at issue, as well as the literature reviewed by Punnett therein. Id. at 3. Regarding IBM's criticisms of Punnett (in particular, the studies relied upon by her), Zoloth provides the following comments: [*77]

### 16. Quality of the Studies

First, it is important to note that Dr. Punnett's review is not restricted to just the 20 VDT studies. Indeed, the non-VDT studies which discuss the established economic risk factors (force, repetition, awkward posture, . . .) which are also present in keyboard use, are important to consider. However, even focusing on just the VDT studies, it is clear that they are all either peer reviewed or government issued, and are all authored by reputable scientists. As such they are of sufficient quality to allow for Dr. Punnett's evaluation.

### 17. Symptoms Reported

To the extent that the researchers in the cited studies discussed symptoms reported by the subject populations, this is a proper and common feature of such occupational health studies. Of course, in the methods sections of various of the reports, the researchers discuss the symptom complexes being studied and how they relate to defined injuries and disorders. n31 Accordingly, they do not present an obstacle to Dr. Punnett's evaluation. Rather, the studies' authors are assessing different symptomatology to determine the prevalence of work-related musculoskeletal disorders n32 in the [*78] various populations. Again, this is entirely proper. Moreover, while symptomatology may be viewed as a surrogate for disease, it can also be seen as a precursor. This makes its consideration entirely proper.

### 18. Statistical Association v. Causation

Within any particular study on any subject (within the field of epidemiology) the association of exposure and outcome is properly noted by the researcher. It is, however, within the larger scope of a comprehensive review -- such as that per-

formed by Dr. Punnett -- that findings of causation are properly discussed. The tests for such conclusions are the well-established epidemiological criteria set out in the beginning of Dr. Punnett's report (pp. 4-10). Since she has followed these criteria, it is entirely proper for her -- especially giver (sic) her qualifications and experience -- to draw conclusions based upon such a review. Indeed, the studies, being of sufficient quality, properly lend themselves to such findings. While IBM's lawyers may review the studies and (assuming they follow the proper criteria) come to different conclusions, that does not mean that the studies do not support Dr. Punnett's conclusions. In fact, they [*79] do.

### 19. Dr. Punnett Acknowledges the Limitation of the Studies in Her Review

Any good and credible epidemiologist will be the first to admit that no study or review is perfect. In fact, it is expected of epidemiologists that they will fully and forthrightly address the weaknesses in their work. Dr. Punnett has properly done this. This in no way impairs her credibility. In fact, just the opposite is true. Moreover, it does not detract from the reliability of her work. Such acknowledgment simply puts into proper context the scope of the work and its limitations. None of those (properly) discussed by Dr. Punnett invalidate or weaken her conclusions.

### 20. Cross-Sectional Design

Cross-sectional studies are valid and generally accepted study designs in epidemiology and are properly considered in a review such as Dr. Punnett's. It is true that a potential limitation inherent in such a design is the subject of temporal relationship between exposure and outcome, if not properly considered and controlled for. The authors of the subject studies acknowledge this, as does Dr. Punnett, who adequately deals with this subject in the body of her report as well as in Table 1. [*80] Accordingly, it does not impair the ability to find a causal relationship in this context.

### 21. Self-Reporting

Use of questionnaires to elicit information concerning the outcome variable in an occupational epidemiological study is standard and well accepted in the field. While IBM's lawyers point to the potential for over-reporting, there is just as great a likelihood of under-reporting, as active workers may choose not to report outcomes for fear of jeopardizing their employment. Moreover, and on a related note, one should consider that the "healthy worker effect" (sick/injured workers are selectively removed from the studies population) will mask the true effect of the exposure.

### 22. Bias

As noted above, no study is perfect or without any potential bias or confounding. IBM's lawyers point to Dr. Punnett's observation that two of the twenty VDT studys [sic] contain potential selection bias, and are critical of her using those studies as part of the bases for her conclusions. This criticism is not well founded. Firstly, as Dr. Punnett properly points out, selection bias can affect results in either direction. Moreover, there is no indication in these two studies [*81] whether this bias is active and to what extent. However, in all events, it would be improper to disregard the findings of these studies as advocated by IBM's lawyers. Rather, Dr. Punnett properly considers them -- acknowledging their potential limitations -- in viewing the whole picture presented by the entire literature.

### 23. Confounding

Again, no study is perfect or completely free of possible confounding. While many of the VDT studies control for some confounding factors some do not. Methodologically, this is properly noted and dealt with by Dr. Punnett in her report and in Table 2. Having done so, it is up to the reviewer to form a professional judgment as to whether or not the potential confounding precludes the drawing of conclusions. Dr. Punnett has done this. While IBM's lawyers may disagree with this conclusion, there is no reasoned basis to disregard Dr. Punnett's judgment.

D.I. 327, Ex. 40 at 5-9.

> n31 In Schneck, Zoloth argues that "the IBM lawyer is mistaken in asserting that epidemiology can only concern itself with 'disease entities.' While the symptom complexes reported in several of the studies represent distinct 'disease entities' (with specific I.C.D. codes), epidemiology does apply to many real non-disease entities (e.g., low birth weight, suicide, violence . . )." D.I. 327, Ex. 40 at P17 n.1.

[*82]

> n32 Further, Zoloth opines that "these symptom complexes are not only representative of distinct 'disease entities,' but are reportable on OSHA 200 logs, and are compensable under the Workers Compensation statutes of many states." D.I. 327, Ex. 40 at P17 n.2.

Punnett further defends the aforementioned studies and her conclusions in a supplemental report dated July 31, 1995. D.I. 327, Ex. 42. Addressing those criticisms set forth by Trichopoulous, Punnett counters that IBM's epidemiologist area of expertise lies primarily in the study of cancer, a disease whose diagnosis, progression and treatment naturally lend themselves to a very different kind of epidemiological study than that associated with musculoskeletal disorders. To wit, as a consequence of the steady worsening of health of a patient afflicted with cancer, that patient is extremely likely to seek medical care, be diagnosed by objective medical tests, be recorded in cancer registries and ultimately have cancer listed as the cause or underlying cause of death on a death certificate. Thus, administrative databases are generally available [*83] to retrospectively and prospectively ascertain cancer cases and potentially link them to other databases offering information on various possible exposure types. In contrast, individuals suffering from musculoskeletal disorders "may or may not seek treatment at any particular point in the progression of the condition; they may experience prolonged periods of pain and impairment or alternating periods of recovery and recurrence (with or without treatment); and there are no uniform case reporting mechanisms at either the state or federal level in this or most other countries." D.I. 327, Ex. 42 Supp. Report at 1-3. Moreover, unlike with cancer, musculoskeletal disorders may enter "remission" in patients with reduced exposure to the stressors, such as resulting from ergonomic intervention in the workplace,