with the added benefit of the prevention of future disorders. Id.

Under these circumstances, where routine databases are not available for case ascertainment of musculoskeletal disorders, epidemiologists generally rely upon alternative approaches for the identification of affected individuals, such as self-reported symptoms. According to Punnett,

> cases defined by symptoms [*84] alone and those defined by findings on physical examination show extremely similar associations with the force and repetition characteristics of subjects' jobs (Silverstein 1986, 1987). . . There is a strong correlation between the frequency of symptoms, for example, among a group of occupations, and the frequency of workers' compensation claims, and of work-related repetitive trauma disorders recorded by employers in those same occupations (eg., Fine 1986). Standardized questionnaire items have been proposed (eg., Kuorinka 1987, Levine 1993) and evaluated with respect to their validity, reproducibility and sensitivity to change; the international comparability of case definitions is increasing.

D.I. 327, Ex. 42 Supp. Report at 3.

In further response to Trichopoulous' criticism that an outcome definition is inherently vague and weak when derived from questionnaires, the epidemiologist also notes that the use of questionnaire items to determine case status is not unique to musculoskeletal disorder study; standardized questionnaires for the assessment of chronic pulmonary obstructive disease have been widely used by epidemiologists for a number of years. Id. at 3-4. [*85]

Punnett's Supplemental Report and recent in limine testimony also specifically address and refute Trichopoulous' assertions that: (1) the studies upon which she relied were not peer-reviewed; (2) there is insufficient experimental evidence that musculoskeletal disorders may develop as a consequence of repetitive motion, static muscle loading and/or awkward postures; (3) the potential for information bias is much greater in studies where exposure measures were derived from questionnaire data and (4) those studies where there were multiple ergonomic exposure dimensions to the risk of musculoskele-

tal disorders poorly or vaguely assessed those potentially confounding individual exposures Id. at 4-6.

With regard to the issue of peer review, Punnett testified at her in limine hearing that there are several different types of accepted peer review, which in and of itself is a "fluid" concept. There is "formal" peer review, where an article submitted to a scientific journal is distributed to "outside" reviewers (other than the journal's editor and unknown author) for comments. Another form of peer review consists of presentation of a study at a scientific conference or symposium, [*86] where it is subjected first to an abstract critique for sound methodology and subject matter relevance by the particular conference's organizers, then later critiqued and commented upon by the conference's audience. Yet another form of peer review consists of review and comments on an article by the editor of the journal to which the work is submitted. D.I. 350 at 56-58.

According to Punnett, of the twenty studies upon which she relied, all were peer-reviewed papers, with the exception of the three NIOSH health hazard evaluation reports, two of which have subsequently been published in peer review journals. However, Punnett maintains that NIOSH reports actually undergo both an internal and (often) external peer review process prior to publication in their present state, so the NIOSH articles considered were also subject to the appropriate review. Further, in reference to her own report prepared for this litigation, Punnett notes that it was presented at a medical conference sponsored by the National Institute of Arthritis and Musculoskeletal Disease in conjunction with several other professional associations, and was reviewed by one of the editors who compiled the conference proceedings [*87] for publication. Moreover, it is currently under formal peer review for publication in an unidentified scientific journal. D.I. 350 at 90-92.

As for Trichopoulous' concerns that no study cited had examined individuals with clearly defined disease or an a priori determined clinical syndrome, Punnett replies:

> It may be true that in some studies these case definitions are based on symptoms "that are difficult to combine into a single disease from the point of view of clinical medicine." However, it is also the opinion of numerous physicians that clinical medicine does not yet provide the necessary diagnostic techniques for these conditions, especially in their early stages, or offer the appropriate taxonomy. The argument that an epidemiologist should only study clinically defined diseases begs

precisely the contribution that epidemiology can make to the development of an appropriate clinical case definition and seems dated in light of many recent developments in the field. For example, epidemiologists were involved early in the scientific attempts to understand the immune system disturbance that is now characterized as Acquired Immune Deficiency Syndrome, but which was under [*88] study long before the disease mechanism was understood or a case definition had been standardized (utilizing epidemiologic data). Many epidemiologic studies utilize as their outcomes not clinically diagnosed disease but markers for early stages in pathogenesis . . . precisely because they offer a greater possibility of identifying affected individuals before clinical disease has developed and when secondary prevention will likely be more effective.

D.I. 327, Ex. 42 Supp. Report at 4 (citations omitted).

Thus, in summary, Punnett concludes:

. . . there is epidemiologic evidence not only that "excessive functioning . . ." (and specifically) "VDT related work may indeed generate musculoskeletal symptoms." (Ex. A, p. 13). There is also evidence that VDT usage is associated with disorders that produce findings on physical examination and clinical testing. Furthermore, there is evidence that musculoskeletal symptoms are valid and reproducible and serve as markers for medical care utilization and other endpoints, whether or not the pathology has been defined or can be objectively assessed as of yet with available clinical techniques. To my knowledge, there are no data [*89] showing the plausibility of alternative explanations for the associations between VDT use and upper extremity disorders. In the light of laboratory studies demonstrating several biologically plausible pathomechanisms, the epidemiologic evidence is most credibly interpreted as causal.

D.I. 327, Ex. 42 Supp. Report at 6.

In light of defendant's criticisms and plaintiffs' responses, the issue regarding the admissibility of Punnett's expert testimony is quite clear: the Court must determine whether Dr. Punnett had good grounds to rely on the studies in question to draw the conclusion that VDT use causes musculoskeletal disorders. See *Paoli II, 35 F.3d at 749*; See also *DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 953 (3rd Cir. 1990)* ("Rule 703 is satisfied once there is a showing that an expert's testimony is based on the type of data a reasonable expert in the field would use in rendering an opinion on the subject at issue.").

The Third Circuit has stated that "it is the judge who makes the determination of reasonable reliance, and that for the judge to make the factual determination under Rule 104(a) that an expert is basing his or her opinion on a type [*90] of data reasonably relied upon by experts, the judge must conduct an independent evaluation into reasonableness." *35 F.3d at 748*. Of course, "the judge can . . . take into account the particular expert's opinion that experts reasonably rely on that type data, as well as the opinions of other experts as to its reliability, but the judge can also take into account other factors he or she deems relevant." *Id.*

While the parties have presented undeniably conflicting testimony regarding Punnett's examined studies and her resulting conclusions, the Court finds that the studies relied upon by Punnett are of the type reasonably relied on by experts in the field to render a conclusion with respect to general causation. Although none of the underlying studies actually concludes that VDT use causes musculoskeletal disorders, it is also recognized that "epidemiology cannot prove causation; causation is a judgment issue for epidemiologists and others interpreting the epidemiological data." Schneck Op. at 31, quoting the *Federal Judicial Center, Reference Manual on Scientific Evidence* 157 (1994); see id. at 126 ("Association is not *causation* . . . A strong association that [*91] is demonstrated consistently in a series of research projects leads a researcher to infer that a causal relationship exists. Even the best of studies do not demonstrate more than a high probability of causal relationship between exposure to an agent and a disease."); see also *Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358, 375 (D.N.J. 1995)* (citations omitted) ("A cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. . . . If conclusive evidence were necessary to admit . . . [a] theory on general causation, we might as well be proceeding under the Frye general acceptance test rejected by Daubert."). As noted in Schneck, Zoloth strongly approved of Punnett's conclusion on general causation in light of her

proper reliance upon underlying studies which were both reliable and of the type that an expert would reasonably rely on to establish causation. D.I. 327, Ex. 40 at P18. While IBM's expert, Trichopoulous, disputes these conclusions, this Court finds sufficient evidence to hold that Punnett had "good grounds" to rely on these studies to reach her [*92] conclusion, and that Trichopoulous' contrary testimony is more properly reserved for consideration by a jury as to the issue of weight. Consequently, it is recommended that defendant's motion to exclude Punnett's general causation testimony be denied.

As part of its argument, defendant contends that since Dr. Punnett does not relate the injuries allegedly suffered by plaintiffs to any amount of typing or keyboard use, her opinion testimony "does not fit the allegations of the plaintiffs in this case, and is, therefore, completely unhelpful to the trier of fact," relying on Daubert at 2795-96. The Daubert analysis under the "fit" or helpfulness requirement of Rule 702 necessitates "a valid scientific connection to the pertinent *inquiry* as a prerequisite for admissibility." Id. (emphasis added). As noted by Daubert, "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. However, Punnett's general causation opinion is not being propounded in the abstract and is not the only opinion on causation. Although Punnett is not being called upon to testify about a relationship between [*93] plaintiffs' alleged injuries and their keyboard use or the IBM keyboards involved, as will be addressed further herein, Dr. Bleeker specifically relies upon Dr. Punnett's methodology and analysis in formulating her general causation opinion and applies that to the injuries involved in this matter. Therefore, defendant has failed to demonstrate that Punnett's testimony will not "assist the trier of fact to understand the evidence or to determine a fact in issue." *Fed. R. Evid. 702.*

### C. Dr. Margit Bleeker

Margit Bleeker ("Bleeker"), M.D., is a board-certified psychiatrist and neurologist who serves as the Director of the Center for Occupational and Environmental Neurology in Baltimore, Maryland and as a consulting neurologist to the Hopkins Health System. D.I. 310, Curriculum Vitae, p. 2. She is also a medical/ergonomic consultant at the Washington Post, for which she reviews workstations and evaluates employees who are developing repetitive strain injuries. D.I. 310, Ex. A-5 at 20-21. Plaintiffs proffer the opinions of Bleeker on the issue of medical causation generally, and specifically with respect to plaintiffs' individual claims of carpal tunnel syndrome resulting from use [*94] of keyboards. n33 D.I. 310, Ex. A-3 at 8-9.

n33 In her deposition, Bleeker outlined the issues she would address in her expert testimony, including causation and warnings. According to the doctor, her opinions do not center upon a particular keyboard, such as the IBM keyboard design now at issue, but are more generalized. D.I. 310, Ex. A-3 at 10.

With regard to the issue of general medical causation, Bleeker opines that "*carpal tunnel syndrome, as far as I'm concerned, is a keyboard issue* and I include with the keyboard-- I include, for instance, the height of a keyboard tray even though somebody might say that's the workstation. That is where the keyboard is being used and that is part of the keyboard problem. I mean, the height of the monitor, whether that's inappropriate, has nothing to do with carpal tunnel syndrome." D.I. 310, Ex. A-73 at 299 (emphasis added). Bleeker's summary statement proffered herein followed detailed deposition responses regarding keyboard design and use (specifically, typing technique, [*95] position, posture, intensity, duration and key depression force) and their association with such repetitive strain injuries as CTS. n34 D.I. 310, Ex. A-69-71 at 276-286, A-73 at 291-296. During her recent *in limine* testimony in this matter, Bleeker maintained that consistent keyboard use may cause carpal tunnel syndrome. (See Bleeker *In Limine* Hearing Testimony, Nov. 3, 1996 and Dec. 6, 1996, D.I. 363 and 353 respectively).

n34 Bleeker admittedly lacks expertise in keyboard design and required and appropriate warnings. D.I. 310, Ex. A-92 at 295, Ex. A-73 at 297-99. Nor is she being offered as an expert to testify in those areas. D.I. 322 at 25.

As to the issue of specific causation, in a January 5, 1996 occupational neurology evaluation of Allen, Bleeker records that "Ms. Allen is a 32-year-old right-handed female who was originally evaluated on November 3, 1994, for continuing problems in both of her hands following carpal tunnel release bilaterally. At that evaluation, the history and physical examination [*96] were suggestive of carpal tunnel syndrome bilaterally." D.I. 310, Ex. A-111. As stated as her "Impression" during the November 1994 examination, the doctor again concludes that "the history demonstrated a strong temporal association between the onset of symptoms and increased keyboard use." D.I. 310, Ex. A-111. While Bleeker's November 3, 1994 and January 5, 1996 occupational neurology evaluations of plaintiff Bowers do not explicitly cite keyboard use as the cause of her carpal tunnel syndrome, both reports focus on Bowers' key-

board activities and its alluded direct association with her CTS injury and its recurrence. D.I. 310, Ex. A-113-17. Moreover, in her deposition testimony, Bleeker un- equivocally claims keyboard use as the cause of both plaintiffs' medical problems:

> Q: Is it your opinion that Mrs. Allen's and Mrs. Bowers' carpal tunnel syndromes were caused solely by their use of com- puter keyboards?
>
> A: What you have to realize is that when you are formulating that opinion is that you look at the fact that these individuals -- I could not find any other stressor ex- cept a change in what had gone on in their work place or the fact that they were us- ing their keyboard [*97] in, maybe, a poorly designed work place and they weren't using the keyboard correctly. That caused the problem.

D.I. 310, Ex. A-73 at 298.

During her *in limine* hearing in November and December 1996, Bleeker was equally emphatic that plaintiffs' re- spective CTS problems were a result of computer key- board use, rather than of their routine activities and hob- bies, although she later conceded that the activities of daily living (ADLs) and other modifiers (i.e., body weight, birth control pills) could exacerbate the CTS conditions:

> Q: The question basically was, did you come to a determination of causality [of CTS] through these examinations of her [Ms. Bowers'] problems?
>
> A: Yeah. I think it's - by causality, I'm more interested in *when the problem be- gan, and what was going on at that point*. And I feel that it was due to using the keyboard. And, unfortunately, in this case, it looks like it was exacerbated because the keyboard, by the patient's description *when she was demonstrating how she was using it, was clearly too high*.

D.I. 363 at 25.

\* \* \*

> Q: Do you state anywhere, in your im- pression, that the etiology of Ms. Bowers' diagnosed [*98] bilateral carpal tunnel syndrome is due to the keyboard or any aspect of the keyboard?
>
> A: I think if you read the entire impres- sion, what I am trying to do is to demon- strate that, for instance, when her condi- tion was treated, the bilateral carpal tunnel syndrome was treated with surgery, symp- toms improved. She had successful surgi- cal outcome. And then, when she returned back to work, the symptoms again in- creased in severity.
>
> I make statements like that because, again, it is having the relationship be- tween the development of the symptoms with the use of the keyboard which is helping us to establish causality.
>
> I tried to explain what was going on with the elevated keyboard, and indicating that she was typing in a position that where she could have increased pressure inside the carpal canal. Again, a causal relation- ship between increased pressure in the carpal canal, we know that from the litera- ture, that people with carpal tunnel syn- drome have increased pressure within the carpal canal, and that is clearly a risk fac- tor for the development of carpal tunnel syndrome. So, yes, as far as I am con- cerned, there is not a question that the use of the keyboard was causally associated [*99] with the development of the carpal tunnel syndrome.

D.I. 353 at 12-13.

\* \* \*

> Q: What sort of non-work activities did you note in Ms. Bowers' history that could be possible causes of carpal tunnel syn- drome?
>
> A: I think that you need to realize that there are many contributing factors to the development of carpal tunnel syndrome. Could her employment at the Acme, where she is grabbing parcels and putting them through the scanner, could that have added a little notch. Obviously, it could.

1997 U.S. Dist. LEXIS 8016, *

But the fact is that you need to look at the number of hours. It's just the same explanation that is given, oh, it's the crocheting, it is the knitting, it is washing the clothes at home. You are not doing that for 37 and a half hours a week. You can actually do a little bit and stop. That is very different than with many of these jobs on the keyboard.

D.I. 353 at 22.

* * *

Q: You did not say or conclude in this report, did you, that keyboard use caused her [Ms. Allen's] carpal tunnel syndrome.

A: Well, I guess I said it in my way. If by saying there a strong temporal association between onset of symptoms and a dramatic increase in her keyboard use, to me, [*100] that says that one caused the other.

Q: Is that enough, Doctor, just having a temporal association between two things, is that enough to assume causation?

A: Clinically? Sure.

Q: From a scientific and medical perspective, doesn't causation require more than just a temporal relationship between the suspected cause and the suspected effect?

A: No. I mean, its very much -- if somebody is throwing a baseball and develops shoulder pain, are they able to associate throwing the baseball with the onset of the shoulder pain? I mean, I don't think too many people would question that. And that's the same thing we're talking about here.

Q: How about in an area of controversy; that is, where it's controversial in the scientific and medical arena as to whether a given cause produces a given effect. In that situation, is a temporal relationship alone sufficient to premise or basis an opinion of causation between the two items?

A: You know, what it is, is I don't know if I fully agree with -- we have been discussing causation of carpal tunnel syndrome with keyboard use. You have brought up that it's a multifactorial problem. No one is going to deny that it's multifactorial. [*101] One of the major factors happens to be ergonomic stressor from the keyboard. If you want to bring in, you know, other modifiers, such as her weight, whether she's on birth control pills, other things like that, those are modifiers.

D.I. 353 at 122-23.

* * *

Q: Is it your impression that her [Ms. Allen's] use of the switchboard [versus the computer keyboard] and her activities of daily living were the cause of her symptoms?

A: Absolutely not.

D.I. 353 at 130.

During her *in limine* testimony on November 23, 1996, Dr. Bleeker described the typical methodology applied in making a diagnosis of an illness, and whether there is a causal factor associated with the patient's particular occupation:

Basically, one approaches as one approaches any patient with reviewing any medical records that have been provided by the individual or their [sic] physician. One gets a history. And part of that history is specialized, because part of it is an occupational history, where one is going through the various jobs and positions that the person has been in, and what those positions have actually entailed.

And one also obviously goes through the medical [*102] history; meaning, what other medical conditions have they been diagnosed with. Do they have any other sort of general symptoms that might suggest that there's an underlying condition that hasn't been diagnosed that needs to be -- that needs to be looked at.

And then one does a physical examination. If it's indicated, nerve conduction studies are performed. In some cases, we actually even do MRIs [magnetic resonance imaging] as part of our workup, because we may be seeing somebody after surgery who is having problems.

Again, there are different avenues that one may take in the evaluation. And as part of this history taking and examination, one is trying to exclude other etiologies. So one is looking at hobbies and other ergonomic stressors to the upper extremities.

And one is always being very careful to try and determine the temporal association between what happened in the workplace and the onset of the symptoms. And what actually went on with relieving the symptoms, if they were treated by another physician, you know, what was modified.

D.I. 363 at 8-10.

Bleeker further opined that when examining the impact of nonwork activities on the development of [*103] CTS, one typically considers the intensity and duration of each nonwork activity.

When questioned about the basis for her temporal association between CTS and keyboard use (i.e., additional reliance on literature on occupational problems or primary emphasis on her own clinical experience), Bleeker responded:

The thing is that one obviously keeps abreast of the literature. I mean, I have a library with many journals, which one can see which ones we have been subscribing to.

So one is -- carpal tunnel has been something that's been of interest to me, since I started in the early 80s. So it is something that whatever journal I'm looking at, and if it has a carpal tunnel article, it's always pulled and put into my files.

So one is relating to a body of literature that has been relating ergonomic stressors and these various health outcomes. I certainly can't necessarily point to one paper and say, this was "the article," because it's

basically many articles which have shown similar outcomes that I'm not [sic] relying on.

D.I. 363 at 10-11.

Bleeker further commented on Punnett's work which reviewed health outcomes related to keyboard use, n35 stating that [*104] where CTS is a frequent outcome in the papers, there is a demonstrated consistency between exposure and such outcome which may be used to establish causality.

n35 Bleeker suggested that the work of Punnett's to which she was referring may have been in a chapter of the Journal of Hand Surgery, but also noted that she had heard Dr. Punnett present the data at a meeting in San Francisco. Further discourse between Bleeker and defense counsel indicates that the Punnett work in question is the same material published from the proceedings of the 1994 Bethesda, Maryland meeting of the American Orthopedic Surgeons, which is the basis of Dr. Punnett's testimony in this case (the Punnett Report).

With regard to the issue of general causation, defendant IBM's primary argument is that Bleeker's conclusion of a causative relationship between the use of keyboards and the development of such musculoskeletal injuries (i.e., carpal tunnel syndrome) as those suffered by plaintiffs is unsupported by recognized, scientifically verifiable [*105] studies. Moreover, assuming that legitimate scientific studies relate CTS to typing, there remain many other factors contributing to and causing CTS. D.I. 309 at 20-22, D.I. 334 at 13-14.

(a) General Causation

(1) Daubert/Paoli II Factors

(i) Does the Methodology Consist of a Testable Hypothesis?

Defendant does not contend that Dr. Bleeker's hypothesis -- that repeated keyboard use is a substantial factor in the development of a cumulative musculoskeletal disorder such as carpal tunnel syndrome, and that such a disorder can be prevented and treated with early identification and ergonomic work modifications -- is not testable. Accordingly, this factor will weigh in favor of the admissibility of the proffered testimony.

(ii) Has the Methodology Been Subject to Peer Review?

During her recent *in limine* testimony Dr. Bleeker specifically referred to the review of epidemiologic studies relating health outcomes (such as CTS) to reported keyboard use presented by Dr. Laura Punnett and previously described and considered at length by this Court. Bleeker cited Punnett's Report, among other more broad references to available scientific literature, as a basis for her [*106] general causation opinion proffered in this litigation. n36 D.I. 363 at 48-50. This Court has already determined that Punnett had good grounds for relying on the studies she used in formulating her general causation conclusion, and that the conflicting opinions of the respective parties' outside experts on the reliability of such studies is appropriately left to the jury to weigh.

n36 There is no doubt that this Court would have preferred a broader base of specifically cited literature and a more defined, delineated methodology with regard to general causation. And, indeed, Bleeker's *in limine* hearing testimony suggests that she reaches her conclusions upon consideration of numerous scientific articles, upon which, unfortunately, counsel for either party failed to elicit elaboration. However, that notwithstanding, Bleeker's primary reliance on Punnett's Report is sufficient for the conduct of a Daubert/Paoli II analysis to determine the admissibility of her expert testimony.

With regard to issue of specific [*107] causation, according to the Journal of American Medical Association ("JAMA") report of Dr. David Rempel ("Rempel"), a well-regarded expert, the following mainstream methodology is appropriate for application to ascribe the cause of occupationally-related upper extremity cumulative trauma disorders: (1) make a reasonably specific and accurate diagnosis; (2) exclude nonoccupational explanations for the disorder; (3) determine whether the disorder is plausibly associated with work-related risk factors, based upon the patient's work history; (4) interview the patient to find out whether the risk factors are present in sufficient degree; and (5) determine whether a temporal association exists between the work place risk factors and the onset or aggravation. D.I. 329, Ex. 54 at 839.

Applying Rempel's outlined methodology, Dr. Bleeker conducted physical examinations of the plaintiffs, took their occupational, social and medical histories, n37 reviewed their medical records and conducted the conventional clinical tests and measures appropriate to the diagnosis (such as Phalen's, Finkelstein, Tinel's, nerve conduction studies and MRI of the affected extremities). Upon evaluation of the aforementioned [*108] factors, including the reasoned exclusion of nonoccupa-

tional factors -- "potential confounders" or factors other than keyboard use which may have contributed to plaintiffs' CTS -- Bleeker opined that plaintiffs' occupational use of keyboard equipment "was the cause of the development of [their] carpal tunnel syndrome." D.I. 311, Ex. A at 65. While the Court acknowledges that Dr. Bleeker did not account for every single possible potential confounder, it nonetheless recognizes the reliability of her conclusions.

n37 Plaintiffs maintain that having eliciting their social and occupational histories, Bleeker was thus fully aware of both the nature and extent of plaintiffs' exposure to defendant's products, and of any other factors which might be medically relevant to a determination of causation in their cases. D.I. 322.

In sum, this Court finds that the respective methodologies in question for general and specific causation have been subject to peer review and this consideration favors the admission of the proffered [*109] testimony.

(iii) Is There a Known or Potential Rate of Error?

The rate of error in Dr. Bleeker's methodology is directly related to the rate of error of those studies upon which her general causation conclusion rests -- i.e., such as the reported results of Dr. Laura Punnett's review of the relevant literature on health outcome and keyboard use. With respect to Dr. Bleeker's consideration of Dr. Punnett's Report, as well as the studies relied upon by Dr. Punnett, this Court has already determined that there were good grounds for relying on such works. Ergo, the rate of error in these studies cannot be so significant thereby rendering invalid a conclusion with respect to general causation. However, the known or potential rate of error with respect to any of the other studies to which Dr. Bleeker broadly referred and relied upon in reaching her conclusion has not been posited. As such, this factor balances only slightly in favor of the admission of the proffered testimony.

(iv) Were There Standards Controlling the Technique's Operation?

Dr. Bleeker's underlying methodology regarding general causation relies substantially upon that utilized in Dr. Punnett's Report. And as [*110] previously noted, the Court has already determined that there were good grounds for relying upon the Report and the validity of the studies contained therein. As such, this component will weigh in favor of the proffered testimony.

(v) Is the Methodology Generally Accepted?

As the Court has noted in its analysis of previous factors, Dr. Bleeker's methodology applied in reaching her conclusion is substantially dependent upon the validity of that of Dr. Punnett's utilized in reaching her Report results, for each individual factor of the Daubert/Paoli II analysis. And as under the other factors, the Court holds that the methodology at issue is a standard and generally accepted epidemiological methodology. Thus, this element favors the admission of the proffered testimony.

(vi) Is There a Relationship Between the Technique and Other Methods Established to be Reliable?

The Court's previous comments address this factor. While a broader base of literature and a more defined, delineated methodology with regard to general causation would have been preferred, Bleeker's primary reliance on Punnett's Report nonetheless supports that the doctor's methodology closely resembles established [*111] and reliable methods. Accordingly, this factor will weigh in favor of the admission of her testimony.

(vii) Are the Qualifications of the Expert Based Upon the Methodology Appropriate?

Defendant does not challenge Dr. Bleeker's qualifications for proffering a general causation opinion. With regard to specific causation, however, defendant points out that Bleeker is not a medical expert on hand disorders. While this may indeed be true, the Court is persuaded that Bleeker's medical training and extensive experience in the medical area now in issue render her qualified to speak on the matter of specific causation in this case. This factor therefore weighs in favor of the admissibility of the proffered testimony.

(viii) Non-Judicial Uses

The Court's prior criticism that Dr. Bleeker was a certain degree vague with regard to specifically identifying the scientific literature upon which she based her general causation conclusion, with the marked exception of Dr. Punnett's study, still stands. However, there is no doubt that the methodology utilized by Dr. Punnett, and adopted by Dr. Bleeker, has been used on a regular basis in non-judicial settings within the field of epidemiology. [*112] The same routine use certainly holds true with regard to the methodology applied by Dr. Bleeker in her specific causation determination. Thus, this factor will also weigh in favor of the proffered testimony.

(x) Conclusion

Upon consideration of the aforementioned factors, this Court finds that the Daubert/Paoli II analysis weighs in favor of admitting Dr. Bleeker's proffered testimony on general causation.

(2) Fit

*Fed. R. Evid. 702*'s third requirement -- that the evidence is relevant or "fits" under the facts of the case -- also must be satisfied before an expert's proffered testimony may meet the Daubert test.

In the case at bar, Dr. Bleeker's testimony has been offered for the proposition that repeated keyboard use can cause such musculoskeletal disorders as carpal tunnel syndrome. In support of this assertion, Bleeker relies substantially upon the Punnett Report of epidemiological studies on this subject matter. Accordingly, this Court finds that Bleeker's testimony regarding general causation is admissible, where there is a "connection between the scientific research or test result to be presented, and particular disputed factual issues in this case." *Velasquez,* [*113] *64 F.3d at 850* (quoting *Downing, 753 F.2d at 1237*)

(3) Conclusion

Based on the foregoing analysis, the Court recommends that Dr. Bleeker's testimony on general causation be admitted.

(b) Specific Causation

With regard to the issue of specific causation, IBM states that Bleeker's opinion that plaintiffs must have developed CTS from typing because of the "temporal" relationship between the use of keyboards and the development of such injuries -- derived from the history given by plaintiffs themselves -- is neither supported by the facts of this case nor by recognized scientific studies. D.I. 334 at 14. In particular, defendant asserts the following criticisms regarding Bleeker's qualifications and the formation of her causation conclusions: (1) Bleeker's explanation of the relationship of the physiology of plaintiffs' CTS to the use of a computer keyboard and why CTS must have been caused by plaintiffs' typing is not credible, where she is unable to cite to one scientifically verifiable study which supports her conclusions, nor can she state that her proffered explanation applies in fact to plaintiffs; (2) further, Bleeker is not a hand surgeon, and contradictory reports [*114] by plaintiffs' own hand surgeons, Drs. Boulos and Raisis, indicate that (i) no studies (to Raisis' knowledge) relate CTS to typing, (ii) there are many other factors which contribute to and cause CTS, including "activities of daily living," and (iii) even if typing is one of the causes of CTS, the amount of typing and posture at a keyboard would not correlate directly to the development of CTS; (3) the doctor never questioned the plaintiffs about their typing technique or examined the particular keyboards or workstations used by plaintiffs, nor does she now specifically address the IBM keyboards at issue; (4) Bleeker is able only to opine that there is a "temporal" relationship between plaintiffs' typing and their development of CTS, a degree of association which even plaintiffs' expert epidemiologist Pun-

1997 U.S. Dist. LEXIS 8016, *

nett recognizes is insufficient to conclude the existence of a cause and effect relationship; and (5) Bleeker is unable to satisfactorily explain why plaintiffs continue to suffer from CTS symptoms even after CTS release surgery and the discontinuation or curtailment of their typing, eventually conceding that "activities of daily living" could be responsible for Bowers and Allen's [*115] current symptoms. D.I. 309 at 20-22, D.I. 334 at 13-14.

Defendant further argues that Bleeker's methodology is unreliable where her conclusions are based upon incomplete case histories of the plaintiffs. To wit, Bleeker was unaware that: (1) Allen had been in an automobile accident and had fallen and sprained her wrist; (2) Bowers also was involved in a car accident; n38 and (3) Bowers worked on other cash registers at Strawbridge's and J.C. Penneys, and, significantly, was using a cash register of unknown origin at Acme at the same time she was working on IBM machines. D.I. 334 at 14.

> n38 In her *in limine* testimony, Bleeker commented that she had, in fact, noted during her first examination of Allen that the plaintiff had been involved in two motor vehicle accidents in 1989 and 1993, which predated the onset of her CTS symptoms and eliminated them as a cause. D.I. 353 at 19-21.

Plaintiffs maintain that Bleeker is eminently qualified to render expert testimony regarding specific causation and applied a reliable, [*116] medically-accepted methodology in her conduct of that analysis. D.I. 322 at 25-29. Specifically, Bleeker conducted physical examinations of the plaintiffs, took their occupational, social and medical histories, n39 reviewed their medical records, and conducted the conventional clinical tests and measures appropriate to the diagnosis (such as Phalen's, Finkelstein, Tinel's, nerve conduction studies and examined an MRI of the affected extremities). Only upon evaluation of the aforementioned factors, including the reasoned exclusion of nonoccupational factors -- "potential confounders" or contributing factors to the development of CTS unrelated to keyboard use -- did Bleeker opine that plaintiffs' occupational use of keyboard equipment caused their development of carpal tunnel syndrome. Id.

> n39 As noted previously, plaintiffs maintain that having eliciting their social and occupational histories, Bleeker was thus fully aware of both the nature and extent of plaintiffs' exposure to defendant's products, and of any other factors which

might be medically relevant to a determination of causation in their cases. D.I. 322.

[*117]

As for defendant's contention that plaintiffs' own hand surgeons Raisis and Boulos refute Bleeker's findings, plaintiffs characterize the charge as "advancing specious and deceptive claims." Specifically, plaintiffs note that neither surgeon offered any opinion or finding about the cause of plaintiffs' injuries. Rather, "responding to the entirely leading questions of defense counsel, Dr. Boulos prosaically and generally agreed that various factors, including typing activities, could 'contribute' to the development of carpal tunnel syndrome." In her analysis, Bleeker considered and eliminated any such "confounding factors." Moreover, plaintiffs maintain that, as a legal matter, the existence of other such contributing agents to plaintiffs' upper extremity injuries does not negate defendant's liability for its own misconduct to the extent thus was similarly a contributing factor. D.I. 322 at 28, n.13.

With respect to Raisis' comments that he was unaware of specific studies demonstrating the causal connection between typing and the development of CTS, plaintiffs emphasize Raisis' further remarks that it was his understanding that this connection was well accepted in "courses and personal [*118] communications with other physicians." n40 Finally, even if defendant is accurate in his assertion that these physicians actually support IBM's contentions on the issue, the conflicting testimony in no way supports exclusion of Bleeker's testimony under a Daubert admissibility motion. D.I. 322 at 28-229, n.13.

> n40 With regard to this issue of "general" causation, Bleeker also stated in deposition testimony that the causal link between keyboard use and CTS is "clearly accepted" among medical professionals in the area of occupational medicine. D.I. 330, Ex. 65 at 85-87. The doctor further addressed the role of keyboard design, stating that "keyboard designs . . . have adversely affected the health of . . . users" (Id. at 276), with specific criticism directed at such design factors as (1) "the amount of force that is required to depress" the keys (Id. at 276); (2) "how the keyboard is actually angled," placing the hands in "ulnar deviation" (Id. at 277); (3) the overloading of tasks on a single hand (Id. at 276); and (4) the lack of instructions regarding "how one is to use the keyboard." Id. at 277.

[*119]

Defendant's argument that Bleeker fails to explain why plaintiffs continue to experience symptoms of CTS even after surgery is likewise unfounded, according to plaintiffs. Bleeker's deposition testimony explained that, with respect to Allen, "as the healing process goes on, . . . the canal . . . is not allowing her to have enough space in there," D.I. 330, Ex. 65 at 167, 174, and "the way the transverse carpal ligament healed following surgery, that might have made . . . the canal slightly smaller." Id. at 317. Accordingly, Bleeker concluded that "the only reason she is continuing to suffer carpal tunnel syndrome is because of the original typing." Id. at 324. The doctor further noted that Allen "returned to typing four weeks after surgery and Mrs. Bowers did not return to work until a year after surgery." Id. at 190. As for Bowers' continuing symptomatology, Bleeker commented that "she did have improvement of her symptoms following surgery," but that there was cause for concern that "she was returning to the same job with no ergonomic modifications." Id. at 212-213. The doctor also stated that "one possibility which we do see is re-entrapment of scar tissue only because [*120] [Bowers] did have good relief of her symptoms when the pressure was relieved immediately following surgery" (Id. at 214), but following the surgery "we have a closed canal again and you are just now returning that person back to the same job which produced the condition initially, [creating] a very high chance of the individual developing the problem again." Id. at 352.

Plaintiffs' position is of merit. The Third Circuit has found that "most of the Daubert factors -- testability, general acceptance, peer review, and degree of production of errors, are of only limited help in assessing whether the methodology [of a physician] is reliable (i.e., scientifically valid)." *Paoli II, 35 F.3d at 758.* Instead, courts must consider whether:

> either (1) [the doctor] engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes and the doctor offered no good explanation as to why his or her conclusion remained reliable, or (2) the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions and [the doctor] offered no reasonable explanation as to why he or she still believes that [*121] the defendants' actions were a substantial factor in bringing about that illness.

*Id. at 760.*

In the case at bar, while the Court finds that although Dr. Bleeker did not eliminate every single conceivable confounding factor, her opinion was nonetheless based upon a sufficient number of diagnostic techniques to be deemed reliable. To wit, prior to rendering her opinion on each plaintiff, Dr. Bleeker: (1) conducted physical examinations of the plaintiffs; (2) recorded their medical histories and reviewed their medical records; (3) conducted the conventional clinical tests and measures appropriate to the diagnosis (such as Phalen's, Finkelstein, Tinel's, nerve conduction studies and review of magnetic resonance imaging of the affected extremities); (4) took their occupational and social histories; and (5) considered alternative causes. D.I. 363 at 11-26. Moreover, as plaintiffs correctly note, the Doctor did address the issue of why plaintiffs continue to experience CTS symptoms. Her testimony confirms that the use of the keyboard was a factor in the recurrence of the CTS symptoms.

As for defendant's alternative criticisms regarding other physicians' opinions about the causation [*122] of plaintiffs' CTS problems, specifically, the general association (or lack thereof) between CTS and keyboard use and other contributing factors, this Court finds that any such analyses go to the weight to which the testimony is entitled. Accordingly, this Court recommends defendant's motion *in limine* to exclude the specific causation testimony of Dr. Margit Bleeker be denied.

### D. Dr. Robert Cunitz

Dr. Cunitz ("Cunitz") is a human factors psychologist "specializing in the area of the safety of the interaction of people with products as they are used in the real world." D.I. 310, Ex. A-161. In other words, he is a "warnings" expert. According to Cunitz's report on warning requirements for keyboard and computer use, specifically prepared for this litigation, "warnings of the danger of various musculo-skeletal injuries were necessary so that equipment purchasers, employers, supervisors and users could become alerted to and knowledgeable with respect to the range of known and suspected risks associated with intensive keyboard use." D.I. 310, Ex. A-164. Furthermore, "the keyboard and data entry products involved in this litigation were defective in the absence of the necessary [*123] warnings . . . . [and] the products involved were unreasonably dangerous because of the defects described above which could have and should have been corrected." D.I. 310, Ex. A-164.

Plaintiffs assert that Cunitz satisfies the criteria to proffer expert testimony, as demonstrated by his professional credentials, "fully informed and reliable methodology," and past acceptance by other courts as a "warnings" expert qualified to testify on the subject. D.I. 322 at 23-24. Defendant maintains that Cunitz's testimony

should be excluded where Cunitz: (1) is not qualified to testify about the alleged causal relationship between typing on any keyboard and the development of physical injuries such as CTS; (2) fails to identify any alleged defect in the design of the keyboards used by plaintiffs; and (3) is unable to state with any specificity that a particular warning would have prevented the alleged injuries suffered by plaintiffs, instead basing his conclusions on "unsupported speculation." D.I. 309 at 20-25.

In its determination of whether a witness may be considered as an expert, this Court must compare the "area in which the witness has superior knowledge, skill, experience, or education [*124] with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990)* (quoting *Gladhill v. General Motors Corp., 743 F.2d 1049, 1052 (4th Cir. 1984))*. Moreover, while an "expert may give his opinion on a particular matter within the scope of his expertise, that opinion must be based on facts." *Randolph v. Laeisz, 896 F.2d 964, 967-68 (5th Cir. 1990)*

Characterizing his "assignment" from plaintiffs as an analysis "of a general nature without emphasis on any one manufacturer or supplier or any particular claimant," and his report as "applicable to all computer and data entry keyboard situations," Cunitz opines that appropriate warnings would have reduced or eliminated the dangers of musculoskeletal injuries experienced by keyboard users. D.I. 310, Ex. A-163-65. The psychologist further states that responsibility for provision of such warnings lay with the manufacturers and suppliers of the computer equipment, and that keyboard and data entry products were defective and unreasonably dangerous instruments absent the cautionary notice. D.I. 310, Ex. A-164.

During his *in limine* testimony, Cunitz outlined the traditional methodology [*125] applied by human factors specialists when conducting a risk/safety analysis on a man-machine interface. According to Cunitz, the first step, a task analysis, focuses on understanding how a person interacts with a given product. Cunitz *In Limine* Hearing, D.I. 349 at 7. Specifically, a task analysis identifies the product and its essential features, as well as the process of how the person interacts and deals with the product. Thereafter, examination of the associated safety component is conducted through such hindsight techniques as surveying the product's prior incident, injury, accident and complaint information. D.I. 349 at 7. Additionally, foresight techniques such as failure mode, effect analyses and faulty analyses applied by systems safety professionals on the product are considered. D.I. 349 at 8.

Cunitz also stated that a common concern for human factors specialists is the issue of warnings, resulting from hazard, risk and danger analyses where the hazardous

("harmful") features of a product are identified, as well as the manner in which people may be exposed to those hazards. D.I. 349 at 8. The goal is to determine the risk and type of injury possible from a person's [*126] foreseeable use of a particular product, and the intervention (i.e., warnings and/or instructions) required to avoid such harm. Where a human factors specialist is not an expert in all areas of harm, the appropriate expert would be consulted to assist in the aforementioned analysis. For example, if the product at issue is of a toxological nature, Cunitz would consult with a toxologist. D.I. 349 at 8-9. With respect to the general issue of warnings and the conduct of a risk/safety analysis, there are a number of long-accepted reference articles from authoritative sources, such as the National Association of Manufacturers, the National Safety Council, the American Psychological Association and the American National Standards Institute. D.I. 349 at 10-12.

The provision of warnings serves three distinct purposes. The first purpose involves the notion of "informed consent;" that a warning allows a person to *knowingly* assume or avoid a risk. D.I. 349 at 16. The second purpose for warnings is as a safety device or behavioral guard. D.I. 349 at 16-17. Finally, warnings serve as reminders to people that they are about to encounter a dangerous situation. D.I. 349 at 17. While all warnings [*127] share a common thread, they are naturally adapted for effective communication to the population at issue, which may require consideration of cultural differences. During an assessment of whether a warning was merited in the instance of an individual's injury from product use, i.e., as during a forensic investigation, a human factors specialist generally does not directly interview the injured party, instead usually relying on the party's sworn deposition testimony or the like. D.I. 349 at 23. Such an approach is practiced because human factors specialists do not have substantial interview training and skills, and also because it is especially difficult to establish how a specific person who has changed as a result of his injury might have previously acted in response to a particular situation. D.I. 349 at 12. Rather, predictions are more readily available for what groups of individuals in similar circumstances are likely to do in response to warnings. As such, Cunitz testified that a direct interview is highly unlikely to elicit any significant information not already provided through sworn deposition testimony. D.I. 349 at 24-25.

With regard to the case at bar, Cunitz conducted a [*128] general human factors task analysis to assess the need for and adequacy of warnings with respect to musculoskeletal injuries associated with the use of the computer and other data entry keyboards. To this end, he considered the nature of the equipment and the keyboard tasks involved; however, he did not examine the actual

workstations. Nor did he consult with outside experts or examine the plaintiffs' respective deposition testimony. Instead, Cunitz relied on testimony from the plaintiffs' medical and ergonomic experts, although he noted that he also was provided with a substantial amount of research information in the medical and ergonomics literature. D.I. 349 at 30-34.

Significantly, while generally familiar with the notion of an association between musculoskeletal injuries and keyboard use, Cunitz freely admits that his general conclusions regarding the unspecified computer keyboards, musculoskeletal disorders and the necessity of warnings n41 are premised upon a series of assumptions, whose validation presumably would be provided by plaintiffs' other expert witnesses. D.I. 310, Ex. A-162. Cunitz's assumptions include, but are not limited to, that:

> . . . the danger [of [*129] musculoskeletal injuries from keyboard use] can be reduced or eliminated if one or more of the following interventions are accomplished: (a) early identification and recognition of symptoms, (b) appropriate medical treatment, (c) changes to furniture, (d) modification of keyboard and monitor placement, (e) the use of rest breaks, exercise breaks, and other means to interrupt the continuous flow of the work, and (f) training in keyboarding techniques such as hand, wrist and arm position and maintenance of proper posture.

D.I. 349 at 57.

* * *

> . . . that the claimants involved in the litigation will have been diagnosed as having musculoskeletal injuries associated with computer and data entry equipment.

D.I. 310, Ex. A-162-63.

> n41 In his assessment of whether warnings were merited, Cunitz applied a "reasonable suspicion of harm standard," which, while his own wording, was argued by the human factors psychologist as being entirely consistent with the threshold standard widely accepted in the human factors field. D.I. 349 at 38.

[*130]

Defendant's position regarding Cunitz's testimony is compelling. While Bleeker, plaintiffs' medical causation expert, may be deemed qualified to testify about the alleged *temporal* association between keyboard use and CTS, this testimony cannot bridge the quantum leap which Cunitz's assumptions mandate. Cunitz never met the plaintiffs in the case at bar, nor did he ever independently examine their workstations or keyboards at issue. D.I. 310, Ex. A-121. He further concedes that he is not addressing any alleged defect in the design of the keyboards used by plaintiffs and, significantly, agrees that he is not qualified to express any opinion with regard to the alleged causal association between typing on any keyboard and the development of CTS or any other physical injury. D.I. 310, Ex A-12-22, 131, 141-42. Moreover, Cunitz fails to identify specific warnings which would address his concerns about the keyboards, stating in his deposition that "that's well beyond anything I would ever be asked to do." D.I. 310, Ex. A-122. And he does not attest that any such warning would have prevented the alleged injuries suffered by plaintiffs, as evidenced by the following colloquy during his [*131] deposition:

> Q: Well, are you assuming or do you know that carpal tunnel syndrome can be prevented if the user warnings that you would regard as appropriate?
>
> A: I have assumed in my third assumption that they [sic] were things to tell people that would make a difference.

D.I. 310, Ex. A-136.

The Schneck court addressed a very similar proffer of testimony by a "warnings" expert, with the same dearth of supporting evidence. In Schneck, "warnings" expert Dr. Samuel Glucksberg ("Glucksberg") submitted a report "in which he stated that 'adequate and timely warnings and instructions on the safe use of keyboards to users and to supervisors would significantly reduce the risk of repetitive stress injuries in the work place.'" Schneck Op. at 44. In excluding Glucksberg as an expert witness, the Schneck court reasoned:

> In the present matter, Dr. Glucksberg suggests that warnings are necessary to provide product users with knowledge that would avoid or minimize the risk of injury. *See Glucksberg* Report at 4. He states that "users should be specifically warned about those [design] deficiencies and the risk that they pose for repetitive

1997 U.S. Dist. LEXIS 8016, *

stress injuries." [*132] *Id* --However, he provides no foundation for the premise that there are "design deficiencies" that pose a risk of injury. Instead, he simply assumes that is so. Moreover, whether users should be warned is a legal issue. Dr. Glucksberg also opines that "adequate warnings [and] instructions . . . can reduce the incidence of repetitive stress injuries to people at risk." *Id.* At 5. This is a medical issue about which he is unqualified to render an opinion. Such an opinion should be given by a medical causation expert, not a psychologist. His opinion assumes there is, in fact, some evidence that has been shown to reduce this alleged risk; however, there is no evidence presented by Dr. Glucksberg to support this assumption. Dr. Glucksberg continues by stating that warnings should be given to "specify the nature and extent of the potential injuries, namely repetitive stress injuries." *Id.* This begs the question of whether there is evidence of a danger posed by the IBM machines to require such a warning.

Dr. Glucksberg simply assumes that there is scientific evidence of a danger posed by the product giving rise to a duty to warn and that effective remedial measures exist. It [*133] is undisputed that IBM did not provide plaintiff [sic] with the kind of warnings plaintiffs claim they should have been given. This is not a case where the adequacy of a particular warning is at issue. Rather, the issue is whether the risk of harm even exists to necessitate a warning . . . Thus, IBM's motion to exclude Dr. Glucksberg's testimony *in limine* is granted.

Schneck Op. at 44-45. See also *Dennis, 927 F. Supp. at 159* (excluding Dr. Glucksberg as an expert on warnings)

Schneck thus denied the proffer of Glucksberg's expert testimony based on the same glaring deficiencies in supporting evidence that this Court now faces with regard to Cunitz. In light of these circumstances, and where it is well recognized that an expert opinion must be based on facts, rather than premised on unsupported assumptions and speculation, the Court recommends that Cunitz's testimony be excluded in its entirety n42

n42 Plaintiffs and defendant submit contradictory decisions from other jurisdictions admitting and excluding, respectively, Cunitz's testimony as a "warnings" expert. While the Court has reviewed the opinions and the reasoning contained therein, which in some instances follows the rationale espoused by this Court, it recognizes that the opinions cited do not serve as controlling case law.

[*134]

### E. Extraneous Arguments Regarding the Admissibility of Plaintiffs' Expert Testimony

Plaintiffs submit two further arguments beyond the Daubert analysis regarding the admissibility of their experts' testimony. Specifically, they contend that: (1) where a Minnesota state court reviewing a similar RSI action allowed plaintiffs' experts to testify upon analysis under the more rigorous Frye standard, the testimony should necessarily be admitted in the case at bar; and (2) plaintiffs' expert testimony is subject to judicial notice by the Court. n43 D.I. 322 at 36-41. Defendant refutes these contentions, citing the Schneck opinion, which squarely rejected the plaintiff's same evidentiary arguments. D.I. 334.

n43 The Schneck court also rejected plaintiffs' arguments that the reliability of a physician's testimony based on differential diagnosis, the testimony of their design defect expert and the issue of causation are subject to judicial notice and the court therefore need not perform the Daubert analysis. See Schneck Op. at 50-52.

[*135]

With regard to the plaintiffs' success under the Frye standard applied by the aforementioned Minnesota state court in Urbanski v. IBM, this Court concurs with Schneck that:

while the Urbanski court found that the proffered testimony "may meet [Frye's] requirements of reliability and trustworthiness," Urbanski slip op. at 9 (citations omitted), such findings are by no means persuasive as to whether the experts in this case pass muster under Daubert/Paoli II. Plaintiffs' suggestion that this Court is somehow bound by the Minnesota state court decision in Urbanski is wholly without merit.

Schneck Op. at 47-48.

As for plaintiffs' alternative argument that the expert testimony is subject to judicial notice, the Court finds this novel argument unsupported by case law and therefore rejects same. As the Schneck court so aptly stated:

> plaintiffs argue that "the scientific techniques, implied in this case, epidemiology, differential medical diagnosis, and product design evaluations, are based on 'well established propositions,' and 'are subject to judicial notice.'" Plaintiffs have not, and indeed can not (sic), come forward with [*136] any authority to support this novel argument. In fact, in each case cited by plaintiffs, the proffered evidence was subjected to some type of judicial scrutiny and was not received into evidence without the requirements of formal proof. Plaintiffs' unsubstantiated argument, therefore, fails to defeat IBM's motion for summary judgment.

Schneck Op. at 50 (citations omitted).

### III. Do IBM's Keyboards Suffer from Defective Design?

Plaintiffs argue that the evidence clearly demonstrates the minimal requisite of the existence of some defect in defendant's product taken as a whole, regardless of whether their proposed liability experts are allowed to testify. According to Bowers and Allen, with respect to a question of design defect, a plaintiff need not even identify with specificity any particular feature or component of the product that is defective. D.I. 322 at 33. See generally *Towe v. Justis Brothers, Inc., 290 A.2d 657, 658 (Del.Super. 1972); Voss v. Black & Decker Inc., 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983).*

Defendant counters that the record provides no support for plaintiffs' allegations of a defective keyboard design by IBM, and that [*137] plaintiffs' reliance on Towe for the proposition that they need only establish a defect in the product "taken as a whole" is misplaced. Specifically, Towe merely states that on a motion to dismiss, as opposed to summary judgment as the case at bar, a plaintiff must only show some evidence of a defect, a minimum proffer plaintiffs have failed to satisfy." n44 D.I. 334 at 16, n.29.

n44 Plaintiffs' reliance upon Towe is completely unsubstantiated. As previously noted in IBM's argument, Towe addressed a motion to dismiss a breach of warranty claim under Super. Ct. Civ. R. 12(b)(6), which is similar to *Fed. R. Civ. P. 12(b)(6)*, wherein the Superior Court interpreted the application of its rule finding that a complaint will only be dismissed for failure to state a claim if "under no set of facts which could be proven to support the claim asserted would plaintiff be entitled to relief." *Towe, 290 A.2d at 658.* This interpretation is similar to this Circuit's application of Rule 12(b)(6). *Conley v. Gibson, 355 U.S. 41, 45-6, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957), Colburn v. Upper Darby Twp., 838 F.2d 663, 665-66 (3rd Cir. 1988)* quoting *Estate of Bailey by Oare v. County of York, 768 F.2d 503, 506 (3rd Cir. 1985).* Although the plaintiffs in Towe had not spelled out "all of the details of their cause of action," their complaint would not be dismissed at the initial stages of the action because it gave "general notice as to the nature of the claim asserted against defendant." Id. This is not the standard for Rule 56 which requires a showing of a genuine issue of material fact, as discussed at pp. 7-8 herein.

[*138]

The Court agrees with defendant. It is well recognized that in a negligence case under Delaware law, a plaintiff must establish a duty, breach of that duty, proximate cause and damages. See *Hubscher v. Pantzer Management Co., 1995 U.S. Dist. LEXIS 13921*, C.A. No. 93-244-SLR, slip op. at 4 (D.Del. Aug. 25, 1995); *Croom v. Pressley, 1994 Del. Super. LEXIS 385*, C.A. No. 93C-01-026, slip op. at 4 (Del.Super. Jul. 29, 1994). These elements must be established by a plaintiff in both "defective design" and "duty to warn" claims in a product liability action. *Macey v. AAA-1 Pool Builders & Serv. Co., 1993 Del. Super. LEXIS 152*, C.A. No. 88C-JN-10 (Del.Super. Apr. 30, 1993). Proof that a product is defective necessitates more than merely showing that the product brought about an injury.

While the potential presence of a defect in IBM keyboards is a matter of first impression in this Court, the New Jersey court in Schneck, and more recently in *Reiff v. Convergent Technologies, 957 F. Supp. 573 (D.N.J. 1997)*, considered whether the plaintiffs had met their burden of establishing a design defect in computer keyboards. Schneck Op. at 3; Reiff, Op. at 9-14. Significantly, the respective New Jersey and Delaware laws applicable to product [*139] design defects are remarkably similar. To wit, under New Jersey law, in order for a plaintiff to establish a design defect, he must prove

that the product was not "reasonably fit, suitable or safe for its intended purpose because it . . . was designed in a defective manner." Schneck at 3. A "risk-utility analysis" must be applied, with the result that a manufacturer is held liable only "if the danger posed by the product outweighs the benefits of the way the product was designed and marketed." Schneck at 4. In other words, to establish a product defect under New Jersey law, proof of either a design defect, a manufacturing defect or an inadequate warning defect, which renders the product unfit, unsuitable or unsafe for its intended or prescribed purpose must be established. Reiff, at 9. Similarly, in Delaware, a product is defective in design where it is not reasonably fit for its intended purpose and where the design has created a risk of harm which is so probable that an ordinary prudent person, acting as the product's manufacturer, would pursue a different available design to substantially lessen the probability of harm. *Dillon v. General Motors Corp*, *315 A.2d 732*, [*140] *736 (Del.Super. 1974)*, aff'd, *367 A.2d 1020 (Del.Supr. 1976)*; *Nacci v. Volkswagen of Am. Inc*, *325 A.2d 617, 620 (Del.Super. 1974)*

The Schneck court found that plaintiffs had not "stated how . . . the IBM machines are defective." n45 Particular emphasis was placed on Kroemer's failure to identify a defect present in the keyboards used by plaintiffs:

> While Dr. Kroemer discusses design defects in "conventional keyboards," his testimony fails to include any reference to or discussion of specific design defects in the IBM machines. Rather, Dr. Kroemer discusses the three general "defects" of "the conventional keyboard." According to Dr. Kroemer, the defects of the conventional keyboard are: too many keys; unergonomic arrangement of keys; and insufficient space to rest wrists. Id. However, all three alleged defects are sufficiently generic that Dr. Kroemer apparently feels he can testify about them without having ever examined the IBM machines used by Mrs. Schneck, inspected the workstation at which she used the IBM machines, or observed her keying techniques.

Schneck at 11.

Similarly, the court in Reiff determined no bridge was provided by [*141] plaintiffs expert, Dr. Hedges, between noncompliance with industry or design specifications and liability under New Jersey product liability law stating that "products that fail to meet these [ANSI] or other such standards may well be defective in the engineering sense, but are not necessarily defective in the products liability sense." Reiff at 11.

> n45 In a number of recent decisions, this jurisdiction and others have rejected similar design defect claims. To wit, in Finley v. NCR Corp., the court granted summary judgment to defendant on plaintiffs' design defect claim, where plaintiffs' experts failed to establish a verifiable scientific link between keyboard use and *CTS. 964 F. Supp. 882 (D.N.J. 1996)*. The Fourth Circuit ruled likewise in Mastalski v. IBM Corp., where it upheld the district court's grant of summary judgment in favor of IBM against plaintiff's claim of injury due to defective design of her IBM keyboard. *1992 U.S. App. LEXIS 20730, *21, 1992 WL 207789*, at *6 (4th Cir. 1992). Finding that plaintiff's expert had failed to establish any scientifically verifiable link between keyboard use and plaintiff's injury, the Mastalski court concluded that "an injury resulting from a requirement to maintain long hours and a fast pace would be more akin to harm from the over consumption of an otherwise relatively safe and non-defective product, such as a tennis racquet." Id.

[*142]

Plaintiffs in the case sub judice likewise fail to identify any defect in the design of IBM keyboards, either generally or with particular regard to the actual keyboards used by Allen and Bowers. Assuming, arguendo, that *all* of plaintiffs' proffered liability experts were deemed satisfactory under Daubert/Paoli II to offer testimony, there is still no evidence that specifically identifies and addresses any alleged keyboard defects demonstrating that the keyboards in question were not fit for their intended purposes. Nor does the record suggest that the IBM products at issue failed to comport with the standards of a reasonably prudent manufacturer. n46 Significantly, the aforementioned experts, in particular Kroemer and Cunitz, did not even examine plaintiffs' keyboards, workstations, types of tasks performed or typing techniques. Although Kroemer's report of August 1995 (D.I. 352, Ex. 78) was admitted during the *in limine* hearing, it provides very limited information regarding QWERTY or conventional keyboard design. Upon review, the report addresses in general five "groups of concerns" regarding keyboard designs, which in essence fall within the broad categories [*143] addressed in Schneck. n47 Further, as noted by Kroemer during his *in limine* hearing in this case:

Keyboard use is, of course, a rather complex issue. One would have to probably observe persons operating keyboards.

* * *

That would require a -- an observation of a person or persons performing *one or several jobs*.

D.I. 359 at 161 (emphasis added).

Moreover, to evaluate the keyboard in question, measurements should be taken, in addition to a comparison with other similar keyboards. D.I. 359 at 164-165, 167-171. These measurements are necessary to compare the distance between key centers with standards, to know the space displacement characteristics of the keys, to determine the tilt or angle involved, to ascertain that the majority of the keys are at elbow height of the operator for comfort of use and if the potential operators are unknown, to determine adjustment angles as compared with various elbow heights. D.I. 359 at 168-170.

n46 Plaintiffs further fail to identify those applicable standards and IBM's alleged subsequent deviation therefrom.

n47 Those broad categories were too many keys, unergonomic arrangement of keys and insufficient space to rest wrists. Schneck at 11.

[*144]

Keyboard use, one of the five factors employed by Kroemer in his evaluation, requires the evaluator to not only visually observe the operator, but also to take certain measurements over a period of time, which include the extent and intensity involved in performing a particular task, the relationship and availability of rest breaks in completing the work, the number of strokes performed, and the actual activation of keys being applied by the operator in comparison to design values. D.I. 359 at 171. As a result, Kroemer's analysis of the presence of design defects and the relationship to the development of repetitive stress injuries in general require both observation of the operation and measurements of the keyboards in question, neither of which occurred in this case. D.I. 359, 158-159.

In addition, it is abundantly clear that keyboard use by the operator, including posture, positioning of the upper limbs and fingers, and stroke pressure applied play a significant role in the development of repetitive stress complaints and injuries, which are not related to the

function or design of the keyboard. D.I. 310, Ex. 21 at 116; D.I. 363 at 19-20, 52, 91-92, 94, 125-27.

While plaintiffs [*145] submit patent applications of alternative design keyboards to apparently suggest that there are more ergonomically appropriate alternatives in existence, plaintiffs' experts do not attest to the virtues of such designs. Further, there is no suggestion therein that the available alternatives would have prevented the injuries allegedly suffered by plaintiffs. D.I. 325, Ex. 32, 33, 34, 35. Indeed, plaintiffs' causality expert, Bleeker, admitted that "alternative" design keyboards were new, and that consequently there are no studies which reflect whether these designs would prevent or lessen incidents of CTS. D.I. 310, Ex. A-90 at 330-32. n48 Thus, the record simply does not support plaintiffs' claim of the existence of a defect in IBM's keyboards which allegedly caused the incurred CTS injuries, and that the risk of harm was so probable that a manufacturer should pursue an alternative, available design which would substantially lessen the probability of that harm. *Nacci, 325 A.2d at 620.* n49

n48 As can best be discerned from the record, Bleeker's comments would include the type of alternative keyboard designs and studies discussed by Kroemer. D.I. 359 at 150-152, 155.

[*146]

n49 As emphasized in Reiff, the existence of alternative designs, such as split-angle keyboards, alone without ergonomic or medical literature demonstrating such devices either reduce typing discomfort or the risk of developing musculoskeletal injuries, are insufficient to prove design defect. Reiff at 13-14.

## IV. Did Defendant Have, and Breach, a Legal Duty to Warn?

Plaintiffs purport that defendant knew or should have known about all potential dangers of its keyboards to users and foreseeable misusers -- as evidenced by IBM internal documents suggesting company recognition of the allegedly hazardous relationship between continuous, repetitive keyboard use and CTS, and had a legal duty to warn which steps must be taken to avoid *possible harm.* n50 See, e.g., *Graham v. Pittsburgh Coming Corp., 593 A.2d 567, 569 (Del. Super. 1990).* Where defendant failed to provide the appropriate warning, the company is liable for the injuries incurred by the plaintiffs. D.I. 322 at 33.

n50 Plaintiffs recite a litany of IBM internal memoranda and company-sponsored studies which examine and address the increased incidence of repetitive stress injury ("RSI") among keyboard operators. It is clear that plaintiffs view this evidence as "the smoking gun." D.I. 322 at 6-15. While the Court in no way shares this perception, as shall be elaborated upon forthwith, plaintiffs' proffers are highlighted. To wit: (1) a 1990 IBM publication discusses carpal tunnel syndrome and its potential relationship to keyboard work *and* workstation design. D.I. 323, Ex. 5; (2) in 1984, an IBM VDU Task Force reported on the increased incidence of RSI among Australian keyboard operators. D.I. 323, Ex. 6 and 7; (3) an IBM senior engineer associated "the CTD problem" to "keyboarding with VDT's" (D.I. 323, Ex. 10), and acknowledged that "repetitive motion trauma" puts IBM at risk for "increased [legal] exposure" as a result of "increased general awareness." D.I. 323, Ex.11; and (4) Richard S. Hirsch, Ph.D., a manager of IBM's Human Factors Engineering Department, appeared before nationwide legislative bodies in the 1980s, representing that the use of VDTs was absolutely safe and that IBM's own employees had many years of experience using VDTs with no resulting adverse health effects, although Hirsch was cognizant of the alleged connection between the reported ailments and keyboard engineering and design. D.I. 323, Ex. 14. Plaintiffs also argue that, in addition to what IBM actually knew about the relationship between VDTs/keyboard use and RSIs, IBM *should have known* about the general propensity of its computer keyboard products to cause such injuries as suffered by Allen and Bowers in light of the expert reports available on the subject and defendant's own internal experiences. Specifically: (1) recognized epidemiologist Dr. Stephen Zoloth had compiled a report establishing that medical and scientific literature dating back several decades contained numerous learned articles by respected authorities which discussed the severity of injuries resulting from keyboard use. D.I. 324, Ex. 21; and (2) IBM's former Director of Health, Dr. O.B. Dickerson, purportedly acknowledged significant numbers of upper tenosynovitis cases resulting from operation of the current [QWERTY] keyboard, which caused unnecessary tension on the hands, wrists and forearms and could be redesigned to reduce such medical symptoms. D.I. 324, Ex. 23. Finally, noted RSI authority Dr. Emil Pascarelli has testified that design flaws contributing to CTS-type injuries occur generally in all manner of QWERTY designed keyboards (such as those manufactured by IBM), and that RSI to a significant degree is entirely preventable if the keyboard user is *given appropriate warnings* regarding rest breaks, ergonomic workstation setup and typing technique. D.I. 324, Ex. 22.

[*147]

Defendant counters that it had no duty to warn because there is nothing inherently dangerous about its keyboards, and a manufacturer's legal duty to warn purchasers about a particular product arises only if there is an inherent danger in the product. *Betts v. Robertshaw Controls Co., 1992 Del. Super. LEXIS 528*, C.A. No. 89C-08-028, slip op. at 5 (Del. Super. Dec. 28, 1992). Courts overwhelmingly have held that keyboard manufacturers have no duty to warn, particularly where a plaintiff's use of a keyboard in a repetitive and rapid manner -- thus potentially resulting in symptoms associated with carpal tunnel syndrome -- is characteristic not of the keyboard, but of that plaintiff's work habits. See, e.g., *Finley v. NCR Corp., 964 F. Supp. 882*, slip. op. at 11-14 (D.N.J. 1996); *Doll v. Digital Equipment Corp., 1996 U.S. Dist. LEXIS 2754*, C.A. No. 93-CV-0359E(M), slip op. at 7-9 (W.D.N.Y. Mar. 1, 1996); Reiff at 14-17. Moreover, in order for a failure to warn claim to succeed, a plaintiff must also offer sufficient evidence indicating that the lack of an adequate warning was a proximate cause of the claimed injuries. Id. Where in this instance plaintiffs have failed to prove such proximate cause, relying on their [*148] warnings expert's "vague allegations that repetitive use of the product, or the positioning of the product being used, is the cause of their injuries," plaintiffs' failure to warn claim must be dismissed. D.I. 309 at 30-34.

Defendant's argument is persuasive. Delaware law pertaining to the duty of a manufacturer to warn purchasers of inherent dangers in its products follows the *Restatement (Second) of Torts § 388* (1965), which provides that a manufacturer's warning to a third person is required when it:

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Betts, slip op. at 4 (quoting *Restatement (Second) of Torts § 388* (1965)).

Delaware courts interpreting this provision have held that "the standard for determining the duty of a manufacturer to warn is that which a reasonable (or reasonably prudent) person engaged in that activity would have [*149] done, taking into consideration the pertinent circumstances at that time." n51 *Graham v. Pittsburgh Coming Corp., 593 A 2d 567, 571 (Del. Super. 1990)* Delaware courts have further held that a manufacturer is not required to warn a consumer about potential harm which is open and obvious to the user of the product. *Farm Family Mut. Ins. Co. v. Perdue, Inc., No. 416, 1990, 1992 Del. LEXIS 27* at *5 (Del.Supr. Jan. 2, 1992) ("Under Delaware law, the duty to warn extends only to those who can reasonably be assumed to be ignorant of the danger.").

> n51 Under Delaware law, the existence of a duty to warn is a question of law for the court. *Macey v. AAA-1 Pool Builders and Serv. Co., 1993 Del. Super. LEXIS 152,* C.A. No. 88-C-JN-10, slip op. at 5.

Moreover, "there is no duty to warn about the physical manipulation inherent in the use of certain objects which can in some persons and under some circumstances cause CTS." Finley, Civ. No. 92-5242, slip op. at 12 (citing *Creamer v. IBM Corp., 877 F.2d 54,* slip op. at 6-7 (3rd Cir. [*150] May 18, 1989)); see also Reiff at 14-15; Schneck at 58; Doll, C.A. No. 93-CV-0359E(M), slip op. at 8; *Hopkins v. NCR Corp., 1994 U.S. Dist. LEXIS 17273, 1994 WL 757510* at *9 (M.D.La. 1994), aff'd, *53 F.3d 1281 (5th Cir. 1995).* Therefore, the threshold issue for consideration in such a case is "whether plaintiffs have proffered sufficient evidence to establish that the alleged danger is not simply the repetitive motion required to use defendant's products. If plaintiffs cannot make such a showing, then their failure to warn claim must be dismissed as a matter of law because defendants would have no duty to warn against any such danger." Schneck at 58. See also *Griesenbeck v. American Tobacco Co., 897 F. Supp. 815, 820 n.3 (D.N.J. 1995)* ("Without a duty to warn, there cannot be any failure to warn.").

Thus, in Hopkins, the court dismissed the plaintiff's claim that the operation of a proof encoder n52 caused her to develop CTS, opining that there was no particular characteristic of the machine which directed the manner by which the plaintiff used the machine. *1994 WL 757510* at *9. Consequently, the defendant machine manufacturer could not be held liable for a failure to warn, as [*151] "the mere fact that plaintiff in this man-

ner had to perform rapid, repetitive manual tasks in order to operate the proof encoder, standing alone, can not (sic) give rise to a duty to warn that such activities could cause CTS." Id. Applying the analysis performed by the Creamer court, which dealt with the issue of CTS allegedly resulting from the use of a grocery checkout scanner, the Hopkins court recognized that repetitive motion "may indeed be the cause-in-fact of plaintiff's CTS," but significantly refused to determine it to be "the proximate cause of plaintiff's CTS," articulating that:

> Such a holding [that there was proximate cause] would necessitate a warning on any object that involves extended manual manipulation inherent in the ordinary use of the object. For example, sport equipment, computers, video games, remote controls, calculators, musical instruments, appliances, garden tools, writing utensils, kitchen utensils, workman's tools, and indeed, Creamer's exemplar milk cow, would all be deemed "unreasonably dangerous" products.

Id. See also Creamer, No. 89-1026, slip op. at 6-7.

> n52 A proof encoder is a device used by banks to encode information on checks. *Hopkins, 1994 WL 757510,* at *1.

[*152]

In fact, other courts addressing this issue have followed the aforementioned rationale, holding that there is no duty to warn the users of equipment where the alleged injury results simply from overuse of the product. To wit, the Doll court found no duty to warn about the alleged dangers associated with the use of the defendant's keyboard. C.A. No. 93-CV-0359E(M), slip op. at 8-9. According to the Doll court,

> The fact the plaintiff may have used the defendant's keyboard in a rapid and repetitive fashion is a characteristic not of the keyboard but of the plaintiff's work habits and, possibly, the requirements placed upon her by her employer. The defendant is not an insurer for such activity, or responsible for such. Hopkins, supra, at 19. Were it so, every carpenter would have a claim arising from every hammered thumb, golfers would spend more

time in litigation than on the links and pianists would strive to get to court rather than to Carnegie Hall.

Id. at 7. See also Finley, Civ. No. 92-5242, slip op. at 11 ("To declare that keyboards are not reasonably safe seems inappropriate in a society in which toys sold for the amusement of children are potentially [*153] more dangerous.").

This rationale was recently affirmed in Reiff wherein the district court noted "products whose use require physical activity often entail a risk that such use will cause harm," that harm is from the manner of use, rather than from the product itself. In explaining the concept of use versus the product itself by the analogy to a snow shovel, Judge Irenas commented "For the same reasons, the law does not and ought not require that computer keyboards contain warnings relating to a keyboard's use in a particular way, by a particular person with particular physical characteristics and work habits."

In the case at bar, plaintiffs offer no evidence to suggest that defendant bore a duty to warn about the dangers associated with its keyboard use under Delaware law, and then breached such duty. Plaintiffs merely set forth vague allegations that the repetitive use or their manner of use of the IBM keyboard, or the positioning of the keyboard while being used, resulted in injury. Indeed, when queried about what was injurious about the keyboards at issue, plaintiffs' warning expert, Dr. Robert Cunitz, responded that a number of factors totally unrelated to the keyboards [*154] themselves contributed to plaintiffs' medical problems:

Q: You're talking about a combination of the chair in which the user sits, the table or surface in (sic) which the equipment is placed, the location or angle of some of the equipment, the location of the screen, all those factors?

A: Right.

Q: Any other?

A: There are other factors that I -- that I know we left out, which is lighting.

D.I. 310, Ex. A-120-21.

Cunitz also testified:

A: . . . it's one thing to design a keyboard that by itself feels comfortable and easy to use. I think your clients [IBM] have probably done about as good a job doing that, at least in my professional experience, as a layperson, that they seem to do very well at that. So it's comfortable. At least so it seems.

D.I. 310, Ex. A-120. n53

n53 Further, according to Bleeker, when performing an ergonomic analysis, she considers posture, positioning of the upper body, including the extremities, back, shoulders and head, layout of the workstation, availability of break time versus continuous typing, amount of muscle force employed, other types of work activity, intensity, repetition, and other factors -- in determining the contribution to and the alleviation of upper extremity disorders, such as carpal tunnel syndrome. D.I. 353 at 15-19. As noted previously herein, such testimony is insufficient to prove the legal requirement that "the risk associated with the use of defendant's product is something more than the physical activity required to use it." Reiff at 16.

[*155]

Interestingly, neither Cunitz nor plaintiffs' other liability experts examined. or tested the IBM keyboards at issue to determine any possible defects. They also made no effort to quantify the number of keystrokes per period of time used which allegedly resulted in plaintiffs' injuries, or to observe plaintiffs' working at the IBM keyboards to support their conclusions about the ergonomics of plaintiffs' workstations or plaintiffs' posture, while typing. Given this unexplained circumstance, and in light of the aforementioned testimony by warnings expert Cunitz, who admittedly only *assumes* that a warning would have prevented the injuries, n54 the Court must conclude that plaintiffs' injuries resulted from the repetitive motion involved with typing on the IBM keyboards. As such, where this scenario is essentially no different than those presented in Schneck, Finley, Creamer, Reiff, Doll, and Hopkins, the Court is compelled to find similarly, that: (1) defendant's keyboards are not inherently dangerous instrumentalities, where the only "danger" associated with the keyboard use is the continuous repetitive motion and (2) that defendant consequently is under no duty to warn [*156] about the keyboard use, where Delaware law imposes no "warning" obligation regarding "the

physical manipulation inherent in the use of certain objects which can in some persons and under some circumstances cause CTS." Also see Schneck Op. at 63-64 (citing Creamer, slip. op. at 6-7).

> n54 And, in fact, none of plaintiffs' remaining experts can say, within a reasonable degree of medical certainty, that some undefined warning would have prevented the particular medical problems suffered by plaintiffs.

As a final comment, it again should be noted that under Delaware law, a defendant is not required to warn a consumer about potential harm which is open and obvious to the product's user. *Farm Family Mut. Ins., 1992 Del. LEXIS 27* at *5. The Finley court addressed this issue with regard to keyboard use and injury thusly: ". . . warning persons from using keyboards beyond a tolerable level of pain seems beside the point. Like most things that produce pain, it should be self-evident that a pain-producing [*157] activity is a threat to health." Finley, slip. op. at 11. See also Doll, slip. op. at 8 ("the defendant was not required to warn against the open or the obvious").

### V. Did the Use of Defendant's Keyboards Proximately Cause Plaintiffs' Injuries?

As previously discussed, in a negligence action or products liability claim, the plaintiff must prove all elements of the claim, including that of proximate causation. The establishment of proximate cause "requires that the plaintiff prove that but for the *tortious* conduct of the defendant, the injury which was suffered would not have occurred." Hubscher, slip op. at 4 (emphasis added). Plaintiffs maintain that the CTS symptoms incurred resulted from the use of defendant's allegedly *defectively designed* keyboard, as evidenced by their causation expert, Bleeker, who concluded causation from the strong temporal association between the plaintiffs' use of the keyboards in question and the onset of symptoms. However, as discussed in the preceding sections, before addressing causation, there must be a finding of a duty owed and a breach of that duty -- in other words, there must be evidence of defective design and a duty to [*158] warn. In light of this Court's previous findings of an absence of either defective design or duty to warn, the issue of proximate cause need not be addressed. n55

> n55 Parenthetically, the Court notes that Bleeker's testimony, although satisfying the Daubert/Paoli II test of admissibility may not meet the legal standard of proximate cause. For example, as noted previously herein, Bleeker's

testimony that plaintiffs' CTS developed from keyboard use primarily rests upon a temporal association between increased typing and development of their respective symptoms. Further, she recognizes a number of other factors that contribute to the development of CTS. D.I. 310, Ex. A-73 at 298; D.I. 353 at 15-19. While a temporal association is sufficient for accepted scientific methodology, reliability and fit under 702, it does not necessarily equate to proximate cause. Being a substantial factor may meet scientific methodology considerations but does not meet the "but for" requirement of proximate cause. *Culver v. Bennett, 588 A.2d 1094, 1096, 1098 (Del. Supr. 1991).*

[*159]

### VI. Related Issues

As highlighted previously herein, plaintiffs heavily emphasize defendant's knowledge of the alleged hazards of keyboard use, acquired from internal and external studies and internal worker's compensation claims for RSI injuries. D.I. 322 at 6-12. IBM does not disclaim its longstanding cognizance that repetitive use of keyboards may result in upper extremity fatigue and injury. n56 Indeed, the company actively sought such inquiry. Nor does IBM challenge plaintiffs' assertion that other keyboard manufacturers have provided instructions and warnings regarding keyboard use. D.I. 334 at 3-6. Rather, IBM claims that the documents cited by plaintiff are not dispositive evidence of design defects in the IBM keyboards at issue and a duty to warn on the part of IBM. D.I. 334 at 4.

> n56 As was pointed out by defendant and recalled by the Court, during at least one status/discovery conference, IBM represented a willingness to stipulate to such knowledge and information.

These documents cited and [*160] relied upon by plaintiffs will be discussed seriatim.

Exhibit 5.

This exhibit (D.I. 323) appears to be an article related to the safety reports of visual display terminals (VDTs) addressing a number of possible health concerns, including radiation exposure, vision, cumulative trauma, skin disorders, and other matters. Specifically, at pages 12 and 13, in a question and answer format, it discusses CTD, RSI and CTS. n57 Although this brief Q & A addresses keyboard use, it emphasizes positioning, posture, workplace design and proper set up. The article specifi-

cally states that "VDT keyboards, per se, do not cause work disorders [CTS]," but relates the development of such condition to any prolonged repetitive motion, noting that prevention may be accomplished through appropriate workstation design and body positioning. As evident from this article, there are numerous issues regarding CTDs and keyboard use. In fact, they are infinite as evidenced from the materials submitted in their case, in particular the various abstracts by Cunitz. Nothing in the exhibit identifies scientific evidence supporting a causal connection between the keyboard and carpel tunnel syndrome. At the most, [*161] the exhibit represents an effort to provide guidance on what a VDT user could do to be comfortable in the workplace. Therefore, the articles does not exhibit a causal relationship between keyboard use and carpal tunnel syndrome, and is irrelevant to the issues under consideration.

n57 CTD (cumulative trauma disorder), RSI (repetitive stress injury), and CTS (carpal tunnel syndrome).

Exhibits 6 and 7.

These two exhibits (D.I. 323) are essentially the same and are 1984 summaries discussing the Australian experience. They fail to establish a causal relationship between keyboard use and CTS. Further, the language cited by plaintiffs' counsel is followed by such qualifying comments:

The occurrence of the disease [tenosynovitis] is not universal, and individual susceptibility *may depend on many general health and environmental factors.*

D.I. 323, Ex. 6; Ex. 7 at 8 (emphasis added).

Further, these same exhibits were submitted in the Schneck case with that court noting that "the perception [*162] that workers were suffering injury due to keyboard operation ultimately proved to be false in Australia," relying upon an extensive study in the September 7, 1987 issue of *The Medical Journal of Australia.* Schneck at 56-57. Therefore, not only do these exhibits reference a multifacet condition arising as a result of a number of factors, the findings were subsequently determined to be inaccurate. Unidentified are any design defects or proof that keyboards are likely to be dangerous for the use for which they are supplied.

Exhibit 9.

This exhibit (D.I. 323) contains two internal memoranda regarding the issue of RSI in Japan. They discuss the Japanese Ministry's guidelines regarding VDT operation, IBM's response to those suggestions, and translation concerns. The isolated and incomplete quote lifted by plaintiffs from the memos does not constitute an admission that IBM Japan deliberately suppressed safety guidelines. The memoranda only concern VDT operations in Japan and the guidelines identified therein only address VDT use in general. No relationship is established between keyboard use and injury. Again, for the reasons discussed in Exhibits 6 and 7, this exhibit does [*163] not establish a design defect or a duty to warn, nor an admission of either.

Exhibit 8.

Within this exhibit (D.I. 323) is a lengthy discussion of the legal avenues available to a plaintiff under Australian law, but fails to even speculate as to the cause or causes of RSI. Nor does it articulate any legal obligation to warn IBM employees or others about VDT use under Australian law or any other country's law, including the states within the United States.

Exhibit 10.

Exhibit 10 (D.I. 323) involves a letter and series of memoranda related thereto in which an IBM employee attempted to obtain a grant from IBM to Ohio State University to determine the genesis of CTD and provide "technical parameters for change in workstation design, tools, methods and processes to combat CTD." The focus of the related memoranda and exhibits are on RSI type conditions occurring in supermarket employees using optical scanners. Plaintiffs' limited quote from this exhibit is taken completely out of context and provides no proof or admission of a design defect or duty to warn.

Exhibit 11.

The majority of this exhibit (D.I. 323) relates to the development of RSI in supermarket employees using [*164] optical scanners. Plaintiffs' minimal quote is again taken out of context and is clearly irrelevant to the issues herein. For the reasons expressed in relation to Exhibit 10, this does not show either defective design or an obligation to warn.

Exhibit 12.

These documents discuss IBM's funding of an ergonomics research program in the grocery industry. Contrary to plaintiffs' representations, rather than the quoted language being IBM's concern of "hiding behind," its lawyers regarding *RSI occurrence with grocery checkout employees,* this statement made by a third party was simply designed to induce IBM to contribute to the Food

Marketing Institute's research efforts. Again, this exhibit is also irrelevant.

Exhibits 13 and 14

These two exhibits (D.I. 323) are related, at least from the plaintiffs' perspective, and include testimony at state hearings in 1983 on health and safety questions of VDTs (Ex. 13) and the deposition testimony of Dr. Hirsch (Ex. 14), during which he was cross-examined about this testimony. Neither of these documents establish a design defect nor a duty to warn. Apparently, they are cited by plaintiffs, as the previous exhibits are, in support of [*165] the proposition, of the safety concerns regarding VDTs and IBM's awareness of the RSI issue and alternative keyboards. First of all, exhibit 13 addressed not only musculoskeletal stress, but also the concerns related to potential radiation exposure and vision, as well as the studies related thereto. The comments made therein show that a number of factors contribute to workplace comfort or discomfort, unrelated to the work tool itself, and are not inconsistent with the previously examined testimony of plaintiffs' experts. At most, this testimony attempts to "set out the complex issue of what had commonly become known as 'repetitive stress injury' (RSI) or 'cumulative trauma disorders' (CTDs)." Schneck at 52-53. It reflects that for this complex issue, there is no single solution, but rather a host of considerations, most of which are directed to modifications of the working environment. Exhibit 13 does not constitute as an admission that VDTs, including the keyboard, were dangerous.

Exhibit 14 is used by plaintiffs to support their argument that Dr. Hirsch, an employee of IBM in its Human Factors Engineering Department, was aware that the alternative split keyboard design alleviated [*166] injuries. No where in the deposition, in particular at the cite referenced by plaintiffs, does Dr. Hirsch admit that he knew that the alternative split keyboard design reduced or eliminated injuries. Further, plaintiffs' own expert, Dr. Bleeker, in additional to enumerating a plethora of elements producing RSI, testified that there is no scientifically recognized study confirming that such a design will alleviate or reduce RSI. Moreover, exhibit 14 was not authored by Hirsch. D.I. 323, Ex. 14 at 63. And, although Dr. Hirsch stated the unrefuted and admitted awareness by IBM of some relationship between RSI and keyboard use, he also maintained that the relationship between hand and arm pain and keyboard design was poorly understood. D.I. 323, Ex. 14 at 169-70. In fact, his personal understanding of that relationship was "there may be no - or minimal - connection between the reported ailments [RSI] and keyboard engineering." Id.

Exhibit 15.

This exhibit (D.I. 324) contains the provisional statements of the WHO (World Health Organization) on occupational health hazards in the use of visual display units (VDUs) resulting from a conference held in Geneva, Switzerland, December 2-6, [*167] 1995, during which the following working agenda was considered and adopted: (1) the definition and classification of VDUs, (2) user characteristics, (3) review of *alleged* problems and biological explanation of health related disorders, (4) measurements of potential hazards, (5) prevention and control strategies, and (6) conclusions and recommendations. The health concerns addressed included adverse pregnancy outcomes, eyes and vision, musculoskeletal disorders and skin disorders. The first quote upon which plaintiffs rely was lifted from the WHO's press release, and is directed generally to *potential* health concerns, and not just RSI or carpal tunnel syndrome. Further, the press release language recognizes a *public* awareness of possible health issues regarding VDU use. It is not limited to keyboards. Further, the provisional statement heading "musculoskeletal disorders" from where plaintiffs' limited quote is taken provides:

> The working group recognizes that musculoskeletal discomfort is commonplace in VDU work. Injury from repeated stress to the musculoskeletal system is plausible. Such effects have been observed in other jobs. Further research on the potential [*168] for injury is warranted. However, the group emphasizes that these conclusions should not be interpreted to mean that musculoskeletal discomfort inevitably leads to injury or is necessarily a sign of injury. It is the view of the working group that musculoskeletal problems in VDU work are largely preventable and that appropriate control measures should be introduced. These include the application of ergonomic principles to the design of the workplace equipment, environment and work organization. Occupational health services play a key role in the early recognition and prevention of musculoskeletal problems in VDU work.

Not only is the quote upon which plaintiffs rely taken out-of-context, but plaintiffs' emphasis is misplaced. When reviewed in its entirety, the reference to musculoskeletal disorders is not limited to the upper limbs, nor directed to a particular condition. No linkage is established between VDU design, in particular keyboard design, and the development of musculoskeletal injury,

specifically CTS. In fact, the summary comments only that stress to the musculoskeletal system "is plausible," further research "is warranted" and that the conclusions therein "should [*169] not be interpreted to mean that musculoskeletal discomfort inevitably leads to injury or is necessarily a sign of injury." Rather than this exhibit proving that use of a VDU or keyboard is a substantial factor in causing carpal tunnel syndrome, it indicates the opposite and recognizes the numerous other contributing factors to the development of musculoskeletal *discomfort*. It does not determine that injury necessarily results from VDU use. There is no suggestion of a causal relationship between keyboard use and injury, of any design defect, or a dangerous condition inherent in VDUs.

Exhibit 16.

Identified by plaintiffs as the Pincas report (D.I. 324), this exhibit is a pre-publication draft of Processor Pincas, analyzing the possible legal exposure that could exist to manufacturers of VDTs. It expresses a number of potential harms consistent with computer use, most of which are not the injuries involved in this matter. No attempt is made by Professor Pincas to include the scientific basis for the alleged associated injuries. Nor is it shown that she is qualified to opine on alleged design defects. The article also discusses a variety of possible legal theories, including [*170] strict liability, which is not applicable in this case. Her analysis only addresses whether, based on her review of case law, liability under some legal theory may arise. Although she may find liability based upon unsubstantiated assumptions, her conclusion is not relevant to the issues addressed herein.

Exhibit 17-20.

These exhibits (D.I. 324), along with exhibits 59-63 (D.I. 326), relate to other manufacturers's warnings and will be addressed later herein. Exhibit 17, as with the other documents attributed to IBM, does not amount to an admission of a causal relationship between keyboard use and injury, as so aptly argued by plaintiffs. Further, as discussed previously, none of plaintiffs' experts, in particular Cunitz, ever addressed the type of warning required nor identified, beyond some vague danger surrounding the activity of typing or keying what about these activities is dangerous. Certainly, IBM by exhibit 17 has not admitted to any danger in such activities. Rather, the exhibit provides suggestions for comfort in using a computer terminal -- all of which are common sense suggestions.

Exhibits 21 and 22.

The article contained therein (D.I. 326, Ex. 21) is a state-of-the-art [*171] review by Stephen Zoloth, Ph.D., an individual who, although used to support Punnett's analysis, has not been identified as an expert in this mat-ter, in particular, state-of-the-art. The report is undated and an opinion by a third-party, not an admission by IBM. Further, noted within this document, Zoloth comments from a public health, non-legal view

> It is an axiom of Public Health that, long before a causal link can be conclusively demonstrated between a potential risk factor and disease, it is prudent practice to intervene to reduce or eliminate exposure.

D.I. 324, Ex. 21 at 6.

The affidavit of Dr. Pascarelli (D.I. 324, Ex. 22), which plaintiffs submit as evidence that the design flaws contributing to carpal tunnel syndrome as sustained by plaintiffs are common to all QWERTY keyboards, such as the IBM keyboards, is an attempt to introduce expert testimony from a witness who was never previously identified in this litigation to testify on this issue. He has not been subject to deposition and he was not presented for examination by plaintiffs during the *in limine* hearings -- the hearings which plaintiffs demanded to enable them to qualify their propounded experts [*172] under Daubert/Paoli II, *after* their answering brief was filed. Pursuant to the various scheduling orders, *Fed.R.Civ.P. 56* and *Fed.R.Evid. 702*, his affidavit is not admissible, and will not be considered by this Court.

Exhibit 23.

This exhibit contains part of an article in the publication, *Practical Ergonomics*, alleged to be authored by D. O. B. Dickerson, IBM's former Director of Corporate Health. The copy provided of this document is not only incomplete, the identity of the author and the date of publication is unknown. Plaintiffs' quotes from this article regarding tenosynovitis follow an incomplete sentence regarding "workplace layout," with no apparent reference to keyboard defects. And, no where does the article suggest that the unknown author opined that Kroemer's studies were reliable. Further, the other quotes attributed by plaintiffs to be the opinion of the author are not. Rather, they are merely statements of findings made by others. Therefore, even if this exhibit was authored by Dr. Dickerson, it does not reveal his opinion on design defects, nor a causal connection between keyboard use and RSI. This unauthenticated document is not admissible and shall [*173] not be considered by this Court.

Exhibits 24 and 25.

Exhibits 24 and 25 have been addressed in the discussion concerning exhibit 7. In fact, Exhibit 25 is essentially the same as exhibit 7.

Exhibits 26-31.

Plaintiffs' reliance upon these exhibits as evidence of defective keyboard design is misplaced. Some of these materials include comments and suggestions by third parties. Devoid from these exhibits are any statements by IBM regarding a causal connection between the use of its keyboards and carpal tunnel syndrome. These documents discuss matters such as posture, positioning, standing, sitting, overall comfort, workplace set up, footrests and chairs. Even the quotes upon which plaintiffs rely, which the Court must assume were the best plaintiffs could gleam from this massive quantity of paper do not support that the specific IBM keyboards involved in this matter caused carpal tunnel syndrome, that any of its keyboards caused carpal tunnel syndrome, that RSI or carpal tunnel syndrome resulted from defectively designed IBM keyboards or that there were common design defects in all standard keyboards.

Similarly, Exhibit 29, a proposal submitted by a third-party and not authored [*174] or attributable to IBM, contains a list of various occupational and non-occupational activities and factors which contribute to the development of RSI, such as, "age, gender, vitamin deficiency, size, posture, ergonomics and physical condition."

Like a significant number of exhibits previously addressed, these documents merely comment upon keyboards and some alleged assumption between keyboard use and RSI.

Exhibit 28 contains IBM workers' compensation records submitted in support of causation. A review shows "nothing more than that claims were being made that musculoskeletal complaints were related to keyboard use." Schneck at 53. No keyboard defects are indicated. Plaintiffs reference that these records definitively show that the cause of injury was a "keyboard," thereby proving design defects common to all keyboards is totally without merit. These forms are routinely completed by some unidentified IBM personnel and are usually required by state law. A review of the entire document shows that they are recordings of hearsay statements by a complainant, which became part of an employee's worker's compensation file. There is nothing to support that those forms were reviewed or [*175] executed or admitted as accurate by a corporate officer from IBM. No where on these forms is there any representation identifying any defect in the keyboard. Nor is there any reference to the keyboards involved in those claims and whether those keyboards were similar to or the same equipment used by plaintiffs. They neither support a finding of causation nor an admission on the part of IBM. Schneck at 54, citing Karolisyn-Morris v. IBM,

Index. No. 14003/92, mem. op. at 7 (N.Y. Supr. January 31, 1994).

The Schneck court addressed substantially similar (and in some instances, identical) evidence submitted by the plaintiffs in support of their product liability claim. With regard to defendant's internal memoranda proffered to demonstrate the recognition and intentional disregard of the relationship between RSI and IBM keyboard use, the court held "the documents plaintiffs' counsel proffers do not amount to an admission of a causal relationship between keyboard use and injury. If anything, they demonstrate IBM was attempting to sort out the complex issue of what had commonly become known as . . . RSI . . ." See Schneck at 51-57. As for Bowers and Allen's assertion that [*176] other manufacturers' enclosed warnings about proper keyboard use and risk of injury, when faced with similar materials, Schneck found that "the documents regarding instructions, warnings, and alternative keyboard products of other manufacturers are irrelevant to [plaintiffs'] action against IBM and, hence, are irrelevant to the causation issues central to IBM's motion for summary judgment." Id. at 64. Indeed, Delaware law clearly further supports this proposition. See, e.g., *Bryant v. Delmarva Power & Light Co., 1995 Del Super. LEXIS 438,* C.A. No. 89C-08-070, slip op. at 26 (Del. Super. Oct. 2, 1995) (industry "custom" does not establish a legal duty). Thus, as in Schneck, this Court finds that plaintiffs have failed to establish the requisite element of causation through submission of the aforementioned documents.

Before more completely addressing plaintiffs' exhibits propounded for the availability of alternative keyboard design, the Court feels compelled to comment upon the morass of materials it waded through in plaintiffs' appendices. Most of these documents have been submitted without any proper foundation, contain hearsay and are irrelevant. In deciding a motion for summary judgment [*177] under Rule 56, only admissible evidence is to be considered. Drowning the Court in a tidal wave of paper does not mean that a genuine issue of material fact exists.

As in Schneck, plaintiffs' herein have submitted materials regarding instructions, warnings and alternative keyboard products of other manufacturers. D.I. 324-325, Ex. 18-20; D.I. 326, Ex. 59-63. Schneck found such evidence lacking probative value and inadmissible under *Fed R Evid. 402.* Schneck at 64.

An issue similar to that presented herein was also addressed in In re Richardson-Merrell, Inc., Bendectin Prods. Liab. Litig., a product liability case involving the prescription drug *Bendectin. 624 F. Supp. 1212 (S.D. Ohio 1985),* affd, *857 F.2d 290 (6th Cir. 1988),* cert. denied, *488 U.S. 1006 (1989).* In Richardson-Merrell, the

plaintiffs offered warning labels on nonprescription drugs produced by other manufacturers. *Id. at 1231.* The court excluded those labels as irrelevant:

> The threshold requirement of relevancy simply was not met. The fact that warnings were placed on these three over-the-counter (nonprescription drugs) by manufacturers other than the defendant did not make the [*178] existence of a fact of consequence more or less probable ... [The evidence] is not germane to the single issue of whether Bendectin causes birth defects.

*Id. at 1230-31.*

In this case, as in both Schneck and Richardson-Merrell, other manufacturers' warning labels have no probative value. The rationales underlying the inclusion of warning labels and/or instructions by other manufacturers, or their production of alternative keyboards, are unknown to this Court. While they *may* relate to safety and causation issues, they could just as likely reflect an action propelled by an overcautious attorney's advice. As such, the probative value of other manufacturers' warning labels is very dubious at best, and the Court must find them inadmissible.

Moreover, even if the other manufacturers attached such warning labels, included instructions with their packaging materials, or developed alternative keyboards premised upon an actual determination of risk and causation relating to their own keyboards, these activities would be meaningless with regard to the risks associated with IBM's keyboards. See Schneck at 66; *Richardson-Merrell, 624 F. Supp. at 1231* (excluding [*179] as irrelevant warning labels of other manufacturers because "the warnings on these drugs are ambiguous, at best, when attempting to infer the purpose for which the warnings were designed."). Without the appropriate factual foundation demonstrating the purpose of the warnings, instructions, and alternative keyboards, not to mention the circumstances under which they are provided, such evidence is irrelevant. Id. In light of the discussion herein, those warnings/instructions and alternative keyboard designs by other computer equipment manufacturers which plaintiffs proffer as evidence of causation and IBM's duty to warn are irrelevant and inadmissible pursuant to *Fed. R. Evid. 401* and *402.*

Most significantly, those warning/instruction and alternative keyboard design materials submitted by plaintiffs are inadmissible under the exclusionary hearsay

rule, and unredeemed by any hearsay exception. See *Fed R. Evid. 805.* Upon a document proffer, the proponent must establish that both the document itself and the hearsay statements contained therein fit within an exception to the hearsay rule. Id. The materials regarding other manufacturer's warnings, instructions, and alternative [*180] keyboards are undeniably out-of-court statements proposed by plaintiffs for the truth of the matter asserted -- i.e., that keyboards can cause not only injury, but the injuries in this matter. As such, they are inadmissible hearsay. See *Fed. R. Evid. 803*; Richardson-Merrell, 624. F. Supp. at 1232 ("The warnings are out-of-court statements offered to prove the truth of the matters asserted ... ... The warnings are in fact inadmissible hearsay.")

Indeed, the various exhibits submitted by plaintiffs also contain an *additional* layer of hearsay, where included are assertions by unknown people about the risks of keyboard operation. As defendant is unable to cross-examine those people, their statements are inadmissible. See *Cedeck v. Hamiltonian Federal Sav. & L. Ass'n, 551 F.2d 1136, 1138 (8th Cir. 1988)* (statements containing a reiteration of what some unknown person told the declarant were excluded as hearsay); *Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1002 (3rd Cir. 1988)* (following Cedeck).

The Federal Rules of Evidence on this matter are unequivocal and allowing plaintiffs to introduce the aforementioned materials would in effect circumvent their obligation [*181] to establish the qualifications of unidentified people to render expert testimony under *Fed R. Evid. 702*, and the factual foundation for those opinions under *Fed R. Evid. 703*, as well as preclude defendant's cross-examination of such experts.

Moreover, no testimony proposed by plaintiffs' experts establishes that any of the alternative designs would have prevented the injuries plaintiffs claim resulted from their use of IBM keyboards. D.I. 310, A-90, 239, 246. Specifically, Dr. Bleeker, plaintiffs' only specific causation expert, admittedly cannot determine whether alternative design keyboards would eliminate, prevent or even reduce incidents of CTS. D.I. 310, Ex. A-90.

Therefore, for all reasons contained herein, the Court must deny admission (and consequent consideration) of all those documents regarding other manufacturers' warnings and instructions related to keyboard use, as well as those documents showing alternative keyboard design, which plaintiffs have proffered. n58

> n58 The bases for finding other manufacturers' warnings and instructions and alternate keyboard designs inadmissible are applicable to plaintiffs' other exhibits.

[*182]

## CONCLUSION

For the reasons contained herein, it is recommended:

1. That defendant's motion to exclude plaintiffs' experts, Drs. Kroemer and Cunitz, on the basis of Daubert/Paoli II standards should be GRANTED.

2. That defendant's motion to exclude plaintiffs' experts, Drs. Punnett and Bleeker should be DENIED.

3. That defendant's motion for summary judgment on plaintiff Bowers' claim as being time-barred by the operation of *10 Del. C § 8119*, the applicable statute of limitations, should be GRANTED.

4. That defendant's motion for summary judgment on the issues of design defect and duty to warn should be GRANTED. As a result, since plaintiff George Allen's claim is derivative and plaintiffs' claim for punitive damages is not an independent claim, but requires a verdict of compensatory damages in their favor before exemplary damages can be considered and awarded, it is further recommended that plaintiffs' entire action be DISMISSED.