# EXHIBIT 19

# Part 1

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) ) | C.A. No. 04-293 (KAJ) |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| HERCULES, INC. and CYTEC INDUSTRIES, INC., | ) ) ) | |
| Defendants. | ) | |

**EXHIBIT 19**
**PLAINTIFF CIBA SPECIALTY CHEMICALS CORPORATION'S
MOTIONS *IN LIMINE* TO EXCLUDE EVIDENCE**

Ciba's Motions *In Limine* to Exclude Evidence

I.  **CIBA'S MOTION IN LIMINE TO PRECLUDE TESTIMONY AND ARGUMENT RELATING "PRIOR ART" EVIDENCE WHERE THERE IS INSUFFICIENT FOUNDATION**

Congress set strict rules for what is considered prior art and what is not considered prior art under section 102 of the patent statute. 35 U.S.C § 102. As to timing, section 102(b) requires that evidence must be public more than one year prior to the patentee's first filing date (before June 11, 1989, in the present case). There are similar requirements under sections 102(a), (d), (e), and (g). Evidence that fails to satisfy such criteria is not prior art and is not admissible for the purpose of alleging invalidity.

In other words, invalidity based on anticipation requires that "**all** of the elements and limitations of the claim are found within a single prior art reference." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991)(emphasis added). "Gap filling" is not permissible. Testimony must "explain in detail how each claim element is disclosed in the prior art reference" or there is no foundation to admit such technological information into evidence. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002). It is impermissible to reach outside a reference to pull in missing disclosure to make out the claimed invention. *Scripps*, 927 F.2d at 1577.

Because of the propensity for untrustworthy evidence relating to invalidity, courts require corroboration for alleged prior art. *See Mahurkar v. C.R.Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). As the Federal Circuit has observed, "testimony must be supported by some type of corroborating evidence." *Woodward Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371-72 (Fed. Cir. 1998). Corroboration is required for both interested and uninterested witnesses. *Finnigan Corp. v. I.T.C.*, 180 F.3d 1354, 1367 (Fed. Cir. 1999).

In the context of an assertion of obviousness under 35 U.S.C. § 103, the same gate keeping rules require that all evidence qualify as "prior art" under section 102. *Graham v. John*

Exhibit 19 page 1

Ciba's Motions *In Limine* to Exclude Evidence

*Deere Co.*, 383 U.S. 1, 14 (1966)(Section 103 "refers to the difference between the subject matter sought to be patented and the prior art, meaning what was known before as described in section 102."); *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 440 (D.Del. 2004) (J. Jordan) ("[W]hen discussing the differences between the claimed invention and the prior art, the focus is on references that qualify as prior art"). The Court must be careful to avoid falling prey to a "hindsight syndrome" by reasoning backward from the teaching of the patent itself. As the Federal Circuit and this Court has recognized "the best defenses against the subtle but powerful attraction of a hindsight-based obviousness analysis is **rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references**." *Creo Prods. Inc. v. Presstek, Inc.*, 166 F. Supp. 2d 944, 966 (D.Del. 2001)(emphasis added)(internal citations omitted). In addition to an explicit suggestion of combination for particular references, the combination must explicitly teach every element of the claimed inventions, just like anticipation. *Oxford Gene*, 345 F. Supp. 2d at 437 ("Dr. Purdue does not undertake the required element-by-element comparison to show that each and every limitation in the asserted claims of the '270 patent is present in a combination of prior art references."). Experts may not offer uncorroborated evidence to fill-in or alter prior art references, as such evidence does not qualify as prior art under section 102 and lacks proper support. *Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1311-12 (Fed. Cir. 2000); *Oxford Gene*, 345 F. Supp. 2d at 438-39.

A.    **There is no foundation for the admissibility of the Flesher patents**

Hercules seeks to assert that the Flesher '346 patent (counterpart to the Flesher '780 European patent referenced in the background of the patents-in-suit) anticipates the claims of the patents-in-suit. However, Hercules is attempting impermissible gap filling to reconstruct the Flesher patents to match the claimed inventions. Among other gaps, the Flesher patents fail to

Exhibit 19 page 2

Ciba's Motions *In Limine* to Exclude Evidence

provide any disclosure or recognition that the particles are of an average size of about .75 microns or below as required in the patents. (See, e.g., '766 patent at Col. 29, lns. 43-45 and '808 patent at Col. 9, lns. 54-56; Exhs. 1 and 2, respectfully.) The Flesher patents are primarily directed to sewage treatment chemicals where the dry particle sizes are around 2 microns. (See Hercules response to Ciba's Interrogatory No. 2 at 22; Exh. 3; see also Flesher '346 at Col. 6, lns. 25-26 and 32-33; Exh. 4.) The small average size of 0.75 microns was recognized in the patents-in-suit and in their prosecutions as providing surprising beneficial properties. (See, e.g., '766 patent at Col. 3, lns. 58-65; Exh. 1.) Relative to the '766 patent, the Flesher patents also lack any teaching of the claimed papermaking process such as dosages, etc. (See '766 patent at Col. 29, lns. 39-42; Exh. 1.) The dosages in Flesher are directed to sewage treatment and are not directed to papermaking REDACTED

Without being able to point to a disclosure of a number average particle size of .75 microns or less or the papermaking process requirements, the Flesher patent fails to meet the foundational requirements for admissibility as anticipating prior art. FED. R. EVID. 401 and 402. Because of the lack of relevance, the Flesher patents have the high probability of confusing the jury and prejudicing Ciba. FED. R. EVID. 403.

**B.    There is no foundation for admissibility of the Prud'homme testimony about uncorroborated alleged prior art teachings, the '958 application and the Allen patents**

To the extent that Hercules attempts to admit the Flesher patent into evidence through the obviousness door, this Court should be rigorous in its application of the foundational rules for admissibility. In an effort to gap fill the Flesher patent, Hercules offers the uncorroborated testimony of Dr. Prud'homme REDACTED

Exhibit 19 page 3

Such *ipse dixit* testimony does not qualify as prior art under section 102, so it cannot be combined with Flesher especially where there is no corroborating evidence. *Upjohn*, 225 F.3d at 1311-12.

The unrelated '958 application documents do not qualify as prior art under 102 because they are later in time. There is no teaching within the four corners of the '958 application of an average size of .75 microns or below, so the combination would not demonstrate the elements of the claims, even if it were prior art.

# REDACTED

There is no foundation that the Allen patent and the application discloses an average particle size of .75 or below. Allen only discloses that it is normally desirable that the particle size of the monomer and polymer droplets are below 5 microns, preferably 0.3 to 3 microns. (See Allen '321 patent Col. 5, lns. 61-66; Exh. 7.) Hercules has not demonstrated a foundation in Allen of an average particle size or that the particles could be used in papermaking. In Allen, Example 1, which references an anhydrous particle size range, does not even state that measurements were actually carried out, just that a suspension was distilled "to give" such a dispersion. No analytical technique is even referenced. Hercules has also failed to show a foundation in Allen for the papermaking process limitations of the '766 patent.

For the foregoing reasons, the Flesher patents, the '958 prosecution and the Allen patents should be

Exhibit 19 page 4

Ciba's Motions *In Limine* to Exclude Evidence

excluded from evidence because of a failure to establish the proper foundation for admissibility. FED. R. EVID. 401 and 402. Hercules has failed to demonstrate a proper foundational suggestion to combine the references or that, once combined, a foundation that the references would teach the limitations of the patent claims identically. As this court has recognized, "rigorous application" of the foundational requirements is the only way to avoid the insidious hindsight reconstruction. *Creo*, 166 F. Supp. 2d at 966.

C.    **There is no foundation for the admissibility of Cynatrol and other evidence**

REDACTED

As to the '766 patent, Hercules and Cytec have not attempted to offer any foundation for admissibility of Cynatrol evidence. Hercules identifies other evidence without foundation as Trial Exhibits 35, 80-82, 86-89, 91, 100, 103, 115, 125, 127-28, 146, 152, and 156.

In each instance, Ciba requests that this Court prohibit Hercules and Cytec from offering evidence for the purpose of challenging validity and enforceability where a proper foundation has not been established. Such evidence should be excluded as lacking foundation under FED. R. EVID. 401 and as being prejudicial and likely to cause jury confusion under FED. R. EVID. 403.

Exhibit 19 page 5

Ciba's Motions *In Limine* to Exclude Evidence

## II.    CIBA'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF DR. RYLES AS TO NON-INFRINGEMENT AND INVALIDITY

Dr. Roderick Ryles is an assignor/inventor of the '808 patent. He is a current employee of Cytec. He has been listed by Cytec to testify about "non-infringement" and "non-willfulness." (See Cytec Rule 26(a)(1) disclosure; Exh. 10; and Cytec Supplemental Rule 26(a)(1) disclosure; Exh. 11.) Hercules has listed Dr. Ryles to testify as to "alleged infringement of, invalidity of, unenforceability of, prior art, and interpretation of technical terms in the claims of, U.S. Patent 5,171,808." (See Hercules Rule 26(a)(1) disclosure; Exh. 12.)

Rule 26(a)(2) of the Federal Rules of Civil Procedure provides that expert reports must be submitted for any witness that will offer expert testimony, especially if it is scientific in nature. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides for the exclusion of expert testimony if the witness failed to submit an expert report. Rule 701 of the Federal Rules of Evidence precludes lay opinion "based on scientific, technical or other specialized knowledge." The Federal Circuit has affirmed the exclusion of inventor testimony on infringement as improper expert testimony. *Air Turbine Tech., Inc. v. Atlas Copco AB,* 410 F.3d 701, 714 (Fed. Cir. 2005); *see also Cordis Corp. v. Boston Scientific Corp.*, 2006 WL 1305227, at *14-15 (D.Del. May 11, 2006)(Exh. 13.). The same holds true for testimony intended to show invalidity. The courts have excluded inventor testimony as to invalidity as impermissibly applying the hypothetical perspective of one of ordinary skill in the art. *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379-80 (Fed. Cir. 2000)(reversing a decision because of the improper admission of inventor testimony in indefiniteness); *accord, Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 246-47 (D.Del. 2001).

Dr. Ryles did not offer any expert opinion under Rule 26(a)(2) in this case in order to entitle him to testify about non-infringement. Any view as to infringement requires a two-step

Exhibit 19 page 6

Ciba's Motions *In Limine* to Exclude Evidence

approach including interpreting the claims and applying them to the accused product. Dr. Ryles

has never offered an expert report on his views as to the proper scope of the claims of the '766

and '808 patents. Dr. Ryles is not even named as an inventor of the '766 patent. Even if Dr.

Ryles had offered an expert report about his interpretation of the '808 claims, his testimony

would be entitled to little or no weight. *Solomon*, 216 F.3d at 1379-80. In addition to failing to

provide an expert report on claim interpretation, Dr. Ryles has never applied the claims to the

accused product or addressed the scope of equivalents under the doctrine of equivalents.

REDACTED

Thus, aside from the fact that Dr. Ryles offered no expert report, there

can be no foundation for any testimony from Cytec's witnesses that there is no infringement

As to invalidity, the analysis requires the steps of interpreting the claims and applying the

interpreted claims to the prior art references. Dr. Ryles has never interpreted the claims or

addressed the prior art asserted by defendants, i.e., Flesher, Allen, Cynatrol, etc.

The analysis of invalidity is done

from the perspective of one of ordinary skill in the art. Dr. Ryles is not one of ordinary skill in

the art by definition since he is an inventor. *Standard Oil Co. v. American Cyanamid Co.*, 774

F.2d 448, 454 (Fed. Cir. 1985). Dr. Ryles has not provided any expert report establishing his

views of what was the hypothetical person of ordinary skill in the art at the time of the invention.

This opinion evidence is the exclusive province of expert testimony. *Solomon*, 216 F.3d at 1379-

80 (reversing a decision because of the improper admission of inventor testimony in

Exhibit 19 page 7

indefiniteness); *accord*, *Lucent*, 168 F. Supp. 2d at 246-47. Dr. Ryles has no basis to analyze the prior art or apply the claims to the art. His testimony is not entitled to any weight.

For the foregoing reason, Ciba asks that this court preclude the testimony of Dr. Ryles as improper expert testimony as regards Hercules "alleged infringement of, invalidity of, unenforceability of, prior art, and interpretation of technical terms in the claims of" the patents in suit and Cytec's alleged "non-infringement" and "non-willfulness." Rule 37(c)(1) provides that expert testimony may be disallowed without an expert report under Rule 26(a)(2). *See* FED.R.CIV.P. 37(c)(1) and 26(a)(2). Further, FED. R. EVID. 701 similarly precludes opinions concerning scientific matters from lay witnesses. Dr. Ryles testimony lacks foundation and relevance under FED. R. EVID. 401 and 402. His proposed testimony is also duplicative of Dr. Prud'homme's testimony and will likely cause prejudicial jury confusion under FED. R. EVID. 403.

Exhibit 19 page 8

Ciba's Motions *In Limine* to Exclude Evidence

III.    CIBA'S MOTION IN LIMINE TO PRECLUDE COMPARISON OF THE
        ACCUSED PRODUCTS TO COMMERCIAL EMBODIMENTS OF THE
        PATENTED INVENTION FOR A NON-INFRINGEMENT PURPOSE

Ciba asserts that the Perform product and its use infringe the claims of the '766 and '808

patents. The defendants have asserted that there is non-infringement by comparing the accused

Perform product to a commercial embodiment, namely, Polyflex CP.3. Such comparisons are

not relevant to non-infringement. It is well established that it is the claims of the patent that are

infringed, not a commercial or preferred embodiment of the invention. *See Amgen Inc. v.*

*Hoescht Marion Roussel, Inc.*, 314 F.3d 1313, 1347 (Fed. Cir. 2003)("But after a correct

discussion of the differences in the infringement analysis, the court eschewed the cardinal

principle that the accused device must be compared to the claims rather than to a preferred or

commercial embodiment.")(citation omitted).

The defendants' attempts at demonstrating non-infringement by reference to the Polyflex

CP.3 product are not relevant. The Polyflex CP.3 product is a preferred embodiment of the

patents where a special monomer MBA is used to form covalent crosslinks. The structure of

MBA is relatively small in comparison to other crosslinking agents and a larger content of CP.3

is used than in other instances. The claims of the '766 and '808 patents are not limited to this

specific preferred embodiment.

REDACTED

Hercules has also identified many documents and

tests for the purpose of alleging non-infringement by a comparison of Perform to Polyflex CP.3,

not the claims of the patent. (See, e.g., Hercules Trial Exhibits 26, 29, 72, 73; etc.; Exhs. 16-19.)

The claims of the patents do not form part of this analysis, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████    within Perform are not

Exhibit 19 page 9

Ciba's Motions *In Limine* to Exclude Evidence

present in the use accused of infringement. Imperfect or inefficient infringement is still infringement and, thus, such comparisons to a commercial embodiment under unusual conditions are irrelevant. *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 792 (Fed. Cir. 1990); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 859 (Fed. Cir. 1988).

Not only is such a comparison irrelevant, but if allowed, it would mislead the jury to believe that Ciba's commercial products, rather that its patent claims, define the inventions at issue in this case. Allowing such a comparison is not harmless, but would mislead and confuse the jury. Courts in Delaware have excluded this type of evidence intended to show non-infringement. *Praxair, Inc. v. ATMI, Inc.*, 2005 WL 3159054, at *2 (D.Del. Nov. 28, 2005)(Exh. 20.). In the *Praxair* decision, the Court explained that "[t]he risks of jury confusion and prejudice [for such evidence] far outweigh the probative value." *Id.*; *see also* FED. R. EVID 403. The same reasons apply here and defendants should be prohibited from taking this wrong turn in the analysis of non-infringement.

Exhibit 19 page 10

Ciba's Motions *In Limine* to Exclude Evidence

## IV.   CIBA'S MOTION IN LIMINE TO PRECLUDE DEVELOPMENTAL AND NON-INFRINGEMENT EVIDENCE ON UNRELATED PRODUCTS

Ciba has accused the Perform product and its use of infringement. Defendants developed the Perform product based on the inclusion of a chemical, ███████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████

In denying infringement, the defendants rely on developmental and testing efforts that do not pertain to the accused Perform product and the specific method used to make the product. For example, the defendants have relied on developmental efforts ███████████████

████ (See, e.g., Hercules Trial Exhibits 169, 174, 176, 178, 179, etc.; Exhs. 21-25.)

# REDACTED

████████████ developmental efforts are not relevant to defendants' allegation that they developed a non-infringing product. Similarly, defendants also rely on development efforts using ████████ (See, e.g., Hercules Trial Exhibits 204, 205, 225, 226, etc.; Exhs. 26-29.) The question for determination by the jury is whether the Perform product infringes, ████████████████ which were never commercial, infringe.

Defendants testing of varying parameters in the manufacturing process to try to come up with the process defendants use to make the infringing product are similarly not relevant to defendants' non-infringement allegations. Defendants apparently intend to offer extensive testimony and evidence of their experiments with varying manufacturing parameters. Such experiments do not have relevance to defendants' non-infringement allegations.

Exhibit 19 page 11

Ciba's Motions *In Limine* to Exclude Evidence

The defendants further rely on modifications and testing of products that, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ are not reacted under the same conditions as the accused Perform product.

The defendants rely on such activities in an attempt to show further developmental efforts and

that Perform does not infringe. As just one example of many evident from Hercules' trial exhibit

list, the defendants are relying on work where the initiation system for Perform

REDACTED

. None of these products relate to Perform

because they are created or processed under radically different circumstances than is Perform.

The defendants' attempts to show that such unrelated products and unrelated reaction

conditions do not infringe the patents in suit are not relevant. *Saint-Gobain Corp v. Gemtron

Corp.*, 2006 WL 1008396, at *4-5 (W.D.Mich. April 17, 2006)(Exh. 40.). In the *Saint-Gobain*

case, the court rejected the defendant's attempts to find a temperature test that would appear to

show a non-infringing condition. The Court noted that it did not matter that the defendants could

Exhibit 19 page 12

## Ciba's Motions *In Limine* to Exclude Evidence

find a special modification of the conditions of the product to show non-infringement because the product was otherwise infringing. *Id.* This is the corollary to the rule that infringement cannot be shown by special modifications to the accused product. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995)(relating to modifying a camera to make infringement was not relevant).

Indeed, what defendants seek to do would be to persuade the jury that the Perform product does not infringe because defendants did a lot of work and, therefore, Perform must be different. The jury should decide the issue of infringement based on what Perform is and how it is made. That there may have been extensive experimentation is not relevant to defendants' allegations of non-infringement nor is the fact that Hercules filed patent applications. (See, e.g., Hercules Trial Exhibits 505, 506, etc.; Exhs. 41 and 42.) "Federal Rule of Evidence 403 gives the court broad discretion to exclude evidence where 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *PharmaStem Therapeutics, Inc. v. Viacell Inc.*, 2003 WL 22244704, at *3 (D.Del. Sept. 30, 2003)(citing FED. R. EVID. 403)(Exh. 43.); *see, e.g., Betterbox Comms. Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 330 (3d Cir. 2002) (emphasizing the district court's broad discretion when ruling on a Rule 403 request).

In the present case, the evidence sought to be offered by the defendants relating to development and non-infringement of unrelated products or special heating conditions is not relevant under FED. R. EVID. 401 and 402 and should not be admitted into evidence. The evidence sought to be offered by the defendants is inherently confusing because it is ostensibly similar to the accused Perform product. But, the evidence is admittedly different and the

Exhibit 19 page 13

Ciba's Motions *In Limine* to Exclude Evidence

products have different characteristics. Thus, the evidence proposed by the defendants will likely confuse the jury and is impermissible under FED. R. EVID. 403. For these reasons, Ciba requests that such evidence be excluded.

Exhibit 19 page 14

Ciba's Motions *In Limine* to Exclude Evidence



REDACTED

Exhibit 19 page 15

Ciba's Motions *In Limine* to Exclude Evidence

REDACTED



Exhibit 19 page 16

<u>Exhibit No. 19: Defendants' Responses to Ciba's *In Limine* Motions</u>

I.    **HERCULES' RESPONSE TO CIBA'S MOTION TO PRECLUDE TESTIMONY AND ARGUMENT RELATING TO PRIOR ART DUE TO ALLEGED LACK OF FOUNDATION**

Ciba's request to keep from the jury essentially all of Hercules' invalidity evidence and some of its evidence of non-infringement should be rejected. Ciba presents a generalized discussion of 35 U.S.C. §§ 102 and 103, and asserts that corroboration is "required" for all prior art even though Hercules relies on prior art patents and publications that do not require corroboration. Ciba further urges that Hercules' invalidity arguments regarding U.S. Patent No. 4,720,346 ("the Flesher '346 patent") and other prior art and expert testimony thereon should be precluded for a supposed lack of foundation. (Ciba Motion at 1-3.) Ciba's arguments are misguided, inaccurate, and should have been made, if at all, at the summary judgment stage.

A.    **The Flesher '346 Patent Invalidates Ciba's Claims**

Hercules has asserted that the Flesher '346 patent invalidates the claims of the '808 and '766 patents-in-suit. Contrary to Ciba's arguments, Hercules and Dr. Prud'homme followed this Court's directive in *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004) by providing an element-by-element comparison between the asserted claims and the prior art. For example, in his July 22, 2005 expert report, Dr. Prud'homme carefully stepped through asserted claims 1, 6-8, 11, 13, 15, 17, and 21 of the '808 patent, comparing its limitations to the Flesher '346 patent disclosure. (*See* D.I. 102, ¶¶ 14-22, 24-25, 28-32, 34, 36-38, 41, 43, and 46-50.) Dr. Prud'homme provided similar specificity regarding asserted claims 1, 3, 5, 9, 11, 13, 17, and 21 of the '766 patent and the Flesher prior art. (*Id.* at ¶¶ 51-65.) As to claim 23, Dr. Prud'homme relied on his own consulting experience and on the opinion of Hercules' papermaking expert Charles Klass that one of skill in the art reading the Flesher '346 patent would have known to add this claimed amount

Exhibit 19 of the Pretrial Order
Page 1 of 18

REDACTED

of a soluble aluminum species to the papermaking furnish. (*See id.* at ¶ 66.) And regarding claim 25 of the '766 patent, Dr. Prud'homme relied on his own experience regarding the fact that it was well known to use alum as an additive in a papermaking process. (*See id.* at ¶ 67.)

In his July 22, 2005 expert opinion, Mr. Klass also used an element-by-element approach to compare the claims of the '766 patent to the prior art. (*See* D.I. 101 at pp. 6-10.) In so doing, Mr. Klass relied in part on Dr. Prud'homme's opinion regarding the particle size and ionicity limitations of claim 1 of the patent. (*See id.* at pp. 7-8, 12.) Mr. Klass opined that the claimed range of addition of a soluble aluminum species (claim 23) and the choice of alum (among others) as that aluminum species (in claim 25) would have been well known to one of skill in the art. (*See id.* at pp. 11-12.) Mr. Klass also identified a prior art reference (the Avery publication) that verified these assertions. (*Id.*)

The Flesher '346 patent issued on January 19, 1988, more than a year before the June 11, 1990 filing dates of the '766 and '808 patents. Hence, the Flesher '346 patent and its related European counterpart (EP 0 202 780) qualify as Section 102(b) prior art to Ciba's claims. Ciba cites no authority that such prior art requires "corroboration."

### B.    Ciba Confuses Admissibility with Weight

Ciba focuses on alleged shortcomings of the Flesher '346 patent to argue that it lacks "foundation." Ciba could have raised its technical arguments at the summary judgment stage but it did not. While Ciba may disagree with Hercules' positions regarding Flesher and other invalidating prior art, that is no reason to keep the information from the jury. And in any event, Ciba's arguments are wrong.

Ciba first asserts that "[t]he Flesher patents are primarily directed to sewage treatment chemicals." But Ciba's papermaking expert, Dr. Clarence King,

Exhibit 19 of the Pretrial Order
Page 2 of 18

Moreover, Ciba's '808 patent claims are not limited to papermaking chemicals; indeed, the '808 patent specifically asserts that "[t]he products of this invention may be used to dewater biologically treated suspensions, such as sewage . . ." ('808 patent, col. 6, lines 38-40.) Ciba also cites no case law to support its argument that a reference must be *exclusively* directed to a certain field of technology in order to anticipate under Section 102(b).

Ciba next contends that Flesher does not disclose the 0.75 micron particle size limitation of the '766 and '808 patents. To the contrary, the Flesher '346 patent states that its particles are "preferably below 2 μm" or 2 microns in size. (Ex. B at col. 6, lines 32-33.) Flesher also teaches that "*[t]he particle size* in the emulsion or reverse phase polymerisation mixture *may be controlled* by the degree of shear applied to the monomers and *by the possible presence of emulsifying agent*." (*Id.* at col. 9, lines 7-10 (emphasis added).) Flesher adds that "[e]mulsifiers, stabilisers, non-aqueous liquids and other reverse phase polymerisation materials and process details are described in, for instance, EP No. 0126528." (*Id.* at col. 9, lines 21-24.) So the Flesher '346 patent clearly directs the reader to EP 0 126 528 (and hence to its corresponding U.S. Patent No. 4,528,321, "the Allen '321 patent"), for emulsifiers, stabilizers, and process details that are used to control particle sizes.

### C.    Hercules Will Provide Detailed Testimony and Evidence about Flesher and Allen and the Limitations of Ciba's Claims

Dr. Prud'homme discussed how the Flesher '346 patent utilizes the polymerization process and conditions to achieve particle sizes less than 0.75 micron in size in his initial expert report (D.I. 102, ¶¶ 21-22), in his September 2005 supplemental expert report (D.I. 189, ¶¶ 23, 25-27), and during his October deposition. Dr. Prud'homme pointed out that the Allen '321 patent contains specific Examples where the polymeric particles have sizes in the ranges of 0.2 to 2.0 microns and 0.3 to 3 microns. (*See* D.I. 189, ¶ 23.) Dr. Prud'homme also opined that because of the skewed distribution of particles sizes in

Exhibit 19 of the Pretrial Order
Page 3 of 18

these organic, polymeric systems (with many more small particles than big ones--*see* D.I. 189, Exs. 2-3), the number average particle sizes in the Allen '321 patent (and hence in the Flesher '346 patent) would be below 0.75 microns. (*See* D.I. 102, ¶¶ 21-22; D.I. 189, ¶ 27.)

The patent attorney at American Cyanamid who prosecuted the applications that issued as the '766 and '808 patents-in-suit, Mr. Frank Van Riet, reached a similar conclusion. Specifically, while prosecuting the '766 and '808 patents, Mr. Van Riet was also prosecuting another American Cyanamid application relating to microparticle technology that had been rejected over the Flesher '346 patent. There American Cyanamid claimed "a method of releasing water from a dispersion of suspended solids" that involved using "highly branched, water-soluble, high molecular weight, polymeric particles" having "an unswollen diameter of less than about 0.1 micron." (Ex. C, U.S. Application Serial No. 07/552,958, Appeal Brief received Sept. 19, 1981 at HERC0076214.) In appealing the rejection, Mr. Van Riet and American Cyanamid stated:

> Further support for Appellants' position is found at col. 9, lines 21-24 of Flesher etal wherein EP No. 0126528 is disclosed as including details of the type of polymerization used in Flesher etal. As mentioned, macroemulsion technology produces polymer particles averaging about one (1) micron in diameter. *Reference to U.S. Patent No. 4,528,321, copy attached, which is an equivalent of the above-identified EP patent, shows the production of polymers having an average particle size range of from 0.2-2.0, see Example 1, line 50.* Thus, it is clear that the Flesher etal polymer particles, which are all above 0.2 micron and average 1.1 micron, are far larger than claimed by Appellants i.e. all are below 0.1 micron, not an average.[1]

(*Id.* at HERC0076221 (referring to the Flesher '346 patent as "Flesher etal") (emphasis added; underlining in original).) In so doing, Mr. Van Riet and American Cyanamid provided strong evidence that persons of skill in this art would, upon analyzing the disclosure

---

[1] Mr. Van Riet apparently incorrectly averaged the smallest and largest particles rather than computing a number average particle size.

Exhibit 19 of the Pretrial Order
Page 4 of 18

REDACTED

of the Flesher patent, look to the Allen patent for particle size information. Their observation (in September of 1991) also dispels Ciba's assertion that Hercules is engaging in "insidious hindsight reconstruction" (*see* Ciba Motion at 5) in urging that the claims of Ciba's patents would have been obvious to one of skill in the art at the time of filing (in June of 1990).

Hercules has also alleged that the claims of the patents-in-suit are unenforceable for inequitable conduct due to, *inter alia*, Mr. Van Riet's failure to cite the Flesher patent to the PTO. Hercules will try its inequitable conduct case to the Court, not to the jury. But the jury is still entitled to consider Hercules' invalidity evidence, including testimony concerning the Flesher patent, the Allen patent, and the '958 application discussing this prior art.

**D.    The Cyanatrol Evidence Rebuts Ciba's Cross-Linking Arguments**

Ciba asserts that the Cyanatrol evidence should also be kept from the jury. Ciba fails to explain that Cyanatrol was a series of commercial American Cyanamid products formed from acrylic acid and acrylamide ███████████████████████████████

████████████████████████████████████████████████████████.

Dr. Prud'homme discussed Cyanatrol at length in his expert report (*see* D.I. 189, ¶¶ 2-15) ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (*see* D.I. 189, ¶ 3.) Under the guise of "foundation," Ciba again raises technical arguments directed to the merits of Dr. Prud'homme's opinion. The jury is clearly entitled to hear testimony about these long-time, non-cross-linked products ██████████████████████████████

███████████    This Ciba foundational argument and Ciba's contention that numerous Hercules trial exhibits (*see* Ciba Motion at 5) should be excluded for completely unspecified reasons should be rejected.

Exhibit 19 of the Pretrial Order
Page 5 of 18

REDACTED

## II.    CYTEC'S AND HERCULES' RESPONSE TO CIBA'S MOTION IN LIMINE II TO PRECLUDE TESTIMONY OF DR. RYLES AS TO NON-INFRINGEMENT AND INVALIDITY

Defendants Cytec and Hercules respectfully submit this memorandum in response to Ciba's Motion In Limine To Preclude Testimony of Dr. Ryles As To Non-Infringement and Invalidity. Ciba contends that Dr. Ryles should be precluded from testifying as to non-infringement and invalidity based upon the fact that Dr. Ryles was not qualified as an expert. But Cytec is not offering the testimony of Dr. Ryles to support its non-infringement position or any position whatsoever on invalidity. Cytec will offer no evidence on invalidity or unenforceability through Dr. Ryles or otherwise. Rather, Dr. Ryles is being offered as a fact witness to support Cytec's non-willfulness position, as well as provide factual testimony regarding his personal knowledge, as one of the inventors, of the patents-in-suit, the background thereto, the patented technology and other related technology.

Willfulness is a question of fact to be determined from the totality of the circumstances. *Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 822 (Fed. Cir. 1992). ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ Cytec must be able to present this factual testimony to counter Ciba's claim that Cytec went forward with no good faith basis of non-infringement.

Furthermore, Dr. Ryles is intimately familiar with the patents-in-suit and the background thereof. Dr. Ryles also has extensive experience with the patented technology and related technologies. His testimony as to these matters will also consist of personal knowledge allowed under Fed. R. Evid. 701, rather than opinions or inferences that would be

Exhibit 19 of the Pretrial Order
Page 6 of 18

characterized as expert testimony under Fed. R. Evid. 702. Such testimony is well within the permissible testimony allowed under Fed. R. Evid. 701, which explicitly allows for a lay witness to testify regarding his own perceptions and knowledge. This is particularly true of inventors. *See Voice Technologies Group, Inc v. VMC Sys, Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) ("[t]he testimony of the inventor may [] provide background information..."); *Hoechst Celanese Corp. v. BP Chem. Ltd*, 78 F.3d 1575 (Fed. Cir. 1996) ("we have treated [the inventor's] testimony as cumulative to the other evidence, and as enlarging our understanding of the technology...").

Judge Farnan addressed a similar issue to that raised by Ciba in *Corning Inc. v. SRU Biosystems*, Civ. No. 03-633, 2005 WL 2465900, (D. Del. Oct. 5, 2005) (Ex. D). There, Judge Farnan noted that:

> Corning objects to the testimony of Dr. Cunningham on the grounds that Dr. Cunningham was not qualified as an expert witness and it was improper for SRU to attempt to elicit expert testimony from him...where, as here, Dr. Cunningham provided no expert report and was not qualified as an expert witness...
>
> ...SRU also contends that Dr. Cunningham's testimony is not being used to prove infringement, and that Dr. Cunningham's position as SRU's chief technical officer qualifies him to offer lay opinion on the operation of SRU's technology.
>
> Under Rule 701, a lay witness may testify regarding his own perceptions and knowledge and participation in the day-to-day affairs of a business. In the Court's view, Dr. Cunningham's testimony was not offered by SRU as expert testimony, but as Rule 701 testimony regarding the background of SRU and its technology[.] Accordingly, Dr. Cunningham's testimony will not be used as expert testimony by the Court in its infringement analysis...

*Id*. at *7-8.

Ciba's *In Limine* motion is far too broad in scope in that it seeks to preclude Dr. Ryles' testimony in its entirety. For the foregoing reasons, Cytec requests that the Court deny Ciba's Motion *In Limine* to preclude testimony of Dr. Ryles.

Hercules joins in this opposition insofar as it relates to Hercules' positions.

Exhibit 19 of the Pretrial Order
Page 7 of 18

III.    **HERCULES' AND CYTEC'S RESPONSE TO CIBA'S MOTION IN LIMINE TO PRECLUDE COMPARISON OF THE ACCUSED PRODUCTS TO COMMERCIAL EMBODIMENTS OF THE PATENTED INVENTION FOR A NON-INFRINGEMENT PURPOSE**

Under the guise of a well-known and correct principle of law, that "the claims of [a] patent are infringed, not a commercial . . . embodiment," Ciba attempts to exclude a substantial volume of scientific testing and analysis which is relevant to the issues in this case. Specifically, Ciba predicates its motion on its contention that "[t]he defendants have asserted that there is non-infringement by comparing the accused PerForm product to a commercial embodiment, namely, Polyflex CP.3." This is inaccurate and mischaracterizes the evidence Hercules intends to offer at trial and the purpose for and manner in which it will be offered.

Hercules does seek to present scientific testing and analysis of its PerForm® SP9232 product. Because there is no scientific test or analytical technique that can in and of itself definitively "see" or prove the existence of a cross-link within a polymer, the tests upon which Hercules and its experts rely with respect to cross-linking are necessarily and unavoidably comparative.[2] In other words, the tests necessarily compare control/standard polymers with well-known, well-understood and well-characterized properties, with an "unknown" polymer--in this case the accused PerForm® SP9232 product--so that the unknown material can be characterized and understood. For example, Hercules' scientists do routinely include in their testing the commercial product Polyflex CP.3. But in these instances, Polyflex CP.3 is used as a control/standard to illustrate the behavior of a **cross-linked** organic retention and drainage aid in those tests. **Cross-linked** is one of the claim

---

2  ████████████████████████████████████████████████████████

Exhibit 19 of the Pretrial Order
Page 8 of 18

REDACTED

limitations found in both patents-in-suit. (*See* U.S. Patent No. 5,167,766 at col. 29, l. 42; U.S. Patent No. 5,171,808 at col. 9, l. 51.) Polyflex CP.3 is known in the industry to be a cross-linked material. In the same way, a commercially available linear organic retention and drainage aid, EM635, is also often used in these tests as a control/standard to illustrate the behavior of a non-cross-linked material.

In fact, many of Ciba's own test results also contain comparative data for both PerForm® SP9232, Polyflex CP.3 and linear polymers, presumably for similar reasons. For example,

Apparently Ciba itself intends to rely at trial on this and similar testing. This particular set of rheological comparisons is set out in an internal Ciba report that is Ciba's trial exhibit PTX-242. (Ex. G) There are also a number of similar documents on its trial exhibit list containing such testing. (*See, e.g.*, PTX 256-257, 267-270, 320, 325-326, 330, 335-337, 339-340.)[3]

The important point is that in no way do Hercules' tests (or the similar Ciba tests) "alleg[e] non-infringement by a comparison of Perform to Polyflex CP.3, not the claims of the patent." (Ciba Motion *In Limine* at 9.) Rather they evidence the behavior of PerForm®

---

[3] Although Ciba does not mention such documents in its motion, to the extent Ciba seeks to exclude Hercules' Trial Exhibits it must accept exclusion of these types of its own exhibits as well. What Ciba claims is irrelevant to non-infringement cannot then be relevant to infringement.

Exhibit 19 of the Pretrial Order
Page 9 of 18

REDACTED

SP9232 for a specific scientific test ████████████ in relation to the behavior of known cross-linked and non-cross-linked products in those same tests.

As an example of Ciba's mischaracterization, consider the paragraphs from the Rebuttal Expert Report of Dr. Prud'homme (D.I. 145, ¶¶ 42, 44-47) asserted by Ciba to be irrelevant to non-infringement. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████ At no time is there a suggestion that Polyflex CP.3 can substitute for the claims of the patents-in-suit or that Polyflex CP.3 defines the scope of those claims. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

This example from the Rebuttal Expert of Dr. Prud'homme also serves to highlight the differences between the situation at hand and the one in the case relied on by Ciba, *Praxair, Inc. v. ATMI, Inc.*, 2005 WL 3159054, at *2 (D. Del. Nov. 28, 2005) (*see* Ex. 20 to Ciba's Motions *In Limine*). In *Praxair*, the court made clear that the defendants were arguing that, "because the [plaintiffs'] product has both a 'flow regulator' and a 'filter,' plaintiffs

Exhibit 19 of the Pretrial Order
Page 10 of 18

REDACTED

referred [in their patents] to, and considered, a flow restrictor as separate from a filter." 2005 WL 3159054, at *2. In contrast, neither Hercules nor Dr. Prud'homme asserts that Polyflex CP.3 has any bearing on the claims of the patents-in-suit. Ciba's claims themselves **require** a cross-linked product.

Ciba's reference to cases related to the principle that "inefficient infringement is still infringement" is illogical and misplaced. ████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ The cases relied on by Ciba clearly do not parallel the situation at hand. For example, when the court in *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, stated that "[i]nefficient infringement is infringement still," the court was referring to the accused infringers' argument that in their accused process, "some of their . . . granules melt and some are removed by an air classifier." *See Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 792 (Fed. Cir. 1990). The court noted that this argument "may at most indicate that [the granules of the accused process] may not achieve perfect uniformity of radiation, but the district court correctly determined that the claim does not require absolute uniformity." *Id.* █████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████

The other case cited by Ciba for the principle that "inefficient infringement is still infringement" is similarly inapposite. *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 859 (Fed. Cir. 1988). The Federal Circuit in *Laitram* discounted tests relied on by the district court because the tests "subjected the [accused product] to a force more than three times the 1500 pounds to which such belts are warranted." *Id.* However, the appellate court was evaluating whether the accused product met, under the doctrine of equivalents, the claim term of "slightly greater" spacing, which was construed as spacing that would "minimize

Exhibit 19 of the Pretrial Order
Page 11 of 18

REDACTED

bending." As discussed above, the tests which Ciba seeks to remove from evidence in this case characterize the nature of the PerForm® SP9232 product itself. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, *Laitram* is inapplicable here.

Hercules also points out that Ciba's motion seeks a wholesale exclusion of entire documents or entire tests simply because Polyflex CP.3 was used as an example of a cross-linked retention and drainage aid in the experiment. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Exclusion of such important evidence of non-infringement would be prejudicial to Hercules and unwarranted. Ciba's concerns that the jury will be confused or misled into thinking that Polyflex CP.3 defines the scope of its invention are: (1) misplaced, because as stated above this is not the way in which Hercules has presented this data or will present it at trial; and, (2) are overstated because the jury can readily be advised through an appropriate instruction as to the correct scope of Ciba's claims.

Cytec joins in this response insofar as it relates to Cytec's positions.

Exhibit 19 of the Pretrial Order
Page 12 of 18

REDACTED

**IV.    HERCULES' AND CYTEC'S RESPONSE TO CIBA'S MOTION IN LIMINE TO PRECLUDE DEVELOPMENTAL AND NON-INFRINGEMENT EVIDENCE ON UNRELATED PRODUCTS**

Ciba seeks to exclude evidence relating to the development and non-infringement of "unrelated" products ███████████████████████████████████████████████ ██████████████████. Additionally, Ciba seeks to exclude evidence regarding Hercules' "testing of varying parameters in the manufacturing process" and "modifications and testing of products that . . . are not reacted under the same conditions as the accused Perform product." (Ciba Motion *In Limine* No. IV.) Ciba argues that this evidence should be excluded under Fed. R. Evid. 401 and 402 because it is not relevant, and is impermissible under Fed. R. Evid. 403 because it is likely to confuse the jury.

Ciba faces a difficult task in seeking to exclude this evidence as irrelevant. Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Because the rule makes evidence relevant 'if it has any tendency to prove a consequential fact, it follows that evidence is irrelevant only when it has no tendency to prove the fact.' Thus the rule, while giving judges great freedom to admit evidence, diminishes substantially their authority to exclude evidence as irrelevant." *Blancha v. Raymark,* 972 F.2d 507, 514 (3d Cir. 1992) (internal citations omitted).

Although Ciba asserts that Hercules relies on developmental and testing efforts that do not pertain to PerForm® SP9232, ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████. Further, these efforts clearly demonstrate the history of Hercules' efforts to purposefully design around the patents-in-suit and Hercules' reasonable and non-willful conduct concerning its PerForm® SP9232 product.

Exhibit 19 of the Pretrial Order
Page 13 of 18

REDACTED

For example, at the Privity Hearing held on May 8-9, 2006, John Harrington testified that in 1998, Hercules began developing its own organic polymer-based drainage aid. (D.I. 368, Privity Hearing Tr., May 8, 2006 at 207-08.) ███████████████████

Exhibit 19 of the Pretrial Order
Page 14 of 18

REDACTED

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ Hercules'
technology platform was consistently and intentionally focused on polymers that were
different from those described in the (Polyflex) '808 and/or '766 patents. (D.I. 368 at 207-
08.) ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ Thus, the
information that Ciba seeks to exclude is highly relevant to Hercules' and Cytec's defenses
against infringement and willful infringement, and should not be excluded under Fed. R.
Evid. 401.

The relevance of this information is further established by the fact that several
documents appearing on Ciba's own Trial Exhibit List relate to Hercules' research ████
████████████ (see, e.g. PTX 80, 81, 84, 85, 86, and 87), and in fact Hercules Trial
Exhibit No. 176, identified by Ciba as a document that should be excluded, appears on Ciba's
own Trial Exhibit List (see PTX No. 57).

Ciba also argues that Hercules and Cytec should not be able to rely on evidence
relating to Cyanatrol or the '371 patent, ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Exhibit 19 of the Pretrial Order
Page 15 of 18

REDACTED

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████  Clearly this evidence is highly relevant and therefore should

not be excluded.

In addition to its arguments under Fed. R. Evid. 401 and 402, Ciba asserts that

Hercules' and Cytec's evidence should be excluded under Fed. R. Evid. 403. Although Rule

403 may give courts "broad discretion" when ruling on a Rule 403 request, the District Court

for the District of Delaware has recognized that "Rule 403 should be exercised 'sparingly' to

exclude evidence, because such evidence is 'concededly probative.' Thus, the balance under

Rule 403 should generally be struck in favor of admissibility." *Bullen v. Chaffinch,* 336 F.

Supp. 2d 342, 354 (D. Del. 2004), citing *Blancha,* 972 F.2d at 516 (internal citations

omitted).

Ciba asserts that this evidence is likely to confuse the jury because it is "ostensibly

similar to the accused Perform product," and that "what defendants seek to do would be to

persuade the jury that the Perform product does not infringe because defendants did a lot of

work and, therefore, Perform must be different." Ciba's interpretation of this evidence,

however, is quite simplistic, and results in Ciba suggesting an argument that Hercules and

Cytec do not intend to make.

As discussed above, the evidence that Ciba seeks to exclude relates to Hercules'

research and development of its own non-infringing drainage aid. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Exhibit 19 of the Pretrial Order
Page 16 of 18



REDACTED

Hercules is entitled to set forth its invention story for the jury, especially in light of Ciba's charges of willful infringement, and this presentation of evidence is not likely to confuse the jury. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 828 (Fed. Cir. 1992) (reversing finding of willful infringement because no jury could find willful infringement under the record evidence which showed that the infringer engaged in a bona fide effort to design around the patent in suit.) Furthermore, this evidence is highly relevant and highly probative with respect to non-infringement as it provides a foundation for Hercules' position

It would clearly be very prejudicial to Hercules and Cytec if this highly relevant and probative evidence was withheld from the jury. For these reasons, Hercules and Cytec respectfully request that this Court deny Ciba's motion, and not exclude this evidence under Fed. R. Evid. 401, 402, or 403.

Cytec joins in this Response to the extent it is applicable to its positions.

Exhibit 19 of the Pretrial Order
Page 17 of 18

REDACTED



Exhibit 19 of the Pretrial Order
Page 18 of 18

# EXHIBIT A

U.S. Patent No. 4,720,346
(Col. 5, lines 35-65)

Another process where the shear resistance of the 35
flocs is desirable is in the formation of paper and paper
products such as board; since the processes of the inven-
tion permit improved dewatering of cellulosic and other
suspensions. In conventional paper production, it is
generally necessary to minimise the amount of shear to 40
which the flocs are subjected and so in practice the
flocculant is added at the end of the pulp flow line, as
late as possible before the drainage or other dewatering
stage. In the invention, however, it is possible, and
frequently desirable, to add the flocculant (preferably 45
an insoluble polymer) at an early stage in the pulp flow
line so that the act of pumping the flocculated disper-
sion along the flow line towards the drainage or other
dewatering stage involves the application of shear to
the flocculated pulp, and this shear converts the flocs to 50
medium or small size flocs substantially free of undesir-
able fines. A preferred process of the invention there-
fore comprises flocculating a cellulosic suspension by
addition of the polymeric material, usually as a stable
homogeneous aqueous composition and pumping the 55
flocculated suspension along a flow line with sufficient
shear to break down the flocs to smaller, shear stable,
flocs and then dewatering the suspension by drainage or
other suitable means. This process is of particular value
when cationic starch is also added to the dispersion 60
since the overall process then gives an exceedingly
good combination of paper strength and retention and
dewatering properties. For this process, the flocculant
polymer is preferably an anionic polyacrylamide. Syn-
ergism appears to exist.                              65

☑ Concerns papermaking

☐   Does not concern papermaking

Date:  Oct. 28, 2005   _Eleanor A. King_



# EXHIBIT B

# United States Patent [19]

## Flesher et al.

[54] FLOCCULATION PROCESSES

[75] Inventors: Peter Flesher; David Farrar; John R. Field, all of West Yorkshire, England

[73] Assignee: Allied Colloids Ltd., England

[21] Appl. No.: 855,509

[22] Filed: Apr. 23, 1986

[30] Foreign Application Priority Data

Apr. 25, 1985 [GB] United Kingdom .......... 8510496
Oct. 29, 1985 [GB] United Kingdom .......... 8526624

[51] Int. Cl.⁴ ........................................ C02F 1/56
[52] U.S. Cl. ............................ 210/734; 210/732;
      210/738; 523/322; 524/922
[58] Field of Search ............ 210/725, 727, 728, 730,
      210/732–736, 738; 523/319, 322, 323; 524/922;
      525/326.1, 329.4

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,235,490 | 2/1966 | Goren | 210/734 |
| 3,380,947 | 4/1968 | Galgoci et al. | 523/323 |
| 3,536,646 | 10/1970 | Hatch et al. | 523/322 |
| 3,624,019 | 11/1971 | Anderson et al. | 210/734 |
| 3,640,897 | 2/1972 | Restaino | 210/734 |
| 3,719,748 | 3/1973 | Manfroy et al. | 210/734 |
| 3,917,529 | 11/1975 | Madole et al. | 210/738 |
| 3,968,037 | 7/1976 | Morgan et al. | 210/734 |
| 3,977,971 | 8/1976 | Quinn et al. | 210/738 |
| 4,051,063 | 9/1977 | Venema | 422/261 |

[11] Patent Number: 4,720,346

[45] Date of Patent: Jan. 19, 1988

| | | | |
|---|---|---|---|
| 4,113,618 | 9/1978 | Pearson | 524/922 |
| 4,172,066 | 10/1979 | Zweigle et al. | 525/329.4 |
| 4,382,864 | 5/1983 | Hashimoto et al. | 210/730 |
| 4,529,794 | 7/1985 | Sortwell et al. | 528/499 |

Primary Examiner—Peter Hruskoci
Attorney, Agent, or Firm—Ostrolenk, Faber, Gerb & Soffen

[57] ABSTRACT

When flocculating an aqueous suspension of suspended solids using a high molecular weight synthetic polymeric flocculant, the shear stability of the flocs is increased if the polymeric material includes polymeric particles of below 10 μm dry size. The flocculated solids can therefore be subjected to shear without increasing the amount of discrete suspended solids in the aqueous medium and generally they are subjected to shear by shearing the aqueous medium containing them, either before dewatering, generally on a centrifuge, piston press or belt press, or by continuously agitating them, for instance in a chemical reaction medium. The polymeric material is generally formed by mixing into water polymeric particles made by reverse phase or emulsion polymerization in the presence of added cross linking agent. Alternatively, particles insolubilized by insoluble monomer may be used. A reverse phase dispersion of water soluble polymer may be used if the particles remain undissolved, e.g. if they are added in the absence of an oil in water emulsifying agent.

24 Claims, 1 Drawing Figure





DEFENDANT'S EXHIBIT
Van Riet 9
10/25/05  SC

CIBA 002405

**U.S. Patent**          Jan. 19, 1988          **4,720,346**



CIBA 002406

4,720,346

1

## FLOCCULATION PROCESSES

When synthetic polymers of water soluble monomers or monomer blends were first introduced as flocculants, in the early to mid-1950's, maximum molecular weights were relatively low, compared to the present day. The initial polymers typically had molecular weights well below 500,000 and thus were of a value comparable to the molecular weight now associated with coagulants, rather than high molecular weight flocculants. These low molecular weights were probably caused by the presence of chain transfer agents and other impurities in the monomer or polymerisation mixture.

It was recognised that the polymers had to be in solution and if the polymers were not, despite their low molecular weight, spontaneously soluble in water (for instance due to excessive cross linking) it was appreciated to be necessary to homogenise them so as to put them into solution. For instance Miller described in U.S. Pat. No. 3,021,269 ultrasonic degradation of a highly cross linked insoluble polymer gel "having almost infinite molecular weight" to render it water soluble as a result of severing the polymeric structure. The end products were always of relatively low molecular weight and the highest quoted molecular weight for the end product is 630,000 and the highest intrinsic viscosity (IV) 2.54 dl/g.

Similarly, Goren described in a 1954 patent application (published as U.S. Pat. No. 3,235,490) dispersing various polymer gels into water using a Waring Blendor. Many of the gels were cross linked spontaneously or by the addition of cross linking agent and the cross linking appears to have caused the formation of some wholly insoluble, non-swellable, polymer that settled out of solution. Solutions of the polymers were also subjected to homogenisation in a hand homogeniser and it was observed that the effect on agglomeration performance of this homogenisation is drastic, with most of the products being useless after homogenisation. Again, all the polymers were of very low molecular weight as is indicated by the fact that the highest specific viscosity (measured by a capillary flow viscometer at 34° C. on a 0.5% solution in deionised water) is quoted as 0.77. This compares to values of well over 100, and usually over 1000, for modern high molecular weight flocculants.

Some polymers having molecular weights typical of those described by Miller and Goren can be used as coagulants, for instance for coagulating very fine suspended solids, e.g., for clearing turbidity or removing colour from aqueous solutions. For instance, typical modern polymer coagulants have a molecular weight of up to about 500,000. Typical polymer coagulants may be formed by reaction of epichlorhydrin with dimethylamine. Since the resultant linear product may have extremely low molecular weight, it is known to include ethylene diamine in order to increase molecular weight by cross linking without rendering the polymer insoluble.

Goren postulated that agglomeration involved electrostatic attraction followed by a sweeping action of a filamentary network of the cross linked polymer. This mechanism has come to be recognised as the classical mechanism of coagulating turbidity and colour, namely very fine suspended solids. Goren made his polymer by bulk polymerisation followed by comminution and showed that his aqueous compositions tended to be

2

non-homogeneous, in that there was a tendency for insoluble polymer to precipitate from the solution. Goren warned against cross linking too much and indicated that the optimum was the level at which the polymer is still readily dispersible in water. Since Goren was postulating a sweeping action by filamentary molecular networks this indicates that his dispersibility had to be on a molecular scale, i.e., true solution. Goren warned that the agglomerating effect of the polymer can be destroyed by homogenising it (column 13 line 74).

In contrast to these low molecular weight polymer coagulants, modern flocculants (for flocculating suspended solids such as sewage) are linear polymers of very high molecular weight. Most have an intrinsic viscosity above 4 and often above 10. The polymers have to be linear since cross linking renders them ineffective and often insoluble, although trivial amounts of cross linking may exist without detracting from the polymer properties (see for instance U.S. Pat. No. 3,557,061 column 3 line 35). .

Whether or not a high molecular weight polymer is suitable for use as a flocculant is determined in part by observing the rheology of aqueous compositions of the polymer. Satisfactory polymers give a "long" or "stringy" rheology. This is recognised in the art and can be demonstrated in that when a 1% stable homogeneous composition of the polymer in deionised water is formed by conventional techniques, such as by stirring using a slowly rotating stirrer followed by ageing, and a glass rod is manually pulled endwise out of the solution the rod draws a long thread of composition with it. The thread is generally at least 5 cm long and the polymer can then be described as having a rheology of 5 cm. Often the rheology is above 10 cm. If, in contrast to this, the polymer gives a "short" or "granular" rheology (i.e., in the above test the rod pulls substantially no thread, for instance below 5 cm and often below 2 cm, of composition), the polymer will be rejected and will not be used as a flocculant. Experience has shown that polymers giving this short rheology are unsatisfactory in conventional flocculation processes since it indicates a high degree of cross-linking and/or a low molecular weight. The short polymers can also be characterised as non-film forming, in that when an aqueous composition is dried it does not form a film.

Similarly the polymer is rejected if it has a large particle size and is cross linked sufficient to ensure that insoluble solid polymer does not go into stable suspension in the aqueous composition.

The stable homogeneous composition is stable in the sense that the polymer is in full equilibrium with the water, i.e., it has reached its ultimate degree of solution or swelling, for instance as a result of ageing for two hours or more. It is homogeneous in the sense that the polymer remains uniformly dispersed throughout the composition (usually in the total absence of dispersing agent although minor amounts may be present as a result of the manufacture of the polymer) with no tendency for material to precipitate from the composition on standing for a few days.

The unsuitability as flocculants of short rheology polymers (as defined above), and of polymers that do not go into stable suspension or solution are well understood in the art. Very high molecular weight, linear, truly dissolved polymers are preferred.

Certain high molecular weight polymers, for instance polymers of Mannich bases, have a tendency to cross link spontaneously and acquire a rather short or very

CIBA 002407

4,720,346

| 3 | 4 |

short rheology or become totally insoluble. It frequently happens that high molecular weight polymers are produced which have rheology that is shorter than is desirable. Polymers of very short rheology (below 2 cm), or that are insoluble, are rejected. Polymers with 5 longer, but still rather poor, rheology may be used under the same conditions as if they had the desired long rheology but this leads to poor performance properties.

In GB Pat. No. 1,579,007 it is alleged that high molecular weight cationic flocculants give optimum performance when the polymers have a cationicity value of at least 90% of the theoretical cationicity value.

Flocculant polymers may be made by reverse phase suspension or emulsion polymerisation to a very small particle size. Before use, the resultant emulsion is added to water, generally in the presence of oil-in-water emulsifying agent and usually with stirring, and allowed to form a true solution before use. Thus the system is always allowed to go to equilibrium (i.e., a stable homogeneous composition), often shown by attainment of maximum viscosity, before it is added to the suspension.

The linear, high molecular weight flocculant polymers are used by forming, with ageing, a true aqueous solution of the polymer and dosing this with minimum agitation into the suspension, followed by dewatering of the suspension. Optimum results require accurate dosing and the minimum of agitation during flocculation. If the dose is too low or too high flocculation is inferior. The optimum dose depends upon the content of the suspension and so variations in it, for instance variations in the metal content of industrial sewage effluent, can greatly affect performance. The flocs are very sensitive to shear and agitation, especially if the dosage is not at an optimum, is likely to redisperse the solids as discrete solids. This is a particular problem when the flocculated solids are to be dewatered under shear, for instance on a centrifuge, because if dosage and other conditions are not optimum the centrate is likely to have a high discrete solids content.

It would be desirable to provide a flocculation process in which the dosage of flocculant is less dose sensitive and the flocs are more stable to shear than with conventional dissolved high molecular weight flocculant polymers.

In the invention, an aqueous suspension of suspended solids is flocculated by adding a synthetic polymeric material to form an aqueous medium containing flocculated solids and the process is characterised in that at the time of addition to the suspension, the polymeric material has a specific viscosity above 10 (generally above 100), and comprises polymeric particles having a dry size of below 10 μm, the polymeric material is added in a floc stabilising amount, and the flocculated solids are subjected to shear in the presence of the aqueous medium substantially without increasing the amount of discrete suspended solids in the aqueous medium.

Thus the invention is based on the discovery that the shear stability of the flocs can be increased by initiating, and usually completing, flocculation while some or all of the polymeric material is in the form of small particles rather than a true solution. For optimum flocculation, the dosage of the polymer should usually be greater than the optimum amount used with fully dissolved polymers but the process is not so dose sensitive as with fully dissolved polymers.

The particulate material can be soluble. Thus a conventional reverse phase emulsion of soluble polymer can be mixed direct into the suspension or, usually, is diluted in the absence of oil-in-water emulsifier and/or with insufficient stirring or ageing to form a true solution, and is added to the suspension. This is in contrast to previous experience where the aqueous composition was always allowed to age to maximum viscosity (true solution) before use since conventional low shear flocculation (e.g., sedimentation) had shown this to be essential for satisfactory results.

It is often preferred that the polymeric material should comprise particulate insoluble polymer. This may be insoluble due to the inclusion of insolubilising monomers or due to the provision of a controlled degree of non-linearity in an otherwise soluble polymer. Commercially, the invention is best performed by making reproducibly a polymeric material having a controlled degree of non-linearity, which is used to flocculate an aqueous suspension and is then subjected to shear without substantial redispersion of the solids to become discrete suspended solids. This procedure is in contrast to previous experience where non-linearity may have occurred by accident and the polymer was then either rejected as being useless or was used in either a conventional low shear process or was used in an inadequate amount in a high shear process, with consequential redispersion of solids.

The shear to which the flocculated solids are subjected may be applied only during dewatering of the solids but preferably the flocculated solids are subjected to shear by shearing the aqueous medium containing them. For instance instead of mixing the aqueous flocculant into the suspension in conventional gentle manner, with little or no agitation of the flocs, in the invention the aqueous medium is preferably sheared by stirring sufficient to reduce floc size. This is particularly desirable when the aqueous suspension is viscous, e.g., it has a solids content above 3% by weight for primary or digested sludges or about 1.5% for activated sludges. At these high solids contents, the flocs are likely to be very large, for instance above 5 cm (and often the solids may go into a substantially continuous floc) and the shear is preferably such as to break this large floc structure down into flocs typically having a size in the range 2 to 20 mm. Because of the particulate nature of the polymer, and appropriate choice of the amount of particulate polymer, this floc breakdown occurs without the amount of discrete suspended solids in the aqueous medium increasing substantially, or preferably at all, compared to the amount that is present if the suspension is not sheared.

After shearing, the medium may be dewatered. Dewatering may be by sedimentation or by drainage or vacuum filtration but a particular advantage of the invention is that the floc structure can be very effectively dewatered under shear, and in particular on a centrifuge, piston press or belt press, to give very high recovery of solids, and very low suspended solids in the filtrate.

Dewatering of flocculated solids can be conducted, especially at relatively low solids concentrations, under shear, e.g., on a centrifuge, even if the flocculated aqueous medium is not first subjected to shear, but generally less effective dewatering is obtained.

The improved floc structure obtainable in the invention, compared to the use of conventional dissolved flocculants, permits dewatering to an increased solids content, thereby for instance reducing the amount of energy required for incinerating a sewage filter cake.

CIBA 002408

4,720,346

5

The increased floc strength however is valuable in various other processes.

The flocs obtained in the process (preferably using insoluble polymer) can be continuously kept in suspension by agitation of the aqueous medium without any substantial increase in the discrete suspended solids in the aqueous medium. For instance, the polymeric material (usually as a stable homogeneous aqueous composition) may be added (optionally with applied shear) to an aqueous suspension whilst it is being agitated and this agitation may provide shear and may keep the resultant, sheared flocculated solids in suspension. The continuous agitation may be continued for several hours and usually for at least a day or several days, without substantial floc breakdown. This is of value, especially when using anionic flocculants, for transporting inorganic or other solids in a fluid medium, for instance by pipeline or in any process in which agitation is applied for prolonged periods, e.g., in chemical or biochemical reactors.

The process is of particular value when the aqueous medium is a chemical reaction medium and the solids are a catalyst for the reaction, since we have surprisingly found that a stirred or otherwise agitated reactor can be operated for prolonged periods with the catalyst in the form of flocs. This facilitates the separation of the aqueous medium from the catalyst, for instance as the medium is withdrawn continuously or batchwise from the reactor. This process is of particular value in the catalytic hydrolysis of a nitrile to form an amide, for instance when the aqueous medium is an acrylonitrile hydrolysis reaction medium to form acrylamide. The catalyst is preferably a copper catalyst, for instance of reduced copper oxide or, preferably, Raney copper.

Another process where the shear resistance of the flocs is desirable is in the formation of paper and paper products such as board, since the processes of the invention permit improved dewatering of cellulosic and other suspensions. In conventional paper production, it is generally necessary to minimise the amount of shear to which the flocs are subjected and so in practice the flocculant is added at the end of the pulp flow line, as late as possible before the drainage or other dewatering stage. In the invention, however, it is possible, and frequently desirable, to add the flocculant (preferably an insoluble polymer) at an early stage in the pulp flow line so that the act of pumping the flocculated dispersion along the flow line towards the drainage or other dewatering stage involves the application of shear to the flocculated pulp, and this shear converts the flocs to smaller or small size flocs substantially free of undesirable fines. A preferred process of the invention therefore comprises flocculating a cellulosic suspension by addition of the polymeric material, usually as a stable homogeneous aqueous composition and pumping the flocculated suspension along a flow line with sufficient shear to break down the flocs to smaller, shear stable, flocs and then dewatering the suspension by drainage or other suitable means. This process is of particular value when cationic starch is also added to the dispersion since the overall process then gives an exceedingly good combination of paper strength and retention and dewatering properties. For this process, the flocculant polymer is preferably an anionic polyacrylamide. Synergism appears to exist.

Another advantage of the invention is that the process is much less dose sensitive than when using truly dissolved flocculants and so there is much less risk of

6

obtaining inferior performance due to under-dosing or over-dosing. Even after shearing the suspension, it is usually possibly to obtain floc size that is much greater than is obtainable using conventional dissolved flocculants. Because, at the optimum dose, the floc size is much greater than is available conventionally this means that the dose can be varied above or below the optimum whilst still obtaining improved results compared to those obtainable conventionally.

Although the invention can be used for flocculating a wide variety of aqueous inorganic suspensions and aqueous organic suspension, especially sewage, it is of particular value in the centrifugal dewatering of municipal sewage that includes a significant industrial component, especially that includes variable amounts of metal. Best results are generally obtained when the flocculated aqueous medium is vigorously stirred, so as to apply shear to the flocculated solids, before entering the bowl of the centrifuge.

The polymeric material can be dosed into the suspension in any convenient manner (e.g., a dispersion in oil could be metered carefully into the suspension) but is preferably added in the form of a dilute aqueous composition, typically having a concentration of 0.01 to 3%, generally 0.05 to 1%. It should preferably be a microdispersion. By this we mean that if a layer of this composition is allowed to dry, microscopic examination readily identifies discrete polymeric particles, optionally interconnected by a film of water soluble polymer. Often the composition does not form a film. The polymer particles must be below 10 μm dry size, preferably below 2 μm, but preferably swell, e.g., to at least twice their dry diameter, and often at least 5 times their dry diameter, in water.

When the polymer particles are insoluble, it is preferred for the aqueous composition to be a homogeneous stable composition as defined above although the polymer particles can go to equilibrium with the water in the flocculated suspension to some extent at least. If the polymer particles are soluble, then they must be added to the suspension before they dissolve and preferably initial flocculation is complete before they can dissolved.

In order that the particles have the desired small size, they are best prepared by emulsion or reverse phase polymerisation.

Although we believe it to be essential to include nondissolved particles, it appears that dissolved polymeric material may also contribute to the invention and so the polymeric material that is added to the suspension may include also dissolved linear polymer. When the polymer particles are cross linked, it is generally preferred to provide this as a soluble component of the cross linked particles, so that upon dispersing the particles in the aqueous composition the particles swell and the soluble component dissolves into the composition. However it is also possible either to blend a dissolved polymer with a particulate (generally insoluble) polymer in the aqueous composition or to add these polymers sequentially to the aqueous suspension, the dissolved polymer generally being added first. When the mixture of dissolved and particulate polymers is made by blending polymers, the chosen polymers are usually co-ionic or one or both may be non-ionic, or they may be counter ionic. Usually the polymers are made from the same monomers, and often differ only in the degree of cross linking.

CIBA 002409

4,720,346

7

The amount of dissolved polymer is usually from 0 to 50%, preferably up to 20%, preferably at least 10%, by weight total polymer, the balance being particulate.

The particles may be wholly insoluble, non-swellable, polymer particles. For instance, they may be formed of wholly water insoluble monomers or, more preferably, a blend of water soluble and water insoluble monomers such that the polymer is insoluble in water (generally at both high and low pH values). Insolubility is often further increased by cross linking.

Preferably, however, the particles are formed of a monomer or monomer blend that is soluble in the aqueous composition and the particles are either soluble in the aqueous composition and are used before they dissolve, or, preferably, are cross linked sufficient that they are insoluble in but swollen by the aqueous composition. This cross linking (which may be chain branching) may be brought about by controlled spontaneous conditions such as heating or irradiation, provided the degree of chain branching or other cross linking is reproducible and controllable, but preferably is brought about by reaction of the monomer or monomer blend, or the final polymer, with a covalent or ionic cross linking agent.

Cross linked polymer can be made by cross linking a preformed linear water soluble polymer having a specific viscosity above 10 with a cross linking agent, e.g., by mixing an aqueous solution of the polymer with cross linking agent whilst stirring with sufficient force to form a homogeneous stable aqueous composition. If the stirring is inadequate, cross linked polymer will precipitate from the composition. If it is adequate, then the polymer will be broken up into sufficiently small particles, below 10 μm and preferably below 2 μm dry size, that the particles will remain in stable homogeneous dispersion. The cross linking agent for this purpose can be, for instance, formaldehyde or glyoxal or metal salts but preferably is a counterionic linear water soluble polymer having specific viscosity above 10. Preferably both polymers have specific viscosity above 100. By selecting appropriate amounts of polymers having anionic and cationic groups, it is possible to obtain a stable homogeneous aqueous composition of coprecipitated, or cross linked, polymer and, if desired, to leave an excess of a water soluble polymer of one ionic type.

The preferred way of making the aqueous composition is by mixing into water particles of polymeric material having dry size below 2, μm and most preferably below 2, μm and which have been made emulsion polymerisation or by reverse phase emulsion or suspension polymerisation of one or more monoethylenically unsaturated monomers. The polymer may be soluble but is preferably insoluble as a result of a controlled addition of cross-linking agent to the monomer or monomer blend, which is preferably water soluble.

The monoethylenically unsaturated material may be contaminated with a small amount of cross-linking agent and the amount of additional cross-linking agent that is added will therefore be selected having regard to this fact. Preferably the monoethylenically unsaturated material is as free of cross-linking agent as is commercially possible, for instance containing cross-linking agent in an amount that gives cross linking or chain branching less than is given by ppm MBA (1 part methylene bis acrylamide per million parts monomer). The amount of MBA that is added is generally at least 0.1 or 0.2 ppm and below 100 ppm (based on monomer), generally 1 to 50 ppm. The precise amount will depend upon the polymerisation and other processing condi-

8

tions. Instead of using MBA, cross-linking may be by equally effective amounts of other diethylenically unsaturated compounds such as ethylene glycol d-acrylate, diacrylamide, cyanomethylacrylate, vinyloxyethylacrylate or methacrylate and other means of cross linking, e.g., formaldehyde or glyoxal or metal salt addition. Preferably a water-soluble cross-linking agent is used.

The degree of non-linearity can additionally be controlled by the inclusion of chain transfer agents in the polymerisation mixture. Their use, in combination with cross-linking agent, will tend to promote chain branching rather than cross linking. Amounts may vary widely. For instance 1,000 to 5,000 ppm (based on monomer) of a moderate chain transfer agent such as isopropyl alcohol may be suitable whilst much lower amounts, typically 100 to 500 ppm, of more effective chain branching agents such as mercaptoethanol are useful. Often, however, adequate results are obtained by conducting polymerisation under conventional conditons; without deliberate addition of chain transfer agent, using commercially pure monoethylenically unsaturated monomer together with the specified amount of MBA or other cross-linking agent.

Instead of insolubilising the polymer by cross linking, it may be formed from an insoluble monomer, or a monomer blend containing sufficient insoluble monomer to insolubilise the polymer.

The monoethylenically unsaturated monomers may consist of one or more ionic monomers or a blend of ionic and non-ionic monomers. The monomers can be allyl monomers but are generally vinyl, preferably acrylic.

Suitable non-ionic monomers are acrylamide, methacrylamide, N-vinylmethylacetamide or formamide, vinyl acetate, vinyl pyrrolidone, methyl methacrylate or other acrylic (or other ethylenically unsaturated) ester or other water insoluble vinyl monomers such as styrene or acrylonitrile.

Suitable anionic monomers are sodium acrylate, methacrylate, itaconate, 2-acrylamido 2-methyl propane sulphonate, sulphopropyl acrylate or methacrylate or other water soluble forms of these or other polymerisable carboxylic or sulphonic acids. Sulphomethylated acrylamide, allyl sulphonate or sodium vinyl sulphonate, may be used.

Suitable cationic monomers are dialkylaminoalkyl acrylates and methacrylates, especially dialkylaminoethyl acrylate, and their quaternary or acid salts, and dialkylaminoalkylacrylamides or methacrylamides and their quaternary or acid salts for instance methacrylamidopropyl trimethyl ammonium chloride and Mannich products, such as quaternised dialkylaminomethylacrylamides. Alkyl groups are generally C₁₋₄ alkyl.

The monomers can contain hydrophobic groups, e.g., as described in EP No. 0172723A2, for instance on page 10 thereof. If the monomer is to impart insolubility to the polymer, the ethoxy chain should be short or absent, i.e., n=0. The allyl ether monomers are especially preferred.

The polymerisation conditions are preferably such that the polymer has, if uncross linked, a conventional flocculant high molecular weight of 5 million to 30 million and an intrinsic viscosity of above 4, preferably above 6, e.g., up to 15 or 20 dl/g. If the polymer is cross linked, it is preferably polymerised such that it would have such molecular weight if it had been made in the

CIBA 002410

4,720,346

9

absence of cross linking agent. However cross linking will reduce the IV but the shearing may then cause the IV to increase, as explained below. The specific viscosity of the polymer, measured as defined above, is generally above 100, preferably above 500 and frequently above 1000.

The particle size in the emulsion or reverse phase polymerisation mixture may be controlled by the degree of shear applied to the monomers and by the possible presence of emulsifying agent. Emulsion polymerisation may be utilised when polymerising, for instance, water insoluble monomers such as acrylic esters or water insoluble but acid soluble monomers such as amines (the resultant polymer being distributed into acidic aqueous composition) but generally reverse phase emulsion or suspension polymerisation is utilised when the monomer or monomer blend is soluble in water. The aqueous monomer is emulsified into a suitable non-aqueous liquid, generally in the presence of a water in oil emulsifier, generally in an amount below the critical micell concentration. Emulsifiers, stabilisers, non-aqueous liquids and other reverse phase polymerisation materials and process details are described in, for instance, EP No. 0126528. The polymer particles may be dehydrated, for instance by subjecting the dispersion to azeotropic distillation.

The liquid product resulting from the reverse phase polymerisation or emulsion polymerisation is generally used as such, without separation of the polymer particles, but if desired dried polymer particles may be separated from the dispersion in known manner. Because these dry particles will be very dusty, they should preferably be formed into pellets that will disintegrate upon addition to water.

The polymer-in-oil emulsion that results from reverse phase polymerisation may be added to water to form the aqueous composition (or to the suspension) in the presence of oil-in-water emulsifier in conventional manner. However when the polymer is water-soluble, it is preferred to make the addition in the absence of the emulsifier so that the rate of solution is slower. The reverse phase emulsion is preferably dehydrated.

The polymerisation conditions are preferably such that the polymer particles resulting from the polymerisation have the desired controlled degree of solubility but it is possible to produce polymer particles that are too highly cross linked and then to subject this polymer to sufficient shear to restore it to a desired, controlled, degree of cross linking. This shear may be applied to the dispersion in which the polymer particles are formed or, preferably, to the aqueous homogeneous composition. For instance when such a solution has short rheology, the mixing may convert it to long rheology. These processes are described in our application Ser. No. 855,519 filed even date herewith.

When the polymeric material is cross linked and cationic, and in particular when it is a copolymer of acrylamide with at least 5%, and preferably at least 10%, by weight dialkylamino alkyl acrylate (generally as acid addition or quaternary ammonium salt), the degree of non-linearity is preferably such that the polymer has an ionic regain (IR) of at least 15%. IR is calculated as $(x-y)/x \times 100$ where $x$ is the ionicity measured after applying standard shear and $y$ is the ionicity of the polymer before applying standard shear.

These values are best determined by forming a 1% composition of the polymer in deionised water, allowing this to age for 2 hours and then further diluting it to

10

0.1% active polymer. The ionicity of the polymer $y$ is measured by Colloid Titration as described by Kock-Light Laboratories Limited in their publication 4/77 KLCD-1. (Alternatively the method described in BP No. 1,579,007 could possibly be used to determine $y$.) The ionicity after shear, $x$, is determined by measuring by the same technique the ionicity of the solution after subjecting it to standard shear.

The shear is best applied to 200 ml of the solution in a substantially cylindrical pot having a diameter of about 8 cm and arranged in its base with a rotatable blade about 6 cm in diameter, one arm of the blade pointing upwards by about 45 degrees and the other downwards by about 45 degrees. The blade is about 1 mm thick and is rotated at 16,500 rpm in the base of the pot for 10 minutes. These conditions are best provided by the use of a Moulinex homogeniser but other satisfactory conditions can be provided using kitchen blenders such as Kenwood, Hamilton Beach, Iona or Osterizer blenders or a Waring Blendor.

In practice the precise conditions of shear are relatively unimportant since, provided the degree of shear is of the same order of magnitude as specified, it will be found that IR is not greatly affected by quite large changes in the amount, for instance the duration, of shear, whereas at lower amounts of shear (for instance 1 minute at 16,500 rpm) IR is greatly affected by small changes in shear. Conveniently, therefore, the value of $x$ is determined at the time when, with a high speed blade, further shear provides little or no further change in ionicity. This generally requires shearing for 10 minutes, but sometimes longer periods, e.g., up to 30 minutes with cooling, may be desired.

It should be understood that the defined shear is not shear that is applied to the polymer solution or to the flocculated suspension during the flocculation process of the invention but is instead shear that is applied as an analytical technique to permit definition of the properties of the polymers that may be used in the invention.

When using cross-linked polymeric material, polymers having IR of 15% have a relatively low degree of non-linearity whilst those having IR 90% have a high degree of non-linearity. It is generally preferred for IR to be below 80%; preferably below 70%, and usually below 60%. If IR is too low, the invention may give inadequate benefit compared to conventional polymers and preferably IR is above 20%. Best results are generally obtained above 25%, preferably 30 to 60%.

It is desirable for the intrinsic viscosity to be as high as possible but satisfactory values of IV reduce as the value of IR increases. Generally $IV=(100-IR)/a$ where $a$ is below 20 and is generally below 15 but is usually above 4; Generally $a$ is in the range 6 to 14. Throughout this specification IV is measured at 25° C. in 3M NaCl according to the method described in Encyclopedia of Polymer Science & Technology, Editors Mark and Gaylord, published John Wiley & Sons, 1971, Volume 14 pages 717–740.

If the polymer is cross-linked, IV can be increased by the application of shear (as is also described in application Ser. No. 855,519 and the polymeric material is preferably one whose IV can be above 4, and preferably above 6, after the application of shear such as the standard shear described above.

The aqueous composition of the polymeric material may be combined with the suspension that is to be flocculated by conventional methods of blending but, as

CIBA 002411

4,720,346

<div style="display:flex">
<div>

**11**

described above, shear is generally applied sufficient to reduce floc size.

The amount of polymer that has to be added for optimum floc stability is often greater than the amounts conventionally used with highly soluble polymeric floc- 5 culants, usually at least 10% and often at least 20% greater than the amount that would be required when using a conventional, highly water soluble, substantially linear polymer. Suitable doses are in the range 0.01 to 3%, often 0.5 to 1%, by weight polymer based on dry 10 solids.

The amount that is required for adequate floc stability can be found by routine experimentation and, for any particular flocculation process, polymer type and degree of shear, the amount of polymer will depend upon 15 the degree of swelling or solution of the polymeric material, e.g., the degree of cross-linking. Generally the optimum amount increases with increasing amounts of cross linking.

A convenient way for determining the optimum floc 20 stabilising amount is to determine the dose that gives maximum floc size when the polymeric material is sheared into the suspension and the suspension is left to settle. The optimum is the dosage that gives maximum floc size after shear and in the invention, the dose that is 25 applied is generally from 50 to 150, preferably 70 to 110% of this optimum dose.

A particularly preferred process according to the invention comprises providing a homogeneous dilute 30 aqueous composition of a reverse phase polymerised, non-film-forming, cross linked, acrylamide copolymer with dialkylaminoalkyl(meth)acrylate (as acid salt or quaternary salt) having a dry particle size below 10 μm (preferably below 2 μm), IR above 15 and IV=(10- 35 0—IR/s) where s is from 6 to 14, adding this composition to sewage sludge in an amount of 50 to 150% of the amount required for maximum floc size after shearing, subjecting the blended mixture to the shearing to reduce floc size substantially without increasing the amount of 40 suspended solids; and dewatering the resultant aqueous medium on a centrifuge, piston press or belt press.

BRIEF DESCRIPTION OF THE DRAWING

The accompanying drawing is a graph of the results 45 in Example 2.

The following are some examples.

In every example, the polymeric material had a specific viscosity well above 100 and a dry particle size below 2 μm and an aqueous composition of the poly- 50 meric material gave a discontinuous, particulate film.

EXAMPLE 1

A copolymer of 58% acrylamide and 42% dimethyl-aminoethylacrylate quaternised with methyl chloride 55 (DMAEA.MeCl) and having intrinsic viscosity 10 dl/g was prepared by reverse phase polymerisation, to give a particle size below 2 μm, followed by azeotropic distillation. It was labelled Polymer AC and was provided as a 50% dispersion of polyme in oil. The monomers used 60 were commercially pure monomers. Polymer BC was formed by the same method but in the presence of 10 ppm MBA, and had intrinsic viscosity 6.6 dl/g.

Each dispersion was mixed with water and allowed to age. A chosen amount of the resultant aqueous com- 65 position was stirred with an activated sludge for 25 seconds using Triton WRC Standard Shear Test Stirrer and Timer Type 133/131 fitted with a marine blade to

</div>
<div>

**12**

give extra shear. This resulted in flocculaton and in reduction of the floc size.

The flocculated suspension was dewatered on a laboratory centrifuge consisting of a cylindrical solid bowl closed at its base and open at its top but with an inwardly extending lip around its periphery. The bowl ran at 2,000 rpm and was, at this speed, filled with water (400 ml). 400 ml of the flocculated sewage sludge was fed gradually into the bowl whilst spinning. Some of the solid was trapped in the bowl whilst the remainder passed out in the overflow, as the centrate. Since the flocculate suspension is accelerated, in a very short period of time, to 2,000 rpm, this centrifugal system of dewatering applies very high shear to the flocculated suspension. Best results are those wherein there is maximum retention of solids in the bowl, with least solids content in the centrifugate.

The dose of g/m³ and the suspended solids in the centrate (mg/l) when treated with each of the polymers AC and BC are shown in Table 1a.

TABLE 1a

| Dose | AC | BC |
|------|------|------|
| 20 | 1148 | 1400 |
| 30 | 1088 | 660 |
| 50 | 667 | 368 |
| 60 | 1663 | 344 |
| 70 | 2227 | 342 |
| 80 | 1670 | 402 |
| 100 | 4627 | 426 |
| 120 | 5372 | 726 |

The cationicity regain of the polymers was recorded for 10 minutes shearing, as in the definition of ionicity regain given above, and also for 1 and 3 minutes shearing, and the values are shown in Table 1b.

TABLE 1b

| Polymer | Shearing Time | | |
|---------|------|------|------|
|  | 1 min | 5 min | 10 min |
| AC | 5% | 9% | 9% |
| BC | 21% | 42% | 42% |

It is apparent that the optimum dose for linear polymer AC, having a regain of 9%, is at 50 g/m³ whilst the optimum dose for non-linear polymer BC, having IR 42%, is at 60 g/m³ but that polymer BC gives better results and its optimum results are obtained over a much wider range, 30 to about 120 g/m³, than is permissible with polymer AC, i.e., the non-linear polymer is less dose sensitive.

EXAMPLE 2

Five polymers were prepared by the same general process as in Example 1 using the same monomers, but with differing amounts of MBA. The polymers, the amounts of MBA in ppm based on monomer, the intrinsic viscosity and the IR values are shown in Table 2.

TABLE 2

| Product | MBA | IV | IR |
|---------|------|------|------|
| GC | 0 | 14.1 | 6.7 |
| HC | 2.5 | 11.1 | 17 |
| IC | 5.0 | 10.2 | 23 |
| JC | 10.0 | 8.7 | 42 |
| KC | 25.0 | 34 | 59 |

Solutions of the above products together with that of product AC were used to treat 100 ml samples of acti-

</div>
</div>

CIBA 002412

4,720,346

## 13

vated sludge over a dosage range. A visual assessment of floc size was carried out after the shearing in the Triton stirrer for 25 seconds. Using a scale of 1–8 where 1 represents the largest and 8 the smallest floc, the results of the assessment were plotted as shown in the attached graph. In this way, the optimum dose for each product was obtained.

Activated sludge samples were then treated at the optimum dose with each product. 200 ml portions of the treated sludge were then fed through the centrifuge as in Example 1, when the following results were obtained.

TABLE 4

| Product | Optimum Dose (mg/l) | Centrate Suspended Solids (mg/l) |
|---|---|---|
| GC | 35 | 824 |
| HC | 45 | 660 |
| IC | 50 | 612 |
| JC | 60 | 190 |
| KC | 90 | 60 |

This clearly demonstrates the improved results in high shear dewatering when using an increased (double) dosage of a polymer that is cross-linked to such an extent that IR is above about 30%.

### EXAMPLE 3

A rane of copolymers of 60 wt% DMAEA.MeCl and 40 wt% acrylamide were prepared as 50% dispersions in oil as in Example 1 using different amounts of MBA and commercially pure monomers.

All products were evaluated on a raw mixed primary activated sewage sludge as aids to gravity and compression filtration. This involved first stirring the sludge with 0.1% w/v solutions of the copolymers at various doses, in order to optimise the dose by observing the influence of cross linking on floc size. Further samples of sludge were then treated at the optimum dose using periods of stirring, which represented different levels of shear and allowed for the optimum development of the floc. The stirring was a Bosch electric drill unit fitted with a marine bladed stirrer. Dewatering was then carried out by allowing 180 seconds of free drainage, on a filter wire retained in a Buchner funnel, followed by 180 seconds of drainage under compression. The filter cakes were weighed, dried and reweighed, in order to provide a measure of dry solids content.

The results obtained were as in Table 3.

TABLE 3

| Product | MBA ppm | Dose (mg/l) | Stirring Time (seconds) | Cake Solids (%) | IR % |
|---|---|---|---|---|---|
| LC | 0 | 140 | 15 | 16.0 | 14.2 |
| MC | 2 | 200 | 45 | 17.1 | 27.6 |
| NC | 4 | 220 | 45 | 17.4 | 38.0 |
| OC | 8 | 300 | 75 | 20.0 | 50.8 |

### EXAMPLE 4

Products PC and QC were made in the same way, and from the monomer proportions, as products GC and IC in Example 2. Additionally, a product RC was prepared at the same cationic monomer content but with 63 ppm MBA. These three additional copolymers were collected together with copolymers JC and KC of Example 2 to form a range which increased in ionicity

## 14

regain and decreased in intrinsic viscosities as shown in Table 4a.

TABLE 4a

| Product | MBA (ppm) | I.V. (dl/g) | I.R. (%) |
|---|---|---|---|
| PC | 0 | 14.3 | 0.5 |
| QC | 5.0 | 8.4 | 21.0 |
| JC | 100.0 | 6.7 | 42.0 |
| KC | 25.0 | 3.3 | 59.0 |
| RC | 63.0 | — | 71.0 |

The above products were evaluated in the laboratory on sewage sludges in order to determine the dose giving optimum technical performance, as described in Example 2. The chosen optimum amount was then mixed into 200 ml sewage sludge in a 400 ml beaker using a Heidolph Type 741.00 unit fitted with a turbine stirrer for 3 minutes on a number 2 setting. The flocculated sludge was then dewatered, in simulation of belt pressing, using a piston press. This involved increasing the pressure through the cycle as shown in Table 4b.

TABLE 4b

| Period of Pressing (minutes) | Pressure (bar) |
|---|---|
| 0–1 | 0.7 |
| 1–2 | 1.4 |
| 2–3 | 2.1 |
| 3–6 | 2.8 |

The process was conducted with two types of sewage.

On completion of the pressing cycle, the cakes were removed for dry solids determination. The results are shown in Table 4c.

TABLE 4c

| Sludge Type | Product | Dose (mg/l) | Cake Solid (%) |
|---|---|---|---|
| Digested | PC | 250 | 24.8 |
| primary/ | QC | 325 | 27.6 |
| activated | JC | 375 | 27.1 |
|  | KC | 650 | 28.1 |
|  | RC | 1000 | 27.7 |
| As above | PC | 40 | 19.9 |
| but | QC | 60 | 22.5 |
| containing | JC | 80 | 23.8 |
| 1.0 M of | KC | 150 | 26.3 |
| added NaCl | RC | 275 | 29.6 |

As can be seen from the above results, the trend is one of increasing optimum dose and cake solids as the MBA content is increased.

### EXAMPLE 5

Tests were carried out in simulation of belt pressing as described in Example 4 using products PC and JC of Table 4a at doses equal to the optimum and also doses above and below it. Shear was applied by pouring the flocculated sludge 10 times from one beaker to another. The digested primary/activated sludge used as test substrate was from an alternative source to that of Example 4.

TABLE 5

| Product | Dose (mg/l) | Cake Solids (%) |
|---|---|---|
| PC | 125 | 10.3 |
| PC | 150 | 11.0 |
| PC | 175 | 10.8 |
| JC | 300 | 13.4 |
| JC | 325 | 14.2 |
| JC | 350 | 13.4 |

CIBA 002413

4,720,346

15

The results demonstrate how the order of cake solids varies about the optimum dose.

### EXAMPLE 6

Tests were carried out in simulation of high pressure filtration (filter pressing). This involved dewatering a raw primary/activated sludge, on the laboratory piston press at pressures of up to 7 bar. As in the previous example, products PC and JC were evaluated at doses equal to and above and below the previously determined optimum, after shearing the flocculated suspension by pouring from one beaker to another 15 times.

Results were as shown in Table 6.

#### TABLE 6

| Product | Dose (g/l) | Cake Solids (%) |
|---------|-----------|-----------------|
| PC | 100 | 14.7 |
| PC | 125 | 15.1 |
| PC | 150 | 15.8 |
| JC | 225 | 15.9 |
| JC | 250 | 16.4 |
| JC | 275 | 16.1 |

Once again, the results demonstrate how the order of cake solids varies about the optimum dose.

### EXAMPLE 7

Three copolymers having ratios of 80 wt% DMAEA MeCl to 20 wt% acrylamide were prepared as reverse phase suspension polymerisation dispersions. The three products contained 0, 4 and 8 ppm of MBA on weight of monomer and were identified as SC, TC and UC. Portions of products SC and UC were mixed together to provide 50:50 and 75:25 blends respectively (SC:UC).

The two blends and the original samples were each added to a digested Primary/Activated sewage sludge over a dosage range and the flocculated product stirred for 25 seconds on the Triton mixer of Example 1. A visual assessment of floc size served to indicate the optimum dose for each treatment.

Further sludge samples, treated at the optimum dose of each product and blend were evaluated on the laboratory centrifuge as described in Example 1 after vigorous stirring of the flocculated aqueous medium with the Triton mixer. Details of the products and results obtained were as in Table 7.

#### TABLE 7

| Product | M.B.A. (ppm) | Ionicity Regain (%) | Optimum Dose (g/m³) | Centrate Solids (mg/l) |
|---------|-------------|--------------------|--------------------|----------------------|
| SC | 0 | 10.0 | 100 | 2272 |
| TC | 4 | 24.5 | 150 | 1050 |
| UC | 8 | 51.2 | 225 | 340 |
| SC:UC:50:50 | (4) | 34.4 | 125 | 1236 |
| SC:UC:25:75 | (7) | 22.5 | 125 | 1846 |

It will be observed that the enhanced performance provided by cross linked flocculants can be obtained by blending linear and cross linking flocculants to intermediate levels of cross linking.

### EXAMPLE 8

A similar exercise to that described in the previous example was carried out on copolymers having 60:40 wt% DMAEA MeCl:Acrylamide composition. Details of the products and results obtained are given in Table 8.

16

#### TABLE 8

| Product | M.B.A. (ppm) | Ionicity Regain (%) | Optimum Dose (g/m³) | Centrate Solids (mg/l) |
|---------|-------------|--------------------|--------------------|----------------------|
| VC | 0 | 14.2 | 100 | 1856 |
| WC | 2 | 27.4 | 150 | 1378 |
| XC | 4 | 38.0 | 175 | 398 |
| YC | 8 | 50.9 | 225 | 274 |
| 50:50: VC:YC | (4) | 31.2 | 150 | 534 |
| 75:25: VC:YC | (7) | 25.3 | 150 | 1416 |

### EXAMPLE 9

A solid grade commercially available cationic copolymer having composition 42 wt% DMAEA MeCl and 38 wt% acrylamide and two commercially available anionic copolymers having composition 10 wt% sodium acrylate: 80 wt% acrylamide and 20 wt% sodium acrylate: 80 wt% acrylamide, identified as products, ZC, JA and KA respectively, were made up as 0.2% solutions. The solution of the cationic product ZC was rapidly mixed (using a Heidolph stirrer) in turn with the solutions of products JA and KA.

When mixing was insufficiently rapid, a precipitate settled.

The three compositions were evaluated on an activated sewage sludge using the laboratory centrifuge as described in Example I, after vigorous stirring using the Triton mixer for 25 seconds. The results are in Table 9.

#### TABLE 9

| Dose (g/m³) | Centrate Suspended Solids (mg/l) | | |
|------------|----------------|----------------|----------------|
| | Solution ZC | Solution 80 ZC:20 KA | Solution 80 ZC:20 JA |
| 30 | 1000 | 1114 | 1260 |
| 40 | 632 | 888 | 1116 |
| 50 | 668 | 808 | 1048 |
| 60 | 684 | 408 | 580 |
| 80 | 1248 | 476 | 460 |
| 100 | 1820 | 510 | 320 |
| 125 | — | 668 | 834 |
| 150 | 1872 | 896 | 1348 |

It can be seen that blends of anionic and cationic solutions made from solid grade products are capable of producing a similar effect to that obtained using performed cross linked polymers.

### EXAMPLE 10

Using a similar procedure to that described in the previous example, solutions of product ZC were rapidly mixed with varying volumes of solution KA to provide blends containing 5, 10, 20 and 30% of KA.

Each solution was used to treat an activated sludge over a dosage range and visual assessment of floc size used to indicate the optimum dose.

Further activated sludge samples were then treated with the optimum dose of each solution before being dewatered on the laboratory centrifuge.

The following results are in Table 10.

#### TABLE 10

| Treatment | Optimum Dose range (mg/l) | Average Suspended Solids of Centrate |
|-----------|--------------------------|--------------------------------------|
| ZC | 40-60 | 1456 |
| 5:95 KA:ZC | 50-80 | 1400 |
| 10:90 KA:ZC | 50-80 | 1176 |
| 20:80 KA:ZC | 60-100 | 1077 |

CIBA 002414

4,720,346

## 17

**TABLE 10-continued**

**TABLE 10-continued**

| Treatment | Optimum Dose range (mg/l) | Average Suspended Solids of Centrate |
|---|---|---|
| 30:70 KA:ZC | 100-140 | 835 |

### EXAMPLE 11

Settlement tests were carried out to compare product AC of Example 1 and product KC of Example 2 in regard to their ability to flocculate Raney copper catalyst.

In carrying out these tests, 0.05% wt/v solutions of flocculant were added to 500 ml portions of 5% w/v Raney copper slurry in deionised, de-oxygenated water at room temperature. These were placed in a cylinder inverter and subjected to inversion to promote mixing after addition of the flocculant solution. Subsequent inversions could be carried out, following those required for mixing, in order to test the floc strength. The quality of the floc formed was, at all stages, measured in terms of the settlement rate of the flocculated slurry, since large flocs invariably produce faster rates of settlement. Settlement rate was measured as the time required to produce a visible mud-line in the flocculated slurry.

Tests were first carried out to determine the optimum dose of flocculant with the results shown in Table 11a.

**TABLE 11a**

| Flocculant Dose (mg/l) | Settlement Time (seconds) Product AC | Product KC |
|---|---|---|
| 0 | 54.3 | 54.3 |
| 1 | 25.1 | 41.3 |
| 10 | 10.4 | 7.8 |
| 20 | 6.3 | 3.0 |
| 30 | 4.7 | 1.6 |
| 40 | 5.4 | 1.0 |
| 50 | 4.5 | 1.7 |
| 60 | 4.6 | 1.3 |
| 70 | 4.6 | 1.3 |
| 80 | 10.6 | 1.4 |
| 90 | 15.4 | 1.9 |
| 100 | 20.7 | 1.2 |
| 140 | | 1.7 |
| 180 | | 1.3 |
| 220 | | 1.4 |
| 260 | | 2.1 |
| 300 | | 1.6 |
| 340 | | 1.7 |

From the above it can be seen that the optimum dose for each product is 30 mg/l. It is, however, apparent that the overdosing effect observed for product AC is not apparent with product KC.

Further samples were treated at the optimum dose level and subjected to inversions with settlement time being measured for each of the flocculated suspensions after equal numbers of inversions.

Results were as shown in Table 11b.

**TABLE 11b**

| Number of Inversions | Settlement Time (seconds) Product AC | Product KC |
|---|---|---|
| 3 | 6.3 | 1.7 |
| 6 | 6.5 | 1.3 |
| 9 | 6.0 | 0.9 |
| 12 | 6.7 | 1.2 |
| 15 | 7.8 | 1.0 |
| 18 | 8.1 | 1.1 |
| 21 | 8.4 | 1.1 |

## 18

**TABLE 11b-continued**

| Number of Inversions | Settlement Time (seconds) Product AC | Product KC |
|---|---|---|
| 24 | 10.3 | 0.9 |
| 27 | 11.3 | 0.9 |
| 30 | 12.6 | 1.4 |
| 33 | 14.4 | 1.3 |
| 36 | 13.9 | 1.3 |
| 39 | 17.3 | 1.7 |
| 42 | 18.9 | 1.3 |
| 45 | 20.8 | 1.2 |
| 60 | | 1.5 |
| 90 | | 1.7 |
| 111 | | 1.6 |
| 141 | | 2.0 |
| 171 | | 2.2 |
| 186 | | 2.4 |

From the results, it can be seen that Raney copper catalyst treated with product KC manifests an significantly more stable floc than that treated with product AC. The flocculated catalyst gave substantially the same yield of acrylamide, when used in a conventional process for the hydrolysis of acrylonitrile, as the corresponding unflocculated catalyst but gave much easier separation of the reaction liquor from the catalyst.

### EXAMPLE 12

A range of anionic copolymers, having composition 40 wt% sodium acrylate, 60 wt% acrylamide, were prepared from monomer mixes containing different amounts of methylene bis acrylamide by reverse phase suspension polymerisation. The degree of structure incorporated into each copolymer increased in proportion to the amount of MBA in the monomer as indicated by depression of the intrinsic viscosity.

The above products were evaluated on coal fines in simulation of dewatering by belt filtration. This involved treating 400 cm³ portions of the coal fines with a solution of the flocculant followed by stirring for 120 seconds to apply shear and induce flocculation. The stirring was by a Heidolph stirrer on setting 2 using a gate stirrer in a 600 cm³ beaker. The flocculated fines were then transferred to the belt press simulator and dewatered under the influence of pressure which was gradually increased to 1.6 bar. On completion of the dewatering cycle, the cake was removed for dry solids determination and calculation of the yield.

The MBA content, IV, results for cake solids and yield at the optimum dose established for each product are shown in Table 12.

**TABLE 12**

| Pro-duct | MBA content (ppm of polymer) | I.V. (dl/g) | Dose (mg/l) | Cake Solids (%) | Yield (%) |
|---|---|---|---|---|---|
| AA | 0 | 18.5 | 100 | 61.5 | 83.2 |
| BA | 2.71 | 14.3 | 150 | 63.0 | 83.8 |
| CA | 6.76 | 11.3 | 400 | 60.8 | 90.0 |
| DA | 13.53 | 6.6 | 500 | 57.8 | 86.6 |
| EA | 10.29 | 5.5 | 600 | 59.8 | 92.6 |
| FA | 27.06 | 2.7 | 800 | 59.8 | 92.4 |
| GA | 40.53 | 1.1 | 1200 | 58.6 | 93.7 |
| HA | 67.60 | — | 1600 | 59.1 | 89.4 |
| IA | 135.30 | — | 1800 | 59.7 | 84.9 |

It can be seen that as the degree of cross linking increases the general trend is for improvement in yield. Products HA and IA demonstrate decreasing yield either because they are too cross linked to be effective or the optimum dose has not been attained.

CIBA 002415

4,720,346

**19**

## EXAMPLE 13

Products AA, CA, EA and GA of Example 12 were used to treat coal tailings over a range of doses and the flocculated suspension was tested on the centrifuge as described in Example 1. The dose, in mg/l, at which optimum centrate quality was obtained and the suspended solids in the centrate (%) are shown below; each result being the average of two tests, one employing 30 seconds of mixing, the other 120 seconds mixing to induce flocculation. The mixing was as in Example 12.

| Polymer | M g A⁻ | Optimum Dose (mg/l) | Suspended Solids in Centrate (%) |
|---|---|---|---|
| A.A. | α | 113 | 1.38 |
| A.C. | 7 | 163 | 0.78 |
| A.E. | 2.0 | 250 | 0.59 |
| A.G. | 4.1 | 550 | 0.47 |

It can be seen that as the degree of structure in the polymer is increased (as indicated by the depressed I.V.), the optimum dose and effectiveness increase.

## EXAMPLE 14

An emulsion in oil of polymeric particles below 2 μm in size is made by reverse phase polymerisation of a blend of 40% acrylamide and 60% MeCl diethylaminoethyl acrylate and methylene bis acrylamide in an amount sufficient to raise IR from near zero to between 35 and 40.

The emulsion is added to water with stirring and allowed to age to provide a stable composition.

The composition is then added at a polymer dose of about 6 kg/t total solids to an aqueous suspension that is flowing towards a commercial sewage dewatering centrifuge, the treated suspension is sheared in a Inline Mixer to reduce floc size without redispersing discrete solids, and the sheared product is then dewatered in the centrifuge. The solids content of the centrate is typically below 0.2% (0% is ideal) and the degree of separation is above 98% (100% is ideal). When the process is repeated using uncross linked polymer, the corresponding values are typically above 1% and below 75%.

## EXAMPLE 15

A 1 liter resin pot containing 250 g water, 1 g Ethylan HA (non-ionic surfactant from Lankro Chemicals Ltd.) 0.1 g V50 (polymerisation initiator from Wako Pure Chemical Industries Ltd.) and 0.1 g Tetralon A (sequestering agent manufactured by Allied Colloids Ltd.) and bubbled with N₂ was placed in a constant temperature water bath at 75° C.

A monomer feed was prepared by mixing 120 g of 65 dimethyl amino ethyl methacrylate and 80 g of methyl methacrylate which was then added to a monomer feed vessel. An aqueous feed was prepared by mixing 200 g

**20**

water, 9 g Ethylan HA, 0.3 g V50 and 0.1 g Tetralon A which was then added to an aqueous feed vessel.

The contents of each vessel were then pumped separately, but in constant proportion, to a premixing chamber containing a high speed stirrer before being added to the resin pot. The pump speed was adjusted such that the total volume of monomer and aqueous feed was added over a period of 90 minutes. After the addition was complete, the same was held at 75° C. for a period of 1 hour before being cooled.

The product of this example, designated Polymer A, was a 30% active polymer in water. Two further samples were prepared in the manner so described but containing 500 ppm and 5000 ppm of alkyl methacrylate in turn. These samples were designated Polymers B and C respectively.

The products prepared as described were then diluted and acidified as the full HCl salt to 2% active in water. Performance tests were then carried out using the sheared CST technique as described previously on a sample of digested primary/activated sludge. The results obtained are given in the following Table:

| Product | Cross-linking amount (ppm) | Polymer Dose (g · m⁻³)/Shearing time (secs) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 250/25 | 400/25 | 500/25 | 600/25 | 700/25 | 800/25 | 900/25 | 1000/25 |
| Polymer A | 0 | 129 | 32 | 19 | 17 | 23 | 28 | 31 | 47 |
| Polymer B | 500 | 249 | 58 | 25 | 19 | 15 | 19 | 24 | 53 |
| Polymer C | 5000 | 388 | 140 | 78 | 67 | 35 | 25 | 16 | 17 |

The results demonstrated that for these emulsion polymerised products, Polymer A (having no crosslinking agent) is susceptible to a significant over-dosing effect above its optimum dose but with Polymers B and C, the over-dosing effect becomes less apparent as the level of cross-linking agent increases.

## EXAMPLE 16

Four solutions were prepared from a sample of 50:50 DMAEAq MeCl:ACM copolymer (originally prepared as a 50% w/w dispersion in oil), as follows:

Sample 1: 1% w/w active polymer with activator
Sample 2: 0.1% w/w active polymer with activator
Sample 3: 1% w/w active polymer without activator
Sample 4: 0.1 w/w active polymer without activator

All solutions were prepared in deionised water using 10 seconds low shear mixing followed by 2 hours tumbling. The activator, when present, was an oil-in-water emulsifier.

Each sample was then used to condition aliquots of digested sewage sludge at a range of dosages, the performance being assessed in each case by means of CST time.

A sample of the same material, prepared as above (with activator) 24 hours earlier was included as a control.

The samples containing activator (1 and 2) and the control exhibited optimum performance at 80–100 g/m³ and at higher doses, an over-dosing effect was seen.

The unactivated samples (3 and 4) had optimum performance at a much higher dosage level (200 g/m³) and did not exhibit any over-dosing effect, and at their optimum dose gave a lower CST (better results) than the CST at the optimum dose of the control and samples 1 and 2.

CIBA 002416

4,720,346

## 21

### EXAMPLE 17

When products prepared by reverse phase polymerisation, as dispersions in oil, are made up directly at low solution concentrations then, by virtue of the imposed low activator concentration in the solution, activation tends to be incomplete. This results in the polymer going only partially into solution. On using such partial solutions, it has been demonstrated that improved technical performance can be obtained.

In accordance with the above, solutions of product CA were made up at concentrations of 1, 0.2 and 0.1% w/v active polymer. Each of the solutions was subjected to ionicity regain determination with those at 1 and 0.2% being diluted to 0.1% immediately prior to determination. In similar manner, the solutions were used to treat an activated sewage sludge prior to centrifugation, as described in example 1, with the 1 and 0.2% concentrations being diluted to 0.1% immediately prior to treatment.

Results were as follows.

| Original Solution Concentration (%) | IR (%) | Optimum Dose (mg/l) | Suspended Solids in Centrate (mg/l) |
|---|---|---|---|
| 1.0 | 18 | 70 | 1,600 |
| 0.2 | 30 | 100 | 850 |
| 0.1 | 60 | 125 | 270 |

What is claimed is:

1. A process for flocculating an aqueous suspension of suspended solids comprising, adding to the suspension a flocculating amount of a synthetic polymeric flocculant material to form thereby an aqueous medium containing flocculated suspended solids and in which the said polymeric flocculant material at the time of addition to the suspension has a specific viscosity (measured by a capillary flow viscometer at 34° C. on a 0.5% solution in deionised water) above 10 and comprises polymeric particles that have a dry size of below 10 μm, the polymeric material is added in a floc stabilising amount, and the flocculant solids are subjected to shear in the presence of the aqueous medium substantially without increasing the amount of suspended solids in the aqueous medium to reduce the size and increase the shear stability of said flocculated suspended solids.

2. A process according to claim 1 in which the aqueous medium is then dewatered.

3. A process according to claim 1 in which the flocculated solids are separated from the aqueous medium by dewatering selected from centrifuge, piston press and belt press dewatering.

4. A process according to claim 1 in which the flocculated solids are continuously kept in suspension by agitation of the aqueous medium.

5. A process according to claim 4 in which the flocculated solids are catalyst particles and the aqueous medium is a chemical reaction medium.

6. A process according to claim 1 in which the polymeric particles are of water insoluble water swellable polymer.

7. A process according to claim 6 in which the particles are of water insoluble, water-swellable polymer and the polymeric material is made by mixing an aqueous solution of linear water soluble polymer having specific viscosity above 10 with a dissolved cross linking agent whilst stirring with sufficient force to form a homogeneous aqueous composition.

## 22

8. A process according to claim 1 in which the cross linking agent is a counterionic polymer having specific viscosity above 10.

9. A process according to claim 1 in which the particles are of water insoluble, water-swellable polymer and are cross linked and have been formed by polymerisation in the presence of added cross-linking agent of a monomer or monomer blend that is soluble in the aqueous composition.

10. A process according to claim 9 in which the cross linking agent is a diethylenically unsaturated monomer and the amount of cross linking agent is from 1 to 100 ppm based on the polymerisable monomers.

11. A process according to claim 9 in which the polymeric material has ionic regain greater than 15% and is cationic wherein said ionic regain is calculated as $(x-y)/x \times 100$ where x is the ionicity measured after applying standard shear and y is the ionicity of the polymer before applying standard shear.

12. A process according to claim 9 in which the polymeric material has ionic regain of 25 to 70% and is cationic.

13. A process according to claim 9 in which the polymeric material has ionic regain of 25 to 70% and is a cationic copolymer of acrylamide with at least 5 mole percent dialkylaminoalkyl acrylate (including acid addition and quaternary ammonium salts thereof).

14. A process according to claim 9 in which the polymer has intrinsic viscosity of $(100 - \text{ionic regain})/a$ dl/g where a is from 6 to 14.

15. A process according to claim 1 in which the polymeric particles are of water soluble polymer and are added to the suspension under conditions such that they have not fully dissolved.

16. A process according to claim 15 in which the particles are added to water while in the form of a polymer-in-oil dispersion in the absence of an oil-in-water emulsifier.

17. A process according to claim 1 in which the particles have been formed by emulsion polymerisation or reverse phase polymerisation.

18. A process according to claim 1 in which the polymeric material is selected from materials that have intrinsic viscosity above 4 and materials that can have intrinsic viscosity above 4 after shearing.

19. A process according to claim 1 in which a 1% aqueous composition of the polymeric material that is added to the suspension gives, if cast as a film on a glass plate and dried, a discontinuous film of discrete swellable particles having a size of below 10 μm.

20. A process according to claim 1 in which the amount of polymeric material is from 50 to 150% of the amount that gives maximum floc size after application of shear to the aqueous medium.

21. A process according to claim 1 and which comprises providing a homogeneous dilute aqueous composition of a reverse phase polymerised, non film-forming, acrylamide copolymer with dialkylaminoalkyl (meth) acrylate acid salt or quaternary salt having a dry particle size below 2 μm, ionic regain (IR) above 15 wherein said ionic regain is calculated as $(x-y)/x \times 100$ where x is the ionicity measured after applying standard shear and y is the ionicity of the polymer before applying standard shear and intrinsic viscosity $= (100 - IR)/a$ where a is from 6 to 14, adding this composition to sewage sludge in an amount of 50 to 150% of the amount required for maximum floc size after shearing, subjecting the blended mixture to the shearing to reduce

CIBA 002417

4,720,346

23

floc size substantially without increasing the amount of discrete suspended solids, and dewatering the resultant aqueous medium on a centrifuge, piston press or belt press.

22. A process according to claim 1 in which the polymeric flocculant is a polymer formed from one or more ethylenically unsaturated monomers selected from the group consisting of acrylamide, methacrylamide, N-vinyl methyl acetamide, N-vinyl methyl formamide, vinyl acetate, vinyl pyrrolidone, (meth)acrylic esters, styrene, acrylonitrile, water soluble forms of carboxylic or sulphonic acids selected from (meth) acrylic acid, itaconic acid and 2-acrylamido methyl-propane sulphonic acid, sulpho methylated acrylamide, allylsulphonate, sodium vinyl sulphonate, dialkylaminoalkyl(-meth)acrylates and their quaternary or acid salts, and dialkylaminoalkyl(meth)acrylamides and their quaternary or acid salts.

23. A process according to claim 1 in which the polymeric material is a polymer formed by polymerisation of a monomer selected from the group consisting of water soluble acrylic acid salt, water soluble 2-acrylamido methyl propane sulphonic acid salt, dialkylaminoalkyl(meth)acrylates and their quaternary or acid salts, and dialkylaminoalkyl(meth)acrylamides and their quaternary or acid salts, and blends of any of said monomers with acrylamide.

24. A process in which an aqueous suspension of suspended solids is flocculated by adding to the suspension a flocculating amount of a synthetic polymeric

24

flocculant material to form thereby an aqueous medium containing flocculated suspended solids and in which the said polymeric flocculant material at the time of addition to said suspension has a specific viscosity (measured by a capillary flow viscometer at 34° C. on a 0.5% solution in deionized water) above 10, and is formed by polymerization of a monomer selected from the group consisting of water soluble acrylic acid salt, water soluble 2-acrylamido methyl propane sulphonic acid salt, dialkylaminoalkyl (meth) acrylates and their quaternary or acid addition salts, and dialkylaminoalkyl (meth) acrylamides and their quaternary or acid addition salts, and blends of any such monomer with acrylamide and has been made by polymerization in the presence of added diethylenically unsaturated cross linking agent in an amount of from 1 to 100 ppm and is in the form of polymeric particles that are water insoluble but water swellable and that have a dry size of below 10 $\mu$m, the aqueous medium containing the flocculated solids is subjected to shear substantially without increasing the amount of suspended solids in the aqueous medium to reduce the size and increase the shear stability of said flocculated suspended solids, the amount of the polymeric material that is added to the suspension is from 50 to 150% of the amount that gives maximum floc size after the application of shear to the aqueous medium, and the aqueous medium is then dewatered on a centrifuge, piston press or belt press.

*  *  *  *  *

CIBA 002418