# EXHIBIT A

**REDACTED**

# EXHIBIT B

REDACTED

# EXHIBIT C

**REDACTED**

# EXHIBIT D

REDACTED

.

# EXHIBIT E

**REDACTED**

`

# EXHIBIT F

                    IN THE UNITED STATES DISTRICT COURT

                    IN AND FOR THE DISTRICT OF DELAWARE

                                - - -

CIBA SPECIALTY CHEMICALS
CORPORATION, INC.,                :      CIVIL ACTION
                                  :
          Plaintiff and           :
          Counter-defendant,      :
                                  :
      v                           :
                                  :
HERCULES INC., and CYTEC          :
INDUSTRIES INC.,                  :
                                  :
          Defendants and          :    NO. 04-293 (KAJ)
          Counter-claimants.      - - -

                    Wilmington, Delaware
               Tuesday, May 9, 2006 at 9:00 a.m.
                    PRIVITY BENCH TRIAL

                              - - -

BEFORE:       HONORABLE KENT A. JORDAN, U.S.D.C.J.

                              - - -

APPEARANCES:


          RICHARDS LAYTON & FINGER
          BY:  CHAD MICHAEL SHANDLER, ESQ.

               and

          LEYDIG, VOIT & MAYER, LTD.
          BY:  GORDON R. COONS, ESQ.,
               ELEY O. THOMPSON, ESQ.,
               GREGORY C. BAYS, ESQ., and
               DOUGLAS ROBINSON, ESQ.
               (Chicago, Illinois)

               and


Ellie Corbett Hannum          Brian P. Gaffigan

Page 214

1  in the sense that the cases in this area of the law mean
2  when they talk about privity.
3       Privity is a word of malleable meaning, as was
4  pointed out in some of the case law. It doesn't always mean
5  the same thing. But in this arena, what it appears to mean
6  is, if one is looking at all the evidence and balancing the
7  equities, that one should be able to say it is equitable,
8  that is, fair and just to take the estoppel which applies to
9  one party and impose it on another party, not because that
10 third party itself was the assignor, but because the
11 relationship between the assignor of the patents at issue
12 and that third party is such that a sense of equity and
13 fairness prompts you to say it would be wrong for the third
14 party to assert the defenses that the assignor doesn't have.
15 That's how I understand the law.
16      It asks me to say, what seems fair balancing all
17 the evidence? And I take it as a not insignificant point
18 that there is a public policy interest here as well. In the
19 Diamond Scientific Company vs. Ambico Inc., the case, 1988
20 Federal Circuit decision which addressed assignor estoppel,
21 the Federal Circuit was careful to note that the Supreme
22 Court in Lear vs. Adkins had reasoned that "the equities of
23 the licensor do not weigh very heavily when they are
24 balanced against the important public interest in permitting
25 full and free competition in the use of ideas which are in

Page 215

1  reality a part of the public domain." And in that, view of
2  that, the Supreme Court explicitly abolished licensee
3  estoppel.
4       Then the Federal Circuit went on to point out
5  the ways in which assignor estoppel is different than
6  licensee estoppel, why it should not be abolished in its
7  totality. Although, it recognized and I quote, "The
8  doctrine of assignor estoppel may no longer be a broad and
9  equitable device acceptable of automatic application." It
10 then did say well, this is the right case for it.
11      So there is an element of public policy that I'm
12 called on to consider as well. And I have.
13      Now, turning to the specific facts. It became
14 clear soon after Ciba purchased the Polyflex patents and
15 associated business from Cytec that Hercules was not going
16 to have the distribution rights for Polyflex it had enjoyed
17 while working with Cytec. Hercules had rights through 2002,
18 I believe was the date that was in evidence. But Ciba was
19 not inclined to continue extending those rights and Hercules
20 was faced with a business imperative. It was either going
21 to come up with some alternative to Polyflex or it was going
22 to lose business, like several million dollars, as the
23 evidence indicated that on this Polyflex product alone there
24 was something in excess of $4 million annually for that
25 retention and drainage chemical.

Page 216

1       And one could also reasonably suspect or wonder
2  whether there wouldn't be additional fallout that might have
3  occurred from Hercules losing that product line. What that
4  might have been isn't in evidence and that would be
5  premature for me to think about that. But it was real money
6  and it was a real business problem for them. And they set
7  out to deal with that by finding some alternative.
8       I find the evidence, even though Hercules didn't
9  have the burden of proof in this regard, I find their
10 evidence more persuasive than not on who developed this
11 product. This was a Hercules initiative. They did the
12 scientific work, the research work that lead ultimately to
13 the chemical AEM 232, which was given the trade name
14 PerForm SP232. And the testimony and documents show that
15 although certain changes were made after Hercules approached
16 Cytec with its formulation, this was not a situation where
17 the involvement of Cytec was such as to warrant calling this
18 a joint research and development project. It wasn't. This
19 was Hercules' research and development project. I find
20 credible the testimony of the Hercules' scientist,
21 particularly the gentleman — I believe his name is
22 Harrington, and the testimony of Dr. Walchuk about what they
23 were doing to produce this chemical and to test it and to do
24 scale-up at their own facility at Trevose, as well as lab
25 testing, before they ever went to Cytec.

Page 217

1       Now, quite naturally, moving from the creation
2  of a product to commercial scale production, one would
3  expect would involve some changes, as the testimony under
4  cross-examination of the last witness did indicate. Whether
5  or not what happened here was so different from a typical
6  toll manufacturing agreement as to be something other than a
7  toll manufacturing agreement, really isn't the issue. I'm
8  inclined to believe what happened here isn't unusual. I
9  thought Mr. Morgan's testimony in this regard was credible
10 and consistent with common sense and, as was forcefully
11 pointed out by counsel for Ciba, that industrial scale
12 production does involve some different considerations or
13 additional considerations to what goes on in a laboratory.
14 It's sufficient in this case for me to say that regardless
15 of whether the level of interaction typical in toll
16 manufacturing was exceeded in this instance, that level of
17 interaction was not such as to make it, the relationship
18 between Cytec and Hercules, one that could fairly be
19 characterized as a privity relationship that should lead to
20 assignor estoppel blocking Hercules from asserting the
21 standard defenses that a defendant in a patent infringement
22 case has a right to assert if the facts warrant it.
23      The changes that were made, I thought were
24 credibly explained by the Hercules witnesses. The change
25 from sodium hydroxide to ammonium hydroxide was not driven

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIBA SPECIALTY CHEMICALS CORPORATION, | ) ) ) | C.A. No. 04-293 (KAJ) |
| Plaintiff, | ) ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| HERCULES INC. and CYTEC INDUSTRIES, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

## CIBA'S TRIAL TRANSCRIPT DESIGNATIONS

Ciba's Trial Transcript Designations

| Transcript | Date | Designations |
|---|---|---|
| | | 274:7 - 274:13 |
| | | 275:24 - 275:25 |
| | | 276:2 - 276:6 |
| | | 278:17 - 278:25 |
| | | 279:2 - 279:14 |
| | | 279:18 - 279:23 |
| | | 280:4 - 280:7 |
| Zhang, Fushan | 10/20/2005 | 3:14 - 3:18 |
| | | 8:12 - 9:7 |
| | | 42:2 - 42:5 |
| | | 42:7 - 42:16 |
| | | 42:19 - 42:24 |
| | | 45:23 - 46:4 |
| | | 46:7 - 46:12 |
| | | 46:14 - 46:17 |
| | | 46:21 - 47:16 |
| | | 47:18 - 48:9 |
| | | 49:6 - 49:14 |
| | | 50:2 - 50:7 |
| | | 50:9 - 50:15 |
| | | 50:18 - 50:23 |
| | | 51:18 - 51:22 |
| | | 52:1 - 52:18 |
| | | 62:21 - 63:1 |
| | | 63:7 - 63:18 |
| | | 89:24 - 90:13 |
| | | 109:8 - 109:13 |
| | | 112:2 - 113:9 |
| | | 113:11 - 113:14 |
| | | 115:22 - 115:24 |
| | | 116:3 - 116:9 |
| | | 116:12 - 118:4 |
| | | 119:11 - 119:12 |
| | | 119:16 - 120:7 |
| | | 120:10 - 122:2 |
| | | 122:5 - 122:8 |
| | | 122:10 - 122:18 |
| | | 124:17 - 124:21 |
| | | 124:23 - 125:7 |
| | | 169:20 - 169:24 |
| | | 171:3 - 171:9 |
| | | 174:9 - 175:2 |
| Privity Hearing | May 8, 2006 | 73:19 - 74:5 |
| | | 74:9 - 79:6 |
| | | 79:10 - 81:15 |

Ciba's Trial Transcript Designations

| Transcript | Date | Designations |
|---|---|---|
| | | 81:18 - 107:2 |
| | | 107:17 - 115:8 |
| | | 115:13 - 116:19 |
| | | 162:2 - 167:8 |
| | | 171:19 - 181:25 |
| | | 182:13 - 201:7 |
| | | 229:3 - 231:8 |
| | | 231:17 - 235:10 |
| | | 238:7 - 238:25 |
| | | 239:8 - 239:23 |
| Privity Hearing | May 9, 2006 | 3:21 - 10:6 |
| | | 24:4 - 41:25 |
| | | 42:9 - 48:14 |
| | | 66:4 - 72:3 |
| | | 73:8 - 74:20 |
| | | 76:7 - 77:13 |
| | | 77:18 - 79:25 |
| | | 81:5 - 81:23 |
| | | 82:19 - 84:6 |
| | | 84:8 - 84:17 |
| | | 87:23 - 89:13 |

# EXHIBIT H

LEXSEE

JEROME HAMILTON, Plaintiff, v. FAITH LEAVY, PAMELA FAULKNER,
WILLIAM QUEENER, FRANCES LEWIS, GEORGE M. DIXON, JACK W.
STEPHENSON, DEBORAH L. GRAIG, JOANNE SMITH, DENNIS LOEBE,
ELDORA C. TILLERY, FRANCIS COCKROFT, JERRY BORGA, RICHARD
SHOCKLEY, Defendants.

Civil Action No. 94-336-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 5886

March 24, 2004, Decided

SUBSEQUENT HISTORY: Motion denied by
Hamilton v. Leavy, 2004 U.S. Dist. LEXIS 7451 (D.
Del., Apr. 27, 2004)

PRIOR HISTORY: Hamilton v. Leavy, 322 F.3d 776,
2003 U.S. App. LEXIS 3727 (3d Cir. Del., 2003)

DISPOSITION: [*1] Defendants' motion for summary
judgment denied. Plaintiff's motion for partial summary
judgment granted.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff inmate sued de-
fendants, members of the correctional facility's multi-
disciplinary team and central institutional classification
committee, for violation of his Eighth Amendment
rights. The appellate court remanded the case to the dis-
trict court to reconsider whether they were entitled to
quasi-judicial absolute immunity, qualified immunity,
and to address the law of the case doctrine. The parties
both moved for summary judgment.

OVERVIEW: The members of the correctional facility's
multi-disciplinary team (MDT) and central institutional
classification committee (CICC) were not entitled to
quasi-judicial absolute immunity on the inmate's claim
for violation of his Eighth Amendment rights because the
members of the MDT and CICC were not hearing offi-
cers with any status independent of the prison bureauc-
racy, the members of the MDT and the CICC were sub-
ordinates of the warden, who could veto or change their
decisions, the members of the MDT and the CICC were
not independent in the quasi-judicial sense, and they did
not perform a classic adjudicatory function. The mem-
bers of the MDT were not entitled to summary judgment

on qualified immunity grounds because the appellate
court's holding that the inmate had raised a genuine issue
of material fact as to whether the members of the MDT
acted with deliberate indifference to the inmate's safety
in violation of the Eighth Amendment was the law of the
case, and the members of the MDT failed to produce
evidence that a reasonable official in their positions
would not have protected the inmate

OUTCOME: The MDT and the CICC's renewed motion
for summary judgment was denied. The inmate's cross-
motion for summary judgment was granted, and the in-
mate's motion to strike was denied as moot

CORE TERMS: protective custody, recommendation,
quasi-judicial, prison, qualified immunity, inmate, abso-
lute immunity, safeguards, summary judgment, genuine
issue of material fact, discipline, immunity, fact finder,
favorable, cellmate, constitutional rights, substantial
risk, recommending, subordinate, warden, administrative seg-
regation, deliberate indifference, disciplinary committee,
constitutional right, public official, decision-making,
materially, discovery, initiate, prisoner

LexisNexis(R) Headnotes

*Criminal Law & Procedure > Postconviction Proceed-
ings > Imprisonment*
*Governments > Courts > Judicial Immunity*
*Legal Ethics > General Overview*
[HN1] Quasi-judicial absolute immunity attaches when a
public official's role is functionally comparable to that of
a judge. The United States Supreme Court has held that a
committee of prison officials who disciplined an inmate
after a hearing was not entitled to quasi-absolute judicial

2004 U.S. Dist. LEXIS 5886, *

immunity. The United States Court of Appeals for the Third Circuit has pointed out, however, that the Court does not hold per se that prison officials can never receive quasi-judicial immunity. The Third Circuit has explained that the Court's holding requires that a court analyze whether the particular defendants are entitled to quasi-judicial immunity. The Third Circuit also explained that the Court has analyzed the independence and safeguards accompanying the committee's decision-making process before holding that members of a prison disciplinary committee could not receive quasi-judicial immunity.

*Criminal Law & Procedure > Postconviction Proceedings > Imprisonment*
*Governments > Courts > Judicial Precedents*
*Torts > Public Entity Liability > Immunity > Judicial Immunity*
[HN2] The United States Supreme Court has stated that the following factors are characteristic of the judicial process and are to be considered in determining the applicability of quasi-judicial absolute immunity: (a) the need to assure that the individual can perform his functions without harassment or intimidation: (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Rights Law > Immunity From Liability > General Overview*
[HN3] The United States Court of Appeals for the Third Circuit has stated that, in determining whether to grant summary judgment on qualified immunity grounds, a court must first consider whether taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right. If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Law of the Case*
[HN4] The law of the case doctrine limits relitigation of an issue once it has been decided in an earlier stage of the same litigation. However, reconsideration of a previously decided issue may be appropriate when the record contains new evidence. But that is so only if the new evidence differs materially from the evidence of record

when the issue was first decided and if it provides less support for that decision. Accordingly, if the evidence at the two stages of litigation is substantially similar, or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply.

*Civil Rights Law > Immunity From Liability > General Overview*
[HN5] The second prong of the qualified immunity defense is that the constitutional right must be clearly established. The question is whether a reasonable public official would know that his or her specific conduct violated clearly established rights.

**COUNSEL:** For JEROME K. HAMILTON, plaintiff: John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE

For FRANCES LEWIS, defendant: Stuart B. Drowos, Department of Justice, State of Delaware, Marc P Niedzielski, Department of Justice, Wilmington, DE.

For FRANCIS COCKROFT, GEORGE DIXON, JOANNE SMITH, defendants: Thomas H Ellis, Department of Justice, Wilmington, DE.

For JERRY BORGA, RICHARD SHOCKLEY, DEBORAH CRAIG, DENNIS LOEBE, defendants: Richard W. Hubbard, Department of Justice, State of Delaware, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

### MEMORANDUM ORDER

#### I. Introduction

The procedural history and the factual background of this case have been previously set forth in detail in published and unpublished [*2] opinions. n1 For present purposes, it is sufficient to state that the Third Circuit Court has remanded the case to this court to "reconsider whether the defendants are entitled to quasi-judicial absolute immunity" and to address the law of the case doctrine and whether the Defendants n2 are entitled to qualified immunity. *Hamilton v. Leavy,* 322 F.3d 776, 786-787 (3d Cir. 2003)

n1 *See Hamilton v. Leavy.* 322 F.3d 776 (3d Cir. 2003) ("Hamilton II"); *Hamilton v. Leavy*, 2001 U.S. Dist. LEXIS 10602, No. Civ. A. 94-336-GMS, 2001 WL 848603 (D. Del. July 27, 2001); *Hamilton v. Leavy.* 117 F.3d 742 (3d Cir. 1997) ("*Hamilton I*"); and *Hamilton v. Lewis* 1995 U.S. Dist. LEXIS 7563, No. 94-336-SLR, 1995 WL 330728 (D. Del. May 26, 1995).

n2 The "Defendants" are Faith Leavy ("Leavy"), Pamela Faulkner ("Faulkner"), William Queener ("Queener"), Frances Lewis ("Lewis"), George Dixon ("Dixon"), Jack Stephenson ("Stephenson"), Deborah Craig ("Craig"), JoAnne Smith ("Smith"), Dennis Loebe ("Loebe"), Eldora Tillery ("Tillery"), Francis Cockroft ("Cockroft"), Jerry Borga ("Borga"), and Richard Shockley ("Shockley").

[*3]

Presently before me is the Defendants' renewed motion for summary judgment (D.I. 260; the "Motion"). Also before me is Plaintiff Jerome Hamilton's ("Hamilton") cross-motion for partial summary judgment (D.I. 268; the "Cross-Motion") and Hamilton's "Motion to strike and/or for leave to file a short reply to defendants supplemental submission in support of summary judgment following remand" (the "Motion to Strike"). (D.I. 313.) For the reasons set forth herein, the Defendants' Motion (D.I. 260) will be denied, Hamilton's Cross-Motion (D.I. 268) will be granted, and Hamilton's Motion to Strike (D.I. 313) will be denied.

## II. Discussion

### A. Quasi-judicial absolute Immunity

[HN1] "Quasi-judicial absolute immunity attaches when a public official's role is 'functionally comparable' to that of a judge." *Hamilton II.* 322 F.3d at 785 (quoting *Butz v. Economou.* 438 U.S. 478, 513, 57 L. Ed. 2d 895. 98 S. Ct. 2894 (1978)). In a Memorandum Opinion issued in July 2001, the Defendants were held not to be entitled to quasi-judicial absolute immunity because quasi-judicial immunity "generally does not extend to prison officials." (D.I. 242 at 14.) Cited in support of that conclusion [*4] was *Cleavinger v. Saxner.* 474 U.S. 193, 88 L. Ed. 2d 507, 106 S. Ct. 496 (1985), which held that a committee of prison officials who disciplined an inmate after a hearing was not entitled to quasi-absolute judicial immunity. (*Id.*) The Third Circuit pointed out, however, that *Cleavinger* does not "hold *per se* that prison officials can never receive quasi-judicial immunity." *Hamilton II.* 322 F.3d at 785 (citing *Cleavinger.* 474 U.S. 193, 88 L. Ed. 2d 507, 106 S. Ct. 496) The Third Circuit explained that "*Cleavinger* requires that [a

court] analyze whether the particular defendants ... are entitled to [quasi-judicial] immunity" and this court "did not do so." *Id.* at 785. The Third Circuit also explained that in *Cleavinger*, "the Supreme Court analyzed the independence and safeguards accompanying the committee's decision-making process" before holding that members of a prison disciplinary committee could not receive quasi-judicial immunity, and, that in this case, they did "not know what facts pertaining to the committees' independence and safeguards were sufficiently proven for summary judgment purposes." *Id.* Accordingly, the Third Circuit remanded this case [*5] in order for this court to consider "whether the defendants are entitled to quasi-judicial absolute immunity." *Id.*

In *Cleavinger,* [HN2] the Supreme Court stated that the following factors are "characteristic of the judicial process" and are to be considered in determining the applicability of quasi-judicial absolute immunity:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process and (f) the correctability of error on appeal

474 U.S. at 202 (citing *Butz.* 438 U.S. at 511). Applying these principles to the members of a federal prison's discipline committee, which heard cases where inmates were charged with prison rules violations, the Supreme Court held that the members of this disciplinary committee were not entitled to quasi-judicial absolute immunity because they did not perform a classic adjudicatory function. *Cleavinger.* 474 U.S. at 203. [*6] "Unlike a federal or state judge," the members of the discipline committee were "not independent" because they were "not professional hearing officers, as are administrative law judges ... instead [they were] prison officials ... temporarily diverted from their usual duties." *Id* at 203-204. The Supreme Court also found that the committee members were "employees of the Bureau of Prisons and they were the direct subordinates of the warden who reviews their decision." *Id* at 204. Finally, the Supreme Court found that because these discipline committee members "worked with the fellow employee who lodged the charge against the inmate upon whom they sat in judgment ... [they] are under obvious pressure to resolve a

2004 U.S. Dist. LEXIS 5886, *

disciplinary dispute in favor of the institution and their fellow employee." *Id*

Furthermore, in *Cleavinger,* the Supreme Court also found that because few of the "procedural safeguards contained in the Administrative Procedure Act" were present, the members of the disciplinary committee were not entitled to absolute immunity.

> The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There [*7] was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.

*Cleavinger,* 474 U.S. at 206.

After further discovery upon remand, the following evidence was presented with regard to the independence and procedural safeguards utilized by the Multi-Disciplinary Team ("MDT") n3 and the Delaware Department of Corrections Central Institutional Classification Committee ("CICC"). n4 Like the members of the discipline committee in *Cleavinger,* members of the MDT and CICC are prison employees. (D.I. 267 at 16.) Similarly, MDT and CICC members are direct subordinates of the warden, who can veto or change their decisions. *Id.* Furthermore, neither the MDT nor the CICC worked under the state or federal Administrative Procedures Acts and inmates are not permitted to have legal representation before either the MDT or [*8] the CICC, inmates are not provided with lawyers, inmates are not permitted to call or cross examine witnesses, discovery is not permitted, and there is no burden of proof. (*Id.* at 17).

> n3 Leavy, Faulkner, and Queener are members of the MDT. (*See* D.I. 242 at 1.)

> n4 Lewis is the chairperson of the CICC. Dixon, Stephenson, Craig, Smith, Loebe, Tillery, Cockroft, Borga, and Shockley are members of the CICC. (*See* D.I. 242 at 1.)

In support of its assertion that the CICC defendants are entitled to quasi-judicial immunity, the Defendants assert that the CICC is independent (D.I. 261 at 11) (citing *Cleavinger*). The Defendants claim that the CICC is independent because it is made up of staff members representing a cross section of bureau personnel, which ensures that decisions affecting a particular inmate are objective, and that members are limited to three year appointments and must remain off the CCIC before being re-appointed. (*Id.* at 12-13.) The Defendants further argue that the CCIC is [*9] independent because internal procedures require a CCIC member to abstain from voting on a matter where the individual has made a recommendation as a member of the MDT. (*Id.* at 13.) The Defendants also claim that there are safeguards in the CCIC's decision-making process because appeals of CICC are directed to the Office of the Classification Administrator. (*Id.*)

These arguments, however, are not well founded. Overriding the factors claimed for independence is the reality that, like the members of the discipline committee in *Cleavinger,* the members of the MDT and CICC are not hearing officers with any status independent of the prison bureaucracy; they are prison officials (D.I. 262 at A235.) The members of the MDT and the CICC, like the members of the discipline committee in *Cleavinger,* are subordinates of the warden, who can veto or change their decisions. (*Id.* at 423-424, A328-329.) Simply put, MDT and CICC members are not independent in the quasi-judicial sense; they are prison officials who are subordinate to the warden and they do not perform a classic adjudicatory function. Because neither the MDT nor the CICC was independent or subject to procedural safeguards [*10] in its decision-making process, the MDT and CICC defendants are not entitled to quasi-judicial absolute immunity.

### B. Qualified Immunity

In *Hamilton II,* [HN3] the Third Circuit stated that, "in determining whether to grant summary judgment on qualified immunity grounds, a court must first consider whether 'taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right" (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001)). 322 F.3d at 786. "If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id*

The Third Circuit, in *Hamilton II,* explained that in *Hamilton I*

We held that Hamilton had raised a genuine issue of material fact whether defendants Leavy, Faulkner, Queener and Lewis acted with deliberate indifference to Hamilton's safety in violation of the Eighth Amendment. The District Court's opinion n5 did not discuss whether a constitutional violation occurred other than to note that we held in *Hamilton I* that a genuine issue of material [*11] fact existed as to the reasonableness of the defendants' conduct. The Court then skipped ahead to address the second prong in the qualified immunity analysis. It seems to us likely that, in so doing, the Court tacitly applied the law of the case doctrine, reasoning that *Hamilton I* had conclusively resolved for summary judgment purposes the first prong of the qualified immunity analysis.

322 F.3d at 787. The Court remanded the case for this court to decide whether the law of the case doctrine applied to defendants Leavy, Faulkner, Queener (the "MDT defendants") and Lewis. *Id.* Defendants Dixon, Stephenson, Craig, Smith, Loebe, Tillery, Cockroft, Borga, and Shockley (the "CICC defendants") were added to the case since *Hamilton I,* and therefore "lacked the opportunity to argue that they had not violated Hamilton's Eighth Amendment rights." *Id.* The Third Circuit stated that "on remand, they will have the opportunity to do so." *Id.*

    n5 *Hamilton v. Leavy* 2001 U.S. Dist. LEXIS 10602, No. Civ. A. 94-336-GMS. 2001 WL 848043 (D. Del July 27, 2001).

[*12]

1. The MDT Defendants and Lewis

[HN4] "The law of the case doctrine 'limits relitigation of an issue once it has been decided' in an earlier stage of the same litigation." *Hamilton II.* 322 F.3d at 787. However, "reconsideration of a previously decided issue may ... be appropriate when the record contains new evidence." *Id.* "But this is so only if the new evidence differs materially from the evidence of record when the issue was first decided and if it provides less support for that decision. Accordingly, if the evidence at the two stages of litigation is 'substantially similar,' or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply." *Id.* (citations omitted).

The Third Circuit, in *Hamilton I,* noted that the "record indicates that the MDT defendants took no immediate action following its recommendation to the CICC that Hamilton should be placed in protective custody. It also took no action after that recommendation was rejected." 117 F.3d at 748. The Third Circuit concluded that "while it appears that the MDT defendants acted reasonably in following the internal [*13] prison procedures by recommending to the CICC that Hamilton be placed in protective custody, the reasonableness of their actions following the rejection of that recommendation remains a question." *Id.* The Third Circuit further noted that "because neither party presented conclusive evidence on [the] issue" of whether the MDT defendants could have taken additional steps beyond recommending that Hamilton be placed in protective custody, such as placing him in administrative segregation, "there remains a genuine issue of material fact regarding whether the MDT's response to the risk Hamilton faced was reasonable." *Id.* at 748. "The failure of the MDT defendants to take additional steps beyond the recommendation of protective custody could be viewed by a factfinder as the sort of deliberate indifference to inmate safety that the Constitution forbids." *Id.* at 749.

After conducting additional discovery following remand by the Third Circuit in *Hamilton II,* the Defendants argue that "the undisputed record establishes that the MDT defendants had no authority other than to provide the recommendation that they did for protective custody" for Hamilton, [*14] and "accordingly, there is no basis for a constitutional claim against the ... MDT defendants." (D.I. 261 at 21.) The record is disputed, however, because Hamilton points out that the Classification Procedures Manual establishes that the MDT defendants "had the power to 'initiate[] protective custody requests' at any time" and that "the shift commander can authorize the placement of the inmate requesting protective custody on administrative transfer pending the outcome of a formal investigation." n6 (D.I. 267 at 23.) The Classification Procedures Manual also provides that the MDT defendants "have the ability to initiate protective custody reviews at any time." (*Id.*) Because this evidence not only does not materially deviate from the evidence in the record when *Hamilton I* was decided, but provides additional support for the *Hamilton I* decision, I find that the law of the case doctrine applies. *See Hamilton II.* 322 F.3d at 787. Therefore, the Third Circuit's holding of *Hamilton I* that "Hamilton had raised a genuine issue of material fact whether the MDT defendants acted with deliberate indifference to Hamilton's safety in violation of the Eighth [*15] Amendment" is the law of the case. *Id.* at 786.

n6 The Defendants argue that the MDT does "not have the authority to place anyone in administrative segregation" and that Hamilton "was already in administrative segregation." (D.I. 261 at 21.) However, the issue is whether the MDT defendants could have taken any steps beyond its recommendation to the CICC that Hamilton be placed in protective custody, and Hamilton's evidence shows that this is a genuine issue of material fact.

n7 The Defendants assert that these protective custody reviews, or follow-up reclassifications, are every six months (D.I. 273 at 6), but the Manual says that "in cases where the MDT feels a more frequent review is appropriate, they may do so." (D.I. 262 at A340.)

The Defendants contend that with respect to defendant Lewis, the record generated after *Hamilton I* "is materially different from the record on which the Court of Appeals based its decision." (D.I. 261 at 25.) First, the Defendants assert that the Third Circuit [*16] erroneously identified more assaults in *Hamilton I* as the basis for their conclusion that Hamilton "has a long history of being assaulted throughout the Delaware prison system." 117 F.3d at 744. The Defendants also imply that the Third Circuit erroneously understood those attacks to have occurred at Gander Hill rather than at the DCC. (D.I. 261 at 25.) Second, the Defendants state that Hamilton's cellmate was not at Gander Hill until more than a month after the MDT's recommendation and the CICC's decision to take no action. (*Id.*) Third, the Defendants claim that the attack occurred after Hamilton's cellmate learned he was a "snitcher," which was more than a month after Lewis, as part of the CICC, decided to take not action. (*Id.*) Fourth, the Defendants argue that Lewis did not have knowledge of Hamilton's grievance of March 25, 1992. (*Id.*) Finally, the Defendants state that the Superior Court ordered Hamilton to remain at Gander Hill. (*Id.*)

These contentions are irrelevant to the Third Circuit's findings in *Hamilton I* that "Lewis was made aware of a substantial risk to Hamilton's safety when she reviewed the MDT's unanimous recommendation to place [*17] Hamilton in protective custody," that "Lewis had good reason to believe that the MDT's fears were well-founded since Lewis herself approved Hamilton for protective custody on two prior occasions," and that "since Lewis should be charged with knowledge of Hamilton's known cooperation with prison officials and the subsequent branding of Hamilton as a 'snitch,' ... a fact finder could infer that Lewis knew that the threat to Hamilton's safety was imminent." 117 F.3d at 747. The Third Circuit found that Lewis knew that Hamilton was at risk of an

assault based on facts known in June 1992, not of an assault specifically by his cellmate. *See Benner v. McAdory,* 165 F. Supp. 2d 773, 778 (D. N.J. 2001) ("[A] failure to protect claim does not require that the plaintiff specifically identify the attacker as a threat prior to the occurrence of the attack"). Because the evidence that the Defendants cite does not differ materially from the evidence considered by the Third Circuit in *Hamilton I,* I hold that the law of the case applies to Lewis.

[HN5] The second prong of the qualified immunity defense is that the constitutional right must be clearly established. *Hamilton II.* 322 F.3d at 787. [*18] This court found that "Hamilton's right to be protected from known risks was clearly established in August 5, 1992." n8 *Id.* However, the Third Circuit explained that this was not sufficient. "The question is whether a reasonable public official would know that his or her specific conduct violated clearly established rights." *Id.* For the MDT defendants, it is whether a reasonable person serving on the MDT would know that doing nothing beyond recommending that Hamilton be placed in protective custody would likely violate his constitutional rights. For Lewis, it is whether a reasonable CICC chairperson would know that a decision to take "no action" on the MDT recommendation violated clearly established rights.

n8 August 5, 1992 was the day that Hamilton was attacked by his cellmate.

The Defendants do not argue whether a reasonable MDT member would know that doing nothing beyond merely recommending to the CICC that Hamilton be placed in protective custody, or whether a reasonable chairperson of the CICC would [*19] know that not placing Hamilton in protective custody after receiving such a recommendation by the CICC violated clearly established rights. (D.I. 261 at 28-29.) Rather, the Defendants argue that the MDT defendants and Lewis had no reason to know that Hamilton's safety was in danger *(Id.)* The Defendants' argument, however, does not meet the standard for establishing whether a public official is entitled to qualified immunity because their argument is subjective, and the standard is objective, not subjective. *See Grant v. City of Pittsburgh.* 98 F.3d 116, 121 (3d Cir. 1996). Moreover, the evidence suggests that the MDT defendants and Lewis did know that Hamilton faced a "substantial risk of serious harm" if he were placed in the general prison population, and thus violated his violated his Eighth Amendment right by failing to protect him. n9 *Farmer v. Brennan,* 511 U.S. 825, 828, 128 L. Ed. 2d 811. 114 S. Ct. 1970 (1994). Because the law of the case applies to the MDT defendants and

2004 U.S. Dist. LEXIS 5886, *

Lewis, and neither the MDT defendants nor Lewis has produced evidence that a reasonable official in their positions would not have protected Hamilton, they are not entitled to qualified [*20] immunity.

> n9 The Third Circuit stated that after considering "Hamilton's history of violent clashes throughout the Delaware prison system, and acknowledging his statement that 'protective custody concerns exist throughout the state,'" the MDT defendants "concluded, unanimously, that Hamilton was in such danger as to justify isolating him from the general population in protective custody." *Hamilton I.* 117 F.3d at 747. "The MDT's recommendation that Hamilton be placed in protective custody was evidence that "Hamilton faced a substantial risk of serious harm." *Id.* The Third Circuit also stated that "the facts constitute sufficient circumstantial evidence upon which a factfinder could conclude that Lewis 'must have known' of the risk to Hamilton's safety." *Id.*

### 2. The CICC defendants

Subsequent to *Hamilton I,* Hamilton amended the complaint to add the CICC defendants. Because the Defendants never argued whether the CICC defendants violated Hamilton's *Eighth Amendment* rights, the [*21] Third Circuit remanded the case in order to give them the opportunity to do so. *Hamilton II.* 322 F.3d at 787.

The Defendants argue that Tillery did not violate Hamilton's *Eighth Amendment* right to be protected from "violence at the hands of other prisoners," *Farmer.* 511 U.S. at 833, because she was not a member of the MDT and not a member of the CICC on the date that the CICC defendants determined to take "no action" on the MDT's recommendation to place Hamilton in protective custody. (D.I 261 at 21.) Citing to the record, Hamilton claims that at the time Hamilton was attacked by his cellmate, Tillery was a "classification officer" and her job was to "review MDT recommendations to ensure the MDT made proper recommendations based on the inmates' institutional history and individual circumstances." (D.I. 267 at 30.) Hamilton asserts that Tillery's review of the same materials reviewed by the MDT "allowed her to acquire the same knowledge of the danger to Mr. Hamilton's safety known to the MDT and to act, as permitted by [the] Classification Guidelines Manual, to protect him by initiating the protective custody procedures." (*Id.*) The Defendants [*22] do not respond to these claims. Thus, taken in a light most favorable to Hamilton, a reasonable fact finder could conclude that Tillery violated

Hamilton's <u>Eighth Amendment</u> right by failing to protect him.

The Defendants argue that Smith, Dixon, and Cockroft did not violate Hamilton's <u>Eighth Amendment</u> rights because they were not present at the CICC meeting when the "no action" decision was made with regard to the MDT's recommendation. (D.I 261 at 21-22.) Hamilton argues that even though they were not present, Smith, Dixon, and Cockroft had the authority to initiate "protective custody procedures at any time." (D.I. 267 at 31-32.) The Defendants did not respond to these allegations. (D.I. 273.) Accordingly, taken in a light most favorable to Hamilton, the facts that Hamilton has alleged are sufficient for a reasonable fact finder to conclude that Smith, Dixon, and Cockroft violated his constitutional rights.

Defendants argue that Stephenson, Craig, Loebe, Borga and Shockley, the CICC defendants that were present when the "no action" decision was taken on the MDT's recommendation, did not violate Hamilton's <u>Eighth Amendment</u> rights because they were not responsible for his safety [*23] and even if they were, Hamilton's "failure to cooperate with the MDT evinces a clear waiver of any <u>Eighth Amendment</u> claim." (D.I. 261 at 23-24.) Hamilton points to evidence in the record that the CICC was responsible for his safety (D.I. 267 at 28), and that claims that the CICC discussed his case when they decided to take "no action," and that Lewis, Stephenson, Craig, Loebe, Borga and Shockley were therefore "aware of a substantial risk to Hamilton's safety when [they] reviewed the MDT's unanimous recommendation to place Hamilton in protective custody." *Hamilton I,* 117 F.3d at 747. Because there is evidence that the CICC was responsible for Hamilton's safety, and because the Defendants do not deny Stephenson's, Craig's, Loebe's, Borga's and Shockley's knowledge of a general risk to Hamilton's safety, and because there is no basis for the Defendants allegation that Hamilton waived his constitutional rights by failing to cooperate, I hold that, taken in a light most favorable to Hamilton, a reasonable fact finder could conclude that Stephenson, Craig, Loebe, Borga and Shockley violated his constitutional rights.

As discussed above, the next question is "whether [*24] a reasonable public official would know that his or her specific conduct violated clearly established rights." *Hamilton II.* 322 F.3d at 787. On this issue, the Defendants have not submitted any evidence that a reasonable CICC member would not know that following the MDT's recommendation that Hamilton be placed in protective custody violated his <u>Eighth Amendment</u> right to be protected from violence at the hands of other prisoners. n10 (See D.I. 261 at 28-29.) Because a reasonable fact finder could conclude that the CICC defendants violated his <u>Eighth Amendment</u> rights, and the Defendants have not

2004 U.S. Dist. LEXIS 5886, *

submitted any evidence that a reasonable CICC member would not know that not acting on an MDT recommendation to protect Hamilton violated his clearly established rights, the CICC defendants are not entitled to qualified immunity. Therefore, the Defendants' Motion will be denied.

> n10 "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." *Donahue v. Gavin.* 280 F.3d 371, 378 (3d Cir. 2002) "Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the objective reasonableness of the defendant's belief in the lawfulness of his actions." *Id.* The burden was thus on the Defendants to establish the objective reasonableness of their

belief in the lawfulness of their actions, and they have failed to provide evidence in that regard.

[*25]

C. Hamilton's motion to strike

Because the Defendants' Motion is denied, Hamilton's Motion to Strike is moot and will therefore be denied.

III. Conclusion

Accordingly, the Defendants' Motion (D.I. 260) is DENIED, Hamilton's Cross-Motion (D.I. 268) is GRANTED, and Hamilton's Motion to Strike (D.I. 313) is DENIED as moot.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

March 24, 2004
Wilmington, Delaware

Westlaw.

Slip Copy
Slip Copy, 2006 WL 38918 (D.Del.)
(Cite as: 2006 WL 38918 (D.Del.))

Page 1

⊵

Motions. Pleadings and Filings

Only the Westlaw citation is currently available

United States District Court,
D. Delaware.
IMX, INC , Plaintiff,
v.
LENDINGTREE, LLC, Defendant.
No. Civ. 03-1067-SLR.

Jan. 6, 2006

David Ellis Moore, Richard L. Horwitz, Potter
Anderson & Corroon, LLP, Wilmington, DE, for
Plaintiff.

Jack B. Blumenfeld, Julia Heaney, Morris, Nichols,
Arsht & Tunnell, Wilmington, DE, for Defendant.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington this 6th day of January, 2006,
having considered the issues raised by defendant at
the December 19, 2005 pretrial conference;

IT IS ORDERED that plaintiff is precluded from
seeking to draw an adverse inference or suggesting
any adverse evidentiary presumption with respect to
the nature of an opinion of counsel on infringement
due to defendant's failure to obtain such an opinion,
for the reasons that follow:

1. At the December 19, 2005 pretrial conference,
defendant raised the following matter for
consideration by the court: "Whether [plaintiff] may
make any arguments or seek to draw inferences
relating to the fact that the opinion of counsel
obtained by defendant addressed the issue of
invalidity of the patent-in-suit, but not the issue of
infringement."

2. The holding of the Federal Circuit in _Knorr-
Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana
Corporation, et al., 383 F.3d 1337 (Fed.Cir.2004)_ (en
banc), provides a clear answer to the question of
whether inferences can be drawn as a result of the

absence of an opinion from counsel The Federal
Circuit noted, "We now hold that no adverse
inference that an opinion of counsel was or would
have been unfavorable flows from an alleged
infringer's failure to obtain or produce an exculpatory
opinion of counsel. Precedent to the contrary is
overruled." _Knorr-Bremse, 383 F.3d at 1341_
Pursuant to this holding, plaintiff may not seek to
draw the inference that, since the opinion by counsel
obtained by defendant failed to discuss infringement,
an opinion by counsel on infringement would have
been unfavorable if obtained by defendant.

3. As the court in _Knorr-Bremse_ further explained,
"Although there continues to be an affirmative duty
of due care to avoid infringement of the known patent
rights of others, the failure to obtain an exculpatory
opinion of counsel shall no longer provide an adverse
inference or evidentiary presumption that such an
opinion would have been unfavorable." _Id_ at 1345
(internal citations omitted). Thus, plaintiff should be
precluded from seeking to draw an adverse inference
or suggesting any adverse evidentiary presumption as
to the nature of an opinion on infringement

4. As for the propriety of an argument relating to the
fact that the opinion of counsel obtained by defendant
addressed the issue of invalidity but not infringement,
such evidence may be considered by the trier of fact
when assessing willful infringement. Unchanged by
_Knorr-Bremse_ is the standard that a determination of
willfulness is made as a result of consideration of the
totality of the circumstances. _Id_ at 1342-43. Several
factors may be considered in the totality of the
circumstances analysis used to evaluate willfulness,
but no factor deserves per se treatment; each factor
must be given the weight warranted by its strength in
a particular case. _[FN1] Rolls-Royce, Ltd. v. GTE
Valeron Corp., 800 F.2d 1101, 1110 (Fed.Cir.1986);
Knorr-Bremse, 383 F.3d at 1347._ As a result of the
holding in _Knorr-Bremse_, however, an adjustment is
made to the factors used in the evaluation of the
totality of the circumstances. _Knorr-Bremse, 383
F.3d at 1346_ (vacating a judgment of willful
infringement and remanding the case, noting that
"[b]ecause elimination of the adverse inference as
drawn by the district court is a material change in the
totality of circumstances, a fresh weighing of the
evidence is required to determine whether the
defendants committed willful infringement."). In
other words, while an evaluation of the factors in the

Slip Copy
Slip Copy, 2006 WL 38918 (D Del )
(Cite as: 2006 WL 38918 (D.Del.))

totality of the circumstances must still be conducted to make a determination on the issue of willful infringement, such an evaluation must be made in the absence of the evidentiary contribution or presumptive weight of an adverse inference that any opinion of counsel was or would have been unfavorable. *Id.* at 1341. The fact that no opinion of counsel on the issue of infringement was acquired by defendant may be considered by the trier of fact in its willful infringement analysis, but no inference may be drawn to suggest that such an opinion, had it been acquired, would have been unfavorable to defendant.

> FN1. The Federal Circuit has identified several factors that may be considered in determining whether infringement is willful: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) the duration of defendant's misconduct; (7) remedial action taken by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827 (Fed.Cir.1992)

Slip Copy, 2006 WL 38918 (D Del.)

Motions, Pleadings and Filings (Back to top)

• 2006 WL 1182408 (Trial Motion, Memorandum and Affidavit) Lendingtree's Reply Brief in Support of its Inequitable Conduct Defense and Counterclaim (Mar. 20, 2006)Original Image of this Document (PDF)

• 2006 WL 1182409 (Trial Motion, Memorandum and Affidavit) Lendingtree, LLC's Reply Brief in Support of its Renewed Motion for Judgment as A Matter of Law Or, in the Alternative, for A New Trial (Mar. 20, 2006)Original Image of this Document (PDF)

• 2006 WL 1182406 (Trial Motion, Memorandum and Affidavit) JMX, Inc 's Opposition to Lendingtree, LLC's Opening Brief in Support of Inequitable Conduct Defense and Counterclaim (Mar. 8, 2006)Original Image of this Document (PDF)

• 2006 WL 1182407 (Trial Motion, Memorandum and Affidavit) Imx, Inc 's Opposition to Lendingtree's Motion for Judgment as A Matter of Law (Mar. 8, 2006)Original Image of this Document (PDF)

• 2006 WL 809086 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendant Lendingtree, LLC's Inequitable Conduct Defense and Counterclaim (Feb 15, 2006)

• 2006 WL 819609 (Trial Motion, Memorandum and Affidavit) Lendingtree, LLC's Opening Brief in Support of its Renewed Motion for Judgment as A Matter of Law or, in the Alternative, for A New Trial (Feb. 15, 2006)

• 2005 WL 2603755 (Trial Motion, Memorandum and Affidavit) Imx, Inc 's Response to Lendingtree Llc'S Citation of Subsequent Authority (Sep 6, 2005)

• 2005 WL 2603754 (Trial Motion, Memorandum and Affidavit) Defendant Lendingtree, LLC'S Citation of Subsequent Authority Pursuant to L.R. 7.1.2(C) in Support of its Motion for Partial Summary Judgment Limiting Damages Pursuant to 35 U.S.C. § 287(a) (Aug. 30, 2005)

• 1:03cv01067 (Docket) (Nov 24, 2003)

END OF DOCUMENT

© 2006 Thomson/West No Claim to Orig. U S Govt Works

# EXHIBIT I

**REDACTED**

# EXHIBIT J

**REDACTED**

# EXHIBIT K

**REDACTED**

# EXHIBIT L

**REDACTED**

# EXHIBIT M

FOCUS - 4 of 46 DOCUMENTS

ADVANCED MEDICAL OPTICS, INC., a Delaware corporation, Plaintiff, v.
ALCON INC., a Swiss corporation, and ALCON LABORATORIES,
INCORPORATED, a Delaware corporation, Defendants.

Civil Action No. 03-1095-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 5803

April 7, 2005, Decided

**SUBSEQUENT HISTORY:** Findings of fact/conclusions of law at Advanced Med. Optics, Inc. v. Alcon Labs., Inc., 2005 U.S. Dist. LEXIS 33369 (D. Del., Dec. 16, 2005)

**PRIOR HISTORY:** Advanced Med. Optics, Inc. v. Alcon Inc., 361 F. Supp. 2d 404, 2005 U.S. Dist. LEXIS 4897 (D. Del., 2005)

**COUNSEL:** [*1] Richard L. Horowitz, Esq. and David E. Moore, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, for Plaintiff. Of Counsel: A. James Isbester, Esq. and Gillian W. Thackray, Esq., Isbester & Associates, Berkeley, California.

Josy W. Ingersoll, Esq. and Melanie K. Sharp, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendants. Of Counsel: Robert G. Krupka, Esq. and Erica S. Olson, Esq., Kirkland & Ellis, LLP, Los Angeles, California.

**JUDGES:** JORDAN, District Judge.

**OPINIONBY:** Kent Jordan

**OPINION:**

MEMORANDUM OPINION

Wilmington, Delaware
April 7, 2005

JORDAN, District Judge.

**I. INTRODUCTION**

This is a patent infringement case. Presently before me are two *Daubert* motions n1 filed by defendants Alcon Laboratories, Inc. and Alcon Manufacturing, Ltd. (collectively, "Alcon") seeking to exclude the testimony of two experts, Dr. Randall Olson (*see* Docket Item ["D.I."] 156) and Mr. Harold Walbrink (*see* D.I. 160), offered by Advanced Medical Optics, Inc ("AMO") pursuant to Federal Rule of Evidence 702. Jurisdiction is proper under 28 U.S.C. § § 1331 and 1338. For the reasons [*2] that follow, Alcon's motions will be granted in part and denied in part.

n1 The motions are based upon Federal Rule of Evidence 702 and the Supreme Court's direction in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), and later cases that district court judges are to perform a "gatekeeping" function when considering the admissibility of expert testimony. (D.I. 156; 160.)

**II. BACKGROUND**

The background related to the patents in suit is set forth in the Opinion construing the disputed claim terms. (D.I. 238 at 1-5.)

**III. STANDARD OF REVIEW**

Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted) n2 [*3] "When the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals

2005 U.S. Dist. LEXIS 5803, *

will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id* at 750

> n2 The Federal Circuit applies the law of the regional circuit in reviewing decisions on whether to admit expert testimony, and, therefore, the Third Circuit's holdings on the issue are binding precedent. *Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we ... [apply] the law of the regional circuit ...")

## IV. DISCUSSION

Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). [*4] Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ..." The party offering the expert testimony has the burden of proving admissibility. *See Daubert,* 509 U.S. at 592 n. 10 (citation omitted). The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id* at 589-90. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id* at 591-92.

In determining "whether an expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue. *Id.* at 592-93. [*5] As part of that inquiry, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir. 1999).

Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to

that field. *See Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1179 (4th Cir. 1997) (metallurgist not qualified to testify about industry standards for safes); *Barrett v. Atl Richfield Co.,* 95 F.3d 375, 382 (5th Cir. 1996) (expert not qualified to testify about correlation of chemical effects on rats and on humans). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the factfinder. *See McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir. 1987) (expert permitted to testify as to the customary duty of factory representatives in the air compressor industry, but should [*6] not have been permitted to opine on breach of such duty because the jury was equally qualified to make that determination); *S.E.C. v. Lipson,* 46 F. Supp. 2d 758, 763 (N.D. Ill 1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

### A. Dr. Olson

Pursuant to Federal Rule of Evidence 702, Alcon seeks to preclude Dr. Olson from testifying in regard to four categories of issues (D.I. 156), each of which will be discussed in turn.

#### 1. General sales and market analysis

Alcon seeks to preclude Dr. Olson from testifying in regards to a general sales and market analysis of phacoemulsification devices. (D.I. 157 at 7-11.) Specifically, Alcon notes four opinions rendered by Dr. Olson on this topic:

> (1) "In regards to companies selling phacoemulsification equipment, I believe there is a competitive disadvantage for any company that does not have Occlusion Mode on its equipment. (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.)

> (2) "I think that [if] that information [on Occlusion Mode were] out there and appropriately marketed [*7] [it] would produce a huge competitive advantage for whoever had occlusion mode." (D.I. 158, Ex. 3 at A172, Dep. of Dr. Olson at 58:14-17, Oct. 11, 2004.)

> (3) "Fluidics drives sales, because removing the air reduces the post-occlusion surge and therefore allows high aspiration levels to be used safely." (D.I. 158, Ex. 1 at A022, Dr. Olson's Revised Expert Disclosure at 21.)

(4) General comments on Alcon's financial size and market strength. For example, "they're the 800 pound gorilla," (D.I. 158, Ex. 3 at A134, Dep. of Dr. Olson at 8:25, Oct. 11, 2004), "they're the biggest. They're the strongest." (*Id.* at A138, 12:12.)

(D.I. 157 at 8.) Alcon asserts that "these opinions venture outside Dr. Olson's general area of cataract surgery because they require specific knowledge about how the phacoemulsification market has responded to Occlusion Mode and the '765 patent, and should be excluded for that reason." (*Id.*) In support of its position, Alcon argues that Dr. Olson admitted during his deposition that he lacks specialized training in analyzing sales or market trends for phacoemulsification machines:

> Q. You don't claim to have any special knowledge or [*8] training in the analysis of sales and market trends for phacoemulsification machines, right?
>
> A. *I'm not in sales and marketing*, but I do see sales and marketing figures. ... I think I have an interest, *but I don't claim any special expertise*

(D.I. 158, Ex. 3 at A206-07, Dep. of Dr. Olson at 173:21-174:4, Oct. 11, 2004 (emphasis added).)

In response, AMO argues that Dr. Olson, as an "expert consumer" of phacoemulsification products, should be permitted to address the jury in regards to the competitive advantage that a phacoemulsification machine having the invention of each of the two patents in suit would have in the market. (D.I. 185 at 6.) For support, AMO asserts that Dr. Olson is a sophisticated consumer of phacoemulsification machines because he is familiar with various phacoemulsification machines, has been performing cataract surgery for thirty years, and because he approves all purchases by his department at the Moran Eye Center. (*Id.*) Additionally, AMO asserts that Dr. Olson provided four reasons why he believes Occlusion Mode offers a competitive advantage:

> 1) Alcon would not have added it to its systems if Alcon did not believe it was important [*9] to do so, 2) his conversations and interactions with leading surgeons such as Bruce Wallace and Howard

Fine led him to conclude that some surgeons would not purchase equipment that did not have occlusion mode, ... 3) [his] review of the trade literature regarding occlusion mode suggests that occlusion mode is an important feature to a number of leading surgeons, and 4) [his] own study of the problem of thermal injury leads him to conclude that the use of occlusion mode can reduce thermal injury eight fold

(*Id.* at 8-9.)

Because Dr. Olson lacks expertise in the analysis of sales and market trends for phacoemulsification machines, he will be precluded from testifying on this topic. He has admitted that he has no expertise in this particular area. Being an "expert consumer," as AMO puts it, does not remedy this deficiency. Further, the "main basis" for Dr. Olson's opinions are "the fact that Alcon decided to put occlusion mode on its latest equipment." (D.I. 158, Ex. 3 at A169, Dep. of Dr. Olson at 55:12, 1-2, Oct. 11, 2004.) That reason, as AMO admits, is "more a matter of plain common sense than special expertise." (*See* D.I. 185 at 9.)

Additionally, Dr. Olson's [*10] opinion regarding the general preferences of other surgeons is speculative and not supported by reliable data. The basis for his opinion on this point is that two of his collegues have preferences for devices with Occlusion Mode, and even as to them, he testified that he could only be certain one of them would actually insist on buying a machine with Occlusion Mode. Dr. Olson testified during his deposition as follows:

> Q. Is there any other basis for your statement?
>
> A. I do feel there are people out there who use occlusion mode and feel its important, and I think that they -- I mean, the Alcon people know. You could ask them, but I'm sure they have surveys. And I'm sure there are people who would not buy the equipment without it, so I think that that's got to be it as well. But my main basis is the fact that Alcon put it in their equipment
>
> Q. You say that you're sure that there were people who would not buy the equipment without it having occlusion mode. *Why are you sure that there are*

2005 U.S. Dist. LEXIS 5803, *

*people who would not buy a phacoemulsi-
fication system if it didn't have occlusion
mode?*

A. Because there are people talking about
occlusion mode and how you should have
it. [*11] There are many names listed
there, Bruce Wallace most recently in the
meeting I was just at, *so I know one,
Bruce Wallace.* I mean, from what he
said, I don't think Bruce Wallace would
buy anything without an occlusion mode.
He talked about the fact that occlusion-
mode phaco was important. *So there have
to be others. If there were none, why
would Alcon add it to their equipment in
face of a patent? It makes no sense.*

Q. Other than Bruce Wallace, can you
identify anyone else who you believe
would not purchase a phacoemulsification
system if it didn't have occlusion mode?

A. *Not without talking to them.* There's
others, who talk about it here, but I -- the
only one I'm aware who's talked to very
recently is Bruce Wallace. Whether How-
ard Fine still thinks it's important or not,
he certainly in there will say he feels it's
very important.

Q. And when you're saying in there,
you're referring to the articles that Ms.
Thackray sent to you, right?

A. Yes, that you now have, yes.

(D.I. 158, Ex. 3 at A169-70, Dep. of Dr. Olson at 55:6-
56:13, Oct. 11, 2004 (emphasis added).)

In that testimony, Dr. Olson admits that he has not
talked to any other surgeons, [*12] besides Bruce Wal-
lace, about whether they would only buy machines with
Occlusion Mode. The articles to which he refers do not
support his opinion in this regard either, because as he
admits, he cannot tell without talking to those surgeons
whether they would only buy machines with the occlu-
sion mode feature. His comments also reveal that he does
not know whether other surgeons agree with Bruce Wal-
lace's view, nor has he conducted a survey to find out.
Thus, his testimony on the viewpoints of other surgeons
is purely speculative.

Lastly, Dr. Olson testified that his opinion on the
sales and marketing aspects of Occlusion Mode were

based on extrapolations from a survey he conducted on
wound burns. That survey, however, which was unpub-
lished and not peer reviewed, did not ask its respondents
whether Occlusion Mode was enabled during the sur-
gery, and did not even mention the Occlusion Mode fea-
ture. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey
Questionnaire; *see* D.I. 158, Ex. 3 at A190-91, Dep. of
Dr. Olson at 97:25-98:6, Oct. 11, 2004 ("Q. Now, the
survey didn't ask whether the occlusion mode feature
was active, correct? A. [It] did not. Q. So it could be that
occlusion mode was [*13] enabled during some of the
wound burns that the ... study found? A. It's possible ").)
Thus, it is not a reliable basis from which an opinion on
the general market and physician preferences could be
based.

Therefore, because Dr. Olson does not have suffi-
cient expertise in the sales and marketing of phacoemul-
sification devices, and his opinion on such matters is not
supported by reliable bases, he will be precluded from
testifying to any sales and market analysis of phacoemul-
sification devices, including testimony addressing the
economic advantages of phacoemulsification devices
incorporating Occlusion Mode and the '765 patent as
they pertain to the market. Dr. Olson will be permitted,
however, to testify about his own preferences for certain
features in phacoemulsification machines and what he
considers advantageous from his perspective, based on
his many years of experience using such machines in the
performance of cataract surgery, to the extent such opin-
ions were disclosed in his expert report.

2. Infringement by Alcon of the '240 or '765 patent

Alcon seeks to preclude Dr. Olson from offering tes-
timony relating to whether Alcon infringes either the
'240 patent or the '765 patent. [*14] (D.I. 157 at 11-12.)
According to Alcon, "Dr. Olson implied at numerous
times throughout his deposition that Alcon's phacoemul-
sification systems infringed the '240 and '765 patents,
and that Alcon's alleged infringement was knowing and
deliberate." (*Id.* at 11.) Alcon argues that Dr. Olson
"lacks the expertise that would enable him to perform a
claim construction analysis of the patents to determine
whether they are infringed by the Infiniti system ... [be-
cause he] admitted that he lacks specialized training in
engineering and patents." (*Id.* (citing D.I. 158, Ex. 3 at
A141, Dep. of Dr. Olson at 18:11-13, Oct. 11, 2004.))

AMO asserts that "Dr. Olson has not done an ele-
ment-by-element analysis of the patents against the ac-
cused products and AMO has no intention of asking him
to do so... " (D.I. 185 at 9.) Rather, AMO argues that Dr.
Olson's view that Alcon's device is so similar to AMO's
device that it appears to have been copied is both compe-
tent and pertinent. (*Id.* at 10.)

Dr. Olson will not be permitted to testify in regards to infringement of either patent. Federal Rule of Civil Procedure 26(a)(2)(B) states, in relevant part, [*15] that "the [expert] report shall contain a complete statement of all opinions to be expressed . ." Dr. Olson did not disclose an opinion on infringement of either patent in his expert report, and as such he may not offer one at trial. *See* Fed. R. Civ. P. 26(a)(2)(B). Additionally, in its Answering Brief in Opposition to Alcon's Motion, AMO lists six things upon which Dr. Olson has been asked to opine, not one of which concerns infringement or copying. n3 (*See* D.I. 185 at 3.) Thus, it is clear that Dr. Olson may not properly offer an opinion on infringement, and it is equally clear that AMO did not intend for him to do so. Therefore, Dr. Olson will not be permitted to offer testimony relating to whether Alcon infringes either patent in suit.

> n3 AMO asserts that it asked Dr. Olson to provide expert testimony in the following six areas: "(i) a tutorial into the physiology and treatment of cataracts; (ii) the importance, from the surgeon's point of view, of each of the patents in suit; (iii) the problem of thermal injury; (iv) the difficulty in manual detection of occlusion; (v) the increased safety of the automatic response to occlusion of the system described in the '240 patent; and (vi) the inapplicability of the Shimizu reference to [the] invention of the '240 patent." (D.I. 185 at 3.)

[*16]

3. Occlusion Mode and Safety of Phacoemulsification

Alcon seeks to preclude Dr. Olson from offering testimony "relating to his opinion that Occlusion Mode made phacoemulsification safer, and consequently a mainstream procedure in cataract surgery because it enabled surgeons to rely on the Occlusion Mode feature to prevent the occurrence of thermal injury to the eye." (D.I. 156 at 1.) More specifically, Alcon objects to five opinions on this topic offered in Dr. Olson's report: (i) that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level" (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17); (ii) that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment" (*id.* at A019); (iii) that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream (*id.* at A018); and, in the same

vein, (iv) that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification [*17] widely available and used by most cataract surgeons in the United States today" (*id.* at A019); and again (v) that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients" (*id.*).

Alcon asserts that these opinions rendered by Dr. Olson are "inadmissible because they lack adequate foundation, and therefore fail to 'assist the trier of fact.'" (D.I. 157 at 13.) Specifically, Alcon asserts that they are based in large part on "(1) biased information supplied almost exclusively by AMO attorneys, (2) materials that Dr. Olson himself labels as 'scanty,' (3) a partial analysis of an unpublished survey, and (4) unsupported assumptions that are speculative at best." (*Id.*)

AMO argues in response that Dr. Olson reviewed whatever publications were available, not merely those provided by AMO, concerning the use of Occlusion Mode in phacoemulsification, and that "Dr Olson did not rely on peer-reviewed articles on occlusion mode because none existed." (D.I. 185 at 10, 12.) AMO asserts that reliance on peer-reviewed journals is not a prerequisite [*18] to admissibility and that the articles on which Dr. Olson relied were "written by respected and well-known practitioners in the field." (*Id.*) Further, AMO argues that "Dr. Olson is well qualified to survey fellow practitioners on the incidence of wound burn, and to opine on the value of occlusion mode in reducing it." (*Id.*)

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 advisory committee's note. The main issue raised by Alcon is the reliability of the opinions offered by Dr. Olson. Alcon does not challenge Dr. Olson's expertise to offer such opinions, but rather challenges the bases upon which he relies to render them. (See D.I. 207 at 5.) Each challenged opinion is discussed below.

a. That the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level"

Alcon challenges Dr. Olson's opinion that the invention of Occlusion Mode "solves this problem [of thermal injury] by automatically [*19] shifting the parameters so that the surgeon can no longer use the ultrasound to a dangerous level." (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson testified at his deposition that "occlusion mode *could* dramatically decrease wound burn . ." (D.I. 158, Ex. 3 at A183, Dep.

of Dr. Olson at 77:5-6, Oct. 11, 2004 (emphasis added).) In his report, Dr. Olson was more emphatic, stating that Occlusion Mode actually did have that effect. (D.I. 158, Ex. 1 at A018, Dr. Olson's Revised Expert Disclosure at 17.) Dr. Olson indicated that his opinion in this regard is largely based upon his survey. (See D.I. 158, Ex. 3 at A182-83, Dep. of Dr. Olson at 76:21-77:6, Oct. 11, 2004.) As discussed earlier, however, see supra Part IV.A.1., Dr. Olson's survey did not inquire whether Occlusion Mode was enabled during the procedures being reported, nor did it mention Occlusion Mode at all. (D.I. 158, Ex. 6 at A341-56, Wound Burn Survey Questionnaire; see D.I. 158, Ex. 3 at A190-91, Dep. of Dr. Olson at 97:25-98:6, Oct. 11, 2004.) Thus, it is not a reliable basis of support for the type of definitive conclusion rendered in Dr. Olson's report. Dr. Olson will [*20] be permitted to testify as to whether he thinks Occlusion Mode "could" decrease wound burn, based on his years of experience n4 and the various articles he has reviewed, but he cannot testify that Occlusion Mode in fact decreases instances of wound burn because his survey does not provide a reliable basis for such a conclusion, and because, as he admits, "there's basically no studies on this subject or anything." (D.I. 158, Ex. 3 at A145, Dep. of Dr. Olson at 26:24-25, Oct. 11, 2004.)

> n4 Dr. Olson's experience with Occlusion Mode is apparently limited, however, because, as he admits, he does not use Occlusion Mode himself. (D.I. 158, Ex. 3 at A173-74, Dep. of Dr. Olson at 59:25-60:2, Oct. 11, 2004.)

b. "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment."

Alcon challenges Dr. Olson's opinion that "Occlusion Mode is one of the safety features that many feel should be standard with modern phacoemulsification equipment." (D.I. 158, Ex. 1 at A019, [*21] Dr. Olson's Revised Expert Disclosure at 18.) Alcon asserts that Dr. Olson lacks a reliable basis to conclude what "many" feel about modern phacoemulsification equipment. (D.I. 157 at 18.) At his deposition, however, Dr. Olson testified that he based his opinion on the articles he reviewed in which various experts have stated preferences for Occlusion Mode. Although Dr. Olson has testified that he considers these articles to be "throw-away" articles, in that "you usually look at them, and [then] you throw them away" (D.I. 158, Ex. 3 at A146, Dep. of Dr. Olson at 27:11-12, Oct. 11, 2004), they do provide an adequate basis for this specific opinion. Alcon's citation to *Tuman v. Genesis Associates,* 935 F. Supp. 1375, 1385 (E.D. Pa. 1996), is unavailing because, as that court held, the ex-

pert's opinion was not "fundamentally unsupported." Neither is Dr. Olson's in this instance, and, as such, Alcon's objections go to the weight of Dr. Olson's opinion, not its admissibility.

c. "The overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream."

Alcon's next challenge is to Dr. Olson's [*22] opinions that "the overall effect of the Occlusion Mode invention described in the ['240] patent was to make phacoemulsification safer and therefore more mainstream." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Alcon's main objection is that this particular conclusion is misleading "because he overstates his propositions." (D.I. 157 at 18.)

I agree with Alcon that, in light of his deposition testimony, Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today, Dr. Olson replied, "I think its one of the steps that has made the procedure safer. *There's others,* but in totality, *all of those different steps are the reason why it's the predominant procedure today.*" (D.I. 158, Ex. 3 at A167, Dep. of Dr. Olson at 53:10-13, Oct. 11, 2004 (emphasis added).) Dr. Olson clarifies that it is the totality of "all of those different steps" that has led to phacoemulsification being the predominant procedure today, not just Occlusion Mode.

In light of that [*23] qualification, I do not believe that his testimony will mislead the jury. He will be subject to cross-examination by Alcon, whose efforts will no doubt highlight the limitations Dr. Olson admitted on this point in his deposition. Alcon has not demonstrated that this opinion is inadmissible under Federal Rule of Evidence 702 and, therefore, he will not be precluded from giving it at trial.

d. "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today."

Alcon makes the same challenge to Dr. Olson's opinion that "Occlusion Mode is one of the breakthroughs that have made phacoemulsification widely available and used by most cataract surgeons in the United States today." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) Again, I agree with Alcon that Dr. Olson has perhaps overstated this conclusion in his report. When asked about his basis for concluding that Occlusion Mode made phacoemulsification safer and put the technology in the hands of sur-

geons who were previously afraid of using phacoemulsi-fication, Dr. Olson replied that ". [*24] . it is *one of many* features that have made phaco safer...." (D.I. 158, Ex. 3 at A165, Dep. of Dr. Olson at 51:11-12, Oct. 11, 2004 (emphasis added).) Dr. Olson's testimony indicates that there are other features which contributed to the safety of phacoemulsification as well. However, for the same reasons discussed, *supra* Part IV.A.3.c., Alcon has not demonstrated that this opinion is inadmissible under Federal Rule of Evidence 702 and, therefore, he will not be precluded from giving it at trial.

e. "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients."

Dr. Olson also opined that Occlusion Mode "put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients." (D.I. 158, Ex. 1 at A019, Dr. Olson's Revised Expert Disclosure at 18.) When asked whether he was aware of any surgeons who were previously afraid of using phacoemulsification before they could use occlusion mode, Dr. [*25] Olson relied: "I don't have any survey. There's no study or published [sic], so this was just my opinion. I don't have anything other specifically than my opinion for that statement ... if there was scientific literature, if we had studies, if we had -- we don't. I mean, all we have is a few opinions, so therefore, when you have nothing else to depend upon, then you can only use your opinion." (D.I. 158, Ex. 3 at A166-67, Dep of Dr. Olson at 52:13-53:3, Oct. 11, 2004.) Furthermore, Dr. Olson testified that he believes Occlusion Mode is not used by most surgeons (*id* at A167, 53:20), but that, in fact, he doesn't "know how many use it and how many do not" (*id* at A168, 54:17-18). Thus, Dr. Olson admits that he has no reliable basis for this opinion, and, he will be precluded from testifying to it at trial.

4. Maximizing Air Removal

Alcon seeks to preclude Dr. Olson from offering testimony "related to his opinion that [the '765 patent] disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg [*26] or higher while maintaining chamber stability." (D.I. 156 at 2.) Alcon asserts that Dr. Olson's opinions on the '765 patent are based on unsupported suppositions as opposed to facts (D.I. 157 at 19), and that he lacks the necessary experience to offer expert testimony on fluidics devices (D.I. 207 at 10-11).

In response, AMO asserts that Dr. Olson's opinions are based on his knowledge and experience of using

phacoemulsification devices in the field of opthalmological surgery (D.I. 185 at 12-13). Thus, AMO argues that Dr. Olson's testimony meets the threshold of admissibility. (*Id.* at 13.)

In *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 324 (3d Cir. 2003), the Third Circuit noted that although a proffered expert has "extensive experience with jet skis," his testimony on the safety of an accelerating mechanism was properly excluded because the expert "had no education or experience in product design of jet skis or accelerating mechanisms; nor did he provide scientific, statistical or other evidence evaluating the relative safety of different jet ski models or the accelerating mechanisms." Similarly, Dr. Olson's qualifications as a renowned ophthalmologist [*27] are not questioned, but he is not qualified to render an opinion on fluidics systems or chamber stability. He is not an engineer and has not conducted any studies to analyze whether different systems can achieve an aspiration level of 500 mmHg while maintaining excellent chamber stability. (D.I. 158, Ex. 3 at A203, Dep. of Dr. Olson at 136:15, Oct. 11, 2004.) Thus, like the expert in *Calhoun,* Dr. Olson would be outside his area of expertise if permitted to testify in this regard. Accordingly, he will be precluded from so testifying. "While [his] . . . background, education, and training may provide [him] with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun*. 350 F.3d at 322.

B. Mr. Walbrink

Alcon seeks to exclude three discrete areas of testimony by Mr. Walbrink. (D.I. 160.)

1. Infringement Opinions

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on infringement of the '240 and '765 patents by Alcon's phacoemulsification systems, the Legacy with Advantec and the Infiniti. (D.I. 160 at 1.) Alcon argues that Mr. Walbrink's testimony contravenes Rule [*28] 702 because his opinions on infringement "are pulled directly from litigation positions crafted by AMO's attorneys, as opposed to conclusions drawn from his own independent assessment of the claims at issue." (D.I. 161 at 6.)

In response, AMO asserts that Federal Rule of Civil Procedure 26(a)(2)(B) "does not preclude counsel from providing assistance to experts in preparing [the expert's] report." (D.I. 186 at 4 (quoting Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note).) Furthermore, AMO argues that Mr. Walbrink did not merely adopt the opinions of AMO's counsel, but rather "engaged in extensive telephone conversations with AMO counsel regarding claim interpretation" (*id* at 13) and "participated

in the compilation, drafting, editing, and organization of his report" (*id.* at 15).

Alcon's position is untenable. It admits that Rule 26 does not preclude counsel from assisting an expert in preparing a report, but it argues that Mr. Walbrink's report merely represents the substantive conclusions of counsel. (D.I. 161 at 5-6.) Alcon's citations to cases in which expert reports were excluded are [*29] distinguishable from the facts of this case because Mr. Walbrink did contribute his expertise to the drafting of the report. *See Crowley v. Chait.* 322 F. Supp. 2d 530, 543 (D.N.J. 2004) (noting that counsel may not draft the entire report without prior "substantive input" from the expert); *Stein v. Foamex Int'l, Inc.*, 2001 U.S. Dist. LEXIS 12211, No. CIV A. 00-2356, 2001 WL 936566, at *5 (E.D. Pa. Aug. 15, 2001) (the rules do not permit "blanket adoption of reports prepared by counsel") (internal citation omitted). Mr. Walbrink testified at his deposition as follows:

> Q. Would you describe for me the process that you went through to develop the report that we've marked as Exhibit 179.
>
> A. First, we discussed the issues at hand.
>
> Q. And when you say "we," you mean you and Ms. Thackray?
>
> A. And Jamie Isbester, as well, collectively. *I drafted some of it, worked on claim construction with one of their other associates* -- I believe his name is Bob -- then met with Gillian, Ms. Thackray, and Jamie Isbester at their facility in Berkeley, and worked for a day, I think, further drafting and putting it together. And then over the course of several days after that, [*30] there were multiple drafts and revisions, and then we submitted it.
>
> Q. Now, you said you drafted some of it. What parts did you draft?
>
> A. That would be hard because, I mean, *I was involved in most of it.* The claim construction was primarily done by -- I believe it was Bob. But as far as the content of the body of the report, it was a collaborative effort. It would be hard to single out what I did versus someone else

(D.I. 162, Ex. 3 at A131-32, Dep. of Mr. Walbrink at 22:8-23:5, Oct. 19, 2004 (emphasis added).) The foregoing testimony supports AMO's contention that Mr. Walbrink collaborated with AMO's counsel and was involved in the creation of his expert report. Thus, Mr. Walbrink's testimony on infringement cannot be excluded as simply reflecting the opinions or work product of AMO's counsel.

2. Commercial success of AMO's systems

Alcon asserts that Mr. Walbrink should be precluded from offering testimony on the commercial success of AMO's two phacoemulsification systems, the Diplomax and the Sovereign, because his opinion is based solely on what AMO's counsel has told him and is therefore unreliable. (D.I. 161 at 9.) Further, Alcon argues that Rule 26(a)(2)(B) [*31] requires that an expert's report "contain a complete statement of all opinions to be expressed *and the basis and reasons thereof* " (D.I. 208 at 9 (quoting Fed. R. Civ. P. 26(a)(2)(B)) (emphasis added).) Thus, Alcon asserts that the four new bases for his opinion identified in the declaration he submitted after his deposition and after the close of discovery should not be considered because those reasons were not presented in his Rebuttal Report. (*Id.* at 9.)

In response, AMO asserts that "counsel for Alcon failed to develop further testimony regarding the content of Mr. Walbrink's discussions with AMO's counsel and failed to acknowledge the further bases set forth in Mr. Walbrink's Rebuttal Report.. .." (D.I. 186 at 17.) AMO points to Mr. Walbrink's statement in his Rebuttal Report that "it would appear to me, as discussed in my opening report on infringement, that the Advantec upgrade to Alcon's Legacy model and the Infinity model of phacoemulsification machines have adopted the exact same technology" (D.I. 162, Ex. 2 at A99-100, Rebuttal Report of Mr. Walbrink at 14-15) as a basis for his opinion on commercial success. (D.I. 186 at [*32] 17-18.) Additionally, AMO notes that Mr. Walbrink's declaration further discusses the bases for his opinion. (*Id.* at 18.)

Under Rule 26(a)(2)(B), an expert's report must contain "the basis and reasons" for the expert's opinions. It is clear that none of Mr. Walbrink's Reports submitted during discovery contains the challenged reasons on which he now seeks to rely for his opinion on commercial success attributable to Occlusion Mode.. Thus, based on Rule 26(a)(2)(B), Mr. Walbrink's Rebuttal Report is critically deficient in this regard. At his deposition, Mr. Walbrink testified as follows:

> Q. Sure. It's at the bottom of page 14. You say, "it is my understanding that the occlusion mode has been an important fea-

Case 1:04-cv-00293-KAJ    Document 406-3    Filed 06/19/2006    Page 37 of 67

Page 9
2005 U.S. Dist. LEXIS 5803, *

ture of two successful phacoemulsification machines sold by AMO, the Diplomax line and the Sovereign line." Did I read that correctly?

A. Yes.

Q. What is the basis for that statement?

A. *Discussions with counsel. And I can't tell you what else may have been considered in that.*

Q. So the only basis, as you sit here today, that you can identify is that AMO's counsel told you that, right?

A. *That's all I can identify today, yes.*

(D. [*33] I. 162, Ex. 3 at A163-64, Dep. of Mr. Walbrink at 197:19-198:7, Oct. 19, 2004 (emphasis added).) The foregoing shows that the only disclosed basis Mr. Walbrink had for this opinion was the "discussions [he had] with [AMO's] counsel." (*See id.*) Therefore, Mr. Walbrink's deposition cannot cure the deficiency of his Rebuttal Report. n5 If there were other bases for Mr. Walbrink's opinion, they were not disclosed as required. Simply claiming to have an understanding, without providing the bases for that understanding, fails to meet the disclosure requirements of the Federal Rules of Civil Procedure.

> n5 This is not meant to say that if Mr. Walbrink had testified to other bases, such testimony would necessarily have been sufficient under Rule 26(a)(2)(B) to remedy his deficient expert report.

Mr. Walbrink's last ditch declaration (D.I. 189) does not remedy this deficiency, for at least two reasons. First, it was submitted long after the close of discovery, as an exhibit to AMO's Answering Brief on this motion. [*34] (D.I. 186.) I agree with Alcon that acceptance of such a late submission would be unfairly prejudicial and would make "a mockery of the Rules' requirements for discovery and expert disclosure." (See D.I. 208 at 9.) Second, Mr. Walbrink has admitted that he is "not versed in the financial aspects of these products," yet he purports to offer four reasons for his opinion, each of which relate to the financial aspects of AMO's products. He cannot disclaim expertise in an area and then opinion on it. Thus, for these independent reasons, Mr. Walbrink will be pre-

cluded from testifying on the issue of commercial success.

3 The '765 patent and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability

Alcon asserts that Mr. Walbrink should be precluded from testifying that "the Sovereign fluidics system, incorporating the invention of the '765 patent, was the first phacoemulsification system to achieve the 500 mg [sic] Hg aspiration level while maintaining excellent chamber stability" because his opinion is based solely on AMO's brochures and promotional materials and Dr. Olson's opinion. (D.I. 161 at 9-10.)

In response, AMO asserts that Mr. Walbrink's opinion [*35] was based on his review of product brochures and promotional materials, the expert report of Dr. Olson, his background and experience, many hours of deliberation, and his examination of Alcon's Infiniti system. (D.I. 186 at 19.) AMO argues that these matters are the proper subject of cross-examination before the jury, not "the basis for a motion to exclude." (*Id.* at 21.) I disagree.

First, Alcon correctly notes that Mr. Walbrink's opinion is directed to AMO's Sovereign system, not Alcon's Infiniti system, and that Mr. Walbrink's examination of the Infiniti system does not provide a reliable basis for his conclusions regarding the Sovereign system. Second, Mr. Walbrink admitted in his deposition testimony that he "has not used the Sovereign." (D.I. 162, Ex. 3 at A154, Dep. of Mr. Walbrink at 142:6, Oct. 19, 2004.) Third, he testified that he only has "incidental knowledge" of the Sovereign system, which he gained by reading Dr. Olson's expert report and "brochures or promotional materials" provided exclusively by AMO. (*Id.* at A154, 142:13, 19.) But as earlier discussed, *supra* Part IV.A.4., Dr. Olson will be precluded from testifying about the invention in the '765 patent [*36] achieving an aspiration level of 500 mmHg while maintaining chamber stability. Thus, all that remains as Mr. Walbrink's basis for his opinion are the brochures or promotional materials provided exclusively by AMO. As noted in *Tuman,* an expert's testimony may be unreliable if the expert "relied almost exclusively on information from one source who was clearly biased." *Tuman,* 935 F. Supp. at 1385 (internal citations omitted). This is such a case. The only remaining basis for this opinion from Mr. Walbrink is information that was provided exclusively by AMO, a party to the case. Thus, Mr. Walbrink will be precluded from testifying with regard to the achievement of an aspiration level of 500 mmHg while maintaining chamber stability.

V. CONCLUSION

2005 U.S. Dist. LEXIS 5803, *

Based on the foregoing reasons and authorities, Alcon's motion to exclude the testimony of Dr. Olson (D.I. 156) will be granted in part and denied in part, and Alcon's motion to exclude the testimony of Mr. Walbrink (D.I. 160) will be granted in part and denied in part. An appropriate order will follow.

### ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED [*37] that the Defendants' motion to exclude the testimony of Dr. Olson (D.I. 156) is GRANTED IN PART, to the extent that Dr. Olson will not be permitted to offer testimony on the analysis of sales and market trends for phacoemulsification machines, infringement by Defendants of the '240 or '765 patent, that Occlusion Mode in fact decreases instances of wound burn, that "[Occlusion Mode] put the phacoemulsification technology in the hands of surgeons who previously were afraid of using phacoemulsification, and so has made cataract surgery available for more patients," and that the '765 patent disclosed a method and apparatus that maximized air removal from the fluidics system of phacoemulsification devices and enabled phacoemulsification devices incorporating its claims to reach, for the first time, aspiration levels of 500 mmHg or higher while maintaining chamber stability, and DENIED IN PART, as to the remainder of Dr. Olson's opinions which have been challenged by Defendants.

Further, IT IS ORDERED THAT Defendants' motion to exclude the testimony of Mr. Walbrink (D.I. 160) is GRANTED IN PART, to the extent that Mr. Walbrink will not be permitted to offer testimony on the issue of commercial [*38] success and the achievement of an aspiration level of 500 mmHg while maintaining chamber stability, and DENIED IN PART, as to the remainder of Mr. Walbrink's opinions which have been challenged by Defendants.

Kent Jordan

UNITED STATES DISTRICT JUDGE

Wilmington, Delaware
April 7, 2005

# EXHIBIT N

**REDACTED**

# EXHIBIT O

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4   CIBA SPECIALTY CHEMICALS      :    CIVIL ACTION
     CORPORATION, INC.,            :
 5                                 :
                  Plaintiff and    :
 6                Counter-defendant, :
                                   :
 7          v                      :
                                   :
 8   HERCULES INC., and CYTEC      :
     INDUSTRIES INC.,              :
 9                                 :
                  Defendants and   :    NO. 04-293 (KAJ)
10                Counter-claimants. :

11                         - - -

12                Wilmington, Delaware
           Tuesday, August 2, 2005 at 2:00 p.m.
13                TELEPHONE CONFERENCE

14                         - - -

15   BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.

16                         - - -
     APPEARANCES:
17

18          RICHARDS LAYTON & FINGER
            BY:  CHAD MICHAEL SHANDLER, ESQ.
19
                     and
20
            LEYDIG, VOIT & MAYER, LTD.
21          BY:  ELEY O. THOMPSON, ESQ., and
                 GORDON R. COONS, ESQ.
22               (Chicago, Illinois)

23                     Counsel for Ciba Specialty
                       Chemicals Corporation
24

25                          Brian P. Gaffigan
                            Registered Merit Reporter
```

2

```
 1    APPEARANCES: (Continued)

 2
                   POTTER ANDERSON & CORROON, LLP
 3                 BY:  RICHARD L. HORWITZ, ESQ.

 4                      and

 5    FINNEGAN HENDERSON FARABOW GARRETT & DUNLAP, LLP
                   BY:  FORD F. FARABOW, JR., ESQ.,
 6                      JOANN NETH, ESQ., and
                       ERIC J. FUES, ESQ.
 7                     (Washington, District of Columbia)

 8                         Counsel for Hercules Inc.

 9                      and

10    GOODWIN PROCTOR, LLP
                   BY:  THOMAS L. CREEL, ESQ., and
11                     MARTA E. GROSS, ESQ.
                      (New York, New York)
12
                           Counsel for Cytec Industries Inc.
13

14

15                        - oOo -

16                    P R O C E E D I N G S

17         (REPORTER'S NOTE:  The following telephone

18    conference was held in chambers, beginning at 2:00 p.m.)

19         THE COURT:  Hi, this is Judge Jordan.  Who do I

20    have on the line?

21         MR. HORWITZ:  Good afternoon, Your Honor.  It's

22    Rich Horwitz from Potter Anderson on behalf of the

23    defendant.  With me on the line for Hercules from Finnegan

24    Henderson are Ford Farabow, Joann Neth and Eric Fues; and

25    also for Cytec from Goodwin Procter Tom Creel and Marta
```

1    Gross.

2              MR. SHANDLER: Your Honor, for the plaintiff,

3    Chad Shandler from Richards Layton. With me on the line are

4    Gordon Coons and Eley Thompson from Leydig Voit & Mayer in

5    Chicago.

6              THE COURT: All right. Well, we were together

7    about two weeks ago and evidently you enjoyed our

8    conversation so much you set up another one. So I have the

9    position papers that you sent in and as I understand it, the

10   argument is that, well, to use the language of the folks

11   from Hercules, roughly speaking, Ciba has arrogated to

12   itself an extension of discovery and report deadlines by

13   filing obviously inadequate expert reports.

14              Neither party was good enough to give me the

15   reports at issue with their filing. They may have come in

16   separately but I'm frank to say I haven't seen them. Were

17   those things filed with the Court?

18              MR. HORWITZ: Your Honor, this is Rich Horwitz.

19   They were filed with the Court under Your Honor's procedure

20   which is I know different from some of the other judges so

21   we put in a docket reference rather than send more papers to

22   the Court. I apologize for that.

23              THE COURT: That's all right. We're getting

24   those copies. But without repeating the arguments that have

25   been made, I'll give the ball to you folks at Hercules

                                                              4

1    first, you're the ones who started this up, and tell me what

2    it is that you want to add, if anything, to what provided to

3    me in the letter of July 12th from Mr. Horwitz.

4            Who is speaking for Hercules?

5            MR. FARABOW:  Your Honor, this is Ford Farabow.

6            I would say in addition to what we say in our

7    paper, Your Honor, that with regard to Mr. Wagner's report,

8    there are really no opinions stated in the report.  There

9    are no bases stated in the report for the opinion, the lack

10   of opinions.  The rule requires that the expert fully set

11   forth his opinion as though it were direct testimony.  If

12   you look at the commentary, the commentary indicates that we

13   should not even have to take his deposition, we should know

14   what he is going to testify to.

15           Basically, all he does is describe in general

16   terms a number of tests and he has one paragraph where he

17   says that he agrees with Ciba technical personnel that the

18   studies are consistent with PerForm being cross-linked.  He

19   doesn't point to any specific tests.  He doesn't identify

20   which documents he is relying on.  He has documents listed

21   at the end of his report but he has absolutely no

22   specificity as to what he is relying on, and that is

23   certainly not an expert report of the type I have ever seen.

24   And he doesn't explain how the data -- he doesn't explain

25   what data he is relying on and he does not explain how that

                                                        5

1    data supports his opinion.  And that paragraph, paragraph 15

2    of his report, is the only one where he even waves his hand

3    at an opinion. So we think his report is totally

4    inadequate.

5              THE COURT: Well, let me stop you there. We'll

6    take these one at a time.

7              MR. FARABOW: Okay.

8              THE COURT: Who is speaking on behalf of Ciba?

9    Because I have D.O. 107, the Wagner report in front of me.

10              The first 14 paragraphs do appear to be

11    statements about his credentials and what he says he is

12    familiar with, and then there is four paragraphs about what

13    he says he may testify to in paragraph 15, and then a

14    statement in paragraph 16 that he expects he'll testify

15    about rheological tests and parameters, and the

16    relationship, in paragraph 17 it says the relationship

17    between storage modules, et cetera. And then you get down

18    to paragraph 20 entitled "Other Possible Testing." So,

19    where is there an opinion in here that satisfies 26(b)?

20    What is your position on that Ciba?

21              MR. THOMPSON: This is Eley Thompson. I'll be

22    speaking on behalf of Ciba.

23              If you look at Dr. Wagner's report --

24              THE COURT: I am.

25              MR. THOMPSON: In the various paragraphs

                                                          6

1    starting at paragraph 9, he provides extreme detail about

2    the testing that he will be testifying about. Say, for

3   example, there is a couple of them that I will just

4   identify, but some parameters the specificity is mentioned

5   here. Like 9, the tests, these are IV tests. He mentions

6   it would be done at 7 pH, that the temperature is at

7   25 degrees Celsius, that one mole of salt is added and there

8   are a number of other extreme details in there.

9           THE COURT: Well, let me stop you long enough to

10  ask you this, Mr. Thompson.

11          As I look at these things, I see consistently

12  statements about "I may testify" or "it may be this" or "it

13  may be that." Is there a -- does he have something he has

14  got a definitive opinion on?

15          MR. THOMPSON: Well, yes. I guess maybe that is

16  a language that he was comfortable with. "He will be

17  testifying" or "the expectation is that he will be

18  testifying." So, I don't know, some people might say "I may

19  testify," some people may say "I will," even though they're

20  not exactly sure. His is framed in an "I may." But the

21  details of what we believe that he will or may be testifying

22  about depends on how much you can put a certainty on it. He

23  puts all of the details in there.

24          Like another example is in connection with the

25  filter tests which are in paragraph 13, he talks, he tells

                                                        7

1   you it's a filter that was used, point two micron holes in

2   it. It's a polycarbonate mix filter. He talks about the

3   average size of the particles that are put through it. He

4   talks about the percentage solutions that were used in those

5   tests, that a 10 mil syringe was used.  He talks about how

6   you wash it through.  I mean the details in here are almost

7   down to the next movement, the next action in minute detail

8   would be this.  And so he walks through.

9         And this is one of.  There are several tests

10  that are identified in paragraphs 9 through 13.  And he goes

11  through each one of them in all of those details.  And then

12  he says "based upon these tests" and then he says what his

13  opinion is.  "My opinion is that these tests demonstrate

14  that...."

15        THE COURT:  What paragraph are you in, sir?

16        MR. THOMPSON:  So on and so forth.

17        THE COURT:  What paragraph are you in, sir?

18        MR. THOMPSON:  Pardon me?

19        THE COURT:  What paragraph are you reading from?

20        MR. THOMPSON:  What I was talking about, the

21  details of the filter tests, I was referring to paragraph

22  13.  When I was talking about that he says his opinion is

23  there is covalent cross-link demonstrated by that tests and

24  the others he demonstrated in great detail, that was 15 and

25  14.  So that is what I was referring to.

8

1         THE COURT:  Now, this has got in it, in your

2   view, the bases for opinions and the opinions that he is

3   going to render at trial and that's it.  Is that it?

4         MR. THOMPSON:  Well, yes.  He also referred to,

5    as Mr. Farabow mentioned, he referred to the documents which

6    have like the picture and stuff from the tests, like the

7    filter images. Those are incorporated through the fact that

8    he referenced them in the documents. So he didn't restate

9    the reports that he was relying upon, he referred to the

10   reports.

11          THE COURT: All right. Mr. Farabow, do you want

12   to respond to Mr. Thompson? Mr. Thompson tells me it's like

13   Ragu, it's in there.

14          MR. FARABOW: Your Honor, I can't see it. I'm

15   sorry. I mean he refers in Exhibit B to some documents that

16   he looked at but he never, in his opinion, relates, if there

17   is an opinion, relates it to any of the documents in any of

18   the specific tests. I can't see, outside paragraph 15, any

19   even passing way of an opinion and I don't see one in

20   paragraph 15, Your Honor. If you do, fine, but I don't.

21          THE COURT: Well, let's go to the one

22   specifically cited by Mr. Thompson. You tell me what.

23   Let's be specific. What is deficient about paragraph 9

24   where he states about intrinsic viscosity, that it can be

25   measured from the flow time of the solution through a glass

9

1    capillary, and then he gives the parameters for such a test

2    and then says in this regard, I may testify about the

3    differences obtained when they're used in the buffering

4    solution, et cetera.

5          What, is there --

6        MR. FARABOW:  There is no opinion there, Your

7   Honor.  There is no conclusion.  There is no test run this

8   way, demonstrate thus-and-so.  He is just describing in

9   general what the test is.  He says in fact in that paragraph

10  that he is familiar with the test.  It's generally measured

11  in a certain way, he says.  He may testify about differences

12  obtained when salt -- how are we supposed to respond to

13  that?  We don't know what he is going to testify to, Your

14  Honor.

15        THE COURT:  Well then, let me ask this.  The

16  assertion is made that I guess, Mr. Thompson, that that

17  statement is the basis for your assertion in paragraph 15

18  that that test somehow supports his opinion or at least his

19  proposed "I may testify" opinion about the polymer being

20  covalently cross-linked.  That is what you were telling me

21  before.  That all this detail in the earlier paragraphs was

22  leading up to paragraph 15, or did I mistake what you were

23  saying?

24        MR. THOMPSON:  No, that is correct, Your Honor.

25  Because he goes through each one of the tests, intrinsic

10

1   viscosity being 9, and then I won't belabor it, but then

2   each paragraph is a different test leading up to 14 and 15

3   where he states that the results -- he says it here.  I mean

4   the results of the tests are consistent with the PerForm

5   polymer exhibiting properties of covalently cross-linked

6   structure.  And then he says more.

7          THE COURT:  All right.  Now, if they say to you

8     in this telephone call this is what his report means, that

9     that detail isn't, in and of itself, an opinion but it's a

10    test on which he relies to say there is covalent bonding,

11    are you saying that that is not disclosing to you

12    information that is useful to you or needed for you,

13    Mr. Farabow, to test his opinion about covalent bonding?

14          MR. FARABOW:  Your Honor, I don't know that it

15    would not be useful but it certainly does not satisfy the

16    obligations of Rule 26, I don't believe, because the

17    commentary says that he is supposed to prepare a detailed

18    and complete report stating the testimony witnesses expect

19    to present during direct examination together with the

20    reasons therefor, and all he has got in paragraph 15 is that

21    he may testify that the results of the tests.  I don't know

22    which tests he is talking about.  He doesn't say in any of

23    these previous paragraphs that Ciba has carried out any

24    particular test.

25          He says he is familiar with tests.  He says he

                                                         11

1     is familiar with rheometry.  He says he is familiar with

2     stress rheometry, oscillating rheometry and creep and so

3     forth.  He is familiar with filtration studies.  He doesn't

4     say I have looked at the filtration studies or the rheometry

5     that Ciba carried out, and any conclusion is that Hercules

6     product is cross-linked because of the shape of the curve in

7     test number X at page number so-and-so of the test.  That is

8    what he is going to testify to at trial or what you would

9    expect he is going to testify to at trial. He just says

10   here "I may testify that the results of the tests ..." I

11   don't know what tests are consistent with the polymer

12   exhibiting properties of a covalently cross linked

13   structure. I don't know what "consistent with" means.

14          He says he agrees with Ciba technical personnel.

15   I don't know what they told him. He doesn't report what

16   discussions he had. He doesn't provide the names. He

17   doesn't provide what they told him. And basically, his

18   whole opinion is in the last sentence of paragraph 15 which

19   says "I anticipate that my investigation concerning the

20   testing and rheological studies pertaining to the polymers

21   at issue here will continue."

22          THE COURT: All right. This is your last crack

23   at it, Mr. Thompson, and I'll tell you folks what I want to

24   do. Are you satisfied to have your witness limited in his

25   testimony strictly to what is disclosed in this report?

1          MR. THOMPSON: Am I? Yes. Well, he does the

2   complete report as regards of the information that was

3   available to him at the time, but as you know, Your Honor,

4   and we explain, there is testimony that their witness,

5   Dr. Gellman, you know, we only have one deposition. We had

6   a 30(b)(6) deposition of Hercules technical studies and they

7   conducted the studies that demonstrated the press of

8   covalent bonding in their own studies. Dr. Gellman wasn't

9    prepared to testify about that.

10                And let me see.  We had attached some letters

11    following up on that.  For example, it's Exhibit C.

12                THE COURT:  Well, hold on.  I'm not interested

13    in Dr. Gellman right now.  I'm focused on the report that is

14    in front of me.  I understand that you're saying if Hercules

15    told us something more, that may be an additional basis for

16    an opinion, but I'm not asking about what comes next, I'm

17    asking about this right here.

18                If we were in court and your witness were on the

19    stand and he were to say I think they're covalently

20    cross-linked and he were asked why, there is no detail that

21    isn't already described in this report that would support

22    that, because what I'm suggesting in my question is if you

23    thought he could get up there and give some additional

24    detail, I wouldn't let that happen.  And would you be

25    comfortable with that?  Because if you wouldn't, I need to

                                                            13

1    know it now.

2                MR. THOMPSON:  Yes, within the framework of what

3    the report is.  This isn't a Q & A.

4                THE COURT:  No, you are missing my point.  I'm

5    not asking to you modify my question and put parameters on

6    it, I'm asking for a straight up yes or no.  Is it in this

7    report or not?  Is there something he would want to say from

8    the stand or you would want to ask him to persuade a jury or

9    to get past a motion to have his testimony stricken for

10    being unsupported which isn't in this report or is it all

11    here?  Everything you need to make out the case, you want to

12    make out on the stand?

13              MR. THOMPSON:  The answer to that is yes, it is,

14    because this report includes all of his opinions, all of the

15    tests that he is going to rely on and it also refers to the

16    documents that he will testify about in Exhibit B.  Yes.

17    The answer is yes.

18              THE COURT:  All right.

19              MR. FARABOW:  But, Your Honor.  May I add

20    something, Your Honor?

21              THE COURT:  Yes, go ahead.

22              MR. FARABOW:  He didn't refer to those documents

23    and he didn't tie them into his testimony.  What he wants

24    him to do on the stand is to go back and look at those

25    documents and spell out how each of them supports what he is

                                                      14


1     saying but he didn't do that in the report. .  He is trying

2     to add to the report already.

3               MR. THOMPSON:  That is not true, Your Honor.

4     The report goes to each one of the tests that he would

5     testify about -- we've already been through this -- in 9

6     through 13.

7               THE COURT:  All right.  Well, I am not going to

8     prevent you  If you think at a later point, after there is

9     a more developed record, Mr. Farabow, if you want to file

10    some kind of a formal motion later in the case under

11    Daubert, I'll let you do it.

12            MR. FARABOW:  Thank you.

13            THE COURT:  But for now under 26(b), I'm not

14    striking these reports and you take care of your questions

15    on cross-examination when you get that expert in a witness

16    room; all right?

17            MR. FARABOW:  Yes, sir.

18            THE COURT:  And one thing I hope will be

19    abundantly clear to everybody, that if you're thinking that

20    you can do a dance where you reveal something in a report

21    but you hold something back and you want to get it out on

22    the record at trial, you're setting yourself up for a

23    disappointment.  And I'll expect both sides to be very

24    conscious of holding each other to the rules because what I

25    won't have is a jury sitting in the jury room while people

15

1    argue to me, "well, wait a second.  He is wanting to testify

2    to something new.  It is in his report," et cetera, et

3    cetera.  So you be vigorous, both sides, in your

4    cross-examination of the other side's witnesses and you

5    bring on your Daubert motions if you need to because I don't

6    want any surprises at trial.  Either you got what you need

7    and it's in your pretrial discovery or you don't.  And if

8    you don't, you won't be permitted to pull something out of

9    the hat on the stand.

10            Now, let's turn -- there was one that I thought

11    was pretty quick and we could handle very quickly and that

12    is this Dr. Goolkasian.

13         MR. FARABOW:  Yes, sir.

14         THE COURT:  Look, I don't even need to hear a

15    discussion about that.  The bottom line is you folks can

16    present to me your legal argument about inequitable conduct

17    but I don't need an expert to get on the stand and tell me

18    what is and isn't inequitable conduct.  So I'm not sure what

19    it is.  And I'll ask you, Mr. Thompson:  What it is you

20    think he's got to say of factual nature?  If you are calling

21    him as an expert, I guess what I'm telling you I don't need

22    it and I don't want it.  Does he have any fact testimony?

23         MR. THOMPSON:  Yes, Your Honor.  And you're

24    quite right.  We did not intend and would not offer a

25    witness to try to offer testimony about what the law is.

16

1    That is not what this was submitted for.  The assertions

2    from the defendants relate to invalidity as well.

3         And this, by the way, is a report that was

4    submitted not on an issue for which Ciba bears the burden of

5    proof but on an issue for which we know how or we believe we

6    know some of, not all the details of how the defendants

7    intend to present this.  And as you can see from his report

8    in particular in the section towards the end of it, which

9    was Sections 5 through 8, that he walks through what

10    happened, the facts, what happened in obtaining these

11    patents.

12         THE COURT:  Well, wait a second.  Hold on.

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CIBA SPECIALTY CHEMICALS
CORPORATION,

             Plaintiff,

        v.

HERCULES INC. and CYTEC INDUSTRIES,
INC.,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 04-293 (KAJ)

JURY TRIAL DEMANDED

---

## CIBA'S SUMMARY OF EXPERT TESTIMONY

---

**Ciba's Summary of Expert Testimony**

Expert Witnesses:

1. <u>Robert G. Gilbert, Ph.D.</u> Dr. Gilbert is expected to testify at trial regarding the opinions set forth in his expert reports. Dr. Gilbert will offer expert testimony on the subject of polymer chemistry as it relates to the technology described in the '766 and '808 patents and the products involved in this case. Dr. Gilbert will testify about (1) whether the accused PerForm® product infringes the asserted claims of the '808 patent, literally and under the doctrine of equivalents; whether use of the accused PerForm product infringes the asserted claims of the '766 patent, literally and under the doctrine of equivalents; (3) whether the defendants have induced infringement of the asserted claims of the '766 patent; and (4) whether Hercules' claims of invalidity and unenforceability are meritorious. Dr. Gilbert may testify in rebuttal to evidence offered by defendants concerning non-infringement, invalidity and/or unenforceability of the patents-in-suit.

2. <u>Clarence A. King, Ph.D.</u> Dr. King is expected to testify at trial regarding the opinions set forth in his expert reports. Dr. King will provide a tutorial on the commercial papermaking process in relation to the technology described in the '766 and '808 patents and employed by the defendants. Dr. King testify about (1) whether use of the accused PerForm product infringes the asserted claims of the '766 patent, literally and under the doctrine of equivalents; (2) whether the defendants have co-infringed the asserted claims of the '766 patent; (3) whether the defendants have induced infringement of the asserted claims of the '766 patent; and (4) whether Hercules' claims of invalidity and unenforceability are meritorious. Dr. King may testify in rebuttal to evidence offered by defendants concerning non-infringement, invalidity and/or unenforceability of the patents-in-suit.

3. <u>Michael E. Tate.</u> Mr. Tate is expected to testify at trial regarding the opinions set forth in his expert reports, and in rebuttal to any testimony or evidence introduced at trial by the defendants regarding damages. Mr. Tate will offer expert testimony on the subject of damages resulting from defendants' infringement of the patents-in-suit. His testimony will include an economic analysis of Ciba's lost profits, an economic analysis of a reasonable royalty on both the '766 patent and the '808 patent, and, if the Court requests, appropriate measures of pre-judgment interest.

4. <u>Norman Wagner, Ph.D.</u> Dr. Wagner is expected to testify at trial regarding the opinions set forth in his expert reports. Dr. Wagner will offer expert testimony on the subject of rheology

Ciba's Summary of Expert Testimony

and how rheological tests and parameters are used to characterize the structure of polymers. Dr. Wagner will offer expert testimony concerning the rheological tests conducted on the products involved in this case and what those tests indicate regarding the structure of such products. Dr. Wagner may testify in rebuttal to evidence offered by defendants concerning non-infringement, invalidity and/or unenforceability of the patents-in-suit.

# EXHIBIT Q

**REDACTED**

# EXHIBIT R

**REDACTED**

# EXHIBIT S

**REDACTED**

# EXHIBIT T

**REDACTED**

# EXHIBIT U

**REDACTED**

# EXHIBIT V

**REDACTED**

# EXHIBIT W

**REDACTED**

# EXHIBIT X

**REDACTED**