# EXHIBIT 26
# REDACTED

# EXHIBIT 27
# REDACTED

# EXHIBIT 28
# REDACTED

# EXHIBIT 29
# REDACTED

# EXHIBIT 30
# REDACTED

# EXHIBIT 31
# REDACTED

# EXHIBIT 32

# United States Patent [19]

## Yang et al.

[11]  Patent Number:    4,918,123

[45]  Date of Patent:    Apr. 17, 1990

[54]  INVERSE EMULSION PROCESS FOR PREPARING HYDROPHOBE-CONTAINING POLYMERS

[75]  Inventors:  Henry W. Yang, Kingwood; Thomas J. Pacansky, Houston, both of Tex.

[73]  Assignee:  Exxon Chemical Patents, Inc., Linden, N.J.

[21]  Appl. No.: 194,800

[22]  Filed:  May 17, 1988

[51]  Int. Cl.⁴ ................ C08L 5/10; C08L 33/14; C08L 39/00

[52]  U.S. Cl. ...................... 524/110; 524/389; 524/457; 524/502; 524/753; 524/760; 524/801; 524/815

[58]  Field of Search ............ 524/457, 801, 759, 110, 524/389, 753, 760, 815

Primary Examiner—C. Warren Ivy
Attorney, Agent, or Firm—R. L. Graham; J. F. Hunt

[57]    ABSTRACT

High solids content, high molecular weight hydrophobe-containing cationic polymer products are prepared by an inverse (water-in-oil) emulsion process wherein the hydrophobic monomer is in the water phase. The resultant polymers have increased activity in oily water clean-up.

24 Claims, No Drawings

Hercules' Trial
Exhibit
127

4,918,123

1

# INVERSE EMULSION PROCESS FOR PREPARING HYDROPHOBE-CONTAINING POLYMERS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention provides a process for preparing water-soluble hydrophobe-containing polymers by a modified inverse polymerization technique. These polymers which will generally also contain cationic functionality to increase their use in oily water clean-up, contain both water soluble monomers and water insoluble monomers. Preferably, the water soluble monomers are acrylamide (AM) and a salt of an unsaturated amine base (C) and the water insoluble monomer is a higher alkyl(meth)acrylamide or alkyl(meth)acrylate (R). These polymers will hereafter be referred to as C-RAM. The process for their preparation relies on placing the water insoluble hydrophobic monomer in the aqueous phase of an inverse, i.e. water-in-oil, emulsion and conducting the entire polymerization in that aqueous phase. Redox, azo, peroxide or other water soluble free radical initiators are used to copolymerize both the water soluble and hydrophobic monomers, forming copolymers of ethylenically unsaturated amine base salts, alkyl(meth)acrylamides or alkyl(meth)acrylates, and acrylamide. These polymers provide exceptional clean-up of waste waters containing organic contaminants. Also they are very effective for resolving oil-in-water emulsions, such as those found in oil production.

### 2. Description of the Prior Art

The production of waste water clean enough for safe disposal continues to be a problem, especially when oil is emulsified in the primary waste water. In oil production, especially where high levels of water flooding or steam flooding are being practiced, oil-in-water emulsions are generated. Other oil-in-water emulsions of concern in the waste water treating area are those produced as a result of steel mill and metal working operations, food processing, refinery and chemical plant operation, cooling water blow-down, bitumen extraction from tar sands and shale oil operations, rain water runoff and a host of others. These emulsions all have in common the fact that the oil or organic phase is insoluble in the water continuous phase. The amount of oil dispersed in these water continuous emulsions varies from a few to several hundred parts per million, in waste waters, to several percent (5 to 25% or more) in fluids right out of the wellhead.

The oil is generally well dispersed in the water phase as very small droplets that are stabilized as a result of the presence of natural surfactants. The stability of these oil-in-water emulsions generally results from either a negative charge imparted to the droplets by these surfactants, or from steric stabilization caused by surfactants, or by shear which the fluid experiences during production, which causes the generation of smaller and more stable droplets, or from several other sources.

Various chemicals, surfactants and polymers are generally applied to these waters to enhance the separation of oil and water. These chemicals are used to aid in foam generation in flotation. In addition they may be used to cause oil droplet surface charge neutralization, which results in destabilization of the oil-in-water emulsion. The destabilization results in agglomeration of the oil droplets, floc formation and, possibly, several other beneficial effects. While the use of such chemicals gen-

2

erally enhances the separation of oil from oil-in-water emulsions, there remains significant room for improvement. The type of water soluble polymers currently used are generally acrylamide copolymers or melamine/formaldehyde polymers or others. For example, Bolhofner, in U.S. Pat. No. 4,472,284, describes the treatment of water containing fats, oils and greases using a melamine-formaldehyde condensation product, alone or in combination with a polyacrylamide. Rather high polymer concentrations are needed and a two polymer system can present handling difficulties during field operations

Another approach to the treatment of waste water involves the use of water insoluble polymeric adsorbents, as described by Renner in U.S. Pat. No. 3,716,483, or Takegani et al. in U.S. Pat. No. 4,081,403. These processes for treating waste water are costly and cannot achieve the degree of clean-up of the polymers produced by the process of the present invention.

Another approach involves the use of copolymers of acrylamide with various cationic monomers of various comonomer ratios. Some of the cationic monomers that have been used are: methacrylamidoalkyltrimethylammonium salts, such as methacrylamidopropyltrimethylammonium chloride (MAPTAC), as described in U.S. Pat. No. 4,160,742, or similar acrylate esters; dialkyl dialkyl ammoniumm salts, as described by Booth and Linke in U.S. Pat. Nos. 3,147,218 and 3,316,181; salts of dimethylaminoethylmethacrylate and the like. Buris et al., U.S. Pat. No. 4,224,150, describe a process for clarifying aqueous systems employing quaternary ammonium adducts of polymerizable tertiary ammonium salts and acrylamide. These polymers are generally available as high molecular weight materials, either in aqueous solution, as emulsions of various types, or in solid form, which requires dissolution before use.

The use of hydrophobic groups on water soluble polymers to enhance the rheological properties of water based fluids has been described. One approach to provide polyacrylamide based systems containing hydrophobic groups is described by Bock et al., U.S. Pat. No 4,520,182. Water soluble acrylamide copolymers containing a small amount of oil soluble or hydrophobic alkyl acrylamide groups were found to impart efficient viscosification to aqueous fluids. Landoll, U.S. Pat. No. 4,304,902, describes copolymers of ethylene oxide with long chain epoxides which also required relatively large polymer concentrations (approximately 1%) for thickening water and required surfactants for solubility due to irregularities in the polymerization. In a related case, U.S. Pat. No. 4,428,277, modified nonionic cellulose ether polymers are described. Although these polymers show enhanced viscosification relative to polymers not containing hydrophobic groups, the viscosification efficiency was very low, requiring 2 to 3 weight percent polymer to provide an enhancement. The use of surfactants to enable solubility and, in turn, viscosification by a water soluble polymer containing hydrophobic groups is described by Evani, U.S. Pat. No. 4,432,881. The need for a surfactant to achieve solubility and thickening efficiency should make such a system very salt sensitive, as well as very sensitive to small changes in surfactant and polymer concentration. Emmons et al., U.S. Pat. No. 4,395,524, teaches acrylamide copolymers as thickeners for aqueous systems. While these polymers possess hydrophobic groups, they do not contain the cationic monomers disclosed in this inven-

4,918,123

3

tion and are not effective in treating oil-in-water emulsions or viscosifying water-based fluids.

One of the objects of this invention is to overcome the deficiencies in the use of the water soluble polymers of the prior art for treating oily waste water and resolving oil-in-water emulsions. A new class of water soluble polymers, described in copending application U.S. Ser. No. 904,548, filed Sept. 8, 1986 (now abandoned) and continuation U.S. Ser. No. 054,382, filed May 26, 1987 now U.S. Pat. No. 4,835,234, can be used at a lower treat rate and hence is more efficient than prior art materials for oily water treatment. Furthermore, these novel terpolymers provide a superior degree of clean-up or oil removal in comparison to the prior art materials. These new polymers contain a nonionic water soluble monomer, such as acrylamide, a cationically charged, water soluble, ethylenically unsaturated amine-based monomer, such as 3-methacrylamido-propyltrimethylammonium chloride (MAPTAC), and a water insoluble or hydrophobic monomer, such as an alkyl(meth)acrylamide or alkyl(meth)acrylate with a chain length of 4 carbons or greater.

When these polymers are placed in an aqueous solvent, the hydrophobic groups aggregate or associate in a manner similar to a surfactant. If oil droplets are present in an aqueous solution there is an attractive interaction between the hydrophobic groups and the hydrophobic oil droplets. We have found that the presence of cationic groups, such as 3-methacrylamidopropyltrimethylammonium chloride (MAPTAC) causes an expansion of the polymer in solution, an improvement in polymer solubility, and an enhancement of the attractive interaction between the polymer chains and the oil droplets which normally have negative surface charges. The synergism between the cationic and hydrophobic groups in terms of oily water treatment or breaking of oil-in-water emulsions sets these polymers apart from those of the prior art.

Synthesis of polymers containing both hydrophobic and hydrophillic functionality presents difficulties. In order for polymerization to be effected, the monomers must obviously come into close proximity to one another. The incompatibility of the oil soluble and water soluble monomers in water, as the solvent, prevents an effective concentration of one or the other of these monomeric species from being achieved at the locus of polymerization of the other comonomer. Several processes described in the prior art could conceivably achieve this, but have serious deficiencies, necessitating this invention. For example, simply dispersing the water insoluble monomer as fine particles in the aqueous medium containing dissolved water soluble monomers would result in low incorporation of the water insoluble monomer and would lead to a heterogeneous product of particles dispersed in a predominantly water soluble polymer. The resulting polymer could not be used to impart efficient and uniform thickening to water based fluids, nor be very effective in treating oily water.

Techniques for polymerizing water soluble polymers, such as those taught in U.S. Pat. No. 4,154,190, 3,211,708, 3,002,960 and 3,284,393, cannot be used to prepare the compositions of this invention. Also, techniques or processes for preparing cationic polymers or copolymers containing cationic monomers, such as U.S. Pat. Nos. 4,452,957, 4,283,517, 4,160,742 and 3,316,181, have deficiencies in terms of incorporating the hydrophobic monomers needed for the polymers of this invention. This art does not teach the formation of a suffi-

4

ciently fine dispersion of the water and oil soluble monomers to enable uniform reaction and homogeneous terpolymers to be produced. The use of mutual solvents or solvent mixtures to dissolve the water and oil soluble monomers, as taught by Lenke et al., U.S. Pat. No. 4,098,987, has some serious limitations. Although this approach undoubtedly allows the incompatible monomers to come into close proximity to one another, since the dispersion is on a molecular scale, often the resulting copolymer is insoluble in the same solvent, as shown in U.S. Pat. No. 4,151,333. This leads to precipitation of the copolymer before it has achieved sufficient molecular weight to provide effective oily water treatment. The nonionic polymeric surfactants taught in U.S. Pat. No. 4,098,987 possess extremely low molecular weight (less than 10,000 amu) and lack the cationic functionality necessary for the present polymers. Thus, these teachings provide polymers which do not provide the extent or efficiency of oily water clean-up or breaking of oil-in-water emulsions. A major objective of this invention is to teach a process for preparing water dispersible or water soluble polymers containing both hydrophobic and cationic functionality. A further objective is to provide a process for producing these polymers for treatment of oily water.

Two techniques have been found most useful for preparing hydrophobically associating copolymers of acrylamide and alkylacrylamides. The first method was based on the use of a water continuous microemulsion to disperse the oil soluble monomer in a solution of the water soluble monomers. Details of the procedures and techniques are taught by Turner et al., U.S. Pat. No. 4,521,580. A second method for preparing copolymers of acrylamide and alkylacrylamide was based on dispersing the oil soluble monomer using low HLB surfactants to form an aqueous micellar solution which contains the water soluble monomers. Suitable surfactants and the details of the polymerization are taught by Turner et al., U.S. Pat. No. 4,528,348. While either the microemulsion or micellar polymerization techniques can be used to prepare hydrophobically associating polymers containing a variety of water soluble nonionic monomers, a problem arises when the monomers have a strong interaction with the surfactants used in the polymerization. In particular, strong ionic interactions or complexes can be formed between cationic water soluble monomers, such as ethylenically unsaturated amine based monomers, and anionic surfactants, such as alkyl sulfates and sulfonates.

A third technique which also has been found useful for preparing hydrophobically associating copolymers of acrylamide and alkylacrylamides is based upon a solution polymerization technique. The solution polymerization utilizes mutual solvents, i.e. alcohols or acetone, with water to provide effective copolymerization of water soluble and water insoluble monomers. The resultant polymeric solutions are generally of very low molecular weight due to the large amounts of solvent used since the solvent acts as a chain transfer agent during polymerization. Low molecular weight products are not effective in cleaning up oily water.

All three of the techniques suffer the same low total solids content, typically less than 10 weight percent to be flowable in the reactor.

A process is described in this application which overcomes the described problems. The present invention teaches the use of a modified water-in-oil emulsion polymerization technique to provide effective copolymer-

4,918,123

5

ization of water soluble and water insoluble monomers. The modified technique entails incorporating the water insoluble monomers into the aqueous phase along with the water soluble monomers and then utilizing a novel surfactant system to maintain the stability of the water-in-oil emulsion during the subsequent polymerization which is conducted solely in the aqueous phase.

## SUMMARY OF THE INVENTION

A process is described for producing unique and novel, preferably cation-containing, polymers of water soluble monomers with water insoluble monomers which polymers are particularly useful for clean-up of waste waters containing organic contaminants. The process relies on the dissolution of the water insoluble monomer(s) into an aqueous solution of at least one of the water soluble monomers by means of a water miscible oil immiscible cosolvent and/or a heating technique, followed by the use of a novel surfactant combination of a conventional low HLB surfactant and a particular polymeric stabilizer. The type and concentration of miscible solvents are chosen to produce a clear, uniform, homogeneous aqueous solution which serves as the aqueous phase of the water-in-oil emulsion. The heating technique is utilized to maintain the water insoluble monomer in the solution so that true copolymers are formed. In addition, by use of both the water miscible solvent and the heating technique, the water insoluble monomer remain dispersed in the aqueous phase so that the polymerization is effected without the substantial formation of particulates of water insoluble polymer.

## DETAILED DESCRIPTION OF THE INVENTION

The inverse, water-in-oil, emulsion polymerization process of this invention comprises the steps of (i) forming a uniform solution of a water-insoluble oil-soluble monomer, a nonionic water soluble monomer (such as acrylamide), and preferably a cationic monomer (such as MAPTAC) using a minor amount of a water miscible oil immiscible solvent (such as methanol or isopropanol) and a major amount of water; (ii) forming an oil phase by adding low HLB surfactant and a steric stabilizer to one or more inert hydrophobic liquids (such as a mineral oil); (iii) homogenizing the aqueous solution and the oil phase to form a water-in-oil emulsion; (iv) deaerating the emulsion system; (v) adding sufficient water soluble free radical initiator to effect the polymerization; and (vi) polymerizing for a sufficient period of time at a sufficient temperature to produce a high molecular weight copolymer at a high solids level. The resulting polymeric emulsion may be formed into a single package product by the addition of breaker surfactant.

The present invention describes the polymerization of a nonionic, water soluble, ethylenically unsaturated monomer, such as acrylamide; a water soluble, cationic monomer from the group consisting of ammoniumalkyl(meth)acrylamides, ammoniumalkyl(meth)acrylates and diallyl dialkyl ammonium salts; and a water insoluble monomer, such as an N-alkyl(meth)acrylamide or alkyl(meth)acrylate. The process for synthesizing these polymers relies on solubilizing the water insoluble monomer into an aqueous monomer solution which will form the aqueous phase of a water-in-oil emulsion. This is accomplished by (i) using a suitable water-miscible, oil-immiscible organic solvent, such as a short chain alcohol, or (ii) heating a normally solid water insoluble

6

monomer in the presence of the nonionic monomer and water to above its melting point and thereafter maintaining the temperature at no lower than about 15° C. below the melting point, or (iii) using a reduced amount of the water-miscible oil-immiscible solvent in combination with the heating technique. As a result, the water insoluble monomer is incorporated into the aqueous phase and polymerization can be initiated by water soluble initiators in the absence of oil soluble initiators to yield extremely high molecular weight polymers in high concentration with essentially no visible water-insoluble particulates.

Suitable water-miscible, oil-immiscible solvents for use herein include the lower alcohols which generally contain about 1 to 4 carbon atoms. Such alcohols include methanol, ethanol, propanol, isopropanol, butanol, isobutanol, and t-butanol. The preferred alcohol solvents are methanol and isopropanol. Most preferably the solvent is methanol. The solvent is generally used in an amount of about 0.75 to 5 times the weight of the water insoluble monomer(s), preferably about 1 to 3 times. If the amount of solvent is substantially above 5 times the water insoluble monomer, then the resultant polymer may be of too low a molecular weight due to the chain transfer effect of the solvent. If the amount of solvent is greatly below about that of the water insoluble monomer, then the water insoluble monomer is prone to separation from the other components in the aqueous phase which leads to unsatisfactory emulsion stability and/or unsatisfactory polymer performances. Another factor to be considered in determining the amount of solvent to be used is the temperature at which the water-insoluble monomer is mixed with the solvent and with the water soluble monomers. The higher the temperature, the lower the amount of solvent needed, and thus the higher the molecular weight of the resultant polymer. Thus the temperature may range from about 20° to about 100° C. Preferably the temperature will be about 40° to about 75° C. If the temperature is sufficiently high then the solvent may be omitted altogether. If the water insoluble monomer is normally a solid at room temperature, then it may be incorporated into the soluble monomer/water solution by heating to above its melting point and thereafter maintaining the temperature at no lower than about 15° C. below the melting point. Further details of this method are disclosed in U.S. Ser. No. 195,060, filed May 17, 1988, incorporated herein by reference.

Preferably the water insoluble monomer is incorporated into the aqueous phase by a combination of a solvent and heating as this has been found to produce the most satisfactory product. In this case, the solvent will be used in an amount of about 50 to about 100 weight percent of the insoluble monomer and the temperature is greater than the melting point of the monomer and will be at least about 50° C. In this case the solvent content is balanced versus the temperature to keep the water insoluble monomer dissolved in the aqueous phase and to obtain a high molecular weight polymer.

The oil phase of the water-in-oil emulsion will be comprised of a conventional inert hydrophobic liquid which is immiscible with water together with a two component stabilizer system. The stabilizer system is a combination of a conventional low HLB surfactant used for water-in-oil emulsion polymerizations and a polymeric stabilizer. The conventional stabilizer will have an HLB value of about 1 to 5 and will generally be

4,918,123

7

used in an amount of about 2 to 8 weight percent, based upon the total weight of the water-in-oil emulsion. Examples of suitable conventional stabilizers include the sorbitan esters and alkyl phenols optionally containing pendant ethylene oxide chains. The polymeric stabilizer is an oil-soluble water-insoluble linear ABA block copolymer of polyester-polyethylene oxide-polyester prepared by reacting condensed 12-hydroxystearic acid with polyethylene oxide according to the procedure outlined in U.S. Pat. No. 4,203,877. These materials are available as Hypermer B246, B261, and others from Imperial Chemical Industries Ltd. The block copolymers have HLB values of about 5–9 depending on the size of the ethylene oxide chain and will be used in an amount of about 0.5 to about 5 weight percent based upon the total weight of the emulsion, preferably about 0.8 to about 2 weight percent. The conventional low HLB surfactant and the block copolymer polymeric surfactant will generally be used in proportions ranging from about 1:1 to about 5:1 as this range has been found to produce the most satisfactory final polymer emulsion.

To ensure that no water insoluble monomer is polymerized in the oil phase, only water soluble initiators are utilized and preferably a radical scavenger is incorporated into the oil phase either prior to forming the initial water-in-oil emulsion, or more preferably shortly after polymerization has been commenced. Examples of oil soluble radical scavengers include benzoquinone, chloranil, pentaphenylethane, carbon tetrachloride, and carbon tetrabromide. Such scavengers are generally used in amounts of about 0.01 to 0.5 weight percent of the oil phase, preferably about 0.05 to about 0.2 weight percent.

Although the present invention has been found to be independent of the particular emulsion polymerization method employed, except for the specific features mentioned above, certain preferences are delineated in the general description of emulsion polymerization which follows.

A preliminary emulsion is made by homogenizing oil and aqueous phases. The oil phase of the emulsion, which generally comprises from about 5 to 40 percent by weight of the emulsion, is comprised of one or more inert hydrophobic liquids. Preferably, the oil phase comprises from about 20 to 30 percent of the emulsion. The oil used may be selected from a large class of organic liquids which are immiscible with water, including liquid hydrocarbons and substituted liquid hydrocarbons. As representative examples there may be mentioned benzene, xylene, toluene, mineral oils, kerosenes, napthas, chlorinated hydrocarbons, such as perchloroethylene, and the like. The oil phase also contains the stabilizer system and the oil soluble radical scavenger as described above.

The aqueous phase generally comprises from about 95 to 60 percent, by weight of the emulsion. Preferably, it comprises from about 80 to 70 percent thereof. In addition to the water, the aqueous phase contains the desired monomers to be polymerized, in an amount equal to from about 20 to 40% by weight based on the total weight of the emulsion, and generally a chain transfer agent and an initiator. Alternatively, the chain transfer agent and/or the initiator may be added to the system after the preliminary emulsion has been prepared. The initiator may also be added continuously during polymerization to control the rate of polymeri-

8

zation depending upon the particular monomers used and their reactivity.

Any conventional chain transfer agent may be employed, such as propylene glycol, isopropanol, 2-mercaptoethanol, dodecyl mercaptan and thioglycolic acid. The chain transfer agent is generally present in an amount equal to from about 0.1 to 10.0 percent by weight based on the total emulsion weight. However, more of the chain transfer agent may be added.

The initiator may be any water soluble, oil insoluble free radical producing material well known in the art. The preferred free radical initiators are the peroxide-type polymerization initiators and the azo-type polymerization initiators. Generally the amount of initiator utilized is from about 0.0005 to 0.5 percent by weight, based upon the total emulsion weight.

A sequestering agent may also be present in the aqueous phase. Although the preferred sequestering agent is ethylenediamine tetraacetic acid (EDTA), other sequestering agents, such as pentasodium diethylenetriamine pentaacetate (DTPA), may be employed. Usually from about 0.01 to 2.0 percent by weight of the emulsion, of the sequestering agent is added, although more may be used.

Following preparation of the preliminary emulsion, polymerization of the monomers is commenced at a temperature sufficiently high to break down the initiator to produce the desired free radicals. General a suitable range of temperatures is about 20° C. to 200° C., with preferred temperatures about 40° C. to 100° C.

Preferably the polymerization is run at pH of about 2–12, and a suitable amount of ammonia or other base, or acid, may be added to the preliminary emulsion to achieve the desired pH. The polymerization is usually completed in from about several hours to several days depending upon the monomers employed and other reaction variables. It is generally carried out at atmospheric pressure.

Following completion of the polymerization, the pH of the emulsion may be adjusted as desired. For the water soluble hydrophobically associating polymers, this is typically about 3–7. A breaker surfactant may also be added to yield a single package final product. Any suitable breaker surfactant may be employed, experimentation being the best means of determining which breaker surfactant will perform optimally with a given emulsion system. A preferred breaker surfactant is a compound prepared by reacting ethylene oxide with nonyl phenol. Typically, the breaker surfactant is added in an amount equal to from about 0.5 to 5.0 percent by weight, based on the total emulsion weight. Preferably, from about 1.5 to 3.5 percent of the breaker surfactant is added.

Once prepared, the emulsions of the present invention may be chemically modified in any known manner. The term chemically modified is intended to cover further treatment of the dispersed water-soluble polymer and/or the addition of components to the dispersed water-soluble polymer which, without the stabilization provided by the two component stabilizer system of the present invention, would cause the normally water-soluble polymeric particles to coagulate or agglomerate. Examples of such further treatments are disclosed in U.S. Pat. Nos. 4,052,353 and 4,171,296, incorporated herein by reference. The emulsion of the present invention may also be concentrated in any suitable manner, such as is disclosed in U.S. Pat. No. 4,021,399. incorporated herein by reference.

4,918,123

9

The water soluble hydrophobically associating polymers which can be prepared by the process of the instant invention are characterized by the formula:

$$\underset{\underset{R_1NR_2}{\overset{C=O}{|}}}{(CH_2-C)_x}-\underset{\underset{NH_2}{\overset{C=O}{|}}}{(CH_2-C)_y}-(Z)_z$$

wherein $R_1$ is preferably a $C_4$ to $C_{30}$ linear or branched alkyl, alkylcycloalkyl or alkylaryl group, more preferable $C_6$ to $C_{22}$, and most preferably $C_6$ to $C_{18}$; and $R_2$ is the same or different group as $R_1$, or hydrogen or $C_1$ to $C_3$ linear or branched alkyl group; and $R_3$ is hydrogen or methyl; and Z is an ammonium cation monomer. The cationic monomer is selected from the group consisting of ammoniumalkyl(meth)acrylamides, ammoniumalkyl(meth)acrylates and diallyl dialkyl ammonium salts. The anion may be chloride, bromide or methyl or hydrogen sulfate. Typical, but not limiting, ranges of composition of the terpolymer are represented preferably by x equal to 0.1 to 20 mole percent, more preferably 0.2 to 10 mole percent and most preferably 0.2 to 5 mole percent. The mole percentage of acrylamide, y, is preferably 0 to 94.9, more preferably 10 to 94.8 and most preferably 25 to 94.8. The mole percentage of the cationic monomer, z, is preferably 5 to 99.9, preferably 5 to 80, most preferably 5 to 70.

The process of the present invention can also provide polymers exemplified by the following formula:

$$\underset{\underset{OR_1}{\overset{C=O}{|}}}{(CH_2-C)_x}-\underset{\underset{NH_2}{\overset{C=O}{|}}}{(CH_2-C)_y}-(Z)_z$$

wherein $R_1$ is preferably a $C_4$ to $C_{30}$ linear or branched alkyl, alkylcycloalkyl or alkylaryl group, more preferably $C_6$ to $C_{22}$, and most preferably $C_6$ to $C_{18}$; $R_2$ is hydrogen or methyl; and Z is an ammonium cationic monomer. The cationic monomer is selected from the group consisting of ammoniumalkyl(meth)acrylamides, ammoniumalkyl(meth)acrylates and diallyl dialkyl ammonium salts. The anion may be chloride, bromide or methyl or hydrogen sulfate. Typical, but not limiting, ranges of composition of the terpolymer are represented preferably by x equal to 0.1 to 20 mole percent, more preferably 0.2 to 10 mole percent and most preferably 0.2 to 5 mole percent. The mole percentage of acrylamide, y, is preferably 0 to 94.9, more preferably 10 to 94.8 and most preferably 25 to 94.8. The mole percentage of the cationic monomer, z, is preferably 5 to 99.9, more preferably 5 to 80, most preferably 5 to 70.

The process of the present invention can also provide polymers exemplified by the following formula:

$$\underset{\underset{R_1NR_2}{\overset{C=O}{|}}}{(CH_2-C)_x}-\underset{\underset{NH_2}{\overset{C=O}{|}}}{(CH_2-C)_y}-\underset{\underset{CH_2}{\overset{|}{\underset{N^+ \; X^-}{\overset{/ \; \backslash}{R_4 \; R_3}}}}}{(CH_2-CH}---CHCH_2)_z}$$

10

wherein $R_1$ is preferably a $C_4$ to $C_{30}$ linear or branched alkyl, alkylcycloalkyl or alkylaryl group, more preferably $C_6$ to $C_{22}$, and most preferably $C_6$ to $C_{18}$; $R_2$ is the same or different group as $R_1$, or hydrogen or $C_1$ to $C_3$ linear or branched alkyl group; $R_3$ is hydrogen or methyl; $R_4$ and $R_5$ can be hydrogen, a $C_1$ to $C_6$ linear or branched alkyl group, or a $C_5$ to $C_8$ cycloalkyl, aromatic or alkylaromatic group; and $X^-$ is an anion such as chloride, bromide or ethyl sulfate. Typical, but not limiting, ranges of composition of the terpolymer are represented preferably by x equal to 0.1 to 20 mole percent, more preferably 0.2 to 10 mole percent, and most preferably 0.2 to 5 mole percent. The mole percentage of acrylamide, y, is preferably 0 to 94.9, more preferably 10 to 94.8, and most preferably 25 to 94.8. The mole percentage of the cationic monomer, z, is preferably 5 to 99.9, more preferably 8 to 80, most preferably 5 to 70.

The process of the present invention can also provide polymers exemplified by the following formula:

$$\underset{\underset{OR_1}{\overset{C=O}{|}}}{(CH_2-C)_x}-\underset{\underset{NH_2}{\overset{C=O}{|}}}{(CH_2-C)_y}-\underset{\underset{CH_2}{\overset{|}{\underset{N^+ \; X^-}{\overset{/ \; \backslash}{R_3 \; R_4}}}}}{(CH_2-CH---CHCH_2)_z}$$

wherein $R_1$ is preferably a $C_4$ to $C_{30}$ linear or branched alkyl, alkylcycloalkyl or alkylaryl group, more preferably $C_6$ to $C_{22}$, and most preferably $C_6$ to $C_{18}$; $R_2$ is hydrogen or methyl; $R_3$ and $R_4$ can be hydrogen, a $C_1$ to $C_6$ linear or branched alkyl group, or a $C_5$ to $C_8$ cycloalkyl, aromatic or alkylaromatic group; and $X^-$ is an anion such as chloride, bromide or methyl or hydrogen sulfate. Typical, but not limiting, ranges of composition of the terpolymer are represented preferably by x equal to 0.1 to 20 mole percent, and most preferably 0.2 to 5 mole percent. The mole percentage of acrylamide, y, is preferably 0 to 94.9, more preferably 10 to 94.8, and most preferably 25 to 94.8. The mole percentage of the cationic monomer, z, is preferably 5 to 99.9, more preferably 5 to 80, most preferably 5 to 70.

Molecular weight of the polymer is also an important parameter which can be controlled by the polymerization process conditions of this invention. High molecular weight polymers incorporating both cationically charged ammonium groups and hydrophobic groups can be prepared by using high monomer concentrations under conditions which provide low effective radical concentration. For example, reducing the reaction temperature or the concentration of initiator will, in general, reduce the radical concentration and result in higher polymer molecular weights. In addition, the solvent and its concentration will influence the polymer molecular weight. The reduction of molecular weight upon increasing alcohol cosolvent concentration can be compensated for by increasing the monomer concentration and the hydrophobe content. Increased molecular weight will improve solution rheological properties and oily water treatment performance. All other things being equal, the higher the molecular weight the less soluble the polymer. Thus, as molecular weight is increased the amount of hydrophobic groups should be reduced and the amount of cationic groups increased. The presence of the alcohol in the polymerization sys-

4,918,123

11

tem also reduces solution viscosity. providing a more easily handled or diluted product

The primary advantage of the polymers disclosed here over polymers currently used is the discovery that the presence of a hydrophobic group on the water soluble polymer results in a significant improvement in the breaking of reverse emulsions and the removal of emulsified or dispersed oil from waste waters. By way of example, oil droplets emulsified in water generally carry a negative surface charge or zeta potential which helps to stabilize the emulsion, keeping the droplets dispersed and making them difficult to resolve or break. Cationic polymers or surfactants are used to neutralize the surface charge. Once the charge is neutral, the droplets may begin to approach each other and agglomerate or coalesce since the electrostatic repulsion responsible for a significant portion of the emulsion's stability has been eliminated. Eventually large floc formation or liquid oil formation occurs. Once the droplets begin to flocculate they can be begin to float since they are much larger than the starting oil droplets. As they grow in size they will rise to the surface of the water at a faster rate. If a high molecular weight cationic polymer is used for charge neutralization, the polymer will accelerate the separation of the oil since the polymer is attracted to the oil droplet by coulombic attraction, hydrogen bonding or other mechanisms. In some cases low molecular weight cationic chemicals are added for charge control and then high molecular weight nonionic or anionic polymers are added next to cause polymer bridging between droplets and accelerate floc formation.

The advantages of the disclosed polymers is related to the fact that they are not only water soluble or dispersible, but also contain small amounts of hydrophobic groups. Not wishing to be bound by any theory, we believe that while conventional polymers can only attach themselves to oil droplets by coulombic attraction, hydrogen bonding or other mechanisms, the hydrophobic groups of these novel terpolymers can also be attached by a hydrophobic group-hydrophobic oil droplet association. While coulombic attraction still appears to be the strongest type of attraction, the hydrophobic association, or hydrophobic effect, appears to add a significant strengthening to this attraction, as evidenced by improved emulsion breaking and waste water clean-up. Indications are that the cationic hydrophobic polymers, prepared by the process of this invention, enable the formation of very strong floc particles. This is based on the observation that, unlike many conventional treatments, the floc particles produced by using the polymers prepared by the process of this invention are very difficult to redisperse. Adsorption of the hydrophobic functionalized water soluble polymer on the surface of the oil droplets is believed to be the cause of this observation. Further details on the use of hydrophobically associating cationic polymers for oily water clean-up treatment can be found in copending application, U.S. Ser. No. 904418, which is incorporated herein by reference.

To evaluate the influence of the polymerization process on the use of these polymers for the removal of emulsified oil from water, about 0.1 to about 200 ppm of the hydrophobically functionalized water soluble cationic polymer were added. After contacting under suitable agitation conditions for a prescribed time period, the emulsified oil droplets and polymer separated under quiescent conditions into a distinct layer from the wa-

12

ter. The rate of mixing after polymer addition varied, depending on the type of water being treated, the amount of oil emulsified in the water, temperature and several other conditions. The concentration of oil remaining in the water after treatment with the disclosed polymers was significantly less than the concentration of oil remaining in the water after similar treatment with a similar polymer not containing the novel hydrophobe functionalization. The oil which separated as a distinct layer from the layer of water was separated from the water by conventional methods.

While it is difficult to exactly simulate a process to break oily water emulsions and oil field-produced fluids, commonly referred to as reverse emulsions, it is common practice to make laboratory emulsions using crude oil from an oil production field of interest by high shear-mixing the given crude into water using a Waring blender or homogenizer. The formed oil-in-water can then be diluted with water and other suitable materials to simulate the oil production field being studied. The emulsions thus produced simulate oily waste waters from a given area. but are recognized as being an approximation. One would typically use these laboratory emulsions for testing chemical additives in the laboratory prior to confirmatory testing on the actual system in the field.

A common laboratory test used to simulate a mild water clarification process in the field is what is referred to as the Jar Test. The Jar Test involves putting 500 ml of a laboratory prepared or actual field emulsion into 600 ml clear glass breakers (six at a time). Larger breakers may be used if enough fluid is available. The breakers are then placed on a six paddle Phipps & Bird stirrer and mixed at a high rate, referred to as the fast mix period. Polymer is added at this mixing speed and timing is begun. After a specified amount of time at high speed, the mixing rate is reduced to a much slower rate for another specified amount of time. The breakers are removed from the mixer and allowed to stand for another period of time. Samples of solution are removed from a point near the 250 ml mark on the breakers and tested for turbidity (NTU) using standard test equipment and oil-in-water content using one of several available methods. An example of one of the oil-in-water determinations is to Freon-extract the oil from a waste water and then measure its infrared absorbance relative to a standard. The object of the test is to achieve the lowest NTU or oil level using the smallest amount of polymer. the actual mixing rates and times used in the Jar Test depend on the system being simulated and vary from study to study. The Jar Test, from the experience of many investigators over the years, has been shown to provide a good simulation of field clarification systems.

Another laboratory test commonly used in the current art is the Wemco 1+1 Laboratory Flotation Machine, available from Wemco in Sacramento, Calif. The technique used by the Wemco is also commonly referred to as induced air flotation. The Wemco 1+1 Laboratory Flotation Machine is a small scale pilot unit designed to model the full scale units, built by Wemco, which are commonly used in oil fields and in several other industries for water clarification and oil and solids removal. The laboratory Wemco, from the experience of several investigators over the years, has been found to provide a good simulation of what will occur in the larger unit when it is used in the evaluation of chemical additives. Laboratory prepared or actual field waste waters or emulsions are added to the test bowl of the

4,918,123

13

Wemco mixed for a few seconds with chemical additives without aeration. The air is then turned on and flotation occurs. Samples of the Wemco treated water are then withdrawn from a point near the bottom of the bowl for turbidity and oil-in-water determinations as described above.

The following examples are illustrative of the present invention, but are not in any way a limitation thereof. All parts and percentages are by weight unless otherwise specified.

## EXAMPLE I

An oil phase is prepared by mixing 68.1 g. oil, 15.0 g. sorbitan monooleate, and 5.01 g. Hypermer B-246 (linear ABA block copolymer of polyester-polyethylene oxide-polyester prepared by reacting condensed 12-hydroxystearic acid with polyethylene oxide according to the procedure outlined in U.S Pat. No. 4,203,877 and available from Imperial Chemical Industries, Ltd.). The mixture is then heated to 120° F. and mixing is continued until complete dissolution is observed.

A portion of the aqueous phase is prepared by combining under agitation 127.5 g. acrylamide (as a 50% solution) 45.0 g. 3-(methacrylamido)propyl-trimethylammonium chloride (as a 50% solution), 1.8 g. pentasodium diethylenetriamine pentaacetate. This portion is slowly heated to 105°–110° F. In a separate vessel 7.2 g. t-octylacrylamide is added to 25.5 g. methanol with heating to 105° F. and stirring until the t-octylacrylamide is dissolved. The methanol solution is then added to the balance of the aqueous phase while 0.03 g. potassium persulfate is also added thereto. Agitation and heating to a maximum of 115° F. is continued until the solution is clear of any solid precipitation.

The aqueous phase is slowly added into the oil phase, in about one minute with agitation and nitrogen purging. The mixing continues for about 15 minutes with the temperature being held in the 110°–115° F. range throughout. The mixture is then homogenized to about 800 cps. in a Silverson homogenizer to form a water-in-oil emulsion. The emulsion is then transferred to a suitable reaction vessel with stirring and nitrogen sparging while maintaining the temperature at 110°–115° F.

Polymerization is commenced by raising the temperature to 120° F. After the refractive index of the emulsion has increased by at least 0.005 (the zero hour) the reaction is continued at the following temperature/time schedule:

| | |
|---|---|
| 120° F. | 2 hours after zero hour |
| 130° F. | 1 hour |
| 140° F. | 1 hour |
| 150° F. | 3 hours plus |

0.7 g. benzoquinone is added in toluene to the oil phase as a radical scavenger when the temperature is increased to 130° F. The reaction is terminated one hour after the refractive index of samples ceases to increase at 150° F. and the reaction has been at 150° F. for at least 3 hours.

To form a single package final product having a total solids content of about 36 weight percent 9 g. polyoxyethylene (20EO) sorbitan monooleate is added slowly (about 40 minutes) and then the emulsion is allowed to cool to room temperature.

Analysis of the resultant polymer shows about 88.2 mole percent acrylamide, 10.6 mole percent MAPTAC, and 1.2 mole percent t-octylacrylamide. The 0.1 weight

14

percent dilute polymer solution viscosity is 3.9 cps and the viscosity of the polymeric emulsion prior to adding the breaker surfactant is 1000 cps. This demonstrates that a high molecular weight polymer is produced with little or no oil phase t-octylacrylamide polymer which would have substantially increased the polymeric emulsion viscosity.

## EXAMPLE II

The procedure of Example I is repeated except that the methanol is omitted and the t-octylacrylamide is predissolved in a portion of the acrylamide monomer solution by heating to about 140° F. and thereafter maintaining the temperature of the emulsion above 113° F. until polymerization is complete. A substantially similar polymeric emulsion results.

## EXAMPLE III

The procedure of Example I is repeated except that the benzoquinone free radical scavenger is omitted. A substantially similar polymeric emulsion results except that the viscosity of the polymeric emulsion is 1900 cps indicating that some polymerization of t-octylacrylamide occurred in the oil phase.

## EXAMPLE IV

The procedure of Example I is repeated except that the Hypermer B-246 is replaced by an equivalent amount of Hypermer B-261 which has a longer polyethylene oxide block thereby giving an HLB value of 7–9 as opposed to 6–8. A substantially similar polymeric emulsion results.

## EXAMPLE V

The procedure of Example I is repeated except that the sorbitan monooleate is replaced by an equivalent amount of sorbitan monostearate. A substantially similar polymeric emulsion results.

## COMPARATIVE EXAMPLE A

The procedure of Example III is repeated except that a dual initiator system is used. The initiators are an oil soluble azobisisobutyronitrile and a water soluble redox combination of potassium bromate and sodium metabisulfate. The resultant polymeric emulsion has a product viscosity in excess of 13,000 cps. showing substantial oil phase polymerization of the hydrophobe.

## COMPARATIVE EXAMPLE B

The procedure of Example I is repeated except that the Hypermer B-246 is replaced by one of the following chemically unrelated polymeric stabilizers:

(a) Hypermer A-409: modified polyester surfactant, HLB 9-11;

(b) Hypermer CG-6: acrylic graft copolymer, HLB 11-12; and

(c) Hypermer E-475: oil soluble emulsifier stabilizer, HLB 5-6.

In each of the attempted subsequent polymerization either the initial emulsion is unstable, or the emulsion breaks down during the polymerization, or the reaction mixture gels. None of these polymeric stabilizers produces a satisfactory polymeric emulsion.

## COMPARATIVE EXAMPLE C

The procedure of Example I to prepare the initial monomeric emulsion is repeated with a different surfac-

4,918,123

15

tant system based upon a combination of sorbitan mono-oleate (HLB 4.3) and ethoxylated sorbitan monooleate (HLB 15). To determine if these surfactants could provide sufficient emulsion stability to even allow a polymerization to occur, the emulsions are held at 50° C. for 85 minutes in the absence of any initiator and the percent separation determined. The results are:

| % SMO | % Ethox SMO | % Separation |
|-------|-------------|--------------|
| 0.17 | 0 | 40 |
| 0.17 | 0.16 | 40 |
| 0.17 | 0.32 | 62 |
| 0.17 | 0.54 | 64 |
| 0.17 | 0.80 | 64 |
| 0.17 | 1.07 | 64 |
| 0.17 | 1.61 | 65 |

None of the emulsions had sufficient stability.

COMPARATIVE EXAMPLE D

The procedure of Comparative Example C is repeated except that the ethoxylated sorbitan monooleate is omitted and the amount of sorbitan monooleate is varied in an attempt to stabilize the preliminary emulsion solely with the SMO. The emulsion stability after 40 minutes at 50° C. is:

| % of SMO | % Separation |
|----------|--------------|
| 1.9 | 74 |
| 2.3 | 70 |
| 2.6 | 67 |
| 3.1 | 66 |
| 3.5 | 66 |

None of the emulsions are stable.

EXAMPLE VI

The procedure of Comparative Example C is repeated with a surfactant system according to the present invention, i.e. sorbitan monooleate and Hypermer B-246, and the percent separation at 54° C. overnight determined. The results are:

| % SMO | % B-246 | % Separation |
|-------|---------|--------------|
| 1.9 | 0 | 100 |
| 1.9 | 0.037 | 45 |
| 1.9 | 0.069 | 30 |
| 1.9 | 0.091 | 10 |
| 1.9 | 0.12 | 7 |
| 1.9 | 0.14 | 6 |
| 1.9 | 0.17 | 1 |

The emulsions having 10 percent or less separation may be successfully polymerized.

EXAMPLE VII

To determine the effectiveness of polymeric emulsions produced by the present process in cleaning up oil-containing waters WEMCO oily water cleanup tests are conducted with a variety of polymeric emulsions and a variety of oily waters. The polymeric emulsions each have a nominal composition of 89% acrylamide, 10% MAPTAC, and 1% t-octylacrylamide and are prepared and characterized as follows:

(a) Emulsion A—Prepared as in Example I using methanol and heat; 35.6% active polymer; polymer solution viscosity of 1.9 cps (30 RPM LVT/UL); and

16

(b) Emulsion B—Prepared as in Example III using heat only; 39.1% active polymer; polymer solution viscosity of 3.9 cps; and

(c) Emulsion C—Prepared as Emulsion B but 1.3% more oil; 34.1% active polymer; polymer solution viscosity of 3.9 cps.

Three different oily water laboratory preparations are evaluated, the oil contents being 19, 59 and 78 ppm.

The percent oil remaining after treatment at various dosage levels is determined to be as follows:

| (1) | Initial Oil Content - 78 ppm | | |
|-----|------------------------------|---|---|
| | Dosage | % Residual Oil | |
| | (ppm) | A | B |
| | none | 100 | 100 |
| | 0.25 | 65 | 63 |
| | 0.5 | 40 | 40 |
| | 1.0 | 22 | 27 |
| | 2.0 | 18 | 30 |

| (2) | Initial Oil Content - 59 ppm | | |
|-----|------------------------------|---|---|
| | Dosage | Residual Oil | |
| | (ppm) | A | C |
| | none | 100 | 100 |
| | 0.25 | 13 | 18 |
| | 0.5 | 6 | 11 |
| | 1.0 | 5 | 14 |
| | 2.0 | 6 | 16 |

| (3) | Initial Oil Content - 19 ppm | |
|-----|------------------------------|---|
| | Dosage | % Residual Oil |
| | (ppm) | A |
| | none | 100 |
| | 0.25 | 28 |
| | 0.5 | 18 |
| | 1.0 | 26 |
| | 2.0 | 28 |

EXAMPLE VIII

To compare the effectiveness of a polymeric emulsion prepared by the present process vs. commercial polymers currently being used to treat oily waste waters, a plant scale Wemco test under plant operating conditions is performed. The polymers evaluated are:

(a) Jayfloc-812: an inverse emulsion of a low charge density cationic polyacrylamide;

(b) Jayfloc-835: an epipolyamine polymer; and

(c) Emulsion D: an inverse emulsion of the present invention containing 88.8 percent acrylamide, 10 percent MAPTAC, and 1.2 percent t-octylacrylamide; prepared as in Example I.

Based upon the results of a series of Wemco tests at the plant with the three different polymers the required treatrate, in quarts per day, is determined is to be as follows:

| (a) | Jayfloc-812 | 17 |
| (b) | Jayfloc-835 | 17 |
| (c) | Emulsion D | 3 |

Thus the emulsion of the present invention is many times superior to the other polymers which are considered the most effective for treating the water at the particular plant. On a cost/performance basis Emulsion D is found to be five times more efficient than either of the commercial polymers.

In a previous test at the same plant when the upstream water oil level was significantly higher, an inverse emulsion of the present invention was found to be

4,918,123

17

twice as effective as Jayfloc-812 and four times as effective as Jayfloc-835, both on a cost/performance basis.

## EXAMPLE IX

The process of Example I is repeated except for varying the monomers being polymerized. The specific monomers and their mole percents in the feed are:

| Sample | Nonionic | Cationic | Oil-Soluble |
|---|---|---|---|
| 1 | Acrylamide-88 | MAPTAC-10 | tOAm-2 |
| 2 | Acrylamide-86 | MAPTAC-10 | tOAm-4 |
| 3 | Acrylamide-84 | MAPTAC-10 | tOAm-6 |
| 4 | Acrylamide-78 | MAPTAC-10 | tOAm-2 |
| 5 | Acrylamide-88 | DMAEMA-10 | tOAm-2 |
| 6 | Acrylamide-87 | METAMS-11 | tOAm-2 |
| 7 | Acrylamide-85 | METAMS-11 | tOAm-4 |
| 8 | Acrylamide-88 | DMDAAC-10 | tOAm-2 |
| 9 | Acrylamide-73.4 | DMDAAC-24.6 | tOAm-2 |
| 10 | Acrylamide-88 | MAPTAC-10 | nOAm-2 |
| 11 | Acrylamide-84 | MAPTAC-10 | nOAm-6 |
| 12 | MethAM-88 | DMAEMA-10 | STMA-2 |
| 13 | MethAM-86 | DMAEMA-10 | STMA-4 |
| 14 | Acrylamide-87 | MAPTAC-10 | BFA-3 |

MethAM is methacrylamide
MAPTAC is 3-methacrylamidopropyltrimethylammonium chloride
DMAEMA is dimethylaminoethylmethacrylate quaternary
METAMS is the dimethylsulfate salt of DMAEMA
DMDAAC is dimethyldiallylammonium chloride
tOAm is t-octylacrylamide
nOAm is n-octylacrylamide
STMA is stearyl methacrylate
BFA is benzyl-2-furanacrylate

In each case a stable polymeric emulsion results. What is claimed is:

1. A process for preparing a polymeric water-in-oil emulsion of a copolymer of a water-soluble monomer and a water-insoluble oil-soluble monomer which comprises:

(i) forming a uniform aqueous solution of the water soluble monomer and the water-insoluble, oil-soluble monomer, said water-insoluble, oil-soluble monomer being solubilized by pre-dissolving it in a water-miscible, oil-immiscible organic solvent or by heating the water-insoluble, oil-soluble monomer in the presence of at least a portion of the water-soluble monomer and water,

(ii) forming an oil solution of an inert hydrophobic liquid oil, a surfactant having an HLB value of about 1 to about 5, and an oil-soluble, water-insoluble linear ABA block copolymer prepared by reacting condensed 12-hydroxystearic acid with polyethylene oxide, said surfactant and block copolymer being present in sufficient amount to stabilize the emulsion during polymerization;

(iii) homogenizing the aqueous solution and the oil solution to form a water-in-oil emulsion;

(iv) deaerating the emulsion;

(v) incorporating a sufficient amount of a water-soluble, oil-insoluble free radical initiator to effect polymerization; and

(vi) polymerizing the monomers for a sufficient period of time and at a sufficient temperature to produce a high molecular weight copolymer in the aqueous phase of the water-in-oil emulsion.

2. The process of claim 1 wherein the solvent is an alkyl alcohol having about 1 to about 4 carbon atoms.

3. The process of claim 2 wherein the solvent is selected from the group consisting of methanol and isopropanol.

4. The process of claim 1 wherein the water-insoluble, oil-soluble monomer is solid at room temperature, and along with the water-soluble monomer and water is

18

heated to above its melting point prior to being added to the aqueous phase and thereafter is maintained at a temperature at no lower than about 15° below the melting point until the polymerization is completed.

5. The process of claim 1 wherein the pre-dissolved mixture of a water-insoluble oil-soluble monomer, which is solid at room temperature, and the water-miscible oil-immiscible organic solvent or a minor portion of the water-soluble monomer, is heated to above the melting point of the water-insoluble, oil-soluble monomer prior to addition thereof to the balance of the water-soluble monomer, and thereafter maintaining the temperature at no lower than about 15° C. below the melting point of the water-insoluble, oil-soluble monomer until the polymerization is completed.

6. The process of claim 1 wherein the surfactant is a sorbitan ester.

7. The process of claim 1 wherein the block copolymer has an HLB value of about 5 to about 9.

8. The process of claim 1 wherein the surfactant is present in an amount about about 2 to about 8 weight percent of the total emulsion.

9. The process of claim 1 wherein the block copolymer is present in an amount of about 0.5 to about 3 weight percent of the total emulsion.

10. The process of claim 1 wherein the surfactant and the block copolymer are used in a proportion of about 1:1 to about 5:1.

11. The process of claim 1 wherein the initiator is incorporated into the uniform aqueous solution prior to homogenization.

12. The process of claim 1 wherein an oil-soluble radical scavenger is added to the oil solution.

13. The process of claim 1 wherein an oil-soluble radical scavenger is added to the water-in-oil emulsion after polymerization has commenced and before polymerization is completed.

14. The process of claim 1 wherein the temperature is about 20 to about 100° C.

15. The process of claim 1 wherein the temperature is about 40 to about 75° C.

16. The process of claim 1 further comprising, after completion of the polymerization, incorporating a breaker surfactant capable of inverting the emulsion to an oil-in-water emulsion upon contact with water to form a single package self-inverting emulsion.

17. The process of claim 1 wherein the water soluble monomer is a nonionic monomer.

18. The process of claim 17 wherein the nonionic monomer comprises acrylamide.

19. The process of claim 1 wherein the water soluble monomer comprises a mixture of a nonionic monomer and a cationic monomer.

20. The process of claim 19 wherein the nonionic monomer comprises acrylamide and the cationic monomer comprises 3-methacrylamidopropyl-trimethylammonium chloride.

21. The process of claim 1 wherein the copolymer produced is represented by the formula:

$$+CH_2-\underset{\underset{R_1NR_2}{|}}{\overset{\overset{R_3}{|}}{\underset{\parallel}{C}}}\overset{}{)}_x+CH_2-\underset{\underset{NH_2}{|}}{\overset{\overset{R_3}{|}}{\underset{\parallel}{C}}}\overset{}{)}_yZ\}_z$$

4,918,123

19

20

wherein $R_1$ is a $C_4$ to $C_{30}$ linear or branched alkyl, alkyl-cycloalkyl or alkylaryl group; $R_2$ is the same or different group as $R_1$, or hydrogen or $C_1$ to $C_3$ linear or branched alkyl group; $R_3$ is hydrogen or methyl; and Z is an ammonium cation monomer, wherein x, y, and z are mole percents, x ranging from 0.1 to 20 mole percent, y from 0 to 94.9 mole percent, and z from 5 to 99.9 mole percent, the cation monomer, z, being selected from the group consisting of ammoniumalkyl(meth)acrylamides, ammoniumalkyl(meth)acrylates, and diallyl dialkyl ammonium salts.

22. The process of claim 1 wherein the copolymer produced is represented by the formula:

$$\left(CH_2-\underset{\underset{OR_1}{\overset{\overset{R_2}{|}}{\underset{|}{C=O}}}{C}\right)_{x}\left(CH_2-\underset{\underset{NH_2}{\overset{\overset{R_2}{|}}{\underset{|}{C=O}}}{C}\right)_{y}(Z)_{z}$$

wherein $R_1$ is a $C_4$ to $C_{30}$ linear or branched alkyl, alkyl-cycloalkyl or alkylaryl group; $R_2$ is hydrogen or methyl; and Z is an ammonium cation monomer; wherein x, y, and z are mole percents, x ranging from 0.1 to 20 mole percent, y from 0 to 94.9 mole percent, and z from 5 to 99.9 mole percent, the cation monomer, z, being selected from the group consisting of ammoniumalkyl(meth)acrylamides, ammoniumalkyl(meth)acrylates, and diallyl dialkyl ammonium salts.

23. The method of claim 21 wherein the ammonium cation monomer is a dially dialkyl ammonium salt.

24. The method of claim 22 wherein the ammonium cation monomer is a diallyl dialkyl ammonium salt

* * * * *

# EXHIBIT 33

# United States Patent [19]

**Fong**

[11] Patent Number: **4,921,903**

[45] Date of Patent: **May 1, 1990**

[54] **PROCESS FOR PREPARING HIGH MOLECULAR WEIGHT HYDROPHOBIC ACRYLAMIDE POLYMERS**

[75] Inventor: Dodd W. Fong, Naperville, Ill.

[73] Assignee: Nalco Chemical Company, Naperville, Ill.

[21] Appl. No.: 256,339

[22] Filed: Oct. 11, 1988

[51] Int. Cl.⁵ ........................... C08L 39/00

[52] U.S. Cl. .......................... 524/555; 524/801; 526/303.1; 526/304

[58] Field of Search .................. 524/555, 801; 526/303.1, 304

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| Re. 28,474 | 7/1974 | Anderson et al. |
| Re. 28,576 | 10/1975 | Anderson et al. |
| 3,284,393 | 11/1966 | Vanderhoff et al. |
| 3,624,019 | 11/1971 | Anderson et al. |
| 3,663,490 | 5/1972 | Sarem ............ 524/555 |
| 3,734,873 | 5/1973 | Anderson et al. |
| 3,767,629 | 10/1973 | Vallino et al. |
| 3,826,771 | 7/1974 | Anderson et al. |
| 3,915,920 | 10/1975 | Slovinsky et al. |
| 3,996,180 | 12/1976 | Kane |
| 3,997,492 | 12/1976 | Kane et al. |
| 4,024,097 | 5/1977 | Slovinsky et al. |
| 4,405,728 | 9/1983 | Krebs et al. ............ 524/555 |
| 4,524,175 | 6/1985 | Stanley, Jr. ............ 524/831 |
| 4,663,408 | 5/1987 | Schulz et al. ............ 526/264 |
| 4,673,716 | 6/1987 | Slano et al. |

Primary Examiner—Joseph L. Schofer
Assistant Examiner—Mark D. Sweet
Attorney, Agent, or Firm—Donald G. Epple; Anthony L. Cupoli

[57] **ABSTRACT**

A process of making a water-in-oil emulsion which contains from 5–60% by weight of a hydrophobic acrylamide terpolymer composed of the random repeating units:

$$-CH_2-\overset{\overset{\text{(A)}}{R}}{\underset{\underset{M}{\overset{|}{O}}}{\underset{|}{\overset{|}{C}=O}}}-CH_2-\overset{\overset{\text{(B)}}{R}}{\underset{\underset{NH_2}{\overset{|}{C}=O}}{\underset{|}{\overset{|}{C}=O}}}-CH_2-\overset{\overset{\text{(C)}}{R}}{\underset{\underset{R^1}{\overset{|}{NH}}}{\underset{|}{\overset{|}{C}=O}}}$$

where:
R is methyl or hydrogen,
M is hydrogen, alkali metal, ammonia, or amine,
R¹ is a hydrophobic radical,

with the mol ratio of A:B:C being A(2–50):B(50–98):C(0.1–15), which comprises reacting a 5–60% by weight water-in-oil emulsion of an acrylamide polymer with a hydrophobic amine at a temperature above 120° C. for a period of time sufficient to transamidate the acrylamide groups in the acrylamide polymer with the hydrophobic amine.

**6 Claims, 2 Drawing Sheets**

Hercules' Trial Exhibit 128



FIG. I

FIG. 2

VISCOSITY OF 2000 PPM INVERSIONS

PAM + ARMEEN S

SALT CONCENTRATION (TDS/LITER)

VISCOSITY

a —— EXAMPLE 19
b —— EXAMPLE 18
c —— EXAMPLE 16
d —— EXAMPLE 17

4,921,903

1

## PROCESS FOR PREPARING HIGH MOLECULAR WEIGHT HYDROPHOBIC ACRYLAMIDE POLYMERS

### INTRODUCTION

Hydrophobically associating polymers which are copolymers of a water-soluble monomer with a water-insoluble monomer are known to be efficient viscosifiers of aqueous and brine media. These polymers are made by copolymerization in aqueous solution with a large amount of surfactant (see U.S. No. 4,673,716 which is incorporated herein by reference) or in a water-in-oil emulsion with an oil-soluble initiator (see U.S. No. 3,284,393 which is incorporated herein by reference). These methods require the use of hydrophobic monomers which usually are not readily available in commercial quantity. We have found that hydrophobically associative polymers can readily be prepared by modifying water-in-oil emulsions of polyacrylamide latices with an appropriate primary amine. The advantages of this process are that the amines are readily available and the molecular weights of the products can easily be regulated in the backbone preparation.

Another advantage is that when these polymers are in the form of a water-in-oil emulsion they are readily inverted into water to provide a quick dispersion of the polymers without necessitating prolonged stirring or agitation.

### THE DRAWINGS

FIG. 1 and FIG. 2 represent solution viscosities of certain mixed fatty hydrophobic[1] acrylamide terpolymers.

[1]Used interchangeably with term "hydrophobically associating"

### GENERAL DESCRIPTION OF THE INVENTION

The invention comprises a process of making a water-in-oil emulsion which contains from 5-60% by weight of a hydrophobic acrylamide terpolymer composed of the random repeating units:

(A)  (B)  (C)
$$-CH_2-C-\;:CH_2-C-\;:-CH_2-C-$$
with R, C=O, C=O, C=O groups; O/M, NH_2, NH/R^1

where:

R is methyl or hydrogen,

M is hydrogen, alkali metal, ammonia, or amine,

$R^1$ is a hydrophobic radical,

with the mol ratio of A:B:C being A(2–50):B(50–98):C(0.1–15), which comprises reacting a 5–60% by weight water-in-oil emulsion of an acrylamide polymer with a hydrophobic amine at a temperature above 120° C. for a period of time sufficient to transamidate the acrylamide groups in the acrylamide polymer with the hydrophobic amine.

### The Starting Water-in-Oil Emulsions of the Acrylamide Polymers

The starting water-in-oil emulsions of the acrylamide polymers useful in this invention contain four basic

2

components. These components and their weight percentages in the emulsions are listed below:

A. The acrylamide polymer:
  1. Generally from 5–60%;
  2. Preferably from 20–50%; and
  3. Most preferably from 35–45%;
B. Water:
  1. Generally from 20–90%;
  2. Preferably from 30–70%; and
  3. Most preferably from 30–55%;
C. Hydrophobic liquid:
  1. Generally from 5–75%;
  2. Preferably from 5–40%; and
  3. Most preferably from 20–30%; and
D. Water-in-oil emulsifying agent:
  1. Generally from 0.1–20%;
  2. Preferably from 1–15%;
  3. Most preferably from 1.2–10%.

It is also possible to further characterize the water-in-oil emulsions of acrylamide polymers with respect to the aqueous phase of the emulsions. This aqueous phase is generally defined as the sum of the acrylamide polymer present in the emulsion plus the amount of water present in the emulsion. This terminology may also be utilized in describing the water-in-oil emulsions which are useful in this invention. Utilizing this terminology, the aqueous phase of the water-in-oil emulsions of this invention generally consists of 25–95% by weight of the emulsion. Preferably, the aqueous phase is between 60–90% and most preferably from 65–85% by weight of the emulsion.

The emulsions also may be characterized in relation to the water/oil ratios. This figure is simply a ratio of the amount of water present in the emulsion divided by the amount of hydrophobic liquid present in the emulsion. Generally, the water-in-oil emulsions of this invention will have a water/oil ratio of from 0.25 to 18. Preferably, the water-in-oil ratio will range from 0.5–14, and most preferably from 1.0–2.75.

### The Water-Soluble Acrylamide Polymers

The acrylamide polymers contained in the emulsions should have a minimum molecular weight of 50,000. A preferred molecular weight for the starting polymers is at least 500,000, and most preferably one million or greater. In most applications where the hydrophobic acrylamide terpolymers are used as hydrophobically associative polymers, the molecular weights will be between 1–20 million.

While the emulsions above described are referred to as water-in-oil emulsions of acrylamide polymers, such emulsions as the term is used herein includes copolymers of acrylamide which contain up to as much as 2–50 mol ratios of acrylic acid. In the transamidation procedure described hereafter, certain amounts of acrylic acid are produced due to hydrolytic effects.

If substantial quantities of acrylic acid are desired in the finished hydrophobic acrylamide terpolymers, then hydrolysis of the latex using appropriate amounts of acid or base during the transamidation step hereafter described.

### The Hydrophobic Liquids

The hydrophobic liquids or oils used in preparing these emulsions may be selected from a large group of organic liquids which include liquid hydrocarbons and substituted liquid hydrocarbons.

4,921,903

3

A preferred group of organic liquids that can be utilized in the practice of this invention are paraffinic hydrocarbon oils. Examples of these types of materials include a branched-chain isoparaffinic solvent sold by Humble Oil and Refinery Company under the trade-name "Isopar M" described in U.S. No. 3,624,019 and a paraffinic solvent sold by the Exxon Company, U.S.A. called "Low Odor Paraffinic Solvent". Typical specifications of this material are set forth below in Table I.

TABLE I

| Specific Gravity 60°/60° F. | 0.780-0.806 |
|---|---|
| Color, Saybolt | + 30 min. |
| Appearance, visual | Bright and Clear |
| Aniline Point, °F., ASTM D-611 | 160 min. |
| Distillation, °F., ASTM D-86 | |
| IBP | 365 min. |
| FBP | 505 max. |
| Flash Point, °F., TCC | 140 min. |
| Sulfur, ppm, Microcoulometer | 15 max. |

While paraffinic oils are the preferred materials for use in preparing the water-in-oil emulsions of this invention, other organic liquids can be utilized. Thus, mineral oils, kerosenes, naphthas, and in certain instances petroleum may be used. While useful in this invention, solvents such as benzene, xylene, toluene, and other water immiscible hydrocarbons having low flash points or toxic properties are generally avoided due to problems associated with their handling.

### The Water-In-Oil Emulsifying Agents

Any conventional water-in-oil emulsifying agent can be used such as sorbitan monostearate, sorbitan monooleate, and the so-called low HLB materials which are all documented in the literature and are summarized in the Atlas HLB Surfactants Selector. Although the mentioned emulsifiers are used in producing good water-in-oil emulsions, other surfactants may be used as long as they are capable of producing these emulsions. It is also contemplated, however, that other water-in-oil emulsifying agents can be utilized.

U.S. Pat. No. 3,997,492 shows the use of emulsifiers generally having higher HLB values to produce stable emulsions similar in character to those discussed above. With the use of the equations present in this reference, which is hereinafter incorporated by reference, emulsifiers having HLB values between 4-9 can be utilized in the practice of this invention.

In addition to the reference described above, U.S. No. 4,024,097 discloses particular emulsifying agents for the water-in-oil emulsions, which are the subject of this invention. These emulsions are generally prepared according to this reference utilizing a water-in-oil emulsifying agent comprising a partially esterified lower N,N-dialkanol substituted fatty amide. Additionally, other surfactants may be combined to produce emulsions having small particle sizes and excellent storage stability.

A most preferred emulsifier system uses a surfactant or mixture of surfactants, preferably including a poly-soap surfactant, which may be exemplified by Rapisol B-246, P-18. Rapisol B-246 is an ABA block copolymer where A=12-hydroxystearate (MW at 1,500) and B=polyethylene oxide (MW at 1,500) with a hydrophylic-hydrophobic balance (HLB) of 5-6. P-18 is a 1:1 copolymer of 1-octadecene and maleic anhydride with a molecular weight of about 50,000 and sold by Gulf Chemical Company.

4

### The Preparation of the Water-In-Oil Emulsions of the Starting Acrylamide Polymers

The general method for the preparation of emulsions of the type described above is contained in Vanderhoff, U.S. No. 3,284,393. A typical procedure for preparing water-in-oil emulsions of this type includes preparing an aqueous solution of acrylamide, and in certain cases solutions of acrylamide and acrylic acid, and adding this solution to one of the hydrocarbon oils described above. With the addition of a suitable water-in-oil emulsifying agent and under agitation, the emulsion is then subjected to free radical polymerization conditions and a water-in-oil emulsion of the acrylamide polymer is obtained. It should be pointed out that the ingredients are chosen based upon the weight percentages given above and their compatibility with each other. As to choice of free radical catalyst, these materials may be either oil or water-soluble and may be from the group consisting of organic peroxides, Vazo type materials, redox type initiator systems, etc. Additionally, ultraviolet light, microwaves, etc. will also cause the polymerization of water-in-oil emulsions of this type.

In the manufacture of emulsions of this type, which are further detailed in U.S. No. 3,624,019, RE 28,474, U.S. No. 3,734,873, RE 28,576, U.S. No. 3,826,771, all of which are incorporated by reference, the use of air may be employed to control polymerization. This technique is described in U.S. No. 3,767,629 which is also hereinafter incorporated by reference.

In addition to the above references, U.S. No. 3,996,180 describes the preparation of water-in-oil emulsions of the types utilized in this invention by first forming an emulsion containing small particle size droplets between the oil, water, monomer and water-in-oil emulsifying agent utilizing a high shear mixing technique followed by subjecting this emulsion to free radical polymerization conditions. Also of interest is U.S. No. 4,024,097 which describes water-in-oil emulsions such as those described above utilizing particular surfactant systems for the water-in-oil emulsifying agent, allowing for the preparation of latexes having small polymer particle sizes and improved storage stability.

Another reference, U.S. No. 3,915,920, discloses stabilizing water-in-oil emulsions of the type above described utilizing various oil-soluble polymers such as polyisobutylene. Employment of techniques of this type provides for superior stabilizes emulsions.

Of still further interest is U.S. No. 3,997,492 which describes the formation of water-in-oil emulsions of the type above described.

### Physical Properties of the Starting Water-In-Oil Emulsions

The starting water-in-oil emulsions of the finely divided acrylamide polymers useful in this invention contain relatively large amounts of polymer. The polymers dispersed in the emulsion are quite stable when the particle size of the polymer is from the range of 0.1 microns up to about 5 microns. The preferred particle size is generally within the range of 0.2 microns to about 3 microns. A most preferred particle size is generally within the range of 0.2 to 2.0 microns.

The emulsions prepared having the above composition generally have a viscosity in the range of from 50 to 3,000 cps. It will be seen, however, that the viscosity of these emulsions can be affected greatly by increasing or decreasing the polymer content, oil content, or water

4,921,903

5

content as well as the choice of a suitable water-in-oil emulsifier.

Another factor attributing to the viscosity of these types of emulsions is the particle size of the polymer which is dispersed in the discontinuous aqueous phase. Generally, the smaller the particle obtained, the less viscous the emulsion. At any rate, it will be readily apparent to those skilled in the art as to how the viscosity of these types of materials can be altered.

### The Starting Hydrophobic Amines

The amines used to produce the hydrophobic acrylamide terpolymers may be selected from a wide variety of primary amines. Usually these amines will contain at least 3 carbon atoms and most preferably will contain at least 12 carbon atoms.

They may be aliphatic, cyclo-aliphatic, arylalkyl or alkaryl amines.

While the amines in a preferred embodiment of the invention are aliphatic and are primarily hydrocarbon substituted amines, they may contain minor amounts of hydrophobic elements within their structure, e.g. oxygen.

For purposes of illustrative amines of the above type, the following amines are considered to be illustrative:

Propylamine
Cyclohexylamine
N-octylamine
Phenethylamine
Oleylamine
Armeen S
Octadecylamine
Hydroxystearyl amine

The above list includes the amine, Armeen S. This is a mixed fatty amine with the hydrocarbon portion being derived from soya radicals which are obtained from

6

soybean oils. Other mixed amines may be used such as tallow and coconut amines.

### Method of Preparation of the Hydrophobic Acrylamide Terpolymers

In the present process a water-in-oil emulsion of polyacrylamide or its acrylic acid copolymer is mixed with hydrophobic amine. The hydrophobic amine is used in amounts previously specified to produce the desired end product. The reaction mixture in a preferred embodiment also contains added low odor paraffinic solvent (LOPS) and added surfactants such as Span 80 (Soribtan monostearate), or preferably a polysoap surfactant such as P-18.

The water-in-oil emulsion of the polyacrylamide used in a starting material is a stabilized water-in-oil emulsion in which the oil or solvent phase is a paraffinic solvent such as LOPS (low odor paraffinic solvent). THe starting polyacrylamide emulsions preferably used as starting materials may have RSV's from 5 and above and preferably from 18 to 50.

The transamidation process of the invention is carried out at a temperature of at least $120°$ C. up to about $180°$ C. for a time period of about 30 minutes to 6 hours or more. Preferred temperatures ranges are from about $130°$ C. to $160°$ C. A preferred reaction time ranges from 1 to 6 hours. The transamidation can be carried out in the presence of varying amounts of NaOH or HCl as indicated. controls the amount of carboxylate formation.

### EXAMPLES

Using the above preparative techniques, a variety of hydrophobic acrylamide terpolymers were prepared. These preparations are set forth below in Table II.

TABLE II

| Example No. | Amine Used | Amount Charge, Mole % (Wt %) | RSV | IV | —CO₂— | 2° Amide Formed | Comment |
|---|---|---|---|---|---|---|---|
| 1 | Propylamine | 10 | 19.2 | — | 29 | — | — |
| 2 | Propylamine | 10 | 31.1 | 16.2 | 31 | 6.4 | — |
| 3 | Propylamine | 10 | 54.7 | 33.3 | 43 | 7.1 | — |
| 4 | Cyclohexylamine | 10 | 40.4 | 23.1 | 21 | 5.2 | — |
| 5 | Cyclohexylamine | 10 | 57.6 | 34.3 | 49 | 3.6 | — |
| 6 | Cyclohexylamine | 0.255 | 16.0 | 10.1 | 35 | 0.122 | — |
| 7 | Cyclohexylamine | 0.512 | 17.9 | 10.6 | 36 | 0.244 | — |
| 8 | Cyclohexylamine | 0.768 | 16.9 | 10.4 | 34 | 0.366 | — |
| 9 | n-octylamine | (5) | — | — | — | — | latex gelled |
| 10 | phenethylamine | (3) | 12.6 | 7.4 | 38 | — | — |
| 11 | phenethylamine | (5) | 29.0 | 17.3 | 39 | — | moderate gel |
| 12 | phenethylamine | (5) | 24.4 | 13.7 | 28 | — | amine neutralized |
| 13 | phenethylamine | (10) | — | — | — | — | latex gelled |
| 14 | oleylamine | (5) | 5.9 | 4.2 | 37 | — | — |
| 15 | oleylamine | (10) | 3.8 | 2.7 | 34 | — | — |
| 16 | Armeen S | (5) | 17.4 | 12.3 | 34 | — | — |
| 17 | Armeen S | (10) | 12.2 | 9.7 | 32 | — | — |
| 18 | Armeen S | (4) | 25.6 | 16.5 | 35 | — | — |
| 19 | Armeen S | (3) | 27.9 | 17.5 | 34 | — | — |
| 20 | Armeen S | (1) | 13.1 | 8.0 | 32 | — | — |
| 21 | Armeen S | (2) | 15.7 | 9.4 | 32 | — | — |
| 22 | octadecylamine | (5) | 10.5 | 3.1 | 33 | — | — |

4,921,903

7                                                      8

TABLE II-continued

| | | Hydrophobically Modified Polyacrylamide Latexes | | | | | |
|---|---|---|---|---|---|---|---|
| Example No. | Amine Used | Amount Charge, Mole % (Wt. %) | RSV | IV | —CO₂— | 2° Amide Formed | Comment |
| 23 | octadecylamine | (10) | 5.0 | 4.7 | 32 | — | — |

Notes:
(1) Residual amine was determined by G.C.
(2) RSV (0.45% polymer in 1 molar NaNO₃ at 30° C.) for the polyacrylamide backbone was 21
(3) RSV (0.045% polymer in 1 molar NaNO₃ at 30° C.) for the polyacrylamide backbone was 15.8
(4) RSV (0.045% polymer in 1 molar NaNO₃ at 30° C.) for the polyacrylamide backbone was 20

The solution viscosities of some hydrophobic acrylamide terpolymers as described in FIGS. 1 and 2

### The Inversion of the Water-in-Oil Hydrophobic Acrylamide Emulsions

The water-in-oil emulsions of the hydrophobic acrylamide terpolymers discussed above have unique ability to rapidly invert when added to aqueous solution in the presence of an inverting agent or physical stress. Upon inversion, the emulsion releases the polymer into water in a very short period of time when compared to the length of time required to dissolve a solid form of the polymer. This inversion technique is described in U.S. No. 3,624,019, hereinafter incorporated by reference. As stated in the Anderson reference, the polymer-containing emulsions may be inverted by any number of means. The most convenient means resides in the use of a surfactant added to either the polymer-containing emulsion or the water into which it is to be placed. The placement of a surfactant into the water causes the emulsion to rapidly invert and release the polymer in the form of an aqueous solution. When this technique is used to invert the polymer-containing emulsion the amount of surfactant present in the water may vary over a range of 0.01 to 50 percent based on the polymer. Good inversion often occurs within the range of 1 0-10 percent based on polymer.

The preferred surfactants utilized to cause the inversion of the water-in-oil emulsion of this invention when the emulsion is added to water are hydrophilic and are further characterized as being water soluble. Any hydrophillic type surfactant such as ethoxylated nonyl phenols, ethoxylated nonyl phenol formaldehyde resins, dioctyl esters of sodium succinate and octyl phenol polyethoxy ethanols, etc, can be used. Preferred surfactants are generally nonyl phenols which have been ethoxylated with between 8-15 moles of ethylene oxide. A more complete list of surfactants used to invert the emulsion are found in Anderson, U.S. No. 3,624,019 at columns 4 and 5.

Having thus described my invention, I claim:
1. A process of making a water-in-oil emulsion which contains from 5-60% by weight of a hydrophobic acrylamide terpolymer composed of the random repeating units:

$$
\begin{array}{ccc}
(A) & (B) & (C) \\
R & R & R \\
| & | & | \\
-CH_2-C-:CH_2-C-:-CH_2-C- \\
| & | & | \\
C{=}O & C{=}O & C{=}O \\
| & | & | \\
O & NH_2 & NH \\
M & & R^1 \\
\end{array}
$$

where:
R is methyl or hydrogen,
M is hydrogen, alkali metal, ammonia, or amine,
R¹ is a hydrophobic radical,
with the mol ratio of A:B:C being A(2–50):B(-50–98):C(0.1–15), which comprises reacting a 5–60% by weight water-in-oil emulsion of an acrylamide polymer with a hydrophobic amine at a temperature above 120° C. for a period of time sufficient to transamidate the acrylamide groups in the acrylamide polymer with the hydrophobic amine.

2. The process of claim 1 wherein the ratio of A:B:C is: A(2–35):B(55–98):C(0.1–10).
3. The process of claim 1 where R¹ is a hydrocarbon radical containing at least 3 carbon atoms.
4. The process of claim 2 where R¹ is a hydrocarbon radical of at least 3 carbon atoms.
5. The process of claim 3 where R¹ contains at least 12 carbon atoms.
6. The process of claim 4 where R¹ is a hydrocarbon radical containing at least 12 carbon atoms.

* * * * *

55

60

65

# EXHIBIT 34
# REDACTED

# EXHIBIT 35
# REDACTED

# EXHIBIT 36
# REDACTED

# EXHIBIT 37
# REDACTED

# EXHIBIT 38

# United States Patent [19]

## Robinson et al.

[11]    **4,339,371**

[45]    **Jul. 13, 1982**

[54] **HIGH CONCENTRATION WATER-SOLUBLE POLYMERS IN WATER-IN-OIL EMULSIONS**

[75] Inventors: Peter M. Robinson, Milford; David H. Rakowitz, Cos Cob; Lesley J. Nowakowski, Shelton, all of Conn.

[73] Assignee: American Cyanamid Company, Stamford, Conn.

[21] Appl. No.: 245,793

[22] Filed: Mar. 20, 1981

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 193,517, Oct. 2, 1980, abandoned.

[51] Int. Cl.³ ............................................. C08L 33/00
[52] U.S. Cl. ....................................... 524/310; 524/458; 524/460; 524/517

[58] Field of Search ............. 260/29.6 RW, 29.6 WB, 260/29.6 WQ

[56]            References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,256,233 | 6/1966 | Hahn | 260/29.6 RW |
| 3,380,944 | 4/1968 | Kay | 260/29.6 RW |
| 3,806,485 | 4/1974 | Frisque | 260/29.6 NR |

Primary Examiner—Paul R. Michl
Attorney, Agent, or Firm—Michael J. Kelly; William H. Calnan; Bruce F. Jacobs

[57]            **ABSTRACT**

Water-in-oil emulsions containing high concentrations of water-soluble polymers are prepared by incorporating therein an oil-soluble, water-insoluble polymeric surfactant prepared from maleic anhydride and a comonomer.

**26 Claims, No Drawings**

CYT0010350

4,339,371

1

## HIGH CONCENTRATION WATER-SOLUBLE POLYMERS IN WATER-IN-OIL EMULSIONS

This application is a continuation-in-part of our prior U.S. application Ser. No. 193,517, filed Oct. 2, 1980 and now abandoned.

This invention relates generally to water soluble polymers dispersed in water-in-oil emulsions. More particularly, the present invention relates to stable water-in-oil emulsions which contain a high concentration of finely dispersed water-soluble polymeric particles and an oil-soluble, water-insoluble polymeric surfactant therein. The stability at the high concentration is made possible by the use of the polymeric surfactants of this invention.

Water-in-oil emulsions having water-soluble polymers dispersed therein are well known in the art. Such emulsions have found a wide variety of uses, for example, as flocculants in the mining industry and in sewage treatment, and as mobility control agents in enhanced oil recovery. However, commercially available stable emulsions have a relatively low polymeric solids content. Accordingly, large volumes of these emulsions must be used, and shipment and storage costs are high.

Heretofore, the most successful method of dealing with this problem was to concentrate low solids emulsions following their preparation. Various concentration processes are disclosed in U.S. Pat. Nos. 3,849,361, 4,021,399 and 4,052,353. However, each of these processes necessitates the additional costly step of concentrating the emulsion. Thus it would be an advancement in the art if stable emulsions containing high concentrations of polymeric solids could be prepared without the requirement of such additional step.

It is, accordingly, an object of the instant invention to provide a method to directly prepare a high polymeric solids content water-in-oil emulsion which possesses excellent stability.

Other objects will become apparent from the ensuing description.

It has been discovered that the addition of certain oil-soluble, water-insoluble polymeric surfactants will permit the water-soluble polymeric solids content in a water-in-oil emulsion to be increased from the current levels of from 20% to 30% to from about 40% to 60% based upon the total emulsion weight, i.e. water, oil and polymer, without the necessity of concentrating the emulsion to achieve this result. The emulsions possess excellent mechanical stability. The emulsions also show significantly improved stability to sedimentation and to inorganic salt breaking which is a problem when the emulsions are produced on a commercial scale using industrial machinery and in industrial use. The oil-soluble, water-insoluble polymeric surfactant of the present invention has the general formula:

wherein x is a whole number greater than about 5; the mole ratio of a:b is from 3:1 to 1:3, provided the HLB number is maintained at less than about 14, preferably

2

less than about 10; and $R_1$, $R_2$, $R_3$ and $R_4$ are each independently hydrogen, alkyl ($C_{1-48}$), alkoxy ($C_{1-48}$), alkenyl ($C_{2-48}$), aryl ($C_{6-12}$) or alkaryl ($C_{7-12}$) with the proviso that $R_1$, $R_2$, $R_3$ and $R_4$ are such that the polymeric surfactant is oil-soluble and water-insoluble.

Preferred surfactants correspond to the above formula wherein x is about 100 to 400, the ratio of a:b is about 1:1, $R_1$, $R_2$ and $R_3$ are hydrogen and $R_4$ is $C_{16}H_{33}$ or $C_{12}H_{24}$.

The polymeric surfactant may be prepared in any suitable manner, generally by reacting maleic anhydride with an appropriate comonomer. Such preparation may, for example, be conducted in the manner disclosed in U.S. Pat. No. 3,732,337, which is incorporated herein by reference. It is to be noted, however, that the particular method of preparing the polymeric surfactant does not constitute a feature of this invention. Such a material is available as, for example, PA-18 or PA-14 from Gulf.

The polymeric surfactant is added to the emulsion in an amount effective to stabilize the same. Preferably, the polymeric surfactant is present in an amount equal to from about 0.1 to 3 percent, by weight, based on the total emulsion weight. Most preferably, the polymeric surfactant is present in an amount equal to from about 0.15 to 1 percent, by weight, based on the total emulsion weight.

Also within the scope of the above definition of the polymeric surfactant are suitable oil-soluble, water-insoluble derivatives thereof. As this is obvious to those skilled in the art, such derivatives may be prepared by reaction of the polymeric surfactant with, for example, an alcohol or an amine. British Pat. No. 1,093,081 discloses the use of a surfactant similar to a cationic derivative of this invention as a dispersing agent for fine particles in non-aqueous solvents.

It has been further discovered that the stability of the high polymeric solids content water-in-oil emulsions may be more greatly enhanced when the hereinabove described polymeric surfactant is used in conjunction with a secondary oil-soluble, water-insoluble polymeric surfactant which is a linear ABA block copolymer of polyester-polyalkylene oxide-polyester wherein the alkylene oxide content is less than about 40 percent, by weight. Preferably, the alkylene oxide content is about 30 percent. Examples of such copolymers are disclosed in U.S. Pat. No. 4,203,877, incorporated herein by reference.

When the secondary polymeric surfactant is used, it is present in an amount effective to enhance the stability of the emulsion. Generally, it is present in an amount equal to from about 0.1 to 1 percent by weight, based on the total emulsion weight. Preferably, it is present in an amount equal to from about 0.15 to 1 percent by weight, based on the total emulsion weight. It is noted that, when the two polymeric surfactants are employed, the total amount of these surfactants generally does not exceed about 3 percent, by weight, of the emulsion. However, more may be used.

Either or both of the polymeric surfactant, and the secondary polymeric surfactant of this invention may be added prior to polymerization, during polymerization, or after polymerization if the system has not previously gelled. Preferably the polymeric surfactant is added prior to polymerization as it has been found to allow the use of higher polymerization temperatures.

4,339,371

3

The emulsion of the instant invention is so termed because the diameters of the dispersed water-soluble polymeric particles range generally from 0.1 to 10 microns, with about 95% of the particles measuring from about 0.7 to 2.5 microns in diameter. This is to be contrasted with a suspension, such as that which is the subject of British Pat. No. 1,329,062, wherein the particle diameters range generally up to 150 microns. Commercial suspensions normally have particle sizes in the 30 to 150 micron range.

Although the present invention has been found to be independent of the particular emulsion polymerization method employed, certain preferences are delineated in the general description of emulsion preparation which follows:

A preliminary emulsion is made by homogenizing oil and aqueous phases. The oil phase of the emulsion, which generally comprises from about 5 to 40 percent by weight of the emulsion, is comprised of one or more inert hydrophobic liquids. Preferably, the oil phase comprises from about 20 to 30 percent of the emulsion. The oil used may be selected from a large class of organic liquids which are immiscible with water, including liquid hydrocarbons and substituted liquid hydrocarbons. As representative examples there may be mentioned benzene, xylene, toluene, mineral oils, kerosenes, napthas, chlorinated hydrocarbons, such as perchloroethylene, and the like.

The oil phase also contains one or more conventional emulsion polymerizaton stabilizers. Such stabilizers are well known to the art, and those preferred for water-in-oil emulsions include the sorbitan esters. The most preferred conventional stabilizer is sorbitan mono-oleate. The conventional stabilizer is present in an amount sufficient to stabilize the emulsion during polymerization. Although the amount will vary depending upon, inter alia, the monomers used and polymerization conditions, generally from about 0.5 to 5.0 percent by weight, based upon the total emulsion weight, is used. The emulsion polymerization stabilizer by itself, even in an increased amount, has been found incapable of stabilizing a resultant emulsion having about 40 to 60% solids.

The aqueous phase generally comprises from about 95 to 60 percent, by weight, of the emulsion. Preferably, it comprises from about 80 to 70 percent thereof. In addition to the water, the aqueous phase contains the desired monomers to be polymerized, in an amount equal to from about 40 to 60% by weight, based on the total weight of the emulsion, and generally a chain transfer agent and an initiator. Alternatively, the chain transfer agent and/or the initiator may be added to the system after the preliminary emulsion has been prepared. The initiator may also be added continuously during polymerization to control the rate of polymerization depending upon the particular monomers used and their reactivity. Further alternatively, the initiator may be present in either phase with the monomers being added either continuously or incrementally thereafter. Or the initiator and the monomers may all be added to the preliminary emulsion.

Any monomers which, when polymerized or copolymerized, yield water-soluble polymers, may be used in the present invention. The term "water-soluble" means that the polymer is soluble in water in an amount of at least 1% by weight. The polymer may be either anionic, non-ionic or cationic. Examples of monomers which yield such water soluble polymers or copolymers include acrylamide, acrylic acid and its salts, methacryl-

4

amide, methacrylic acid and its salts, maleic acid and its salts, methyl acrylate, ethyl acrylate, propyl acrylate, methyl methacrylate, ethyl methacrylate, dimethylaminoethyl acrylate, dimethylaminoethyl methacrylate, diethylaminoethyl acrylate, diethylaminoethyl methacrylate, diethylaminoethyl acrylate, hydroxyethyl methacrylate, diethylaminoethyl acrylate methylsulfate, dimethylaminoethyl methacrylate methylchloride, quaternary, styrene, acrylonitrile, 2-acrylamido-2-methylpropane sulfonic acid and its salts, 3-(methylacrylamido)propyl-trimethylammonium chloride, vinyl methyl ether, vinyl ethyl ether, alkali metal and ammonium salts of vinyl sulfonic acid, vinyl pyridine, vinyl pyrrolidone, vinyl imidazole, diallyl dimethylammonium chloride and the like. Preferably, the monomers are selected from acrylamide, acrylic acid and its salts, a quaternary of dimethylaminoethylmethacrylate, and 3-(methylacrylamido)propyl-trimethylammonium chloride. Most preferably, the polymer is polyacrylamide, polyacrylic acid, or a copolymer of acrylamide and acrylic acid.

Generally, an anionic polymeric surfactant is used when the water soluble polymer is anionic, and a cationic polymeric surfactant is employed when the water-soluble polymer is cationic. A non-ionic polymeric surfactant may be utilized for any type of water-soluble polymer. However, it is not critical that this practice be followed. Again, routine experimentation will determine optimum combinations.

Any conventional chain transfer agent may be employed, such as propylene glycol, isopropanol, 2-mercaptoethanol, dodecyl mercaptan and thioglycolic acid. The chain transfer agent is generally present in an amount equal to from about 0.1 to 10.0 percent, by weight, based on the total emulsion weight. However, more of the chain transfer agent may be added.

The initiator may be any free radical producing material well known in the art. The preferred free radical initiators are the peroxide-type polymerization initiators and the azo-type polymerization initiators. Generally the amount of initiator utilized is from about 0.0005 to 0.5 percent by weight, based on the total emulsion weight. Radiation may also be used to initiate the reaction, if desired.

A sequestering agent may also be present in the aqueous phase. Although the preferred sequestering agent is ethylenediamine tetraacetic acid (EDTA), other sequestering agents, such as pentasodium diethylenetriamine pentacetate, may be employed. Usually from about 0.01 to 2.0 percent by weight based on the weight of the emulsion, of the sequestering agent is added, although more may be used.

Following preparation of the preliminary emulsion, polymerization of the monomers is commenced at a temperature sufficiently high to break down the initiator to produce the desired free radicals. Generally a suitable range of temperatures is about −20° C. to 200° C., with preferred temperatures about 20° C. to 100° C. Preferably the polymerization is run at a pH of about 2–12, and a suitable amount of ammonia or other base, or acid, may be added to the preliminary emulsion to achieve the desired pH. The polymerization is usually completed in from about an hour or two to several days, depending upon the monomers employed and other reaction variables. It is generally carried out at atmospheric pressure, but super-atmospheric pressure is advantageously used when volatile ingredients are involved.

CYT0010352

4,339,371

5

Following completion of the polymerization, the pH of the emulsion may be adjusted as desired. For an anionic polymer emulsion, this is generally about 4–10. For a cationic polymer emulsion, this is typically about 3–5. For a non-ionic polymer emulsion, it is about 3–7. A breaker surfactant may also be added to yield a single package final product. Any suitable breaker surfactant may be employed, experimentation being the best means of determining which breaker surfactant will perform optimally with a given emulsion system. A preferred breaker surfactant is a compound prepared by reacting ethylene oxide with nonyl phenol. Typically, the breaker surfactant is added in an amount equal to from about 0.5 to 5.0 percent by weight, based on the total emulsion weight. Preferably, from about 1.5 to 3.5 percent of the breaker surfactant is added.

Once prepared, the emulsions of the present invention may be chemically modified in any known manner. The term chemically modified is intended to cover further treatment of the dispersed water-soluble polymer and/or the addition of components to the dispersed water-soluble polymer which, without the stabilization provided by the oil-soluble, water-insoluble polymeric surfactants of the present invention, would cause the normally water-soluble polymeric particles to coagulate or agglomerate. Examples of such further treatments are disclosed in U.S. Pat. Nos. 4,052,353 and 4,171,296, incorporated herein by reference. The emulsion of the present invention may also be concentrated in any suitable manner, such as is disclosed in U.S. Pat. No. 4,021,399, incorporated herein by reference.

The following examples are illustrative of the present invention, but are not in any way a limitation thereof. All parts and percentages are by weight unless otherwise specified.

EXAMPLE 1

A water phase containing 173.9 g. of acrylamide, 75.4 g. of acrylic acid, about 19 g. of ammonia, 5.2 g. of propylene glycol, 0.48 g. of the disodium salt of ethylene diaminetetraacetic acid; and 0.008 g. of tertiary butyl hydroperoxide in 138.6 g. of water (for a total aqueous phase of 412.6 g.) and an oil phase containing 143.1 g. oil, 11.4 g. of sorbitan mono-oleate and 2.85 g. of an oil-soluble, water-insoluble polymeric surfactant having the formula:

$$\left[\left[\begin{array}{cc} R_1 & R_2 \\ | & | \\ R_4 & R_1 \end{array}\right]_a \begin{array}{cc} -CH & CH- \\ | & | \\ C & C \\ \diagdown & \diagdown \\ O & O \end{array}\right]_b$$

where x is about 100 to 400, the ratio of a:b is 1:1, $R_1$, $R_2$ and $R_3$ are hydrogen, and $R_4$ is $C_{16}H_{33}$ (for a total oil phase of 157.35 g.) were homogenized. The resulting emulsion system was then transferred to a suitable reaction vessel with stirring and sparged with $N_2$. As 0.5 cc/hr of a 0.36% solution of sodium metabisulfite was added for 4 to 5 hours, the temperature of the emulsion increased to about 50° C., and agitation was maintained

6

for 5 to 6 hours, polymerization being completed at the end of that time.

The water-soluble polymeric solids content of the emulsion product was about 46 percent by weight.

In the following examples, emulsions were prepared generally in accordance with the procedure outlined in Example 1, but with the water-soluble polymeric content changed as indicated. Also, in each instance a breaker surfactant, prepared by reacting ethylene oxide with nonyl phenol, was added to the final emulsion to yield a one package product. (Such an addition is commonly made in commercial preparation so that less work is involved on the consumer's part to ready the emulsion for use.)

In each Example, the emulsions were stirred at room temperature and a given emulsion's resistance to gellation under those circumstances is the measurement of its mechanical stability.

EXAMPLE 2

Emulsions were prepared containing about 46 percent, by weight, of water-soluble polymeric solids (as a 70/30 acrylamide/ammonium acrylate copolymer), and having oil phases with the characteristics set out in Table I. Also included is the mechanical stability determined for each emulsion.

It is seen from Table I that the use of the polymeric surfactant of the instant invention renders the resultant emulsion significantly more stable than when either sorbitan mono-oleate or sorbitan mono-laurate or sorbitan monolaurate is used as cosurfactant.

EXAMPLE 3

Emulsions were prepared containing water-soluble polymeric solids as in Example 2 but having oil phases with the characteristics set out in Table II. As can be seen from the results shown, the polymeric surfactant of the present invention greatly enhanced the mechanical stability of the emulsions prepared therewith.

EXAMPLE 4

Emulsions were prepared containing about 44 percent, by weight, of water-soluble polyacrylamide solids (the polymer being a homopolymer of acrylamide) and having oil phases with the characteristics set out in Table III. The results are self-explanatory.

TABLE I

| | Emulsion A | Emulsion B | Emulsion C | Emulsion D | Emulsion E |
|---|---|---|---|---|---|
| Oil Phase* | 21.9 | 21.9 | 27.3 | 21.9 | 27.7 |
| Oil Phase Components* | | | | | |
| Oil | 18.9 | 18.9 | 23.8 | 18.9 | 25.1 |
| Sorbitan Mono-oleate | 2.0 | 1.5 | 3.5 | 2.0 | 2.0 |
| Sorbitan Monolaurate | 1.0 | 1.5 | | | |
| Polymeric Surfactant of Example 1 | — | — | — | 1.0 | 0.5 |
| Mechanical Stability | 4 hrs. | gelled during polymerization | 3–5 hrs. | 1000 hrs. | 1000 hrs. |

*expressed as percentages of total emulsion weight.

TABLE II

| | Emulsion F | Emulsion G | Emulsion H | Emulsion I | Emulsion J | Emulsion K |
|---|---|---|---|---|---|---|
| Oil Phase* | 25.8 | 25.8 | 25.8 | 25.8 | 25.8 | 25.8 |

7                                    4,339,371                                    8

### TABLE II-continued

|  | Emulsion F | Emulsion G | Emulsion H | Emulsion I | Emulsion J | Emulsion K |
|---|---|---|---|---|---|---|
| Oil Phase Components* |  |  |  |  |  |  |
| Oil | 23.8 | 22.8 | 22.8 | 21.6 | 23.3 | 22.8 |
| Sorbitan Mono-oleate | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 |
| Sorbitan Trioleate | — | — | 1.0 | — | — | — |
| Sorbitan Monolaurate | — | 1.0 | — | — | — | — |
| Polymeric Surfactant of Example 1 | — | — | — | 0.2 | 0.5 | 1.0 |
| Mechanical Stability | 2–5 hrs. | gelled during polymeri-zation. | 6–17 hrs. | 120–140 hrs. | 1000 hrs. | 1000 hrs |

*expressed as percentages of total emulsion weight.

### TABLE III

|  | Emulsion L | Emulsion M |
|---|---|---|
| Oil Phase* | 28.2 | 27.8 |
| Oil Phase Components* |  |  |
| Oil | 25.6 | 25.7 |
| Sorbitan Mono-oleate | 2.0 | 2.0 |
| Polymeric Surfactant of Example 1 | 0.5 | — |
| Mechanical Stability | 600 hrs. | gelled during polymerization |

*expressed as percentage of total emulsion weight.

### TABLE IV

|  | Emulsion N | Emulsion O |
|---|---|---|
| Oil Phase* | 27.6 | 27.6 |
| Oil Phase Components* |  |  |
| Oil | 25.0 | 25.0 |
| Sorbitan Mono-oleate | 2.0 | 2.0 |
| Polymeric Surfactant of Example 1 | 0.5 | — |
| Mechanical Stability | 600 hrs. | gelled during polymerization |

*expressed as percentage of total emulsion weight.

### EXAMPLE 5

Emulsions were prepared containing about 50.5 percent, by weight, of water-soluble polymeric solids (as ammonium acrylate in a homopolymer of acrylic acid) and having oil phases with the characteristics outlined in Table IV.

### EXAMPLE 6

Emulsions having increased solids over those of Example 4, i.e., 47.5 percent, by weight, of water-soluble polymeric solids (the polymer being a homopolymer of acrylamide), and having oil phase contents as set forth in Table V, were prepared. In addition to the polymeric surfactant of Example 1, emulsion R contained a secondary oil-soluble, water-insoluble polymeric surfactant of the present invention which is a linear ABA block copolymer of polyester-polyethylene oxide-polyester, prepared by reacting condensed 12-hydroxy-ystearic acid with polyethylene oxide according to the procedure outlined in U.S. Pat. No. 4,203,877, and containing about 30% by weight, ethylene oxide. This copolymer is available as, for example, Rapisol TM B-246 from Imperial Chemical Industries, Ltd. Emulsion S contained an oil-soluble, water-insoluble polymeric surfactant which is a branched polyester-polyethylene oxide compound, prepared by reacting an alk(en)yl succinic anhydride with polyethylene oxide. This com-

pound is commercially available as, for example, Rapisol A-430 from Imperial Chemical Industries, Ltd.

The results set forth in Table V demonstrate that the polymeric surfactant of this invention is an essential ingredient providing mechanical stability and that when the secondary polymeric surfactant of the present invention (A) is further added to the emulsion, the mechanical stability is even that much more enhanced.

### EXAMPLE 7

This example demonstrates the mechanical and sedimentation stabilities of emulsions containing the oil-soluble, water-insoluble polymeric surfactant alone and the polymeric surfactant together with the second oil-soluble, water-insoluble polymeric surfactant.

### TABLE V

|  | Emulsion P | Emulsion Q | Emulsion R | Emulsion S |
|---|---|---|---|---|
| Oil Phase* | 25.3 | 25.3 | 25.3 | 25.3 |
| Oil Phase Components* |  |  |  |  |
| Oil | 23.8 | 23.8 | 23.8 | 23.8 |
| Sorbitan Mono-oleate | 1.5 | 1.0 | 0.5 | 0.5 |
| Polymeric Surfactant of Example 1 | — | 0.5 | 0.5 | 0.5 |
| A | — | — | 0.5 | — |
| B | — | — | — | 0.5 |
| Mechanical Stability | Emulsion not stable prior to polymeri-zation. | 2–12 hrs. | 50–100 hrs. | 2–12 hrs. |

*expressed as percentage of total weight.

Emulsions containing about 46.5 percent, by weight, of water-soluble polymeric solids (as a 70/30 acrylamide/ammonium acrylate copolymer) and having oil phase contents as set forth in Table VI were prepared.

The data in Table VI shows that the combination of the instant invention's polymeric surfactant with secondary polymeric surfactant A not only provided the emulsion with excellent mechanical stability (as did the polymeric surfactant by itself), but also resulted in a smaller water-soluble polymeric particle size and no oil phase separation after two months. When used without the polymeric surfactant, however, the secondary polymeric surfactant A did not work.

### EXAMPLE 8

The method of preparing the emulsion set forth in Example 1 is repeated in every detail except that the oil-soluble, water-insoluble polymeric surfactant of this invention is not present in the preliminary emulsion.

CYT0010354

4,339,371

9

Instead, it is added during the polymerization of the monomers. Similar results are obtained.

### EXAMPLE 9

The procedure of Example 1 is repeated except the polymeric surfactant is replaced by other oil-soluble water-insoluble polymeric surfactants as per the formula:

wherein $R_1$, $R_2$, $R_3$, $R_4$, x and the ratio of a:b were as follows:

### TABLE VI

| | Emulsion T | Emulsion U | Emulsion V |
|---|---|---|---|
| Oil Phase* | 23.7 | 23.7 | 23.7 |
| Oil Phase Components* | | | |
| Oil | 19.7 | 19.7 | 19.7 |
| Sorbitan Mono-oleate | 2.0 | 2.0 | 2.0 |
| Polymeric Surfactant of Example 1 | | 1.0 | 2.0 |
| A | 2.0 | 1.0 | |
| Mechanical Stability | gelled during polymerization | 100 hrs. | 100 hrs. |
| Particle Size (95% of particles within range) | | 0.8–1.5 microns | 0.8–2.3 microns |
| Separation of oil after two (2) months | | no separation | 8% by volume |

*expressed as percentage of total emulsion weight.

| $R_1$ | $R_2$ | $R_3$ | $R_4$ | x | a:b |
|---|---|---|---|---|---|
| $CH_3$ | H | H | $C_8H_{17}$ | 100 | 2:1 |
| H | $C_{10}H_{21}$ | H | H | 8 | 1:2 |
| $C_2H_5$ | $CH_3$ | $OCH_3$ | $C_{12}H_{25}$ | 400 | 1:1 |
| H | H | H | $C_{22}H_{45}$ | H | 700 | 1:3 |

In each case, substantially similar stabilized emulsions having 40 to 60% water-soluble polymeric solids result.

### EXAMPLE 10

The procedure of Example 1 is repeated except that the monomers are replaced with equal amounts of

(a) 95:5 mole percent acrylamide:dimethylaminoethyl methacrylate methylchloride quaternary, which yields a cationic water-soluble polymer, and the temperature of polymerization is raised to 60° C.;

(b) 100 mole percent acrylic acid, yielding an anionic water-soluble polymer; and

(c) 100 mole percent methacrylamide, yielding a non-ionic, water-soluble polymer and the polymeric surfactant is derivatized (but remains non-ionic, oil-soluble and water-insoluble) by reacting it with methanol for about 5 hours at about 120° C.

Stable emulsions result in each instance.

### EXAMPLE 11

The procedure of Example 1 is repeated, except that the monomers used are 90 mole percent acrylamide and 10 mole percent 3-(methacrylamido)propyl-trimethylammonium chloride (the resultant water-soluble polymer being cationic), and the oil-soluble, water-

10

insoluble polymeric surfactant is made cationic by derivatization with diethylenetriamine by reacting diethylene triamine with it under reflux conditions for 4 to 6 hours at about 200° C.

A stable emulsion results.

Numerous modifications and variations of the present invention are possible in light of the foregoing disclosure and, therefore, within the scope of the appended claims, the invention may be practiced otherwise than is particularly described.

What is claimed is:

1. A stable water-in-oil emulsion comprised of from about 40 to 60% by weight, based on the total weight of the emulsion, of a water-soluble polymer, and an oil-soluble, water-insoluble, polymeric surfactant, in an amount sufficient to stabilize the emulsion, said polymeric surfactant having the formula:

wherein x is a whole number greater than about 5, the mole ratio of a:b is from 3:1 to 1:3, provided the HLB number is maintained at less than about 14, $R_1$, $R_2$, $R_3$ and $R_4$ are independently selected from the group consisting of hydrogen, alkyl ($C_1$–$C_4$), alkoxy ($C_1$–$C_4$), alkenyl ($C_2$–$C_4$), aryl ($C_6$–$C_{12}$), alkaryl ($C_7$–$C_{12}$), and $R_1$, $R_2$, $R_3$, and $R_4$ are such that the surfactant is oil-soluble and water-insoluble.

2. The emulsion of claim 1 wherein the HLB number is less than about 10.

3. The emulsion of claim 1 wherein x is about 100 to 400, the mole ratio of a:b is 1:1, $R_1$, $R_2$ and $R_3$ are each hydrogen and $R_4$ is $C_{16}H_{33}$.

4. The emulsion of claim 1 wherein said water-soluble polymer is a polymer or copolymer comprised of monomers selected from acrylamide, acrylic acid and its salts, methacrylamide, methacrylic acid and its salts, maleic acid and its salts, methyl acrylate, ethyl acrylate, propyl acrylate, methyl methacrylate, ethyl methacrylate, dimethylaminoethyl acrylate, dimethylaminoethyl methacrylate, diethylaminoethyl acrylate, diethylaminoethyl methacrylate, hydroxyethyl acrylate, hydroxyethyl methacrylate, diethylaminoethyl acrylate methylsulfate, dimethylaminoethyl methacrylate methylchloride quaternary, styrene, acrylonitrile, 2-acrylamido-2-methylpropane sulfonic acid and its salts, 3-(methylacrylamido)propyl-trimethylammonium chloride, vinyl methyl ether, vinyl ethyl ether, vinyl pyridine, vinyl pyrrolidone, vinyl imidazole, diallyldimethylammonium chloride, or mixtures thereof.

5. The emulsion of claim 1 wherein said water soluble polymer is comprised of monomers selected from the group consisting of acrylamide, acrylic acid and its salts, a quaternary of dimethylaminoethylmethacrylate, and 3-(methylacrylamido)propyl-tri-methylammonium chloride.

6. The emulsion of claim 5 wherein said water soluble polymer is comprised of acrylamide, acrylic acid and its salts, or mixtures thereof.

CYT0010355

4,339,371

| 11 | 12 |

7. The emulsion of claim 1 wherein the polymeric surfactant is present in an amount of about 0.1 to 3.0% by weight, based on the total weight of the emulsion.

8. The emulsion of claim 1 wherein the polymeric surfactant is present in an amount of about 0.15 to 1.0% by weight, based on the total weight of the emulsion.

9. The emulsion of claim 1 further containing a second oil-soluble, water-soluble polymeric surfactant which is a linear ABA block copolymer of polyester-polyalkylene oxidepolyester, wherein the alkylene oxide content is less than about 40% by weight, based on the weight of the copolymer, in an amount effective to enhance the stability of said emulsion.

10. The emulsion of claim 9 wherein the alkylene oxide content is about 30% by weight.

11. The emulsion of claim 9 wherein the second polymeric surfactant is prepared by reacting condensed 12-hydroxystearic acid with polyethylene oxide and contains about 30% by weight, based on the weight of the copolymer, of ethylene oxide.

12. The emulsion of claim 9 wherein the second polymeric surfactant is present in an amount of about 0.1 to 3.0% by weight, based on the total weight of the emulsion.

13. The emulsion of claim 9 wherein the second polymeric surfactant is present in an amount of about 0.15 to 1.0% by weight, based on the total weight of the emulsion.

14. The emulsion of claim 1 wherein said water soluble polymer is comprised of acrylamide, acrylic acid and its salts, or mixtures thereof, and the emulsion contains sorbitan mono-oleate as an emulsion polymerization stabilizer, the polymeric surfactant wherein x is about 100 to 400, the ratio of a:b is 1:1, $R_1$, $R_2$ and $R_3$ are each hydrogen and $R_4$ is $C_{16}H_{33}$, propylene glycol as a chain transfer agent, ethylenediamine tetra-acetic acid as a sequestering agent, and tertiary-butylhydroperoxide as a polymerization initiator optionally activated by sodium metabisulfite.

15. The emulsion of claim 14 further containing a second oil-soluble, water-insoluble polymeric surfactant which is a linear ABA block copolymer prepared by reacting condensed 12-hydroxystearic acid with polyethylene oxide and containing about 30% by weight, based on the weight of the copolymer, of ethylene oxide.

16. In a process for preparing a stable water-in-oil emulsion containing a water soluble polymer by emulsion polymerization of monomers in the presence of an amount of an emulsion polymerization stabilizer sufficient to stabilize such emulsion during polymerization, the improvement which comprises increasing the monomer content to about 40 to 60% by weight based on the total weight of the emulsion, and incorporating into the emulsion an oil-soluble, water-insoluble polymeric surfactant, in an amount sufficient to stabilize the product emulsion, said polymeric surfactant having the formula:

$$\left[ \begin{array}{c} R_3 \quad R_2 \\ | \quad \; | \\ -C - C - \\ | \quad \; | \\ R_4 \quad R_1 \end{array} \right]_a -CH - CH- \left[ \begin{array}{c} \\ \\ \\ \end{array} \right]_x $$

wherein x is a whole number greater than about 5, the ratio of a:b is from 3:1 to 1:3, provided the HLB number is maintained at less than about 14, $R_1$, $R_2$, $R_3$ and $R_4$ are independently selected from the group consisting of hydrogen, alkyl ($C_{1\text{-}48}$), alkoxy ($C_{1\text{-}48}$), alkenyl ($C_{2\text{-}48}$), aryl ($C_{6\text{-}12}$) and alkaryl ($C_{7\text{-}12}$), and $R_1$, $R_2$, $R_3$ and $R_4$ are such that the surfactant is oil-soluble and water-insoluble.

17. The process of claim 16 wherein the polymeric surfactant is present in an amount of about 0.1 to 3.0% by weight, based on the total weight of the emulsion.

18. The process of claim 16 wherein the polymeric surfactant is present in an amount of about 0.15 to 1.0% by weight, based on the total weight of the emulsion.

19. The process of claim 16 further comprising the addition of a second oil-soluble, water-insoluble polymeric surfactant, which is a linear ABA block copolymer of polyester-polyalkylene oxide-polyester wherein the alkylene oxide content is less than about 40% by weight, based on the weight of the copolymer.

20. The process of claim 16 or 19 wherein x is about 100 to 400, the ratio of a:b is 1:1, $R_1$, $R_2$ and $R_3$ are each hydrogen and $R_4$ is $C_{16}H_{33}$.

21. The process of claim 16 wherein the polymeric surfactant is added to the emulsion prior to polymerization.

22. The process of claim 16 wherein the polymeric surfactant is added to the emulsion during polymerization.

23. The process of claim 16 wherein the polymeric surfactant is added to the emulsion following polymerization.

24. The process of claim 19 wherein the second polymeric surfactant is added to the emulsion prior to polymerization.

25. In a water-in-oil emulsion wherein one or more monomers are polymerized in the presence of an emulsion polymerization stabilizer to produce a water soluble polymer in such emulsion, the improvement which comprises increasing the monomer content in the emulsion to about 40 to 60% by weight, based on the total weight of the emulsion, and incorporating therein an oil-soluble, water-insoluble polymeric surfactant having the formula:

$$\left[ \begin{array}{c} R_3 \quad R_2 \\ | \quad \; | \\ -C - C - \\ | \quad \; | \\ R_4 \quad R_1 \end{array} \right]_a -CH - CH- \left[ \begin{array}{c} \\ \\ \\ \end{array} \right]_x $$

wherein x is a whole number greater than about 5, the ratio of a:b is from 3:1 to 1:3, provided the HLB number is maintained at less than about 14, $R_1$, $R_2$, $R_3$ and $R_4$ are independently selected from the group consisting of hydrogen, alkyl ($C_{1\text{-}48}$), alkoxy ($C_{1\text{-}48}$), alkenyl ($C_{2\text{-}48}$), aryl ($C_{6\text{-}12}$) and alkaryl ($C_{7\text{-}12}$) and $R_1$, $R_2$, $R_3$ and $R_4$ are such that the surfactant is oil-soluble and water-insoluble.

26. The emulsion of claim 25 comprising further incorporating of a second oil-soluble, water-insoluble polymeric surfactant, which is a linear ABA block copolymer of polyester-polyalkylene oxide-polyester wherein the alkylene oxide content is less than about 40% by weight, based on the weight of the copolymer, in an amount effective to enhance the stability of said emulsion.

* * * * *

# EXHIBIT 39
# REDACTED

# EXHIBIT 40

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 1008396 (W.D.Mich.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Michigan,Southern
Division.
SAINT-GOBAIN CORPORATION, Plaintiff,
v.
GEMTRON CORPORATION, Defendant.
No. 1:04-cv-387.

April 17, 2006.

Barry J. Herman, Oblon Spivak McClelland Maier &
Neustadt PC, Alexandria, VA, Mark S. Pendery,
Rhoades McKee, Grand Rapids, MI, for Plaintiff.
Randall G. Litton, Eugene J. Rath, III, Matthew
Gipson, Price Heneveld Cooper Dewitt & Litton,
Grand Rapids, MI, Stanley Allen Schlitter, Mark P.
Vrla, Marshall J. Schmitt, Paul David Margolis,
Jenner & Block LLP, Chicago, IL, for Defendant.

*OPINION AND ORDER ON PARTIES' RENEWED
MOTIONS FOR PARTIAL SUMMARY JUDGMENT*
WENDELL A. MILES, Senior District Judge.
**\*1** At issue in this action are two patents owned by
defendant, Gemtron Corporation. Currently before
the court are the following motions for summary
judgment filed by both parties: (1) "Plaintiff Saint-
Gobain's Motion for Summary Judgment of Non-
Infringement Based Upon the Test Set Forth in the
Court's October 24, 2005 Opinion and Order on
Motions for Summary Judgment" (docket no. 145),
and (2) "Gemtron Corporation's Second Motion for
Summary Judgment as to Infringement" (docket no.
157).[FN1]

> FN1. Saint-Gobain has filed a separate
> "Motion for Oral Argument" (docket no.
> 227) on both parties' motions. Gemtron has
> opposed the scheduling of oral argument on
> the motions.
> In this district, requests for oral argument
> are not made by separate motion. This
> court's local rules provide that any party
> desiring oral argument with respect to a
> dispositive motion shall include a request in
> the caption and heading of its brief and that
> the court, in its discretion, may either
> schedule oral argument or dispose of the

motion at the end of the briefing schedule.
W.D. Mich. L. Civ. R. 7.2(d). At this point,
both motions have been fully briefed and the
court has determined that oral argument will
not materially aid the court in its resolution
of the motions.

For the reasons to follow, the court **DENIES** Saint-
Gobain's motion and **GRANTS** Gemtron's motion.

*I*

Gemtron is the owner of United States Patent Nos.
6,422,673 ("the '673 patent") and 6,679,573 ("the
'573 patent") (collectively "the patents" or "both
patents"). The '673 patent, issued on July 23, 2002, is
directed to a "REFRIGERATOR COMPARTMENT
HOUSING       VERTICALLY       ADJUSTABLE
SHELVES, EACH FORMED FROM A PIECE OF
TEMPERED GLASS SNAPPED-FASTENED TO
AN INJECTION MOLDED FRAME." The '573
patent, issued on January 20, 2004, is, in contrast,
directed merely to a "REFRIGERATOR SHELF." To
put it more simply, the '673 patent is directed to a
refrigerator compartment having adjustable shelves
both supported and held in place by ribs or ledges,
while the '573 patent is directed to the refrigerator
shelf itself, which is composed of a frame made of
molded synthetic material enclosing a snap-in glass
panel.

In its Amended Complaint (docket no. 238), Saint-
Gobain seeks a declaratory judgment of non-
infringement and invalidity of both patents. Saint-
Gobain has also asserted claims of unfair competition
and antitrust violations against Gemtron. In its
Counterclaim, Gemtron accuses Saint-Gobain of
infringing both patents by manufacturing, using,
importing into the United States, and selling
refrigerator shelves which incorporate the inventions
claimed in the patents. Answer, Affirmative
Defenses, and Counterclaim to Amended Complaint
(docket no. 251) at 6.

On October 3, 2005, the court issued an Order on
Claim Construction (docket no. 113) interpreting the
relevant claim language *"relatively resilient end edge
portion which temporarily deflects and subsequently
rebounds to snap-secure."* The court concluded that
*the claim language has the following meaning:* **the**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

end edge portion is sufficiently resilient that it can temporarily deflect and subsequently rebound when glass is being inserted into the frame. Previously, the court also denied motions for summary judgment filed by the parties. Opinion and Order on Motions for Summary Judgment (docket no. 123). In denying the parties' motions, the court noted that neither party had adequately addressed a critical issue, namely, whether glass could be snap-fitted into Saint-Gobain's frame as imported into the United States. Because the Saint-Gobain shelves, as imported into the United States, already have the glass inserted, the court concluded that it would be necessary to remove the glass in order to perform testing to determine whether the frame (or some portion of it) was sufficiently resilient that the glass (or another identical piece of glass) could be re-inserted or "snap-secured" into the frame. The court denied the motions because the parties had not provided evidence of the results of such testing.

## II

*2 In this action, Saint-Gobain has both denied any infringement and maintained that the patents are invalid. However, neither party's motion raises the issue of the validity or invalidity of the patents at the present time. [FN2] In its motion, Saint-Gobain instead seeks "summary judgment of non-infringement based upon the test set forth" in the court's previous order denying the parties' original motions for summary judgment. In its motion, Gemtron seeks summary judgment in its favor on the issue of whether Saint-Gobain's SGI, SG2, and SG3 refrigerator shelves infringe claims 23-30 of Gemtron's 573 patent.

> FN2. Gemtron's patents are presumed to be valid. 35 U.S.C. § 282; Lisle Corp. v. A.J. Mfg. Co., 398 F.3d 1306, 1313 (Fed.Cir.2005). The party attacking the patent bears the burden of proving invalidity by clear and convincing evidence. Iron Grip Barbell Co., Inc. v. USA Sports, Inc., 392 F.3d 1317, 1320 (Fed.Cir.2004); AK Steel Corp. v. Sollac and Ugine, 344 F.3d 1234, 1238-1239 (Fed.Cir.2003). However, patent infringement and patent validity are treated as separate issues. Pandrol USA, LP v. Airboss Rwy. Prod., Inc., 320 F.3d 1354, 1364 (Fed.Cir.2003). "Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of

determination without regard to its validity." Medtronic, Inc. v. Cardiac Pacemakers, Inc., 721 F.2d 1563, 1583 (Fed.Cir.1983).

"As in other cases, the grant of summary judgment under Fed.R.Civ.P. 56, is appropriate in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." Becton Dickinson and Co. v. C.R. Bard, Inc., 922 F.2d 792, 795 (Fed.Cir.1990) (footnote omitted). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 2552 (1986). In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512 (1986).

Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986). However, while inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S.Ct. at 1356. The applicable substantive law governing the issue determines what facts are relevant; only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are deemed "material." Anderson, 477 U.S. at 248.

## III

An analysis of whether a patent is infringed involves a two-step determination: (1) determining the meaning and scope of the patent claims allegedly infringed, and (2) comparing the properly construed claims to the accused device. Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1454 (Fed.Cir.1998); Markman v. Westview Instruments, 52 F.3d 967, 976 (Fed.Cir.1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384 (1996). "[T]he interpretation and

Slip Copy                                                                                                    Page 3
Slip Copy, 2006 WL 1008396 (W.D Mich.)
(Cite as: Slip Copy)

construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." _Markman, 52 F.3d at 970-971_. Infringement, in contrast, is a question of fact. _Pause Technology, LLC v. TiVo, Inc., 419 F.3d 1326, 1329 (Fed.Cir.2005); Ferguson Beauregard/Logic Controls v. Mega Sys., LLC, 350 F.3d 1327, 1338 (Fed.Cir.2003); Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812 (Fed .Cir.2002)_. The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. _SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed.Cir.1988)_. In comparing a properly construed claim with the accused product, the second step of the inquiry, the patentee–here, Gemtron–bears the burden of proving by a preponderance of the evidence that every limitation set forth in the asserted claim is found in the accused product, either literally or by a substantial equivalent. _Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1196 (Fed.Cir.1994)_.

*3 Literal infringement requires the patentee to prove that the accused product or device contains each and every limitation set forth in the asserted claim. _V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1312 (Fed.Cir.2005); Catalina Mktg., 289 F .3d at 812_. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." _Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 21, 117 S.Ct. 1040, 1045 (1997)_. "Infringement under the doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent." _Aquatex Indus., Inc. v. Techniche Solutions, 419 F.3d 1374, 1382 (Fed.Cir.2005)_. "An element in the accused product is equivalent to a claim limitation if the differences between the two are insubstantial. The analysis focuses on whether the element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." _Id_

In its motion, Gemtron argues that it is clear that Saint-Gobain's refrigerator shelves have the relatively resilient end edge portion and all of the other limitations of at least claims 23-30 of the 573 patent. Gemtron argues that Saint-Gobain's shelves therefore literally infringe claims 23-30 of the patent. Although Saint-Gobain has not disputed that its shelves meet

the other limitations of claims 23-30 of the 573 patent, Saint-Gobain does dispute whether its shelves have the claimed "relatively resilient" characteristic; Saint-Gobain argues that its shelves do not have the characteristic.

The court's Order on Claim Construction interpreted the relevant claim language–"_relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure_"–as follows: the end edge portion is sufficiently resilient that it can temporarily deflect and subsequently rebound when glass is being inserted into the frame. The question presented by the current motions is whether, based on this construction, a genuine issue of fact remains regarding whether Saint-Gobain's shelves have the claimed characteristic. The court concludes that no genuine issue remains and that the accused shelves do indeed have the claimed characteristic.

Each party has supported its position by submitting the affidavit of an expert. According to Gemtron's expert, Greg Miedema, he has performed testing as a result of which he determined that it is possible to insert glass pieces for all of the SG1, SG2, and SG3 shelves by snap-securing them into the glass-receiving channel of their respective frames. According to Saint-Gobain's expert, Dr. Henry Stoll, he has attempted to fit glass panes for each of the SG1, SG2, and SG3 shelves into the respective frames but has determined that "it is clear" that they "cannot be so fitted."

*4 However, these affidavits do not present a "classic battle of the experts" which would require a jury to evaluate what weight and credibility each expert opinion deserves. _See Phillips v. Cohen, 400 F.3d 388, 399 (6th Cir.2005)_ ("competing expert opinions present the 'classic battle of the experts' and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves") (citation omitted). Here, there is no dispute that the experts performed their testing under different conditions, and that these different conditions account for the differing results. Subsequent to Gemtron's submission of the Miedema affidavit, Saint-Gobain deposed Mr. Miedema. In his testimony, Miedema admitted that he had performed his testing after he had heated the Saint-Gobain frames in an oven. As for Dr. Stoll, during his own deposition he testified that he performed his testing at "room temperature," which turned out to be the temperature of his garage during the month of October. Because the experts' affidavits are not in conflict, the court can and does assume that the information contained in both of the affidavits is true–

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 4
Slip Copy, 2006 WL 1008396 (W.D.Mich.)
(Cite as: Slip Copy)

and Saint-Gobain loses on the infringement issue as a matter of law.

Saint-Gobain argues that the Miedema test is "bogus" because it involved the application of heat to the plastic frames of the Saint-Gobain shelves. According to Saint-Gobain, the testing previously suggested by the court did not contemplate heating the frame. Moreover, according to Saint-Gobain, a test in which the shelf is heated is not a proper test of the product as it is sold and used.

Certainly, "a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Medical Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed.Cir.1995). However, the Saint-Gobain shelves were not altered; instead, they were heated slightly, to show that the "relatively resilient" characteristic is present when the glass is heated. The court interpreted the relevant claim language-*"relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure"*-as follows: the end edge portion is sufficiently resilient that it can *temporarily deflect and subsequently rebound when glass is being inserted* into the frame. Thus, the relevant characteristic is defined by the patent in terms of *the time of insertion,* and not the time of actual use in a refrigerator or freezer compartment. For this reason, this case is unlike the hypothetical situation described in *Bionx Implants, Inc. v. Linvatec Corp.*, 299 F.3d 1378, 1382 (Fed.Cir.2002).

In *Bionx Implants,* the plaintiff held a patent for a surgical procedure to repair a torn meniscus (part of the human knee joint) and the device employed in that procedure. The plaintiff alleged that the defendant's surgical fastener and the method of using it infringed the plaintiff's patent. At issue was whether the accused device was "rigid" within the meaning of that term as used in the patent. The district court had construed the term "rigid" to require that the claimed suture be sufficiently rigid to be pushed through the meniscus tissue without a pre-cut channel for the suture to follow. 299 F.3d at 1380. In granting summary judgment in favor of the defendant, the district court discounted the plaintiff's videotaped demonstration of the accused device showing its insertion into uncut meniscal tissue through use of a cannula designed specifically for the demonstration. Citing *High Tech,* the district court concluded that the demonstration was insufficient to defeat summary judgment "because it ran afoul of 'the well-established rule that a device does not

infringe merely because it can be altered to make it infringe.' " *Bionx Implants,* 299 F.3d at 1382.

*5 The Federal Circuit panel in *Bionx,* however, held that the use of a cannula during the plaintiff's videotaped demonstration of the accused surgical fastener did not render the demonstration invalid on the ground that it constituted an alteration of the accused device or the context in which the rigidity of the patented device was to be judged. 299 F.3d at 1383-1384. The panel disagreed that the use of the cannula constituted an improper alteration of the accused device analogous to removal of the set screws in *High Tech.* 299 F.3d at 1382. Although acknowledging that "the accused device would not be shown to be 'rigid' if it were frozen in liquid nitrogen before being inserted into the meniscal tissue, or if it were shot as a high-speed projectile into the meniscus" because these conditions would "differ too dramatically from the conditions contemplated for use of the patented device[,]" the panel held that the use of a cannula to insert the accused device into human tissue was within the context in which the patent contemplated that the claimed invention would be used. 299 F.3d at 1382-1383. The panel's decision therefore vacated the entry of summary judgment in favor of the defendant, on the basis that the district court's ruling could not rest on the reasoning that the plaintiff's test was invalid. 299 F.3d at 1383.

Here, in contrast, no method of use of the patented product is at issue, and the question is solely whether the accused frames are able to temporarily deflect and subsequently rebound when glass is being inserted at *any* temperature. Even though the patent for Gemtron's shelf contemplates an ultimate use within the fresh food or freezer compartment of a refrigerator, the asserted claims themselves contain no temperature limitation and the characteristic of relatively resiliency is defined solely with respect to the ability to insert glass into the frame, which could only occur while the shelf is not in use. The court cannot read a temperature limitation into the claim which is not contained in the claim language. *See, e.g., E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.) ("It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim.... But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper") (citation omitted), cert. *denied,* 488 U.S. 986, 109 S.Ct. 542 (1988). [FN3]

FN3. Of course, the time for claim

construction has already passed. However, it is noted that at the relevant time, Saint-Gobain did not argue that the court should construe the term "relatively resilient" with reference to any temperature limitation. *See* Saint-Gobain's *Markman* Brief (docket no. 57) at 4 (urging a construction of "relatively resilient" as "the end edge portion is sufficiently flexible to permit the glass in the finished product to be pushed out of the frame and pushed back into the frame").

Saint-Gobain has not shown or even argued that its frames do not temporarily deflect when glass is being inserted at the temperatures used by Miedema in his tests. Saint-Gobain also does not argue that its frames do not subsequently rebound after the glass is inserted. Moreover, Saint-Gobain has not argued that its shelves do not have all of the other limitations of claims 23-30 of the 573 patent. The court therefore concludes that Gemtron is entitled to summary judgment as a matter of law that Saint-Gobain's SG1, SG2, and SG3 refrigerator shelves infringe claims 23-30 of the 573 patent.

*6 Finally, it is noted that Saint-Gobain has, in its motion, sought permission to have Dr. Stoll repeat his room temperature testing live for the court. Gemtron has objected to such a demonstration, arguing that it will add nothing to the court's determination. Saint-Gobain has also argued that Miedema's own demonstration, provided in a DVD submitted with his affidavit by Gemtron in support of its motion, is entitled to "little weight" because it represents an *ex parte* test. However, the cases cited by Saint-Gobain as support for this proposition are not on point here. *In re Newman,* 782 F.2d 971 (Fed.Cir.1986) involved testing pursuant to a discovery request under Fed.R.Civ.P. 34. In addition, *Wagoner v. Barger,* 463 F.2d 1377 (CCPA 1972) involved a patent which described methods for the manufacture of films at specified temperatures. Here, there is no specified temperature(s) and the method or process of manufacture is not at issue. And, in *Congoleum Indus., Inc. v. Armstrong Cork Co.,* 319 F.Supp. 714 (E.D.Pa.1970), the court held that it was "proper procedure" for the parties to submit as evidence *at trial* the testimony of experts and other witnesses which fully explained their respective commercial processes (the patents at issue being directed to a process for making chemically embossed foamed vinyl floor coverings) and the test procedures employed. The court in fact denied the defendant's motion to conduct a series of inter partes tests, concluding that "[s]uch a procedure would

simply result in a duplication of effort" which would further delay the trial. *Id.* at 716.

It is undoubtedly proper for the court, in a patent case, to view a demonstration of the accused product as evidence. *See Bionx,* 299 F.3d at 1383 (district court erred in discounting, as evidence, videotaped demonstration of accused device). However, it is not appropriate, on summary judgment, to conduct an evidentiary hearing for the purpose of observing the demeanor of a witness in the case. *Willetts v. Ford Motor Co.,* 583 F.2d 852, 855 (6th Cir.1978).[FN4] The court agrees with Gemtron and concludes that a demonstration-whether live or otherwise[FN5]-will add nothing here, where it is not the experts' affidavits which are in conflict, but rather the parties' views on the legal relevance of the experts' opinions. Here, Saint-Gobain has not challenged the finding of Gemtron's expert that glass may be inserted into Saint-Gobain's shelves after the application of heat but without permanently altering them.

> FN4. The court looks to Sixth Circuit precedent in this situation, which involves a procedural matter not unique to patent law. *See Arthur A. Collins, Inc. v. Northern Telecom Ltd.,* 216 F.3d 1042, 1047-1048 (Fed.Cir.2000); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1560 n. 3 (Fed.Cir.1995).

> FN5. In contrast with Gemtron, which has provided the court with a DVD video of Miedema inserting glass into the Saint-Gobain frames, Saint-Gobain has not elected to provide the court with a video demonstration of the testing performed by Dr. Stoll.

### Conclusion

Saint-Gobain has, in its motion, demonstrated non-infringement only at a single temperature. However, the asserted claims do not limit the temperature at which relative resiliency-as construed by the court-is present. Gemtron has demonstrated that conditions exist under which Saint-Gobain's shelves have the relatively resilient characteristic contained within the construed claims. Therefore, Saint-Gobain is not entitled to summary judgment of non-infringement, and Gemtron is entitled to summary judgment as a matter of law that SaintGobain's SG1, SG2, and SG3 refrigerator shelves infringe claims 23-30 of the 573 patent.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 6
Slip Copy, 2006 WL 1008396 (W.D.Mich.)
(Cite as: Slip Copy)


*7 So ordered this 17th day of April, 2006.

W.D.Mich.,2006.
Saint-Gobain Corp. v. Gemtron Corp.
Slip Copy, 2006 WL 1008396 (W.D.Mich.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1205871 (Trial Pleading) Answer,
Affirmative Defenses, and Counterclaim to Amended
Complaint for Declaratory Judgment, Unfair
Competition, and Antitrust Violation (Mar. 13, 2006)
Original Image of this Document (PDF)
• 2006 WL 417763 (Trial Motion, Memorandum and
Affidavit) Saint-Gobain's Opposition to Gemtron's
Second Motion for Summary Judgment as to
Infringement (Jan. 6, 2006) Original Image of this
Document (PDF)
• 2005 WL 3734248 () (Partial Testimony) (Dec. 27,
2005)
• 2005 WL 3734247 () Declaration of Henry W.
Stoll, Ph.D., P.E. (Nov. 3, 2005)
• 2005 WL 3138091 (Trial Motion, Memorandum
and Affidavit) Gemtron's Brief in Support of Its
Second Motion to Compel Production of Documents
(Oct. 7, 2005) Original Image of this Document
(PDF)
• 2005 WL 3734246 () Expert Report of Paul H.
Taylor, August 1, 2005 (Oct. 7, 2005)
• 2005 WL 2577955 (Trial Motion, Memorandum
and Affidavit) Saint-Gobain's Opposition to
Gemtron's Motion to Compel Inspection of Saint-
Gobain's Facility (Aug. 15, 2005) Original Image of
this Document (PDF)
• 2005 WL 3093318 () (Report or Affidavit) (Aug. 1,
2005) Original Image of this Document (PDF)
• 2005 WL 3734249 () Declaration of Dr. Alan T.
McDonald (May 19, 2005)
• 2004 WL 3685309 () Declaration of Greg Miedema
(Nov. 23, 2004)
• 2004 WL 2234792 (Trial Pleading) Amended
Complaint for Declaratory Judgment and Unfair
Competition (Aug. 27, 2004) Original Image of this
Document (PDF)
• 2004 WL 2234697 (Trial Pleading) Complaint for
Declaratory Judgment (Jun. 10, 2004) Original Image
of this Document (PDF)
• 1:04cv00387 (Docket) (Jun. 10, 2004)


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 41
# REDACTED

# EXHIBIT 42
# REDACTED

# EXHIBIT 43



Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 22244704 (D.Del.)
(Cite as: 2003 WL 22244704 (D.Del.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
PHARMASTEM THERAPEUTICS, INC., Plaintiff,
v.
VIACELL INC., Cryo-Cell International, Inc.,
Corcell, Inc., Stemcyte, Inc., CBR
Systems, Inc. f/k/a Cord Blood Registry, Inc.,
Birthcells Technology, Inc.,
Nustem Technologies, Inc., and Bio-Cell, Inc.,
Defendants.
No. 02-148 GMS.

Sept. 30, 2003.
Philip A. Rovner, Potter Anderson & Corroon, LLP,
Wilmington, DE, for plaintiff/counter-defendant.

Jeffrey L. Moyer, David Allan Felice, Richards,
Layton & Finger, Richards, Layton & Finger, Robert
F. Stewart, Jr., Dilworth Paxson LLP, Wilmington,
DE, Richard D. Kirk, Morris, James, Hitchens &
Williams, Wilmington, DE, for defendant/counter-
claimant.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 On August 5, 2003, PharmaStem Therapeutics,
Inc. ("PharmaStem") filed a motion *in limine* to
exclude from evidence the July 21, 1999 decision of
the European Patent Office ("EPO") revoking one of
PharmaStem's related European patents (the "EPO
Decision") On August 12, 2003, Viacell Inc., Cryo-
Cell International, Inc., Corcell, Inc., Stemcyte, Inc.,
CBR Systems, Inc. f/k/a Cord Blood Registry, Inc.,
Birthcells Technology, Inc., Nustem Technologies,
Inc., and Bio-Cell, Inc. (collectively "Viacell") filed
an answer to PharmaStem's motion, and on August
15, 2003, PharmaStem filed a reply. The court
conducted a pretrial conference on September 8,
2003 in which it heard oral argument from the parties
on PharmaStem's motion. Upon consideration of the

arguments raised at the pretrial conference and in the
parties' briefs, the court will grant PharmaStem's
motion *in limine*. The EPO Decision is not admissible
evidence. The court bases its ruling on the following
reasons.

II. DISCUSSION

The EPO Decision revokes PharmaStem's European
patent that is related to its '681 patent presently at
issue. The decision applies European, as opposed to
United States, patent laws, and examines different
claims than the ones at issue in this case. In the
opinion, the EPO cites a 1997 article written by Hal
Broxmeyer (the "Broxmeyer Article"), one of the
inventors of the patents-in-suit. Published nearly ten
years after the initial filing of the patents-in-suit, the
Broxmeyer Article is not a prior art reference. The
EPO cited the Broxmeyer Article for the proposition
that the relevant scientific community considered
progenitor cell assays to be reliable assays for stem
cells. In addition, the EPO found that Koike, a prior
art reference that PharmaStem also cited to the PTO,
discloses stem cells.

The EPO Decision was published on July 21, 1999.
A little over eight months later, the United States
Patent and Trademark Office ("PTO") finished a near
seven-year   reexamination   proceeding   of
PharmaStem's   '681   patent   and   issued   the
reexamination certificate on April 11, 2000. Before
the EPO Decision came out, PharmaStem argued to
the PTO during the reexamination proceedings that
Koike did not teach stem cells. In the intervening
time period between the EPO Decision and the PTO's
reissue of the '681 patent, PharmaStem did not cite
the Broxmeyer Article to the PTO. Nor did
PharmaStem disclose to the PTO the EPO's finding
that the Koike reference teaches stem cells.

Viacell claims that the EPO Decision is relevant to
these proceedings because it illustrates the materiality
of the Broxmeyer Article and therefore supports
Viacell's argument that PharmaStem engaged in
inequitable conduct by failing to disclose the article
to the PTO. Viacell further contends that the EPO's
factual findings regarding the Koike reference may
have been important to a reasonable patent examiner
in deciding whether to reissue the patents-in-suit.
According to Viacell, the EPO Decision therefore
must be admitted into evidence so that the jury may

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2003 WL 22244704 (D.Del.)
(Cite as: 2003 WL 22244704 (D.Del.))

evaluate the EPO's factual determination that Koike discloses stem cells. Finally, Viacell claims that the EPO's finding of invalidity is relevant to its defense against PharmaStem's willful infringement claim because it confirms the reasonableness of the opinions of counsel upon which some of the defendants in this case relied. The court disagrees.

*2 The EPO Decision cites the Broxmeyer Article in the portion of its opinion on novelty. The relevant language of the opinion states, "It appears undoubtful to the Opposition Division that there is a broad consensus in the scientific community as to the reliability of surrogate assays for progenitors, such as assays for CFU-GM, as indirect evidence for the presence of stem cells in a sample, as shown for example by the patent itself (paragraphs 6.6.3 and 6.8) and other documents, e.g., D21, D143 [the Broxmeyer Article] and D145." Decision Revoking the European Patent (Article 102(1) EPC) at 22. The EPO's mention of the Broxmeyer Article in this regard, at best, marginally supports Viacell's position that the Broxmeyer Article is material information. Indeed, the EPO itself refers to the article as an example of "indirect evidence" and cites it merely to refute PharmaStem's argument that progenitor cell assays were not predictive of the presence of stem cells. [FN1]

> FN1. Notably, the index of the EPO Decision lists at least 140 references.

Similarly, the fact that the EPO Decision cited the article in this particular context has very little bearing on the issue of PharmaStem's intent to deceive the PTO. Applicants do have a duty to disclose to the PTO "any material prior art or other information cited or brought to their attention in any related foreign application." Manual of Patent Examining Procedure § 2001.06(a) (4th ed., rev.8, Oct. 1981). However, a finding of inequitable conduct for nondisclosure of information requires proof that the applicant made a deliberate decision to withhold a known material reference from the PTO. See *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1181 (Fed.Cir.1995). Given the EPO's peripheral reliance on the Broxmeyer Article, the relatively short period of time between the EPO and PTO decisions, and the fact that the Broxmeyer Article is not a prior art reference to the patents-in-suit, the EPO Decision has little probative value suggesting that PharmaStem thought the Broxmeyer Article was material and deliberately failed to disclose it to the PTO.

The EPO Decision's probative value is further

diminished in view of the high standard of proof required to establish inequitable conduct. "One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO." *Molins,* 48 F.3d at 1178; accord *Rockwell Techs., LLC v. Spectra Physics Lasers, Inc.,* 2002 WL 531555, at *3 (D.Del. Mar.26, 2002). "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence." *Life Techs., Inc. v. Clontech Labs., Inc.,* 224 F.3d 1320, 1324 (Fed.Cir.2000); accord *Isco Int'l, Inc. v. Conductus, Inc.,* 2003 WL 22006253, at *6 (D.Del. Aug.21, 2003). The fact that the EPO cited the Broxmeyer Article under the described circumstances does little to carry Viacell's heavy burden.

*3 Viacell relies on *Molins* for the proposition that PharmaStem's failure to cite the Broxmeyer Article to the PTO after the EPO referred to it constitutes evidence of inequitable conduct requiring admission of the entire EPO Decision. This reliance is misplaced. The circumstances of *Molins* are distinguishable from the present situation. First, unlike the Broxmeyer Article, the reference at issue in *Molins* was prior art. See *id.* at 1180. Second, PharmaStem argued the validity of its patents to the PTO before the EPO decision came out. In sharp contrast, the patentee in *Molins* had amended and distinguished its claims around the prior art reference to several foreign patent offices over the course of thirteen years but never disclosed that reference to the PTO. See *id.* These distinctions are significant. [FN2] In this light, the probative value the EPO Decision on the issue of PharmaStem's intent to deceive is outweighed by the substantial risk that admitting the opinion would unfairly prejudice PharmaStem and confuse the jury.

> FN2. Likewise, the circumstances surrounding this court's decision in *Rockwell* were also vastly distinguishable from the present facts. In *Rockwell,* the alleged material information was also prior art and the patentee had similarly distinguished the references to two different foreign patent offices without disclosing them to the PTO. *Rockwell,* 2002 WL 531555, at *3. Based on those facts, the court determined that genuine issues of material fact existed with regard to the patentee's inequitable conduct.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22244704 (D.Del.)
(Cite as: 2003 WL 22244704 (D.Del.))

*Id.* at *4.

Federal Rule of Evidence 403 gives the court broad discretion to exclude evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." F.R.E. 403; *see, e.g., Betterbox Comms. Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 330 (3d Cir.2002) (emphasizing the district court's broad discretion when ruling on a Rule 403 request). An opinion, although of a quasi-judicial or administrative body and albeit that of a foreign jurisdiction, carries with it a certain imprimatur, which creates a substantial risk that the jury will give its conclusions undue deference. Even if the jury is instructed to consider the opinion for its limited purposes, there is a strong likelihood that the jury would be confused as to its relevance. Thus, the EPO's citation to the Broxmeyer Article in a string of exemplary documents supporting its conclusion on one issue relating to novelty is not grounds for admitting the entire decision, particularly where less prejudicial means of making its argument are available to Viacell. Indeed, Viacell can make its argument that the Broxmeyer Article is material and that PharmaStem knew of its existence by submitting the article itself into evidence.

Viacell's remaining arguments for the admissibility of the EPO Decision also lack merit. The fact that EPO found that the Koike reference discloses stem cells does not render the entire opinion admissible. It is the role of the jury to make its own factual findings, not to rely on the factual findings of a foreign patent office. Again, Viacell can submit the Koike reference itself into evidence and argue its teachings to the jury.

The EPO Decision's relevance to Viacell's defense to PharmaStem's willful infringement claim also lacks the degree of probative value that would outweigh the opinion's substantial risk of jury confusion and prejudice to PharmaStem. Viacell argues that the EPO's revocation of the related patent confirms the reasonableness of opinions of counsel relied upon by some of the defendants in this case. The opinions of counsel themselves are admissible evidence. Introducing the EPO Decision to buttress these opinions, therefore, would be cumulative, confusing to the jury, and unfairly prejudicial to PharmaStem.

III. CONCLUSION

*4 The court finds the EPO Decision's probative value to be substantially outweighed by the risk of unfair prejudice to PharmaStem and the likelihood of jury confusion. Because Viacell could accomplish a substantially similar and less prejudicial result by admitting the Broxmeyer Article, the Koike reference, and the legal opinions of counsel themselves, the court will exercise its discretion to exclude the EPO Decision from evidence.

Therefore, IT IS HEREBY ORDERED that:
   1. PharmaStem Therapeutics, Inc.'s Motion *In Limine* to Exclude Decision of the European Patent Office From Evidence is GRANTED.
   2. Viacell may not introduce the July 21, 1999 Decision of the European Patent Office into evidence.

Not Reported in F.Supp.2d, 2003 WL 22244704 (D.Del.)

**Motions, Pleadings and Filings** (Back to top)

• 2004 WL 3333206 (Trial Motion, Memorandum and Affidavit) CBR Systems, Inc.'s Opposition to Stembanc, Inc.'s Motion to Dismiss CBR Systems, Inc.'s First, Second, Third, Forurth, Fifth, and Sixth Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(6) (Nov. 19, 2004)

• 2004 WL 3570627 (Trial Pleading) Complaint for Patent Infringement (Jul. 28, 2004)

• 2003 WL 23310808 (Verdict and Settlement Summary) (Oct. 29, 2003)

END OF DOCUMENT

# EXHIBIT 44

**REDACTED**

# EXHIBIT 45

**REDACTED**

# EXHIBIT 46
# REDACTED

# EXHIBIT 47
# REDACTED

# EXHIBIT 48
# REDACTED

# EXHIBIT 49

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 29271 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

**H**
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
UNITED STATES of America
v.
PREMISES KNOWN AS 1625 S. DELAWARE
AVENUE, PHILADELPHIA, PA.
CIV. A. No. 86-5977.

March 29, 1989.

Michael L. Levy, Special Attorney, Philadelphia Strike Force, Philadelphia, Pa., for plaintiff.
Dorothy S. Hangton, Philadelphia, Pa., for Michael Borelli.
Robert E. Gabriel, Philadelphia, Pa., for Peter Donato.
Nino V. Tinari, Philadelphia, Pa., for John Renzulli.
Mark D. Mungello, Philadelphia, Pa., for John Renzulli, Claimant.

MEMORANDUM
DITTER, Senior District Judge.
*1 In this civil forfeiture action, the government sought to depose Michael Borelli and John A. Renzulli, two claimants of the defendant property. Both claimants, however, informed the government that at any deposition they would exercise their privilege against self-incrimination to all questions asked of them except those regarding their names, their addresses, and whether they are record owners of the defendant property.[FN1] Because the two claimants have exercised their privilege, the government has filed a motion for sanctions [FN2] seeking to bar them from testifying at trial with regard to any matters about which they refused to testify and to admit into evidence the fact that during discovery both claimants invoked their privilege against self-incrimination.[FN3]

While the fifth amendment forbids the compelled self-incrimination by one accused of a crime, courts have not hesitated to forbid parties from asserting the fifth amendment privilege as a shield against discovery and then attempting to convert it to a sword by testifying at trial. *C & W Construction Co. v. Brotherhood of Carpenters,* 108 F.R.D. 389, 393 (D.Hawaii 1985). *See Backos v. United States,* 82 F.R.D. 743, 745 (E.D.Mich.1979) (although refusing to dismiss plaintiffs' suit because they failed to

answer interrogatories on the basis of their fifth amendment privilege, court stated that it would "exercise care to prevent plaintiffs from turning the Fifth Amendment into an offensive tactic at trial by surprising the government with testimony concerning matters as to which the privilege was claimed during discovery."); *Duffy v. Currier,* 291 F.Supp. 810, 815 (D.Minn.1968) (stating that court "would not tolerate nor indulge a practice whereby a defendant by asserting the privilege against self-incrimination during pre-trial examination and then voluntarily waiving the privilege at ... trial surprised or prejudiced the opposing party." )  Although the property is the nominal defendant in this forfeiture action, Borelli and Renzulli, by virtue of having filed claims pursuant to Fed.R.Civ.P. C(6), have been accorded the right to present a defense. Their status, thus, is more akin to that of a party than to that of a non-party witness [FN4]  Since the claimants have refused to answer questions pertaining to their knowledge of the manufacture of methamphetamine on the defendant property or about the source of the money used to purchase the property, it would be inappropriate and, indeed, prejudicial to the government to allow them to testify at trial as to their lack of knowledge of drug violations on the property [FN5] or about the source of the money to purchase the property when the government has been given no opportunity to depose them about these issues.  I will, therefore, grant the government's motion and preclude the claimants' testimony at trial about any matters except their names, their addresses, and the fact that they were record owners of 1625 S. Delaware Avenue.  *See C & W Construction Co.,* 108 F.R.D. at 393; *In Re Anthracite Coal Antitrust Litigation,* 82 F.R.D. 364, 369-70 (M.D.Pa.1979) (precluding corporate defendant's introduction into evidence of testimony of corporate officers where officers invoked their fifth amendment privilege and refused to provide information to plaintiff); *Securities & Exchange Comm'n v. American Beryllium & Oil Corp.,* 303 F.Supp. 912, 921 (S.D.N.Y.1969) (precluding introduction of documents into evidence by defendants who had claimed during discovery that documents were self-incriminatory).  I will also permit the government to introduce into evidence the fact that claimants have exercised their privilege against self-incrimination during discovery.  In *RAD Services, Inc. v. Aetna Casualty and Surety Co.,* 808 F.2d 271 (3rd Cir.1986), the defendant sought at trial to introduce

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 29271 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

as substantive evidence the fact that non-party agents of the plaintiff had claimed the fifth amendment privilege during their depositions. The district court instructed the jury that it could, but need not, infer that the witnesses would have answered the questions put to them adversely to the plaintiff. *Id.* at 272. The Third Circuit held that the trial court had not erred in admitting as evidence the depositions of the non-party witnesses, nor in permitting the jury to draw adverse inferences from the witnesses' invocation of the fifth amendment. *Id.* The Supreme Court, in *Baxter v. Palmigiano,* 425 U.S. 308 (1976), had previously stated that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" *Id.* at 320. In this case, whether they are considered parties to the action or non-party witnesses, the claimants' silence in the face of accusation is a relevant fact not barred from admission into evidence at trial. *Baxter,* 425 U.S. at 320.

**\*2** An order follows.

## ORDER

AND NOW, this 28th day of March, 1989, it is hereby ordered:

1. Claimants Michael Borelli and John A. Renzulli are precluded from testifying at trial about any matters except their names, their addresses, and the fact that they were record owners of 1625 S. Delaware Avenue, Philadelphia, PA.

2. The government may introduce into evidence the fact that claimants Michael Borelli and John A. Renzulli exercised their privilege against self-incrimination during discovery.

> FN1. Each claimant executed a stipulation with the government providing that he need not actually appear for deposition and stating that, if such a deposition was held, the government would ask the following questions and the claimant would refuse to answer these questions based upon his privilege against self-incrimination:
> a. Where did you get the money for the down-payment for the purchase of 1625 S. Delaware Avenue?;
> b. Isn't it a fact that the money which you used for the down-payment for the purchase

of 1625 S. Delaware Avenue came from the proceeds of the sale of methamphetamine or other controlled substances?;
c. Where did you get the money to make the mortgage payments for 1625 S. Delaware Avenue?;
d. Isn't it a fact that at least one of the payments which you made on the mortgage on this property came from the proceeds of the sale of methamphetamine or other controlled substances?;
e. Isn't it a fact that you manufactured methamphetamine on the car lot at 1625 S. Delaware Avenue?;
f. Isn't it a fact that you were aware that other persons were manufacturing methamphetamine on the car lot at 1625 S. Delaware Avenue?

> FN2. Although the government identifies its motion as one pursuant to Fed.R.Civ.P. 37, it does not identify under which section of rule 37 it seeks to proceed. The government has not moved to compel discovery of either claimant pursuant to rule 37(a), and the claimants have not failed to comply with a court order so as to warrant sanction under rule 37(b). Even assuming that the claimants are "parties" to this action because they have asserted their ownership interest in the defendant property, they have not failed to appear at a deposition so as to warrant sanction under rule 37(d). Therefore, I do not find that the provisions of rule 37 apply. I will, however, construe the government's motion as one in limine with respect to the testimony of Borelli and Renzulli.

> FN3. Borelli filed an answer to the government's motion for sanctions arguing that the sanction sought by the government is "odious and patently unwarranted." Renzulli has not answered the government's motion.

> FN4. In any event, even if the claimants are considered non-party witnesses, preclusion of their testimony is appropriate since they invoked their fifth amendment privilege during discovery.

> FN5. While 21 U.S.C. § 881(a)(7) subjects a property to forfeiture if it has been used to facilitate a drug violation, the section also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 29271 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

        excepts from forfeiture any interest of an owner who had no knowledge of the violation.

E.D.Pa.,1989.
U.S. v. Premises Known as 1625 S. Delaware Ave., Philadelphia, Pa.
Not Reported in F.Supp., 1989 WL 29271 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2006 I hand delivered the foregoing document to the following persons and electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P. O. Box 951
Wilmington, DE   19899-0951

I hereby certify that on June 12, 2006, I have Federal Expressed the foregoing document to the following non-registered participants:

Ford F. Farabow, Jr., Esquire
Joann M. Neth, Esquire
A. Neal Seth, Esquire
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
901 New York Avenue, N.W.
Washington, DC  20001-4413

Thomas L. Creel, Esquire
Goodwin Proctor, LLP
599 Lexington Avenue
New York, NY  10022

_Kelly E. Farnan_
Kelly E. Farnan (#4395)