# EXHIBIT 71

ALLSTATE LEGAL ® 800-222-0510    P2-03    RECYCLED

Date:        4/12/2002 9:47 AM
Sender:          JHarrington@Herc.com
To:      Zeb Morgan
cc:         RBrady@Herc.com; BWalchuk@Herc.com
Priority:        Normal
Subject:         Product samples - QC test data
-------------------------------------------------------------------------
------------

Zeb,

You will be receiving the following 5 product samples:

AEM 232 [lot 7562]
AEM 232 [lot 3174]
AEM 232 [lot 1502]
SP 9232 [lot 2590-135]
PA 8137 [lot EM 635]

The blade utilized for product makedown is included.

Also, attached are viscosity test data for the above lots and the 5 lots
produced at your Mobile plant. The lots which provide acceptable and poor
activity are noted in the file.

As discussed, our data indicate that the ratio of the 0.5 : 0.1 or the 0.2
: 0.1 may differentiate the performance of the various lots. Please note
that we utilized 1000 rpm for product makedown at 0.5%, then sequentially
diluted to 0.2%, then 0.1%.

We can discuss your test results upon completion.

Thank you again for your help. Please call if you have any questions.

Regards,

John Harrington
Hercules
7510 Baymeadows Way
Jacksonville, FL 32256
904-733-7110

(See attached file: SP9232 QC tests to Cytec 041202.xls)
Received: from usgmsnot01.gm.cytec.com (usgmsnot01.gm.cytec.com

**HHX-071**

CYT0000541

[164.84.200.245]) by stnt01.cytec.com with SMTP
  (IMA Internet Exchange 3.14) id 00807031; Fri, 12 Apr 2002
09:40:04 -0400
Received: FROM cytec-gmfw2 BY usgmsnot01.gm.cytec.com ; Fri Apr
12 09:40:01 2002
-0400
Received: from csdnsg1.herc.com ([147.116.14.51]) by
interlock.herc.com with
SMTP id JAA29246
  (InterLock SMTP Gateway  for <Zeb_Morgan@ma.cytec.com>);
  Fri, 12 Apr 2002 09:40:18 -0400
Subject: Product samples - QC test data
To: Zeb_Morgan@ma.cytec.com
Cc: RBrady@Herc.com, BWalchuk@Herc.com
X-Mailer: Lotus Notes Release 5.0.2b  December 16, 1999
Message-Id: <OFE44B18F9.2A5F2F36-ON85256B99.004AB3FD@herc.com>
From: JHarrington@Herc.com
Date: Fri, 12 Apr 2002 09:47:02 -0400
X-Mimetrack: Serialize by Router on CSDNSG1/Servers/Herc(Release
5.0.6a |January
17, 2001) at
 04/12/2002 09:33:12 AM
Mime-Version: 1.0
Content-Type: multipart/mixed;
Content-Disposition: inline

CYT0000542

# EXHIBIT 76

Custom Manufacturing Agreement

THIS CUSTOM MANUFACTURING AGREEMENT ("AGREEMENT"), dated as of __ June, 2002, between Cytec Industries Inc., with principle offices at 5 Garret Mountain Plaza, West Paterson, New Jersey 07424 ("Cytec") and Hercules Inc., with principle offices at 1313 North Market Street, Wilmington, DE 19894 ("HERCULES").

<u>RECITALS</u>

WHEREAS, **HERCULES** desires to engage **CONTRACTOR** to perform the services described herein for the preparation and delivery of certain products; and WHEREAS, in consideration of the payments described herein, **CONTRACTOR** is willing to perform said services in a manner that will assure **HERCULES** and its customers of the delivery of the products specified herein.

NOW, THEREFORE, the parties agree as follows:

**ARTICLE I    DEFINITIONS**

In this Agreement, the following terms have the indicated meanings:

1.1    "Product" means: AEM-232 (also known as Perform™ SP9232).

1.2    "Essential Material(s)" means:  Those materials listed in Schedule B.

1.3    "**HERCULES** Representative" means any one or more persons designated by **HERCULES** from time to time in writing to **CONTRACTOR**.

**ARTICLE II    SCOPE**

2.1    **CONTRACTOR** shall manufacture and deliver, exclusively for HERCULES, Product in accordance with the directions set forth in Schedules A, B, C, D, E, F, G and H and the instructions of the **HERCULES** Representative.

2.2    The quantity of Product produced hereunder is estimated to be between _____ and _____ pounds and shall not exceed _____ (____) pounds in any consecutive twelve (12) month period nor more than fifteen percent (15%) thereof in any one (1) month without **CONTRACTOR'S** consent.  **CONTRACTOR** agrees to produce the total quantities requested by **HERCULES** within the limits specified above.

2.3    The Product shall be manufactured hereunder in bulk form and in packaged form

2.4    The transfer of ownership and of risk of loss to all Product shall pass from **CONTRACTOR** to **HERCULES** or to its customer, as the case may be, upon delivery by **CONTRACTOR** to the carrier in accordance with the instructions of **HERCULES**.

2.5    All Product delivered by **CONTRACTOR** hereunder shall be deemed to have been sold to **HERCULES** in accordance with the terms and conditions set forth on both sides of the **HERCULES** standard printed Purchase Order form in effect at the time of delivery.  A blank copy of the **HERCULES** printed Purchase Order form currently in effect is attached marked



**HHX-076**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015495

Schedule H. In the event of a conflict between the terms and conditions of said form and this Agreement, the terms of this Agreement shall prevail.

**ARTICLE III    PRODUCT AND ITS PREPARATION**

3.1    Product in Completed Form.    All Product prepared and delivered by **CONTRACTOR** hereunder shall meet all the specifications set forth in the attached document marked "Schedule A", entitled "**HERCULES** Product Specifications".

3.2    Essential Materials. All Product prepared and delivered by **CONTRACTOR** hereunder shall be manufactured from the Essential Material(s) described in the attached document marked "Schedule B", entitled "Essential Material Specifications".

3.3    Manufacturing Method. All Product prepared and delivered by **CONTRACTOR** hereunder shall be manufactured in accordance with the instructions, procedures, and Process Specifications, supplied by **HERCULES**.    Such instructions, procedures, and Process Specifications, (and certain equipment relating thereto if any) are described in a group of documents attached hereto marked "Schedule C", entitled "Process Specifications".

3.4    Quality Control and Testing .    While performing all services hereunder, **CONTRACTOR** shall perform and observe all the quality control and testing procedures described in the attached document marked "Schedule D", entitled "Test Methods".

3.5    Quality Assurance. While performing all services hereunder, **CONTRACTOR** shall perform and observe all quality assurance procedures described in the attached document marked "Schedule E", entitled "Quality Procedures".

3.6    Records and Reports. While performing all services hereunder, **CONTRACTOR** shall prepare, maintain and deliver to **HERCULES** all the reports and records described in the attached document marked "Schedule F", entitled "Record Keeping & Reporting Rules".

3.7    Logistics. While performing all services hereunder, **CONTRACTOR** shall observe and perform all logistical task, e.g., packaging, labelling, warehousing, etc., in accordance with procedures described in "Schedule G".

3.8    Legal Compliance.    While performing all services hereunder, **CONTRACTOR** shall comply with all applicable local, state and federal laws, ordinances, rules and regulations

4 .               3.9    Inspection and Monitoring. **HERCULES** shall have the right to inspect **CONTRACTOR'S** facilities, records, manufacturing and quality control practices to ensure that: (a) Products manufactured for **HERCULES** by **CONTRACTOR** conform to **HERCULES'** Product Specifications and quality; (b) Starting Materials and Product owned by **HERCULES** are properly segregated and marked to reflect **HERCULES'** ownership interest therein; and (c) **CONTRACTOR'S** manufacturing practices are conducted in compliance with applicable laws, rules and regulations, and do not create any potential liabilities for **HERCULES**. This inspection right shall include the right to take samples of Essential Materials and/or Products. **HERCULES** shall also have the right to approve all Products manufactured by **CONTRACTOR**. **HERCULES'** failure to exercise its inspection or approval privileges hereunder shall not waive or otherwise alter, limit, or excuse **CONTRACTOR'S** obligations under this Agreement.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015496

3.10.   Labels. HI, at HI's cost, will furnish (i) an MSDS for AEM-232 including periodic updates and (ii) all labeling required for the AEM-232.

3.11   Forecasts. By the 15th of each month during the term hereof, commencing by May 15, 2002, HI shall furnish to CONTRACTOR a good faith forecast of Product requirements from CONTRACTOR from the Plant hereunder for each of the next succeeding six (6) months or such shorter number of months as are then remaining in the initial term or then current renewal term HERCULES shall use best efforts to place firm orders for AEM-232 at least ten (10) business days prior to the requested shipment dates for same.

3.12   Waste. CONTRACTOR shall be responsible for all costs attributable to cleanup and waste disposal relating to Products or Essential Materials (or wastes generated therefrom) while in the possession, custody or control of CONTRACTOR, or where CONTRACTOR has arranged for the disposal of Products or Essential Materials, including, without limitation, cleanup of Products or Essential Materials (or wastes generated therefrom) spilled or released onto soil, to surface water, or to groundwater at, under or around CONTRACTOR'S premises, or otherwise. CONTRACTOR shall provide prompt notice to HERCULES in the event any Products or Essential Materials used to manufacture Products (or wastes generated therefrom) are spilled or released onto soil, to surface water, or to groundwater at, under or around CONTRACTOR'S premises, or otherwise.

3.13   Modifications. HERCULES shall have the right to modify Schedules A through G at any time upon reasonable notice to CONTRACTOR. If the modification affects the cost of producing Product, the charge mentioned in Article 4.1 shall be adjusted appropriately. If the modification materially affects the scope of services, the CONTRACTOR will in good faith strive to negotiate a revised agreement with HERCULES.

(b)

## ARTICLE IV   CHARGES

For all services hereunder, HERCULES shall pay a charge of _____ Dollars (\$_____ ) for each pound of Product prepared and delivered in bulk. For all services hereunder, HERCULES shall pay a charge of _____ Dollars (\$_____) for each pound of Product prepared and delivered for packaged Product. For all services hereunder, HERCULES shall pay a charge of _____ Dollars (\$_____) for each pound of Product prepared and delivered in drums and totes. For all services hereunder, HERCULES shall pay a charge of _____ Dollars (\$_____) for each pound of Product prepared and delivered for BGVV compliant Product. Said charge shall constitute payment in full for (i) all services performed; and (ii) all Product delivered by CONTRACTOR hereunder.

The manufacturing fees shall remain firm for calendar year 2002. The parties shall meet in good faith annually in October of each year to renegotiate the price applicable for the following year. Should the parties agree on an adjustment to the then current purchase price, such adjustment shall be reflected in a written amendment to this Agreement executed by authorized representatives of the parties. Should the parties fail to agree on an adjustment by November 30th, however, the then current purchase price shall

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)                                          HERC0015497

remain in effect, with either party entitled to terminate this Agreement effective on at least one hundred and twenty (120) days prior written notice to the other party notwithstanding anything else to the contrary in this Agreement

## ARTICLE V    TERMS OF PAYMENT

CONTRACTOR shall render invoices monthly for Product shipped during the prior month, and payment shall be due by HERCULES within forty-five (45) days of receipt of invoice. HERCULES may offset against any invoice an amount equal to any sums owing to HERCULES on account of off-grade or damaged Product or other proper claims by HERCULES against CONTRACTOR, whether or not arising under this Agreement.

Delivery of each shipment of AEM-232 shall be FCA the Plant unless otherwise agreed.

## ARTICLE VI    CHANGE NOTIFICATION

CONTRACTOR shall notify HERCULES in writing prior to implementing any and all changes in raw material feedstocks, feedstock sources, equipment and processes for HERCULES' evaluation of the potential impact on the final Product, end use applications and/or TSCA compliance. In the event that any such change adversely impacts the final Product, end use applications and/or TSCA compliance, CONTRACTOR shall cooperate with HERCULES to take corrective action to eliminate such adverse impact

## ARTICLE VII    WARRANTIES

7.1    CONTRACTOR warrants that at the time the Products leave CONTRACTOR'S possession, custody or control, the Products: (a) shall strictly conform with the Product Specifications; (b) are free from defects in workmanship, and are of merchantable quality; and (c) do not contain contaminants or impurities which affect the quality or performance of the Products.

7.2    CONTRACTOR represents and warrants that it will comply in all material respects with all laws, rules and regulations applicable to CONTRACTOR'S business, including, without limitation, laws, rules and regulations pertaining to:  (a) worker health and safety; (b) protection of animal and human health and the environment; and (c) the handling, processing, and disposal of chemicals and hazardous materials, hazardous substances and hazardous wastes (as those terms are defined in applicable environmental laws). CONTRACTOR shall provide prompt notice to HERCULES in the event any action (whether by a government agency or private party) is threatened or commenced against CONTRACTOR alleging a breach of the foregoing representations and warranties, or alleging a violation of any law, rule or regulation. CONTRACTOR also represents and warrants that it will comply in all material respects with all of HERCULES' health, safety and environmental recommendations for handling, storing and disposing of chemicals used by CONTRACTOR in furtherance of this Agreement. HERCULES shall have the right to audit CONTRACTOR'S compliance with the requirements of this Paragraph upon reasonable advance notice to CONTRACTOR.

## ARTICLE VIII    INSURANCE

[FileName]                                           4

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO 04-293 (KAJ)

HERC0015498

8.1   Minimum Coverage   **CONTRACTOR** shall, until the completion or termination of this Agreement, procure and maintain insurance of the type and with the minimum limits hereinafter set forth:

(a)   Workers' Compensation, including coverage for Occupational Disease:

|  | Minimum Limits |
|---|---|
| Workers' Compensation | Statutory Benefits |
| Employer's Liability | $100,000 |

(b)   Comprehensive General Liability, including coverage for Contractual Liability assumed by **CONTRACTOR** under Article IX, INDEMNITIES, Premises-Operations, Products-Completed Operations, Independent Contractors, and explosion, collapse and underground property damage hazards ("XCU").

|  | Minimum Limits |
|---|---|
| Bodily Injury | $500,000 each occurrence |
|  | $500,000 annual aggregate |
| Property Damage | $500,000 each occurrence |
|  | $500,000 annual aggregate |

The above policy(ies) shall include **HERCULES** Incorporated as an additional insured with respect to any claims arising out of, resulting from, or in consequence of the preparation or delivery of Product or the performance of work under this Agreement.

(c)   Comprehensive Automobile Liability, including coverage for Owned, Hired and Non-owned Automobiles.

|  | Minimum Limits |
|---|---|
| Bodily Injury | $500,000 each person |
|  | $500,000 each accident |
| Property Damage | $500,000 each accident |

(d)   Umbrella Liability, providing limits which, in addition to the primary limits described in subparagraphs (c) and (d) above, shall total, for each such coverage respectively, a minimum of Two Million Dollars ($2,000,000) per occurrence and Two Million Dollars ($2,000,000) annual aggregate. This coverage may be subject to a retained limit of Ten Thousand Dollars ($10,000) per occurrence for those losses it covers which are not covered by the policies obtained in accordance with subparagraphs (c) and (d) above. The above policy(ies) shall include **HERCULES** Incorporated as an additional insured with respect to any claims arising out of, resulting from, or in consequence of the preparation or delivery of Product or the performance of work under this Agreement.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015499

8.2    Waiver.  CONTRACTOR waives and releases on behalf of itself and its insurer(s), by subrogation or otherwise, all claims against HERCULES on account of risks covered under all policies of insurance that are secured and maintained by CONTRACTOR and that are in any way related to the preparation or delivery of Product or the performance of work under this Agreement.

8.3    Coverage.  The coverages referred to above are set forth in full in the respective policy forms, and the foregoing descriptions of such policies are not intended to be complete.

8.4    Certificate of Insurance.  CONTRACTOR shall furnish, before commencing any work under this Agreement, Certificates of Insurance indicating (1) types and amounts of insurance as required by the above; (2) insurance company or companies carrying said coverage; (3) effective and expiration dates of policies; (4) that HERCULES Incorporated is an additional insured under the Comprehensive General Liability and Umbrella Liability policies with respect to any claims arising out of, resulting from, or in consequence of the preparation or delivery of Product or the performance of work under this Agreement; and (5) that thirty (30) days' advance written notice will be given to HERCULES of any material change or cancellation. Throughout the course of work under this Agreement, CONTRACTOR shall supplement such Certificates as needed and provide current Certificates of Insurance which certify that the insurance required by this Article is being renewed seasonably and maintained in force.

## ARTICLE IX   INDEMNITIES

9.1    CONTRACTOR agrees to defend, indemnify and save HERCULES Incorporated, its officers, directors, employees, agents and servants (hereinafter referred to collectively as "HERCULES" for the purposes of this Article), harmless from and a against all liability, loss or expense (including costs and attorneys' fees) for any suit, claim, settlement, award, penalty, fine or judgment (hereinafter referred to singly or collectively as "Claim") because of personal injury (including death at any time resulting therefrom) or loss of or damage to property (including loss of use thereof) sustained by any person or persons (including third parties or HERCULES' or CONTRACTOR'S employees, agents or servants), arising out of, resulting from or in consequence of the preparation or delivery of Product or performance of the work under this Agreement, and whether or not caused or alleged to be caused in whole or in part by the joint, concurrent or sole act or omission (whether negligent or otherwise) of CONTRACTOR and/or its employees, agents or servants, regardless of whether caused in part by the joint or concurrent act or omission (whether negligent or otherwise) of HERCULES, but excluding Claims caused by the sole act or omission (whether negligent or otherwise) of HERCULES.

9.2    CONTRACTOR agrees to defend, indemnify and save HERCULES (as defined in this Article) harmless from and against all liability, loss or expense (including costs and attorneys' fees) for any Claim (as defined in this Article) because of contamination of, adverse effects on, or damage to the environment, or the violation of any environmental law or regulation,

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015500

sustained or brought by any person or persons (including government agencies, third parties, or **HERCULES'** or **CONTRACTOR'S** employees, agents or servants), arising out of, resulting from or in consequence of the preparation or delivery of Product or the performance of the work under this Agreement, and whether or not caused or alleged to be caused in whole or in part by the joint, concurrent or sole act or omission (whether negligent or otherwise) of **CONTRACTOR** and/or its employees, agents or servants, regardless of whether caused in part by the joint or concurrent act or omission (whether negligent or otherwise) of **HERCULES**, but excluding Claims caused by the sole act or omission (whether negligent or otherwise) of **HERCULES**.

9.3    **CONTRACTOR** shall, upon **HERCULES'** request, permit **HERCULES** to participate in the defense or settlement of any Claim against **HERCULES** which is subject to the provisions of this Article.

9.4    **CONTRACTOR** agrees to indemnify **HERCULES** and to save **HERCULES** harmless in regard to any and all liability that may be incurred in connection with the Product prepared or delivered hereunder where Product fails to meet the specifications set forth in Schedule A.

9.5    The provisions of this Article shall survive the expiration or termination of this Agreement.

(a)

5.    <u>Labeling</u>.  HERCULES, at HERCULES's cost, will furnish (i) an MSDS for AEM-232 including periodic updates and (ii) all labeling required for the AEM-232.

5.    <u>Forecasts and Orders; Excess Quantities</u>

By the 15th of each month during the term hereof, commencing by May 15, 2002, HERCULES shall furnish to CONTRACTOR a good faith forecast of Product requirements from CONTRACTOR from the Plant hereunder for each of the next succeeding six (6) months or such shorter number of months as are then remaining in the initial term or then current renewal termHERCULES shall use best efforts to place firm orders for AEM-232 at least ten (10) business days prior to the requested shipment dates for same.

*[FileName]*

7

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015501

be. **ARTICLE X   RELATIONSHIP OF PARTIES**

It is understood and agreed that the relationship of the parties is that of individual, independent contracting parties and that neither party nor any of their respective officers, agents, servants or employees is or shall be or become the agent or employee of the other party hereto for any purpose in connection with the performance hereof.

**ARTICLE XI   NOTICES**

Any notices hereunder shall be deemed to have been duly given if delivered in person or mailed by registered or certified mail to the address given below:

If to **CONTRACTOR:**

Attention: _____

If to **HERCULES:**

Hercules Incorporated
1313 North Market Street
Hercules Plaza
Wilmington, Delaware  19894
Attention: _____

**ARTICLE XII   ASSIGNMENT**

This Agreement shall not be assignable by **CONTRACTOR** except with the prior written consent of **HERCULES**, and any assignment without such prior consent shall be void.

**ARTICLE XIII   INTELLECTUAL PROPERTY AND CONFIDENTIALITY**

13.1   DEFINITIONS

"PRODUCT INFORMATION" means all technical information (whether patentable or not) now or hereafter owned or possessed by **HERCULES** which relates to PRODUCT, including the specifications attached to this Agreement, and which **HERCULES** is free to disclose without obligation to others.

"CONFIDENTIAL INFORMATION" means PRODUCT INFORMATION as well as all other business and technical information which relates in any way to Product, including, without limitation, formulation, properties, manufacture or use, which **HERCULES** discloses to **CONTRACTOR** or is learned by **CONTRACTOR** from **HERCULES**. CONFIDENTIAL INFORMATION may include, by way of example, but without limitation, data, know-how, formulae, processes, designs, sketches,

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015502

photographs, plans, drawings, specifications, proprietary software, samples, reports, customer lists, pricing information, studies, findings, inventions and ideas

"PLANT" means a production facility owned by CONTRACTOR (identified as _____ by CONTRACTOR) located at _____, which is the only production facility which will be used by CONTRACTOR to manufacture PRODUCT under this Agreement.

### 13.2    GRANT

(a)    HERCULES grants CONTRACTOR a non-transferable license, without the right to grant sublicenses, under PRODUCT INFORMATION:

(i) to manufacture PRODUCTS for HERCULES at the PLANT only, and

(ii) to ship PRODUCTS to a site or sites designated in writing by HERCULES. (Sites may be HERCULES facilities, facilities operated by or for HERCULES, or customer locations, as designated in writing by HERCULES.)

(b)    No other rights or licenses are granted by HERCULES to CONTRACTOR under this Agreement.

### 13.3    CONFIDENTIALITY AND RESTRICTED USE

(a)    CONTRACTOR shall hold CONFIDENTIAL INFORMATION in strict confidence and shall only use the same for the purposes of this Agreement. CONTRACTOR shall only disclose CONFIDENTIAL INFORMATION internally on a need-to-know basis to employees, and then only provided that there is a clear understanding by such individuals of their obligation to maintain the trade secret status of such information, to restrict its use solely to the purpose specified in this AGREEMENT and to assign to HERCULES inventions made using CONFIDENTIAL INFORMATION.

(b)    CONTRACTOR shall use its best efforts to prevent disclosure of CONFIDENTIAL INFORMATION to third parties without prior written consent of HERCULES. CONTRACTOR may disclose PRODUCT INFORMATION to a contractor hired to design, build or operate the PLANT or a portion thereof on a need to know basis, provided that the contractor agrees to protect the PRODUCT INFORMATION in a written agreement under terms at least as restrictive of those of this ARTICLE of the AGREEMENT (which written agreement designates HERCULES as a third party beneficiary having the right to enforce the secrecy and restricted use provisions of the written agreement), and further provided that HERCULES does not object to disclosure to the contractor.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015503

(c)     The restrictions on disclosure and use of information shall not apply to any information (a) that is or becomes known publicly through no fault of CONTRACTOR, but only after it becomes known to the general public, (b) that is learned by CONTRACTOR from a third party entitled to disclose it and which CONTRACTOR without breach of any obligation is free to disclose to another, (c) that was already known to CONTRACTOR at the time of disclosure by HERCULES as shown by CONTRACTOR'S prior written records (except information received from HERCULES). Information which is specific shall not be deemed to be within the foregoing exceptions to secrecy merely because it is embraced by more general information covered by an exception. In addition, any combination of features shall not be deemed to be within an exception merely because individual features are in such exception, but only if the combination itself and its principle of operation are in such exception.

(d)     The obligations of this Article shall not apply to disclosure of any portion of CONFIDENTIAL INFORMATION to the U.S. or any state Government (U.S. only) to comply with the laws of the U.S. or the state, provided that CONTRACTOR shall request the Government to preserve the confidentiality of the CONFIDENTIAL INFORMATION to the fullest extent possible and that CONTRACTOR shall inform HERCULES in advance of any such disclosure of the information that will be disclosed, the scheduled date of the disclosure and the law under which the disclosure is to be made. At HERCULES' request, CONTRACTOR shall consult with HERCULES concerning limiting the scope of the disclosure. CONTRACTOR agrees to contest, at its expense, any request for CONFIDENTIAL INFORMATION and to use reasonable efforts to limit the amount of CONFIDENTIAL INFORMATION that is disclosed to the Government. In addition, if requested and if reasonably possible, HERCULES or its designee shall be provided with an opportunity to contest such disclosure and/or obtain a protective order or other similar protection.

(e)     Due to the irreparable harm that can occur to HERCULES or its affiliates by breach of these nondisclosure and restricted use provisions, CONTRACTOR agrees that HERCULES shall be entitled to injunctive relief due to any breach and agrees to submit to immediately notify HERCULES of and take all actions to correct any breach of these provisions. This provision of the Agreement shall be construed in accordance with the laws or the United States of America and the state of

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015504

Delaware, without giving effect to their principles of conflicts of law, and shall be enforceable in any court of law.

      (f)     The secrecy and restricted use provisions of this Article shall apply to all CONFIDENTIAL INFORMATION previously disclosed by HERCULES to CONTRACTOR and shall be in lieu of and control over any other agreements entered related to the subject matter of this Agreement unless the agreement is entered by an authorized representative of each party.

      (g)     CONTRACTOR shall not, during the term of this AGREEMENT or at any time thereafter, knowingly export, directly or indirectly, any CONFIDENTIAL INFORMATION (including software or samples) or any product manufactured using the CONFIDENTIAL INFORMATION to any country for which the U.S. Government or any agency thereof at the time of export requires an export license or other government approval without first obtaining such license or approval, and agrees to indemnify and hold HERCULES harmless for any such violation by CONTRACTOR or anyone acting on CONTRACTOR'S behalf.

      (h)     The secrecy and restricted use obligations of this paragraph shall survive expiration or termination of this AGREEMENT. CONTRACTOR consents to jurisdiction of any court or other tribunal in which CONFIDENTIAL INFORMATION is present due to CONTRACTOR'S violation of this Article or goods made using CONFIDENTIAL INFORMATION in violation of this Article are present.


**ARTICLE XIV**   **TERM AND TERMINATION**

    14.1   This Agreement is effective on the date first above written and shall continue in effect for an initial term of _____ (_) months ending on _____, and shall be automatically renewed from year to year thereafter until either party shall terminate it at the end of its initial term or any annual renewal by delivering a written notice to the other not less than ____ (_) days prior to the last day of the initial term or any annual renewal thereof.

    14.2   Notwithstanding any other provision in this Agreement, either party may terminate this Agreement: (i) if the other party commits a breach of any of its obligations under this Agreement and fails to remedy (or fails to begin to remedy and diligently pursue to complete the remedy, if the remedy cannot be timely competed) that breach within fifteen (15) days after it has been given written notice to do so; or (ii) if the other party becomes insolvent or commits any act of bankruptcy or becomes a party to any proceeding under any law having to do

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015505

with the relief of that party as a debtor.

14.3  In the event this Agreement expires or is terminated, **CONTRACTOR** shall, at **HERCULES'** option, honor all Purchase Orders delivered by **HERCULES** to **CONTRACTOR** prior to the date of termination. In addition, **CONTRACTOR** shall cooperate with **HERCULES** to ensure a smooth transition to another vendor(s) or to manufacturing facilities owned or controlled by **HERCULES**.

**ARTICLE XV    TAXES**

**HERCULES** will be responsible for the payment of any personal property taxes levied on **HERCULES'** owned goods in the possession of **CONTRACTOR**. All other taxes of every kind and description shall be for **CONTRACTOR'S** account.

**ARTICLE XVI    FORCE MAJEURE**

16.1  Neither party shall be liable for any prevention or delay in performance resulting in whole or in part, directly or indirectly, from fires, floods or other catastrophes; strikes, lockouts or labor disruptions; wars, riots, embargo, import or export quotas, or mandatory allocations; actions by foreign, federal, state or local governments; shortages of transportation equipment, fuel, labor or materials; or any other circumstances or causes beyond the control of the parties or their suppliers.

16.2  In the event of such prevention or delay, the time for performance shall be extended for a period of sixty (60) days. If performance is not made within such extended sixty (60) day period, either party shall have the option at any time thereafter and upon written notice to the other party to cancel that portion of this Agreement affected by the force majeure conditions without liability to either party.

**ARTICLE XVII    DISPUTES RESOLUTION/ARBITRATION**

17.1  In the event of a dispute, claim or controversy arising out of or relating to this Agreement, the parties shall attempt to resolve such matter through good faith, friendly discussions and negotiations for a reasonable period of time. If, after such reasonable period of time of no more than three (3) months after written notice by one party to the other party regarding the dispute, claim or controversy, no resolution has been agreed upon, then either party may seek to resolve such matter pursuant to the provisions for arbitration set forth in Section 17.2 below.

17.2  Subject to the provisions of Section 17.1, any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the American Arbitration Association's Rules.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015506

17.3    The arbitral award, which shall not include punitive damages, injunctive relief or specific performance, shall be final and binding upon all parties and shall be enforceable in accordance with its terms in all jurisdictions and may be entered in any court having jurisdiction. The cost of the arbitration shall be borne by the parties equally, and no allowance for attorneys' fees shall be awarded.  The parties agree that the award is to be considered as a settlement of the dispute between them and shall accept it as the true expression of their own determination in connection therewith.

## ARTICLE XVIII    ENTIRETY

This document, together with its attachments, constitutes the entire agreement between the parties, and there are no other understandings except as expressly set forth herein.

        IN WITNESS WHEREOF, the parties have executed this Agreement
effective as of the date first written above.

                                   HERCULES INCORPORATED


                            By:    _____
                                   Name:
                                   Title:

                            CYTEC INDUSTRIES INC.


                            By:    _____
                                   Name:
                                   Title:

| | |
|---|---|
| EXHIBIT A | Point G-946, Hypermer B246SF, Versenex 80, water, and AIBN (also known as Vaso 64) |
| PROCESSES | |

**AEM-232 Laboratory Procedure**

Procedure:

Equipment:

Oil phase preparation-
        Tare the 1L reaction kettle and weigh in the desired amount of Escaid 110, Arlacel 80AC, and Hypermer B246SF.  Place the kettle in a water bath heated to ~ 40 °C and warm with stirring to dissolve the Hypermer B246SF.  Prepare the aqueous monomer phase while the oil phase is warming.

1 L reaction kettle with 4-necked top, condenser, Claisen adapter, bubbler, sparge tube, thermocouple, 2-blade glass stir shaft, heating mantle, overhead stirrer, homogenizer, 500 mL Erlenmeyer flask, pH meter, Brookfield viscometer.

Chemicals:

Aqueous phase preparation-
        Tare the 500 mL Erlenmeyer flask and add the desired amount of

Acrlyamide, acrylic acid, ammonium hydroxide, Exxsol D-80 oil, Atlas

[FileName]                          13

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A
NO. 04-293 (KAJ)

HERC0015507

acrylamide, acrylic acid, and water. Add the required amount of ammonium hydroxide slowly with swirling of the flask contents. Measure the temperature and pH of monomer solution. Add the required amount of Versenex 80 chelant.

Phase mixing-
    While the aqueous phase is still warm from base neutralization (35-40 °C) add the aqueous phase slowly to the warm (35-40 °C) oil phase which should now be homogenous. The phases are homogenized during the mixing step with the use of a wand- style hand blender purchased from a local retailer. After all of the monomer phase has been added ~ 1min. The mixture is further homogenized for 1 min to give a milky white emulsion. The viscosity of the emulsion is typically 140-200 cps at ~35 °C (Brookfield viscometer using spindle LV#1 at 6RPM).

Reactor setup-
    The reaction kettle is then fitted with the reactor top with the four necks occupied by the Claisen adapter connected to the condenser and sparge tube, the glass stir shaft, a thermocouple, and a rubber septum.

Pre-polymerization-
    The reactor contents are stirred at 200-300 RPM to ensure adequate mixing. The sparge tube is lowered below the emulsion surface and nitrogen is bubbled through the mixture. The heating mantle is placed on the reactor and the reactor is warmed to 57 °C over a 1h period concurrent with the nitrogen sparge.

Initiator preparation-
    Prepare a 3% by weight solution of Vazo 64 (AIBN) in Escaid 110.

Polymerization-

    Raise the sparge tube and adjust the flow rate to give a positive nitrogen pressure in the headspace of the reactor. Add the initiator solution by syringe through the rubber septum. The temperature is maintained at 56-58 °C for four hours by use of the heating mantle and a cooling bath as needed. After four hours, the second initiator shot is added. Temperature is maintained until the exotherm has subsided usually 1-2h.

Burnout procedure-
    The burnout solution (3% AIBN in Escaid 110) is prepared. The temperature of the reactor is set to 65 °C. The burnout solution is added and held at 65 °C for 3h.

Final adjustments and filtering-
    After the burnout, the reactor is cooled to <40 °C and ammonium hydroxide is added for the final pH adjustment. The reactor is allowed to cool below 40 °C after the base addition and the Tergitol 15-S-9 is added. The reactor is cooled to ambient temperature and the contents are filtered through fine mesh to remove any gel particles.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015508

EXHIBIT B

LIST OF RAW MATERIALS AND RELATED RAW
MATERIAL SPECIFICATIONS

[See Attached]

1. Acrlyamide:

| | |
|---|---|
| Assay by RI | $50 - 54$ % |
| pH | $5.0 - 6.5$ |
| Copper, ppm | $20 - 30$ |

2. Acrylic acid:

| | |
|---|---|
| Assay | 98.0% min. |
| Water (%) | 0.2 max. |
| MEHQ (ppm) | $180 - 220$ |
| Dimer Content (%) | 0.5 max. |

3. Ammonium Hydroxide,

| | |
|---|---|
| NH3% - 29.4-30% | |
| Chloride (as Chlorine) | 0.003 Max |
| Sulfur (as SO4) | 0.001 |
| Baume @ 60°F | 20.02 to 26.3 |

4. Sodium Hydroxide, NSF / Potable Approved

| | |
|---|---|
| Sodium Chloride (%) | 1.10 max. |
| Silica (ppm) | 1,100 max. |
| Mercury (ppm) | 100 max |

5. Escaid 110

| | |
|---|---|
| Flash Point | >70 °C |
| Aromatic Content | 0.5 Max |
| Distillation IBP, C | 200 min |
| Distillation DP, C | 248 Max |

6. Arlacel 80AC

| | |
|---|---|
| Acid Number | 12 max. |
| Hydroxyl Number (mg KOH/g) | $190 - 215$ |
| Water (%) | 1.0 max. |
| Saponification Value | 145-160 |

7. **Poly[hydroxystearate] Poly[ethylene glycol] diester⊛also known as Hypermer B246SF),**

| | |
|---|---|
| Acid Value (g/ meq KOH) | $0 - 11$ |
| Water Value | $0 - 2$ |

8. Versenex 80 (also known as **Diethylenetriaminepentaacetic Acid):**

| | |
|---|---|
| pH (1% solution) | $11.0 - 11.8$ |
| Water (%)   58.8 max | |

Mobile City Water
Typical Analysis:
  Alkaninity, Total as CaCO3, ppm
  7.2
  Calcium, ppm
  9.7
  Chloride, ppm
  7
  Color, Pt. Co. Units
  <5
  Conductance @ 25 oC, micromho/cm
  55
  Hardness as CaCO3, ppm
  28

Vaso 64 (also known as AIBN)
Typical Properties
  Specific Gray (70F)
  1.009
  Vapor Pressure (mmHG)
  <0.1
  Freeze Point (F)
  43
  Vapor Density (air=1)
  >1.00
  Viscosity (cps 70F)
  85
  % Solubility (water)
  30.0
  Appearance
  Colorless
  Physical State
  Liquid
  Flash Point  P-M(CC)
  >200F
  PH 5% Sol. (approx.)
  -6.0

Vasco 64

| | |
|---|---|
| Molecular formula | $C_8H_{12}N_4$ |
| Molecular weight | 164.21 |
| CAS number | 78-67-1 |
| Form Noodles Noodles | |
| Color   White | |

[FileName]                    15

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015509

Bulk density, approx  lb/ft 3  15-18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015510

EXHIBIT C

AEM-232  TARGET  SPECIFICATION

# CYTEC

**PRODUCT**

AEM-232
Flocculants & Reagents
    Perform SP 9232
Target Properties

| SUPERCEDES | DATE REVIEW BEFORE 07/1/02 | | |
|---|---|---|---|
| 06/20/02 | 07/03 | | SHEET 1 |

of 2

| General Properties Method | Target |
|---|---|
| *Polymer Solids (%) Theoretical | 26.14 +/- 0.5 |

| Parameter | Specification |
|---|---|
| pH of 0.5% Solution | 6 - 9 |
| Bulk Viscosity, cps\mPas (#2 spindle at 60 rpm) | 100 to 500 |
| Viscosity at 0.5% Solution, cps\mPas (#3 spindle at 12 rpm) | 3750 - 8000 |
| Standard Viscosity, cps\mPas | 3.75 – 7.25 |
| 0.5% Viscosity/Standard Viscosity | 1000 minimum |
| Residual Acrylamide, ppm | 200 ppm, maximum |

| | |
|---|---|
| Oven Solids, % | 31 - 36 |
| Appearance | Yellow to Amber liquid |
| Residual Acrylic Acid, ppm | 1000 ppm, maximum |

QCP-104

QCP-104

| | | |
|---|---|---|
| Coagulum, % maximum | QCP-013 | 0.2% |

Method of analysis

Insolubles, % maximum | QCP-057 | .1%
(% polymer basis)

For samples, refer to QCP-132 for sample preparation

QCP-132

Special Notations:
These are target properties; *Polymer solids is a proprietary property of this product and is not for public disclosure.

TBD

| REVIEWED BY | | |
|---|---|---|
| | Date | |
| | Date | |
| Z.B. Morgan | 07/1/02 | |
| J. Kozakiewicz | 01/30/02 | |

[FileName]          17

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015511

--------------------------------------------------------------------------
----------------------------------------------------------------

**APPROVED BY**

*Daphne L Sprayberry*

Daphne Sprayberry          Date: 07/1/02

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015512



# CYTEC

**PRODUCT**

AEWM-232
Flocculants & Reagents
    Perform SP 9232
Target Properties

| REVIEW BEFORE | DATE | SUPERCEDES |
|---|---|---|
| 07/03 | 07/1/02 | 06/20/02 |
| | SHEET 1 of 2 | |

| DATE | REASON FOR REVISION |
|---|---|
| 01/23/02 | New. |
| 01/30/02 | Added values and QCP for pH of 0.5% solution; changed 0.5% viscosity from 4000-5000 to 3000-8000; added values for oven solids (32-38); changed coag max from 0.5 to 0.2%; changed insols max from 0.5 to 0.3%; dropped standard viscosity. |
| 06/20/02 | Add 0.2% viscosity; add standard viscosity. |
| 07/01/02 | Change pH of 0.5% Solution from 7 – 10 to 6 – 9; change Bulk Viscosity from 100 – 400 to 100 – 500; change 0.5% Viscosity from 3000 – 8000 to 3750 – 8000; drop 0 2% viscosity; change Standard Viscosity from 3.5 – 5.5 to 3.75 – 7 25; change Oven Solids from 32 – 38 to 31 – 36; Include Perform SP designation; add 0.5% Viscosity/Standard Viscosity ratio. |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015513

# CYTEC

## PRODUCT

**AEM-232 BG**

Flocculants & Reagents
    Perform SP 9232 BG

Target Properties

P-104

| | SUPERCEDES | DATE REVIEW BEFORE 07/1/02 | |
|---|---|---|---|
| of 2 | 05/15/02 | 07/03 | SHEET 1 |

| General Properties | | |
|---|---|---|
| Method | Target | |
| *Polymer Solids (%) Theoretical | 26 14 +/- 0.5 | |

| Parameter | Specification |
|---|---|
| pH of 0.5% Solution | 6 - 9 |
| Bulk Viscosity, cps\mPas (#2 spindle at 60 rpm) | 100 to 600 |
| Viscosity at 0.5% Solution, cps\mPas (#3 spindle at 12 rpm) | 3750 - 8000 |
| Standard Viscosity, cps\mPas | 3.75 – 7.25 |
| 0.5% Viscosity/Standard Viscosity | 1000 minimum |
| Residual Acrylamide, ppm | 200 ppm, maximum QC |

| Oven Solids, % | 31 - 36 |
|---|---|
| Appearance | Yellow to Amber liquid |
| Residual Acrylic Acid, ppm | 1000 ppm, maximum QCP-104 |

| Coagulum, % maximum Method of Analysis | QCP-013 | 0.2% |
|---|---|---|
| residuals, refer to QCP-132 for sample preparation maximum | QCP-057 | 5-3% |
| QCP polymer basis) | | |

QCP-132

QCP-058

**Special Notations:**
These are target properties; *Polymer solids is a proprietary property of this product and is not for public disclosure.

**REVIEWED BY**

| | Date |
|---|---|
| | Date |
| Z.B. Morgan | 07/1/02 |
| J Kozakiewicz | 05/15/02 |

[FileName]    20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015514

_____
_____

**APPROVED BY**

*Daphne L Sprayberry*

Daphne Sprayberry              Date: 07/1/02

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015515

# CYTEC

**PRODUCT**

| AEM-

232 BG
Flocculants & Reagents
   Perform SP 9232 BG
Target Properties

|

--------------------------------------------------

| | **DATE** | **SUPERCEDES** |
|---|---|---|
| **REVIEW BEFORE** | 07/1/02 | 05/15/02 |
| 07/03 | SHEET 1 of 2 | |

--------------------------------------------------

**DATE**    **REASON FOR REVISION**

01/23/02    New.

07/01/02    Change pH of 0.5% Solution from 7 – 10 to 6 – 9; change 0.5% Viscosity from 3000 – 8000 to 3750 – 8000; drop 0.2% viscosity; change Standard Viscosity from 3.5 – 5.5 to 3.75 – 7.25; change Oven Solids from 32 – 38 to 31 – 36; Include Perform SP designation; add 0.5% Viscosity/Standard Viscosity ratio.

[FileName]    22

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0015516

Section 6, 7 and 12 of the Fair Labor Standards Act of 1938, as amended

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO  04-293 (KAJ)

HERC0015517