EXHIBIT 8

Global Polyflex Distributorship Agreement

AMENDED AND RESTATED
AGREEMENT

THE AGREEMENT is entered into as of the 20th day of May, 1998 by and between Cytec Industries Inc. with its principal offices at Five Garret Mountain Plaza, West Paterson, NJ 07424 ("Cytec") and Hercules Incorporated, Pulp and Paper Division with its principal offices at 1313 North Market Street, Wilmington, DE 19894 ("Hercules") and is amended and restated in its entirety effective as of May 1, 1999.

Preamble

Whereas, Hercules and Cytec are both worldwide manufacturers and distributors of specialty chemicals for end-uses in a broad range of industrial processes, including the Pulp and Paper Industry, and;

Whereas, Cytec has developed a certain retention, drainage, and formation system which contains proprietary micropolymer polyacrylamide technology and is willing to sell Agreement Products to Hercules and Hercules desires to be able to offer the Agreement Products as a portion of its total resource offering to certain customers, and;

Whereas, Cytec desires to expand the worldwide market penetration for its Agreement Products, and;

Whereas, Cytec wishes to offer to Hercules a non-exclusive limited license and right to distribute the Agreement Products only during the term of this Agreement and only in order to distribute Agreement Products purchased from Cytec hereunder in accordance with the terms and conditions set forth herein, and;

Whereas this agreement was originally between Cytec Industries Inc. and BetzDearborn Paper Process Group Inc and was assigned to Hercules Inc. by BetzDearborn Paper Process Group Inc. on October 15, 1998 , and was subsequently amended and restated effective May 1, 1999.

Therefore, in consideration of the mutual premises and covenants contained in this Agreement, and intending to be legally bound, the parties agree as follows:

Article 1: Definitions

1) Affiliated Companies of Hercules means all companies in which Hercules (I) owns, directly or indirectly, at least 50% of the equity interest, and/or (II) controls, directly or indirectly, at least 50% of the voting stock and/or any company controlling Hercules.

2) Affiliated Companies of Cytec means all companies in which Cytec (I) owns, directly or indirectly, at least 50% of the equity interest, and/or (II) controls, directly or indirectly, at least 50% of the voting stock and/or any Company controlling Cytec.

3) Agreement Products means Cytec's complete Polyflex® range of products, including Polyflex CP.3, CP.2, SC 20 series ("Micropolymers") and any related enhancements, equivalents or alternatives as they may exist now or be developed in the future, if commercialized by Cytec in its sole discretion. The Polyflex range of products includes Accurac® retention aids (and other similar products commercialized by Seller when agreed by Buyer) when fed in conjunction with Cytec Micropolymers but not when used separately.

4) Agreement Year shall mean the 12 month period commencing June 1, of any year provided the first Agreement Year shall be the period from the date of this Agreement through May 31, 1999.

PHX008



5) Specifications means the specifications of Agreement Products as contained in Attachment A.

6) Agreement Fields means all pulp and paper business of Buyer or its Affiliated Companies.

7) Regions means: all of the world except Japan, The People's Republic of China, Hong Kong, Cambodia, Vietnam, Thailand, Myanmar, Indonesia, Brunei, The Philippines, Western Pacific Islands, Malaysia, Singapore, Bangladesh, Pakistan, India, Sri Lanka and Tibet (collectively, such exceptions are the "Excluded Territory"). In the event that Cytec may, without expense to itself, provide for the expansion of the Regions to include all or any part of the Excluded Territory during the term of this Agreement, Cytec will provide notice of same to Hercules and the definition of Regions shall be automatically extended to include such additional parts of the Excluded Territory.

8) Buyer shall mean Hercules.

9) Seller shall mean Cytec.

Article 2:  Supplier and Supplies; Product Shipping; Governing Terms and Conditions

Buyer will purchase from Seller 100% of its requirements, in all Regions, of Agreement Products meeting the Specifications for use in Agreement Fields. Seller hereby appoints Buyer as a non-exclusive distributor of Agreement Products and will supply 100% of Buyer's requirements up to a maximum of twenty-five million (25,000,000) pounds per Agreement Year, in all Regions, of Agreement Products meeting the Specifications for use in Agreement Fields. Hercules will provide to Cytec an eighteen (18) month rolling forecast estimate of its anticipated Agreement Product needs.

Hercules, and any other distributor of Agreement Products approved by Cytec, will be an equally preferred supplier for any sole source opportunities. During the term of this Agreement, neither Cytec nor Hercules will actively solicit the sale of Agreement Products to any then current customer of Agreement Products of the other.

Hercules agrees that during the term of this Agreement Cytec will be, and it will advertise within its organization that Cytec is, its exclusive preferred supplier of resale polymers for its paper machine accounts and applications obtained after the date of this Agreement so long as Cytec's applicable polymers, as reasonably determined by Hercules, are: a) cost competitive, and b) efficacy competitive as compared with alternative polymer products. Hercules agrees to review with Cytec on a quarterly basis any customer opportunities for resale polymers where Cytec products failed to meet the criteria in a) or b) above with the intent of providing Cytec the opportunity to make appropriate improvements. Hercules will have sole discretion as to whether any improvements satisfy the requirements of any customer's applications with regard to a) or b) above. Unless otherwise agreed, such resale polymers will be relabeled by Hercules as corresponding Hercules products, as they are not Agreement Products.

Hercules agrees that it will use reasonable commercial efforts to purchase each Agreement Year a minimum of approximately 1.5 pounds of resale polymer products for each pound of Accurac retention aids Agreement Products purchased hereunder. Failure to meet this target for resale polymer purchases will not constitute a breach of the Agreement, nor give rise to any claims.

Unless otherwise agreed to by the parties, Seller will ship Agreement Products directly (at Buyer's expense) to Buyer's customer, with Buyer handling all invoicing to and payments from its customers. Polyflex Agreement Products will be shipped and sold only under Seller's trade names. Accurac retention aids Agreement Products will be shipped and sold under Seller's trade names unless Buyer provides Seller with proper labels for such products, including Buyer's ERIM telephone number, in which case Seller shall use Buyer's labels and tradenames on the Accurac retention aids Agreement Product purchased by Buyer hereunder. At the request of Hercules, Seller will provide reasonable levels of technical support from its Stamford and field based application specialists and local technical sales and service representatives. Cytec will make available, at the request of Hercules and at no cost to Hercules, reasonable supplies of technical sales literature, as available, in support of the sale and use of Agreement Products. Hercules may from time to time request permission of Cytec to use Cytec's Polyflex trade dress in collaborative support literature. Cytec will have sole discretion and approval rights for the use of Cytec's Polyflex trade dress in such support material, but such approval shall not be unreasonably withheld.

A:\gpda-052899                                                    2

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0058391

Buyer recognizes in the Regions the exclusive ownership by Seller (or by any subsidiary, parent or affiliated company of Seller) of all trademarks and trade dress affecting Agreement Products on the date of this Agreement. Buyer shall not, either while this Agreement is in effect or any time thereafter, register, use or attempt to obtain any right in or to any such trademark or trade dress, or in and to any trademark or trade dress confusingly similar thereto. Except to the extent required or permitted in this Agreement Buyer shall not use, without prior written consent of Seller, the word, "Cytec" or any other trademark of Seller or of any subsidiary, parent or affiliated company of Seller in its advertising, labels, signs, literature or commercial stationery; provided, however, that while this Agreement remains in force, Buyer shall be entitled to describe itself as Seller's non-exclusive distributor of Agreement Products in the Field of Use in the Regions, and to identify Seller as the source of Products and/or disclose the country of origin.

To the extent not inconsistent with the terms and conditions in this Agreement, Buyer and Seller agree to be bound by the Terms and Conditions of Sale set forth in Attachment C. If inconsistencies exist, this Agreement governs. No modification of this Agreement will be affected by the acknowledgment or acceptance of purchase order or shipping instruction forms or any other documents containing terms or conditions different from or in addition to those set forth in this Agreement, all such different or additional terms being hereby objected to.

Article 3: Pricing

The price for Agreement Products shall be according to the details contained in Attachment B.

The prices in Attachment B are fixed until March 31, 2000. Thereafter, the prices in Attachment B will be reviewed on a regular basis and, effective on and after April 1, 2000, may be altered, upon mutual agreement of the parties, based on evidence of increases or decreases in Sellers' costs including raw material, labor and regulatory costs or on evidence of a change in competitive market conditions. Products sold to Hercules under this Agreement are also subject to the provisions of Cytec's Corporate Rebate Program with Hercules, which as of May 1, 1999 provided Cytec to pay Hercules an annual rebate in an amount equal to 2% of the price of certain products purchased by Hercules from Cytec, which rebate program may be changed by Cytec on a prospective basis at any time in its sole discretion. Prices for Agreement Products introduced after the date of this Agreement will be established initially by Seller in its sole discretion.

If no agreement on price alterations is reached within three (3) months of the request by either party, either party may terminate this Agreement with a notice of twenty four (24) months during which period the then current prices remain in effect.

Article 4: Warranty, Disclaimer and Limitation of Remedies and Liabilities

1)    Seller has supplied Buyer with Seller's current material safety data sheets (MSDS) for each Agreement Product. During the term of this Agreement, Seller shall provide to Buyer any additional health and safety information related to any Agreement Product actually known to Seller to require such MSDS to be amended. Buyer acknowledges that it has read and understands the content of such MSDS. Buyer agrees to handle Agreement Products in a safe and responsible manner in light of risks of such chemical products, including but not limited to those risks identified on the MSDS. Buyer agrees to provide all customers for Agreement Products and all persons who are reasonably foreseeable to be exposed to Agreement Products with copies of the relevant MSDS.

2)    Seller warrants that the Agreement Products and the containers in which the goods are shipped will conform to the agreed Specifications. Seller further warrants that the Agreement Products will be manufactured and shipped in accordance with all applicable laws.

This warranty is effective for the period during which claims may be made pursuant to the Terms and Conditions of Sale, provided that the Agreement Products are processed by Buyer or its customers within the guaranteed shelf life of such Agreement Products and provided further that the Agreement Products are stored by Buyer or its customers in accordance with the written instructions for such storage provided to Buyer by Seller.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C A.
NO. 04-293 (KAJ)

HERC0058392

Seller's liability for breach of the foregoing warranties shall be limited as set forth in the attached Terms and Conditions of Sale in Attachment C.

Specifications may be amended by mutual agreement of the parties. Unless and until Buyer and Seller agree to any change in the Specifications, Seller shall continue to deliver Agreement Products complying with the original Specifications.

3)    Except as set forth in Section 4.2, and except as provided in the attached Terms and Conditions of Sale, Seller makes no warranty or representation of any kind, express or implied (including any warranty of merchantability or fitness of the Agreement Products for any use contemplated by Buyer) concerning the Agreement Products.

4)    IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER IN CONNECTION WITH THIS AGREEMENT FOR SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT CAUSED BY OR RESULTING FROM THE NEGLIGENCE OF SUCH PARTY, EXCEPT THAT THIS SECTION SHALL NOT APPLY TO CLAIMS OF UNAFFILIATED THIRD PARTIES TO THE EXTENT PERMITTED UNDER THE STANDARD TERMS AND CONDITIONS OF SALE ATTACHED HERETO.

Article 5: Most Favorite Nation Treatment

If, during the term of this Agreement, or any renewal, Seller concurrently sells any Agreement Products to unaffiliated third parties in the Regions who purchase on a worldwide/regional basis a volume of Agreements Products equal to or less then the volume of Agreement Products purchased by Buyer, under conditions similar to those set forth in this Agreement at a more favorable price (net of any discount or rebate) than the then current price in effect hereunder (net of any discount or rebate), Seller shall offer Buyer the same price as the price given to any such unaffiliated third party.

Article 6: Changes in the Manufacturing Process and/or Formulation of Agreement Products

If, at any time, during the term of this Agreement or any renewal, Seller will undertake to make material changes in the formulation of Agreement Products and/or in the manufacturing process of Agreement Products, which changes do not lead to a change in the Specifications of Agreement Products but could lead to a change in the performance of Agreement Products as used by Buyer in the Agreement Fields, Seller will notify Buyer of the planned, material changes and will supply Buyer with a sample of the newly formulated and/or manufactured product in order to allow Buyer to undertake performance testing before such product is sold to Buyer commercially. Seller shall not be liable for its failure to notify Buyer of any such changes.

Article 7: Term of Agreement

1)    This Agreement will become effective on May 20, 1998, for an initial term through December 31, 2002. Thereafter, it will automatically renew for further periods of one calendar year each. Buyer or Seller may terminate the Agreement effective at any time after December 31, 2002 with twenty-four (24) months advance written notice.

2)    Notwithstanding Article 7.1 above, this Agreement may be terminated by either party as a result of a default by the other party, provided, however, that the party in default shall have been given 60 days' notice and such default shall not have been cured during such period.

3)    Either party shall have the right, by giving immediate notice, to terminate this Agreement upon the occurrence of one or more of the following events:

A:\gpda-052899                    4

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)                    HERC0058393

a.    the other party's insolvency or bankruptcy;

b.    the commencement of any proceedings by or against the other
      party under any law having to do with the relief of debtors; or

c.    the appointment of a trustee or receiver for any portion of the
      other party's property.

Article 8: Force Majeure

        Deliveries may be reduced or suspended by either party upon the occurrence of any event beyond the
reasonable control of such party, or in the event of labor trouble, strike, lockout or injunction which makes
impracticable the manufacture, transportation, acceptance or use of a shipment of Agreement Product or of a raw
material or intermediate upon which the manufacture of Agreement Product is dependent. If, because of any such
event, it is impracticable for Seller to supply the total demand for Agreement Product, Seller may allocate its
available supply of Agreement Product, without obligation to purchase similar Agreement Product from other
sources, among itself and its customers on such basis as it determines to be equitable. Deliveries suspended under
this section may be canceled without liability, but this Agreement shall otherwise remain unaffected. In the event
that deliveries hereunder have been suspended due to force majeure for any consecutive three (3) month period,
either party may cancel this Agreement upon thirty (30) days written notice. Nothing herein shall obligate either
party to resolve a labor dispute against its better judgment.

Article 9: Governance

        (a) This Agreement will be governed by a team to be selected by the parties. This team will have
responsibility for the overall implementation and operation of this Agreement and shall attempt to resolve any
disputes amicably. Each party reserves rights to pursue all applicable remedies if any dispute is not resolved
amicably.

        (b) Seller shall have the right to have the performance of Buyer's obligations pursuant to the third
paragraph of Article 2 and the fifth paragraph of Article 2 audited by an independent certified public accounting
firm to whom Buyer has no reasonable objection. Buyer and Seller agree that the scope of any such audit shall be
limited to that reasonably necessary to confirm whether Buyer is in compliance with its obligations under such
paragraphs, that the auditor shall be obligated to sign a customary confidentiality agreement with Buyer prior to
conducting such audit and that detailed findings of such audit shall not be reported to Seller unless the auditor
determines that Buyer has not complied with its obligations under such paragraphs.

Article 10: Confidentiality

        Except as required by law, neither party shall make any public announcements, advertisements or other
public identification regarding this Agreement, its terms or additional information pertaining to the other party
without prior approval of the other party.

        In connection with the performance of this Agreement, Cytec may disclose information relating to its
products and Hercules may disclose information relating to its customers, each of which, as to their own, deems
such information to be confidential (hereinafter referred to as "Confidential Information"). The disclosure of
Confidential Information shall be within each party's discretion. Each party agrees not to use for its own benefit, or
disclose to any third party, or use for the benefit of any third party, any such Confidential Information received
from the other party without first obtaining the written consent of the other party.

        The foregoing obligations of non-disclosure and non-use shall terminate three years after the date of
termination or expiration of this Agreement and shall not apply to the extent that:

A:\gpda-052899                                            5

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0058394

(a)  any or all of the Confidential Information disclosed by the disclosing party to the receiving party was known to the receiving party at the time of its disclosure by the disclosing party and such knowledge is documented in records made prior to such disclosure, which records the receiving party shall furnish to the disclosing party at the disclosing party's request; or

(b)  such Confidential Information is or later becomes generally available to the public through no act in breach of this Agreement by the receiving party; or

(c)  such Confidential Information is lawfully received without restriction by the receiving party from any third party who is not under an obligation of non-disclosure or non-use; or

(d)  such Confidential Information is independently developed by the receiving party, and the receiving party's business or scientific records prove such independent development occurred without any benefit from access to the Confidential Information, which records the receiving party shall furnish to the disclosing party at the disclosing party's request;

provided however, that specific Confidential Information disclosed by the disclosing party to the receiving party pursuant to this Agreement shall not be deemed to be within any of the above four exclusions merely because it is embraced by more general information within one of said exclusions. Each party agrees to use reasonable commercial efforts to bind its employees having access to Confidential Information to take no steps inconsistent with, or preventing it from, carrying out the terms of this Agreement.

Each party shall have the sole, right, title and interest in and to any inventions and/or discoveries developed by it during the term of this Agreement except that Seller agrees that any inventions or improvements that relate to Agreement Products (distributed under this Agreement) and are made by Buyer as a result of its distribution activities hereunder shall be owned by Buyer. Buyer agrees that Seller shall have a non-exclusive, perpetual, worldwide, royalty-free license (which shall not terminate with the termination of this Agreement) to practice such inventions or improvements and can pass this license to its end-use paper customers. In the case of joint inventions and/or discoveries, as recognized by US Patent law, made by at least one employee of one of the parties in conjunction with at least one employee of the other party during the course of activities hereunder, the parties shall be joint owners of any patent rights and/or discoveries except as may be otherwise agreed upon between them in writing.

Article 11: Final Provisions

1)  This Agreement shall not be assignable or transferable by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Cytec may assign or delegate any or all its rights or duties hereunder to any of its Affiliated Companies for so long as such entity remains an Affiliated Company, provided Cytec shall thereafter remain fully liable for performance of such Affiliated Company's obligations hereunder. Similarly, Hercules may assign or delegate any or all its rights or duties hereunder, to any of its Affiliated Companies for so as long as such entity remains an Affiliated Company, provided Hercules shall thereafter remain fully liable for performance of such Affiliated Company's obligations hereunder. This Agreement shall inure to and bind each party's permitted successors and assigns.

2)  This Agreement supersedes any previous supply agreement between Seller and Buyer or between any Seller and Buyer Affiliated Company covering the Agreement Products in the Agreement Fields.

3)  No alterations of or amendment to this Agreement shall be of any force or effect unless made in writing and signed by both parties.

A:\gpda-052899                     6

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C A
NO. 04-293 (KAJ)

HERC0058395

4)    During the term of this Agreement and for two years thereafter, neither Buyer nor Seller will hire any then current employee of the other or induce or otherwise encourage any then current employee of the other to leave employment of the other. Buyer and Seller shall each cause their Affiliated Companies to comply with these obligations as well. The obligations in this paragraph shall apply only to those employees of each party directly and substantially involved in the implementation and administration of this Agreement or the manufacture, sale, distribution, technical service or research and development of Agreement Products.

5)    Notices

Any notice under this Agreement shall be sent to the following address:

If to Seller:          Cytec Industries Inc.
                       Five Garret Mountain Plaza
                       West Paterson, NJ  07424
                       Attention:      Secretary

If to Buyer:           Hercules Inc.
                       Hercules Plaza
                       1313 North Market Street
                       Wilmington, DE  19894
                       Attention:      Director Global Procurement, PPD
                       Copy to:        Business Director Retention, Drainage and
                                       Clarification

6)    The parties agree to exclude the application of the U.N. Convention on Contracts for the International Sales of Goods, 1980. This Agreement shall be governed by the law of the State of New Jersey, U.S.A., excluding its conflicts of law provisions.

7)    The parties may arrange to have all or part of the sale of Agreement Products to Customers covered in a commission arrangement, with the sale occurring directly from Seller to the Customer. In such case(s), the parties will negotiate a separate agreement to cover the terms of such an arrangement.

This Amended and Restated Agreement has been executed by the authorized representatives of each party.

HERCULES INC.                              CYTEC INDUSTRIES INC.

By: _____             By: _____

Title: BUSINESS DIRECTOR, PDC              Title: Buyer & Director WSB
                         PAPER

Date: 6/7/51                               Date: 6/4/88

A:\gpda-052899                        7

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)                                          HERC0058396

# Attachment A

A:\gpda-052899                    8

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C A
NO. 04-293 (KAJ)

HERC0058397

## Attachment B
### Agreement Product Pricing

A. <u>Micropolymer</u>:  The price applicable to each micropolymer in any Agreement Year sourced from North America and Europe shall be determined independently from each other based on the aggregate volume of polymer products purchased sourced from North America and Europe respectively in the last three months of such Agreement Year multiplied by four as set forth in the tables below.  The invoice price for micropolymer for any Agreement Year sourced from North America and Europe will be estimated by Seller on the basis of Buyer's actual buying patterns.  Each of Buyer and Seller agree to pay any adjustments required to reconcile the price for the quantities actually purchased to the prices invoiced on the basis of estimated quantities.  Seller will calculate and invoice or pay such adjustment, at least once with respect to each Agreement Year, no later than 30 days after the end of such Agreement Year.  If any Agreement Year is less than a full year, the quantities in the table below shall be adjusted proportionality.

<u>Americas and Asia Pacific (where applicable)</u>  Cytec Total Americas and Asia Pacific (where applicable)

| Volumes and Pricing Component | 0 up to 4MM Lbs | 4 up to 6MM Lbs | 6 up to 8MM Lbs | 8 up to 12MM Lbs | 12or more MMLbs |
|---|---|---|---|---|---|
| CP.3 | $0.75 | $0.73 | $0.71 | $0.69 | .65 |
| CP.2, CS, SC 20 Series | 0.68 | 0.66 | 0.64 | 0.62 | .59 |

Prices are in US dollars for bulk quantities FCA (Incoterms 1990) Mobile, Alabama.  For bulk shipments FCA Longview, Washington, add $.06 per pound.  Add $0.07 per pound to bulk pricing for Schutz bins.

<u>Special Estimated Pricing for Americas and Asia Pacific, where applicable, for Period Ending May 31, 2000.</u>

For the period from March 1, 1999 through May 31, 2000, micropolymer pricing will be based on estimated polymer volume levels of 6 million lbs./yr. in North America.  If this volume level is not achieved for the full Agreement Year ending May 31, 2000, then the pricing for the period from March 1, 1999 through May 31, 2000 will revert back to the rate determined by actual volume sold to Buyer hereunder in the three-month period ending May 31, 2000 multiplied by four and Buyer will pay to Seller no later than 30 days after May 31, 2000 the excess of the aggregate price that should have been paid to Seller hereunder for the purchase of micropolymers during the period from March 1, 1999 through May 31, 2000 over the aggregate amount already paid for such purchases.

<u>European Volumes and Pricing:*</u>

Due to the very competitive market in Europe, micropolymer pricing in this region must be lower than pricing in North America to achieve the volumes projected.  These prices are FCA Botlek, Netherlands and are applicable only to products sold for use in Europe.

| | | CYTEC Total Europe Polymer Sales Volume to Hercules PPD | | |
|---|---|---|---|---|
| Component | 0 up to 1.5 MM lbs. | 1.5 up to 3.0 MM lbs. | 3.0 up to 4.5 MM lbs. | 4.5 or more MM lbs. |
| CP.3 | .67 | .65 | .63 | .60 |
| CP.2, CS, SC 20 Series | .60 | .58 | .56 | .54 |

Prices are in the U.S. dollars.  The parties will fix the prices in equivalent ECU terms, as determined by mutual agreement of the parties by June 30, 1999.  Prices are for bulk quantities FCA Botlek.  Add $0.07 per pound to bulk pricing for Schutz bins.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)                                                    HERC0058398

B. <u>Other Polymer Agreement Product</u>     (Same pricing applicable to all regions, no volume pricing)

| <u>Component</u> | <u>Buyer Price</u> |
|---|---|
| Accurac 171 RS | $.39 |
| Accurac 182 RS | $.55 |
| Accurac 184 | $.60 |
| Accurac 186 | $.70 |
| Accurac 188 | $.80 |
| Accurac 120 | $.55 |
| Accurac 140 | $.60 |

All prices are for bulk quantities FCA (Incoterms 1990) Mobile, Alabama. For bulk shipments FCA (Incoterms 1990) Botlek, Netherlands and Longview, Washington, add $0.06 per pound. Add $0.07 per pound to bulk pricing for Schutz bins.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO  04-293 (KAJ)

HERC0058399

Attachment C

## TERMS AND CONDITIONS OF SALE

1. Price

If Seller desires to revise any price specified in this Agreement pursuant to any provision of this Agreement, but is prevented from so doing by any law, governmental decree, order or regulation, or if any price at any time in effect hereunder is nullified or reduced by reason of any law, governmental decree, order or regulation, Seller shall have the right to terminate this Agreement by giving written notice of termination to Buyer which shall be effective upon the receipt thereof.

2. Payment

Unless otherwise agreed to by Seller and Buyer in connection with one or more specific transactions or transactions in a specific country or region, payment for products sold by Seller to Buyer hereunder shall be made by check until such time as buyer has the capability to make such payments by wire transfer and after which time they shall be made by wire transfer, in each case in U.S. dollars (unless another specified currency has been mutually agreed to based on local business practices or otherwise), net 30 days from the date of the invoice.

3. Terms of Sale

FCA (Incoterms 1990) Seller's plant where such Agreement Product is manufactured.

4. Weights; Shipments

Seller's weights taken at shipping point shall govern unless shown to be in error.

A:\gpd₂-052899                               11

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)                                        HERC0058400

5.     Nonpayment; Credit

If any conforming lot or parcel shall not be accepted and/or paid for in accordance herewith, or any stated periodic minimum quantity shall not be ordered out, then Seller may without prejudice to other lawful remedy defer shipments until settlement is made or treat such failure as substantially impairing the value of the whole Agreement and hence as a breach hereof, or in the case of a payment default, terminate this Agreement if such default is not cured within 30 days.

6.     Waiver

Failure of either party to exercise any right under this Agreement shall not be deemed a waiver thereof.

7.     Patents

Seller warrants that the sale, pursuant to this Agreement, of Polyflex and Accurac retention aid products in Attachment A and use of such products in paper specifically for retention and drainage and in accordance with Seller's recommendations or product literature do not infringe any valid patent issued before April 1, 1990 and Seller shall indemnify Buyer for liability and loss (excluding Buyer's attorneys' fees) arising out of claims, suits or actions alleging such infringement of such patents; provided, however, that the total amount expended by Seller under the aforesaid provision shall not exceed half of the total sales (from Seller to Buyer) under this Agreement. This warranty and indemnification is given upon condition that Buyer notify Seller within 30 days of any claim, threatened claim or suit involving Buyer in which such infringement is alleged and that Buyer permit Seller to control completely the defense or compromise of any allegation of infringement with respect to such patents. Seller reserves the right to discontinue deliveries hereunder of any material if, in the opinion of Seller, its manufacture, sale and/or use would infringe or raise a substantial issue of infringement with respect to any patents, trademarks, copyrights, or other intellectual property rights now or hereafter issued under which Seller is not licensed.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0058401

8.    Disclaimer of Warranties; Limitation of Claims

(a)    Seller warrants that all Agreement Product sold by it hereunder shall conform to the Specifications included on Attachment A hereto. NO OTHER WARRANTIES, EXPRESS OR IMPLIED, WHETHER OF MERCHANTABILITY, FITNESS, OR OTHERWISE ARE MADE.

(b)    EXCEPT AS OTHERWISE PROVIDED IN THESE TERMS AND CONDITIONS OF SALE, BUYER ASSUMES ALL RISK WHATSOEVER AS TO THE RESULTS OF USE OF EACH AGREEMENT PRODUCT, WHETHER USED SINGLY OR IN COMBINATION WITH OTHER SUBSTANCES. SELLER SHALL NOT HAVE RESPONSIBILITY UNDER ANY LEGAL THEORY (INCLUDING, BUT NOT LIMITED TO WARRANTY, STRICT LIABILITY OR NEGLIGENCE) FOR THE RESULTS OBTAINED BY USE OF ANY AGREEMENT PRODUCT BY BUYER OR ITS CUSTOMERS. NOTWITHSTANDING THE FOREGOING, PROVIDED THAT BUYER HAS NOT FAILED TO FOLLOW RECOMMENDATIONS FOR THE USE OF PRODUCTS, SELLER SHALL INDEMNIFY AND HOLD BUYER HARMLESS FROM LIABILITY FOR DAMAGE TO THE PROPERTY OF BUYER OR FOR INJURY, INCLUDING DEATH, TO BUYER'S EMPLOYEES TO THE EXTENT ARISING OUT OF THE NEGLIGENT ACTS OR OMISSIONS OF SELLER. EXCEPT AS PROVIDED BY THE PRECEDING SENTENCE, NO CLAIM BY BUYER OF ANY KIND SHALL BE GREATER IN AMOUNT THAN THE PURCHASE PRICE OF THE MATERIAL WHICH IS THE BASIS OF THE CLAIM UNLESS THE CLAIM IS DERIVATIVE TO A CLAIM MADE BY AN END CUSTOMER OF BUYER'S. WITH RESPECT TO ANY SUCH DERIVATIVE CLAIM, NO CLAIM BY BUYER OF ANY KIND SHALL BE GREATER IN AMOUNT THAN THE LESSER OF (X) 50% OF THE AMOUNT ACTUALLY PAID BY BUYER TO SETTLE SUCH CUSTOMER CLAIM AND (Y) THE AGGREGATE PURCHASE PRICE (FROM SELLER TO BUYER) OF THE AGREEMENT PRODUCTS SOLD BY BUYER TO SUCH CUSTOMER FOR USE AT THE

A:\gpda-052899                                    13

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C A
NO. 04-293 (KAJ)                                    HERC0058402

SPECIFIC MANUFACTURING LOCATION WHERE THE CLAIM AROSE IN THE THREE MONTH PERIOD IMMEDIATELY PRIOR TO THE OCCURRENCE GIVING RISE TO THE CLAIM (OR IF SUCH CUSTOMER HAS ON THE DATE OF SUCH OCCURRENCE BEEN PURCHASING AGREEMENT PRODUCTS FROM BUYER FOR USE AT SUCH LOCATION FOR LESS THAN THREE MONTHS, A REASONABLE FORECAST OF PURCHASES OF AGREEMENT PRODUCTS FROM SELLER FOR USE AT SUCH LOCATION IN THE THREE MONTHS FOLLOWING THE DATE OF SUCH OCCURRENCE. SELLER SHALL HAVE NO LIABILITY FOR ANY CLAIM SETTLED BY BUYER WITHOUT SELLER'S CONSENT, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD. FAILURE BY EITHER PARTY TO GIVE THE OTHER WRITTEN NOTICE WITHIN ONE YEAR FROM THE DATE OF DELIVERY OR IN THE CASE OF NON-DELIVERY, FROM THE DATE FIXED FOR DELIVERY SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ALL CLAIMS IN RESPECT OF SUCH MATERIALS. ANY ACTION FOR BREACH OF THIS AGREEMENT MUST BE COMMENCED WITHIN ONE YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED.

A:\gpda-052899                                    14

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0058403

# EXHIBIT 20

Daniel L
Michalopoulos

12/29/2000 11:07 AM

To: Richard L. Brady/RCWilm/NA/Herc@HERCULES, David A.
Gerstenhaber/RCWilm/NA/Herc@HERCULES, Martha G.
Hollomon/RCWilm/NA/Herc@HERCULES, Baraka A.
Kawawa/RCWilm/NA/Herc@HERCULES, Brian L.
Walchuk/RCWilm/NA/Herc@HERCULES, John C
Harrington/Jacksonville/NA/Herc@HERCULES, Frank J
Sutman/Jacksonville/NA/Herc@HERCULES, Fushan
Zhang/Jacksonville/NA/Herc@HERCULES, Mark T
Aubel/Jacksonville/NA/Herc@HERCULES
cc: Tuyen T. Nguyen/RCWilm/NA/Herc@HERCULES, George A
Lock/RCWilm/NA/Herc@HERCULES, William S.
Carey/RCWilm/NA/Herc@HERCULES, Mike N
Miller/Jacksonville/NA/Herc@HERCULES, Robert A.
Gelman/RCWilm/NA/Herc@HERCULES, Edward J
Connors/RCWilm/NA/Herc@HERCULES, Richard M
Irwin/Jacksonville/NA/Herc@HERCULES
Subject: Alkaline Printing & Writing Drainage Aid Program Assignments

Based on year-end reviews with both the RDC SBU and PPD Program Managers, you have been assigned to work on the Subject Program.

The per centage of your 2001 hours that you will be expected to spend on this program are listed below.

| | |
|---|---|
| Brady | 35% |
| Gerstenhaber | 25% |
| Hollomon | 100% |
| Kawawa | 100% |
| Walchuck | 80% |
| Harrington | 100% |
| Sutman | 50% |
| Zhang | 100% |
| Aubel | 10% |

Attached are the most current program return map and a Microsoft Project 98 Gantt Chart. Please review these, paying particular attention to the program objective and milestones.

This is a critical program for PPD, as it will provide us with a replacement for Polyflex CP.3, an industry benchmark that we currently license from Cytec. As you may know, Cytec has divested its paper business and Hercules will not have access to this product after 2002.

I plan on speaking to each of you individually early in January. I also will plan on a team meeting, probably via phone, to review our efforts to date, including a recent mill trial, and to discuss the program milestones. My goals are to have work plans in place for each of you by the end of January, so please give these some thought.

If you have any questions, please give me a call. If I am not available, Susan McClure, my secretary, will either find me or schedule a follow-up call.

I look forward to working closely with you in 2001.

Happy New Year!

Regards,

Dan





CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
DIST. DELAWARE C.A.
NO. 04-293 (KAJ)

HERC0064798